Paul R. Kiesel, State Bar No. 119854
  *kiesel@kiesel.law*
Jeffrey A. Koncius, State Bar No. 189803
  *koncius@kiesel.law*
Nicole Ramirez, State Bar No. 279017
  *ramirez@kiesel.law*
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel:   310-854-4444
Fax:   310-854-0812

Jason 'Jay' Barnes (admitted *pro hac vice*)
  *jaybarnes@simmonsfirm.com*
An Truong (admitted *pro hac vice*)
  *atruong@simmonsfirm.com*
Eric Johnson (admitted *pro hac vice*)
  *ejohnson@simmonsfirm.com*
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:   (212) 784-6400
Fax:   (212) 213-5949

Stephen M. Gorny (admitted *Pro Hac Vice*)
  *steve@gornylawfirm.com*
**GORNY DANDURAND, LC**
4330 Belleview Avenue, Suite 200
Kansas City, MO 64111
Tel.:   816-756-5071
Fax:   816-756-5067

Amy Gunn (admitted *Pro Hac Vice*)
  *agunn@simonlawpc.com*
**THE SIMON LAW FIRM, P.C.**
800 Market St., Ste. 1700
St. Louis, MO 63101
Tel.:   314-241-2929
Fax:   314-241-2029

*Attorneys for Plaintiffs*
JOHN DOE, JANE DOE I, JANE DOE II, and
JOHN DOE II, on behalf of themselves and all
others similarly situated

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN DOE, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 5:22-cv-03580-NC <br><br> <u>**CLASS ACTION**</u> <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 6

III.    PARTIES TO THE LITIGATION ..................................................................... 6

IV.     FACTS COMMON TO ALL COUNTS ............................................................ 7

        A.      HEALTH PRIVACY LAWS IN THE UNITED STATES ...................... 7

        B.      FACEBOOK'S CONTRACTUAL PROMISES ................................... 10

        C.      HOW THE PIXEL WORKS ................................................................ 12

        D.      FACEBOOK PUBLICLY ACKNOWLEDGES THAT HEALTH-BASED
                ADVERTISING IS INAPPROPRIATE ................................................ 18

        E.      FACEBOOK CHANGED ITS CONTRACTUAL PRIVACY PROMISES IN
                2018 .................................................................................................... 19

V.      CLASS ACTION ALLEGATIONS .................................................................. 20

VI.     TOLLING ........................................................................................................ 21

VII.    CAUSES OF ACTION .................................................................................... 22

        FIRST CAUSE OF ACTION - BREACH OF CONTRACT ............................. 22

        SECOND CAUSE OF ACTION - BREACH OF THE IMPLIED COVENANT OF
                GOOD FAITH AND FAIR DEALING ................................................. 24

        THIRD CAUSE OF ACTION - INTRUSION UPON SECLUSION—
                CONSTITUTIONAL INVASION OF PRIVACY ................................ 25

        FOURTH CAUSE OF ACTION - VIOLATION OF THE ELECTRONIC
                COMMUNICATIONS PRIVACY ACT ............................................... 27

        FIFTH CAUSE OF ACTION - THE CALIFORNIA INVASION OF PRIVACY ACT ... 29

        SIXTH CAUSE OF ACTION - NEGLIGENT MISREPRESENTATION ....................... 31

        SEVENTH CAUSE OF ACTION - VIOLATION OF CALIFORNIA'S UNFAIR
                COMPETITION LAW ......................................................................... 31

        EIGHTH CAUSE OF ACTION - TRESPASS ................................................. 33

VIII.   PRAYER FOR RELIEF .................................................................................. 35

IX.     DEMAND FOR JURY TRIAL ....................................................................... 37

1    Plaintiffs John Doe, Jane Doe I, Jane Doe II, And John Doe II on behalf of themselves and

2 all others similarly situated, allege as follows upon personal knowledge as to their own conduct and

3 on information and belief as to all other matters based on an investigation by counsel, such that each

4 allegation has evidentiary support or is likely to have evidentiary support upon further investigation

5 and discovery:

6 **I.      INTRODUCTION**

7    1.    Plaintiffs bring this action on behalf of themselves and millions of other Americans

8 whose medical privacy has been violated by Facebook's Pixel tracking tool. As explained herein,

9 Facebook knows (or should have known) that its Pixel tracking tool is being improperly used on

10 hospital websites resulting in the wrongful, contemporaneous, re-direction to Facebook of patient

11 communications to register as a patient, sign-in or out of a supposedly "secure" patient portal,

12 request or set appointments, or call their provider via their computing device. This unlawful

13 collection of data is done without the knowledge or authorization of the patient, like Plaintiffs, in

14 violation of federal and state laws as well as Facebook's own contract with its users.

15    2.    When a patient communicates with a health care provider's website where the

16 Facebook Pixel is present on the patient portal login page, the Facebook Pixel source code causes

17 the exact content of the patient's communication with their health care provider to be re-directed

18 to Facebook in a fashion that identifies them as a patient.

19    3.    For example, Plaintiff John Doe is a patient of the Medstar Health System

20 ("MedStar") in Baltimore, Maryland. In the course of receiving medical care at MedStar, Plaintiff

21 John Doe has used the "MyMedStar" patient portal to review his lab results, make appointments,

22 and communicate with his providers.

23    4.    Unbeknownst to Plaintiff John Doe, and millions of other patients around the

24 country, when he signed-in to the patient portal, the Facebook Pixel secretly deployed on the

25 webpage sent the fact that he has clicked to sign-in to the patient portal to Facebook.

26    5.    The data that the Facebook Pixel causes to be re-directed from the patient's

27 computing device to Facebook includes:

28 / / /

a.   The patient was communicating with MedStar via its www.MedStarHealth.org property;

b.   The patient engaged in an 'ev' or event called a SubscribedButtonClick;

c.   The content of the button the patient clicked was "Login to myMedstar;"

d.   The page from which the button the patient clicked was Patient Portal – *i.e.* Home;

e.   The patient had previously been at a MedStar page about breast health;

f.   The patient's Internet Protocol address;

g.   Identifiers that Facebook uses to identify the patient and his/her device, including cookies named c-user, datr, fr, and fbp (*i.e.* Facebook Pixel); and

h.   Browser attribute information sufficient to fingerprint the patient's device.



6.   Likewise, MedStar disclosed identical fields of information when Plaintiff Jane Doe I used the MyMedStar patient portal.

