GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY (SBN 268184)
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA (SBN 301746)
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

TRENTON J. VAN OSS (*pro hac vice*)
tvanoss@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    (202) 955-8500
Facsimile:    (202) 467-0539

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
rhodesmg@cooley.com
KYLE C. WONG (SBN 224021)
kwong@cooley.com
CAMERON J. CLARK (SBN 313039)
cclark@cooley.com
CAROLINE A. LEBEL (SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>Case No. 3:22-cv-3580-WHO (Doe) | Case No. 3:22-cv-3580-WHO<br><br><u>PUTATIVE CLASS ACTION</u><br><br>**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>*[Declarations of Tobias Wooldridge and Abigail A. Barrera filed concurrently herewith]*<br><br>Action Filed:  June 17, 2022<br><br>Honorable Judge William H. Orrick<br><br>Date: November 9, 2022<br>Time: 2:00 p.m.<br>Location: Courtroom 2, 17th Floor |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

        A.    Meta's Policies ............................................................................................ 3

        B.    Meta's Restrictions On Use Of The Pixel Tool ........................................ 6

        C.    Previous Litigation .................................................................................... 7

        D.    Procedural History ................................................................................... 8

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.     The Planned Consolidated Amended Complaint Moots Plaintiffs' Motion. .............. 10

    II.    Plaintiffs Cannot Meet Their Heavy Burden To Justify A Preliminary Injunction. ................................................................................................. 11

        A.    Plaintiffs Will Not Suffer Irreparable Harm Absent A Preliminary Injunction. ................................................................................. 11

        B.    The Balance Of Equities Does Not Tip In Plaintiffs' Favor. ...................... 13

        C.    A Preliminary Injunction Is Not In The Public Interest. ................................ 14

        D.    Plaintiffs Are Unlikely To Succeed On The Merits. ...................................... 15

            1.    Consent bars all of plaintiffs' claims. ................................................. 15

            2.    Each of plaintiffs' claims also fails for multiple other reasons........... 20

    III.   Plaintiffs' Requested Relief Is Impermissibly Overbroad. .......................................... 24

CONCLUSION .................................................................................................................... 25

-i-

DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

# TABLE OF AUTHORITIES

**Cases**   **Page(s)**

*Adtrader, Inc. v. Google LLC*,
   2018 WL 1876950 (N.D. Cal. Apr. 19, 2018) ................................................................12

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ........................................................................................12

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ......................................................................................................13

*Astra USA, Inc. v. Santa Clara Cnty.*,
   563 U.S. 110 (2011) ......................................................................................................18

*Barrilleaux v. Mendocino Cnty.*,
   2016 WL 4269328 (N.D. Cal. Aug. 15, 2016) ...............................................................10

*Bernhardt v. Los Angeles Cnty.*,
   339 F.3d 920 (9th Cir. 2003) ........................................................................................14

*Brien v. J.P. Morgan Chase Bank, N.A.*,
   2010 WL 11597807 (C.D. Cal. Nov. 24, 2010) .............................................................12

*Brodsky v. Apple Inc.*,
   445 F. Supp. 3d 110 (N.D. Cal. 2020) ..........................................................................21

*Brown v. Google LLC*,
   525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........................................................................22

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ........................................................................................24

*Clay v. Wells Fargo Home Mortg., N.A.*,
   2013 WL 1189712 (E.D. Cal. Mar. 21, 2013) ..............................................................10

*Cline v. Reetz-Laiolo*,
   329 F. Supp. 3d 1000 (N.D. Cal. 2018) ........................................................................21

*Cuyler v. United States*,
   362 F.3d 949 (7th Cir. 2004) ........................................................................................18

*Doe v. Va. Mason Med. Ctr.*,
   2020 WL 1983046 (Wash. Sup. Ct. Feb. 12, 2020) ......................................................13

*In re DoubleClick Inc. Privacy Litig.*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001) ..........................................................................20

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
   92 F.3d 1486 (9th Cir. 1996) ........................................................................................24

*Envtl. Democracy Project v. Green Sage Mgmt., LLC*,
   2022 WL 4596616 (N.D. Cal. Aug. 23, 2022) ...............................................................13

-ii-

DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

*F.B.T. Prods., LLC v. Aftermath Records*,
    621 F.3d 958 (9th Cir. 2010)................................................................................17, 20

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020).................................................................................22, 24

*Falck N. Cal. Corp. v. Scott Griffith Collaborative Sols., LLC*,
    25 F.4th 763 (9th Cir. 2022) .......................................................................................11

*Fogelstrom v. Lamps Plus, Inc.*,
    195 Cal. App. 4th 986 (Cal. Ct. App. 2011) ..............................................................23

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) (en banc)....................................................2, 10, 11, 15

*Garcia v. Mid-Atl. Military Family Communities LLC*,
    2021 WL 1429474 (E.D. Va. Mar. 4, 2021) ..............................................................10

*Geisert v. Brown*,
    No. 3:9-cv-670 (N.D. Tex. Mar. 22, 2010) ...............................................................10

*In re Google Inc.*,
    2013 WL 5423918 .....................................................................................................22

*In re Google Inc. Gmail Litig.*,
    2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ...........................................................20

*In re Google, Inc. Privacy Policy Litig.*,
    58 F. Supp. 3d 968 (N.D. Cal. 2014) .........................................................................23

*Hammerling v. Google LLC*,
    2022 WL 2812188 (N.D. Cal. July 18, 2022)......................................................23, 24

*Hartmann v. Cal. Dep't of Corr. & Rehab.*,
    707 F.3d 1114 (9th Cir. 2013) ....................................................................................13

*Hernandez v. Hillsides, Inc.*,
    211 P.3d 1063 (Cal. 2009) ..........................................................................................22

*Hill v. Nat'l Coll. Athletic Ass'n*,
    865 P.2d 633 (Cal. 1994) ......................................................................................15, 22

*Illinois v. Facebook*,
    No. 2018 CH 3868 (Ill. Cir. Ct. Mar. 8, 2021) ..........................................................19

*Krackenberger v. Northwestern Memorial Hosp., et al.*,
    No. 1:22-cv-04203 (N.D. Ill.) .......................................................................................9

*Lee v. Canada Goose US, Inc.*,
    2021 WL 2665955 (S.D.N.Y. June 29, 2011)............................................................19

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009).................................................................................10, 11

*McCoy v. Alphabet, Inc.*,
    2021 WL 405816 (N.D. Cal. Feb. 2, 2021) ...............................................................23

-iii-

DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

*Med. Lab. Mgmt. Consultants v. Am. Broadcasting Cos.*,
    306 F.3d 806 (9th Cir. 2002)............................................................................................23

*Miller v. Elam*,
    2011 WL 1549398 (E.D. Cal. Apr. 21, 2011).................................................................18

*Miller v. Nat'l Broadcasting Co.*,
    187 Cal. App. 3d 1463 (Cal. Ct. App. 1986) .................................................................23

*Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*,
    743 F.2d 1365 (9th Cir. 1984).......................................................................................24

*Naugle, et al. v. Meta Platforms, Inc., et al.*,
    No. 1:22-cv-00727-UA-JEP (M.D.N.C.).........................................................................9

*NRDC v. Winter*,
    508 F.3d 885 (9th Cir. 2007)..........................................................................................25

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985)........................................................................................11

*People v. Nakai*,
    183 Cal. App. 4th 499 (Cal. Ct. App. 2010) ..................................................................22

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011)..........................................................................................11

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1190 (N.D. Cal. 2014) ...........................................................16, 17, 18

*Price v. City of Stockton*,
    390 F.3d 1105 (9th Cir. 2004).......................................................................................24

*Ramirez v. Cnty. of San Bernardino*,
    806 F.3d 1002 (9th Cir. 2015).......................................................................................10

*Revitch v. New Moosejaw, LLC*,
    2019 WL 5485330 (N.D. Cal. Oct. 23, 2019)................................................................21

*Rodriguez v. Google LLC*,
    2021 WL 2026726 (N.D. Cal. May 21, 2021) ................................................................20

*Schulman v. Grp. W Prods., Inc.*,
    955 P.2d 469 (Cal. 1998) ...............................................................................................23

