1   Paul R. Kiesel, State Bar No. 119854
      *kiesel@kiesel.law*
2   Jeffrey A. Koncius, State Bar No. 189803
      *koncius@kiesel.law*
3   Nicole Ramirez, State Bar No. 279017
      *ramirez@kiesel.law*
4   **KIESEL LAW LLP**
    8648 Wilshire Boulevard
5   Beverly Hills, CA 90211-2910
    Tel.:   310-854-4444
6   Fax:   310-854-0812

7   Jason 'Jay' Barnes (admitted *pro hac vice*)         Stephen M. Gorny (admitted *pro hac vice*)
      *jaybarnes@simmonsfirm.com*                              *steve@gornylawfirm.com*
8   An Truong (admitted *pro hac vice*)                  **GORNY DANDURAND, LC**
      *atruong@simmonsfirm.com*                           4330 Belleview Avenue, Suite 200
9   Eric Johnson (admitted *pro hac vice*)               Kansas City, MO 64111
      *ejohnson@simmonsfirm.com*                          Tel.:   816-756-5071
10  Jennifer Paulson (admitted *pro hac vice*)           Fax:   816-756-5067
      *jpaulson@simmonsfirm.com*
11  **SIMMONS HANLY CONROY LLC**                         Amy Gunn (admitted *pro hac vice*)
    112 Madison Avenue, 7th Floor                          *agunn@simonlawpc.com*
12  New York, NY 10016                                   Elizabeth S. Lenivy (admitted *pro hac vice*)
    Tel.:   212-784-6400                                   *elenivy@simonlawpc.com*
13  Fax:   212-213-5949                                  **THE SIMON LAW FIRM, P.C.**
                                                         800 Market St., Suite 1700
14                                                       St. Louis, MO 63101
                                                         Tel.:   314-241-2929
15  *Attorneys for Plaintiffs*                           Fax:   314-241-2029
    JOHN DOE, JANE DOE I, JANE DOE II, and
16  JOHN DOE II, on behalf of themselves and all
    others similarly situated

17  [*Additional counsel listed on signature page*]

18

19              **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
20                **SAN FRANCISCO DIVISION**

21  IN RE META PIXEL HEALTHCARE          **Case No. 3:22-cv-03580-WHO**
    LITIGATION
22                                        <u>CLASS ACTION</u>

23  This Document Relates To:             **\*\*REDACTED VERSION\*\***

24  *Doe v. Meta Platforms, Inc.*, Case No. 3:22-cv-   **PLAINTIFFS' REPLY IN SUPPORT OF**
    03580-WHO                            **MOTION FOR PRELIMINARY INJUNCTION**
25
                                         Date:   November 9, 2022
26                                        Time:  2:00 p.m.
                                         Ctrm.: 2, 17th Floor
27                                        Judge: Hon. William H. Orrick

28

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     ARGUMENT ................................................................................................................2

        A.      Meta Admits Underlying Facts and Presents Red Herrings ...................................2

        B.      Plaintiffs' Motion Is not Moot .........................................................................5

        C.      Meta Blames Its Users for the Rampant Misuse of Its Own Tools ..........................6

        D.      Plaintiffs Will Suffer Irreparable Harm ..............................................................6

        E.      The Balance of Equities Tips In Favor of Plaintiffs ..............................................7

        F.      The Public Interest Favors Patient Privacy .........................................................7

        G.      Plaintiffs Will Succeed on all Claims ................................................................8

                1.      The Class Did not Consent to Meta Taking Patient Portal Data ...................8

                2.      Plaintiffs Will Prevail on All Claims .....................................................10

                        a.      Meta Is Violating the ECPA with Respect to Portal
                                Communications ................................................................11

                        b.      Meta Is Violating CIPA with Respect to Portal Communications ...12

                        c.      Meta Is Violating Plaintiffs' Common Law Privacy Rights ...........13

        H.      The Requested Relief Is Tailored to Plaintiffs' Protected Communications ...........14

III.    CONCLUSION ............................................................................................................15

1

# <u>TABLE OF AUTHORITIES</u>

2

3  <u>Cases</u>

4  *Arvindson v. Buchar*
        2018 WL 10613032 (V.I. Jun. 6, 2018) ............................................................... 11
5
6  *Astra USA, Inc. v. Santa Clara County*
        563 U.S. 110 (2011) .......................................................................................... 10

7  *Bresgal v. Brock*
        843 F.2d 1163 (9th Cir. 1987) ............................................................................ 15
8
9  *Brown v. Google*
        525 F. Supp. 3d 1049 (N.D. Cal. 2021) ............................................................... 13

10 *Clay v. Wells Fargo Home, N.A.*
        2013 U.S. Dist. LEXIS 39689 (E.D. Cal. Mar. 21, 2013) ........................................ 5
11

12 *Cline v. Reetz-Laiolo*
        329 F. Supp. 3d 1000 (N.D. Cal. 2018) ............................................................... 13

13 *Doe v. Medstar*
        Case No. 24-C-20-000591 (Baltimore City, Md.) .................................................. 5
14

15 *Doe v. Mercy Health*
        Case No. A 2002633 (Hamilton County, Ohio) .............................................. 5, 11

16 *Doe v. Partners*
        Case No. 1984-CV-01651 (Suffolk County, Mass.) ................................................ 5
17

18 *Doe v. Sutter*
        Case No. 34-2019-00258072-CU-BT-GDS (Sacramento County, Cal.) ..................... 11

19 *Doe v. Virginia Mason*
        2020 WL 1983046 (Wash. Super. Feb. 12, 2020) ................................................. 11
20

21 *E. Bay Sanctuary Covenant v. Garland*
        994 F.3d 962 (9th Cir. 2020) .............................................................................. 15

22 *Easyriders Freedom F.I.G.H.T. v. Hannigan*
        92 F.3d 1486 (9th Cir. 1996) .............................................................................. 15
23

24 *Falck v. N. Cal. Corp. v. Scott Griffith Collaborative Sols., LLC*
        25 F.4th 763 (9th Cir. 2022) ................................................................................ 5

