James M. Wagstaffe (94435)
Frank Busch (258288)
**WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK LLP**
100 Pine Street, Suite 2250
San Francisco, CA 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Rachel Kesten (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | Case No.: 3:22-cv-03580 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA d/b/a UCSF MEDICAL CENTER, | |
| Defendant. | |

Plaintiff Jane Doe ("Plaintiff"), on behalf of herself and all others similarly situated, asserts the following against Defendant, the Regents of the University of California d/b/a UCSF Medical Center ("UC Regents" or "Defendant") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel, which included, among other things, consultation with experts in the field of data privacy.

## SUMMARY OF ALLEGATIONS

1.      UC Regents was endowed by the California Constitution with the power to govern the University of California system. The UC Regents university system operates the nation's largest

academic health system comprised of six medical centers, including University of California San Francisco Medical Center ("UCSF"), forming a more than $14 billion enterprise providing nationally ranked health care. UC Regents offers a wide range of medical services, including primary and specialty care.

2.      In 2021 alone, UCSF had over 2.5 million patients, approximately $8 million in assets, and over $5 million in revenue.[1]

3.      UC Regents provides UCSF patients with an online patient portal known as "MyChart" which is available at www.ucsfhealth.com. Through MyChart, patients can schedule appointments, communicate with their health care team, and review test results, among other things.

4.      UC Regents incorporates Meta Platform, Inc.'s ("Meta") tracking technology, the Meta Pixel, on the UCSF website and within its MyChart patient portal.

5.      The Meta Pixel is a snippet of code that, when embedded on a third-party website, tracks each user's activity on that website and sends that data to Meta. For example, Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information they input into the website, such as answers to questions or inputs to a form requesting health information.

6.      Meta Pixel takes each of these pieces of information and sends it to Meta with personally identifiable information ("PII"), such as the user's IP address, name, email, or phone number. Meta stores this data on its own server, in some instances, for years on end.

7.      Defendant's inclusions of the Meta Pixel on the UCSF website and MyChart patient portal, therefore, resulted in sensitive health information, including that relating to Plaintiff's and Class members' medical conditions, appointments, specific treatment, messages to health care providers, and PII (hereinafter "User Data") being sent to Meta. Plaintiff and Class members did not consent to UC Regents sharing this highly sensitive information with Meta or any other third parties,

---

[1] *FY 2021 Financial Performance*, UCSF Health, https://www.ucsfhealth.org/about/annual-reports (last visited Dec. 23, 2022).

1  including for targeted advertising.

2         8.      UC Regents knew by embedding Meta Pixel—a Meta advertising tool—they were

3  disclosing and permitting Meta to intercept and use Plaintiff's and the Class members' User Data,

4  including sensitive medical information.

5         9.      UC Regents' actions constitute an extreme invasion of Plaintiff and Class members'

6  right to privacy and violate state statutory and common law.

7  **PARTIES**

8    **A.**      **Plaintiff Jane Doe**

9        10.     **Plaintiff Jane Doe** is a resident of Sacramento County, California.

10        11.     Plaintiff is a Facebook user and has had a Facebook account since at least 2012.

11  Plaintiff also maintains an Instagram account.

12        12.     Plaintiff is a patient at UCSF Medical Center. She has been using UCSF Medical

13  Center's MyChart patient portal since approximately February 2022.

14        13.     Plaintiff visited UCSF Medical Center after being referred for a cardiology

15  assessment for heart health and high blood pressure.

16        14.     Plaintiff was advised to utilize UCSF's MyChart online patient portal to make

17  appointments, track and receive test results, receive medical treatment, and communicate with her

18  doctors.

19        15.     Plaintiff's use of UCSF's MyChart patient portal required her sensitive medical

20  information, along with other personal information.

21        16.     Unbeknownst to Plaintiff, UC Regents disclosed and allowed Meta to intercept, this

22  data and Meta associated it with Plaintiff's Facebook account and other information for use in

23  targeting her with advertisements.

24        17.     Indeed, after entering this information on the UCSF website and its MyChart patient

25  portal, Plaintiff received targeted advertisements for medications and treatments relating to the

26  medical conditions for which she was treated for at UCSF on her Facebook page, in her email, and

27

28

3

in her text messages.

**B.      Defendant**

18.      **Defendant The Regents of the University of California** is a corporation with its principal place of business located in Oakland County in the State of California. Defendant UC Regents operates UCSF Medical Center.

## JURISDICTION AND VENUE

19.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class members are citizens of a state different from the Defendant. Defendant is not a State, State official, or other governmental entity against whom the district court may be foreclosed from ordering relief within the meaning of Section 1332(d)(5)(A).

20.      This Court has general personal jurisdiction over UC Regents because it maintains its principal executive offices in Oakland, California. UC Regents is "at home" in this County and State and is a registered California corporation. Additionally, UC Regents is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State. UC Regents operates the UCSF MyChart platform on the UCSF website and makes all policies and decisions regarding the operation of the UCSF MyChart platform.

