1   Marshal J. Hoda, Esq.
    TX Bar No. 24110009
2   THE HODA LAW FIRM, PLLC
3   12333 Sowden Road, Suite B, PMB 51811
    Houston, Texas 77080
4   o. (832) 848-0036
5   marshal@thehodalawfirm.com
6   *Pro hac vice pending*

7   Steven C. Vondran, Esq.
    CA Bar No. 232337
8   THE LAW OFFICES OF STEVEN C. VONDRAN, PC
9   One Sansome Street, Suite 3500
10  San Francisco, California 94104
    o. (877) 276-5084
11  steve@vondranlegal.com
12
13  *Attorneys for Plaintiff & the Class*
    *(Additional Counsel on Signature Page)*
14

15            **UNITED STATES DISTRICT COURT**
16      **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
           **SAN FRANCISCO & OAKLAND DIVISION**

17  **JOHN DOE & JANE DOE, on**          Case No. 3:22-cv-07557
    **behalf of themselves and all others**
18  **similarly situated,**

19                                        **CLASS ACTION COMPLAINT**
              Plaintiffs,
20
                                          **JURY TRIAL DEMANDED**
21  v.

22  **META PLATFORMS, INC.,**

23
              Defendant.
24

25

26
                          1
27  ─────────────────────────────────────────
              CLASS ACTION COMPLAINT
28

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | SUMMARY OF THE ACTION | 4 |
| III. | PARTIES | 5 |
| IV. | JURISDICTION & VENURE | 5 |
| | A. Subject-Matter Jurisdiction | 5 |
| | B. Personal Jurisdiction | 6 |
| | C. Venure & Divisional Assignment | 6 |
| V. | FACTUAL ALLEGATIONS | 7 |
| | A. Meta' Business | 7 |
| | B. How the Pixel Works | 8 |
| | C. Meta's Broken Promises | 11 |
| | D. Meta Gathers Tax Filers' Financial Data | 16 |
| | E. Why Meta's Actions Were Unlawful | 18 |
| | i. Disclosing tax-return information Without Consent is a crime. | 18 |
| | ii. Filers did not consent to disclose their tax-return information. | 20 |
| VI. | CAUSES OF ACTION & CLASS ALLEGATIONS | 23 |
| VII. | PRAYER FOR RELIEF | 42 |
| VIII. | DEMAND FOR JURY TRIAL | 42 |

2

CLASS ACTION COMPLAINT

<div align="center">

**CLASS ACTION COMPLAINT**

</div>

"*We do not have an adequate level of control and explainability over how our systems use data … if we can't enumerate all the data we have—where it is; where it goes; how it's used—then how can we make commitments about it to the outside world?'*"

- **Meta engineering memo (2021)**

"*Facebook's internal controls … have been very limited and were not effective at enforcing Facebook's policy or preventing the receipt of sensitive data.*"

- **New York Department of Financial Services,** *Report on Investigation of Facebook, Inc. Data Privacy Concerns* **(2021)**

## I.    Introduction

Major tax filing services have been quietly transmitting sensitive financial information to Meta Platforms, Inc. ("Meta") when Americans file their taxes online. Plaintiffs John Doe and Jane Doe were amongst the Americans whose confidences were breached. They thus bring this Complaint, on behalf of themselves and all others similarly situated, and in support thereof allege as follows.[1]

---

[1] Statements related to Mr. Doe's and Ms. Doe's own experiences are within their personal knowledge. All other allegations are the result of investigation by the undersigned attorneys.

## II.   Summary of the Action

1.   Meta's "Pixel" is piece of code that logs users' activities on third-party websites and sends the details back to Meta.[2] It has now emerged that major online tax-filing services such as H&R Block, TaxAct, and TaxSlayer embedded the Pixel in their websites and sent tens of millions of filers' tax-return data to Meta without their consent in violation of federal law.

2.   The Pixel sent Meta the tax-filers' names, email addresses, adjusted gross incomes, tax-filing statuses, refund amounts, dependents' college scholarship amounts, and their dependents' names—and perhaps more. It did so regardless whether the filer had an account on Meta's social media platforms like Facebook or Instagram. And even when filers **expressly declined** to share their information, the Pixel collected it anyway.

3.   In its contract with Facebook users, Meta promised that it "requires" businesses that use the Pixel "to have lawful rights to collect, use, and share your data before providing any data to us." In actuality, Meta makes no effort to enforce that promise—relying on a broken honor-system that has resulted in repeated, documented violations of Meta's own contractual promises and state and federal law. That is precisely what occurred here.

---

[2] Meta is the company formerly known as Facebook, Inc., and is now the parent company to Facebook, Instagram, WhatsApp, and much more.

CLASS ACTION COMPLAINT

4.      Meta's actions amount to (i) breach of contract, (ii) breach of the duty of good faith and fair dealing, (iii) intrusion upon seclusion, (iv) violation of the Electronic Communications Privacy Act, (v) violation of the California Invasion of Privacy Act, (vi) negligent misrepresentation, and (vii) violation of California's Unfair Competition Law.

**III.   Parties**

5.      Plaintiff John Doe is a Georgia resident. Mr. Doe filed his taxes using H&R Block's online tax filing service from 2016 to 2020, and was thus amongst the persons who were spied on by the Pixel. Mr. Doe is also a Facebook user.

6.      Plaintiff Jane Doe is a California resident. Ms. Doe filed her 2020 taxes using H&R Block's online tax filing service and was thus amongst the persons who were spied on by the Pixel. Ms. Doe is also a Facebook user.

