GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY (SBN 268184)
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA (SBN 301746)
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
rhodesmg@cooley.com
KYLE C. WONG (SBN 224021)
kwong@cooley.com
CAROLINE A. LEBEL (SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.
(formerly known as Facebook, Inc.)*

GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Jason 'Jay' Barnes (admitted *pro hac vice*)
jaybarnes@simmonsfirm.com
SIMMONS HANLY CONROY LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: (212) 784-6400
Facsimile: (212) 213-5949

*Additional Attorneys in Signature Block*

*Co-Lead Counsel for Plaintiffs and the
Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>All Actions | Case No. 3:22-cv-03580-WHO<br><br>**CASE MANAGEMENT STATEMENT**<br><br>Date: March 14, 2023<br>Time: 2:00 p.m.<br>Courtroom: 2, 17th Floor<br>Judge: Hon. William H. Orrick |

Plaintiffs and Defendant Meta Platforms, Inc. ("Meta"), by and through their respective counsel of record, hereby submit the following Joint Case Management Statement pursuant to Civil Local Rule 16-10 in advance of the Case Management Conference scheduled in the above-captioned case for March 14, 2023 at 2:00 P.M. before the Honorable William H. Orrick, in Courtroom 2, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102.

## 1. UPDATE ON CASE STATUS

**Plaintiffs' Portion:**

This action was first filed in June 2022. Following 23(g) briefing, the Court appointed leadership on December 21, 2022.

At the January 17 CMC, the Court "express[ed] its desire that this case move to resolution, one way or the other, with dispatch." Dkt. No. 173. The Court ordered:

- "Prior to the next CMC, the parties should engage on the case calendar and propose a joint or competing schedules."
- "The parties should finish negotiating the ESI protocol, protective and clawback orders by February 21, 2023. Any disputes may be presented at the next CMC."
- "The parties should begin negotiating custodians, search terms, and other prerequisites for discovery now."

On February 9, Plaintiffs served their First Set of RFPs and Interrogatories (the responses to which are due March 13), and on February 21, Plaintiffs filed their Consolidated Amended Complaint.

Pursuant to the Court's directive at the prior CMC, and after several meet and confers with Meta, Plaintiffs now propose to the Court an ESI Protocol, Protective Order, Clawback Order, and case schedule for consideration.

As the Court rightfully noted at the prior CMC, it is imperative that this case move forward "with dispatch." The next, necessary step to that end is entry of an ESI Protocol, Protective Order, and Case Schedule. As explained below, with regard to the ESI protocol, the parties require the Court's guidance with regard to a handful of remaining, but important issues. Chief of among these is the requirement to preserve potentially relevant documents. Meta seeks permission, via the ESI protocol,

to unilaterally destroy entire categories of documents, such as "server, system, or network logs" without consulting with the Plaintiffs or providing any explanation. This issue, as well as the handful of remaining outstanding issues, deserve the Court's attention. Similarly, with regard to the Protective Order, the parties have narrowed the dispute to a handful of issues.

Finally, with regard to the proposed Case Schedule, the difference between the parties' proposals concerns only two main issues. First, Plaintiffs believe that the schedule should include interim deadlines to select search terms and custodians, and a deadline to substantially complete the initial production of documents. Meta will not agree to this proposal and to date, it has not proposed any search terms or custodians (despite repeated requests from Plaintiffs). Nothing focuses the mind like Court imposed deadlines, and Plaintiffs respectfully submit that clear deadlines are necessary to move this case forward.  Second, Plaintiffs believe that the schedule should provide for one round of expert disclosures, while Meta seeks two rounds.  As explained below, there is no need for two rounds of expert disclosures, which will only cause delay and impose more costs on the parties. Accordingly, and as explained more fully below, Plaintiffs respectfully request that the Court enter Plaintiffs' proposed ESI Protocol, Protective Order, Clawback Order, and Case Schedule. These foundational documents are necessary to move forward, and there is no need for further delay.

**Meta's Position:**

The parties previously submitted joint Rule 26(f) reports on September 28, 2022 (prior to consolidation of the cases under *In re Meta Pixel Healthcare Litigation*), and the Court subsequently held a case management conference on October 5, 2022.  ECF Nos. 66, 68.  On December 21, 2022, the Court appointed Interim Lead Counsel in the consolidated action.  ECF No. 158.  The parties filed another joint case management statement on January 10, 2023, and the Court subsequently held a case management conference on January 17, 2023.  ECF Nos. 167, 173.

Following the January 17, 2023 Conference, the parties have met and conferred seven times, on February 17, 22, 23, and 28, 2023 and March 1, 2, and 6, 2023, to discuss, inter alia, the issues raised in this Joint Case Management Statement.  Pursuant to the Court's January 17, 2023 minute order, the parties submit this case management statement to update the Court on developments in the

1   case, including disputes that have arisen during the parties' negotiation of the ESI protocol, protective

2   order, and clawback order, and each party's proposed case schedule.  ECF No. 173.

3   Although Meta believes that many of the remaining issues can be resolved among the parties,

4   Meta agrees with Plaintiffs that the parties would benefit from this Court's guidance on a few key

5   issues in dispute.  In particular, fundamental disagreements concerning what is proportional discovery

6   have led the parties to a standstill.  Meta, for example, should not be required to freeze all potentially

7   relevant sources—including backup tapes and systems no longer in use—unless and until it seeks a

8   court order.  It is Meta's position that Plaintiffs' emphasis on speed overlooks the ability of the parties

9   to find common ground, as they have done, through the meet and confer process.

10   Meta's position is that, following the Court addressing the issues raised in this statement, the

11   parties should utilize the Court's guidance to reach an agreement on the remaining issues.  However,

12   given that Plaintiffs have indicated that they want the court to enter and ESI Protocol, Protective Order,

13   Clawback Order, and case schedule today, Meta respectfully requests that the Court enter Meta's

14   proposed ESI Protocol, Protective Order, 502(d) Clawback Order, and proposed schedule.

15   **2.  SCHEDULE**

16   **Plaintiffs' Statement:**

17   This is Plaintiffs' second request for the Court to enter a schedule. In early January, Plaintiffs

18   attempted to engage Meta regarding a case schedule. However, Meta refused to negotiate. Thus, in

19   the parties' January 10 case management conference statement, Plaintiffs proposed a schedule, and

20   Meta asked for further negotiations. Dkt. No. 167 at 11-12.

21   At the January 17 case management conference, the Court declined to enter a schedule, but

22   ordered that, "Prior to the next CMC, the parties should engage on the case calendar and propose a

23   joint or competing schedules." ECF No. 173.

24   The parties have met-and-conferred and reached agreement on some scheduled dates,

25   including the close of fact discovery on March 13, 2024 (1 year from the upcoming case

26   management conference).

27

28

The parties have reached impasse on the schedule. Below, Meta asks the Court for "guidance" so that the parties can negotiate, yet again, about the schedule. Plaintiffs respectfully request that the Court enter Plaintiffs' schedule. There is no need for further negotiation of the schedule. The parties only have identified two substantive disputes regarding the schedule, which the Court can adjudicate.

**Dispute No. 1: Plaintiffs Propose Interim Deadline to Ensure that Discovery Moves Forward in An Expeditious Manner**

First, Plaintiffs propose the following intermediate deadlines:

- March 28, 2023 - Deadline for parties to propose initial search terms, custodians, and sources of ESI to search their own ESI and to produce organizational charts
- April 18, 2023 - Deadline for parties to reach agreement on initial search, custodians, and sources of ESI or submit the issue to the Court
- June 23, 2023 - Substantially complete production from initial custodians and search terms

Plaintiffs propose these intermediate deadlines to ensure that discovery moves forward in an expeditious manner. Plaintiffs' proposed intermediate deadlines will provide the parties with the needed time to review documents and conduct depositions, and to also serve follow-up discovery requests. Without intermediate document discovery deadlines, the parties will likely end up with an untenably backloaded schedule. A fair, mutual schedule will ensure orderly and efficient discovery, and will avoid last minute productions in the midst of depositions or on the eve of the discovery cut-off. This schedule also ensures that the parties will have time to review the documents from the initial custodians and search terms before selecting any additional custodians and search terms.

**Dispute No. 2: Plaintiffs Propose One Round of Expert Reports Instead of Two Rounds**

Plaintiffs propose that the parties have one round of expert reports rather than bifurcating class and merits expert reports in two rounds. Because the parties have agreed that the fact discovery should not be bifurcated, it is more efficient to have one round of expert reports. This will move the

-5-

parties more quickly towards trial and resolution. Furthermore, it would be a waste of resources to have two rounds of expert depositions or two rounds of *Daubert* briefing.

Meta generally asserts that, "Without a decision on class certification, the parties will be forced to present expert evidence on issues that may become moot, unnecessarily increasing the costs and burdens on the parties." Given the issues in this case, Plaintiffs expect that their experts would include the same information in their class expert reports as their merit expert reports. Plaintiffs do not foresee any efficiencies that will be gained through two rounds of expert reports, and certainly no efficiencies that would outweigh the costs of the parties' experts producing two rounds of reports on the same issues, potentially being deposed twice, or potentially being briefing two *Daubert* motions.

Thus, Plaintiffs propose the following schedule:

| **Event** | **Date** |
| --- | --- |
| Deadline for parties to propose initial search terms, custodians, and sources of ESI to search their own ESI and to produce organizational charts | Tuesday, March 28, 2023 |
| Deadline for parties to reach agreement on initial search, custodians, and sources of ESI or submit the issue to the Court | Tuesday, April 18, 2023 |
| Responsive Pleading Shall Be Filed | Monday, May 8, 2023 |
| Opposition to Motion to Dismiss Shall be Filed | Monday, June 12, 2023 |
| Substantially Complete Production from Initial Custodians and Search Terms | Friday, June, 23, 2023 |
| Reply to Motion to Dismiss Shall be Filed | Monday, July 17, 2023 |
| Deadline for First Settlement Conference | Monday, November 13, 2023 |
| Close of Fact Discovery | Wednesday, March 13, 2024 |
| Opening Expert Disclosures | Friday, May 3, 2024 |
| Rebuttal Expert Disclosures | Friday, June 7, 2024 |
| Reply Expert Disclosures (response to Rebuttal Expert Reports) | Monday, July 8, 2024 |
| Expert Discovery Deadline | Friday, August 16, 2024 |
| Motion for Class Certification Shall be Filed | Friday, September 6, 2024 |
| Opposition to Class Certification Shall be Filed | Friday, October 11, 2024 |
| Reply in Support of Class Certification Shall be Filed | Friday, November 15, 2024 |
| Dispositive and Daubert Motions Shall be Filed | Friday, February 7, 2025 |
| Opposition to Dispositive and Daubert Motions Shall be Filed | Friday, March 14, 2025 |

| Reply to Dispositive and Daubert Motions Shall be Filed | Friday, April 18, 2025 |
| Pre-Trial Conference | Monday, June 9, 2025 |
| Trial | Monday, August 11, 2025 |

**Meta's Statement:**

As requested by the Court, the parties have engaged on a case schedule.

On February 16, 2023, Meta provided  Plaintiffs with its counter-proposal to the schedule that Plaintiffs presented to the Court prior to the January 17, 2023 Conference.  ECF No. 167 at 11–12.  On March 1, 2023, Plaintiffs sent Meta a revised proposal.  Notably, Plaintiffs' most recent proposal moved forward many of the deadlines it previously provided to the Court, which Meta disagrees with. Despite this, it is Meta's position that the parties can reach agreement on a schedule with guidance from the Court on two gating issues: (1) unnecessary interim discovery deadlines, and (2) the sequencing of class certification briefing.

Because the Court requested joint or competing schedules from the parties, Meta also provides its proposed schedule below, with time periods keyed off the sequencing Meta proposes.

