GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY (SBN 268184)
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA (SBN 301746)
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
rhodesmg@cooley.com
KYLE C. WONG (SBN 224021)
kwong@cooley.com
CAROLINE A. LEBEL (SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Jason 'Jay' Barnes (admitted *pro hac vice*)
jaybarnes@simmonsfirm.com
SIMMONS HANLY CONROY LLC
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: (212) 784-6400
Facsimile: (212) 213-5949

*Additional Attorneys in Signature Block*

*Co-Lead Counsel for Plaintiffs and the*
*Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>All Actions | Case No. 3:22-cv-03580-WHO-VKD<br><br>**JOINT STATEMENT REGARDING ESI PROTOCOL**<br><br>Hon. Virginia K. DeMarchi |

In accordance with the Court's direction at the April 20, 2023 Discovery Conference, *see* Dkt. No. 216, the parties in *In re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (VKD), *In re Meta Pixel Tax Filing Cases*, Case No. 3:22-cv-07557-SI (VKD), and *Gershzon v. Meta*, Case No. 3:23-cv-00083-SI (VKD), have continued to meet and confer regarding the terms of an ESI Protocol to be entered in their respective cases. While the parties have made progress in certain areas, they have been unable to reach agreement on others. The issues on which the Parties are at impasse are as follows: (1) preservation, (2) search methodology, (3) content of privilege logs, (4) document families, (5) email threading, (6) technical feasibility, and (7) proprietary files.

Accordingly, the parties' competing draft proposals are attached as Exhibits A–C. The parties submit the following statements regarding the remaining disputes.

**PLAINTIFFS' STATEMENT**

For the Court's reference, the *Healthcare* Plaintiffs' proposed ESI Protocol is attached hereto as Exhibit A. The *Healthcare* Plaintiffs' positions as to the issues on which the Parties are at impasse are as follows:

**(1) Preservation (Section V)**

For more than five months, the *Healthcare* Plaintiffs have asked Meta to engage with the *Healthcare* Plaintiffs regarding Meta's preservation efforts. At the April 20 discovery conference, the Court directed the parties to "have a kind of candid discussion about what are the relevant data sources in the first place," including conversations about "Named Plaintiffs' data, figuring out where that lives [and] how it's kept." Hearing Tr. 54:23-55:22. The Court ordered the parties to submit briefs about any disputes regarding preservation by May 9. ECF No. 216.

Despite the Court's direction, Meta has still *not* engaged in substantive conversations with the *Healthcare* Plaintiffs about its preservation efforts. In the last 48 hours, Meta has told the *Healthcare* Plaintiffs that it will be ready to have a conversation about "the relevant ESI sources and Meta's position on preservation" on May 19. Meta also seeks an order that "the Parties will enter a separate order regarding preservation in this matter."

Meta's tardy offer to discuss preservation should not stop the entry of a full ESI Protocol. Instead, Plaintiffs ask the Court to enter Plaintiffs' proposed preservation language that reiterates the parties' existing legal obligations and creates a fair procedure for any requests by a party to stop preserving specific relevant evidence.

## 1. Meta's Request for Delay and a Separate Order is Not Warranted

Meta's last-minute request for a delay and an order that "the Parties will enter a separate order regarding preservation in this matter" is not appropriate for several reasons.

*First*, Meta has a pre-existing legal obligation to preserve relevant, non-duplicative information. In the absence of an order, the existing legal obligations apply. If Meta wants relief from its obligations, it can gain the Plaintiffs' agreement or file a motion for protective order seeking such relief, but such motion must be accompanied by (1) an explanation of the relevant, non-duplicative evidence that it seeks to delete; and (2) actual evidence of burden.

Plaintiffs still agree that the parties should have discussions about the sources of Meta's relevant, non-duplicative information. Indeed, Plaintiffs have made discovery requests seeking Meta's production of information about relevant systems. With enough disclosures from Meta about what exists and where, the parties may be able to enter into a separate order, but the Court should not require it.

*Second*, entering this language will order the Plaintiffs to continue negotiating with Meta over how to relieve Meta from its existing discovery obligations. Plaintiffs respectfully submit that it would not be appropriate to order Plaintiffs to negotiate the entry of "a separate order regarding preservation in this matter" when Meta has delayed those conversations for months and failed to abide by the Court's instructions.

On April 20, the Court told the parties to confer to see if there are categories where the parties "can say categorically this kind of information doesn't need to be preserved because it just really isn't reasonable for anyone to preserve it." Hearing Tr. 54:1-8. The Court also directed the parties to "have a kind of candid discussion about what are the relevant data sources in the first place," including conversations about "Named Plaintiffs' data, figuring out where that lives [and] how it's kept." Hearing

Tr. 54:23-55:22. The Court explained that, to get to the "worthy goal" of agreement on what need not be preserved, Meta would "have to provide some information to the Plaintiffs collectively so that they can agree to that or conversely, if they don't agree, you have to persuade me that that data source is something that you shouldn't have to preserve. So you would have to provide the explanation one way or the other eventually to me." Hearing Tr. 61:12-23.

Meta responded by asserting that "Plaintiffs' counsel obviously doesn't understand the way all of this data works. So we will work with them so they can better understand that, but we certainly are attempting to preserve all of the kinds of descriptions of data that they have described thus far." Hearing Tr. 61:24-62:6.

At the end of the portion of the hearing on *preservation*, Plaintiffs asked, "In lieu of continuing to pepper Meta with requests to respond to the letter, could the Court set a date certain for Meta to respond to our letter and start a meet-and-confer process?" The Court answered:

> Why don't you just talk to each other. I mean, I'm not going to micromanage it. Don't go there. Don't be those parties where I'm going to tell you when to talk to each other and when to respond to letters. Don't be that way. You have a deadline. You need to get it done. You need to talk. Okay. … People have to talk.

Hearing Tr. 139:4-18.

As noted at the April 20, 2023 hearing, Plaintiffs' counsel had previously requested that Meta provide information about Named Plaintiff Data and its systems via meet-and-confers, letters, and email follow-ups on March 21, March 23, March 24, April 4, April 11, and April 17, 2023. Plaintiffs' March 24 letter identified multiple systems and identifiers for which they sought information. Plaintiffs obtained this information by scouring publicly filed documents associated with the sanctions motion that was granted in the *Facebook Consumer Privacy Profile Litigation*. Those documents indicate that Meta (eventually) provided extensive discovery about Named Plaintiff Data collection and use systems in that action.

Meta responded on April 20, 2023 – the evening after the previous hearing. Its response did not provide any substantive information. Instead, Meta instructed Plaintiffs to seek information through

Rule 34 of the Federal Rules of Civil Procedure, and then stated that "Meta is willing to continue the parties' ongoing meet and confer discussions on this topic."

Meta's reference to Rule 34 discovery was particularly bizarre because Plaintiffs had already served Rule 34 requests regarding Meta's systems. These include documents sufficient to identify:

1. "[T]he databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel for Medical Provider Web-Properties;" Plaintiffs' Request for Production No. 6;

2. "[T]he fields in databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel for Medical Provider Web-Properties[;]" Plaintiffs' RFP No. 7;

3. "[H]ow the databases, logs, or other electronic sources where Meta receives, re-directs or stores event-level and/or derived data collected through and associated with the Meta Pixel for Medical Provider Web-Proeprties … can be searched, extracted, and produced." Plaintiffs' RFP No. 8.

