EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAT BROOKS, et al., | Case No. 21-cv-01418-EMC |
| Plaintiffs, | **REDACTED PUBLICLY FILED VERSION (ECF NO. 213)** |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| THOMSON REUTERS CORPORATION, et al., | |
| Defendants. | Docket No. 130 |

Plaintiffs Cat Brooks ("Ms. Brooks") and Rasheed Shabazz ("Mr. Shabazz") filed suit individually and on behalf of others similarly situated ("Plaintiffs") against Defendant Thomson Reuters, Corp. ("Reuters") for unjust enrichment and injunctive relief under Unfair Competition Law, Cal. Bus. & Prof. § 17200. Docket No. 145 ("FAC"). Ms. Brooks and Mr. Shabazz allege that Reuters has appropriated and sold individuals' personal data without their consent through its platform CLEAR, reaping millions of dollars in profit. *Id.*

Now pending before the Court is Brooks and Shabazz's Motion for Class Certification. Docket No. 148 ("MCC"). For the following reasons, the Court **GRANTS** Brooks and Shabazz's Motion for Class Certification.

## I.        BACKGROUND

A.    Factual Background

Thomson Reuters Corporation ("Reuters") is a multinational media company incorporated in Ontario, Canada, with its principal place of business in Toronto, Canada. FAC ¶ 8. Reuters owns a news agency (Reuters) and an online legal research service (Westlaw). FAC ¶ 1.

1.     The CLEAR Platform

Reuters also owns an online platform called CLEAR, which provides access to public and non-public information about American consumers, including Californians.  FAC ¶¶ 1–2.  Reuters collects surface and deep web data, including from social media, third-party data brokers, law enforcement agencies, live cell phone records, location data from license plate detections, real-time booking information from thousands of facilities, historical arrest records and intake photos, credit agencies, DMV records, cellphone registries, social-media posts, property records, utility accounts, professional and fishing licenses, internet chat rooms, court records, and bankruptcy filings.  FAC ¶¶ 2, 17.  Reuters also licenses third-party records from law enforcement and credit bureaus.  MCC at 4; Exhibit 24 (Licensor Table).  These data points are aggregated and stored on the CLEAR platform.  FAC ¶ 15.  The data points are regularly updated based on new online records.  MCC at 4; Exhibit 21 (CLEAR RTIA Spreadsheet).

The CLEAR platform receives approximately 100,000 search queries each day.  FAC ¶ 22.  Users can conduct a "batch search" for many individuals at once.  Docket No. 130 Exhibit 28 (Reuters Batch Services).  Users can also conduct a "person search" to locate information about a specific individual.  FAC ¶ 25.  The graphical display provides visual depictions of the individual's legal history; relationship to registered agents, relatives, and other people with whom the individual shares phone numbers; personal information of the individual's family members and other associates; and a satellite imagery map of all addresses associated with the individual.  FAC ¶ 30.  Users can also conduct a "risk inform" search that provides a numerical score that denotes if the individual is "safe" or "risky."  FAC ¶ 32.  The platform then provides various flags and categories of state criminal offenses, including "Abortion," "Breach of Peace," "Anarchism," "Indecent, Obscene, or Vulgar Language," "Homosexual Act with a Man/Woman," "Possession of a Weapon," etc.  FAC ¶ 36.

A CLEAR report contains 40 categories of records that may be available about an individual.  MCC at 3; Exhibit 12 (Sample CLEAR Report).  These include names, photographs, contact information, relatives, associates, social security numbers, live cell phone records, location data from billions of license plate detections, real-time booking information from thousands of

United States District Court
Northern District of California

2

facilities, gender, race, current and historical driver's licenses, marriage and divorce records, professional and recreational licenses or permits, work history, education, aliases, current and historical addresses, utility services, military records, political donations, voter registrations, criminal records, community service information, arrest records, liens and judgments, bankruptcy records, civil lawsuits, real property and deed transfers, property tax records, motor vehicle information, unclaimed assets, and more. MCC at 3; Exhibit 12 (Sample CLEAR Report).

### 2. Customers

Reuters then aggregates and sells the information, such as names, photographs, criminal history, relatives, associates, financial information, and employment information. FAC ¶ 2. Users can buy a monthly subscription for CLEAR data plans or pay for each individual search. FAC ¶ 60. Reuter's "pay-as-you-go" pricing model has users pay per each component of a search and per report, such as $5.00 for a basic "Person Search" and additional charges for a "Photo Line-Up Search" and a "Web Analytics Search." FAC ¶ 63.

Reuters markets the CLEAR platform to private corporations, law enforcement, and other government agencies. FAC ¶ 59; *see also* Docket No. 130 Exhibit 64 (listing a basic plan for "CLEAR for Law Enforcement" and a premium plan for "CLEAR for Law Enforcement Plus"). Also among Reuters' customers are Native American tribes, state legal aid foundations, universities, child welfare agencies, school districts, public defenders and state attorneys general, departments of health and social services, ethics boards and bar examiners, banks, and credit unions. Docket No. 152-2 Exhibit B-2 (List of CLEAR Customers); Opp. to MCC at 1.

For instance, U.S. Immigration and Customs Enforcement ("ICE") has signed over $54 million in contracts with Thomson Reuters to access CLEAR to surveille and track immigrants. FAC ¶ 64. The San Bernardino Police Department also used CLEAR to identify, locate, and stop the 2015 San Bernardino shooter. Docket No. 153-1 Exhibit C-1 (San Bernardino Shooting Webpage).

### 3. Revenue

Based on Dr. Terry Lloyd's expert report, Reuters has made ███████ in revenue from CLEAR since 2017, with ███████ for 2021 alone. MCC at 7; Docket No. 127-12 (Expert

Report of Terry Lloyd ("Lloyd Rep.")) at 10.  Of that, based on Dr. Lloyd's calculations, Reuters made ███████████ in net profit since 2017, with ███████████ for 2021 alone.[1]  Lloyd Report at 18.

    4.   <u>Subjects</u>

Reuters does not obtain the consent of the Californian subjects whose information is on CLEAR.  *See* MCC at 5; Turow Report at 15 ("Thomson Reuters does not market or otherwise reach out to Californians to inform them that their information is included in CLEAR, or that their information was searched in CLEAR.").  Indeed, most Californians do not even know that their data is on CLEAR.  *See* Turow Report at 14 ("Californians have not consented to the collection or sale of their information through Thomson Reuters' CLEAR platform, and largely do not know about it.").

Moreover, Reuters does not give subjects a reasonable way to remove or correct their information on CLEAR.  Reuters has a Public Records Privacy Policy that applies uniformly to Californians.  At the bottom of a Reuters' webpage about CLEAR, there is a link titled "Do not sell or share my personal information and limit the use of my sensitive personal information."[2]  As of May 2023, clicking on the link leads to a Privacy Web Form to file a request to remove your personal information.  Only if the applicant meets one of Reuters' limited circumstances can the information be removed:

> You may request that your personal information be suppressed from our Public Records Products if you are able to demonstrate one of the following circumstances:
> - You are a judge, public official or member of law enforcement
> - You can provide evidence that the availability of your personal information on our Public Records Products

---

[1] As further explained in the accompanying order on the motion to exclude Dr. Lloyd's testimony, Dr. Lloyd's assumptions—determining what proportion of Reuter's revenue stems from California and from CLEAR—need not be excluded under *Daubert*.

[2] Thomson Reuters, *Thomson Reuters' CLEAR*, https://legal.thomsonreuters.com/en/products/clear-investigation-software.  The FAC, filed in December 2022, describes the link as stating "For CA: Do not sell my information" in fine print. FAC ¶ 47.  Ms. Brooks attempted to opt out of the sale of her personal information via CLEAR but did not complete the process because Reuters required that she provide a photograph of her government-issued identification card and a separate picture of her face.  FAC ¶ 50.

United States District Court
Northern District of California

exposes you to risk of physical harm
- You are a victim of identity theft as substantiated by a police report

We will require a written explanation substantiating the request and depending on the nature of the request, you may be required to provide:
- Copies of credentials verifying your position in law enforcement or public office
- Letters from supervisors verifying that you are a member of law enforcement or a public official
- Police reports or court orders regarding potential physical harm
- Police reports or letters from credit reporting companies regarding identity theft

Docket No. 130 Exhibit 11 at 3–4. Under Reuters' policies, a subject must:

(1) know that their information was on CLEAR,

(2) navigate through links in the footer of the Reuters webpage to a privacy portal, Docket No. 130 Exhibit 10 (Thomson Reuters Privacy Statement); Docket No. 130 Exhibit 11 (Thomson Reuters Public Records Privacy Statement),

(3) complete a form with basic name and address information, Docket No. 130 Exhibit 65 (CLEAR Personal Information Record Request Portal),

(4) complete a form with name, address, birthdate, last four digits of SSN, and "complete an identity proofing process," Docket No. 130 Exhibit 66 (CLEAR US Public Records).

