Jason 'Jay' Barnes (admitted *pro hac vice*)
  *jaybarnes@simmonsfirm.com*
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:    212-784-6400
Fax:    212-213-5949

Jeffrey A. Koncius, State Bar No. 189803
  *koncius@kiesel.law*
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel:    310-854-4444
Fax:    310-854-0812

*Attorneys for Plaintiffs*
JOHN DOE, JANE DOE I, JANE DOE II, and
JOHN DOE II, and DOE, on behalf of
themselves and all others similarly situated

[*Additional counsel listed on signature page*]

Geoffrey Graber, State Bar No. 211547
  *ggraber@cohenmilstein.com*
**COHEN MILSTEIN SELLERS & TOLL
PLLC**
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel:    202-408-4600
Fax:    202-408-4699

Beth E. Terrell, State Bar No. 178181
  *bterrell@terrellmarshall.com*
**TERRELL MARSHALL LAW GROUP
PLLC**
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.:   206-816-6603
Fax:    206-319-5450

Andre M. Mura, State Bar No. 298541
  *amm@classlawgroup.com*
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.:   510-350-9700
Fax:    510-350-9701

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | **Case No. 3:22-cv-03580-WHO (VKD)** |
| | <u>CLASS ACTION</u> |
| This Document Relates To: | **\*\*REDACTED VERSION\*\*** |
| All Actions | **PLAINTIFFS' NOTICE OF MOTION AND RULE 37 MOTION FOR SANCTIONS TO ENFORCE DKT. 275, THE COURT'S JUNE 13, 2023 ORDER FOR PRODUCTION OF DOCUMENTS RESPONSIVE TO REQUESTS FOR PRODUCTION NOS. 5-7** |
| | Judge: Hon. Virginia K. DeMarchi<br>Hearing Date: November 7, 2023<br>Hearing Time: 10:00 a.m.<br>Courtroom: 2, Fifth Floor |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 7, 2023, at 10:00 a.m., in Courtroom 2, 5th Floor, of this Court, located at 280 South 1st Street, San Jose, California, before the Honorable Virginia K. DeMarchi, Magistrate Judge of the United States District Court for the Northern District of California, Plaintiffs will and do hereby move the Court, pursuant to Federal Rule of Civil Procedure 37(b), Civil Local Rule 37, and ¶ 4 of the Standing Order for Civil Cases before the Honorable Magistrate Judge Virginia K. DeMarchi and for the reasons set forth below and in the accompanying Declaration of Jay Barnes, for an Order to enforce Dkt. 275, the Court's June 13, 2023 Order for the production of documents responsive to Plaintiffs' Requests for Production ("RFP") Nos. 5-7 and additional sanctions that the Court deems appropriate, including monetary sanctions, a finding of contempt, or any other relief.

The Court ordered Meta to complete discovery in response to Plaintiffs' RFP Nos. 5-7 by June 30, 2023. Dkt. 275. Meta has failed to comply with the Court's Order. Meta has produced just 19 documents – 13 of which are publicly available – that omit information concerning data sources, data flow, and data fields that have been the subject of the parties' discussions since the inception of this case. Plaintiffs have sent over a dozen letters to Meta concerning the deficient production and have met and conferred with Meta on three occasions. Meta claims it has not identified any additional responsive documents. At the parties' meet and confer, Meta suggested its severely incomplete production is based on the "phrasing" of Plaintiffs' Requests.

This motion seeks an Order enforcing the Court's June 13, 2023 Order at Dkt. 275 and requiring Meta to produce document including but not limited to:

1.      Documents concerning Hive, DYI/DYD, Switchboard, Everstore, Manifold, Scuba, logs referenced in Meta's January 2023 white paper titled "Shared Foundations: Modernizing Meta's Data Lakehouse," containers, ███████, ███████, ███████, TAO, MySQL, ZippyDB/Akkio, Memcache, Laser, Puma, Stylus, Swift, and the filter identified in Meta's opposition to Plaintiffs' motion for preliminary injunction, as well as any other data source as yet unknown to Plaintiffs due to Meta's failure to produce responsive documents;

/ / /

2.     The fields within each data source identified, including derived and inferred fields; and

3.     Corresponding data flow, including through Meta's backend systems such as Hive and the list included in paragraph 1.

Plaintiffs request that the order specify that Meta must produce this information by no later than November 14, 2023, or at a time the Court considers reasonable, as well as all other forms relief the Court deems appropriate.

Dated: October 3, 2023                    By: /s/ Jay Barnes

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
  jaybarnes@simmonsfirm.com
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:    212-784-6400
Fax:    212-213-5949

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Geoffrey Graber, State Bar No. 211547
  ggraber@cohenmilstein.com
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel:     202-408-4600
Fax:    202-408-4699

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
  koncius@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel:    310-854-4444
Fax:    310-854-0812

**TERRELL MARSHALL LAW GROUP PLLC**
Beth E. Terrell, State Bar No. 178181
  bterrell@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.:    206-816-6603
Fax:    206-319-5450

**GIBBS LAW GROUP LLP**
Andre M. Mura, State Bar No. 298541
  amm@classlawgroup.com
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.:    510-350-9700
Fax:    510-350-9701

3

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     BACKGROUND .....................................................................................................3

        A.      Plaintiffs' Requests for Production Nos. 5-7 ...........................................3

                1.      Meta's Omissions – Data Sources ................................................5

                        a.      Relevant Data Sources Identified by Meta in this Litigation ............5

                        b.      Relevant Data Sources Identified in Public Engineering Documents, Court Filings, and Meta's Limited Production .............8

                2.      Meta's Omissions – The Pixel Filter ...........................................10

                3.      Meta's Omissions – Fields ..........................................................12

                4.      The Parties' Discussions Regarding RFP Nos. 5-7 .....................14

                5.      Why the Information Is Critical ...................................................15

III.    LEGAL STANDARDS .........................................................................................21

IV.     ARGUMENT ........................................................................................................21

V.      CONCLUSION .....................................................................................................22

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Apple Inc. v. Samsung Elecs. Co.*
    2018 WL 1586276 (N.D. Cal. Apr. 2, 2018) ................................................................. 21

*Hyde & Drath v. Baker*
    24 F.3d 1162 (9th Cir. 1994) ...................................................................................... 21

*M2 Software, Inc. v. M2 Commcn's, L.L.C.*
    217 F.R.D. 499 (C.D. Cal. 2003) .................................................................................. 4

*Valley Engineers Inc. v. Elec. En'g Co.*
    158 F.3d 1051 (9th Cir. 1998) ..................................................................................... 21

<u>Statutes</u>

18 U.S.C. § 2511(2)(d) ......................................................................................................... 17

<u>Rules</u>

Fed. R. Civ. P. 37 ................................................................................................................... 1

Fed. R. Civ. P. 37(b)(2) ....................................................................................................... 21

Fed. R. Civ. P. 37(b)(2)(A) .................................................................................................... 1

## I.     INTRODUCTION

Pursuant to Fed. R. Civ. P. 37 and ¶ 4 of the Court's Standing Order for Civil Cases, Plaintiffs move for sanctions to enforce the Court's June 13, 2023 Order (Dkt. 275), which directed Meta to complete discovery in response to Plaintiffs' Request for Production Nos. 5-7 (the "Requests") by June 30, 2023. *See* Fed. R. Civ. P. 37(b)(2)(A); N.D. Cal. Civ. L.R. 37-4. To date, Meta has failed to comply with the Court's Order.

