| | |
|---|---|
| Jason 'Jay' Barnes (admitted *pro hac vice*)<br>  jaybarnes@simmonsfirm.com<br>**SIMMONS HANLY CONROY LLC**<br>112 Madison Avenue, 7th Floor<br>New York, NY 10016<br>Tel:     212-784-6400<br>Fax:    212-213-5949 | Geoffrey Graber, State Bar No. 211547<br>  ggraber@cohenmilstein.com<br>**COHEN MILSTEIN SELLERS & TOLL PLLC**<br>1100 New York Avenue NW, Fifth Floor<br>Washington, DC 20005<br>Tel:     202-408-4600<br>Fax:    202-408-4699 |
| Jeffrey A. Koncius, State Bar No. 189803<br>  koncius@kiesel.law<br>**KIESEL LAW LLP**<br>8648 Wilshire Boulevard<br>Beverly Hills, CA 90211<br>Tel:     310-854-4444<br>Fax:    310-854-0812 | Beth E. Terrell, State Bar No. 178181<br>  bterrell@terrellmarshall.com<br>**TERRELL MARSHALL LAW GROUP PLLC**<br>936 North 34th Street, Suite 300<br>Seattle, WA 98103<br>Tel.:    206-816-6603<br>Fax:    206-319-5450 |
| *Attorneys for Plaintiffs*<br>JOHN DOE, JANE DOE I, JANE DOE II, and JOHN DOE II, and DOE, on behalf of themselves and all others similarly situated<br><br>[*Additional counsel listed on signature page*] | Andre M. Mura, State Bar No. 298541<br>  amm@classlawgroup.com<br>**GIBBS LAW GROUP LLP**<br>1111 Broadway, Suite 2100<br>Oakland, CA 94607<br>Tel.:    510-350-9700<br>Fax:    510-350-9701 |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>This Document Relates To:<br><br>All Actions | **Case No. 3:22-cv-03580-WHO (VKD)**<br><br>CLASS ACTION<br><br>**DECLARATION OF DR. TIMOTHY LIBERT IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS TO ENFORCE DKT. 275**<br><br>Judge: Hon. Virginia K. DeMarchi<br>Hearing Date: November 7, 2023<br>Hearing Time: 10:00 a.m.<br>Courtroom: 2, Fifth Floor |

**DECLARATION OF DR. TIMOTHY LIBERT**

I, DR. TIMOTHY LIBERT, hereby declare under penalty of perjury:

1. I am the owner of webXray LLC, a data protection and privacy engineering consultancy with a focus on litigation support, large-scale measurement of web tracking, and forensic measurement of data transmissions. The firm is run by me and we employ an additional expert in the advertising technology sector (Ms. Shoshana Wodinsky) who assists with specific types of investigations. This declaration is my sole work and reflective of my years of experience in this sector.

2. I submit this declaration in support of Plaintiffs' Motion to Enforce Dkt. 275, a discovery order relating to Plaintiffs' request for documents relating to data flow, data sources, and data fields in Meta's logging and other infrastructure systems.

3. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to them.

4. I reserve the right to modify, supplement, or otherwise amend my statements, analyses, and conclusions as new and additional information becomes available to me.

**I.   QUALIFICATIONS**

5. I am highly experienced in the areas of web technologies and data privacy. I have been designing, coding, and analyzing websites for the past 24 years, and I am fluent in several programming languages and data analysis techniques. I received my Ph.D. from the University of Pennsylvania in 2015 where I pursued interdisciplinary coursework and research in communications policy, computer science, law, business, and medicine. I completed my post-doctoral training at the University of Oxford where I studied the impact of Europe's General Data Protection Regulation on news websites. I was a Specialty Faculty Instructor at Carnegie Mellon University for three years where I taught several courses in the world's only Privacy Engineering program and conducted research into web tracking at the CyLab Security and Privacy Institute.

6. I have been researching the privacy implications of medical data on the web for over a decade and have published numerous academic studies on the topic and worked closely with

professors at the University of Pennsylvania's Perelman School of Medicine. I am well versed in the legal, ethical, and technical issues which pertain to data protection in the medical sector.

7. In addition to my consultancy and academic work, I have worked in the private sector as Staff Privacy Engineer at Google from 2018 to 2023. In this role, I oversaw internal privacy policies and technical enforcement mechanisms for cookies across all Alphabet products. I have written both polices and code, a rare combination which gives me unique insight into the issues at the center of this case.

