GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (admitted *pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (admitted *pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

ANDREW M. KASABIAN, SBN 313210
akasabian@gibsondunn.com
3161 Michelson Drive
Irvine, CA 92612 USA
Telephone:    (949) 451-3800
Facsimile:    (949) 451-4220

COOLEY LLP
MICHAEL G. RHODES, SBN 116127
rhodesmg@cooley.com
KYLE C. WONG, SBN 224021
kwong@cooley.com
CAROLINE A. LEBEL, SBN 340067
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION <br><br> This Document Relates To: <br><br> All Actions | Case No. 3:22-cv-3580-WHO-VKD <br><br> **DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS TO ENFORCE DKT. 275** <br><br> <u>CLASS ACTION</u> <br><br> Judge: Hon. Virginia K. DeMarchi <br> Date: November 7, 2023 <br> Time: 10:00AM <br> Courtroom 2, Fifth Floor |

REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 2

    A.    Plaintiffs Served RFP Nos. 5 to 7. ................................................................... 2

    B.    Meta Provided Informal Discovery Concerning Its Data Systems and Tools. ............. 3

    C.    Meta Produced Documents Responsive to RFP Nos. 5 to 7. ....................................... 5

    D.    Plaintiffs Objected to Meta's Production. ................................................................... 10

    E.    Meta Attempted to Resolve this Dispute, Plaintiffs Ignored Meta's Proposal, and Plaintiffs Instead Filed this "Motion for Sanctions." ............................................ 12

ARGUMENT ............................................................................................................................. 13

    A.    Meta Complied with the Court's Discovery Order. ................................................... 13

    B.    Plaintiffs' Arguments About Each Alleged "Data Source" Are Misguided. ............. 14

        1.    Hive Tables ..................................................................................................... 14

        2.    Scuba Tables ................................................................................................... 15

        3.    DYI/DYD ....................................................................................................... 16

        4.    Switchboard ................................................................................................... 16

        5.    Everstore and Manifold .................................................................................. 16

        6.    TAO ................................................................................................................ 17

        7.    MySQL ........................................................................................................... 17

        8.    ZippyDB/Akkio, Memcache, Laser ............................................................... 17

        9.    Puma, Swift, and Stylus ................................................................................. 18

        10.    █████████ ................................................................................................ 18

        11.    EventScribe/Scribe and LogDevice ............................................................... 18

        12.    "█████████" and "Containers" ................................................................... 19

        13.    "Log Sources" ................................................................................................ 19

        14.    "Meta's Data Lakehouse" .............................................................................. 19

        15.    The Health Filter ............................................................................................ 19

C.      Plaintiffs' Remaining Arguments About Why They Need Additional
        Documents in Response to these RFPs Are Misguided. ............................................ 21

D.      Plaintiffs' Sanctions Request is Improper. .................................................................. 23

CONCLUSION ............................................................................................................................. 24

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**CASES**

4

*Am. Unites for Kids v. Rousseau,*
    985 F.3d 1075 (9th Cir. 2021)......................................................................................24

5

6

*Gabriela Zarate v. Victory Packaging, LP, et al.,*
    2023 WL 6190706 (C.D. Cal. Aug. 14, 2023)................................................................13

7

8

*Garcia v. City of Imperial,*
    2010 WL 1337224 (S.D. Cal. Apr. 5, 2010)............................................................13, 15

9

10

*In re Google RTB Consumer Priv. Litig.,*
    2023 WL 3170566 (N.D. Cal. Apr. 28, 2023) ................................................................22

11

*Reinsdorf v. Skechers U.S.A., Inc.,*
    296 F.R.D. 604 (C.D. Cal. 2013) ..................................................................................13

12

13

*In re Takada,*
    2022 WL 4913183 (N.D. Cal. Oct. 3, 2022)..................................................................13

14

*In re Toyota Motor Corp. Sec. Litig.,*
    2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ..............................................................13

15

16

*United States v. DAS Corp.,*
    18 F.4th 1032 (9th Cir. 2021) .......................................................................................24

17

**RULES**

18

Civ. L.R. 37-4 ........................................................................................................................23, 24

19

20

**OTHER AUTHORITIES**

21

*Primer on Crafting eDiscovery Requests with "Reasonable Particularity,"* The Sedona Conference
    (Nov. 2021) ....................................................................................................................14

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiffs' motion to compel—misleadingly and groundlessly stylized as a motion for sanctions—should be denied. Meta satisfied the three requests for production at issue and has fully complied with the Court's June 13, 2023 order. Dkt. 275.

The three requests seek documents "sufficient to" show or identify (1) the *data flow* by which Meta *receives* information via the Meta Pixel (RFP No. 5); (2) the *data "sources"* where that information is received, redirected, and stored (RFP No. 6); and (3) the *fields* included in those sources (RFP No. 7). In response, Meta produced detailed schematics and documentation that catalogue how data received via the Pixel enters into—and flows through—Meta systems, identifying systems and databases by name (RFP Nos. 5 and 6). And Meta produced documentation showing fields and types of events that Meta receives from third-party developers via the Pixel and which Meta may store (RFP No. 7). Although Meta has explained to plaintiffs both (1) that the documents it produced were sufficient to provide the information that plaintiffs sought, and (2) that those were the only responsive documents Meta had identified after a reasonably diligent search, plaintiffs have insisted, without basis, that Meta must have more. Most recently, in an effort to avoid burdening the Court with this dispute, Meta offered to *create* a document with additional information that plaintiffs had requested in response to RFP No. 7. Plaintiffs never responded to that offer.

In their motion, Plaintiffs now argue that they need information broadly "concerning" approximately two dozen alleged Meta systems and sources, several of which plaintiffs had *never* raised until filing this motion. In so arguing, plaintiffs try to rewrite the RFPs, so that they call for a wide variety of documents that could potentially help their expert opine on whether Meta is using Pixel data "properly." These efforts are unjustified. Many of the alleged systems bear no relevance to this case, as Meta has previously explained to plaintiffs (with respect to the systems plaintiffs *had* raised prior to their motion). And, for the other systems, Meta produced the documents responsive to these "sufficient to show" requests that it identified in its possession, custody, or control.

Finally, plaintiffs' tack-on request for "sanctions" is baseless and improper. Meta complied with the Court's order, and plaintiffs do not even try to show that any particular sanction is merited.

Indeed, before filing, plaintiffs told Meta that they would seek only the production of documents via this motion, not sanctions.  Harris Decl. ¶ 3.

