| | |
|---|---|
| Jason 'Jay' Barnes (admitted *pro hac vice*)<br>  jaybarnes@simmonsfirm.com<br>**SIMMONS HANLY CONROY LLP**<br>112 Madison Avenue, 7th Floor<br>New York, NY 10016<br>Tel:    212-784-6400<br>Fax:    212-213-5949 | Geoffrey Graber, State Bar No. 211547<br>  ggraber@cohenmilstein.com<br>**COHEN MILSTEIN SELLERS & TOLL PLLC**<br>1100 New York Avenue NW, Fifth Floor<br>Washington, DC 20005<br>Tel:    202-408-4600<br>Fax:    202-408-4699 |
| Jeffrey A. Koncius, State Bar No. 189803<br>  koncius@kiesel.law<br>**KIESEL LAW LLP**<br>8648 Wilshire Boulevard<br>Beverly Hills, CA 90211<br>Tel:    310-854-4444<br>Fax:    310-854-0812 | Beth E. Terrell, State Bar No. 178181<br>  bterrell@terrellmarshall.com<br>**TERRELL MARSHALL LAW GROUP PLLC**<br>936 North 34th Street, Suite 300<br>Seattle, WA 98103<br>Tel.:   206-816-6603<br>Fax:    206-319-5450 |

*Attorneys for Plaintiffs*
JOHN DOE, JANE DOE I, JANE DOE II, and JOHN DOE II, and DOE, on behalf of themselves and all others similarly situated

[*Additional counsel listed on signature page*]

Andre M. Mura, State Bar No. 298541
  amm@classlawgroup.com
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.:   510-350-9700
Fax:    510-350-9701

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION<br><br>This Document Relates To:<br><br>All Actions | Case No. 3:22-cv-03580-WHO (VKD)<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SANCTIONS TO ENFORCE DKT. 275, THE COURT'S JUNE 13, 2023 ORDER FOR PRODUCTION OF DOCUMENTS RESPONSIVE TO REQUESTS FOR PRODUCTION NOS. 5-7**<br><br>Judge: Hon. Virginia K. DeMarchi<br>Hearing Date: November 7, 2023<br>Hearing Time: 10 a.m.<br>Courtroom: 2, Fifth Floor |

## I. INTRODUCTION

Meta represented to Plaintiffs and the Court that it would produce documents in response to RFP Nos. 5-7. After Meta's repeated delays, the parties briefed when that production of documents should occur, and the Court ordered Meta to produce the documents responsive to RFP Nos. 5-7 by June 30, 2023. Dkt. 275. There are therefore only two issues before the Court: (1) whether Meta failed to obey the Court's order, and, if so, (2) what the appropriate order is to remedy its conduct.

*First*, Meta's opposition effectively admits that it did not produce documents sufficient to comply with the Court's order. In short, the Court ordered Meta to produce documents sufficient to show the Pixel data flow (RFP 5); the data sources to or through which Pixel data (and data inferred from Pixel data) flows (RFP 6); and the fields and field descriptions for those data sources (RFP 7) by June 30, 2023—nearly four months ago. Plaintiffs have made clear that these documents are foundational to their case because they will illuminate Meta's intent in acquiring and using users' health information. Yet despite repeatedly stating that its systems are incredibly complicated, Meta produced only 19 documents on or around the due date (13 of which are public).

That production is woefully deficient. For RFP No. 5, Meta produced two documents, and neither sufficiently details Pixel data flow. For RFP No. 6, Meta all but admits it failed to comply with the Court's order. Indeed, its Ex. 18 and other documents make clear that Meta has not produced documents sufficient to show the relevant data sources. And, for RFP No. 7, Meta openly admits it did not comply. Rather than produce any responsive documents, Meta suggests that it answer an interrogatory that asks a different question from what the Plaintiffs sought to learn.

Despite violating the Court's order, Meta claims its violations should go unaddressed because, in their view, Plaintiffs have not sufficiently detailed their request for a remedy. But the Court is not powerless here. Rule 37(b)(2) "gives a district judge discretion to 'make such orders ... as are just' in regards to a party's failure to obey a discovery order[.]" *Valley Eng'rs, Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1056 (9th Cir. 1998). Here, Plaintiffs' motion requested a full production by November 14, as well as any further relief the court deems appropriate, including monetary sanctions. This Court ordered this exact relief—a production by a specified date and monetary

sanctions to compensate the plaintiffs for motion practice—in another case, while rejecting the defendant's argument that a showing or prejudice or bad faith was required to impose such sanctions. *Handloser v. HCL America, Inc.*, No. 19-cv-01242-LHK (VKD), 2020 WL 4923971, at *8-9 (N.D. Cal. Aug. 21, 2020). At a minimum, ordering Meta to comply fully and quickly with the Court's order by November 14 is a "just" sanction under the circumstances.

