**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:   (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:   (415) 393-8200
Facsimile:    (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION,<br><br>This Document Relates To:<br><br>All Actions | Case No. 3:22-cv-3580-WHO<br><br>**DECLARATION OF ELIZABETH K. MCCLOSKEY IN SUPPORT OF META'S OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS**<br><br><u>CLASS ACTION</u><br><br>Date: February 19, 2025<br>Time: 2:00 p.m.<br>Courtroom 2<br><br>**HON. WILLIAM H. ORRICK** |

# REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

I, Elizabeth K. McCloskey, declare as follows:

1. I am a member in good standing of the State Bar of California and am admitted to practice before this Court. I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, counsel for Meta Platforms, Inc. ("Meta") in the above-captioned action. I make this declaration in support of Meta's Opposition to Plaintiffs' Motion for Sanctions. If called as a witness, I could competently testify to the information in this declaration.

2. Plaintiffs first mentioned the ▮▮▮▮▮▮▮▮ table in a letter dated July 7, 2023, after Meta had already internally identified it as potentially relevant based on its own investigation and preserved more than ▮▮▮▮▮▮ worth of data from it.

3. Attached as Exhibit 1 is a true and correct copy of a February 22, 2024 email from plaintiffs' counsel to Meta's counsel. In February 2024, plaintiffs demanded that Meta "produce data from *all* data sources and tables" that contained "responsive" information for all putative class members, as well as all relevant Hive data for the Named Plaintiffs, including duplicative data. Meta explained that it would be technologically impossible to find and produce all the data plaintiffs were requesting and offered to instead discuss a sampling method for the primary tables that store Pixel data.

4. Attached as Exhibit 2 is a true and correct copy of a March 1, 2024 email from plaintiffs' counsel to Meta's counsel, which stated plaintiffs' position that plaintiffs would not agree to a sampling approach.

5. Attached as Exhibit 3 is a true and correct copy of a May 7, 2024 email from Meta's counsel to plaintiffs' counsel concerning the parties' disputes regarding sampling, in which Meta reiterated in writing the earliest date from which Meta possessed data in certain tables. Meta had previously shared that information during a meet and confer on April 26, 2024.

6. After Judge DeMarchi asked Meta to investigate whether it would be possible to produce all responsive data from the Disputed Tables (▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮), even if sampling would be required for the others, Meta determined it could likely produce that data by the substantial-completion deadline, so Meta agreed to do so.

7.      For the purpose of responding to plaintiffs' motion, we have conducted, at my direction, a preliminary analysis of some of the event data Meta has produced in this litigation, including from the tables at issue.

8.      In these Pixel event data tables, there is a ▇▇▇▇ identifier called a "Separable ID" that is often used in the context of third-party data sent via the Business Tools. A Separable ID is a pseudonym that corresponds to a Meta user at a given time. I understand that users can adjust their settings so that their Separable ID rotates to a new number every day.

9.      We ran a comparison to see how many of the Separable IDs that appeared in ▇▇▇▇ also appeared in other tables Meta produced on overlapping days. The goal was to test plaintiffs' claim that not having eight months of data would meaningfully affect their arguments about class size, given that plaintiffs possess data from other tables from the same periods.

10.     There appears to be substantial overlap for the Separable IDs that appeared in ▇▇▇▇ compared to the other tables. For example, 96.85% of the Separable IDs appearing in ▇▇▇▇ on March 24, 2023 also appeared in ▇▇▇▇ In other words, for 96.85% of the users who had an event associated with them in the ▇▇▇▇ event data that was produced from March 24, 2023 (generated using the Pixel IDs that plaintiffs claim to correspond to healthcare websites at issue), one or more events associated with that same user were also identified in the event data from March 24, 2023 that Meta produced from the ▇▇▇▇ table (generated using the same Pixel IDs). We used March 24, 2023 for this analysis because the produced data for these tables overlapped on this day—which did not always occur because the Court ordered and the parties entered a sampling agreement for certain tables.

11.     We similarly analyzed how many of the Separable IDs that appeared in ▇▇▇▇ also appeared in ▇▇▇▇ on days of overlapping productions. We limited the data in ▇▇▇▇ to reflect only ▇▇▇▇, rather than other types of Business Tool event data, for consistency. There were 24 overlapping days that we tested. The lowest percentage of all 24 days was 96.11% overlap and the highest was 97.91% overlap. In other words, for ~96–98% of the users who had an event associated with them in the ▇▇▇▇ event data that was produced, one or more events associated with that same user were also identified in the event data from

1    ▇▇▇▇▇▇▇ from that same day.  Again, this comparison is based on data generated using the Pixel

2    IDs that plaintiffs claim to correspond to relevant healthcare provider websites.

3        12.    We also analyzed how many of the Pixel IDs that appeared in ▇▇▇▇▇▇▇ also

4    appeared in ▇▇▇▇▇▇▇ or ▇▇▇▇▇▇▇ on days of overlapping productions.  We likewise found

5    significant overlap across the 24 available days.  The lowest percentage of all 24 days was 91% overlap

6    and the highest was 92.04% overlap.  In other words, for ~91-92% of the Pixel IDs that had an

7    associated event in the ▇▇▇▇▇▇▇ event data that was produced, one or more events associated

8    with that same Pixel ID were also identified in the event data from ▇▇▇▇▇▇▇ or ▇▇▇▇▇▇▇

9    from that same day.  This comparison is likewise based on data generated using the Pixel IDs that

10   plaintiffs claim to correspond to relevant healthcare provider websites.

