# Further Proposed Redacted Version of Exhibit 1 to the Motion for Sanctions Against Meta and for a Hearing to Address Relief
# (Dkt. 739-6)

# EXHIBIT 1

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY  10166-0193
Tel 212.351.4000
www.gibsondunn.com

Lauren R. Goldman
Direct: +1 212.351.2375
Fax: +1 212.716.0875
LGoldman@gibsondunn.com

May 18, 2023

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
VIA ELECTRONIC MAIL

Jay Barnes
*jaybarnes@simmonsfirm.com*
SIMMONS HANLY CONROY LLC
112 Madison Avenue, 7th Floor
New York, NY 10016

Re:   *In re Meta Pixel Healthcare Litig.*, Case No. 3:22-cv-3580 WHO

Dear Counsel:

As previously discussed during the parties' April 3 and April 6 meet-and-confers, and in accordance with the guidance provided by Judge DeMarchi at the April 20, 2023 discovery conference, I write (1) to provide fulsome information regarding how data, which is transmitted to Meta through the Pixel, proceeds through Meta's systems, (2) to explain how user-generated data is stored in Meta's system and the specific categories of user-generated data of the named plaintiffs which Meta is preserving, and (3) to provide additional information concerning the sources of ESI that Meta is preserving.

**I.    Pixel Data Sources Being Preserved**

Meta has undertaken extensive, time-consuming, manual processes to preserve data from the structured warehouse sources that contain data transmitted by third parties to Meta via the Meta Pixel (the "Pixel").

Third parties that choose to implement the Pixel on their websites—not Meta—control where and how to integrate Pixel code into their websites, what visitor activity is recorded as events on their webpage(s), and how to transmit such events to Meta.  When a person visits a third-party's webpage that has implemented the Pixel and takes an action that triggers an event (per the third-party's configuration), the event data is then sent from the visitor's browser to Meta's servers via the Pixel.  Data transmitted by third parties via the Pixel to Meta's servers is processed and stored into a structured data warehouse called "Hive," which is the primary source for data transmitted via the Pixel to Meta.

Hive tables are the primary storage location for data that Meta receives from third parties via the Pixel.  Accordingly, Meta has undertaken a process to preserve relevant data

**GIBSON DUNN**

May 18, 2023

Page 2

stored in Hive tables. The process of identifying which Hive tables contain relevant data, however, is a time-consuming and complex process. Hive tables are not indexed and are not structured to support centralized searches of, for example, individual developers' event data. Each Hive table is subject to a retention period set in the ordinary course of Meta's business. The retention periods for Hive tables containing Pixel event data range from ▮▮▮▮▮▮ ▮▮▮▮ depending on the specific table.

The volume of incoming data Meta receives from the Pixel is significant. During a six-week period beginning in July 2022, for example, Meta received ▮▮▮▮▮▮▮ events via the Pixel in the United States alone. Consequently, it would be overly broad, burdensome, and disproportionate to the needs of this case to place all Hive tables containing Pixel data on hold in their entirety because of the technical limitations involved in doing so. Meta's data systems are "enormously complex," and, as such, it cannot "take every conceivable step or disproportionate steps to preserve each instance of relevant electronically stored information." *Sedona Principles*, The Sedona Conference, 19 Sedona Conf. J. 1, 5; *see* Guideline 2.01(b), <u>Guidelines for Discovery of Electronically Stored Information</u>, Northern District of California ("The parties should strive to define a scope of preservation that is proportionate and reasonable and not disproportionately broad, expensive, or burdensome.").

Indeed, Meta has taken steps *beyond* its obligations here. Based on its knowledge of the data within its system and its understanding of the data at issue here, Meta identified the Hive tables with information potentially relevant to this litigation. For example, Meta identified tables containing event data that Meta received from the specific third party domains at issue in this litigation. After identifying the Hive tables, Meta then began the process of placing potentially relevant data within the Hive tables on legal hold. While some of the identified Hive tables could be held in whole; others were too large to be reasonably usable or produceable. In order to ensure that, not only would relevant data be duly preserved, but would also be feasibly produceable, Meta undertook the complex and time-consuming process of building custom data pipelines specifically for the purposes of this litigation. These pipelines were built specifically to preserve data that otherwise would not be reasonably usable or produceable. Meta also undertook extremely burdensome steps to retrieve as much historical data as possible from the relevant Hive tables along with the construction of custom data pipelines.

