# Proposed Redacted Version of the Shafiq Declaration for the Reply to Motion for Sanctions (Dkt. No. 813-5)

Jason 'Jay' Barnes (admitted *pro hac vice*)
*jaybarnes@simmonsfirm.com*
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel: 212-784-6400
Fax: 212-213-5949

Geoffrey Graber, State Bar No. 211547
*ggraber@cohenmilstein.com*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Jeffrey A. Koncius, State Bar No. 189803
*koncius@kiesel.law*
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel: 310-854-4444
Fax: 310-854-0812

Beth E. Terrell, State Bar No. 178181
*bterrell@terrellmarshall.com*
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax: (206) 319-5450

*Attorneys for Plaintiffs*

[*Additional counsel listed on signature page*]

Andre M. Mura, State Bar No. 298541
*amm@classlawgroup.com*
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.: (510) 350-9700
Fax: (510) 350-9701

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | **Case No. 3:22-cv-03580-WHO (VKD)** |
| This Document Relates To:<br><br>All Actions | **DECLARATION OF PROF. ZUBAIR SHAFIQ IN SUPPORT OF PLAINTIFFS' MOTION FOR SACTIONS RELATING TO PIXEL-BUTTON-CLICK DATA** |

# DECLARATION OF PROF. ZUBAIR SHAFIQ

## I. Introduction and Qualifications

1. I am an Associate Professor of Computer Science at the University of California, Davis, where I run a research lab focused on Internet privacy, security, and safety. My lab's research over the last several years has specifically aimed to uncover personal data collection, sharing, and usage in the online advertising ecosystem.

2. In addition to my research, I regularly teach undergraduate and graduate courses on computer networks and computer security, including special topics covering emerging trends in online advertising and tracking.

3. I have received several awards and distinctions for my research. I am a recipient of the Caspar Bowden Runner-up Award for Outstanding Research in Privacy Enhancing Technologies (2024), Chancellor's Fellowship (2022-2023), Dean's Scholar Award (2020), National Science Foundation CAREER Award (2018), and Fitch-Beach Outstanding Graduate Research Award (2013).

4. I have co-authored more than 100 peer-reviewed research papers. I received the Best Paper Award at the 2023 ACM Internet Measurement Conference for my research on tracking, profiling, and ad targeting in the Amazon Alexa ecosystem. I also received the 2018 Andreas Pfitzmann Award at the Privacy Enhancing Technologies Symposium for my research on designing a system to reliably detect advertising and tracking information flows in mobile apps. I also received the Best Paper Award at the 2017 ACM Internet Measurement Conference for my research on identifying and investigating the abuse of a security vulnerability in Facebook Graph API. I also received the Best Paper Award at the 2012 IEEE International Conference on Network Protocols for my research on reverse-engineering proprietary network traffic protocols.

5. I am the editor-in-chief of the Proceedings on Privacy Enhancing Technologies (PoPETs). I am on the steering committee of the Workshop on Measurements, Attacks, and Defenses for the Web (MADWeb). I am the general chair of the IEEE Workshop on Technology and Consumer Protection (ConPro). Recently, I have served as the program chair for the IEEE Workshop on Technology and Consumer Protection (ConPro 2022 and 2023) and the Workshop on Measurements, Attacks, and Defenses for the Web (MADWeb 2022 and 2023).

6. I have submitted several prior declarations in this case relating to Meta's systems.

## II. Summary of Assignments and Conclusions

7. For this declaration, counsel asked me to answer certain questions to address analysis conducted by Meta in connection with Meta's opposition to Plaintiffs' motion for sanctions.[1]

(1) Whether the number of healthcare provider websites from which the Pixel collected button click information from has increased or decreased since 2022.

(2) Whether the button click data produced by Meta includes at-issue data for healthcare providers, such as patient portal logins, medical appointment scheduling, health conditions and treatments, and health risk assessments.

(3) Whether Meta can identify relevant healthcare provider web properties and at-issue data using its internal classification systems.

8. Based on my analysis of documents Meta has produced in discovery, my review of publicly available information, as well as my own testing, analysis, and experience, I have reached the following conclusions:

(1) I conducted an analysis of the limited number of healthcare provider web properties whose 2022 Pixel configuration information was archived by the Internet Archive's Wayback Machine. Among these healthcare providers, the Pixel collected button click information from 83% of the healthcare provider web properties in 2022. By 2023, the percentage was reduced to 33%. This is more than a 50% reduction. And by 2024, the percentage was reduced to 0%. There is a clear trend that Meta's collection of button click information from healthcare provider web properties has substantially decreased since 2022.

(2) My analysis of the button click data produced by Meta shows that it includes button clicks that captures information about [redacted]

[1] Declaration of Elizabeth K. McCloskey in Support of Meta's Opposition to Plaintiffs' Motion for Sanctions.



