# Redacted Version of the Opposition to the Motion for Sanctions Against Meta and for a Hearing to Address Relief (Dkt. No. 800-3)

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE META PIXEL HEALTHCARE LITIGATION

This Document Relates To:

All Actions

Case No. 3:22-cv-3580-WHO-VKD

**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS**

CLASS ACTION

Date: February 19, 2025
Time: 2:00 p.m.
Courtroom 2

**HON. WILLIAM H. ORRICK**

# DOCUMENT FILED UNDER SEAL

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

BACKGROUND ..... 3

A. Meta's Preservation Efforts Have Been Diligent, Extensive, And Ongoing. ..... 3

1. Meta's data systems are extraordinarily complex, and identifying relevant tables requires time and analysis by subject-matter experts. ..... 3

2. Preserving data from individual tables requires complex and time-consuming processes. ..... 4

3. Meta has worked diligently to identify and preserve potentially relevant data throughout this litigation. ..... 5

4. Meta determined that two additional tables contained non-duplicative data in January 2023 and promptly preserved them. ..... 7

B. Meta Affirmatively Offered To Produce Data From The Two Tables At Issue—And Then Produced More Than [redacted] Rows. ..... 8

C. Plaintiffs' Motion Follows A Series Of Scorched-Earth Discovery Tactics. ..... 9

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. Sanctions Are Not Warranted Because Meta Took Reasonable Steps To Preserve Relevant Data. ..... 11

II. Sanctions Are Not Warranted Under Rule 37(e)(2) Because Meta Did Not Intend To Deprive Plaintiffs Of The Information's Use In Litigation. ..... 12

A. Plaintiffs Have Not Shown Intent. ..... 13

B. Both Of Plaintiffs' Requested Remedies Require Them To Show Intent, Which They Have Not Done (And Cannot Do). ..... 17

III. Sanctions Are Not Warranted Under Rule 37(e)(1) Because Plaintiffs Have Not Suffered Any Prejudice. ..... 17

IV. Plaintiffs' Requested Remedies Are Inappropriate. ..... 19

CONCLUSION ..... 21

# TABLE OF AUTHORITIES


**Page(s)**

*Best Label Co. v. Custom Label & Decal, LLC*,
2022 WL 1525301 (N.D. Cal. May 13, 2022) ....11

*Estate of Bosco v. County of Sonoma*,
640 F. Supp. 3d 915 (N.D. Cal. 2022) ....13

*Burris v. JPMorgan Chase & Co.*,
2024 WL 1672263 (9th Cir. Apr. 18, 2024) ....16

*Chinitz v. Intero Real Estate Servs.*,
2020 WL 7389417 (N.D. Cal. May 13, 2020) ....17

*Dish Network LLC v. Jadoo TV, Inc.*,
2022 WL 11270394 (N.D. Cal. Oct. 19, 2022)....11–13

*In re Google RTB Consumer Priv. Litig.*,
2025 WL 28641 (N.D. Cal. Jan. 3, 2025) ....12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
639 F. Supp. 3d 944 (N.D. Cal. 2022) ....13–14

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006)....17

*Lopez v. Apple, Inc.*,
2024 WL 4561320 (N.D. Cal. July 17, 2024)....21

*Matthew Enter., Inc. v. Chrysler Grp. LLC*,
2016 WL 2957133 (N.D. Cal. May 23, 2016) ....17

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
328 F.R.D. 543 (N.D. Cal. 2018)....11

*Oracle USA, Inc. v. SAP AG*,
264 F.R.D. 541 (N.D. Cal. 2009)....3

*Porter v. City and County of San Francisco*,
2018 WL 4215602 (N.D. Cal. Sept. 5, 2018) ....13

*Resnik v. Coulson*,
2019 WL 2256762 (E.D.N.Y. Jan. 4, 2019), ....20

*Torres v. Prudential Financial, Inc.*,
2024 WL 4894289 (N.D. Cal. Nov. 26, 2024)....21

*Ungar v. City of New York*,
329 F.R.D. 8 (E.D.N.Y. 2018) ....13

*Wisk Aero LLC v. Archer Aviation Inc.*,
2023 WL 2277112 (N.D. Cal. Feb. 28, 2023) ....13–14, 17

**Other Authorities**

Library of Congress, *Frequently Asked Questions*, available at https://tinyurl.com/3p77v97h (last visited Jan. 15, 2025) .......... 6

**Rules**

Fed. R. Civ. P. 37(e) .......... 2, 10–12

Fed. R. Civ. P. 37(e)(1) .......... 2, 10–11, 17, 21

Fed. R. Civ. P. 37(e)(2) .......... 2, 11–13, 17

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs' motion for sanctions is a meritless, misdirected attempt to litigate discovery rather than the merits of their case. Throughout this litigation, plaintiffs have ginned up discovery disputes at every turn, rushed to brief as many of those disputes as possible, disregarded Judge DeMarchi's orders, and repeatedly overreached even after being rebuffed for doing so. This motion, improperly noticed before this Court rather than Judge DeMarchi, is the latest in that pattern of scorched-earth discovery conduct. It should be denied.

Meta's preservation efforts in this case have been diligent, extensive, and ongoing. Meta's data warehouse (called "Hive") is extraordinarily complex, consists of millions of individual data tables that store overlapping sets of data, and exists in a dynamic environment. Putting data from a table on "hold" in that system can require weeks of work from software engineers. Before the first complaint in this litigation was even filed, in connection with other litigation, Meta had put on hold a data table called [redacted], the principal table for Meta Pixel ("Pixel") data at that time. Soon after the first complaint in this litigation was filed in June 2022, Meta also placed on hold two additional tables—[redacted] and [redacted]—that [redacted]; Meta itself has used those tables as its "source of truth" for event data analysis.

Developers can send many different event types via the Pixel, including several different event types that reflect button clicks on webpages. As it turned out, aspects of one such event type, called SubscribedButtonClick, was not fully reflected in the tables Meta had initially preserved. As part of its own ongoing investigation into potentially relevant data sources, Meta determined in January 2023 that two additional tables—[redacted] and [redacted] (the "Disputed Tables")—stored incremental button click data and had not yet been put on legal hold. Those tables have, respectively, 90-day and 10-day standard retention periods. Meta promptly put data in those tables on hold, backfilled them with historical data to the extent possible, and later identified them to plaintiffs and affirmatively produced more than [redacted] rows of data from them. The process of

placing data in these tables on hold began before plaintiffs had served a single discovery request, let alone identified these tables as relevant or requested data from them.

