# Proposed Redacted Version of the Joint Discovery Dispute Letter Regarding Request for Production 251 (Dkt. No. 1036-3)

CONFIDENTIAL

May 30, 2025

Judge Virginia K. DeMarchi
San Jose Courthouse, Courtroom 2 – 5th Floor
280 South 1st Street
San Jose, CA 95113

      Re:    *In re Meta Pixel Healthcare Litigation*, Case No. 22-cv-03580-WHO (VKD)

Dear Judge DeMarchi,

Pursuant to the Court's Standing Order, Plaintiffs and Meta Platforms, Inc. ("Meta") submit this joint discovery dispute letter.

### A.    STATEMENT OF THE DISPUTE REQUIRING RESOLUTION

*Plaintiffs' Position:* The dispute that requires resolution is whether the Meta should produce "Documents sufficient to show Facebook's analyses of the relationship between user time spent on Facebook and Facebook's revenue," pursuant to RFP No. 251.

*Meta's Position:* Whether Meta should be required to produce documents unconnected to the core issues in this litigation based on plaintiffs' speculation as to why Facebook users choose to log on, stay on, and log off their Facebook accounts and how, if at all, an expert might craft a hypothetical damages model utilizing this information.

### B.    PLAINTIFFS' POSITION

I.   **Introduction**

Plaintiffs served RFP No. 251, which they narrowed through the meet-and-confer process to "Documents sufficient to show Facebook's analyses of the relationship between user time spent on Facebook and Facebook's revenue."

Plaintiffs' expert will use, in part, Facebook's responsive analyses to quantify the damages to the class. Users' time spent on Facebook corresponds to revenue for Meta because it means users will see more ads. Facebook has been unjustly enriched by users spending more time on Facebook than they would have had Facebook disclosed that it was collecting their sensitive health data. For Plaintiffs' expert to calculate the value of that excess time, or Meta's unjust enrichment, a relevant data point is Meta's analyses responsive to RFP 251.

Meta objects that Plaintiffs are not entitled to the requested discovery because Plaintiffs have not submitted their expert report. But this turns discovery on its head. Plaintiffs' expert seeks to rely on the requested materials in his expert report, so of course, he seeks to obtain the materials before submitting his expert report. Meta's burden objections are equally unavailing. They are based on distorting the request far beyond its true scope, which is a discrete request for documents "sufficient to show" certain revenue analyses.

1

CONFIDENTIAL

**II.      Documents responsive to RFP No. 251 are relevant to calculating damages in this case**

The time Facebook users spend on the platform has quantifiable, monetary value. As a nominally free, ads-based service, Meta's revenue is directly tied to the amount of time that Facebook users spent on the platform. That is because users' on-platform time corresponds to more time spent viewing advertisements, and thereby more advertising revenue for Meta. Meta itself has repeatedly admitted that its business is centered around capturing its users' time because this translates to advertising revenue. In its 10-K, Meta explains that "[o]ur advertising revenue can also be adversely affected by a number of [] factors, including decreases in user engagement, including time spent on our products."[1] *Id*. at 17. Similarly, Meta discloses that changes to Meta's platforms may have "the effect of reducing time spent . . . in which case our business would likely be harmed." *Id*. at 22.

The company's internal materials confirm that users' time spent on Facebook is a metric that Meta tracks in connection with revenue. For example, the Board of Directors' materials on the company's financials track "Time Spent" on the Facebook application (reported as ▓▓▓ in 2022) as a revenue metric. PIXEL_HEATLH001191582 at '85. These same materials indicate that users' time spent on Meta's platforms is linked to advertising revenue, for instance noting that ▓▓▓ and noting that ▓▓▓ *Id*. at '84, '90. The Meta Signals and Identity team explains it thus: ▓▓▓ . . . Our DR ads business has thrived in part because we provided tools such as the pixel, app SDK . . . through this we have ▓▓▓ PIXEL_HEALTH000372199 at '200. In the context of discussions regarding the use of third-party data, such as the health data at issue here, to rank users' newsfeed content, Meta has explained that a ▓▓▓ PIXEL_HEALTH000621806 at -810.

