Redacted Version of the Joint Discovery Dispute Letter Brief regarding 30(b)(6) Topics (Dkt. No. 928-3)

CONFIDENTIAL

March 24, 2025

Judge Virginia K. DeMarchi
San Jose Courthouse, Courtroom 2 – 5th Floor
280 South 1st Street
San Jose, CA 95113

> **Re:** ***In re Meta Pixel Healthcare Litigation*, Case No. 22-cv-03580-WHO (VKD)**
> JLB re: 30(b)(6) Topics

Dear Judge DeMarchi,

Meta Platforms, Inc. ("Meta") and Plaintiffs submit this joint discovery dispute letter pursuant to the Court's Standing Order.

## A.    STATEMENT OF THE DISPUTE REQUIRING RESOLUTION

<u>Joint Statement</u> – The Parties dispute whether Meta should be required to provide the 30(b)(6) testimony sought by the Plaintiffs. The Parties note that this joint discovery dispute letter exceeds the 1,500 per side word limit. To streamline the issues for the Court and to avoid the submission of multiple letters on related topics, the Parties are including all issues in one letter. To the extent the Court would prefer separate letters, the Parties will revise and re-file.

## B.    PLAINTIFFS' INTRODUCTORY STATEMENT

### 1.    Background

#### a.    Plaintiffs' extensive details about what they intend to ask decreases rather than increases Meta's burden.

A 30(b)(6) notice requires a party to describe deposition topics "with reasonable particularity." Fed. R. Civ. P. 30(b)(6). This does not mean listing every piece of evidence, sub-topic, or follow-up question. For instance, a topic drafted by this Court in *Armas v. USAA Cas. Ins. Co.* was:

> "The use of Auto Injury Solutions, a third-party used to review Plaintiffs' claims for medical-payments benefits under their policy with USAA CIC to determine whether fees and expenses were reasonable and whether treatment was medically necessary and appropriate, arising out of their 2012 and 2014 motor vehicle accidents."

2019 WL 1501578, at *3 (N.D. Cal. Apr. 5, 2019).

Plaintiffs could have followed this model, drafting topics at a similar level of conceptual generality—e.g., "The use of ███████ a processor used by Meta to categorize and classify

CONFIDENTIAL

health data collected from Meta's Business Tools from 2017-2023." Such an approach would have resulted in a notice with fewer than a dozen topics.

Instead, Plaintiffs went beyond the duty imposed by the Rules, providing extensive detail to aid Meta's preparation and avoid unnecessary court intervention. Many topics explicitly outline the questions Plaintiffs intend to ask. For example, Topic 2 covers the initial processing of Pixel and SDK data from healthcare provider web properties. Rather than leaving it there, Plaintiffs specify: "Explain the basic functions of the storage and processors identified in the data flow document produced at PIXEL_HEALTH00000064,"and even list 13 specific items from that document to aid Meta's preparation, adding as many sub-sub-topics to the overall count. Given the technical nature of the issues, Plaintiffs anticipated that witnesses would need to reference documents and identified them accordingly.

This approach is the opposite of burdensome—it is a roadmap for preparation.

### b.    Meta misrepresents Plaintiffs' extensive efforts to reduce Meta's burden.

Meta tells this Court that Plaintiffs have not "engage[]in a good faith effort to narrow the topics for testimony by corporate representatives." This comes as a surprise to Plaintiffs, given the actual history here.

First, despite repeated requests from Plaintiffs over several weeks, Meta refused to confer on the bulk of topics from Plaintiffs' notice or to identify witnesses. Meta then served its responses and objections *24 hours before the deadline for raising all disputes*, requiring Plaintiffs to suggest to Meta that the Court's order needed to be changed in order for a good faith meet and confer to occur. If Meta had its way, that meet and confer process would have been an empty and rushed formality.

Second, as a result of the meeting forced by Plaintiffs, Plaintiffs served Meta with several pages of additional narrowing proposals addressing every concern for which Meta was able to offer even the barest substantiation. Moreover, Plaintiffs accepted the lion's share of Meta's proposals for narrowing, reserving objections only as to one topic and seeking clarification of another.

Unfortunately, Meta has decided to rely on false characterizations about Plaintiffs' effort to narrow these topics and appeals to emotion and the length of the deposition notice in asking this Court to shield it from legitimate discovery, when instead it should have spent its time concretely substantiating any of its actual burden arguments. It has failed to do so.

## C.    META'S INTRODUCTORY STATEMENT

Instead of engaging in a good faith effort to narrow the topics for testimony by corporate representatives—an effort that would benefit both parties and allow Meta to properly prepare witnesses on the specific topics that plaintiffs are interested in—plaintiffs take the position that they are entitled to testimony about overbroad topics that extend to wholly irrelevant material,

CONFIDENTIAL

regardless of the lack of connection to plaintiffs' allegations or the burden on Meta to prepare witnesses. Plaintiffs' overbroad topics will inevitably result in further disputes during the deposition as to witness preparation and is not an efficient way to progress discovery. Instead, through its carefully considered responses and objections, Meta sought to balance the burdens imposed by the overbroad topics with its goal of making prepared, informed witnesses available to plaintiffs.

Plaintiffs served Meta with two 30(b)(6) deposition notices on January 20, 2025 and January 24, 2025. Combined, the deposition notices span 25 pages, plus 14 pages of exhibits connected to definitions, and enumerate 43 topics, 116 sub-topics, and 56 sub-sub-topics. These numbers exclude the topics that were not formally split into sub-topics, despite the multiple topics therein, along with broad catch-alls, such as "any other efforts" (Topic 1(j)) and "any table with ████████ or Feature data not identified by Plaintiffs here" (Topic 8(ee)). Many of these topics are highly technical in nature, with over 160 lines of Source Code identified as subjects for testimony. For example, Topic 2(i) demands "explanations" about 13 tables, storage repositories, and processors. Topic 4(h) demands that Meta "explain" ten "source code elements." Topic 8 demands six categories of topics for 30 separate tables, as well as the aforementioned catch-all of "any" other tables. Topic 15 seeks 6 categories of topics about ██ crawlers or tables, plus "crawler content tables our [*sic*] sources generally." To claim, as plaintiffs do, that their approach "is the opposite of burdensome" is to blink at reality. While Meta agrees that specificity regarding a request for testimony can be helpful, when that specificity exponentially expands the scope of information sought and demands numerous complex, detailed, and probing items, the "specific" request becomes incredibly and unduly burdensome and is no longer proportional to the needs of the case.

Despite this, Meta undertook a good faith effort to respond to these voluminous topics. Meta's 65 pages of responses and objections took into account the information that it could reasonably prepare witnesses on—both in terms of what is reasonably available and what is relevant—and attempted to define or narrow the vague and overbroad language employed by plaintiffs. The parties met and conferred on February 12 and February 14 to discuss Meta's initial concerns and questions, including topics that did not make sense as drafted and for which Meta asked for clarification, and did not receive for weeks. On February 14, 2025, the parties submitted a status update to the Court in which plaintiffs sought forty-two hours of 30(b)(6) deposition testimony. Dkt. 845. On February 18, 2025, this Court issued an order that plaintiffs may take no more than 20 hours of 30(b)(6) testimony. Dkt. 850.

On March 10, 2025, Meta served its responses and objections. In total, Meta agreed to designate witnesses for all or a portion of 25 of the 43 topics, and agreed to meet and confer on the remaining 18 topics. On March 15, the parties met and conferred for approximately four hours. When Meta asked whether plaintiffs were planning to scale back or narrow their requested topics in light of the Court's order limiting them to 20 hours of 30(b)(6) testimony, plaintiffs refused and instead <u>informed Meta that they were confident that they would get more time—yet another effort to seek reconsideration of this Court's orders</u>. Following the meet and confer, Meta agreed to designate witnesses for all or a portion of 37 of the 43 topics, even though the burden of preparing for those topics is immense.

CONFIDENTIAL

But plaintiffs are still not satisfied. Although plaintiffs agreed to some of Meta's narrowing, plaintiffs continue to demand overbroad, irrelevant information—and to force Meta to seek a protective order rather than find a reasonable compromise. Meta's positions are not an "appeal to emotion," as plaintiffs claim; they are an appeal to reality supported by case law and the good faith conduct and proportionality that should underlie all discovery.

## D. DISPUTED ISSUES

For ease of reference, the parties have structured this letter by topic, with each side's position on the topic included.

### 1. BURDEN

#### a. <u>Plaintiffs' Position</u>

##### i. **A party objecting to providing 30(b)(6) testimony must seek a protective order with concrete and specific objections.**

A party seeking to avoid presenting a witness for a properly noticed Rule 30(b)(6) deposition topic must obtain a protective order. *DarbeeVision, Inc. v. C&A Mktg., Inc.*, CV 18-0725 AG (SSX), 2019 WL 2902697, at *9 (C.D. Cal. Jan. 28, 2019). Unless Meta secures a protective order, it must produce a witness for all topics where its objections remain unresolved.

