# EXHIBIT 16

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN FRANCISCO DIVISION

4    IN RE META PIXEL HEALTHCARE   ) Case No.  3:22-cv-3580-WHO (VKD)
     LITIGATION                    )

5                                  )

                                   )
6                                  )

     This Document Relates to:     )

7    All Actions.                  )

8

9           CONFIDENTIAL VIDEOTAPED 30(b)(6) DEPOSITION OF

10                            FRED LEACH

11                      Palo Alto, California

12                      Monday, May 16, 2025

13

14

15                 REPORTED BY: Derek L. Hoagland

16                        CSR No. 13445

17

18

19

20

21

22

23

24

25

1                UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4   IN RE META PIXEL HEALTHCARE   ) Case No.  3:22-cv-3580-WHO (VKD)

    LITIGATION                    )

5                                 )

    _____  )

6                                 )

    This Document Relates to:     )

7   All Actions.                  )

    _____  )

8

9

10

11      VIDEOTAPED 30(b)(6) Deposition of Fred Leach, taken

12      before Derek L. Hoagland, a Certified Shorthand Reporter

13      for the State of California, commencing at 9:44 a.m.,

14      Monday, May 16, 2025, at Gibson Dunn & Crutcher, LLP,

15      310 University Avenue, Palo Alto, California 94301.

