# EXHIBIT 39

**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL**

Page 1

1          UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF CALIFORNIA
2              SAN FRANCISCO DIVISION
3                        )
   IN RE META PIXEL       ) Case No.
4   HEALTHCARE LITIGATION ) 3:22-cv-3580-WHO (VKD)
                          )
5
6
   ***********************************************
7        ORAL AND VIDEOTAPED DEPOSITION OF
8                  BRAYTON DECKARD
9                  JUNE 10, 2025
   ***********************************************
10
11        ORAL AND VIDEOTAPED DEPOSITION OF
12   BRAYTON DECKARD, produced as a witness at the
13   instance of the Plaintiff, and duly sworn,
14   was taken in the above-styled and numbered
15   cause on June 10, 2025, from 10:21 a.m. to
16   7:03 p.m., before Donna Wright, CSR in and
17   for the State of Texas, reported by machine
18   shorthand, at the law offices of LATHAM &
19   WATKINS, 300 Colorado Street, Suite 2400,
20   Austin, Texas, pursuant to the Federal Rules
21   of Civil Procedure and the provisions stated
22   on the record or attached hereto.
23
24
25

```
 1              A P P E A R A N C E S
 2
        FOR THE PLAINTIFFS:
 3              Mr. Andre M. Mura
                Ms. Hanne Jensen
 4              GIBBS MURA LLP
                1111 Broadway
 5              Suite 2100
                Oakland, California 94607
 6              (510) 350-9700
                amm@classlawgroup.com
 7              hj@classlawgroup.com
 8
        FOR THE DEFENDANT AND THE WITNESS:
 9              Ms. Darcy C. Harris
                Ms. Taylor Bernstein
10              GIBSON DUNN & CRUTCHER LLP
                200 Park Avenue
11              New York, New York 10166
                (212) 351-3894
12              dharris@gibsondunn.com
13
        ALSO PRESENT:
14              Timothy Desadier - Videographer
                Veronica Nauts - Meta In-House Counsel
15
16
17
18
19
20
21
22
23
24
25
```

```
                                           Page 6
 1          plaintiffs.
 2                   MS. JENSEN:  And Hanne Jensen
 3          from Gibbs Mura, also for plaintiffs.
 4                   MS. HARRIS:  Good morning.
 5          Darcy Harris from Gibson Dunn &
 6          Crutcher on behalf of the witness and
 7          defendant Meta.  I'm joined by my
 8          colleagues, Taylor Bernstein and
 9          Veronica Nauts, in-house counsel for
10          Meta.
11                   BRAYTON DECKARD,
12     having been first duly sworn, testified as
13     follows:
14                         EXAMINATION
15     BY MR. MURA:
16          Q.     Good morning, sir.  Can you
17     hear me?
18          A.     I can.
19          Q.     Great.  Do you mind stating
20     your full name for the record and spelling
21     your last name for the court reporter?
22          A.     Yes.  My name is Brayton
23     Deckard, last name spelled D-E-C-K-A-R-D.
24          Q.     Sir, you have been sworn in by
25     the court reporter, which means you are under
```

Page 34

1          Q.    (BY MR. MURA)  But you have
2     received no training at work about HIPAA?
3               MS. HARRIS:  Object to form,
4          vague, argumentative.
5               THE WITNESS:  I don't believe
6          that's -- I would say a -- there has
7          not been -- I cannot recall a specific
8          HIPAA training specific to HIPAA.
9          Q.    (BY MR. MURA)  Have you ever
10    been provided any materials describing HIPAA
11    or educating you about HIPAA?
12              MS. HARRIS:  Object to form,
13         vague, compound.
14              THE WITNESS:  I don't remember.
15         It's possible.
16         Q.    (BY MR. MURA)  It's possible
17    that you received materials discussing HIPAA?
18              MS. HARRIS:  Object to form,
19         vague.
20              THE WITNESS:  Again, I don't
21         remember.
22         Q.    (BY MR. MURA)  Have you ever
23    heard of the HIPAA privacy rule?
24              MS. HARRIS:  Object to form,
25         vague.