7.   The same disclosures occurred for patients around the country when they accessed their medical provider's portals. For example, substantively identical disclosures occurred on Rush

University System for Health's ("Rush") web property when patient Jane Doe II signed into the Rush MyChart patient portal:

| Name | Value |
|---|---|
| id | ███████ |
| ev | SubscribedButtonClick |
| dl | https://www.rush.edu/patients-visitors |
| rl | https://www.rush.edu/patients-visitors/medical-records |
| if | false |
| ts | ██████ |
| cd[buttonFeatures] | {"classList":"icon-mychart external","destination":"https://mychart.rush.edu/?_ga█ |
| cd[buttonText] | MyChart |
| cd[formFeatures] | [] |
| cd[pageFeatures] | {"title":"Patients & Visitors | Rush System"} |
| cd[parameters] | [] |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.64 |
| r | stable |
| ec | 2 |
| o | 30 |
| fbp | fb.███████ |
| it | ███████ |
| coo | false |
| es | automatic |
| tm | 3 |
| exp | p1 |
| rqm | GET |

8.  As with MedStar, Rush discloses:

   a.  The patient was communicating with Rush via its mychart.rush.edu property;

   b.  The patient engaged in an 'ev' or event called a SubscribedButtonClick;

   c.  The content of the button the patient clicked was "MyChart;"

   d.  The page from which the button the patient clicked was Patient Portal – *i.e.* the "Patients & Visitors" page;

   e.  The patient had previously been at a Rush page about medical records;

   f.  The patient's Internet Protocol address;

   g.  Identifiers that Facebook uses to identify the patient and his/her device, including cookies named c-user, datr, fr, and fbp (*i.e.* Facebook Pixel); and

   h.  Browser attribute information sufficient to fingerprint the patient's device.

9.      Like MedStar and Rush, UK HealthCare ("UKH") also disclosed the same fields of personal information through a "SubscribedButtonClick" when patients, including John Doe II, accessed the UKH MyChart patient portal.

10.     As explained in further detail below, patient-status is protected by HIPAA, which requires a valid HIPAA-compliant authorization before it is collected by Facebook.

11.     Neither Facebook nor any of the hospitals that deployed the Facebook Pixel on their web properties ("Facebook Partner Medical Providers") procured HIPAA authorizations for the disclosure of patient status and health information to Facebook.

12.     Facebook's collection of patient status and the content of patient communications with their medical providers, including when they register, log-in and logout of patient portals and set up appointments, in the absence of a HIPAA authorization, violates Facebook's privacy promises to users.

13.     Facebook promises users, that "publishers can send us information through Meta Business Tools [such as] the Meta Pixel" but Facebook "require[s] each of these partners to have lawful rights to collect, use, and share your data before providing any data to us."

14.     However, Facebook knowingly receives patient data—including patient portal usage information— from hundreds of medical providers in the United States that have deployed the Facebook Pixel on their web properties.

15.     To date, through experts, Plaintiffs have identified at least 664 hospital systems or medical provider web properties where Facebook has received patient data via the Facebook Pixel.

16.     Despite knowingly receiving health-related information from medical providers, Facebook has not taken any action to enforce or validate its requirement that medical providers obtain adequate consent from patients before providing patient data to Facebook.

17.     Facebook monetizes the information it receives through the Facebook Pixel deployed on medical providers' web properties by using it to generate highly-profitable targeted advertising on- and off-Facebook.

18.     The targeted advertising Facebook offers for sale includes the ability to target patients based on specific actions that a patient has taken on the medical providers' websites.

19.     Facebook also offers the ability to engage in remarketing based on positive targeting – that is, serving specific ad campaigns to patients based on the specific actions those patients took on the medical providers' website. For example, Facebook could target ads to a patient who had (1) used the patient portal and (2) viewed a page about a specific condition, such as cancer.

20.     Facebook also offers medical providers the ability to engage in remarketing based on negative targeting – that is, ensuring that ads are not shown to users who have taken specific action. This could mean that Facebook would exclude existing patients from a medical provider's advertising campaign in order to establish new patients.

21.     Facebook employs thousands of account managers or representatives to help partners, including medical providers, use the Facebook Pixel and other tools.

22.     Through its account managers and representatives, Facebook is aware that it is receiving patient data from hundreds of different medical providers in the United States without patient knowledge, consent, or valid HIPAA authorizations.

23.     Facebook also utilizes "The Facebook Crawler" that scans pages of partner apps and websites and through which Facebook gathers information about the app or website, including its title and description.

24.     Through the Facebook Crawler, Facebook is aware that it is receiving patient data.

25.     Facebook has also been served subpoenas in other actions regarding disclosure of patient information through the Facebook Pixel.

26.     Facebook is also aware of every web property where the Facebook Pixel is deployed and fully capable of conducting the same types of expert analysis that Plaintiffs conducted to identify at least 664 hospitals or medical provider properties where the Facebook Pixel is present.

27.     Facebook's actions described herein give rise to causes of action for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) intrusion upon seclusion / violation of Article I, section 1 of the California Constitution; (4) federal and state electronic communications privacy and wiretap claims; (5) the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632; (6) Negligent Misrepresentation; (7) Violation of California's Unfair Competition Law; and (8) Trespass.

## II. JURISDICTION AND VENUE

28. This Court has personal jurisdiction over the Defendant because it has sufficient minimum contacts with this District in that it operates and markets their services throughout the country and in this District. Additionally, Defendant is headquartered in this District.

29. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under 18 U.S.C. §2510, et. seq., (the Electronic Communications Privacy Act). This Court further has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a State different from any Defendant.

30. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

31. Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because Facebook's Terms of Use governing its relationship with its users and developers adopt California law and choose California as the venue for disputes.

## III. PARTIES TO THE LITIGATION

32. Plaintiff John Doe is a Maryland resident, Facebook user, and a patient of MedStar MedStar who used MedStar's myMedStar patient portal, currently located at https://www.medstarhealth.org/mymedstar-patient-portal, to view medical records, lab results, and otherwise communicate with his provider. Plaintiff's use of the myMedStar patient portal included the time during which the Facebook Pixel was secretly deployed on the portal login page.