*Smidga v. Meta Platforms, Inc., et al.*,
    No. 2:22-cv-01231-MPK (W.D. Pa.)...............................................................................9

*Smith v. Facebook, Inc.*,
    262 F. Supp. 3d 943 (N.D. Cal. 2017) ........................................................................7, 8

*Smith v. Facebook, Inc.*,
    745 F. App'x 8 (9th Cir. 2018) ...............................................................8, 16, 17, 18

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009)........................................................................................14

*Susan S. v. Israels*,
    55 Cal. App. 4th 1290 (Cal. Ct. App. 1997) ...................................................................................23

*Sussman v. Am. Broad. Cos., Inc.*,
    186 F.3d 1200 (9th Cir. 1999) ........................................................................................................20

*TBG Ins. Servs. Corp. v. Superior Court*,
    96 Cal. App. 4th 443 (Cal. Ct. App. 2002) ....................................................................................22

*Techtronic Power Tools Tech. Ltd. v. Harbor Freight Tools USA, Inc.*,
    No. 8:20-cv-2004 (D.S.C. Oct. 21, 2020) .....................................................................................10

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) ........................................................................................................17

*United States v. Holtzman*,
    762 F.2d 720 (9th Cir. 1985) ..........................................................................................................14

*Webb v. Smart Document Sols., LLC*,
    499 F.3d 1078 (9th Cir. 2007) ........................................................................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................................................9

*Zhang v. Superior Court*,
    304 P.3d 163 (Cal. 2013) ................................................................................................................18

*In re Zynga Privacy Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ........................................................................................................21

**Statutes**

18 U.S.C. § 2510(8) ...............................................................................................................................21

18 U.S.C. § 2511 ...............................................................................................................................15, 20, 21

Cal. Penal Code § 631(a) .................................................................................................................15, 21

Cal. Penal Code § 632(a) .................................................................................................................15, 21

**Rules**

Rule 65(d) ..............................................................................................................................................14

**Regulations**

45 C.F.R. § 164.502 ..............................................................................................................................18

45 C.F.R. § 164.508 ..............................................................................................................................18

65 Fed. Reg. 82601 ...............................................................................................................................18

-v-

DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

# **STATEMENT OF ISSUES TO BE DECIDED**

1. Whether plaintiffs' motion for a preliminary injunction is moot in light of the Court's consolidation order requiring plaintiffs to file a superseding consolidated amended complaint.

2. Whether "the law and facts *clearly favor* [plaintiffs'] position," and whether plaintiffs can otherwise satisfy the "doubly demanding" standard for the "particularly disfavored" remedy of a mandatory injunction. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quotation marks and citation omitted).

3. Whether, even assuming plaintiffs could satisfy the standard for a mandatory injunction, the relief plaintiffs seek is impermissibly overbroad.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs, four Facebook users, allege that their healthcare providers sent sensitive information about them to Meta through a common Internet tool, in violation of both HIPAA and Meta's policies. They have not sued their healthcare providers; they have sued Meta. They now ask this Court to issue a sweeping preliminary injunction that would bar Meta's receipt or use of all "patient information and communications" from all "HIPAA-covered entities." Plaintiffs do not explain how such an injunction would work, given that (1) website developers (not Meta) choose what information they send to Meta, and (2) Meta already takes extensive measures to prevent even *potentially* sensitive data from being sent to it. Nor do plaintiffs allege that before filing their motion they invoked any of the privacy controls Meta provides to users, including the option to disconnect their off-Facebook activity (*i.e.*, the data at issue in this case) from their user accounts. Plaintiffs have put forth no factual or legal justification for the extraordinary relief they seek, and this Court should deny their motion.

This lawsuit challenges the way in which certain healthcare providers use a common Internet tool offered by numerous companies across many industries. Meta's version of this tool, known as the "Meta Pixel," is a publicly available piece of code that allows website developers to gather analytics information about people who visit their websites. Developers can choose to install this code on their websites and customize it to measure particular types of activity, such as online purchases. When a person engages in that activity on the developer's site, information about the specified activity is sent automatically to Meta's systems, which attempt to match it with a Facebook account. Meta's systems then send de-identified information back to the web developer, which can use the data to improve its online services. Facebook users consent to the transmission and use of data sent to Meta through the Pixel tool, including for advertising purposes, when they sign up for Facebook and agree to its policies. Users also have the option to (1) disconnect their off-Facebook activity from their Facebook accounts, and (2) disconnect any historical information that has been collected about their off-Facebook activity.

Meta does not want healthcare providers—or any other website developers—to send sensitive data to it. Accordingly, Meta takes extensive measures to prevent developers from transmitting that information, including: (1) contractually requiring them to have the legal right to share any information

they send to Meta; (2) contractually prohibiting them from sending any health-related or other sensitive information to Meta; (3) developing filters that are constantly improving Meta's ability to screen out potentially sensitive information that Meta detects; and (4) notifying developers when potentially sensitive data is detected and instructing them to ensure they are not sending sensitive information.

Plaintiffs allege that various healthcare companies nevertheless sent sensitive information about them to Meta, in violation of the companies' contractual obligations to Meta and their legal obligations under HIPAA. Plaintiffs' claim is that by receiving this information, *Meta* violated state and federal privacy statutes and common-law doctrines, and breached its promise to users that it would require its business partners to comply with applicable privacy laws. Months after filing their lawsuit, the plaintiffs in this case moved for a preliminary injunction that would order Meta to stop receiving and using *all* "patient information and communications" from *all* "HIPAA-covered entities" using the Meta Pixel tool.

This motion is meritless. Plaintiffs have not come close to demonstrating that the facts and the law "*clearly favor*" them—the "doubly demanding" prerequisite for an injunction that seeks to change the status quo. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Plaintiffs certainly cannot show extreme or irreparable harm; injunctive relief is unavailable as a matter of law when (1) the plaintiffs themselves could, but have not chosen to, prevent the alleged harm from occurring, *or* (2) the plaintiffs cannot show that their harm resulted from conduct *by the defendant* (as opposed to third-party web developers). Both are true here. For the same reasons, the balance of equities favors Meta, and an injunction is not in the public interest. Finally, plaintiffs cannot demonstrate *any* likelihood (much less a strong likelihood) of success on the merits: the three claims they press in their motion— under the Electronic Communications Privacy Act, the California Invasion of Privacy Act, and California privacy tort law—fail, both because plaintiffs consented to the activity they complain about and because they fail to make out the elements of each claim.

## BACKGROUND

This case centers on a tool called "Pixel" that Meta makes available to third-party website developers. The Meta Pixel—Meta's version of a common analytics tool used across the web and offered by numerous other companies—is a free, publicly available piece of code that third-party

website developers can choose to install and customize on their websites to measure certain actions

taken by users on their own sites (*e.g.*, online purchases); this data helps inform and improve the

developers' online services.  Declaration of Tobias Wooldridge ("Wooldridge Decl.") ¶ 3.[1]  The Pixel

tool is widely deployed across many industries and is not healthcare-specific.  Each developer chooses

whether to use this tool (Meta does not obligate anyone to use Pixel) and what user actions to measure,

but Meta contractually bars developers from sending sensitive data to it and takes steps to prevent

developers from doing so.  *Id.* ¶¶ 3–4.  Meta also explains to its users how the Pixel works and what it

is used for, and gives users the option of disconnecting their off-Facebook activity from their Facebook

accounts.  *Id.* ¶¶ 11–12; *see also* Declaration of Abigail A. Barrera ("Barrera Decl."), Exs. F, G, H, I.