25 *Fogelstrom v. Lamps Plus, Inc.*
        195 Cal. App. 4th 986 (2011) ............................................................................. 14
26

27 *Garcia v. Google*
        786 F.3d 733 (2015) ........................................................................................... 7

28

*Garcia v. Mid-Atlantic Military Family Cmtys. LLC*
2021 U.S. Dist. LEXIS 78074 (E.D. Va. Mar. 4, 2021) ..................................... 5

*Gardner v. Health Net, Inc.*
2010 U.S. Dist. LEXIS 157448 (C.D. Cal. Aug. 12, 2010) ................................. 9

*Geisert v. Brown*
No. 3:9-cv-670 (N.D. Tex. Mar. 22, 2010) ..................................................... 5

*Hammerling v. Google, LLC*
2022 WL 2812188 (N.D. Cal. Jul. 18, 2022) ................................................... 14

*Hernandez v. Hillsides*
47 Cal. 4th 272 (2009).......................................................................... 14

*Illinois v. Facebook*
No. 2018 CH 3868 (Ill. Cir. Ct. Mar. 8, 2021) ............................................... 8

*Immigr. Assistance Project of Los Angeles Cnty. Fed'n of Lab. (AFL-CIO) v. I.N.S.*
717 F. Supp. 1444 (W.D. Wash. 1989) ....................................................... 15

*In re Facebook Consumer Privacy User Profile Litig.*
402 F. Supp. 3d 767 (N.D. Cal. 2019) ....................................................... 8

*In re Facebook Internet Tracking Litig.*
956 F.3d 589 (9th Cir. 2020) .............................................................. 4, 14

*In re Google Inc. Privacy Policy Litig.*
58 F. Supp. 3d 968 (N.D. Cal. 2014) ......................................................... 14

*In re Pharmatrak, Inc.*
329 F.3d 9 (1st Cir. 2003) .................................................................. 13

*In re Zynga*
750 F.3d 1098 (9th Cir. 2014).............................................................. 12

*In re: Facebook, Inc. Consumer Privacy User Profile Litig.*
Case No. 3:18-MD-02843-VC-JSC (N.D. Cal.) ............................................. 3, 13

*Just Film, Inc. v. Merch. Servs., Inc.*
2011 WL 2433044 (N.D. Cal. June 13, 2011) ............................................... 14

*McCoy v. Alphabet, Inc.*
2021 WL 504816 (N.D. Cal. Feb. 2, 2022) .................................................. 14

*Michaels v. Internet Ent. Grp., Inc.*
5 F. Supp. 2d 823 (C.D. Cal. 1998)......................................................... 8

*Miller v. Elam*
2011 U.S. Dist. LEXIS 46132 (E.D. Cal. Apr. 21, 2011).................................... 10

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*
762 F.2d 1374 (9th Cir. 1985).............................................................. 7

*Opperman v. Path*
    205 F. Supp. 3d 1064 (N.D. Cal. 2016) .................................................................. 14

*Opperman v. Path, Inc.*
    87 F. Supp. 3d 1018 (N.D. Cal. 2014) .................................................................... 14

*Revitch v. New Moosejaw, LLC*
    2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ......................................................... 13

*Sussman v. ABC*
    186 F.3d 1200 (9th Cir. 1999) ................................................................................ 11

*Techtronic Power Tools Tech. Ltd. v. Harbor Freight Tools USA, Inc.*
    No. 8:20-cv-2004 (D.S.C. Oct. 21, 2020) ................................................................ 5

*Timbisha Shoshone Tribe v. Salazar*
    697 F. Supp. 2d 1181 (E.D. Cal. 2010) .................................................................... 8

*Webb v. Smart Doc. Sols., LLC*
    499 F.3d 1078 (9th Cir. 2007) .................................................................................. 9

*Wilder v. Virginia Hosp. Ass'n*
    496 U.S. 498 (1990) ............................................................................................... 10

*Zhang v. Superior Court*
    57 Cal. 4th 364 (2013) ............................................................................................. 9


<u>Statutes and Codes</u>

18 U.S.C. § 2510(8) ......................................................................................................... 12

18 U.S.C. § 2511(2)(d) .................................................................................................... 11

42 U.S.C. § 1320d-6 .................................................................................................... 1, 12

45 C.F.R. § 160.103 ........................................................................................................ 11

45 C.F.R. § 164.510(1) ................................................................................................... 12

65 FR 82717 (Dec. 28, 2000) ......................................................................................... 11

67 FR 53186 (Aug. 14, 2002) ..................................................................................... 1, 11

78 FR 6542 (Jan. 25, 2013) ............................................................................................ 11

Cal. Pen. Code § 632(a) .................................................................................................. 12


<u>Other Authorities</u>

Black's Law Dictionary (11th ed. 2019) ............................................................................ 9

iv

# I.      INTRODUCTION

Meta does not deny the essential facts of Plaintiffs' Motion. The Meta Pixel transmits the content of patient communications to Meta, including when Plaintiffs and millions of other patients log-in and logout of purportedly "secure" patient portals, make appointments, and otherwise exchange "event" communications with their health care providers. Decl. of Richard M. Smith in Supp. of Pls.' Mot. for Prelim. Inj., Dkt. 49 ("Smith. Decl.") ¶¶ 4-5. Meta admits it then "attempts to match the Events it receives to Meta users" and enables its healthcare "partners" to "create 'Custom Audiences' based on Events" to target advertisements "to Meta users who have taken certain actions on their own website." Decl. of Tobias Wooldridge in Supp. of Meta Platforms, Inc.'s Opp'n to Pls.' Mot. for Prelim. Inj., Dkt. 76-1 ("Wooldridge Decl.") ¶¶ 3-4. Plaintiffs' Motion identifies five examples of hospital web-properties where this occurs and Plaintiffs also provided Meta a list of others. Smith Decl. ¶¶ 4-5. Meta does not deny the activity in question occurs on any of the HIPAA-protected properties Plaintiffs identified.