21.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, UC Regents' principle executive offices are located in this District, and a substantial portion of the events giving rise to the claims occurred within this County, including the disclosure of Plaintiff and Class members' User Data.

22.      Divisional Assignment: a substantial part of the events and omissions giving rise to the violations of law alleged herein occurred in the County of Alameda, and as such, this action may

1  properly be assigned to the San Francisco or Oakland divisions of this Court pursuant to Civil Local

2  Rule 3-2(c).

3                                    **FACTUAL BACKGROUND**

4  **I.    UCSF's Website, Patient Portal, and Promises to Patients**

5        23.    UC Regents operates UCSF, a medical center in California with approximately 2.5

6  million outpatient visits and approximately 40,000 inpatient admissions in 2021 alone.

7        24.    UC Regents provides UCSF patients with an online patient portal, MyChart, through

8  which patients can manage their health care needs. For example, through MyChart, patients can

9  message their health care provider, schedule appointments, refill prescriptions, pay bills, and view

10  information about past and upcoming appointments. Patients can also view their clinical notes,

11  electronic health information, medical records, and test results, including laboratory, radiology,

12  cardiology, and microbiology results as soon as they become available.

13        25.    Patients access MyChart through the UCSF website, www.ucsfhealth.org/mychart,

14  by logging in with their username and password.

15        26.    UC Regents touts the UCSF MyChart as a "confidential" and "easy, secure way to

16  manage your health care needs" and "access your care team and medical information online."

17        27.    The UCSF's Notice of Privacy Practices claims that they "are committed to

18  protecting the privacy of your medical or health information" and that it will only use and disclose

19  that information for specific uses, such as for treatment and payment. None of those reasons include

20  the disclosure of PII and sensitive medical information to Meta or other advertisers for their own

21  use.

22        28.    In fact, the UCSF "Privacy Statement" under the heading "Sharing of data" explicitly

23  states that "Personal information is not disclosed *without your consent* other than as required by

24  laws." It also states that disclosures of "health information" for "marketing purposes . . . are strictly

25  limited and require your *written authorization*."

26

27                                                 5

28

29.     In addition, the UCSF MyChart login page simply states: "Your privacy is important to us. The information you provide on this website is protected by applicable law. To learn more about how your rights to privacy are being protected, please contact UCSF Health Web Services."[2]

30.     Given these representations, and the sensitivity of medical information, patients like Plaintiff and Class members expected their User Data, including highly sensitive medical information, to remain confidential.

31.     Despite these promises, UC Regents intentionally incorporated Meta Pixel on the UCSF website and password protected MyChart portal, disclosing and allowing Meta to intercept Plaintiff's and Class members' data, including highly sensitive medical information.

**II.    Meta's Tracking Technology on UCSF's Website and Patient Portal**

32.     Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising bringing in a grand total of $114.93 billion.

33.     Meta's advertising business began back in 2007 with the creation of "Facebook Ads" which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."[3]

34.     Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 2.9 billion active users.

35.     Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.  "Among many possible target audiences, [Meta] offers advertisers, for example, 1.5 million people 'whose activity on Facebook suggests that they're

---

[2] *MyChart*, UCSF Health, https://ucsfmychart.ucsfmedicalcenter.org/ucsfmychart/Authentication/Login?mode=stdfile&option=hlthprivacy (last visited Jan. 4, 2023).

[3] *Facebook Unveils Facebook Ads*, Meta (November 6, 2007), https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/.

more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[4]

36.    Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Facebook's advertising services. Meta generates almost all of its revenue from selling advertisement placements:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

37.    One of its most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015.

38.    Meta touted Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[5] According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the actions people take on [its] website." The Meta Pixel is incorporated on 6.7 million websites.

39.    Meta Pixel is a snippet of code embedded on a third-party website that tracks a user's activity as the user navigates through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

---

[4] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, New York Times (April 11, 2018), https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.
[5] Cecile Ho, *Announcing Facebook Pixel*, Meta (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

40.     Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with PII, such as the user's IP address. Meta stores this data on its own server, and, in some instances, for years on end.

41.     This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits UCSF's website, Meta receives third party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

42.     Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

43.     Lastly, Meta can link User Data to individual users by identifying information collected through Meta Pixel through what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[6]

44.     And, importantly, even if Meta Pixel collects data about a non-user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.[7]

_____

[6] While Meta purports to "hash" the PII provided by patients, Meta actually uses the hashed format **specifically to link Meta Pixel data to Facebook profiles**. *See* Anson Chan, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022, 12:46 PM), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[7] Dell Cameron, *Facebook is Dodging Questions About Surveillance of Users Seeking Abortions*, Gizmodo (June 15, 2022), https://gizmodo.com/facebook-abortion-surveillance-data-privacy-meta-1849066802.