7.      Defendant Meta Platforms, Inc., formerly known as Facebook, Inc.,[3] is a Delaware corporation headquartered in Menlo Park, California. Meta does business throughout the United States and the world.

**IV.   Jurisdiction & Venue**

   **A.      Subject-Matter Jurisdiction**

---

[3] Facebook changed its name to Meta in October 2021. This was a name change rather than creation of a separate legal entity and merger. Meta therefore *is* Facebook and successor liability is not at issue.

8.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d) (*i.e.*, the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the plaintiff class is a citizen of a different state than the Defendant.

9.     This Court further has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises in part under 18 U.S.C. § 2510 *et seq.* (*i.e.*, the Electronic Communications Privacy Act). The Court has jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. § 1367 because the state-law claims form part of the same controversy as the Electronic Communications Privacy Act claim under Article III of the United States Constitution.

### B.     Personal Jurisdiction

10.     This Court has general personal jurisdiction over Meta because Meta's principal place of business is in Menlo Park, California.

### C.     Venue & Divisional Assignment

11.     Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Meta developed the Pixel from its headquarters in Menlo Park and continues to operate the Pixel from that location to this day.

12.     For these same reasons, divisional assignment to the San Francisco and Oakland Division is appropriate pursuant to Civil L.R. 3-2(c). Facebook's Menlo Park headquarters sits in San Mateo County, which is encompassed by said Division.

CLASS ACTION COMPLAINT

1  **V.    Factual Allegations**

2       **A.    Meta's Business**

3       13.    Meta is an American multinational technology company. It

4  owns and operates several of the most popular social media and

5  technology products in the world—including Facebook, Instagram, and

6  WhatsApp.

7       14.    Like most social-media companies, Meta does not in general

8  charge consumers to use its platforms. Meta makes its money, instead,

9  by selling advertising space to third parties. These advertisers pay for

10  the privilege of putting their notices in front of the billions of consumers

11  who use Meta's products. In 2021, Meta had nearly $115 billion in

12  advertising revenue—which made up 97.5% of its total haul.[4]

13       15.    Giving advertisers more and more effective means of

14  targeting potential customers is central to Meta's business. From the

15  time Mark Zuckerberg announced Facebook Ads back in 2007, the main

16  selling point of social media avertising—as opposed to traditional

17  mediums—was the ability to customize, micro-target, and monitor

18  advertising campaigns. From the beginning, Facebook Ads gave

19  advertisers access to data on users' Facebook activity, demographics,

20  and interests. Over time, as competing social media platforms emerged,

21  a user-data arms race began. Platforms looked for ways to gather more

22

23  ────────────

24       [4] Securities and Exchange Commission, *Form 10-K for Meta Platforms, Inc. (2021)*, at 93, available at https://perma.cc/Q6PF-2FGS.

25

26

27  CLASS ACTION COMPLAINT

and more data, and thereby build more and more detailed user profiles. Enter: The Pixel.

### B.    How The Pixel Works

16.    Facebook introduced the Pixel in 2015. The Pixel is a piece of computer code that records users' activity on sites all around the internet and transmits logs of that activity back to Meta. It is enormously popular. At least six million distinct websites use the Pixel— including 30% of the world's 100,000 most-visited.

17.    Meta markets the Pixel to third parties that use Facebook Ads as a way to "make sure [their] ads are shown to the right people" on the platform. Meta boasts that the Pixel allows third parties to improve users experience on their websites, target advertisements more effectively, and drive more sales.

18.    Meta gives the Pixel to third-party advertisers free of charge and instructs them how to use it. In its directions for setting up the Pixel, Meta notes that advertisers should "[s]imply place the pixel base code … on all pages of your website." Meta further recommends that advertisers "add [the Pixel's] base code between the opening and closing <head> tags on every page where you will be tracking website visitor actions." Doing so "reduces the chances of browsers or third-party code blocking the [P]ixel's execution" and "executes the code sooner, increasing the chance that your visitors are tracked before they leave your page."

19.    Once a third-party advertiser sets up the Pixel in this way, the information collection and sharing begins. As soon as a user takes

CLASS ACTION COMPLAINT

any action on a Pixel-enabled webpage, Meta's source code commands the user's computer to direct a log of that action to Meta. This happens contemporaneously. In other words, Meta receives real-time logs of a user's actions even while that user's interaction with the target website is ongoing.

20. The information Meta gathers on users is then used to create or add to Meta's consumer dossiers. The key organizational hook is the "c_user cookie." This cookie is a means of identification for users of Meta's platforms. Each Meta user account has a unique c_user cookie. Meta uses the c_user cookie to record and organize user activities and communications.

21. Once a consumer dossier is created under the c_user heading, Meta adds information as it is collected by the Pixel and Meta's other tracking tools. A typical instance includes the user's real name, location, email address, friends, interests, and personal identifiers such as IP addresses[5] and device identifers. When that consumer visits a third-party domain with the Pixel enabled, Meta collects information such as the sub-pages they visit, the buttons they click, the options they select (*e.g.*, from a multiple-choice form), and often the things they type.

22. In public communications, Meta has suggested that the information it receives about consumers is "hashed" or otherwise

---

[5] An Internet Protocol (IP) Address is a unique address that identifies a device on the internet or a local network.