*(1) Interim discovery deadlines are unnecessary*

The parties have agreed that fact discovery will close on March 13, 2024.  The parties have also agreed that briefing on the upcoming motion to dismiss will be completed by July 17, 2023.  As per the guidance of the Court, the parties agree that discovery will proceed while the motion to dismiss is pending.

Despite this, Plaintiffs seek to impose unnecessary interim discovery deadlines that require "substantial[] complet[ion]" of documents connected to an undefined set of "initial" requests approximately *one month prior* to the completion of motion to dismiss briefing.

Such interim discovery deadlines are neither appropriate nor necessary.  Meta continues to meet and confer with Plaintiffs and will have responded and objected to Plaintiffs' initial sets of interrogatories and requests for production by the date of the Conference.  The initial set of sixty-seven requests for production served by Plaintiffs on February 9, 2023, reveals that Plaintiffs envision broad and wide-ranging discovery that will require on-going conversations between the parties—and potentially judicial intervention—to locate, review, and produce responsive information tailored to the

claims and defenses in this litigation.  In fact, Plaintiffs' first proposed interim deadline is 14 days after the upcoming Conference.  Plaintiffs' next proposed interim deadline will bring the parties back to court with discovery disputes roughly one month after the upcoming Conference.  Front-loading discovery in this manner will invite unnecessary costs and burdens on the parties and the court to address discovery issues, mutually or through judicial intervention, in a manner prioritizing speed over substance.

Meta's position is that the parties should continue to meet and confer in good faith, and the discovery process will continue to progress in the regular course.  Meta believes that this process will provide the parties time to fully address discovery issues before raising them with the court, if necessary.

### (2) Sequencing Class Certification briefing will promote efficiency

Meta proposes that the parties should sequence the case schedule so that class certification briefing, including any associated expert evidence offered in connection with such briefing, occurs prior to expert evidence offered in connection with non-class certification issues.  Once class certification briefing is completed and the motion has been decided, Meta proposes that the parties undertake merits expert discovery, followed by briefing on *Daubert* and dispositive motions.

Plaintiffs rejected this proposal.  Instead, Plaintiffs propose combining all expert discovery (including experts on class certification and merits issues) after the end of fact discovery and then briefing class certification, followed by *Daubert* and dispositive motions.

Meta believes that its proposed sequencing provides for a more efficient adjudication of the case.  Class certification will impact merits issues and specific subjects on which the parties will likely offer expert evidence.  Without a decision on class certification, the parties will be forced to present expert evidence on issues that may become moot, unnecessarily increasing the costs and burdens on the parties.  Accordingly, Meta believes a schedule in which class certification is addressed first, followed by expert discovery on all other issues, is the most efficient way to proceed.

### Meta's Proposed Schedule

Meta proposes the following schedule.

| Event | Date |
|---|---|
| Responsive Pleading | Monday, May 8, 2023 |
| Opposition to Motion to Dismiss | Monday, June 12, 2023 |
| Reply to Motion to Dismiss | Monday, July 17, 2023 |
| Deadline to Amend Consolidated Amended Complaint | 30 days after the Motion to Dismiss is decided |
| Deadline for First Settlement Conference | Monday, November 13, 2023 |
| Close of Fact Discovery | Wednesday, March 13, 2024 |
| Motion for Class Certification (with all evidence and expert reports) | Friday April 26, 2024 |
| Opposition to Motion for Class Certification (with all evidence and expert reports) | Friday, July 12, 2024 |
| Reply to Motion for Class Certification (with all evidence and expert reports) | Friday, August 16, 2024 |
| Opening Expert Disclosures (merits and non-class) | 45 days following the decision on class certification |
| Rebuttal Expert Disclosures (merits and non-class) | 45 days following the filing of opening expert disclosures |
| Reply Expert Disclosures (merits and non-class) | 30 days following the filing of rebuttal expert disclosures |
| Expert Discovery Deadline | 30 days following the filing of reply expert disclosures |
| Deadline for Dispositive and *Daubert* Motions | 60 days following expert discovery deadline |
| Opposition to Dispositive and *Daubert* Motions | 45 days following the filing of opening dispositive and *Daubert* motions |
| Reply to Dispositive and *Daubert* Motions | 30 days following the filing of opposition to dispositive and *Daubert* motions |
| Pre-Trial Conference | 60 days prior to the start of trial |
| Trial | TBD |

### 3. ESI PROTOCOL

**Plaintiffs' position**:

On January 17, the Court ordered the parties to "finish negotiating the ESI protocol, protective and clawback orders by February 21, 2023. Any disputes may be presented at the next CMC." ECF No. 173. The parties have negotiated regarding the ESI protocol and reached impasse on four

substantial issues. These are: (1) evidence preservation and destruction, (2) the search protocol, (3) privilege log timing, and (4) the production of non-public attachments linked to other documents.

Plaintiffs moved with alacrity to negotiate an ESI Protocol. On January 5, Plaintiffs sent Meta their proposed ESI protocol. Forty-one days later, on February 15, Meta sent a counterproposal. The parties conferred on February 22 and 23. On February 27, Plaintiffs sent a counter to Meta. The parties exchanged further proposals on March 4 and March 6. Meta sent Plaintiffs a revised ESI Protocol proposal at 7:14 pm on March 7, the day that this case management conference statement was due.

As discussed below, Plaintiffs respectfully request that the Court enter Plaintiffs' proposed ESI protocol. To move this case forward, it is imperative that an ESI Protocol is entered. The Court already made that clear at the last CMC, and no further delay in entry of an ESI Protocol is warranted.

In addition to the four substantive issues that need to be resolved, Meta briefly references eight issues relating to the format in which the documents will be produced that are unresolved. For example, the parties disagree regarding whether PowerPoint presentations should be produced in their native format or as TIFF images. Plaintiffs are hopeful that most of these document production format issues can be resolved prior to March 14.

To the extent that some of these document production format issues are not resolved prior to March 14, the Court should still enter the remainder of the ESI protocol. If necessary, the parties can be directed to brief and/or file a short addendum regarding the remaining issues. Until an ESI Protocol is entered regarding the core elements of ESI discovery in this matter, discovery will be stymied. The Court should not allow document production format disputes to hold up entry of an ESI Protocol.

Plaintiffs attach hereto, as Exhibit I, Plaintiffs' proposed ESI protocol ("Plaintiffs' ESI Protocol"). Plaintiffs also attach hereto, as Exhibit J, a redline comparing Plaintiffs' ESI Protocol with the Northern District of California model ESI protocol.

**A.  Preservation: Meta Should Not Be Grated License to Delete Critical Evidence**

The parties have proposed fundamentally different approaches to preservation. Meta has refused to engage in substantive conversations about its preservation efforts and now asks the Court to enter an ESI protocol that authorizes Meta to delete more than a dozen broad categories of relevant

evidence without explanation. By contrast, Plaintiffs seek a modest agreement on preservation that reiterates the parties' existing legal obligations and creates a fair procedure for any requests by a party to stop preserving specific relevant evidence.

Plaintiffs' ESI Protocol is based on well-established legal standards for the preservation of evidence. First, under Plaintiffs' ESI Protocol, the parties affirm their commitment to follow the governing law on preservation under which they are obligated to "preserve evidence that they know or reasonably should know is relevant to any claim or defense in the action." Exhibit I, Plaintiffs' ESI Protocol, at § 5. As this Court has explained, "as soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Rockman Co. (USA), Inc. v. Nong Shim Co., Ltd*, 229 F. Supp. 3d 1109, 1122 (N.D. Cal. 2017) (Orrick, J.) (quoting *In re Napster*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006)).

Second, Plaintiffs' ESI Protocol creates a fair procedure for any request by a party to stop preserving specific relevant evidence. Under Plaintiffs' proposal, if "a Party seeks to be relieved of the obligation to preserve certain relevant evidence, it may file a motion for a protective order seeking to be relieved of that obligation for specific relevant evidence." Exhibit I, Plaintiffs' ESI Protocol, at § 5. The moving party bears the burden of demonstrating "good cause" and a "particular need" for a protective order to not preserve relevant evidence. This is a standard approach endorsed by the Manual for Complex Litigation. § 11.442. ("[T]he party seeking destruction should be required to show good cause before destruction is permitted."). So that the parties can properly assess requests to stop preserving certain relevant evidence, Plaintiffs' ESI Protocol requires that the party seeking the protective order provide a precise description of what it seeks to stop preserving, and specific information, including regarding the "costs and burdens of preservation." Exhibit I, Plaintiffs' ESI Protocol, at § 5.

Meta asserts below that Plaintiffs' proposed ESI Protocol ignores that preservation of ESI should be "reasonable and proportionate." Not so. Plaintiffs are willing to discuss proportionality, but Meta must provide information about what specifically it seeks to stop preserving, its associated

1    burden, and alternatives. Without that information, neither the Court nor the Plaintiffs can make an

2    informed decision about the reasonableness or proportionality of preservation.

3        Without a showing of good cause or any explanation of its systems, Meta demands the Court

4    enter an ESI Protocol that permits it to categorically stop preserving more than a dozen broad,

5    undefined categories of relevant documents. Disturbingly, Meta's ESI Protocol states that the parties

6    should stop preserving both "server, system, or network logs" and "[d]ynamic fields in databases or

7    log files not stored or retained in the ordinary course of business." Meta's Proposed ESI Protocol, at §

8    5(f). But those logs contain evidence at the very heart of this litigation: the health information

9    transmitted by healthcare providers and covered entities to Meta. The Court has also recognized that

10   the "amount of data that seeps through [Meta's] filtration systems" is relevant to this action. Order

11   Denying Preliminary Injunction at 32. Based on general knowledge, the logs and databases Meta seeks

12   permission to stop preserving would likely include key data to prove some of Plaintiffs' core allegations

13   in the Consolidated Amended Complaint. See CCAC ¶¶ 5-9, 13, 75, 79, 81-82, 249-258, 268-270, 303-

14   310, 312, 314-315, 335-340, 368, 371-372, 376, 381-382, 387, 396-398, 407, 419, 421, 460, 475, 476-

15   481, 492; see also Smith Decl. ¶¶ 5-6, 26-33, 52, 62, 67, 97, 130-141, 149-150, 157-162, 171-186, 187-

16   191, 192-196, 199-201. And, if the logs and databases did not contain relevant information, then there

17   would no need for Meta to obtain an order permitting their destruction.

18       Meta's ESI Protocol also authorizes Meta to stop preserving ESI created before April 1, 2018

19   or after the filing of the Consolidated Complaint on February 21, 2022. Meta's Proposed ESI Protocol,

20   at § 5(b). This provision would empower Meta to stop preserving the documents relating to Meta's

21   ongoing violation of patients' privacy rights and Plaintiffs' request for injunctive relief. Meta also does

22   not provide any justification for failing to preserve ESI created before April 1, 2018. There are class

23   members whose claims arose prior to April 1, 2018 because (among other reasons) Plaintiffs allege

24   that "all applicable statutes of limitations have been tolled based on the discovery rule and Meta's

25   concealment, and Meta is estopped from relying on any statutes of limitations in defense of this action."

26   Plaintiffs' Consolidated Amended Complaint, Dkt. No. 185, at ¶¶ 281-285. In addition, documents

27   relating to the other important issues – such as creation of the Pixel and Meta's "Health" division and

28

how they operate – were likely created before April 1, 2018. There is no reason for the Court to enter an ESI protocol that grants Meta a categorical license to delete documents created before April 1, 2018.

Furthermore, many of the categories of documents that Meta seeks authorization to stop preserving are black boxes. For example, Meta's ESI Protocol states that it will only use "standard business processes" to retain "instant messages and chats that are not chronicled to an email archive system." Meta's Proposed ESI Protocol, at § 5. But Plaintiffs are unable to evaluate this proposal, as Meta has neither disclosed how its instant messages and chats are archived nor what "standard business processes" Meta uses to retain its instant messages and chats.