But Meta initially objected to the production of such documents.

On April 26, 2023, Plaintiffs sent a follow-up letter asking specifically:

> [W]hen will Meta provide any substantive information about where Named Plaintiff data relevant to this case is stored, the fields that are located in those data bases or data sources, and how they can be searched, extracted, and preserved in a way that is efficient, cost-effective, and proportionate to the scope of this case?

Meta did not provide any substantive response or a date to discuss.

On May 2, 2023, Plaintiffs sent another email to "renew their request that Meta provide substantive about its ESI systems, including Named Plaintiff Data." Plaintiffs again specifically asked, "When will Meta engage in a substantive conversation about its ESI systems?" and requested "Pursuant to Plaintiffs' previous requests and Judge DeMarchi's instructions, please providing your availability to meet and confer this week concerning Meta's ESI systems and Named Plaintiff Data."

Meta never provided a date. Instead, on May 3, 2022, Meta responded:

> Thank you for following up on Meta's ESI systems. We are continuing to investigate the relevant systems, including how they can best be accessed and searched. Our investigation is still ongoing. We hope to be in a position to discuss these issues with you soon, and will reach out then to schedule the meet and confer.

Plaintiffs appreciate that Meta says it is investigating its systems, but its investigation is late: the first-filed case in this consolidated action was filed on June 17, 2022.[1]

On May 5, 2023, Meta finally confirmed that it would produce responsive documents for Plaintiffs' Requests for Production Nos. 6 and 7. Plaintiffs asked Meta to provide a date certain for a producing documents in response to these requests that were initially served on February 9, 2023. On May 9, 2023, Meta responded to Plaintiffs request by refusing to provide a date certain and claiming that a dispute about Meta's failure to produce in a timely fashion – and failure to even provide a date by which it will respond – was not ripe to bring to the Court's attention.

Plaintiffs have now made at least eight requests for Meta to provide information that would enable the parties to reach the "worthy goal" of agreement. It may turn out that the parties can agree that some of these data sources need not be maintained. But Plaintiffs cannot agree to any of this in a vacuum – where Meta has repeatedly failed to provide any substantive information, even after being instructed to do so by the Court.

**2. Meta's Alternative Proposal is Not Supported by Any Evidence**

In the alternative to an "agreement" from the Plaintiffs that the parties stipulate that "[t]he Parties will enter a separate Order regarding preservation in this matter," Meta made slight changes to its previous proposal. However, entry of Meta's last-minute changes should be rejected for the same reasons that its first proposal should not have been entered. (Plaintiffs incorporate by reference their previous opposition to Meta's proposal. See Dkt. Dkt. 191 at 10-13)

*First*, as the Court instructed at the April 20, 2023 hearing, for Meta to obtain such relief, it would "have to provide some information to the Plaintiffs collectively so that they can agree to that or

---

[1] The answers to these questions are important to Plaintiffs' request for injunctive relief – and a potential forthcoming renewed motion for preliminary injunction. Meta's delay is prejudicial to the *Healthcare* Plaintiffs and their ability to efficiently prosecute this action.

conversely, if they don't agree, you have to persuade me that that data source is something that you shouldn't have to preserve. So you would have to provide the explanation one way or the other eventually to me." Hearing Tr. 61:12-23. Meta has not done either – and its new proposal admits as much. While Meta's previous proposal stated (incorrectly) that "[t]he Parties have discussed the sources and types of ESI they believe will be sources of potentially relevant information," Meta has now changed this to reflect the truth. It now states that, "The parties will discuss the sources and types of ESI they believe will be sources of potentially relevant information." This admission should be dispositive to the rest of Meta's request. Plaintiffs filed the first complaint in this consolidated action approximately 11 months ago. Meta should have had these discussions with Plaintiffs in the Rule 26(f) conference – but did not. Since then, Plaintiffs have asked at least eight times for Meta to engage in substantive discussions.

*Second*, Meta moves two items from the list of sources from which it seeks permission to destroy relevant, non-duplicative evidence into a new category for which Meta claims "the parties agree are not reasonably accessible" and that will not be preserved, collected, processed, reviewed, and/or produced unless "a party identifies discoverable information contained" in the sources. The two items Meta places into this category are (1) "server, system, or network logs;" and (2) "dynamic fields in databases or log files not stored or retained in the usual course of business."

But the parties have not agreed on any of this. Meta has not provided any evidence that either of these categories "are not reasonably accessible," and Plaintiffs' counsel strenuously disagrees. In fact, Plaintiffs' counsel has been involved in data privacy cases where "server, system, or network logs" were produced in discovery and were highly relevant to liability and class certification. *Doe v. Virginia Mason*, Case No. 19-2-26674-1 SEA (King Cty. Wash), Plaintiffs' Motion for Class Certification at 9:14-16 , filed Dec. 7, 2020 ("[D]ocuments produced by VM show that Jane Doe's … communications can be ascertained with certainty from its log-files … VM maintains the same records for all class members."); class certification granted on Sept. 21, 2021.

Similarly, Meta has not shown that "dynamic fields in databases or log files not stored or retained in the usual course of business" are "not reasonably accessible." For this category, Meta has

not defined what it means by "dynamic field" or "stored or retained in the usual course of business." As with the server, system, or network logs, "dynamic fields" in databases that are not "stored or retained in the usual course of business" may include highly relevant, non-duplicative information. For example, it would be highly relevant if Meta had systems that place a temporary tag on data that it receives from Medical Web-Properties that flag the information as being potentially sensitive, but then quickly deletes the tag before it goes into Meta's long-term storage systems.

*Third*, Meta's proposed preservation section remains without any evidentiary or legal support. For example, Meta proposes that it be permitted to delete "video recordings." However, discovery often involves disclosure of internal videos giving explanations or instructions to employees about relevant information. In this case, Plaintiffs' Consolidated Complaint discusses several videos at length. Under Meta's proposal, Meta could destroy those videos.

Likewise, Meta misstates the facts and the law in its section stating that "the Parties agree data from the following sources (a) could contain relevant information; but (b) under the proportionality factors, should not be preserved." The parties have made no such agreement and Meta has not presented any evidence regarding "the proportionality factors."

Meta's list also contains sources of potentially highly relevant information. For example, Meta proposes that it be granted permission to delete "on-line data such as temporary internet files, history, cache, cookies, and the like." But allegations about browsing history and cookies are throughout the complaint and Meta's evidence of each (including the Medical Web-Properties at issue) is relevant to the claims. Meta's order would grant it license to delete the relevant "history … cookies, and the like" in this case – without any assurance that there are alternative sources for this information. Similarly, Meta's proposal to delete "[m]obile device activity logs" would erase relevant evidence about unauthorized collection of data from mobile devices.

For these reasons, and the reasons stated in the prior opposition to Meta's proposal, the Court should not enter an Order granting Meta license to destroy relevant, non-duplicative information when

-8-

Meta has neither (1) identified specifically that which is seeks to destroy; nor (2) provided any evidence of burden or proportionality.[2]

Finally, in Meta's statement below (which Meta sent after 10:30 pm Pacific Time on the day of the filing), Meta again misstates Plaintiffs' position.