*See also* MCC at 8–9. According to Turow's expert report, "the steps outlined by this policy are convoluted, and I have not seen evidence that this policy is at all effective in giving Californians control over their information, whether to correct that information or to remove it." Turow Report at 16. Moreover, some data categorically falls outside the scope of removable information. Docket No. 130 Exhibit 11 (Reuters Public Records Privacy Statement) (explaining that Reuters is "unable to remove records from (1) databases comprising information made available by governmental agency such as court dockets, real estate records, liens, and judgments, lawsuits, death records, or motor vehicle registration, or (2) information coming through one of our live gateways [third party licensees]").

5.     Plaintiffs and a Proposed Class

Plaintiffs Cat Brooks and Rasheed Shabazz are activists and residents of Alameda County, California, whose name, photo, likeness, and other personal information Reuters has allegedly

appropriated and sold without their consent. FAC ¶¶ 6–7. Ms. Brooks is a 2018 Oakland mayoral candidate, author, actress, and self-described activist and public figure. Opp. to MCC at 4. Mr. Shabazz is an activist, journalist, and also maintains active social media. Opp. to MCC at 4. Some of the information CLEAR provided about Mr. Shabazz (such as marriage status and children) was inaccurate. FAC ¶ 55. Both were given high "risk inform scores." FAC ¶¶ 45, 56.

Excluding the work done for this case, three CLEAR searches were conducted on Ms. Brooks: ██████ (which also generated a CLEAR report), ███████████████████ and ████████ (for a social security number not matching Ms. Brooks). Docket No. 152-4 Exhibit B-4 (Brooks Searches). One CLEAR search was conducted on Mr. Shabazz's current name: ████████████████████████████████. Docket No. 152-5 Exhibit B-5 (Shabazz Searches).

B.    Procedural History

Plaintiffs filed their amended complaint on December 2, 2022. Docket No. 145 ("FAC"). In its First Amended Complaint, Plaintiffs argue that Reuters' CLEAR aggregates billions of data points about individuals and sells this information without obtaining consent or providing compensation. FAC ¶¶ 12–14. Plaintiffs assert two causes of action: (1) unjust enrichment; and (2) a claim for injunctive relief for violations of California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code § 17200.

On December 14, 2022, Plaintiffs filed a motion to certify class. Docket No. 148 ("MCC"). Ms. Brooks and Mr. Shabazz propose a class of "[a]ll persons who, during the limitations period, both resided in the state of California and whose personal information Thomson Reuters made available for sale through CLEAR without their consent," excluding "any officers and directors of Thomson Reuters; Class Counsel; and the judicial officer(s) presiding over this action and the members of his/her immediate family and judicial staff." FAC ¶¶ 72–73. Plaintiffs argue that Reuters' business practices are uniform across the putative class members, each of whom has been deprived of the right to exercise control over the use and sale of their personal information, and ask the Court to certify the class with Ms. Brooks and Mr. Shabazz as class representatives. MCC at 2. Reuters filed an opposition. Docket No. 150-4 ("Opp. to

1  MCC"). Plaintiffs filed a reply. Docket No. 170 ("Repl. to MCC").

2  Plaintiffs have also presented the court with the expert testimony of Prof. Joseph Turow,

3  who analyzed Californians' privacy interests affected by CLEAR, and Dr. Terry Lloyd, who

4  calculated Reuters' net profits attributable to CLEAR. Reuters presented rebuttal experts Dr. Ran

5  Kivetz, who challenges the commonality of the ethical and social privacy harms elucidated by

6  Prof. Turow, and Prof. Jane Bambauer, who challenges Prof. Turow's definition of privacy harms.

7  The Court addressed those issues separately. Docket No. 206.

## II.     LEGAL STANDARD

9  A.     Motion to Certify Class (Rule 23)

10  Although expressly authorized by Rule 23, the "class action is 'an exception to the usual

11  rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart*

12  *Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682,

13  700–01 (1979)). "In order to justify departure from that rule, 'a class representative must be part

14  of the class and possess the same interest and suffer the same injury as [her fellow] class

15  members.'" *Id.* (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

16  A class must be "sufficiently cohesive to warrant adjudication by representation." *Amchem*

17  *Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

18  Accordingly, before certifying a class, the Court "must conduct a 'rigorous analysis' to

19  determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v.*

20  *Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Zinser v. Accufix Rsch.*

21  *Inst., Inc.*, 253 F.3d 1180, 1186, *amended* 273 F.3d 1255 (9th Cir. 2001)). The Supreme Court has

22  made it clear that Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v.*

23  *Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at 349). Rather, the party seeking

24  certification must "affirmatively demonstrate" her compliance with the requirements of both Rules

25  23(a) and 23(b). *See Wal-Mart*, 564 U.S. at 349.

26  Rule 23(a) permits plaintiffs to sue as representatives of a class only if (1) "the class is so

27  numerous that joinder of all members is impracticable" ("numerosity" requirement); (2) "there are

28  questions of law or fact common to the class" ("commonality" requirement);  (3) "the claims or

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    defenses of the representative parties are typical of the claims or defenses of the class"

2    ("typicality" requirement); and (4) "the representative parties will fairly and adequately protect the

3    interests of the class" ("adequacy" requirement).  Fed. R. Civ. P. 23(a)(1)–(4).  The purpose of

4    Rule 23(a)'s requirements is largely to "ensure[] that the named plaintiffs are appropriate

5    representatives of the class whose claims they wish to litigate" and to "effectively limit the class

6    claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart*, 564 U.S. at 349

7    (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

8              If each of the Rule 23(a) requirements are satisfied, the purported class must also satisfy

9    one of the three prongs of Rule 23(b).  Here, Plaintiffs seek certification under Rule 23(b)(2) and

10   Rule 23(b)(3), or only Rule 23(b)(3).  Rule 23(b)(2) requires that "the party opposing the class has

11   acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

12   corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

13   23(b).  Rule 23(b)(3) requires the Court to find that "questions of law or fact common to class

14   members predominate over any questions affecting only individual members" ("predominance"

15   requirement) and "that a class action is superior to other available methods for fairly and

16   efficiently adjudicating the controversy" ("superiority" requirement).  Fed. R. Civ. P. 23(b).

17             The underlying merits of the case, while admittedly relevant at the class certification stage,

18   should not overly cloud the Court's certification analysis—the only question presently before the

19   Court is whether the requirements of Rule 23 are met.  *See Comcast*, 569 U.S. at 33–34.  The fact

20   that certain elements of proof may favor the defendant on the merits does not negate class

21   certification; the issue is whether the proof is amenable to class treatment, not whether the

22   plaintiffs or defendants is likely to prevail on the issue.

23             Moreover, "[n]either the possibility that a plaintiff will be unable to prove [her]

24   allegations, nor the possibility that the later course of the suit might unforeseeably prove the

25   original decision to certify the class wrong, is a basis for declining to certify a class which

26   apparently satisfies the Rule."  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  Indeed,

27   even "after a certification order is entered, the judge remains free to modify it in the light of

28   subsequent developments in the litigation."  *Gen. Tel. Co. of Sw.*, 457 U.S. at 160.  Ultimately,

1    whether to certify a class is within the discretion of the Court.  *See Levya v. Medline Indus. Inc.*,

2    716 F.3d 510, 513 (9th Cir. 2013); *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied*

3    *Indus. & Serv. Workers Int'l Union, AFL–CIO CLC v. ConocoPhilips Co.*, 593 F.3d 802, 810 (9th

4    Cir. 2010).

## III.    DISCUSSION

### A.    Standing

As a preliminary matter, Reuters contests that Plaintiffs have not shown standing.  For

Article III standing, a plaintiff must show that it suffered injury-in-fact that is concrete,

particularized, traceable to the conduct that forms the basis for their claims, and redressable.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992).  Reuters argues that

Plaintiffs' "right to control" theory of injury is not concrete or closely related to traditional harms,

and that Plaintiffs' injury is not traceable to Reuters' conduct.  Opp. to MCC at 7–8.