The Requests, served nearly eight months ago, seek discovery sufficient to identify the data flow related to the Meta Pixel (RFP 5), as well as relevant data sources (RFP 6), and corresponding data fields (RFP 7). *See* Declaration of Jason "Jay" Barnes ISO Plaintiffs' Motion to Enforce ("Barnes Decl."), Ex. 1. Following a two-month period of meet and confers, during which Meta delayed production, Plaintiffs moved - via joint letter brief dated May 17, 2023 - to compel production by a date certain. *See* Dkt. 247. In that May 17, 2023 Joint Letter Brief, Meta agreed to "the exact discovery Plaintiffs seek," but resisted a production deadline. *Id.* at 4. On June 13, 2023, the Court ordered Meta to produce documents responsive to RFP Nos. 5-7 by June 30, 2023. Dkt. 275.

Meta failed to comply with this Court-mandated deadline and, three months later, has given no indication that it will ever comply with the order. To date, Meta has not completed discovery related to data flow, data sources, and data fields. Instead, between June 30 and July 2, 2023, Meta produced merely 19 documents – 13 of which are publicly available. Barnes Decl., ¶ 6. Plaintiffs' review of these documents reveals glaring deficiencies. Specifically, Meta did not produce: (1) documents concerning relevant data sources, omitting from its production *at least nine* relevant data sources; (2) documents related to the Pixel filter, which Meta itself placed at issue in its opposition to Plaintiffs' motion for preliminary injunction and Meta's motion to dismiss;[1] and (3) documents sufficient to identify and describe the fields contained within relevant data sources.

---

[1] As discussed below, in its opposition to Plaintiffs' Motion for Preliminary Injunction, Meta asserted that the Pixel Filter would alter the flow of the data at issue. *See* Dkt. 76 at 19; Dkt. 76-1, Declaration of Tobias Wooldridge in Support of Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction ¶ 8.

These documents are critical to Plaintiffs' and their experts' understanding of how Meta uses the at-issue data and the accuracy of its claims regarding its privacy programs. In fact, Plaintiffs' expert Dr. Timothy Libert states that it is not possible to conduct a privacy audit in the absence of these documents – a statement that is supported by other experts and standard operating procedures for privacy audits. *See* Declaration of Timothy Libert ISO Plaintiffs' Motion to Enforce Dkt. 275, the Court's June 13, 2023 Order for Production of Documents Responsive to Request for Production Nos. 5-7 ("Libert Decl."), ¶¶ 11, 15, 19-26.

On July 7, 2023, Plaintiffs identified these deficiencies to Meta and requested a meet and confer. Barnes Decl., ¶ 58, Ex. 20 (7/7/23 letter); *see also id.*, ¶ 57, Ex. 19 (7/3/23 email). Meta essentially ignored Plaintiffs' request. *See id.*, ¶ 59, Ex. 21 (7/17/23 email). In the ensuing six weeks, Plaintiffs sent six follow-up letters requesting a response (*see id.*, ¶ 60, Ex. 22 (7/24/23 letter), ¶ 61, Ex. 23 (7/31/23 letter), ¶ 62, Ex. 24 (8/2/23 letter), ¶ 64, Ex. 26 (8/7/23 letter), ¶ 65, Ex. 27 (8/14/23 letter), ¶ 66, Ex. 28), to which Meta vaguely responded that it "continued to investigate" the existence of additional documents. *See id.*, ¶ 63, Ex. 25 (8/5/23 email). Finally, after nearly two months, during the parties' meet and confer on August 28-29, Meta claimed – for the first time in almost seven months since RFP Nos. 5-7 were served – that its deficient production was due to the "phrasing" of Plaintiffs' Requests. *See id.*, ¶ 69; *see also id.*, ¶ 70, Ex. 30 (8/30/23 letter). But neither claims of "investigation" nor "phrasing" refute the deficiencies that Plaintiffs identified.[2] In truth, Meta's purported investigation and feigned confusion has simply delayed discovery of documents that are foundational to Plaintiffs' case and rebutting Meta's asserted defenses. Worse, Meta's conduct violates this Court's Order, which directed completion of production by June 30, 2023. Plaintiffs respectfully request enforcement of the June 13, 2023 Order and such other relief as the Court deems appropriate.

/ / /

/ / /

---

[2] On September 15, 2023, Meta offered to convert Plaintiffs' RFP No. 7 into an Interrogatory, providing Plaintiffs with a list of fields that Meta's counsel decides to disclose. Barnes Decl. ¶ 73, Ex. 32 (9/15/23 letter); *see also id.*, ¶¶ 71, 72, Ex. 31 (9/1/23 letter).

## II.     BACKGROUND

The details of Meta's data flow, data sources, and fields contained within them are foundational to this litigation. *See* Libert Decl. ¶ 10 ("the documents requested in RFP Nos. 5-7 are critical to investigating and answering the questions that I have been assigned to investigate"). From these documents, Plaintiffs seek to learn key information about exactly how Meta uses the at-issue data, an issue relevant to Meta's knowledge, intent, damages, and class certification. These documents have been a focus of discussions about preservation and ESI as well — and will ultimately serve as evidence supporting Plaintiffs' claims and/or Meta's defenses, as illustrated by the Court's focus on Meta's purported filter in its preliminary injunction (Dkt. 159 at 31-32) and motion to dismiss orders (Dkt. 316 at 4-5).

### A.     Plaintiffs' Requests for Production Nos. 5-7

Plaintiffs propounded their first set of Requests for Production on February 9, 2023, three of which are relevant to this motion. *See* Barnes Decl., Ex. 1. Request No. 5 requests "[d]ocuments sufficient to show the data flow through which Meta receives information via the Meta Pixel deployed on Medical Provider Web-Properties[.]" *Id.*, ¶ 5. Request No. 6 requests "[d]ocuments sufficient to identify the databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel for Medical Provider Web-Properties[.]" *Id*. And Request No. 7 requests "[d]ocuments sufficient to identify and describe each of the fields in databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel for Medical Provider Web-Properties . . . includ[ing] but not limited to, data dictionaries." *Id*.