8. Attached as **Exhibit A** is a current copy of my curriculum vita.

II. **ASSIGNMENTS AND CONCLUSION FOR THIS DECLARATION**

9. Plaintiffs have asked me to explain whether the information requested in Requests for Production Nos. 5-7 is necessary to my broader work in this case, which will be to investigate and explain the following:

　　a. Whether and how Meta uses the at-issue data after it is received by Meta's front-end servers;

　　b. Whether and how Meta protects the data in any fashion through any privacy programs, including the filter, and whether such systems produce verifiably correct outcomes;

　　c. Whether and how Meta can identify at-issue data; and

　　d. Whether and how Meta could comply with an injunction prohibiting the collection and/or use of the at-issue data.

10. As explained in further detail below, it is my opinion that the documents requested in RFP Nos. 5-7 are critical to these subsequent determinations. Put simply, it is not possible for myself or any other expert to investigate and explain Meta's use, filtering, or identification of at-issue data in the absence of providing a complete set of the documents requested.

11. In addition, if the privacy program is properly designed to be verified and audited, these documents should be readily available and easy to produce. If an end-to-end verification and audit trail does not exist, nobody, not even Meta, can say for sure if data is sufficiently protected.

## III. WHY THE DOCUMENTS REQUESTED ARE CRITICAL TO UNDERSTANDING HOW META USES, FILTERS, AND CAN IDENTIFY AT-ISSUE DATA TO COMPLY WITH AN INJUNCTION

12. Plaintiffs have alleged that Meta's has engaged in the unauthorized collection and *use* of health information from thousands of healthcare provider web-properties in the United States.[1] For the case as a whole, Plaintiffs have asked that I investigate and explain whether and how Meta collects and uses the at-issue data.

13. It is my understanding that, in response to Plaintiffs' allegations, Meta claims that it does not intend to collect or use the at-issue data and that it places certain controls on it. On this, I have been informed that the Court stated the following in a recent ruling:

> What's Meta true intent is, what steps it actually took to prevent receipt of health information, the efficacy of its filtering tools, and the technological feasibility of implementing other measure to prevent the transfer of health information, all turn on disputed questions of fact that need development on a full evidentiary record.

14. Based on my years of experience, it is not possible to do an adequate investigation of how Meta actually uses the at-issue data without the documents requested in RFPs 5-7. In fact, it is my opinion that no person of adequate education or experience would ever conduct an investigation into how a company uses a specific category of data in the absence of the information requested in RFPs 5-7.

15. It is also my opinion that no person of adequate education or experience could conduct a robust investigation into a company's claimed privacy program in the absence of these documents. It simply is not possible to analyze actual use or an actual privacy program without knowing precisely how the system is designed through data flow and data storage schematics and related information.

16. It is also my opinion that the dataflow, data storage, and data fields documents requested are vital to understand how Meta's systems work to investigate and explain whether and how Meta could comply with a Court order that it stop collecting such information in the first place

---

[1] As part of my work in this case, I have identified 1,844 such web-properties. It is my understanding that Plaintiffs provided this list to Meta through counsel.

– and stop using data in its systems that was either collected without authorization as alleged by the Plaintiffs or inferred or derived from unauthorized data collection.

17. I note that based on my investigations in this case thus far I have been able to observe HTTP request data entering Meta's systems and HTTP responses going back to the user's web browser.  This means that some form of backend processing is happening to the data.  The optimal means for Meta to prove they are not misusing data would be to simply return an HTTP error code when requests are received from pages with sensitive data (for example, a "403 Forbidden" could be issued for Pixel requests without unduly disrupting the user's experience).  However, this is not how Meta's systems work, thus placing the burden of demonstrating the existence of backend systems controls on Meta.

18. My opinions are based on my education and real-world experience conducting substantially similar investigations into data use and privacy systems.

19. In the course of any regulatory or litigation or internal data investigation, it is required that a company prove certain claims about how they use or protect user data. For example, if a company like Meta claims that certain user data is not used for ads targeting, the company must provide evidence to prove that point. As with many assertions, the claim itself is easy to make, but verifying such a claim can be quite difficult – for the company itself, as well as for regulators and litigants.