Meta respectfully requests that this Court deny plaintiffs' motion.

## BACKGROUND

This case and the requests for production at issue center on the Meta Pixel, "a free and publicly available piece of code that Meta allows third-party website developers" in "a range of industries" to "install on their websites." Dkt. 159 at 2–3.  Plaintiffs are Facebook users who allegedly communicate with their healthcare providers through the providers' websites.  Dkt. 335 (First Amended Consolidated Complaint) ¶¶ 1, 5–6.  Plaintiffs allege their providers chose to incorporate the Pixel onto the provider websites in a manner that resulted in allegedly sensitive health information being sent to Meta (*id.*), even though Meta contractually forbids developers from sending it such information (Dkt. 232 at 3).

### A.    Plaintiffs Served RFP Nos. 5 to 7.

On February 9, 2023, plaintiffs served the first 67 of their now 239 Requests for Production ("RFPs").  *See* Dkt. 324-1 at 3 (Ex. 1).  Three of those RFPs are at issue here:

> **REQUEST FOR PRODUCTION NO. 5:**  Documents sufficient to show the data flow through which Meta receives information via the Meta Pixel deployed on Medical Provider Web-Properties, Including those listed in Exhibit A.

> **REQUEST FOR PRODUCTION NO. 6:**  Documents sufficient to identify the databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel for Medical Provider Web-Properties, Including those listed in Exhibit A.

> **REQUEST FOR PRODUCTION NO. 7:**  Documents sufficient to identify and describe each of the fields in databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel for Medical Provider Web-Properties, Including those listed in Exhibit A. This request includes, but is not limited to, data dictionaries.

Together, the requests asked Meta to produce documents *sufficient to show* three things:  (1) the data flow by which Meta "receives" information via the Meta Pixel (RFP No 5); (2) the names of data

-2-

"sources" where that information is received, redirected, and stored (RFP No 6); and (3) the names and descriptions of "fields" included in those sources (RFP No 7).

On March 13, 2023, Meta agreed to produce documents responsive to RFP No. 5, to the extent it could find such documents after a reasonable search. Dkt. 271 at 10–12. As for RFP Nos. 6 and 7, Meta responded that several of the terms plaintiffs had used in those requests, including "logs," "fields," and "derived data" were unclear, but offered to meet and confer with plaintiffs. *Id.* at 12–14. On March 20, 2023, plaintiffs sent a 70-page letter concerning Meta's RFP responses, including these three requests, requesting a response in seven days. *See* Harris Decl. Ex. 1.

Three days later, on March 23, 2023, plaintiffs sent Meta a letter that informally requested that Meta produce named plaintiff data from 11 alleged "Meta systems," the names of which plaintiffs had found in documents unrelated to this litigation. Dkt. 324-1 at 7 (Ex. 2). These alleged "Meta systems" were: "Hive tables," "Scuba," "DYI," "Switchboard." "Presto," "Manifold," "Everstore," "Centra," "SRT," "Spark," and "Diagraph." *Id.* at 1–2; *see* Dkt. 324-5 at 1–2.

The parties continued to discuss these matters on meet and confers, as they also negotiated the Protective Order and ESI Protocol. On May 4, 2023, Meta agreed it would search for and, if found, produce documents responsive to RFP Nos. 6 and 7. Dkt. 247 at 4–5.

But on May 8, 2023, plaintiffs sent a letter demanding that Meta produce responsive documents to RFP Nos. 5, 6, and 7 in eight days, by May 16, 2023. Dkt. 247 at 4. Meta offered to produce responsive documents by June 30, 2023. *Id.* at 5. Plaintiffs rejected this offer, as well as another offer by Meta to send, by the following week, "a letter outlining information responsive to RFP Nos. 5-7." *Id.* The parties filed a discovery dispute letter brief on May 17, and the Court adopted Meta's position, ordering Meta to produce responsive documents by June 30, 2023. Dkt. 275.

**B.     Meta Provided Informal Discovery Concerning Its Data Systems and Tools.**

Despite the ongoing disputes on these topics, on May 18, 2023, Meta sent plaintiffs a letter that provided significant information about Meta's preservation efforts, Meta's investigation into the relevant data sources that contain Pixel data, and the 11 supposed "Meta systems" about which plaintiffs had previously inquired. *See* Dkt. 326-5 (Ex. 3). Much of the information Meta provided in this letter is relevant to plaintiffs' current arguments. Among other matters, Meta explained that:

-3-

- <u>Hive</u> tables ████████████████████████████████████████.

- <u>Scuba</u> tables are also data sources, but, unlike Hive, Scuba is designed for real-time, approximate analysis of that data.  Wooldridge Decl. ¶ 12.  Meta also explained later that ████████████████████████████████████████████████████████████ ██.  *See* Harris Decl. Ex. 2 at 11.

- <u>DYI/DYD</u> is a tool that allows Facebook and Instagram users to access their data, such as their "Ads History."  DYI/DYD can fetch data related to users' off-Facebook activity, which can include activity related to the Pixel.  *See id.* at 9.  Plaintiffs themselves already have access to all this data.  *See* Dkt. 323 at 7 n.6.

- <u>Switchboard</u> is a tool that Meta uses to manage law enforcement and other legal requests and may access user data for that purpose.  Like DYI/DYD, Switchboard can also fetch data related to users' off-Facebook activity.  *See* Harris Decl. Ex. 2 at 9–10.

- <u>Everstore and Manifold</u> are data sources, but DYI/DYD and/or Switchboard pull in user-generated data from them.  Meta later explained it ████████████████████ ████████████████████████ in Manifold or Everstore; those systems contain data like Facebook photos, videos, and attachments.  *See* Dkt. 326-16 (Ex. 32) at 1–2.

- <u>Presto, Centra, and SRT</u> are *tools* used to view or query data—not data sources themselves.

- <u>Spark</u> is a *compute engine* Meta uses to process data—not a data source itself; and

- <u>Diagraph</u> is not a system Meta uses.

*See* Dkt. 326-5 (Ex. 3).

Over the next several weeks, plaintiffs continued to seek informal discovery on these topics. On May 31, 2023, plaintiffs sent Meta a letter that asked approximately 100 questions about Meta's systems and preservation efforts, including the same systems, tools, and engines mentioned above, as well as several other topics plaintiffs mention in their motion.  Dkt. 326-18 (Ex. 42).  In response, Meta sent a letter on August 11, 2023 that provided even more information, describing again how Pixel data (also sometimes known as "event data") flows into Meta's systems (Harris Decl. Ex. 2 at 3), and also identifying types of Pixel-related data that exists in Hive that Meta is preserving, including the ███ ████████████████████████████████████████████████████████████

1 ███████████████████████████████████████████████████████████

2 ████████████████████████████████ (*Id.* at 6, 11).