## II. HISTORY OF THE DISPUTE IN RESPONSE TO META'S OPPOSITION

In Dkt. 275, the Court ordered Meta to produce (by June 30, 2023) documents sufficient to show (1) the data flow at issue in this case, (2) the data sources to which at-issue data flows and is stored, and (3) the fields and field descriptions for those data sources. As detailed in Plaintiffs' opening brief, Meta produced 19 documents—13 of which were public—around the court-ordered production deadline.[1] *See* Dkt. 323 ("Motion" or "Mot.") at 1; Dkt. 324 ("Barnes Decl.") ¶ 6. Plaintiffs notified Meta of deficiencies within a week, specifying that Meta had not produced any internal documents regarding fields or field descriptions. Barnes Decl. ¶ 57-58; Barnes Decl., Ex. 19; Barnes Decl., Ex. 20. Meta acknowledged receipt of the letter, then ignored **six** follow-up requests for more information. Mot. at 2; Barnes Decl. ¶¶ 59-68. After a month, Meta stated that it "continued to investigate." Barnes Decl. ¶ 63. Plaintiffs continued to ask questions. *Id.* ¶¶ 64-73.

Two months after the Court's June 30 deadline and after it had become clear that Plaintiffs would seek relief from the Court if necessary, Meta responded to the merits of Plaintiffs' deficiency letter—not with a production of documents—but by claiming for the first time that its deficient production was due to the "phrasing" of Plaintiffs' requests. *Id.* ¶ 69. Despite discussions during repeated meet and confers and in written correspondences—which culminated in Meta's agreement to produce the documents Plaintiffs sought—Meta had never expressed concerns regarding the "phrasing" of Plaintiffs' requests. Rather than produce the documents requested, Meta asked to convert the requests into an interrogatory requesting a list of fields—with no mention of other material Plaintiffs sought from the RFPs, including data flow documents, data sources, or field

---

[1] Meta made a partial production on June 30 and the remainder of the production days later. Plaintiffs do not take issue with Meta's *de minimis* delay in meeting the Court' June 30 deadline.

descriptions. *Id.* ¶¶ 71-73. Plaintiffs did not agree to abandon the Court ordered production pursuant to Dkt. 275. *Id.*

Meta proposed—for the first time on September 1, 2023—to resolve this dispute by converting RFP No. 7 into an interrogatory through which Meta would "create a document that identified" and described additional fields that Meta had discovered as part of its investigation. *Id.*; Opp. at 12. Plaintiffs responded to that proposal, in writing, the same day. *See* Barnes Decl., Ex. 31. Plaintiffs noted that RFP Nos. 5-7 sought "actual documents regarding data flow, data sources, fields, and descriptions of those fields in Meta's systems. If the documents 'sufficient to' be fully responsive to RFPs 5-7 are not contained within any one single document at Meta, then the proper discovery response is to produce the underlying documents necessary to sufficiently respond to the request." *Id.* Plaintiffs further stated that they would of course accept the attorney-created primer, but it would "not be a substitute for responding in full to RFPs 5-7." *Id.* On September 15, 2023, Meta made essentially the same offer, converting the RFP to an Interrogatory that would not provide underlying documents and would not provide the information that was ordered to be produced in RFP Nos. 5-7. Barnes Decl. ¶ 73. This functionally terminated the meet and confer process.

### III. ARGUMENT

Meta's core defense in this case is that it did not intend to acquire and use patient health information. To rebut that defense, Plaintiffs have sought discovery for more than a year into how Meta's backend systems work, including by serving RFP Nos. 5-7. Plaintiffs need these documents to conduct a "privacy audit" of Meta's system. Dkt. 323-2 ("Libert Decl.") ¶¶ 10-11, 14-16, 19-28. After multiple discussions, Meta agreed to produce these documents. Indeed, Meta told the Court on the initial motion to compel that "Meta has already agreed to produce the exact discovery Plaintiffs seek." Dkt. 247 at 4. The Court ordered that discovery to be produced by June 30, 2023. *See* Dkt. 275. But the documents were not produced, even after the Court entered its order, so Plaintiffs are now required to seek further assistance from the Court through this motion for sanctions.

At minimum, the Court should order full compliance with its order and require Meta to

produce internal documents sufficient to show (1) Pixel "data flow," including how the data flow changes within Meta's systems; (2) the specific data sources through and to which such data (and data inferred or derived from it) flow; and (3) the fields and field descriptions for those data sources.