11       13.    We also analyzed how many total Pixel events, unique Pixel IDs, and unique Separable

12   IDs were produced from these four tables, on average, for each day of produced data, for the specific

13   Pixel IDs that plaintiffs have identified as allegedly corresponding to health-related entities.  The

14   results are as follows:

[table redacted]

23       14.    Therefore, on average, using the figures for ▇▇▇▇▇▇▇ as the denominator, the

24   figures for the ▇▇▇▇▇▇▇ table were 14.2% of Pixel IDs, 2% of average daily events, and

25   1.1% of SIDs compared to the comparable figures for ▇▇▇▇▇▇▇.  On average, then, only around

26   1 in 7 Pixel IDs in this data set sent ▇▇▇▇▇▇▇,

27   and the volume of that data was much smaller.

28

15. Plaintiffs claim in their motion that the number of websites using the Pixel that they claim to be relevant were decreasing over time. To test this claim, we analyzed Meta's production of ▮▮▮▮, spanning ▮▮▮▮, for the number of Pixel IDs appearing in the data over time. The results of that analysis (not to scale on the x-axis) are depicted in the chart below:

16. For the same reason, we analyzed the data from ▮▮▮▮ for the number of Pixel IDs appearing in the data over time. The results were consistent (similarly note that the x-axis moves from ▮▮▮▮ on the last data point):



17. We also conducted an analysis to test plaintiffs' assumption that all or a substantial number of events in the ▮▮▮▮ table involve medical appointment scheduling. To do so,

-4-

1  we analyzed the number of events in that table, from the data Meta produced, that had "button" entries
2  that might correspond to scheduling (regardless of whether they involved medical scheduling
3  specifically) or patient portals by applying certain search terms. There were approximately ▮▮▮▮▮
4  rows of data produced from this table. Based on our analysis, only approximately .65% of those entries
5  included the term ▮▮▮▮ in the button metadata field, 1% included the term ▮▮▮▮ and
6  .83% included the term ▮▮▮▮ (or close variations of it). I understand that ▮▮▮▮ is also
7  a standard event type for the Pixel. We ran similar analyses for the terms ▮▮▮▮ or close
8  variations of them (again, regardless of whether they had any connection to medical logins), and those
9  terms appeared in the button metadata field in approximately 9.5% and 4.55% of the event data entries,
10 respectively. None of these figures are mutually exclusive, meaning that if a button included more than
11 one of these terms, it is reflected in more than one of the percentages listed here.

12       18.    I have reviewed examples of data produced from the ▮▮▮▮ table. To give
13 the Court some examples of some of the types of information produced from this table that seem to
14 have nothing to do with healthcare information, we queried the data for a single pixel ID that plaintiffs
15 claim to be relevant. I see:



22       There are numerous others; these are just examples. I have included some of these examples
23 and others for the Court's consideration at Exhibit 4.

24       19.    Attached as Exhibit 5 is a true and correct copy of excerpts of a spreadsheet sent by
25 plaintiffs' counsel to Meta's counsel on June 21, 2023. The cover email accompanying the spreadsheet
26 asserted that the spreadsheet reflected "medical web-properties identified by Plaintiffs' outside
27 investigation as within the scope of this action." Included on this list are websites such as
28

albertsons.com, costco.com, kroger.com, safeway.com, tylenol.com, vons.com, walmart.com, and zyrtec.com.

20.     There are 1,844 web domains identified in this spreadsheet that plaintiffs assert are at issue. Plaintiffs also included a column called "has_portal_link," which plaintiffs stated meant "Whether the property has a portal" (i.e., a patient portal). Of the 1,844 web domains in this spreadsheet, 984 of them have a "FALSE" entry for "has_portal_link."

21.     In this litigation overall, plaintiffs have served 315 requests for production (including an Eleventh Set served four days ago), filed 21 joint letter briefs with Judge DeMarchi, spent more than 50 days examining Meta's source code, and sent Meta approximately 200 discovery letters over the last two years.

22.     Throughout this litigation, plaintiffs have insisted that Meta is precluded from preserving any data or information about the named plaintiffs unless plaintiffs provide their advance consent and Meta submits to certain conditions (regardless of Rule 26). Plaintiffs claimed, on several occasions, including on November 27, 2023, that "Meta does not have the consent required under the ECPA to preserve, search, or extract any data from its systems about the named plaintiffs that it does not also produce to the named plaintiffs and their counsel. Any preservation, search, or extraction of the named plaintiffs' data without also producing the named plaintiffs' own data to them and their counsel is a violation of 18 U.S.C. § 2702 for which there is no exception for divulgence of the contents of a communication to counsel." In other words, plaintiffs threatened that Meta would be violating the Electronic Communications Privacy Act unless Meta produced all data about the named plaintiffs preserved in Meta's systems.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed in San Francisco, California on this 27th day of January 2025.

*/s/ Elizabeth K. McCloskey*
Elizabeth K. McCloskey