Based on the allegations in the complaints filed, including the operative Consolidated Complaint, and Meta's internal reviews, Meta identified Hive tables with information potentially relevant to this litigation and built bespoke pipelines to preserve that information. Simultaneously, Meta retrieved and preserved the historical data contained in those Hive tables at the time. Meta undertook these steps to preserve information potentially relevant to this litigation based on the list of web domains that Plaintiffs provided to Meta in Exhibit A of their First Set of Requests for Production of Documents, dated July 29, 2022.

**GIBSON DUNN**

May 18, 2023

Page 3

Even given the significant efforts Meta has undertaken to meet and exceed its obligations here, there are still practical limitations to what is possible to preserve. Critically, Meta cannot preserve data that it does not have. Not all data that is sent to Meta's servers is received, and data that is received may be discarded in whole or part during processing for a variety of reasons, including having an invalid format or due to Meta's signals integrity system detecting and filtering out potentially prohibited data. Meta is also limited by the earliest date data is available under the applicable retention period.

Further, as Meta has explained during the parties' meet-and-confers, Meta is not able to identify entities (or their webpages) based on whether they are covered by HIPAA or CMIA. Thus, to the extent Plaintiffs seek information predicated on an entity's HIPAA or CMIA status, Meta can only identify and preserve that data to the extent that it is provided with the Pixel IDs implemented on the entity webpages that Plaintiffs assert are relevant. If Plaintiffs do not have a comprehensive list of relevant Pixel IDs, Plaintiffs may instead provide the URLs for those entities' patient portals or similar features; however, as Meta has explained during the parties' prior meet-and-confers, Meta's method of identifying the Pixel IDs associated with a given URL is not guaranteed to capture *all* Pixel IDs that Plaintiffs may contend are relevant.

Based on the flow of data transmitted via the Pixel, as described above, Meta is preserving the data from the primary source—i.e., Hive—where data potentially relevant to this litigation is stored. This is consistent with the Sedona Principles, which explain that "duplicative instances of identical ESI need not be preserved" and proportionality should apply to all preservation determinations. *The Sedona Principles*, The Sedona Conference, 19 Sedona Conf. J. 1, 39 (2018). The process "for addressing the preservation and production of unique, relevant ESI," should "start[] with the primary and most readily available sources, and only mov[e] down the continuum to secondary and less readily available sources, as necessary, until it is no longer reasonable or proportionate to the needs of the case." *Id*. at 42. Meta has determined that Hive is the primary and most readily available system where Pixel data relevant to this litigation is stored.

The "emphasis placed on proportionality in the 2015 amendments to the Federal Rules [] recognize[d] that some ESI relevant to a matter may reside in an enormously complex system, of which only some ESI and some metadata is relevant to the case or needed to render the ESI produced reasonably usable." *Sedona Principles*, The Sedona Conference, 19 Sedona Conf. J. 1, 46. As noted above, Meta's data systems are "enormously complex." *Id*. at 51. Given the complexity of its systems and the technical challenges to preserving data in Hive, Meta's efforts to date here are more than reasonable.

**GIBSON DUNN**

May 18, 2023

Page 4

### II. Named Plaintiffs' User-Generated Data

When users log into Facebook or Instagram, their activity on those services generate "user-generated data." Meta allows users to use "Download Your Information" or Download Your Data" ("DYI" or "DYD") to access their own user-generated data from a Facebook or Instagram account. All Facebook and Instagram users have access to the DYI and DYD files associated with their accounts and may download these files themselves. DYI and DYD files include "Ads Topics" information—i.e., the topics of the ads Meta has served on a user, and "Ads History" information—i.e., any ad a user has actively interacted with (as opposed to merely viewing the ad). Switchboard is a different tool Meta uses to manage law enforcement and other legal requests and may access user information or user-generated data for such purposes.

As Meta has raised previously, for it to identify the appropriate accounts and place the data associated with those accounts on hold, Meta needs the account information for a specific Facebook or Instagram user. Specifically, Meta needs the Facebook username, Instagram handle, email, and phone number to identify the relevant user accounts associated with a particular user. Only after Meta has this information can it locate reasonably accessible, potentially relevant user-generated data within its data sources. Named Plaintiffs provided this information on March 23, 2023, and Meta has taken and continues to take steps to preserve the user-generated data from Plaintiffs' Facebook accounts (as well as Instagram account data, to the extent Plaintiffs have provided Instagram accounts).