(3) My analysis shows that Meta is capable of identifying using its internal classification systems such as verticals, and filters that have specific classifications.

## III. Detailed Analysis for Each Assignment

### A. Assignment #1: Meta's Collection of Button Click Information from Healthcare Provider Web Properties Has Substantially Decreased Since 2022

9. Meta's counsel writes that her team "analyzed Meta's production of spanning for the number of Pixel IDs appearing in the data over time."[2] Meta's counsel claims that this analysis shows that the number of websites using the Pixel increased after June 2022.[3] However, her analysis is not limited to healthcare providers.

10. Plaintiffs' counsel asked me to analyze whether the number of healthcare provider websites from which the Pixel collected button click information has increased or decreased since 2022.

11. To this end, the most efficient way to conduct this analysis would be to directly examine the data stored in the tables where Meta stores button click information.

12. However, I have been informed that Meta did not preserve button click information for healthcare provider web properties from the table prior to and the table prior to .

---

[2] Declaration of Elizabeth K. McCloskey in Support of Meta's Opposition to Plaintiffs' Motion for Sanctions, at ¶ 15.

[3] *Id.*

13. In the absence of that full and direct evidence, I devised a two-step methodology to investigate Meta's collection of button click information. First, I analyze Meta Pixel source code on a web property to determine whether it was configured to collect button click information from that web property. Second, I retrospectively analyze Meta Pixel source code on a web property that is archived by the Wayback Machine.

14. Web developers and researchers in the field of computer science commonly analyze the source code of a web property to investigate data collection by advertisers and trackers.[4] It is my understanding that Meta's employee Tobias Wooldridge also testified that one way to investigate Meta Pixel on a web property would be to "look at the code of that website and what's it running on" including "how that website has configured and implemented and is running the Meta Pixel."[5]

15. An expert can determine whether Meta can collect button click information from a given web property by analyzing Meta Pixel's source code as follows.

16. When Meta Pixel is installed on a web property, it includes two JavaScript source code files:

a. The first JavaScript source code file is the generic Meta Pixel JavaScript source code applicable to all websites that install the Meta Pixel.[6]

b. The second JavaScript source code file contains the Pixel ID specific to the Meta Pixel installed on that web property.[7]

---

[4] Iqbal, Umar, Steven Englehardt, and Zubair Shafiq. "Fingerprinting the fingerprinters: Learning to detect browser fingerprinting behaviors." In 2021 IEEE Symposium on Security and Privacy (SP), pp. 1143-1161. IEEE, 2021; Bekos, Paschalis, Panagiotis Papadopoulos, Evangelos P. Markatos, and Nicolas Kourtellis. "The Hitchhiker's guide to facebook web tracking with invisible pixels and click IDs." In Proceedings of the ACM Web Conference 2023, pp. 2132-2143. 2023; Amjad, A.H., Munir, S., Shafiq, Z. and Gulzar, M.A., 2024, December. Blocking Tracking JavaScript at the Function Granularity. In Proceedings of the 2024 on ACM SIGSAC Conference on Computer and Communications Security (pp. 2177-2191).

[5] Wooldridge Deposition Tr. at 45:20-46:16

[6] This file is served from the URL https://connect.facebook.net/en_US/fbevents.js.

[7] This file is served from the URL https://connect.facebook.net/signals/config/{PIXEL_ID} with the value of PIXEL_ID equal to the Pixel ID for the web-property.

17. To determine whether Meta Pixel can collect button click information from a web property, an expert can review the Pixel's configuration information that is reflected in the second JavaScript source code file.

18. Meta collects button click information in the default configuration for the Pixel using a feature called "Automatic Setup" or "Automatic Configuration," which was implemented by Meta in 2017.[8,9,10,11,12,13]

19. When Automatic Setup is used, according to Meta's public documentation, Meta automatically collects button click information from a web property through the "SubscribedButtonClick" event.[14]

20. In Automatic Setup, the "SubscribedButtonClick" event fires on every button click, sending the button text and other associated information to Meta.[15,16]

---

[8] https://developers.facebook.com/docs/meta-pixel/advanced/#automatic-configuration

[9] https://www.pixelyoursite.com/major-facebook-pixel-update-automatic-facebook-pixel-events

[10] https://web.archive.org/web/20180125110944/https://developers.facebook.com/docs/ads-for-websites/pixel-events/v2.11

[11] ("Starting end of May we've included an automatic event in the standard FB pixel called "SubscribedButtonClick". This event automatically collects data related to buttons on the web page.") PIXEL_HEALTH000614879 at -882

[12] ("We updated our pixel terms to support logging button text, form fields and other page meta data by default for intent and to power the automatic setup feature for all advertisers (even if the event predictions are not used).") PIXEL_HEALTH000898218 at -229