Plaintiffs now seek sanctions against Meta under Rule 37(e). They argue that if Meta had placed the Disputed Tables on hold the day the complaint was filed rather than in early 2023, there would be several additional months' worth of data available. Plaintiffs baselessly assert that the failure to hold these tables on day one was calculated to prevent plaintiffs from accessing this data, and they ask for adverse evidentiary sanctions against Meta. But their motion comes nowhere close to justifying that extraordinary relief—or any other.

First, sanctions under Rule 37(e) are warranted only where a party has "failed to take reasonable steps" to preserve evidence. Meta took reasonable steps here: it promptly held tables containing substantially all U.S. Pixel data at the outset of this litigation, continued its investigation for potentially relevant sources of evidence, and worked to put data in the Disputed Tables on hold as soon as it determined they contained additional non-duplicative data—all before plaintiffs ever served a single discovery request. There is nothing unreasonable or improper about a party continuing to identify potentially relevant sources as a case progresses (particularly in complex data cases like this one), and indeed Meta's ongoing efforts to do so should be encouraged, not sanctioned.

Second, sanctions under Rule 37(e)(2) are warranted only where the moving party proves the other party acted with an "intent to deprive [them] of the information's use in litigation." Plaintiffs come nowhere close to making that showing—nor could they, because Meta had no such intent. The only deletion at issue occurred pursuant to the tables' standard retention periods, and Meta acted affirmatively to preserve data in both tables as soon as it determined they contained non-duplicative data (again, long before plaintiffs ever asked about them). Plaintiffs' contrary narrative is simply uncharitable speculation unsupported by evidence. And because both of the remedies plaintiffs request—adverse evidentiary presumptions—are available only under Rule 37(e)(2), plaintiffs' failure to show intentional destruction of evidence renders both remedies unavailable.

Third, plaintiffs are not entitled to any lesser sanction under Rule 37(e)(1) because they have not shown "prejudice." Meta has produced [redacted] of rows of data from these tables. Plaintiffs assert that without all of the data they will be prejudiced at class certification, but Judge

DeMarchi has already rejected that meritless argument in the context of resolving the parties' data-sampling dispute (in Meta's favor)—holding it is "just not true" that plaintiffs are entitled to every last piece of data to make their arguments in support of class certification. Apr. 9, 2024 Tr. at 44:8–45:11, 55:3–12; *see* Dkt. 510 ¶¶ 4–5. Even if Meta had put both tables on hold on the day the complaint was filed (likely an impossible task), the tables still would not reach back through the full period plaintiffs say is relevant (purportedly to 2015). But as Judge DeMarchi explained, plaintiffs do not need "everything" to make their case for class certification. Apr. 9, 2024 Tr. at 47:22 (Judge DeMarchi admonishing plaintiffs that "you cannot have everything"). Plaintiffs' argument that they will be prejudiced without every single line of data from the Disputed Tables thus rings hollow.

One final, related point: Plaintiffs noticed this motion before Judge Orrick in an apparent strategic calculus after losing a string of disputes before Judge DeMarchi. But the Court has referred all "discovery disputes and all discovery matters" to Judge DeMarchi, Dkt. 179, who already has extensive familiarity with the parties' prior disputes on related topics and these Hive tables in particular. Contrary to plaintiffs' insinuation (at 1–2), the relief sought is not "dispositive of a party's claim or defense." *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 546 (N.D. Cal. 2009); *see also id*. at 545 ("Sanctions for discovery conduct pursuant to Rules 16 and 37 are plainly within the purview of the assigned magistrate judge in the first instance, whether in the form of a report and recommendation or an order."). While Meta believes that this motion falls clearly within the scope of what this Court has referred to Judge DeMarchi, Meta respectfully defers to the Court's determination of the proper arbiter for this dispute.

Plaintiffs' motion should be denied.

## BACKGROUND

### A. Meta's Preservation Efforts Have Been Diligent, Extensive, And Ongoing.

#### 1. Meta's data systems are extraordinarily complex, and identifying relevant tables requires time and analysis by subject-matter experts.

As Meta has explained throughout discovery, its internal data storage systems—including the systems that store data received through the Meta Pixel—are extraordinarily complex. Meta primarily stores data in its "Hive" data warehouse, which consists of millions of individual data tables stored in

a highly compressed form and spanning multiple exabytes (each one quintillion bytes) of storage space. *See* Dkt. 143-3 ¶¶ 33–39. Meta cannot search across all of Hive at once, nor can Meta run a search to determine where all of the data from a particular web developer is stored; instead, Meta must individually analyze the data in each table, one by one, to determine that table's contents. Xia Decl. ¶ 6. As a result, identifying potentially relevant data sources is a complicated and iterative process.

This process is further complicated by the fact that Meta's data systems exist in a live, dynamic environment. Individual tables and the data they hold can, and do, change frequently in the ordinary course of Meta's business. *Id.* ¶ 8. Data fields can be added, removed, or renamed; the data those fields contain can change; and tables can be created, combined, or discontinued as Meta's business evolves. *Id.* The data contained in many tables often overlaps in full or in significant part with the data in other tables, and many tables store multiple types of data and can be used for varying purposes. *Id.* ¶ 7; *see also* Dkt. 740-12 (Plts. Ex. 9) at -627 (noting that certain tables "[redacted]"). Tables can contain many different data fields (plaintiffs, for example, have asked about several tables that each contain more than [redacted] individual fields, Xia Decl. ¶ 7); fields with the same names can contain different data; and fields with different names can contain the same data. *Id.* Meta receives [redacted] of Pixel events every day, and the data from those events can be stored in some form in hundreds or thousands of tables that all serve different purposes. *Id.*; Wooldridge Decl. ¶¶ 6–7. In short, ascertaining which tables and which fields have additional, unique data at any given point in time can be extremely challenging, and can require extensive analysis from Meta's data scientists and engineers who can interpret the underlying source code and data. Xia Decl. ¶ 6.

### 2. Preserving data from individual tables requires complex and time-consuming processes.

Once Meta identifies a table with potentially relevant, unique data, preserving that data requires substantial additional work. Every table in Meta's Hive data warehouse has its own retention period. Xia Decl. ¶ 11. Given the enormous size of some tables, it is often not feasible to place them on hold in full. *Id.* ¶ 12. For tables that can be held in full past normal retention periods, Meta stores the data in a compressed state called "cold storage," which means the data in them must be "warmed

up"—*i.e.*, taken out of its compressed state—before it can be used, queried, or produced for litigation. *Id.* ¶ 13. Some tables, including some of the tables at issue in this case, also span vast numbers of topics and entities (here, listed by Pixel IDs), such that only a small portion of their data is potentially relevant. *Id.* ¶ 14.