Meta complains that the expert report is "hypothetical," but expert reports are not due until August 8, 2025. As discussed above, Plaintiffs' expert seeks to rely on the requested materials in his expert report, so of course, he seeks to obtain the materials before submitting his expert report.

Plaintiffs' experts will develop a damage model to estimate the damages to class members based on the excess time that they spent on the platform. Plaintiffs are *not* moving to compel Meta to produce documents regarding how much less time, if any, users would have spent on Facebook had they known Meta was collecting their protected health information. Nor are they seeking any information about "user preferences." However, for Plaintiffs' expert to calculate the economic value of that excess time, a relevant piece of data is Meta's own analyses of the relationship between user time spent on Facebook and Meta's revenue. As a simplistic hypothetic, Plaintiffs' expert could find (through his analysis) that class members would have spent 10% less time on Facebook if Meta had disclosed to them that it was collecting their sensitive health data from their

---

[1] Meta Platforms, Inc. Form 10-K for Fiscal Year Ended December 31, 2024, Edgar, Securities and Exchange Commission, at 17, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001326801/000132680125000017/meta-20241231.html

2

healthcare providers. If Meta conducted analyses showing that there is a 2% decline in Meta revenue for every 10% decline in time spent by Facebook users, then the class would be entitled to unjust enrichment-based damages of 2% of Meta's profits.

The testimony available to date from Plaintiffs confirms that users would have spent less time on Facebook had they known Facebook was collecting their health information: many have testified that since learning about Facebook's alleged conduct, they have spent less time on the platform because they are unsettled and disturbed by Meta's collection of their sensitive health data. *See e.g.*, Jane Doe IX Deposition Transcript, 224:5-226:16; Jane Doe X Deposition Rough Transcript, 102:19-23; 129:18-20. Plaintiffs will further proffer expert evidence showing that users would have spent less time on Facebook had they known Meta was collecting their protected health information and quantifying that reduction.

The excess time that plaintiffs spent on Facebook because of Meta's misconduct is money that they are owed. In addition to having a standalone claim for unjust enrichment, Meta's unjust enrichment is a cognizable measure of damages for Plaintiffs' invasion of privacy and intrusion upon seclusion claims. *Rodriguez v. Google LLC*, 2024 WL 38302, at *11 (N.D. Cal. Jan. 3, 2024); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599–601 (9th Cir. 2020) (unjust enrichment available as a remedy for invasion of privacy). Furthermore, "a party who has provided goods or services in a transaction and has not been paid the fair value of those goods or services has suffered an economic injury." *Brown v. Google LLC*, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021). In *Brown*, consumers who had used Google's free browsing platform alleged they had lost "money or property" because of Google's misrepresentation that they would not sell plaintiffs' browsing data. *Id*. The court rejected Google's arguments that the plaintiffs could not show monetary loss because they had not paid money for Google's service. *Id*. The court found that Plaintiffs were owed compensation for their payment to Google in the form of their personal data, which Google would not have freely acquired but for its misrepresentations. *Id*. Other courts have also endorsed similar damage theories by recognizing that a plaintiff's excess and compensable payment to a defendant need not take the form of money, but can be anything of value. *See e.g.*, *Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1070 (N.D. Cal. 2014) (explaining that "courts need not restrict the definition of 'payments' ... to cash"); *Fed. Trade Comm'n v. Meta Platforms, Inc.*, 2024 WL 4772423, at *14 (D.D.C. Nov. 13, 2024) ("consumers of Meta's products generally 'pay' by watching advertisements"). Here, the value that class members provided to Facebook is, in part, the excess time they spent on Facebook.

Meta's burden objections are unavailing and based on distortions of RFP 251. Meta asserts that responding will require "extensive, user-specific inquiry," investigations into "why users engage on Meta's platform . . . the differences among which users engage and for how long and over what time period," and "discovery into user preferences," among other items. But none of that is within the request's scope. Rather, as Meta fails to acknowledge, RFP No. 251 is a discrete request for "documents sufficient to show" Facebook revenue analyses. Meta will not need to run custodial searches or collect a large number of documents, but merely pull analyses which its own internal documents and SEC filings indicate it possesses. Meta's objections are really with Plaintiffs' expert's calculation methodology. These are appropriately lodged at the *Daubert* stage, but not to block relevant discovery.