To justify a protective order based on undue burden, Meta must provide specific, concrete details about the difficulty of preparing a witness. *Puckett v. Cnty. of Sacramento*, 2:22-CV-0350 KJM DB, 2024 WL 1641888, at *6 (E.D. Cal. Apr. 16, 2024). Generic or boilerplate objections are not sufficient. The burden in this context refers to the effort required to prepare a witness, and only Meta possesses the necessary information to assess that effort. *See id; see also Rubalcava v. City of San Jose*, 20CV04191BLFVKD, 2023 WL 2434292, at *3 (N.D. Cal. Mar. 9, 2023) (noting that the difficulty of preparing for a broad question depends on facts known only to the responding party). Likewise, if Meta claims a topic is vague, it must explain *why* it is vague—simply labeling a term as ambiguous is an insufficient boilerplate objection. *Puckett*, 2024 WL 1641888 at *4.

For example, whether preparing a witness for a topic covering "all investigations or disciplinary actions" is unduly burdensome or insufficiently particular depends on the number of such actions and how they are documented internally. *See Johnson v. City of San Jose*, 21CV01849BLFVKD, 2023 WL 3687968, at *3 (N.D. Cal. May 25, 2023).

Even if Meta substantiates a burden, it must still show that the burden is *undue*. A burden is not undue if it is justified by factors such as "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Puckett*, 2024 WL 1641888 at *6 (internal citation and quotation omitted); *see also In re Google RTB Consumer Privacy Litig.*, 21CV02155YGRVKD, 2023 WL 5836816, at *2 (N.D. Cal. Sept. 8, 2023) (same).

4

CONFIDENTIAL

A company that grows to become one of the largest in the world does not get to use that size to leverage objections about how hard it becomes to answer questions about the company's operations; on the contrary, with the blessing of that level of market capitalization comes the heightened burden of responding to otherwise reasonable questions in litigation. Such burden is a natural consequence of "the privilege of being able to use the [organizational] form in order to conduct business." *Id.* at *3 (E.D. Cal. Apr. 16, 2024) (internal citation and quotation omitted).

>               **ii.        The Court should strike all of Meta's burden-related objections.**

Meta's objections based on burden, proportionality, and overbreadth are boilerplate, specific only in their insertion of words or phrases from the topics that are purportedly too much. None of the objections explain why preparing a witness would be difficult, let alone unduly so. *See Puckett*, 2024 WL 1641888 at *6 (discussing what makes a burden undue). Such objections should be stricken.

Meta's burden objections rely on hypothetical difficulties rather than actual ones. For instance, Meta objects to preparing a witness regarding predecessor or successor ██████ tables without having determined how many such tables exist or whether they are difficult to identify. The objection is purely speculative. If ten tables are clearly labeled as successors, the burden is minimal. The same principle applies to all of Meta's burden objections—it has not taken the necessary steps to determine whether preparation will *actually* be difficult, such as assessing the availability of relevant documents to assist the witness. As a result, none of its objections contain concrete representations about the alleged burden.

Meta also fails to demonstrate that any identified burden is undue. Its objections do not account for the amount in controversy or its own vast resources. *See In re Google RTB Consumer Privacy Litig.*, 2023 WL 5836816 at *2 (noting these as relevant factors). Meta is a trillion-dollar company, and this case involves alleged violations affecting millions of users and billions of dollars in damages. In this context, preparing a witness for a relevant topic should have to be quite burdensome to qualify as undue.

Because Meta's written objections do not substantiate any of its burden-related objections, and Meta could not do so at the meet and confer, the Court should strike the objections. Even once stricken, Meta would remain protected by the fact that Meta's obligation to prepare a witness extends only to what is "reasonably available." *In re JDS Uniphase Corp. Sec. Litig.*, Case No. 02-CV-1486 CW (EDL), 2007 WL 219857, at *1 (N.D. Cal. Jan. 29, 2007) (internal citation and quotation omitted). Instead of withholding a witness due to speculative concerns about burden, Meta should make reasonable efforts to prepare and present a witness on each topic.

>       **b.      Meta's Position**

>               **i.        A Blanket Rejection of Meta's Burden Objections Fails to Account for Meta's Good Faith Efforts to Weigh the Significant Burdens When Identifying Topics for Which it Will Prepare Witnesses.**

CONFIDENTIAL

Plaintiffs' own cited caselaw acknowledges that "[w]hile a corporation must make a good faith effort to prepare a 30(b)(6) witness to 'fully and unevasively answer questions about the designated subject matter…that task becomes less realistic and increasingly impossible as the number and breadth of noticed subject areas expand.'" *DarbeeVision, Inc. v. C&A Marketing, Inc.*, 2019 WL 2902697, at \*8 (C.D. Cal. Jan. 28, 2019) (internal citation omitted). "Topics should be drafted in accordance with the widely-recognized understanding that 'Rule 30(b)(6) is not designed to be a memory contest.'" *Id.* at \*7 (internal citation omitted). In other words, the burden of preparing witnesses is not simply a topic-by-topic analysis—it is cumulative. *See, e.g., U.S. v. HVI Cat Canyon, Inc.*, 2016 WL 11683593, at \*10 (C.D. Cal. Oct, 26, 2016) ("The breadth of the Topics in Plaintiffs' 30(b)(6) Notice, considered collectively, would make witness preparation a nearly impossible task."); *Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1511901, at \*2 (N.D. Cal. Jan. 27, 2012 ) ("The Court finds that under the circumstances, Samsung's 229-topic notice is facially excessive. . . . [T]he purpose served by Fed.R.Civ.P 30(b)(6) . . . does not extend to burdening the responding party with production and preparation of a witness on every facet of the litigation.").

Faced with more than 215 topics, sub-topics, and sub-sub-topics, Meta did not immediately seek a blanket protective order, but rather endeavored to identify and agree to topics that address issues relevant to this litigation in a manner that allows it to properly prepare the witnesses within the available time prior to the close of fact discovery. Meta sought to address its objections during meet and confers to streamline and clarify the issues about which it will be required to prepare a witness. Clarity benefits both parties. *See HVI Cat Canyon, Inc.*, 2016 WL 11683593, at \*6 ("The process for obtaining 30(b)(6) testimony was designed to provide certain advantages to both the requesting and responding party while simultaneously imposing obligations on each side.").

In response, however, plaintiffs seek a blanket rejection of Meta's burden objections, claiming either that Meta has not substantiated its burden, or simply that plaintiffs do not believe there is a burden. The reason for this is clear. Plaintiffs do not want to compromise; they want to force Meta to prepare witnesses on overbroad, irrelevant topics in their continued pattern of seeking significantly overbroad discovery that goes far beyond the needs of the case. Meta is trying to avoid gamesmanship during these depositions where Meta has properly prepared a witness on its reasonable interpretation of an otherwise vague topic, only for plaintiffs to argue that the interpretation is not reasonable and the witness should have been prepared to address additional items. This is not efficient. Rather than find a compromise on the remaining disputed issues, plaintiffs' position is that Meta must seek a protective order for every topic to which it objects or will not produce a witness to testify to the topics as specifically worded by plaintiffs. This all-or-nothing approach is unworkable and unsupported by case law.

Plaintiffs' cited cases offer no support for their argument. Although both *Puckett v. County of Sacramento*, 2024 WL 1641888 (E.D. Cal. Apr. 16, 2024 ) and *In re Google RTB Consumer Privacy Litig.*, 2023 WL 5836816 (N.D. Cal. Sept. 8, 2023) cite the proportionality standard of Rule 26(b)(1) when considering burden, neither provides plaintiffs with any supporting analysis as to why plaintiffs' burdensome topics are proportional to the claims and defenses in this litigation. To be clear, they are not. Instead, these cases just recite the standard but do not apply it to the facts there at issue. Further, although plaintiffs cite *Puckett* as supporting their argument that Meta cannot leverage its size to claim burden, that case does not stand for the proposition that

CONFIDENTIAL

a large company is therefore required to agree to an excessive number of broad, burdensome topics that plaintiffs unilaterally deem "key" or "critical." Similarly, *Johnson v. City of San Jose*, 2023 WL 3687968 (N.D. Cal. May 25, 2023) and *Rubalcava v. City of San Jose*, 2023 WL 2434292, at *2 (N.D. Cal. Mar. 9, 2023) actually support Meta's position. Those cases show how this process should work. They address discrete disputed topics regarding police policies, reports, and discipline that the parties narrowed based on objections, not a blanket rejection of the objective fact that overbroad discovery is unduly burdensome.

A blanket rejection of Meta's burden objections is not appropriate. Plaintiffs should not get a free pass to ignore the real obstacles Meta faces in its preparation of witnesses on the topics as noticed by plaintiffs. Nor should plaintiffs be able to ignore that they need to connect their discovery with the issues in this case.

> ### ii. Plaintiffs' Topics Should Be Rejected As Unduly Burdensome Because of the Breadth and Volume of Information Requested.