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 3
 1      APPEARANCES:
 2      COUNSEL FOR PLAINTIFFS AND THE PUNITIVE CLASS
        SIMMONS HANLY CONROY
 3      One Court Street
        Alton IL 62002
 4      BY:  JAY BARNES, ESQ.
             618.693.3104
 5           jaybarnes@simmonsfirm.com
 6      -- AND --
 7      GIBBS MURA LAW GROUP
        1111 Broadway Suite 2100
 8      Oakland CA 94607
        BY:  HANNAH JENSEN, ESQ.
 9           hj@classlawgroup.com
10      -- AND --
11      KIESEL LAW LLP
        8648 Wilshire Blvd
12      Beverly Hills CA 90211
        BY:  JEFFREY KONCIUS, ESQ.
13           310.854.4444
             koncius@kiesel.law
14
        COUNSEL FOR DEFENDANT AND WITNESS
15      GIBSON DUNN & CRUTCHER, LLP
        One Embarcadero Center, Suite 2600
16      San Francisco, California 94111
        BY:  KYLAH TURNER, ESQ.
17           415.393.8226
             kturner@GibsonDunn.com
18           -- and --
        BY:  TAYLOR BERNSTEIN, ESQ.
19
        -- AND --
20
        LATHAM & WATKINS, LLP
21      555 Eleventh Street, NW, Suite 1000
        Washington DC 20004
22      BY:  ANDREW CLUBOK, ESQ.
             202.637.3309
23           andrew.clubok@lw.com
24      ALSO PRESENT
        Nikki Stitt-Sokol, in-house Counsel at Meta
25      Vinny Bezera, Videographer
```

CONFIDENTIAL

Page 8

1    appearances and affiliations for the record, beginning

2    with the noticing attorney.

3          MR. BARNES:  Thank you.  Jay Barnes,

4    Simmons Hanly Conroy, Hannah Jensen, Gibbs Mura Law

5    Group, and Jeffrey Koncius of the Kiesel Law Firm here

6    on behalf of the plaintiffs and the punitive class.

7          MR. CLUBOK:  Good morning.  Andrew Clubok from

8    Latham & Watkins LLP on behalf of the defendant and

9    witness.

10          MS. TURNER:  Kylah Turner of Gibson Dunn &

11    Crutcher.  And also, my colleague Taylor Bernstein is on

12    Zoom.

13          MS. STITT-SOKOL:  Nikki Stitt-Sokol, Director

14    and Associate General Counsel at Meta Platforms, Inc.

15          THE VIDEOGRAPHER:  Will the court reporter

16    please introduce yourself and swear in the witness.

17          THE REPORTER:  Yes.  My name is Derek Hoagland.

18    My CSR is 13445.

19          MR. BARNES:  Thank you.

20          Mr. Leach, I am going to hand you what we're

21    going to mark as Exhibit 634.

22          (Exhibit No. 634 marked for identification.)

23          (Whereupon, the deponent is duly sworn by the

24    court reporter.)

25    ///

CONFIDENTIAL

Page 44

1    language on pages 29 and 30 that Meta believes makes a

2    difference in its testimony about the disclosure?

3            MR. CLUBOK:  Objection to the form of the

4    question.

5            THE DEPONENT:  I think this one is a bit easier

6    to understand from -- it looks less like a, you know,

7    legal paragraph and more like something -- like a

8    website you might read.  So I think it is a bit easier

9    to understand.

10   BY MR. BARNES:

11   Q.     Okay.  Anything else?

12   A.     No.

13   Q.     Okay.  Did you review Meta's cookie statement in

14   preparation for today's deposition?

15          You can put that exhibit aside.

16   A.     The whole --

17   Q.     Yeah, for now.

18   A.     -- five-pound -- five-pound 636?

19          MR. BARNES:  Yeah, put 636 aside.  I'm going to

20   hand you what we're going to mark as Exhibit 637.

21          (Exhibit No. 637 marked for identification.)

22          MR. BARNES:  Counsel, it's the -- we have the

23   black-and-white version.  He gets the fancy color

24   version.

25          MR. CLUBOK:  This one?

CONFIDENTIAL

Page 45

1          MR. BARNES:  Correct.

2          MR. CLUBOK:  Thanks.

3     BY MR. BARNES:

4     Q.     Is it Meta's belief that the cookie statement is

5     part of its contract with users?

6     A.     I think we require users to accept the cookie

7     statement in order to use our services, so yes.

8     Q.     Can you -- can you please show the jury

9     specifically in the cookie statement where Meta obtained

10    consent to collect, process, or use information from

11    healthcare providers?

12         Let me pause, and I'm going to restate the

13    question.  I'm going to make a representation about this

14    exhibit, same representation as the prior two.  This is

15    a combined -- this is all of the cookie policies Meta

16    produced combined into a single exhibit.

17         With that preface, can you please show the jury

18    specifically in the cookie statement where Meta obtained

19    consent to collect, process, or use information from

20    healthcare providers?

21         MR. CLUBOK:  Objection to the form of the

22    question.

23         THE DEPONENT:  So in the exhibit, let's go to 3

24    of 67.  "Advertising, Recommendations, Insight and

25    Measurement," that's the heading.

CONFIDENTIAL

Page 46

1           "We use cookies to help us show ads and to make

2       recommendations for businesses and other organizations

3       to people who may be interested in the products,

4       services, or causes they promote."

5       BY MR. BARNES:

6       Q.      Where would a person who is a patient of the

7       healthcare provider look at that to understand that Meta

8       is collecting, processing, and using information

9       associated with communications with their healthcare

10      provider?

11          MR. CLUBOK:  Objection to the form of the

12      question.

13          THE DEPONENT:  Again, I can't specify sort of

14      how any individual person would respond or what

15      inferences they would make, but I think it's pretty

16      clear that this is a pretty broad encompassing statement

17      that would include healthcare providers.  I think that

18      they would pretty clearly fall under the category of

19      businesses and other organizations, which talks about

20      products, services, and causes.

21      BY MR. BARNES:

22      Q.      Is there anything, in Meta's estimation, that

23      this paragraph would not cover?

24          MR. CLUBOK:  Objection to the form of the

25      question.

CONFIDENTIAL

Page 47

1            THE DEPONENT:  I think it's primarily focused on

2     advertising and businesses and other entities that

3     would -- would advertise, so there are lots of entities

4     that don't fit under that grouping that wouldn't be

5     covered.

6     BY MR. BARNES:

7     Q.      Okay.  With respect to advertisers, can you

8     identify any advertiser who Meta believes this would not

9     cover, any type -- sorry.  Any type of advertiser whom

10    Meta believes this would not cover?

11    A.      No.

12    Q.      By agreeing to these -- this cookie policy, it

13    is Meta's belief that users have written Meta a blank

14    check to collect information from advertisers?

15            MR. CLUBOK:  Objection to the form of the

16    question.

17            THE DEPONENT:  No.  Advertisers are required to

18    comply with the laws in their jurisdiction, even the

19    norms, I believe, in our commercial terms of their -- of

20    their industry for what they collect and what they send,

21    not just -- not just to Meta, but to -- to anyone, and

22    then we have commercial terms that requires -- that

23    additionally requires that.  So in no way, shape, or

24    form does this indicate any sort of blank check.

25    ///

CONFIDENTIAL

Page 49