Page 47

2        Q.      Sir, is it true that Meta has a

5                MS. HARRIS:   Object to form,
6          assumes facts.

10       Q.      (BY MR. MURA)  I'm asking for
11   your understanding.  Please don't tell me
12   what the legal team may have told you.  So --
13       A.      I'm not referring to this legal
14   team.
15       Q.      Okay.  To your knowledge, has

20       Q.      So during your work at Meta,

25       Q.      Do you know why Meta does not

Page 129

```
 1      clients on how to avoid sending sensitive
 2      health information to Meta?
 3                      MS. HARRIS:  Object to form,
 4           vague, assumes facts.
 5                      THE WITNESS:  Again, as we've
 6           talked about previously, when they
 7           accept the terms, they are -- them and
 8           their legal terms are, you know,
 9           under -- have to consider the impact
10           to them.
11           Q.     (BY MR. MURA)  I'm not asking
12      what their legal term -- legal team should
13      consider, sir.  My question was do you train
14      new clients on how to avoid sensitive health
15      information to Meta?
16                      MS. HARRIS:  Object to form,
17           vague, assumes facts.
18                      THE WITNESS:  Can you -- can
19           you define what you mean by "sensitive
20           health information"?
21           Q.     (BY MR. MURA)  Well, what do
22      you understand sensitive health information
23      to mean?
24                      MS. HARRIS:  Object to form,
25           vague.
```

Page 130

```
 1              THE WITNESS:  Well, I'm
 2         wondering if you're referring to a
 3         specific law or regulation, a specific
 4         warning, a specific -- I mean, what do
 5         we mean here?  It can mean different
 6         things in different places.
 7         Q.    (BY MR. MURA)  Well, health
 8    information that someone might not want to
 9    share publicly.
10              MS. HARRIS:  Object to form,
11         vague.
12              THE WITNESS:  That the
13         advertiser is not going to share?
14         Q.    (BY MR. MURA)  Correct, that
15    the advertiser should not be obtained through
16    the pixel.
17              MS. HARRIS:  Object to form,
18         vague, assumes facts.
19              THE WITNESS:  Again, what they
20         consider to be health information is
21         based on their interpretation of the
22         laws and regulations and geography of
23         where they advertise.  And, yeah,
24         that's up to them.
25         Q.    Okay.  So you don't train
```

```
 1          vague, assumes facts.
 2                  THE WITNESS:  I believe our
 3          policy is that advertisers enter into
 4          an agreement do not send Meta data
 5          that they are not supposed to.
 6          Q.      (BY MR. MURA)  So is that a yes
 7   or a no?  Is it consistent with Meta's
 8   policies, yes or no?
 9                  MS. HARRIS:  Object to form,
10          vague, asked and answered.
11                  THE WITNESS:  Again, I would
12          restate my previous answer.  I believe
13          it's the policy that an advertiser is
14          to not send Meta data that they are
15          not supposed to when they accept those
16          terms.
17          Q.      (BY MR. MURA)  So is an
18   advertiser not supposed to send Meta
19   information about when a user is clicking an
20   appointment scheduling button on a healthcare
21   provider's website?
22                  MS. HARRIS:  Object to form,
23          vague, assumes facts, calls for
24          speculation.
25                  THE WITNESS:  That's not up for
```

Page 201

1              me to determine.  That's up to them
2              and their legal team.
3              Q.     (BY MR. MURA)  I'm asking about
4      your understanding as an account manager of
5      Meta's policies.
6              A.     I think I've stated Meta's
7      policies twice, that they enter into that
8      agreement do not send us -- send Meta
9      information that they are not supposed to.
10              Q.     And does information about
11      appointment scheduling clicks on a healthcare
12      provider website, is that information that
13      should or should not be sent to Meta through
14      the pixel?
15              MS. HARRIS:  Object to form,
16              vague, compound, assumes facts, calls
17              for speculation.
18              THE WITNESS:  Again, that's not
19              for me to determine as an account
20              manager.  That is up to them and their
21              lawyers.
22              Q.     (BY MR. MURA)  What about if
23      Meta is receiving URLs that include a user's
24      doctors' names?
25              MS. HARRIS:  Object to form.