33. Plaintiff Jane Doe I is a Maryland resident, Facebook user, and a patient of MedStar who used MedStar's myMedStar patient portal, currently located at https://www.medstarhealth.org/mymedstar-patient-portal, to view medical records, lab results, and otherwise communicate with her provider. Plaintiff's use of the myMedStar patient portal included the time during which the Facebook Pixel was secretly deployed on the portal login page.

/ / /

34.     Plaintiff Jane Doe II is a Wisconsin resident, Facebook user, and a patient of Rush who used Rush's MyChart patient portal, currently located at https://mychart.rush.edu/mychart/Authentication/Login, to view medical records, lab results, and otherwise communicate with her provider. Plaintiff's use of the Rush MyChart patient portal included the time during which the Facebook Pixel was secretly deployed on the portal login page.

35.     Plaintiff John Doe II is a Vermont resident, Facebook user, and a patient of UKH who used UKH's MyChart patient portal, currently located at https://mychart.uky.edu/MyChart/Authentication/Login?, to view medical records, lab results, and otherwise communicate with his provider. Plaintiff's use of the UKH MyChart patient portal included the time during which the Facebook Pixel was secretly deployed on the portal login page

36.     Defendant Meta Platforms, Inc. (referred to herein by its previous name of "Facebook") is a publicly traded Delaware corporation headquartered in Menlo Park, California, and does business throughout the United States and the world, deriving substantial revenue from interstate commerce.

## IV.     FACTS COMMON TO ALL COUNTS

### A.     HEALTH PRIVACY LAWS IN THE UNITED STATES

37.     Patient health care information in the United States is protected by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations promulgated by the United States Department of Health and Human Services ("HHS").

38.     The HIPAA Privacy Rule establishes "national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as "protected health information") and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically. The Rule requires appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization. The Rule also gives individuals rights over their protected health information, including rights to examine and obtain a copy of their health records, to direct a covered entity to transmit to a third party an electronic copy of their protected health information

in an electronic health record, and to request corrections. The Privacy Rule is located at 45 CFR Part 160 and Subparts A and E of Part 164." https://www.hhs.gov/hipaa/for-professionals/privacy/index.html

39.    Under 45 C.F.R. § 164.502, a health care provider or business associate of a health care provider "may not use or disclose 'protected health information' except as permitted or required by" the HIPAA Privacy Rule.

40.    Under 45 C.F.R. 160.103, the Privacy Rule defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

41.    Under 45 C.F.R. § 160.103, the Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

42.    Under 45 C.F.R. § 164.514, the HIPAA de-identification rule states that "health information is not individually identifiable only if" (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed: Names … Medical record numbers; … Account numbers … Device identifiers and serial numbers; … Web Universal Resource Locators (URLs); Internet Protocol (IP) address numbers; … and any other unique identifying number, characteristic, or code." In addition, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

43. Under 42 U.S.C. § 1320d-6, any "person [individual ... or a corporation] who knowingly and in violation of this part—(1) uses or causes to be used a unique health identifiers; [or] (2) obtains individually identifiable health information relating to an individual ... shall be punished" by fine or, in certain circumstances, imprisonment, with increased penalties for "intent to sell, transfer, or use individually identifiable health information for commercial advantage[.]" The statute further provides that a "person ... shall be considered to have obtained or disclosed individually identifiable health information ... if the information is maintained by a covered entity ... and the individual obtained or disclosed such information without authorization."

44. Patient status alone is protected by HIPAA.

45. Guidance from HHS instructs health care providers that patient status is protected by HIPAA. In <u>Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule</u>, HHS sets out:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. ... *If such information was listed with* health condition, *health care provision* or payment data, *such as an indication that the individual was treated at a certain clinic*, then this information would be PHI.[1]

46. In its guidance for Marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*.[2]

---

[1] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf at 5 (emphasis added).

[2] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf at 1-2 (emphasis added).

47.    HHS has previously instructed that HIPAA covers patient-status alone:

a.    "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b.    "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

c.    It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

d.    The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

48.    There is no HIPAA-exception for the Internet or online patient portals.

**B.    FACEBOOK'S CONTRACTUAL PROMISES**

49.    Every Facebook user is legally deemed to have agreed to the Terms, Data Policy, and Cookie Policy via a checkbox on the sign-up page; and the Terms, Data Policy, and Cookie Policy are binding upon Facebook and its users.

50.    The Facebook Data Policy expressly provides that Facebook "requires" businesses that use the Facebook Pixel "to have lawful rights to collect, use, and share your data before providing any data to [Facebook]."

> **Information from partners.**
> Advertisers, app developers, and publishers can send us information
> through Meta Business Tools they use, including our social plug-ins (such
> as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel.
> These partners provide information about your activities off of our
> Products—including information about your device, websites you visit,
> purchases you make, the ads you see, and how you use their services
> —whether or not you have an account or are logged into our Products.
> For example, a game developer could use our API to tell us what games
> you play, or a business could tell us about a purchase you made in its
> store. We also receive information about your online and offline actions
> and purchases from third-party data providers who have the rights to
> provide us with your information.
>
> Partners receive your data when you visit or use their services or through
> third parties they work with. We require each of these partners to have
> lawful rights to collect, use and share your data before providing any data
> to us. Learn more about the types of partners we receive data from.
>
> To learn more about how we use cookies in connection with Meta
> Business Tools, review the Facebook Cookies Policy and Instagram
> Cookies Policy.

51.     But Facebook does not "require" medical providers to have lawful rights to share patient data associated with their respective patient portals and appointment software before sending it to Facebook.

52.     Instead, Facebook merely includes a provision in its form contract which creates an unenforced "honor system" for publishers, stating that, by using the Facebook Business Tools, the publisher "represent[s] and warrant[s] that [it has] provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."