### A.     Meta's Policies

Meta operates Facebook, the world's largest social technology company.  Compl. ¶ 58.[2]  When

users sign up for a Facebook account, they agree to Meta's Terms of Service, Data Policy, and Cookies

Policy.  *Id.* ¶ 49.  Those policies are contractually binding on both Meta and its users, and they contain

important disclosures about Facebook and how Meta collects and uses data, including through the Pixel

tool.  *Id.*[3]

***Terms of Service.***  The Terms of Service govern the "use of Facebook, Messenger, and the

other products, features, apps, services, technologies, and software" Meta offers.  Barrera Decl., Ex. A

at 1.  Meta believes its "services are most useful when people are connected to people, groups, and

organizations they care about," and Meta informs users that it "use[s] data about the connections you

---

[1]  When someone takes an action that the developer has chosen to measure on its website, the Meta Pixel is triggered and sends Meta certain data, called an "Event."  Wooldridge Decl. ¶ 4.  Meta attempts to match the Events it receives to Meta users.  *Id.*  The developer can then choose to show ads to users who have taken a certain action on their own website.  *Id.*  But the identity of matched Meta users is not revealed to the developer or to any advertiser.  *Id.*  Meta can also provide the developer with de-identified, aggregated reporting that helps the developer better understand the impact of its ads by measuring what happens when people see them.  *Id.*

[2]  Meta was previously known as "Facebook, Inc."  In late 2021, the company changed its name to "Meta Platforms, Inc.," but the social media platform itself is still known as Facebook.

[3]  Plaintiffs refer to these policies as the "Terms of Use," the "Data Policy," and the "Cookie Policy."  Compl. ¶¶ 31, 49; Dkt. 46 ("Mot.") at 4.  The Data Policy is now called the "Privacy Policy," but to avoid confusion, this brief uses the version referenced in plaintiffs' complaint and in their motion.  The policies are attached as Exhibits A, B, and C to the Barrera declaration, and where a policy has since been updated, the updated versions are attached separately.

make, the choices and settings you select, and what you share and do on and off our Products - to personalize your experience." *Id.* at 2. The Terms of Service explain that Meta shows users "personalized ads, offers, and other sponsored or commercial content to help [them] discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Meta Products." *Id.* at 3. To provide these services, Meta's terms explain, Meta "collect[s] and use[s] your personal data." *Id.* at 5. The terms link to the Data Policy for more information. *Id.* at 1.

*Data Policy.* The Data Policy "describes the information [Meta] process[es] to support Facebook, Instagram, Messenger and other products and features offered by Meta." Barrera Decl., Ex. B at 1. Among other things, the Data Policy tells users that "[a]dvertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel." *Id.* at 4. "These partners," the policy explains, "provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have an account or are logged into our Products." *Id.* at 4–5. The policy further explains that "[p]artners receive your data when you visit or use their services or through third parties they work with," and says that Meta "require[s] each of these partners to have lawful rights to collect, use and share your data before providing any data to us." *Id.* at 5.

The Data Policy also informs users that Meta uses this information "to personalize features and content (including your ads, Facebook News Feed, Instagram Feed, and Instagram Stories) and make suggestions for you." *Id.*; *see also id.* at 6 ("We use the information we have (including your activity off our Products, such as the websites you visit and ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, and understand the types of people who use their services and how people interact with their websites, apps, and services."). Meta does not, however, "share information that personally identifies" users with advertisers unless users give permission. *Id.* at 9.

*Cookies Policy.* Cookies are "small pieces of text used to store information on web browsers." Barrera Decl., Ex. C at 1. They "store and receive identifiers and other information on computers, phones and other devices," and they can serve a number of different functions—for example,

"personalising content, tailoring and measuring ads, and providing a safer experience." *Id.* at 1–2. Meta's Cookies Policy informs users that Meta "use[s] cookies if you have a Facebook account, use the Meta Products, including our website and apps, or visit other websites and apps that use the Meta Products (including the Like button)." *Id.* at 1.  Meta explains that cookies allow it to "understand the information that we receive about you, including information about your use of other websites and apps, whether or not you are registered or logged in," and that Meta "use[s] cookies to help us show ads and to make recommendations for businesses and other organisations to people who may be interested in the products, services or causes they promote." *Id.* at 1–2.  Cookies allow Meta "to provide insights about the people who use the Meta Products, as well as the people who interact with the ads, websites and apps of our advertisers and the businesses that use the Meta Products." *Id.* at 3.  The policy also describes the cookie used to enable the Meta Pixel ("_fbp") and explains that Meta's "business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook account or are logged in." *Id.* at 4; *see also id.* at 4–5 ("Meta uses cookies and receives information when you visit [websites and apps that use the Meta Products], including device information and information about your activity, without any further action from you.  This occurs whether or not you have a Facebook account or are logged in.").

**Business Tools Terms.**  All third-party web developers that use Meta services—including Meta's Pixel tool—must agree to the publicly available Business Tools Terms.  Consistent with the Data Policy's statement that Meta requires partners to "have lawful rights to collect, use and share" user data, Barrera Decl., Ex. B at 5, the Business Tools Terms require developers to "represent and warrant that you (and any data provider that you may use) have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." Barrera Decl., Ex. D at 1.  Partners must also "represent and warrant that [they] have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage," including a "clear and prominent notice on each web page where [Meta] pixels are used that links to a clear explanation [of] . . . how users can opt-out of the collection and use of information for ad targeting." *Id.* at 3.  As a condition of using the Pixel tool, developers specifically agree that they will "*not share Business Tool Data . . . that*

*[they] know or reasonably should know . . . includes health, financial or other categories of sensitive information* (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *Id.* at 2 (emphasis added); *see also* Barrera Decl., Ex. E at 2 (similar provision in Commercial Terms).

**User Control.**   Meta gives users the ability to control the use of information about their off-Facebook activity (such as activity on third-party websites) for advertising purposes.  Wooldridge Decl. ¶ 11.  The Off-Facebook Activity tool allows users to view a summary of information Meta has received about their activity from third parties through the Business Tools, including Pixel.  *Id.*  Users can disconnect the off-Facebook activity that has been associated with their account—which prevents the data from being used for personalized advertising—and can turn off storage of any future connections for all third-party websites (or on a website-by-website basis).  *Id.*  The "Data About Your Activity From Partners" tool also allows users to choose whether data that third parties share with Meta about their activities on other websites and apps can be used to show them personalized ads.  *Id.* ¶ 12; *see also* Barrera Decl., Exs. F, G, H, I (collecting screenshots and articles regarding these tools).

## B.   Meta's Restrictions On Use Of The Pixel Tool

The Meta Pixel tool is available to web developers across numerous industries, and each developer who configures the Pixel code on their website chooses what types of user activity to measure.  Wooldridge Decl. ¶¶ 3–4.  Meta does not want to receive health information, or any other sensitive data, from developers who use Pixel.  *Id.* ¶ 5.  Accordingly, Meta takes several measures designed to (1) prevent the transmission of such data and (2) block any such data that *is* transmitted.

*First*, Meta requires developers who choose to use the Pixel tool to warrant that they have the legal right to share any information they choose to send to Meta, and expressly prohibits developers from sending health-related or otherwise sensitive information.  *Id.* ¶ 6.  Those requirements are set forth in clear and direct terms.  Before integrating the Pixel code on their website, developers must agree to the Business Tools Terms, described in detail above.  Barrera Decl., Ex. D at 1–4.  Developers must also agree to Meta's Commercial Terms before using Meta for a business purpose; those terms similarly provide that developers cannot send Meta any "information that . . . includes health, financial, biometrics, or other categories of similarly sensitive information (including any information defined as

1  sensitive under applicable law).” Barrera Decl., Ex. E at 2; Wooldridge Decl. ¶ 6.  Meta repeatedly
2  reminds developers not to send this information, including during the “Pixel ID” creation process—a
3  necessary step to install and use the Pixel—when developers are told not to send Meta sensitive user
4  data, and are provided a link to Meta’s Business Help Center page about restricted data.  Wooldridge
5  Decl. ¶ 7.