On the issue of consent, Meta admits that it promised Plaintiffs (and all other users) that it "requires each of its [Pixel] partners to have lawful rights to collect, use, and share your data before providing any data to [Meta]" Decl. of Abigail A. Barrera in Supp. of Meta Platforms, Inc.'s Opp'n to Pls.' Mot. for. Prelim. Inj., Dkt. 76 ("Barrera Decl.") Ex. B at 6. Thus, as Plaintiffs' opening brief states, there is not "any dispute of material fact regarding the underlying technology that allows Meta to acquire and use the health care information described above." Mot. 1. Instead, the only question is whether Meta should be permitted to continue using the Pixel to knowingly track protected health communications between millions of American patients and their healthcare providers.

The law is clear: in the absence of consent, Meta cannot intercept user communications on non-Facebook websites. And this is doubly true where the communications in question are protected by federal law, which expressly prohibits advertising companies from obtaining or using protected health information without the patient's informed, written consent.[1] Meta is no exception.

---

[1] *See, e.g.,* 42 U.S.C. § 1320d-6 ("A person who knowingly … obtains individually identifiable health information relating to an individual … shall be punished" by a fine and "If the offense is committed with intent to … use individually identifiable information for commercial advantage [or] personal gain," the penalty is up to $250,000 or 10 years in prison.); 67 FR 53186 (Aug. 14, 2002) ("[P]rior written

In response, Meta admits it knows there is a problem. Rather than deny that it tracks patient portal communications, Meta acknowledges its Pixel is being misused but maintains that it uses an opaque internal "filtering mechanism" that can identify sensitive medical content transmitted in violation of its terms of service and prevent it "from being ingested into Meta's ad ranking and optimization systems." Wooldridge Decl. ¶ 8. But Meta provides no evidence that it uses the filter to prevent patient portal associated Pixel event collection and use. In fact, Meta provides no detail whatsoever on how the filter works or why it has not used it to stop the transmission of communications from patient portal Pixels.

Nor does Meta take any steps to attempt to refute the Smith Decl., which demonstrates health-related advertisements displayed to Mr. Smith related to his activity on the hospital websites. Facebook displayed an advertisement to Mr. Smith relating to "ulcerative colitis" "[w]ithin two hours" of Mr. Smith exchanging a communication on the HartfordHospital.org property with the content "digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis." Smith Decl. ¶¶ 189-90. This complete lack of factual or evidentiary support for how Meta's filter works or how successful it has been proven to be—particularly in light of the fact that Meta represented that its declarant was the "key person" with such information—should be determinative. But regardless, Meta's acknowledgement of the need to constantly filter illicit inbound data supports Plaintiffs' Motion because it demonstrates that Meta: (1) receives data in violation of its contractual promises; and (2) has already built the infrastructure necessary to comply with an injunction.

## II.     ARGUMENT

### A.     Meta Admits Underlying Facts and Presents Red Herrings

Meta does not dispute the material facts. Rather than deny the data flow at the heart of this Motion, Meta instead offers a series of unavailing legal defenses and a set of additional facts that, taken in context, support the issuance of an injunction.

Meta Blames the Patient – First, Meta insists that Plaintiffs "consented" to Meta receiving their personal health information when they log-in or -out of their respective patient portals–and that they have

authorization" required "to use or disclose protected health information for marketing communications[.]").

1   options to disconnect any information Facebook has collected about them. Opp'n 1. However, the consent

2   Meta purports to have obtained does not comport with Meta's contract language, the common law, or

3   HIPAA. First, Meta's admits, as it must, that it promises to "require each of its partners to have lawful

4   rights to collect, use, and share your data before providing any data to [Meta]." Barrera Decl., Ex. B at 6;

5   Ex. J. But there is no actual requirement – because patient data continues to be sent via the Meta Pixel.

6   <u>Meta Claims Tools Can Stop the Tracking</u> – Second, Meta points to various "tools" it "provides"

7   to purportedly "enable[] its users to review a summary of information Meta has received about their

8   activity from third parties" via "the Off-Facebook Activity Tool." Wooldridge Decl. ¶ 11. However,

9   publicly-available documents released from other privacy litigation against Meta demonstrate that the

10  Off-Facebook Activity Tool does not accurately reflect all of the information Meta has received about

11  users' activities from third-parties. *In re: Facebook, Inc. Consumer Privacy User Profile Litig.*, Case No.

12  3:18-MD-02843-VC-JSC (N.D. Cal.), Dkt. 982, Ex. L at 118 (ECF p. 448). Meta also points to functions

13  that Meta contends allows users "to control how data shared by third parties can be used to show them

14  relevant ads." Wooldridge ¶ 12. Yet, nowhere in Meta's Opposition does it represent that patients can

15  prevent Facebook from receiving it.

16  <u>Meta Blames the Health Care Provider</u> – Third, Meta insists it "does not want health care

17  providers … to send sensitive data to it[.]" Opp'n 1. In support, Meta cites (1) a contract of adhesion with

18  web developers that states developers warrant they have permission to share information with Meta, and

19  (2) a statement in the Meta Pixel ID process that Meta does not wish to receive "sensitive" information.

20  As discussed below, contracts of adhesion between Meta and its "partners," however, do not alter Meta's

21  obligations to Facebook users where, as here, it knows or reasonably should know that HIPAA-covered

22  entities are sending prohibited data to Meta.

23  <u>Meta Claims to Already Have Systems to Block Sensitive Information</u> – Fourth, Meta claims to

24  have an internal "filtering mechanism to screen out potentially sensitive data" that Meta detects,

25  "including health data." Wooldridge Decl. ¶ 8. Meta further states that "the filter prevents that detected

26  data from being ingested into Meta's ads ranking and organization systems." *Id*. However, Facebook

27  provides no evidence regarding how pervasively this tool is deployed or if it actually works.