45.     Once the data intercepted through the Meta Pixel is processed, Meta makes this data available through the "Meta Pixel page" in Events Manager, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match that audience's criteria.

46.     In addition to using the data collected through Meta Pixel to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

47.     Meta has no way to limit or prohibit the use of data collected through Meta Pixel given Meta's open systems and advanced algorithms.

48.     According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . and it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"[8]

49.     In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[9] Thus, once the data enters the Meta system through Meta Pixel, the data can be used for any and all purposes.

50.     Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica

---

[8] Lorenzo Francheschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, Vice (Apr. 26, 2022), https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.
[9] *Id.*

scandal of 2018, Meta's own engineers testified that there was not a "single person" at Meta who could answer that question.

51.     UC Regents uses the Meta Pixel on UCSF's website, including in its MyChart patient portal.

52.     Significantly, UC Regents was expressly warned by MyChart about the incorporation of technology like Meta Pixel. Epic Systems, the company behind MyChart, "specifically recommended heightened caution around the use of custom analytics scripts" e.g., Meta Pixel. Despite this warning, UC Regents continued to incorporate Meta Pixel on its UCSF website and patient portal.

53.     As a result of UC Regents' incorporation of Meta Pixel, UC Regents disclosed and Meta intercepted users' interactions on UCSF's website, including sensitive medical information. For instance, when a user clicks a button to schedule an appointment with a specific UCSF clinic, Meta Pixel received the text of the button, the clinic, and the user's answers to the additional screening questions, such as the patient's name, date of birth, and reason for appointment. Likewise, when a user logs in to MyChart to send a message to their health care provider or schedule an appointment, Meta Pixel received the actions taken in order to send the message and the content of the message itself.

54.     Plaintiff is a Facebook user and signed up for UCSF's MyChart with one of the email addresses she used for her Facebook account.

55.     Plaintiff is a patient at UCSF and used MyChart to enter her User Data including sensitive medical information, such as her heart issues and high blood pressure. UC Regents disclosed, and allowed Meta to intercept, this sensitive data.

56.     After entering this information on the UC Regents' UCSF patient portal, and receiving her test results and heart condition and blood pressure diagnoses, Plaintiff Doe started receiving ads on her Facebook page related to these conditions, as demonstrated below:



57.     Plaintiff Doe also began receiving targeted email advertising, as demonstrated below, to the email address associated with her Facebook account, related to the same conditions for which she provided User Data through the UC Regents' website.

From: Easy Health Options <email@news.easyhealthoptions.com>
To: _____@yahoo.com> <_____@yahoo.com>
Sent: Monday, July 11, 2022 at 09:08:05 AM PDT
Subject: An Urgent Message about the State of Cardiovascular Care

The medical community has access to more state-of-the-art equipment, surgical innovations and...

View as Webpage  |  White List Us  |  Unsubscribe

Dear _____ ,

The medical community has access to more state-of-the-art equipment, surgical innovations and treatment strategies for cardiovascular disease than ever before.

**Yet heart disease is still the number one killer.**

You may be asking yourself "why?" right now.

**In short, the simple truth is this...**

Cardiovascular care in this country has taken a misguided path, and not even our health care authorities — the government, physicians or pharmaceutical companies — have a plan to get us back on track.

**Here's what we know:**

- In 2019, the results of a federally funded 100-million-dollar study concluded that risky and expensive invasive heart procedures were no more effective in terms of influencing outcomes than drugs or lifestyle changes.
- In May of 2022, the BMJ revealed the risk of dying following a heart attack in the U.S. was "concerningly high" compared to other countries including Canada, England, The Netherlands, Israel and Taiwan.

**Worst of all, they KNOW they're failing us...**

In 2019, a presidential advisory from the American Heart Association issued an urgent call to action that appeared in the journal *Circulation*. This excerpt is from that abstract:

*Although spending on technological changes for cardiovascular care showed high value through the 1990s, with benefits in length and*

58.     Plaintiff Jane Doe did not consent to the interception or disclosure of her User Data, including sensitive medical information, to Meta. UC Regents' disclosure, and Meta's interception of Plaintiff's PII, medical information, and other highly sensitive information without her consent is an invasion of privacy and violates state laws.

### III.    Plaintiff and Class Members Do Not Consent to UC Regents' Disclosure of Their Sensitive Information

59.     Plaintiff and Class members had no way of knowing that UC Regents was disclosing, and Meta was intercepting, their User Data, including sensitive medical information, when they engaged with UCSF's website because the software is inconspicuously incorporated in the background.

60.     This undisclosed conduct is all the more egregious given the nature of the information entered into the MyChart patient portal, e.g., PII, test and lab results, requests for appointments, messages to health care providers, and other health information, among other things. Plaintiff and Class members would not expect this information would be disclosed or intercepted without their consent.