CLASS ACTION COMPLAINT

obscured such that Meta cannot personally identify user profiles. This is untrue. An intermediate computer user can obtain the c_user value for any Facebook user and match that information with the user's Facebook profile in just a few seconds, as follows.

      a.    To identify the c_user cookie value for any Facebook user, one simply (1) navigates to the user's Facebook page, (2) right-clicks on the mouse, (3) selects 'View Page Source,' (4) and copies the number value that appears after "fb://profile" in the page source code.

      b.    With the c_user cookie value in hand, one can then access the associated Facebook account by typing in "www.facebook.com/#," with "#" replaced with the c_user cookie identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

23.    The organizational system described above relies on subjects' pre-existing Meta-platform accounts (*e.g.*, Facebook or Instagram profiles). But when a data-collection subject doesn't have an account on Meta's platforms, the Pixel logs their activities and sends the data to Meta anyway. The dossiers Meta compiles on these persons are known as "shadow profiles." When asked by Congress about these shadow profiles, Mark Zuckerberg responded: "[W]e collect data on people who have not signed up for Facebook for security purposes." Meta has not

CLASS ACTION COMPLAINT

otherwise publicly revealed how it organizes and uses information about non-users. Discovery in this matter will reveal the full extent of Meta's practices in this regard.

### C. Meta's Broken Promises

24. Every Facebook user is required to agree to Meta's Terms of Service, Data Policy, and Cookie Policy via a checkbox on the account signup page. The Terms, Data Policy, and Cookie Policy and binding on Meta and on Facebook users.

25. Meta's Data Policy expressly provides that Meta "requires" businesses that use the Pixel "to have lawful rights to collect, use, and share your data before providing any data to us." Meta further claims that "[i]t is against [Meta's] policies for websites and apps to send sensitive information about people through our Business Tools," and that Meta's "system is designed to filter out potentially sensitive data it detects."

26. Each of these promises and representations is false. Meta does not verify that advertisers have obtained adequate consent from users before transmitting their sensitive data. Instead, the Pixel is made available to any willing publisher regardless of their privacy policies, consent processes, or the nature of their business. Nor does Meta effectively filter the sensitive data it receives. To the contrary, the company routinely collects, stores, and uses consumers' sensitive data without appropriate consent and—in some instances—in violation of

CLASS ACTION COMPLAINT

state and federal laws and regulations. Specifically, consider the following.

27.    In 2019, the Wall Street Journal reported that Facebook was receiving sensitive user health data from at least 11 popular mobile apps. The data being sent included information such as users' heart rates, blood pressure readings, menstrual cycles, and pregnancy statuses. This information was reportedly being collected without valid user consent.

28.    In response to these revelations, the Governor of New York ordered the New York State Department of Financial Services ("NYDFS") to undertake an investigation. In its final report, issued in February 2021, NYDFS noted first that Facebook's Business Tools Terms prohibited app developers and other third parties from sending Facebook certain data.[6] These Terms provide that **"You [*i.e.*, the developer] will not share Customer Data with us that you know or reasonably should know ... includes health, financial information, or other categories of sensitive information (including any information defined as sensitive under applicable law)."** Nevertheless, during NYDFS's investigation, Facebook's representatives admitted that the company "routinely

---

[6] New York Dep't of Financial Services, *Report on Investigation of Facebook Inc. Data Privacy Concerns* (2021), available at https://perma.cc/G7YJ-7AE5.

CLASS ACTION COMPLAINT

obtained sensitive data from app developers" in violation of its own policies.

29. The NYDFS Final Report went on to note the following:

a. "[N]otwithstanding Facebook's policy that app developers should not transmit sensitive data to Facebook, there were many examples where the developers violated that policy and Facebook did indeed—unwittingly, it contends—receive, store, and analyze sensitive data."

b. "The information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective at enforcing Facebook's policy or preventing the receipt of sensitive data."

c. "Facebook has repeatedly rebuffed NYDFS's efforts to obtain information that would have provided more fulsome transparency with respect to the scope and scale of the problem. Though Facebook acknowledges the problem—*i.e.*, that in the past it did receive sensitive information from app developers contrary to its own policy—it has failed to provide sufficient detail about, among other things, specifically what kinds of sensitive information was obtained, how regularly it was received, or which app developers violated the rules by transmitting such information."

d. "As noted, the sharing of sensitive user information by an app developer is a violation of Facebook Business Tools' terms

of service. Merely stating a rule, however, has little meaning if the rule is not enforced, and the unfortunate fact is that Facebook does little to track whether app developers are violating this rule and takes no real action against developers that do."

e. "The Department finds Facebook's efforts here seriously lacking and recommends it undertake significant additional steps to police its own rules. Even assuming a strong screening program on the back end, Facebook must take steps to determine whether app developers are transmitting sensitive data."

30.    In June 2022—nearly a year and a half after NYDFS issued its report—investigative journalists at The Markup revealed that the Pixel was installed on the patient portals and websites of dozens of the nation's top hospitals.[7] Using a custom-built "Pixel inspector," these journalists showed that Meta was collecting patients' names, the dates and times of their medical appointments, and the names of their doctors. Meta is currently facing several class-action lawsuits arising from this collection of patients' medical data, which allege that the collection of this information violated the Health Insurance Portability and Accountability Act ("HIPAA").

---

[7] The Markup, *Facebook is Receiving Sensitive Financial Information from Hospital Websites* (June 16, 2022), available at https://perma.cc/L8GJ-ZBVY.

31.    In April 2022, the online news outlet Motherboard published a leaked internal memorandum that revealed the true nature of Meta's data-gathering operation.[8] In that memorandum, Meta engineers analyzed their company's "privacy infrastructure" and made recommendations for "long-range investments" to address mounting regulatory and legal scrutiny. They were shockingly direct. Some of their sentiments were as follows.

a.    "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."

b.    "If we can't enumerate all the data we have—where it is; where it goes; how it's used—then how can we make commitments about it to the outside world?"

c.    "We've built systems with open borders. The result of these open systems and open culture is well described with an analogy: Imagine you hold a bottle of ink in your hand. This bottle of ink is a mixture of all kinds of user data (3PD [i.e., Third-Party Data], 1PD [i.e., First-Party Data], SCD [i.e., Sensitive Customer

---

[8] Motherboard, *ABP Privacy Infra, Long Range Investments* (2021), available at perma.cc/W4MN-UPGQ.