Meta cannot have it both ways. Meta refuses to provide Plaintiffs with information about its preservation efforts, but also wants to Plaintiffs to endorse Meta's limitations on its preservation efforts. Plaintiffs cannot authorize Meta to delete relevant information when Plaintiffs are in the dark as to what Meta is preserving and what specifically Meta seeks to stop preserving.

Contrary to Meta's incorrect assertion, Meta's proposed ESI protocol does not follow, let alone "mirror," this district's model ESI Protocol. This District's Model ESI protocol is based on the parties discussing preservation, and begins by stating, "*The parties have discussed their preservation obligations and needs* and agree that preservation of potentially relevant ESI will be reasonable and proportionate." Model ESI Protocol at § 4 (emphasis added). Here, Meta refuses to have any substantive discussions regarding preservation despite Plaintiffs' repeated requests. (Meta has stated in meet-and-confers that it would be willing to discuss preservation at some undefined point in the future.)[1]  Also, contrary Meta's assertion, the Model ESI Protocol also does not endorse that the parties stop preserving any particular source of ESI, but instead leaves a blank where the parties can fill in any sources of ESI that they agree need not be preserved. Model ESI Protocol at § 4(d),(e),(f). Here, Meta filled in the blanks itself, and refused to provide any information to Plaintiffs. This bears no resemblance to the cooperative approach endorsed by this District's Model ESI protocol.

---

[1] Meta's misses the point when it criticizes Plaintiffs for not identifying data bases by name prior to discovery or engagement by Meta on preservation. See *In re FB Cons. Privacy User Profile Litig.*, Case No. 3:18-md-02843-VC, Dkt. 1104 at 49, ("How were the plaintiffs supposed to know what specific information Facebook collected about them[?]… Through discovery, the plaintiffs were entitled to this evidence – that is the whole point of civil discovery."")

**B. Search Protocol: Meta Should Not Be Permitted to Unilaterally Control Selection of Custodians and Search Terms and Should be Required to Engage in Cooperative Process**

At the last Case Management Conference, the Court ordered the parties to "begin negotiating custodians, search terms, and other prerequisites for discovery now." ECF No. 173. Despite repeated requests from Plaintiffs, Meta has not proposed search terms or custodians to search its ESI. Meta has not provided any excuse for dragging its feet in negotiating search terms and custodians.

The parties have a fundamental dispute regarding whether search terms and custodians should be selected via negotiation and, if necessary, court order (Plaintiffs' proposal) or whether the producing party should be granted the unilateral right to make final decisions regarding search terms and custodians (Meta's proposal). Meta's ESI Protocol transfers final decision-making authority regarding search terms and custodians from the district court to the producing party. Specifically, Meta proposes a novel ESI Protocol in which the producing party "determine[s]" which documents it will search and produce. Meta ESI Protocol at § 6. Under its proposal, Meta would unilaterally pick the custodians and Plaintiffs would be prohibited from requesting additional search terms after receiving Meta's production. Model ESI Protocol at § 6 ("No additional iterations of search term development will be conducted.")

Meta does not identify *any* ESI Protocols that follow Meta's proposed search approach. Meta's ESI Protocol not only violates this Court's existing order that the parties negotiate search terms and custodians, but it is also the antithesis of a cooperative or transparent process for searching ESI. Courts have repeatedly emphasized that, "while key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process." *In re Seroquel Prod. Liab. Litig.*, 244 F.R.D. 650, 662 (M.D. Fla. 2007). Meta's approach is "is contrary to case law requiring the joint development of search terms, often with the use of experts, to be applied to electronic databases." *In re eBay Seller Antitrust Litig.*, No. C 07-1882 JF (RS), 2009 WL 10694848, at *2 (N.D. Cal. July 13, 2009).

Meta defends its novel process by assuring that it will review a "null set" of documents that do not contain Meta's search terms. While the "null set" could provide some useful information, it does

not provide the same information as a "hit report," which provides the volume of documents returned by various search terms. Meta proclaims that "hit reports" are unnecessary because they do not provide information about responsiveness. But Meta does not explain why the parties should not exchange both "hit reports" and "null sets," which both provide useful (but different) information. Nor does Meta's production of null sets justify divesting the Court of jurisdiction over disputes regarding search terms and custodians. (Of course, Meta could also produce null sets as part of the parties' negotiations regarding search terms and custodians.)

Plaintiffs' ESI Protocol includes a standard process for ESI negotiations. First, the producing party will "propose initial search terms, custodians, and sources of ESI for custodial searches..." Exhibit I, Plaintiffs' ESI Protocol, at § 6. Second, the producing party's proposal "will be subject to negotiation and input from the receiving party." Exhibit I, Plaintiffs' ESI Protocol, at § 6. The receiving party may ask for (and the producing party will not unreasonably withhold) qualitative and quantitative information about the producing party's search methodology, including hit reports. Third, "if the Parties are unable to reach agreement on initial search terms, custodians and sources of ESI, they shall present their dispute to the Court in accordance with its Standing Order." *Id.*, at § 6.

Negotiations over search terms and custodians are a standard part of modern discovery in which Meta has participated in other cases. *See e.g., Price v. Facebook, Inc.*, No. 18-MD-02843-VC (JSC), 2020 WL 13200227, at *1 (N.D. Cal. Apr. 2, 2020) (Meta "negotiat[ing] search terms and custodians" in a consumer privacy class action); *see also DZ Reserve v. Meta Platforms*, *Inc.*, 3:18-cv-04978-JD, Dkt. No. 86 at 5-6. Meta has not explained why this case is different, such that Meta alone should control selection of search terms and custodians.

Meta asserts that the receiving party should not be allowed to participate in negotiating search terms and custodians because they are "least situated to understand the systems and data at issue…" Meta's position is absurd. Meta seeks to deny Plaintiffs the opportunity to seek judicial relief regarding search terms and custodians *because* Meta refuses to provide any information about its systems and data. The superior approach is for Meta to tell Plaintiffs what sources of ESI it intends to search, so that the parties can have an informed conversation. The approach is doubly absurd because Meta would

preclude Plaintiffs from offering additional search terms after initial productions and discovery gives Plaintiffs greater insight into "the systems and data at issue."

Meta also claims that Plaintiffs' proposed search process should be rejected because "there are no stated time, sequencing, volume, or other limits on this amorphous process." This criticism is spurious. As for timing and sequencing, Plaintiffs propose timing and sequencing for the selection of search terms and custodians and the production in its proposed schedule. In fact, Meta opposes Plaintiffs' proposed timing and sequencing in the schedule section as "unnecessary." As for the volume of the ESI produced, Meta does not propose a limit. Instead, only Plaintiffs' proposed search plan requires the parties to produce hit reports, which are one necessary prerequisite for any negotiations or judicial determination regarding volume.

### C. Privilege Logs: Meta Must Produce Timely Privilege Logs

The parties also provide competing proposals on the privilege log timing.[2] Plaintiffs' ESI Protocol specifies that the "Parties will produce privilege logs within 30 days of when the document would have otherwise been produced." Exhibit I, Plaintiffs' ESI Protocol, at § 9(c). Plaintiffs propose the 30-day interim deadline so that any privilege-log related disputes can be resolved efficiently and not delay discovery. Given the parties have not agreed to a privilege log format, it is particularly important that the privilege logs are produced in a timely fashion. While the Northern District's Model ESI Protocol does not specify a deadline, courts generally require parties to agree on interim and final dates for the exchange of privilege logs. *See e.g.,* Magistrate Judge Virginia K. Demarchi's Standing Order for Civil Cases, at 2 ("The parties should agree on interim and final dates for the exchange of privilege logs that permit any disputes about claims of privilege or work product protection to be addressed in advance of the discovery cut-off.").

### D. Document Families: Meta Must Produce Linked Attachments to Its Documents

As is standard practice in discovery, the parties agree that the ESI Protocol should require that "parent-child relationships will be maintained in production." *See* Exhibit I, Plaintiffs' ESI Protocol,

---

[2] The parties also have a dispute about the necessary information to include in a privilege log. However, rather that litigate the issue in a vacuum, Plaintiffs have agreed to defer the issue to a later date, with the parties reserving rights to challenge privilege log designations (and the format and sufficiency of those designations) when made.

Appendix 1, § 1; Meta's ESI Protocol, Appendix 1, § 1. For example, if a responsive e-mail attaches a Microsoft Word document, then that document will also be produced.

A dispute has arisen because Meta has added a sentence to its ESI Protocol to redefine the attachment: "Links within a document are not considered attachments." Meta's ESI Protocol, Appendix 1, § 1. Meta's categorical-exception would swallow the rule, allowing Meta to withhold non-public or internal documents attached to relevant e-mails through links. This problem is not theoretical. Publicly filed documents from other litigation reveal that Meta employees routinely communicate by attaching internal documents to their e-mails through links. *See e.g., DZ Reserve v. Meta Platforms*, *Inc.*, 3:18-cv-04978-JD, Dkt. No. 356-15 (N.D. Cal. Dec. 21, 2021), at 9 of 18 (e-mail between Meta employees attaching a non-public document through a link – "Link to GMS hub message").

Plaintiffs' ESI Protocol thus specifies that "documents referenced … via links to internal or non-public documents" are part of family groups and thus must be produced along with their parent document. *See* Exhibit I, Plaintiffs' ESI Protocol, Appendix 1, § 1. Other courts facing this problem have adopted Plaintiffs' approach. *See Stitch Editing Ltd. v. TikTok, Inc.*, No. CV 21-06636-SB (SKX), 2022 WL 17363054, at *1 (C.D. Cal. Aug. 31, 2022) ("Documents referenced in hyperlinks from all productions—existing and future—must be produced together with the source document containing the hyperlinks so that the association between parent document and hyperlinked document is maintained."); *IQVIA, INC. v. Veeva Sys., Inc.*, No. 2:17-CV-00177-CCC-MF, 2019 WL 3069203, at *5 (D.N.J. July 11, 2019).

In the cases cited by Meta, the producing party was not permitted to withhold all linked attachments from its production. For example, in *Noom*, the receiving party was allowed to review the producing party's production and identify linked attachments that it sought to have produced. *See Nichols v. Noom Inc.*, No. 20CV3677LGSKHP, 2021 WL 948646, at *4 (S.D.N.Y. Mar. 11, 2021) ("the process the Court already ordered is appropriate. It will allow Plaintiffs to evaluate Noom's production and, if Plaintiffs determine there is a need for an additional targeted pull or production or clarifying information about a hyperlinked document's identity or Bates number, Plaintiffs can request it.") Here, Meta has not agreed to produce the linked attachments, even if they are specifically requested

1  by the Plaintiffs.

2  **Meta's position**:

3        Meta's position on the ESI Protocol is guided by Sedona Conference Principle 6, which

4  instructs that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and

5  technologies appropriate for preserving and producing their own electronically stored information."

6  *The Sedona Principles*, The Sedona Conference, 19 Sedona Conf. J. 1, 52 (2018).

7        On February 15, 2023, Meta sent Plaintiffs its revised draft of the ESI Protocol, including the

8  citation to Sedona Conference Principle 6 in the section on "Preservation."  Certain portions of the ESI

9  Protocol were topics of discussion during the meet and confers on February 17, 22, and 23.  After

10  repeated requests for a full set of proposed edits, on February 27, 2023, Plaintiffs provided Meta with

11  their revised draft of the ESI Protocol.  Notwithstanding the delay in receiving Plaintiffs'

12  counterproposal, Meta proceeded expeditiously to address both the substantive areas of disagreement

13  described below and the more technical disputed issues (such as production formats, metadata fields,

14  etc.) that require discussions with Meta's eDiscovery vendor.  On March 4, 2023, Meta sent Plaintiffs

15  a revised draft of the ESI Protocol.  The parties met and conferred again on March 6, 2023, after which

16  Plaintiffs circulated a revised version of the ESI Protocol.

17        The parties have made progress in negotiating the ESI Protocol, and it is Meta's position that

18  many of the remaining issues can be resolved through additional discussions prior to the Conference.