*First*, Meta tells that Court that it "was hoping that plaintiffs would be willing to engage in cooperative discussions" regarding Preservation, "but plaintiffs stated they are not willing to take this approach with the ESI Protocol." This statement is false. Plaintiffs have attempted to get Meta to cooperate with respect to this issue for months – including letters, informal requests in meet-and-confers, requests that the Court order Meta to confer with Plaintiffs on the issue, and by serving formal discovery on the topic. On the last meet and confer (which took place on the day of this filing), Meta changed its proposal and yet refused to commit to any date certain by which it would provide any details. Even then, Plaintiffs agreed that further discussions were necessary. However, Plaintiffs stated it would not be helpful to enter an order requiring the parties to agree to a further order eleven months into the case on a topic that Meta should have been discussing with Plaintiffs beginning with the Rule 26(f) conference.

*Second*, Meta claims it "provided initial descriptions of relevant sources of data it has identified" in a meet and confer on March 21, 2023. This is misleading. If, by initial descriptions, Meta means it told the Plaintiffs (1) Meta understood its preservation obligations and was meeting them; and (2) Plaintiffs were mistaken about Meta's proposals, then the statement is true. But those statements were not accompanied by any details of what Meta is proposing, where that Named Plaintiff Data "lives," and if there was any relevant, non-duplicative data that it would not be preserving.

*Third*, Meta argues that its provision that it need not change any existing preservation policies "does not suggest that Meta will fail to preserve appropriate data." As this Court is no doubt aware, some data sources are kept for shorter periods of time than others. If a data source is only kept for 30

---

[2] Here, the Healthcare Plaintiffs are confident that Meta's total preservation costs will not be unduly burdensome. While other cases involve preservation of data relating to millions of web-properties, the properties at issue in the *Healthcare* case numbers in the thousands. However, it is not Plaintiffs' burden to demonstrate as much.

days in the ordinary course of business, entry of Meta's order would give Meta legal excuse to delete evidence it knows to be relevant and non-duplicative, without making any showing about burden.

*Fourth*, Meta misstates Plaintiffs' position when it asserts that "Plaintiffs continue to demand the preservation" of any specific data source. Plaintiffs have been clear from Meta from the beginning. We expect Meta to preserve that which it is required by law: relevant, non-duplicative data. At this juncture, nearly a year into the case, Plaintiffs do not have any information from Meta about where that the relevant data lives or how it may be extracted.

### (2) <u>Search Methodology (Section VI)</u>

Following the parties' April 20 discovery conference, the parties have narrowed their disputes regarding the "search methodology" section of the ESI protocol. However, differences remain between the *Healthcare* Plaintiffs and Meta's proposed search methodologies.

*First*, consistent with the Court's guidance, Plaintiffs' ESI Protocol makes clear that the Receiving Party will have the right to propose custodians, search terms, and sources of ESI, and that disputes regarding custodians, search terms, and sources of ESI "may be presented to the Court for resolution in accordance with Judge DeMarchi's Standing Order." *See* Hearing Transcript at 77:23-78:2 ("If there is a dispute about search terms or custodians, it will come to me….If you have a dispute, you have to have some recourse.")

*Second*, under Plaintiffs' proposal, the Receiving Party can request "additional search terms or custodians." Plaintiffs' ESI Protocol at § 6(e). Under Meta's proposal, Plaintiffs would be prohibited from requesting additional search terms after receiving Meta's production. Meta's ESI Protocol at § 6 ("No additional iterations of search term development will be conducted.")  Once again, the Court rejected Meta's approach at the hearing and explained that it is not "atypical" to have follow-up search terms and custodians. *See* Hearing Transcript at 90:4-17 ("[I]s is certainly not atypical to have one party or the other say, 'Oh, we didn't appreciate that. This was a relevant word that might generate, you know, responsive documents….It is also not unusual for some witnesses of significance to become apparent in the course of discovery that maybe wasn't appreciated by any party at the outset.")

*Third*, with respect to "null sets," Plaintiffs now agree that the Producing Party may provide a

"null set" sample (along with hit reports). However, to ensure that the creation of "null sets" does not become a cause of delay in the litigation, Plaintiffs have included a provision that states, "The Producing Party may also provide the Receiving Party with a "null set" sample *so long as the creation of the "null set" sample does not cause a substantial delay in the negotiation of search terms."* Plaintiffs' Proposed ESI Protocol, § 6(c) (emphasis added).

Meta has still not identified any ESI Protocols that utilized "null sets" in the selection of search terms. Plaintiffs' language is necessary to ensure that the novel "null set" samples do not cause substantial delays to the discovery process. It would not be fair to require the Plaintiffs to wait for a long time for Meta to generate "null set" samples.

*Fourth*, consistent with the Court's guidance, Plaintiffs' ESI Protocol proposal states that, "Neither Party will utilize technology-assisted review to filter out their potentially responsive ESI without agreement of the other Party or a Court order." Plaintiffs' Proposed ESI Protocol, § 6(d).  By contrast, Meta's ESI Protocol allows a Producing Party to utilize technology assisted review without agreement of the parties or a court order. Like with custodians and search terms, the Receiving Party needs to have the explicit right to raise disputes regarding a Producing Party's proposed use of technology assisted review.

### (3) Production of Linked Attachment (Appendix 1, Section 1)

Plaintiffs' ESI Protocol specifies that "documents referenced … via links to internal or non-public documents" are part of family groups and thus must be produced along with their parent document.  Plaintiffs' Proposed ESI Protocol, Appendix 1, § 1. Based on information provided by Plaintiffs' discovery vendor, there are commercially available methods to automate the collection of links to internal or non-public documents. *See* Ex. D, Declaration of Doug Forrest. Thus, Meta has no excuse not to produce documents referenced via links to internal or non-public documents as part of family groups.

In the parties' prior submission regarding the ESI Protocol, Meta asserted that "The process of tracing hyperlinks to the referenced material that Plaintiffs' process contemplates would be a

*completely manual*, costly, and burdensome process that involves a source-by-source, hyperlink-by-hyperlink review." ECF No. 191 (emphasis added).

At the parties' April 20 discovery hearing, the Court explained, "If there is a dispute on the technical aspect of whether these things can be produced, well, then I would like to hear from you all about that *because if it can be done in an automated way, then it should be*. If it can't and it's a manual exercise, I just -- I can't order that across the board if there's a large volume. It's just too burdensome." Hearing Transcript at 103:18-24 (emphasis added).

Upon further investigation, Plaintiffs have learned from their discovery vendor that there are commercially available methods to automate the collection of links to internal or non-public documents. Douglas Forrest explains in his declaration:

> While I do not know what email platform Facebook is using in its regular course of business, e.g., Microsoft Exchange, Google Mail, etc., there are well known cost-effective commercially available tools for automatically collecting links to non- public documents in related systems and such tools are regularly used for ESI discovery during litigation.

Declaration of Doug Forest, at ¶ 12. Mr. Forest provides specific examples of commercially available methods to automatically collect links from documents: Microsoft Purview eDiscovery (Premium) and Metaspike's Forensic Evidence Collector. *Id.* at ¶¶ 13-14.

Because links to internal or non-public documents can be collected in automated ways, the Court should adopt Plaintiffs' proposed language regarding the production of linked attachments.