### 1.    Injury-in-fact

First, Plaintiffs have shown a concrete and particularized injury-in-fact.  The injury-in-fact

prong of Article III standing requires the plaintiff to show that he suffered "an invasion of a

legally protected interest" that is "concrete and particularized . . . real and not abstract."  *Spokeo v.*

*Robins*, 578 U.S. 330, 336 (2016).  "'Traditional tangible harms, such as physical harms and

monetary harms' are concrete injuries, as are intangible harms with a 'close historical or common-

law analogue.'"  *Nyberg v. Portfolio Recovery Assocs., LLC*, No. 17-35315, 2023 WL 2401067, at

*1 (9th Cir. Mar. 8, 2023) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)).

Here, a historical right to privacy is well-established.  *See In re Facebook, Inc. Internet Tracking*

*Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) ("[T]he the legislative history and statutory text

demonstrate that Congress and the California legislature intended to protect these historical

privacy rights."); *see also U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749,

763 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the

individual's control of information concerning his or her person.").  The Court reemphasizes the

Supreme Court's understanding that "both the common law and the literal understandings of

privacy encompass the individual's control of information concerning his or her person."  *U.S.*

United States District Court
Northern District of California

*Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989).  As a matter of state law, the California Supreme Court has also recognized the tremendous harm that can result from a loss of control over one's personal information: "Privacy rights also have psychological foundations emanating from personal needs to establish and maintain identity and self-esteem by controlling self-disclosure . . . The claim is not so much one of total secrecy as it is of the right to define one's circle of intimacy—to choose who shall see beneath the quotidian mask.  Loss of control over which 'face' one puts on may result in literal loss of self-identity, and is humiliating beneath the gaze of those whose curiosity treats a human being as an object." *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 647 (Cal. 1994).  The information is not merely the aggregation of otherwise publicly available information.  Plaintiffs have alleged that the gathered information includes "deep web data" that is not publicly available: "information from third-party data brokers and law enforcement agencies that are not available to the general public, including live cell phone records, location data from billions of license plate detections, real-time booking information from thousands of facilities, and millions of historical arrest records and intake photos."  Compl. ¶¶ 2, 19.  While the Court in *Hill* was addressing privacy rights under the California Constitution, its observations were more broadly rooted in the general right to privacy which transcends California-specific law.  *Hill*, 865 P.2d at 647–48.  Hence, the privacy rights asserted here, articulated with specificity under California law—and the claims here are based on California law—have a close historical and common-law analogue and constitutes a "legally protected interest." *Spokeo*, 578 U.S. at 336.

Because the right to privacy in personal information is a traditionally recognized right and "encompasses the individual's control of information concerning his or her person," allegations that a company has violated a plaintiff's right to privacy by collecting personal information without consent involve a sufficiently "concrete" injury, even if there are no additional allegations of publication, because the invasion itself causes harm to the plaintiff's interest in controlling the information. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017); *see also Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1139 (E.D. Cal. 2021) ("Though *Facebook Tracking* and *Eichenberger* were decided before *TransUnion*, they are not overruled by *TransUnion*.").  Reuters

has directly contravened Californians' right to keep private their most intimate and personal information by collecting their data without consent, aggregating, and offering it for sale to great profit. Such harm is sufficient to confer Article III standing. As this Court previously explained, "the harm to Plaintiffs is tremendous: an all-encompassing invasion of Plaintiffs' privacy, whereby virtually everything about them—including their contact information, partially redacted social security number, criminal history, family history, and even whether they got an abortion, to name just a few—is transmitted to strangers without their knowledge, let alone their consent." Docket No. 54 at 14. Even before there is an actual inquiry into Plaintiffs' class database (as there was for both Plaintiffs), the information placed in the communally available database exposed the information to third parties. *See Hill*, 865 P.2d at 647. Indeed, Plaintiffs alleged that their private information was taken by Reuters and monetized and thereby unjustly enriched. It is alleged that there are CLEAR subscribers who have purchased access to the entire CLEAR database, and thus all Californians in the database have had their private information shared with third parties. *See* Compl. ¶¶ 60–63. It is thus no defense for Reuters to argue "that Plaintiffs consented to, or were informed of and failed to try to stop [the defendant's] data collection practices [when there are] allegations in the CFAC that Plaintiffs were unaware of, and did not consent to, [the defendant's] practices." *Id.* at 481.

"[A]ny monetary loss, even one as small as a fraction of a cent, is sufficient to support standing." *Van v. LLR, Inc.*, 61 F.4th 1053, 1064 (9th Cir. 2023). Indeed, in similar cases, plaintiffs have been found to have successfully alleged an invasion of privacy rights and corresponding harm when a defendant secretly collects "data about the users" such as "healthcare, educational, social, transportation, childcare, political, saving, budgeting, dining, entertainment, and other habits" and "sells this personal data to third parties." *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 481 (N.D. Cal. 2021); *see also Katz-Lacabe v. Oracle America, Inc.*, Case No. 3:22-cv-04792-RS at *8–9 (N.D. Cal. April 6, 2023) (finding Article III standing for "financial, dignitary, reputational, and relational harms" when the plaintiffs alleged that Oracle tracked and compiled information even though they did not specify that the profiles "were actually sold or made available for sale by Oracle to anyone"). This Court agrees.

As noted, Plaintiffs alleged that Ms. Brooks and Mr. Shabazz's personal data specifically—including sometimes inaccurate data—has been sold and transmitted to third parties. Three CLEAR searches were conducted on Ms. Brooks: ███ (which also generated a CLEAR report), ███████████ and ██████ (for a social security number not matching Ms. Brooks).  Docket No. 152-4 Exhibit B-4 (Brooks Searches).  One CLEAR search was conducted on Mr. Shabazz's current name: ████████████████████████ ███████████████  Docket No. 152-5 Exhibit B-5 (Shabazz Searches).  The extensive list of CLEAR customers and high CLEAR profits suggests that most Californians have had their name or information searched and disseminated to CLEAR's consumers.  *See* Docket No. 152-2 Exhibit B-2 (List of CLEAR Customers).

Contrary to Reuters' argument, the Supreme Court's decision in *TransUnion* does not bar this result.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021); *see also* Opp. to MCC at 8.  In *TransUnion*, the Supreme Court provided additional guidance for finding standing for privacy harms.  *TransUnion* addressed the situation where inaccurate information with only "a material risk of future harm" was not disseminated to third parties who acted on that information, finding this was an insufficient, speculative risk.  *See TransUnion*, 141 S. Ct. at 2213–14 (finding concrete harm to class members whose inaccurate credit reports were sent to potential creditors, but no harm to non-class members with inaccurate credit reports that were never sent to potential creditors).  In determining whether an alleged harm is sufficiently "concrete" to confer Article III standing, the Supreme Court explained that, while certain harms, such as physical and monetary harms, "readily qualify as concrete injuries under Article III," other intangible injuries, such as "reputational harms, disclosure of private information, and intrusion into seclusion," are harder to discern but may nevertheless qualify as "concrete" as well.  *Id.* (citing *Spokeo*, 578 U.S. at 340–41).  The Supreme Court explained "there is a significant difference between (i) an actual harm that has occurred but is not readily quantifiable, as in cases of libel and slander per se, and (ii) a mere risk of future harm."  *TransUnion*, 141 S. Ct. at 2211.  Without some other injury, the latter confers no standing.  *Id.*  The former applies here: Plaintiffs and other subjects of CLEAR's informational sweep were harmed by the breadth of personal information collected and put up for

12

public sale. Plaintiffs were deprived of control over a wide swath of their personal data, which was then made publicly available. They were deprived of the value of their data. They were left without the practical ability to correct erroneous information before it was seen by third parties. *Id.* The Ninth Circuit has explained that a company's "tracking and collection practices would cause harm or a material risk of harm to [plaintiffs'] interest in controlling their personal information" because it would allow "amass[ing] a great degree of personalized information . . . an individual's likes, dislikes, interests, and habits over a significant amount of time, without affording users a meaningful opportunity to control or prevent the unauthorized exploration of their private lives." *In re Facebook*, 956 F.3d at 599. As the court in *Mastel* observed, *In re Facebook* was not overturned by *TransUnion*. 549 F. Supp. 3d at 1139. *TransUnion* involved claims involving statutory violations that the court analogized to *defamation* (such as when an inaccurate credit report mislabels a consumer as a terrorist or drug trafficker) which is not actionable absent publication—rather than statutory violations that are more closely analogized to *invasion of privacy* as here where the breadth of information implicates historically rooted privacy interests. *See id*. Hence, the breadth and publicization of private information here gives rise to a privacy violation unlike that in *TransUnion*; and, in any event, Plaintiffs have alleged their information was purchased both via inquiries directed specifically at them and via broad subscribers, further stating a privacy violation.