The information requested by RFP Nos. 5-7 is undisputedly core to Plaintiffs' claims and Meta's defenses. As explained by Dr. Libert, this information is critical to understanding "how a company uses a specific category of data," "precisely how the system is designed through data flow and data storage schematics and related information," and "how Meta could comply with a Court order that it stop collecting such information in the first place – and stop using data in its systems that was either collected without authorization as alleged by the Plaintiffs or inferred or derived

3

1   from unauthorized data collection." Libert Decl. ¶¶ 14-16.

2       Despite Plaintiffs' early focus on obtaining this information, production has been slow to

3   appear. This is not for Plaintiffs' lack of trying. Data source disclosures have been repeatedly

4   discussed at case management conferences and discovery hearings. *See* Barnes Decl., ¶¶ 74-76, Ex.

5   33 (3/14/23 Hr'g Tr.); ¶¶ 85-87, Ex. 37 (Apr. 20, 204/20/23 Hr'g Tr.); ¶¶ 91-94, Ex. 40 (5/23/23

6   Hr'g Tr.). Plaintiffs have also sent Meta numerous letters requesting information on "where Named

7   Plaintiff Data relevant to this case is stored" and "the fields that are located in those databases or

8   data sources[.]" *Id.*, ¶ 89, Ex. 39 (4/26/23 letter); *see also id.*, ¶ 97, Ex. 42 (5/31/23 letter). When

9   Meta was not forthcoming with information, Plaintiffs scoured public sources to send further letters

10  inquiring into specific data systems and fields identified in Meta's public engineering documents

11  and prior court filings. *Id.*, ¶¶ 7, 12, 17, 21, 26, Ex. 2 (3/23/23 letter); *see also id.*, ¶ 80, Ex. 35

12  (4/4/23 letter). Meta, in contrast, has stymied the flow of information, identifying only a limited set

13  of data sources in its ESI disclosures and preservation correspondence. *Id.*, ¶¶ 8, 13, 18, 22, 27, Ex.

14  3 (5/18/23 letter); ¶¶ 9, 14, 19, Ex. 4 (6/30/23 letter). In total, Plaintiffs have sent Meta well over a

15  dozen emails, letters or formal discovery requests seeking information on relevant data sources, data

16  flow and data fields. *See e.g., id.*, Exs. 1, 2, 10, 24, 28, 31, 35, 36, 39, 41, 42. Yet, more than a year

17  into this case, Plaintiffs are effectively nowhere – possessing not much more information on this

18  foundational issue than that which was already publicly available.

19      On May 17, 2023, the parties filed a joint discovery dispute letter concerning the timeline

20  for Meta's production of documents responsive to the Requests. Dkt. 247. Meta did not question

21  relevance, scope, or proportionality. *See id.*[3] Instead, Meta simply stated it would provide Plaintiffs

22  with the "exact discovery Plaintiffs seek" by June 30, 2023. *Id.* at p. 4. Thus, on June 13, 2023, the

23  Court accepted Meta's representation and ordered "Meta to produce the documents responsive to"

24  the RFPs by June 30. Dkt. 275.

25

26  _____

27  [3] In so doing, Meta waived any such arguments and may not raise them as a defense to its failure
    to comply with a Court order. *See M2 Software, Inc. v. M2 Commcn's, L.L.C.,* 217 F.R.D. 499,
    501 (C.D. Cal 2003) (party had "waived relevancy objections by responding to each request that it
28  will produce the requested documents").

1.    **Meta's Omissions – Data Sources**

Despite the agreement (and Court order) that Meta would produce documents responsive to RFP Nos. 5-7, Meta produced only 19 documents between June 30 and July 2, 2023. Barnes Decl., ¶ 6. Meta's production contained multiple notable omissions, including a failure to produce documents related to relevant data sources that Meta has acknowledged to be "██████████████" or "███████" to this litigation. *See id.*, Ex. 3 (5/18/23 letter), Ex. 4 (6/30/23 letter). The production also omits data sources that have been identified in public engineering documents and other court filings, the descriptions of which indicate that they are relevant and responsive to the Requests. Plaintiffs address these *known* data sources below.[4]

a.    *Relevant Data Sources Identified by Meta in this Litigation*

1.    Hive

In initial correspondence concerning preservation, Plaintiffs requested that Meta preserve Named Plaintiff Data from "Hive." Barnes Decl., ¶ 7, Ex. 2 (3/23/23 letter). ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████" *Id.*, ¶ 8, Ex. 3 (5/18/23 letter). Meta also ██████, *id.*, ¶ 9, Ex. 4 (6/30/23 letter), ████████████████████████████, *id.*, ¶ 10. The following chart is a diagram from a public document describing the Hive's very general architecture:[5]

---

[4] Plaintiffs do not intend the list included herein to be considered a complete list. There is no way for Plaintiffs to know what a complete list would entail given Meta's failure to identify data sources in the ESI process and its violation of the Requests at issue here. To obtain what *may* be a complete list, Plaintiffs served RFP 180.6, which sought documents related to a "update[d] list of 149 systems identified in the Declaration of David Pope," a Meta employee. Barnes Decl., ¶ 95, Ex. 41. In response, Meta informed Plaintiffs that RFP 180 sought an "update" to such a list, and no update was given. *Id.*, ¶ 96. When Plaintiffs asked if Meta would produce the Pope Declaration that identified those systems, Meta refused to provide an answer and stated that RFP 180 did not request the Declaration itself, *id.*, thus suggesting that Plaintiffs would have to propound another RFP.

[5] "Data Warehousing and Analytics Infrastructure at Facebook," available at http://borthakur.com/ftp/sigmodwarehouse2010.pdf

---

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14



**Figure 2: Hive System Architecture**

15   To date, Meta has not any responsive documents concerning Hive. *Id.*, ¶ 11.

16   2.  <u>Switchboard</u>

17   Plaintiffs requested that Meta preserve Named Plaintiff data from "Switchboard." Barnes

18   Decl., ¶ 12, Ex. 2 (3/23/23 letter). Meta later ███████████████████████████

19   ████████████████████████████████████████████████████████████████████████

20   ███" other data sources. *Id.*, ¶ 13, Ex. 3 (5/18/23 letter). Meta also ████████████████

21   ██████, *id.*, ¶ 14, Ex. 4 (6/30/23 letter), and agreed to produced Named Plaintiff data from the source,

22   *id.*, ¶ 15.

23   To date, Meta has not produced any responsive documents concerning Switchboard. *Id.* ¶ 16.

24   3.  <u>DYI/DYD</u>

25   Plaintiffs requested that Meta preserve data from "Download Your Information" or "DYI."

26   Barnes Decl., ¶ 17, Ex. 2 (3/23/23 letter). Meta subsequently ███████████████████████

27   ████████████████████████████████████████████████████████████ *Id.*, ¶ 18, Ex. 3

28   (5/18/23 letter). DYI/DYD includes "Off-Facebook Activity," *i.e.* the data Meta collects from other

6

1    apps and websites, including activity collected through the Pixel.[6] Meta also ███████████

2    ████████. Barnes Decl., ¶ 19, Ex. 4 (6/30/23 letter).