20. Fortunately, there is an ample body of guidance on how to audit the privacy properties of any given computer records system stretching back to the passing of the 1974 U.S. Privacy Act.  Since that law was passed, numerous guidelines and techniques for privacy analyses, variously called privacy audits, privacy impact assessments, or data protection impact assessments, have proliferated around the world.  For example, professional organizations such as the International Association of Privacy Professionals (IAPP),  the Future of Privacy Forum (FPF), and the Interactive Advertising Bureau (IAB) have a range of resources and publications regarding how

to measure the privacy and compliance properties of a given system.[2,3] Many U.S. federal agencies have similar instruction and guidelines,[4,5,6] technical standards bodies such as NIST and W3C provide detailed guidance,[7,8] and while non-U.S. data protection law is immaterial to this case, various regulators around the world provide easy to understand guidance on how to audit a system for compliance with a range of data protection.[9,10,11] Finally, academic research is constantly

---

[2] The International Association of Privacy Professionals, "Building a Privacy Risk Framework for Accountability Through PIAs", https://iapp.org/resources/topics/web-conferences/a0l1P00000FMXWWQA5/

[3] The Future of Privacy Forum, "Privacy Metrics Report", https://fpf.org/wp-content/uploads/2023/05/FPF-PrivacyMetricsReport-R10-Digital.pdf

[4] U.S. Department of Homeland Security, "Guide to Implementing Privacy", https://www.dhs.gov/xlibrary/assets/privacy/dhsprivacyoffice-guidetoimplementingprivacy.pdf

[5] Federal Trade Commission, "Protecting Personal Information: A Guide for Businesses", https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

[6] Bureau of Justice Assistance, "Guide to Conducting Privacy Impact Assessments for State, Local, and Tribal Justice Entities", https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/Guide%20to%20Conducting%20Privacy%20Impact%20Assessments_compliant.pdf

[7] The National Institute of Standards and Technology, "NIST PRIVACY FRAMEWORK: A TOOL FOR IMPROVING PRIVACY THROUGH ENTERPRISE RISK MANAGEMENT", https://www.nist.gov/system/files/documents/2020/01/16/NIST%20Privacy%20Framework_V1.0.pdf

[8] The World Wide Web Consortium, "Self-Review Questionnaire: Security and Privacy", https://www.w3.org/TR/security-privacy-questionnaire/

[9] U.K. Information Commissioner's Office, "Data Protection Impact Assessments (DPIAs)", https://ico.org.uk/for-organisations/uk-gdpr-guidance-and-resources/accountability-and-governance/data-protection-impact-assessments-dpias/

[10] Office of the Australian Information Commissioner, "Australian Privacy Principles Guidelines", https://www.oaic.gov.au/privacy/australian-privacy-principles/australian-privacy-principles-guidelines

[11] Office of the New Zealand Privacy Commissioner, "Privacy Impact Assessment Toolkit", https://privacy.org.nz/publications/guidance-resources/privacy-impact-assessment/

evolving, and there is a huge body of guidance found in the academic space.[12, 13, 14]

21. While the range of resources available is potentially daunting, the common features of all privacy assessments are as follows:

    a. <u>Data Lifecycle Analysis</u> – This is an analysis of the time period between which data is initially collected or created and when it is either destroyed or transformed in such a way to make it impossible to link back to the specific user.

    b. <u>Purpose Specification Analysis</u> – This is an analysis of the purposes to which data is used by a company, including those purposes that are (a) specified in advance of the data collection; and (b) provided to the data subject. This analysis requires asking whether the company has a policy about how certain data is used – and whether and how it informs the user about that purpose.

        i. Note that Meta *already* has such analysis available as they publicly state that cookies (which I believe includes the Meta Pixel _fpb cookie) are used for "Authentication", "Security", "Advertising", and other purposes. Meta should have no trouble identifying the systems and processes by which Meta Pixel data is processed for the above types of tasks which they have identified.[15] Furthermore, this type of analysis is a matter of daily routine for

---

[12] Roger Clarke, "An evaluation of privacy impact assessment guidance documents", https://academic.oup.com/idpl/article/1/2/111/664434

[13] Fred H. Cate, "The Failure of Fair Information Practice Principles", https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1156972

[14] Nissenbaum, Helen. *Privacy in Context: Technology, Policy, and the Integrity of Social Life*. Stanford University Press, 2009.

[15] https://www.facebook.com/help/336858938174917

anybody working in the data protection industry and should require virtually no effort for Meta to produce.[16,17]

c. <u>Purpose Limitation Analysis</u> – This analysis asks whether the at-issue data is used in accordance with the purpose specifications set forth by the company. This analysis requires examining how the company uses the information at every single stage of the data lifecycle.[18]

d. <u>Data Access Controls Analysis</u> – This analysis examines whether the company puts physical or other safeguards in place to protect the data against unauthorized uses. This includes administrative process by which individuals and systems are able to utilize data based on their role within the organization and what they intend to do with the data. Relatedly, it involves examination of any penalties for breaching the data access controls.[19]