3    In sum:

4    - Hive tables and Scuba tables ██████████████████████████

5    ██████████████████████████████████████████████████████. Meta

6    therefore agreed to produce data from Hive tables.  Dkt. 326-6 (Ex. 4).

7    - DYI/DYD and Switchboard are tools that can be used to fetch users' off-Facebook

8    activity.  Meta therefore agreed to pull and produce data from these tools.  *Id.*

9    - The other "data sources" plaintiffs had mentioned at this point either are not data sources

10   at all or, based on Meta's reasonable investigation, █████████████████████

11   ████.

12 **C.    Meta Produced Documents Responsive to RFP Nos. 5 to 7.**

13    Per the Court's order, between June 30 and July 2, 2023[1], Meta produced documents sufficient

14 to show the issues raised in RFPs 5 through 7.

15    ***RFP No. 5.***  RFP No. 5 sought documents "sufficient to show the data flow through which

16 Meta receives information via the Meta Pixel."  In response, Meta produced a detailed, confidential

17 data flow chart that █████████████████████████████████████████████████

18 ████████████████████. Wooldridge Decl. ¶¶ 4–5; Dkt. 326-12 (Ex. 17).  A small portion of

19 this schematic is excerpted below; █████████████████████████████████████████

20 ██████████████████████████████ ██ ███████ ██ ███ (Wooldridge Decl.

21 ¶¶ 4–5):

22

23

24

25

26

27

---

[1]    A technical glitch resulted in Meta needing to produce some of the responsive documents over the
July 1–2, 2023 weekend.

28



This document was "sufficient to show" how Meta receives information via the Meta Pixel. *Id.* But Meta provided other documents that went into greater detail. For example, Meta also produced a document from its Internal Wiki called "How the Meta Pixel works" (Harris Decl. Ex. 3), which provides further detailed information related to how Meta "receives" information via the Pixel (Wooldridge Decl. ¶ 6). The Wiki explains:



*Id.* at 2–3.

    ***RFP No. 6.*** RFP No. 6 sought documents "sufficient to identify the databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel." The detailed data flow diagram noted above identifies

the names of sources where Pixel data is "received," "redirected," and "stored," starting with the Pixel fire itself. *See supra* at 6.

To illustrate, Meta determined through its preservation efforts that "Hive tables ███████." Dkt. 326-5 (Ex. 3) at 1. The data flow diagram identifies Hive tables ████████████.[2] Wooldridge Decl. ¶ 11.  And other documents Meta produced go into greater detail.  For example, the Internal Wiki noted above describes how, as of the document's date, Meta ███████ Harris Decl. Ex. 3 at -059. ███████ (Wooldridge Decl. ¶¶ 5–6):

████████████

████████████

████████████

████████████

---

2 As Meta has explained to plaintiffs, the process of identifying the Hive tables that contain relevant data is time-consuming and complicated (Dkt. 326-5 (Ex. 3) at 2), in part because there are ███████ Dkt. 143-3 ¶ 34.  It would therefore not be feasible to identify documents that contextualize each Hive table that arguably might, in some way, relate to the Pixel.

-7-

OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS TO ENFORCE DKT. 275
CASE NO. 3:22-CV-3580-WHO-VKD

Harris Decl. Ex. 3 at -059.  Moreover, this same document also contains █████████

████████████████████████████████████████████████████████████████████████████

███████████████  (Wooldridge Decl. ¶ 6):



*See* Harris Decl. Ex. 3 at -058.

Meta also produced confidential schematics that show how Pixel data may interact with Meta advertising delivery systems.  The following ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

(Wooldridge Decl. ¶ 7):

*See* Harris Decl. Ex. 4 at -049.  And Meta produced an extremely detailed diagram concerning Meta's advertising delivery system—a small excerpt of which is below— ████████████████████████ ███████████████████████.[3] ████████████ appears in the middle left of the document (Wooldridge Decl. ¶ 8):

████████████████████████████████████████████████████████████████████████████████

*See* Dkt. 326-11 (Ex. 16).

All these documents fulfilled Meta's obligations under RFP No. 6 to make reasonable efforts to find and produce documents sufficient to identify the names of sources where Pixel data is "received," "redirected," and "stored."

**RFP No. 7.**  RFP No. 7 sought documents "sufficient to identify and describe each of the fields in databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel."  In response, Meta produced documentation showing fields and events that Meta receives from third-party developers via the Pixel,

---

[3] Plaintiffs cite this and other documents from Meta's production in plaintiffs' recently-filed Amended Consolidated Complaint.  Dkt. 335 at 37–38.  Plaintiffs thus appear to believe they have benefitted from this production.

including descriptions of those events, their object properties (fields developers can send for those event types), as well as descriptions of those object properties:



Harris Decl. Ex. 5 at -161, 163; *see also, e.g.*, *id.* Ex. 6 at -173 (describing standard events and other data sent via the Pixel).

Meta has continued to search for additional documents reflecting the other fields in the sources Meta had identified as potentially containing relevant Pixel data.  Harris Decl. ¶ 2.  But, to date, Meta has not identified other documents showing that information.  *Id.*

**D.    Plaintiffs Objected to Meta's Production.**

On July 3, 2023, plaintiffs sent a letter (Dkt. 324-2 at 28 (Ex. 19)) that claimed Meta's document production was deficient.  Plaintiffs claimed, incorrectly, that "Meta did not provide any documents about data flow, data storage, fields, or field descriptions for 'the Hive.'"  *Id.*  Similarly, plaintiffs claimed that Meta had failed to "produce documents sufficient to identify the 'Databases' or 'Logs' where off-Facebook data is stored."  *Id.*

In a letter four days later, plaintiffs appeared to walk back this criticism.  As to RFP No. 5, plaintiffs conceded that the documents Meta produced "appear to demonstrate the 'data flow' for the Meta Pixel," recognizing Meta had produced "a detailed internal Pixel data flow diagram responsive to RFP No. 5."  Dkt. 326-13 (Ex. 20) at 1–2.  For RFP No. 6, plaintiffs similarly conceded these documents reflected at least "some of the 'databases, logs, or other electronic sources where Meta receives, re-directs, or stores event-level and/or derived data collected through and associated with the Meta Pixel.'"  *Id.*  Finally, with respect to RFP No. 7, plaintiffs recognized that the documents "included descriptions of certain fields that the Pixel causes to be sent."  *Id.* at 4.