Beyond the Court having already ordered their production, these documents are a core part of the case. As Plaintiffs' expert put it in an unrebutted declaration, "if any of these aspects are not sufficiently detailed by the company, it is impossible to verify the company's claims about the data." Libert Decl. ¶ 23. In the absence of such production, Plaintiffs' ability to prosecute their case is substantially impaired—thus if not rectified by production of the documents, Meta's intent and Filter-based defenses should be struck. Put simply, a party cannot maintain a defense for which it refuses to provide requested discovery that unrebutted expert testimony states is necessary to fully investigate and rebut the defense. *See, e.g.*, *Carlson Produce, LLC v. Clapper*, No. 18-cv-07195-VKD, 2021 WL 292031, at *5-6 (N.D. Cal. Jan. 28, 2021) (precluding defendant from relying on material not earlier produced to create a dispute of material fact at summary judgment).

Meta argues that sanctions would be inappropriate for three reasons: (1) it complied with the requirements of Dkt. 275, (2) Plaintiffs' counsel did not "attempt 'to resolve all disputed issues,'" and (3) Plaintiffs have not requested any specific sanctions. Opp. at 23-24. Meta is incorrect on all three counts.

**A. Meta's productions are facially deficient.**

There is no credible argument that Meta has fully complied with the Court's order to produce responsive documents to RFP Nos. 5-7 by June 30, 2023.

- For RFP No. 5, Meta produced no documents for the Filter data flow and no documents showing how the data flow changes or stays the same as it moves through Meta's internal systems.

- For RFP No. 6, although Meta says there are a vast array of tables in its major data storage systems, such as the Hive and Scuba, the only identification of any such data sources was in limited general data flow descriptions. In fact, one of the key documents that Meta cites to argue that it complied with the order states that "event data is logged to many databases," but Meta has only identified a handful.

- For RFP No. 7, Meta concedes that it has not produced documents sufficient to identify internal fields or internal field descriptions, as required.

Meta's opposition effectively concedes that these documents were not produced in accordance with Meta's agreement and the Court's order, particularly as to RFP Nos. 6 and 7.

### 1. RFP No. 5 – Data Flow

Meta argues that its production of two documents constitutes complete compliance with the Court's order to produce responsive documents to RFP No. 5. *See* Opp. at 5-6 (citing Dkt. 326-12 (Barnes Decl., Ex. 17) and Dkt. 350-7). To be clear, the issue before the Court is not whether Meta produced *any* responsive documents, but whether Meta fully satisfied the Court's order at Dkt. 275. Plaintiffs agree that these two documents are responsive. However, the production is facially incomplete based on Meta's prior representations to the Court about how its Filter functions. Meta previously told the Court that "the filter prevents . . . detected data from being ingested into Meta's ads ranking and optimization systems." Dkt. 77-4 ("Wooldridge Decl.") ¶ 8. Yet, the two documents that Meta relies upon do not include any information on how the Filter affects Meta's receipt of Pixel data. Therefore, either Meta's production is incomplete, or the Filter does not actually affect the flow of Pixel data. Both cannot be true at the same time. If Meta persists in its statements regarding the Filter and data flow documents, its Filter defense should be struck.

Filter aside, these documents are also not "sufficient to show" what occurs at each step of the Pixel data flow process. Although the two documents provide a partial, generalized overview of Pixel data flow, they also raise more questions than provide answers. For example, Exhibit 17 to the Barnes Declaration shows that Pixel data generally flows through a three-step initial process to determine whether to "Limit data use[.]" Dkt. 326-12. However, the diagram provides no information on what happens to the data flow at each step. For example, it is not clear whether *all* data received by the Pixel flows through each step, or only a portion of the data. Nor is it clear whether the data is modified, appended, or otherwise categorized at that or any other step. A similar problem arises at the decision point "Limit data use?" From Meta's production, it is unclear what system makes the determination or how it is made. The only information included in the diagram is, if the answer is "no," then some un-defined data flows one way, whereas if the answer is "yes," then some un-defined data flows another way. (But what data, in each case?) Barnes Decl., Ex. 17. To

comply with Dkt. 275, documents should have been produced that sufficiently show such data flow, named the systems involved, and identified the fields and their descriptions. But they were not.