Meta's preservation of data generated from named Plaintiffs' Facebook and/or Instagram accounts is more than sufficient to meet its discovery obligations. Once Meta received the necessary information identifying named Plaintiffs' accounts, Meta made reasonable, good-faith efforts to locate potentially relevant, user-generated data from those accounts that is reasonably accessible within its systems, and has taken and continues to take steps to preserve that data. To the extent this data is indeed relevant to Plaintiffs' claims in this litigation, it will be reviewed and produced accordingly. Meta cannot feasibly put on hold *all* user-generated data. Meta has made "reasonable and good faith efforts to retain" named Plaintiff data "that is expected to be relevant to claims or defenses" in the pending litigation. As numerous authorities recognize, "it is unreasonable to expect parties to take every conceivable step or disproportionate steps to preserve each instance of relevant electronically stored information." *Id*. at 51; *see also* Guideline 2.01(b), *Guidelines for Discovery of Electronically Stored Information* (stating that "parties should strive to define a scope of preservation that is proportionate and reasonable and not disproportionately broad, expensive, or burdensome"); *Rodriguez v. Google LLC*, 2021 WL 8085492, at *2 (N.D. Cal. Dec. 1, 2021) (denying plaintiffs' request for the court to require Google to alter its data retention policies, and stating that it would not "require Google to start saving petabytes of data per day, indefinitely, without a more compelling showing of need"). And as the party responding to

May 18, 2023

Page 5


Plaintiffs' discovery requests, Meta is "best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing [its] own electronically stored information." *The Sedona Principles*, The Sedona Conference, 19 Sedona Conf. J. 1, 52.

Plaintiffs' prior letters requesting Meta preserve named Plaintiff data from a number of systems and including a number of identifiers (pulled from another litigation completely unrelated to the present case) is "overbroad." *See* Guideline 2.01(c), <u>*Guidelines for Discovery of Electronically Stored Information*</u>, Northern District of California. As an initial matter and as Meta noted in its April 20, 2023 letter, Plaintiffs' March 23, 2023 letter does not explain how the systems and identifiers listed in that letter are relevant to the claims or defenses in this litigation, nor is it readily apparent to Meta upon review of the letter how they are relevant. Indeed, many of the systems referenced in Plaintiffs' letter are not data sources and/or are not suitable for preservation. For example, Presto and Centra are tools used to view or query data stored in other systems and are not sources of data themselves. SRT is a tool used to review data and is not used to collect or generate user data itself. Spark is a compute engine that Meta uses to process data, but it is not a data source itself. Unlike Hive, Scuba is designed for short-term data storage and approximate analysis. For systems that actually are data sources (like Everstore and Manifold), the DYI/DYD and/or Switchboard tools pull in reasonably accessible user-generated data from those systems. Finally, Meta does not use a system called "Diagraph."

Meta is not obligated to preserve data that is not relevant to this litigation, nor is it obligated to preserve duplicative data. To the extent Plaintiffs contend certain data *is* relevant and not already preserved in any of the steps Meta has outlined above, please explain why Plaintiffs believe the data is both unique and relevant.

### III.   Additional ESI Preservation

#### A.   Preservation of Custodial Data

In addition to the data preservation methods described above for structured data, Meta is also preserving relevant custodial ESI through its legal hold process. Meta issued legal holds to individuals identified as possessing potentially relevant materials in connection with the healthcare litigation. Automated deletion and retention settings have been disabled in the most common sources of potentially relevant custodial data. Meta provides below information regarding the most common Meta sources of potentially relevant custodial data.

**Email and Workplace Chat.** Meta preserves email and Workplace Chat in Meta's email archive system.

**GIBSON DUNN**

May 18, 2023

Page 6

**Microsoft 365 (OneDrive, SharePoint).** Microsoft OneDrive is a file hosting service generally used as a personal repository to store, share, and synchronize files. Users can open and edit documents in OneDrive on a web browser as well as share their personal OneDrive documents with others for collaboration. It contains user uploaded files. Microsoft OneDrive is a third party application and the data is stored off-premises in Microsoft's cloud infrastructure.

Sharepoint is a web-based platform generally used for sharing and collaboration where everyone invited to a site can create and edit documents. It contains user uploaded files, dashboards, and project management tools. Sharepoint is a third party application and the data is stored off-premises in Microsoft's cloud infrastructure.