[13] ("AutomaticSetUpRollout: 6/19/2017") PIXEL_HEALTH000898971

[14] "The Meta Pixel will send button click and page metadata (such as data structured according to Opengraph or Schema.org formats) from your website to improve your ads delivery and measurement and automate your Pixel setup." https://developers.facebook.com/docs/meta-pixel/advanced/#automatic-configuration

[15] https://www.pixelyoursite.com/major-facebook-pixel-update-automatic-facebook-pixel-events

[16] https://www.pixelyoursite.com/new-facebook-pixel-events-video

21. Automatic Setup shows up in Meta's second JavaScript source code file as: instance.optIn("{PIXEL_ID}", "AutomaticSetup", true). Therefore, the presence of this line of code indicates that Meta can collect button click information from a web property.

22. To retrospectively analyze Meta's collection of button click information from healthcare provider web properties that installed Meta Pixel, I analyzed Meta Pixel settings as reflected in the JavaScript source code files that are archived by the Wayback Machine.[17]

23. Web developers and researchers in the field of computer science commonly use the Wayback Machine to review archived versions of webpages and the related source code.[18]

24. I used the Wayback Machine to obtain the archives of the JavaScript source code files of Meta Pixel installed on the top 1100 healthcare provider web properties in the data produced by Meta.[19] I then compared the presence of the aforementioned line of code, which indicates Automatic Setup, in the Meta Pixel source code archived in 2022, 2023, and 2024.

25. However, I note that only a small portion of the Meta Pixel source code running on healthcare provider web properties is archived in the Wayback Machine. I was only able to obtain the Meta Pixel JavaScript source code files for approximately 6% of the Pixels installed on top 1100 healthcare provider web properties in the data that Meta has produced in this case to date.[20]

26. The results of my analysis are summarized below:

---

[17] https://web.archive.org

[18] Bahrami, P.N., Iqbal, U. and Shafiq, Z., 2022. FP-Radar: Longitudinal Measurement and Early Detection of Browser Fingerprinting. Proceedings on Privacy Enhancing Technologies, 2, pp.557-577; Lerner, A., Simpson, A.K., Kohno, T. and Roesner, F., 2016. Internet jones and the raiders of the lost trackers: An archaeological study of web tracking from 1996 to 2016. In 25th USENIX Security Symposium.

[19] I identified health care provider web properties in the data produced by Meta using the list of healthcare related verticals and sub-verticals produced by Meta. Specifically, PIXEL_HEALTH000735433 contains the list of [REDACTED] categorized by Meta into [REDACTED]

[20] I determined the top 1100 healthcare web properties from the data produced by Meta by applying the following two criteria: (1) that Meta placed the property into healthcare related verticals and sub-verticals; and (2) that there were at least [REDACTED] events for the web property in the produced data.

a. In 2022, Meta Pixel was configured to collect button click information on 83% (55 out of 66) of the Pixels installed on health provider web properties.

b. In 2023, Meta Pixel was configured to collect button click information on 33% (23 out of 73) of the Pixels installed on health provider web properties.[21]

c. In 2024, Meta Pixel was configured to collect button click information on 0% (0 out of 45) of the Pixels installed on health provider web properties.

27. Note that the Wayback Machine archived the Meta Pixel source code for only 6% of the health provider web properties, but the numbers point to a clear trend that Meta's collection of button click information from healthcare provider web properties substantially decreased after 2022.

28. Based on the foregoing, the available information suggests that Meta's collection of button click information from healthcare provider web properties has decreased since the filing of this action in June 2022.

29. If Meta had preserved the data in the [REDACTED] and [REDACTED] tables, it would be easy to identify all healthcare web properties where Meta was collecting button click information, including the specific button text information that Meta collected from those websites.

**B. Assignment #2: The Types of Health-Related Button Click Information in the Data Produced by Meta**

30. Meta's counsel also states that her team "conducted an analysis to test plaintiffs' assumption that all or a substantial number of events in the [REDACTED] involve medical appointment scheduling."[22] Meta's lawyer then describes a methodology looking for [REDACTED] button clicks or items with [REDACTED] in it.[23] However, Meta's counsel does not

---

[21] The Wayback Machine archived the Meta Pixel source code of different number of healthcare provider web properties across different years. However, a higher archival count in a given year does not necessarily mean that more healthcare provider sites were using the Pixel that year—it may simply reflect variations in the Wayback Machine's archival process.

[22] McCloskey Decl. ¶ 17.

[23] Id.

describe the methodology used to conduct this investigation so I could not replicate it.

31. A flaw in Meta's analysis of button click data is that Meta analyzed web properties that are not healthcare providers. Meta's lawyer provided examples of button clicks associated with a [REDACTED], and a [REDACTED][24]

32. Counsel asked me to investigate whether the button click data for healthcare providers produced by Meta includes patient portal log-in buttons, medical appointment scheduling buttons, and other relevant healthcare buttons (such as health conditions and treatments, and health risk assessments).