A partial solution to these technical issues is for Meta to build a "pipeline" to extract and preserve potentially relevant data. *Id.* ¶ 15. To build a pipeline, a Meta engineer writes code to extract potentially relevant portions of an existing table (*e.g.*, certain data fields, or data in the table from certain developers) and create a new (smaller) table that can more easily be preserved. *Id*. This pipeline process is forward-looking—*i.e.*, it extracts and preserves data that Meta receives after the pipeline is put in place. To preserve even more data, Meta can also "backfill" a pipelined table by extracting any existing potentially relevant data from a given table (but only as far back as that table's retention period). *Id.* ¶ 16. The time necessary to build and quality-check a pipeline can vary, but can take weeks or months to complete, and pipelines require ongoing monitoring to ensure they are functioning as intended; backfilling a pipelined table requires additional time. *Id.* ¶ 15.

**3. Meta has worked diligently to identify and preserve potentially relevant data throughout this litigation.**

From the outset of this litigation, Meta has worked diligently to preserve potentially relevant data. That work has been, and continues to be, an ongoing effort.

As noted above, the tables that store Pixel data can change over time, and that includes the tables relevant in this case. There is no designated table for storing "sensitive health" event data sent from covered entities through the Pixel—because Meta does not intend to receive such data at all. Wooldridge Decl. ¶ 8.

Before this case was filed, the principal table for substantially all Pixel data Meta received was called [redacted]." Because the table stored substantially all Pixel data, this table was enormous and contained approximately [redacted] fields. *Id.* ¶ 7. But Pixel data, and data sent via other Meta Business Tools, was also stored in other tables. *Id.* Throughout 2020 and 2021, Meta centralized many of those disparate tables and fields into an even larger superset table called [redacted]" (and similar variations, such as "[redacted]"). *Id.* After it was created, the [redacted]

table became Meta's "source of truth for event [data] analysis." Dkt. 740-7 (Plts.' Ex. 4) at -059. A document that plaintiffs cite from late 2020 describes this process, noting how [redacted] is "where all of the offsite events data will be logged." Dkt. 740-12 (Plts.' Ex. 9) at -627.

When the first complaint in this case was filed on June 17, 2022, *see* Dkt. 1, Meta already had on hold *all* data for United States users in [redacted] in connection with other litigation, and Meta continues to hold all that data for this case. Xia Decl. ¶ 18.[1] Meta then worked to put on hold and backfill [redacted] and [redacted] in their entirety—which, given the enormous size of both tables, required substantial resources. *Id.* ¶ 20.[2] Meta undertook this preservation in an abundance of caution, even though the Pixel data in these two tables largely overlapped with the data stored in [redacted]. Meta completed that process on or around September 29, 2022; because those tables each have 90-day retention periods, this preserved data from July 2, 2022 forward.[3] *Id.* ¶ 20.

As the case has progressed, Meta has also made ongoing efforts to preserve additional data as new information is learned. For example, in June 2023, after plaintiffs identified for the first time a list of more than 1,800 Pixel IDs (*i.e.*, particular pixels on particular websites) they believed were at issue, Meta modified its existing pipelines to capture data associated with those Pixel IDs. *Id.* ¶ 23. Similarly, on October 10, 2023, plaintiffs filed an amended complaint that expanded their case to include several additional named plaintiffs; Meta thus expanded its preservation to include those new individuals (once plaintiffs supplied sufficient identifying information)—which Meta has done on several occasions as plaintiffs have provided additional identifiers. *Id.* Plaintiffs have expressed

---

[1] Plaintiffs correctly note that Meta also preserved a table called [redacted]." Mot. 5. That table contains data received from Meta's SDK (software development kit) on apps, not from the Pixel on websites, and had also already been put on hold in connection with other litigation before this case was filed. Xia Decl. ¶ 18.

[2] To put these tables' size in context, as of March 2024, [redacted] alone contained more than [redacted] of data. Xia Decl. ¶ 20. For comparison, in 2022 the entire Library of Congress contained 21 petabytes of digital content. *See* Library of Congress, Frequently Asked Questions, available at https://tinyurl.com/3p77v97h (last visited Jan. 27, 2025).

[3] Meta has also identified and preserved other tables containing potentially relevant data, including, for example, a table identifying [redacted], from which Meta has produced information in this case. Xia Decl. ¶ 23.

interest in literally hundreds of Hive tables (many of which have not existed for years), and Meta has placed data in numerous additional tables on hold based on its own independent investigation. *Id.* ¶ 23.

**4. Meta determined that two additional tables contained non-duplicative data in January 2023 and promptly preserved them.**

The vast majority of the relevant Pixel event data in this case was available in [redacted], and [redacted], which Meta preserved in full. *See* Xia Decl. ¶¶ 18, 20; Wooldridge Decl. ¶¶ 6–8. Those tables include data from Meta's 17 standard events like "CompleteRegistration" (which occurs when users sign up for a particular website offering), "Subscribe" (when a user signs up for a subscription), and "Schedule" (which can track appointment bookings), as well as all developer-customized events. Wooldridge Decl. ¶ 4.[4]

As it turned out, however, a particular event type called "SubscribedButtonClick," which for a subset of Pixel IDs logs the online buttons users click, was not fully included in those tables. As of late 2020, Meta planned to [redacted] tables." Dkt. 740-12 (Plts.' Ex. 9) at -630. And, indeed, the schema describing what data is stored in [redacted] *says* that it contains "SubscribedButtonClicks" and "[redacted] Dkt. 740-29 (Plts.' Ex. 26) at 6 (in the "[redacted]" and "[redacted]). But that transition happened only for [redacted] SubscribedButtonClick events (such as events that [redacted]). Wooldridge Decl. ¶ 10. [redacted] SubscribedButtonClick events generally continued to be logged [redacted] (*id.*), although certain [redacted] SubscribedButtonClick events could be stored in [redacted] and [redacted] (*see id.* ¶ 6).