In sum, Meta's valuation of users' time spent on the Facebook platform is highly relevant to calculating damages. The extra time that Facebook stole from users corresponds to profits for Meta that it unjustly acquired and owes to Plaintiffs. The Court should compel Meta to produce

CONFIDENTIAL

documents sufficient to show Facebook's analyses of the relationship between user time spent on Facebook and revenue. If court is considering denying the relief requested, Plaintiffs ask that the Court allow their expert to file a declaration further explaining why the discrete information requested here is relevant to damages calculations.

### C.     META'S POSITION

Discovery must be both relevant and proportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  Plaintiffs' demands fail on both accounts.  These failures are the bases of Meta's objections to plaintiffs' request—not, as plaintiffs try to frame it, the hypothetical expert report.  At this late stage in discovery, plaintiffs demand broad discovery into "Facebook's analyses of the relationship between user time spent on Facebook and Facebook's revenue" without establishing any connection to revenue from the purported transmission of data via Business Tools, let alone any connection to users whose data was purportedly transmitted by third parties—the subject matter of this litigation.  Instead, they anchor this request on speculation about why users engage with Meta's platform and propose a hypothetical damages model an expert might create that, to the extent it even offers a sound methodology (which it does not), demands extensive new lines of discovery to attempt to understand the reasons users choose to engage or not engage with Meta's platform and how a variety of unrelated factors impact those decisions.  This gambit should be rejected.

By plaintiffs' logic, in virtually every litigation, a plaintiff seeking damages against Meta could demand such unbounded discovery based on the unsupported proposition that the plaintiff must have used the platform less due to the issues in the litigation.  It is nonsensical.  The documents sought through RFP 251(5)[2] are irrelevant to the issues in this litigation, disproportionate to the needs of the case, and the breadth of what is requested (and the expansion of discovery that would be required) is overly burdensome on Meta.

To be clear, plaintiffs' request is based on pure speculation as to, among other things, why any user chooses to log onto their Facebook account and for how long (regardless of whether the user ever visited a health-related website), why any user chooses not to log onto their account (and/or to log off sooner than usual), and how, if at all, any privacy- or health-related issues impact these decisions (if at all).  It is a far cry from what plaintiffs characterize as "discrete discovery."  Plaintiffs speculate that "expert evidence [will] show[] that users would have spent less time on Facebook," but offer nothing to support this.  In fact, the basis for this irrelevant request appears to be that they want data to fit a theory and therefore it is relevant data.  Further, plaintiffs claim that "[t]he testimony available to date from Plaintiffs confirms that users would have spent less time on Facebook."  But the testimony confirms the opposite.  One named plaintiff admitted to *signing up for more* Facebook accounts *after* joining this litigation. Multiple named plaintiffs admitted continuing use of Facebook even *after* learning of the facts

---

[2] Eight separate RFPs were served on Meta as "No. 251." For clarity, Meta refers to the RFP at issue as No. 251(5).

4

CONFIDENTIAL

giving rise to this litigation. Another named plaintiff admitted to stopping the use of Facebook *before* learning of the facts giving rise to this litigation.

An analysis of time spent on Facebook or other Meta properties for an undefined time period by *all* users, and any purported connection to *all* revenue, far exceeds the scope of this already expansive litigation and the basic concept of relevance. It cannot be that plaintiffs simply get to speculate that health privacy concerns are the sole reason motivating *all* Facebook users (who should not be considered as a monolith) to log on or off of Facebook and therefore any usage statistics connected to revenue must be attributable to health privacy concerns and can transform irrelevant information into relevant information. That does not make sense. And no expert declaration that plaintiffs now seek to submit would change the burdensome nature of what is being requested. Meta should not be forced into burdensome discovery based on the hope that an expert report might concoct a theory to support it after the fact. To even attempt to respond to this hypothetical would entail investigations that are neither relevant nor proportional to the needs of this case.