As even the cases cited by plaintiffs makes clear, 30(b)(6) topics must be relevant to the issues in dispute and identified with "painstaking specificity." "Because 'Rule 30(b)(6) places substantial responsibilities and burdens on the responding corporate party . . . , for the Rule 'to effectively function, the requesting party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute.'" *DarbeeVision, Inc.*, 2019 WL 2902697, at *7; *see also Johnson*, 2023 WL 3687968, at *1 ("[A] Rule 30(b)(6) deposition must be directed to non-privileged matter that is relevant to a claim or defense and that is proportional to the needs of the case."); *Rubalcava*, 2023 WL 2434292, at *2 (same).

The First Amended Consolidated Class Action Complaint alleges that Meta used business tool data transmitted by third parties to target advertising to users. *See, e.g.*, Compl. ¶ 13 ("Meta collects the transmitted identifiable health information and uses 'cookies' to match it to Facebook users, allowing its healthcare partners and others to target advertisements both on and off Facebook."). Meta's responses are guided by plaintiffs' own allegations, particularly with respect to what is proportional to the litigation. *See, e.g., Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

Accordingly, Meta continues to object to topics and sub-topics that are overbroad, unduly burdensome, and disproportionate to the needs of the case. While Meta addresses several such topics in the following sections of this letter, this is not an exhaustive list of all of Meta's objections to plaintiffs' noticed 30(b)(6) topics.[1] The sheer volume and expansive scope of plaintiffs' noticed

---

[1] For example, for many of plaintiffs' topics and sub-topics, Meta has proposed to provide testimony on a more narrow or general scope in order to avoid undue burden, improper assumptions, and other issues. *E.g.*, topics 7(e), 7(i)(5), 7(j)(5), 16(b), 33(c). Similarly, Meta has objected to certain topics and sub-topics that seek an inordinate amount of detail on highly technical issues—including demands to identify particular lines or files of source code, often in

CONFIDENTIAL

topics is itself excessive and improper when assessed collectively, and Meta also objects to plaintiffs' noticed 30(b)(6) topics on that basis.  *E.g.*, *HVI Cat Canyon, Inc.*, 2016 WL 11683593, at *10; *Apple Inc.*, 2012 WL 1511901, at *2.

   **2.    TOPIC 7(g)**

      **a.    Meta's Position**

   Topic 7(g) seeks: "How Meta inferred and used ███████ and features from data collected through the Pixel, SDK, and Business Tools for healthcare provider properties, including:…(g) Locations where ██████████████ was sent and stored, including the fields identified in the ████████████ ████████████████ including identification of specific categories, use cases, and tables in ZippyDB, UP2X, and Hive where ████████████████████████ were sent, stored, and/or used."

   Meta agreed to the following: "General explanation as to how Meta inferred and used ███ ████ and features from data transmitted through at-issue Business Tools for healthcare provider properties, including:…(g) Locations where ████████████ was sent and stored, including the fields identified in the ████████████████."

   Meta did not agree to the broader "identification of specific categories, use cases, and tables in ZippyDB, UP2X, and Hive where ████████████ processors were sent, stored, and/or used."  This unbounded request is unduly burdensome, especially in light of the detailed information Meta has *already* agreed to provide in response to the broader Topic 7—including in response to topics 7(a), 7(b), 7(c), 7(d), 7(e), 7(f), 7(i), 7(i)(2), 7(i)(3), 7(i)(4), 7(i)(5), 7(i)(6), 7(i)(7), 7(j), 7(j)(1), 7(j)(2), 7(j)(3), 7(j)(4), 7(j)(5), 7(j)(6), 7(j)(7), 7(j)(8), 7(j)(10), and 7(k)—and the existing data and Source Code produced or made available for inspection.  *See, e.g.*, *HVI Cat Canyon, Inc.*, 2016 WL 11683593, at *9 ("The depth of information sought by the Topics also increases the degree of difficulty Defendant would face in preparing witnesses to testify.").

      **b.    Plaintiffs' Position**



██████████████████—including in UP2X, ZippyDB, and Hive tables. Plaintiffs seek corporate testimony on specifically where this critical data is sent because how such data is actually used is a core question in this case. Plaintiffs have sought these answers since the beginning of the case— as the Court understands, and expressed in a hearing seven months ago:

---

areas where Meta has already agreed to provide testimony about the general processes and systems at issue; these topics and sub-topics are unduly burdensome and disproportionate to the needs of the case.  *E.g.*, topics 7(e), 7(i)(1), 7(i)(5), 7(j)(5), 12(c), 14(c).

CONFIDENTIAL

> "It's the ███████████████ imposed by Meta that they're
> really focusing on … so, where is that? ***If it's in UP2X but it's also
> in some place else, where is it?*** …. [Meta] has … ████████ …
> there's an inference of what's the ████████████████████
> ███████████, and this is a form of content characterization that Meta
> imposed on data that received and … it's categorized …. [in a way
> that] relates to the kind of healthcare information that they are
> concerned about in this case. And, so, they're after something that
> shows that happening to this data. ***So, where is that?***"

See Aug. 21, 2024 Hearing Tr. at 153:21-154:14. Plaintiffs are still seeking the answer to this basic
question. The Daiquery Protocol did not provide any answers for UP2X or ZippyDB. And Meta's
recent answer to Interrogatory No. 12 did not provide any details about UP2X or ZippyDB either.
Nor did Meta's answer address the vast majority of the critical tables that Plaintiffs had identified
to Meta (see Topic 7 for a list).

The only discovery mechanism left is a deposition, which is exactly what Meta requested.
In the last motion hearing, the Court voiced its "concern" about "dataflow" and other discovery is
that they could be best "obtained from sitting down with a witness who's prepared and just asking
all the questions that you want to ask. … for some of these things where what you're really trying
to understand is how the dataflow works, would it not be helpful for you to have a witness right
now who can talk about those things, and then maybe you'll have more clarity about other aspects
of your discovery?" Jan. 15, 2025 Hearing Tr. at 16:11-17:8.

In response, Plaintiffs' counsel pointed out their concern that "with a system that's
complicated, there is no way that Mr. Wooldridge, or any individual Meta employee … can answer
the sort of detailed data lineage questions that we have off the top of their head." *Id.* at 17:16-20.

Plaintiffs explained that they sought the answers through an interrogatory because they
wanted details. However, the Court addressed the concern by stating, "why not have somebody
who's knowledgeable, who knows in advance what your questions are that you want to know
about, sit there and answer questions for you?" Id. at 18:6-9. The Court then told Meta that, if
Plaintiffs' experts reviewing the source code were incorrect, it "would expect that to come out in
fact discovery. And what's the best way for it to come out in fact discovery? I thought depositions
might be a more efficient tool in light of the kind of nitty-gritty information the plaintiffs seem to
be seeking. … so what about a deposition?" Id. at 21:2-12. Meta's response was, "I agree
completely… And I think one of the issues is the plaintiffs' scope and number of questions isn't
really suited to interrogatories. It is a deposition, where you can ask as many questions as you want
in the time allotted." Id. at 21:13-19.

The Court should reject Meta's bid to preclude this testimony from a deposition.

CONFIDENTIAL

### 3.    TOPIC 7(h)

#### a.    Meta's Position

Topic 7(h) seeks: "How Meta inferred and used ██████ and features from data collected through the Pixel, SDK, and Business Tools for healthcare provider properties, including:…(h) For each ZippyDB, UP2X, or Hive category or table where ████████ ██████████████ were sent, stored, or used: (1) Identify the specific ZippyDB, UP2X, or Hive category or table; (2) Identify the information stored in that category or table; (3) Identify how the information stored in that category or table is used; (4) Identify how it flows into other systems at Meta."

Meta objected to this topic and its multiple sub-topics as overbroad and disproportionate to the needs of the case in that it would require Meta to prepare a witness or witnesses on significant volumes of highly technical data that is unnecessary for the litigation of this case. Further, the use of undefined terms like "how it flows into other systems at Meta" not only invites misinterpretation and later disputes, but also wanders into data and systems not relevant or proportional to the claims and defenses in this action. As noted above, Meta further believes that such detail is not required in light of both plaintiffs' access to documents and Source Code, and the sub-topics that Meta has already agreed to for Topic 7, which adequately cover the ██████ topic in which plaintiffs are interested. Given that Meta has agreed to provide 30(b)(6) testimony regarding the role of ZippDB, Up2X, and Hive as they relate to ██████ and User Features that incorporate at-issue business tools data, it is not necessary for Meta to identify *every single* ZippyDB, Up2X, or Hive category or table and other highly detailed information that is not necessary for plaintiffs to understand these processes. Investigating and preparing a witness on every detail of potentially dozens or hundreds of categories, use cases, and tables would be incredibly burdensome, and there is no basis to force Meta to get into this level of detail.

#### b.    Plaintiffs' Position

This topic is an extension of Topic 7(g) seeking details for the ZippyDB, UP2X, and Hive categories or tables that the witness identifies. Meta's objection should be overruled for the same reasons as Topic 7(g).