```
 1    BY MR. BARNES:
 2    Q.      I apologize.  From Facebook, rather than Meta?
 3            MR. CLUBOK:  Objection to the form of the
 4    question.
 5            THE DEPONENT:  I am -- so this cookie policy
 6    talks about how to use cookies, and that it's used in
 7    association with various aspects of advertising, but
 8    there's also an aspect of site features and services,
 9    that they can be part of different websites, different
10    performance aspects of the websites.  And so, you know,
11    subject to the businesses implementing everything
12    properly, users, when they're using Meta's services,
13    agree to the cookie policy.
14            MR. CLUBOK:  At some point when --
15            MR. BARNES:  Perfect.  Thank you.  Let's take a
16    break.
17            THE VIDEOGRAPHER:  This is the end of Media
18    No. 1.  We are off the record at 10:42 a.m.
19            (A recess transpires.)
20            THE VIDEOGRAPHER:  This is the beginning of
21    Media No. 2.  We are back on the record at 11:06 a.m.
22            MR. BARNES:  Welcome back, Mr. Leach.  You
23    stated just before we went back on the record here that
24    you wanted to add something.  So go ahead.
25            THE DEPONENT:  Yeah.  So going back to 636, we
```

CONFIDENTIAL

1    were talking about the differences in the policies over
2    time, and I recalled something, and then I went back and
3    had a chance to check it.  So we can just go to -- let's
4    go to -- I think it's 14 of 362.  It should be the same.
5    And it's -- I'll wait until you get there.
6            MR. BARNES:  Let's wait on your counsel, too.
7            MR. CLUBOK:  Thank you.
8            MR. BARNES:  I'm ready.  He's ready.
9            THE DEPONENT:  Okay.  So it's the section that
10   starts:
11           "Partners receive your data when you visit or
12   use their services or through third parties they work
13   with.  We require each of these partners to have lawful
14   rights to collect, use, and share your data before
15   providing any data to us."
16           So I'll pause there.
17           And then if we go to 30 of 362, that's the one
18   where we -- so this is -- so this one is, I believe,
19   2022.  In the paragraph that's right above, "What if you
20   don't let us collect certain information," I'll read the
21   two sentences there.
22           "These partners collect your information when
23   you visit their site or app or use their services, or
24   through other businesses or organizations they work
25   with.  We require partners to have the right to collect,

CONFIDENTIAL

Page 51

```
 1      use, and share your information before giving it to us."
 2              And so the distinction between the two is that
 3      in 2022, the word "lawful" is removed, and by not
 4      qualifying right with lawful right, it's a more
 5      expansive requirement for partners.  So it would, like,
 6      have to respect industry norms or other kinds of rights.
 7      That's the clarification.
 8      BY MR. BARNES:
 9      Q.      Okay.  Thank you for that clarification.
10      Let's -- staying on topic 27, I'm going to hand you what
11      we're going to mark as Exhibit 638.
12              (Exhibit No. 638 marked for identification.)
13              MR. BARNES:  The type is small.  And, Counsel,
14      you will see that there's a handwritten Bates number on
15      the bottom.  That's because in printing, somehow the
16      Bates number got removed.
17              And, Mr. Leach, you will see that as well.  I'll
18      tell you the type is small because that's how it was
19      produced.
20      BY MR. BARNES:
21      Q.      Do you recognize this document, Mr. Leach?
22      A.      I think I've seen it before.  I'm going to have
23      trouble placing exactly where it goes.
24      Q.      Okay.  Did you review this document in
25      preparation for today's testimony?
```

CONFIDENTIAL

Page 59

1    details about them.  The behavioral information doesn't

2    necessarily convey anything more than, again, just the

3    behavior.

4    BY MR. BARNES:

5    Q.    Is it Meta's testimony that a healthcare

6    provider is better able to identify the people who go to

7    their website without logging in than Meta is?

8            MR. CLUBOK:  Objection to the form of the

9    question.

10           THE DEPONENT:  There's a broad kind of --

11           MR. CLUBOK:  Also, by the way, way outside the

12   scope.

CONFIDENTIAL

Page 60

9     BY MR. BARNES:

10    Q.     Okay.  I want to go back to the first question.

11           With respect to row 1, is it Meta's testimony

18    that's sent and merely visiting a website, seeking

19    information, is -- is not sensitive information.

20    Q.     Okay.  So let's try this again.  Let's -- let's

21    assume that hartfordhospital.org was on the list of

22    domains for which the filter would apply.  Would -- or

23    based on the About Sensitive Health Information page,

24    should the filter apply to portions of the URL in row 1

25    or not?

CONFIDENTIAL

1    seeks to honor the commitments that it makes to its

2    users.

3    BY MR. BARNES:

4    Q.    Let's go to topic 33, please, which is labeled

     ██████████████████████

6           MR. BARNES:  Do you want to take a break?

7           MR. CLUBOK:  Well, I was thinking about it.

8           MR. BARNES:  Yeah, let's do it.  Let's do it.

9           MR. CLUBOK:  If you're switching topics, then it

10   wouldn't be bad.

11          MR. BARNES:  Let's take a break.

12          MR. CLUBOK:  Thanks.  Appreciate it.

13          THE VIDEOGRAPHER:  This is the end of media

14   No. 3.  We are off the record at 2:10 p.m.

15          (A recess transpires.)

16          THE VIDEOGRAPHER:  This is the beginning of

17   Media No. 4.  We are back on the record at 2:22 p.m.

18   BY MR. BARNES:

19   Q.    Mr. Leach, we are going to move on to topic 33.

20   Can you please identify for the jury all actions Meta

21   took to require partners to have lawful rights or the

22   right to share user data before providing any data to

23   Meta?

24   A.    Yeah.  The privacy policy clearly discloses its

25   use of data, including data sent by third parties, and

CONFIDENTIAL

Page 132