Page 202

```
 1          Q.    (BY MR. MURA)  Is that
 2     consistent or inconsistent with Meta's
 3     policies?
 4               MS. HARRIS:  Object to form,
 5          vague, compound, assumes facts, calls
 6          for speculation.
 7               THE WITNESS:  That is up to
 8          them and their legal team to determine
 9          if they are within policy.
10          Q.    (BY MR. MURA)  So if a client
11     of yours called you and said, "I would like
12     to know if Meta receiving URLs from our
13     website that include users' doctors' names, I
14     would like to know whether that's consistent
15     with Meta's policies," what would your answer
16     be?
17               MS. HARRIS:  Object to form,
18          vague, assumes facts, calls for
19          speculation, compound.
20               THE WITNESS:  First, I would
21          say that I can't think of a time that
22          that's ever happened to me.  As I
23          think I have mentioned several times
24          throughout the day, I would refer them
25          to their legal team and their
```

```
 1            interpretation of the laws and
 2            regulations that they are subject to.
 3            I would, if necessary, share any legal
 4            resources that may be relevant.  Those
 5            are the steps I would take.
 6            Q.    (BY MR. MURA)  So you wouldn't
 7     tell them that this is against Meta's
 8     policies, fair?
 9                 MS. HARRIS:  Object to form,
10            misstates the testimony, vague,
11            argumentative, calls for speculation.
12                 THE WITNESS:  I did not say
13            that.  I said it's up to them and
14            their legal team to determine, based
15            on the laws and regulations that they
16            are subject to.
17                 Additionally, the tools -- the
18            terms that they have agreed to on the
19            platform, if it falls within that.
20            That is my response.
21            Q.    (BY MR. MURA)  What about if
22     Meta is receiving URLs that include inquiries
23     on healthcare providers' websites, is that
24     consistent or inconsistent with Meta's
25     policies?
```

Page 204

1              MS. HARRIS:  Object to form,

2         vague, compound, assumes facts, calls

3         for speculation.

4              THE WITNESS:  I believe I have

5         answered this already.  I will refer

6         to my previous answers.  I can state

7         it again.  I would refer them to their

8         legal team to understand and determine

9         if they are in accordance with the

10         laws and regulations that they are

11         subject to and the terms that they

12         have accepted to advertise on the

13         platform.  And that would be my

14         response to that.

15         Q.    (BY MR. MURA)  One more.  What

16    if Meta is receiving button click events on

17    the login button on a patient portal, would

18    that be consistent or inconsistent with

19    Meta's internal policies?

20              MS. HARRIS:  Object to form,

21         vague, compound, assumes facts, calls

22         for speculation.

23              THE WITNESS:  Again, I would

24         refer them to their legal team to

25         determine if that is something that is

1              in compliance with the laws and
2              regulations that they are subject to
3              and the terms that they accepted on
4              our platform.
5         Q.      (BY MR. MURA)   Sir, Meta has
6     business tools other than the pixel, correct?
7                   MS. HARRIS:  Object to form,
8              vague, assumes facts.
9                   THE WITNESS:  There are others.
10        Q.      (BY MR. MURA)   And CAPI is one
11    of those other business tools, correct?
12        A.      CAPI is a business tool.
13        Q.      CAPI stands for conversions
14    API, correct?
15        A.      Yes.
16        Q.      And CAPI sends data to Meta
17    from the server side instead of the user
18    side, correct?
19                   MS. HARRIS:  Object to form,
20              vague, assumes facts.
21                   THE WITNESS:  Server side is --
22              server side as opposed to pixel.
23        Q.      (BY MR. MURA)   Right, which
24    sends data from the user side, correct?
25                   MS. HARRIS:  Object to form,

1    any of the health clients that are also using

2    CAPI, do they still use the pixel?

3                    MS. HARRIS:  Object to form,

4            vague, assumes facts, calls for

5            speculation.

8            Q.    (BY MR. MURA)   Let's go to the

9    page ending in 316 of this document.  Do you

16                    Did I read that correctly?

17           A.     Yeah, I do see that sentence.

18    That's correct.

24                    Do you see that?

25                    MS. HARRIS:  Object to form,

Page 222

1          asked and answered.

2                    THE WITNESS:  Yeah, I believe I

9          Q.     (BY MR. MURA)  So fair to say

13                    MS. HARRIS:  Object to form,

14          vague, assumes facts.

15                    THE WITNESS:  I don't recall

16          what my thought was on telehealth

17          advertisers at the time.

21                    MS. HARRIS:  Object to form,

22          argumentative.

```
 4              Q.      (BY MR. MURA)  Right.  So the
 5       question is you recognized that this was
 6       important for all of your telehealth
 7       advertisers on the platform, yes?
 8                    MS. HARRIS:  Object to form,
 9              asked and answered, argumentative.
10                    THE WITNESS:  I don't recall
11              what my thoughts were at the time.  I
12              also, just reading this back, would
```

```
18              Q.      (BY MR. MURA)  And it's
```

```
23                    MS. HARRIS:  Object to form,
24              calls for speculation, assumes facts.
25                    THE WITNESS:  No, I don't
```

Page 224

1   believe I said that.