/ / /

/ / /

/ / /

/ / /

/ / /

Special Provisions Concerning the Use of Certain Business Tools

a. This section applies to your use of Business Tools to enable Facebook to store and access cookies or other information on an end user's device.

b. You (or partners acting on your behalf) may not place pixels associated with your Business Manager or ad account on websites that you do not own without our written permission.

c. You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage that includes, at a minimum:

    i. For websites, a clear and prominent notice on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Facebook, may use cookies, web beacons, and other storage technologies to collect or receive information from your websites and elsewhere on the Internet and use that information to provide measurement services and target ads, (b) how users can opt-out of the collection and use of information for ad targeting, and (c) where a user can access a mechanism for exercising such choice (e.g., providing links to: http://www.aboutads.info/choices and http://www.youronlinechoices.eu/).

    ii. For apps, a clear and prominent link that is easily accessible inside your app settings or any privacy policy and from within any store or website where your app is distributed that links to a clear explanation (a) that third parties, including Facebook, may collect or receive information from your app and other apps and use that information to provide measurement services and targeted ads, and (b) how and where users can opt-out of the collection and use of information for ad targeting.

d. In jurisdictions that require informed consent for storing and accessing cookies or other information on an end user's device (such as but not limited to the European Union), you must ensure, in a verifiable manner, that an end user provides all necessary consents before you use Facebook Business Tools to enable the storage of and access to Facebook cookies or other information on the end user's device. (For suggestions on implementing consent mechanisms, visit Facebook's Cookie Consent Guide for Sites and Apps.)

53.     In reality, Facebook does not actually verify publishers have obtained adequate consent per the contract.[3]

54.     Instead, the Facebook Pixel is blindly made available to any willing publisher regardless of their privacy policies, consent processes, or the nature of their business.

55.     Facebook's contract with medical providers for use of the Facebook Pixel does not mention HIPAA at all.

56.     Facebook does not take any action to discourage medical providers from using the Facebook Pixel.

57.     Facebook actively encourages medical providers to use the Facebook Pixel for their marketing campaigns.

**C.     HOW THE PIXEL WORKS**

58.     Facebook operates the world's largest social media company.

59.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers including IP addresses, cookies, and device identifiers.

---

[3] In contrast, Facebook requires publishers in the European Union to provide "all necessary consents" in a "verifiable manner."

60.     Facebook also tracks non-users across the web through its widespread Internet marketing products and source code.

61.     Facebook's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites.

62.     Facebook Business is the division that provides advertising services to developers. Facebook Business and the advertising tools it provides to developers are focused on trade and commerce.

63.     The Facebook Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize and build audiences for … ad campaigns."[4]

64.     The Facebook Pixel is an invisible 1x1 web bug that Facebook makes available to web-developers to help track ad-driven activity from Facebook and others on their website.

65.     Key features of the Facebook Pixel include its ability to help developers:

a.      "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion";

b.      "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action"; and

c.      "Create custom audience from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones."

66.     Facebook describes the Facebook Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts."

/ / /

/ / /

/ / /

---

[4] https://www.facebook.com/business/learn/facebook-ads-pixel

67.    Facebook further explains "How the Facebook Pixel Works"[5]

## How the Facebook pixel works

When someone visits your website and takes an action (for example, buying something), the Facebook pixel is triggered and reports this action. This way, you'll know when a customer took an action after seeing your Facebook ad. You'll also be able to reach this customer again by using a custom audience. When more and more conversions happen on your website, Facebook gets better at delivering your ads to people who are more likely to take certain actions. This is called conversion optimization.

68.    Facebook provides simple instructions for developers to set up the Facebook Pixel:

### Setting up the Facebook pixel

If you have access to your website's code, you can add the Facebook pixel yourself. Simply place the Facebook pixel base code (what you see when you create your pixel) on all pages of your website. Then add standard events to the pixel code on the special pages of your website, such as your add-to-cart page or your purchase page. For full step-by-step instructions on adding the Facebook pixel to your site, visit the Help Center.

Many people need the help of a developer to complete this step. If that's the case, simply email your Facebook pixel code to them, and they can easily add it to your site.

### Create your Facebook pixel to send to your developer, or install it yourself.

Go to Ads Manager

69.    Facebook creates the Facebook code for each developer who installs it.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[5] https://www.facebook.com/business/learn/facebook-ads-pixel

70.     Facebook recommends that the Pixel code be placed early in the source code for any given webpage or website to ensure that the user will be tracked:

---

**Installing The Pixel**

To install the pixel, we highly recommend that you add its base code between the opening and closing `<head>` tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages.

Placing the code within your `<head>` tags reduces the chances of browsers or third-party code blocking the pixel's execution. It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page.

---

71.     By executing the code sooner, Facebook has designed the Pixel such that Facebook receives the information about patient actions on the medical provider's properties contemporaneous with their making.

72.     As soon as a patient takes any action on a webpage which includes the Facebook Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook's source code commands the patient's computing device to re-direct the content of the patient's communication to Facebook while the exchange of the communication between the patient and the medical provider is still occurring.

73.     By design, Facebook receives the content of a patient's patient portal sign-in communication immediately *after* the patient clicks the log-in button and *before* the medical provider receives it.

74.     In *all* cases, the content of the patient's portal and appointment communications are re-directed to Facebook while the communications are still occurring.

75.     The cookies that Facebook identifies patients with include, but are not necessarily limited to, cookies named: c_user, datr, fr, and _fbp.

76.     The c_user cookie is a means of identification for Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

77.     A skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

78.     It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

79.     The Facebook datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users.

80.     Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

81.     Any Facebook user can view the specific datr cookie identifiers that Facebook has associated with their account by using the Facebook Download Your Information tool.

82.     The Facebook fr cookie is an encrypted combination of the c_user and datr cookies.[6]

83.     The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Pixel. The _fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third party cookie blockers and share data more directly between a medical provider and Facebook.

84.     The medical providers or its developers then simply copy-paste the Facebook Pixel code that Facebook creates and provides into the medical provider's web-property.

/ / /

---

[6] *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, available at https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

85.   Facebook expressly admits that the Pixel "log[s] when someone takes an action" such as "adding an item to their shopping cart or making a purchase."



Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

86.   For medical providers, the actions that the Facebook Pixel logs include:

a.   When a patient clicks to register for the patient portal;

b.   When a patient clicks to log-in to the patient portal;

c.   When a patient clicks to logout of the patient portal;

d.   When a patient sets up an appointment;

e.   When a patient clicks a button to call the provider; and

f.   The specific communications a patient exchanges at the provider's property, including those relating to specific providers, conditions, and treatments and the timing of such actions, including whether they are made while a patient is still logged-in to a patient portal or around the same time that the patient has scheduled an appointment, called the medical provider, or logged in or out of the patient portal.