6      *Second*, Meta has implemented a filtering mechanism to screen out potentially sensitive health
7  data it detects that is sent in violation of these policies. *Id.* ¶ 8.  Meta developed the filter to detect data
8  sent through the Pixel that Meta categorizes as even *potentially* sensitive—including health data—and
9  the filter prevents any such data it detects from being ingested into Meta’s ads ranking and optimization
10 systems. *Id.* ████████████████████████
11 ████████████████████████████
12 ████████████████████████████
13 ████████████████████████. *Id.* When
14 Meta’s systems filter out data detected as potentially sensitive, Meta sends notifications to the
15 developer. *Id.* ¶ 9.  These notifications warn that potential health data was detected and blocked and
16 provide details about the affected data—including the URL where the events occurred, the location of
17 the potentially violating information, steps the developer can take to address the issue, and an email
18 address to contact with questions. *Id.*

19      **C.    Previous Litigation**

20      In 2016, a group of plaintiffs represented by the same counsel as in this case sued Meta (then
21 called Facebook) and several healthcare providers over Meta’s alleged collection of information about
22 their browsing histories on the providers’ websites.  The plaintiffs alleged that this collection took place
23 when healthcare providers placed certain Meta code (such as the “Like” button) on their websites,
24 which resulted in Meta obtaining the URLs of those webpages via cookies when users visited them.
25 *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017).  They further alleged that
26 collecting information about their browsing activities on the healthcare sites—for example, a user’s
27 visit to “pages containing information about treatment options for melanoma,” or a query for “search
28 results related to the phrase ‘intestine transplant’”—revealed their “sensitive medical information,” and

that this communication did not comply with heightened consent standards established by HIPAA. *Id.* at 954–55. They brought claims against Meta and the healthcare providers under the Electronic Communications Privacy Act, the California Invasion of Privacy Act, the California constitution, and California contract and tort law. *Id.* at 949.

Judge Davila granted Meta's motion to dismiss, holding that the plaintiffs had "consented to [Meta]'s tracking activity" by "agree[ing] to several [Meta] policies when they signed up for accounts"; these policies contained "broad disclosures . . . about how [Meta] tracks users to improve its ad targeting." *Id.* at 953. The court rejected the plaintiffs' argument that Meta's disclosures were insufficient because they "d[id] not meet HIPAA's heightened authorization requirements." *Id.* at 954. The court dismissed with prejudice because, in light of the plaintiffs' consent, "amendment would be futile." *Id.* at 956. The Ninth Circuit affirmed. *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018). In light of its holding that consent barred all of the plaintiffs' claims, the court did not reach Meta's other arguments for dismissal. *Id.* at 9.

### D.     Procedural History

Plaintiffs are four Facebook users who logged into patient portals on healthcare providers' websites. Compl. ¶¶ 32–35. They allege that each of their healthcare providers—MedStar Health System, Rush University System for Health, and UK Healthcare, none of which is named as a defendant—installed the Meta Pixel on their patient portals. *See id.* ¶¶ 3–11. As a result, plaintiffs say, the providers sent Meta information about "when they register, log-in and logout of patient portals and set up appointments." *Id.* ¶ 12; *see also, e.g.*, *id.* ¶¶ 5, 7–8, 86, 122, 146 (recounting information allegedly sent by Meta's Pixel). That information, plaintiffs allege, revealed their status as patients and is therefore subject to HIPAA's heightened consent requirements because, plaintiffs say, "[p]atient status alone is protected by HIPAA." *Id.* ¶ 44. Plaintiffs do *not* allege that they have ever used the tools Meta provides to disconnect off-Facebook activity from their accounts or to clear their history of third-party activity data. *See supra* at 6.

Plaintiffs sued in June 2022 and brought eight claims against Meta. Four challenge Meta's receipt of information from healthcare providers that placed the Meta Pixel on their websites. *See id.* ¶¶ 131–38 (California privacy tort law), 139–55 (Electronic Communications Privacy Act), 156–65

-8-

(California Invasion of Privacy Act), 188–99 (trespass).  Three more challenge Meta's alleged failure to ensure healthcare providers who installed Meta's Pixel were complying with HIPAA.  *See id.* ¶¶ 108–23 (breach of contract), 124–30 (breach of the implied covenant of good faith and fair dealing), 166–73 (negligent misrepresentation).  Plaintiffs also bring a claim for alleged violations of California's Unfair Competition Law.  *See id.* ¶¶ 174–87.

On August 25—more than two months after filing suit, and shortly after three similar cases had been filed—plaintiffs filed a motion for a preliminary injunction.  Dkt. 46 ("Mot.").  The motion rests on plaintiffs' claims under ECPA, CIPA, and California tort law.  *Id.* at 1.  It seeks an order broadly "enjoin[ing] Defendant Meta Platforms, Inc. ('Meta') from intercepting patient information and communications from HIPAA-covered entities through its use of the Meta Pixel" and "enjoin[ing] Meta from disseminating and/or using patient information and communications that it has intercepted from HIPAA-covered entities through its use of the Meta Pixel."  Dkt. 46-1 at 1.

This case is one of four consolidated cases currently before the Court, with three more inbound.  *See* Dkt. 73; *Krackenberger v. Northwestern Memorial Hosp., et al.*, No. 1:22-cv-04203 (N.D. Ill.) (transferred October 6); *Smidga v. Meta Platforms, Inc., et al.*, No. 2:22-cv-01231-MPK (W.D. Pa.) (transferred October 5); *Naugle, et al. v. Meta Platforms, Inc., et al.*, No. 1:22-cv-00727-UA-JEP (M.D.N.C.) (agreed transfer motion forthcoming).  The consolidation order provides that this Court will appoint lead counsel, who will "file a consolidated complaint" that "shall be the operative complaint in the consolidated action and shall supersede all complaints filed in any action consolidated herein."  Dkt. 73 ¶¶ 6, 10.  The order also provides that Meta "shall not be required to respond to the complaint in any action consolidated into this action, other than the consolidated complaint."  *Id.* ¶ 5.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  Where, as here, a party seeks a "mandatory injunction"—*i.e.*, one that requires "affirmative action," rather than "maintaining the status quo"—the burden is "doubly

-9-

demanding" and preliminary relief is "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quotation marks and citation omitted).  "The district court should deny such relief unless the facts and law *clearly favor* the moving party." *Id.* (emphasis added).  "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotation marks and citation omitted); *see also, e.g.*, *Barrilleaux v. Mendocino Cnty.*, 2016 WL 4269328, at *1 (N.D. Cal. Aug. 15, 2016).

## ARGUMENT

Plaintiffs want this Court to order Meta to stop receiving or using their "patient information and communications," even though it is *third-party web developers* who choose whether to send that information to Meta and *plaintiffs themselves* who could disconnect off-Facebook activity from their accounts.  Plaintiffs do not even try to propose an injunction tailored to the problem they identify, nor do they overcome the numerous fundamental factual and legal problems in their legal theories and claims for relief.  Their motion comes nowhere close to justifying the extraordinary remedy they seek.

### I.     The Planned Consolidated Amended Complaint Moots Plaintiffs' Motion.

"It is well-established in [the Ninth Circuit] that an amended complaint supersedes the original, the latter being treated thereafter as non-existent." *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015).  This Court has ordered that "[t]he consolidated complaint shall be the operative complaint in the consolidated action and shall supersede all complaints filed in any action consolidated herein," and has made clear that Meta "shall not be required to respond to the complaint in any action consolidated into this action, other than the consolidated complaint."  Dkt. 73 ¶¶ 5–6.  As a result of this order, the amended complaint filed in *John Doe* is no longer operative, and the preliminary injunction motion based on that complaint is moot.  Numerous cases have held exactly that.[4]

---

[4] *E.g.*, *Garcia v. Mid-Atl. Military Family Communities LLC*, 2021 WL 1429474, at *3 (E.D. Va. Mar. 4, 2021); *Clay v. Wells Fargo Home Mortg., N.A.*, 2013 WL 1189712, at *2 (E.D. Cal. Mar. 21, 2013); Dkt. 63, *Techtronic Power Tools Tech. Ltd. v. Harbor Freight Tools USA, Inc.*, No. 8:20-cv-2004 (D.S.C. Oct. 21, 2020); Dkt. 20, *Geisert v. Brown*, No. 3:9-cv-670 (N.D. Tex. Mar. 22, 2010).

Notably, this rule applies regardless of whether plaintiffs expect the consolidated amended complaint to differ materially from the amended complaint filed in *John Doe*.  A motion based on an inoperative pleading is moot even when the initial complaint and the amended complaint are "substantively the same." *Falck N. Cal. Corp. v. Scott Griffith Collaborative Sols., LLC*, 25 F.4th 763, 764–66 (9th Cir. 2022) (holding initial complaint "is a legal nullity even if much like the operative complaint," rejecting argument that court "could grant effective relief because [the initial complaint] is substantively the same as [the] amended complaint," and dismissing as moot interlocutory appeal of denial of anti-SLAPP motion).  The purpose of consolidation is to streamline litigation into a single case and avoid piecemeal litigation of motions tethered to superseded complaints.