28  Relatedly, Meta claims that, "[w]hen Meta's systems detect and filter out data they categorize as

potentially sensitive, Meta sends notifications to the developer (1) via email and (2) in two locations in Meta's developer dashboard, Events Manager." Wooldridge Decl. ¶ 9. Meta claims to "inform the developer that Meta detected and blocked data that may not comply with Meta's terms" and provide details, "including the URL where the events occurred … steps the developer can take to address the issue, and an email address to contact with questions." *Id.* However, with respect to the patient portal data at issue, Meta does not provide any evidence that any email or notification was ever sent to any HIPAA-covered entity that disclosure of patient portal information violates Meta's terms. Even for the hospitals identified in the various complaints before the Court, Meta fails to produce a single notification or communication identified by its filtering mechanism.

On the other hand, the Smith Decl. identifies public statements of a hospital that discovered and determined that use of the Pixel violated federal law. ¶¶ 139-43. That hospital's public statement further states that it "reached out to Meta Facebook several times and through different channels, but never got a response" regarding what Facebook had done with its patients' data. *Id.* ¶ 142. According to its own press release, the hospital had used the Pixel "over a two-year period" but "first learned of the possibility in May of this year when a reporter called and asked about the use of MetaPixel." *Id.* ¶ 143.

Regardless, Meta fails to address the central issues in this case. Meta's employee-declarant does not contend that the filter prevents Meta from: (1) receiving the data; (2) matching patient portal login events and related communications with health care providers to specific Facebook users; or (3) pouring patient portal data into "Custom Audience" systems that Meta describes as using Pixel data. If the filter worked as Meta claimed, there would not be hundreds of hospitals sending patient portal login and associated information to Meta. Further, the existence of Meta's filtering system demonstrates that Meta is fully capable of complying with a court order to turn off the patient data flow.

<u>*Smith* Does Not Apply Because the Facts Are Different</u> – Meta's reliance on *Smith* is misplaced. *Smith* is an unreported decision from 2018. The rule in the Ninth Circuit is derived from its recent decision in *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020), not *Smith* from two years prior. And the differences between *Smith* and this case are many:

| Issue | *Smith v. Facebook* | *Doe v. Meta* |
|---|---|---|
| Plaintiffs | Anyone who visited site | Patients of HIPAA-covered entities |

| Web-Properties | Any "medical" site | HIPAA-covered medical providers |
|---|---|---|
| Technology | Visible Share / Like buttons | Invisible Meta Pixel |
| Patient-Status Nexus | None | Patient portal logins and logouts |
| Meta Contract Term | N/A | Meta "requires" Pixel "partners" to have "lawful rights" to share data. |

As the Court is aware, there are several cases already pending directly against hospitals that used the Pixel, and each of the courts that considered whether *Smith* applied to these facts concluded it did not. *See Doe v. Medstar,* Case No. 24-C-20-000591 (Baltimore City, Md.); *Doe v. Mercy Health*, Case No. A 2002633 (Hamilton County, Ohio); *Doe v. Partners*, Case No. 1984-CV-01651 (Suffolk County, Mass.).

Finally, Meta erroneously contends HIPAA has no bearing on Plaintiffs' claims because there is no private right of action under it. As explained below, Plaintiffs do not bring suit under HIPAA.

### B.     Plaintiffs' Motion Is not Moot

The potential of a future consolidated complaint does not retroactively moot Plaintiffs' Motion. To be clear, Meta's argument is not that Plaintiffs' FAC—in its current procedural posture—is already moot. Rather, Meta argues that the filing of a consolidated complaint at a yet-to-be-determined time would moot the FAC at the time the consolidated complaint is filed. Yet Meta cites no law for the proposition that a motion for a preliminary injunction based on a live complaint is deemed moot based on the probability of a consolidated complaint.[2] Regardless, even on its merits, Meta does not claim that the facts or issues would be materially altered by a consolidated complaint. Therefore, Plaintiffs' Motion is not moot, nor would it be even after a consolidated complaint is filed.[3]

---

[2] Meta's citation to *Falck v. N. Cal. Corp. v. Scott Griffith Collaborative Sols., LLC*, 25 F.4th 763, 765 (9th Cir. 2022), is irrelevant. There, the Ninth Circuit held an appeal was "moot because we can no longer grant any effective relief on the First Amended Complaint" since a second amended complaint had been filed even if the claims in each were similar. Here, an amended pleading has yet to be filed.

[3] Meta's string-cite of cases (some out of circuit, one docket entry) are inapposite. *See Garcia v. Mid-Atlantic Military Family Cmtys. LLC*, No. 2:20cv308, 2021 U.S. Dist. LEXIS 78074, at *7 (E.D. Va. Mar. 4, 2021) (granting pro se leave to file amended complaint after submitting multiple documents in response to motion to dismiss and declaring preliminary injunction moot under Fourth Circuit law); *Clay v. Wells Fargo Home, N.A.*, 2013 U.S. Dist. LEXIS 39689, *6-7 (E.D. Cal. Mar. 21, 2013) (injunction mooted because amendment removed cause of action TRO based upon); *Techtronic Power Tools Tech. Ltd. v. Harbor Freight Tools USA, Inc.*, No. 8:20-cv-2004, ECF 63 Text Order (D.S.C. Oct. 21, 2020) (filing of amended complaint mooted complaint on which injunction was based pursuant to Fourth Circuit law); *Geisert v. Brown*, No. 3:9-cv-670, ECF 20 (N.D. Tex. Mar. 22, 2010) (granting defense motion for more definite statement and denying injunction because there was "no longer a live pleading").

5

**C.      Meta Blames Its Users for the Rampant Misuse of Its Own Tools**

Meta's arguments ignore the central offending conduct in this case: Meta permitting healthcare providers to send patient data to Meta via the Pixel despite Meta's promises to the contrary. Curiously absent from Meta's response is any argument that its users can prevent Meta from receiving their data and communications from healthcare providers. Instead, Meta moves the goal posts and argues that its users can "disconnect" their off-Facebook activity from being associated directly with their account. Opp'n 19. While Meta's association between sensitive information, like health data, and a person's Facebook account would certainly be egregious, the issue here is that Facebook users do not want Meta to intercept their communications at all. And this expectation is consistent with Meta's promise to its users that it requires Pixel partners to have lawful rights to share the data at issue before Meta *receives* health data—not before Meta *monetizes* it through account-associated targeted ads.