61.     This is especially true given UC Regents' consistent representations that this information would remain private and confidential.

62.     For instance, UC Regents' Notice of Privacy Practices claims that they "are committed to protecting the privacy of your medical or health information" and that it will only use and disclose that information for specific uses, such as for treatment, and payment. None of those reasons include the disclosure of PII and sensitive medical information to Meta for their own use.

63.     It also states that disclosure of "health information" for "marketing purposes . . . are strictly limited and require your **written authorization**."

64.     Likewise, the UC Regents' "Privacy Statement" under the heading "Sharing of data" explicitly states that "Personal information is not disclosed **without your consent** other than as required by laws."

65.     When Plaintiff logged into the UCSF MyChart patient portal, she was equally unaware her User Data may be disclosed to and intercepted by Meta, as there was no indication that Meta Pixel was embedded or that it would collect her User Data, including sensitive medical information. In fact, the MyChart login page expressly assures Plaintiff and Class members that it is a "secure" and "confidential" way to manage your healthcare needs.

66.     Accordingly, Plaintiff and Class members could not consent to UC Regents' conduct when they were unaware their sensitive medical information would be disclosed to and intercepted by Meta in the first place.

**IV.    Plaintiff and Class Members Have a Reasonable Expectation of Privacy in Their User Data**

67.    Plaintiff and Class members have a reasonable expectation of privacy in their User Data, including sensitive medical information.

68.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

69.    For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

70.    Users act consistent with these preferences.  Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.

71.    Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.

72.    Other privacy law experts have expressed concerns about the disclosure to third parties of a user's sensitive medical information.  For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increasing the rate you are charged on loans, and leaving you vulnerable to workplace discrimination.

**V.    The Data UC Regents Intercepted is Plaintiff's Property, Has Economic Value, and its Illicit Disclosure Caused Economic Harm**

73.    It is common knowledge in the industry that there is an economic market for consumers' personal data—including the User Data UC Regents allowed Meta to intercept from Plaintiff and Class members.

74.    For instance, according to Experian, health data is a "gold mine" for health care companies and clinicians.

75.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and within that context, "age, gender and location" information are sold for about "$0.50 per 1,000 people."[10] This estimate was based upon "industry pricing data viewed by the Financial Times," at the time.[11]

76.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name."[12] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge"[13] and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.[14]

77.    Notably, a 2021 report from *Invisibly* found that personal medical information is one of the ***most valuable pieces of data*** within this data-market. "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves.  While a single social security number might go for $0.53, a complete health care record sells for $250 on average. For criminals, the more complete a dataset, the more potential

---

[10] Emily Steel, et al., *How much is your personal data worth?*, Fin. Times (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u.
[11] *Id.*
[12] Pauline Glickman and Nicolas Glady, *What's the Value of Your Data?*, TechCrunch (October 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.
[13] *Id.*
[14] *Id.*

value they can get out of it. As a result, healthcare breaches increased 55% in 2020."[15] The article noted the following breakdown in average price for record type:

| Record Type | Average Price |
| --- | --- |
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

78.     The Federal Trade Commission has also confirmed the value of user data and, particularly, health information. It found back in 2014 that data brokers sell data that categorize users into sensitive categories, such as "expectant parent."[16] It recently sued one of these companies for selling location data on people who visit abortion clinics for approximately $160 a week.

79.     Indeed, even access to just prescription information is extremely valuable. For instance, Datarade.ai advertises access to U.S. customers names, addresses, email addresses, telephone numbers who bought brand name medicine. The starting price for access to just some of

---

[15] *How Much is Your Data Worth? The Complete Breakdown for 2021*, Invisibly (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/.

[16] FTC, *Data Brokers: A Call for Transparency and Accountability* (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

this data was $10,000. Other companies, like Pfizer, spend $12 million annually to purchase health data and the medical data industry itself was valued at over $2.6 billion back in 2014.

80.     Furthermore, individuals can sell or monetize their own data if they so choose. A myriad of other companies and apps such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.

81.     Given the monetary value *already* assigned to personal information, UC Regents has deprived Plaintiff and Class members of the economic value of their sensitive medical information by acquiring such data without providing proper consideration for Plaintiff's and Class members' property.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All natural persons in the United States who used the UCSF website and MyChart patient portal and whose communications and/or data was shared with third parties, including Meta.

83.     Excluded from the Class are UC Regents and their subsidiaries and affiliates; all employees of UC Regents and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Nationwide Class; Plaintiff's counsel and UC Regents' counsel and members of their immediate families; government entities; and any judge to whom this case is assigned, including his/her immediate family and court staff.