1   Data], Europe, etc.) You pour that ink into a lake of water (our open

2   data systems; our open culture) … and it flows … everywhere. How

3   do you put that ink back in the bottle? How do you organize it

4   again, such that it only flows to the allowed places in the lake?"

5       32.   This internal document "admit[ted] what [experts] long

6   suspected: that there is a data free-for-all inside Facebook and the

7   company has no control whatsoever over the data it holds."[9] Meta knows

8   it is collecting sensitive data, violating state and federal laws, and

9   breaching its agreements with users—but has failed to do anything

10   about it.

11           **D.     Meta Gathers Tax Filers' Financial Data**

12       33.   Against this backdrop, in November 2022, The Markup

13   published additional revelations about Meta's data-gathering

14   practices.[10] "Major tax filing services such as H&R Block, TaxAct, and

15   TaxSlayer have been quietly transmitting sensitive financial

16   information to Facebook when Americans file their taxes," The Markup

17   found, "including data on users' income, filing status, refund amounts,

18   and dependents' college scholarship amounts." More than 150 million

19   Americans file individual tax returns electronically each year. The

20   Markup's reporting revealed that Meta gathered financial information

---

[9] Motherboard, *Facebook Doesn't Know What It Does With Your Data, Or Where it Goes: Leaked Document* (2022), available https://perma.cc/S6AR-ZRDJ.

[10] The Markup, *Tax Filing Websites Have Been Sending Users' Financial Information to Facebook* (Nov. 28, 2022), available at https://perma.cc/NPW4-LV6F.

CLASS ACTION COMPLAINT

from tens of millions of those filers through the Pixel, embedded on tax-filing services' websites.

34.   When users sign up for the popular service TaxAct, for example, they are asked to provide information to calculate their returns—including how much money they make and the amount and nature of their investments. A Pixel on TaxAct's website sent that data to Facebook, including users' filing status, their adjusted gross income, and the amount of their tax refund. The Pixel also sent the names of filers' dependents in an obfuscated but reversible format. TaxAct has about three million annual users.

35.   Tax-preparation heavyweight H&R Block similarly offers its users an online filing option, with 6.7 million online filings in 2020. H&R Block embedded a Pixel on its site that gathered filers' health savings account usage and dependents' college tuition grants and expenses.

36.   TaxSlayer, another widely used filing service, sent personal information to Facebook as part of Facebook's "advanced matching system," which gathers information on web visitors to link them to Facebook accounts. The information gathered through the Pixel on TaxSlayer's site included phone numbers, the name of the user filling out the form, and the names of any dependents added to the form. TaxSlayer users completed more than 10 million federal and state returns last year.

37.   In addition, the Pixels embedded by TaxSlayer and TaxAct used a feature called "automatic advanced matching." That feature

CLASS ACTION COMPLAINT

scans forms looking for fields that contain personally identifying information like phone numbers, first names, last names, or email addresses, and then send the detected information to Meta. On TaxSlayer's site this feature collected phone numbers and the names of filers and their dependents. On TaxAct it collected the names of dependents.

### E.   Why Meta's Actions Were Unlawful

  *i. Disclosing tax-return information without consent is a crime.*

  38. The transmission of tax filers' data to Meta was unlawful. It is a crime for any business that "prepar[es], or provid[es] services in connection with the preparation of" federal tax returns to "disclose any information furnished to him for, or in connection with, the preparation of any such return," or to "use[] any such information for any purpose other than to prepare, or assist in preparing, any such return."[11] For purposes of this provision, "tax return information means any information, including, but not limited to, a taxpayer's name, address or identifying number, which is furnished in any form or manner for, or in connection with, the preparation of a tax return of the taxpayer."[12]

---

[11] 28 U.S.C. § 7216.

[12] 26 C.F.R. § 301.7216-1(b)(3).

39.     As described in Section V(D), *infra*, that is precisely what occurred here. Several of the nation's largest online tax-preparation services installed the Pixel on their websites and thereby transmitted "tax return information" to Meta, including filers' names, income, filing status, refund amounts, names of dependents, and dependents' college scholarship amounts.

40.     There are circumstances in which tax preparers may disclose or use tax-return information, including by providing that information to third parties, **but only with valid consent**.[13] The standards for obtaining valid consent are detailed at length in the applicable regulations. Substantively, the consent must "specify the tax return information to be disclosed or used by the return preparer," "describe the particular use authorized," and "identify the specific recipient (or recipients) of the tax return information."[14] Procedrually, the consent must be "knowing and voluntary"[15] and "signed and dated by the taxpayer."[16] In addition, "conditioning the provision of any services on the taxpayer's furnishing consent will make the consent involuntary,"

---

[13] There are, in addition, some circumstances in which a tax preparer may disclose tax return information *without* the filers' consent, such as disclosure in response to a subpoena or other lawful process. *See* 26 C.F.R. § 301.7216-2. No such exception is relevant in these circumstances.

[14] 26 C.F.R. § 301-7216-3(a)(3)(B).

[15] 26 C.F.R. § 301-7216-3(a)(1).