19  Nevertheless, Meta raises five issues[3] with the Court: (1) data preservation; (2) search methodology;

20  (3) privilege logs; (4) electronic links in documents, and (5) unresolved additional issues.  For the

21  Court's reference, attached hereto are the following exhibits: Exhibit A (Meta's draft ESI Protocol),

22  Exhibit B (A redline of Meta's draft ESI Protocol compared to Plaintiffs' draft ESI Protocol), and

23

24

---

25  [3] Although some departures from the Model Protocol are appropriate to clarify issues or tailor

26  procedures to the needs of a case, Meta has endeavored to follow the guidance of the Model Protocol.
   Plaintiffs, however, continue to insist on edits that depart from the Model Protocol, which Meta

27  believes are unnecessary and/or duplicative of information already included in the Model Protocol and
   agreed to by the parties.  Meta hopes that such issues can be addressed through additional meet and

28  confer discussions.

Exhibit C (A redline of Meta's draft ESI Protocol compared to the Northern District of California's Model ESI Protocol).

### (1) Data Preservation

At the January 10, 2023 Conference, this Court rejected Plaintiffs' demand for written disclosures from Meta concerning data preservation, noting that "Defendant recognizes its preservation obligations regarding records and will not be required to provide written disclosures to plaintiffs." ECF No. 173 ¶ 2.

Meta continues to recognize and abide by its preservation obligations under the Federal Rules. Accordingly, Meta proposed a process for ESI preservation that mirrors Section 4 of the Northern District of California's Model Stipulated Order re: Discovery of Electronically Stored Information for Standard Litigation (the "Model Protocol"), which this Court has directed parties to consult. Meta's proposed process is designed "[t]o reduce the costs and burdens of preservation and to ensure proper ESI is preserved." *See* Model Protocol Sec. 4.

First, Meta adds a section that is not in the Model Protocol, but that reiterates the obligations of the parties to preserve relevant data: "[t]he Parties will preserve non-duplicative, relevant information currently in their possession, custody, or control; however, the Parties are not required to modify, on a going forward basis, the procedures used by them in the usual course of business to back up and archive data." This second clause does not suggest that Meta will fail to preserve appropriate data; it simply states that no changes are needed to existing procedures for backing up and archiving data to address Meta's preservation obligations.

Second, in accordance with Section 4(a) of the Model Protocol, Meta proposes the time period for which data will be preserved – from April 1, 2018 through the filing of the Consolidated Complaint.

Third, in accordance with Sections 4(b) and 4(c) of the Model Protocol, Meta provides for discussions among the parties regarding ESI sources and custodians, including that the parties will agree on a number of custodians for whom to preserve data, but with an option to meet and confer to discuss additional custodians as reasonably necessary.

Fourth, in accordance with Section 4(d) of the Model Protocol, Meta's proposal identifies sources that "are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B)." Meta proposes that "unwarranted extraordinary measures will not be taken to preserve ESI from these sources," but clarifies that "ESI from these sources will be retained pursuant to standard business processes, but not otherwise preserved, searched, reviewed, or produced unless ordered by the Court upon a motion of a Party." These sources include two of the example sources identified in the Model Protocol: "backup systems and/or tapes used for disaster recovery" and "systems no longer in use that cannot be accessed by using systems currently in use by the Party," as well as additional specified sources. Here, Meta is not, as Plaintiffs frame it, asking to delete broad categories of relevant evidence. Instead, Meta is, pursuant to the Model Protocol, identifying data source that are either (1) not reasonably accessible such that it would be unduly burdensome or costly to access those data sources to determine if they might contain relevant information, or (2) data sources that, while they could contain relevant information, are similarly too burdensome, difficult, and costly to preserve under the proportionality factors.

Fifth, Meta proposes, in accordance with Section 4(e) of the Model Protocol and utilizing some of the example sources in the Model Protocol, that certain information that may contain relevant information need not be preserved under the proportionality factors, including "(1) Deleted, slack, fragmented, or unallocated data only accessible by forensics. (2) Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system. (3) On-line data such as temporary internet files, history, cache, cookies, and the like. (4) Data in metadata fields that are frequently updated automatically, such as last-opened or last modified dates. (5) Mobile device activity logs. (6) Server, system, or network logs. (7) Dynamic fields in databases or log files not stored or retained in the usual course of business. (8) Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and/or disposition of computer equipment by the Party."

Finally, Meta proposes that, due to various privacy regulations and court orders that require the disposition of certain identifiable user data, the parties will meet and confer concerning the preservation

of such information if any such information is determined to be relevant to the claims or defenses in this litigation.  Meta has entered into numerous ESI Protocols in this District that follow these directives of the Model Protocol.  *See, e.g.*, *Gullen v. Facebook, Inc.*, No. 3:16-cv-00937-JD, Dkt. 70 (N.D. Cal. Feb. 17, 2017); *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747-JD, Dkt. 144 (N.D. Cal. Sept. 9, 2016).

Plaintiffs' proposal completely rejects the Model Protocol's guidance.  With minor exceptions,[4] they propose their own system for data preservation that would require Meta to freeze all potentially relevant data sources, regardless of cost or burden, unless and until Meta seeks judicial intervention in the form of a protective order.

First, Plaintiffs propose broadly that: "The Parties are obligated to identify, locate, maintain and preserve evidence that they know or reasonably should know is relevant to any claim or defense in the action."

Second, Plaintiffs propose that: "If a Party seeks to be relieved of the obligation to preserve certain relevant evidence, it may file a motion for a protective order seeking to be relieved of that obligation for specific relevant evidence."  Plaintiffs require that before filing a motion for a protective order, a party must first provide the other party a "precise description" with several pieces of information about the data sources, including whether or not the party will stipulate to waive certain elements of the other party's claims or defenses connected to the data at issue.

Third, Plaintiffs propose that: "Nothing in this Protocol shall be construed to permit a Party to destroy or fail to retain any materials relevant to any complaint filed in this matter, including event level data."

This novel process is unnecessarily costly and burdensome on both the parties and the Court, and ignores the Model Protocol's guidance that "preservation of potentially relevant ESI will be reasonable and proportionate."  Model Protocol Sec. 4; *see, e.g.*, *Rodriguez v. Google LLC*, 2021 WL 8085492, at *2 (N.D. Cal. Dec. 1, 2021) (denying plaintiffs' request for the court to require Google to

---

[4] Plaintiffs have counter-proposed a time period for the preservation of data, without offering any basis for the approximately twleve year period, and have identified a single data source (server, system, or network logs) for which they seek additional information.  Meta believes that both of these issues can be addressed by the parties within the framework of Meta's proposal, as guided by the Model Protocol.

alter its data retention policies, and stating that it would not "require Google to start saving petabytes of data per day, indefinitely, without a more compelling showing of need").   There is nothing proportionate about requiring a party to "retain **any** materials relevant to **any** complaint filed in this matter," without taking into account, as the Model Protocol suggests, sources that are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B).  And several of the data sources that Plaintiffs would require Meta to retain are particularly and inappropriately burdensome for preservation and collection.  *See, e.g.*, *See Toshiba Am. Elec. Components, Inc. v. Superior Court of Santa Clara*, 124 Cal. App. 4th 762, 768 (Cal. Ct. App. Dec. 3, 2004) ("Finding relevant data on a large number of backup tapes can be an expensive and time-consuming process.").

Although Plaintiffs' proposal cites two cases which are also cited by Plaintiffs in this statement, neither one supports their proposal; both cases merely stand for the unremarkable proposition that parties need to preserve relevant data in litigation.  But Meta's proposal, based on the Model Protocol, already acknowledges this obligation and makes clear that Meta "will preserve non-duplicative, relevant information currently in their possession, custody, or control."

Meta continues to abide by its preservation obligations, and takes the position that the Model Protocol provides the most efficient and appropriate approach to preservation in this case.

### *(2) Search Methodology*

Meta's proposed process for the review and production of relevant, non-privileged documents aligns with Sedona Conference Principle 6, which states that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information."  *The Sedona Principles*, 19 Sedona Conf. J. at 52.

Plaintiffs mischaracterize both the process Meta has proposed and the level of cooperation attendant to this process.  For clarity, Meta has proposed the following approach for searching potentially responsive data, which Meta believes is a transparent, efficient process.  First, Meta[5] will come up with search terms, that will be shared with Plaintiffs as discussed further below, that are designed to flag potentially relevant, responsive documents.  In addition to reviewing the documents

_____

[5] For the sake of clarity, Meta has described the process applicable to Meta's use of search terms under Meta's proposal.  This proposed process applies equally to all parties.

that contain those designated search terms, Meta will review a statistically valid, randomly generated sample set of documents that do *not* contain any of those search terms (the "Null Set").  The purpose of reviewing the Null Set is to validate the search terms and identify potential gaps; if the Null Set contains a material number of responsive documents, that would indicate that the search terms are potentially underinclusive.  Meta would then undertake a review of the Null Set to identify any responsive, non-privileged documents therein, produce that set of documents to Plaintiffs, and then consider any revisions to the search terms that may be necessary to reasonably identify the responsive documents identified in the Null Set.  The full set of search terms then would be provided to Plaintiffs for review and comment, and Meta, if requested to do so by Plaintiffs, would engage in the review of a second Null Set and consider additional search terms proposed by Plaintiffs.  Meta would then review a randomly generated, statistically valid sample set to assess the search terms proposed by Plaintiffs. If the results indicate that the search terms are not overbroad, Meta would then use them to identify additional potentially responsive documents for review.

Plaintiffs have rejected Meta's proposal, arguing that it fails to involve Plaintiffs as early in the process as they demand to be involved.[6]  Instead, Plaintiffs propose a search methodology that turns Sedona Conference Principle 6 on its head by empowering the party least situated to understand the systems and data at issue to freeze everything in place until it is satisfied with the search parameters, and, further, explicitly contemplates a process leading to judicial intervention at each step if the parties are unable to reach agreement.  Pursuant to Plaintiffs' proposal, first, the parties must meet and confer over "the use of search tools and methodologies, including the use of search terms and [technology

---

[6] Plaintiffs' case citations are inapposite.  In the 2007 case from the Middle District of Florida, for example, not only was the case in a different procedural posture, wherein approximately 10 million pages of documents had already been produced purportedly with significant errors, but the Court expressed dissatisfaction with a search process that defendant "undertook . . . in secret"—a process that does not reflect the transparent process proposed by Meta here.  *See In re Seroquel Prods. Liability Litig.*, 244 F.R.D. 650, 661–62 (M.D. Fl. 2007).  Similarly, in *In re eBay Seller Antitrust Litig.*, 2009 WL 10694848, at *2 (N.D. Cal. July 13, 2009), the court expressed dissatisfaction with a defendant's "failure to incorporate any of plaintiffs' input into the terms" negotiated during an extensive negotiation period.  Here, unlike in *In re eBay*, Meta's proposal specifically includes Plaintiffs' input as described herein.  Finally, *Price v. Facebook*, 2020 WL 13200227, at *1 (Apr. 2, 2020 N.D. Cal.), a case concerning a motion to compel the production of search terms used in response to a government demand, does not address the issues before the court.

-23-

assisted review ("TAR")], before any particular tool or methodology is applied."  Absent agreement, Plaintiffs propose that neither party can utilize TAR to filter out potentially responsive ESI without "a Court order."  Next, the Producing Party must propose search terms, custodians, and sources of ESI "for the consideration of the Receiving Party."  Plaintiffs mandate broadly that these proposals "will be subject to negotiation and input from the Receiving Party" without any description of what such negotiation and input will entail.