**(4) Privilege Logs (Section IX)**

The parties have mostly agreed on language for Section 9 of the ESI Protocol regarding privilege logs. The parties have agreed to address the format of the privilege logs at a later date. Plaintiffs do not agree to include language proposed by Meta that states, "Communications may be identified on a privilege log by category, rather than individually, if appropriate." Plaintiffs' position is that communications should be individually logged. In any event, since the parties have already agreed to address the format of the privilege logs at a later date (rather than in the ESI Protocol), it is inappropriate to have language about categorial logging in the ESI Protocol.

-12-

**(5)** <u>**E-mail Threading (Section VII(b))**</u>

Pursuant to the Court's direction, Plaintiffs have agreed that parties may use e-mail threading. The parties, however, have been unable to agree on language for e-mail threading. Plaintiffs propose reasonable language to ensure that e-mailthreading is used appropriately. With that in mind, Plaintiffs have proposed language that clarifies that an e-mail may only be withheld as part of e-mail thread when (1) the e-mail has identical attachments to later in time e-mails, (2) the e-mail has identical participants, including that those BCC'd on an e-mail must be included in later in time e-mails, (3) with the exception of the added prefixes "Re:" or "Fw:", all emails in the thread must have the same subject line, and (4) the full body text of every email in the thread must be included in the produced document.

Plaintiffs' proposal is consistent with the purpose of e-mail threading: to reduce the burden on the producing party while ensuring that the receiving party receives all e-mail unique information. However, if there are earlier e-mails with different attachments, participants, subject lines, and/or body texts, those earlier e-mails must also be produced. Otherwise, e-mail threading is inappropriate and will cause the parties to lose unique information from e-mail productions.

Because there is nothing objectionable about the standard language that Plaintiffs propose for e-mail threading, Meta feigns ignorance and pretends not to understand it. Meta also suggests that some of Plaintiffs' proposed e-mail threading language is unnecessary because it is inherently part of e-mail threading. But if Meta plans on following Plaintiffs' proposed e-mail threading approach, then there should be no problem with memorializing it.

Plaintiffs also propose the following language: "Where a Last In Time E-Mail is produced, the Producing Party will include metadata corresponding to the following metadata fields for each of the earlier thread members fully contained within the Last In Time E-Mail: Sent Date, Sender, Recipient, CC, BCC, and Subject." This is a routine practice that has been used in other cases involving Meta, including *Facebook Consumer Privacy Profile Litigation*. Case no. 18-MD-2843 (N.D. Cal.).

**(6)** <u>**Technical Feasibility**</u>

In many places in the ESI Protocol, Meta seeks to add language that would allow the parties to only follow the ESI Protocol processes "to the extent it is reasonably and technically feasible."  But

-13-

the whole purpose of the ESI Protocol was to negotiate processes that are reasonable. Meta's proposed language will undermine the parties' compromises and weaken the ESI Protocol.

For example, in Section 5(c), concerning TIFFs, Meta proposes that TIFF'd images will display all data visible in the native application "to the extent it is reasonably and technically feasible." However, in the ordinary course of business, documents are stored in native rather than TIFFs. At the Court's direction and to reduce Meta's burden, Plaintiffs agreed to expand the types of documents that can be produced in TIFF rather than native. If the TIFF images are unable to display all the native data, then the correct solution would be for the document to be produced in native, not for the producing party to avoid its discovery obligations by unilaterally determining that it is not "reasonably and technically feasible."

**(7) <u>Proprietary Files</u>**

Plaintiffs propose language that states, "To the extent a response to discovery requires production of ESI accessible only through proprietary software, the parties should continue to preserve each version of such information."

Plaintiffs expect that Meta is preserving each version of ESI that is only accessible through proprietary software. If Meta seeks to stop preserving versions of relevant ESI, then Meta should seek a protective order, as discussed in the preservation section.

**META'S STATEMENT**

Meta's position on the ESI Protocol is guided both by the Northern District of California's Model Stipulated Order re: Discovery of Electronically Stored Information for Standard Litigation (the "Model Protocol"), relevant case law, and Sedona Conference Principle 6, which instructs that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." *The Sedona Principles*, *Third Edition: Best Practice, Recommendations & Principles for Addressing Electronic Document Production*, The Sedona Conference, 19 Sedona Conf. J. 1, 52 (2018).

For the Court's reference, Meta's proposed ESI Protocol is attached as Exhibit B. A redline of Meta's proposal against Plaintiffs' proposal is attached as Exhibit C.

1

***(1) Data Preservation***

2      Meta continues to recognize and abide by its preservation obligations under the Federal Rules.

3   During the April 20, 2023 discovery conference, the Court suggested that the parties did not need to

4   address preservation issues in the ESI Protocol.  Meta thus proposed that the parties remove the

5   preservation section from the ESI Protocol and negotiate a separate document regarding preservation

6   on a separate timeline.  Plaintiffs did not agree with this proposal, and thus Meta includes in its

7   proposed ESI Protocol submitted herewith a section regarding preservation.  However, Meta would

8   also be willing to separately discuss preservation issues and remove this topic from the ESI Protocol—

9   this would narrow the disputes being presented to the Court, and it would allow the parties to further

10  meet and confer regarding relevant data sources and preservation as described below.

11      During the April 20, 2023 discovery conference, this Court recommended that the parties have

12  a "candid discussion about what are the relevant data sources in the first place."  Apr. 20, 2023 Hearing

13  Tr. at 54:25-55:1.  Meta began preliminary discussions on this issue prior to the April 20 discovery

14  conference,[3] and Meta continues to work diligently to compile the relevant information in order to have

15  a fulsome discussion with all plaintiffs on this topic.  Meta has offered to meet and confer with plaintiffs

16  on this topic next week, and the parties are negotiating a time on Friday, May 19.  Meta also seeks to

17  obtain from plaintiffs an understanding as to the types of data sources relevant to named plaintiffs.  To

18  date, none of the plaintiffs have identified the sources of potentially relevant data in their possession,

19  custody, or control, nor have they identified the types of data that they are preserving.  *See* Apr. 20,

20  2023 Hearing Tr. at 62:19-20 ("The Plaintiffs have their own preservation obligations.").

21      It is Meta's position that the parties continue to engage in these discussions in accordance with

22  this Court's guidance.  Plaintiffs' statements above are far afield from the information relevant to this

23  Court's consideration of a governing ESI Protocol, and Meta strongly disputes Plaintiffs' recitation of

24

25

26  ───────────────
    [3] During a meet and confer with plaintiffs on March 21, 2023, Meta provided initial descriptions of
27  relevant sources of data it has identified, and agreed to further address relevant sources in more detail
    in later discussions.

28

the numerous discussions that have occurred between the parties to date.[4]  Meta believes that, through

further discussions, the parties may be able to narrow the disputed issues regarding ESI sources and

preservation that would need to be brought to the Court.  Accordingly, Meta believes it is premature to

address preservation issues with the Court, and Meta proposes separating the preservation discussion

from the ESI Protocol.  Accordingly, Meta has proposed language for Section 5 of the ESI Protocol

stating: "The Parties will enter a separate Order regarding preservation in this matter."

Meta was hoping that plaintiffs would be willing to engage in cooperative discussions in this

regard, but plaintiffs stated they are not willing to take this approach with the ESI Protocol.