  2. <u>Traceability</u>

  Second, Plaintiffs' injury is traceable to Reuters' conduct. The Ninth Circuit has, in line with California state law, "recognize[d] a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss." *In re Facebook*, 956 F.3d at 600. "In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable." *Id.* Reuters argues that traceability requires Plaintiffs to show that Plaintiffs had control over their information in the first place. Opp. to MCC at 8. Although Plaintiffs has not necessarily alleged that, absent Reuters' conduct, they would have collected and

13

monetized their personal information of their own accord, Plaintiffs have alleged that their data "carries financial value" and that the defendant "profited from this valuable data." *In re Facebook*, 956 F.3d at 600 (finding injury sufficient for standing where "Plaintiffs allege that their browsing histories carry financial value" and that "Facebook sold user data to advertisers in order to generate revenue"). Plaintiffs have sufficiently alleged that Reuters' profits were thus "unjustly earned." *Id.*

This is especially so given Reuters' aggregation of the data. *See* Repl. to MCC at 3 ("CLEAR provides an array of information about them and other Californians that is not publicly available or easily accessible, including live cell phone records, location data from billions of license plate detections, real-time booking information, motor vehicle service records, unclaimed assets, historical utility records, and more."); FAC ¶¶ 18–20 (compiling information about Plaintiffs that is "not ascertainable via public records or traditional search engine queries," "facts hidden online," and "key proprietary and public records").

### 3. Redressability

Plaintiffs' injury is redressable through an injunction or monetary relief. *Lujan*, 504 U.S. at 571. Plaintiffs would cease to suffer violations of their privacy should the CLEAR platform be dismantled, or should individual consent be required prior to inclusion in the CLEAR database, or should individuals be given an easily accessible method of removing their data from the CLEAR database. The parties do not contest redressability.

Accordingly, Plaintiffs have Article III standing to allege invasion of the historically recognized right to privacy.

### B. Class Certification Under Rule 23(a)

To be certified as a class, Plaintiffs must meet (1) the ascertainability and numerosity requirement, (2) the commonality requirement, (3) the typicality requirement, and (4) the adequacy requirement of Rule 23(a). *See* Fed. R. Civ. P. 23(a). Plaintiffs here seek certification of the following proposed class:

> All persons who, during the limitations period, both resided in the state of California and whose information Thomson Reuters made available for sale through CLEAR without their consent.

United States District Court
Northern District of California

Docket No. 123-1 at 15; MCC at 10.

### 1. Ascertainability and Numerosity

The proposed class satisfies the ascertainability requirement.  Before analyzing numerosity under Rule 23(a)(1), courts typically require a showing that the class to be certified is ascertainable.  *See James v. Uber Techs. Inc.*, 338 F.R.D. 123, 130 (N.D. Cal. 2021).  To be ascertainable, the definition of the class must be "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member" before trial, and by reference to "objective criteria."  *Id.*  The Court must identify "the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action."  *Id.* (quoting *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 121 (N.D. Cal. 2014)).  Here, Plaintiffs seek to certify a class of Californians whose information was available for sale on CLEAR without their consent: "All persons who, during the limitations period, both resided in the state of California and whose personal information Thomson Reuters made available for sale through CLEAR without their consent," excluding "any officers and directors of Thomson Reuters; Class Counsel; and the judicial officer(s) presiding over this action and the members of his/her immediate family and judicial staff."  FAC ¶¶ 72–73.  As this Court has previously explained, "[m]embership in [a] class is objectively ascertainable from [the defendant company]'s business records."  *Id.*  Reuters does not dispute that it maintains a record—indeed, an entire portfolio—with respect to each individual for ▮▮▮ of Californians.  Docket No. 127-18 Exhibit 71 (Coverage Table by State).  Reuters does not dispute that it keeps these business records.  Nor can it, because maintaining such records are the entire premise of CLEAR's business model.  Reuters does not demonstrate that it asked for or obtained the consent of any of its subjects prior to gathering their private information.  Reuters does not contest that the ascertainability requirement is met.

The proposed class of tens of millions of individuals also satisfies the numerosity requirement.  Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. Proc. 23(a)(1).  "All persons" who "resided in the state of California" during the limitations period and "whose information Thomson Reuters made available for sale

through CLEAR without their consent" amounts to nearly 40 million people. Plaintiffs cite to the U.S. Census Bureau for the estimate that California's population was nearly 40 million people. MCC at 11 (citing Annual Estimates of the Resident Population for the United States, Regions, States, DC and Puerto Rico: April 1, 2020 to July 1, 2021, *available at* https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html). The Court takes judicial notice of the undisputed census data. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 676 n.6 (9th Cir. 2017) (taking judicial notice of undisputed facts regarding a county's population). Plaintiffs cite to CLEAR's state coverage chart, which reports that CLEARS covers ███████ of 37,253,956 individuals in California ███████. MCC at 11 (citing Docket No. 127-18 Exhibit 71 (Coverage Table by State)). "While no court has set the precise number of class members that are needed to satisfy the numerosity requirement, there is general recognition that Rule 23(a)(1) is satisfied when the proposed class contains one hundred or more members." *James*, 338 F.R.D. at 130. A class with almost 40 million members satisfies the numerosity requirement. *See, e.g.*, *id.* (certifying with 5000 members); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1998) (certifying with 40 members). Reuters does not contest that the numerosity requirement is met.

### 2. Commonality

Rule 23(a)(2) also requires that "there are questions of law or fact common to the class." Fed. R. Civ. Proc. 23(a)(2). To satisfy this requirement, the common question must be of "such nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350 ("This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention . . ."). "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do." *Id.* at 359 (internal quotations and brackets omitted).

Plaintiffs pinpoint two common questions of fact:

> (1) did Thomson Reuters seek the class members' consent or compensate them before making their personal information available for sale through CLEAR, and

United States District Court
Northern District of California

> (2) did Thomson Reuters give class members any meaningful ability
> to control the use of their personal information once it was offered
> through CLEAR?

MCC at 12.  Reuters claims that the proposed class is "so broad" that it includes Californians who moved between California and other states during the period of time that CLEAR was functioning, and thus the class members will not share common answers.  Opp. to MCC at 11.  But even if California law cannot apply to conduct occurring outside of California, as defined, all members at one point were subject to Reuters' sweep of privacy data and thus the common questions still apply as to them and others.

Plaintiffs identify two common questions to resolve the UCL claim:

> (1) is "the harm to the public" from making Californians' personal
> information available for sale through CLEAR without their consent
> "greater than the utility" of allowing Thomson Reuters to not seek
> class members' consent before selling access to their information in
> CLEAR," and

> (2) does Thomson Reuters' failure to seek Californians' consent
> before selling access to their information through CLEAR offend
> public policy as expressed in California's constitution, statutes, or
> regulations?

MCC at 12.  These two questions weigh the harms to individuals against any benefit to consumers or competition, elucidating the public policy implications of CLEAR.  Under the "unfair" prong of the UCL, courts consider "whether the conduct . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious."  *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 960 (N.D. Cal. 2022); *see also* Cal. Bus. & Prof. § 17200 (prohibiting "unlawful, unfair, or fraudulent business acts or practices").  To do so, courts will "balance the practice's harm to the consumer against the benefit to the defendant . . ."  *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 430 (N.D. Cal. 2013); *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886, 85 Cal. Rptr. 2d 301, 316 (1999) (setting forth the balancing test).  Where a singular systemic practice is being challenged, that balancing test looks at the harm and benefits in the aggregate.  *See, e.g.*, *Day v. GEICO Cas. Co.*, 580 F. Supp. 3d 830, 845 (N.D. Cal. 2022) (aggregately weighing consumer harms where the defendant "offer[ed] only minimal relief to new and renewing policyholders and nothing to overcharged policyholders who