3         To date, Meta has not produced any documents concerning DYI/DYD. *Id.* ¶ 20.

4         4.   Everstore & Manifold

5         Plaintiffs requested that Meta preserve data from "Manifold" and "Everstore," Barnes Decl.,

6    ¶ 21, Ex. 2 (3/23/23 letter), and Meta thereafter ████████████████████████████

7    ███████████████████████████████████████████████████████████

8    ███████████████████████████████████" *id.*, ¶ 22, Ex. 3 (5/18/23 letter).

9    During a meet and confer, Meta stated that ███████████████████████████████

10   ███████████████████████████████████████████████████████████

11   ███████████████████████████████. *Id.*, ¶ 23. Then, Meta changed course and stated

12   it ████████████████████████████████████████████████████████

13   ████████████ ¶ 24.

14        To date, Meta has not produced any documents concerning Everstore or Manifold. *Id.*, ¶ 25.

15        5.   Scuba

16        Plaintiffs requested that Meta preserve data from "Scuba." Barnes Decl., ¶ 26, Ex. 2 (3/23/23

17   letter). In response, Meta identified "Scuba" as "████████████████████████████████."

18   *Id.*, ¶ 27, Ex. 3 (5/18/23 letter). At a meet and confer, Meta stated that Scuba contains data that is

19   ████████████████████. *Id.*, ¶ 28. Based on counsel's experience, Plaintiffs reasonably believe that

20   Scuba will be a crucial source of discovery in this case. As a ████████████ log, it likely has a

21   wide variety of relevant information on how Meta actually uses the at-issue data.

22        To date, Meta has not produced any documents concerning Scuba. *Id.*, ¶ 29.

23   / / /

24   / / /

25   / / /

26   ─────────────────────

27   [6] *See* Facebook Help Center, "Download a copy of your information on Facebook," available at https://www.facebook.com/help/212802592074644; Facebook Help Center, "Review your Off-

28   Facebook activity," available at https://www.facebook.com/help/2207256696182627.

b. *Relevant Data Sources Identified in Public Engineering Documents, Court Filings, and Meta's Limited Production*

Meta has described the following additional relevant data sources in public engineering documents and court filings. Barnes Decl., ¶¶ 30-31, 33, 35, 37-38, 40-41.

1. "Shared Foundations: Modernizing Meta's Data Lakehouse"

In January 2023, Meta engineers published a white paper describing how Meta "transformed the legacy data lake-house stack at Meta" to create "a more modern data architecture." Barnes Decl., ¶ 30, Ex. 5. The paper illustrates the "high level schematic" of the architecture, including "Logs" containing data originating from "WWW" (*e.g.*, web-properties that deploy the Pixel):



Figure 1: High-level data flow: Meta's data lakehouse stack.

*Id.*, ¶ 31.

To date, Meta has not produced any documents identifying or concerning the logs identified in the paper. *Id.*, ¶ 32.

2. TAO

Meta's engineering website describes "The Associations and Objects" ("TAO") as "one of the most important data stores at Facebook[.]"[7] Meta characterizes TAO as a "data store for the

---

[7] Engineering at Facebook, "TAO:: The power of the graph," available at
https://engineering.fb.com/2013/06/25/core-data/tao-the-power-of-the-graph/

social graph," *i.e.*, a graph derived from users' comments, check-ins, likes, and other activities. *Id.*; Barnes Decl., ¶ 33, Ex. 6. The graph allows internal and external developers to store, cache, and query the graph. *Id*. Meta illustrates an example of a TAO graph:[8]



To date, Meta has not produced any documents concerning TAO. Barnes Decl., ¶ 34 .

3. MySQL

In *Consumer Privacy*, Meta describes MySQL as "TAO's backbone" that "provides transactional and availability properties to columnar data" such as "a user's comment," "comment id, user id, and type of reaction." Barnes Decl., ¶ 35, Ex. 6.

To date, Meta has not produced any documents concerning MySQL. *Id.*, ¶ 36.

4. ZippyDB/Akkio, Memcache, and Laser

In *Consumer Privacy*, Meta identified ZippyDB/Akkio, Memcache, and Laser as additional data sources associated with TAO. Barnes Decl., ¶ 37, Ex. 6. For instance, Meta described Laser as

---

[8] Engineering at Facebook, "TAO:: The power of the graph," available at
https://engineering.fb.com/2013/06/25/core-data/tao-the-power-of-the-graph/

"an indexing service" that reads and indexes data on a per user basis to "support first-party (i.e. Meta) products." *Id.*, ¶ 38, Ex. 6.

To date, Meta has not produced any documents concerning these sources. *Id.*, ¶ 39.

5. Puma, Swift, & Stylus

Meta published a paper titled "Realtime Data Processing at Facebook" that explains how Meta uses realtime data processing systems. Barnes Decl., ¶ 40. The paper identifies Meta's "stream processing systems" that support the realtime data processing as "Puma, Swift, and Stylus." *Id.* Meta's paper illustrates an overview of the systems:



Figure 1: An overview of the systems involved in realtime data processing: from logging in mobile and web products on the left, through Scribe and realtime stream processors in the middle, to data stores for analysis on the right.

*Id.*, ¶ 41, Ex. 7.

To date, Meta has not produced any documents concerning Puma, Swift, or Stylus. *Id.*, ¶ 42.

6. Log Sources Identified in Meta's Production

Meta produced an internal document ███████████████████████ ████████████. Barnes Decl., ¶ 54, Ex. 17 (PIXEL_HEALTH00000064). However, other than the fact that these data sources are identified in Ex. 17, Meta has not produced any other information about them. *Id.*, ¶ 55.

## 2.   **Meta's Omissions – The Pixel Filter**

Meta's production is also deficient in that it omits discovery related to the Pixel Filter, a tool that Meta has acknowledged would impact the data flow. Specifically, in its opposition to Plaintiffs'

10

motion for preliminary injunction, Meta argued that its "filter" alters the flow of Pixel data. *See* Declaration of Tobias Wooldridge, Dkt. 76-1 at ¶ 8 ("the filter prevents that detected data from being ingested into Meta's ads ranking and optimization systems."). In denying Plaintiffs' motion, the Court noted that without the benefit of discovery, the Court had "no reason not to credit Meta's assertions[.]" Dkt. 159 at 31-32. However, the Court stated, "[d]iscovery will eliminate some of these unknowns. . .Should plaintiffs learn that Meta's filtration system is indeed ineffective or that Meta can readily refine its systems to block the patient information at issue here, the balance of equities may at that point tilt in favor of an injunction." *Id.* at 32. Clearly, documents related to the Filter, its design, and its effectiveness (or lack thereof), are all directly relevant to Meta's core defense. The Court's order on the motion to dismiss made similar statements. Dkt. 316 at 4-5 ("What Meta's true intent is, what steps it actually took to prevent receipt of health information, the efficacy of its filtering tools, and the technological feasibility of implementing other measures to prevent the transfer of health information, all turn on disputed questions of fact that need development on a full evidentiary record.").