22. Given the above factors, it is my opinion that: *Any efficacy claim about a data protection system must be backed by evidence that the purpose of data collection is specified in advance, the data is not used for other purposes without consultation with the data subject, there is a documented process for gaining access to data, clear penalties for misusing data, and that this is true for the entirety of the data's lifecycle.*

---

[16] Imane Fouad, Cristiana Santos, Feras Al Kassar, Nataliia Bielova, Stefano Calzavara, "On Compliance of Cookie Purposes with the Purpose Specification Principle", https://www.researchgate.net/publication/346374632_On_Compliance_of_Cookie_Purposes_with_the_Purpose_Specification_Principle

[17] The Organization for Economic Co-operation and Development, "OECD Privacy Principles", http://oecdprivacy.org/

[18] Max von Grafenstein, "The Principle of Purpose Limitation in Data Protection Laws: The Risk-based Approach, Principles, and Private Standards as Elements for Regulating Innovation", https://www.researchgate.net/publication/324540883_The_Principle_of_Purpose_Limitation_in_Data_Protection_Laws_The_Risk-based_Approach_Principles_and_Private_Standards_as_Elements_for_Regulating_Innovation

[19] Vincent C. Hu, Tim Grance, David F. Ferraiolo, D. Rick Kuhn, "An Access Control Scheme for Big Data Processing", https://csrc.nist.gov/csrc/media/projects/access-control-policy-and-implementation-guides/documents/big_data_control_access_7-10-2014.pdf

23. If the above aspects of a data claim are comprehensively detailed and provided to an investigator, claims about data use may be appropriately evaluated. However, if any of these aspects are not sufficiently detailed by the company, it is impossible to verify the company's claims about the data.

24. Similarly, it is incumbent on any company like Meta to document the above information for its own internal auditing purposes, to have enforcement mechanisms to ensure compliance, and to build technical monitoring systems to find and fix bugs, errors, and other issues that occur.

25. Specifically, with regards to investigating Meta's claims that the at-issue data is used properly, the following is required to be disclosed for the entire of the data lifecycle for a proper investigation:

   a. A pre-specified description of each use of the at-issue data. For example, the purposes described in Meta's public cookie disclosures.[20] A complete classification of uses should be exclusive (no overlap between uses) and exhaustive (all uses are accounted for).[21] Note that while a specifc cookie may have more than one use, the use categories themselves must be distinct.

   b. Specific and unambiguous documentation of each system and data store through which the at-issue data flows. For example, the process by which the data is gated at an HTTP front-end and how that data is transferred, re-directed, or accessed by other downstream systems.

   c. The precise purpose of each system and data store the at-issue data flow through or can be accessed by.

/ / /

/ / /

---

[20] https://www.facebook.com/help/336858938174917

[21] This is the accepted methodology. *See* Krippendorff, Klaus. "Agreement and information in the reliability of coding." Communication methods and measures 5.2 (2011): 93-112.

    d. The technical steps taken to ensure that systems with different purposes are not able to access the data from each other. For example, documentation of the mechanisms employed to ensure systems are isolated according to their purpose specification.

    e. Internal policies and procedures for employee and systems access to the aforementioned datastores, including but not limited to written policies, team-specific guidelines, processes for evaluating employee access requests, and what penalties are levied against employees who violate policy or instruct subordinates to violate policy.

    f. Precise documentation of monitoring for errors and bugs in the above processes, as well as any "post-mortem" reports which detail how such failures were detected and remediated.

    g. Any and all points at which the data lifecycle is terminated, either in regards to deletion or precise methods of aggregation/de-identification. This should include specific details as to data retention windows (e.g., if data is deleted or anonymized after 90 days).

26. The above forms of documents allow claims to be investigated on architectural and administrative levels. Further, the very existence and precise documentation indicated so-called "Privacy by Design" techniques have influenced the overall design and functioning of the systems (which is the currently accepted industry standard). The absence of such documents makes the investigation impossible. And, if it is true that the documents do not exist, there is no way for Meta *themselves* to verify *any* data protection claims.

27. If Meta discloses the above information, I will be able to investigate and determine their systems architecture and internal procedures. If Meta does not do so, I will not be able to.

28. If hired by Meta to conduct an internal audit, these are the exact same questions I would need answered. Likewise, if asked by Meta to design a system which would block incoming traffic at the earliest possible stage (thereby largely obviating the need for a deeper audit), I would be able to do so.

///

29. While I do possess a unique set of skills, based on my knowledge of the top-tier caliber of employees hired by Meta, I am fully confident they already have in-house expertise to accomplish all of the goals set forth above without any outside assistance whatsoever, as well as do so in a short amount of time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 2, 2023

_____
Dr. Timothy Libert