The parties continued to discuss plaintiffs' concerns (*see* Dkt. 324-3 (Ex. 21) at 2), and on August 5, 2023, Meta confirmed that, based on further investigation, it had not located additional documents responsive to RFP Nos. 5 to 7.  Dkt. 324-3 at 13 (Ex. 25).  Meta reiterated, however, that as the parties proceeded through discovery, including through custodial review and production, Meta would produce any additional responsive documents as it identified them.[4]  *Id.*

On August 19, 2023, plaintiffs sent another letter that said they intended to file a "Motion to Enforce" RFP Nos. 5 to 7.  Plaintiffs claimed Meta's production was deficient because it allegedly (1) did not include Pixel data flow or fields related to Scuba, Everstore, and Manifold; (2) did not identify relevant Hive tables or include fields for them; and (3) did not identify "how the Filter does or does not impact data flow in Meta's systems."  Dkt. 326-14 (Ex. 28) at 1.

On August 28 and 29, 2023, the parties met and conferred again concerning these RFPs.  Meta explained to plaintiffs that, as to RFP Nos. 5 and 6, Meta had produced documents sufficient to show the information plaintiffs had requested and that plaintiffs' demands had shifted, such that the requests did not call for all the documents and information that plaintiffs were now seeking.  Harris Decl. ¶ 5.  For example, counsel for Meta pointed out that RFP No. 5 sought only documents sufficient to show how Meta receives information via the Pixel.  *Id.*  In response, plaintiffs' counsel conceded that Meta

---

[4] Plaintiffs attempt to paint the inaccurate picture that Meta refused to engage on these issues.  *See, e.g.*, Dkt. 323 at 14 (saying "Plaintiffs sent Meta a total of eight letters").  In truth, many of these letters were just summary emails listing a chart of the parties' ongoing discussions, not separate substantive correspondences about RFP Nos. 5 to 7.  *See, e.g.*, Dkt. 324 (Exs. 22, 23, 26, 27).

had produced a document that showed how Meta receives data, but stated that plaintiffs now needed to see the data flow for what happens after Pixel data is received.  *Id.*

On August 28, 2023, plaintiffs' counsel informed Meta that plaintiffs planned to file a motion to enforce Dkt. 275.  *Id.* ¶ 3.  Plaintiffs stated that, while they might call the motion a "sanctions" motion, they would seek only the production of documents, not sanctions.  *Id*.

Thereafter, Plaintiffs served their eighth set of RFPs, which include numerous requests for documents that relate to the same alleged systems and topics plaintiffs reference in their motion.  *See* Harris Decl. Ex. 7 at 11–22.  In other words, as Meta had raised in numerous meet and confer calls, the new requests implicitly concede that plaintiffs had *not* previously requested these documents through RFP Nos. 5 to 7, even though plaintiffs argue, including through the instant motion, that the documents sought in their eighth set of RFPs should have been produced in response to RFP Nos. 5 to 7.

**E.     Meta Attempted to Resolve this Dispute, Plaintiffs Ignored Meta's Proposal, and Plaintiffs Instead Filed this "Motion for Sanctions."**

During a September 1, 2023 call, Meta reiterated that, after a reasonable search, it had not identified documents responsive to RFP No. 7 that reflected all of the "fields" plaintiffs sought.  Harris Decl. ¶ 6.  However, Meta explained that its counsel had identified information regarding additional fields as part of its investigation, so Meta was willing to *create* a document that identified those fields and described them.  *Id*.  Plaintiffs rejected this proposal the same day, demanding  "documents" containing this information, rather than the information itself.  Dkt. 324-4 at 3 (Ex. 31).

On September 15, 2023, Meta made a last effort to resolve plaintiffs' objections concerning RFP No. 7.  Meta proposed that it:

> [P]repare and produce a document that lists the non-duplicative metadata fields that correspond to the event-level data that developers send to Meta via the Pixel, in the tables Meta has identified after a reasonably diligent search, as well as the 'derived data' fields in those same tables.  This document will also describe each of these fields, as plaintiffs' request seeks.

Dkt. 326-16 (Ex. 32) at 2.  Even though Meta's proposal tracked plaintiffs' "sufficient to show" RFP seeking the same information, plaintiffs never responded.  Instead, plaintiffs filed this motion.

During the numerous conversations between the parties over the past several months concerning RFP Nos. 5–7, plaintiffs never brought up the following alleged "systems," which they now demand

via this motion: ███████, Akkio, "containers," EventScribe, Laser, LogDevice, Memcache, mySQL, Puma, ██████████ Stylus, and Swift.

## ARGUMENT

### A.     Meta Complied with the Court's Discovery Order.

It "is axiomatic that a request for documents 'sufficient to show' does not require the production of *all* conceivably relevant information." *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 616 (C.D. Cal. 2013); *see In re Takada*, 2022 WL 4913183, at *5 (N.D. Cal. Oct. 3, 2022) (Demarchi, J.) (distinguishing between "sufficient to show" requests and requests seeking "all documents").  Plaintiffs asked Meta to identify information—a request "narrow[] in scope." *Garcia v. City of Imperial*, 2010 WL 1337224, at *3 (S.D. Cal. Apr. 5, 2010); *see In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *20 (C.D. Cal. Mar. 12, 2012) (denying motion to compel because "any additional documents" beyond those already "sufficient to show" would be "cumulative").  Meta's production complied with the Requests as written and based on Meta's reasonable investigation.