Because of its inadequacies, Exhibit 17 is only sufficient to help Plaintiffs understand general areas inside Meta where data flowed, not whether all or some data flowed, and if some, how that data was sorted.[2] Meta's internal filtering of data is part and parcel of the data flow and is critical to understanding how Meta uses the data at-issue. If the Filter does not alter the data flow at all, then Meta's Filter defense is frivolous. If the Filter does alter the data flow somewhere, it is critical to know where and how that flow is altered, and where the Filter has no impact on the data flow, how specific pieces of data are used in those un-impacted areas of Meta's internal systems. For example, what is the at-issue data flow into systems used for conversions? For Custom Audiences? For customer uploads? For Lookalike Audiences? *See* Dkt. 336 ("First Am. Compl.") ¶¶ 52, 81-83, 295-300. For other as yet unknown purposes because Meta has not produced sufficient discovery? Plaintiffs' request, which Meta understood based on several conversations, included documents that describe *what* and *how* data is moving through Meta's systems, not just *that* some data is moving through Meta. But Meta has not produced any such documents.

Meta now argues that RFP No. 5 was limited to Meta's receipt of Pixel information at the front end of its collection systems. *See* Opp. at 22 ("Meta has already produced documents that show data flows of how Meta 'receives' information via the Pixel, just as plaintiffs' RFP No. 5 sought."). But Meta's interpretation is inconsistent with the language of the RFP, the party's discussions, Meta's prior representations, and a common-sense review of information Plaintiff already submitted to the Court through their own thorough research and expert reports.[3] If Plaintiffs had intended to limit this RFP to Meta's "front-end" servers, they would have said as much—and if Meta intended to produce only front-end documents, it should have so indicated. But that is not what happened.

---

[2] Similarly, the Workflow document Meta claims suffices (Opp. at 8) does not provide any specifics of system names and processes. It is also not a "schematic."

[3] *See, e,g,*, First Am. Compl. ¶¶ 88, 95; Dkt. 49 ("Smith Decl.") ¶¶ 4, 9, 20, 27, 32, 52, 93, 97, 130-32, 149, 159, 176-186. Thus, it would make no sense for Plaintiffs to move to compel a date certain to produce documents sufficient to show the data flow to Meta's front-end servers.

Plaintiffs and Meta proceeded from the first meet-and-confer on RFP Nos. 5-7 with the understanding that Plaintiffs were seeking documents about internal data flow, not just front-end receipt of data. In its response to Plaintiffs' motion to compel a date certain, Meta stated that it would produce "the exact discovery Plaintiffs seek." Dkt. 247. It was only months later, in September 2023, that Meta claimed it misunderstood Plaintiffs' requests. Further, Meta's production of Exhibit 17 (showing internal data flow) and its reliance on that document to state that it complied with Dkt. 275 (Opp. at 6) demonstrate that it had the same understanding.

### 2. RFP No. 6 – Data Sources for Event Level and Derived Data

Meta argues that it complied with Dkt. 275 as to RFP No. 6 because it (1) revealed the existence of the Hive as the "primary storage location" for Pixel data, and (2) identified three databases/tables within the Hive as containing relevant data. Opp. at 7. Again, however, Meta's own documents belie the sufficiency of this production. For example, Meta itself argues that there are so many Hive tables potentially containing Pixel data that even "the process of identifying the Hive tables that contain relevant data is time-consuming and complicated." *Id.* So, Meta admits, it did not identify them. *See id.* And as with RFP No. 5, Meta did not produce any documents relating to the Filter, much less documents that identify any data source's relationship to the Filter. This failure cannot be squared with Meta's voluminous list of websites that Meta itself claims the Filter identified as potentially sending health-related data. *See, e.g.*, First Am. Compl. ¶ 336. Even if the Filter does not alter the data-flow in any way, at the very least, some data must pass through it for such an analysis to be made.

Meta similarly asserts that Plaintiffs were incorrect in stating that Meta had "not produced any documents concerning DYI/DYD." Opp. at 16, citing Ex. 8 as "a detailed schema that describes the categories of data viewable using DYI," for which Meta asserts that there is not "anything more to produce for these RFPs related to DYI/DYD."[4] It is true that Meta produced one document

---

[4] DYI/DYI stands for "Download Your Information" or "Download Your Data," a system through which, upon a user's request, Meta will search its system to extract a limited set of information it has associated with that user's activity on non-Facebook websites and apps. For example, DYI/DYD would not include the full content of a SubscribedButtonClick or the file path that Facebook

1  relating to DYI/DYD on September 28, 2023 (three months after the date ordered by Dkt. 275).[5]
2  However, Meta is incorrect that it is a "detailed schema." Opp. at 16. Indeed, the document again
3  includes a single sentence about the data relevant here, and does not identify the fields, field
4  descriptions, or other underlying sources for DYI/DYD. *See* Barnes Decl., Ex. 8 at 17. But the
5  underlying data sources are particularly important here, because they will reveal where Meta stores
6  underlying data for each absent class member – and what is stored there.