**Google Workspace (Google Drive, Google Shared Drive).** Google Workspace is a data storage system and synchronization service generally used for productivity, collaboration, and sharing. Google Workspace contains Google Drive, Forms, Drawings, Keep, Google Docs (GDocs), Google Sheets, Google Slides, and user uploaded files. It is a third-party application and the data is stored off-premises in Google's cloud infrastructure. The deployment of Google Workspace within Meta includes the following: My Drive, Team Drive, Sites, Docs, Sheets, Slides, Forms, Drawings, and Keep.

**Dropbox.** Dropbox is a storage and sharing platform with collaboration capabilities generally used for synchronization for file sharing across teams as well as external sharing. This data source contains user uploaded files. Dropbox is a third party application and the data is stored off-premises in Dropbox's cloud storage infrastructure.

**Quip.** Quip is a Salesforce SaaS collaboration tool and productivity suite. It is generally used to collaborate with Word and Excel-like documents, add comments in Word and Excel-like documents, and create documents, spreadsheets, and task lists in one place accessible across multiple devices. Quip contains documents, spreadsheets, and task lists. Quip is a third party application and the data is stored off-premises in Salesforce's cloud infrastructure.

**B.     ESI Sources That Should Not Be Preserved**

As described in Sections 5(e) and 5(f) of Meta's Proposed ESI Protocol, *see* Dkt. 191-1, Meta proposes sixteen categories of ESI that it will not preserve because, among other reasons, these sources are not reasonably accessible, they are duplicative of more readily accessible information, the limits of technical capabilities, and the disproportionate burden of preservation.

May 18, 2023

Page 7

Plaintiffs specifically requested additional information on three such categories—backup systems and/or tapes used for disaster recovery, systems no longer in use that cannot be accessed by using systems currently in use by the Party, and instant messages. These sources are discussed in more detail below. Thereafter, in accordance with Judge DeMarchi's guidance, this letter also addresses the additional categories of sources in Meta's proposed ESI Protocol.

As noted above, numerous authorities recognize the preservation of potentially relevant ESI must be reasonable and proportionate to the litigation at hand. Judge DeMarchi, too, emphasized this at the April 20, 2023 discovery conference. *See* Hearing Tr. 54:18-22 ("There's usually categories of technical information that the parties can agree up front are just -- they are not primary evidence, and they are the kind of thing that everyone can reasonably agree to"); 54:24-55:4 (noting the parties should "have a kind of candid discussion about what are the relevant data sources in the first place. And . . . the answer to that question should really guide the preservation obligations at least at this stage of the case"); 134:21-24 ("[T]he normal rules here apply. And like I said, I will not be requiring the producing party to do something that is unusual and out of the ordinary and burdensome by way of producing things"). As set forth above, Meta has made significant efforts to preserve voluminous data—both custodial and structured data—relevant to the claims and defenses asserted in this case, including by taking time-consuming and burdensome efforts to preserve historical data. Meta also believes, however, that preserving other ESI is not reasonable and proportionate. Meta's position is entirely supported by relevant case law.

First, regarding backup tapes, based on Meta's experience, it believes that it is highly unlikely that there is unique discoverable information only available on backup tapes. Instead, Meta has preserved potentially relevant data and information from other less burdensome sources. To be clear, Meta has not, to date, identified any unique, relevant data which is stored on backup tapes. To the extent there is a remote possibility that unique data exists on such tapes, the excessive burden associated with collecting, reviewing, and producing data from such tapes outweighs its relevance. *See* Fed. R. Civ. P. 26(b)(1) ("Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering . . . whether the burden or expense of the proposed discovery outweighs its likely benefit."). California statutory law and case law confirm that backup tapes are widely considered to be "not reasonably accessible" data sources because of their undue burden and/or cost. *See Toshiba Am. Elec. Components v. Superior Ct.*, 124 Cal. App. 4th 762, 771 (Cal. Ct. App. 2004) ("[T]he cost of recovering data from backup tapes or other data compilations can be exorbitant."); *see also* CCP § 2031.280(e) ("If necessary, the responding party at the reasonable expense of the demanding party shall, through detection devices, translate any data compilations included in the demand into reasonably usable form.").