33. To comprehensively analyze the button clicks, I would need access to [REDACTED] data, before many healthcare providers apparently stopped collecting button clicks through the Pixel. Unfortunately, this data does not exist.

34. Nonetheless, I analyzed the button click data and then extracted and analyzed button click text for two healthcare provider web properties such as Banner Health (bannerhealth.com) and University of Miami Health System (umiamihealth.org) about (1) scheduling an appointment, (2) patient portal login, (3) health risk assessments, and (4) health conditions and treatments using keywords and simple patterns.

35. For example, I used keywords like (1) [REDACTED] and [REDACTED] to identify button clicks related to scheduling an appointment, (2) [REDACTED] and [REDACTED] to identify button clicks related to patient porta login, (3) [REDACTED] and [REDACTED] to identify button clicks related to health risk assessments, and (4) [REDACTED] and [REDACTED] to identify button clicks related to health conditions and treatments.

36. Using this simple approach, I have been able to identify relevant button clicks from healthcare provider web properties. For example, I identified the following buttons from Banner Health and University of Miami Health System:

---

[24] Id.

a. scheduling an appointment: [REDACTED] and [REDACTED]

b. patient portal login: [REDACTED] and [REDACTED]

c. health risk assessments: [REDACTED] and [REDACTED]

d. health conditions and treatments: [REDACTED]" and [REDACTED] and [REDACTED] and [REDACTED]

37. Based on my analysis of button clicks for Banner Health, 20.6% of the button events are [REDACTED] buttons and 3.5% are [REDACTED] buttons.

38. Based on my analysis of button clicks for University of Miami Health System, 7.0% of the button events are [REDACTED] button events and 14.6% are [REDACTED] button events.

39. Contrary to Meta's flawed analysis, it appears that a substantial portion of the button clicks on healthcare provider websites are relevant.

**C. Assignment #3: It Would Be Trivial for Meta to Identify Relevant Healthcare Provider Web-Properties and At-Issue Communications**

40. It is my understanding that Meta's lawyer identified "examples of data produced from the [REDACTED] table … that seem to have nothing to do with healthcare information."[25] Meta's lawyer provided examples of button clicks associated with a [REDACTED].[26]

41. In my opinion, the button click analysis by Meta's lawyer was not appropriately scoped to relevant healthcare provider web properties. As discussed above, I was able to find a substantial

[25] McCloskey Decl. ¶ 18

[26] Id.

number of health-related button click information simply by limiting the analysis to relevant healthcare provider web properties that were identified by Meta.

42. My analysis of discovery shows that Meta is capable of identifying relevant [REDACTED] using its internal classification systems such as verticals, [REDACTED] and filter.

a. **Verticals:** Meta's sales team classifies advertisers according to their industry in segments called "verticals." Meta has identified [REDACTED].[27] Meta has identified [REDACTED] that it has classified into these verticals.[28]

b. [REDACTED] Meta's advertising engineering teams maintain a [REDACTED].[29] Meta produced a document stating that "[REDACTED]."[30] It is my understanding that Meta has produced [REDACTED] but has not produced health classifications for [REDACTED] for any period.[31]

---

[27] August 30, 2024 Letter. Lauren Goldman. In re Meta Pixel Healthcare Litigation, No. 3:22-cv-03580-WHO (VKD)

[28] PIXEL_HEALTH000735433

[29] See Dkt. 627-10, list of health-related classifications for [REDACTED] and a [REDACTED] called [REDACTED] that can also be used to appropriately scope the at-issue data in this case.

[30] PIXEL_HEALTH000667137

[31] PIXEL_HEALTH000778051 ([REDACTED] Classifications).

c. **Filter**: Thee Filter is operated by Meta's Signals Integrity team and [REDACTED] [REDACTED].[32] Meta has identified healthcare provider web properties that the Filter [REDACTED] in this case.[33] The Filter system also has a keyword list that contains thousands of medical keywords and phrases, including [REDACTED].[34]

43. In summary, Meta can identify relevant healthcare [REDACTED] through any or all of these internal classification systems. This should ensure that the data considered in this case does not include the types of information that Meta's lawyer put in her declaration. However, I have been informed that Meta has not yet fully produced those classifications, as applied to healthcare provider [REDACTED]

I declare under penalty of perjury that the foregoing is true and correct.

Executed February 7, 2025.

By: ____________________
Zubair Shafiq

[32] PIXEL_HEALTH000859295 (Slide show by Abhinav Anand describing Filter "[REDACTED] classification")

[33] Meta Ex. 1 to Answer to Plaintiff Interrogatory No. 3, served Oct. 10, 2023.

[34] PIXEL_HEALTH00000176.