As part of its ongoing preservation efforts, Meta determined in January 2023 that the Disputed Tables contained non-duplicative button click data. Xia Decl. ¶ 21. One of those tables ([redacted]) has a 90-day retention period, and the other ([redacted]) has a 10-day retention period. *Id.* Meta promptly worked to build pipelines for both tables, which it completed

[4] Developers can choose any event name they want for custom events, subject to certain restrictions Meta imposes, and can use that event to measure whatever action they want—so Meta cannot necessarily determine, from the name of a custom event, what that event is measuring. Wooldridge Decl. ¶ 5. A developer could, for example, create a custom event for button clicks, which would be logged in [redacted] and/or [redacted] *Id.* ¶ 5.

on February 23, 2023. *Id.* Meta also worked to backfill each table as much as possible, resulting in data from [redacted] being preserved back to November 26, 2022, and data from [redacted] being preserved back to February 17, 2023.[5] *Id.* As a result of those efforts, Meta has now preserved more than two years' worth of [redacted] SubscribedButtonClick data from these tables.

### B. Meta Affirmatively Offered To Produce Data From The Two Tables At Issue—And Then Produced More Than [redacted]

Plaintiffs first mentioned the [redacted] table on July 7, 2023, after Meta had already internally identified it as potentially relevant based on its own investigation and pipelined more than seven months' worth of data from it. McCloskey Decl. ¶ 16; Xia Decl. ¶ 21. In February 2024, plaintiffs demanded that Meta "produce data from *all* data sources and tables" that contained "responsive" information for all putative class members, as well as all relevant Hive data for the Named Plaintiffs—including duplicative data, even though there are millions of tables in Hive and it would require a painstaking search to identify all such data. *See* McCloskey Decl. Ex. ¶ 17, Ex. 1 (emphases added). Meta responded that it would be technologically impossible to find and produce all of the data plaintiffs were requesting, and offered to instead discuss a sampling method for the principal tables that store Pixel data. *Id.* ¶ 17. But plaintiffs refused to agree to a sampling approach and insisted that Meta was required to produce *all* the data. *Id.* ¶ 18, Ex. 2.

This dispute over sampling went to Judge DeMarchi in March 2024, and Judge DeMarchi agreed with Meta that sampling was appropriate. *See* Dkt. 452; *see* Apr. 9, 2024 Tr. at 44:10–16 (plaintiffs' main argument against sampling was "just not true"); *id.* at 47:22 ("you cannot have everything"). In tandem with the sampling dispute, Meta filed a separate brief that volunteered that Meta was working on producing data from the principal tables that store potentially relevant Pixel data, specifically naming the Disputed Tables. Dkt. 435-2 at 1–2. Judge DeMarchi's sampling order provided that, for the tables that Meta had identified, Meta should "identify the data sources from which

---

[5] The button click information in [redacted] is substantially reflected in [redacted] and the data in [redacted] on hold goes back further, so Meta focuses primarily on the [redacted] table in this brief, like plaintiffs do. *See* Mot. at 12 (plaintiffs arguing that they are missing "eight months" of data).

it would be unduly burdensome to produce all responsive class member data," "explain why that is so," and "provide [a] sampling proposal." Dkt. 452 at 2; *see* Apr. 9, 2024 Tr. at 60:18–61:11 (Meta proposing production from six specific tables). At the further June 11, 2024 hearing on this dispute, Meta explained that the Disputed Tables were already in "warm" storage as a result of Meta's pipelining process. *See* Dkt. 510 at 2. Judge DeMarchi therefore asked Meta to investigate whether it would be possible to produce all responsive data from the Disputed Tables, even if sampling would be required for the others. *Id.* Meta determined it could likely produce that data by the substantial-completion deadline, so it affirmatively agreed to do so. McCloskey Decl. ¶ 20.

On November 1, 2024, Meta produced more than [redacted] rows of data from the Disputed Tables. Xia Decl. ¶ 27. Given the sampling approach that plaintiffs ultimately agreed to for the other tables, the data produced from [redacted] and [redacted] contained more unique days' worth of data than Meta produced for any other table. *Id.* ¶ 28. Even so, it was just a fraction of the overall volume of data produced. Under its sampling approach, Meta produced nearly [redacted] rows of data from the other four tables in December 2024, an unsurprising disparity given that those other tables store substantially all Pixel data that Meta receives. *Id.*

**C. Plaintiffs' Motion Follows A Series Of Scorched-Earth Discovery Tactics.**

Plaintiffs have known about the preservation dates for the Disputed Tables since at least April 2024, when Meta shared that information in a meet-and-confer. *See* McCloskey Decl. ¶ 19; Mot. 8. Meta also sent a letter conveying this information in May 2024. McCloskey Decl. ¶ 19, Ex. 3 at 3–4. By May 2024, plaintiffs were already accusing Meta in discovery disputes before Judge DeMarchi of failing to preserve this data. *See* Dkt. 495 at 2. But they waited to bring this motion until late December 2024, after a long string of unsuccessful scorched-earth discovery tactics that Judge DeMarchi has repeatedly admonished them over.

Plaintiffs have habitually over-litigated discovery, and refused to back down even when their positions have been rejected. For example, after Judge DeMarchi rejected their arguments against sampling, plaintiffs would not even engage with Meta's sampling proposals (despite Judge DeMarchi's order to do so), resulting in a *second* discovery dispute over sampling. Dkt. 452 at 1 (order on first sampling dispute finding "none of the authority on which plaintiffs rely supports [their] position");

Dkt. 495 (second joint letter brief); *see also* Apr. 9, 2024 Tr. at 58:20–22 ("I just don't know what to tell the Plaintiffs. You want everything, and then you are mad when you don't get it immediately."); *id.* at 78:1–8 ("I perceive the Plaintiff as asking for literally everything and just waiting for the Court to, you know, cut it back for you. You don't make reasonable proposals about what you need. You just say, 'I want X and you must give it to me and I'm entitled to it.' And that's the most frustrating thing. That's not compliant with Rule 26."). Plaintiffs have rushed to file discovery disputes without conferring with Meta about them, even when ordered to do so, leaving "[un]clear what dispute remains" for Judge DeMarchi to resolve. Dkt. 685 at 4; *see also* Dkt. 734 at 1 (filing another dispute over the same issues without conferring with Meta). They also previously sought "sanctions" against Meta in the context of a routine discovery dispute, which Judge DeMarchi denied. *See* Dkt. 379; Nov. 7, 2023 Tr. at 6:15–16 ("[W]hen I read the papers it doesn't feel to me like . . . an appropriate motion for sanctions.").