Plaintiffs' attempts to downplay the extensive discovery that would be required by claiming that they only seek documents "sufficient to show" falls flat. Although plaintiffs may want only data that they think would confirm their hypothesis—discovery is not one-sided. This request would require extensive discovery into user preferences regarding platform engagement. The hypothetical expert report not only demands further discovery into *why* users engage on Meta's platform, but also further discovery into the differences among *which* users engage and for how long and over what time period. It would also require specialized investigations into how users interact with the health-related websites that were transmitting the purported sensitive data and whether users chose to avail themselves of the tools available to opt out of certain advertising features. Notably, this theory finds no support in plaintiffs' Complaint which makes no reference to user time spent on Facebook, nor any reference to revenue analyses associated therewith.

Plaintiffs' attempt to overcome the lack of relevance by framing this request as related to their unjust enrichment claims finds no support in the documents they cite and mischaracterize. Although plaintiffs cite Meta's 130-page SEC Form 10-K filing to support the proposition that "Meta itself has repeatedly admitted that its business is centered around capturing its users' time," the citations—with liberal use of ellipses—do not support this claim. The relevant citations are from two of the forty-eight risk disclosures in the Risk Factors section of Meta's filing that address the risks of marketers reducing spending on the platform and the risks of competition. Citations to snippets from risk disclosures do not establish a basis to open broad discovery into user preferences regarding engagement with Meta properties based on what (unreliable) conclusions a damages expert might try to draw based on that information.

Plaintiffs fare no better trying to tie this speculative request to out-of-context quotes from documents produced in this litigation. To make their case that "users' time spent on Meta's platforms is linked to advertising revenue," plaintiffs quote snippets from a 235-page collection of materials for a Board of Directors meeting. *See* PIXEL_HEALTH001191582. But their quotes support no such claim of a link. For example, the quote ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is about ▮▮▮▮▮▮▮—not revenue. Plaintiffs fare no better quoting from a forward-looking "Signals Vision 2021" document prepared by the

5

CONFIDENTIAL

Signals team to address potential responses to increasing competition in the industry. *See* PIXEL_HEALTH000372199. Nor does a document about NewsFeed rankings (an on-platform service) render the demanded data relevant to this litigation. *See* PIXEL_HEALTH000621806. Regardless, any connection between calculating time spent across all Meta properties by all Meta users and all revenue potentially connected thereto is disproportionate to the needs of this case and cannot be justified based on a plainly unsupported calculation method that an expert might try to utilize.

Unsurprisingly, plaintiffs' cited caselaw fails to support their overbroad, irrelevant demand. In *Rodriguez*, plaintiffs proposed a damages calculation that simply mimicked the $3 payments made to study participants to allow a similar type of tracking in a related study. *Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2024 WL 38302, at *11 (N.D. Cal. Jan. 3, 2024). Here, no such payment is at issue. Instead, plaintiffs have proposed a multi-step hypothetical in the hopes of constructing a multi-step damages model based on a multitude of factors related to engagement, or non-engagement, by users on Meta's platforms without any regard for why those individual users or non-users chose to engage on the platform, whether they did so for anything having to do with this case, whether changes over time impact this theory, and how or why their reasons may have changed—all of which requires extensive new discovery.

Plaintiffs' remaining cases concern whether plaintiffs can allege standing based on income earned through their use of a free product, not that any particular method of calculating this income is relevant or proportional. For example, in *Brown* the court stated only that plaintiffs have "adequately alleged that they 'lost money or property.'" *Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at*17 (N.D. Cal. Dec. 22, 2021); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020). Neither of these cases supports the expansive document request at issue here—nor, for that matter, do either of these cases concern any discovery requests.

In sum, plaintiffs' attempts to stitch together a theory of unjust enrichment to justify this unbounded request falls flat. At its core, this is a request for an investigation into user preferences as to when, why, and for how long to engage on Meta's platforms, how such engagement might impact revenue, and how an expert might create a report to come up with a damages calculation. This hypothetical chain of events fails to support this irrelevant, disproportionate request and should be rejected.