### 4.    TOPIC 7(j)(9)

#### a.    Meta's Position

Topic 7(j)(9) seeks: "How Meta inferred and used ██████ and features from data collected through the Pixel, SDK, and Business Tools for healthcare provider properties, including:…(j) Explain how ██████████████████████ including:…(9) Are ██████████ created based on analysis of on-platform activity? If yes, are they joined with ████ from the Pixel/SDK to create 'features'? What are the rules for that process?"



Meta agreed to: "General explanation as to how Meta inferred and used ██████ and features from data transmitted through at-issue Business Tools for healthcare provider properties,

including:…(j) General testimony explaining how ███████████████████████
including:…(9) Generally whether ████████' are created based on analysis of on-platform
activity? If yes, are they joined with ██████████ from the Pixel/SDK to create 'features'?"

Meta did not agree to answer the question, "What are the rules for that process?" The rules for a process to join Business-Tool-related data with other irrelevant data is far afield from the issues in this case. Meta has agreed to designate a witness to discuss the aspects of this topic that relate to the data actually at issue. But identifying the "rules" for a process involving irrelevant data would require Meta to investigate and prepare a witness or witnesses on a topic that concerns data not at issue in this litigation—"on-platform activity." Although Meta agreed to prepare a witness to answer the first two questions, requiring Meta to investigate the technical specifics relating to a process involving data not at issue would be unduly burdensome and disproportionate.

### b.   Plaintiffs' Position

Whether Meta uses that at-issue data by combining it with other data in its possession (including from on-platform activity) and then uses that commingled data is highly relevant to each of Plaintiffs' claims and is separately actionable on its own. *See* Plaintiffs' Position at Section 6(b)(i), *supra*.

### 5.   TOPIC 12

### a.   Meta's Position

Topic 12 seeks several overbroad and unduly burdensome categories of information regarding lookalike audiences. In response, far from being "cagey" or requiring some undefined "magic language," as plaintiffs suggest below, Meta agreed to provide more general, narrowed testimony in response to topics 12(a), 12(b), and 12(d) in order to reduce the burden on Meta to prepare one or more witnesses on these highly technical topics and remove or correct inaccurate assumptions built into plaintiffs' topics—assumptions they repeat below to justify their overbroad topics. Plaintiffs lay out in significant detail below, based on both public and (uncited) non-public documents Meta produced in discovery, how they believe lookalike audiences work, what they claim Meta represented to advertisers about lookalike audiences, and why lookalike audiences are allegedly important. This only underscores the vast amount of information that Meta has already provided to plaintiffs in discovery—and where plaintiffs assert that they want to know even more, Meta has agreed to provide general, narrowed testimony on those topics, as follows:

12:  General information about Lookalike Audiences related to healthcare advertisers.
12(a):  General overview of the creation of Lookalike Audiences.
12(b):  Whether Lookalike Audiences are derived in part from Features.
12(d):  Whether Lookalike Audiences were deemed by Meta as an alternative to health-related targeted advertising, and if so, why. For the purposes of responding to this topic, the witness will not provide testimony concerning a legal conclusion with respect to the term "deemed."

Meta did not agree to provide testimony identifying the source code files that explain these processes, as doing so would be highly burdensome and not proportional to the issues in the case.

CONFIDENTIAL

As reiterated in their statement below, plaintiffs' only justification for their detailed, highly technical topics is their allegation that Meta suggested lookalike audiences could be an alternative to health-related targeted advertising. Accordingly, although Meta has consistently objected to this characterization and does not agree that it is accurate or relevant to this case, Meta agreed to provide testimony regarding this allegation. But that does not warrant questioning into every detail and source code file involved in the process of creating a lookalike audience—including whether lookalike audiences "are derived in part from ▮▮ ▮▮ or Features, and, if so, from where Meta extracts those specific ▮▮ and Features—for example, specific ZippyDB, UP2X, and/or Hive categories or tables." Plaintiffs' topic 12(b). These sub-topics are plainly overbroad and unnecessary for plaintiffs to understand the issues in this case. The Court should order Meta's reasonable, proportionate proposal.

### b. <u>Plaintiffs' Position</u>

When Meta purportedly deprecated direct interest-based targeted based on health categories, it also contemporaneously advised health advertisers that Lookalike Audiences could achieve the same marketing goals as direct targeting. Accordingly, Plaintiffs' Topic 12 seeks to learn the specifics on how this could be true—for which there is no relevance dispute.

To figure it out, Plaintiffs have requested testimony on "How Lookalike Audiences are created; i.e. how Meta takes the seed set of audience members provided by advertisers and uses information about those users to identify other people to be included in a Lookalike Audiences," including "whether Lookalike Audiences are derived from ▮▮ or Features, and, if so, from where Meta extracts those specific ▮▮ and Features – for example, specific ZippyDB, UP2X, and/or Hive categories or tables." In addition, Plaintiffs ask for "identification of the source code files that explain these process" and "how and why Lookalike Audiences were deemed by Meta as an alternative to health-related targeted advertising."

Meta's objections hope to substitute generalities in place of specifics. But specifics are necessary to explain how the data was actually used. To understand why, the Court should be aware of some basic facts about Lookalike Audiences. The first step to creating a "Lookalike Audience" is for an advertiser to provide Meta with a seed set, i.e. "an existing custom audience" that an advertiser "selects for its source audience," which Meta defines as "the audience a lookalike audience is based on."[2] Meta then publicly states that, "[t]o create a lookalike audience, our system leverages information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities."[3] Plaintiffs seek corporate testimony on the specific demographics, interests, and behaviors and the sources that Meta draws upon to grow the "source audience" into the ultimate "lookalike audience." If Meta's statements to health advertisers was accurate at all, the "demographics, interests, and behaviors" must include some health-related information—or else it could not be a viable replacement for direct health-related targeting.

Plaintiffs also believe the Court should be aware of why Lookalike Audiences are important. By building Lookalike Audiences from "demographics, interests, and behaviors" that

---

[2] https://www.facebook.com/business/help/475669712534537
[3] https://www.facebook.com/business/help/164749007013531

CONFIDENTIAL

relate to health, Meta is permitting direct health-targeting by proxy. For example, if a Lookalike Audience is created in part by comparing the ███████ categorizations assigned to users who view a certain page (like www.hospital.org/cancer-treatment), then any advertiser (including non-healthcare providers) can target users with a ███████ by simply creating a "source audience" from ███████████. What this also means is that Meta would be permitting its own internal classifications of one healthcare provider's data to benefit health-targeted advertising for that healthcare provider's competitors, and any company selling a quack remedy—such as the ads from non-healthcare providers Meta targeted towards Plaintiffs' expert Richard Smith shortly after he exchanged communications with a healthcare provider about "ulcerative colitis."

Meta's response and argument above is misleading.

First, Plaintiffs already have a "general overview of the creation of Lookalike Audiences" from public documents. What is necessary in this case is the specifics called for in the topic—how Meta uses the "seed set" to find other LAL audience members.

Second, Meta's agreement to provide testimony about "whether Lookalike Audiences are derived in part from Features" excludes other data in Meta's systems from which they could be derived—such as ████████████ or some other relevant source of which Plaintiffs are not currently aware. To understand why Meta's response is cagey, the Court should be aware of some basic concepts about how Meta transforms, categorizes █████████ via the Pixel. First, Meta intercepts all events in a class member's ████████ at a hospital with the Pixel, such as a visit to the homepage (www.hospital.org); a page about cancer treatment (www.hospital.org/cancer-treatment) and a Patient Portal login. Second, Meta ███████ which is stored in a table named █████████ Third, Meta runs the event data through the █████████████████████. Fourth, ████████████ Meta may attach an ███████ to that class member. Fifth, once a class member accrues enough ████████████ That is, Plaintiffs' understanding is that a User Feature is the last step of the process: ██████████████████ Meta proposes to skip all steps prior to the "Feature" This is insufficient because Plaintiffs believe that, to be effective, ███████████████████████.[4]

Third, Meta does not carry its burden to establish that it would be overly burdensome to identify the specific ZippyDB, UP2X, and Hive sources from which Lookalike Audiences are derived. The testimony that Plaintiffs seek is not secret: "[i]t's the ███████ imposed by Meta that they're really focusing on … so, where is that? If it's in UP2X but it's also in some place else, where is it?" Here, Plaintiffs are seeking testimony on how those ███████ ████████ are used for Lookalike Audiences. Such testimony is relevant and not unduly burdensome given the scope of the case and the importance of the issue.

---

[4] It may also be that Plaintiffs have not used the magic language that Meta uses internally to describe how it grows the "source audience" into the Lookalike Audience. Regardless of the magic language, how Lookalike Audiences are derived (in whole or in part) from Pixel or SDK data or data derived from it is highly relevant and an appropriate topic of 30(b)(6) testimony.