```
 1       then also the terms of service that govern the use of
 2       Facebook Messenger and the other products, features,
 3       apps, services, technology, and software, that Meta
 4       offers.  And there are various other communications
 5       about it.
 6       Q.      And, for the record, you're reading from the
 7       notebook again.  Is that correct?
 8       A.      I looked at the notebook, read a couple of
 9       items, but did not -- I would say half of it was just
10       from top of my head.
11       Q.      Okay.  Fair enough.
12               Okay.  Is there anything else you can identify
13       for the jury about actions Meta took to require partners
14       to have lawful rights or the right to share data before
15       providing any data to Meta?
16       A.      So there's -- again, there's the terms of
17       service, there's the business tools, there's all of the
18       things that we have covered previously.  We have
21       sort of different layers that over time have improved
22       the way that we have been helping advertisers, you know,
23       continually understand and reinforce what they shouldn't
24       send to us, and then, in some cases, augmenting that
25       with technology to block things that we think shouldn't
```

CONFIDENTIAL

Page 133

1    be coming in.

2    Q.      Let me go to the second bullet point there.

3            Can you please identify for the jury all actions

4    Meta took to employ dedicated teams around the world,

5    work with external service providers, partners, and

6    other relevant entities and develop advanced technical

7    systems to detect potential misuse, harmful conduct

8    towards others, and situations where Meta may be able to

9    help support or protect the community, including to

10   respond to reports of potentially violating conduct --

11   conduct -- content?

12           MR. CLUBOK:  Objection to the form of the

13   question.

14           THE DEPONENT:  So again, there are some elements

15   of the terms of service that really govern this.  We

16   have, as -- as it notes, kind of teams around the world

17   that work with advertisers.  We have partnerships with

18   folks that work with external service providers, as well

23   or other similar entities around the world.  We have

24   also put together the internal resources for developers,

25   the data use security guide about how to best use the

CONFIDENTIAL

1    business tools, and -- yeah.

2    BY MR. BARNES:

16    several.

17    Q.    I would have to believe, you would acknowledge

18    you're speculating and you don't know the list?

19         MR. CLUBOK:  Objection to the form of the

20    question.

21         THE DEPONENT:  I -- I do not know the list of

22    all of the advertisers on the various trade bodies.

23    What I'm referencing, though, is they're very fairly

24    well-known trade bodies.  And, you know, healthcare in

25    the United States is a -- is a well-known part of our

CONFIDENTIAL

1    society, and so, sure, speculating that the two overlap.

2    But I'm not too worried about the speculation.

3    BY MR. BARNES:

4    Q.    Do you have any relationships -- does Meta

5    maintain relationships with the American Hospital

6    Association?

7    A.    I am not aware of any engagements there, but

8    it's possible.

9    Q.    33C, is there anything else the jury should be

10    aware of regarding discussions or agreements with

11    healthcare providers regarding the use of the Pixel on

12    healthcare provider websites?

13        MR. CLUBOK:  Objection to the form of the

14    question.

15        THE DEPONENT:  I think we've covered everything.

16    BY MR. BARNES:

17    Q.    All right.  Let's move on to topic 18.

21    A.    So we've talked about one of them, the off-Meta

22    technologies that was formerly known as off-Facebook

23    activity.  And it allows users to control their

24    disconnect off Facebook activity that's been or would be

25    associated with their Facebook account historically

CONFIDENTIAL