2   Q.    (BY MR. MURA)  Isn't that why

9   MS. HARRIS:  Object to form,

10  vague, assumes facts, calls for

11  speculation.

12  THE WITNESS:  I don't believe I

13  ever say that.  I also don't remember

14  the background here.

19  MS. HARRIS:  Object to form,

20  vague, assumes facts, calls for

21  speculation, asked and answered.

22  THE WITNESS:  That is not for

23  me to determine in my role as account

24  manager.

25  Q.    (BY MR. MURA)  Were you

```
 5                    MS. HARRIS:  Object to form,
 6           vague, assumes facts.
 7                    THE WITNESS:  I don't recall my
 8           level of concern or not concern at the
 9           time.
10           Q.    (BY MR. MURA)  Well, sitting
11      here today, if this happened today, would you
12      be concerned?
13                    MS. HARRIS:  Object to form,
14           vague, calls for speculation.
15                    THE WITNESS:  Concerned about
16           what?
17           Q.    (BY MR. MURA)  If a client
18      contacted you today and said, "We have
19      identified that we have unsanitized URLs that
20      have information in them and are at risk of
21      violating HIPAA compliance," would you be
22      concerned?
23                    MS. HARRIS:  Object to form,
24           vague, assumes facts, calls for
25           speculation.
```

Page 226

```
 5          Q.     (BY MR. MURA)  Sir, my question
 6    is would you be concerned receiving this
 7    message today?  You said you couldn't recall
 8    how you felt at the time and I'm asking you
 9    if you received this message today, would you
10    be concerned?
11              MS. HARRIS:  Object to form,
12          vague, assumes facts, calls for
13          speculation, asked and answered.
14              THE WITNESS:  I believe I would
15          take the same route I took here.  I
16          would bring in legal and I would
17          provide a POV for them.
18          Q.     (BY MR. MURA)  And you
19    previously said that it was up to the
20    advertisers to determine whether they were or
21    were not compliant with HIPAA.
22              Do you recall that?
23              MS. HARRIS:  Object to form,
24          compound.
25              THE WITNESS:  I do believe that
```

```
 1            I mentioned that it is on -- it is up
 2            to the determination of advertisers
 3            and their lawyers to determine what
 4            they do and do not -- what I said and
 5            what is -- falls under the regulations
 6            and laws that they are subject to and
 7            as well as our terms on -- Meta's
 8            terms on the platform.
 9            Q.    (BY MR. MURA)  And here, an
10      advertiser told you explicitly that having
```

17            Q.    Isn't it correct that

20                  MS. HARRIS:  Object to form,
21        vague, assumes facts.
22                  THE WITNESS:  No.
23                  THE REPORTER:  Pardon?

Page 228

```
 3         A.     They don't have to use --
 4    sorry, excuse me.
 5              MS. HARRIS:  Object to form,
 6         vague, assumes facts.
 7              THE WITNESS:  They don't have
 8         to use the pixel.
 9         Q.    (BY MR. MURA)  I see.  So your
10    solution would be not to use the pixel?
11              MS. HARRIS:  Object to form,
12         vague, assumes facts.
13              THE WITNESS:  No, that's not
14         what I said.  I said they have the
15         option to not use the pixel.  I
```

```
18         thread.
19         Q.    (BY MR. MURA)  And let's assume
```

```
23         A.     No.
```

1              MS. HARRIS:  Object to form,

2       asked and answered.

3              THE WITNESS:  This document --

4       sorry.

5              MS. HARRIS:  Assumes facts.

6              THE WITNESS:  This document

7       provides several options forward for

8       them.

9         Q.    (BY MR. MURA)  Sir, can you

10   look back at 306?  Do you see your response

11   where you wrote in reference to the

16              Do you see that?

17       A.    I do see that sentence.

21              MS. HARRIS:  Object to form,

22       vague, assumes facts.

Page 230

2        Q.      (BY MR. MURA)  When did Meta

3    first make the pixel available to health

4    advertisers?

5                 MS. HARRIS:  Object to form,

6           vague.

7                 THE WITNESS:  I have no clue.

8           Way before I started at the company.

9                 Q.      (BY MR. MURA)  When did you

12               MS. HARRIS:  Object to form,

13          vague, assumes facts, calls for

14          speculation.

15               THE WITNESS:  With respect to

16          the JavaScript version of the pixel is

25               Q.      (BY MR. MURA)  And when you say

Page 231

1    "here," are you referring to this e-mail

2    correspondence, that's when you learned?