/ / /

/ / /

/ / /

**D.    FACEBOOK PUBLICLY ACKNOWLEDGES THAT HEALTH-BASED ADVERTISING IS INAPPROPRIATE**

87.    Facebook has publicly acknowledged that targeted advertising based on health information is not appropriate.

88.    On November 9, 2021, Facebook announced that it was removing the ability to target users on "topics people may perceive as sensitive, such as options referencing causes, organizations, or public figures that relate to health[.]"[7]

89.    Facebook's announcement was a public relations success:

    a.    Reuters published a story headlined "Facebook plans to remove thousands of sensitive ad-targeting options" and lead the story with a sentence about Facebook's "plans to remove detailed ad-targeting options that refer to 'sensitive' topics, such as ads based on interactions with content around … health[.]"[8]

    b.    The New York Times published a similar story with a similar headline, "Meta plans to remove thousands of sensitive ad-targeting categories: Ad buyers will no long be able to use topics such as health … to target people[.]"[9]

    c.    Many more, similar, articles were published, giving Facebook's users the misimpression that Facebook would not allow targeting based on health.

90.    But Facebook did not change the most insidious types of targeting based on health: those marketing campaigns from medical providers that disclose patient identities and their individually identifiable health information to Facebook for the purpose of targeted marketing based on their communications with their medical providers.

/ / /

---

[7] https://www.facebook.com/business/news/removing-certain-ad-targeting-options-and-expanding-our-ad-controls

[8] https://www.reuters.com/technology/facebook-removes-target-options-advertisers-some-topics-2021-11-09/

[9] https://www.nytimes.com/2021/11/09/technology/meta-facebook-ad-targeting.html

91.   Facebook clarified that the change was limited to "people's interactions with content" on the Facebook "platform."

92.   Facebook then informed advertisers that they could still use "website custom audiences and lookalike" to "help reach people who have already engaged with a business or group's website or products." In the case of medical providers, the "people who have already engaged" are patients.

**E.   FACEBOOK CHANGED ITS CONTRACTUAL PRIVACY PROMISES IN 2018**

93.   Prior to April 2018, Facebook's contract did not "require" partners to have the lawful rights to share user data before doing so.

94.   Upon information and belief, Facebook changed its contract with users on or about April 19, 2018, which added a clause stating: "We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."

95.   The following is a side-by-side comparison of the pre- and post-April 2018 contract provisions:

| Before April 19, 2018 | After April 19, 2018 |
|---|---|
| **Information from websites and apps that use our Services.** We collect information when you visit or use third-party websites and apps that use our Services (like when they offer our Like button or Facebook Log In or use our measurement and advertising services). This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us.<br><br>**Information from third-party partners.** We receive information about you and your activities on and off Facebook from third-party partners, such as information from a partner when we jointly offer services or from an advertiser about your experiences or interactions with them. | **Information from partners.** Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services —whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.<br><br>Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.<br><br>To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy. |

/ / /

/ / /

## V.   CLASS ACTION ALLEGATIONS

96.   Plaintiffs file this as a class action on behalf of themselves and the following class:

All Facebook users who are current or former patients of medical providers in the United States with web properties through which Facebook acquired patient communications relating to medical provider patient portals, appointments, phone calls, and communications associated with patient portal users, for which neither the medical provider nor Facebook obtained a HIPAA, or any other valid, consent.

97.   Excluded from the Class are the Court and its personnel and the Defendant and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

98.   The members of the Class are so numerous that joinder is impracticable.

99.   Common questions of law and fact are apt to drive resolution of the case, exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class including, but not limited to, the following:

   a.   Whether the Facebook Pixel is designed to send individually identifiable information to Facebook;

   b.   Whether the Facebook Terms and Privacy Notice are valid contracts;

   c.   Whether Facebook failed to require medical providers to have lawful rights to share patient data with Facebook before deploying the Facebook Pixel;

   d.   Whether Facebook acquired the content of patient communications;

   e.   Whether the patient class provided Facebook with authorization to acquire their communications with their medical providers, including through the patient portal, appointment forms, and phone calls;

   f.   Whether the Facebook Pixel's presence and use on medical provider websites where it discloses actions that patients take relating to patient portals, appointments, and phone calls to their medical providers is highly offensive;

   g.   Whether Facebook's acquisition of the content of communications between patients and their medical providers occurred contemporaneous to their making;

1           h.      Whether Facebook breached its contract with users;

2           i.       Whether the information at issue has economic value; and

3           j.      Whether Facebook unjustly profited from its collection of patient portal,

4    appointment, and phone call information.

5    100.    The named Plaintiffs' claims are typical of the claims of other Class members, as

6    all members of the Class were similarly affected by Facebook's wrongful conduct in violation of

7    federal and California law, as complained of herein.

8    101.    The named Plaintiffs will fairly and adequately protect the interests of the members

9    of the Class and have retained counsel that is competent and experienced in class action litigation.

10    The named Plaintiffs have no interests that conflict with, or are otherwise antagonistic to, the

11    interests of, other Class members.

12    102.    A class action is superior to all other available methods for the fair and efficient

13    adjudication of this controversy since joinder of all members is impracticable. Further, as the

14    damages that individual Class members have suffered may be relatively small, the expense and

15    burden of individual litigation make it impossible for members of the Class to individually redress

16    the wrongs done to them. There will be no difficulty in management of this action as a class action.

17    **VI.    TOLLING**

18    103.    Any applicable statute of limitations has been tolled by Defendant's knowing and

19    active concealment of the misrepresentations and omissions alleged herein. Through no fault or

20    lack of diligence, Plaintiffs and members of the Class were deceived and could not reasonably

21    discover Defendant's deception and unlawful conduct.

22    104.    Plaintiffs and members of the Class did not discover and did not know of any facts

23    that would have caused a reasonable person to suspect that Defendant was acting unlawfully and

24    in the manner alleged herein. As alleged herein, the representations made by Facebook were

25    material to Plaintiffs and members of the Class at all relevant times. Within the time period of any

26    applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered

27    through the exercise of reasonable diligence the alleged wrongful conduct.

28    / / /

105.    At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true nature of the disclosures being made and the lack of an actual "requirement" before the data was shared with it.

106.    Defendant knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's concealment.

107.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## VII.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

108.    Plaintiffs hereby incorporate all prior paragraphs as if fully stated herein.

109.    Facebook requires users to click a box indicating that, "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies Policy."

110.    "Click-wrap agreements" such as those at issue herein are valid and binding contracts.