## II.    Plaintiffs Cannot Meet Their Heavy Burden To Justify A Preliminary Injunction.

Plaintiffs' motion also fails on the merits.  They cannot show irreparable harm; neither the balance of equities nor the public interest tips in their favor; and they are not likely to succeed on the merits.  Plaintiffs are not entitled to relief under any standard—much less the "doubly demanding" standard for a preliminary injunction that would require Meta to take affirmative action to change the status quo.  *Garcia*, 786 F.3d at 740.

### A.    Plaintiffs Will Not Suffer Irreparable Harm Absent A Preliminary Injunction.

To justify a mandatory injunction, plaintiffs must show "extreme or very serious damage will result" without one.  *Marlyn Nutraceuticals*, 571 F.3d at 879.  For several reasons, they cannot do so.

1. Plaintiffs' "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also, e.g.*, *Garcia*, 786 F.3d at 746 (months of delay "undercut [plaintiff's] claim of irreparable harm").  Plaintiffs waited more than two months to seek a preliminary injunction, and finally did so only after other plaintiffs' counsel began filing related lawsuits.

2. Plaintiffs have "not shown a sufficient causal connection between irreparable harm" and Meta's conduct. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011) (no preliminary injunction where plaintiff failed to connect alleged harm to "Google's operation of its search engine").  The exact opposite is true.  Plaintiffs say "the irreparable harm Meta has caused and will continue to

-11-

cause is the *interference with the patient Class's right to confidential medical care and communications*." Mot. at 19 (emphasis added).  That theory runs straight into several fundamental factual problems.

First, plaintiffs can disconnect their off-Facebook activity from their accounts at any time, including on a website-by-website basis, but do not allege that they have done so.  *See supra* at 6; *see also* Dkt. 49 at 11 n.3 (plaintiffs' declaration acknowledging MedStar disclosure that users can "'unlink' their Facebook account from the MedStar website").  Injuries that are "avoidable" or "self-inflicted" are "not irreparable harm."  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020); *see also, e.g.*, *Adtrader, Inc. v. Google LLC*, 2018 WL 1876950, at *4 (N.D. Cal. Apr. 19, 2018) (no irreparable injury where plaintiffs were "free to opt out" of challenged dispute resolution agreement); *Brien v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 11597807, at *2 (C.D. Cal. Nov. 24, 2010) (no irreparable injury where plaintiffs "can easily mitigate the alleged harm").  The fact that plaintiffs have not taken even this basic step is fatal to their request for extraordinary relief.

Second, plaintiffs have not shown their alleged harm is caused *by the defendant.*  Meta already takes extensive measures to prevent third-party developers from sending it sensitive information.  Plaintiffs are "confident" that "Meta is able to identify all web properties from which it is currently acquiring such patient information—and to immediately stop the data flow."  Mot. at 2.  Plaintiffs may be confident, but they are wrong.  It is third-party *web developers*, not Meta, who decide how to configure the code on their websites to send their chosen information to Meta, and it is not clear what plaintiffs' injunction would have Meta do beyond what it already does: instruct developers not to send sensitive data; require them to agree to a contract warranting as much; attempt to filter out any potentially sensitive data developers nonetheless send; and notify developers when Meta detects potentially sensitive data, and instruct them to take steps to ensure they are not sending sensitive information.  *See supra* at 6–7.

Plaintiffs' own submission underscores that it is not *Meta's* conduct at issue.  John Doe—the only plaintiff who submitted a declaration in support of plaintiffs' motion—concedes that it is the healthcare sites' conduct, not Meta's, that plaintiffs seek to change: He states that he "would like to be able to freely use the MedStar patient portal again *after MedStar removes its third-party tracking tools*,

-12-

including the Facebook Pixel." Dkt. 47 ¶ 8 (emphasis added).  That contemplates action by *MedStar*, not by Meta; if plaintiffs are concerned with how healthcare providers configure the Pixel tool on their own websites (in spite of Meta's requirements and data filtering systems), then the proper parties to sue would be the providers themselves.  *Cf. Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (plaintiff challenging state policy must "name the official within the entity who can appropriately respond to injunctive relief").[5]  Indeed, plaintiffs' own declaration states that since the complaint in this case was filed, several healthcare providers have "recently removed the Meta Pixel" from their own websites.  Dkt. 49 at 104.

### B.    The Balance Of Equities Does Not Tip In Plaintiffs' Favor.

To assess the relative equities, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).  Because plaintiffs acknowledge that they already have the ability to disconnect off-Facebook activity from their accounts, but have not chosen to take this basic step, any harm to them from withholding injunctive relief is minimal.  *Cf. Envtl. Democracy Project v. Green Sage Mgmt., LLC*, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022) ("the balance of equities favors Plaintiff because Defendant's alleged harms are self-inflicted").

But the harm to Meta if this Court issues an injunction would be significant.  Plaintiffs broadly demand that Meta stop receiving *all* "patient information and communications" from *all* "HIPAA-covered entities" using the Pixel tool, Dkt. 46-1 at 1, but they offer no solution that is tailored to the problem they identify—the receipt of *sensitive* information—beyond the steps Meta already takes to prevent the use and receipt of even potentially sensitive data.  Imposing an injunction on Meta under these circumstances—where it is already making extensive efforts to prevent the receipt and use of

---

[5] In an attorney declaration submitted along with their preliminary injunction motion, plaintiffs cited and attached state cases not involving Meta, in which individuals did exactly that: sued healthcare providers based on the information they allegedly shared with third parties.  *See* Dkt. 48; *see also* Mot. at 15 (arguing that "deployment of the Meta Pixel on a medical provider website associated with a patient portal sets forth a viable claim *against the medical provider* for violation of state criminal laws") (emphasis added).  In fact, plaintiffs' leading case expressly states that it "does not hinge on the relationship between the Plaintiff and Facebook."  *Doe v. Va. Mason Med. Ctr.*, 2020 WL 1983046, at *2 (Wash. Sup. Ct. Feb. 12, 2020).

potentially sensitive data, and plaintiffs have no suggestions for what more it could do—would be decidedly inequitable.

Rule 65(d) recognizes the harm that may flow from such a vague injunction: a motion for injunctive relief must "state its terms specifically" and "describe in reasonable detail . . . *the act or acts restrained or required*." Fed. R. Civ. P. 65(d); *see also, e.g.*, *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985) ("Rule 65(d) requires the language of injunctions to be reasonably clear so that ordinary persons will know precisely what action is proscribed."). Plaintiffs make no serious attempt to meet that requirement; they simply assert that their injunction "merely requires compliance" with the law. Mot. at 20. For the reasons discussed below (at 15–24), that is incorrect; Meta's existing practices go *beyond* what the law requires. And in any event, plaintiffs' conclusory assertion falls far short of meeting their burden to identify the relative harms and demonstrate that the balance tips in their favor.

### C.    A Preliminary Injunction Is Not In The Public Interest.

When "the impact of an injunction reaches beyond the parties," courts must consider the broader effects of any injunction and "may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009); *see also, e.g.*, *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003) ("The public interest inquiry primarily addresses impact on non-parties rather than parties."). Again, plaintiffs are not clear about how their proposed injunction would actually operate. Although their proposed order applies only to Meta, plaintiffs' motion seeks an injunction against not just Meta but also "all other persons acting in concert with it," and as explained above, John Doe's declaration contemplates action by MedStar, not Meta. *Compare* Dkt. 46-1 at 1 (proposed order), *with* Mot. at 1, *and* Dkt. 47 ¶ 8 (declaration of John Doe). If plaintiffs seek an injunction against Meta only, then it would be ineffective—because developers (not Meta) control the code on their own websites and choose which information to send, and Meta *already* has measures in place to prevent the receipt and use of sensitive information. *See supra* at 6–7. If plaintiffs seek an injunction against every medical provider who uses the Meta Pixel, by contrast, then the burden on non-parties would be sprawling and substantial. *See* Mot. at 2 (purporting to identify 660 non-party

-14-

medical providers).  The public interest thus weighs strongly against injunctive relief that, to be effective, would operate against (at least) many hundreds of non-parties.