Moreover, there is no dispute that Meta should not receive health information through its Pixel. Meta admits as much over the first seven pages of its papers. However, despite this uncontested obligation, Meta apparently does nothing to require health care providers to obtain lawful consent before sending patient data via the Pixel. Rather, Meta pretends to be willfully blind. Perhaps its partnership with MedStar Health is the most poignant example of Meta's failure: *"health" is in the name of MedStar Health.* Meta did not need to rely on complex ███████████████████ to prevent the transmission of health information from MedStar—it merely needed to read its own contract and decline to partner with a company that was literally named "Health."[4]

**D.      Plaintiffs Will Suffer Irreparable Harm**

Meta's argument this Motion is untimely is wrong. First, the Motion was filed only 41 days after

---

[4] Furthermore, even if Meta's diversion of health information through its filtering tool was a defense to having received the information in the first place, the tool is ineffective. In 2021, New York State's Department of Financial Services (DFS) issued its "Report on Investigation of Facebook Inc. Data Privacy Concerns" which investigated the effectiveness of Facebook's filtering program. *New York State DFS Report*, available at https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf. This report examined Facebook's interception of sensitive health information and concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective at enforcing Facebook's policy or preventing the receipt of sensitive data." *Id.* at 7-8. Furthermore, Facebook "repeatedly rebuffed DFS's efforts to obtain information that would have provided more fulsome transparency with respect to the scope and scale of the problem." *Id.* at 8.

the FAC (and, obviously, if it had been filed before, Meta would be arguing about it now being mooted). Next, both cases Meta cites had much longer delays. In *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374 (9th Cir. 1985), the court affirmed the denial of the injunction because "the exclusivity provisions which plaintiff seeks to enjoin have been in effect for a number of years". And in *Garcia v. Google*, 786 F.3d 733, 738, 746 (2015), after finding the copyright claim forming the basis for the injunctive relief to be "doubtful", the opinion notes that "the film trailer had been on the Internet for five months" and the plaintiff "did not seek emergency relief when the firm first surfaced on the Internet."

### E.     The Balance of Equities Tips In Favor of Plaintiffs

Patient privacy rights outweigh any financial interest Meta has in continued collection and use of patient portal related information. Rather, Meta's only real concern appears to be that Plaintiffs do not offer a methodology on how to prevent the transmission of health information. In response, Plaintiffs have provided the Declaration of Christo Wilson, which describes the preventative and remedial steps that Meta already has available to comply with an injunction. Mr. Wilson explains how Meta could use its filter prospectively and retroactively to identify, delete, and prevent unlawful Pixel transmissions of patient data. Crucially, Mr. Wilson explains that Meta can use the filter to identity its healthcare partners that share health data without "lawful rights" to do so and restrict further unlawful use, just as it blocks consumers who violate its terms.[5]

### F.     The Public Interest Favors Patient Privacy

Meta argues that "an injunction against Meta only … would be ineffective—because developers (not Meta) control the code on their own websites and choose which information to send, and Meta already has measures in place to prevent the receipt and use of sensitive information." Opp'n at 14. However, Plaintiffs are merely asking the Court to require that Meta abide by its own contract with consumers. Meta itself explains that this action is based "on a tool called 'Pixel' that Meta makes

---

[5] Meta's website states that it already "uses technology and review teams to detect, review and take action on millions of pieces of content every day on Facebook and Instagram." *How Meta Enforces Its Policies*, available at https://transparency.fb.com/enforcement. That is, Meta is already self-policing users as part of its content moderation and disables accounts where users violate Meta policies "despite repeated warnings and restrictions." *Disabling Accounts*, available at https://transparency.fb.com/enforcement/ taking-action/disabling-accounts. Its treatment of its business partners should require no greater burden.

available to third-party website developers." Opp'n at 2. The injunction seeks accountability for promises Meta makes to users regarding technology that Meta itself makes available to healthcare entities.

Finally, the premise of Meta's public interest argument misses the mark. The public interest factor explores "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Timbisha Shoshone Tribe v. Salazar*, 697 F. Supp. 2d 1181, 1191 (E.D. Cal. 2010). Courts have found a "strong public interest in litigation concerning individuals' right to privacy" and issued injunctions to prevent further violations. *Michaels v. Internet Ent. Grp., Inc*., 5 F. Supp. 2d 823, 842 (C.D. Cal. 1998). Here, the public interest at issue is the right to personal medical privacy—not hospitals' right to monetize data that Meta concedes was obtained through the misuse of its tracking tools. Thus, the public interest factor strongly favors the patient Class's personal privacy interests and disfavors the continued use of violative data.

### G.      Plaintiffs Will Succeed on all Claims

#### 1.      The Class Did not Consent to Meta Taking Patient Portal Data

Meta expressly promises that it "require[s]" its Pixel "partners to have lawful rights to collect, use, and share your data before providing any data to us." Barrera Ex. B at 6. Yet, despite its knowledge that hundreds of hospitals are sending patient portal login data to Meta without first obtaining lawful consent to do so, Meta continues to use the Pixel to receive such data and use it for advertising purposes. Regardless of Meta's claims about form contracts for developers and warnings in the Pixel set-up process, it cannot state that it "requires" Pixel partners to obtain "lawful consent" when Meta does nothing to require it when those Pixel partners fail to obtain it. There is no requirement when Meta knowingly ignores its partners' failure to obtain lawful consent.

Meta's reliance on *Illinois v. Facebook*, No. 2018 CH 3868, at *11 (Ill. Cir. Ct. Mar. 8, 2021), an unreported state court case about the Cambridge Analytica scandal, is surprising because Meta ignores that the same argument it makes here was rejected in this district. In *In re Facebook Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019) (Cambridge Analytica case on behalf of consumers) Meta made certain promises regarding what it "allowed" developers to do with user data. Like here, Meta argued that, "in essence, 'we tell … developers that they can only use your information to facilitate their interactions with your friends, but you can't really be sure they'll honor that." *Id.* The

court rejected the argument, finding another reasonable interpretation of Meta's contract terms would be that it is "actively policing the activities of app developers on its platform, and thereby successfully preventing sensitive information from being misappropriated" and/or referencing "technological block[s]" of disallowed data. *Id*. So too here, Meta essentially argues that a contract of adhesion is all that "require" means. But a more plausible interpretation is that require means that Meta will "actively police" developers and/or enact a "technological block" to require partners to obtain lawful consent.