84.     **Numerosity:** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are likely tens of thousands, if not millions, of members of the Class, the precise number of Class members is unknown to Plaintiff. Class members may be identified through objective means, including UC Regents' own records. Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

85.     **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.   Whether UC Regents' acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

b.   Whether UC Regents violated Plaintiff's and Class members' privacy rights;

c.   Whether UC Regents' acts and practices violated California's Constitution, Art. 1, § 1;

d.   Whether UC Regents' acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

e.   Whether Plaintiff and Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

f.   Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

86.     **Typicality:** Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of all Class members because Plaintiff, like other Class members, had her communications to UCSF, including her PII and sensitive medical information, disclosed to and intercepted by third parties such as Meta by UC Regents.

87.     **Adequacy of Representation:** Plaintiff is an adequate Class representative because she is a member of the Class and her interests do not conflict with the interests of other Class members that he seeks to represent. Plaintiff is committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiff has retained counsel competent and experienced in complex class action litigation of this type and Plaintiff intends to prosecute this action vigorously. Plaintiff, and her counsel, will fairly and adequately protect the Class's interests.

88.     **Predominance and Superiority:** As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiff's case will also

18

resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against UC Regents, so it would be impracticable for members of the Class to individually seek redress for UC Regents' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

89.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

90.     California substantive laws apply to every member of the Class. California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and Class members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

91.     The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

92.     UC Regents is a California corporation, with its principal place of business in this State. UC Regents also owns property and conducts substantial business in this State, and therefore California has an interest in regulating UC Regents' conduct under its laws. UC Regents' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

## TOLLING, CONCEALMENT, AND ESTOPPEL

93.     The applicable statutes of limitation have been tolled as a result of UC Regents' knowing and active concealment and denial of the facts alleged herein.

94.     UC Regents secretly incorporated the Meta Pixel into its UCSF website and patient portal, providing no indication to users that their User Data, including PII and medical information, would be disclosed to Meta.

95.     UC Regents had exclusive knowledge that the Meta Pixel was incorporated on its website and patient portal, yet failed to disclose that fact to users, or that by interacting with its website and patient portal Plaintiff's and Class members' User Data, including PII and health data, would be disclosed to Meta.

96.     Plaintiff and Class members could not with due diligence have discovered the full scope of UC Regents' conduct, including because the incorporation of Meta Pixel is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that UC Regents was disclosing to and allowing the interception of User Data, including PII and health data, by Meta.

97.     The earliest Plaintiff and Class members could have known about Defendant's conduct was shortly before the filing of this Complaint.

98.     UC Regents was under a duty to disclose the nature and significance of its data disclosure practices but did not do so.  UC Regents is therefore estopped from relying on any statute of limitations under the discovery rule.

99.     Additionally, UC Regents engaged in fraudulent conduct to prevent Plaintiff and Class members from discovering the disclosure and interception of their data. UC Regents misled Plaintiff and Class members to believe their User Data, including health information and PII, would not be disclosed.

100.    Plaintiff and Class members were not aware that UC Regents disclosed their User Data, including PII and health information.

101.    Plaintiff and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of UC Regents' misconduct by virtue of their fraudulent concealment.

102.    Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**(Cal. Penal Code § 631, *et seq.*)**
**(On Behalf of the Plaintiff and the Class)**

103.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

104.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

105.    Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2)

21

"willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

106.   UC Regents is a person for purposes of Cal. Penal Code § 631.

107.   UC Regents and Meta maintain their principal places of business in California, where they designed, contrived, agreed, conspired, effectuated, aided, and/or received the interception and use of the contents of Plaintiff and Class members' communications.

108.   Meta Pixel and Plaintiff's and Class members' browsers, and Plaintiff's and Class members' computing and mobile devices qualify as a "machine, instrument, contrivance, or . . . other manner" under this statute.

109.   At all relevant times, Meta, using its Meta Pixel, intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiff and Class members and UCSF's website, including its MyChart patient portal, without the consent of all parties to the communication.

110.   Meta, willfully and without the consent of Plaintiff and Class members, reads or attempt to read, or learn the contents or meaning of Plaintiff and Class members' communications to UCSF's website, including its MyChart patient portal, while the communications are in transit or passing over any wire, line or cable, or were being received at any place within California when it intercepted Plaintiff and Class members' communications and User Data with UCSF's website, including MyChart patient portal, located in California, in real time.

111.   By embedding Meta's technology on its website, UC Regents aided, agreed with, employed, and conspired with Meta to carry out the wrongful conduct alleged herein.

112.   The interception of Plaintiff's and Class members' communications was without authorization and consent from the Plaintiff and Class members. Accordingly, the interception was unlawful and tortious.

113.   Plaintiff and the Class members seek statutory damages in accordance with Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

114.   Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive personal information have been collected, viewed, accessed, stored, and used by Meta, and have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law, Plaintiff and Class members are entitled to injunctive relief.