[16] 26 C.F.R. § 301-7216-3(a)(3)(E).

and thus "the consent will not satisfy the requirements" of the regulations.[17] Finally, the consent cannot be retroactive. "A taxpayer must provide written consent **before** a tax return preparer discloses or uses the taxpayer's tax return information."[18]

           *ii.*    *Filers did not consent to disclose their tax-return information.*

41.    The prohibition on disclosure of tax-return information applies to H&R Block, TaxAct, and TaxSlayer (collectively, henceforth, the "Tax-Filing Services"). Each of these businesses is "engaged in the business of preparing, or providing services in connection with the preparation of, returns of the tax imposed by [the Internal Revenue Code]."[19] TaxAct admits this in its Privacy Policy, where it notes that: "[t]he use and disclosure of Tax Return Information is governed by Section 301-7216 of the Internal Revenue Code." Similarly, TaxSlayer's Privacy Policy notes that "Section 301-7216 of the Internal Revenue Code specifically governs the use and disclosure of Tax Return Information."

42.    Each of the Tax-Filing Services has adopted a Privacy Policy that details its data-usage practices. These policies purport to be valid consents for at least some disclosures and uses of filers' data. For the

---

[17] 26 C.F.R. § 301-7216-3(a)(1).

[18] 26 C.F.R. § 301-7216-3(b).

[19] 28 U.S.C. § 7216.

CLASS ACTION COMPLAINT

reasons set out below, none of these purported consents were valid for the purpose of authorizing transmission of filers' tax-return information to Meta via the Pixel.

43.     Each of the Tax-Filing Services' websites required users to agree to its terms of use and privacy policy as a condition of signing up for their online tax-preparation services. Two of the services—H&R Block and TaxAct—required users to click a checkbox indicating their consent to these agreements before signing up. The third, TaxSlayer, noted that users would be deemed to agree to its privacy policy and license agreement simply by clicking "Create Account." Users cannot access any of the Tax-Filing Services online offerings without agreeing to these purported consents. At the same time, none of the three businesses required users to open their privacy policies or terms of use or sign and date them. In fact, none of the Tax-Filing Services terms of use or privacy policies contained spaces for dates or signatures.

44.     In light of these facts, it is clear that H&R Block's, TaxAct's, and TaxSlayer's purported consents failed to satisfy the applicable requirements as a procedural matter. As noted above, the regulations dictate that "conditioning the provision of any services on the taxpayer's furnishing consent will make the consent involuntary, and the consent will not satisfy the requirements of this section."[20] Because each of the Tax-Filing Services conditioned their provision of services on users'

[20] 26 C.F.R. § 301-7216-3(a)(1).

1    accepted of their terms of use and privacy policies, all three of their

2    purported consents failed outright.

3        45.    In addition, as noted above, the regulations dictate that "a

4    consent to disclose or use tax return information must be signed and

5    dated by the taxpayer."[21] None of the Tax-Filing Services' websites

6    required users to **open** their terms and conditions or privacy policies—

7    much less sign and/or date them. In fact, none of the Tax-Filing Services'

8    terms and conditions or privacy policies contained signature or date

9    blocks. Again, each of the Tax-Filing Services purported consents fails

10   outright.

11       46.    In addition, the Tax-Filing Services' purported consents fail

12   for substantive reasons. As noted, the regulations require that a valid

13   consent "identify the specific recipient (or recipients) of the tax return

14   information."[22] None of the Tax-Filing Services' terms and conditions or

15   privacy policies mention Meta or Facebook as a recipient of tax-return

16   information. Further, a valid consent must "specify the tax return

17   information to be disclosed or used by the return preparer" and "describe

18   the particular use authorized."[23] None of the Tax-Filing Services' terms

19

20

21   _____

22   [21] 26 C.F.R. § 301-7216-3(a)(3)(E).

23   [22] 26 C.F.R. § 301-7216-3(a)(3)(B).

24   [23] 26 C.F.R. § 301-7216-3(a)(3)(B).

25

26                                  22

27   CLASS ACTION COMPLAINT

of use or privacy policies mention the Pixel or specify the information it provided to Meta.

47.     Because the Pixel began transmitting filers' information to Meta contemporaneously after filers' signup on the Tax-Filing Services' websites, and because user consent to disclose tax-return information cannot be granted retroactively,[24] the Tax-Filing Services' only opportunity to secure valid consent under the regulations and federal law was during the sign-up process. Because they failed to do so for the reasons described above, their actions were unlawful.

## VI.     Causes of Action & Class Allegations

48.     In light of the foregoing allegations, Plaintiffs bring the following causes of action on behalf of themselves and all others similarly situated.

<div align="center">

**Count One**

**Breach of Contract**

</div>

49.     All preceding allegations are incorporated as if fully set forth herein.

50.     Meta requires Facebook users to click a box indicating that, "By clicking Sign Up, you agree to our Terms, Data Policy, and Cookies Policy."

51.     The Terms are binding on Facebook and its users.

---

[24] 26 C.F.R. § 301-7216-3(b).

<div align="center">

23

CLASS ACTION COMPLAINT

</div>

52. The Data Policy is binding on Facebook and its users.

53. The Cookies Policy is binding on Facebook and its users.

54. The Data Policy promises users that Facebook "requires each of [Meta's] partners to have lawful rights to collect, use, and share your data before providing any data to [Meta]."

55. Facebook breached this contractual promise, as described in detail above, by not requiring its partners that are tax preparation service providers to obtain valid user consent before sharing user data through the Pixel.

56. In addition to the express contract provision set forth above, an implied contract existed between Facebook and its users that Facebook would not conspire with others to violate users' legal rights to privacy in their individually identifiable financial and personal information.

57. Plaintiffs are Facebook account holders who used online tax filing services through which Facebook obtained their individually identifiable financial and personal information.