There are no stated time, sequencing, volume, or other limits on this amorphous process.  In fact, Plaintiffs state that the Receiving Party "may ask for (and the Producing Party will not unreasonably withhold) qualitative and quantitative information regarding search methodology, including but not limited to, production of hit reports (to include unique hits and hits with families), and associated testing and validation to be conducted after the methodology is implemented."  There are no definitions of, nor limits on, this proposed "qualitative and quantitative information" that can be requested or what the "associated testing and validation" will entail, nor are there any limits (or perceivable end) to the rounds of negotiations.  Instead, Plaintiffs' proposal once again relies on establishing a process leading to judicial intervention, noting that if there are disagreements, then the parties "shall present their dispute to the Court in accordance with its Standing Order."  Under Plaintiffs' proposal, the parties "may request additional search terms and custodians."  The only guardrail to this otherwise carte blanche authority is that such additional requests "must be made in good faith," but, again, disputes will "be presented to the Court."

The contrast between the proposals is evident.  Meta's proposal provides a cooperative, transparent, and efficient search, review, and production process that can target potentially responsive documents because it is implemented by the party best situated to evaluate its own ESI.  Meta's structured proposal guards against runaway discovery by implementing specific steps, validation procedures, and a conclusion to the process.  Plaintiffs contemplate a process leading to judicial intervention concerning the use of TAR to filter out potentially responsive documents if the parties cannot reach agreement.  In contrast, Meta has proposed the use of TAR, if a party so chooses, to filter out **non**-responsive documents, and further provided both that the parties will meet and confer to

discuss the use of TAR for any other purpose and a transparent process concerning the use of TAR, including sharing information about the measures used to validate the results.  In contrast, Plaintiffs offer only an unlimited, unrestricted process of back-and-forth negotiations on search terms, custodians, and other parameters, including requests for an unlimited amount of "qualitative and quantitative information," such as hit reports.  But hit reports do not provide insight into responsiveness; it is the process of reviewing samples of documents to validate the results of search terms that provides meaningful insight.  Plaintiffs otherwise broadly state that undefined "associated testing and validation [will be] conducted," but Meta's proposed process explicitly describes the validation process and the high-quality information that is shared with Plaintiffs.

It is Meta's position that structuring a search and review process in a manner that incorporates validation of search terms, rather than just volume counts, will result in a more meaningful process leading to a reasonable universe of potentially responsive documents for review, while at the same time creating a more efficient, less antagonistic process.

### (3) Privilege Logs

The parties have agreed to address the format of privilege logs in this matter at a later date, but the parties do not agree on the timing for the production of privilege logs.  The Model Protocol does not impose any timeline for the production of privilege logs.  Based on its experience with the document review and privilege review process, Meta proposes that privilege logs be provided on a rolling basis and prior to the close of fact discovery.  As is often the case during the document review process, documents identified as potentially privileged are flagged for privilege review and analysis to determine if they are privileged and to guard against the production of privileged information.  Plaintiffs, however, propose that each party would have only 30 days from when a document would otherwise have been produced to produce a privilege log.  Based on the anticipated volume and complexity of discovery in this matter, forcing a short timeline on Meta to produce documents while at the same time undergoing the separate privilege review process is not reasonable.  Nevertheless, Meta understands concerns about bulk delivery of privilege logs towards the end of discovery and plans to produce rolling logs that adhere to Magistrate Judge DeMarchi's guidance that parties should

exchange privilege logs within a time frames that "permit any disputes about claims of privilege or work product protection to be addressed in advance of the discovery cut-off." *See* Magistrate Judge Virginia K. DeMarchi's Standing Order for Civil Cases at 2.

Meta's proposal to provide rolling privilege logs before the close of fact discovery provides a more reasonable schedule that allows for flexibility based on the complexity of privilege review and the ultimate volume of documents at issue while providing adequate time to review and challenge privilege determinations prior to the close of fact discovery.

### (4) Electronic Links Are Not Attachments

Both Meta and Plaintiffs agree that parent-child relationships will be maintained in the productions based on the available metadata. Accordingly, an email that attaches a document will be produced in a manner that connects the email and its attachment in a family relationship.

However, the parties disagree about whether or not a hyperlink in a document should, or even can, be associated with the document in a family relationship. Meta's proposal specifies that any hyperlinks within a document are not attachments to that document. Plaintiffs, however, have proposed that hyperlinks within a document must be traced to wherever the hyperlink led at the time the document was created, and then a party must manually associate that purported "child" document with the purported "parent" document containing the hyperlink, despite the fact that in the normal course of business no document "child" was attached to the original "parent" document.

Hyperlinks within documents are not attachments. *See, e.g.*, *Porter v. Equinox Holdings, Inc.*, 2022 WL 887242, at *2 (Cal. Sup. Ct. Mar. 17, 2022) ("[L]inked documents can present unique challenges that make them different from email attachments. For example, a responding party may not be able to collect the precise linked documents referenced in a message if the document has been modified or deleted."); *see also Nichols v. Noom Inc.*, 2021 WL 948646, at *4 (S.D.N.Y. Mar. 11, 2021) ("To start, the Court does not agree that a hyperlinked document is an attachment. . . . When a person creates a document or email with attachments, the person is providing the attachment as a necessary part of the communication. When a person creates a document or email with a hyperlink, the hyperlinked document/information may or may not be necessary to the communication."). From a

purely technical perspective, there is nothing "attached" to a document by virtue of the fact that the document contains a hyperlink, and thus there is no file or other ESI to include as an "attachment." The process of tracing hyperlinks to the referenced material that Plaintiffs' process contemplates would be a completely manual, costly, and burdensome process that involves a source-by-source, hyperlink-by-hyperlink review.[7]  *See Porter*, 2022 WL 887242, at *2 ("[L]inked documents can also create review challenges and inefficiencies given the complexity of connecting those documents to the communications which reference them."); *see also Shenwick v. Twitter, Inc.*, 2018 WL 5735176, *1 (N.D. Cal. Sept. 17, 2018) (describing the necessary "multi-step process by a human being" to identify, if possible, a hyperlinked document).  It is Meta's position that such a process is not reasonable or appropriate to include in the ESI protocol.

### *(5) Unresolved Additional Issues*

Although Meta believes that many of these issues can be resolved through further discussion among the parties, it is Meta's understanding that Plaintiffs are asking the Court to order their version of the ESI Protocol in full.  As such, Meta provides the following summaries of its positions on the remaining issues in dispute.  These edits can be seen in the redline comparing Meta's proposed ESI Protocol and Plaintiffs' proposed ESI Protocol that accompanies this statement:

---

[7] Plaintiffs' citation to an email filed as an exhibit in an unrelated case (which does not even purport to show a hyperlinked document in a family relationship with the document in which it is referenced) simply assumes its argument to be true while offering no response to either the burden imposed on Meta or the lack of any automated technical process for the requested proposal.  *See DZ Reserve v. Meta Platforms, Inc.*, 3:18-cv-04978, Dkt. No. 356-16 (N.D. Cal. Dec. 21, 2021).  Similarly, Plaintiffs' citation to *Stitch Editing Ltd. v. TikTok, Inc.*, 2022 WL 17363054, at *1 (C.D. Cal. Aug. 31, 2022), is misplaced.  The cited case merely memorializes a ruling made during a discovery conference, but fails to address the substance of the reasoning behind that ruling.  The conference transcript reveals the court, in assessing whether a party should trace URL-linked documents, was guided by the "manageable number" of already produced documents with hyperlinks that were identified by the plaintiffs and stated that it did not "need to get into those definitions [of families]"—reiterating that "we're talking about a manageable number of URLs."  No. 2:21-cv-06636-SB-SK, Dkt. No. 126 at 40:10–14; 40:22–23; 42:2–3 (Aug. 31, 2022 C.D. Cal.); *see also IQVIA, Inc. v. Veeva Systems, Inc.*, 2019 WL 3069203, at *5 (D.N.J. July 11, 2019) (concerning disputes over already-produced documents).  Here, Plaintiffs have not, and cannot, identify specific documents because document production has not begun; Plaintiffs' request for a blanket order to undertake a burdensome, manual process to create familial relationships that do not exist is unreasonable and should be rejected.

(1)  Meta proposed that the parties include a statement in the "Cooperation" section regarding the proportionality necessary in large, complex document productions:  "The parties' cooperation includes propounding reasonably particular discovery requests, identifying appropriate limits to eDiscovery, including limits on custodians, identifying relevant and discoverable ESI, establishing time periods for eDiscovery and other parameters to limit and guide preservation and eDiscovery issues.  The failure of counsel or the parties to cooperate in facilitating and reasonably limiting eDiscovery requests and responses will be considered in cost-shifting determinations.  The parties agree to use reasonable, good faith, and proportional efforts to preserve, identify and produce relevant and discoverable information consistent with Fed. R. Civ. P. 26(b)(1)."  Plaintiffs have repeatedly rejected this provision.  It is Meta's position that such edits are reasonable and necessary to ensure a cooperative, efficient discovery process.

(2)  Meta proposed that the parties use email threading—that is, a requirement to produce only the most inclusive message in an email chain.  This is a standard document production approach that minimizes the duplication of content in a party's productions and increases efficiencies.  Plaintiffs have rejected this proposal, citing concerns with the technical process for accomplishing email threading.  It is Meta's position that email threading is a standard eDiscovery process and Meta will continue to meet and confer with Plaintiffs regarding the technology involved.

(3)  With respect to privilege logs, Meta proposed that certain communications – such as communications among employees and in-house counsel about this litigation that post-date the complaint – do not need to be logged on a privilege log.  Meta also proposed that only last-in-time emails based on email threading need to be included on a privilege log.  Meta's proposal also includes the Model Protocol language stating that parties may utilize categorical privilege logs if appropriate.  Plaintiffs rejected these edits.  Although the parties have agreed it is premature to determine the format of privilege logs in this manner, it is Meta's position that such edits are reasonable to include in the ESI Protocol to inform future negotiations.

(4)  Meta's proposal states that a Producing Party does not waive any objections to the production, discoverability, admissibility, or confidentiality of documents and ESI.  Plaintiffs rejected

this provision.  It is Meta's position that this is a reasonable addition to the ESI Protocol to protect all parties.

(5)   The parties have one remaining disagreement concerning the metadata fields to be included in productions.  It is Meta's position that the field DUPLICATE FILEPATH is burdensome and unnecessary in light of the other fields Meta has agreed to provide.  It is Meta's understanding that this is a metadata field that is frequently updated automatically and may require manual revision to provide the relevant underlying information.

(6)   Based on the technical issues that often arise in productions, Meta's proposal states that the parties (i) will undertake a process designed to reveal hidden information in documents (e.g., hidden rows in an Excel sheet) and (ii) will TIFF images in a manner such that all data from the native is visible in the TIFF, "to the extent it is reasonably and technically feasible."  Plaintiffs rejected these provisions and propose a requirement that a Producing Party "identify and disclose any instances when it was not feasible to display all [hidden] data visible in the native application."  In practice, that could require a manual re-review of every TIFF and/or native document produced—a non-standard process that would be extremely and unjustifiably burdensome.  It is Meta's position that the parties can address production issues, if any, as they arise during the course of discovery.  Rather than mandate an overbroad and inflexible rule to identify potential outliers, Meta proposes a reasonable process with a mechanism to address any outliers that may or may not arise.