Accordingly, Meta has also included in its proposal a section regarding preservation that follows

Section 4 of the Model Protocol.  Meta's proposal is designed "[t]o reduce the costs and burdens of

preservation and to ensure proper ESI is preserved."  *See* Model Protocol, Sec. 4.  This proposal is

similar to the previously-submitted ESI Protocol discussed at the April 20, 2023 discovery conference.

*See* Dkt. 191-1.  For completeness, Meta restates its proposal below, and highlights additional

information that aligns with this Court's guidance.

First, as previously stated, Meta's proposal adds a subsection that is not in the Model Protocol,

but that reiterates the obligations of the parties to preserve relevant data: "[t]he Parties will preserve

non-duplicative, relevant information currently in their possession, custody, or control; however, the

Parties are not required to modify, on a going forward basis, the procedures used by them in the usual

course of business to back up and archive data."  Ex. B, Sec. 5(a).  This second clause does not suggest

that Meta will fail to preserve appropriate data; it simply states that no changes are needed to existing

procedures for backing up and archiving data to address Meta's preservation obligations.

Second, in accordance with Sections 4(b) and 4(c) of the Model Protocol, Meta provides for

discussions among the parties regarding ESI sources and custodians, including that the parties will

agree on a number of custodians for whom to preserve data, but with an option to meet and confer to

---

[4] Meta notes that Plaintiffs again reference partisan discovery motion exhibits in an unrelated
litigation involving different plaintiffs, different causes of action, and different discovery requests.
Plaintiffs do not have full knowledge as to what Meta produced in that action and under what
circumstances, and their reliance on such materials is thus misplaced.

discuss additional custodians as reasonably necessary.  Meta has already provided Healthcare plaintiffs with a list of custodians.

Third, in accordance with Section 4(d) of the Model Protocol and this Court's guidance during the April 20 discovery conference, Meta's proposal identifies sources that "are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B)."  Model Protocol, Sec. 4(d).  Meta proposes that "unwarranted extraordinary measures will not be taken to preserve ESI from these sources," but clarifies that "ESI from these sources will be retained pursuant to standard business processes, but not otherwise preserved, searched, reviewed, or produced unless ordered by the Court upon a motion of a Party."  Ex. B, Sec. 5(e).

These sources include two of the example sources identified in the Model Protocol: "backup systems and/or tapes used for disaster recovery" and "systems no longer in use that cannot be accessed by using systems currently in use by the Party," as well as additional specified sources.  As this Court noted, without "prejudging the issue," "[i]t would be an unusual case where backup tapes would need to be preserved."  Apr. 20, 2023 Hearing Tr. at 54:8-18; *see id.* at 64:18-21 ("[I]t seems pretty straightforward that [(1) and (2)] should be the kinds of things that the parties could agree would not be preserved.").  This observation aligns with California statutory law and case law that confirm that backup tapes are widely considered to be "not reasonably accessible" data sources because of the associated undue burden and/or cost.  *See Toshiba Am. Elec. Components v. Super. Ct.*, 124 Cal. App. 4th 762, 771 (Cal. Ct. App. 2004) ("[T]he cost of recovering data from backup tapes or other data compilations can be exorbitant.").  Despite this common practice and understanding, plaintiffs continue to demand the preservation of backup systems as a data source.

Similarly, courts emphasize that "the primary source of ESI to be produced during discovery's progression should be *active* ESI, typically defined as ESI currently or habitually in use by the requested entity."  *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 238 (S.D. Cal. 2015) (emphasis in original); *see Martinelli v. Johnson & Johnson*, No. 2:15-CV-01733-MCE (EFB), 2016 WL 1458109, at *2 (E.D. Cal. Apr. 13, 2016) ("Data remaining from systems no longer in use that are

unintelligible on the systems currently in use" are not discoverable).  Despite this, Plaintiffs continue to demand the preservation of this data source.

Fourth, Meta proposes, in accordance with Section 4(f) of the Model Protocol and utilizing some of the example sources in the Model Protocol, that certain information that may contain relevant information need not be preserved under the proportionality factors, including "(1) Deleted, slack, fragmented, or unallocated data only accessible by forensics. (2) Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system. (3) On-line data such as temporary internet files, history, cache, cookies, and the like."  Ex. B, Sec. 5(f).  As this Court observed, "the kinds of things that are listed in items 1, 2 and 3 seem like the kind of things that nobody would have to preserve[.]"  Apr. 20, 2023 Hearing Tr. at 65:13-15.  Plaintiffs have ignored this guidance and have to date refused to consider Meta's proposal regarding sources that need not be preserved under the proportionality factors.

Within this section, Meta has proposed the following categories of information that need not be preserved under the proportionality factors: "(4) Data in metadata fields that are frequently updated automatically, such as last-opened or last modified dates. (5) Mobile device activity logs. (6) Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and/or disposition of computer equipment by the Party."  Ex. B, Sec. 5(f).  As this Court noted during the April 20, 2023 discovery conference: "Some of those things may not need to be preserved.  Some of those things might be."  Apr. 20, 2023 Hearing Tr. at 65:16-17.  Meta is willing to discuss these topics with plaintiffs further, which is why Meta's preferred approach is to remove preservation from the ESI Protocol so that the parties may engage in more fulsome discussions in an attempt to further narrow—and potentially resolve—their disputed issues.

Fifth, Meta proposes a new section to address the specific sources identified by plaintiffs as potentially having relevant information.  Meta has provided more detailed information to plaintiffs on these sources ("server, system, or network logs" and "dynamic fields in databases or log files not stored or retained in the usual course of business," Ex. B, Sec. 5(g)), and Meta has proposed separate treatment for these sources that states these sources will not be preserved based on mutual representation of the

-18-

parties' counsel that these sources that are not reasonably accessible.  However, if in the process of reviewing custodial discovery a party identifies relevant information contained in these sources, that party will preserve, collect, process, review, and/or produce non-privileged, responsive material therein.

Finally, Meta proposes that, due to various privacy regulations and court orders with which Meta must comply that require the disposition of certain identifiable user data, the parties will meet and confer concerning the preservation of such information if any such information is determined to be relevant to the claims or defenses in this litigation.  Meta has entered into numerous ESI Protocols in this District that follow these directives of the Model Protocol.  *See, e.g.*, Dkt. 70, *Gullen v. Facebook, Inc.*, No. 3:16-cv-00937-JD, Dkt. 70 (N.D. Cal. Feb. 17, 2017); Dkt. 144, *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747-JD, Dkt. 144 (N.D. Cal. Sept. 9, 2016).

Despite the guidance provided by this Court, Plaintiffs' proposal is almost entirely unchanged. As previously stated, Plaintiffs' proposal completely rejects the Model Protocol's guidance—and ignores both this Court's guidance and the relevant case law with respect to the preservation of data sources.  Plaintiffs propose their own system for data preservation that would require Meta to freeze all *potentially* relevant data sources, regardless of cost or burden, unless and until Meta seeks judicial intervention in the form of a protective order.  Although during the April 20, 2023 discovery conference Plaintiffs' counsel stated that Plaintiffs "underst[ood] that [Meta] shouldn't have to preserve everything in the world," the plain language of Plaintiffs' proposal requires just that.  *See* Apr. 20, 2023 Hearing Tr. at 58:18-19.