United States District Court
Northern District of California

United States District Court
Northern District of California

did not renew their policies" against the defendant's benefits where there was "no societal benefit to that conduct"); *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 WL 3910169, at *13 (N.D. Cal. Oct. 5, 2010) (aggregately weighing consumer harms despite differences in "amounts to the loss of a small sum of money, coupled with the inconvenience and frustration entailed in identifying and canceling the unwanted subscription"); *Beckman v. Arizona Canning Co., LLC*, No. 316CV02792JAHBLM, 2019 WL 4277393, at *11 (S.D. Cal. Sept. 9, 2019) (aggregately weighing defendant's benefits in "value gained from selling a less-than-half-full product to unsuspecting consumers" as less than consumers' harm in "unknowingly purchasing a product less than half-full"). This balancing test accounts for the defendant's uniform conduct towards the putative class. *See Gaudin*, 297 F.R.D. at 430 (finding common issues predominate under the unfair prong of the UCL based on "Defendant's uniform practices"); *see also Vaccarino v. Midland Nat. Life Ins. Co.*, No. CV 11-5858 CAS MANX, 2013 WL 3200500, at *15–16 (C.D. Cal. June 17, 2013) (finding common issues predominate for common law fraud and the fraud prong of the UCL where "all class members here received uniform representations, and [Defendant] treated the proposed class the same"). Consideration of the plaintiffs' state of mind is also evaluated in the aggregate—as a collective "reasonable person," not consumer-by-consumer. *See In re JUUL Labs*, 609 F. Supp. 3d at 967–968 (finding that common issues predominate even if "purchasers of JUUL are heterogenous" with different "journeys" in terms of prior nicotine use, based on JUUL's consistent marketing and the harm to "reasonable consumers"); *Vaccarino*, 2013 WL 3200500, at *12 (finding that common issues predominate considering the state of mind of a "reasonable prospective purchaser" or "reasonable person"); *see also Vaccarino*, 2013 WL 3200500, at *15 (citing *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976)) (finding that the behavior and state of mind of individual plaintiffs do not defeat commonality when "plaintiffs' theory is that defendant's own omissions or deception results in plaintiffs remaining unaware about their injury or its cause"). Here, even if some putative class members may have benefitted from some usages of CLEAR, those intermittent benefits must be weighed, in the aggregate, at large against the harms caused to the entire class as a whole. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017) (considering "if the consumer

1    injury is substantial, is not outweighed by any countervailing benefits to consumers or to

2    competition").  Thus, the issues here are common to the class.

3          Reuters argues that the "unfairness" prong of the UCL requires an individualized analysis

4    into "the category and content of the information at issue, whether it was returned in response to a

5    search query, whether the query regarded the class member or someone else, what customer

6    conducted the search, for what purpose, what happened as a result (including the benefits and

7    harms, if any), and many other factors."  Opp. to MCC at 12–13.  But what is challenged here is

8    one uniform practice—the claim is asserted with respect to CLEAR as a whole.  The assessment

9    of the legality of this singular practice under the UCL is measured in the aggregate.  *See Ellsworth*

10   *v. U.S. Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at *28 (N.D. Cal. June 13, 2014)

11   ("Whether a practice is unfair in the context of legislative policy, or whether harms outweigh

12   utilities, are questions capable of classwide resolution.").  Whether a challenged practice

13   contravenes public policy inherently entails an aggregative judgement.  *See In re Facebook*, 956

14   F.3d at 606 ("Actionable invasions of privacy also must be 'highly offensive' to a reasonable

15   person, and 'sufficiently serious' and unwarranted so as to constitute an 'egregious breach of the

16   social norms.' . . . The highly offensive analysis focuses on the degree to which the intrusion is

17   unacceptable as a matter of public policy."); *see also Gaudin*, 297 F.R.D. at 429 (certifying class

18   and finding common issues in "Defendant's uniform practices related to issuing [a Trial Period

19   Plan loan modification document] to borrowers and countersigning it"); *Campion v. Old Republic*

20   *Home Prot. Co.*, 272 F.R.D. 517, 526 (S.D. Cal. 2011) (finding commonality (but denying class

21   certification on other factors) because "Defendant's advertisements were disseminated via uniform

22   written materials . . . sent to every class member" and "Defendant's uniform wrongful practices

23   interfered with the class members' right to receive benefits under the plan").  Collective treatment

24   of Plaintiffs' UCL claim is particularly appropriate where, as here, Plaintiffs challenge Reuters'

25   practice which systematically collects, aggregates, and offers for sale class members' information,

26   and uniformly affects all Californians whose personal information is collected by CLEAR;

27   Reuters uniformly does not seek consent from class members; subjects of CLEAR all share the

28   same severely limited ability to request the removal of their personal information; and the alleged

United States District Court
Northern District of California

privacy violations are equally shared by all individual Californians.

"The requirements of Rule 23(a)(2) have been construed permissively, and all questions of fact and law need not be common to satisfy the rule." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (cleaned up). "For purposes of Rule 23(a)(2), even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (cleaned up). The common questions identified by Plaintiffs here inform the legality of Reuters' systematic business practice.

Plaintiffs also identify two common questions to resolve the unjust enrichment claim:

> (1) did Thomson Reuters retain a "benefit" from its unfair practices, such as profits from its customers who paid to have access to the universe of information in CLEAR, including Californians' personal information; and
>
> (2) is it "unjust" for Thomson Reuters to retain the profits attributable to Californians' data being available for sale through CLEAR, when Californians never consented to Thomson Reuters using or selling their information?

MCC at 12. Reuters also argues that the unjust enrichment claim "requires careful consideration of the equities at work based on a close examination of the facts." Opp. to MCC at 12. Reuters argues that the Court must examine the facts of each relationship between Reuters and a potential class member. Opp. to MCC at 12 (citing *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1663 (1992) ("The fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it.")). Although it is true that some authorities have found that "[i]nquiries regarding unjustness are typically individualized," *id.* (citing 1 McLaughlin on Class Actions § 5:60 (11th ed.)), here, the Plaintiffs challenge to the generalized and uniform CLEAR program and its aggregation of a broad swath of private data for commercial sale gives rise to common legal issues. *See, e.g.*, *Smith v. Keurig Green Mountain, Inc.*, No. 18-CV-06690-HSG, 2020 WL 5630051, at *5 (N.D. Cal. Sept. 21, 2020) ("But the Court finds the inquiry presented here—whether Keurig was unjustly enriched by the proposed class members' purchase of the Products given its allegedly false representations regarding recyclability—raises the *same legal issues as to all class members*.") (emphasis added). Here, the inquiry of whether Reuters retained a benefit from its CLEAR sales

20

and whether such action was unjust involves at least one common question for the purposes of Rule 23(a)(2) across all class members. "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (internal quotations and brackets omitted).

To the extent that some consumers may have modified their relationship with Reuters by consenting to Reuters' use of their information without compensation, the proposed class definition already excludes such individuals from the class. *See* FAC ¶ 72 (proposing a class of "[a]ll persons who, during the limitations period, both resided in the state of California and whose personal information Thomson Reuters made available for sale through CLEAR *without their consent*") (emphasis added). Reuters is also incorrect that an unjust enrichment claim requires a contractual relationship between a business and consumers, *see* Opp. to MCC at 12 n.29—in fact, "[u]nder California law, '[w]hen a plaintiff alleges unjust enrichment, a court may *construe* the cause of action as a quasi-contract claim seeking restitution.'" *Smith*, 2020 WL 5630051, at *5 (citing *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)).

The class members' claims sufficiently raise one or more common questions of law or fact.

### 3. Typicality

Rule 23(a)(2) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. Proc. 23(a)(3). Typicality tests "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). Representative claims are "typical" if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020).

Here, Ms. Brooks and Mr. Shabazz suffered alleged privacy rights violations typical of the class; each of the class members has the same injury of violation of their privacy rights. Each of the class members' injury is based on the same Reuters' conduct of selling Plaintiffs' information on the CLEAR platform. There is no indication that Reuters tailors CLEAR to treat any individual subject differently. And no other class members have been injured by the same course of conduct:

if a class member's identity is not ascertainable through CLEAR's records of ██████████

Californians, then it stands to reason that their information has not been consolidated or sold on

CLEAR.  Although individuals living in other non-California states are predictably injured by

Reuters for the same conduct, those suits should be brought in other states under those states'

unfair business practice laws.

Ms. Brooks and Mr. Shabazz's claims are typical of their fellow class members' claims.

### 4.    Adequacy

Rule 23(a)(2) requires that "the representative parties will fairly and adequately protect the

interests of the class."  Fed. R. Civ. Proc. 23(a)(4).  A named plaintiff satisfies the adequacy test if

(1) the individual has no conflicts of interest with other class members and if (2) the named

plaintiff will prosecute the action vigorously on behalf of the class.  *In re Hyundai & Kia Fuel*

*Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc).  The typicality and adequacy inquiries

tend to significantly overlap.  *See* NEWBERG ON CLASS ACTIONS § 3:32 (5th ed. 2015).