To date, Meta's document productions contained only a single document concerning the purported filter and no documents regarding its data flow. Barnes Decl., ¶ 43.[9] Furthermore, when Meta made a limited set of its source code available for review, it failed to produce any source code related to the Filter. *Id.*, ¶ 49.

---

[9] On July 7, 2023, Meta produced a list of Filter keywords in an Excel spreadsheet. Barnes Decl., ¶ 44, Ex. 8. This document was produced only after Plaintiffs stated that they would move to compel immediate production if Meta continued to delay production of the Filter keyword list that Meta relied upon and referenced in opposition to the motion for preliminary injunction. *Id.* The produced document, however, appears to be created by counsel. Upon receipt, Plaintiffs immediately inquired as to whether the Excel spreadsheet was counsel created. *Id.*, ¶ 45, Ex. 9 (7/18/23 letter). Meta refused to answer. On July 19, 2023, Plaintiffs served four follow up Requests for Production seeking the underlying documents from which the Excel spreadsheet was created. *Id.*, ¶ 46, Ex. 10. Meta responded that it would produce those documents but to date has not produced any responsive documents nor provided any timeframe for production, despite Plaintiffs' repeated (at least four different) inquiries. *Id.*, ¶¶ 47-48, Ex. 11 (8/21/23 letter), Ex. 12 (9/14/23 letter), Ex. 13 (9/18/23 letter), Ex. 14 (9/22/23 letter).

MOTION TO ENFORCE THE COURT'S JUNE 13, 2023 ORDER
CONSOLIDATED CASE NO. 3:22-cv-03580-WHO (VKD)

### 3.    <u>Meta's Omissions – Fields</u>

RFP No. 7 requests documents identifying and describing fields in relevant data sources, but Meta's production to date has omitted this category of discovery entirely. Barnes Decl., ¶ 5.

Meta has not produced any information on fields stored in the Hive, Switchboard, DYI/DYD, Everstore, Manifold, Scuba, TAO, MySQL, ZippyDB/Akkio, Memcache, Laser, Puma, Stylus, or Swift. Barnes Decl., ¶ 56(a). Nor did it produce information on fields in the ███████ that Meta's limited production identified as containing Pixel data. *Id.*, ¶ 56(c).

Meta produced another document that references data sources "███████" and "███████." *Id.*, ¶ 52, Ex. 16. Public engineering documents from Meta suggest that "███████" is an important data source for this case. In a public post about "Scribe," Meta states that its "hardware infrastructure comprises millions of machines, all of which generate logs that we need to process, store, and serve."[10] Meta explains that, "eventually, every log makes it to one of Scribe's back-end servers," which is called "LogDevice, a distributed store for logs."[11] Then, "[o]nce LogDevice persistently stores a record in a partition, the record becomes available for reading."[12] Although "Scribe retains records in LogDevice for a limited amount of time – typically a few days, … [c]ustomers that require retention for longer than a few days typically push their logs to long-term storage."[13] Other public documents place Scribe at the heart of Meta's log storage systems. "Tulip: Schematizing Meta's Data Platform" illustrates that Scribe sends data to a "Data analytics reading library":[14]

---

[10] Engineering at Meta, "Scribe: Transporting petabytes per hour via a distributed, buffered queueing system," available at https://engineering.fb.com/2019/10/07/data-infrastructure/scribe/

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Engineering at Meta, "Tulip: Schematizing Meta's data platform," available at https://engineering.fb.com/2022/11/09/developer-tools/tulip-schematizing-metas-data-platform/.

The same document states that "logging schema are published to various systems in the data platform" at Meta that "is translated into a serialization scheme" that "holds lists of (field name, field type, field ID) for a corresponding logging schema as well as the field history."



*Id.*

These documents suggest that responsive documents are readily available at Meta. Yet, Meta did not produce any documents about fields in ██████ or ██████. Barnes. Decl., ¶ 53.

Further, Meta's production indicates ████████████████████████████████

████████████████████████████." *Id.*, ¶ 50, Ex. 15. Similarly, Meta's public developer documentation identifies that it stores data collected from the Pixel and other sources in "containers."[15] Meta did not produce any documents identifying the ████████ or containers that contain relevant data or the fields within them. Barnes Decl., ¶¶ 51, 56 (d), (e).

---

[15] Meta for Developers, "Conversions API for App Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/app-events.

In addition, Meta's production does not contain any documents identifying fields relating to inferred or derived data (as opposed to raw data) that is comingled with Pixel data. *Id.*, ¶ 56(f).

Finally, Meta omitted documents concerning a number of fields disclosed in *Consumer Privacy*, and which Plaintiffs inquired about in early preservation discussions. *Id.*, ¶ 56(g). These fields include UserID, Replacement ID, Separable ID, and App Scope Identifiers. *Id.*, ¶ 56(g), Ex. 19.

Months after Plaintiffs notified Meta of its deficiencies, Meta offered to provide Plaintiffs with a list of fields that would be created for purposes of this litigation. *Id.*, ¶ 71. Plaintiffs reiterated that RFP No. 7 requests the underlying documents that identify the fields and which Meta would presumably rely upon to create its list. *Id.*; *see also id.*, ¶ 72, Ex. 31 (9/1/23 letter). Meta, one of the largest data companies in the world, responded that no such documents exist. *Id.*, ¶ 73, Ex. 34 (9/15/23 letter). This response conflicts with the public document above, which states that "logging schema are published to various systems in the data platform" at Meta that "is translated into a serialization scheme" that "holds lists of (field name, field type, field ID) for a corresponding logging schema as well as the field history."