Meta complied with the Court's order by producing detailed information responsive to each of plaintiffs' "sufficient to show" requests.  *See* Dkt. 275.  As set forth above, for RFP No. 5, Meta produced detailed schematics that show data flows of how Meta "receives" information via the Meta Pixel, along with other documents that describe the process.  *See* Wooldridge Decl. ¶ 6; Dkt. 326-13 (Ex. 20) at 1 (plaintiffs conceding that Meta produced documents that "appear to demonstrate the 'data flow' for the Meta Pixel").  These and other documents that Meta produced "identify" data sources where Pixel data is received, redirected, and stored under RFP No. 6.  Wooldridge Decl. ¶ 4-6; *see supra* at 5–9.  And, for RFP No. 7, as plaintiffs previously recognized, Meta's productions contain documents that "include[] descriptions of certain fields that the Pixel causes to be sent," which were the documents responsive to RFP No. 7 that Meta identified based on its reasonable investigation.  Dkt. 326-13 (Ex. 20) at 4.  Meta fulfilled its obligations under the Court's discovery order and the relevant law.  *See Gabriela Zarate v. Victory Packaging, LP, et al*., 2023 WL 6190706, at *7 (C.D. Cal. Aug. 14, 2023) (requiring a party to produce only the documents it could reasonably identify in its "possession, custody, or control" in response to a "sufficient to identify" request).  When Meta offered to create documents that did not exist—to provide additional information that Meta had identified as

-13-

responsive to RFP No. 7, and to respond to plaintiffs' complaints regarding the sufficiency of Meta's productions (Harris Decl. ¶ 6)—plaintiffs rejected that offer to provide information above and beyond the documents Meta had identified in its possession, custody, or control.[5]

Through their motion, however, plaintiffs now appear to seek significantly more than what their RFPs sought in the first place. In their proposed order, plaintiffs ask for documents "*concerning*" more than two dozen supposed "data source[s]," all fields in each of those "data source[s]" (regardless of any connection between those systems and the Pixel), and "corresponding" data flow (not limited to Meta's receipt of Pixel information). *See* Dkt. 323-1 (emphasis added); *compare* Dkt. 324-1 at 3 (Ex. 1). This is much broader than the "sufficient to show" requests at issue.

**B.      Plaintiffs' Arguments About Each Alleged "Data Source" Are Misguided.**

Plaintiffs list various alleged data sources about which they claim Meta was obligated to provide additional documents. Plaintiffs' arguments are misguided: several ignore the parties' conversations over the last several months, and others plaintiffs have never before raised with Meta.

**1.      Hive Tables**

Meta previously confirmed that Hive tables are ███████████████████████████████ ████████████. Plaintiffs continue to claim that "Meta has not [produced] any responsive documents concerning Hive" (Dkt. 323 at 6) and that Meta's production "does not contain any of the information" about "data sources expressly called-for in plaintiffs' requests" (*id.* at 21). Both claims are false. Hive tables containing Pixel data are identified in Meta's production, including the data flow diagrams (*see supra* at 5–8), as well as a document that describes a particular Hive table as ████████████ ████████████████████ Harris Decl. Ex. 3 at -059.

As for Hive "fields," Meta produced documentation showing event names, event descriptions, object properties, and object property descriptions that correspond to Pixel fires stored in Hive. *See*

---

[5] Because of the complexity associated with visually depicting the information plaintiffs seek, these "sufficient to identify" requests would have made much more sense as interrogatories. *See* Primer on Crafting eDiscovery Requests with "Reasonable Particularity," The Sedona Conference (Nov. 2021), *available at* https://thesedonaconference.org/sites/default/files/publications/Primer-on-Crafting-Requests-with-Reasonable-Particularity-Public-Comment-November-2021_0.pdf (Interrogatories "requiring identification of" information can "be more straightforward than a sufficient-to-show request."). Meta noted on an August 28, 2023 meet and confer that, if plaintiffs wanted a further description of an underlying system, they should issue an interrogatory. Harris Decl. ¶ 4. Plaintiffs' response was that they did not want to "burn a rog." *Id.*

Harris Decl. Exs. 5–6. Meta also previously described to plaintiffs other fields that Meta had identified in potentially relevant Hive tables, including █████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. *Id.* Ex. 2 at 6, 11.

Meta's offer to create a document identifying and describing additional fields from relevant tables, including all "derived" fields in those tables (Dkt. 326-16 (Ex. 32) at 2), was an appropriate effort to compromise, given that RFP No. 7 sought that information.[6] Dkt. 326-16 (Ex. 32) at 2. To illustrate, in *Garcia v. City of Imperial*, 2010 WL 1337224, at *1, the plaintiff issued an RFP seeking information about the "number of times" a particular department's police officers used tasers. The department responded by providing that information over email, but the plaintiff insisted it was entitled to receive "narrative reports and officers' reports of taser use" to calculate that information itself. *Id.* The department found the underlying reports but insisted that, because of privacy concerns, it should instead be allowed to create an "outline" of the reports to provide only the information actually sought by the RFP. *Id.* at 2. Because the "outline" would provide the "narrow" information requested by the RFP, the Magistrate Judge permitted the Department to simply create and produce the "outline" document, and the District Court upheld the decision. *Id.* at 2–4. The difference here is that Meta has *not* been able to identify "documents" that supply the underlying information; it has identified that information through an investigation by counsel. Harris Decl. ¶ 6. Meta's offer was an appropriate effort to provide information sought by plaintiffs' RFP, even though Meta had complied with its obligation to provide the documents it identified in its possession, custody, or control.

## 2. Scuba Tables

Meta also previously confirmed that Scuba tables can contain data related to the Pixel, but that the data stored there is ████████████████████████████████████. *See supra* at 4–5. Plaintiffs claim, with no support, that "[b]ased on counsel's experience, Plaintiffs reasonably believe that Scuba will be a crucial source of discovery in this case." Dkt. 323 at 7. Plaintiffs then claim that "Meta has not produced any documents concerning Scuba." *Id.*

---

[6] Meta offered this information, even though many of the fields Meta would identify are likely irrelevant to this litigation, and it would be unduly burdensome for Meta to produce information associated with many of the fields. Dkt. 326-16 (Ex. 32) at 2.

This is, again, wrong.  As Meta has previously noted to plaintiffs, Meta's production contained information reflecting data flows associated with Scuba.  Dkt. 326-16 (Ex. 32) at 2.  Plaintiffs never asked for more information, but several of the tables identified in the Pixel data flow diagram are Scuba tables ███████████████████.  Wooldridge Decl. ¶ 5, 12.  Moreover, Meta has already provided plaintiffs with information concerning Scuba through informal discovery.  *See supra* at 3–5.  ███

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████   Wooldridge Decl. ¶¶ 5, 12.

### 3.      DYI/DYD

As plaintiffs note, Meta already named DYI/DYD as an ESI source in this case and agreed to produce information using the tool (*see* Dkt. 323 at 6)—even though all Facebook users, including plaintiffs, can access that data on their own (*see id.* at 7 n.6).  Plaintiffs claim that Meta "has not produced any documents concerning DYI/DYD." *Id.* at 7.  That is again wrong.  Meta has produced to plaintiffs a detailed schema that describes the categories of data viewable using DYI.  Harris Decl. Ex. 8.  Meta does not believe that there is anything more to produce for these RFPs related to DYI/DYD.