7  Meta's factual assertions about the data sources identified by Plaintiffs are not a defense to
8  the underlying motion. The fact that Plaintiffs have not been able to piece together Meta's systems
9  more than a year into the litigation based only on vague, generalized diagrams is no fault of
10 Plaintiffs. As Meta has repeatedly stated, its backend systems are complicated. The same is true for
11 Meta's complaint that Plaintiffs had not identified such systems to Meta in previous correspondence.
12 *See* Opp. at 23. Under the Federal Rules of Civil Procedure, it is not the Plaintiffs' responsibility to
13 explain a defendant's complicated data systems to the defendant. Rather, Rule 26 requires that the
14 defendant disclose this information—even in the absence of a discovery request. As Judge Chhabria
15 put it in another case involving Meta's efforts to obstruct discovery into its Named Plaintiff Data
16 collection systems, "[i]t's worth remembering that Facebook and Gibson Dunn had superior access
17 to all the evidence needed in this case. How were the plaintiffs supposed to know what specific
18 information Facebook collected about them …? … Through discovery, the plaintiffs were entitled
19 to this evidence – that is the whole point of civil discovery." *In re Facebook, Inc. Cons. Privacy*

---

22 collected from a Health Care Provider Web-Property. According to Facebook, building the "Off-Facebook Activity" portion of DYI "required an extensive redesign of the way our systems store and process this activity[.]" *See Redesigning our systems to provide more control over Off-Facebook activity*, Engineering at Meta (Aug. 20, 2019), https://engineering.fb.com/2019/08/20/core-infra/off-facebook-activity/. Facebook publicly states that this tool does now "show off-site activity [collected] while a person was not logged into Facebook on that particular device" even though Meta can still identify it to a specific user in order to purportedly "disconnect it from the person's account" if they delete their data.

[5] Plaintiffs apologize for the mistake and explain the background at Barnes Rebuttal Decl. ¶¶ 127-144. This document was only produced after multiple conferences had resulted in an impasse and Plaintiffs had provided Meta with their half of a Joint Letter Brief to compel its production.

*User Profile Litig.*, No. 18-md-02843-VC, 2023 WL 1871107, at *28 (N.D. Cal. Feb. 9, 2023).[6]

### 3. RFP No. 7 – Fields and Field Descriptions

Meta concedes that it has not complied at the Court's order for RFP No. 7 with respect to fields and field descriptions in internal databases. *See* Opp. at 10 ("To date, Meta has not identified" documents "reflecting the other fields in the sources Meta had identified as potentially containing relevant Pixel data."). Meta states it "produced documentation showing fields and events that Meta receives from third-party developers via the Pixel." Opp. at 9-10. It did so by producing a handful of publicly available documents. While responsive, the fields identified are not complete because they do not identify internal fields associated with Pixel data or data inferred from Pixel data.

These documents are plainly insufficient. With their motion, Plaintiffs submitted a declaration from Dr. Timothy Libert, an expert with broad experience in academia as a data scientist and the private sector as a Staff Privacy Engineer at Google from 2018 to 2023, where he "oversaw internal privacy policies and technical enforcement mechanisms for cookies across all Alphabet products." Libert Decl. ¶ 7. In his declaration, Dr. Libert explained that it is vital for a large data company to keep records of fields and field descriptions in the data bases and other sources where it maintains consumer and publisher information. *See id.* ¶ 24 ("[I]t is incumbent on any company like Meta to document [fields and field descriptions] for its own internal auditing purposes, to have enforcement mechanisms to ensure compliance, and to build technical monitoring systems to find and fix bugs, errors, and other issues that occur.").

Meta does not submit any evidence that rebuts Dr. Libert. Instead, it submits a declaration from Tobias Wooldridge, who states that he is "not personally aware of any additional non-privileged documents that 'identify and describe each of the fields' in data sources that contain Pixel data." Dkt. 349-001 ("Wooldridge Opp. Decl.") ¶ 9. Dr. Libert states that, in his experience working for a large data company, based on Mr. Wooldridge's job title and a disclaimer in Exhibit 17, it is

---

[6] Meta's criticism resembles its conduct in the Privacy Profile Litigation where it responded to Plaintiffs' requests for similar information about "documents describing [Facebook's complex data storage system] so that they could understand where … named plaintiff data might be stored" by telling the Plaintiffs to "Google" it. *Id.* at 11.

unlikely that Wooldridge is the right person to ask to identify these systems. Libert Rebuttal Decl. ¶¶ 4 -5. Libert further explains that, even if the statement is true for *Wooldridge*, it is not credible that *Meta* cannot identify documents that detail the data flow, data sources, fields, and field descriptions for the Pixel. Libert Rebuttal Decl. ¶ 3. In fact, Meta has been under a consent decree from the FTC to maintain certain privacy risk assessments since 2011—precisely where this type of information might be kept even apart from Meta's need for it in its everyday business. *See* First Am. Compl. ¶¶ 339-341.