**GIBSON DUNN**

May 18, 2023

Page 8

Second, and similarly, it would be highly burdensome for Meta to preserve, collect, review, and/or produce data that exists in systems no longer in use. For Meta to access that data, and then make it searchable and reviewable, Meta would have to create systems that do not presently exist, and would take a significant investment of time and money. Meta has not yet identified any unique, relevant data located in systems no longer in use. The case law again supports Meta's position. Courts emphasize that "the primary source of ESI to be produced during discovery's progression should be *active* ESI, typically defined as ESI currently or habitually in use by the requested entity." *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 238 (S.D. Cal. 2015) (emphasis in original). The sources identified in Section 5(e)(2) of Meta's proposed ESI Protocol, Dkt. 191-1, are systems that are no longer actively utilized by Meta and would require significant expenditures to make them accessible.

Notably, the Northern District of California's Model ESI Protocol identifies "backup media" and "systems no longer in use that cannot be accessed" as ESI sources that may not be reasonable and proportionate to preserve. *See* Model Stipulated Order Re: Discovery of Electronically Stored Information for Standard Litigation, Sec. 4(d). Courts have routinely entered orders relieving defendants of the burden to preserve information from this type of burdensome data source. *See, e.g.*, *Martinelli v. Johnson & Johnson*, No. 2:15-CV-01733-MCE (EFB), 2016 WL 1458109, at *2 (E.D. Cal. Apr. 13, 2016) ("Data remaining from systems no longer in use that are unintelligible on the systems currently in use" are not discoverable).

During the April 20, 2023 discovery conference, Judge DeMarchi acknowledged that Meta's proposals regarding preservation—including in connection with backup systems and/or tapes used for disaster recovery and systems no longer in use that cannot be accessed by using systems currently in use—are reasonable and supported by the law. *See* Apr. 20, 2023 Tr. at 54:7-17. Judge DeMarchi indicated the same with respect to Meta's proposals for preservation of deleted, slack, fragmented, or unallocated data only accessible by forensics; RAM, temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and on-line data such as temporary internet files, history, cache, cookies, and the like. *See id.* at 64:12-21.

Third, Plaintiffs have inquired about instant messages. To be clear, Meta is preserving Workplace Chats, Meta's internal instant message channel. Section 5(e)(4) of Meta's proposed ESI Protocol *only* applies to those instant messages and chats that are "not chronicled to an email archive." This category would *not* include communications sent via Workplace Chat, which *are* chronicled to an email archive system and which Meta has confirmed it is preserving. To the extent any relevant non-Workplace Chats do exist, they will be preserved through Meta's custodial preservation measures. Custodians are clearly instructed to preserve these communications, and any relevant instant messages identified by custodians will be collected, reviewed, and produced as required. Thus, Meta's language in its proposed ESI

**GIBSON DUNN**

May 18, 2023

Page 9


Protocol applies to only those chats and instant messages not chronicled to an email archive system and which are not identified through the custodial preservation procedures, a limitation courts regularly uphold. *See Martinelli*, 2016 WL 1458109, at *2 ("Text messages and instant messages that are not retained in the ordinary course of business" are not discoverable).

In accordance with Judge DeMarchi's instruction to further discuss the remaining ESI Protocol categories, the information below addresses the named sources, not already addressed above, within the two categories identified in Meta's ESI Protocol—sources which are not reasonably accessible (Section 5(e) of Meta's Proposed ESI Protocol) and sources which should not be preserved under proportionality factors (Section 5(f) of Meta's Proposed EDI Protocol).

Meta's proposed ESI Protocol identifies, in addition to those addressed above, the following sources which it believes should not reasonably be preserved: (1) voice messages, sound recordings, video recordings, and information contained solely on mobile devices; and (2) version histories for Google Docs or Google Sheets. Meta will preserve these sources pursuant to standard business processes, but will not take "unwarranted extraordinary measures" to preserve ESI from these sources."

Meta addresses each of these sources in more detail below.

**(1) Voice Messages, Sound Recordings, Video Recordings, and Information Solely Contained on Mobile Devices**

Meta cannot effectively search and review, using available technology, the following sources: voice messages, sound recordings, video recordings, and information solely contained on mobile devices. Indeed, to review this information, Meta would need to listen to or look at any potentially responsive information, requiring significant person-hours. Meta does not have a central repository or archive of all voice, sound, or video recordings, unlike more commonly used systems, such as email and Workplace Chat, nor for information solely contained on mobile devices. Based on Meta's experience and understanding of the data relevant to this case, it does not expect these sources to contain unique discoverable data.