Overall, plaintiffs have served 315 requests for production (including an Eleventh Set served four days ago), filed 21 joint letter briefs with Judge DeMarchi, spent more than 50 days examining Meta's source code, and sent Meta approximately 200 discovery letters in the last two years. McCloskey Decl. ¶ 21. As Judge DeMarchi recently noted, this litigation has generally been "unidirectional." Jan. 15, 2025 Tr. at 15:6–7. All the while, plaintiffs have used overblown claims of "spoliation" and threats of sanctions as a persistent lever to demand more and more discovery. *See, e.g.*, Dkt. 326-18 (letter from plaintiffs captioned "META'S ONGOING DESTRUCTION OF RELEVANT DATA").[6] This motion, filed before depositions have even begun and more than two years before trial is scheduled, continues this scorched-earth litigation strategy.

## LEGAL STANDARD

A party seeking sanctions under Rule 37(e) must prove that ESI was "lost because a party failed to take reasonable steps to preserve it, and [the ESI] cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If the Court further finds prejudice, it may order "measures no

[6] Notably, plaintiffs have also insisted that Meta was precluded from preserving any information about the named plaintiffs until plaintiffs expressly consented to that preservation—and even then, they threatened that Meta would violate the Electronic Communications Privacy Act unless Meta produced every byte of information about the named plaintiffs preserved in Meta's systems. McCloskey Decl. ¶ 22.

greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If the moving party shows that the counterparty "acted with the intent to deprive another party of the information's use in the litigation," the court may order adverse evidentiary presumptions or terminating sanctions. *Id.* R. 37(e)(2); *see also Dish Network LLC v. Jadoo TV, Inc.*, 2022 WL 11270394, at *4 (N.D. Cal. Oct. 19, 2022) ("The moving party has the burden to establish intent to obtain the more severe sanctions available under Rule 37(e)(2).").

**ARGUMENT**

Plaintiffs' motion is meritless and reflects an improper attempt to litigate discovery rather than the merits of their case. Sanctions are inappropriate because Meta "t[ook] reasonable steps" to preserve potentially relevant evidence, Fed. R. Civ. P. 37(e), and indeed identified and preserved data in the tables at issue early in this case and long before plaintiffs asked about them. Additionally, plaintiffs come nowhere close to proving a nefarious "intent to deprive [them] of the information's use in the litigation," *id*. R. 37(e)(2)—the evidence shows the opposite—and without intent, both remedies plaintiffs request (adverse evidentiary presumptions) are unavailable. Nor is there any "prejudice," *id*. R. 37(e)(1), given plaintiffs' access to voluminous data from November 2022 forward. Moreover, the remedies plaintiffs request are counterfactual in the extreme. The motion should be denied.

## I. Sanctions Are Not Warranted Because Meta Took Reasonable Steps To Preserve Relevant Data.

Rule 37(e) "requires only that a party take 'reasonable steps' to preserve" evidence likely relevant to litigation. *Best Label Co. v. Custom Label & Decal, LLC*, 2022 WL 1525301, at *4 (N.D. Cal. May 13, 2022) (DeMarchi, J.). Here, Meta took reasonable steps to identify and preserve potentially relevant data, and did so for the tables at issue long before plaintiffs even asked about them.

The duty to preserve potentially relevant evidence "does not extend to every bit of ESI in a defendant's possession," and "[e]ven when a claim is anticipated, the full scope of preservation may not be reasonably foreseeable." *Id*. (quoting *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 550 (N.D. Cal. 2018)). That principle applies doubly in a case like this, where Meta must sift through extraordinarily complex data systems—which are built for business purposes, not litigation purposes, and thus are not easily searchable for data potentially relevant to every particular case—and

plaintiffs have demanded enormous swaths of data regarding not only the named plaintiffs but also a putative nationwide class. *See* Xia Decl. ¶¶ 4–16, 25–29. As set out above, there is no "sensitive health" event data table for covered entities. Wooldridge Decl. ¶ 8. Meta therefore took the overbroad approach of preserving in full the two tables containing substantially all Pixel data ([redacted] and [redacted]),[7] including certain button click data, in addition to continuing to hold the [redacted] table that had already been put on hold for other litigation. Xia Decl. ¶ 20. Thereafter, in line with its ongoing discovery obligations, Meta continued to investigate sources of potentially relevant information, and in January 2023—relatively early in this case, and before plaintiffs served any discovery requests—Meta identified and began working to preserve data in the Disputed Tables after it determined they contained non-duplicative, [redacted] button click data. *Id.* ¶ 21. Meta promptly built a pipeline to preserve incoming data for those two tables, and also backfilled both tables as far as possible given their retention periods. *Id.*

There is nothing improper about a party uncovering, and working to preserve, additional potentially relevant evidence as a case progresses. To the contrary, that sort of ongoing diligence should be encouraged, particularly in complex data cases like this one. Because Meta took reasonable steps to preserve the data at issue as part of its extensive discovery efforts in this case, Rule 37(e) sanctions are inappropriate. *Cf. In re Google RTB Consumer Priv. Litig.*, 2025 WL 28641, at *7 (N.D. Cal. Jan. 3, 2025) (DeMarchi, J.) (even assuming evidence should have been preserved, no sanctions where "plaintiffs have not shown that Google acted unreasonably").

## II. Sanctions Are Not Warranted Under Rule 37(e)(2) Because Meta Did Not Intend To Deprive Plaintiffs Of The Information's Use In Litigation.

Setting aside Meta's reasonable preservation efforts, sanctions under Rule 37(e)(2) are inappropriate because plaintiffs come nowhere close to proving that Meta acted with an "intent to deprive [them] of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2)—because Meta did not. Plaintiffs bear the burden to prove intent. *See Dish Network*, 2022 WL 11270394, at *4. Because

[7] Indeed, Meta produced, on average, close to 50 times the number of events from [redacted] as it did from [redacted] on a per-day basis. McCloskey Decl. ¶ 13.

they have not met and cannot meet that burden, they are not entitled to the adverse evidentiary presumptions they request.