### D. NEED FOR A HEARING

Meta believes that a hearing would be helpful if the Court is inclined to entertain the relief plaintiffs are seeking and prefers an in-person hearing if one is held.

Plaintiffs do not believe a hearing is necessary.

### E. CUT-OFF DATES FOR FACT AND EXPERT DISCOVERY

The schedule sets forth the following dates for fact and expert discovery cut-offs:

CONFIDENTIAL

Fact discovery cut-off:  May 30, 2025

Expert discovery cut-off:  July 17, 2026

### F. STATEMENT RE COMPLIANCE WITH STANDING ORDER

The parties met and conferred about the issues listed herein.

### G. ATTACHMENTS
1. Plaintiffs' Request for Production No. 251
2. Meta's Response to Plaintiffs' Request for Production No. 251

Dated:                                              By:    */s/ Jason 'Jay' Barnes*
                                                                Jason 'Jay' Barnes

**SIMMONS HANLY CONROY LLC**

Jason 'Jay' Barnes (admitted *pro hac vice*)
  jaybarnes@simmonsfirm.com
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:     212-784-6400
Fax:    212-213-5949


By:    */s/ Geoffrey Graber*
          Geoffrey Graber

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Geoffrey Graber, State Bar No. 211547
  ggraber@cohenmilstein.com
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel:     202-408-4600
Fax:    202-408-4699

**KIESEL LAW LLP**

Jeffrey A. Koncius, State Bar No. 189803
  koncius@kiesel.law
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel:     310-854-4444
Fax:    310-854-0812

**TERRELL MARSHALL LAW GROUP PLLC**

7

CONFIDENTIAL

        Beth E. Terrell, State Bar No. 178181
         *bterrell@terrellmarshall.com*
        936 North 34th Street, Suite 300
        Seattle, WA 98103
        Tel.:   206-816-6603
        Fax:   206-319-5450

        **GIBBS LAW GROUP LLP**
        Andre M. Mura, State Bar No. 298541
         *amm@classlawgroup.com*
        1111 Broadway, Suite 2100
        Oakland, CA 94607
        Tel.:   510-350-9700
        Fax:   510-350-9701

        *Attorneys for Plaintiffs and Putative Class*

Dated:              By:    */s/ Lauren R. Goldman*
                            Lauren Goldman

        **GIBSON, DUNN & CRUTCHER LLP**
        LAUREN R. GOLDMAN (*pro hac vice*)
        lgoldman@gibsondunn.com
        DARCY C. HARRIS (*pro hac vice*)
        dharris@gibsondunn.com
        200 Park Avenue
        New York, NY 10166
        Telephone: (212) 351-4000
        Facsimile: (212) 351-4035

        ELIZABETH K. MCCLOSKEY (SBN 268184)
        emccloskey@gibsondunn.com
        ABIGAIL A. BARRERA (SBN 301746)
        abarrera@gibsondunn.com
        One Embarcadero Center, Suite 2600
        San Francisco, CA 94111-3715
        Telephone: (415) 393-8200
        Facsimile: (415) 393-8306

        **LATHAM & WATKINS LLP**
        MELANIE M. BLUNSCHI (Bar No. 234264)
        melanie.blunschi@lw.com
        KRISTIN SHEFFIELD-WHITEHEAD (Bar No. 304635)

CONFIDENTIAL

        kristin.whitehead@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

ANDREW B. CLUBOK (pro hac vice)
andrew.clubok@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

GARY S. FEINERMAN (pro hac vice forthcoming)
gary.feinerman@lw.com
300 North Wabash Ave, Suite 2800
Chicago, IL 60611
Telephone: +1.312.876.7700

*Attorneys for Defendant Meta Platforms, Inc.*

CONFIDENTIAL

## CIVIL L.R. 5-1(i)(3) ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I, , hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.


Dated:                    By:    /s/ Eric A. Kafka