CONFIDENTIAL

Fourth, Meta does not carry to carry its burden to establish that it would be overly burdensome to identify the specific source code files that relate to this narrow topic. As Plaintiffs have previously explained, Meta has produced ███████████ source code files. It is not sufficient for it to point to the pile of those documents and tell Plaintiffs to figure it out on their own, particularly where Plaintiffs have asked a discrete question. Plaintiffs seek identification of the specific source code files because Meta has repeatedly told Plaintiffs that the source code is the ultimate source of truth for such questions.[5]

## 6.    RELEVANCE
### a.    Meta's Position

#### i.    Plaintiffs' Eleventh Hour Attempts to Expand the Scope of the Case By Expanding the Relevant Systems At Issue Should Be Rejected.

"[A] Rule 30(b)(6) deposition must be directed to non-privileged matter *that is relevant to a claim or defense* and that is proportional to the needs of the case." *Johnson*, 2023 WL 3687968, at *1 (emphasis added); *see Rubalcava*, 2023 WL 2434292, at *2. Because the complaint guides the parties' discovery, Meta's agreement to, and preparation for, corporate testimony regarding Meta's "use" of data received via the Business Tools will be limited to the allegations in the operative complaint, namely, the alleged use of such business tool data to target advertising to users. *See, e.g.,* Compl. ¶ 13. This is precisely the general topic that Meta has agreed to designate witnesses to discuss in multiple topics and sub-topics.

At the eleventh hour, however, plaintiffs seek to expand the scope of this case to include unalleged use of data in systems or tools that are not at issue in this litigation: NewsFeed, Facebook Marketplace, Instagram, WhatsApp, "friend suggestions," "other purposes," and "any other purpose for which Meta uses such data." *See* Topics 7(i)(6), 7(i)(7), 7(j)(4), 7(j)(6), 11, and 29. None of these systems or tools are substantively addressed in the Complaint. In fact, these all relate to *on-platform* systems or tools (*i.e.*, NewsFeed, Marketplace, "friend suggestions"), *separate systems* altogether (*i.e.*, Instagram, WhatsApp), or are far too broad to reasonably prepare a witness on ("other purposes," "any other purpose for which Meta uses such data").

In addition to the previous discussion on burden and proportionality, Meta also objects to Topics 7(i)(6), 7(i)(7), 7(j)(4), 7(j)(6), 11, and 29 as not relevant or proportional to the litigation to the extent they incorporate these "other" systems and tools that are not the subject of this case.

Plaintiffs' attempts to shoehorn these systems into "advertising" are meritless. Without citation to anything—caselaw, produced documents, or the Complaint—plaintiffs assert for the first time that "there are many other ways Meta increases its advertising revenue using data gathered about users. . . . includ[ing] increasing the amount of user engagement with Meta's other services." But plaintiffs' own topics undermine their argument. These systems and tools are explicitly identified as being separate from advertising. And to be clear, to the extent that

---

[5] Despite a direct document request, Meta also has not produced principal engineering, design, and explanatory documents for Lookalike Audiences, which is likely to be briefed soon.

CONFIDENTIAL

advertisements are shown in these other systems, they are already encompassed within the testimony that Meta has agreed to provide regarding ad delivery.

Plaintiffs' attempt to tie these new systems and tools to a litany of claims and defenses fails to make up for the fact that these new systems and tools have not been part of this case or the contemplated scope of discovery for the past two-and-a-half years.[6]  Meta should not now be required to prepare a witness on new topics that were not even addressed in document discovery. Doing so would not only require Meta to investigate these irrelevant topics, but would inevitably lead to further document and written discovery requests when discovery should be wrapping up, not getting started.  This would impermissibly expand the scope of the case and would impose a highly disproportionate and undue burden on Meta.

The Court should reject this last-minute attempt to expand the scope of discovery.

> ### ii.    Plaintiffs' Attempts to Expand the Case at the Eleventh Hour by Expanding the At-Issue Data Should be Rejected.

Similarly, plaintiffs' attempts to expand the at-issue data should be rejected.  Notably, Meta has agreed to prepare witnesses for the topics identified by plaintiffs (Topics 7, 8, 9, 10, and 12), but only insofar as they concern data that is at issue in this litigation.  This should be uncontroversial.  Requiring Meta to prepare witnesses about data not at issue in this litigation is both burdensome and disproportionate to the needs of the case, especially in light of the number of topics Meta has agreed to.

> ### iii.    Meta agreed to prepare a witness on topics relevant to ZippyDB and UP2x.

Plaintiffs' rejection of Meta's objections to Topics 7 and 9 are not well taken.  As discussed throughout this letter, Meta investigated these highly technical topics and agreed to prepare witnesses on relevant topics.

For example, with respect to Topic 9, plaintiffs are simply incorrect when they state that "Meta has objected that this information is irrelevant."  Plaintiffs describe Topic 9 as requiring Meta to prepare a witness "to '[i]dentify and explain the specific UP2X and ZippyDB categories involved in the formation and use of ███████ and Features,' and to describe 'for each such category, what is stored within them and how they are used,' and 'how the contents can be searched including the identification and description of any internal tools already created for this purpose.'"

---

[6] Neither case cited by plaintiffs supports a last-minute expansion of discovery.  *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020); *Hill v. NCAA*, 7 Cal.4th 1 (1994).  On a motion to dismiss, *In re Facebook* identified the factors for determining "highly offensive" behavior, but fails to support the expansion of the claims and defenses in this action to hypotheticals posed by plaintiffs.  Meta already agreed to prepare a witness as to how, if at all, health-related ███████ were used in advertising.  Similarly, *Hill* cites, without analysis, the "principal focus" of the California constitutional privacy provision but provides no support for the expansion of systems at issue in this litigation.

CONFIDENTIAL

Meta agreed to prepare a witness or witnesses to "[g]enerally identify the principal UP2X and ZippyDB use cases involved in the formation and use of ████████ and Features that include or are derived from data received via the Business Tools and the search tools utilized by Meta in the normal course of business, if any, that can search ZippyDB or UP2x." Given the highly technical nature of this request, Meta agreed to prepare a witness on the information requested at a level that is appropriate for a 30(b)(6) witness and responsive to plaintiffs' requests.

### iv. Discovery regarding proposals that were not implemented is not warranted.

Meta objects to Topic 5 insofar as it includes proposed changes to the Pixel, SDK, or CAPI *from 2015 to the present* that were not implemented. Identifying all proposals that were not implemented over the course of a decade could not be done without undue burden, nor would it be appropriate for a witness to have to memorize all such proposals that were not implemented. *See Crystal Lakes v. Bath & Body Worls, LLC*, 2018 WL 10467489, at *2 (E.D. Cal. Aug. 15, 2018) ("Rule 30(b)(6) deponents are not expected to be clairvoyant or encyclopedic in their knowledge"); *HVI Cat Canyon, Inc.*, 2016 WL 11683593, at *8 ("[I]t is simply impractical to expect Rule 30(b)(6) witnesses to know the intimate details of everything." (citation omitted)). This aspect of this topic is not proportional to the needs of the case.

### b. Plaintiffs' Position

### i. The Court should strike Meta's relevance objections concerning use of at-issue data beyond advertising.

In Topics 7, 11, and 29 Meta refuses to designate a witness to testify about how Meta uses at-issue data affects beyond advertising. For example, Topic 7 concerns the role of ████████ derived from at-issue data. Plaintiffs seek testimony regarding its use in determining what information to show users through advertisements, the NewsFeed, Facebook Marketplace, Instagram, WhatsApp, and friend suggestions. Meta objects, arguing that only advertising-related uses are relevant. On a subsequent call, Meta suggested that no discovery should be had unless Plaintiffs could identify a measurable theory of monetization for any such use. Meta's objection is incorrect for several reasons.

First, even taking Meta's objection at face value, each of these topics relates to advertising. At-issue data may be used in ads-ranking and other advertising optimization systems. But there are many others ways Meta increases its advertising revenue using data gathered about users. This includes increasing the amount of user engagement with Meta's other services by choosing what to include and how to order the information appearing there. Accordingly, even if Plaintiffs sole interest were how Meta increases its advertising revenue using Plaintiffs' health data, it would still be important to discover how that data is used in other services like the NewsFeed.