```
14      Q.      Let me back up to core setup.

15              Meta agrees core setup still sends the domain

16      name, correct?

17      A.      Correct.

18      Q.      Does core setup still send the subdomain name?

19      A.      Can you be specific about what you mean by sub?

20      Q.      By sub, I mean information that -- I --

21      A.      Let me help.

22      Q.      Yeah.

23      A.      I will help on a couple things.
```

CONFIDENTIAL

Page 294

1                          REPORTER'S CERTIFICATE

2

3        STATE OF CALIFORNIA            )   ss.

4        I, DEREK L. HOAGLAND, CSR #13445, State of California,

5        do hereby certify:

6        That prior to being examined, the witness named in the

7        foregoing proceeding was by me sworn to testify to the

8        truth, the whole truth and nothing but the truth;

9        That said proceeding was taken down by me by stenotype

10       at the time and place therein stated and thereafter

11       transcribed under my direction into computerized

12       transcription.

13       I further certify that I am not of counsel nor attorney

14       for nor related to the parties hereto, nor am I in any

15       way interested in the outcome of this action.

16       In compliance with section 8016 of the Business and

17       Professions Code, I certify under penalty of perjury

18       that I am a certified shorthand reporter with license

19       number 13445 in full force and effect.

20       Witness my hand this July 1, 2025.

21

22                          DEREK L. HOAGLAND, CSR #13445

23

24

25

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

IN RE META PIXEL HEALTHCARE
LITIGATION

Case No. 22-cv-03580

## ERRATA SHEET FOR THE TRANSCRIPT OF
## JUNE 16, 2025 DEPOSITION OF FRED LEACH

| Page(s) | Line(s) | Change | Reason |
|---------|---------|--------|--------|
| 1 | 9 | | Clarification |
| 2 | 11 | | Clarification |
| 8 | 23-24 | | Mistranscription |
| 49 | 6 | | Mistranscription |
| 81 | 11 | | Mistranscription |
| 82 | 6 | | Typographical |
| 82 | 25 | | Mistranscription |
| 83 | 22 | | Mistranscription |
| 84 | 20 | | Mistranscription |
| 107 | 19 | | Typographical |
| 112 | 18-20 | | Clarification |
| 118 | 14 | | Mistranscription |
| 119 | 17 | | Mistranscription |
| 120 | 11 | | Mistranscription |
| 138 | 2 | | Typographical |
| 138 | 21 | | Mistranscription |

| Page(s) | Line(s) | Change | Reason |
|---------|---------|--------|--------|
| 139 | 7 | | Typographical |
| 139 | 14 | | Typographical |
| 139 | 15 | | Typographical |
| 157 | 13 | | Mistranscription |
| 158 | 4 | | Typographical |
| 158 | 24 | | Typographical |
| 159 | 8 | | Typographical |
| 163 | 9 | | Mistranscription |
| 174 | 3 | | Mistranscription |
| 176 | 18 | | Typographical |
| 176 | 21 | | Typographical |
| 177 | 8 | | Typographical |
| 192 | 15 | | Mistranscription |
| 219 | 11 | | Mistranscription |
| 227 | 18 | | Typographical |
| 245 | 3 | | Mistranscription |
| 245 | 17 | | Mistranscription |
| 248 | 25 | | Typographical |
| 251 | 24 | | Typographical |
| 251 | 24 | | Typographical |
| 252 | 18 | | Mistranscription |
| 256 | 5-6 | | Mistranscription |
| 262 | 19 | | Mistranscription |

## <u>CERTIFICATE OF DEPONENT</u>

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed by:

_Fred Leach_
—1549FE5F29E74C8...
Fred Leach

04-Aug-2025 | 5:43 PM BST
Date