3            A.      I do not recall hearing that

4    before this.  Yeah, I do not recall.

7    proactively alert health advertisers using

8    the pixel that they may be sending sensitive

9    health information to Meta?

10           MS. HARRIS:  Object to form,

11        vague, assumes facts, calls for

12        speculation.

13           THE WITNESS:  Can you clarify

14        the question?  Sorry, restate the

15        question.

16           Q.      (BY MR. MURA)  Sure.  Did Meta

17    ever proactively alert health advertisers

18    using the pixel that they may be sending

19    sensitive health information to Meta?

20           MS. HARRIS:  Same objections.

21           THE WITNESS:  I believe we

Page 232

8    My question to you is, did Meta

9 alert other health advertisers about these

10 facts after this event?

11    MS. HARRIS:  Object to form,

12    vague, assumes facts, calls for

13    speculation, misstates the document

14    and testimony.

18    Q.  (BY MR. MURA)  Did you ever

19 tell any of your other clients that sending

22    MS. HARRIS:  Object to form,

23    vague, assumes facts, calls for

24    speculation.

25    THE WITNESS:  I can't recall

Page 233

```
 1            ever having any conversations about
 2            that or if that came up.
 3            Q.    (BY MR. MURA)  Does Meta have a
 4    policy of informing health clients that an
 5    advertiser has determined that a practice may
 6    violate HIPAA?
 7                  MS. HARRIS:  Object to form,
 8            vague, assumes facts.
 9                  THE WITNESS:  Can you clarify
10            the question?  Are you asking if Meta
11            would alert the advertiser if they
12            reached out to us?
13            Q.    (BY MR. MURA)  I would like to
```

20                  MS. HARRIS:  Object to form,
21            vague, assumes facts, calls for
22            speculation.
23                  THE WITNESS:  Every advertiser
24            is different in how they advertise,
25            what events they use, what tools they

Page 234

```
 1          use, how they advertise, what their
 2          business model is.  Every advertiser
 3          is different.
 4     Q.      So is that a no?
 5              MS. HARRIS:  Object to form.
 6              THE WITNESS:  The answer is
 7          that there may not be any relevance.
```

███████████████████████████████████████

```
13              MS. HARRIS:  Object to form,
14          vague, assumes facts, calls for
15          speculation, misstates the testimony.
16              THE WITNESS:  I believe we are
17          talking about two different things
18          here.  I want to go back to, I think,
19          the message you're referring to.  I
```

███████████████████████████████████████

```
25     Q.      (BY MR. MURA)  Sir, if an
```

Page 235

1    advertiser informs you, as a client manager,
2    that information being collected routinely
3    through the pixel may be at risk of violating
4    federal law -- here, HIPAA -- do you inform
5    other advertisers of that?
6                MS. HARRIS:  Object to form,
7         vague, assumes facts, calls for
8         speculation.
9                THE WITNESS:  If I told another
10        advertiser that one advertiser
11        believes they may be violating HIPAA,
12        I feel like that would violate a lot
13        of privacy rules.  I don't think that
14        would be very considerate, at the very
15        least.
16        Q.    (BY MR. MURA)  What if an
17    advertiser tells you that the pixel is

25                MS. HARRIS:  Object to form,

Page 236

```
 1          vague, assumes facts, calls for

 2          speculation.

 3               THE WITNESS:  The advertiser is

 4          in charge of their configuration of

 5          their pixel.  How they want to use it,

 6          what events, et cetera.

 7               Again, I would refer back if I

 8          were -- that would be sharing

 9          sensitive business information about

10          one client to another client.  I don't

11          believe that would be appropriate.

12          Q.   (BY MR. MURA)  Let's look
```

[redacted]

```
17               Do you see that?
```

[redacted]

```
23          Q.   So after you told this
```

[redacted]

```
 1          Q.      (BY MR. MURA)  Sir, I'm going
 2      to have the court reporter read it to you
 3      again.  It's a question about Meta.  So
 4      please pay attention to the question and
 5      answer the question to the best of your
 6      ability.
 7                  MR. MURA:  So, court reporter,
 8          please read the question again.
 9                  (The requested testimony was
10          read back)
11                  MS. HARRIS:  Object to form,
12          vague, assumes facts, compound, calls
13          for speculation.
14                  THE WITNESS:  I guess I get a
15          third shot at this.  I don't believe
16          that's my job to determine that.
17          Q.      (BY MR. MURA)  Sir, do you see
```

21          A.      Are we on 72295?
22          Q.      Yes, I believe so.

Page 244

███████████████████████████████████

2          MS. HARRIS:  Object to form,

3      assumes facts, calls for speculation.