111.    The Facebook Terms are binding on Facebook and its users.

112.    The Facebook Data Policy is binding on Facebook and its users.

113.    The Facebook Cookies Policy is binding on Facebook and its users.

114.    The Facebook Data Policy promises users that Facebook "requires each of [Facebook's] partners to have lawful rights to collect, use and share your data before providing any data to [Facebook]."

115.    Facebook breached this contractual promise, as described in detail above, by not requiring its partners that are medical providers to obtain patient consent before sharing patient status and other data relating to online patient portal registration, logins, and logouts as well as appointment information with Facebook through the Facebook Pixel and through other means.

116.    In addition to the express contract provision set forth above, an implied contract existed between Facebook and its users that Facebook would not conspire with others to violate

1   Plaintiffs' legal rights to privacy in their individually identifiable health information.

2   117.   Plaintiffs are Facebook account holders who used patient portals and/or
3   appointment-related functionality of their medical providers' respective web-properties through
4   which Facebook obtained their individually identifiable health information.

5   118.   Plaintiff John Doe used the MyMedStar patient portal by signing in and out of the
6   portal to access medical records, lab results, and otherwise to communicate with his provider.

7   119.   Plaintiff Jane Doe I used the MyMedStar MyChart patient portal by signing in and
8   out of the portal to access medical records, lab results, and otherwise to communicate with her
9   provider.

10   120.   Plaintiff Jane Doe II used the Rush MyChart patient portal by signing in and out of
11   the portal to access medical records, lab results, and otherwise to communicate with her provider.

12   121.   Plaintiff John Doe II used the UKH MyChart patient portal by signing in and out of
13   the portal to access medical records, lab results, and otherwise to communicate with his provider.

14   122.   The patient health information that Facebook obtained in breach of the contract
15   included:

16          a.   Patient identifiers including, but not limited to, email addresses, IP
17               addresses, persistent cookie identifiers, device identifiers, and browser
18               fingerprint information;

19          b.   the data and time of patient registrations for their medical providers' patient
20               portals;

21          c.   log-in and logout times for their medical providers' patient portals;

22          d.   the contents of communications that patients exchange inside their medical
23               providers' patient portals immediately before logging out of those portals;

24          e.   the contents of communications relating to appointments that patients made
25               with their medical providers; and

26          f.   the user's status as a patient of their medical provider.

27   123.   Facebook's breach caused Plaintiffs and Class members the following damages:

28          a.   Nominal damages for breach of contract;

b.   General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.   Sensitive and confidential information including patient status and appointments that Plaintiffs and Class members intended to remain private are no longer private;

d.   Facebook eroded the essential confidential nature of the patient-provider relationship;

e.   Facebook took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value;

f.   Benefit of the bargain damages in that Facebook's contract stated that payment for the service would consist of a more limited set of collection of personal information than that which Facebook actually charged.

## SECOND CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

124.   Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

125.   A valid contract exists between Plaintiffs and Facebook.

126.   The contract specifies that California law governs the parties' relationship.

127.   Facebook prevented Plaintiffs and Class members from receiving the full benefit of the contract by intercepting the content of protected individually identifiable health information exchanged with medical providers.

128.   By doing so, Facebook abused its power to define terms of the contract, specifically the meaning of the term "require" in Facebook's promise that it would "require" partners to have lawful rights to share users' data with Facebook before doing so and then taking no action (and actually encouraging) medical providers to share protected health information without valid patient authorization.

129.   By doing so, Facebook did not act fairly and in good faith.

130.   Facebook's breach caused Plaintiffs and Class members the following damages:

    a.   Nominal damages for breach of contract;

    b.   General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

    c.   Sensitive and confidential information including patient status and appointments that Plaintiffs and Class members intended to remain private are no longer private;

    d.   Facebook eroded the essential confidential nature of the patient-provider relationship;

    e.   Facebook took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value; and

    f.   Benefit of the bargain damages in that Facebook's contract stated that payment for the service would consist of a more limited set of collection of personal information than that which Facebook actually charged.

## THIRD CAUSE OF ACTION

## INTRUSION UPON SECLUSION—CONSTITUTIONAL INVASION OF PRIVACY

131.   Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

132.   Article I, section 1 of the California Constitution provides:

> *All people* are by nature free and independent and *have inalienable rights.*
> *Among these are* enjoying and defending life and liberty, acquiring, possessing,
> and protecting property, and *pursuing and obtaining* safety, happiness, and
> *privacy.*

Cal. Const. art. I, § 1 (emphasis added).

133.   Plaintiffs had no knowledge and did not consent or authorize Facebook to obtain the content of their communications with their medical providers as described herein.

134.   Plaintiffs enjoyed objectively reasonable expectations of privacy surrounding communications with their medical providers relating to the respective patient portals and

appointments based on:

  a. The medical providers status as their health care providers and the reasonable expectations of privacy that attach to such relationships;

  b. HIPAA;

  c. the Electronic Communications Privacy Act; and

  d. Facebook's promise that it would "require" partners to have lawful permission to share their data before Facebook would collect it.

135. Plaintiffs' claims are based on the following private facts:

  a. that Plaintiffs are patients of the various medical providers;

  b. The specific dates and times Plaintiffs clicked to log-in or log-out of the various medical providers' patient portals;

  c. The specific and detailed communications exchanged while logged-in to a patient portal; and

  d. The specific dates and times where Plaintiffs requested appointments and from which doctor's or practice group pages such appointments were requested.

136. Facebook's conduct was intentional and intruded on Plaintiffs' and Class members' medical communications which constitute private conversations, matters, and data.

137. Facebook's conduct in acquiring patient portal and appointment communications would be highly offensive to a reasonable person because:

  a. Facebook conspired with Plaintiffs' medical providers to violate a cardinal rule of the provider-patient relationship;

  b. Facebook's conduct violated federal law designed to protect patient privacy;

  c. Facebook's conduct violated the ECPA; and

  d. Facebook's conduct violated the express promises it made to users.

138. Facebook's breach caused Plaintiffs and Class members the following damages:

  a. Nominal damages for breach of contract;

/ / /

b.    General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.    Sensitive and confidential information including patient status and appointments that Plaintiffs and Class members intended to remain private are no longer private;

d.    Facebook eroded the essential confidential nature of the patient-provider relationship;

e.    Facebook took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value; and

f.    Benefit of the bargain damages in that Facebook's contract stated that payment for the service would consist of a more limited set of collection of personal information than that which Facebook actually charged.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

139.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

140.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511.