Plaintiffs do not address this burden on non-parties.  Instead, they simply extol the importance of privacy in general and assert hyperbolically that "Meta is creating a turn-key solution for totalitarianism."  Mot. at 21–22.  That rhetoric is misplaced.  This case is not a referendum on privacy in general, nor does it have anything to do with making "governmental actors [] immune from the same or similar conduct."  *Id.* at 22.  It is, rather, about the ways in which website developers—with full disclosure and user consent, and subject to user controls—use a common Internet tool to facilitate online advertising.  Plaintiffs cannot rely on vague and overwrought abstractions as a substitute for the concrete showing necessary to justify a preliminary injunction.

### D.      Plaintiffs Are Unlikely To Succeed On The Merits.

To justify a preliminary injunction that requires affirmative action by Meta (or other parties, like the healthcare companies who would be affected by plaintiffs' proposed relief), plaintiffs "must establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed."  *Garcia*, 786 F.3d at 740.  Plaintiffs cannot meet even the more lenient standard, both because the overarching issue of consent bars all of their claims and for reasons specific to each claim.

#### 1.      Consent bars all of plaintiffs' claims.

##### (i)      Plaintiffs consented to Meta's collection of information when they signed up for a Facebook account.

Plaintiffs base their preliminary injunction motion on their claims brought under ECPA, CIPA, and California privacy tort law.  *See* Mot. at 1.  The absence of consent is an express or implied element of each of these claims.[6]  And while "[t]here may be subtle differences" among the consent doctrines applicable to each claim, "the question under [each] is essentially the same: Would a reasonable user

---

[6]  Under ECPA, "[i]t shall not be unlawful . . . for a person not acting under color of law to intercept a wire, oral, or electronic communication where . . . one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(d).  Under CIPA, plaintiffs must show a defendant intercepted covered information "without the consent of all parties" to the communication. Cal. Penal Code §§ 631(a), 632(a).  For a California privacy tort claim, the general "maxim of the law 'violenti non fit injuria' (no wrong is done to one who consents) applies as well to the invasion of privacy tort."  *Hill v. Nat'l Coll. Athletic Ass'n*, 865 P.2d 633, 648 (Cal. 1994); *see also* Restatement (Second) of Torts § 892A (1979) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct.").

who viewed [Meta's] disclosures have understood that [Meta] was collecting [the information at issue]?" *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014) (discussing ECPA and Stored Communications Act claims); *see also Smith*, 745 F. App'x at 8.  Plaintiffs' claims all fail under this standard, because Meta disclosed the use of the Pixel tool in policies that every Facebook user agrees to when they sign up for an account.

Plaintiffs admit they are "legally deemed to have agreed" to three of Meta's relevant policies—its Terms of Service, Data Policy, and Cookies Policy—and that those policies contractually bind them. Compl. ¶ 49.  The Data Policy informs users that "[a]dvertisers, app developers, and publishers can send [Meta] information through Meta Business Tools they use, including . . . the Meta pixel," with a hyperlink from "Meta pixel" to a page containing additional information.  Barrera Decl., Ex. B at 4. The Data Policy further explains that "[t]hese partners provide information about your activities off of our Products . . . whether or not you have an account or are logged into our Products," and includes examples: "information about your device, websites you visit, purchases you make, the ads you see, and how you use their services."  *Id.* at 4–5.  The Data Policy provides additional examples and explanations, and invites users to "learn more about how [Meta] use[s] cookies in connection with Meta Business Tools" by reviewing the Cookies Policy, *id.* at 5—which itself explains that Meta could receive "information about your use of other websites and apps" and use that information to "show ads," as well as a description of the specific cookie that enables Pixel, Barrera Decl., Ex. C at 1–2. These disclosures (and others) amply communicated to users that Meta collected information about their activities on third-party websites.  *Cf. Smith*, 745 F. App'x at 8.

**(ii)     Plaintiffs' attempts to circumvent *Smith* fail.**

In *Smith*, the Ninth Circuit affirmed the district court's holding that, as a matter of law, the plaintiffs had "consented to Facebook's data tracking and collection practices" in light of the "numerous disclosures related to information collection on third-party websites" in Facebook's policies.  745 F. App'x at 8.  "A reasonable person viewing those disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes," the court held, and "[k]nowing authorization of the practice constitutes Plaintiffs' consent."  *Id.* at 8–9.  The court expressly rejected the plaintiffs' argument that

they had provided only "general consent" and "did not consent to the collection of health-related data due to its 'qualitatively different' and 'sensitive' nature." *Id.* at 9.[7]

So too here: Plaintiffs consented to Meta's collection of information about their activity on third-party websites, and that consent bars each of their claims.  As in *Smith*, a reasonable person viewing Meta's disclosures—including disclosures specifically about Pixel and Meta's receipt of "information about your activities off of our Products," such as the "websites you visit" and "how you use their services," Barrera Decl., Ex. B at 4—would understand that Meta collects information about user activities on third-party websites and uses that information for advertising purposes.  *See also Perkins*, 53 F. Supp. 3d at 1212.  And as in *Smith*, plaintiffs' "[k]nowing authorization of the practice constitutes Plaintiffs' consent."  745 F. App'x at 9.  Indeed, the case for consent here is even stronger than in *Smith*, because plaintiffs could disconnect off-Facebook activity from their accounts at any time (including on a website-by-website basis, which would allow plaintiffs to disconnect from their respective healthcare providers' sites).  *See supra* at 6.  Plaintiffs' claims therefore fail.

Trying to circumvent that result, plaintiffs claim there are "four key differences between this case and *Smith*."  Mot. at 7.  None of those "key differences" changes the analysis.

**HIPAA does not replace** **Smith*'s standard for consent*.**  Plaintiffs' first three attempts to distinguish *Smith* all seek to invoke HIPAA's heightened consent standard.  They say (1) "*Smith* was not limited to patients," (2) "the 'medical' websites at issue in *Smith* were not limited to HIPAA-covered entities," and (3) "*Smith* had not distinguished the data at issue as *patient*-data."  Mot. at 7.  Those differences, plaintiffs argue, justify uprooting *Smith*'s "reasonable user" standard for consent and supplanting it with HIPAA's complex regulatory scheme.  HIPAA's implementing regulations provide that certain entities, for certain uses and disclosures of certain health information, must obtain a "valid authorization" meeting a detailed list of requirements—*e.g.*, descriptions of the information to

---

[7]  Here again, plaintiffs say their consent is ineffective because "consent must be . . . to the particular conduct or substantially the same conduct."  Mot. at 8 (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012)).  But Meta's policies broadly described third parties' ability to measure activity on their websites using the Meta Pixel, and "[a] contractual term is not ambiguous just because it is broad."  *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 964 (9th Cir. 2010).  Plaintiffs' only response is to recite the Data Policy's statement that Meta requires developers to have lawful rights to send information to Meta, *see* Mot. at 8–9, but for the reasons below, that does nothing to vitiate plaintiffs' consent.  *See infra* at 18–20.

be used or disclosed, the parties who may make and receive the disclosure, the purpose of the disclosure, information about the individual's right to revoke authorization, and more. *See* 45 C.F.R. § 164.508(c); *see generally id.* §§ 164.502, 164.508. That detailed scheme differs from the standard for consent applicable to plaintiffs' claims: whether "a reasonable user who viewed [Meta's] disclosures [would] have understood that [Meta] was collecting" the information at issue. *Perkins*, 53 F. Supp. 3d at 1212; *see also Smith*, 745 F. App'x at 8.