The Opposition ignores simple rules of contract interpretation. In a consumer contract of adhesion, if an undefined term is ambiguous, the court must interpret the term in favor of the consumer – particularly where the drafter's interpretation would render it unconscionable. A "requirement" is "[s]omething that must be done because of a law or rule." Black's Law Dictionary (11th ed. 2019). But Pixel partners need not obtain lawful rights to share data before Meta collects data from the partner via the Pixel. Nor do Pixel partners need to obtain lawful rights to share data after Meta learns that they have not done so. Instead, Meta lets any developer use the Pixel regardless of whether lawful consent was obtained. Meta's promise to require partners to obtain lawful rights before sending Pixel data renders any general consent to the Pixel inapplicable to unlawful transmissions that Meta enables through the Pixel.

Moreover, Meta's argument that HIPAA is inapplicable here because there is no private right of action under the statute misses the mark. Plaintiffs do not dispute there is no private right of action under HIPAA and do not assert a cause of action specifically for violation of it. However, Plaintiffs are not prohibited from bringing other causes of action based on conduct also proscribed by HIPAA. *See Webb v. Smart Doc. Sols., LLC*, 499 F.3d 1078 (9th Cir. 2007) (noting no private right of action exists under HIPAA, but nevertheless conducting analysis of UCL claim based on whether allegations sufficiently stated HIPAA violation); *Gardner v. Health Net, Inc.*, No. CV 10-2140 PA (CWx), 2010 U.S. Dist. LEXIS 157448, at *30 (C.D. Cal. Aug. 12, 2010) (finding HIPAA violation may constitute an unlawful business practice under UCL).

*Zhang v. Superior Court*, 57 Cal. 4th 364, 384 (2013), a case to which Meta cites, analyzed the viability of UCL claims based on insurer conduct covered by the Unfair Insurance Practices Act ("UIPA"). There, the court held that, although there is no private right of action under UIPA, that does not immunize insurers from liability for conduct that violates other laws in addition to the UIPA. Applied

9

1    here, while HIPAA does not provide for a private right of action, that does not immunize HIPAA violators

2    from liability for conduct that violates other laws (like the Wiretap Act, CIPA, intrusion upon seclusion,

3    and violation of Article I, section 1 of the California Constitution) in addition to HIPAA.

4         Meta's reliance on other inapposite cases demonstrates the lack of support for its position. In

5    *Astra USA, Inc. v. Santa Clara County*, the Court ruled that a third party could not sue as the third-party

6    beneficiary of a form opt-in agreement for a federal program which statutorily prohibited a private right

7    of action. 563 U.S. 110, 118 (2011). Thus, in *Astra*, the issue was not whether HIPAA could inform the

8    standard of care or bring color to an independent claim. In fact, HIPAA was not at issue, but rather,

9    whether a third party could contractually enforce an enrollment form which merely recited pre-existing

10   statutory obligations. *Miller v. Elam*, No. 2:11-cv-0931 KJN P, 2011 U.S. Dist. LEXIS 46132 (E.D. Cal.

11   Apr. 21, 2011), is also inapplicable. There, the court found that a *pro se* prisoner could not sue under §

12   1983 for a violation of HIPAA. *Miller's* recognition that a HIPAA violation is not a cognizable § 1983

13   claim is unsurprising given the "exception to the general rule that § 1983 provides a remedy for violation

14   of federal statutory rights only when Congress has affirmatively withdrawn the remedy." *Wilder v.*

15   *Virginia Hosp. Ass'n*, 496 U.S. 498, 509 n.9 (1990). Of course, here, Plaintiffs do not bring claims under

16   § 1983 so HIPAA's interaction with it is entirely inapplicable to this case.

17        Still, whether or not the data disclosed is HIPAA PHI, Plaintiffs are likely to succeed on their

18   claims. Meta violated the Wiretap Act and CIPA by intercepting Plaintiffs' communications with their

19   medical providers without Plaintiffs' consent, as Meta is not a party to those communications. *See* Mot.

20   13:17-25, 14:14-27, 16:11-28. And, even if Meta did obtain consent, it intercepted those communications

21   with the intent to commit a knowing intrusion upon seclusion; violation of the UCL, and violation of

22   Article I, section 1 of the California Constitution, among others. *Id.* With respect to Plaintiffs' claims for

23   intrusion upon seclusion and violation of the California Constitution, each claim is based on Meta's

24   intrusion into Plaintiffs' private communications with their medical providers inside of a supposedly

25   secure patient portal. Whether or not those communications are deemed HIPAA PHI, Plaintiffs have a

26   reasonable expectation of privacy in those communications and Meta's interception of those

27   communications are, no doubt, highly offensive. *See* Mot. 17:16-18:26.

28        **2.    Plaintiffs Will Prevail on All Claims**

a.      *Meta Is Violating the ECPA with Respect to Portal Communications*

Meta argues that consent from healthcare providers to share patient information is valid under the ECPA's one-party consent exception. However, as Meta notes, that exception has its own exception, where the "communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). Meta then cites *Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir. 1999), for the point that, for analysis of the criminal or tortious exception, "the focus … is upon whether the purpose of the interception—its intended use—was criminal or tortious." Meta then claims that the act of "advertising" is not itself criminal or tortious. Opp'n at 20.

But this misstates the nature of this case. The use of patient data for advertising in the absence of express written consent is criminal and tortious. In fact, every court to consider the issue has found that allegations that a health care provider placed the Pixel on their property for advertising purposes is actionable in tort, contract, statute, or all of the above. *See Doe v. Virginia Mason*, 2020 WL 1983046 (Wash. Super. Feb. 12, 2020); *Doe v. Medstar*, *supra*; *Doe v. Mercy Health*, *supra*; *Doe v. Partners*, *supra*; *Doe v. Sutter*, Case No. 34-2019-00258072-CU-BT-GDS (Sacramento County, Cal.).