**SECOND CLAIM FOR RELIEF**
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Class)**

115.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

116.   Plaintiff asserting claims for intrusion upon seclusion must plead (1) that the UC Regents intentionally intruded into a matter as to which plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

117.   UC Regents' disclosure of Plaintiff's and Class members' sensitive User Data, including the user's name, email address, phone number, information entered into forms, the doctor's name, the search term used to find the doctor (e.g., "high blood pressure"), the condition selected from any dropdown menus (e.g., "heart condition"), the users' medications, information regarding their allergies, messages sent to their health care providers and details about their upcoming doctor's appointments, and other sensitive medical information constitutes an intentional

intrusion upon Plaintiff and Class members' solitude or seclusion in that UC Regents disclosed this User Data that were intended to stay private without users' consent.

118.    Plaintiff and Class members had a reasonable expectation of privacy in their User Data, including sensitive medical information. Plaintiff's and Class members' sensitive medical information, including diagnoses, lab and test results, appointment requests, prescriptions and other interactions with the UCSF website and MyChart patient portal are inherently sensitive in nature. Plaintiff and Class members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

119.    This expectation is especially heightened given UC Regents' consistent representations to users that this information would remain confidential and would not be disclosed.

120.    For example, UC Regents' Notice of Privacy Practices claims that they "are committed to protecting the privacy of your medical or health information" and that it will only use and disclose that information for specific uses, such as for treatment, and payment. None of those reasons include the disclosure of PII and sensitive medical information to Meta for their own use.

121.    Likewise, the UC Regents' "Privacy Statement" under the heading "Sharing of data" explicitly states that "Personal information is not disclosed *without your consent* other than as required by laws." It also states that disclosure of "health information" for "marketing purposes . . . are strictly limited and require your *written authorization*."

122.    And when Plaintiff logged into the UCSF MyChart patient portal, she equally was promised her User Data would not be disclosed to and intercepted by Meta. The MyChart patient portal login page expressly assures Plaintiff and Class members that it is a "secure" and "confidential" way to manage your healthcare needs.

123.    Given these representations, Plaintiff and Class members had a reasonable expectation of privacy in their User Data, including sensitive medical information, and expected this information would not be disclosed.

124.    Plaintiff and Class members did not consent to, authorize, or know about UC

Regents' intrusion at time it occurred. Accordingly, Plaintiff and Class members never agreed that UC Regents could disclose their data to third parties.

125.     The surreptitious taking and disclosure of User Data, including PII and sensitive medical information, from thousands if not millions of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

126.     The offensiveness of this conduct is all the more apparent because UC Regents' disclosure of this information was conducted in secret in a manner that Plaintiff and Class members would be unable to detect through the seamless incorporation of Meta Pixel.

127.     Accordingly, UC Regents' disclosure of Plaintiff and Class members' User Data, including PII and sensitive medical information, would be (and in fact is) highly offensive to a reasonable person.

128.     As a result of UC Regents' actions, Plaintiff and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

129.     Plaintiff and Class members have been damaged as a direct and proximate result of UC Regents' invasion of their privacy and are entitled to just compensation, including monetary damages.

130.     Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by UC Regents as a result of its intrusions upon Plaintiff's and Class members' privacy.

131.     Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of UC Regents' actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter UC Regents

1  from engaging in such conduct in the future.

2      132.    Plaintiff also seeks such other relief as the Court may deem just and proper.

3                          **THIRD CLAIM FOR RELIEF**
       **Violation of the California Constitution, Art. 1, § 1 – Invasion of Privacy**
4                     **(On Behalf of Plaintiff and the Class)**

5      133.    Plaintiff re-alleges and incorporates the preceding allegations of this Class Action

6  Complaint with the same force and effect as if fully restated herein.

7      134.    Art. I, § 1 of the California Constitution provides: "All people are by nature free and

8  independent and have inalienable rights. Among these are enjoying and defending life and liberty,

9  acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and

10  privacy." California Constitution, Article I, § 1.

11      135.    The right to privacy in California's Constitution creates a private right of action

12  against private and government entities.

13      136.    To state a claim for invasion of privacy under the California Constitution, a Plaintiff

14  must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and

15  (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an

16  egregious breach of the social norms.

17      137.    Plaintiff and Class members have and continue to have a reasonable expectation of

18  privacy in their User Data, including PII and sensitive medical information, pursuant to Article One,

19  Section One of the California Constitution.

20      138.    Plaintiff and Class members had a reasonable expectation of privacy under the

21  circumstances, including that: (i) the User Data disclosed by UC Regents included personal,

22  sensitive medical information, decisions, and medical diagnoses; and (ii) Plaintiff and Class

23  members did not consent or otherwise authorize UC Regents to share and disclose this private

24  information for their own monetary gain.

25      139.    The confidential and sensitive User Data, which UC Regents intruded upon and

26  disclosed without Plaintiff's and Class members' authorization or consent, included the user's name,

27                                      26

28

email address, phone number, information entered into forms, the doctor's name, the search term used to find the doctor (i.e., "heart disease"), the condition selected from any dropdown menus (i.e., "Alzheimer's"), the user's medications, information regarding their allergies, messages to health care providers, details about their upcoming doctor's appointments, and other sensitive medical information.