58. The user financial and personal information that Facebook obtained in breach of the contract included tax filers' names, usernames, IP addresses, the devices they used, their incomes, their tax-filing status, the amount of their tax returns, their number of dependents, the names of their dependents, and the amount of their dependents' college scholarships (if any).

59.     Facebook's breach caused Plaintiffs and the class members the following damages:

      a.    Nominal damages for breach of contract;

      b.    General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

      c.    Sensitive and confidential information including financial and personal information that Plaintiffs and the class members intended to remain private is no longer private;

      d.    Meta eroded the essential confidential nature of the user-tax preparer relationship;

      e.    Meta took something of value from Plaintiffs and the class members and derived benefits therefrom without the Plaintiffs' or the class members' knowledge or informed consent and without sharing the benefit of such value, and;

      f.    Benefit of the bargain damages in that Meta's contract stated that payment for the service would consist of a more limited set of collection of personal information than that which Meta actually charged.

<div align="center">

**Count Two**

**Good Faith & Fair Dealing**

</div>

60.     All preceding allegations are incorporated as if fully set forth herein.

CLASS ACTION COMPLAINT

61.     Valid contracts existed between Plaintiffs, the class members, and Meta.

62.     The contract specifies that California law governs the parties' relationship.

63.     Meta prevented Plaintiff and the class members from receiving the full benefit of the contract by intercepting the content of protected individually identifiable financial and personal information exchanged with tax filing services.

64.     By doing so, Meta abused its power to define terms of the contract, specifically the meaning of the term "require" in Meta's promise that it would "require" partners to have lawful rights to share users' data with Meta before doing so and then taking no action (and actually encouraging) tax filing services to share protected financial and personal information without valid user authorization.

65.     By doing so, Meta did not act fairly and in good faith.

66.     Meta's breach caused Plaintiffs and the class members the following damages:

      a.      Nominal damages for breach of contract;

      b.      General damages for invasion of privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

      c.      Sensitive and confidential information including financial and personal information that Plaintiffs and the class members intended to remain private are no longer private;

CLASS ACTION COMPLAINT

d. Meta eroded the essential confidential nature of the user-tax preparer relationship

e. Meta took something of value from Plaintiffs and the class members and derived benefits therefrom without the Plaintiffs' or the class members' knowledge or informed consent and without sharing the benefit of such value, and;

f. Benefit of the bargain damages in that Meta's contract stated that payment for the service would consist of a more limited set of collection of personal information than that which Meta actually charged.

## Count Three

## Intrusion Upon Seclusion – Constitutional Invasion of Privacy

67. All preceding allegations are incorporated as if fully set forth herein.

68. Article I, Section I of the California Constitution provides:

> *All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and **privacy**.*

69. Plaintiffs and the class members had no knowledge and did not consent or authorize Meta to obtain the content of their communications with their tax-service providers as described herein.

70. Plaintiffs and the class members enjoyed objectively reasonable expectations of privacy surrounding communications with their tax-preparation providers based on:

  a. The tax-preparation providers' status as trusted recipients of their most sensitive financial and personal information;

  b. The laws and regulations prohibiting disclosure of tax return information cited herein;

  c. the Electronic Communications Privacy Act, and;

  d. Meta's promise that it would "require" partners to have lawful permission to share their data before Facebook would collect it.

71. Plaintiffs' and the class members' claims are based on the following private facts:

  a. that Plaintiffs and the class members are customers of the various tax-preparation providers;

  b. the specific dates and times Plaintiffs and the class members clicked to log-in or log-out of the various tax-preparation providers' user portals;

  c. the specific and detailed communications exchanged while logged in the tax-preparation providers' user portals, and;

  d. the specific dates and times when Plaintiffs and the class members submitted their taxes and information incorporated into those tax filings.

72.     Meta's conduct was intentional and intruded on Plaintiffs' and the class members' financial and personal communications which constitute private conversations, matters, and data.

73.     Meta's conduct in acquiring Plaintiffs' and the class members' financial and personal tax-related communications would be highly offensive to a reasonable person because:

a.     Meta conspired with Plaintiffs' and the class members' tax-preparation service providers to violate a cardinal rule of the provider-preparer relationship;

b.     Meta's conduct violated federal law designed to protect tax-preparation services' users' privacy;

c.     Meta's conduct violated Electronic Communications Privacy Act;

d.     Meta's conduct violated the express promises it made to users.

74.     Meta's breach caused Plaintiff and the class members the following damages:

a.     Nominal damages for breach of contract;

b.     General damages for invasion of privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.     Sensitive and confidential information including financial and personal information that Plaintiffs and the class members intended to remain private are no longer private;

CLASS ACTION COMPLAINT

        d.      Meta eroded the essential confidential nature of the user-tax preparer relationship

        e.      Meta took something of value from Plaintiffs and the class members and derived benefits therefrom without the Plaintiffs' or the class members' knowledge or informed consent and without sharing the benefit of such value, and;

        f.      Benefit of the bargain damages in that Meta's contract stated that payment for the service would consist of a more limited set of collection of personal information than that which Meta actually charged.

# Count Four

## Violation of the Electronic Communications Privacy Act

75.     All preceding allegations are incorporated as if fully set forth herein.

76.     The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the contents of any electronic communication.[25]

77.     The ECPA protects both the sending and receipt of communications.

78.     The ECPA provides a private right of action to any person whose electronic communications are intercepted.[26]

---

[25] 18 U.S.C. § 2511.

[26] 18 U.S.C. § 2520(a)

79. Meta intentionally intercepted the electronic communications that Plaintiffs and the class members exchanged with their tax-preparation service providers on the providers properties where the Pixel was present.