(7)   Due to the anticipated complexity of production in this matter, and to avoid unnecessary discovery disputes, it is Meta's position that the ESI Protocol should be clear and concise where possible.  Accordingly, Meta has rejected Plaintiffs' inclusion of a duplicative section concerning email families.  Similarly, Meta proposed language to identify acceptable file formats for the production of structured data and data from the databases.  These proposed file formats—CSV format, tab delimited format, Microsoft Excel format, and Microsoft Access format—are standard formats to transmit data. Plaintiffs rejected this provision, but it is Meta's position that this is a reasonable and appropriate provision to include in the ESI Protocol.

(8)  It is Meta's position that Excel, audio, video, and multi-media files will be produced in native format.  Plaintiffs would require the parties to produce PDFs, Word documents, PowerPoints, and image files in native form as well.  This is unduly burdensome and not standard, and Meta's position is that no such requirement is appropriate here.

### 4.  PROTECTIVE ORDER

**Plaintiffs' position**:

Plaintiffs' proposed protective order accomplishes the purpose of protective orders: protecting material that is confidential while avoiding unwarranted restrictions to access material that is not entitled to special protection.

The Parties have been engaged in engaged in negotiations regarding a proposed protective order since December 2022, with Plaintiffs first sending a proposed protective order on December 8, 2022, and Meta sending a competing version on December 9, 2022. From there, multiple drafts have been exchanged and meet and confers completed.

At this time, the Parties continue to meet and confer and Plaintiffs believe there are certain issues that can be resolved without the Court's intervention. However, there are issues on which the Plaintiffs believe the Parties are at an impasse and request the Court's assistance.  Those issues relate to the following: (1) the definition of "Expert"; (2) the definition of "Source Code"; (3) Meta's limitations on printing Source Code; (4) electronic note-taking during source code review; (5) leaked materials in the public domain; (6) production of source code paper logs; and (6) unresolved additional issues.  For the Court's reference, attached hereto are the following exhibits: Exhibit K (Plaintiffs' proposed Protective Order) and Exhibit L (A redline of Plaintiffs' proposed Protective Order compared to the Northern District of California's Model Protective Order).

#### *Definition of "Expert"*

Plaintiffs accept Meta's definition of "Expert" as "an individual qualified to be an expert pursuant to Rule 702 the Federal Rules of Evidence." Plaintiffs also accept Meta's proposal that documents designated as "Confidential," "Highly Confidential – Attorneys' Eyes Only," and "Highly Confidential – Source Code," can only be viewed by "Experts" who also meet the requirements set

forth in the Model Order (including that such designated documents cannot be viewed by Experts "who are not past or current employees or contractors of a Party or of a Party's Competitor" and "who, at the time of retention, are not anticipated to become employees or contractors of a Party or of a Party's Competitor (a fellow or intern shall not be considered an employee) . . . .") (See Meta's Proposed Protective Order, Sections 7.3-7.5), unless otherwise ordered by the Court. Plaintiffs proposed adding language to Sections 7.3-7.5 confirming that Plaintiffs may move the Court for an order that documents designated as "Confidential," "Highly Confidential – Attorneys' Eyes Only," and "Highly Confidential – Source Code," may be viewed by an Expert who does not fit within the aforementioned description in Sections 7.3-7.5. The purpose for Plaintiffs' addition is to avoid a preemptive and categorical preclusion of disclosure to certain Experts based on their past, current, or future employment where, for example, such Expert was employed by a Party or competitor for a short period of time or in a non-competitive department and poses no threat of business harm to Meta. Plaintiffs' proposal addresses Meta's concern regarding unfettered dissemination of confidential material as Plaintiffs must still obtain an order from the Court allowing for disclosure of confidential information to certain Experts, while also providing a reasonable alternative to an unfair categorical preclusion of disclosure to certain Experts.

### Definition of "Source Code"

Plaintiffs propose that the definition of Source Code follow the model order such that it is defined as "extremely sensitive" computer code. Good cause does not exist to depart from the model order to describe source code as "Confidential, proprietary, or trade secret computer code . . ." instead of "extremely sensitive . . . computer code" as Meta proposes. Indeed, Meta's proposed definition of source code creates substantial risk of over-designation of source code as Highly Confidential-Source Code, making such material unnecessarily subject to the onerous source code review procedures. Over-designation will occur because the terms "confidential, proprietary, or trade secret" cover more than what is encompassed by the term "extremely sensitive." Such an outcome will only serve to prejudice and increase costs for Plaintiffs.

Through this departure from the model order, Meta would give itself an opening to dramatically increase discovery burdens on Plaintiffs and their experts. Plaintiffs also note that protective orders for source code review are far more important for cases involving business competitors, where one party's access to another's source code could lead to unfair business conduct by one of the parties. Here, Plaintiffs are not in competition with the Defendant. The only risk to any source code is through unintentional leakage, but other portions of the Protective Order adequately address this risk by requiring Plaintiffs to treat confidential information with great care.

### *Meta's Limitations on Source Code Printing*

Meta proposed the following limitations to the access, review, and printing of Source Code:

(1) A party may print no more than 20 consecutive pages or an aggregate of 200 pages of Source Code "without prior written approval of the producing party, which will not be unreasonably withheld."

(2) Any excerpts of Source Code to be included with a pleading, court filing, expert report, trial exhibit, demonstrative, deposition exhibit/transcript, mediation brief, or draft of these documents must not comprise more than 25 consecutive lines of Source Code.

With respect to Meta's first limitation, Plaintiffs do not believe that good cause exists to depart from the model order to impose a numerical limit on the number of pages of source code the Receiving Party may request. Meta proposes the following limit: "In no case will the Receiving Party receive more than 20 consecutive pages or an aggregate of more than 200 pages of Source Code during the duration of the case without prior written approval of the Producing Party . . . ." Meta's proposed limitation creates substantial risk of prejudice to Plaintiffs particularly where, as here, no discovery has been produced and Plaintiffs do not yet know how much source code will be produced in this litigation. Instead, Plaintiffs believe the following language provided in the model order is appropriate and fair: "The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the 'Challenging Party' and the Receiving Party is the 'Designating Party' for purposes of dispute resolution." This allows Meta to challenge requests if they become overly burdensome and does not force Plaintiffs to agree to arbitrary numerical limits in a vacuum.

Finally, Plaintiffs do not accept Meta's second limitation, which proposes to limit the number of consecutive lines of Source Code that can be included in a filing to 25, for the same reasons set forth in the preceding paragraph.

***Plaintiffs' Reasonable Proposal re Electronic Note-Taking During Source Code Review***

To increase efficiency and decrease costs, Plaintiffs propose that, during Source Code review, the Receiving Party's experts/consultants may take notes electronically on a separate note-taking computer in the Source Code review room and, at the end of the day, such expert/consultant would transfer their electronic notes via a USB drive. To address Meta's concern regarding improper dissemination of Source Code, Plaintiffs proposed that the separate note-taking computer would be fully locked down, with the exception of the USB drive, and that the USB drive would be disabled during the Source Code review by way of a USB port blocker, which can only be removed with a key that the Producing Party will maintain control of.

Meta proposes that an individual reviewing Source Code on a computer formatted for such review only be able to take handwritten notes. However, Meta notes in this Case Management Statement that it anticipates this case will involve a substantial volume of discovery. Such limitation, therefore, will surely prolong source code reviews and increase costs. Plaintiffs' proposal provides for both a secure and efficient way to take notes during Source Code review.

***Leaked Materials in the Public Domain***

Information in the public domain is not entitled to special protection. To further clarify this principle, Plaintiffs propose to add the following language noting that the protections afforded by the protective order do "not apply to documents or information of another Party that are leaked without permission or otherwise disseminated without appropriate authorization to the public at large or published by a media organization."

Meta, on the other hand, proposes that special protection will be afforded to information that is in the public domain as a result of publication involving a violation of this Order, another Court's Order, unlawful conduct, or a breach of any confidentiality obligation otherwise owed to the Designating Party." This is where the dispute between the Parties lies. Meta's proposal would include information

disseminated to the public at large or published by a media organization. Plaintiffs do not understand why or how Meta would propose to ex post facto place a confidentiality designation on a document that has already been published for all the world to see. By nature of such publication, any such document is, by definition, no longer confidential. For example, see "Whistle-Blower Says Facebook Chooses 'Profits Over Safety," a New York Times article describing documents leaked for Facebook whistleblower Frances Haugen at others, available at https://www.nytimes.com/2021/10/03/technology/whistle-blower-facebook-frances-haugen.html. If a whistleblower releases what were otherwise confidential documents to the New York Times or the United States Congress through no doing of the Plaintiffs or their counsel here – and those documents are published to the world, there is no reason to pretend that they are confidential anymore.

### Production of Source Code Paper Logs

Departing from the model order, Meta unreasonably proposes that a Receiving Party must, at the Producing Party's request and within two business days, produce a copy of its log of all paper copies of the Source Code. Such proposal is burdensome and unnecessarily departs from the model order. However, Plaintiffs have offered a reasonable middle ground, agreeing that the only reviewers and recipients of paper copies of Source Code will be approved experts and appointed counsel.

### Unresolved Additional Issues

Although the Parties are continuing meet and confer efforts and Plaintiffs believe the remaining issues can be resolved between the Parties, Plaintiffs note their position as to those remaining issues:

It is Plaintiffs' position that a Designating Party must designate for protection only those parts of material that qualify for protection. Meta seeks to qualify the requirement with an exception that such restraint in designating material for protection is only required if it is not burdensome to the Designating Party. During a recent meet and confer with Meta, Plaintiffs expressed their concern with Meta's proposed qualification, noting that it could unfairly allow a Designating Party to claim this requirement is burdensome under any circumstance. Plaintiffs asked Meta for clarification, asking for an example under which such requirement would be burdensome. Meta noted that certain review platforms might not allow for designation of only portions of a document. To address Meta's concern,

Plaintiffs proposed the following language, which Meta rejected: "To the extent it is impractical to do so (for example where the platform on which the material, documents, items, or oral or written communications are being reviewed does not allow for designation of only those parts that qualify), the Designating Party shall identify the specific portions of the material that qualify for protection on a separate document to the Receiving Party within 7 days of production." Requiring Plaintiffs to be the ones to seek more specific confidentiality designations once they anticipate the need to use the document for a filing is unfair, inefficient, and goes against the spirit of a protective order: providing protection only for information that is confidential.

It is also Plaintiffs' position that Source Code will be produced in original and native format, and in a format where versions of the Source Code may be extracted. Meta seeks to qualify the requirement with an exception: that this is only required if it is practical and not burdensome. Plaintiffs concern with Meta's proposed qualification is that it could unfairly allow a Designating Party to claim this requirement is impractical and burdensome under any circumstance, and that such hedging language only serves to create confusion.

**Meta's position**:

Under the Northern District of California's Model Stipulated Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets (the "Model Order") protection is warranted for all "confidential, proprietary, trade secret, or private information" disclosed in this litigation.  Model Order Sec. 1.  The purpose of a protective order is to provide "special protection from public disclosure and from use for any purpose other than prosecuting this litigation." *Id.*  It is likely that portions of Meta's highly confidential, proprietary, and trade secret Source Code will be disclosed in discovery.  Any dissemination of this Source Code would create substantial risk of serious harm to Meta.

Plaintiffs agree with the general principles set out in the Model Order, but have proposed revisions that lessen the protections for Meta's Source Code.  On February 10, 2023, Meta provided Plaintiffs with its revised draft of the protective order.  The parties met and conferred on February 17, 2023, after which Meta received Plaintiffs' revisions to the protective order on February 18, 2023.  The

parties met and conferred on February 22 and 23, 2023, during which the protective order was discussed.  The parties again met and conferred on February 28, 2023 and March 1, 2023.  On March 2, 2023, Meta provided Plaintiffs with a revised version of the protective order.  Meta continued to investigate open issues and, after further review of a technical question, was able to incorporate an open request from Plaintiffs.  On March 4, 2023, Meta provided Plaintiffs with a revised version of the protective order with this revision incorporated.  On March 6, 2023, the parties met and conferred, after which Plaintiffs sent a revised version of the protective order.