First, Plaintiffs propose broadly that, "[t]he Parties are obligated to identify, locate, maintain and preserve evidence that they know or reasonably should know is relevant to any claim or defense in the action."  Ex. A.  Second, Plaintiffs propose that, "[i]f a Party seeks to be relieved of the obligation to preserve certain relevant evidence, it may file a motion for a protective order seeking to be relieved of that obligation for specific relevant evidence."  *Id.*  Plaintiffs require that before filing a motion for a protective order, a party must first provide the other party a "precise description" with several pieces of information about the data sources, including whether or not the party will stipulate to waive certain

-19-

elements of the other party's claims or defenses connected to the data at issue.  *Id.*  Third, Plaintiffs propose that, "[n]othing in this Protocol shall be construed to permit a Party to destroy or fail to retain any materials relevant to any complaint filed in this matter, including event level data."  *Id.*

As Meta previously stated, this novel process is unnecessarily costly and burdensome on both the parties and the Court, and ignores the Model Protocol's guidance that "preservation of potentially relevant ESI will be reasonable and proportionate."  Model Protocol, Sec. 4; *see, e.g.*, *Rodriguez v. Google LLC*, No, 3:20-cv-04688-RS (AGT), 2021 WL 8085492, at *2 (N.D. Cal. Dec. 1, 2021) (denying plaintiffs' request for the court to require Google to alter its data retention policies, and stating that it would not "require Google to start saving petabytes of data per day, indefinitely, without a more compelling showing of need").  There is nothing proportionate about requiring a party to "retain ***any*** materials relevant to ***any*** complaint filed in this matter," (Ex. A), without taking into account, as the Model Protocol suggests, sources that are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B).  As stated above, several of the data sources that Plaintiffs would require Meta to retain are particularly and inappropriately burdensome for preservation and collection.

Finally, neither of the two cases cited by Plaintiffs in their ESI Protocol supports their novel proposal; both cases merely stand for the unremarkable proposition that parties need to preserve relevant data in litigation.  But Meta's proposal, based on the Model Protocol, already acknowledges this obligation and makes clear that Meta "will preserve non-duplicative, relevant information currently in their possession, custody, or control."  Ex. B, Sec. 5(a).

Meta continues to abide by its preservation obligations.  Based on this Court's guidance, Meta believes that the most efficient way forward is for the parties to have further discussions about ESI sources, which Meta proposes to occur next week, and then to enter a separate Order.  Given that plaintiffs have rejected this approach, Meta has also put forth a proposal that mirrors the Model Protocol, comports with governing case law, and provides the most efficient and appropriate approach to preservation in this case.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### *(2) Search Methodology*

The substance of the search methodologies proposed by the Parties are not significantly different.  The key distinction is that Meta's proposal structures the search process with defined steps and a specified end to the process.  This defined structure encourages efficient negotiations and guards against never-ending discovery negotiations.

Following the guidance provided by the Court during the April 20, 2023 discovery conference, Meta has supplemented its proposal for the review and production of relevant, non-privileged documents in a manner that provides Plaintiffs with even more involvement in the process than they already had under Meta's prior proposal.

To begin with, Meta added two sections to its proposal to underscore the transparent, cooperative nature of Meta's proposal.  First, Meta added a section clarifying that the parties will meet and confer regarding the sources and types of ESI that the parties believe to be sources of potentially relevant information.  *See* Ex. B, Sec. 6(a).  Second, Meta added a section to make clear that the Producing Party will propose custodians whose ESI will be subject to search, after which the parties will meet and confer on appropriate custodians.  *See* Ex. B, Sec. 6(b).

For clarity, Meta restates below the search term methodology it is proposing, along with the additional information that Meta has included to supplement its proposal in line with the Court's guidance.  Meta[5] will propose search terms that are designed to capture all potentially relevant, responsive documents, and those terms will be shared with Plaintiffs in multiple rounds as discussed further below.  In light of the Court's guidance, Meta proposes up to three rounds of the Null Set review process, described in more detail below, which specifically incorporate Plaintiffs' input into the development and selection of search terms.

Under Meta's process, Meta will propose search terms.  Following this Court's guidance, Meta has agreed to produce hit reports that include unique hits and hits with families.  *See* Ex. B, Sec. 6(b).  As this Court observed, hit reports are "not very useful because they don't tell you anything about responsiveness."  *See* Apr. 20, 2023 Hearing Tr. at 85:9-11.  Meta agrees with the Court, but has

[5] For the sake of clarity, Meta has described the process applicable to Meta's use of search terms under Meta's proposal.  This proposed process applies equally to all parties.

1   included hit reports in an effort to reach a compromise in this process.  After Meta has selected proposed

2   search terms, Meta will review a statistically valid, randomly generated sample set of documents that

3   do *not* contain any of those search terms (the "Null Set").  The purpose of reviewing the Null Set is to

4   validate the search terms and identify potential gaps; if the Null Set contains a material number of

5   responsive documents, that would indicate that the search terms are potentially underinclusive.

6          Following Meta's review of the Null Set to identify any responsive, non-privileged documents

7   therein, Meta will produce that set of documents to Plaintiffs, and then consider any revisions to the

8   search terms that may be necessary to reasonably identify the responsive documents identified in the

9   Null Set.  The full set of search terms then would be provided to Plaintiffs for review and comment,

10   and Meta, if requested to do so by Plaintiffs, would engage in the review of a second Null Set and

11   consider additional search terms proposed by Plaintiffs.  Meta would then review a randomly generated,

12   statistically valid sample set to assess the search terms proposed by Plaintiffs.  If the results indicate

13   that the search terms are not overbroad, Meta would then apply those search terms for its review.  As

14   stated, further aligning with the Court's guidance, Meta has agreed to conduct up to three rounds of the

15   Null Set review process in order address Plaintiffs' concerns about their involvement in this process

16   and their ability to propose search terms for consideration.

17          Meta further proposes that a party may use Technology Assisted Review ("TAR") to filter out

18   non-responsive documents and, in accordance with this Court's guidance, a Producing Party will

19   inform the Receiving Party if TAR is used in this manner.  *See* Apr. 20, 2023 Hearing Tr. at 96:4-6.

20   Meta's proposal identifies the types of information regarding TAR that a Producing Party will provide

21   to a Receiving Party upon request, including the TAR tool utilized and the data sources and custodians

22   against which TAR will be run.  However, Meta does not believe it is necessary or appropriate for a

23   Producing Party to obtain the Receiving Party's agreement regarding the use of TAR.  Such

24   transparency in tandem with deference to the Producing Party aligns the relevant case law.  *See id.*;

25   *William Morris Endeavor Ent., LLC v. Writers Guild of Am. W., Inc.*, No. 2:19-CV-05465-ABA-

26   AFMx, 2020 WL 6162797, at *2 (C.D. Cal. June 8, 2020) ("The Court further notes that it is not

27

28

-22-

necessary for counterclaimants to agree in advance to the number of custodians or the use of TAR in connection with counterclaim defendants' document search, review and production process.").