First, Ms. Brooks and Mr. Shabazz have no discernable conflicts of interest with absent

class members.  They "seek the same relief and share an identical interest in proving Defendant's

liability."  *Wortman v. Air New Zealand*, 326 F.R.D. 549, 557 (N.D. Cal. 2018).  Reuters argues

that Ms. Brooks and Mr. Shabazz are inadequate named plaintiffs because they seek to represent a

class of people who "lost money or property" as the result of Reuters' conduct when they

themselves have not lost any money or property.  *See* D's Opp. to MCC at 9 (citing Docket No.

145 (Amended Complaint) ¶ 100).  This argument overlooks the premise of Plaintiffs' argument—

that a privacy violation itself constitutes a harm to the subject, and that personal data carries

financial value that Reuters profits from selling access to.  Assuming this is true, then every class

member whose information remains up for sale (and in fact has been sold to subscribers) in the

CLEAR platform without consent or compensation—including Ms. Brooks and Mr. Shabazz—has

been harmed in the same way.  *See id.* ¶ 49 ("Thomson Reuters has never offered individuals

compensation for the sale of [named plaintiffs'] photos, names, identifying information, or other

personal data. And it provides no mechanism by which individuals can seek compensation."); *id.* ¶

96 ("The class members received no compensation for Thomson Reuters' use of their names,

United States District Court
Northern District of California

United States District Court
Northern District of California

1   images, likenesses, and other personal identifying information."). Ms. Brooks and Mr. Shabazz

2   are adequate representatives with similar injuries, claims, and defenses as the class members. *See*

3   *id.* ¶ 102 ("The named plaintiffs' and class members' information is likely to remain available

4   through CLEAR, without their consent, and without compensation from Thomson Reuters for its

5   appropriation and sale of that information.").

6         Additionally, the Court must determine whether the named plaintiffs are "subject to unique

7   defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976

8   F.2d 497, 508 (9th Cir. 1992). "Class certification should not be granted if there is a danger that

9   absent class members will suffer if their representative is preoccupied with defenses unique to it."

10   *Id.* Indeed, a named plaintiff without unique defenses (*i.e.*, satisfies typicality) is more likely to

11   adequately represent their fellow class members (*i.e.*, satisfies adequacy). *See James*, 338 F.R.D.

12   at 133 ("For instance, a named plaintiff who is subject to unique defenses (i.e., may not satisfy

13   typicality) may also have a conflict of interest with her fellow class members (i.e., be an

14   inadequate class representative).").

15         Ms. Brooks and Mr. Shabazz rely on no unique factual circumstances and do not appear to

16   face legal defenses unique to them. Reuters argues that Ms. Brooks and Mr. Shabazz are public

17   figures who enjoy unique First Amendment defenses, and that other class members have not

18   created similar "legitimate and widespread attention to their activities" in the public eye. *See* D's

19   Opp. to MCC at 9–10. Reuters is incorrect that Ms. Brooks and Mr. Shabazz's public figure status

20   avails them of unique defenses in this case—the Court has already denied Reuters' anti-SLAPP

21   motion and explained that Reuters cannot assert First Amendment defenses because CLEAR is not

22   a public forum and Plaintiffs' biographical information is not in connection with an issue of public

23   interest. *See* Docket No. 154 (Order Granting in Part and Denying in Part D's Motion to Dismiss)

24   at 25–26 ("Reuters fails to explain how the dossiers it posts on the CLEAR platform are 'in

25   connection with an issue of public interest.' Cal. Civ. Proc. Code § 425.16(e)(3). . . . The public

26   does not have a particular cognizable interest in the 'speech' at issue here—the dissemination of

27   Plaintiffs' personal information—because that information is purely a matter of private concern,

28   does not relate to any matter of 'political' or 'social' concern, and does they seek to communicate

a political or social point of view.").  Although Ms. Brooks and Mr. Shabazz's portfolio may include more public information than many of the other subjects, their injuries are not materially different from those of the class members.  Moreover, the class representatives need not have injuries strictly "identical" to the rest of the class.  *Castillo*, 980 F.3d at 730.

Second, Ms. Brooks and Mr. Shabazz and their counsel, experienced in class actions, have thus far litigated the action vigorously on behalf of the class, and it is reasonable to conclude that they will continue to do so.  *See* Docket No. 130 Exhibit A (Declaration of Andre M. Mura) at ¶ 5 ("Gibbs Law Group has been actively involved in prosecuting this litigation. The firm has dedicated considerable time and resources to this case. Gibbs Law Group attorneys have drafted pleadings, briefed and argued dispositive motions and discovery motions, hired and worked with class certification experts, deposed Thomson Reuters' employees and experts and defended Plaintiffs' depositions, obtained and reviewed thousands of documents, and prepared Plaintiffs' motion for class certification.").  Each named plaintiff has actively participated in the litigation, and counsel has vigorously pursued this litigation since January 29, 2021.  Docket No. 1 Exhibit A.

Ms. Brooks and Mr. Shabazz are adequate class representatives.

Thus, the proposed class meets the certification requirements of Rule 23(a).  *See* Fed. R. Civ. P. 23(a).

## C.  Class Certification Under Rule 23(b)

Next, under Rule 23(b), Plaintiffs must meet one of the three types of classes.  As relevant here, Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. Civ. P. 23(b).  Rule 23(b)(3) requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members" ("predominance" requirement) and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" ("superiority" requirement).  Fed. Civ. P. 23(b).  Plaintiffs here seek certification as a hybrid Rule 23(b)(2)/(b)(3) class or, in the alternative, as a

United States District Court
Northern District of California

single Rule 23(b)(3) class.  The Court certifies the class under Rule 23(b)(3).

      1.      Rule 23(b)(3) Class

Rule 23(b)(3) requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members" ("predominance" requirement) and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" ("superiority" requirement).  Fed. R. Civ. P. 23(b).  The predominance and superiority requirements work together to ensure that certifying a class "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem*, 521 U.S. at 615 (internal citation and quotation omitted).  Plaintiffs' proposed class meets both these requirements.

      a.      Predominance

Rule 23(b)(3) requires the Court to determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) (citation omitted).  "Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (cleaned up).  The Court may certify a class "even if just one common question predominates . . . even though other important matters will have to be tried separately."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019); *see also Tyson*, 577 U.S. at 454.  "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir.), *cert.*

United States District Court
Northern District of California

*denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc., on Behalf of Itself & All Others Similarly Situated*, 214 L. Ed. 2d 233, 143 S. Ct. 424 (2022).  This Court thus analyzes the UCL claim and the unjust enrichment claim separately.

> ### i.  UCL Claim

As to the UCL claim, the elements are whether the defendant's business practice "offends an established public policy" or "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  To prove that there is a common question of law or fact that relates to a central issue in an UCL class action, Plaintiffs must establish that there are essential elements of the claim that are "capable of being established through a common body of evidence, applicable to the whole class."  *Olean*, 31 F.4th at 666.  Plaintiffs' unfairness claim under the UCL alleges that Reuters has engaged in unfair practices "[b]y selling Californians' personal information and data without consent [and] knowingly used and continues to use the names, photographs, and other identifying information of the class members in its CLEAR database, and for the purpose of selling access to products linked to the CLEAR database."  FAC ¶¶ 92–93.  The primary issue centers around Reuters' uniform practice of collecting data from a range of online sources, aggregating that data into individual profiles, and offering the data for sale on the CLEAR platform is a common question that underlies the claims of every class member.  Moreover, it appears Reuters has a systematic practice of not asking for consent or offering compensation.  These questions are "common to the entire class and [require] no separate inquiry into the actions or beliefs of individual class members."  *Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 390 (C.D. Cal. 2009) (internal citation omitted).  These questions are significant to the ability of every class member to prove their case.  Plaintiffs have also provided enough evidence at the class certification stage to allege a "central, uniform policy or practice" by Reuters.  *See Diacakis v. Comcast Corp.*, No. C 11-3002 SBA, 2013 WL 1878921, at *8 (N.D. Cal. May 3, 2013) (requiring Plaintiff to show a "uniform practice underlying his claims" for the predominance requirement).  There is no indication or evidence that Reuters treated any individuals' information in a manner different from its general business practice on the CLEAR platform.  *See Olean*, 31 F.4th at 666–67 (permitting a court to "weigh conflicting expert testimony," "resolve expert disputes," and

"resolve dispute about historical facts" in determining predominance).  As with many UCL claims, the Court "may make one uniform determination of whether the utility of the conduct outweighed the harm to class members."  *Newton v. Am. Debt Servs., Inc.*, No. C-11-3228 EMC, 2015 WL 3614197, at *10 (N.D. Cal. June 9, 2015) (holding that the court may make a uniform determination where the defendant "structured their affairs" uniformly across all class members, "even if some individual inquiry were required").  To the extent it may be contended that liability and/or damages may turn on whether some member of the class had their private information specifically singled out and sold to third parties and thus suffered a deeper invasion of privacy than those who did not, and thus the class should be divided into two subclasses.  The Court will discuss the issue at the next status conference.