### 4.     The Parties' Discussions Regarding RFP Nos. 5-7

On July 7, 2023, Plaintiffs sent Meta detailed correspondence that explained the above omissions in Meta's production. Barnes Decl., ¶ 58, Ex. 20 (7/7/23 letter); *see also id.*, ¶ 57, Ex. 19 (7/3/23 email). Ten days later, Meta responded that it was "coordinating to find available" dates for a meet and confer. *Id.*, ¶ 59, Ex. 21 (7/17/23 email). Over the course of six weeks, Plaintiffs sent Meta a total of eight letters, requesting that Meta engage in discussions on the issue. *Id.*, ¶ 57, Ex. 19 (7/3/23 email), ¶ 58, Ex. 20 (7/7/23 letter); ¶ 60, Ex. 22 (7/24/23 letter), ¶ 61, Ex. 23 (7/31/23 letter), ¶ 62, Ex. 24 (8/2/23 letter), ¶ 64, Ex. 25 (8/7/23), ¶ 65, Ex. 26 (8/14/23 letter), ¶ 66, Ex. 28 (8/19/23 letter). Meta responded that it "continued to investigate" additional responsive documents but it had "not identified any such documents." *Id.* ¶ 63, Ex. 25 (8/5/23 letter). Finally, on August 28-29, 2023, the parties met and conferred. *Id.* ¶ 69. At the conference, Meta repeated that it was investigating the issues raised in Plaintiffs' letters. *Id.* Plaintiffs explained again that Meta's clearly insufficient production violated the Court's order. *Id.* However, for the first time, Meta also stated

that based on the "phrasing" of Plaintiffs' Requests, it was unaware of any responsive documents other than the 19 already produced. *Id.*

There is no reason for any confusion: data flow, data sources, and fields have been an issue of discovery since the start of this case. *See, e.g., id.*, ¶¶ 74-76, Ex. 33 (3/14/23 Hr'g Tr.); Ex. 2 (3/23/23 letter); ¶ 80, Ex. 35 (4/4/23 letter); ¶¶ 85-87, Ex. 37 (4/20/23 Hr'g Tr.); ¶ 89, Ex. 39 (4/26/23 letter); ¶¶ 91-94, Ex. 40 (5/23/23 Hr'g Tr.); ¶ 97, Ex. 42 (5/31/23 letter). In short, the data flow, data sources, and fields information at issue have been discussed repeatedly and at length and undermine the belated claims of confusion as to "phrasing."

There is no reason for any confusion: data flow, data sources, and fields have been an issue of discovery since the start of this case. *See, e.g., id.*, ¶¶ 74-76, Ex. 33 (3/14/23 Hr'g Tr.); Ex. 2 (3/23/23 letter); ¶ 80, Ex. 35 (4/4/23 letter); ¶¶ 85-87, Ex. 37 (4/20/23 Hr'g Tr.); ¶ 89, Ex. 39 (4/26/23 letter); ¶¶ 91-94, Ex. 40 (5/23/23 Hr'g Tr.); ¶ 97, Ex. 42 (5/31/23 letter). In short, the data flow, data sources, and fields information at issue have been discussed repeatedly and at length and undermine the belated claims of confusion as to "phrasing."

### 5. <u>Why the Information Is Critical</u>

As a threshold matter, Meta's boilerplate relevance objection is insufficient to preserve an actual objection to production, and even if it was sufficient, Meta forfeited any such objection by explicitly agreeing to produce the discovery Plaintiffs sought. Nevertheless, Plaintiffs believe it is important for the Court to understand why the documents are not just relevant, but foundational to this case and the rest of discovery. Their importance is underscored by the facts that (1) Plaintiffs moved to compel a date certain by which they would be produced—prior to production of any other documents; (2) Plaintiffs told the Court in response to its request for views on a Special Master for preservation issues, that no Special Master would be necessary so long as Meta produced the documents responsive to these RFPs; and (3) the Court's orders on the motion for preliminary injunction and motion to dismiss emphasize the need for a "full evidentiary" record on Meta's systems and how they work. Plaintiffs have repeatedly emphasized the importance of these documents for several reasons:

/ / /

1       *First*, how Meta actually uses the at-issue health information is relevant to all claims and

2   defenses. Plaintiffs' expert, Dr. Libert, explains that it is not possible to do an adequate investigation

3   of how Meta actually uses the at-issue data in the absence of the documents requested in RFP Nos.

4   5-7. Libert Decl. ¶ 14.

5       *Second*, Meta has indicated that its primary defense will be intent – specifically, that it did

6   not intend to collect the at-issue data and is doing the best it can to prevent such data from being

7   used. *See, e.g.,* Dkt. 232 (Defendant Meta Platforms, Inc.'s Notice of Motion and Motion to Dismiss

8   Consolidated Class Action Complaint ("Meta MTD") at 5-6. Evidence of Meta's collection, data

9   flow, and different uses of the at-issue data are therefore critical to rebut Meta's intent defense. *See*

10  Libert Decl. ¶ 15. The documents Plaintiffs requested should exist inside Meta as a matter of

11  standard operating procedure to ensure that its systems abide by its statements and purposes. "Step

12  1" of a privacy typical audit involves taking a "data inventory" that involves preparation of "a

13  flowchart that depicts the flow of personal information, including inputs, processing, points of

14  storage, outputs, personnel, and/or third parties that are involved in various aspects of the flow, as

15  well as who could access the personal information."[16] The reason is simple: "documentation of the

16  data flows can … identify any points in the data flow that represent significant inherent risks and

17  whether mitigating controls exist for those risks."[17] To be effective, the "flowchart should identify

18  the information system components (networks, applications, databases, end-user computing, etc.),

19  used in receipt, processing, storage, access, and reporting of personal information."[18] Under the

20  Generally Accepted Privacy Principles adopted by the American Institute of Certified Public

21  Accountants, "[t]he information compiled in the data inventory … *is necessary* for the organization"

22  to conduct a risk assessment.[19]

23  / / /

24

25  [16] Journal of Accountancy, "GAPP Targets Privacy Risks," available at
    https://www.journalofaccountancy.com/issues/2011/jul/20103191.html.

26  [17] *Id.*

27  [18] *Id.*

28  [19] *Id.* (emphasis added).

*Third*, Meta has argued that it cannot be liable for an interception under the ECPA because healthcare providers consented to collection of this information. *See* Meta MTD at 6-9. Plaintiffs disagree. However, even if true, an exception exists if the communication was "intercepted for the purpose of committing any criminal or tortious act[.]" 18 U.S.C. § 2511(2)(d). Evidence of the data flow, fields, and backend systems containing the at-issue data is critical to the "criminal or tortious" element of 18 U.S.C. § 2511(2)(d).

*Fourth*, evidence regarding dataflow and fields in these systems is relevant to show the extent to which the at-issue data is identifiable at collection and afterwards, which is a key component of standard privacy audit frameworks. For example, the Generally Accepted Privacy Principles (GAPP) were created by the American Institute of Certified Public Accountants, Inc.[20] to help "facilitate privacy compliance and effective privacy management" of companies that collect and maintain the personal information of individuals.[21] GAPP establishes basic principles for the management of privacy programs; the auditing privacy programs; and the measurement of the performance of privacy programs.[22] "Step 1" to applying these principles is "[u]nderstanding the data associated with personal information is useful for identifying the processes that involve or could involve personal data, and for the owner of those processes."[23] The reason understanding "end-to-end" data flow is critical, is because, once that is accomplished, an auditor can truly understand the specific personal information the organization collect; uses in carrying out business; and how the information is "obtained, captured, stored, and transmitted."[24] In other words, end-to-end data flow is critical to exactly what Plaintiffs endeavor to do here: understand and audit Meta's data flow as it relates to its legal and contractual obligations related to personal health information. If the at-issue

---

[20] Generally Accepted Privacy Principles, available at
https://bcourses.berkeley.edu/courses/1457298/files/70759534/download.