### 4.      Switchboard

As plaintiffs note, Meta has already identified Switchboard as an ESI source in this case and agreed to pull and produce information using the tool.  Again, ████████████████████ ███████████████████████████████████.  Harris Decl. Ex. 2 at 4.  Meta is not aware of anything more to produce for these RFPs related to Switchboard.

### 5.      Everstore and Manifold

Meta has explained to plaintiffs that Meta ████████████████████ in Everstore/Manifold, which are essentially the same system.  *See* Dkt. 326-16 at 1–2 (Ex. 32); *see* Wooldridge Decl. ¶ 13.  Meta has not "changed course" on this, as plaintiffs wrongly assert.  Dkt. 323 at 7.  DYI and Switchboard contain information that has nothing to do with the Pixel (Harris Decl. Ex. 2 at 12) so the fact that they extract some data from Everstore/Manifold does not necessarily mean that Everstore/Manifold contain Pixel data.  Again, here too, there is nothing more for Meta to produce.

-16-

### 6.     TAO

Plaintiffs have never before raised TAO in discussions with Meta related to RFP Nos. 5–7. Harris Decl. ¶ 8.  In any event, Meta ███████████████████ in TAO.  Wooldridge Decl. ¶ 14.  The public article that plaintiffs cite does not reveal any connection between TAO and the Pixel.  Dkt. 323 at 8–9.  By plaintiffs' own account, TAO stores data for the "social graph," which includes datapoints like users' "comments," "checks-ins," and "likes." *Id.*

### 7.     MySQL

Plaintiffs have never before raised MySQL in discussions with Meta related to RFP Nos. 5–7. Harris Decl. ¶ 8.  In any event, Meta ███████████████ in MySQL.  Wooldridge Decl. ¶ 15. All plaintiffs' say is that MySQL is "TAO's backbone" that "provides transactional and availability properties to columnar data" such as "a user's comment," "comment id, user id, and type of reaction." Dkt. 323 at 9.  This does not show any connection to the Pixel.

### 8.     ZippyDB/Akkio, Memcache, Laser

Plaintiffs have never before raised Akkio, Memcache, or Laser in discussions with Meta related to RFP Nos. 5–7 (Harris Decl. ¶ 8), and they do little to justify them as deficiencies in Meta's production.  Plaintiffs identified ZippyDB by viewing Meta's production (Dkt. 323 at 10 (citing Ex. 17)), and Meta is not presently aware of further documents related to it that are responsive to RFP Nos. 5 to 7 (*see* Wooldridge Decl. ¶ 16).

Plaintiffs say only that Meta has "identified ZippyDB/Akkio, Memcache, and Laser as additional data sources associated with TAO," but that Laser is "an indexing service."  Dkt. 323 at 9. Laser is indeed "an indexing service" for Hive, meaning it ████████████████████ ███.  Wooldridge Decl. ¶ 16; *see* Dkt. 324-1 at 32.  To the extent Laser could be characterized as a separate data source, ████████████, and Meta is not aware of anything further related to Laser that would be responsive to RFP Nos. 5 to 7.  The same is true for Memcache, which is a caching service, not a data storage system.  *Id.* ████████████████ ██ and Akkio.  *See id.*

9.      **Puma, Swift, and Stylus**

Plaintiffs have never before raised Puma, Swift, or Stylus in discussions with Meta.  Harris Decl. ¶ 8.  As plaintiffs seem to recognize, however, Puma, Swift, and Stylus are processing services; they are not "data sources" (Wooldridge. Decl. ¶ 17), so they do not implicate these RFPs.  There is nothing to produce for them.

10.      █████████

Plaintiffs have never before raised ████████ in discussions with Meta (Harris Decl. ¶ 8), but they concede they identified ████████ by viewing the information in Meta's document productions.  Dkt. 323 at 12.  Plaintiffs' only complaint seems to be that Meta did not produce "fields" from "████████."  *Id.* at 13.  But ████████████████████████████████████████████.  Wooldridge. Decl. ¶ 18.  Meta is not aware of anything further related to AdLogger that would be responsive to RFP Nos. 5 to 7.

11.      **EventScribe/Scribe and LogDevice**

Plaintiffs likewise concede they identified EventScribe/Scribe and LogDevice by reviewing the information in Meta's document productions.  Dkt. 323 at 12.  Their only complaint seems to be that Meta did not produce "fields" from them.  *Id.*

Plaintiffs never before raised Log Device or "EventScribe" in discussions with Meta.  Harris Decl. ¶ 8.  Meta is not aware of a separate system called "EventScribe."  Wooldridge Decl. ¶ 19.  Plaintiffs did previously raise "Scribe," which appears in Meta's productions.  *See, e.g.*, Dkt. 326-11 (Ex. 16). Dkt. 326-12 (Ex. 17).  Meta informed plaintiffs that Scribe is a messaging system and that the ████████████████████████████████████████████████████████ ████████████████████████████████  Harris Decl. Ex. 2 at 4.  So, to the extent Scribe could be characterized as a separate data source, ████████████████████████ ████████████████████████████—and there is no "field" information for it.  Wooldridge. Decl. ¶ 19.  Meta is not aware of anything further related to Scribe that is responsive to RFP Nos 5 to 7.

As for LogDevice, this system stores metadata related to the sequential order in which information comes in and out of Scribe; it's essentially a "level down" from Scribe.  *Id.*  Meta is not

-18-

1    aware of anything further related to LogDevice that would be responsive to RFP Nos. 5 to 7 (*id.*), and

2    the documents plaintiffs cite do not mention the Pixel.

3          **12.**    ██████████ and "Containers"

4          Plaintiffs argue that "Meta's production indicates that it stores the data collected about

5    individual users (such as the named plaintiffs) in a '██████.'" Dkt. 323 at 13 (citing Dkt. 324-2 at

6    Ex. 15). They also say that Meta's public developer documentation identifies that it stores data

7    collected from the Pixel and other sources in 'containers.'" *Id.* "██████" and "containers" are

8    generic computing terms; they are not specific data sources at Meta. Wooldridge Decl. ¶ 20. There is

9    nothing to produce.