Meta alternatively seeks to avoid producing these documents by demanding that Plaintiffs reframe RFP No. 7 as an interrogatory. But there are four major problems with this.

*First*, Meta has not made any showing that the RFP is improper or unduly burdensome – and it waived any such objection in Dkt. 247 by asserting that it had "already agreed to produce the exact discovery Plaintiffs seek" without raising any such objection at that time.

*Second*, Meta proposes to provide information different than that which the responsive documents would provide. Plaintiffs seek to learn the different fields in different sources so that they can understand how Meta's systems specifically work to monetize the data, not a single undifferentiated list of field names and descriptions that would only create additional disputes.

*Third*, Meta's last-minute proposal demonstrates that there are responsive internal documents at Meta that have not been produced as ordered. It would not be possible for Meta's counsel to answer a converted interrogatory requesting fields and field descriptions in the absence of internal documents that would serve as reference. Meta has repeatedly told the Court and Plaintiffs that its internal systems are complicated and that the Hive has a vast quantity of tables. Given that complexity, it is not credible to suggest that someone could answer such an interrogatory from memory alone. To do so would require underlying documents and systems descriptions. It is those documents and systems descriptions (including fields and field descriptions) that Plaintiffs have specifically requested, and that the Court ordered be produced by June 30, 2023. Plaintiffs seek those internal documents because they will describe Meta's systems *as Meta and its engineers describe them* in its day-to-day business, not as outside counsel describes and translates them after review.

*Fourth*, Meta has already used this "convert an RFP to an Interrogatory" tactic elsewhere, and it has only slowed down discovery in this case. Specifically, Plaintiffs' RFP No. 27 sought "documents sufficient to show All terms and keywords used by the Filter and its 'Block List' to detect potentially sensitive data sent through the Meta Pixel." On July 7, 2023, Meta produced a single responsive document which appeared to be attorney-created. Barnes Decl., ¶¶ 44-45; *id.*, Exs. 8-9. To prevent delay from another dispute, Plaintiffs contemporaneously notified Meta of the deficiency and served additional RFPs seeking the underlying documents. *Id.* ¶ 46; *id.*, Ex. 10. A month later Meta agreed to produce the underlying documents—but Meta still has not produced them. *Id.* ¶ 48. There is no reason to believe that transforming Plaintiffs' RFP into an interrogatory here would yield any better results.

Nothing in Meta's opposition supports finding that it has produced documents sufficient to show the information Plaintiffs requested in RFP Nos. 5-7.

### B. Meta's References to Other Discovery Requests and Opportunities are Unavailing

Meta also periodically refers to discovery issues that are unrelated to this dispute. These are all red herrings. The question is whether Meta complied with Dkt. 275, not whether Meta has agreed to participate in discovery for other requests at some future date.

*First*, Meta argues that Plaintiffs' Eighth Set of RFPs "implicitly concede that plaintiffs had *not* previously requested these documents through RFP Nos. 5 to 7." Opp. at 12. But Plaintiffs' precautionary step of propounding additional, targeted requests, does not concede any such thing—all it shows is that Meta's failure to comply with Dkt. 275 has needlessly multiplied the discovery requests and disputes in this case.[7]

*Second*, Meta's opposition includes a recitation of Filter discovery that it agreed to produce. *Id.* at 20-21. Among other things, Meta states that Plaintiffs had "neglect[ed] to mention that, before plaintiffs filed this motion," Meta had agreed to "make available for inspection the 'Filter Source Code." *Id.* at 20. However, this agreement is *completely irrelevant* to whether Meta complied with Dkt. 275. Source code is different than the information requested in RFP Nos. 5-7. Further, Meta's

---

[7] This is not the first time that Meta's failure to comply with an RFP as written led to a new set of RFPs to fix the prior deficiencies. *See* Barnes Decl. ¶¶ 44-48.

conduct with respect to the Source Code only further demonstrates why Court intervention is necessary here.