To the extent any such documents or communications in the formats described above exist and are identified through the custodial interview process, Meta will collect and review them through the course of discovery and produce them in accordance with Meta's responses and objections to Plaintiffs' discovery requests.

**(2) Version Histories of Google Docs or Google Sheets**

**GIBSON DUNN**

May 18, 2023

Page 10

It is Meta's understanding that there is a *manual* process by which prior iterations of a Google Doc or Google Sheet can be accessed for viewing. However, it is a highly burdensome, manual process to identify such versions for collection, review, and production, including printing/taking screenshots of each iteration. It is Meta's understanding that any available technology would similarly require a manual process to identify and review prior iterations of a document, if available.[1]

In Meta's proposed ESI Protocol, the following categories of sources are identified as sources that could contain relevant information, but, under the proportionality factors, should not be preserved: (3) data in metadata fields that are frequently updated automatically, such as last-opened or last-modified dates and dynamic fields in databases or log files not stored or retained in the usual course of business; (4) mobile device activity logs; (5) system, server, or network logs; and (6) information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and/or disposition of computer equipment by the Party.

These sources are described in more detail below.

**(3) Data in Metadata Fields that are Frequently Updated Automatically, such as Last-Opened or Last-Modified Dates and Dynamic Fields in Databases or Log Files Not Stored or Retained in the Usual Course of Business**

Data that is frequently updated automatically and/or existing in dynamic fields not retained in the usual course of business is very difficult to accurately identify and preserve because the act of identification, preservation, and/or collection impacts the data (i.e., the last opened field). Further, this metadata is only accurate as of a specific period in time, as of time of collection, which undercuts the usefulness and relevance of the data.

Dynamic fields in databases or log files not stored or retained in the usual course of business are describing fields that are operating system-level fields rather than business-related fields; that is, these fields are temporary storage for the operation of Meta's databases and do not contain business information. Meta does not store or retain dynamic fields in databases or log files in the ordinary course of its business. To do so, Meta would need to create processes solely for the purposes of this litigation in order to attempt to store or retain this data.

---

[1] Preserving version histories for Quip and OneDrive, described in more detail in Sec. III(A), is a similarly highly burdensome and manual task.

**GIBSON DUNN**

May 18, 2023

Page 11

The parties have already agreed to a comprehensive list of metadata fields to be included in the ESI Protocol. The requirement to create processes to capture the fields in this category is not proportional to the needs of this case.

### (4) Mobile Device Activity Logs

It is Meta's understanding that such logs are automatically created by a mobile device and track specific activities, such as when an app was opened or closed. Such data is unlikely to contain responsive information to the issues in this litigation.

Further, such data would be unduly burdensome to collect. It would require the physical collection of each mobile device and then a forensic imaging of each mobile device. Such data is unlikely to be relevant to the transmission of information via the Pixel. Further, as already noted, to the extent there is responsive substantive information on mobile devices, such information will be identified through the custodial review process.

### (5) Server, System, or Network Logs

The server, system, or network logs are logs automatically created and maintained by either the server, system, or network, and consist of a list of activities performed by the given source. In Meta's experience, these logs rarely contain unique, discoverable data and are overly burdensome to search, review, and collect.

### (6) Information Created or Copied During the Deployment, Maintenance, Retirement and/or Disposition of Computer Equipment

Meta states that there would not be any unique relevant data contained within this category that could not be obtained from a less burdensome source. As the description of the source makes clear, the information at issue concerns duplicative data created during the process of deployment, maintenance, retirement, and/or disposition of equipment. Such data will already be available from other sources.

\*   \*   \*

Meta continues to abide by its preservation obligations. Meta's proposed ESI Protocol seeks to focus preservation on the responsive, unique data relevant to this litigation while not preserving duplicative data, irrelevant data, or data not proportional to the needs of the case that create undue costs and burdens. To the extent further conversations are required, please let us know. Meta reserves all rights.

**GIBSON DUNN**

May 18, 2023

Page 12


Sincerely,

*Lauren Goldman*

Lauren R. Goldman


CC:    All Counsel of Record
           Counsel of Record in *In re Meta Pixel Tax Filing Cases*
           Counsel of Record in *Gershzon v. Meta*