**A. Plaintiffs Have Not Shown Intent.**

Under Rule 37(e)(2), "intent" means that "a party *purposefully* destroyed evidence to avoid its litigation obligations." *Dish Network LLC*, 2022 WL 11270394, at *3 (emphasis added); *see also, e.g.*, *Wisk Aero LLC v. Archer Aviation Inc.*, 2023 WL 2277112, at *4 (N.D. Cal. Feb. 28, 2023) (Orrick, J.). "[N]egligence—even gross negligence—in failing to retain relevant evidence is not sufficient to support an adverse inference under Rule 37(e)(2)." *Dish Network*, 2022 WL 11270394, at *3 (quotation marks omitted).[8] Rather, plaintiffs must show "a specific intent to deprive, rather than a mere knowing failure to preserve." *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 977 (N.D. Cal. 2022). Relevant factors include "the timing of the destruction," "the method of deletion (*e.g.*, automatic deletion vs. affirmative steps of erasure)," "selective preservation," "the reason some evidence was preserved," and "where relevant, the existence of institutional policies on preservation." *Dish Network*, 2022 WL 11270394, at *3; *see also Wisk Aero*, 2023 WL 2277112, at *4 (identifying similar factors).

The facts here come nowhere close to showing that Meta acted with a specific intent to deprive plaintiffs of the use of information from the Disputed Tables. For one thing, there was no active deletion at all; data in those tables was simply subject to the tables' standard retention periods until Meta put them on hold. A "passive failure to halt an automatic deletion process, without more, often does not rise to a reasonable inference of intent." *Estate of Bosco v. County of Sonoma*, 640 F. Supp. 3d 915, 929 (N.D. Cal. 2022) (collecting cases regarding standard retention policies); *see also, e.g.*, *Porter v. City and County of San Francisco*, 2018 WL 4215602, at *4 (N.D. Cal. Sept. 5, 2018) (similar). Moreover, Meta acted affirmatively *to preserve* data in those tables once it determined they contained non-duplicative data, by promptly building pipelines to preserve incoming data and backfilling the tables as much as possible—all based on Meta's own ongoing investigation, before

[8] Citing a district court case from New York, plaintiffs suggest that "conscious dereliction of a known duty to preserve electronic data" is sufficient to show intent. Mot. 15 (quoting *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018)). Meta has identified no case from this Circuit applying that standard, and in any event it is not met here.

plaintiffs served their first discovery requests or specifically asked about these tables. *See supra* at 7–8. Those "attempt[s] to recover the data" further "indicate a lack of intent to deprive [plaintiffs] of evidence." *hiQ Labs*, 639 F. Supp. 3d at 978. And Meta has since produced more than [redacted] rows of data from these tables, representing more unique days' worth of data *than for any other table*. Xia Del. ¶ 27–28. These facts reflect a good-faith effort by Meta to comply with its preservation responsibilities on an ongoing basis, not a nefarious intent to destroy evidence.

Plaintiffs' contrary narrative does not hold up. Plaintiffs say that "Meta's selective preservation, timing of destruction, potential motivation for destruction, and subsequent obfuscation" show intent. Mot. 16. But none of their speculative arguments finds support in the evidence.

***"Selective preservation."*** Plaintiffs' leading argument is that Meta engaged in "selective preservation" by placing some tables on hold but not others. Mot. 16. That makes little sense. For one thing, the other Pixel tables that Meta held from the outset—[redacted] and [redacted]—*also* contain button click records (though not all of them), so a purported "intent to destroy the button click records" is a poor explanation for what actually happened. Wooldridge Decl. ¶¶ 10–11. In any event, it is not "selective preservation" for Meta to omit (at the outset of litigation) two out of the millions of tables in its Hive data warehouse, especially when Meta was working diligently to preserve the tables that contain the vast majority of U.S. user Pixel data. Xia Decl. ¶¶ 18, 20; Wooldridge Decl. ¶ 7. Selective preservation implies a conscious, knowing choice to preserve one thing and not another; here, Meta began preserving the tables at issue as soon as it determined they contained non-duplicative data. *Compare Wisk Aero*, 2023 WL 2277112, at *10 (finding selective preservation—but still not finding intent—where a party deliberately deleted some files but not others).

***"Timing of destruction."*** For similar reasons, plaintiffs' arguments about the "timing of destruction," Mot. 16–17, do not suggest an intent to delete data. Plaintiffs argue that Meta "was on notice" from the beginning of the case "of the importance of the button click records." Mot. 17. But that does not translate into notice that the two particular tables at issue here contained non-duplicative data that should be preserved. As explained above, Meta's data systems are extraordinarily complex and span millions of individual tables built for various business purposes, many of which store

overlapping data. *See supra* at 3–5. When this case was filed, Meta already had the [redacted] on hold, and it promptly began holding in full two other tables with the vast majority of Pixel and other Business Tool data. *See supra* at 5–6. When Meta determined in January 2023—again, an early point in the case, before any discovery had been served—that the Disputed Tables contained additional non-duplicative data, it promptly worked to preserve and backfill that data. *See supra* at 7–8. Nothing about that timing suggests "an intent to destroy the button click records." Mot. 16. With the benefit of hindsight and over 130,000 produced documents, plaintiffs point to particular documents (some many years old) and particular communications among software engineers indicating that there was button click data in these two tables. Mot. at 5–6 (citing Pltfs.' Exs. 6–11). But that does not translate into an intent to delete data for litigation, and plaintiffs' own documents demonstrate why this exercise is complicated. *See, e.g.*, Dkt. 740-12 (Plts.' Ex. 9) at -627, -630 (noting in 2020 that [redacted] will "soon" store "all of the offsite events data" including all "button clicks" data); *see also* Dkt. 740-7 at -061 (complex data flow diagrams); Dkt. 740-29 ([redacted] schema containing over [redacted] fields, which indicates that it contains [redacted]" information in the [redacted]" and [redacted]" fields).

***"Potential motivation for destruction."*** Plaintiffs also speculate that Meta "appears" to have intentionally destroyed the data so that it could reduce its "financial exposure." Mot. 17. Again, that makes little sense. Meta preserved, and later produced, [redacted] of rows of data from the Disputed Tables. *See supra* at 7–8. Plaintiffs' theory that Meta intentionally destroyed eight months' worth of data to marginally reduce its potential liability—but then preserved and backfilled that same data on its own initiative, before plaintiffs had served a single discovery request—is baseless and malign speculation, and it is false.