Second, information about how Meta utilizes Pixel-generated health data is actionable on its own regardless of any connection to advertising and directly relevant to multiple key issues, including the offensiveness of the privacy invasion, consent, profit, and necessary injunctive relief:

CONFIDENTIAL

a. *Offensiveness of the Privacy Invasion* – Plaintiffs assert claims where offensiveness is a relevant factor. One aspect of offensiveness is the purpose for which Meta collected the data. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020) (listing "the intruder's motives and objectives" as considerations for offensiveness). Meta's use of health-related ███████ in other parts of its service such as the NewsFeed may heighten the offensiveness of the alleged invasion. For example, bombarding class members with messages about their health conditions—or creating a system through which that can occur—would be a factor in favor of Meta's conduct being highly offensive.

b. *Consent-Related Defenses* – Meta asserts that users consented to the use of their data, relying on disclosures made to users. *See Dkt. 497 at 78-83.* The accuracy of these disclosures about use depends on how Meta actually used the data, not just for advertising but across its platforms.

c. *Knowledge and Intent* – The full extent of Meta's use is relevant to knowledge and intent because it will demonstrate that Meta's interception and use was not accidental but instead systematic.

d. *Unjust Enrichment Claims*– Meta's use of at-issue data in non-advertising contexts is relevant to determining the extent of Meta's unjust enrichment from this data.

e. *Unauthorized Use is Independently Actionable* – The Electronic Communications Privacy Act provides that it is unlawful (and actionable) for any purpose to "intentionally use[], or endeavor[] to use, the contents of any … electronic communication, knowing or having reason to know that the information was obtained through the interception of a[]n … electronic communication" in violation of the ECPA. 18 U.S.C. § 2511(1)(d). This does not have any limitation to uses for which the profits can be quantified or monetized. The California Information Privacy Act is even more direct, creating a cause of action against any person who "uses or attempts to use, *in any manner, or for any purpose* … any information … obtained" in violation of CIPA. Cal. Pen. Code § 631(a) (emphasis added). Likewise, the California Comprehensive Data Access and Fraud Act makes it unlawful for any person to knowingly access and without permission "*use*[] any data, computer, computer systems, or computer network." Cal. Pen. Code § 501 (e)(1). Likewise, a "principal focus" of the invasion of privacy claim under the California Constitution is to guard against "unnecessary information gathering, *use*, and dissemation by … private entities" of personal information. *Hill v. NCAA*, 7 Cal.4th 1, 21 (1994) (emphasis added).

f. *Injunctive Relief* – Plaintiffs seek an injunction, and determining the appropriate scope of relief requires understanding all ways Meta uses this data, not just in advertising.

For these reasons, Meta's relevance objections concerning the use of at-issue data beyond advertising should be stricken.

CONFIDENTIAL

Meta's response here is false.

Plaintiffs alleged Meta's unauthorized use of health information—without limitation to advertising purposes—in the complaint. See Dkt 334, ¶¶ 5 ("Plaintiffs are Facebook users who allege that Meta acquires their confidential health information from their healthcare providers and covered entities … despite Meta's promises that it: (1) only collects and *uses* their Dat if Meta's Partners have obtained the 'right' or 'lawful right' to share their data with Meta[.]"); 22 ("Meta's interception, dissemination, and use of individually identifiable health information … violates federal and state law [and] intrud[es] upon their privacy[.]"); 266 ("Meta's unauthorized acquisition [of health information] violated their property rights to control how their data and communications are used and who may be the beneficiaries of their data and communications"); 287 (Citing Zuckerberg testimony to Congress in response to a question about getting "clear permission from users before selling or sharing sensitive information about your health," that Meta does "require permission … *for all the uses of it*."), emphasis in original; 399(f) ("Meta took something of value from Plaintiffs and class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value"); 411(f); 429(c) (Unauthorized "use" triggers exception to exception under ECPA); 436(b) (Meta's purpose was tortious because it included "intent to sell, transfer, or *use* individually identifiable health information"); 477 ("Plaintiffs and Class members have … an interest in precluding the … misuse of their health information by Meta."); 534 ("Meta 's use of Plaintiffs' and Class members' data is wrongful in that the use is prohibited by state and federal laws and Meta's own policies[.]"); 535 ("Meta lacks permission to use … Plaintiffs' … data[.] .. Plaintiffs … never authorized Meta to … use their data[.]").

Plaintiffs have also sought such evidence from the beginning of the case. Plaintiffs have not and do not seek discovery into how Meta "collects" information through these other systems – because that would not be relevant. However, Meta's *use* of at-issue data is relevant to all claims and that has always been Plaintiffs' position.

Plaintiffs did not specifically allege that Meta used the at-issue data for purposes other than advertising. The reason is because Plaintiffs did not have the basis to allege the specifics when the case started because Meta does not disclose these uses of off-platform activity to the general public.[7] Plaintiffs' only option was to obtain such information through discovery and prove other such uses at trial, which is precisely what it seeks to do with this deposition testimony. See *In re Facebook Cons. Privacy User Profile Litig.*, 655 F.Supp.3d 899, 934 (N.D. Cal. 2023) ("It's worth remembering that Facebook and Gibson Dunn had superior access to all the evidence needed in this case. How were plaintiffs supposed to know [about details of Meta's conduct]? Through discovery, the plaintiffs were entitled to this evidence—that is the whole point of civil discovery.")

Meta's claim that the NewsFeed, Facebook Marketplace, Instagram, and WhatsApp are unrelated to advertising is also false. Meta sells ads on these systems, including ads derived from

---

[7] To the contrary, see https://about.fb.com/news/2021/01/how-does-news-feed-predict-what-you-want-to-see/, which makes no mention of Meta's misuse of off-Facebook health information—or OFA data at all.

CONFIDENTIAL

offsite data, and it makes more money if it can keep users engaged longer so that it can sell more ads.

There is no basis for the Court to prohibit discovery into how Meta uses the at-issue data.

### ii. The Court should strike Meta's relevance objections concerning use of at-issue data after it is combined with other data.

In Topics 7-10, and 12 Meta refuses to designate a witness to testify about how its systems merge at-issue data with non-at-issue data and how the resulting combination is used. For instance, Topic 7 seeks an explanation of ██████████████ including how and why █████████ derived from at-issue data are "joined or commingled" with those from other sources. Meta objects to providing testimony on these points, asserting that the inquiry is overbroad, irrelevant, and disproportionate to the needs of the case because it involves, in part, data that is not at-issue.

However, as discussed previously, Meta's use of at-issue data is central to this case, and its commingling with other data does not diminish its relevance. For example, the invasion of privacy claim tort under the California Constitution has a "principal focus" to guard against "unnecessary information gathering, use and dissemination by … private entities, images of … computer stored and general 'dossiers' and 'cradle-to-grave' profiles on every American' dominate[d] the framers' appeal to voters." *Hill v. NCAA*, 7 Cal.4th 1, 21 (1994). Meta's actions to combine the at-issue data with other data in formation of a "dossier" or "cradle-to-grave" is directly relevant.

Suppose, for example, Meta serves an ad based on a █████████ related to diabetes. The selection of that particular ad may result from both at-issue data—such as a patient portal login—and non-at-issue data—such as a visit to a page on Facebook.com. If Meta cannot distinguish between these data sources when determining why the ad was served, then its enrichment should arguably be measured based on the entire ad revenue.

Even if Plaintiffs were required to apportion Meta's profit between lawful and unlawful causes, discovery into the details of this commingling remains relevant. In fact, it becomes *more* relevant in that scenario, as Plaintiffs would need information about Meta's point-weighing systems and other internal mechanisms to determine how data sources influence the selection and targeting of advertisements. Understanding how at-issue data is merged, weighed, and applied within Meta's broader systems is essential to assessing both liability and damages.

For these reasons, the Court should strike Meta's relevance objections concerning discovery about the commingling and use of at-issue data with non-at-issue data

### iii. The Court should strike Meta's relevance objections concerning ZippyDB and UP2X (Topics 7 and 9).

Topic 9 asks Meta to prepare a witness to "[i]dentify and explain the specific UP2X and ZippyDB categories involved in the formation and use of █████████ and Features," and to

CONFIDENTIAL

describe "for each such category, what is stored within them and how they are used," and "how the contents can be searched including the identification and description of any internal tools already created for this purpose." Meta has objected that this information is irrelevant.

ZippyDB and UP2X appear to function as the ███████ of Meta's data flow related to ad-ranking and ad-targeting, and include ███████████ (as Plaintiffs' understand it, the UP in UP2X stands for ████████ Understanding how these systems interact with the ████████ and Features derived from health-related data is critical. Even if Meta's objection is limited to questions about how the contents of these databases can be searched, that objection is meritless. Meta has previously asserted that it cannot provide additional details in response to interrogatories or requests for production because it███████████████████████████████ ████████. If that claim is accurate, then it can be confirmed through straightforward deposition testimony. If it is inaccurate, then Plaintiffs are entitled to discover that fact and pursue appropriate follow-up.

At a recent discovery hearing, Meta's counsel argued that interrogatories were not the proper vehicle for obtaining this information and that Plaintiffs should instead pursue it through a deposition, where they could "ask as many questions as [they] want in the time allotted." Jan. 15, 2025 Hearing Tr. at 21:13-19. Now, Meta claims that the topic is not suitable for a deposition either. The Court should reject that position and strike Meta's objections about the relevance of these systems.

## 7.    CRAWLERS

### a.    Meta's Position

### b.

#### i.    Meta Objects to Preparing a Witness on Irrelevant Crawlers (Topic 15).

For Topic 15, plaintiffs identified ██ crawlers or potential crawler-related sources for which they seek a witness or witnesses to discuss 6 enumerated sub-categories of information. Plaintiffs also seek information about unidentified crawlers in a catch-all that would require Meta to confirm "whether any additional crawlers exist." Following the meet and confer, plaintiffs followed up to identify 9 more questions regarding one of the sub-categories.