███████████████████████████████████████

███████████████████████████████████████

11          Q.     (BY MR. MURA)  Sir, can you

12      look at the page ending in 294?

13          A.     Okay.

███████████████████████████████████████

21          A.     He did at the time.

22          Q.     And what was his role there?

23          A.     I believe he worked in business

24      engineering.

██████████████████████████████████████

Page 245



17              MS. HARRIS:  Object to form,

18        vague, assumes facts, argumentative.

Page 246

1     provided to Meta, correct?

2                    MS. HARRIS:  Object to form,

3          misstates the document, assumes facts.

4                    THE WITNESS:  I believe that's

5          a mischaracterization.  Again, one, I

6          would say I'm not Owen, so I don't

7          know what he was -- what his thoughts

8          were when he wrote this or what his

9          intentions were, what specifically he

10         was responding to.

17                   Q.     (BY MR. MURA)  You didn't tell

18    them not to use the pixel, correct?

19                   MS. HARRIS:  Object to form,

20         assumes facts, misstates the document,

21         argumentative.

22                   THE WITNESS:  I think in his

Page 249

 2          Q.     Is that your understanding of
 3     the advantages of using both the pixel and
 4     CAPI?
 5                MS. HARRIS:  Object, form,
 6          vague, assumes facts.

13                Q.     (BY MR. MURA)  Sir, when you
14     are notified that a client has sent
15     potentially violating information to Meta,
16     what do you, as an account manager, do?
17                MS. HARRIS:  Object to form,
18          vague, assumes facts.
19                THE WITNESS:  Can you clarify
20          what you mean by "potential violating
21          information"?
22          Q.     (BY MR. MURA)  Yes.  If a
23     client notifies you that the pixel has
24     transmitted sensitive health information to
25     Meta, what do you do?

Page 250

```
 1                MS. HARRIS:  Object to form,
 2         vague, assumes facts, calls for
 3         speculation.
 4                THE WITNESS:  Generally, I
 5         would refer to their legal team to
 6         confirm that that is the case.  I
 7         would provide them the resources to
 8         make any updates they need to make to
 9         feel comfortable with what they are
10         doing moving forward.
11         Q.     (BY MR. MURA)  Do you take any
12    action within Meta to disable the pixel from
13    sending you further events?
14                MS. HARRIS:  Object to form,
15         vague, assumes facts, calls for
16         speculation.
```

21         Q.     (BY MR. MURA)  Well, you have
22    the ability to reach out to the engineering
23    team and the legal team, correct?
24                MS. HARRIS:  Object to form,
25         vague, compound, calls for

Page 251

```
 1           speculation.
 2                   THE WITNESS:  Is the question
 3           do I have the ability to reach out to
 4           the legal team and our engineering
 5           teams?  If so, yes, I do have the
 6           ability to reach out to them.
 7           Q.     (BY MR. MURA)  Do you ever
 8     reach out to the engineering team to ask them
 9     to disable the pixel from sending further
10     events if a client informs you that
11     potentially violating information is being
12     sent through the pixel to Meta?
13                   MS. HARRIS:  Object to form,
14           vague, assumes facts, calls for
15           speculation.
16                   THE WITNESS:  I don't believe
17           that scenario has ever happened before
18           today.
19           Q.     (BY MR. MURA)  Well, we talked
20     about how there are warnings and alerts,
21     correct?
22                   MS. HARRIS:  Object to form,
23           vague.
24                   THE WITNESS:  Are you referring
25           to the language in document 626?
```

Page 252

1           Q.      (BY MR. MURA)  Well, just
2      generally, you testified that their system
3      alerts when potentially sensitive information
4      is being shared, correct?
5           A.      I believe I read a section of
6      the document that said that.
7           Q.      Okay.  So my question is when
8      that -- when those alerts go out, do you, as
9      an account manager or, to your knowledge,
10     anyone at Meta ever take any action to
11     disable the pixel from sending further
12     events?
13               MS. HARRIS:  Object to form,
14          vague, assumes facts, calls for
15          speculation, compound, asked and
16          answered.
17               THE WITNESS:  The alert says
18          potentially.  It does not say it is.
19          Q.      (BY MR. MURA)  I understand.
20     But I'm asking you about what actions do you
21     take, if any, to disable the pixel from
22     sending further events, either you, the
23     engineering team or anyone else?
24               MS. HARRIS:  Object to form,
25          vague, assumes facts, calls for