141.    The ECPA protects both the sending and receipt of communications.

142.    18 U.S.C. § 2520(a) provides a private right of action to any person whose electronic communications are intercepted.

143.    Facebook intentionally intercepted the electronic communications that Plaintiffs exchanged with their respective medical providers on the providers properties where the Facebook Pixel was present.

144.    The transmissions of data between Plaintiffs and their medical providers qualify as communications under the ECPA's definition in 18 U.S.C. § 2510(12).

/ / /

145.   Facebook acquired patient communications with their medical providers as alleged herein contemporaneous with their making.

146.   The intercepted communications include:

a.   the content of patient registrations for various patient portals, including clicks on buttons to "Register" or "Signup" for said portals;

b.   the content patient log-in and logout of the various patient portals, including clicks to "Sign-in," "Log-in," "Sign-out," or "Log-out."

c.   the contents of communications that patients exchange inside various patient portals immediately before logging out of those portals; and

d.   the contents of communications relating to appointments with medical providers.

147.   The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   The cookies Facebook used to track patients' communications;

b.   The patients' browsers;

c.   The patients' computing devices;

d.   Facebook's web-servers;

e.   The web-servers of the properties of the medical providers where the Facebook Pixel was present; and

f.   The Facebook Pixel source code deployed by Facebook to effectuate its acquisition of patient communications.

148.   Facebook is not a party to patient communications with their medical providers.

149.   Facebook received the content of patient communications through the surreptitious redirection of them from the patients' computing devices to Facebook.

150.   Patients did not consent to Facebook's acquisition of their patient portal, appointment, and phone call communications with their medical providers.

151.   Facebook did not obtain legal authorization to obtain patient communications with their medical providers relating to patient portals, appointments, and phone calls.

/ / /

152.   Facebook did not require any medical provider to obtain the lawful rights to share the content of patient communications relating to patient portals, appointments, and phone calls.

153.   Any purported consent that Facebook received from medical providers to obtain patient communications content was not valid.

154.   In acquiring the content of patient communications relating to patient portals, appointments, and phone calls, Facebook had a purpose that was tortious, criminal, and designed to violate state constitution provisions including:

        a.    A knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person;

        b.    A violation of 42 U.S.C. § 1320d-6, which is a criminal offensive punishable by fine or imprisonment;

        c.    Violation of state unfair business practice statutes;

        d.    Violation of HIPAA;

        e.    Violation of Article I, section 1 of the California Constitution; and

        f.    Trespassing upon Plaintiffs' personal and private property via the placement of an fbp cookie associated with the domains and patient portals for Plaintiffs' medical providers on Plaintiffs' personal computing devices within their homes and businesses.

155.   Facebook knew that such conduct would be highly offensive, as evidence by its announcement in DATE, that it would no longer allow advertising targeted based on health, yet continued to use the Facebook Pixel on medical provider properties for that purpose.

## FIFTH CAUSE OF ACTION

## THE CALIFORNIA INVASION OF PRIVACY ACT

### (Cal. Penal Code §§ 631 and 632)

156.   Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

157.   The California Invasion of Privacy Act (CIPA) is codified at Cal. Penal Code §§ 630-638. The Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for

the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

158.   Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner …. willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars."

159.   Cal. Penal Code § 632 provides, in pertinent part, that it is unlawful for any person to "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to … record the confidential communication." As used in the statute, a "confidential communication" is "any communication carried on in circumstances as may reasonably indicate that any part to the communication desired it to be confined to the parties thereto[.]"

160.   Facebook is a "person" within the meaning of CIPA §§ 631 and 632.

161.   Facebook did not have the consent of all parties to learn the contents of or record the confidential communications at issue.

162.   Facebook is headquartered in California, designed and contrived and effectuated its scheme to track patient communication at issue here from California, and has adopted California substantive law to govern its relationship with users.

163.   At all relevant times, Facebook's conduct alleged herein was without the authorization and consent of the Plaintiffs and Class members.

164.    Facebook's actions were designed to learn or attempt to learn the meaning of the patient portal and appointment communications patients exchanged with their medical providers.

165.    Facebook's learning of or attempt to learn the contents of patient communications occurred while they were in transit or in the process of being sent or received.

## SIXTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

166.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

167.    Facebook represented to Plaintiffs and the members of the Class that a fact was true, namely, that before receiving the confidential information at issue, Facebook "requires" business "to have lawful rights to collect, use, and share [Plaintiffs' and Class members'] data before providing any data" to Facebook.

168.    Facebook's representation was not true.

169.    Although Facebook may have honestly believed that the representation was true, Facebook had no reasonable grounds for believing the representation was true when it was made.

170.    Facebook intended that Plaintiffs and the members of the Class rely on the representation.

171.    Plaintiffs and the members of the Class reasonably relied on Facebook's representation.

172.    Plaintiffs and the Class were harmed as set forth above.

173.    Plaintiffs and Class members' reliance on Facebook's representation was a substantial factor in causing the harm.

## SEVENTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

174.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

175.    California Business and Professions Code section 17200 ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."

176.   Facebook has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

177.   Defendant has engaged in unlawful acts or practices under section 17200 by its violations of the California Constitution's right to privacy, ECPA and California Penal Code sections 631 and 632, through the acts and practices set forth in this Complaint.

178.   Defendant has engaged in fraudulent business acts or practices under section 17200 because its misrepresentations and omissions regarding its requirement that businesses have lawful rights to collect, use, and share Plaintiffs' and Class members' data before providing any data to Defendant, and Defendant's receipt of the confidential information at issue, were intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs and the Class. The information Defendant misrepresented and concealed would be, and is, material to reasonable consumers because Defendant does not require businesses to have lawful rights to collect, use, and share Plaintiffs' and Class members' data before providing any data to Defendant and Defendant receives the confidential information at issue nonetheless.

179.   Defendant has engaged in unfair acts and practices under section 17200 based on the acts and practices alleged herein, namely, that Defendant claims that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Class members'] data before providing any data" to Defendant, but in reality knows (or should have known) that its Pixel tracking tool is being improperly used on hospital websites resulting in the wrongful, contemporaneous, re-direction to Facebook of patient communications without the knowledge or authorization of Plaintiffs.