Plaintiffs' bid to import HIPAA's consent standard into this case fails as a matter of law, principally because HIPAA does not provide a private right of action. *Webb v. Smart Document Sols., LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007); 65 Fed. Reg. 82601 (Dec. 28, 2000). Litigants cannot plead around that problem by channeling substantive standards from one claim (which they cannot bring) through another, different claim. *Cf. Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 114 (2011) (where a statute does not provide a private right of action, "it would make scant sense to allow [plaintiffs] to sue on a form contract implementing the statute"). A contrary conclusion would render meaningless congressional decisions to withhold a private right of action—and the extensive body of law addressing that question statute-by-statute—because if "every statute that specified a standard of care [were] automatically enforceable by tort suits for damages," then "every statute in effect would create an implied private right of action." *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004). That "clearly is not the law." *Id.* And it is why courts have refused attempts by plaintiffs to effectively bring claims they cannot bring directly through the backdoor of other causes of action. *See, e.g.*, *Miller v. Elam*, 2011 WL 1549398, at *4 (E.D. Cal. Apr. 21, 2011) ("Because there is no private right of action under HIPAA, plaintiff's HIPAA claim is not cognizable under 42 U.S.C. § 1983."); *Zhang v. Superior Court*, 304 P.3d 163, 177 (Cal. 2013) (where there is no private right of action, "a litigant may not rely on the proscriptions of [that statute] as the basis for a UCL claim").

**Plaintiffs' contract claims do not vitiate their consent.** Plaintiffs next contend that "Meta's current contract and promises to users are different than they were in *Smith*," Mot. at 7—specifically, the Data Policy was updated in 2018 to state that Meta "require[s]" third parties who send information through Pixel to "have lawful rights to collect, use and share your data before providing any data to

-18-

DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-CV-3580-WHO

us." Barrera Decl., Ex. B at 5. Plaintiffs say that because Meta did not adequately "enforce its promise," their consent was based on a "mistake" and is therefore invalid. Mot. at 9.

Every part of that argument is wrong. *First*, there is no "mistake": Meta *does* require third parties to have lawful rights to share user data. Meta's publicly available Business Tools Terms—which any third party who wishes to use Pixel must agree to—requires web developers to "represent and warrant that you (and any data provider that you may use) have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." Barrera Decl., Ex. D at 1; *see also id.* at 3 (requiring web developers to provide their users with "robust and sufficiently prominent notice" about data collection). That is precisely the requirement contemplated in Meta's Data Policy. Plaintiffs do not—because they cannot—dispute this. Instead, they assert Meta breached its promise by failing to make "any effort to enforce its promise" *beyond* the "provision in its form contract with developers." Mot. at 9. But Meta's policies did not promise any particular enforcement process. *See, e.g.*, *Illinois v. Facebook*, No. 2018 CH 3868, at *11 (Ill. Cir. Ct. Mar. 8, 2021) ("Facebook's relevant policies only indicate the enforcement available to it and Facebook makes no guarantee as to how it will proceed"). Plaintiffs have failed to show any breach of any promise Meta actually made. *Cf. Lee v. Canada Goose US, Inc.*, 2021 WL 2665955, at *6 (S.D.N.Y. June 29, 2011) (statements about company practices are not inaccurate simply because plaintiffs allege they are "insufficient and unsatisfactory").

*Second*, even if Meta had promised some additional level of "enforcement," there still would not be any "mistake" because Meta already engages in extensive efforts to avoid receiving sensitive information, including potentially sensitive health-related information. *See supra* at 6–7. Plaintiffs say that "to [their] knowledge, the only evidence that Meta makes any effort to enforce its promise is that it includes a provision in its form contract with developers stating that the developer asserts it has permission to send Meta data." Mot. at 9. That is inaccurate. In addition to requiring web developers to warrant that they have the legal right to share any information they send to Meta, Meta expressly instructs them not to send any "health" information. Barrera Decl., Ex. D at 2. If they nevertheless do so, Meta has systems in place to filter and screen out information sent through Pixel that it detects and categorizes as potentially sensitive, including health data. Wooldridge Decl. ¶ 8. When potentially

-19-

1    sensitive information is detected, Meta prevents it from being ingested into Meta's ads ranking and

2    optimization systems, and Meta sends notifications to the developer warning it to ensure it is not using

3    Meta's Pixel to send sensitive data (along with instructions for doing so).  *Id.* ¶ 9.

4         *Third*, even if plaintiffs could show a breach of the Data Policy, it would not vitiate their

5    consent.  Plaintiffs provided consent in three separate policies (the Terms of Service, Data Policy, and

6    Cookies Policy)—each of which they allege is legally binding, each of which disclosed the practices

7    at issue here, and none of which conditioned consent on any particular level of enforcement of any

8    particular pledge made by Meta in those policies.  *See* Compl. ¶ 49; *see supra* at 3–5.  Those policies

9    described the broad nature of the information Meta could receive from third parties, and a "contractual

10   term is not ambiguous just because it is broad."  *F.B.T. Prods.*, 621 F.3d at 964.  Even assuming Meta

11   should have put *additional* enforcement mechanisms in place, plaintiffs were clearly informed that

12   third parties had the ability to send Meta information about users' activity on their websites.

13                       **2.      Each of plaintiffs' claims also fails for multiple other reasons.**

14                            **(i)      Plaintiffs' ECPA claim is not likely to succeed.**

15        ECPA is a one-party consent statute: there is no liability "where *one* of the parties to the

16   communication has given prior consent," unless "such communication is intercepted for the purpose

17   of committing any criminal or tortious act."  18 U.S.C. § 2511(2)(d) (emphasis added).  Even assuming

18   *plaintiffs* did not consent to sharing information with Meta, the healthcare providers who configured

19   Pixel on their own websites clearly did, and the purpose for collecting the information—advertising—

20   is not itself criminal or tortious.  *See, e.g.*, *Rodriguez v. Google LLC*, 2021 WL 2026726, at *6 n.8

21   (N.D. Cal. May 21, 2021); *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 n.13 (N.D. Cal.

22   Mar. 18, 2014); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 518–19 (S.D.N.Y. 2001).

23   That alone is enough to defeat plaintiffs' ECPA claim.[8]

24

25   _____

26   [8]  Plaintiffs make a conclusory assertion that Meta has a criminal or tortious purpose and simply list a
     number of allegedly violated laws, but this argument confuses Meta's *receipt* of information with the
27   *purpose* to which that information is allegedly put.  *See Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d
     1200, 1202 (9th Cir. 1999) ("Under section 2511, the focus is not upon whether the interception itself
28   violated another law; it is upon whether the purpose for the interception—its intended use—was
     criminal or tortious." (quotation marks and citation omitted)).

Nor can plaintiffs show that all of the online activities healthcare providers allegedly measure qualify as "content," as ECPA requires.  *See* 18 U.S.C. § 2511.  ECPA defines "contents" to include "any information concerning the substance, purport, or meaning of [a] communication."  18 U.S.C. § 2510(8).  Here, plaintiffs allege that the Meta Pixel measures their *activity* on patient portals and collects certain identifying information, including "the names of buttons they click on the website as well their associated URLs" and "detailed URL information for the webpage the patient visited immediately preceding logging into the portal."  Mot. at 11–12.  But not all activities that web developers choose to measure will reveal any "communication itself."  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014).  Plaintiffs also say this information can "reveal the patient's HIPAA-protected patient status by way of the fact that they are a registered portal user."  Mot. at 12.  But even if Meta can *infer* patient status from the activity information it obtains, that would not qualify as "content."  *See In re Zynga*, 750 F.3d at 1107 (deeming irrelevant what "an enterprising advertiser could uncover" using a referer header).

### (ii)     Plaintiffs' CIPA claim is not likely to succeed.

Plaintiffs' CIPA claim likewise fails.  Plaintiffs allege that Meta violated two provisions of CIPA: Section 631(a) (the wiretapping provision) and Section 632(a) (the recording provision).

**Section 631(a).**  Section 631(a), like ECPA, applies only to "the contents or meaning of any message, report, or communication."  Cal. Penal Code § 631(a); *see also Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (the "analysis for a violation of CIPA is the same as that under the federal [ECPA]") (citation omitted).  For the reasons above, plaintiffs cannot show that all of the activities healthcare providers choose to measure on their websites would qualify as "content."  *See supra* at 21.