Under federal law that applies to patient portals, protected health information includes information that relates to "the provision of health care to an individual." 45 C.F.R. § 160.103. And, the only federal court to have considered whether patient-status alone is protected ruled that it was. *Arvindson v. Buchar*, No. ST-16-CV-410, 2018 WL 10613032 (V.I. Jun. 6, 2018). *See also*, 65 FR 82717 (Dec. 28, 2000) ("The sale of a patient list to a marketing firm" not permitted under HIPAA.); 67 FR 53186 (Aug. 14, 2002) ("[P]rior written authorization" required "to use or disclose protected health information for marketing communications[.]"); 78 FR 6542 (Jan. 25, 2013) (Would violate federal law "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers"); HHS, Guidance Regarding Methods for Deidentification of PHI in Accordance with HIPAA ("An indication that [an] individual was treated at a certain clinic" is PHI.); HHS Marketing Guide ("Covered entities may not sell lists of patients to third parties without obtaining written authorization from each person on the list.").

Federal law makes clear that patient protections apply to online patient portals and the only exception is that a hospital may "maintain a directory of individuals in its facility" when used or disclosed

11

to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object. 45 C.F.R. § 164.510(2). Nor can there be any dispute that marketing companies, including Meta, are prohibited from knowingly receiving or using protected health information. *See* 42 U.S.C. § 1320d-6.

Meta's argument on "content" is also inapposite. Under federal law, content "includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). Here, the "content" intercepted are, as conceded by Meta, "events" where the Pixel re-directs the precise content of the buttons that Internet users click. For example, the Smith Decl. demonstrates that the Pixel re-directs the fact that a patient has clicked to "Log in" to the respective hospital patient portals. Smith Decl. ¶¶ 5 (Medstar); 176 (Rush Univ. Hosp.); 179 (Hartford Hosp.); 181 (Summa Health); 185 (Univ. Hosps.). The word "Log in" is content. It not only "concern[s] the substance, purport or meaning" of the patient portal log-in, but it is the very communication itself. Similarly, "digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis" is content. *Id.* ¶ 189.

Thus, with respect to the ECPA, Plaintiffs' allegation is not that Meta is able to infer patient-status, but that it has used the Pixel to re-direct the precise contents of communications that the patients exchanged on their providers' web-properties. *In re Zynga*, 750 F.3d 1098 (9th Cir. 2014), is inapposite. There, the Ninth Circuit held that Facebook URLs did not contain content where they merely revealed the name of a Facebook user or group – because that would only reveal the party to a communication. Here, information disclosed to Meta that reveals the party of the communication is the first part of the domain name – for example: www.medstarhealth.com – while the "content" is that additional information that "concern[s] the substance, purport, or meaning" of the communications between the patients and their providers – such as "login." In fact, no court has ever held that communications like those at issue in this case are not "content."

> b.    *Meta Is Violating CIPA with Respect to Portal Communications*

First, Meta's arguments regarding "content" under CIPA fail for the same reasons as the ECPA. Second, Meta's arguments regarding whether a patient-provider communication is "confidential" under Cal. Pen. Code § 632(a) fails because the patient-provider relationship is far different than those analyzed in the cases Meta cites. On this, Meta states that California courts "have developed a *presumption* that

12

Internet communications do not reasonably give rise to that expectation." Opp'n at 21 (*citing Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *3) (N.D. Cal. Oct. 23, 2019)) (emphasis added). But it is just that – a presumption, not a rule.

In *Moosejaw*, the issue was a clothing website selling coats, shirts, and shoes. In *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1051-52 (N.D. Cal. 2018) (Orrick, J.), the issue was purported health-related emails with non-medical providers, where the Court found no support for the position that emails with non-medical providers were "confidential" within the meaning of 632(a). This case is different as portal communications are confidential as a matter of law. *See In re Facebook, Inc.*, *Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 783 ("[I]f you are diagnosed with a medical condition, you can expect to conceal it completely only if you keep it between you and your doctor. But it does not follow that if you send an email to selected colleagues and friends explaining why you'll be out of commission for a while, you've relinquished any privacy interest in your medical condition, such that the email provider could disseminate your diagnosis to anyone who might be interested in your health status.").

Furthermore, in *Brown v. Google*, 525 F. Supp. 3d 1049, 1074 (N.D. Cal. 2021), the Court found that the plaintiffs adequately stated a § 632 claim when the defendant's policies "did not indicate that data would be collected from users in private browsing mode." *See also In re Pharmatrak, Inc.*, 329 F.3d 9, 21 (1st Cir. 2003) ("Pharmatrak makes a frivolous argument that the internet users visiting client Pharmacia's webpage for rebates on Detrol thereby consented to Pharmatrak's intercepting their personal information. On that theory, every online communication would provide consent to interception by a third party."). Here, Meta promised users that it would "require" its Pixel "partners" to "have lawful rights to collect, use, and share your data before providing any data to" Meta. Barrera Decl., Ex. B. Yet, it has not presented any evidence that it actually requires healthcare providers to obtain such "lawful rights" even though Meta has a filtering mechanism that is readily capable of identifying unlawful patient portal communications that its Pixel "partners" continue to send to Meta.

### c.     *Meta Is Violating Plaintiffs' Common Law Privacy Rights*

Meta's argument that Plaintiffs do not have a "reasonable expectation of privacy" for portal communications has no basis in fact or law. Plaintiffs' expectations of privacy are grounded in their doctor-patient relationships; common law obligation to maintain the confidentiality of patient data and

13

communications; laws and regulations protecting the confidentiality of medical information; state and federal laws protecting the confidentiality of communications; and Meta's express promises to protect those communications. The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know." *The Hippocratic Oath: Modern Version*, available at https://www.pbs.org/wgbh/nova/doctors/oath_modern.html.