140.    UC Regents' actions constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the User Data disclosed was highly sensitive and personal, as protected by the California Constitution; (ii) UC Regents did not have authorization or consent to disclose this information and did so in contravention of its own representations to patients; and (iii) the invasion deprived Plaintiff and Class members the ability to control the circulation of said information, which is considered a fundamental right to privacy.

141.    UC Regents' invasion violated the privacy rights of hundreds of thousands of Class members, including Plaintiff, without authorization or consent. Their conduct constitutes a severe and egregious breach of social norms.

142.    Plaintiff and Class members have sustained damages and will continue to suffer damages as a direct and proximate result of UC Regents' conduct, including an invasion of privacy.

143.    Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by UC Regents as a result of its intrusions upon Plaintiff's and Class members' privacy.

144.    Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of UC Regents' actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter UC Regents from engaging in such conduct in the future.

145.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**Violation of California Confidentiality of Medical information Act**
**Civil Code § 56.06**
**("CMIA")**
**(On Behalf of Plaintiff and the Class)**

146.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

147.    UC Regents is a provider of health care under Cal. Civ. Code. § 56.06, subdivisions (a) and (b), because it operates hospitals that are providers of health care, maintains medical information, and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or for the diagnosis, treatment, or management of a medical condition.

148.    UC Regents is therefore subject to the requirements of the CMIA and obligated under subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

149.    The CMIA defines medical information to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." As explained above, the information UC Regents maintained and disclosed is medical information because it is identifiable as relating to patient's medical histories, conditions, treatments, and prescriptions.

150.    UC Regents violated Civil Code § 56.06 because it did not maintain the confidentiality of users' medical information. Instead, UC Regents disclosed to third parties Plaintiff's and Class members' medical information without consent, including information concerning physical health conditions, treatments, medications, allergies, and messages to their health care providers.

151.     UC Regents shared this identifiable information with Meta, whose primary business is to sell advertisements and analytics based on the data it collects about individuals, including the data Plaintiff and the Class shared with UC Regents.

152.     UC Regents knowingly and willfully disclosed medical information without consent to third parties such as Meta for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise their services, in violation of Civil Code § 56.06 subdivisions (e) and (f). UC Regents' conduct was knowing and willful as it was aware that Meta Pixel would collect all User Data inputted while using their website, yet intentionally embedded Meta Pixel anyway, including within its MyChart patient portal.

153.     At the very least, UC Regents negligently disclosed medical information to third parties such as Meta in violation of Civil Code § 56.06, subdivisions (e) and (f).

154.     Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**FIFTH CLAIM FOR RELIEF**
**Violation of California CMIA**
**Civil Code § 56.101**
**(On Behalf of Plaintiff and the Class)**

155.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

156.     Civil Code § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

157.     Any health care provider who "negligently creates, maintains, preservers, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of [Civil Code] § 56.36."

158.     UC Regents is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information.

159.     UC Regents failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Meta, Plaintiff's and Class members' User Data, including PII and sensitive medical information concerning physical health conditions, treatments, medications, allergies, appointments, and messages to their health care providers, without consent.

160.     UC Regents' failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Civil Code § 56.101, subdivision (a).

161.     Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SIXTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Civil Code § 56.10**
**(On Behalf of Plaintiff and the Class)**

162.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

163.     Civil Code § 56.10, subdivision (a), prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

164.     UC Regents disclosed medical information without first obtaining authorization when it disclosed to Meta Plaintiff's and Class members' sensitive medical information without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as PII. No statutory exception applies. As a result, UC Regents violated Civil Code § 56.10, subdivision (a).

165.   UC Regents knowingly and willfully disclosed medical information without consent to Meta for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise their services, in violation of Civil Code § 56.10, subdivision (a).

166.   At the very least, UC Regents negligently disclosed medical information in violation of Cal. Civ. Code § 56.10, subdivision (a) through the unauthorized disclosure of Plaintiff's and Class members' sensitive medical information.

167.   Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36; (4) punitive damages pursuant to Civil Code § 56.35; and (5) reasonable attorneys' fees and other litigation costs reasonably incurred.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of the Plaintiff and the Class)

168.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

169.   UC Regents expressly promised to safeguard Plaintiff's and Class members' User Data, including sensitive medical information.

170.   UC Regents represents on its website that it is "committed to protecting [patients'] medical information." Its "Notice of Privacy Practices" packet explicitly states that it will only disclose patients' medical information for explicit reasons, none of which state that it will disclose PII and sensitive medical information to Meta for Meta's own use. Similarly, its "Privacy Statement", under the heading "Sharing of data" explicitly states that "Personal information is not disclosed **without your consent** other than as required by laws." In addition, its MyChart page simply states: "Your privacy is important to us. The information you provide on this web site is protected by federal laws. To learn more about how your rights to privacy are being protected, please contact UCSF Health Web Services."