80. The transmissions of data between Plaintiffs and the class members and their tax-preparation service providers qualify as communications under the ECPA.[27]

81. Meta acquired user communications with their tax-preparation service providers as alleged herein contemporaneous with their making.

82. The intercepted communications include:

a. the content of user registrations for various tax-preparation service portals, including clicks on buttons to "Register" or "Signup" for said portals;

b. the contents of communications that users exchange with their tax-preparation providers inside various web portals immediately before logging out of those portals; and

c. the contents of communications relating to users' financial and personal information provided for the purpose of preparing tax filings.

---

[27] 18 U.S.C. § 2510(12).

CLASS ACTION COMPLAINT

83.  The following constitute "devices" under the ECPA.[28]

    a.  The cookies Meta used to track users' communications;

    b.  The users' browsers;

    c.  The users' computing devices;

    d.  Meta's web-servers;

    e.  The web-servers of the properties of the tax-preparation service providers where the Pixel was present; and

    f.  The Pixel source code deployed by Meta to effectuate its acquisition of users' tax-related communications.

84.  Meta is not a party to users' communications with their tax-preparation service providers.

85.  Meta received the content of user communications through the surreptitious redirection of them from the users' computing devices to Meta.

86.  Users did not consent to Meta's acquisition of their communications with their tax-preparation service providers.

87.  Meta did not obtain legal authorization to obtain user communications with their tax-preparation service providers.

88.  Meta did not require any tax-preparation service provider to obtain the lawful rights to share the content of user communications relating to tax filings.

---

[28] 18 U.S.C. § 2510(5)

CLASS ACTION COMPLAINT

89.     Any purported consent that Meta received from tax-preparation service providers to obtain user communications content was not valid.

90.     In acquiring the content of user communications relating to users' financial and personal information provided for the purpose of preparing tax filings, Meta had a purpose that was tortious, criminal, and designed to violate state constitution provisions including:

       a.     a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person;

       b.     violation of 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment;

       c.     violation of state unfair business practice statutes;

       d.     violation of the laws and regulations prohibiting disclosure of tax return information cited herein;

       e.     violation of Article I, section 1 of the California Constitution.

91.     Meta knew that such conduct would be highly offensive, yet continued to use the Pixel on tax-preparation service providers' properties for that purpose.

## Count Five

## Violation of the California Invasion of Privacy Act

92.     All preceding allegations are incorporated as if fully set forth herein.

93.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630-38. The Act begins with its statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of **eavesdropping upon private communications** and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and **cannot be tolerated in a free and civilized society**.[29]

94.     CIPA goes on to provide, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner …. willfully and without the consent of all parties to the communication, or in **any unauthorized manner**, reads, or attempts to read, or to learn the contents or meaning of **any message, report, or communication** while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to **communicate in any way, any information so obtained,** or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, **is punishable by a fine not exceeding two thousand five hundred dollars**.[30]

95.     CIPA further provides, in pertinent part, that it is unlawful for any person to "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to … record

---

[29] Cal. Penal Code § 630.

[30] Cal. Penal Code § 631(a).

CLASS ACTION COMPLAINT

the confidential communication." As used in the statute, a "confidential communication" is "any communication carried on in circumstances as may reasonably indicate that any part to the communication desired it to be confined to the parties thereto[.]"[31]

96.  Meta is a "person" within the meaning of CIPA §§ 631 and 632.

97.  Meta did not have the consent of all parties to learn the contents of or record the confidential communications at issue.

98.  Meta is headquartered in California, designed and contrived and effectuated its scheme to track users' tax-related communications from California, and has adopted California substantive law to govern its relationship with users.

99.  At all relevant times, Meta's conduct alleged herein was without the authorization and consent of Plaintiffs and class members.

100.  Meta's actions were designed to learn or attempt to learn the meaning of the confidential tax-related communications users exchanged with their tax-preparation service.

101.  Meta's learning of or attempt to learn the contents of tax filers' communications occurred while they were in transit or in the process of being sent or received.

<div align="center">

**Count Six**

**Negligent Misrepresentation**

</div>

---

[31] Cal. Penal Code § 632.

<div align="center">CLASS ACTION COMPLAINT</div>

102.  All preceding allegations are incorporated as if fully set forth herein.

103.  Meta represented to Plaintiffs and the class members that a fact was true, namely, that before receiving the confidential information at issue, Meta "requires" business partners to "have lawful rights to collect, use, and share [Plaintiffs' and class members'] data before providing any data" to Meta.

104.  Meta's representation was not true.

105.  Even if Meta honestly believed that this representation was true, Meta had no reasonable grounds for believing the representation was true when made.

106.  Meta intended that Plaintiffs and the class members rely on the representation.

107.  Plaintiffs and the class members reasonably relied on Meta's representation.

108.  Plaintiffs and the class members were harmed as set forth above.

109. Plaintiffs and the class members reliance on Meta's representation was a substantial factor in causing the harm.

## Count Seven

### Violation of California's Unfair Competition Law

110.  All preceding allegations are incorporated as if fully set forth herein.

CLASS ACTION COMPLAINT

111. California's Unfair Competition Law ("UCL") is codified at Calfornia Business and Professions Code Section 17200. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising …"

112. Meta has enged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. Specifically, Meta has engaged in unlawful acts or practices under the UCL by its violations of the California Constitution's right to privacy, the Electronic Communications Protection Act, and the California Invasion of Privacy Act, through the acts and practices set forth in this Complaint.