Although the parties have made progress in negotiating the protective order, and it is Meta's position that many of the remaining issues can likely be resolved through additional discussions, Meta raises six issues with the Court: (1) the definition of "Expert"; (2) the definition of "Source Code"; (3) reasonable limitations on printing Meta's proprietary Source Code; (4) confidentiality designations for leaked documents; (5) production of a Source Code viewing log; and (6) unresolved additional issues. For the Court's reference, attached hereto are the following exhibits: Exhibit D (Meta's draft Protective Order), Exhibit E (A redline of Meta's draft Protective Order compared to Plaintiffs' draft Protective Order), and Exhibit F (A redline of Meta's draft Protective Order compared to the Northern District of California's Model Protective Order).

### (1) Definition of Expert

The parties spent significant time negotiating the definition of Expert.  Despite Plaintiffs' insistence on departing from the Model Order, Meta continued to work with Plaintiffs to define Experts in a manner that satisfied Plaintiffs and protected access to Meta's confidential materials, including Highly Confidential Materials and  Source Code.

Plaintiffs' proposed language in sections 7.3, 7.4, and 7.5 is unnecessary and redundant, and their explanation for the language raises serious concerns about future attempts to subvert the unobjectionable restrictions regarding Experts' access to confidential information provided by the Model Order.  The introductions to the sections in which Plaintiffs have added their proposed language, Sections 7.3, 7.4, and 7.5, expressly provide:  "Unless otherwise ordered by the Court . . . a Receiving Party may disclose" the materials only to the enumerated categories of individuals relevant to each

section.  Plaintiffs' addition of "whether in response to a motion by the Receiving Party, which motion the Receiving Party is permitted to make, or otherwise," is superfluous and should be rejected. Plaintiffs stated goal is to provide themselves an "out" from the standard language in the Model Order restricting a party's competitors from having access to the party's confidential information and no such out should be condoned or granted.

### (2) Definition of "Source Code"

Meta proposed a definition of Source Code that is in line with language used in the Model Order that is appropriate for this case.  *See* Model Order Sec. 2.9.  Meta defines Source Code as: "Confidential, proprietary, or trade secret computer code and associated comments, revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms, computer code, or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means."

Plaintiffs largely agree with this definition, but seek to limit Source Code to "extremely sensitive computer code."  Meta rejected Plaintiffs' addition of the qualifier "extremely sensitive," because, although such language also appears in the Model Order, it is a vague term and the portion of the definition that both parties already agree to ("create a substantial risk of serious harm that could not be avoided by less restrictive means") appropriately describes the sensitive nature of source code. However, in an effort to bridge the gap, Meta counter-proposed the addition of the following language to describe the type of source code that will be governed by this protective order: "confidential, proprietary, or trade secret computer code."

Meta has offered a reasonable proposal to appropriately identify the Source Code subject to this protective order and protect its confidential data.

### (3) Reasonable Limitations Should be Placed on Source Code Printing

As previously stated, Meta seeks protection for its Source Code, the potential dissemination of which creates substantial risk of serious harm to Meta.  Meta understands, however, that if portions of the Source Code are responsive to issues in the litigation, the Source Code may need to be accessed,

viewed, and/or printed in hard copy.  As such, the parties agreed to various procedures to accomplish such tasks.

In connection with those agreed-upon procedures, Meta has proposed reasonable limitations concerning the printing of Source Code, as well as mechanisms to seek increases to such limitations as needed.  Plaintiffs have wholesale rejected Meta's multiple proposals, declining to counter-propose any limitations on printing despite Meta's repeated requests.

Meta proposed the following reasonable limitations on printing Source Code:

(1) A party may print no more than 20 consecutive pages or an aggregate of 200 pages of Source Code "without prior written approval of the producing party, which will not be unreasonably withheld."

(2) Any excerpts of Source Code to be included with a pleading, court filing, expert report, trial exhibit, demonstrative, deposition exhibit/transcript, mediation brief, or draft of these documents must not comprise more than 25 consecutive lines of Source Code.

Plaintiffs rejected all of these limitations, stating that they cannot know at this stage how much Source Code will be needed and therefore cannot agree to *any* printing limitations.  This argument, however, ignores the specific mechanisms provided by Meta to increase limits as needed throughout the course of the litigation.  Even though specific limits are not included in the Model Order, reasonable limitations on printing Source Code are granted by Courts in the Northern District and Southern District of California.  *See, e.g.*, *Taction Tech., Inc. v. Apple Inc.*, 2021 WL 4150342, at *8 (S.D. Cal. Sept. 13, 2021) (granting a protective order that limited aggregate printed pages to 250 and required a meet and confer for any printing of contiguous blocks of code over 10 pages); *FastVDO LLC v. AT&T Mobility LLC*, 2016 WL 9049521, at *9 (S.D. Cal. July 25, 2016) (granting a protective order in which a presumption that more than 30 printed pages of a continuous block of source code was excessive); *Linex Tech. Inc. v. Hewlett Packard Co.*, 2013 WL 1820909, at *2 (N.D. Cal. Apr. 30, 2013) (rejecting a requested increase to an existing protective order limit of five copies of printed source code).

Similarly, in order to protect its Source Code, Meta proposes that an individual reviewing Source Code on a computer formatted for such review only be able to take handwritten notes.  Plaintiffs requested a second computer on which they could take electronic notes which they would then transfer

via USB drive.  Meta continues to explore the possibility of such an arrangement, but has not yet been able to identify a solution that is not costly and burdensome.  For example, Plaintiffs seek to take electronic notes and then download them onto a USB drive at the end of the day.  The problem, however, is that allowing a second computer in the same room with the Source Code presents a risk that Source Code could be disseminated.  To protect against this risk, the second computer would need to be fully locked down (including disabling all USB ports), and thus there would be no way to download the electronic notes at the end of each day.  Although Meta is seeking to accommodate Plaintiffs, it is Meta's position that handwritten notes are sufficient in this circumstance.

Meta's proposal for reasonable limits to Source Code printing, including specific mechanisms that allow for the Receiving Party to exceed those limits as needed, is tailored to the needs of discovery while limiting the substantial risk of harm to Meta if its Source Code were disseminated.

### *(4) Confidentiality Designations for Leaked Documents*

Section 3 of the protective order, which has been agreed to by the parties, states that the protective order does not confer protections on "any information that is in the public domain . . . as a result of publication ***not involving*** a violation of this Order, another Court's Order, unlawful conduct, or a breach of any confidentiality obligation otherwise owed to the Designating Party." (Emphasis added).  In other words, information that is in the public domain as a result of publication involving a violation of this Order, another Court's Order, unlawful conduct, or a breach of any confidentiality obligation otherwise owed to the Designating Party is still subject to protection.  Meta further proposed a process, which Plaintiffs have agreed to, whereby a party will have the opportunity to review a leaked document to determine whether a confidentiality designation is appropriate in accordance with the terms of the protective order.

Plaintiffs, however, proposed additional edits to Section 3 that contradict this purpose: "Notwithstanding the foregoing, this section does not apply to documents or information of another Party that are leaked without permission or otherwise disseminated without appropriate authorization to the public at large or published by a media organization."  Pursuant to this proposal, Plaintiffs would be able to use a leaked document for virtually any purpose without providing Meta the opportunity to

1   review the document and determine whether it should be designated as confidential pursuant to the

2   protective order.  Plaintiffs seek to capitalize on the unlawful conduct of others without affording a

3   party even the *opportunity* to assert confidentiality over materials that were unlawfully leaked to the

4   public.  Such a provision condones unlawful conduct and should be rejected.

5       It is Meta's position that potentially confidential documents do not lose their confidential status

6   pursuant to a protective order because they have been improperly leaked and/or published in violation

7   of law, a court order, or other obligation, and, therefore, Plaintiffs' proposal should be rejected.

8       ***(5) The Log of Paper Copies of the Source Code Should Be Produced Upon Request***

9       In accordance with Section 9(c) of the Model Order, Meta proposed:  "The Receiving Party

10  shall maintain a log of all paper copies of the Source Code.  The log must include the names of all

11  reviewers and recipients of paper copies, dates and times of inspection, and locations where each paper

12  copy is stored."  Meta further proposed that the Receiving Party, upon two days' advance written notice,

13  shall provide a copy of the log to the Producing Party.  *See, e.g.*, *Taction Tech.*, 2021 WL 4150342, at

14  *8 (granting a protective order that required the production of the log with one day's advance notice).

15      Although Plaintiffs agreed to the creation and maintenance of a log in accordance with Meta's

16  proposal and the Model Order, Plaintiffs rejected any requirement to produce the log upon request,

17  stating that the Model Order does not require it.  Plaintiffs further raised privilege concerns associated

18  with the log.  Instead, Plaintiffs propose to agree that the only reviewers and recipients of paper copies

19  of Source Code will be approved Experts and appointed counsel.

20      Plaintiffs' proposal, however, is not sufficient to protect Meta's confidential, proprietary, and

21  trade secret Source Code.  A provision that requires that a log be maintained is an empty shell if the

22  party requiring the log for protection of its Source Code cannot confirm the log's existence or review

23  its contents if needed.  Further, the proposal that the only reviewers of the Source Code would be

24  approved Experts and counsel merely restates other requirements of the protective order.  Privilege

25  concerns are similarly misplaced because the stated contents of the log merely identify names, dates,

26  times, and locations that does not reveal any privileged information or work product.

27

28

It is Meta's position that this proposal is necessary to confirm the protections in place to guard against the dissemination of its Source Code.

### *(6) Unresolved Additional Issues*

Although Meta believes that many of these issues can be resolved through further discussion among the parties, it is Meta's understanding the Plaintiffs are asking the Court to enter their version of the Protective Order in full.  As such, Meta provides the following summary of its position on the remaining issue in dispute.  These edits can be seen in the redline that accompanies this statement:

(1)  It is Meta's position that, due to the practicalities of reviewing documents on review platforms, it may be impractical and/or burdensome to designate only portions of a document as confidential.  To address concerns with the potential for document-level designation hindering the use of documents in filings, Meta proposes a process whereby a party can seek more specific confidentiality designations, if appropriate, prior to including a document in a public filing.

## 5.  CLAWBACK ORDER

**Plaintiffs' position**:

On December 9, 2022, Meta sent Plaintiffs a proposed clawback order for use in this litigation. Over the next several weeks, the Parties engaged in numerous discussions regarding the propriety of a clawback order in this action. On February 22, 2023, once such discussions were settled, Plaintiffs sent Meta their revisions to the proposed clawback order.  While the Parties have agreed to the use of a clawback order, they are at an impasse as to one issue that is ripe for the Court's determination: whether the Parties can use the content of a document clawed back as privileged to challenge the privilege assertion. For the Court's reference, attached hereto as Exhibit M is Plaintiffs' proposed Clawback Order.

Plaintiffs propose that a Party may use the content of a document clawed back as privileged to challenge the privilege assertion. Under Plaintiffs' proposal, a Party may not use the content for any other purpose but to challenge the claw back, and any such challenge would be filed under seal. Additionally, if there are some portions of the document that the parties agree are privileged, and other portions that the parties do not agree are privileged, the *in camera* submission would redact the portions

that the parties agree are privileged.

Rule 26 of the Federal Rules of Civil Procedure contemplates a party's ability to use the content of a document "clawed-back" on the basis of privilege to challenge the producing party's privilege assertion. More specifically, Rule 26 provides as follows:

> If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; *and may promptly present the information to the court under seal for a determination of the claim*. The producing party must preserve the information until the claim is resolved.