Unfortunately, Plaintiffs continue to propose a search methodology that turns Sedona Conference Principle 6 on its head by empowering the party least situated to understand the systems and data at issue to freeze everything in place during countless rounds of negotiation until it is satisfied with the search parameters. Although Plaintiffs have reworded their proposal from the prior process submitted to the Court, the substance is largely the same. Plaintiffs simply ignore Meta's stated concerns regarding runaway discovery in which Plaintiffs are unencumbered by any meaningful restrictions. In fact, Plaintiffs now propose to add even more steps to the process—each of which specifically envision court intervention.

Pursuant to Plaintiffs' proposal, the Producing Party must identify the sources and types of ESI that contain potentially relevant information and then the Producing Party must propose a method to search each source or type of ESI. The Receiving Party may then propose "additional, or alternative" sources, and the parties must meet and confer. Ex. A. Plaintiffs make clear that disputes will be presented to the Court. Plaintiffs' proposal includes a similar procedure for custodians, and the Parties must again repeat the process for search terms. Under Plaintiffs' proposal, a Producing Party proposes initial search terms and then must provide a hit report. Plaintiffs allow for the possibility that the Producing Party will provide a Null Set, but not if it "delays" search term negotiations; no consideration is given to the quality of information provided through the Null Set review. Plaintiffs' proposal envisions unlimited "negotiation and input" from the Receiving Party, without any description of what such negotiation and input will entail. And, again, Plaintiffs make clear that disputes will be presented to the Court.

Plaintiffs also propose that neither Party may utilize TAR "without agreement of the other Party or a Court order." Ex. A.

Despite Meta's repeated concerns expressed to Plaintiffs, there are no stated time, sequencing, volume, or other limits on this amorphous process. In fact, under Plaintiffs' proposal, the parties "may request additional search terms and custodians" without limit. Ex. A. The only guardrail to this

otherwise carte blanche authority is that such additional requests "must be made in good faith," but, again, disputes will "be presented to the Court."  Ex. A.

The contrast between the proposals is evident.  Meta's proposal provides a structured, cooperative, transparent, and efficient search, review, and production process that can target potentially responsive documents because it is implemented by the party best situated to evaluate its own ESI. Following the April 20, 2023 discovery conference, Meta further enhanced the cooperative nature of this process to address Plaintiffs' stated concerns.  Meta's structured proposal guards against runaway discovery by implementing specific steps, validation procedures, and a conclusion to the process.

In contrast, Plaintiffs contemplate an unstructured process that, essentially, relies on judicial intervention to progress discovery at every stage.  Whereas Meta proposes a system to target responsive documents through validation, Plaintiffs rely only on hit reports.  Further, Plaintiffs seek a veto over Meta's option to use TAR to filter out or exclude non-responsive documents.  As this Court explained, transparency is the key with TAR.  And transparency is what Meta's proposal provides.

In sum, it is Meta's position that a structured approach to searching that incorporates validation of search terms, rather than just volume counts on hit reports, will result in a more meaningful process leading to a reasonable universe of potentially responsive documents for review, while at the same time creating a more efficient, less antagonistic process.

### (3) Document Families and Hyperlinked Documents

As this Court stated during the April 20, 2023 discovery conference, "[h]yperlinked documents are not like regular attachment emails.  They just aren't. . . . [T]he only appropriate way to handle this is [] on a case-by-case basis" because associating hyperlinked documents "could be very, very burdensome."  Apr. 20, 2023 Hearing Tr. at 102:11-12; *id.* at 103:1-4; 103:11-12.  This position aligns with Meta's proposed ESI Protocol, which makes clear that hyperlinks are not attachments while leaving open the possibility that the parties can meet and confer about specific linked documents identified by Plaintiffs at a later point, as appropriate.  As the Court remarked, this "is the only practical approach here."  *Id.* at 108:16; *see* 137:17-18 (the "answer is no" to "automatic production of linked documents").

The *Healthcare* plaintiffs have ignored the Court's guidance and maintain the same language in their proposed ESI protocol that the Court previously rejected. *See* Dkt. 191-9 at 8–9 ("Parent-child relationships include … a document with [] stubs or links … and … [the] non-public documents so linked"). The Court should reject this proposal.

To justify this approach, plaintiffs are submitting a declaration from a consultant that plaintiffs have retained, who purports to opine that there are two discovery tools that allow a party to collect linked documents in particular environments involving particular types of linked documents (for "Google Mail" and "Microsoft Exchange" environments). Plaintiffs provided no advance notice of this information, said nothing about it until the parties' meet and confer held today, did not provide any detail or explanation during the meet and confer, and did not provide a copy of the declaration until 2:27 pm Pacific Time *today*, May 9. Accordingly, Meta has had no opportunity to assess, discuss, or vet these claims with its own e-discovery consultants, and Meta reserves the right to review and further respond to this information as appropriate.

Regardless, Meta notes that plaintiffs have supplied no authority that requires a party to use a particular discovery tool, nor have plaintiffs explained how the limited nature of these purported tools addresses the potential scope of linked documents in this case. Moreover, this information does not change the basic fact that linked documents are "not like regular attachment emails" (Apr. 20, 2023 Hearing Tr. at 102:11-12), such that they always must be produced along with family members, even if the linked documents themselves are not responsive.

The *Gershzon* plaintiff has taken a similar approach and seeks to address the case-by-case specifics of linked documents within the ESI Protocol. Again, Meta is willing to discuss the specifics at the appropriate time. However, as this Court already observed, hyperlinks are not attachments in a familial relationship and therefore should not be addressed in the ESI Protocol as such.

Relatedly, Meta restates that Plaintiffs' addition of an "Email Families" section in its Appendix, Section 6, is duplicative and should not be included in the ESI Protocol to avoid the possibility of conflicting provisions.

### (4) Content of Privilege Logs

Following the Court's guidance, Meta agreed to remove the privilege log exception regarding communications involving in-house counsel related to this litigation.  *See* Apr. 20, 2023 Tr. at 120:1-6.  But, as the Court recognized, the necessity of logging these communications in each scenario "really comes down to a burden question" (*id.*) and the Court could not discern "at this point how burdensome it would be for you to do a [log] of in-house counsel communications that you think are privileged" (*id.* at 120:25-121:2).  The Court was therefore inclined to "at least require a logging to see how burdensome it is with the possibility that you can say, 'Look, if we were required to log these kinds of things having to do with a lawsuit, it would be, you know, thousands of entries.'"  *Id.* at 121:18-22.

Meta's proposal does just this, by adding a provision that says the parties can revisit whether these communications need to be logged (if, for example, doing so would impose a disproportionate burden).  Meta's proposal is limited: it only applies to communications with in-house counsel that were created "to pursue or defend this action" or to obtain legal advice on issues relevant to the claims or defenses in this case.  This constraint fully addresses the concern that a communication omitted from the log might relate to non-privileged "business advice" rather than "legal advice."  *See* Apr. 20, 2023 Hearing Tr. at 120:7-24.  And Meta's proposal merely states that the parties can revisit the issue of burden that the Court identified at a later point.

Plaintiffs rejected this approach.  Meta submits that its proposal more faithfully applies the Court's guidance and provides the parties with appropriate flexibility moving forward.

### (5) Email Threading

Meta proposed that the parties use email threading—that is, a requirement to produce only the most inclusive message in an email chain to minimize duplication of content in a party's review and production of documents and increase efficiencies.[6]  As the Court remarked at the April 20, 2023 discovery conference, "e-mail threading is very normal."  Apr. 20, 2023 Hearing Tr. at 114:12-13.