Under the *Cel-Tech* tethering test, courts evaluate whether the unfairness is "tethered to some legislatively declared policy."  *Cel-Tech*, 973 P.2d at 544.  This inquiry hinges on whether any California statutes reflect the state's public policy of protecting consumer data.  *See* Order at 17–18 (listing California statutes protecting privacy interests, including the California Consumer Privacy Act, Cal. Civ. Code § 1798.1, Cal. Civ. Code § 1798.81.5(a), Cal. Bus. & Prof. Code § 22578).  In response, Reuters lists public policy considerations that weigh against privacy interests: for instance, the public interest in finding missing children, combatting government fraud, and investigating crimes.  Opp. to MCC at 16–17 (listing the corresponding supporting authorities, including Cal. Fam. Code § 3020 and case law).  But the existence of other statutes and policies (and their application to the case at hand) is a matter that can be resolved on a class-wide basis:  the tethering test can be conducted on a class-wide basis, incorporating Californian statutes that weigh in both directions. Again, assessing a particular business practice in the context of public policy considerations entails an aggregative judgment. *See In re Facebook*, 956 F.3d at 606.

No individualized inquiries are needed for Plaintiffs' UCL claim, and the common questions clearly predominate.

        ii.        <u>Unjust Enrichment Claim</u>

As to the unjust enrichment claim, the elements are whether "the defendant received and

unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016).  Here, Plaintiffs allege that Reuters unjustly retained the revenue from the sale of CLEAR subscriptions by "s[elling] the named plaintiffs' and the class members' names, photographs, personal identifying information, and other personal data without their consent for substantial profits" and "unjustly retained the benefits of its unlawful and wrongful conduct."  FAC ¶¶ 85, 87.  While "[i]nquiries regarding unjustness are typically individualized," unjust enrichment claims are amenable to class treatment when the inquiry presented "raises the same legal issues as to all class members."  *Smith*, 2020 WL 5630051, at *5 (finding predominance for an unjust enrichment claim that implicate the issue of whether the defendant was unjustly enriched by class members' purchase of its products, given its allegedly false representations regarding recyclability); *see also Gaudin*, 297 F.R.D. at 429 (finding that "common issues predominate over individualized inquiries" in an unjust enrichment claim because there are "significant common questions of law and fact concerning the nature and scope of the [contract]"); *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 330 (C.D. Cal. 2015) (finding that common issue predominate based on common issues in the reasonableness of "Defendants to arrange for a 35% rebate of each FPI premium to be kicked back from Assurant as an incentive for the referral"); *Ellsworth*, 2014 WL 2734953, at *28 (certifying a class for claims of unjust enrichment because common issues predominate in "the reasonableness of the kickbacks or backdating, not choices that buyers make to take an easy insurance option").  That is the case here. Plaintiffs' unjust enrichment claim raises the common inquiry of whether Reuters' uniform business practice of maintaining CLEAR unjustly resulted in Reuters retaining a financial benefit. Liability turns on class-wide common conduct.

Moreover, Plaintiffs have quantified Reuters' alleged enrichment by providing expert evidence of a damages calculation based on a reasonable methodology.[3]  "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's

---

[3] The reasonableness of Plaintiffs' damages calculation is further explained in the accompanying order on the *Daubert* motion challenging the methodology of the damages calculation done by Plaintiffs' expert Dr. Lloyd.  *See* Docket No. 206.

damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (internal citations omitted). Damages under Plaintiffs' unjust enrichment theory can be determined on a class-wide basis without delving into the specific facts surrounding any one individual class member. *See* Docket No. 127-12 (Expert Report of Terry Lloyd ("Lloyd Rep.")) (calculating Reuters' net profit from CLEAR that is attributable to its conduct related to Californians in total). Unlike cases where individualized inquiry is needed to determine which class members were financially harmed through which liability theories and how much they could be compensated as a result, *see Behrend*, 569 U.S. at 38 (failing to attribute damages to any one of four different theories of anticompetitive impact), there is only one theory of liability at issue here. Reuters tries to tease out two different theories of liability—the "just" aspects of CLEAR for which no recovery is possible, and the "unjust" aspects of CLEAR for which recovery is possible. Opp. to MCC at 18. But that is a distinction without a difference. CLEAR aggregates publicly available and non-publicly available data into individual profiles; as Plaintiffs allege, the large-scale aggregation and offer of sale of these profiles renders Reuters liable, regardless of whether the separate pieces of data are "justly" or "unjustly" incorporated. *See* Docket No. 124-7 (Report of Prof. Joseph Turow ("Turow Rep.")) ("Reuters' collection and sale of data about Californians without their knowledge and consent causes these harms regardless of the accuracy of the data being stored or used, and regardless of whether or not that information is publicly available in disaggregated forms."). And the issue of whether Reuters' profits are "just" or "unjust"—whether the beneficial uses of CLEAR in the aggregate outweigh the privacy harms—is a class-wide issue that considers the benefits of the aggregated data in CLEAR as a whole. Plaintiffs' damages theory meets *Comcast*'s requirement of being "consistent with its liability case." *Comcast*, 569 U.S. at 35.

Lastly, potential allocation of an award upon a finding of liability among class members is not an impediment to class certification. Plaintiffs suggest a pro rata, "equal allocation of disgorgement among the class." Repl. to MCC at 13; *see, e.g.*, *United States v. Real Prop. Located at 13328 & 13324 State Highway 75 N., Blaine Cnty., Idaho*, 89 F.3d 551, 553 (9th Cir.

1    1996) (agreeing with the district court's pro rata allocation because "tracing fictions should not be

2    utilized under circumstances involving multiple victims and commingled funds . . . [instead,] the

3    equities demanded that all victims of the fraud be treated equally"). This pro rata, equal allocation

4    aligns with Plaintiffs' theory that all privacy violations cause harm. Plaintiffs' claims do not turn

5    on the specific availability, type, or amount of their information that CLEAR used, so all class

6    members should equally share in the disgorgement. Even if a second stage of adjudication were

7    required to allocate damages on a more granular level, that would not defeat certification. "[T]he

8    presence of individualized damages cannot, by itself, defeat class certification." *Bowerman v.*

9    *Field Asset Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023); *see also Olean Wholesale Grocery*

10   *Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir.) (affirming that Rule 23(b)(3)

11   permits "the certification of a class that potentially includes more than a de minimis number of

12   uninjured class members" because it "requires only that the district court determine after rigorous

13   analysis whether the common question predominates over any individual questions").

14          In sum, common questions predominate over any individual questions in this case.

15                b.    <u>Superiority</u>

16          Moreover, under Rule 23(b)(3), a class action is the superior approach to adjudicating this

17   controversy. Certification under Rule 23(b)(3) is appropriate only if a class action is the superior

18   approach to resolving the dispute. Fed. R. Civ. P. 23(b)(3). "The superiority inquiry under Rule

19   23(b)(3) requires determination of whether the objectives of the particular class action procedure

20   will be achieved in the particular case. . . . This determination necessarily involves a comparative

21   evaluation of alternative mechanisms of dispute resolution." *Diacakis*, 2013 WL 1878921, at *9.

22   A court should consider "(A) the class members' interests in individually controlling the

23   prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

24   the controversy already begun by or against class members; (C) the desirability or undesirability

25   of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties

26   in managing a class action." *Id.*

27          First, there is no evidence or argument that most class members would be inclined to

28   invoke the expense, resources, and time needed to individually control the prosecution of their

United States District Court
Northern District of California

30

claim in separate actions.  Plaintiffs have provided sufficient evidence that there are millions of class members whose information was collected, aggregated, and offered for sale by Reuters on the CLEAR platform.  *See* Docket No. 127-18 Exhibit 71 (Coverage Table by State) (CLEARS covers ██████ of 37,253,956 individuals in California ██████).  Compared to forty million class members pursuing their own claims, proceeding on a class action basis would avoid millions of repetitive and wasteful lawsuits.  If these class members would be unlikely to pursue their claims individually, then a class action would assist them in vindicating their claims, claims that would likely go unchallenged given the amount at stake for each individual.  Individualized litigation would cause needlessly cumulative expense for individual litigants and the court, impose on litigants the difficulty of finding counsel to take individual cases, and inundate the court's time with duplicative litigation.