[21] *Id.* at iii-iv.

[22] *Id.* at 8.

[23] Journal of Accountancy, "GAPP Targets Privacy Risks," available at
https://www.journalofaccountancy.com/issues/2011/jul/20103191.html.

[24] *Id.*

data is collected and stored in systems that contain fields that are tied to a User ID and have a sufficient level of "entropy," those fields can be used to tie the at-issue data back to the individual user even if the Facebook User ID is removed. For example, evidence produced in the *Consumer Privacy* case suggests that, so long as a person keeps their Facebook account, Meta *never* fully de-identifies the information it has collected about them. Barnes Decl., ¶ 98, Ex. 43.

GAPP also highlights the need for businesses to create an intelligible classification process which identifies sensitive information and applies "[s]pecific security and privacy policies and procedures" for such information.[25] Again, Plaintiffs are trying to understand whether Meta's filtering process is functional and competent given that it is the foundation of Meta's defense. And, again, understanding the end-to-end data flow of information which flows—or does not flow—through the filter is essential to evidence of this defense.

*Fifth*, the requested documents are likely relevant to show how much Meta profited from its conduct, for individual class members and for the class as a whole. Plaintiffs reasonably believe that Meta may maintain logs with revenue information attached to individual users and specific data collection actions, including its collection and use of at-issue data. Similarly, Plaintiffs reasonably expect that Meta may track conversions to take credit for user actions based on seeing an ad on Facebook or the Facebook Audience Network that was placed by a healthcare provider. Such information is foundational to discovery into damages and unjust enrichment.

*Sixth*, the requested documents are likely to contain evidence relevant to Meta's geo-location defense under California statutory claims, for which Meta argues Plaintiffs must show a sufficient nexus to activity that took place in California. Meta MTD at 10, 12. For Plaintiffs Cal. Pen. Code § 631 claim, Meta states that the statute requires actions that occur "while the [communication] is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." Plaintiffs reasonably expect that Meta will have logs indicating the location of the patient, the healthcare provider's webserver, and Meta's servers involved in the interception,

---

[25] Generally Accepted Privacy Principles, p. 14-15, available at https://bcourses.berkeley.edu/courses/1457298/files/70759534/download.

processing, and storage of the at-issue data.

*Seventh*, the requested documents are likely to contain evidence relevant to the creation and use of user profiles with at-issue data. Meta's documents produced here (and in other litigation) ███████████████████████████████████████████████████████████████████████████████ ████. *See* Barnes Decl., ¶ 50, Ex. 15. Plaintiffs reasonably believe that the ████████ can be and is used to create user profile information for purposes of targeted advertising. Meta claims that it does not use the at-issue information for such purposes. If true, the requested documents will likely support Meta's defense. If not true, the requested documents will inform how such profiles are formed and used.

*Eighth*, the requested documents may contain evidence of intentional wrongdoing via the placement of certain characterizations of the data in the logs. For example, ███████████ ████████████████████████████████████████████████, Barnes Decl., ¶¶ 99-100, Exs. 44 & 45,[26] and claims that it flags certain information tagged as potentially sensitive health information by the Filter, Dkt. 142-1, Suppl. Wooldridge Decl., ¶¶ 22-26. It is highly relevant if Meta keeps a record of such information in fields associated with the at-issue data. The existence of such fields alongside Meta's continued use of the at-issue data in any fashion is proof of intent and relevant to whether it was tortious or criminal intent for the interception.

/ / /

---

[26] After multiple conferences, Meta provided an amended answer to Interrogatory Nos. 1 and 3 identifying the raw number of advertisers in certain health-related verticals. Barnes, Decl., ¶ 101. Plaintiffs responded by requesting that Meta identify the actual entities classified as health-related either via verticals or the Filter, consistent with the Court's statements at the hearing on the parties' Joint Letter Brief filed at Dkt. 223 and the Court's Order at Dkt. 278 (ordering parties, on June 16, 2023, to confer "about whether Meta can provide information—e.g. a list of entities served by the Health Division, websites or web pages identified by the filter mechanism, and any health-related classifications used by Meta"). *Id.*, ¶ 102. After additional conferences, the parties reached impasse on the issue of whether Meta would identify the actual entities rather than provide a raw number. *Id.*, ¶ 103, Ex. 30. On August 30, 2023, Plaintiffs sent Meta a letter noting the impasse and requesting a briefing schedule. *Id.* Meta requested another conference. *Id.*, ¶ 104. On September 1, 2023, Meta agreed to produce the actual lists, not just the raw numbers. *Id.*, ¶ 104, Ex. 31. Despite repeated requests that Meta inform Plaintiffs when it would provide those lists, Meta has thus far failed to provide the lists or even a date by which it will do so. *Id.*, ¶¶ 105-106, Exs. 12, 13, & 14.

*Ninth*, the requested documents will inform the parties' ongoing discussions about preservation. To date, Meta has told Plaintiffs that it is ███████████████████████████████ ███████████████████████████████████████. *See* Barnes Decl., ¶ 10, ¶ 77, Ex. 34 (3/21/23 letter).[27] Meta has also stated that ███████████████████████████ ███████████████████████████████." Barnes Decl., Ex. 3 (5/18/23 letter). Plaintiffs are concerned that Meta has engaged and continues to engage in the destruction of relevant absent class member data. Plaintiffs seek the information in RFP Nos. 5-7 to determine other locations where Meta stores information relating to the at-issue data so that those locations may be considered for preservation. Public documents from other litigation indicate that Meta never destroys or de-identifies certain information so long as a person remains a Facebook user. Barnes Decl., ¶ 98, Ex. 43 (*Consumer Privacy*, Dkt. 1103-1, p. 12). Documents about these sources would be relevant to ensure that Meta is engaged in adequate preservation.

*Tenth*, the requested documents are critical to Plaintiffs' request for injunctive relief – that Meta destroy all remnants of the at-issue data in its systems. To determine the data that needs to be destroyed, Plaintiffs (and Meta) must first be able to track all the places where at-issue data resides in Meta's systems. Libert Decl. ¶ 16. A full response to RFP Nos. 5-7 should resolve this issue.

*Eleventh*, the requested documents will be critical to a class notice and a claims administration process in the event of settlement. Ascertainability is not an element of class certification, but it is still important for class notice and claims administration. Discovery into Meta's dataflow, fields, and systems for storing at-issue data are critical to determine the best way to identify all or substantially all absent class members, how they can be provided notice, paid in the event of a verdict or settlement, and verified as class members as part of a claims process.