10          **13.**    **"Log Sources"**

11          Plaintiffs concede they identified these supposed "log sources" by reviewing Meta's document

12    productions. *See* Dkt. 323 at 10. ████████████████████████████████████████

13    ████████    Wooldridge Decl. ¶ 21. And Hive tables containing Pixel data are identified in Meta's

14    productions. Meta reiterates that it has offered to create a document that contains metadata fields for

15    relevant tables Meta has identified as containing Pixel event data.

16          **14.**    **"Meta's Data Lakehouse"**

17          Plaintiffs reference a white paper that shows a "high level schematic" of Meta's data

18    architecture. Dkt. 323 at 8. As Meta has explained to plaintiffs, this chart does not show the specific

19    data flow for data transmitted by third parties via the Pixel (Harris Decl. Ex. 2 at 5), nor is it intended

20    to represent an exact mapping of Meta's underlying systems (Wooldridge Decl. ¶ 22). Plaintiffs' claim

21    that "WWW" reflects the "web-properties that deploy the Pixel" is wrong. *Id.*

22          Meta has not identified any sources from this paper that alter its prior statements or require

23    Meta to identify additional sources beyond what has already been provided in Meta's productions.

24          **15.**    **The Health Filter**

25          The Health Filter, which Meta has previously described in detail (*see* Dkt. 77-4 ¶¶ 8–9;

26    Dkt. 143-3 ¶¶ 7–48), is not a data source. Wooldridge Decl. ¶ 23. It therefore also has no "fields." *Id.*

27    Plaintiffs claim that "documents related to the Filter, its design, and its effectiveness (or lack thereof),

28

are all directly relevant to Meta's core defense" (Dkt. 323 at 11)—but that does not render any such documents responsive to the three RFPs at issue here.

Plaintiffs try to create the misimpression that Meta is attempting to conceal critical information about the Filter, but the opposite is true.  Meta has already produced information related to the Filter, including the Filter's block list.[7]  *See* Dkt. 323 at 11 n.9.  Plaintiffs also neglect to mention that, before plaintiffs filed this motion, Meta had already agreed to make available for inspection the "Filter Source Code," as well as the Source Code "*related to how data Meta receives via the Pixel is stored and used within Meta's system*."  Harris Decl. Ex. 9 (emphasis added).  Plaintiffs thus will be able to inspect the Filter Source Code themselves to see how it works.  To the extent such documents exist, Meta has also already agreed to search for and produce, among other things:

- Documents "sufficient to show how the Filter identified potentially sensitive data and what happened to the potentially sensitive data after it was identified as potentially sensitive" (RFP No. 28);

- Documents "sufficient to show the frequency with which the Filter detected potentially sensitive data" (RFP No. 29);

- Documents "sufficient to identify … employees responsible for Meta's Filter" (RFP No. 3);

- Documents "sufficient to show the creation of the Filter and material modifications over the Relevant Time Period" (RFP No. 32);

- Documents "sufficient to identify current and former employees who materially participated in the development, implementation, maintenance, or oversight of the Filter" (RFP No. 33);

- Documents "sufficient to show the types of notifications sent to entities that were flagged by the health integrity system as having sent potentially sensitive data during the Relevant Time Period" (RFP No. 49);

---

[7]  Meta disagrees with plaintiffs' various footnotes recounting discovery disputes and ongoing conversations between the parties that are largely irrelevant to this motion.  *See, e.g.*, Dkt. 323 at 5 n.4, *id.* at 11 n.9; *id.* at 19 n.26.  Meta is engaging in good faith discussions with plaintiffs on these topics and, as these footnotes reflect, working with plaintiffs to provide much of the information requested.  *See, e.g., id.* at 19 n.26.

-20-

- Documents "relied upon … in the creation of the" Filter Block List (RFP No. 188); and

- Document identifying "the methods or methodology by which Meta" identified the "listed keywords" in the Filter Block List (RFP No. 189).

In short, plaintiffs' argument that they will be precluded from understanding "Meta's filtering process" (Dkt. 323 at 18) is inaccurate and disingenuous.

## C. Plaintiffs' Remaining Arguments About Why They Need Additional Documents in Response to these RFPs Are Misguided.

For similar reasons, plaintiffs' thirteen remaining arguments about why it is "critical" that they receive further documents—in response to these specific, narrow RFPs—are meritless. And many of these arguments are premised on expanding the three RFPs far beyond their scope. *See id.* at 16–21.

Plaintiffs primarily claim they need additional documents to help prepare an expert report about Meta's privacy measures. *See* Dkt. 323 at 16, 20–21 (first, twelfth, and thirteenth arguments). In his accompanying declaration, plaintiffs' intended expert says that, to complete his work, he needs to understand whether Meta is using Pixel data "properly" and "[w]hether and how Meta protects the data in any fashion through any privacy programs." Dkt. 323-2 at 3, 9. To do so, he claims to need to access a wide range of documentation factoring into "privacy impact assessments" as defined by various industry bodies. *Id.* at 5–10. For example, he says he requires a "pre-specified description of each use of the at-issue data," documentation showing the "purpose of data collection," "[a] complete classification of [data] uses," "[t]he precise purpose of each system," "[i]nternal policies and procedures for employee and systems access to the aforementioned datastores," information about the "penalties … levied against employees who violate policy," "precise documentation of monitoring for errors and bugs in the above processes," "'post-mortem' reports which detail how such failures were detected and remediated," "[a]ny and all points at which the data lifecycle is terminated," and "specific details as to data retention windows." *Id.* at 8–10; *see also* Dkt. 323 at 2.

These requests are a far cry from the three "sufficient to show" RFPs at issue here—which ask merely for the *identification* of relevant data sources and fields, and documents showing how Meta *receives* information sent via the Pixel. Plaintiffs, moreover, have never before raised many of these requests or concerns with Meta in the months of discussion leading up to this motion.

1    Plaintiffs also argue that they need additional "data flow" documents to help determine whether

2    Meta *intends* to collect sensitive health information; whether Meta has committed any "criminal or

3    tortious" acts; whether user data is non-identifiable at certain steps; whether Meta creates "user

4    profiles" for targeted advertising; to assess plaintiffs' own request for injunctive relief; and to assess

5    plaintiffs' questions about preservation.[8]  Dkt. 323 at 16–20 (plaintiffs' second, third, fourth, seventh,

6    ninth, and tenth arguments).  For starters, Meta does not dispute that how Meta receives and "uses"

7    data received via the Pixel from relevant health entities may be an appropriate subject to explore in

8    discovery.  But these arguments ignore the fact that Meta has already *produced* documents that show

9    data flows of how Meta "receives" information via the Pixel, just as plaintiffs' RFP No. 5 sought.  *See*

10   *supra* at 5–8.  While plaintiffs may now want *additional* documents beyond what they asked for in RFP

11   No. 5, they have not shown that Meta has failed to produce "documents sufficient to show the

12   information it was required to provide."  *In re Google RTB Consumer Priv. Litig.*, 2023 WL 3170566,

13   at *2 (N.D. Cal. Apr. 28, 2023) (DeMarchi, J.).