The relevancy of Meta's Source Code is not in dispute. Nevertheless, Meta forced Plaintiffs to engage in protracted meet and confers—including forcing the issue to impasse, then agreeing to produce it, then changing its mind and refusing to produce it, then forcing the issue to impasse again, and then relenting again after Plaintiffs sent their half of a Joint Letter Brief. Barnes Rebuttal Decl. ¶¶ 112-125. And, Meta still has not produced the Filter Source Code and will not do so until December 2023. *Id.* ¶ 126. As this Court has explained, "The timeline that follows the conference of lead counsel is intended to prevent one party from unreasonably holding up submission of a genuine dispute to the Court." *Handloser*, at *7. Further, "[t]he Court expects a party that makes a commitment about when it will respond to keep that commitment." *Id*. Thus, far from an example of why Meta should not be sanctioned, the source code issue is an example of how Meta's conduct is not consistent with how this Court expects discovery to proceed.

### C. Plaintiffs followed all required procedures.

Plaintiffs have diligently sought this discovery informally and formally for more than a year. Plaintiffs served discovery in February, met-and-conferred with Meta, filed a joint-letter brief, and obtained relief from the Court when it ordered responsive documents to be produced by June 30, 2023. *See* Mot. at 4. When Meta's production was deficient, Plaintiffs notified Meta within a week. *See* Barnes Decl. ¶ 57; *id.*, Ex. 19. Meta then ignored Plaintiffs for more than a month. *Id.* ¶ 63. Once Meta did confer, it provided no additional information and continued to delay. *Id.* ¶¶ 63, 69, 71-73.

When it became clear that Plaintiffs would have to (and would) seek court intervention, Meta proposed to convert RFP No. 7 into an interrogatory. *See id.* ¶¶ 71-73. In the process, Meta revealed that it must have identified fields and field descriptions and was proposing to rely upon whatever it had identified to provide Plaintiffs with an attorney-crafted response rather than simply produce the actual internal documents. *See id.* ¶ 71. Contrary to Meta's representation that Plaintiffs "chose not to respond" to this proposal, Plaintiffs rejected that improper proposal on the same day that it was

made—and explained their reasons for doing so. Opp. at 23-24; Barnes Decl. ¶ 72; *id.*, Ex. 31.[8] Meta ignored this response and then made essentially *the same proposal* again two weeks later. Barnes Decl. ¶ 73; *id.*, Ex. 32.

The Local Rules require counsel to "have previously conferred for the purpose of attempting to resolve all disputed issues." Civil L.R. 37-1. Plaintiffs have done that. Indeed, they even expressly told Meta two months ago that they intended to seek a motion to enforce Dkt. 275 pursuant to Rule 37 if the deficient production were not remedied, but still continued to try to reach a resolution for another month. *See* Barnes Decl. ¶ 70. There is no requirement in Local Rule 37-1 that counsel confer on an endless loop when they have already had multiple meet-and-confers on a topic for six months, the Court has already compelled production, and it is obvious that there is no possible avenue of resolution absent Court intervention. To the contrary, this Court has made clear that its Standing Order "is intended to prevent one party from unreasonably holding up submission of a genuine dispute to the Court." *Handloser*, 2020 WL 4923971 at *7. Even so, Plaintiffs repeatedly followed-up with Meta about the status of production and conferred again to attempt to avoid having to file this motion. *See* Barnes Decl. ¶¶ 57-73.

**D.  At a minimum, a full production by November 14 is a "just" remedy.**

Meta claims that Plaintiffs' motion is insufficiently specific and requires a showing of bad faith. Meta is doubly wrong. In *Handloser*, this Court found that a "just" sanction for violation of a discovery order was a further order directing the defendant to comply by a specified date and monetary compensation for attorneys' fees and costs incurred in seeking compliance. 2020 WL 4923971, at *8-9. Second, *Handloser* explained that a Court "need not find that the violations prejudiced plaintiffs or that [defendant] acted in bad faith in order to impose sanctions." *Id.* at *8.

Here, Plaintiffs have sought the same remedies as in *Handloser*: full compliance by November 14 and monetary sanctions. These same remedies are "just" here—and although Plaintiffs

---

[8] Plaintiffs' immediate follow-up is consistent with this Court's sound guidance that "cooperation and professional courtesy" requires that "counsel should respond promptly to each other's discovery-related communications," including that "some communications … should be answered within at most a day or two." *Handloser*, at *7. Meta's persistent delays are not.

need not show prejudice or bad faith, they would certainly be prejudiced by any further delay. These core documents must be analyzed early in the case to develop the merits. Meta's insistence that its systems are complicated only underscores that the documents must be produced in full, and immediately, so that Plaintiffs can begin their work of unpacking these complicated systems. And, because discovery is iterative and these documents are foundational, Plaintiffs face serious prejudice to their ability to build their case, serve further discovery, and prepare their experts, unless and until they are able to analyze a full production in compliance with the Court's order at Dkt. 275.