***"Subsequent obfuscation."*** Finally, plaintiffs say that Meta "obfuscated that it had destroyed the button click records." Mot. 17. That, too, is false, and plaintiffs distort the record. The two docket entries they cite (Dkts. 191 and 253), each of which postdate Meta's preservation of the tables by months, do not support any claim of "obfuscation." The first is a citation to plaintiffs' own section of a case management conference statement, referring to irrelevant arguments plaintiffs made about

"network logs" in opposition to Meta's proposed ESI protocol, which have nothing to do with the Hive tables at issue. *See* Dkt. 191. The second is Judge DeMarchi's order rejecting *both* parties' preservation proposals. *See* Dkt. 253. Neither addressed the two tables at issue here, and plaintiffs' suggestion that Meta sought "retroactive blessing" to destroy data is simply false. Mot. 6; *see* Dkt. 191 at 12 (plaintiffs trying to create the false impression that "network logs" meant Pixel event data); *id.* at 20. Moreover, Meta affirmatively provided information about the preservation periods for the Disputed Tables at a meet-and-confer and in writing, in connection with Meta's sampling proposal (with which plaintiffs refused to engage until they were ordered to comply). McCloskey Decl. ¶ 19. This case thus bears no resemblance to the single "obfuscation" case plaintiffs cite (at 16), where the plaintiff engaged in "systematic efforts" to destroy ESI "from an array of phones, laptops, email accounts, and external storage devices," and "wiped at least one of his devices the day before he was required to produce it for forensic examination." *Burris v. JPMorgan Chase & Co.*, 2024 WL 1672263, at *2 (9th Cir. Apr. 18, 2024).

Notably, running throughout plaintiffs' motion is the narrative that the first few months' worth of data after the complaint was filed is particularly important because healthcare providers may have "removed the Pixel or limited its use," Mot. 17, once this litigation commenced. The numbers do not support that narrative: in the data Meta produced from [redacted] and [redacted] (the latter of which, again, was held even before this litigation began), the number of Pixel IDs for the entities that plaintiffs claim are relevant—*i.e.*, the number of relevant websites using the Pixel—*increased* over time from before the litigation to the end of the discovery period. McCloskey Decl. ¶ 10–11. And in any event, plaintiffs' speculation that Meta waited for hospitals to remove the Pixel before preserving data is just that—speculation—further undermined by the quantity of data Meta *has* preserved. A much more plausible (and correct) explanation is that Meta put the Disputed Tables on hold as soon as it determined they contained non-duplicative data, at an early point in the litigation and as part of Meta's ongoing investigation into potentially relevant data sources. Plaintiffs' uncharitable speculation is simply wrong.

**B. Both Of Plaintiffs' Requested Remedies Require Them To Show Intent, Which They Have Not Done (And Cannot Do).**

Plaintiffs request two specific remedies. First, they ask the Court to "deem that the Pixel transmitted button click records for patient portal logins and medical appointment scheduling functions to Meta between March 19, 2022, and November 25, 2022, for *any* healthcare provider that had the Pixel on its website during that time period." Mot. 18. Second, they ask the Court to "deem that any named Plaintiff or putative class member who visited a healthcare provider website that had the Pixel between March 19, 2022, and November 25, 2022, had a button click (through a patient portal log-in or medical appointment scheduling) transmitted to Meta, and that their transmission record was stored in the [redacted] and [redacted] tables." *Id.*

Because those remedies would "presume that the lost information was unfavorable to the party," Fed. R. Civ. P. 37(e)(2), at least under plaintiffs' view of the case, they fall under Rule 37(e)(2) and require a showing of intent. *See, e.g.*, Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (explaining it would be "inappropriate" to award sanctions that "have the effect of measures that are permitted under subdivision (e)(2)" without a finding of intent); *Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 2957133, at *3 (N.D. Cal. May 23, 2016) (same); *see also Chinitz v. Intero Real Estate Servs.*, 2020 WL 7389417, at *3 (N.D. Cal. May 13, 2020) (deeming mandatory adverse-inference instructions "quite extraordinary"). And because plaintiffs have not shown and cannot show intent, they are not entitled to either remedy.

**III. Sanctions Are Not Warranted Under Rule 37(e)(1) Because Plaintiffs Have Not Suffered Any Prejudice.**

Plaintiffs also are not entitled to any lesser sanctions under Rule 37(e)(1), which require a finding of "prejudice . . . from loss of the information." Fed. R. Civ. P. 37(e)(1). Prejudice exists where a party's actions "impaired [the moving party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). "A finding of prejudice is based on [the Court's] discretion and depends in part on the importance of the information to the case." *Wisk Aero*, 2023 WL 2277112, at *4 (quotation marks omitted).

There is no prejudice here. Meta has produced more than [redacted] rows of data from the Disputed Tables (as well as roughly [redacted] rows of other event data). Xia Decl. ¶¶ 27–28. Even if Meta had built pipelines and backfilled both tables on the very day John Doe's lawsuit was filed—likely an impossible task—they still would only have stretched back for 90 days and 10 days for each table, given their respective retention periods. *Id.* ¶ 21. Based on Meta's identification and preservation of these tables in early 2023, plaintiffs have data stretching back to November 2022 for [redacted] and February 2023 for [redacted]. *Id.* Notably, plaintiffs do not claim that this data is somehow different in kind from the data that would have existed prior to November 2022. Plaintiffs thus have more than enough data to make whatever arguments they intend to make at class certification and on the merits.

Plaintiffs suggest they will be prejudiced at class certification, but that is wrong. Plaintiffs argue that the data would (1) show "the full scope of healthcare provider buttons" that transmitted data to Meta, and (2) allow plaintiffs to "identify class members." Mot. 14–15. But class certification is about identifying an appropriate *methodology* for identifying class members and litigating classwide claims, and plaintiffs' complaints merely affect the *size* of any class. That is why, in connection with the parties' sampling dispute, Judge DeMarchi already rejected plaintiffs' argument that they need *every piece of data* from a particular table in order to make their class certification arguments. *See* Dkt. 452; Apr. 9, 2024 Tr. at 44:25–45:2 ("[W]hat's critical for the Plaintiffs at the class cert stage is being able to have the kind of data that you can say is representative of the class."); *id.* at 46:1 ("Everything is not the answer."). To be clear, Meta does not believe plaintiffs will be able to identify any such methodology, and Meta intends to vigorously oppose any motion for class certification based on the numerous individualized issues among web developers and class members. But to the extent plaintiffs seek to rely on button click data from the Disputed Tables to support class certification (again, a position Meta does not believe is supportable), they will be able to do so. Indeed, plaintiffs have *more* unique days' worth of data from these two tables than from any other. Xia Decl. ¶ 28. The fact that eight months' worth of data from those tables is unavailable does not change that.