Meta investigated the ██ identified crawlers or sources and agreed to prepare a witness or witnesses for ████████. Meta investigated the other identified crawlers and objected that they were not relevant to the claims and defenses in this action.

Plaintiffs rejected this explanation and rejected Meta's efforts to clarify the scope of crawlers and sources that it needs to prepare the witnesses on. Plaintiffs' demand for a catch-all forces Meta to investigate irrelevant data to confirm its irrelevance. Plaintiffs' position, stated above, that "before excluding a crawler from discovery, Plaintiffs are entitled to basic information about what that crawler does in order to determine its relevance" turns discovery on its head. This forces Meta to prepare a witness on the details of irrelevant information so that the witness can explain why something is not relevant. This is neither a reasonable, nor efficient, way to pursue

CONFIDENTIAL

discovery. Tellingly, during the meet and confer, plaintiffs raised what they claimed to be a potentially relevant crawler that was not listed in Topic 15. This underscores Meta's concern that despite reasonable investigation and preparation in accordance with Rule 30(b)(6) to identify relevant crawlers, the overbroad "any additional crawlers" demanded by plaintiffs will invite gamesmanship during the depositions to create disputes.

Plaintiffs have access to a significant volume of data and documents, as well as written discovery responses and data productions related to crawlers that Meta has already provided, and they identified the crawlers or sources they believed to be relevant therefrom. Meta investigated and agreed to █ of the 14. This list allows Meta to properly prepare a witness while avoiding the undue burden of investigating and preparing a witness to discuss irrelevant information.

While Meta has agreed to provide testimony regarding ██ of the ██ crawlers or crawler-related sources, it does not agree that responding to the nine detailed questions plaintiffs specified for topic 15(c) for each of these crawlers or sources is necessary or proportionate. The topic of crawlers is already far afield from the relevant issues in this case, and investigating the minute intricacies of crawlers that Meta does not even agree are relevant is a bridge too far.

c.     **Plaintiffs' Position**

i.     **The Court should strike Meta's relevance objections concerning additional crawlers beyond the ██ it has agreed to discuss on Topic 15.**

A key issue in this case is how Meta categorized healthcare provider web properties and whether it could have identified them more accurately if it had chosen to. One way Plaintiffs intend to investigate this is through analysis of Meta's crawler data—information gathered by automated tools that scan and store web content.

Topic 15 requests that Meta designate a witness to testify about "[h]ow Meta used or uses crawlers in its systems relating to Pixel, SDK, and other business tools." Plaintiffs specifically asked Meta to prepare a witness to discuss ██ different crawlers or data sources derived from crawlers and to confirm whether any additional relevant crawlers exist. However, Meta has agreed to testify only about ████████████████████████████—while refusing to testify about ████████ or confirm whether additional relevant crawlers exist.

For example, one crawler about which Meta refuses to offer a witness is the ████████████ ████████████ which Plaintiffs believe ████████████████████. Meta objects that the crawler "is not relevant to the claims and defenses in this action" without offering any explanation or substantiation of that assertion. As another example, Meta asserts as a defense that it lacked the requisite knowledge and intent to be found liable. However, Plaintiffs reasonably believe that Meta deployed a crawler during the Class Period that ████████████████████████ which would, by definition, ████████ ████████████████████████████████. If confirmed by a 30(b)(6)

CONFIDENTIAL

witness, this crawler could have easily been used ███████████████████████████
██████ – so that Meta could have avoided intercepting patient data.

During the meet-and-confer process, Plaintiffs made clear that they only seek testimony on crawlers ████████████████████████████████████████. If a crawler merely ████████████████████████████████████████████ for instance, it would not be relevant. But before excluding a crawler from discovery, Plaintiffs are entitled to basic information about what that crawler does in order to determine its relevance.

It is possible that Plaintiffs have already identified all relevant crawlers. If Meta's witnesses are unaware of any additional crawlers that gathered ███████████████████████████
██████████ they can simply state that under oath. There is no associated burden to doing so. Conversely, if relevant crawlers exist, Meta should have no difficulty preparing a witness to identify them and answer the fundamental questions posed in Topic 15.

For these reasons, the Court should strike Meta's relevance objections and compel it to provide testimony regarding additional crawlers.

8.    **PRESERVATION**

    a.    <u>**Meta's Position**</u>

        i.    **Meta Objects to Plaintiffs' Demands for Unencumbered Discovery on Discovery into All Aspects of Meta's Preservation of Data.**

Topics 18(f), 20, 21, and 26 seek expansive discovery into all aspects of Meta's preservation of data in this litigation including, for example, "whether and for what time period Meta preserved [] information [concerning settings or controls]" (Topic 18(f)), "any store of data for the purpose of preserving data that may be at issue in this litigation, when it was created and what it contains" (Topic 20(a)), "data sources at Meta with the longest retention periods that contain records of User ID, Separable ID, or any other unique identifier for a user or their device, plus" additional enumerated conditions (Topic 21), "all steps you took to preserve" data, including "the contents and recipients of notices of any litigation holds," and "the scope of the litigation hold or other preservation effort, including the custodians, document types, data sources, data tables, data fields, or other Data Organization subject to the hold or other preservation effort." (Topic 26).

Such discovery into Meta's preservation is unwarranted, and implicates both disfavored discovery on discovery and privilege issues. *See Watkins v. HireRight, Inc.*, 2013 WL 10448882, at *3 (S.D. Cal. Nov. 18, 2013) ("Plaintiff is not entitled to 'independently assess the adequacy of [Defendants'] preservation.'"); *see also LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 162-63 (N.D. Ill. 2023) ("Discovery on discovery should be the exception, not the norm. Mere speculation about missing evidence is insufficient to allow discovery on discovery.").

During the meet and confer, plaintiffs argued that Judge Orrick's recent Order concerning button click data serves as justification for these requests. *See* Dkt. 880. But these requests are

not limited to button click data, the preservation of which has already been litigated at length. These topics seek unencumbered discovery into *every aspect of Meta's preservation*. Although the Court held there were issues with the preservation of button click data, this is not a wedge through which plaintiffs can pry open the door to Meta's entire preservation process.

Further, as Meta stated on the meet and confer, these broad topics unmistakably delve into privileged information, including the scope and contents of litigation holds. Plaintiffs, again, offer no justification for delving into such privileged matters other than the recent Court Order specific to button click data. In *Rg Abrams Insurance v. Law Office of C.R. Abrams*, for example, the Central District of California rejected discovery into litigation holds merely to inquire as to whether a party satisfied their preservation obligations. *See* 2021 WL 10312431, at *12 (C.D. Cal. Dec. 22, 2021) ("Plaintiffs appear to seek the Litigation Hold Information to determine if Defendants have satisfied their preservation obligations—that is, whether a litigation hold notice issued, whether Defendants received it, the types of ESI Defendants were instructed to preserve. However, 'discovery on discovery,' as this type of discovery is known, generally is disfavored and not allowed."). That is precisely what plaintiffs seek here.

What is more, testimony as to preservation is unnecessary because plaintiffs have already asked preservation-related questions via Requests for Admission. Meta has already answered and agreed to clarify its responses to the Requests for Admission on many of these topics.

Similarly, plaintiffs have also already sought this information via interrogatories which Meta has answered, and is in the process of supplementing. This Court should "not [be] persuaded that plaintiffs require detailed information about [Meta]'s litigation holds in this . . . litigation[]" through 30(b)(6) testimony. *In re Google RTB Consumer Priv. Litig.*, No. 21-CV-02155-YGR (VKD), 2024 WL 3407069, at *3 (N.D. Cal. July 11, 2024) (finding where defendant represented "that it is prepared to provide information concerning its standard data retention periods, changes made to those periods, and the earliest dates for which it has preserved data[,] . . . plaintiffs should be able to readily discern whether [the defendant], in fact, timely preserved potentially relevant data from these sources once it had notice of the litigation and/or notice of the potential significance of a particular data source."). Further, Meta has already produced documents discussing the retention periods for data received via the Business Tools. Meta has also made available for inspection its Source Code and configuration repositories, which includes ███████ ██████████████████████████████████████████████████████ .

In light of the information that Meta has already provided through other discovery and the information plaintiffs have already sought through other discovery requests, preparing a witness or witnesses on improper discovery on discovery preservation topics that implicate privilege, is improper, inefficient, and unduly burdensome, and should not be permitted.

      **b.**    **Plaintiffs' Position**

Meta's statement is incorrect.