Page 253

```
 1          speculation, compound.
 2                    THE WITNESS:  Are you asking if
 3          I have the ability to go into an
 4          advertiser's setup and disable their
 5          pixel?
 6          Q.      (BY MR. MURA)  Do you?
 7          ███████████████████
 8                    THE REPORTER:  Pardon?
 9                    THE WITNESS:  No.
10                    THE REPORTER:  Okay.
11          Q.      (BY MR. MURA)  Do you have the
12     ability to reach out -- I mean, do you tell
13     anyone at Meta, "We should disable the pixel
14     from sending further events, I was just
15     alerted that this is happening"?
16                    MS. HARRIS:  Object to form,
17          vague, assumes facts, calls for
18          speculation, asked and answered.
19                    THE WITNESS:  Again, I just
20          recently said it says potentially.
21          Q.      (BY MR. MURA)  Understood.  Do
22     you take any action to disable a pixel when
23     there is the potential that it's sending
24     sensitive health information, sir?
25                    MS. HARRIS:  Object to form,
```

Page 254

```
 1              vague, assumes facts, calls for
 2              speculation.
 3                      THE WITNESS:  I have answered
 4              this multiple ways.
 5              Q.      (BY MR. MURA)  So fair to say
 6      you take no action to disable the pixel when
 7      you learn that there is the potential that
 8      it's sending sensitive health information to
 9      Meta, fair?
10                      MS. HARRIS:  Object to form.
11                      THE WITNESS:  No.
12                      MS. HARRIS:  Assumes facts,
13              calls for speculation, vague.
14              Q.      (BY MR. MURA)  So what actions
15      do you take, sir?
16                      MS. HARRIS:  Same objections.
17                      THE WITNESS:  And, again, there
```

███████████████████████████████████████████████

```
21              Q.      (BY MR. MURA)  Do you ever ask
22      the engineering team to disable the pixel
23      because it is potentially sending sensitive
24      health information to Meta?
25                      MS. HARRIS:  Object to form,
```

Page 255

1          calls for speculation, assumes facts,
2          vague.
3                    THE WITNESS:  I have no clue if
4          they have the ability to do that.
5          Q.     (BY MR. MURA)  Do you ever
6     alert the user whose information was sent to
7     Meta?
8                    MS. HARRIS:  Object to form,
9          calls for speculation, assumes facts,
10         vague.
11                   THE WITNESS:  I have no access
12         to that information.
13         Q.     (BY MR. MURA)  Do you know if
14    anyone at Meta alerts the user whose
15    information was sent to them?
16                   MS. HARRIS:  Object to form,
17         vague, calls for speculation, assumes
18         facts.
19                   THE WITNESS:  I don't believe
20         anyone at Meta or the advertiser would
21         be able to access that information.
22         Again, we're talking potentially.  In

Page 256

```
 1          Q.     (BY MR. MURA)  So you wouldn't
 2     take action because it's simply a
 3     possibility?
 4               MS. HARRIS:  Object to form,
 5          calls for speculation, argumentative,
 6          assumes facts.
 7               THE WITNESS:  Is the question
 8          because the word "potentially" is
 9          used, I wouldn't --
10          Q.     (BY MR. MURA)  Yes, sir.  You
11     keep emphasizing the word "potentially," so
12     I'm asking is that the reason why you don't
13     take any action?
14               MS. HARRIS:  Object to form,
15          argumentative, assumes facts, calls
16          for speculation, vague.
17               THE WITNESS:  I don't think I
18          have ever said I wouldn't take any
19          action.  I'm disagreeing with the
20          premise.
21          Q.     (BY MR. MURA)  Sir, are you
22     familiar with the contracts or terms that
23     health advertisers are bound by when they use
24     Meta's Business Tools?
25               MS. HARRIS:  Object to form,
```