180.   Defendant's actions offend public policy.

181.   Defendant's conduct, misrepresentations and omissions have also impaired competition within the health care market in that those actions have prevented Plaintiffs and the Class from making fully informed decisions about whether to communicate online with their healthcare providers and to use their healthcare providers' website in the first instance.

182.   Plaintiffs and the Class have suffered an injury in fact, including the loss of money and/or property, as a result of Defendant's unfair, unlawful and/or deceptive practices, to wit, the

disclosure of their personally identifiable data which has value as is demonstrated by the use and sale of it by Defendant. While only an identifiable "trifle" of injury is needed to be shown, as set forth above Plaintiffs, patients, and the public at large value their private health information at more than a trifle. And, sale of this confidential and valuable information to has now diminished the value of such information to Plaintiffs and the Class.

183.    Defendant's actions caused damage to and loss of Plaintiffs' and other patients' property right to control the dissemination and use of their personally identifiable patient data and communications.

184.    Defendant's actions caused damage to and loss of Plaintiffs' and other patients' property rights to control the dissemination and use of the personally identifiable communications.

185.    Defendant's representation that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Class members'] data before providing any data" to Defendant was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used their health care provider's website.

186.    The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

187.    Plaintiffs and the Class request that this Court enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class, in the form of restitution, any money Defendant acquired through its unfair competition.

## EIGHTH CAUSE OF ACTION

### TRESPASS

188.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

189.    At all times relevant, Plaintiffs owned, leased, occupied, and/or controlled their computing devices and their homes and/or businesses from which they communicated with their medical providers.

190.    The Facebook Pixel tracking source code is designed such that, when Plaintiffs and other patients visit the web-properties and patient portals associated with their medical providers,

a cookie named 'fbp' is automatically set upon Plaintiffs' and others patients' computing devices.

191.   The 'fbp' cookie is designed to avoid any attempts by Plaintiffs or other patients to block transmissions to Facebook via cookies. To accomplish this task, the Facebook Pixel tracking source code transmits and commands the 'fbp' cookie to be lodged in Plaintiffs' computing device by asserting that it is a cookie from Plaintiffs' and patients' medical providers.

192.   Facebook lodges the fbp cookies on Plaintiffs' and other patients' computing devices regardless of whether Plaintiffs or patients have attempted to block third-party cookies.

193.   For security purposes, as a rule, the patient portals that Plaintiffs and patients use to exchange communications with their medical providers and access their medical records, require patients to have enabled first-party cookies in order to access the patient portal. As a result of this, every patient who accessed a patient portal for a medical provider that deployed the Facebook Pixel had the Facebook fbp cookie lodged on their computing device.

194.   Plaintiffs' communications with their medical providers via the patient portals occurred while they were in their own homes and businesses. As a result, Facebook's actions to lodge the 'fbp' cookie on their computing devices also had the impact of entering Plaintiffs' private property through the Plaintiffs' computer connections.

195.   Facebook's placement of the fbp cookie associated with Plaintiffs' and patients' use of their medical providers' patient portals and appointment settings products was done intentionally and without Plaintiffs' or patients' knowledge or authorization.

196.   Facebook's placement of the fbp cookie on Plaintiffs' computing devices associated with their use of their medical providers' patient portals is the modern equivalent of the placement of a bug in someone's telephone. Facebook's source code, fbp cookie, and the Facebook Pixel have taken the place of the "bug," which is why these tools are often called "web-bugs."

197.   Plaintiffs' computing devices derive value from their ability to facilitate communications between Plaintiffs and their medical providers.

198.   Facebook's placement of the fbp cookie results in the persistent and unavoidable interception of Plaintiffs' communications with their medical providers, which deprives Plaintiffs of the full value of using their computing devices for such communications.

199.    Facebook's trespass of Plaintiffs' computing devices and of their homes and/or businesses resulted in harm to Plaintiffs and caused Plaintiffs the following damages:

    a.    Nominal damages for trespass;

    b.    Significant reduction of storage, disk space, and performance of Plaintiffs' computing devices;

    c.    Loss of value of Plaintiffs' computing devices; and

    d.    The total deprivation of Plaintiffs' use of their computing devices to communicate with their medical providers.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Certify the proposed Class, designating Plaintiffs John Doe, Jane Doe I, Jane Doe II, and John Doe II as the named representatives of the Class, and designating the undersigned as Class Counsel;

2.    Award compensatory damages, including statutory damages where available, to Plaintiffs and the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Award punitive damages on the causes of action that allow for them and in an amount that will deter Defendant and others from like conduct;

4.    Award attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure section 1021.5;

5.    Award pre-judgment and post-judgment interest, as provided by law; and,

6.    For such other, further, and different relief as the Court deems proper under the circumstances.

DATED: July 15, 2022          **KIESEL LAW LLP**

By:    */s/ Jeffrey A. Koncius*
    Paul R. Kiesel
    Jeffrey A. Koncius
    Nicole Ramirez

**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
An Truong (admitted *pro hac vice*)
Eric Johnson (admitted *pro hac vice*)

**GORNY DANDURAND, LC**
Stephen M. Gorny (admitted *pro hac vice*)

**THE SIMON LAW FIRM, P.C.**
Amy Gunn (admitted *pro hac vice*)
Elizabeth S. Lenivy (admitted *pro hac vice*)

Attorneys for Plaintiffs
JOHN DOE, JANE DOE I, JANE DOE II, and
JOHN DOE II, on behalf of themselves and all
others similarly situated

IX.     **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury of any and all issues in this action so triable of right.

DATED: July 15, 2022                    **KIESEL LAW LLP**

By:     _/s/ Jeffrey A. Koncius_
                              Paul R. Kiesel
                              Jeffrey A. Koncius
                              Nicole Ramirez

                              **SIMMONS HANLY CONROY LLC**
                              Jason 'Jay' Barnes (admitted *pro hac vice*)
                              An Truong (admitted *pro hac vice*)
                              Eric Johnson (admitted *pro hac vice*)

                              **GORNY DANDURAND, LC**
                              Stephen M. Gorny (admitted *pro hac vice*)

                              **THE SIMON LAW FIRM, P.C.**
                              Amy Gunn (admitted *pro hac vice*)
                              Elizabeth S. Lenivy (admitted *pro hac vice*)

                              Attorneys for Plaintiffs
                              JOHN DOE, JANE DOE I, JANE DOE II, and
                              JOHN DOE II, on behalf of themselves and all
                              others similarly situated