**Section 632(a).**  Section 632(a) applies only to eavesdropping or recording of "a *confidential* communication," Cal. Penal Code § 632(a) (emphasis added), and "in California, courts have developed a presumption that Internet communications do not reasonably give rise to that expectation."  *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *3 (N.D. Cal. Oct. 23, 2019) (collecting cases and holding that "browsing activity and form field entries" are not "confidential"); *see also, e.g.*, *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1051–52 (N.D. Cal. 2018) (emails not "confidential" despite

containing "private medical and financial information") (Orrick, J.); *People v. Nakai*, 183 Cal. App. 4th 499, 517–18 (Cal. Ct. App. 2010) (instant messages, including sexually explicit photos, not "confidential communication," despite sender's "desire[] [for] the communication to be confidential"). That is particularly true here, where Meta's policies informed users that their information could be collected on third-party websites. *Compare Nakai*, 183 Cal. App. 4th at 518 (pointing to disclosures in Yahoo!'s privacy policy as one reason instant messages were not "confidential"), *with Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1074 (N.D. Cal. 2021) (distinguishing *Nakai* where user was in "private browsing mode" and "Google's policies did not indicate that data would be collected from users in private browsing mode").

### (iii)   Plaintiffs' California privacy tort claim is not likely to succeed.

To prevail on a claim for intrusion upon seclusion, plaintiffs must show that "(1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020); *see also Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1072 (Cal. 2009) (discussing elements for "common law tort of intrusion"); *Hill*, 865 P.2d at 657 (similar elements for "constitutional right to privacy"). They cannot meet either requirement.

The first—a reasonable expectation of privacy—is similar to the analysis of whether a communication is "confidential" under CIPA. *See In re Google Inc.*, 2013 WL 5423918, at *22 ("confidential communication" is one that plaintiff "had an objectively reasonable expectation was not being recorded") (citation omitted).   For the same reasons that their communications were not "confidential" under CIPA, *see supra* at 21–22, plaintiffs cannot show they had a reasonable expectation of privacy in them—a conclusion that is bolstered by Meta's robust disclosures, because "notice, combined with [a plaintiff's] written consent to the policy, defeats his claim that he had a reasonable expectation of privacy." *TBG Ins. Servs. Corp. v. Superior Court*, 96 Cal. App. 4th 443, 452 (Cal. Ct. App. 2002).

Nor have plaintiffs shown that any intrusion was "highly offensive," which contemplates "an exceptional kind of prying into another's private affairs" such as "taking the photograph of a woman in the hospital with a rare disease that arouses public curiosity over her objection" or "using a telescope

to look into someone's upstairs bedroom window for two weeks and taking intimate pictures with a telescopic lens." *Med. Lab. Mgmt. Consultants v. Am. Broadcasting Cos.*, 306 F.3d 806, 819 (9th Cir. 2002) (quotation marks omitted; citing Restatement (Second) of Torts § 652B).  The allegations here—using consented-to online activity as a basis for improving online services—do not even approach that level of offensive intrusion.  *Cf. Fogelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 992 (Cal. Ct. App. 2011) ("obtaining plaintiff's address without his knowledge or permission, and using it to mail him coupons and other advertisements," was "not an egregious breach of social norms").

To the contrary, "[c]ourts in this district have consistently refused to characterize the disclosure of common, basic digital information to third parties as serious or egregious violations of social norms." *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 985 (N.D. Cal. 2014) (rejecting California constitutional claim based on disclosure of "personal identifying information, browsing habits, search queries, responsiveness to ads, demographic information, declared preferences and other information," including "the contents of Gmail communications," *id.* at 973); *see also, e.g.*, *Hammerling v. Google LLC*, 2022 WL 2812188, at *12 (N.D. Cal. July 18, 2022) (collecting cases, rejecting claim based on collection of information from "fertility tracker app," and noting that "[e]ven disclosure of highly personal information such as social security numbers is not 'highly offensive'"); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *7–8 (N.D. Cal. Feb. 2, 2021) (noting "the high bar in this district").  In the medical context, successful privacy claims have involved much more egregious circumstances: for example, in-person camera crews recording a person's medical treatment immediately after a traumatic event and broadcasting it in a documentary or the nightly news,[9] or using health records to "intimidate[], embarrass[] and humiliate[]" a victim of sexual battery.[10]  Again, the conduct alleged in this case is worlds away, and the improved online services related to the information Meta obtains lack the potential for public humiliation present in successful privacy cases.

The Ninth Circuit's decision in *In re Facebook, Inc. Internet Tracking Litigation* is the exception that proves the rule.  There, the court framed its reasonable-expectation-of-privacy analysis

---

[9]  *See, e.g.*, *Schulman v. Grp. W Prods., Inc.*, 955 P.2d 469, 474–75, 497 (Cal. 1998); *Miller v. Nat'l Broadcasting Co.*, 187 Cal. App. 3d 1463, 1469, 1483–84 (Cal. Ct. App. 1986).

[10]  *Susan S. v. Israels*, 55 Cal. App. 4th 1290, 1299 (Cal. Ct. App. 1997).

as asking "whether a user would reasonably expect that Facebook would have access to the user's individual data *after the user logged out of the application*," and it answered no because "Facebook's privacy disclosures at the time allegedly failed to acknowledge its tracking of logged-out users, suggesting that users' information would not be tracked."  956 F.3d at 602 (emphasis added); *see also id.* ("Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway.").  Plaintiffs' claim is not based on logged-out tracking, nor could it be: the Data Policy discloses that Meta receives "information about your activities off of our Products . . . *whether or not you have an account or are logged into our Products*."  Barrera Decl., Ex. B at 4–5 (emphasis added).  Similarly, the court concluded the plaintiffs in *In re Facebook* had "identified sufficient facts to survive a motion to dismiss" on the "highly offensive" prong in light of their "allegations of surreptitious data collection when individuals were not using Facebook."  956 F.3d at 606.  By contrast, where a policy is not "blatantly deceitful" about the information a company collects, courts have rejected claims that an alleged privacy intrusion was "highly offensive."  *See Hammerling*, 2022 WL 2812188, at *12 (distinguishing *In re Facebook* where policy was merely "ambiguous," not "blatantly deceitful").

### III.     Plaintiffs' Requested Relief Is Impermissibly Overbroad.

Finally, even if preliminary relief were appropriate, the scope of the relief plaintiffs request here is wildly overbroad.  "[A]n injunction must be narrowly tailored to affect only those persons over which [the court] has power, and to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law."  *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (quotation marks and citation omitted).  The relief plaintiffs ask for runs afoul of that requirement for at least two reasons.

*First*, "in the absence of class certification, the preliminary injunction may properly cover only the named plaintiffs."  *Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1371 (9th Cir. 1984); *see also, e.g.*, *California v. Azar*, 911 F.3d 558, 582–83 (9th Cir. 2018) (rule that scope of relief must be limited to parties before the court "applies with special force where there is no class certification"); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) ("injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification").  There are four named plaintiffs in this action, and collectively they allege that they

-24-

used three medical providers' patient portals: MedStar (John Doe, Jane Doe I), Rush (Jane Doe II), and UKH (John Doe II).  Compl. ¶¶ 32–35.  Only one of the named plaintiffs (John Doe) has submitted a declaration to provide any factual support.  *See* Dkt. 47.  Yet plaintiffs' proposed order encompasses *all* "HIPAA-covered entities" that use Pixel, and they identify "more than 660 HIPAA-covered entities" as to which they seek relief.  Mot. at 2.  That is plainly overbroad.  Moreover, on the merits, those entities will necessarily differ in how they use Pixel, what information they share, what disclosures they provide and consent they obtain from users, and any number of other relevant issues; plaintiffs' proposed order accounts for none of those differences.

*Second*, in addition to sweeping in all "HIPAA-covered entities," plaintiffs' proposed order would apply to all "patient information and communications" from those entities.  Dkt. 46-1 at 1.  But not all "patient information and communications" are HIPAA-protected—and plaintiffs' entire theory of the case hinges on their (incorrect) assertion that HIPAA provides the standard for consent.  Nor are all "patient information and communications" necessarily "content" under ECPA or CIPA, or the sort of information that would make out a privacy tort.  *See supra* at 21–24.  The scope of plaintiffs' requested injunction is thus entirely untethered to the claims and legal theories they advance.  *See NRDC v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) ("injunctive relief must be tailored to remedy the specific harm alleged").

## CONCLUSION

Plaintiffs' motion should be dismissed as moot.  If the Court does not dismiss it as moot, then the motion should be denied.

DATED: October 17, 2022                    **GIBSON, DUNN & CRUTCHER LLP**


By:    /s/ Lauren R. Goldman
       Lauren R. Goldman