Meta next argues that its conduct is not "highly offensive" with citations to a set of inapposite cases.[6] *Fogelstrom*, 195 Cal. App. 4th at 992, involved zip codes. *In re Google Inc. Privacy Policy Litig.*, 58 F. Supp. 3d at 968 was distinguished by the Ninth Circuit in *Facebook Internet Tracking Litig.*, 956 F.3d at 608 n.8, because it only involved allegations of unauthorized tracking on the defendant's own services.

However, Meta ignores the decisions finding that misappropriation of health information via the Pixel is an actionable invasion of privacy, including *Doe v. Medstar*, *supra*, a case involving one of the hospitals from whom Meta continued to accept Pixel data despite knowing that the provider did not have "lawful rights" to use the Pixel. It also mischaracterizes *In re Facebook Internet Tracking Litig.*, which is not the exception to prove the rule – *it is the rule* – and it explains that "the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy." 956 F.3d at 606 (citing *Hernandez v. Hillsides*, 47 Cal. 4th 272, 287 (2009)). Here, the "public policy" determination has already been made. Meta's conduct violates the ECPA, CIPA, and HIPAA.

**H.      The Requested Relief Is Tailored to Plaintiffs' Protected Communications**

The Ninth Circuit does not restrict relief in a preliminary injunction to named plaintiffs. *Just Film, Inc. v. Merch. Servs., Inc.*, No. C 10-1993 CW, 2011 WL 2433044, at *8 (N.D. Cal. June 13, 2011), aff'd, 474 F. App'x 493 (9th Cir. 2012) ("Although a class has not yet been certified, the circumstances of this

---

[6] *See Opperman v. Path*, 205 F. Supp. 3d 1064, 1069 (N.D. Cal. 2016) (explaining why *Fogelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 992 (2011) and *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 95 (N.D. Cal. 2014) were "unhelpful" in analyzing privacy claims. Similarly, in *Hammerling v. Google, LLC*, 2022 WL 2812188, at *1, 12, n. 11 (N.D. Cal. Jul. 18, 2022), the Court explained that Plaintiffs did "not clearly plead that the 'personal information' collected by Google [was] non-aggregate or de-anonymized," and that the data at issue only involved "installation metrics" for non-Google apps, not content of any communication. *McCoy v. Alphabet, Inc.*, 2021 WL 504816, at *7-8 (N.D. Cal. Feb. 2, 2022) involved claims similar to *Hammerling. See also*, *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1061 (N.D. Cal. 2014)

case support broad preliminary injunctive relief."); *see also Immigr. Assistance Project of Los Angeles Cnty. Fed'n of Lab. (AFL-CIO) v. I.N.S.*, 717 F. Supp. 1444, 1447 (W.D. Wash. 1989) (nationwide injunction before certification). Rather, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 986 (9th Cir. 2020). And, "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) (emphasis omitted). While true that "a federal court may not attempt to determine the rights of persons not before the court," it is also true that the injunction sought in this case will be "issued only against the [the defendant], who is a party." *Id*.

Here, all factors support the need for broad injunctive relief. First, the fact that injunctive relief levied against Meta implicates its conduct as to its business partners not before the Court (i.e. the hospitals that are using the Pixel but have not yet treated Plaintiffs) does not alter the analysis since the Court is only enjoining a party. *Id*. ("The fact that forestry labor contractors are not among the parties here does not prevent the district court, or this court, from issuing an injunction *directed to the Secretary* requiring him to enforce the act against forestry labor contractors."). Second, the Ninth Circuit has recognized the need to broadly enjoin conduct where it would be impractical to tailor Plaintiff-specific relief, such as precluding law enforcement from issuing citations to only the named plaintiffs. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996). Finally, and as a practical matter, this is precisely a such a case where the protection of an injunction must extend beyond Plaintiffs' current healthcare providers. Failure to do so would necessarily create an untenable restriction on their ability to seek future medical care from different providers. That is, Plaintiffs, would be functionally prevented from electronically communicating with new medical providers without first extending the injunction to those providers in order to protect their communications. Of course, the mere existence of a perverse procedure requiring Plaintiffs to notify Meta (and disclose their protected patient status) before interacting with a new medical provider would cause the same harm that the injunction seeks to remedy.

## III.   CONCLUSION

Plaintiffs respectfully request the Court enter the preliminary injunction.

1    DATED: October 26, 2022            **SIMMONS HANLY CONROY LLC**

2

3                                       By:      */s/ Jason 'Jay' Barnes*
                                        _____
4                                                Jason 'Jay' Barnes (admitted *pro hac vice*)
                                                 An Truong (admitted *pro hac vice*)
5                                                Eric Johnson (admitted *pro hac vice*)
                                                 Jennifer Paulson (admitted *pro hac vice*)
6

7                                                **KIESEL LAW LLP**
                                                 Paul R. Kiesel
8                                                Jeffrey A. Koncius
                                                 Nicole Ramirez
9

10                                               **GORNY DANDURAND, LC**
                                                 Stephen M. Gorny (admitted *pro hac vice*)
11

12                                               **THE SIMON LAW FIRM, P.C.**
                                                 Amy Gunn (admitted *pro hac vice*)
                                                 Elizabeth S. Lenivy (admitted *pro hac vice*)
13

14                                               **TERRELL MARSHALL LAW GROUP PLLC**
                                                 Beth E. Terrell, State Bar No. 178181
15                                                 *bterrell@terrellmarshall.com*
                                                 936 North 34th Street, Suite 300
16                                               Seattle, WA 98103
                                                 Tel.:    (206) 816-6603
17                                               Fax:    (206) 319-5450

18                                               Attorneys for Plaintiffs
19                                               JOHN DOE, JANE DOE I, JANE DOE II, and
                                                 JOHN DOE II, on behalf of themselves and all
20                                               others similarly situated

21

22                  <u>**CIVIL L.R. 5-1(h)(3) ATTESTATION**</u>

23          Pursuant to Civil Local Rule 5-1(h)(3), I, Jeffrey A. Koncius, hereby attest under penalty of

24   perjury that concurrence in the filing of this document has been obtained from all signatories.

25

26    Dated: October 26, 2022                     */s/ Jeffrey A. Koncius*
                                                  _____
27                                               Jeffrey A. Koncius

28
                                            16