171.     Plaintiff and Class members accepted UC Regents' promises not to disclose their User Data without explicit consent and/or authorization when they entered into a contract with UC Regents in which they paid money for medical services and/or treatment.

172.     Plaintiff and Class members fully performed their obligations under their contract with UC Regents, including by providing their User Data and paying for medical services and/or treatment.

173.     UC Regents did not hold up its end of the bargain. UC Regents secretly disclosed Plaintiff and Class members' User Data, including sensitive medical information, to Meta without consent in violation of their agreement with Plaintiff and Class members.

174.     Plaintiff and Class members would not have entrusted UC Regents with their User Data in the absence of a contract between them and UC Regents' express promise not to disclose this information.

175.     As a direct and proximate result of UC Regents' breach of their contract, Plaintiff and Class members sustained damages as alleged herein. Plaintiff and Class members would not have used UC Regents' services, or would have paid substantially less for these services, had they known their User Data would be disclosed.

176.     Plaintiff and Class members are entitled to compensatory and consequential damages as a result of UC Regents' breach of contract.

**EIGHTH CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(In the alternative)**
**(On Behalf of the Plaintiff and the Class)**

177.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

178.     When Plaintiff and Class members paid money and provided their User Data to UC Regents in exchange for services, they entered implied contracts pursuant to which UC Regents agreed to safeguard and not disclose their User Data without consent.

179.    Plaintiff and Class members accepted UC Regents' offers and provided their User Data to UC Regents.

180.    Plaintiff and Class members would not have entrusted UC Regents with their User Data in the absence of an implied contract between them and UC Regents obligating them not to disclose this information without consent.

181.    UC Regents breached these implied contracts by disclosing Plaintiff and Class members' User Data to a third party, i.e., Meta.

182.    As a direct and proximate result of UC Regents' breaches of these implied contracts, Plaintiff and Class members sustained damages as alleged herein. Plaintiff and Class members would not have used UC Regents' services, or would have paid substantially less for these services, had they known their User Data would be disclosed.

183.    Plaintiff and Class members are entitled to compensatory and consequential damages as a result of UC Regents' breach of implied contract.

### NINTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(In the alternative)**
**(On Behalf of the Plaintiff and the Class)**

184.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

185.    Plaintiff and Class members conferred a benefit upon UC Regents in the form of valuable sensitive medical information that UC Regents collected from Plaintiff and Class members under the guise of keeping this information private. UC Regents collected and used this information for its own gain, including advertisement purposes or sale. Additionally, Plaintiff and Class members conferred a benefit upon UC Regents in the form of monetary compensation.

186.    Plaintiff and Class members would not have used UC Regents' services, or would have paid less for these services, if they had known UC Regents would use and disclose this information.

187.    UC Regents unjustly retained those benefits at the expense of Plaintiff and Class members because UC Regents' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

188.    The benefits that UC Regents derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in California and every other state for UC Regents to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

189.    UC Regents should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that UC Regents received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the proposed Classes, respectfully request that the Court enter an order:

 a. Certifying this case as a Class action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as the Class counsel;

 b. Declaring that UC Regents' conduct, as set out above, violates the laws cited herein;

 c. Awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiff and the Class in an amount to be determined at trial;

 d. Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

 e. Awarding Plaintiff and the Class pre-and post-judgment interest, to the extent allowable;

 f. Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

1       g.     Awarding such other and further relief as the Court deems reasonable and just.

2

<u>**DEMAND FOR JURY TRIAL**</u>

3       Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial

4 as to all issues triable by a jury.

5

6 Dated: January 5, 2023                      <u>*/s/ Christian Levis*</u>

7                                Christian Levis (*pro hac vice* forthcoming)

Amanda Fiorilla (*pro hac vice* forthcoming)

8                                Rachel Kesten (*pro hac vice* forthcoming)

9                                **LOWEY DANNENBERG, P.C.**

44 South Broadway, Suite 1100

10                                White Plains, NY 10601

11                                Telephone: (914) 997-0500

Facsimile: (914) 997-0035

12                                clevis@lowey.com

afiorilla@lowey.com

13                                rkesten@lowey.com

14                                James M. Wagstaffe (94435)

Frank Busch (258288)

15                                **WAGSTAFFE, VON LOEWENFELDT, BUSCH**

16                                **& RADWICK LLP**

100 Pine Street, Suite 2250

17                                San Francisco, CA 94111

18                                Telephone: (415) 357-8900

Facsimile: (415) 357-8910

19                                wagstaffe@wvbrlaw.com

busch@wvbrlaw.com

20

21                                *Attorneys for Plaintiff and the Proposed Class*

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

CASE NO. 3:22-cv-03580