113. Meta has engaged in fraudulent business acts or practices in violation of the UCL because its misrepresentations and omissions regarding its requirement that businesses have lawful rights to collect, use, and share Plaintiffs' and the class members' data before providing any data to Meta. Meta's receipt of the confidential information at issue was intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs and the class members. The information Meta misrepresented and concealed would be, and is, material to reasonable consumers because Meta does not require businesses to have lawful rights to collect, use, and share Plaintiffs' and the class members' data before providing any data to Meta and Meta receives the confidential information at issue nonetheless.

114. Meta's actions offend public policy.

CLASS ACTION COMPLAINT

115.  Meta's conduct, misrepresentations, and omissions have also impaired competition within the tax-preparation market in that those actions have prevented Plaintiffs and the class members from making fully informed decisions about whether to communicate online with their tax-preparation service providers and to use their tax-preparation service providers' website in the first instance.

116.  Plaintiffs and the class members have suffered an injury in fact as a result of Meta's unfair, unlawful, and/or deceptive practices, to wit, the disclosure of their personally identifable data which has value as it is demonstrated by the use and sale of that data by Meta. While only an identifiable "trifle" of injury is required under the UCL, as set out above Plaintiffs and the class members value their private financial and personal information more than a trifle. Sale of this confidential and valuable information has diminshed the value of such information to Plaintiffs and the class members.

117.  Meta's actions caused damage to and loss of Plaintiffs' and the class members' property right to control the dissemination and use of their personally identifiable tax-related data and communications.

118.  Meta's representation that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and the class members'] data before providing any data" to Meta was untrue. Again, had Plaintiffs and the class members known these facts, they would not have used the tax-preparation service providers' websites.

119.  The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Meta's business. Meta's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

120.  Plaintiffs and the class members request that this Court enjoin Meta from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the class members, in the form of restitution, any money Meta acquired through its unfair competition.

<div align="center">

### Class Allegations

### (Applicable to All Counts)

</div>

121.  Plaintiffs bring this action individually and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).

122.  Plaintiffs file this as a class action on behalf of themselves and the following class (the "Class"):

> All Facebook users who are current or former users of tax-preparation service providers in the United States with web properties through which Meta acquired tax return information, and for which neither the tax-preparation service provider nor Meta obtained a valid consent.

123.  Excluded from the Class are the Court and its personnel and the Defendant and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

124. The members of the Class are so numerous that joinder is impracticable. More than ten million individuals used H&R Block Online, TaxAct, or TaxSlayer to file their taxes in 2021 alone. The Pixel appears to have collected information about all users of these services.

125. Common questions of law and fact are apt to drive the resolution of this case, exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class including, but not limited to, the following:

      a.    Whether the Pixel is designed to and in fact does send individually identifiable financial and personal tax-related information to Meta;

      b.    Whether the Terms and Privacy Notice are valid contracts;

      c.    Whether Meta failed to require tax-preparation service providers to have lawful rights to share user data with Meta before deploying the Pixel;

      d.    Whether Meta acquired the content of filers' communications;

      e.    Whether the Class members provided Meta with authorization to acquire their communications with their tax-preparation service providers;

      f.    Whether the Pixel's presence and use on tax-preparation service providers' websites is highly offensive;

CLASS ACTION COMPLAINT

g.      Whether Meta's acqusition of the content of communications between users and their tax-preparation service providers occurred contemporaneous to their making;

h.      Whether Meta breached its contract with users;

i.      Whether the information at issue has economic value;

j.      Whether Meta unjustly profited from its collection of the Class members' sensitive financial and personal tax-related information.

126.   The named Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Meta's wrongful conduct in violation of federal and California law, as complained of herein.

127.   The named Plaintiffs will fairly and adequately protect the interest of the members of the Class and have retained counsel competent in class action litigation. The named Plaintiffs have no interests that conflict with, or are otherwise antagonistic to, the interests of other Class members.

128.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the joinder of all members is impracticable. Further, as the damages that individual Class members have suffered may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

CLASS ACTION COMPLAINT

## VII.  Prayer for Relief

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court grant the following relief.

a.     Certify the proposed Class, designation Plaintiffs John Doe and Jane Doe as the named representatives of the Class, and designating the undersigned as Class Counsel;

b.     Award compensatory damages, including statutory damages where available, to Plaintiff and the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Award punitive damages on the causes of action that allow for them and in an amount that will deter Defendant and others from like conduct;

d.     Award attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure Section 1021.5;

e.     Award pre-judgment and post-judgment interest, as provided by law, and;

f.     Such other, further, and different relief as the Court deems proper under the circumstances.

## VIII. Demand for Jury Trial

Plaintiffs hereby demand a jury trial on all issues so triable.

CLASS ACTION COMPLAINT

Dated:  December 1, 2022         Respectfully submitted,

Marshal J. Hoda, Esq.
Texas Bar No. 2411009
(*Pro hac vice* application forthcoming)
12333 Sowden Road, Suite B
Houston, TX 77080
o. (832) 848-0036
marshal@thehodalawfirm.com
THE HODA LAW FIRM, PLLC

*/s/ Patrick Yarborough, Esq.*
Patrick Yarborough, Esq.
Texas Bar No. 24084129
(*Pro hac vice* application forthcoming)
917 Franklin Street, Suite 220
Houston, TX 77002
o. (713) 331-5254
patrick@fosteryarborough.com
FOSTER YARBOROUGH PLLC

*/s/  Steven C. Vondran, Esq.*
Steven C. Vondran, Esq.
California Bar No. 232337
One Sansome Street, Suite 3500
San Francisco, CA 94104
o. (877) 276-5084
steve@vondranlegal.com
THE LAW OFFICES OF STEVEN C. VONDRAN, P.C.

43

CLASS ACTION COMPLAINT