(emphasis added). And, as one District Court has observed: "It would be wholly illogical to read Rule 26(b)(5)(B) as prohibiting the use of documents 'subject to a claim of privilege' when resolving that very claim of privilege." *U.S. Home Corp. v. Settlers Crossing, LLC*, DKC 08-1863, 2012 WL 5193835, at *5 (D. Md. Oct. 18, 2012). Indeed, privilege claims are almost always content-specific. To determine whether a privilege exists, or whether it has been lost through disclosure, circumstance, conduct or other action by the party seeking to claw it back, a court generally must look to the information's content, how and to whom that information has been communicated, and whether the information or its content has been disclosed elsewhere or carelessly, among other factors.

Additionally, one of the purposes of Rule 502(d) is to avoid the need for "exhaustive pre-production privilege reviews" by allowing parties to claw back privileged materials after production without waiving privilege. *See* Fed. R. Evid. 502, Addendum to Advisory Committee Notes, Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence, Subdivision (d)—Court orders. Plaintiffs' proposal does not upend such purpose--a party is still able to claw-back a privileged document and there is still not an automatic waiver for inadvertent production of privileged material. Plaintiffs' proposal simply allows a party to reference the content if there is a good faith dispute as to whether the document is privileged.

**Meta's position**:

On December 9, 2022, Meta sent Plaintiffs a draft clawback order pursuant to Federal Rule of

Evidence 502(d) (the "502(d) Order").  On February 22, 2023, Plaintiffs sent Meta their proposed revisions to the 502(d) Order.  After discussing the draft 502(d) Order during the meet and confers on February 23, 28, and March 1, 2023, Meta sent Plaintiffs a redline of its revised draft on March 2, 2023.  Meta sent Plaintiffs a further revised draft on March 4, 2023, that re-inserted agreed-upon language that had been inadvertently omitted in the prior draft.  On March 6, 2023, the parties met and conferred and identified the one remaining issue for which the parties are at an impasse.

Through negotiations, the parties have agreed to a 502(d) Order with the exception of one issue: (1) the ability to use clawed back information in arguments challenging the clawback.  For the Court's reference, attached hereto are the following exhibits: Exhibit G (Meta's draft 502(d) Order) and Exhibit H (a redline of Meta's draft 502(d) Order compared to the Plaintiffs' draft 502(d) Order).

The purpose of Rule 502 as described by the Court in *In re Google RTB Consumer Priv. Litig.*, 2022 WL 1316586, at *3 (N.D. Cal. May 3, 2022) (DeMarchi, J.), is "'to allow the parties to conduct and respond to discovery expeditiously, without the need for exhaustive pre-production privilege reviews, while still preserving each party's right to assert the privilege to preclude use in litigation of information disclosed in such discovery.'" (quoting Fed. R. Evid. 502, Addendum to Advisory Committee Notes, Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence, Subdivision (d)).

*(1) The substance of clawed-back documents should not be used to challenge clawback designations*

In accordance with the purpose of Rule 502 to allow parties to engage in efficient document production without the fear of unintended consequences connected to inadvertent production of privileged material, Meta proposed that: "The receiving party must not use or disclose the Protected Document(s) covered by the Clawback Notice during the time in which the receiving party is challenging the Protected Document(s)."

Plaintiffs rejected this language and proposed the following language allowing them to use the clawed back information in briefing and argument challenging a clawback:  "If the party challenging the clawback has a good faith belief that the entire document or key portions of the document are not

1   privileged, the challenging party may use those portions of the document for which it has a good faith

2   belief are not privileged solely in briefing or argument submitted in connection with any challenge to

3   a Clawback Notice and by providing the document to the Court for in camera review (with any portions

4   of the document that the parties agree are privileged redacted). In the case of such a challenge and use

5   of contents of the underlying document, the challenging party agrees not to argue that such use

6   constitutes waiver of the claimed privilege or work product protection. In no case shall a challenge to

7   a Clawback Notice be filed in the public record." Plaintiffs, citing Rule 26 of the Federal Rules of

8   Civil Procedure and *U.S. Home Corp. v. Settlers Crossing, LLC*, 2012 WL 5193835, at *5 (D. Md. Oct.

9   18, 2012), argue that Rule 26 "contemplates" a party's ability to use the content of a clawed back

10   document. Plaintiffs further argue that privilege claims are "almost always content-specific" and

11   therefore a court must generally look at a document's contents.

12      Case law from this district, however, confirms Meta's position that information from clawed

13   back documents should not be used to challenge the clawback. *See In re Google RTB Consumer Priv.*

14   *Litig.*, 2022 WL 1316586, at *1 (DeMarchi, J.).[8]  In *In re Google RTB Consumer Priv. Litig.*, the court

15   held: "If, as plaintiffs suggest, a receiving party were permitted to examine and brief the contents of

16   any putatively privileged document subject to a clawback notice," Rule 502(d)'s purpose of avoiding

17   the need for "exhausting pre-production privilege reviews" would be frustrated and would likely fail

18   to "achieve the objectives Congress envisioned." *See id.* at *3. Further, as agreed to in the 502(d)

19   Order, any clawed back document will be logged on a privilege log, the information from which can

20   be used to challenge the clawback in the same manner as any other challenge to a privilege designation.

21      It is Meta's position that its proposed language in the 502(d) Order concerning the use of clawed

22   back information complies with the Rule's purpose as recognized by courts in this district.

23

24

25

---

26   [8] Notably, the plaintiffs in *In re Google RTB Consumer Priv. Litig.* cited the same 2012 case from the
District of Maryland that the Plaintiffs cite here—*U.S. Home Corp.*—to support a similar position. In

27   response, the court in *In re Google* held that "the abbreviated discussion of the issue [in *U.S. Home Corp.* was] not persuasive." *See* 2022 WL 1316586, at *1 (holding that a party could not review

28   documents subject to a clawback notice).

1

### 6.  RELATED CASES

2

Ten cases have already been related by order of this Court: (1) *John Doe v. Meta Platforms,*

3

*Inc.*, Case No. 3:22-cv-03580 (N.D. Cal. June 17, 2022); (2) *Jane Doe v. Meta Platforms, Inc. et al.*,

4

Case No. 3:22-cv-04293 (N.D. Cal. July 25, 2022); (3) *Doe v. Meta Platforms, Inc.*, Case No. 3:22-cv-

5

04680 (N.D. Cal. Aug. 15, 2022); (4) *Jane Doe v. Meta Platforms, Inc.*, Case No. 3:22-cv-04963 (N.D.

6

Cal. Aug. 30, 2022); (5) *Krackenberger v. Northwestern Memorial Hospital, et al.*, Case No. 3:22-cv-

7

06020 (N.D. Cal. Aug. 10, 2022); (6) *Smidga v. Meta Platforms, Inc., et al.*, Case No. 3:22-cv-05753

8

(N.D. Cal Aug. 25, 2022); (7) *Naugle, et al. v. Meta Platforms, Inc., et al.*, Case No. 3:22-cv-9200

9

(N.D. Cal. Sept. 1, 2022); (8) *C.C. v. Meta Platforms, Inc. et. al.*, Case No. 3:22-cv-09199 (N.D. Cal.

10

Oct. 6, 2022); (9) *Doe, et al v. Meta Platforms, Inc.*, No. 3:22-cv-06665 (N.D. Cal. Oct. 28, 2022); and

11

(10) *Smart v. Main Line Health*, Case No. 3:23-cv-000528 (N.D. Cal. Dec. 30, 2022).

12

On March 1, 2023, *Murphy v. Thomas Jefferson University Hospitals Inc., et al.*, Case No. 3:23-

13

cv-00899, was referred to this Court for the purposes of determining whether the case is related to this

14

action.  On March 5, 2023, Meta filed a statement in support of relating *Murphy* to this action.  ECF

15

No. 188.  On February 28, 2023, *Stewart v. Advocate Aurora Health, Inc. et al.*, Case No. 3:23-cv-

16

05964 (N.D. Ill. Oct. 28, 2022) was transferred to the Northern District of California (Case No. 3:23-

17

cv-00900).

18

Claims against Meta in *Hartley v. University of Chicago Medical Center, et al.*, Case No. 1:22-

19

cv-05891 (N.D. Ill. Oct. 25, 2022) have been severed and are in the process of being transferred to this

20

District, at which point Meta intends to file motions to relate those claims to this case so that they may

21

be consolidated with this action.  Finally, Meta has filed a motion to sever and transfer the claims

22

against it in *Santoro v. Tower Health*, Case No. 5:22-cv-04580 (E.D. Pa. Nov. 16, 2022).  The motion

23

is pending before the court in *Santoro*.

24

### 7.  AMENDMENT OF PLEADINGS

25

The parties agree to set a deadline of 30 days following a decision on the motion to dismiss for

26

Plaintiffs to amend their pleadings.

27

28

### 8.  OTHER – EXPANSION OF DISCOVERY LIMITS

The parties have conferred and agree that it is premature to propose any potential expansion of the discovery limits set forth in the Federal Rules of Civil Procedure.

Plaintiffs' position is that an expansion of the discovery limits in the Federal Rules of Civil Procedure will be appropriate in this litigation. However, given that Meta has not yet produced any discovery, it is premature for the parties to negotiate any specific numerical expansion. Plaintiffs intend to confer with Meta when appropriate, and raise this issue at a later case management conference if necessary.

Dated: March 7, 2023               **GIBSON, DUNN & CRUTCHER LLP**

                                    By:  */s/ Lauren Goldman*
                                           Lauren Goldman

                                    **COOLEY LLP**

                                    By:  */s/ Michael G. Rhodes*
                                           Michael G. Rhodes

                                    *Attorneys for Meta Platforms, Inc. (formerly known as Facebook, Inc.)*

Dated: March 7, 2023               By:  */s/ Jason "Jay" Barnes*
                                           Jason 'Jay' Barnes

                                    **SIMMONS HANLY CONROY LLC**

                                    Jason 'Jay' Barnes (admitted *pro hac vice*)
                                       *jaybarnes@simmonsfirm.com*
                                    112 Madison Avenue, 7th Floor
                                    New York, NY 10016
                                    Tel:    212-784-6400
                                    Fax:    212-213-5949


                                    By:  */s/ Geoffrey Graber*
                                           Geoffrey Graber

                                    **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                    Geoffrey Graber, State Bar No. 211547
                                       *ggraber@cohenmilstein.com*
                                    1100 New York Avenue NW, Fifth Floor
                                    Washington, DC 20005
                                    Tel:    202-408-4600
                                    Fax:    202-408-4699

                                    **KIESEL LAW LLP**
                                    Jeffrey A. Koncius, State Bar No. 189803
                                       *koncius@kiesel.law*
                                    8648 Wilshire Boulevard
                                    Beverly Hills, CA 90211
                                    Tel:    310-854-4444
                                    Fax:    310-854-0812

                                    **TERRELL MARSHALL LAW GROUP PLLC**
                                    Beth E. Terrell, State Bar No. 178181
                                       *bterrell@terrellmarshall.com*
                                    936 North 34th Street, Suite 300
                                    Seattle, WA 98103
                                    Tel.:   206-816-6603
                                    Fax:    206-319-5450

-47-

**GIBBS LAW GROUP LLP**
Andre M. Mura, State Bar No. 298541
   amm@classlawgroup.com
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.:    510-350-9700
Fax:    510-350-9701

*Attorneys for Plaintiff*

CASE MANAGEMENT STATEMENT
CASE NO. 3:22-CV-03580-WHO

1

## CIVIL L.R. 5-1(h)(3) ATTESTATION

2

Pursuant to Civil Local Rule 5-1(h)(3), I, Lauren Goldman, hereby attest under penalty of

3

perjury that concurrence in the filing of this document has been obtained from all signatories.

4

5

Dated: March 7, 2023                    By:    */s/ Lauren Goldman*

6

Lauren Goldman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE MANAGEMENT STATEMENT
CASE NO. 3:22-CV-03580-WHO