Plaintiffs have now agreed that email threading in principle is appropriate, but they seek to impose non-industry standard provisions with a litany of vague and ill-explained conditions that Meta

---

[6] The parties have agreed to separately discuss the content of privilege logs.  If email threading is adopted, it is Meta's position that only Last In Time emails for threaded emails need to be logged.

has not had sufficient opportunity to evaluate (as plaintiffs again proposed these terms for the first time *today*, May 9).

Plaintiffs, for example, state that email threading may be used only where (1) any attachment to any email in the thread is an attachment *to all emails in the thread*; (2) any "participant with a role (sender, to, cc, bcc) in any email in the thread must have *some role* in *every email* in the thread"; (3) "all emails in the thread have the *same subject line*." Ex. A. The first condition is unclear and confusing. An attachment to an email is only an attachment to that email—not to each email in the thread. It is not appropriate for Meta to create familial relationships that do not exist. The second and third conditions appear unnecessary because, as Meta has repeatedly explained to Plaintiffs, threading separates (into separate, inclusive "branches") all subsets of responsive emails that have unique material, such that all pertinent data is produced. Further, Plaintiffs propose: "Where a Last In Time E-Mail is produced, the Producing Party will include metadata corresponding to the following metadata fields for each of the earlier thread members fully contained within the Last In Time E-mail: Sent Date, Sender, Recipient, CC, BCC, and Subject." Ex. A. Given the minimal time that Meta has had to try to understand Plaintiffs' proposal, Meta has not yet had the opportunity to investigate the feasibility of providing the metadata Plaintiffs describe. Meta is aware that Plaintiffs refer to an unrelated case in which similar language was contained in an ESI Protocol, but the existence of such a Protocol provides no technical insight into the actual feasibility of providing such information in practice.

Meta is willing to follow the Court's guidance to continue these discussions about email threading "with the view in mind" of both what is "practical and what's technically feasible." Apr. 20, 2023 Hearing Tr. at 114:12-20. But Plaintiffs have not given Meta an adequate opportunity to engage in those discussions.

Plaintiffs' proposal also contains an override provision that would allow a Party to request the production of any in-thread messages that were subject to threading, and in response the Producing Party "may not unreasonably deny such a request." This provision is unnecessary and would undercut the purpose of using threading in the first place—it would require the parties to produce information that is already fully contained in a document that has already been produced.

Meta therefore maintains that its industry-standard email threading approach is appropriate and strikes the right balance. Meta is willing to continue to meet and confer with Plaintiffs regarding the technology involved in email threading and other ways in which to make this process most efficient for all parties. During the April 20, 2023 discovery hearing, Healthcare plaintiffs conceded that Meta had responded to their specific questions about email threading, but added that they wanted more information. Apr. 20, 2023 Tr. at 113:11-15. Plaintiffs did not seek any additional information from Meta following the April 20 discovery conference and only sent their complex email threading proposal to Meta today, May 9th—thus, Meta has not been able to meaningfully engage on this technical topic that requires consultation with its eDiscovery vendor.

### *(6) Technical Feasibility*

Based on technical issues that often arise in productions, Meta's proposal states in various places that the parties will undertake a process "to the extent it is reasonably and technically feasible." Ex. B, Appendix 1, Sec. 5(b). For example, Meta included this statement in Appendix section 5(b) of the ESI protocol regarding hidden content and the parties' agreement to produce documents using a process designed to reveal hidden information in documents (e.g., track changes in a Word document) "to the extent it is reasonably and technically feasible." Plaintiffs reject the quoted language.

Similarly, in Section 5(c), concerning TIFFs, Meta proposes that TIFF'd images will display all data visible in the native application "to the extent it is reasonably and technically feasible." Plaintiffs again rejected this language. *Id.* at Sec. 5(c).

Relatedly, in Section 8, concerning production formats, Meta proposes that if discovery is not reasonably usable absent translation, the parties shall meet and confer regarding translation by the Producing Party "to the extent the information is reasonably accessible and it is not unduly burdensome to provide." *Id.* at Sec. 8. Plaintiffs rejected this language.

As the Court observed, "perfection is not the goal" and it is Meta's position that these issues "fall[] into the bucket of proportionality concerns." *Id.* at 129:25–130:2. Meta agrees and believes the parties can address production issues, if any, as they arise during the course of discovery. Rather than

-28-

mandate overbroad and inflexible rules, Meta proposes reasonable processes with mechanisms to address any outliers that may or may not arise.

### (7) Proprietary Files

The parties have agreed on language requiring that the parties meet and confer in the event that discovery requires the production of ESI accessible only through proprietary software in order to discuss an appropriate production format.   However, Plaintiffs' proposal then includes further provisions regarding data preservation within this narrow context.  Data preservation is a separate issue, and it is Meta's position that it is not necessary or appropriate to inject a stray data preservation requirement in this section of the ESI Protocol.

Dated: May 9, 2023

**GIBSON, DUNN & CRUTCHER LLP**

By:   */s/ Lauren Goldman*
        Lauren Goldman

**COOLEY LLP**

By:   */s/ Michael G. Rhodes*
        Michael G. Rhodes

*Attorneys for Meta Platforms, Inc. (formerly known as Facebook, Inc.)*

Dated: May 9, 2023

By:      */s/ Jason 'Jay' Barnes*
           Jason 'Jay' Barnes

**SIMMONS HANLY CONROY LLC**

Jason 'Jay' Barnes (admitted *pro hac vice*)
   *jaybarnes@simmonsfirm.com*
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:     212-784-6400
Fax:     212-213-5949

1
2

By:   /s/ Geoffrey Graber
      Geoffrey Graber

3
4

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Geoffrey Graber, State Bar No. 211547
*ggraber@cohenmilstein.com*

5

1100 New York Avenue NW, Fifth Floor
Washington, DC 20005

6

Tel:    202-408-4600

7

Fax:    202-408-4699

8

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
  *koncius@kiesel.law*

9

8648 Wilshire Boulevard

10

Beverly Hills, CA 90211
Tel:    310-854-4444

11

Fax:    310-854-0812

12

**TERRELL MARSHALL LAW GROUP PLLC**
Beth E. Terrell, State Bar No. 178181

13

  *bterrell@terrellmarshall.com*
936 North 34th Street, Suite 300

14

Seattle, WA 98103
Tel.:    206-816-6603

15

Fax:    206-319-5450

16

**GIBBS LAW GROUP LLP**
Andre M. Mura, State Bar No. 298541

17

  *amm@classlawgroup.com*
1111 Broadway, Suite 2100

18

Oakland, CA 94607
Tel.:    510-350-9700

19

Fax:    510-350-9701

20

*Attorneys for Plaintiffs*

21
22
23
24
25
26
27
28

-30-

1

## CIVIL L.R. 5-1(h)(3) ATTESTATION

2       Pursuant to Civil Local Rule 5-1(h)(3), I, Lauren Goldman, hereby attest under penalty of

3   perjury that concurrence in the filing of this document has been obtained from all signatories.

4

5   Dated: May 9, 2023                    By:    */s/ Lauren Goldman*

6                                                Lauren Goldman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATEMENT REGARDING ESI PROTOCOL
CASE NO. 3:22-CV-03580-WHO-VKD