Second, the parties point to no pending litigation concerning Reuters' CLEAR platform. The Court is unaware of any relevant pending litigation.  *See also Kidd v. Thomson Reuters Corp.*, 299 F. Supp. 3d 400 (S.D.N.Y. 2017), *aff'd*, 925 F.3d 99 (2d Cir. 2019) (claims that Reuters' CLEAR platform violated provisions of the federal Fair Credit Reporting Act); *Landry v. Time Warner Cable, Inc.*, No. 16-CV-507-SM, 2017 WL 3444825 (D.N.H. Aug. 9, 2017) (same). Reuters does not offer any argument on this factor.  This factor is neutral.

Third, concentrating the litigation in the Northern District of California is proper in this case.  This class action challenges Reuters' conduct pertaining to Californians under California's Unfair Competition Law, Cal. Bus. & Prof. § 17200.  Reuters argues that Plaintiffs' "overbroad class definition raises complex exterritoriality and choice of law issues."  Opp. to MCC at 21.  As previously explained, even if some Californians periodically resided in other states, they would be eligible as class members for the harms suffered while they resided in California.  Limiting the harms in this way would not implicate any "exterritoriality" issues.  Compensation would be based on these members' injuries suffered while residing in California.  As to whether a district court is the proper type of forum, it is true that other forums—such as the legislative branch or in federal agencies—may also remedy privacy violations.  *See, e.g., Diacakis*, 2013 WL 1878921, at *9 (finding no superiority because "Plaintiff makes no effort to discuss the factors relevant to the

United States District Court
Northern District of California

superiority requirement," including explaining that the plaintiff's CLRA, UCL, FAL, fraud, unjust enrichment, and CPA claims "may be addressed by regulatory agencies such as the Federal Communications Commission, the Federal Trade Commission and the California Public Utilities Commission").  However, federal agencies may not be permitted to order restitution, only injunctive relief.  *See, e.g.*, *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021) (holding that the Federal Trade Commission Act, which prohibits, and authorizes the Federal Trade Commission to prevent, unfair methods of competition and unfair or deceptive acts or practices, permits the FTC to obtain injunctive relief but not equitable monetary relief such as restitution or disgorgement).  This factor weighs in favor of certification in this district court litigation.

Fourth, there are no substantive issues of manageability in proceeding with a class action in this case.  Manageability "'encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit,' which typically includes 'potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages.'"  *James*, 338 F.R.D. at 143 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S. Ct. 2140, 40 L.Ed.2d 732 (1974); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990)).  At this juncture, there are no demonstrable manageability issues because the Court can address numerous common questions with common answers in a single trial.  Reuters offers no proof or argument that class members would be difficult to notify; in fact, it likely has these individuals' names and contact information through its own database.  It offers no proof that calculation of individual damages would be unfeasible; indeed, as Plaintiffs suggest, the Court can simply equally divide the disgorgement amount by the number of class members, which is consistent with its liability case arguing that Plaintiffs' loss of control over their personal information constitutes harm.[4]  *See Comcast*, 569 U.S. at 35 ("Calculations need not be exact, but at the class-certification stage (as at trial), any model

---

[4] To the extent that Californians may have suffered different damages from having their information collected, sold, and searched for, or only collected and sold, the Court may invite further briefing on dividing the class into subclasses.

United States District Court
Northern District of California

supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.") (internal citations omitted).  Reuters offers no proof that damages would be difficult to distribute.  There is no concern that "consumers would not be able to reliably identify themselves as class members" because Reuters possesses a database precisely listing the class members.  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017).  Moreover, any administrative difficulties of managing a class action or identifying class members are not dispositive of whether a class should be certified.  *See id.* at 1128 ("The authors of Rule 23 opted not to make the potential administrative burdens of a class action dispositive and instead directed courts to balance the benefits of class adjudication against its costs. We lack authority to substitute our judgment for theirs.").  Courts have "a variety of procedural tools courts can use to manage the administrative burdens of class litigation," such as "divid[ing] classes into subclasses or certify[ing] a class as to only particular issues."  *Id.*  This factor weighs in favor of certification.

Considering the balance of these four factors—two of which weigh in favor of class certification and two of which are neutral—Plaintiffs have met the superiority requirement of Rule 23(b)(3).

2.     Rule 23(b)(2) Class

In the alternative, Plaintiffs ask that their UCL claim for injunctive relief be certified under Rule 23(b)(2).  Rule 23(b)(2) states that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. Proc. 23(b)(2).

In their prayer for relief, Plaintiffs request "injunctive relief to enjoin Thomson Reuter's continued violation of California's Unfair Competition Law."  FAC.  The Tenth Circuit has cautioned against of requests for injunctive relief made at  "a stratospheric level of abstraction" and required a "fairly detailed description" under Rule 23(b)(2).  *Shook v. Board of County Commissioners of County of El Paso*, 543 F.3d 597, 604-07 (10th Cir. 2008).  But the Ninth Circuit has applied a more permissive approach, explaining that it "seriously doubt[s] that the

33

United States District Court
Northern District of California

1   degree of specificity suggested in *Shook II*'s wide-ranging dicta is properly required at the class

2   certification stage for a Rule 23(b)(2) class." *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir.

3   2014). Moreover, expert reports may inform how to shape injunctive relief. *Id.* (crediting the

4   description of injunctive relief as supported by "four expert reports that explain which policies are

5   deficient and what sorts of policy remedies could alleviate the alleged violations").

6       Here, while Plaintiffs have neglected to include any specific description of injunctive relief

7   in their FAC, Plaintiffs' expert Prof. Turow has suggested some policy remedies. *See, e.g.*, Turow

8   Report at 15 ("There is no public campaign to inform Californians that CLEAR exists or to give

9   them an opportunity to control the information about them within CLEAR. Thomson Reuters

10   does not market or otherwise reach out to Californians to inform them that their information is

11   included in CLEAR, or that their information was searched in CLEAR. Nor does Thomson

12   Reuters affirmatively reach out to inform Californians how they may opt out of having their

13   information included in CLEAR—which may be a complex and labyrinthine process, if it's even

14   possible at all."). Bolstered by the expert report, Plaintiffs have presented a sufficient description

15   of the "general contours" of possible injunctive relief. *See B.K. by next friend Tinsley v. Snyder*,

16   922 F.3d 957, 972 (9th Cir. 2019) ("In this case, the 'general contours of an injunction' are

17   enjoining [Defendant] to abate the nine policies identified by the district court as amenable to

18   class-wide litigation. That was enough. A more specific injunction will depend on further fact-

19   finding and what claims the plaintiffs actually prove through further litigation.").

20       In whatever form injunctive relief takes—whether creating a public campaign to inform

21   Californians that CLEAR exists, enhancing its Public Records Privacy Policy for individuals to

22   easily request to opt-out and remove their information from CLEAR, reaching out to individuals

23   for consent, or shutting down the CLEAR platform altogether—"a proposed injunction addressing

24   those policies and practices would . . . prescribe a standard of conduct applicable to all class

25   members." *Parsons v. Ryan*, 754 F.3d 657, 687 (9th Cir. 2014) (holding that "the remedy in this

26   case would not lie in providing specific care to specific inmates, but rather the level of care and

27   resources would be raised for all inmates").

28       The Court thus also certifies the class for UCL injunctive relief under Rule 23(b)(2) under

1    Plaintiffs' hybrid certification approach.

2                           IV.      **CONCLUSION**

3           For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Class Certification.

4    To the extent that some class members may have had their personal information collected and

5    disclosed via a specifically focused customer search and suffered a particularly intrusive privacy

6    invasion thus warranting consideration of subclasses, the Court will discuss the issue at the next

7    status conference. A Status Conference is scheduled for August 8, 2023, at 2:30 p.m.

8           At this juncture, the Court instructs the Clerk of the Court to file this order, in its entirety,

9    under seal. The Court orders the parties to meet and confer to determine which portions of this

10   order may be publicly filed. The parties shall jointly file their request to file under seal within a

11   week of the date of this order.

12          This order disposes of Docket No. 130.

13

14          **IT IS SO ORDERED**.

15

16   Dated: July 31, 2023

17

18   _____

19   EDWARD M. CHEN
     United States District Judge

20

21

22

23

24

25

26

27

28