*Twelfth*, discovery of this information is critical to discover whether and how Meta applies any actual privacy controls to the at-issue data, including through use of the purported Filter. Dr. Libert, who has academic and real-world experience in such audits, explains that it is not possible

---

[27] Meta subsequently indicated orally ████████████████████████████████████████ ████████████████████████████████████████████ Barnes Decl., ¶ 77 at fn. 1.

to conduct an adequate systems-privacy audit in the absence of robust production the information requested by RFP Nos. 5-7. *See* Libert Decl. ¶¶ 11, 15, 19-26.

*Finally*, Plaintiffs sought production of this information *early* in the discovery process because it will inform and guide the remainder of discovery – including additional discovery requests, additional requests for custodians, who Plaintiffs will choose to depose, and the specific questions they will ask of those chosen deponents. Plaintiffs will be significantly prejudiced if these documents are not produced until later in the litigation because they will have been deprived of the opportunity to craft a discovery plan with the documents that Plaintiffs' expert Timothy Libert states are the most important documents to determine how Meta uses the information—and whether the Filter has any impact at all.

## III.   LEGAL STANDARDS

"Federal Rule of Civil Procedure 37(b)(2) gives a district judge discretion to 'make such orders ... as are just' in regard to a party's failure to obey a discovery order." *Valley Engineers Inc. v. Elec. En'g Co*., 158 F.3d 1051, 1056 (9th Cir. 1998) (quoting Fed. R. Civ. P. 37(b)(2)). Bad faith is not required to obtain relief. *See Hyde & Drath v. Baker,* 24 F.3d 1162, 1171 (9th Cir. 1994), as amended (July 25, 1994). Furthermore, "[t]he Court has the inherent authority to enforce its orders." *Apple Inc. v. Samsung Elecs. Co*., No. 11-CV-01846-LHK, 2018 WL 1586276, at *20 (N.D. Cal. Apr. 2, 2018).

## IV.   ARGUMENT

Meta's production in response to the Court's June 13th order is plainly deficient. The documents produced are largely pulled from Meta's public websites and do not contain any of the information about fields or data sources expressly called-for in Plaintiffs' requests. Although some data flow documents were produced, those documents are also not sufficient because they do not identify impacts of the Filter or how data flows to, from, or within systems Meta has identified as "███████████" and/or "███████████████████" including, but not limited the ███ ████████████████. The production also excludes known data sources that have been the subject of discussions among the parties. When Plaintiffs raised these deficiencies, Meta continued to delay without offering explanation.

Meta's deficient production is not the result of overly narrow discovery requests or a misunderstanding about the scope of Plaintiffs' Requests. Plaintiffs have repeatedly inquired about specific data sources and fields. *See* Barnes Decl., Ex. 2 (3/23/23 letter) (identifying Hive, Scuba, Switchboard, DYI, Manifold, Everstore, User ID, Replacement ID, Separable ID, App-Scoped ID); Ex. 35 (4/4/23 letter); Ex. 20 (7/7/23 letter). Plaintiffs have further stressed the need for "a robust disclosure process up front for this backend [data] system discovery[.]" *Id.*, ¶ 76, Ex. 33 (3/14/23 Hr'g Tr.). Meta suggested it understood: "[W]e are trying to figure out where the data is for all of these cases, and there's a lot of data; but we have every intention of understanding what it is they want and making sure that we are preserving it or talking to them about, you know, where it may be difficult to do so." Barnes Decl., ¶ 86; Ex. 37 (4/20/2023 Hr'g Tr.). And indeed, the Court understood that Meta had agreed to produce responsive documents.

At no point since the Court's June 13th order did Meta seek reconsideration. Nor did Meta at any time raise to Plaintiffs that it did not believe it was under an obligation to produce the information identified in RFP Nos. 5-7, discussed at length during several meet-and-confers and letters, and described by Meta itself as relevant to this case. Nevertheless, Meta has failed to produce information central to basic understanding of its data collection, use, storage, and filtration systems.

Plaintiffs' efforts to resolve this matter without the Court's assistance have failed. There is no indication that Meta will produce any further documentation without judicial intervention, much less that any production would be at any time soon. At this point, the parties are closer to the close of fact discovery than they are to the date RFP Nos. 5-7 were served.

Because Meta agreed and was ordered to produce responsive documents by June 30, 2023, there is nothing left for Plaintiffs to do but seek the Court's assistance in ordering production of this information that is foundational to the litigation—again.

## V.  CONCLUSION

Plaintiffs respectfully request the Court order Meta to comply with the June 13th Order by producing documents responsive to RFP Nos. 5-7, including but not limited to:

1.  Documents concerning Hive, DYI/DYD, Switchboard, Everstore, Manifold, Scuba, logs referenced in Meta's January 2023 white paper titled "Shared Foundations: Modernizing

Meta's Data Lakehouse," containers, ██████, ██████, ██████, TAO, MySQL, ZippyDB/Akkio, Memcache, Laser, Puma, Stylus, Swift, and the filter identified in Meta's opposition to Plaintiffs' motion for preliminary injunction, as well as any other data source as yet unknown to Plaintiffs due to Meta's failure to produce responsive documents;

2.      The fields within each data source identified, including derived and inferred fields; and

3.      Corresponding data flow, including through Meta's backend systems such as Hive and the list included in paragraph 1.

Plaintiffs request that the order specify that Meta must produce this information by no later than November 14, 2023, or at a time the Court considers reasonable, as well as all other forms of relief, including monetary sanctions, a finding of contempt, or any other relief the Court deems appropriate.

Dated: October 3, 2023

By: /s/ Jay Barnes

**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
  *jaybarnes@simmonsfirm.com*
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:    212-784-6400
Fax:    212-213-5959

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Geoffrey Graber, State Bar No. 211547
  *ggraber@cohenmilstein.com*
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel:    202-408-4600
Fax:    202-408-4699

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
  *koncius@kiesel.law*
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel:    310-854-4444
Fax:    310-854-0812

**TERRELL MARSHALL LAW GROUP PLLC**
Beth E. Terrell, State Bar No. 178181
  *bterrell@terrellmarshall.com*

23

936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.:   206-816-6603
Fax:    206-319-5450

**GIBBS LAW GROUP LLP**
Andre M. Mura, State Bar No. 298541
  *amm@classlawgroup.com*
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.:   510-350-9700
Fax:    510-350-9701

1

## <u>CIVIL L.R. 5-1(h)(3) ATTESTATION</u>

2

Pursuant to Civil Local Rule 5-1(h)(3), I, Jeffrey A. Koncius, hereby attest under penalty

3

of perjury that concurrence in the filing of this document has been obtained from all signatories.

4

Dated: October 3, 2023

*/s/ Jeffrey A. Koncius*
Jeffrey A. Koncius

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28