14   Plaintiffs also raise several arguments in which they ask for certain metadata or field

15   information.  *See* Dkt. 323 at 17–19 (plaintiffs' fourth, fifth, sixth, and eighth arguments).  These

16   concerns, again, ignore Meta's production, the prior discussions between the parties concerning RFP

17   No. 7, and Meta's offer to create a document to show and describe additional "fields" in tables Meta

18   has identified as containing event data sent via the Pixel.[9]

19   Plaintiffs last suggest they would be hamstrung in this litigation if the Court does not now order

20   Meta to produce more documents related to RFP Nos. 5 to 7 because, otherwise, plaintiffs will be

21   unable to understand how Meta stores and uses Pixel data, and they will be unable to "craft a discovery

22   plan."  Dkt. 323 at 16–21 (plaintiffs' twelfth argument and more generally throughout their motion).

23   That too is wrong.  Plaintiffs' expert has already spent five days examining the Pixel Source Code

---

25   [8]  Plaintiffs' characterization of Meta's preservation efforts, and Meta's statements concerning them, are inaccurate.  *See* Dkt. 323 at 20.

26   [9]  Several of plaintiffs' arguments make little sense, such as their claim that undefined documents Meta has purportedly not produced would assist the "claims administration process in the event of

27   settlement."  Dkt. 323 at 20 (eleventh argument).  Or their claim that these requests would help show "how much Meta profited from its conduct."  *Id*. at 18 (fifth argument).  To the extent

28   plaintiffs' fifth argument seeks the identification of "fields," Meta again notes it has offered to create a document showing fields it has identified.

(Harris Decl. ¶ 9), and Meta has agreed to make available for inspection the server-side Source Code showing "how data Meta receives via the Pixel is stored and used within Meta's system." Harris Decl. Ex. 9). As for the relevant data sources, Meta has already agreed to produce information from Hive tables, DYI/DYD, and Switchboard once plaintiffs provide their consent (Meta asked for plaintiffs' consent over a month ago, but plaintiffs have not yet responded). *See* Dkt. 326-14 (Ex. 28) at 2; Harris Decl. ¶ 7. Meta has also identified and described the relevant sources in numerous meet and confers with plaintiffs, and in compliance with the ESI Protocol, and Meta has offered to create documents to provide the remaining information these RFPs request. *See supra* at 3–12.

In short, Meta in good faith complied with the Court's order and fulfilled its obligations under RFP Nos. 5 to 7. Plaintiffs will have ample opportunities through discovery—during depositions and pursuant to the other 236 RFPs they have issued—to inquire about the other information they now request.

**D.    Plaintiffs' Sanctions Request is Improper.**

Rule 37(b) authorizes courts to enforce the orders they issue. But the Court's Civil Standing Order and the Civil Local Rules require parties to conform to certain requirements for a party to seek sanctions. Civil Local Rule 37-1(a), for example, requires counsel to first confer to attempt "to resolve all disputed issues." And, to seek attorneys' fees or costs under Rule 37, the movant must itemize "with particularity" in the motion "the otherwise unnecessary expenses, including attorney fees" that they are seeking. Civ. L.R. 37-4(b)(3).

Plaintiffs' motion for sanctions is improper on several grounds. First, and most important, Meta has produced documents sufficient to respond to RFPs 5–7 and has fully complied with the Court's June 13, 2023 order. Dkt. 275. On that basis alone, sanctions are inappropriate.

Second, as noted above, in the months of correspondence between the parties on these topics, plaintiffs never raised approximately half of the alleged Meta "systems" with which they take issue here in connection with RFP Nos. 5–7. *Supra* at _. And even though plaintiffs told Meta that they were considering calling this filing a "sanctions" motion, they clarified that plaintiffs would be seeking only the production of documents, not sanctions. Harris Decl. ¶ 3. Plaintiffs, moreover, chose not to

respond to Meta's last effort to compromise on RFP No. 7.  These shortcomings render plaintiffs' motion deficient.

Third, plaintiffs have not requested any specific sanctions.  Plaintiffs merely ask the Court to enter "other forms of relief, including monetary sanctions, a finding of contempt, or any other relief the Court deems appropriate."  Dkt. 323 at 23.  With respect to monetary sanctions, plaintiffs have not itemized any of their attorneys' fees or costs associated with this dispute, as the Local Rules require. *See* Civ. L.R. 37-4(b)(3).  And, with respect to contempt, plaintiffs have not shown that such a finding is appropriate.  *See United States v. DAS Corp.*, 18 F.4th 1032, 1039 (9th Cir. 2021) (a movant seeking a finding of civil contempt bears the burden of showing by "clear and convincing evidence" (1) a violation of a court order, (2) beyond "substantial compliance," (3) "not based on a good faith and reasonable interpretation of the order") (internal citations omitted).[10]  At most, this is an ordinary discovery dispute, and Meta's productions show that it complied with the Court's order in good faith. *See supra* at 5–10.

## CONCLUSION

Plaintiffs' "motion for sanctions" should be denied.

Dated: October 17, 2023

**GIBSON, DUNN & CRUTCHER LLP**
By:  */s/ Lauren R. Goldman*
Lauren R. Goldman

**COOLEY LLP**

By:  */s/ Michael G. Rhodes*
Michael G. Rhodes

*Attorneys for Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

---

[10] Plaintiffs also reference the Court's "inherent authority to enforce its orders" by sanctions (Dkt. 323 at 21), but such a finding requires "(1) a willful violation of a court order; or (2) bad faith" (*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021)), neither of which are met here.

1

**CIVIL L.R. 5-1(i)(3) ATTESTATION**

2        Pursuant to Civil Local Rule 5-1(i)(3), I, Lauren R. Goldman, hereby attest under penalty of

3    perjury that concurrence in the filing of this document has been obtained from all signatories.

4

5    Dated: October 17, 2023                              **GIBSON, DUNN & CRUTCHER LLP**

6                                                  By:   */s/ Lauren R. Goldman*

7                                                        Lauren R. Goldman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28