Indeed, there is no disagreement that these documents are critical to Plaintiffs' case—the Court has already explained the need for information about how health data moves though, is collected, and stored in Meta's systems. Judge Orrick agreed that "[t]he allegations against Meta are troubling: plaintiffs raise potentially strong claims on the merits and their alleged injury would be irreparable if proven," but credited Meta's assertions that it was "doing all it can to minimize the problems raised by plaintiffs" and finding a "need for discovery" to clarify both the scope of the problems and potential solutions for them." Dkt. 159 at 1, 11. And Judge Orrick previewed the importance of this discovery in particular when he noted that "discovery will eliminate" some of the "unknowns," including potentially learning how Meta could "refine its systems to block the patient information at issue here" and stating that it "expect[s] Meta to continue to refine its filtration systems to address the issues raised by this case." *Id*. at 32. Now, nearly a year later, Meta has produced only six non-public documents regarding its data infrastructure, including the Filter.

Given the importance of these documents and a consistent pattern of delay, Meta's response that "Plaintiffs will have ample opportunities through discovery—during depositions and pursuant to the other 236 RFPs they have issued—to inquire about" the information at issue is woefully inadequate. Opp. at 23; *see, e.g.*, Barnes Rebuttal Decl. ¶¶ 112-126. Having already been ordered to produce documents responsive to these RFPs, Meta cannot unilaterally decide not to comply with a court order because it might decide to produce other discovery at some later date. Whether Plaintiffs

could obtain this information by some other means is also immaterial.[9] Absent a protective order or a motion to reconsider this Court's prior order—neither of which Meta has sought—Meta must comply with this Court's order.

Through this motion for sanctions, Plaintiffs seek only to hold Meta accountable to its production obligations without setting a precedent that encourages or rewards delay and obstruction. Plaintiffs sought this discovery in February, secured Meta's agreement to produce responsive documents in May, and expected their production per the Court's order in June. It is four months later, and Plaintiffs are again briefing the same issue.

If this were later in the discovery process, Plaintiffs believe that striking many of Meta's defenses would be an appropriate sanction. *See Handloser*, 2020 WL 4923971, at *8 (taking account of case schedule in selecting "just" remedies). At this time, however, Plaintiffs believe full compliance with this Court's orders by November 14 is a "just" sanction, if not the least drastic sanction available. If the Court also agrees with Plaintiffs that monetary sanctions sufficient to compensate them for this motion practice would also be "just," Plaintiffs will submit an application detailing fees and costs incurred.

Dated: October 26, 2023

By: */s/ Jay Barnes*
**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes (admitted *pro hac vice*)
  jaybarnes@simmonsfirm.com
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:   212-784-6400
Fax:   212-213-5949

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Geoffrey Graber, State Bar No. 211547
  ggraber@cohenmilstein.com
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel:    202-408-4600

---

[9] In any event, it is not realistic for Meta to assert that Plaintiffs can obtain the discovery they need relating to RFP Nos. 5-7 through deposition testimony when Meta has stated there are a vast array of Hive tables and an untold number of relevant data sources and fields. Large data systems such as Meta's do not lend themselves to explanation by memory. If that were so, Meta could not truthfully tell the Court that its systems are "complicated."

|   |   |
|---|---|
| 1 | Fax:   202-408-4699 |
| 2 | **KIESEL LAW LLP** |
|   | Jeffrey A. Koncius, State Bar No. 189803 |
| 3 |   *koncius@kiesel.law* |
|   | 8648 Wilshire Boulevard |
| 4 | Beverly Hills, CA 90211 |
|   | Tel:   310-854-4444 |
| 5 | Fax:   310-854-0812 |

**TERRELL MARSHALL LAW GROUP PLLC**
Beth E. Terrell, State Bar No. 178181
  *bterrell@terrellmarshall.com*
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.:   206-816-6603
Fax:   206-319-5450

**GIBBS LAW GROUP LLP**
Andre M. Mura, State Bar No. 298541
  *amm@classlawgroup.com*
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.:   510-350-9700
Fax:   510-350-9701

**CIVIL L.R. 5-1(i)(3) ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I, Andre M. Mura, hereby attest that concurrence in the filing of this document has been obtained from all signatories.

Dated: October 26, 2023          /s/ Andre M. Mura
                                   Andre M. Mura