At most, the absence of this data would matter only after a hypothetical class is certified and Meta is found liable for its receipt of button click data. *Cf.* Dkt. 623 at 5 (Meta agreeing that, if a class

were certified, it may produce additional event data from sampled tables to identify the class). Plaintiffs tacitly admit as much, arguing that "Meta cannot be permitted to reduce the size of the class through the deletion of data." Mot. 18.[9] Awarding sanctions at this juncture would thus be, at best, premature, without any certified class or even a clear idea of the contours of a potential class—much less a liability determination.

## IV. Plaintiffs' Requested Remedies Are Inappropriate.

Even if sanctions were otherwise appropriate—and they are not—plaintiffs' requested remedies would not be, because they are counterfactual in the extreme. In deciding whether and what sanctions are appropriate, "[m]uch is entrusted to the court's discretion," and "[t]he remedy should fit the wrong." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Plaintiffs' requested remedies would give them an unjustified evidentiary windfall.

Plaintiffs' first requested remedy is that the Court "deem that the Pixel transmitted button click records for patient portal logins and medical appointment scheduling functions to Meta between March 19, 2022, and November 25, 2022, for *any* healthcare provider that had the Pixel on its website during that time period." Mot. 18. That presumption would bear no resemblance to reality. From the data produced in this case, the percentage of Pixel IDs that transmit button click records appearing in the [redacted] table is, on average, approximately 14%—nowhere close to plaintiffs' 100% presumption. McCloskey Decl. ¶ 2. And, even of those, not every button click involves "patient portal logins and medical appointment scheduling functions," Mot. 18—in fact, plaintiffs have previously conceded that more than *half* of the websites they claim are at issue do not even have a patient portal link. McCloskey Decl. ¶ 15. That concession is unsurprising, because plaintiffs assert that a host of generic websites for things like grocery stores (*e.g.*, albertsons.com), employee benefits (*e.g.*, metlife.com), and over-the-counter medications (*e.g.*, tylenol.com) are all at issue. *Id.* ¶ 14, Ex. 5. Moreover, a basic analysis of the data produced from [redacted] shows that buttons titled

---

[9] It is also possible that any reduction in class size would be negligible, because the data that Meta has produced in this case indicates there is close to a 100% overlap between the "Separable IDs" identified in [redacted] and those identified in other tables ("Separable IDs" are identifiers for a particular user on a particular date). The Separable IDs that appear in the existing [redacted] data also appear in [redacted] at a rate of 96% to 98%, on every overlapping day of data. McCloskey Decl. ¶ 10. Similarly, 91% to 92% of Pixel IDs appear in both the existing [redacted] data and in [redacted] on overlapping days. *Id.* ¶ 12.

"[redacted] or something similar reflect a tiny percentage of the total events, much less scheduling events that relate to medical providers. *Id.* ¶ 12; *see id.* ¶ 13, Ex. 4 (providing numerous examples of button click records in the produced data that have nothing to do with scheduling medical appointments or patient portals). Also, by stretching back to March 19, 2022—*i.e.*, 90 days before John Doe filed the first complaint—plaintiffs' proposed remedy presumes that Meta should have identified, preserved, and backfilled data for every "healthcare provider" in [redacted] on the *very same day* plaintiffs filed the complaint (which named only a single healthcare entity, MedStar). That is unrealistic and unreasonable. *See* Xia Decl. ¶¶ 15–16 (describing the cumbersome processes necessary to do this work).

Plaintiffs' second requested remedy is that the Court "deem that any named Plaintiff or putative class member who visited a healthcare provider website that had the Pixel between March 19, 2022, and November 25, 2022, had a button click (through a patient portal log-in or medical appointment scheduling) transmitted to Meta, and that their transmission record was stored in the [redacted] and [redacted] tables." Mot. 18. That request suffers from many of the same infirmities identified above, including plaintiffs' fantastical timeline. Additionally, it is obviously not correct that every person who visits a health-related website (including, allegedly, the home pages of grocery stores) is a "patient" of that particular provider, such that they could have logged into a patient portal or scheduled an appointment. Plaintiffs' request would deem every visitor to aflac.com, costco.com, kroger.com, safeway.com, vons.com, walmart.com, and zyrtec.com, all of which plaintiffs claim are healthcare sites within scope of this lawsuit, among numerous others, to be a "patient" of those entities. *See* McCloskey Decl. ¶ 14, Ex. 5. Moreover, even for actual medical providers, only a small percentage of "Separable IDs" (again, an identifier that corresponds to users) engage in *any* button click event logged in [redacted], and an even smaller percentage engage in one relating to a "patient portal log-in or medical appointment scheduling." *See id.* ¶ 14 (showing that, on average, approximately *1.1%* of the Separable IDs that appear in the produced offsite_signals data appear in [redacted]); *id.* ¶ 17 (showing that a nominal percentage of the events in pixel button clicks involve [redacted] or [redacted].

None of the cases plaintiffs cite support their counterfactual presumptions. In *Resnik v. Coulson*, a husband going through divorce proceedings allegedly installed spying software on his wife's devices, and then violated a court order by wiping his own devices before they were seized to investigate the matter. *See* 2019 WL 2256762, at *1–3. After finding that the "defendant engaged in egregious, intentional spoliation," the court determined that he "should be deemed to have installed and used spyware on [his wife's] cell phone during the relevant time"—a conclusion that was amply supported by the available evidence. *Id.* at *14–15. In *Lopez v. Apple, Inc.*, after the defendant deleted certain data, the court found prejudice, imposed sanctions under Rule 37(e)(1), and ordered that the defendant "should be precluded from affirmatively arguing or otherwise using Plaintiffs' failure to make certain showings that they could have made if they had access to the deleted [] data." 2024 WL 4561320, at *9 (N.D. Cal. July 17, 2024). Because it deferred any finding on intent, the court did *not* order adverse inferences. *See id.* And *Torres v. Prudential Financial, Inc.*, 2024 WL 4894289 (N.D. Cal. Nov. 26, 2024), the only other case plaintiffs cite in support of their requested remedies, is not a sanctions case at all. Plaintiffs offer no support for their counterfactual presumptions, which would simply deliver an unjustified windfall by overinflating the size of the putative class.

## CONCLUSION

Plaintiffs' motion for sanctions should be denied.

Dated: January 27, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Lauren R. Goldman*
Lauren R. Goldman

*Attorneys for Meta Platforms, Inc.*