First, Plaintiffs did not limit their justification of preservation discovery to ███████████████████ To the contrary, the ███████████████ spoliation is known and Plaintiffs do

CONFIDENTIAL

not intend to spend much, if any, deposition time on ███████████. Meta omits that it acknowledged on January 14, 2025 that it failed to preserve health classifications and inferences for websites, apps, class members, and their communications during the Class Period from certain sources identified by Plaintiffs—such as the ███████████ Judge Orrick has previously ruled that this now spoliated discovery goes "to the heart of this case." On March 14, 2025, Meta said it was looking into whether it could remediate this spoliation. Plaintiffs' preservation topic is designed to figure out how to remedy Meta's spoliation of such data—which is beyond the ███████████ data, for which there is no remedy possible.

Second, Meta says above that it has answered preservation interrogatories. This is false. Meta objected, has not agreed to provide an answer, and, although the parties have discussed the issue for two years and conferred on it multiple times, refuses to take a final position—thereby delaying briefing.

Third, Meta says it answered Requests for Admission relating to this topic. This is misleading. Meta's RFA responses are incomprehensible. It stated long ago that it would update them, but has not yet done so.

Fourth, Meta's citation to *LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 162 (N.D. Ill. 2023) and other cases precluding preservation evidence is misplaced. In LKQ, the Court stated that "mere speculation about missing evidence is insufficient to allow discovery on discovery." Here, Plaintiffs are not speculating: Meta has not produced any health inferences that it attached to class members or their communications that Judge Orrick found were at "the heart of this case."

The Court should permit the discovery.

9.    **REVENUE**

    a.    **Meta's Position**

        i.    **Meta Objects to Revenue from Entities Not Relevant to the Litigation (Topic 35).**

Topic 35 seeks "[r]evenue from non-Healthcare Providers derived from ███████████  categories for advertisements to ███████████ or features."

Meta objects to Topic 35 on two primary grounds: (1) relevance, and (2) undue burden. Meta has already agreed to prepare witnesses on revenue topics related to the entities and data at issue.  *See* Topics 34, 36, and 37.  But, topic 35 itself concedes that it seeks testimony about revenue from *non*-Healthcare Providers.  The scope of this litigation does not include non-Healthcare Providers.  And plaintiffs cannot make this topic relevant by presuming a hypothetical chain of connection that does not exist.  That an irrelevant advertiser may serve an ad that has some health-related topic or category has nothing to do with the issues in this case.   And forcing Meta to prepare a witness on wholly irrelevant information is the epitome of undue burden. Plaintiffs have consistently attempted to stretch the scope of discovery far past what is reasonable or proportionate—this breaks the connection entirely and should not be permitted.

CONFIDENTIAL

###### b. **Plaintiffs' Position**

Evidence of how Meta monetized that at-issue health information in this case is relevant whether or not the advertiser that Meta enabled to serve health information ads was a healthcare provider. Plaintiffs do not seek testimony about non-healthcare providers serving health ads that have no connection to at-issue data. Instead, Plaintiffs seek testimony about revenues from non-healthcare provider advertisers for health-related advertising that uses systems that contain the at-issue data in this case – and information derived from it. For example, when Meta transforms the at-issue data into ████████ or features and then uses the resulting ████ and Features to help a non-healthcare provider serve a health-related advertisement, the revenue from that ad is part of this case. Meta's objection is based on an unreasonable and unsupported assumption about the scope of this case. No reasonable party could have thought that using the Plaintiffs' health data to serve health-related ads from non-healthcare providers was not the subject of discovery.

### E.    **Meta's Concluding Statement**

#### 1.    **Meta's Responses To Plaintiffs' Myriad Topics Are More Than Sufficient To Prepare Witnesses on Relevant Topics, And No Further Burden Is Warranted.**

Substantiating the undue burden underlying Meta's proposal to narrow plaintiffs' myriad topics and sub-topics is itself highly burdensome. Plaintiffs essentially contend that Meta must prepare to provide testimony on all of plaintiffs' topics as written, so it can then explain the precise burden necessary to do so. This would defeat the purpose and ignore the collective excess and overbreadth of the voluminous and all-encompassing topics on which plaintiffs seek 30(b)(6) testimony. *See HVI Cat Canyon, Inc.*, 2016 WL 11683593, at *10; *Apple Inc.*, 2012 WL 1511901, at *2. Further, there is a fundamental disconnect between the volume of plaintiffs' topics and their technical depth on the one hand, and the limit of 20 hours of 30(b)(6) testimony that this Court has ordered on the other. Yet, plaintiffs maintain that Meta must prepare witnesses to cover all of these topics, even though plaintiffs will not have time to cover them all in the time permitted.

Faced with this daunting task, Meta proposed reasonable ways to narrow the vast majority of plaintiffs' requests. Rather than meaningfully engage with Meta to reach reasonable compromises, plaintiffs instead seek to strike all of Meta's burden-related objections. Further, the volume of topics, and technical depth demanded, cannot be addressed in the 20 hours of testimony that this Court ordered—yet plaintiffs demand that Meta prepare witnesses for topics they will not be able to cover. This is the opposite of pursuing discovery in good faith.

To the extent Meta has not offered or agreed to provide testimony on specific topics or sub-topics not referenced herein, Meta objects to providing such testimony in light of the overall breadth and unreasonableness of plaintiffs' requested 30(b)(6) topics, which makes them unduly burdensome and disproportional to the needs of the case. *HVI Cat Canyon, Inc.*, 2016 WL 11683593, at *10. In accordance with Meta's foregoing arguments, the Court should confirm that Meta does not have to provide 30(b)(6) testimony beyond the scope that Meta has proposed.

CONFIDENTIAL

## F.    Plaintiffs' Concluding Statement

Plaintiffs negotiated resolutions to the vast majority of Meta's objections, including every objection for which Meta offered even minimal substantiation about burden concerns. Plaintiffs' position is simply that for any objection for which the parties were not able to reach agreement, which is now a relatively narrow list, Meta must substantiate the objection to the Court's satisfaction and seek a protective order.

As explained in detail above, it is rarely the case that the burden for preparing for a question can be determined in a vacuum based on the question alone. To give one more example of the burden objections Meta refuses to substantiate, it could be the case that a single table proves that Lookalike Audiences work the way Meta will claim at the deposition. If that is so, there is virtually no burden associated with preparing a witness to say that. Meta's position is that its counsel need not even take the minimal step to find that out before objecting on burden grounds. That position should be rejected as it would mean civil discovery turns entirely on Meta's untestable fiat.

## G.    NEED FOR A HEARING

Plaintiffs do not believe a hearing is necessary but would be happy to further explain their position if the Court believes it would be helpful.

Meta is available for a hearing on this issue if the Court would find one helpful.  Meta prefers an in-person hearing if a hearing is ordered.

## H.    CUT-OFF DATES FOR FACT AND EXPERT DISCOVERY

The schedule sets forth the following dates for substantial completion of document production and fact and expert discovery cut-offs:

*Parties substantially complete document production*: December 18, 2024

*Fact discovery cut-off*: May 30, 2025

*Expert discovery cut-off*: July 17, 2026

## I.    STATEMENT RE COMPLIANCE WITH STANDING ORDER

The parties met and conferred about this dispute on March 14, 2025.

## J.    ATTACHMENTS

Exhibit 1:  Plaintiffs' Deposition Notices

Exhibit 2:  Meta's Responses and Objections

CONFIDENTIAL

Dated:  March 24, 2025

By:      */s/ Jason 'Jay' Barnes*
       Jason 'Jay' Barnes
**SIMMONS HANLY CONROY LLC**
Jason 'Jay' Barnes (admitted *pro hac vice*)
  *jaybarnes@simmonsfirm.com*
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel:    212-784-6400
Fax:    212-213-5949


By:      */s/ Geoffrey Graber*
       Geoffrey Graber
**COHEN MILSTEIN SELLERS & TOLL PLLC**
Geoffrey Graber, State Bar No. 211547
  *ggraber@cohenmilstein.com*
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel:    202-408-4600
Fax:    202-408-4699


**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
  *koncius@kiesel.law*
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel:    310-854-4444
Fax:    310-854-0812


By:      */s/ Beth E. Terrell*
       Beth E. Terrell
**TERRELL MARSHALL LAW GROUP PLLC**
Beth E. Terrell, State Bar No. 178181
  *bterrell@terrellmarshall.com*
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.:    206-816-6603
Fax:    206-319-5450

CONFIDENTIAL

**GIBBS LAW GROUP LLP**
Andre M. Mura, State Bar No. 298541
  *amm@classlawgroup.com*
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.:   510-350-9700
Fax:   510-350-9701

*Attorneys for Plaintiffs and Putative Class*

Dated:  March 24, 2025        By:    */s/ Lauren Goldman*
                                     Lauren Goldman
**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
  lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
  dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Tel:   (212) 351-4000
Fax:   (212) 351-4035

ELIZABETH K. MCCLOSKEY (SBN 268184)
  emccloskey@gibsondunn.com
ABIGAIL A. BARRERA (SBN 301746)
  abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Tel:   (415) 393-8200
Fax:   (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

## CIVIL L.R. 5-1(i)(3) ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I, Beth E. Terrell, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: March 24, 2025        By:    */s/ Beth E. Terrell*