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

IN RE META PIXEL HEALTHCARE
LITIGATION

Case No. 22-cv-03580

## ERRATA SHEET FOR THE TRANSCRIPT OF JUNE 10, 2025
## DEPOSITION OF BRAYTON DECKARD

| Page(s) | Line(s) | Change | Reason |
|---|---|---|---|
| 9 | 9 | | Typographical |
| 17 | 14 | | Mistranscription |
| 17 | 23 | | Mistranscription |
| 19 | 24 | | Mistranscription |
| 20 | 5 | | Mistranscription |
| 21 | 11 | | Mistranscription |
| 21 | 12 | | Mistranscription |
| 21 | 18 | | Mistranscription |
| 21 | 20 | | Mistranscription |
| 21 | 21 | | Mistranscription |
| 22 | 24-25 | | Mistranscription |
| 27 | 14-15 | | Mistranscription |
| 33 | 9 | | Mistranscription |
| 40 | 19 | | Mistranscription |
| 41 | 20 | | Mistranscription |
| 54 | 4 | | Mistranscription |
| 55 | 22 | | Mistranscription |

| Page(s) | Line(s) | Change | Reason |
|---|---|---|---|
| 56 | 12 | | Mistranscription |
| 59 | 7 | | Mistranscription |
| 62 | 15 | | Mistranscription |
| 62 | 20 | | Mistranscription |
| 64 | 5 | | Typographical |
| 64 | 9 | | Mistranscription |
| 64 | 20 | | Mistranscription |
| 81 | 1 | | Mistranscription |
| 96 | 13 | | Typographical |
| 106 | 4 | | Mistranscription |
| 110 | 12 | | Mistranscription |
| 113 | 9 | | Typographical |
| 114 | 3 | | Typographical |
| 120 | 10 | | Mistranscription |
| 120 | 22 | | Mistranscription |
| 121 | 7 | | Mistranscription |
| 140 | 8 | | Mistranscription |
| 156 | 25 | | Mistranscription |
| 161 | 22-23 | | Mistranscription |
| 176 | 24 | | Mistranscription |
| 189 | 5 | | Mistranscription |
| 193 | 8 | | Mistranscription |
| 203 | 22 | | Mistranscription |

| Page(s) | Line(s) | Change | Reason |
|---------|---------|--------|--------|
| 211 | 9 | ███████████████ | Mistranscription |
| 214 | 19 | ███████████████ | Mistranscription |
| 215 | 21 | ███████████████ | Mistranscription |
| 220 | 5 | ███████████████ | Mistranscription |
| 220 | 23 | ███████████████ | Mistranscription |
| 226 | 16 | ███████████████ | Mistranscription |
| 319 | 5 | ███████████████ | Mistranscription |

### **CERTIFICATE OF DEPONENT**

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed by:

*Brayton Deckard*

DD7692D0CD4F46A...

Brayton Deckard

20-Aug-2025 | 4:54 PM BST

Date

Page 327

```
 1              UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                 SAN FRANCISCO DIVISION
 3                         )
    IN RE META PIXEL       ) Case No.
 4  HEALTHCARE LITIGATION  ) 3:22-cv-3580-WHO (VKD)
                           )
 5
 6

           REPORTER'S CERTIFICATION OF THE ORAL
 7             DEPOSITION OF BRAYTON DECKARD
                    JUNE 10, 2025
 8
 9          I, Donna Wright, a Certified Shorthand
10    Reporter and Notary Public in and for the
11    State of Texas, hereby certify to the
12    following:
13          That the witness, BRAYTON DECKARD, was
14    duly sworn by the officer and that the
15    transcript of the oral deposition is a true
16    record of the testimony given by the witness;
17          That the original deposition was
18    delivered to Ms. Darcy C. Harris;
19          That a copy of this certificate was
20    served on all parties and/or the witness
21    shown herein on _____;
22          I further certify that pursuant to FRCP
23    Rule 30(3) that the signature of the
24    deponent:
25          __X__ was requested by the deponent or
```

Page 328

1    a party before the completion of the
2    deposition and that the signature is to be
3    before any notary public and returned within
4    30 days from date of receipt of the
5    transcript.  If returned, the attached
6    Changes and Signature page contains any
7    changes and the reasons therefore:
8          ____ was not requested by the deponent
9    or a party before the completion of the
10   deposition.
11         I further certify that I am neither
12   counsel for, related to, nor employed by any
13   of the parties or attorneys in the action in
14   which this proceeding was taken, and further
15   that I am not financially or
16   otherwise interested in the outcome of the
17   action.
18         Certified to by me on this, the 29th
19   day of June, 2025.
20
21
22
          DONNA WRIGHT, Texas CSR 1971
23        Expiration Date:  11/30/26
          VERITEXT LEGAL SOLUTIONS
24        300 Throckmorton Street
          Ft. Worth, Texas 76102
25        Firm Registration No. 571