# Proposed Redacted Version of Exhibit 4 (Dkt. No. 1154-7)

# EXHIBIT 4

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**EXPERT REPORT OF I. GLENN COHEN, JD**

September 9, 2025

*In re Meta Pixel Healthcare Litigation*
Northern District of California Case No. 3:22-cv-3580-WHO-VKD

**TABLE OF CONTENTS**

I.      QUALIFICATIONS ........................................................................................................ 3

II.     ASSIGNMENT .............................................................................................................. 4

III.    BACKGROUND ........................................................................................................... 5

IV.    METHODOLOGY ........................................................................................................ 5

V.      SUMMARY OF OPINIONS ........................................................................................ 8

VI.    THE PRINCIPLES OF AUTONOMY, BENEFICENCE, NONMALEFICENCE, AND JUSTICE ....................................................................................................................... 9

VII.   THE CODES OF CONDUCT, STATUTES, REGULATIONS, AND POLICY FRAMEWORKS APPLICABLE TO A HEALTH CARE PROVIDER'S COLLECTION, USE, AND SHARING OF PATIENT HEALTH INFORMATION ................................. 14

     A.     Professional Codes of Conduct ........................................................................... 14

     B.     HIPAA ................................................................................................................. 18

     C.     HHS Guidance on Online Tracking Technologies ............................................. 26

     D.     Office of the National Coordinator for Health Information Technology ............. 28

VIII.   HEALTH CARE PROVIDERS VIOLATE PREVAILING STANDARDS OF MEDICAL ETHICS WHEN USING META COLLECTION TOOLS IN THE WAY AT ISSUE IN THIS CASE ................................................................................................................. 30

     A.     The Disclosure of the Communications Violates Prevailing Standards of Ethics 30

     B.     Analogizing from the Online to the Physical World ........................................... 41

IX.    CONCLUSION ............................................................................................................ 42

## I. QUALIFICATIONS

1.      I am the James A. Attwood and Leslie Williams Professor of Law at Harvard Law School; Deputy Dean of Harvard Law School; and Faculty Director of the Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics at Harvard Law School.

2.      I joined Harvard Law School as a fellow in health law policy, bioethics, and biotechnology in 2006 and joined the faculty as an assistant professor in 2008. Prior to joining Harvard Law School, from 2004 to 2006, I worked as an appellate attorney at the Civil Division of the Department of Justice. After graduating law school in 2003, I clerked for then-Chief Judge Michael Boudin, on the U.S. Court of Appeals for the First Circuit, from 2003 to 2004. I am licensed to practice law in the state of New York.

3.      I have been teaching subjects related to health law, bioethics, and food and drug law at Harvard Law School for 18 years. I have also co-taught courses and guest lectured at Harvard Medical School and guest lectured at Harvard T.H. Chan School of Public Health. I have also given guest lectures and grand rounds at medical schools and hospitals and universities across the world on health privacy, AI, and related subjects. I have been invited to speak to the judges and attorneys at the Circuit Conferences for the U.S. Courts of Appeals for the Second and Sixth Circuit on these topics as well.

4.      I am an elected member of the National Academy of Medicine and have been invited to speak as an expert before national advisory bodies such as the National Academies of Science Engineering and Medicine (NASEM). I have served on numerous NASEM committees as an expert, as well as the committees of other national organizations in the medical and scientific arena such as the Ethics Committee for the American Congress of Obstetricians and Gynecologists (ACOG) and Organ Procurement and Transplantation Network/United Network for Organ Sharing Ethics Committee as well as the ethics advisory boards of companies such as Illumina and Bayer. I have been asked to speak at meetings at the White House chaired by Vice President Kamala Harris regarding the impact of the Supreme Court's decision on the constitutional protection for abortion in *Dobbs v. Jackson Women's Health Organization*.[1] I have testified before the Senate Judiciary Committee on the questions of health privacy and scope of the Health Insurance Portability and Accountability Act (HIPAA) in their hearing *23 and You: The Privacy and National Security Implications of the 23andMe Bankruptcy*.

5.      I am the author, co-author, editor, or co-editor of more than 20 books on health law, bioethics, food and drug law, AI and medicine, and biotechnology. These include one of the leading treatises on these subjects,[2] one of the leading casebooks on these subjects,[3] and the books *Big*

---

[1] 597 U.S. 215 (2022).
[2] THE OXFORD HANDBOOK OF U.S. HEALTH LAW (I. Glenn Cohen, Allison K. Hoffman, William Sage eds. Oxford University Press 2015-2016).
[3] MARK HALL, MARY ANNE BOBINSKI, DAVID ORENTLICHER, I. GLENN COHEN, NICHOLAS BAGLEY, NADIA SAWICKI, HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024).

*Data, Health Law, and Bioethics*[4] and *Digital Health Care outside of Traditional Clinical Settings: Ethical, Legal, and Regulatory Challenges and Opportunities*.[5]

6.      I am the author or co-author of more than 300 articles in the leading peer-reviewed scientific (such as Science, Nature Genetics, Cell), medical (such as the New England Journal of Medicine, JAMA, Nature Medicine), and medical ethics (such as the American Journal of Bioethics, the Hastings Center Report) journals as well as leading law reviews (such as the Harvard and Stanford Law Reviews). My work is highly cited in the field – for example, my 2019 paper "Privacy in the Age of Big Data" in *Nature Medicine* has been cited 1350 times.

7.      In addition, I was named to the Greenwall Foundation Faculty Scholars Program in Bioethics, through which, over the subsequent decade, I met numerous times with a community of leading scholars in bioethics and health law. I was also named as a fellow of the Hastings Center, one of the leading bioethics think tanks in the world.

8.      My most recent curriculum vitae, which lists my publications, is provided as **Appendix A** to this Report.

## II.    ASSIGNMENT

9.      I have been retained by counsel for Plaintiffs to opine on whether the use of Meta Collection Tools[6] on Health Care Provider[7] websites and apps in the manner alleged by Plaintiffs in this case violates medical ethics.[8]

10.     I am being compensated at an hourly rate for the actual time that I devote to this case, at the rate of $850 per hour for the first 50 hours of any review of records, preparation of reports, declarations, and deposition and trial testimony. For any additional hours I am being compensated at the rate of $750 per hour.

11.     My compensation does not depend on the outcome of this litigation, the opinions that I express, or the testimony that I provide.

---

[4] Big Data, Health Law, and Bioethics (I. Glenn Cohen, Holly Fernandez Lynch, Effy Vayena, Urs Gasser, eds Cambrigde University Press, 2018).

[5] Human Subjects Research Regulation: Perspectives on the Future (I. Glenn Cohen & Holly Fernandez Lynch, eds MIT Press, 2014).

[6] "Meta Collection Tools" as used in this report means "the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, Meta Graph API, server-to-server transmissions, and any other similar collection tools." First Amended Consolidated Class Action Complaint (Complaint), ¶ 1, fn. 1.

[7] "Health Care Provider" as used in this report means persons and entities that provide health care services to patients, including hospitals, doctors, nurses, and others who work for healthcare provider entities, but not health insurers or prescription drug companies. I understand that Meta internally classifies entities from whom it obtains information via Meta Collection Tools into "Megataxon" categories. I have reviewed these categories and they converge with entities I would generally categorize as Health Care Providers.

[8] Most scholars in the space use "bioethics" and "medical ethics" relatively interchangeably and I shall do the same.

12. This report presents my independent, expert opinions based on my study, training, and experience as a medical ethicist; my review of relevant scholarly literature; and my review of the pleadings, discovery, and other case-related materials. In addition to the materials cited in this Report, I considered the materials set forth in **Appendix B**.

13. Through this report, I do not speak herein for or otherwise represent the views of Harvard Law School nor for any other organization with which I have been affiliated.

14. I reserve the right to revise and supplement the opinions expressed in this report or on the bases for them if any new information becomes available in the future, including new scientific research or publications in response to the statements and issues that may arise in my area of expertise. I may also further supplement these opinions in response to information produced in discovery and in response to additional information from Defendants' or other parties' designated experts.

## III.  BACKGROUND

15. In reaching my opinions, I assume the following facts, which are taken from Plaintiffs' Complaint, the Declaration of Richard Smith In Support of Plaintiffs' Motion for Preliminary Injunction, dated August 25, 2022, and the Expert Report of Zubair Shafiq, PhD.

> Plaintiffs are Facebook users and patients of Health Care Providers that utilized Meta Collection Tools on their websites and mobile applications. [9]

> These Meta Collection Tools operate invisibly within the source code of the websites and apps, running silently in the patient's browser without any affirmative action on the part of the patient. [10]

> The Tools intercept and transmit to Meta patients' IP addresses, device identifiers, and cookie IDs, along with the URLs of pages visited and interactions such as clicking to log into a patient portal. [11]

> Meta matches this information to patients' Facebook accounts. [12]

## IV.  METHODOLOGY

16. In reaching my opinions, I employed standard methods used in medical ethics. Medical ethics has its roots in religious studies, philosophy, law, and the clinical practice of medicine. Methodologically, it relies on high level moral theory, mid-level principles, analogical reasoning, and empirical methods, depending on the nature of the problem.

---

[9] *See* Complaint, ¶¶ 1, 5, 24-35.
[10] *See* Complaint, ¶¶ 10-12; Smith Declaration, ¶ 16.
[11] *See* Complaint, ¶¶ 8, 396; Smith Declaration, ¶ 31.
[12] Shafiq Report, ¶¶ 12(b), 40.

17.     One common and widely accepted way that medical ethicists think about a new problem is through "Principlism," an approach associated with the Tom L. Beauchamp and James F. Childress classic book in the field, *Principles of Biomedical Ethics*.[13] Principlism seeks to guide the analysis between high-level theory and case-level application by focusing attention on four foundational principles: [14]

    1. Autonomy

    2. Beneficence

    3. Nonmaleficence

    4. Justice[15]

18.     Principlism then considers how the four principles apply to the particular case in question, including potential conflicts or need for accommodations between the principles.[16] Applying these principles is also guided by considering codes of ethics and other statements of the health care professions that show their contextual understanding of the ethics of the profession. It is also widely-accepted as part of the methods of medical ethics to consider existing legal rules (be they statutory, regulatory, common law, or constitutional) and governmental guidance, where appropriate, which can provide additional insight on settled judgments about ethical issues.[17] Finally, the analysis is informed by drawing analogies to existing cases, especially when considering newer technologies.

19.     Thus, following well-accepted methods in the field, I considered various codes of ethics and other statements of the health care profession to tailor the four foundational principles to the particular context raised in this case. These sources included:

    • The Hippocratic Oath

    • The American Medical Association (AMA) Code of Ethics

    • The AMA Ethics Opinions

---

[13] Tom L. Beauchamp & James F. Childress, Principles of Biomedical Ethics (8th ed. 2019).
[14] *Id.*; Jennifer Flynn, *Theory and Bioethics*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta & Uri Nodelman eds Winter 2022 Edition), available https://plato.stanford.edu/archives/win2022/entries/theory-bioethics.
[15] More modern sources would broaden this to justice and equity.
[16] To be more precise the relationship between principles and the cases is not merely top-down but one informs the other. This can be described as a process of "reflective equilibrium," which is an idea associated with the political philosopher John Rawls and "a process by which our considered responses to actual cases influence our moral principles, and those improved-upon principles then provide enhanced guidance for our response to further cases." Jennifer Flynn, *Theory and Bioethics*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta & Uri Nodelman eds Winter 2022 Edition), available https://plato.stanford.edu/archives/win2022/entries/theory-bioethics; *see also* Tom L. Beauchamp & James F. Childress, PRINCIPLES OF BIOMEDICAL ETHICS 439-444 (8th ed. 2019).
[17] To be sure the domain of law and medical ethics are not co-extensive. In many instances law offers a floor below which regulated actors may not go. Law is often a starting but not an ending point for ethical obligations. Professions like medicine impose ethical obligations that go beyond the legal minimum. It is also possible in some instance for medical ethics to critique legal obligations as not ethically justified.

- The American Nursing Association (ANA) Code of Ethics for Nurses

- American Psychiatric Association, Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry

20.    Following this method, I also considered existing legal rules and governmental guidance applicable to Health Care Providers' collection, use, and disclosure of patient health information, with an emphasis on electronic health information when available. These sources included:

- HIPAA and the HITECH Act of 2009

- Department of Health and Human Services (HHS) Guidances and Bulletins

- The Office of National Coordinator (ONC) Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information

21.    I then extracted common ethical precepts from the above to further define the four fundamental principles and derive more specific guidance:

1. **Autonomy**
   - *Protect patients' privacy rights and follow duties of confidentiality.* This includes obligations such as:

     - Sharing health information only in narrow circumstances, when necessary to allow the health care system to function, to deliver beneficial health care directly to the patient, or to protect the patient or others from harm (also supported by the principles of **beneficence and nonmaleficence).**

     - Practicing data minimization, *i.e.*, collecting and sharing only the minimum amount of data necessary for these purposes (also supported by the principle of **nonmaleficence)**.

     - Using appropriate de-identification techniques (also supported by the principle of **nonmaleficence)**.

   - *Ensure voluntary informed consent for data collection, use, and sharing.*

2. **Beneficence and Nonmaleficence**

   - *Ensure that data collection, use, and sharing practices benefit patient care.*

3. **Justice (and Equity)**

   - *Avoid discrimination.*

- *Pay particular attention to the risk of stigma and others harms to vulnerable groups.*

22.     Finally, I considered analogies in the physical world to the use of Meta Collection Tools on Health Care Provider websites and apps as a further test of the ethics of the practices at issue in this case.

23.     I put these methodological steps together to reach an opinion on whether the practices violate prevailing standards of medical ethics.

## V.     SUMMARY OF OPINIONS

24.     Health Care Providers' disclosures of Pixel Button Clicks and communications related to physicians, treatments, and conditions via the Meta Collection Tools violates prevailing standards of medical ethics.

    a.  The alleged practices here represent a clear departure from the principle that non-deidentified[18] patient information should remain within the confines of the treatment relationship unless disclosed under one of the narrowly delineated, ethically justified exceptions. This principle is reinforced in government guidance, including the ONC's Framework and the HHS Bulletin. This principle is also reflected in the AMA and ANA's codes of conduct and the HIPAA Privacy Rule – each of which Health Care Providers violate when using the Meta Collection Tools in the ways alleged by Plaintiffs.

    b.  Health Care Providers' use of the Meta Collection Tools in the manner alleged here plainly violates data minimization obligations set out by the AMA and HIPAA. Use of the Tools is also inconsistent with data minimization principles expressed by HHS and the ONC. By sending non-deidentified patient health information to Meta for purposes unrelated to patient care, the Health Care Provider would not only exceed the "minimum necessary" threshold but wholly depart from the central tenet of the data minimization principle: avoiding the unnecessary exposure of patient information that creates avoidable privacy harms and undermines patient trust.

    c.  Under the facts alleged, the transmissions to Meta of Pixel Button Clicks and communications related to physicians, treatments, and conditions fall squarely outside the bounds of both AMA's professional guidance and HIPAA's de-identification provision. By failing to remove identifying information before transmitting data for third-party commercial purposes, Health Care Providers violate core medical ethical requirements to respect patient autonomy and to avoid preventable harms that may result from unauthorized disclosure or re-identification of health information.

---

[18] "Non-deidentified" means information that does not meet the de-identification requirements of the HIPAA Privacy Rule, 45 C.F.R. § 164.514(a).

d.  Professional standards, HIPAA, and government guidance make explicit that non-deidentified patient information (such as the Communications at issue) may only be shared with voluntary, informed consent (or written authorization in the case of HIPAA), except pursuant to clearly defined circumstances unrelated to marketing or where disclosures occur pursuant to a BAA. Importantly, the disclosure of the use of Meta Collection Tools in a Health Care Provider's policy, terms of use, or similar document on a website does not constitute a valid written authorization under the HIPAA Privacy Rule or generally satisfy the principle of informed consent. Thus, the transmissions of the Communications to Meta does not comply with HIPAA and violate the core ethical requirement of informed consent. Relatedly, under the facts alleged by Plaintiffs, Meta constitutes a business associate for which no BAA was entered into, in violation of the HIPAA Privacy Rule.

e.  The principles of beneficence and nonmaleficence suggest another, related obligation that applies here: data collection, use, and sharing practices should, wherever feasible, be designed to directly benefit patient care. This reflects the "positive" aspect of beneficence, *i.e.*, the duty to take steps that actively promote the patient's welfare, as well as the mandate of nonmaleficence to avoid exposing patients to unnecessary risks. Sharing patient information for purposes unrelated to care, such as commercial tracking or marketing, generally falls outside these obligations and risks undermining them.

f.  The disclosure of Pixel Button Clicks and communications about physicians, conditions, and treatments in the manner alleged here runs contrary to the principles of justice and equity. It risks exacerbating existing inequalities by enabling discrimination and by multiplying the stigma and harm suffered by already vulnerable populations – precisely the outcomes the principle of justice is intended to prevent.

## VI.  THE PRINCIPLES OF AUTONOMY, BENEFICENCE, NONMALEFICENCE, AND JUSTICE

25.  As discussed, the four key principles of medical ethics are (1) autonomy, (2) beneficence, (3) nonmaleficence, and (4) justice.

26.  **Autonomy** is described in the leading book in medical ethics:

To respect autonomous agents is to acknowledge their right to hold views, to make choices, and to take actions based on their values and beliefs. Respect is shown through respectful *action*, not merely a respectful *attitude*. The principle of respect for autonomy requires more than noninterference in others' personal affairs. It includes, in some contexts, building up or maintaining others' capacities for autonomous choice while helping to allay fears and other conditions that destroy or disrupt autonomous action. Respect involves acknowledging the value and decision-making rights of autonomous persons and enabling them to act

9

autonomously, whereas disrespect for autonomy involves attitudes and actions that ignore, insult, demean, or are inattentive to others' rights of autonomous action.

…

Respect for autonomy obligates professionals in health care and research involving human subjects to disclose information, to probe for and ensure understanding and voluntariness, and to foster adequate decision making.

…

[The] negative and positive sides of respect for autonomy support more specific moral rules, some of which may also be justified, in whole or in part, by other moral principles discussed in this book. Examples of such rules include the following:

> 1. Tell the truth.
>
> 2. Respect the privacy of others.
>
> 3. Protect confidential information.
>
> 4. Obtain consent for interventions with patients.
>
> 5. When asked, help others make important decisions.[19]

27.    The principle of autonomy is the source for a patient's right to **voluntary informed consent** in health care. In medical ethics, it is important that the person making the decision be competent, that they have an adequate understanding of the choice they are making (with disclosure of relevant information in a way understandable to the patient), and that the decision be made freely without fraud, deceit, duress, or coercion.[20]

28.    A **patient's right to privacy and the duty of confidentiality** also spring from the principle of autonomy.

29.    In medical ethics, a right to privacy is understood as the patient's right to control the use and disclosure of information about them as an individual. The duty of confidentiality is a

---

[19] Tom L. Beauchamp & James F. Childress, PRINCIPLES OF BIOMEDICAL ETHICS 104-105 (8th ed. 2019).

[20] *E.g.*, THE NATIONAL COMMISSION FOR THE PROTECTION OF HUMAN SUBJECTS OF BIOMEDICAL AND BEHAVIORAL RESEARCH, THE BELMONT REPORT: ETHICAL PRINCIPLES AND GUIDELINES FOR THE PROTECTION OF HUMAN SUBJECTS OF RESEARCH 10 (1978) ("Respect for persons requires that subjects, to the degree that they are capable, be given the opportunity to choose what shall or shall not happen to them. This opportunity is provided when adequate standards for informed consent are satisfied. . . . there is widespread agreement that the consent process can be analyzed as containing three elements: information, comprehension and voluntariness."); Joan McGregor & Rebecca Tsosie, *Rethinking Research Protections for Tribal Communities*, 21 AMERICAN JOURNAL OF BIOETHICS 30 (2021) ("Self-determination based on the moral principle of autonomy, [] extends to all individual persons and to all 'peoples.' The right of self-determination secures individual liberties and personal privacy, protecting the individual's right to consent to medical procedures, or withhold that consent.").

reciprocal duty of physicians, nurses, other health care workers and the institutions in which they work to protect the information that has been shared with them by patients and not to share without the patient's consent or other limited recognized exceptions.

30.     Respecting the patient's right to privacy is essential to respecting the dignity and autonomy of the patient. The patient presents him or herself to the medical system at the most vulnerable point, exposing personal and sometimes debilitating facts about their body and/or mental health. It would be a deep violation of trust, indeed even an abuse of power, to transform that information into an engine to generate profit for a health care provider.

31.     Beyond protecting dignity and autonomy, a patient's right to privacy and the corresponding duty of confidentiality serve a very practical function necessary to ensure the best health outcomes: they encourage a patient to be as candid as possible with the health care team, thus improving the chance of a correct diagnosis and successful treatment. Without the protection of a right to privacy and corresponding duty of confidentiality, patients may withhold sensitive information that would hamper the health care system from providing them the best health care possible.

32.     These rights and correlative duties have a long and storied history in medical ethics:

Rules of confidentiality have long been common in codes of medical ethics. Requirements of confidentiality appear as early as the Hippocratic oath and continue in the code of Ethics of the AMA. For example, the code adopted in 1957 included this rule: "A physician may not reveal the confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or community." In 1980, the AMA revised this rule to hold that a physician "shall safeguard patient confidences within the constraints of the law." The World Medical Association has likewise affirmed rules of confidentiality. The Declaration of Geneva asserts an obligation of "absolute secrecy" and includes the following pledge: "I will respect the secrets which are confided in me, even after the patient has died." Its International Code of Medical Ethics States the most stringent requirement of all: "A doctor shall preserve absolute secrecy on all he knows about his patient because of the confidence entrusted to him."[21]

33.     The *Routledge Handbook of Medical Law and Ethics* further explains the long history of these rights and correlative duties:

The obligation of physicians to safeguard the confidentiality of patient-derived info dates back at least to the fourth century BCE and the Oath of Hippocrates. The pertinent provision of the Oath reads:

---

[21] Tom L. Beauchamp & James F. Childress, PRINCIPLES OF BIOMEDICAL ETHICS 418-419 (4th ed. 1994)

> What I may see or hear in the course of treatment in regard to the life of men, which on no account must be spread abroad, I will keep to myself, holding such things shameful to be spoken about. (See Reich 1995: 2632).

Although the Oath had a somewhat different meaning in ancient Greece than in often ascribed to it today (Miles 2004: 150), modern conceptions of the Oath are perhaps more important than the actual wording (Rothstein 2010a). Today, the Hippocratic Oath is generally considered the original source of a physician's duty to maintain as confidential virtually all patient health information.

In the nineteenth century, medicine emerged as a scientifically based health profession (Starr 1982). Codes of medical ethics, beginning with Thomas Percival's code of medical ethics in 1803, incorporated confidentiality requirements. The American Medical Association's (AMA) first Code of Ethics in 1847 also expressed the physician's duty to maintain confidentiality. The current version of the AMA's Code of Medical Ethics provides that:

> The information disclosed to a physician by a patient should be held in confidence. The patient should feel free to make a full disclosure of information to the physician in order that the physician may most effectively provide needed services. The patient should be able to make this disclosure with the knowledge that the physician will respect the confidential nature of the communication. (AMA 2011: section 5.05)

The AMA's Code of Medical Ethics, like other such codes, links maintaining confidentiality with the ability to provide appropriate health services. Without assurances of confidentiality, patients would be reluctant to share intimate information about their health and lifestyle. Likewise, without accurate and detailed histories and symptoms from patients, it would be difficult to provide appropriate medical care.

Codes of ethics from around the world similarly place a high priority on protecting the confidentiality of patient information. The World Medical Association's International Code of Medical Ethics and Declaration of Geneva explicitly mention the duty of a physician to protect confidentiality:

> A physician shall respect a patient's right to confidentiality. It is ethical to disclose confidential information when the patient consents to it or when there is a real and imminent threat of harm to the patient or to others and this threat can only be removed by a breach of confidentiality. (World Medical Association (WMA) 2013: 2)

Similar provisions appear in the codes of ethics or ethical guidelines of various national medical associations, including the Australian Medical Association (2006:

subsection 1.1 12)), the British Medical Association (2013), and the Canadian Medical Association (2013: paras 31-7).[22]

34.     The principle of **beneficence** and the principle of **nonmaleficence** are paired moral principles relating to providing positive benefits to patients and avoiding harms to them, respectively.

35.     **Nonmaleficence**:

Obligat[es] us to abstain from causing harm to others. In medical ethics this principle has often been treated as effectively identical to the celebrated maxim *Primum non nocere*: "Above all [or first] do no harm." Often proclaimed the fundamental principle in the Hippocratic tradition, this principle does not appear in the Hippocratic writings, and a venerable statement sometimes confused with it— "at least, do no harm"—is a strained translation of a single Hippocratic passage. Nonetheless, the Hippocratic oath incorporates both an obligation of nonmaleficence and an obligation of beneficence: "I will use treatment to help the sick according to my ability and judgment, but I will never use it to injure or wrong them."[23]

36.     The principle extends beyond physical harms and covers violations of privacy and confidentiality, stigma, and emotional and group harms.[24]

37.     When it comes to the principle of **beneficence,** it "potentially demand[s] more than the principle of nonmaleficence, because agents must take positive steps to help others, not merely refrain from harmful acts[.]" An "implicit assumption of beneficence undergirds all medical and health care professions and their institutional settings," because "attending to the welfare of patients—not merely avoiding harm—is at the heart of medicine's goal, rationale, and justification."[25]

38.     As Beauchamp and Childress observe in the leading book in medical ethics: "The principle of positive beneficence supports an array of prima facie rules of obligation, including ... 1. Protect and defend the rights of others. 2. Prevent harm from occurring to others. 3. Remove conditions that will cause harm to others."[26]

39.     Finally, the principle of **justice** (and today many medical ethicists would speak of justice *and* equity) requires "fair equitable, and appropriate treatment in light of what is due or

---

[22] Mark A. Rothstein, *Privacy and Confidentiality*, ROUTLEDGE HANDBOOK OF MEDICAL LAW AND ETHICS 52, 52-53 (Yann Joly and Bartha Maria Knoppers eds. 2015).

[23] Tom L. Beauchamp & James F. Childress, PRINCIPLES OF BIOMEDICAL ETHICS 155 (8th ed. 2019).

[24] *See, e.g., Id.* at 201-202 (noting the danger of "psychosocial" risks from using biologic samples or data for reasons other than those initially disclosed to subjects because it "threatens the trust between subjects and investigators").

[25] *Id.* at 217. See also, for example, THE NATIONAL COMMISSION FOR THE PROTECTION OF HUMAN SUBJECTS OF BIOMEDICAL AND BEHAVIORAL RESEARCH, THE BELMONT REPORT: ETHICAL PRINCIPLES AND GUIDELINES FOR THE PROTECTION OF HUMAN SUBJECTS OF RESEARCH 6 (1978) ("Persons are treated in an ethical manner not only by respecting their decisions and protecting them from harm, but also by making efforts to secure their well-being. Such treatment falls under the principle of beneficence").

[26] Tom L. Beauchamp & James F. Childress, PRINCIPLES OF BIOMEDICAL ETHICS 219 (8th ed. 2019).

owed to affected individuals.'[27] It requires health care providers to, among other things, prove fair opportunities, avoid discrimination in health care, and "[r]edress[] [r]acial, [e]thnic, [g]ender, and [s]ocial [s]tatus [d]isparities in [h]ealth [c]are."[28]

## VII.    THE CODES OF CONDUCT, STATUTES, REGULATIONS, AND POLICY FRAMEWORKS APPLICABLE TO A HEALTH CARE PROVIDER'S COLLECTION, USE, AND SHARING OF PATIENT HEALTH INFORMATION

40.    As discussed above, while the four principles are useful guides for analyzing the ethics of a set of practices, it is widely accepted in medical ethics to consider additional resources in order to apply and analyze the principles to a particular set of practices. These additional sources include: codes of ethics and other statements of the health care professions that demonstrate the contextual understanding of the ethics of the profession; existing legal rules and governmental guidance; and analogies to existing cases.

### A.    Professional Codes of Conduct

41.    The American Medical Association (AMA) has existed for more than 175 years and is widely recognized as the leading source of ethical guidance in the medical profession.

42.    Similarly, the American Nurses Association (ANA) has existed more than 125 years and sets the definitive standard for ethical nursing practices.

43.    Among other things, the AMA and ANA Codes operationalize the right to privacy and duty of confidentiality and what it means for sharing patient information beyond the treatment relationship for purposes other than the provision of health services.

44.    For example, the ANA Code of Ethics for Nurses, Provision 3.1 reads in relevant part:

Privacy is the right of the recipient of care to control access to, and to disclose or not disclose, information pertaining to oneself and to control the circumstances, timing, and extent to which information may be disclosed. Nurses safeguard the right to privacy for individuals, families, and communities. . . .

Confidentiality pertains to the nondisclosure of personal information that has been communicated within the nurse-patient relationship. Central to that relationship is an element of trust and an expectation that personal information will not be divulged without consent. The nurse has a duty to maintain confidentiality of all patient information, both personal and clinical, in the work setting and off duty in all venues, including social media or any other means of communication. Because of rapidly evolving communication technology and the porous nature of social media, nurses maintain vigilance regarding all forms of media that intentionally or

---

[27] *Id.* at 268-269.
[28] *Id.* at 282-283.

unintentionally breach their obligation to maintain and protect patients' rights to privacy and confidentiality.

Personal information relevant to clinical care may need to be disclosed for continuity of care under defined practices, policies, or protocols. Information disclosed for education, peer review, professional practice evaluation, and other quality improvement or risk management mechanisms may be disclosed once anonymized, if anonymization does not hinder required processes. When using electronic communications or working with electronic health records, nurses make every effort to maintain security related to items within their control, including preventing external attempts to breach data security and adhering to best practices by using secure internal portals.[29]

45.    Similarly, the AMA's Principles of Medical Ethics, Principle 4 reads, "A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law."[30]

46.    The AMA's Ethics Opinions elaborates on the application of this principle.

47.    AMA Opinion 1.1.1 provides that the "relationship between a patient and a physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others...."[31]

48.    In Opinion 3.1.1, the AMA notes:

Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should:

(a) Minimize intrusion on privacy when the patient's privacy must be balanced against other factors.

(b) Inform the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware.

(c) Be mindful that individual patients may have special concerns about privacy in any or all of these areas.

(d) Be transparent with any inquiry about existing privacy safeguards for patient data but acknowledge that anonymity cannot be guaranteed and that breaches can occur notwithstanding best data safety practices.[32]

---

[29] ANA Code of Ethics for Nurses, Provision 3.1, *Privacy and Confidentiality*, https://codeofethics.ana.org/provision-3-1.
[30] AMA Principles of Medical Ethics, Principle IV, (2001), https://code-medical-ethics.ama-assn.org/principles.
[31] AMA Code of Medical Ethics, Opinion 1.1.1, *Patient-Physician Relationships*, https://code-medical-ethics.ama-assn.org/ethics-opinions/patient-physician-relationships.
[32] AMA Code of Medical Ethics, Opinion 3.1.1, *Privacy in Health Care*, https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care/.

49.     Similarly, AMA Opinion 3.2.1 makes clear there are only limited reasons why a physician may breach patient confidentiality, and when necessary to do so it imposes an obligation to disclose only the minimum necessary information and to notify the patient of the disclosure when feasible:

> Patients need to be able to trust that physicians will protect information shared in confidence. They should feel free to fully disclose sensitive personal information to enable their physician to most effectively provide needed services. Physicians in turn have an ethical obligation to preserve the confidentiality of information gathered in association with the care of the patient.

> In general, patients are entitled to decide whether and to whom their personal health information is disclosed. However, specific consent is not required in all situations. When disclosing patients' personal health information, physicians should:

> (a) Restrict disclosure to the minimum necessary information; and

> (b) Notify the patient of the disclosure, when feasible.

> Physicians may disclose personal health information without the specific consent of the patient (or authorized surrogate when the patient lacks decision-making capacity):

> (c) To other health care personnel for purposes of providing care or for health care operations; or

> (d) To appropriate authorities when disclosure is required by law.

> (e) To other third parties situated to mitigate the threat when in the physician's judgment there is a reasonable probability that:

> > (i) the patient will seriously harm him/herself;

> > (ii) the patient will inflict serious physical harm on an identifiable individual or individuals.

> For any other disclosures, physicians should obtain the consent of the patient (or authorized surrogate) before disclosing personal health information.[33]

50.     The exceptions highlighted in the AMA opinion are not random. They share a common purpose. They specify that breaches of a patient's right to privacy and the release of confidential information are justified only in narrow exceptional cases that are necessary *to allow the health care system to function, to deliver beneficial health care directly to the patient, or to protect the patient or others from harm*.

---

[33] AMA Code of Medical Ethics, Opinion 3.2.1, *Confidentiality*, https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality.

51.    The AMA Medical Ethics Opinion 3.2.4 specifically addresses the ethical concerns surrounding the sharing of patient information for commercial purposes. The Opinion notes that disclosing information to third parties for marketing purpose without patient consent undermines trust, violates informed consent, and risks harming the patient-physician relationship. The AMA Medical Ethics Opinion 3.2.4 reads:

> Information contained in patients' medical records about physicians' prescribing practices or other treatment decisions can serve many valuable purposes, such as improving quality of care. However, ethical concerns arise when access to such information is sought for marketing purposes on behalf of commercial entities that have financial interests in physicians' treatment recommendations, such as pharmaceutical or medical device companies.

> Information gathered and recorded in association with the care of a patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should:

> (a) Only provide data that has been de-identified.

> (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted.

> Physicians who propose to permit third parties to access the patient's full medical record should:

> (c) Obtain the consent of the patient (or authorized surrogate) to permit access to the patient's medical record.

> (d) Prohibit access to or decline to provide information from individual medical records for which consent has not been given.

> (e) Decline incentives that constitute ethically inappropriate gifts, in keeping with ethics guidance.

> Because de-identified datasets are derived from patient data as a secondary source of data for the public good, health care professionals and/or institutions who propose to permit third-party access to such information have a responsibility to

establish that any use of data derived from health care adhere to the ethical standards of the medical profession.[34]

52.    Importantly, "[i]nformation gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored."[35]

53.    While it is easy to conceptualize violations of a patient's privacy that would be involved in disclosing information about the patient's care (such as the details of a surgery or the medications a patient is taking), under prevailing standards of medical ethics a patient's right to privacy extends far beyond that.

54.    A patient's right to privacy also protects sharing information regarding the patient's *seeking* of care. If information about care-seeking behavior was disclosed to third-parties, individuals who are *considering* care might be deterred from gathering information and talking to professionals. One can imagine very dramatic examples where this would be true – seeking an abortion, seeking treatment for alcoholism, meeting the medical needs of those harmed by domestic violence, or gender re-assignment surgery – as well as more quotidian ones – determining if one is a candidate for hair replacement for the start of baldness.

55.    Indeed, merely being identified as being in the role of "patient" can carry stigma as well as the potential for discrimination (such as in employment). For this reason, under prevailing standards of medical ethics, physicians should, with very limited exceptions, avoid identifying someone as a patient. For example, the American Psychiatric Association, The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry, notes that, "Psychiatric records, including even the identification of a person as a patient, must be protected with extreme care. Confidentiality is essential to psychiatric treatment."[36]

**B.    HIPAA[37]**

56.    In August 2002, the U.S. Department of Health and Human Services (HHS) published the "Standards for Privacy of Individually Identifiable Health Information" in accordance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[38]  The Standards, contained in 45 C.F.R. Part 160 and 164, have become known as the HIPAA Privacy Rule.[39]

---

[34] AMA Code of Medical Ethics, Opinion 3.2.4, *Access to Medical Records by Data Collection Companies,* https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies.

[35] AMA Code of Medical Ethics, Opinion 3.3.2, *Confidentiality & Electronic Medical Records*, https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records.

[36] *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry*, AMERICAN PSYCHIATRIC ASSOCIATION 6 (2013).

[37] When I refer to "HIPAA" in the rest of this report, I mean the entire HIPAA regime – including the statute, its implementing regulations, and regulatory guidance from HHS, unless I seek to specify a particular part of the regime in which case I am explicit on that point.

[38] *Summary of the HIPAA Privacy Rule*, U.S. DEP'T OF HEALTH & HUMAN SERVICES 1-2, https://www.hhs.gov/sites/default/files/privacysummary.pdf.

[39] *Id.*

57.    The Rule establishes national standards for the protection of certain health information (*i.e.*, "protected health information"), "as well as standards for individuals' privacy rights to understand and control how their health information is used."[40]

### i.    Covered Entities & Business Associates

58.    The HIPAA Privacy Rule applies to covered entities and their business associates.

59.    A "covered entity" is defined as "(1) A health plan[,] (2) A health care clearinghouse[, or] (3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter."[41]

60.    A "business associate" is a person who:

(i) On behalf of such covered entity or of an organized health care arrangement (as defined in [45 C.F.R. § 160.103]) in which the covered entity participates, but other than in the capacity of a member of the workforce of such covered entity or arrangement, creates, receives, maintains, or transmits protected health information for a function or activity regulated by this subchapter, including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities listed at 42 C.F.R. 3.20, billing, benefit management, practice management, and repricing; or

(ii) Provides, other than in the capacity of a member of the workforce of such covered entity, legal, actuarial, accounting, consulting, data aggregation (as defined in § 164.501 of [45 C.F.R]), management, administrative, accreditation, or financial services to or for such covered entity, or to or for an organized health care arrangement in which the covered entity participates, where the provision of the service involves the disclosure of protected health information from such covered entity or arrangement, or from another business associate of such covered entity or arrangement, to the person.

. . .

(3) Business associate includes:

(i) A Health Information Organization, E–prescribing Gateway, or other person that provides data transmission services with respect to protected health information to a covered entity and that requires access on a routine basis to such protected health information.

---

[40] *Id.* at 1.
[41] 45 C.F.R. § 160.103.

(ii) A person that offers a personal health record to one or more individuals on behalf of a covered entity.

(iii) A subcontractor that creates, receives, maintains, or transmits protected health information on behalf of the business associate.[42]

61.     "Business Associate Agreements" (BAAs) are a key way of ensuring that all those who access PHI are meeting HIPAA's requirements, enable HHS oversight, assign responsibility, and ultimately protect the privacy of patients:

The HIPAA Rules generally require that covered entities and business associates enter into contracts with their business associates to ensure that the business associates will appropriately safeguard protected health information. The business associate contract also serves to clarify and limit, as appropriate, the permissible uses and disclosures of protected health information by the business associate, based on the relationship between the parties and the activities or services being performed by the business associate. A business associate may use or disclose protected health information only as permitted or required by its business associate contract or as required by law. A business associate is directly liable under the HIPAA Rules and subject to civil and, in some cases, criminal penalties for making uses and disclosures of protected health information that are not authorized by its contract or required by law. A business associate also is directly liable and subject to civil penalties for failing to safeguard electronic protected health information in accordance with the HIPAA Security Rule.

A written contract between a covered entity and a business associate must: (1) establish the permitted and required uses and disclosures of protected health information by the business associate; (2) provide that the business associate will not use or further disclose the information other than as permitted or required by the contract or as required by law; (3) require the business associate to implement appropriate safeguards to prevent unauthorized use or disclosure of the information, including implementing requirements of the HIPAA Security Rule with regard to electronic protected health information; (4) require the business associate to report to the covered entity any use or disclosure of the information not provided for by its contract, including incidents that constitute breaches of unsecured protected health information; (5) require the business associate to disclose protected health information as specified in its contract to satisfy a covered entity's obligation with respect to individuals' requests for copies of their protected health information, as well as make available protected health information for amendments (and incorporate any amendments, if required) and accountings; (6) to the extent the business associate is to carry out a covered entity's obligation under the Privacy Rule, require the business associate to comply with the requirements applicable to the obligation; (7) require the business associate to make available to HHS its internal practices, books, and records relating to the use and disclosure of protected health information received from, or created or received by the business associate

---

[42] *Id.*

on behalf of, the covered entity for purposes of HHS determining the covered entity's compliance with the HIPAA Privacy Rule; (8) at termination of the contract, if feasible, require the business associate to return or destroy all protected health information received from, or created or received by the business associate on behalf of, the covered entity; (9) require the business associate to ensure that any subcontractors it may engage on its behalf that will have access to protected health information agree to the same restrictions and conditions that apply to the business associate with respect to such information; and (10) authorize termination of the contract by the covered entity if the business associate violates a material term of the contract. Contracts between business associates and business associates that are subcontractors are subject to these same requirements.[43]

ii.    Health Information

62.    HIPAA has a broad definition of "health information," meaning:

any information, including genetic information, whether oral or recorded in any form or medium, that: (1) Is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.[44]

63.    HIPAA defines a subset of "protected health information" (PHI) to mean "individually identifiable health information" (IIHI), which in turn is defined as:

information that is a subset of health information, including demographic information collected from an individual, and:

(1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and

(i) That identifies the individual; or

(ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.[45]

iii.    Disclosures of PHI

---

[43] *Business Associate Contracts,* U.S. Dep't of Health & Human Services (Jan. 25, 2013), https://www.hhs.gov/hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html.
[44] 45 C.F.R. § 160.103.
[45] *Id.*

64. The Privacy Rule creates a strict <u>baseline rule of no disclosure of PHI</u> unless the disclosure can fit into one of several specified narrow regulatory exceptions such as disclosure to a patient's personal representative, with a valid authorization, disclosure as part of "treatment, payment, or health care operations," or where required by law.[46]

65. In publishing the Privacy Rule, HHS sought to maintain a delicate balance between its goal of protecting patient privacy and other goals such as not unduly hindering medical innovation that could help patients based on using patient data. Among the ways it set this balance was by providing rules permitting some sharing of patient data when enough identifiers were removed and the risk of patient reidentification was low. Technically speaking, HIPAA specifies when removing such identifiers is sufficient to make the information no longer IIHI. The relevant provision reads:

> (a) Standard: De-identification of protected health information. Health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual is not individually identifiable health information.

> (b) Implementation specifications: Requirements for de-identification of protected health information. A covered entity may determine that health information is not individually identifiable health information only if:

>> (1) A person with appropriate knowledge of and experience with generally accepted statistical and scientific principles and methods for rendering information not individually identifiable:

>>> (i) Applying such principles and methods, determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information; and

>>> (ii) Documents the methods and results of the analysis that justify such determination; or

>> (2)(i) The following identifiers of the individual or of relatives, employers, or household members of the individual, are removed:

>> (A) Names;

>> (B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census:

---

[46] 45 C.F.R. §§ 164.506, 164.508.

(1) The geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and

(2) The initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000.

(C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

(D) Telephone numbers;

(E) Fax numbers;

(F) Electronic mail addresses;

(G) Social security numbers;

(H) Medical record numbers;

(I) Health plan beneficiary numbers;

(J) Account numbers;

(K) Certificate/license numbers;

(L) Vehicle identifiers and serial numbers, including license plate numbers;

(M) Device identifiers and serial numbers;

(N) Web Universal Resource Locators (URLs);

(O) Internet Protocol (IP) address numbers;

(P) Biometric identifiers, including finger and voice prints;

(Q) Full face photographic images and any comparable images; and

(R) Any other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section; and

(ii) The covered entity does not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information.[47]

66.     Importantly, this provision applies not only to these categories of information about the patient, but also "relatives, employers, or household members of the individual." Thus, the provision is violated even if only a relative or household member information and not patient data of this sort was shared.[48]

67.     The Privacy Rule also requires the practice of "data minimization":

(b) Standard: Minimum necessary – Minimum necessary applies. When using or disclosing protected health information or when requesting protected health information from another covered entity or business associate, a covered entity or business associate must make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request.[49]

68.     The Privacy Rule requires that covered entities obtain prior written valid authorization from an individual before using or disclosing their PHI for marketing purposes except when the communication is face-to-case or involves a promotional gift of nominal value.[50] Under HIPAA, "marketing means to make a communication about a product or service that encourages recipients of the communication to purchase or use the product or service."[51]

69.     Similarly, the Rule requires prior written authorization from an individual before any disclosure of PHI which is a sale of protected health information.[52] "Such authorization must state that the disclosure will result in remuneration to the covered entity."[53]

70.     Unless it fits into one of the aforementioned narrow regulatory exceptions, the Rule generally requires a valid authorization for any other use or disclosure of PHI.

71.     A valid authorization must contain "at least" the following:

(i) A description of the information to be used or disclosed that identifies the information in a specific and meaningful fashion.

(ii) The name or other specific identification of the person(s), or class of persons, authorized to make the requested use or disclosure.

---

[47] 45 C.F.R. § 164.514.
[48] *Id*.
[49] 45 C.F.R. § 164.502(b).
[50] 45 C.F.R. § 164.508(a)(3)(i).
[51] 45 C.F.R. § 164.501. The regulation does contain some exceptions not considered marketing, but none of them appear relevant to this case. *Id*.
[52] 45 C.F.R. § 164.508(a)(4).
[53] 45 C.F.R. § 164.508(a)(4)(ii).

(iii) The name or other specific identification of the person(s), or class of persons, to whom the covered entity may make the requested use or disclosure.

(iv) A description of each purpose of the requested use or disclosure...

(v) An expiration date or an expiration event that relates to the individual or the purpose of the use or disclosure…

(vi) Signature of the individual and date…[54]

72.    The authorization also:

must contain statements adequate to place the individual on notice of all of the following: (i) The individual's right to revoke the authorization in writing…(ii) The ability or inability to condition treatment, payment, enrollment or eligibility for benefits on the authorization…(iii) The potential for information disclosed pursuant to the authorization to be subject to redisclosure by the recipient and no longer be protected[.].[55]

73.    The Rule also requires that "[t]he authorization must be written in plain language" and that the covered entity provide a copy of the signed authorization to the individual.[56]

74.    HIPAA also provides that "an individual has a right to adequate notice of the uses and disclosures of" PHI and of their "rights and the covered entity's legal duties with respect to" PHI.[57] Thus, HIPAA requires covered entities to provide individuals with what is commonly referred to as a Notice of Privacy Practices.[58]

75.    The Notice must be "written in plain language" and contain a number of elements that describe how the covered entity may use and disclose PHI; the individual's rights with respect to the information and how the individual may exercise their rights; the covered entity's legal duties with respect to PHI, including a statement the covered entity is required by law to maintain the privacy of PHI; and whom individuals can contact for further information about the covered entity's privacy policies.[59]

---

[54] 45 C.F.R. § 164.508(c)(1).
[55] 45 C.F.R. § 164.508(c)(2).
[56] 45 C.F.R. § 164.508(c)(3), (c)(4).
[57] 45 C.F.R. § 164.520(a)(1).
[58] 45 C.F.R. § 164.520(b).
[59] 45 C.F.R. § 164.520(b),(c); *Notice of Privacy Practices for Protected Health Information*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (Revised April 3, 2003), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/privacy-practices-for-protected-health-information/index.html.

76.     HHS has also made clear that a "covered entity must prominently post and make available its notice on any web site it maintains that provides information about its customer services or benefits."[60]

### C.     HHS Guidance on Online Tracking Technologies

77.     The HHS has issued detailed guidance – most recently updated in June 2024[61] – on how HIPAA applies to the use of online tracking technologies like the Meta Collection Tools implicated in this litigation, when such tools are used by covered entities and their business associates: the Bulletin on the Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (hereinafter "the Bulletin").

78.     The Bulletin recognizes:

The information disclosed [to tracking technology vendors through tracking technologies] might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code.[[62]] In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI).[63]

79.     The Bulletin goes on to explain that information is PHI in this context when: (1) visits to a Health Care Provider's webpages relate to an individual's past, present, or future health, health care, or payment for health care and (2) the information is identifiable.[64]

---

[60] , *Model Notices of Privacy Practices*, U.S. Dep't of Health & Human Services (last updated April 8, 2013), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/model-notices-privacy-practices/index.html

[61], *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health & Human Services (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. The most recent version is an update of a 2022 guidance. *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health & Human Services (2022). HHS updated the guidance to reflect a decision issued by the United States District Court for the Northern District of Texas declaring portions of the Bulletin unlawful. *See Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024). Specifically, the *Becerra* Court vacated the Bulletin "to the extent it provides that HIPAA obligations are triggered in circumstances where an online technology connects (1) an individual's IP address with (2) a visit to an unauthenticated public webpage addressing specific health conditions or healthcare providers." *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health & Human Services (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. . I understand that this case involves the disclosure of information that is never limited to just the combination of an IP address and a visit to an "unauthenticated webpage." Rather, it is my understanding that the disclosures always include a variety of additional identifying information. Thus, even assuming *arguendo* that the *Becerra* decision was correct, it has no bearing on my analysis and opinions.

[62] While the Bulletin lists these particular identifiers as examples, in a footnote attached to this paragraph, the Bulletin points to all the identifiers in the Privacy Rule, citing 45 C.F.R. § 164.514(b).

[63] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health & Human Services (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[64] *Id*.

80.     The Bulletin cites examples of when PHI may be implicated, including logging into a patient portal, scheduling appointments, using online tools to obtain a health analysis, and viewing pages about specific treatment options:

> [I]f an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.[65]

81.     The Bulletin explains that PHI is *not* implicated, however, if

> a student were writing a term paper on the changes in the availability of oncology services before and after the COVID-19 public health emergency because the collection and transmission of information showing that the student visited a hospital's webpage listing the oncology services provided by the hospital would not constitute a disclosure of PHI, even if the information could be used to identify the student.[66]

82.     The Bulletin warns that "[r]egulated entities are required to comply with HIPAA Rules when using tracking technologies," specifically noting that website banners requesting users to accept or reject the use of tracking technologies (such as cookies), privacy policies, notices, or terms and conditions are insufficient to permit disclosures of PHI and do not constitute a valid HIPAA authorization.[67]

83.     The Bulletin emphasizes HIPAA's data minimization requirement of "[e]nsuring that all disclosures of PHI to tracking technology vendors are specifically permitted by the Privacy Rule and that, unless an exception applies, only the minimum necessary PHI to achieve the intended purpose is disclosed."[68]

84.     The Bulletin also explains that tracking technology vendors may be business associates that require the execution of BAAs:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.*, health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services

---

[65] *Id*.
[66] *Id*.
[67] *Id*.
[68] *Id*.

and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate, and a BAA is required.[69]

### D.    Office of the National Coordinator for Health Information Technology

85.    The HITECH Act of 2009 was enacted, primarily, to promote the adoption and use of health information technology, in particular electronic health records (EHRs). The Act also strengthened HIPAA enforcement, mandated breach notification requirements, created business associate accountability, and emphasized data minimization and security for PHI [70]

86.    The HITECH Act also formally codified the Office of the National Coordinator (ONC) within the HHS to serve as the federal entity responsible for advancing health IT infrastructure and policy.[71]

87.    In 2008, the ONC published its "Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information." The Framework aimed "to establish a policy framework for electronic health information exchange that can help guide the Nation's adoption of health information technologies and help improve the availability of health information and health care quality."[72]

88.    In this document, the ONC noted:

If individuals and other participants in a network lack trust in electronic exchange of information due to perceived or actual risks to individually identifiable health information or the accuracy and completeness of such information, it may affect their willingness to disclose necessary health information and could have life-threatening consequences.[73]

89.    The Framework provides eight core privacy and security principles that "are expected to guide the actions of all health care-related persons and entities that participate in a network for the purpose of electronic exchange of individually identifiable health information":

a. Individual Access: "Access to information enables individuals to manage their health care and well-being. Individuals should have a reasonable means of access to their individually identifiable health information."

---

[69] Id.

[71] E.g., The Health Information Technology for Economic and Clinical Health (HITECH) Act, CONGRESSIONAL RESEARCH SERVICE 1 (April 27, 2009), https://www.congress.gov/crs_external_products/R/PDF/R40161/R40161.9.pdf.

[71] E.g., The Health Information Technology for Economic and Clinical Health (HITECH) Act, CONGRESSIONAL RESEARCH SERVICE 1 (April 27, 2009), https://www.congress.gov/crs_external_products/R/PDF/R40161/R40161.9.pdf.

[72] Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information, ONC 1 (Dec. 15, 2008), https://www.healthit.gov/sites/default/files/nationwide-ps-framework-5.pdf.

[73] Id.

b.  Correction: "Individuals should be provided with a timely means to dispute the accuracy or integrity of their individually identifiable health information, and to have erroneous information corrected or to have a dispute documented if their requests are denied."

c.  Openness and Transparency: "Individuals should be able to understand what individually identifiable health information exists about them, how that individually identifiable health information is collected, used, and disclosed and whether and how they can exercise choice over such collections, uses, and disclosures. Persons and entities, that participate in a network for the purpose of electronic exchange of individually identifiable health information, should provide reasonable opportunities for individuals to review who has accessed their individually identifiable health information or to whom it has been disclosed, in a readable form and format. Notice of policies, procedures, and technology-- including what information will be provided under what circumstances -- should be timely and, wherever possible, made in advanced of the collection, use, and/or disclosure of individually identifiable health information."

d.  Individual Choice: "Individuals should be provided a reasonable opportunity and capability to make informed decisions about the collection, use, and disclosure of their individually identifiable health information. . . . When an individual exercises choice, including the ability to designate someone else to make decisions on his or her behalf, the process should be fair and not unduly burdensome."

e.  Collection, Use, and Disclosure Limitation: "Persons and entities, that participate in a network for the purpose of electronic exchange of individually identifiable health information, should only collect, use, and/or disclose information necessary to accomplish a specified purpose(s). Persons and entities should take advantage of technological advances to limit data collection, use, and/or disclosure."

f.  Data Quality and Integrity: "Persons and entities should take reasonable steps to ensure that individually identifiable health information is complete, accurate, and up-to-date to the extent necessary for the person's or entity's intended purposes and has not been altered or destroyed in an unauthorized manner."

g.  Safeguards: "Persons and entities, that participate in a network for the purpose of electronic exchange of individually identifiable health information, should implement administrative, technical, and physical safeguards to protect information, including assuring that only authorized persons and entities and employees of such persons or entities have access to individually identifiable health information."

h.  Accountability: "These principles should be implemented, and adherence assured, through appropriate monitoring and other means and methods should be in place to report and mitigate non-adherence and breaches."[74]

## VIII.  HEALTH CARE PROVIDERS VIOLATE PREVAILING STANDARDS OF MEDICAL ETHICS WHEN USING META COLLECTION TOOLS IN THE WAY AT ISSUE IN THIS CASE

90.     I have examined two categories of information at issue in this case, which I sometimes refer to collectively as the "Communications": (1) Pixel Button Clicks from Health Care Provider Web-Properties and (2) communications related to physicians, treatments, and conditions from Health Care Provider Web-Properties.

91.     "Pixel Button Clicks" encompasses communications that indicate a patient has clicked to:

a.  schedule an appointment;

b.  log into a patient portal;

c.  complete a health assessment (*e.g.,* online tools, often framed as a questionnaire, that solicit health information about a patient); or

d.  pay a bill.

92.     Communications related to physicians, treatments, and conditions encompass:

a.  information about physicians or other members of a health care team, *e.g.*, a URL that reveals a search for the name of a particular physician;

b.  information about health conditions or a particular disease, *e.g.*, a URL that reveals a search for a particular condition like "infertility," "diabetes," or "erectile dysfunction"; and

c.  information about diagnostics or treatments, *e.g.*, a URL that reveals a search for "mammogram" or "gastric bypass," or "gender reassignment surgery."

### *A.    The Disclosure of the Communications Violates Prevailing Standards of Ethics*

93.     Employing the methodology from Section IV establishes that Health Care Providers' disclosures of Pixel Button Clicks and communications related to physicians, treatments, and conditions via the Meta Collection Tools violates prevailing standards of medical ethics.

---

[74] *Id*. at 6-10.

94.     As an initial matter, the Communications are the kinds of information protected under professional codes of conduct, HIPAA, and the foundational ethical principles of privacy and confidentiality as a whole. As explained above, privacy and confidentiality obligations apply not only to explicit health details (e.g., diagnoses, treatments) but also to information that can reasonably identify someone as patient or reveal their healthcare-seeking behavior. The communications at issue in this case fall into these categories of information. Further, Pixel Button Clicks and communications related to physicians, treatments, and conditions involve IIHI under HIPAA because they (1) are created or received by a health care provider; (2)"[r]elate[] to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) identify an individual or (b) there is a reasonable basis to believe they can be used to identify an individual.[75]

     i.    <u>Autonomy</u>

95.     "Nothing is more valuable in health care organizations and contexts than the maintenance of a culture of trust. Trust and trustworthiness are essential when patients are vulnerable and place their hope and their confidence in health care professionals."[76] In my expert opinion, the practices in this case do not meet that culture of trust for several reasons.

     1.    Patient Data Should Not Be Shared Outside the Treatment Relationship Except Under Narrow Exceptions Not Present Here.

96.     First, as discussed above, the principle of autonomy requires protecting patient privacy, and a concomitant duty of confidentiality. The authorities I reviewed converge on the idea that patient information should not be shared outside the treatment relationship except in narrow circumstances not present in this case.

97.     For example, AMA Opinion 3.2.1 provides that "patients are entitled to decide whether and to whom their personal health information is disclosed" and "[p]hysicians in turn have an ethical obligation to preserve the confidentiality of information gathered in association with the care of the patient." It specifies that physicians "may disclose personal health information without the specific consent of the patient (or authorized surrogate when the patient lacks decision-making capacity)" only in narrow circumstances such as:

(c) To other health care personnel for purposes of providing care or for health care operations; or

(d) To appropriate authorities when disclosure is required by law.

(e) To other third parties situated to mitigate the threat when in the physician's judgment there is a reasonable probability that:

---

[75] 45 C.F.R. § 160.103.
[76] Tom L. Beauchamp & James F. Childress, PRINCIPLES OF BIOMEDICAL ETHICS 40 (8th ed. 2019).

(i) the patient will seriously harm him/herself;

(ii) the patient will inflict serious physical harm on an identifiable individual or individuals.

For any other disclosures, physicians should obtain the consent of the patient (or authorized surrogate) before disclosing personal health information.[77]

98.     Similarly, the ANA Code of Ethics for Nurses, Provision 3.1 requires nurses to safeguard patient privacy in all settings and permits disclosures only for continuity of care under defined protocols, or for educational, peer review, professional practice evaluation, or quality improvement purposes where the information has been anonymized. In both codes, disclosures for purposes unrelated to the patient's treatment or safety, such as marketing, fall outside the scope of these ethical allowances.

99.     Likewise, HIPAA creates a strict <u>baseline rule of no disclosure of PHI</u> unless the disclosure can be fit into one of several specified narrow regulatory exceptions such as disclosure to a patient's personal representative, with a valid authorization, disclosure as part of "treatment, payment, or health care operations," or where required by law.[78]

100.    The conduct alleged by Plaintiffs here (the transmission of identifiable patient information to Meta without patient knowledge or consent) does not plausibly fit within any of the narrow exceptions recognized by HIPAA applicable professional codes, or principles of medical ethics. It is not a disclosure for treatment, for payment, or for a legitimate healthcare operation on behalf of the provider, and it is not made to protect the patient or others from imminent harm.

101.    In fact, the disclosure of patient information for marketing purposes is expressly proscribed by the AMA, which warns that disclosing patient information for commercial purposes without consent undermines trust, violates informed consent and confidentiality, and damages the patient-provider relationship.

102.    HIPAA likewise prohibits these kinds of marketing disclosures absent a valid, written authorization.[79] The HHS's Bulletin on tracking technologies characterizes this type of unconsented transmission of health-related information as violative of the HIPAA Privacy Rule.[80]

103.    Allowing such disclosures not only breaches the treatment relationship but also fundamentally erodes trust in the provider. This was a concern ONC itself flagged, writing:

---

[77] AMA Code of Medical Ethics, Opinion 3.2.1, *Confidentiality*, https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality.
[78] 45 C.F.R. §§ 164.506, 164.508.
[79] 45 C.F.R. § 164.508.
[80] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health & Human Services (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

If individuals and other participants in a network lack trust in electronic exchange of information due to perceived or actual risks to individually identifiable health information or the accuracy and completeness of such information, it may affect their willingness to disclose necessary health information and could have life-threatening consequences.[81]

104.     Indeed, when information is shared, even if the person who receives it makes an inferential error – that is, they reach the wrong conclusion about the data subject – privacy has been breached. A hospital system violates its medical ethical obligations if it directly shares with a third-party information that a patient has HIV, even if turns out to be a mistake in the record. Similarly, a hospital system violates those obligations if it directly shares with a third-party information that a patient has undergone gastric bypass surgery, even if turns out this was information about *another* patient mistakenly entered into *this* patient's record. The patient's privacy has been violated even if the receiver of the information has made an inferential error about the significance of the information. The privacy violation was consummated when the information was improperly shared, and the inferences correctly or incorrectly made or perhaps not made at all are not necessary for that violation. This is because even *incorrect* inferences from private information can impose stigma, undermine trust, and dissuade patients from sharing critical information with their health care team. An important part of privacy is not just to shield others from knowing sensitive information about us that is *truthful*, but also in making incorrect inferences about us. The application of stereotypes to us based on private information, even if false, can be very damaging and stigmatic, and is part of what medical ethics seeks to avoid.

105.     In sum, the alleged practices here represent a clear departure from the principle that non-deidentified patient information should remain within the confines of the treatment relationship unless disclosed under one of the narrowly delineated, ethically justified exceptions. This principle is reinforced in government guidance, including the ONC's Framework and the HHS Bulletin. This principle is also reflected in the AMA and ANA's codes of conduct[82] and the HIPAA Privacy Rule[83] – each of which Health Care Providers violate when using the Meta Collection Tools in the ways alleged by Plaintiffs.

### 2.     Data Minimization

106.     Second, the materials I reviewed converged on a <u>requirement of "data minimization" – collecting and sharing only the minimum amount of data necessary for proper purposes</u> (allowing the health care system to function, to deliver beneficial health care directly to the patient, or to protect the patient or others from harm). The rationale for this principle is tied to both the principle of autonomy and the principle of nonmaleficence: when less information is collected or disclosed, the patient's control over their health information is better preserved, and the risk of harm from misuse, re-identification, or unauthorized secondary uses of that information is correspondingly reduced.

---

[81] *Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information*, ONC 1 (Dec. 15, 2008), https://www.healthit.gov/sites/default/files/nationwide-ps-framework-5.pdf.

[82] *E.g.,* AMA Code of Medical Ethics, Opinion 3.2.1, *Confidentiality*; ANA Code of Ethics for Nurses, Provision 3.1, *Privacy and Confidentiality*.

[83] *E.g.,* 45 C.F.R. § 164.508.

107.    The requirement of data minimization emerges repeatedly across professional, legal, and governmental sources. In Opinion 3.1.1, the AMA notes:

> Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should:
>
> (a) Minimize intrusion on privacy when the patient's privacy must be balanced against other factors.[84]

108.    Similarly, AMA Opinion 3.2.1 requires that "When disclosing patients' personal health information, physicians should: (a) Restrict disclosure to the minimum necessary information."[85]

109.    The HIPAA Privacy Rule codifies this concept as a legal requirement, requiring covered entities to "make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request."[86]

110.    HHS has directly applied this concept to tracking technologies in its Bulletin, underscoring the importance of "[e]nsuring that all disclosures of PHI to tracking technology vendors are specifically permitted by the Privacy Rule and that, unless an exception applies, only the minimum necessary PHI to achieve the intended purpose is disclosed."[87]

111.    Data minimization is also at the heart of ONC's eight core principles in its Nationwide Privacy and Security Framework discussed above, which notes that entities "should only collect, use, and/or disclose information necessary to accomplish a specified purpose(s). Persons and entities should take advantage of technological advances to limit data collection, use, and/or disclosure."[88]

112.    In sum, Health Care Providers' use of the Meta Collection Tools in the manner alleged here plainly violates data minimization obligations set out by the AMA[89] and HIPAA.[90] Use of the Tools is also inconsistent with data minimization principles expressed by HHS and the ONC. By sending non-deidentified patient health information to Meta for purposes unrelated to patient care, the Health Care Provider would not only exceed the "minimum necessary" threshold but wholly depart from the central tenet of the data minimization principle: avoiding the

---

[84] AMA Code of Medical Ethics, Opinion 3.1.1, *Privacy in Health Care*, https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care/.

[85] AMA Code of Medical Ethics, Opinion 3.2.1, *Confidentiality,* https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality.

[86] 45 C.F.R. § 164.502(b).

[87] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[88] *Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information*, ONC 1 (Dec. 15, 2008), https://www.healthit.gov/sites/default/files/nationwide-ps-framework-5.pdf.

[89] AMA Code of Medical Ethics, Opinion 3.1.1, *Privacy in Health Care*, https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care/; AMA Code of Medical Ethics, Opinion 3.2.1, *Confidentiality,* https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality.

[90] 45 C.F.R. § 164.502(b).

unnecessary exposure of patient information that creates avoidable privacy harms and undermines patient trust.

### 3.    Deidentification

113.    Third, under both the principle of autonomy and the principle of nonmaleficence, there is an <u>obligation to adequately deidentify patient data shared outside the treatment relationship.</u> Autonomy mandates that patients retain control over their health information and by deidentifying the data the patient's control over their health information is better preserved. This is reinforced by the principle of nonmaleficence, *i.e.,* to prevent harms such as the risk of re-identification, stigma, discrimination, and other misuses. Deidentification reduces these risks by removing identifying elements. Deidentification thus safeguards patient autonomy and furthers the commitment to do no harm.

114.    The ethical obligation to perform meaningful de-identification before sharing patient information is recognized in AMA Opinion 3.2.4, which states, "Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified."[91]

115.    HIPAA formalizes deidentification obligations in 45 C.F.R. § 164.514, which provides two avenues for deidentifying PHI: (1) an expert determination that the risk of reidentification is "very small"; and (2) the "safe harbor" method that requires the removal of 18 delineated identifiers.

116.    Plaintiffs allege that Pixel Button Clicks and communications related to physicians, treatments, and conditions include identifiers set forth in HIPAA's de-identification provision, including IP addresses, device identifiers, URLs, and unique identifying numbers such as cookie values. Each of these is explicitly listed among HIPAA's safe harbor identifiers that must be removed to constitute adequate de-identification.

117.    In sum, under the facts alleged, the transmissions to Meta of Pixel Button Clicks and communications related to physicians, treatments, and conditions fall squarely outside the bounds of both AMA's professional guidance[92] and HIPAA's de-identification provision.[93] By failing to remove identifying information before transmitting data for third-party commercial purposes, Health Care Providers violate core medical ethical requirements to respect patient autonomy and to avoid preventable harms that may result from unauthorized disclosure or re-identification of health information.

### 4.    Voluntary Informed Consent/Valid Written HIPAA Authorization

118.    Fourth, <u>the sharing of patient data in this case cannot be justified as the result of voluntary, informed consent of the patients, nor is there a valid HIPAA authorization or BAA.</u>

---

[91] AMA Code of Medical Ethics, Opinion 3.2.4, *Access to Medical Records by Data Collection Companies,* https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies.
[92] *Id.*
[93] 45 C.F.R. § 164.514.

119.    Under the principle of autonomy, patients have the right to voluntary, informed consent about their health care. For consent to be valid in medical ethics, the person making the decision be competent, have an adequate understanding of the choice they are making (with disclosure of relevant information in a way understandable to the patient), and act freely without fraud, deceit, duress, or coercion.

120.    The concept of informed consent is deeply embedded in professional ethics codes. The ANA Code of Ethics, Provision 3.1 notes, "[c]onfidentiality pertains to the nondisclosure of personal information that has been communicated within the nurse-patient relationship" and "[c]entral to that relationship is an element of trust and an expectation that personal information will not be divulged without consent."[94]

121.    AMA Ethics Opinion 3.1.1 echoes this principle and instructs to "[i]nform the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[95]

122.    AMA Opinion 3.2.1 states that outside of the narrow exceptions mentioned above: "[f]or any other disclosures, physicians should obtain the consent of the patient (or authorized surrogate) before disclosing personal health information."[96]

123.    Most directly, AMA Opinion 3.2.4 prohibits the disclosure of patient information to third parties for commercial purposes without consent, recognizing that doing so "undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." When commercial disclosure is contemplated, physicians should "[f]ully inform each patient whose record would be involved…about the purpose(s) for which access would be granted." The Opinion continues:

> Physicians who propose to permit third parties to access the patient's full medical record should:
>
> (c) Obtain the consent of the patient (or authorized surrogate) to permit access to the patient's medical record.
>
> (d) Prohibit access to or decline to provide information from individual medical records for which consent has not been given.[97]

124.    These professional standards align with ONC's privacy and security principle of "individual choice" as one of its eight privacy and security principles, which affirms:

---

[94] ANA Code of Ethics for Nurses, Provision 3.1, *Privacy and Confidentiality* , https://codeofethics.ana.org/provision-3-1.

[95] AMA Code of Medical Ethics, Opinion 3.1.1, *Privacy in Health Care*, https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care/.

[96]. AMA Code of Medical Ethics, Opinion 3.2.1, *Confidentiality,* https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality.

[97] AMA Code of Medical Ethics, Opinion 3.2.4, *Access to Medical Records by Data Collection Companies*, https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies.

Individuals should be provided a reasonable opportunity and capability to make informed decisions about the collection, use, and disclosure of their individually identifiable health information. . . . When an individual exercises choice, including the ability to designate someone else to make decisions on his or her behalf, the process should be fair and not unduly burdensome.[98]

125.    ONC's "openness and transparency" principle similarly emphasizes:

Individuals should be able to understand what individually identifiable health information exists about them, how that individually identifiable health information is collected, used, and disclosed and whether and how they can exercise choice over such collections, uses, and disclosures. Persons and entities, that participate in a network for the purpose of electronic exchange of individually identifiable health information, should provide reasonable opportunities for individuals to review who has accessed their individually identifiable health information or to whom it has been disclosed, in a readable form and format.[99]

126.    Under HIPAA, valid written authorization is the concept that serves the equivalent function of informed consent. The HIPAA Privacy Rule requires that covered entities obtain prior written valid authorization from an individual before using or disclosing their PHI for marketing purposes except when the communication is face-to-face or involves a promotional gift of nominal value.[100] Similarly, the Rule requires prior written authorization from an individual before any disclosure of PHI which is a sale of protected health information.[101] "Such authorization must state that the disclosure will result in remuneration to the covered entity."[102]

127.    The valid written authorization must meet the requirements of 45 C.F.R. § 164.508. Such authorization must "at least": (1) describe the information to be disclosed in a specific and meaningful fashion, (2) name the person authorized to make the disclosure and the person to whom the disclosure is being made, (3) describe each purpose of the disclosure, (4) set an expiration date or event related to the individual or purpose of disclosure, (5) be signed and dated by the individual, and (6) provide specific statements about revocation rights and the risk of redisclosure.[103] The authorization must also be written in plain language, and a copy of the signed authorization must be provided to the patient.[104]

128.    However, the HIPAA Privacy Rule allows the sharing of PHI to business associates, even without a patient's valid written authorization, so long as the covered entity and the business associate have entered into a BAA.

---

[98] *Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information*, ONC 8 (Dec. 15, 2008), https://www.healthit.gov/sites/default/files/nationwide-ps-framework-5.pdf.
[99] *Id.*
[100] 45 C.F.R. § 164.508(a)(3)(i).
[101] 45 C.F.R. § 164.508(a)(4).
[102] 45 C.F.R. § 164.508(a)(4)(ii).
[103] 45 C.F.R. § 164.508(c)(1),(2).
[104] 45 C.F.R. § 164.508(c)(3),(4).

129.    Covered entities may disclose PHI to a business associate "only to help the covered entity carry out its health care functions – not for the business associate's independent use or purposes[.]"[105]

130.    Business associates include entities that receive or maintain PHI on behalf of a covered entity or provide services to or for a covered entity involving the disclosure of PHI.[106] The HHS Bulletin has explained that tracking technology vendors may be business associates in certain circumstances:

> For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate, and a BAA is required.[107]

131.    If acting as a business associate, "regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules."[108]

132.    HIPAA also provides that "an individual has a right to adequate notice of the uses and disclosures of" PHI and of their "rights and the covered entity's legal duties with respect to" PHI.[109] Thus, HIPAA requires covered entities to provide individuals with what is commonly referred to as a Notice of Privacy Practices. [110]

133.    The Notice must be "written in plain language" and explain, among other things, how the entity may use and disclose PHI; the individual's rights with respect to PHI; and the entity's legal duties with respect to PHI.[111]

134.    HHS has also made clear that a "covered entity must prominently post and make available its notice on any web site it maintains that provides information about its customer services or benefits."[112]

---

[105] *Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (revised April 3, 2003), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html .

[106] 45 C.F.R. § 160.103.

[107] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[108] *Id.*

[109] 45 C.F.R. § 164.520(a)(1).

[110] 45 C.F.R. § 164.520(b).

[111] 45 C.F.R. § 164.520(b)(1); *Notice of Privacy Practices for Protected Health Information*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (Revised April 3, 2003), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/privacy-practices-for-protected-health-information/index.html.

[112] *Model Notices of Privacy Practices,* U.S. DEP'T OF HEALTH & HUMAN SERVICES (last updated April 8, 2013), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/model-notices-privacy-practices/index.html.

135.    The facts alleged by Plaintiffs stand in contrast to these standards. The Meta Collection Tools are hidden in the website source code, invisible to the naked eye. While the Health Care Provider's website or app may contain a general policy or website banner referencing the use of Meta Collection Tools, these are insufficient to constitute the type of voluntary, informed consent contemplated by medical ethics.

136.    Indeed, HHS's Bulletin explains that such documents do not suffice as valid written authorization under HIPAA: "[T]he Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures."[113]

137.    The HHS's Bulletin aligns with the principles that informed consent is meant to be a dynamic process, whereby if someone has questions, they can have things explained to them at a level appropriate for their understanding and can ask follow-up questions. Website policies do not offer a meaningful back and forth that would characterize true, valid, voluntary informed consent.

138.    Nor does a patient's voluntary sharing of information impliedly satisfy informed, voluntary consent standards. For example, if an individual shares a diagnosis, that they were seeking to schedule care, or even that they were a patient with friends or on social media, such disclosure does not constitute consent or authorization for a Health Care Provider to share the same information with Meta.

139.    Under principles of medical ethics, it is utterly irrelevant that patients may have shared health information themselves. Rights of privacy and duties of confidentiality are all about *the autonomy of the patient to decide what to share*. The obligation not to breach confidentiality applies with force no matter who else a patient, herself, decides to share the information with. A medical professional's breach of privacy is prohibited irrespective of what the patient might choose to share or not share with others. If a patient has told her brother, her knitting group, or even NBC News about her breast cancer diagnosis, that does not diminish the confidentiality obligation of her physician or diminish her right to privacy. It is *the patient* who is empowered to decide who shares what, and merely by sharing the information with someone she does not relinquish that decisional autonomy nor empower a health care worker or his or her institution to breach duties of confidentiality.

140.    The ONC emphasizes that a Health Care Provider's obligations are distinct from patient rights, that is, "these principles do not apply to individuals with respect to their own individually identifiable health information":

Individuals may use and/or disclose their individual health information as they choose. For example, an individual may share details of a chronic disease on the

---

[113] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEP'T OF HEALTH & HUMAN SERVICES (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

Internet or in a public meeting but may decide not to share that information with all his or her health care providers or employers.

141.    In sum, professional standards, HIPAA, and government guidance make explicit that non-deidentified patient information (such as the Communications at issue) may only be shared with voluntary, informed consent (or written authorization in the case of HIPAA), except pursuant to clearly defined circumstances unrelated to marketing or where disclosures occur pursuant to a BAA. Importantly, the disclosure of the use of Meta Collection Tools in a Health Care Provider's policy, terms of use, or similar document on a website does not constitute a valid written authorization under the HIPAA Privacy Rule or generally satisfy the principle of informed consent. Thus, the transmissions of the Communications to Meta does not comply with HIPAA or the other applicable standards set out above and violate the core ethical requirement of informed consent. Relatedly, under the facts alleged by Plaintiffs, Meta constitutes a business associate for which no BAA was entered into, in violation of the HIPAA Privacy Rule.

      ii.    Beneficence and Nonmaleficence

142.    As discussed above, several bioethical obligations relevant to this case are supported not only by the principle of autonomy but also the principles of beneficence and nonmaleficence: the rule against sharing patient data outside the treatment relationship except under narrow circumstances necessary to allow the health care system to function, to deliver beneficial health care directly to the patient, or to protect the patient or others from harm; the requirement of "data minimization" – collecting and sharing only the minimum amount of data necessary for proper purposes; the obligation to adequately deidentify patient data before sharing. The four key principles of medical ethics are meant to work in tandem, so it is not unusual for an obligation to be supported by more than one such principle.

143.    In addition to these already-discussed duties, the principles of beneficence and nonmaleficence suggest another, related obligation that applies here: data collection, use, and sharing practices should, wherever feasible, be designed to directly benefit patient care. This reflects the "positive" aspect of beneficence, *i.e.*, the duty to take steps that actively promote the patient's welfare, as well as the mandate of nonmaleficence to avoid exposing patients to unnecessary risks. Sharing patient information for purposes unrelated to care, such as commercial tracking or marketing, generally falls outside these obligations and risks undermining them.

      iii.    Justice (and Equity)

144.    The final principle of medical ethics is the principle of justice, which is often expanded in contemporary discourse to "justice and equity." In the context of medical ethics, justice concerns the fair, equitable, and appropriate treatment of individual to ensure that no person or group suffers disparity in healthcare. Applied here, two specific obligations emerge.

145.    First, the principle of justice counsels against practices that could facilitate discrimination. Sensitive patient information, if improperly disclosed, can be used – intentionally or indirectly – in ways that disadvantage people based on race, ethnicity, gender, disability, health condition, or social status. Health care providers have both an ethical and professional responsibility to prevent their actions from enabling such biases. Sharing identifiable health-related information with third parties outside the treatment relationship, without patient consent, opens the door to uses that the patient cannot monitor or control.

146.    Second, justice demands the need to pay particular attention to the risk of stigma and other harms to vulnerable populations. As discussed above, medical ethicists take seriously the way breaches of privacy can create psychosocial harms to disfavored groups and dissuade those already skeptical about the medical profession from free and open communication with a health care provider. A URL that might reveal a patient's condition, treatment, or even their status as a patient is exactly the kind of thing that might stigmatize vulnerable groups and dissuade them from seeking out much needed care.

147.    In sum, the disclosure of Pixel Button Clicks and communications about physicians, conditions, and treatments in the manner alleged here runs contrary to the principles of justice and equity. It risks exacerbating existing inequalities by enabling discrimination and by multiplying the stigma and harm suffered by already vulnerable populations – precisely the outcomes the principle of justice is intended to prevent.

### B.    Analogizing from the Online to the Physical World

148.    In the preceding pages I have analyzed the questions presented in this case in light of the principles of medical ethics, supplemented by consideration of various codes of ethics and other statements of the health care professions, and existing legal rules and governmental guidance applicable to Health Care Providers' collection, use, and disclosure of patient health information. But, as I suggested in the beginning, medical ethics also often draws analogies to existing cases especially when considering newer technologies. In this case, I think it is helpful to close by considering the equivalent of the practices alleged in this case if they took place in the physical rather than the online world.

149.    Imagine a hospital system that invites a lurker who worked for a third party into its physical space to surreptitiously observe patients. Perhaps the lurker observes which patients checked in at the front desk to see a doctor or receive test results (the equivalent to portal log-ins); listens in when patients schedule appointments (the equivalent of website appointment scheduling); observes the patient being asked probing questions about the patient's health for an initial assessment (the equivalent to online health assessments); records the patient telling a hospital staff member what service they are paying for and observes them providing their credit card (the equivalent of bill pay); observes patient inquiries about whether a particular physician with a particular specialty works in the hospital system and the patient asking for information about that physician and the scope of the physician's practice (the equivalent of a URL revealing a search for a particular physician); observes questions from patients to hospital staff about medical conditions or diseases (the equivalent of a URL revealing a search for information about a health condition or a particular disease); or observes questions from patients to hospital staff about whether a particular diagnostic or treatment (e.g., "mammogram" or "gastric bypass," or "gender reassignment surgery") was offered at the facility, what it entailed, and its risks and benefits (the equivalent of a URL revealing a search for information about a health condition or a particular disease). Imagine that lurker followed the patient out of the hospital to the patient's home in order to try to promote the sale of goods or services based on what was learned as part of that monitored conversation. I know of no medical ethicist who would view that conduct as ethical. In fact, I believe most would find it downright shocking.

150.    The fact that similar behavior is being undertaken electronically, where it is *harder* for patients to detect and avoid the problematic monitoring, does not make it any more ethical.

## IX.    CONCLUSION

151.    The above represents my views in this case. I have actual knowledge of the matters stated in this report. If called to testify in this matter, I would testify truthfully and based on my expert qualifications.

Executed Sept 9, 2025

I. Glenn Cohen

# APPENDIX A – CURRICULUM VITAE

## HARVARD LAW SCHOOL

### I. GLENN COHEN

DEPUTY DEAN
JAMES A. ATTWOOD AND LESLIE WILLIAMS PROFESSOR OF LAW
FACULTY DIRECTOR, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY,
BIOTECHNOLOGY, AND BIOETHICS
Griswold Hall 503, Harvard Law School
Cambridge, MA  02138
(617) 496-2518~ igcohen@law.harvard.edu ~Twitter: @CohenProf

## CURRENT POSITION

HARVARD LAW SCHOOL,
Deputy Dean, 2020 - present
James A. Attwood and Leslie Williams Professor of Law, 2017 - present
Professor, 2013-2017
Assistant Professor, 2008-2013

HARVARD LAW SCHOOL, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY, BIOTECHNOLOGY, AND
BIOETHICS,
Faculty Co-Director, 2009 - 2014
Faculty Director, 2014 - present

THE BROAD INSTITUTE OF MIT AND HARVARD, Associate Member, 2013 - present

## EDUCATION

HARVARD LAW SCHOOL, J.D., *magna cum laude*, 2003
Sears Prize, 2001 (awarded to the two 1L students with the highest GPA)
*Harvard Law Review*, Primary Editor
Hewlett Fellow in Law and Negotiation, Harvard Law School Program on Negotiation, 2001-2003
Derek Bok Center Award of Distinction in Teaching and nominee for the Joseph R. Leven Memorial
Teaching Prize as Teaching Fellow for Michal Sandel's "Justice" course at Harvard College

UNIVERSITY OF TORONTO, Hon. B.A. Bioethics (Philosophy) and Psychology, *High Distinction* (GPA 3.99), 2000
Alumni Association Scholar (awarded to five graduating students)
Cressy Award for Student Leadership
Theses: *The Ethics of Deception in Psychological Research; The Janus Problem: Insanity, Automatism,
and the Problem of Disposition in Anglo-American Criminal Law.*

## PUBLICATIONS

### (1) REPRODUCTIVE TECHNOLOGY/REPRODUCTION/GENETICS

#### Books

CONSUMER GENETIC TECHNOLOGIES: ETHICAL AND LEGAL CONSIDERATIONS (Cambridge University Press, 2021)
(co-editor with Nita A. Farahany, Henry T. Greely, Carmel Shachar)

REPRODUCTIVE TECHNOLOGIES AND THE LAW (Carolina Academic Press, 3rd ed. 2022) (co-author with Judith
Daar, Seema Mohapatra, Sonia Suter)

#### Law Journals

*The Constitution and the Rights Not to Procreate*, 60 STANFORD L. REV. 1135 (2008) (reprinted in Brazil *in* MEI AMBIENTE, DIREITO E BIOTECNOLOGIA (Thiago Pires Oliveira ed. 2010))

*The Right Not to Be a Genetic Parent?*, 81 S. CAL. L. REV. 1115 (2008) (selected for the 2008 Stanford-Yale Junior Faculty Forum)

*Intentional Diminishment, The Non-Identity Problem, and Legal Liability*, 60 HASTINGS L. J. 347 (2008) (Solicited) (reprinted in BIOETHICS AND THE LAW (Ramkistaiah Jillaed. 2009-2010)

*Trading-Off Reproductive Technology and Adoption: Does Subsidizing IVF Decrease Adoption Rates and Should It Matter?* 95 MINN. L. REV. 485 (2010) (co-authored with Daniel Chen) (selected for the 2010 Stanford-Yale Junior Faculty Forum)

*Regulating Reproduction: The Problem with Best Interests*, 96 MINN. L. REV. 423 (2011)

*Rethinking Sperm Donor Anonymity: Of Changed Selves, Non-Identity, and One Night Stands,* 100 GEO. L. J. 431 (2012)

*Beyond Best Interests*, 96 MINN. L. REV. 1187 (2012)

*Can you Buy Sperm Donor Identification? An Experimen*t, 10 J. EMPIRICAL LEG. STUDIES 715 (2013) (co-authored with Travis Coan)

*What (If Anything) Is Wrong with Human Enhancement? What (If Anything) Is Right with It?*, 49 TULSA L. REV. 645 (2014) (festschrift honoring Einer Elhauge)

*Complexifying Commodification, Consumption, ART, and Abortion*, 43 J. L. MED. & ETHICS 307 (2015) (solicited commentary)

*My Body, My Bank*, 93 TEXAS L. REV. 953 (2015) (Book Review) (Solicited)

*Sperm Donor Anonymity and Compensation: An Experiment with American Sperm Donors*, 3 J. L. & BIOSCIENCES 468 (2016) (co-authored with Travis Coan, Michelle Ottey, and Christina Boyd)

*Germ-Line Gene Editing and Congressional Reaction in Context: Learning from Almost 50 Years of Congressional Reactions to Biomedical Breakthroughs*, 30 J.L. & HEALTH 20 (2017) (co-authored with Russell Spivak and Eli Y. Adashi)

*Moratoria and Innovation in the Reproductive Sciences: Of Pretext, Permanence, Transparency, and Time-Limits*, 15 J. HEALTH. & BIOMED. L. 5 (2018) (co-authored with Russell Spivak and Eli Y. Adashi)

*The Lumbering Crawl Toward Human Germline Editing*, 46 J. L. MED. & ETHICS 1010 (2018) (co-authored with Eli Y. Adashi)

*Gene Editing Sperm and Egg (Not Embryos): Does it Make a Legal or Ethical Difference?*, 48 J. L. MED. & ETHICS 619 (2020) (co-authored with Eli Y. Adashi and Jacob S. Sherkow)

*Borrowed Wombs: On Uterus Transplants and the "Right to Experience Pregnancy"*, 2022 U. CHI. L. F. 127 (2023)

*The Dyson Distinguished Lecture: The Alabama Embryo Decision in Ethics, Law, and Politics*, 45 PACE L. REV. 11 (2024)

*The Regulation of Polygenic Risk Scores,* 38 HARV. J. L. & TECH. 377 (2024-2025) (co-authored with Jin K. Park)

**Medical, Science and Bioethics Journals**

*Prohibiting Anonymous Sperm Donation and the Child Welfare Error*, 41 HASTINGS CTR. REP, Sept-Oct, 13 (2011)

*When Potential Does Not Matter: What Developments in Cellular Biology Tell Us About the Concept of Legal Personhood*, 13 AM. J. BIOETHICS 38 (2013) (co-authored with Jonathan Will and Eli Adashi)

*Of Modest Proposals and Non-Identity: A Comment on The Right to Know Your Genetic Parents*, 13 AM. J. BIOETHICS 45 (2013) (peer- reviewed)

*Made-to-Order Embryos for Sale – A Brave New World?*, 368 N. ENGL. J. MED. 2517 (2013) (co-authored with Eli Adashi)

*Plan B: Access to Emergency Contraception in the Legal and Political Cross Hairs*, 88 CONTRACEPTION 477 (2013) (co-authored with Eli Adashi and Lisa Sullivan)

*When Religious Freedom Clashes with Access to Care*, 370 N. ENG. J. MED. 596 (2014) (co-authored with Holly Fernandez Lynch and Gregory D. Curfman)

*Transatlantic Lessons in Regulation of Mitochondrial Replacement Therapy: prospect of disease-free children for women carriers through MRT*, 348 SCIENCE 178 (2015) (co-authored with Julian Savulescu & Eli Y. Adashi)

*Going Germline: Mitochondrial Replacement as a Guide to Genome Editing*, 164 CELL 832 (2016) (co-authored with Eli Y. Adashi)

*Preventing Mitochondrial DNA Diseases: One Step Forward, Two Steps Back*, 315 JAMA 273 (2016) (co-authored with Eli Y. Adashi)

*Embryo Disposition Disputes: Controversies and Case Law*, 46 HASTINGS CTR. REP. 13 (2016) (co-authored with Eli Y. Adashi)

*The FDA is prohibited from Going Germline*, 353 SCIENCE 545 (2016) (co-authored with Eli Y. Adashi) (peer-reviewed)

*Mitochondrial Replacement Therapy: The IOM Report and Its Aftermath*, 17 NATURE REVIEWS GENETICS 189 (2016) (co-authored with Eli Y. Adashi)

*Embryo Disposition Disputes: Controversies and Case Law*, 46 HASTINGS CTR. REP., July-Aug. 2016, at 13.

*Disruptive Reproductive Technologies,* 9 SCIENCE TRANS. MED. eaag2959 (2017) (Jan 11, 2017) (co-authored with George Q. Daley and Eli Y. Adashi)

*Preventing Mitochondrial Disease: A Path Forward*, 131 OBSTETRICS & GYNECOLOGY 553 (2018) (co-authored with Eli Y. Adashi)

*Building Capacity for a Global Genome Editing Observatory: Conceptual Challenges*, 36 TRENDS IN BIOTECHNOLOGY 639 (2018) (co-authored with Krishana Sahu et al.)

*Building Capacity for a Global Genome Editing Observatory: Institutional Design*, 36 TRENDS IN BIOTECHNOLOGY 641 (2018) (co-authored with Krishana Sahu et al.)

*Personhood and the Three Branches of Government*, 378 N. ENG. J. MED. 2453 (2018) (co-authored with Eli Y. Adashi)

*Losing Embryos, Finding Justice: Life, Liberty, and the Pursuit of Personhood*, 169 ANN. INTERN. MED. 800 (2018) (co-authored with Eli Y. Adashi and Dov Fox)

*The Ethics of Heritable Genome Editing New Considerations in a Controversial Area*, 320 JAMA 2531 (2018) (co-authored with Eli Y. Adashi)

*Commentary, The Lumbering Crawl Toward Human Germline Editing*, 46 J. LAW, MED. AND ETHICS 1010 (2019) (co-authored with Eli Y. Adashi)

*Stem Cell-Derived Human Gametes: The Public Engagement Imperative*, 25 TRENDS IN MOLEC. MED. 165 (2019) (co-authored with Eli Y. Adashi, Jacob H. Hanna, Azim M. Surani, and Katsuhiko Hayashi)

*A Troubling Court Decision for Reproductive Rights: Legal Recognition of Fetal Standing to Sue*, 322 JAMA 23 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*Heritable Genome Editing: Is a Moratorium Needed?*, 322 JAMA 104 (2019) (co-authored with Eli Y. Adashi)

*How Bans on Germline Editing Deprive Patients with Mitochondrial Disease,* 37 NATURE BIOTECH. 589 (2019) (co-authored with Eli Y. Adashi and Vardit Ravitsky)

*Genetic Testing, Insurance Discrimination, and Medical Research: What the US Can Learn from Peer Countries*, 1198 NATURE MED. 1198 (2019) (co-authored with Jean-Christophe Bélisle-Pipon, Effy Vayena and Robert C Green)

*Fertility Fraud, Legal Firsts, and Medical Ethics*, 134 OBSTETRICS & GYNECOLOGY 918 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*Heritable Genome Editing—Edited Eggs and Sperm to the Rescue?,* 322 JAMA 1754 (2019) (co-authored with Eli Y. Adashi)

*Reproduction Reimagined*, 1 F & S REPORTS 7 (2020) (co-authored with Eli Y. Adashi)

*Commentary on 'Gestation, Equality and Freedom: Ectogenesis as a Political Perspective'*, 46 J. MED. ETHICS 87 (2020) (solicited)

*Heritable Genome Editing: The International Commission Report,* 324 JAMA 1941 (2020) (co-authored with Eli Y. Adashi)

*The Regulation of Mitochondrial Replacement Techniques Around the World*, 21 ANN. REV. GENOMICS & HUM. GEN. 565 (2020) (co-authored with  Eli Y. Adashi, Sara Gerke, César Palacios-González, and Vardit Ravitsky)

*Disruptive Synergy: Melding of Human Genetics and Clinical Assisted Reproduction*, 1 CELL REP. MED. 100093 (2020) (co-authored with Eli Y. Adashi)

*Heritable Human Genome Editing: The Public Engagement Imperative*, 6 CRISPR J. 434 (2020) (co-authored with Eli Y. Adashi et al.)

*The Case for Remedial Germline Editing – the Long-Term View*, 323 JAMA 1762 (2020) (co-authored with Eli Y. Adashi)

*Therapeutic Germline Editing: Sense and Sensibility*, 36 TRENDS IN GEN. 315 (2020) (co-authored with Eli Y. Adashi)

*What Would Responsible Remedial Human Germline Editing Look Like?*, 38 NATURE BIOTECHNOLOGY 398 (2020) (co-authored with Eli Y. Adashi)

*Assisted Same-Sex Reproduction: The Promise of Haploid Stem Cells?,* 29 STEM CELLS AND DEVELOPMENT 1417 (2020) (co-authored with Eli Y. Adashi)

*Legal and Ethical Issues in the Report Heritable Human Genome Editing*, 51 HASTINGS CTR. REP. 8 (2021) (co-authored with Eli Y. Adashi)

*Governing Human Germline Editing Through Patent Law*, 326 JAMA 1149 (2021) (co-authored with Jacob S. Sherkow and Eli Y. Adashi)

*Mitochondrial Disease: Replace or Edit?*, 373 SCIENCE 1200 (2021) (co-authored with Eli Y. Adashi, Donald S. Rubenstein, Jim A. Mossman, and Eric A. Schon)

*CRISPR Immunity: A Case Study for Justified Somatic Genetic Modification?* 48 J. MED. ETHICS 83 (2022) (co-authored with Eli Y. Adashi)

*Handle with Care: The WHO Report on Human Genome Editing*, 52 HASTINGS CENTER REPORT 10 (2022) (co-authored with Eli Y. Adashi and Jake Sherkow)

*Who Will Oversee the Ethical Limits of Human Embryo Research?*, 40 NATURE BIOTECH. 463 (2022) (co-authored with Eli Y. Adashi)

*The Enduring Allure of Person-Affecting Arguments for Reproductive Technologies*, 22 AM. J. BIOETHICS 44 (2022) (co-authored with Eli Y. Adashi)

*The End of Anonymous Sperm Donation in Colorado: A Step Forward to a New Fertility Future in the US?* 328 JAMA 1903 (2022) (co-authored with Seema Mohapatra and Eli Y. Adashi)

*Maternal Mortality Crisis and Extension of Medicaid Postpartum Coverage*, 330 JAMA 911 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Assisted Reproduction Post-Dobbs: The Prospect of Legislative Protection*, 4 F & S REPORTS 128 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Misplaced Embryo: Legal Parenthood in 'Embryo Mix-Up' Cases*, _ J. MED. ETHICS _ (2023) (co-authored with Vardit Ravitsky & Shelly Simana)

*Preimplantation Sex Selection Via In Vitro Fertilization: Time for a Reappraisal*, 4 F & S REPORTS 241(2023) (co-authored with Vitaly A. Kushnir and Eli Y. Adashi)

*CRISPR Therapy of Sickle Cell Disease: The Dawning of the Gene Editing Era*, 137 AM. J. MED. 390 (2024) (co-authored with Eli Y. Adashi and Philip A. Gruppuso)

*Ethical and Legal Challenges in Assisted Same-Sex Conception Through In Vitro Gametogenesis*, 30 NATURE MED. 322 (2024) (co-authored with Eli Y. Adashi and Katsuhiko Hayashi)

*The Alabama Embryo Decision—The Politics and Reality of Recognizing "Extrauterine Children,"* 331 JAMA 1083 (2024) (co-authored with Rebecca S. Feinberg and Michael S. Sinha)

*Hippocratic Beneficence: The Ethical Grounding of Remedial Germline Editing*, 25 AM. J. BIOETHICS 7 (2025) (co-authored with Eli Y. Adashi)

*The Stillbirth Calamity: Reenergized Congressional Relief Efforts*, 34 J. WOMEN'S HEALTH _ (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Rural Maternity Care Crisis: A State of Peril*, 34 J. WOMEN'S HEALTH _ (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Maternity Care Deserts: Remedial Congressional Efforts*, 100 Mayo Clinic Proc. 413 (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Ethical and legal implications of in vitro gametogenesis and germline editing—current status,* 123 FERTILITY & STERILITY _ (2025) (co-authored with Eli Y. Adashi)

*Bankruptcy, Genetic Information, and Privacy — Selling Personal Information*, 392 N. ENGL. J. MED. 937 (2025) (co-authored with Melissa B. Jacoby and Sara Gerke)

*23andMe's Bankruptcy Raises Concerns about Privacy in the Era of Big Data*, 389 BMJ r1071 (2025) (co-authored with Melissa B. Jacoby and Sara Gerke)


## Book Chapters

*Las Recientes Controversias sobre la Tecnología Reproductiva en los Estados Unidos, in* I. GLENN COHEN & ESTER FARNOS AMORÓS, DERECHO Y TECNOLOGÍAS REPRODUCTIVAS, FUNDACIÓN COLOQUIO JURÍDICO EUROPEO, MADRID 11 (2014) (trans. Pablo de Lora).

*Sperm and Egg Donor Anonymity: Legal and Ethical Issues*, *in* THE OXFORD HANDBOOK OF REPRODUCTIVE ETHICS (Leslie Francis ed., 2015-2016)

*Religion and Reproductive Technology*, *in* LAW, RELIGION, AND HEALTH IN THE UNITED STATES 360 (Holly Fernandez Lynch, I. Glenn Cohen, and Elizabeth Sepper eds., Cambridge University Press, 2017)

*Gestational Surrogacy Agreements: Enforcement and Breach*, in HANDBOOK OF GESTATIONAL SURROGACY 85 (E. Scott Sills ed., Cambridge University Press, 2016) (co-authored with Katherine Kraschel)

*The Regulation of Reproduction and Best Interests Analysis*, in THE OXFORD HANDBOOK OF CHILDREN AND THE LAW 19 *(*James G. Dwyer, ed., Oxford University Press, 2019*)*

*The Right(s) to Procreate and Assisted Reproductive Technologies in the United States*, in THE OXFORD HANDBOOK OF COMPARATIVE HEALTH LAW 1009 (Tamara K. Hervey and David Orentlicher eds., Oxford University Press, 2021)

*MRT in the United States*, *in* REPRODUCTION REBORN 129 (Diana M. Bowman, Karinne Ludlow, and Walter G. Johnson eds., Oxford University Press, 2023) (co-authored with Priyanka Menon & Eli Y. Adashi)

*Reproductive Technologies and Embryo Destruction After Dobbs*, in ROE V. DOBBS: THE PAST, PRESENT AND FUTURE OF A CONSTITUTIONAL RIGHT OF ABORTION _ (Geoffrey R. Stone and Lee Bollinger eds., 2024)

*Bioethics, Reproduction, and Extending Life*, *in* LAW AND THE 100 YEAR LIFE _ (Abbe Gluck, Anne Alstott & Eugene Rusyn eds., 2024)

## Online Law Review Contributions

*Trading-Off Reproductive Technology and Adoption: A Response to Appleton and Pollak*, 96 MINN. L. REV. HEADNOTES 1 (2012) (co-authored with Daniel Chen) (Responding to Susan Appleton and Robert A. Pollak, *Exploring the Connections Between Adoption and IVF: Twibling Analyses*, 95 MINN L. REV. HEADNOTES 60 (2011), responding to our earlier article)

*Burying Best Interests of the Resulting Child: A Response to Professors Crawford, Alvaré, and Mutcherson*, 97 MINN. L. REV. HEADNOTES 1 (2012) (Responding to Bridget J. Crawford, *Authentic Reproductive Regulation*, 96 MINN. L. REV. HEADNOTES 31 (2012), Helen M. Alvaré, *A Response to Professor I. Glenn Cohen's* Regulating Reproduction: The Problem with Best Interests, 96 MINN. L. REV. HEADNOTES 8 (2012), and Kimberly M. Mutcherson, *In Defense of Future Children: A Response to Cohen's* Beyond Best Interests, 96 MINN. L. REV. HEADNOTES 46 (2012)).

*The Science, Fiction, and Science Fiction of Unsexed Motherhood, Online Symposium*, HARV. J. L. & GENDER ONLINE (2012)

**(2) MEDICAL TOURISM/GLOBALIZATION OF HEALTH CARE**

**Books**
THE GLOBALIZATION OF HEALTH CARE: LEGAL AND ETHICAL CHALLENGES (Oxford University Press 2013) (editor, and contributing introduction and chapter)

PATIENTS WITH PASSPORTS: MEDICAL TOURISM, LAW, AND ETHICS (Oxford University Press, 2014)

**Law Journals**

*Protecting Patients with Passports*: *Medical Tourism, Medical Tourism and the Patient-Protective Argument*, 95 IOWA L. REV. 1467 (2010) (selected by the American Society of Law, Medicine, and Ethics for the Health Scholar Award Program)

*Medical Tourism, Access to Health Care, and Global Justice*, 52 VA J. INT'L L. 1 (2011) (reprinted with a new introduction in 1 CAN. J. COMP. & CONTEMP. L 1 (2015))

*Circumvention Tourism*, 97 CORNELL L. REV. 1309 (2012)

*Transplant Tourism: The Ethics and Regulation of International Markets for Organs,* 41 J. L. MED. & ETHICS 269 (2013) (solicited)

*Medical Tourism, Medical Migration, and Global Justice: Implications for Biosecurity in a Globalized World*, 25 MED. L. REV. 200 (2017) (solicited)

**Medical, Public Health and Bioethics Journals**

*Medical Tourism: The View from Ten Thousand Feet*, 40 HASTINGS CTR. REP., Mar.-Apr. 2010, at 11-12.

*Medical Tourism, Consumer-Driven Healthcare, and Patient Protection*, 17 LAHEY CLINIC MED. ETHICS J. 4 (Spring 2010)

*How to Regulate Medical Tourism (and Why Bioethicists Should Care?)*, 12 J. DEVELOPING WORLD BIOETHICS 9 (2012)

*S.H. and Others v. Austria and Circumvention Tourism,* REPRODUCTIVE BIOMEDICINE ONLINE (2012) (solicited) (available at http://www.sciencedirect.com/science/article/pii/S1472648312004531)

*Ethical and Legal Implications of the Risks of Medical Tourism for Patients: A Qualitative Study of Canadian Health and Safety Representatives' Perspectives,* 3 BRITISH MED. J. OPEN e002302 (2013) (co-authored with Valorie A. Crooks, Leigh Turner, Janet Brister, Jeremy Snyder, Vicky Casey, Rebecca Whitmore)

*Navigating Physicians' Ethical and Legal Duties to Patients Seeking Unproven Interventions Abroad*, 61 CANADIAN FAMILY PHYSICIAN 584-586 (2015) (co-authored with Jeremy Snyder, Krystyna Adams, Y.Y. Chen, Daniel Birch, Valorie A. Crooks, Judy Illes, and Amy Zarzeczny)

*Inbound Medical Tourism to Barbados: A Qualitative Examination of Local Lawyers' Prospective Legal and Regulatory Concerns*, 15 BMC HEALTH SERVICES RESEARCH 291 (2015) (co-authored with Valorie A. Crooks, Krystyna Adams, Rebecca Whitmore and Jeffrey Morgan)

*Circumvention Medical Tourism and Cutting Edge Medicine: The Case of Mitochondrial Replacement Therapy*, 25 INDIANA J. GLOB. L. STUD. 439 (2018) (Invited as the George P. Smith Lecture)

*Regulation of Stem Cell Therapy Travel*, 4 CURRENT STEM CELL REPORTS 220 (2018) (co-authored with Shelly Simana)

*Traveling Across States for Prohibited Treatments: Medical Aid in Dying and Looming Battles Over Abortion*, 38 J. GEN. INTERN. MED. 517 (2022) (co-authored with Thaddeus M. Pope and Eli Y. Adashi)


## Book Chapters

*Medical Outlaws or Medical Refugees? An Examination of Circumvention Tourism*, *in* RISKS AND CHALLENGES IN MEDICAL TOURISM: UNDERSTANDING THE GLOBAL MARKET FOR HEALTH SERVICES CONTROVERSIES IN THE EXPLODING INDUSTRY OF GLOBAL MEDICINE 207 (Jill Hodges et al eds., Praeger, 2012).

*Las Fronteras del Derecho sanitario: Globalización y Turismo Médico*, *in* LAS FRONTERAS DEL DERECHO BIO-SANITARIO, ANUARIO DE LA FACULTAD DE DERECHO DE LA UNIVERSIDAD AUTÓNOMA DE MADRID 21 (Pablo de Lora y Blanca Mendoza eds. 2014) (trans. Pablo de Lora).

*Medical Tourism: Bioethical and Legal Issues, in* ROUTLEDGE COMPANION TO BIOETHICS (John D. Arras et al. eds, Routledge 2014)

*Medical Tourism for Services Legal in the Home and Destination Country: Legal and Ethical Issues, in* BODIES ACROSS BORDERS: THE GLOBAL CIRCULATION OF BODY PARTS, MEDICAL TOURISTS AND PROFESSIONALS (Brownyn Parry et al. eds, Ashgate, 2015).

*Medical Tourism for Services Illegal in Patients' Home County*, *in* HANDBOOK ON MEDICAL TOURISM AND PATIENT MOBILITY (Neil Lunt et al. eds, 2015)

*Traveling for Assisted Suicide, in* EUTHANASIA AND ASSISTED SUICIDE: GLOBAL VIEWS ON CHOOSING TO END LIFE 373 (Michael J. Cholbi ed., Praeger 2017)

## (3) ORGAN TRANSPLANTATION

## Law Journals

*Regulating The Organ Market: Normative Foundations for Market Regulation*, 77 LAW AND CONTEMP. PROB. 71 (2014) (symposium)

*Organs Without Borders? Allocating Transplant Organs, Foreigners, and the Importance of the Nation State (?)*,77 LAW AND CONTEMP. PROB. 175 (2014) (symposium)

**Medical, Economics, and Bioethics Journals**

*Selling Bone Marrow – Flynn v. Holder*, 366 N. ENG. J. MED. 296 (2012)

*Can the Government Ban Organ Sale? Recent Court Challenges and Future of U.S. Law on Selling Human Organs and Other Tissue,* 12 AM. J. TRANSPLANTATION 1983 (2012)

*A Fuller Picture of Organ Markets*, 14 AJOB 19 (2014)

*On Repugnance, Distribution, and the Global Kidney Exchange*, 75 J. INST. THEOR. ECON. 20 (2019)

**(4) ABORTION, CONTRACEPTION, AND STEM CELLS**

**Law Journals**

*Fetal Pain, Abortion, Viability and the Constitution*, 39 J. L. MED. & ETHICS 235 (2011) (co-authored with Sadath Sayeed)

*Are all Abortions Equal? Should there be Exceptions to the Criminalization of Abortion for Rape and Incest?,* 43 J. L. MED. & ETHICS 87 (2015) (solicited)

*Personhood Seeking New Life with Republican Control*, 93 INDIANA L. J. 499 (2018) (co-authored with Jonathan Will and Eli Adashi)

**Medical, Philosophy, Public Health and Bioethics Journals**

*Balancing Religious Freedom and Health Care Access*, LAHEY CLINIC MED. ETHICS J. 7 (Fall 2015) (co-authored Holly Fernandez Lynch)

*Human Embryonic Stem-Cell Research Under Siege — Battle Won but Not the War*, 364 N. ENG. J. MED. e48 (2011) (co-authored with Eli Adashi)

*Sherley v Sebelius and the Future of Stem Cell Research*, 308 JAMA 2087 (2012) (co-authored with Eli Adashi and Jeremy Feigenbaum)

*Balancing Religious Freedom and Health Care Access*, LAHEY HEALTH JOURNAL OF MEDICAL ETHICS 7 (Fall 2015) (co-authored with Holly Fernandez Lynch)

*Artificial Wombs and Abortion Rights*, 47 HASTINGS CTR. REP, July 2017, Back Cover

*The Law and Ethics of Fetal Burial Requirements for Reproductive Health Care*, 322 JAMA 1347 (2019) (co-authored with Eli Y. Adashi and Dov Fox)

*June Medical Services v Russo—The Future of Abortion Access in the U.S.*, 1 JAMA HEALTH FORUM e201107 (2020) (co-authored with Eli Y. Adashi and Dov Fox)

*The Supreme Court, the Texas Abortion Law (SB8), and the Beginning of the End of Roe v Wade?*, 326 JAMA 1473 (2021) (co-authored with Eli Y. Adashi and Lawrence O. Gostin)

*The Supreme Court Ruling on the Texas Abortion Law: Beginning to Unravel Roe v. Wade,* 327 JAMA 621 (2022) (co-authored with Rebecca Reingold and Lawrence O. Gostin)

*The Next Two Decades of Mifepristone at FDA: History as Destiny*, 109 CONTRACEPTION 1 (co-authored with Eli Y. Adashi, Rohit S. Rajan, & Daniel P. O'Mahony)

*The End of Roe v Wade and New Legal Frontiers on the Constitutional Right to Abortion*, 328 JAMA 325 (2022) (co-authored with Lawrence O. Gostin and Melissa M. Murray)

*Travel to Other States for Abortion After Dobbs*, 22 AM. J. BIOETHICS 42 (2022) (peer commentary)

*What Overturning Roe v Wade May Mean for Assisted Reproductive Technologies in the US*. 328 JAMA 15 (2022) (co-authored with Eli Y. Adashi and Judith Daar)

*EMTALA After Dobbs: Emergency Reproductive Health Care in the Balance*, 176 ANN. INTERN. MED. 268 (2022) (co-authored with Eli Y. Adashi)

*Alliance for Hippocratic Medicine v. FDA-Dobbs's Collateral Consequences for Pharmaceutical Regulation*, 388 N. ENGL J. MED. e29 (2023) (co-authored with Patti J. Zettler and Eli Y. Adashi)

*The Mifepristone Litigation: Untangling the Implications of the Fifth Circuit's Decision for Abortion Access and the U.S. Food and Drug Administration*, 176 ANN. INTERN. MED. 1666 (2023) (co-authored with Patti J. Zettler, Lewis A. Grossman, and Eli Y. Adashi)

*The New Threat to Abortion Access in the United States—The Comstock Act*, 330 JAMA 405 (2023) (co-authored with Eli Y. Adashi and Mary Ziegler)

*The FDA Declares Levonorgestrel a Nonabortifacient-A 50-Year Saga Takes a Decisive Turn*, 4 JAMA HEALTH FORUM e232257 (2023) (co-authored with Eli Y. Adashi and Allen J. Wilcox)

*The New Threat to Medical Travel for Abortion*, 4 J. AM. FAM. MED. 298 (2024) (co-authored with Eli Y. Adashi and Mary Ziegler)

*Paying for Over-the-Counter Contraception: The Opill Quandary*, 137 J. AM. FAM. MED. 200 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*State Legal Initiatives to Restrict and Protect Mifepristone Access*, 107 R.I. MED J. 44 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Who Will Save Legal Access to Emergency Abortion?,* 332 JAMA 1141 (2024) (co-authored with Holly Fernandez Lynch and Eli Y. Adashi)

*FDA v. Alliance for Hippocratic Medicine and the Future of Mifepristone Access*, _ FERTILITY & STERILITY _ (2024) (co-authored with Lewis A. Grossman, and Eli Y. Adashi)

*The Privacy of Reproductive Health Care Data: A Critical Health Insurance Portability and Accountability Act of 1996 Update*, _ J. WOMEN'S HEALTH _ (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

**(5) RESEARCH ETHICS**

**Books**

HUMAN SUBJECTS RESEARCH REGULATION: PERSPECTIVES ON THE FUTURE (co-editor with Holly Fernandez Lynch) (MIT Press, 2014)

SPECIMEN SCIENCE: ETHICS AND POLICY IMPLICATIONS (MIT Press, 2017) (co-editor with Holly Fernandez Lynch, Barbara E. Bierer, and Suzanne M. Rivera)

**Medical, Philosophy, Science Public Health and Bioethics Journals**

*In the Wake of Guatemala: The Case for Voluntary Compensation and Remediation,* 102 AM. J. PUB. HEALTH e4 (2012) (co-authored with Eli Adashi)

*Streamlining Review by Accepting Equivalency*, 14 AJOB 11 (2014) (co-authored with Holly Fernandez Lynch) (peer commentary)

*Clinical Trials and the Right to Remain Silent*, 174 JAMA INTERNAL MEDICINE E1 (co-authored with Michelle Mello)

*Confronting Biospecimen Exceptionalism in Proposed Revisions to the Common Rule*, 46 HASTINGS CENTER REPORT 4 (2016) (co-authored with Holly Lynch and Barbara Bierer)

*When Clinical Trials Compete: Prioritising Study Recruitment,* 43 J. MED. ETHICS 803 (2017), (co-authored with Luke Gelinas, Holly Fernandez Lynch, and Barbara Bierer)

*Institutions as an Ethical Locus of Research Prioritisation,* 43 J. MED. ETHICS 816 (2017), (co-authored with Luke Gelinas, Holly Fernandez Lynch, and Barbara Bierer)

*Public Engagement, Notice-and-Comment Rulemaking, and the Common Rule*, 39 IRB: ETHICS & HUM. RES. (January/February 2017) (co-authored with Holly Fernandez Lynch and Barbara E. Bierer)

*Using Social Media as a Research Recruitment Tool: Ethical Issues and Recommendations,* 17 AM. J. BIOETHICS 3 (2017) (co-authored with Luke Gelinas, Robin Pierce, Sabune Winkler, Holly Fernandez Lynch, and Barbara Bierer)

*Nonexceptionalism, Research Risks, and Social Media: Response to Open Peer Commentaries on "Using Social Media as a Research Recruitment Tool: Ethical Issues and Recommendations,* 17 AM. J. BIOETHICS W1 (2017) (co-authored with Luke Gelinas, Robin Pierce, Sabune Winkler, Holly Fernandez Lynch, and Barbara Bierer)

*Stakeholder Perspectives and Ethical and Regulatory Oversight Issues in Patient-Centered Outcomes Research*, 40 IRB: ETHICS & HUMAN RES. 7 (2018) (co-authored with Emily A. Largent, Holly Fernandez Lynch, Melissa Abraham, Ronen Rozenblum, Avni Gupta, and Joel S. Weissman)

*A Framework for Ethical Payment to Research Participants*, 378 N. ENGL. J. MED. 766 (2018) (co-authored with Luke Gelinas, Emily A. Largent, Susan Kornetsky, Barbara Bierer, and Holly Fernandez Lynch)

*On Scarcity and the Value of Clinical Trials*, 4 AJOB 71 (2018) (co-authored with Luke Gelinas, Barbara Bierer, and Holly Fernandez Lynch) (peer commentary)

*Truth in Advertising: Disclosure of Participant Payment in Research Recruitment Materials*, 52 THERAP. INN. & REG. SCI 68 (2018) (co-authored with Luke Gelinas, Holly Fernandez Lynch, Emily A. Largent, Carmel Shachar, and Barbara Bierer)

*Patient-Centered Outcomes Research: Stakeholder Perspectives and Ethical and Regulatory Oversight Issues*, ETHICS AND HUM. RES. 7 (Jan/Feb 2018) (co-authored with Emily Largent, et al.,)

*IRB Oversight of Patient-Centered Outcomes Research: A National Survey of IRB Chairpersons*, 13 J. EMP. RES. ON HUM. RES. ETHICS 421 (2018) (co-authored with Joel Weissman, et al.)

*Oversight of Patient-Centered Outcomes Research: Recommendations from a Delphi Panel*, 169 ANN. INTERN. MED. 559 (2018) (co-authored with Luke Gelinas, et al.)

*Organ Donor Intervention Trials and Risk to Bystanders: An Ethical Analysis*, 16 CLIN. TRIALS 463 (2019)

*Overcoming Obstacles to Experiments in Legal Practice*, 367 SCIENCE 1078 (2020) (co-authored with Holly Fernandez Lynch and Jim Greiner)

*Observational Studies must be Reformed before the Next Pandemic*, 29 NATURE MED. 1903 (2023) (co-authored with Emily E. Ricotta, Annette Rid & Nicholas G. Evans)

*Ethically Cleared to Launch?*, 381 SCIENCE 1408 (2023) (co-authored with Vasiliki Rahimzadeh et al.)

**Book Chapters**

*From Medical Experimentation to Non-Medical Experimentation: What Can and Cannot be Learned from Medicine as to the Ethics of Legal and Other Non-Medical Experiments?, in* MEDICAL EXPERIMENTATION: PERSONAL INTEGRITY AND SOCIAL POLICY, NEW EDITION (Oxford University Press 2016) (co-authored with James D. Greiner)

**(6) BIOETHICS AND HEALTH CARE IN SPORTS**

**Reports/Law Journals**

*Protecting and Promoting the Health of NFL Players: Legal and Ethical Analysis and Recommendations* (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch) (reprinted in 7 HARV. J. SPORTS & ENT. L. 1 (2016))

*Evaluating NFL Player Health and Performance: Legal and Ethical Issues*, 165 U. PENN. L. REV. 227 (2017) (co-authored with Jessica L. Roberts, Christopher R. Deubert, and Holly Fernandez Lynch)

*Comparing Health-Related Policies and Practices in Sports: The NFL and Other Professional Leagues* (2017) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch) (reprinted in 8 HARV. J. SPORTS & ENT. L. 1 (2017))

*The NFL as a Workplace: The Prospect of Applying Occupational Health and Safety Law to Protect NFL Workers*, 60 ARIZ. L. REV. 291 (2018) (co-authored with Adam M. Finkel, Christopher R. Deubert, Orly Lobel, and Holly Fernandez)

**Bioethics, Medical, and Other Journals**

*NFL Player Health: A Proposal to Address NFL Club Doctors' Conflicts of Interest and to Promote Player Trust*, 46 HASTINGS. CTR. REP. S2 (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch)

*NFL Player Health: A Response to Commentaries*, 46 HASTINGS. CTR. REP. S45 (2016) (co-authored with Christopher R. Deubert, and Holly Fernandez Lynch)

*The Legality of Biometric Screening of Professional Athletes*, 17 AM. J. BIOETHICS 65 (2016) (co-authored with Jessica L. Roberts, Christopher R. Deubert, and Holly Fernandez Lynch) (peer commentary)

*Life on an Emotional Roller Coaster: NFL Players and Their Family Members' Perspectives on Player Mental Health*, 12 J. CLIN. SPORTS PSYCH. 404 (2018) (co-authored with Sarah A. McGraw, Christopher R. Deubert, and Holly Fernandez Lynch, Alixandra Nozzolillo, and Lauren Taylor)

*NFL or 'Not For Long'? Transitioning Out of the NFL*, 42 J. SPORT BEHAV. 461 (2019) (co-authored with Sarah A. McGraw, Christopher R. Deubert, and Holly Fernandez Lynch, and Alixandra Nozzolillo)

**(7) HEALTH LAW, HEALTH POLICY, AND BIOETHICS GENERALLY**

**Books**

HEALTH LAW AS PRIVATE LAW: PATHOLOGY OR PATHWAY (Cambridge University Press, 2025) (co-editor with Susannah Baruch, Wendy Netter Epstein, Carmel Shachar and Christopher Robertson)

HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 10th ed. 2024) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, Nicholas Bagley, and Nadia Sawicki)

BIOETHICS AND PUBLIC HEALTH LAW (Wolters Kluwer, 5th ed. 2024) (co-author with Mary Anne Bobinski, David Orentlicher, and Mark A. Hall)

MEDICAL LIABILITY AND TREATMENT RELATIONSHIPS (Wolters Kluwer, 5th ed. 2024) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, Nicholas Bagley, and Nadia Sawicki)

COVID-19 AND THE LAW: DISRUPTION, IMPACT AND LEGACY (Cambridge University Press 2023) (co-edited with Abbe R. Gluck, Katherine Kraschel, and Carmel Shachar)

DISABILITY, HEALTH, LAW, AND BIOETHICS (co-editor with Carmel Shachar, Anita Silvers, Michael Ashley Stein, Cambridge University Press, 2020)

READINGS IN COMPARATIVE HEALTH LAW AND BIOETHICS (Carolina Academic Press, 3d ed. 2020) (co-author with Nathan Cortez and Tim Jost)

TRANSPARENCY IN HEALTH AND HEALTH CARE IN THE UNITED STATES (co-editor with Holly Fernandez Lynch, Carmel Shachar, Barbara J. Evans, Cambridge University Press, 2019)

HEALTH CARE LAW AND ETHICS (Wolters Kluwer, 9th ed. 2018) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, and Nicholas Bagley)

BIOETHICS AND PUBLIC HEALTH LAW (Wolters Kluwer, 4th ed. 2018) (co-author with Mary Anne Bobinski, David Orentlicher, and Mark A. Hall)

MEDICAL LIABILITY AND TREATMENT RELATIONSHIPS (Wolters Kluwer, 4th ed. 2018) (co-author with Mark A. Hall, David Orentlicher, Mary Anne Bobinski, and Nicholas Bagley)

LAW, RELIGION, AND HEALTH IN THE UNITED STATES (co-editor with Holly Fernandez Lynch and Elizabeth Sepper, Cambridge University Press, 2017)

THE OXFORD HANDBOOK OF U.S. HEALTH CARE LAW (Oxford University Press, 2015-2016) (co-editor with Bill Sage and Allison Hoffman)

NUDGING HEALTH: HEALTH LAW AND BEHAVIORAL ECONOMICS (John Hopkins University Press, 2016) (co-editor with Holly Fernandez Lynch and Christopher Robertson)

HEALTH LAW AS PRIVATE LAW: PATHOLOGY OR PATHWAY (Cambridge University Press, 2025) (co-editor with Susannah Baruch, Wendy Netter Epstein, Carmel Shachar and Christopher Robertson)

**Law Journals**

*Making Residency Work Hour Rules Work,* 41 J. L. MED. & ETHICS 310 (2013) (co-authored with Charles A. Czeisler and Christopher P. Landrigan)

*Honoring the Public Trust: Curbing the Bane of Physician Sexual Misconduct,* 9 J. L. & BIOSCI. (2022) (co-authored with Kunal K. Sindhu, Adam C. Schaffer, Rebecca Haw Allensworth, and Eli Y. Adashi)

*Random Drug Testing of Physicians: A Question of Safety,* 5 DEPAUL J. HEALTH CARE L. 1 (2024) (co-authored with Eli Y. Adashi and Jeffrey Julian)

**Medical, Philosophy, Public Health and Bioethics Journals**

*The Constitutionality of the ACA's Medicaid-Expansion*, 366 N. ENG. J. MED. 103 (2012) (co-authored with Jim Blumstein)

*The Taxing Power and the Public's Health*, 367 N. ENG. J. MED. 1777 (2012) (co-authored with Michelle Mello)

*Conscientious Objection, Coercion, the Affordable Care Act, and U.S. States*, 19 ETHICAL PERSPECTIVES 163 (2013) (solicited)

*Physicians, Medical Ethics, and Execution by Lethal Injection,* 311 JAMA 2375 (2014) (co-authored with Robert Truog and Mark Rockoff)

*Hospital-Based Active Shooter Incidents: Sanctuary Under Fire*, 313 JAMA 1209 (2015) (co-authored with Eli Y. Adashi and Hans Gao)

*Private Rights and the Public Interest in Drug and Medical Device Litigation*, 180 JAMA INT. MED. 299 (2019) (co-authored with Nicholas Bagley)

*Medical Crowdfunding for Unproven Medical Treatments: Should Gofundme Become a Gatekeeper?*, 49 HASTINGS CTR. REP. 32 (2019)

*Potential Legal Liability for Withdrawing or Withholding Ventilators During COVID-19: Assessing the Risks and Identifying Needed Reforms*, 323 JAMA 1901 (2020) (co-authored with Andrew M. Crespo and Douglas B. White)

*A Legislative Blueprint for the Next Pandemic,* 1 JAMA HEALTH FORUM e e200882 (2020) (co-authored with Eli Y. Adashi)

*Universal Masking in the United States: The Role of Mandates, Health Education, and the CDC*, 323 JAMA 837 (2020) (co-authored with Lawrence O. Gostin & Jeffrey P. Koplan)

*The Interstate Medical Licensure Compact: Attending to the Underserved*, 325 JAMA 1607 (2021) (co-authored with Eli Y. Adashi and Winston L. McCormick)

*Industry-Sponsored Speaker Programs-End of the Line?*, 325 JAMA 1835 (2021) (co-authored with Eli Y. Adashi)

*An Overdue Executive Order: Reinstating the National Bioethics Commission*, 21 AM. J. MED. S0002 (2021) (co-authored with Eli Y. Adashi)

*Legislation to Criminalize Gender-Affirming Medical Care for Transgender Youth*, 325 JAMA 2251 (2021) (co-authored with Jack L. Turban and Katherine L. Kraschel)

*The American Rescue Plan Act of 2021: A Historic if Transitory Expansion of the ACA*, 326 JAMA 27 (2021) (co-authored with Eli Y. Adashi)

*Enforcement of the Physician Payments Sunshine Act: Trust and Verify*, 326 JAMA 807 (2021) (co-authored with Eli Y. Adashi)

*Antiviral Therapeutics: Key to Curbing the COVID-19 Pandemic*, 135 AM. J. MED. 411 (2022) (co-authored with Eli Y. Adashi)

*Preventing Female Genital Mutilation in the United States: The Legal Threat to Effective Action*, 110 AM. J. PUB. HEALTH 813 (2020) (co-authored with Nikolas Bowie, Megan Jones, and Eli Y. Adashi)

*The Biden Administration's Proposal for an Advanced Research Projects Agency for Health (ARPA-H)*, 2 JAMA HEALTH FORUM e212972 (2021) (co-authored with Eli Y. Adashi)

*When Failure Is Not an Option: The Independent Panel Pandemic Report*, 135 AM. J. MED. 131 (2021) (co-authored with Eli Y. Adashi)

*The Affordable Care Act Resurrected: Curtailing the Ranks of the Uninsured*, 326 JAMA 1797 (2021) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Pandemic Preparedness Program: Reimagining Public Health*, 327 JAMA 219 (2022) (co-authored with Eli Y. Adashi)

*Health Care Fraud: The Leading Violation of the False Claims Act*, 135 AM. J. MED. 558 (2022) (co-authored with Eli Y. Adashi)

*The CMS Vaccine Mandate at the Supreme Court: A Hippocratic Imperative*, 135 AM. J. MED. 1035 (2022) (co-authored with Eli Y. Adashi)

*Stamping Out the Medicaid Coverage Gap: An ACA Imperative*, 135 AM. J. MED. E225 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*And Then There Were Three: The Decimation of the Affordable Care Act (ACA) CO-Ops*, 35 *J. Am. Bd. Fam. Med.* 867 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Legislation Restricting Gender-Affirming Care for Transgender Youth: Politics Eclipse Healthcare,* 3 CELL REP. MED. 100719 (2022) (co-authored with Katherine L. Kraschel, Alexander Chen, Jack L. Turban)

*Criminalizing Medical Errors Will Undermine Patient Safety*, 11 NATURE MED. 2241 (2022) (co-authored with Eli Y. Adashi)

*Failing Grade: The Pandemic Legacy of HHS*, 64 AM. J. PREVENTATIVE MED. 142 (2022) (co-authored with Eli Y. Adashi)

*The Nursing Home Crisis: Prognosis Guarded*, 135 AM. J. MED 1130 (2022) (co-authored with Eli Y. Adashi)

*The PREVENT Pandemics Act: A National Road Map*, 64 AM. J. PREVENTATIVE MED. 298 (2022) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Mounting Violence in Health Care: Is It Time to Harden the Sanctuary?*, 135 AM. J. MED 1391 (2022) (co-authored with Eli Y. Adashi)

*Transparency and the Doctor-Patient Relationship - Rethinking Conflict-of-Interest Disclosures*, 386 N. ENGL. J MED. 300 (2022) (co-authored with Eli Y. Adashi and Jacob T. Elberg)

15

*Persistent Inpatient Harm: The Unremitting Challenge of Patient Safety*, 38 J. GEN. INTERN. MED. 1532 (2023) (co-authored with Eli Y. Adashi)

*Should the Administration for Strategic Preparedness and Response Lead the National Response to a Public Health Emergency?* 4 JAMA HEALTH F. e224824 (2023) (co-authored with with Eli Y. Adashi and Daniel P. O'Mahony)

*Persistent Inpatient Harm: The Unremitting Challenge of Patient Safety*, 38 J. GEN. INTERN. MED. 1532 (2023) (co-authored with Eli Y. Adashi)

*Violence in Health Care: Protective Federal Legislation Must not be Delayed*, 136 AM. J. MED. 611 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Inflation Reduction Act: Recasting the Medicare Prescription Drug Plans*, 64 AM. J. PREVENTATIVE MED. 936 (2023) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Hospital at Home Receives a New Lease on Life: A Promising if Uncertain Future*, 136 AM. J. MED. 958 (2023) co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Affirmative Action Ruled Unconstitutional: Options for Building a Diverse Health Care Workforce*, 330 JAMA 1031 (2023) (co-authored with Eli Y. Adashi and Philip A. Grupposo)

*State Approaches to Stopping Violence Against Health Care Workers*, 331 JAMA 825 (2024) (co-authored with Rebekah J. Ninan and Eli Y. Adashi)

*The Pregnant Workers Fairness Act—a Bipartisan Step Forward*, 5 JAMA HEALTH F. e235386 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Medicare Advantage: Growth Amidst Mounting Scrutiny*, 36 J. AM. BD. FAM. MED. 1062 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Remote Patient Monitoring: A Leading Anchor of the 'Hospital-at-Home' Paradigm* 137 AM. J. MED. 81 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The White House Initiative on Women's Health Research: A Presidential Boost*, 33 J. WOMEN'S HEALTH 1151 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Medicare Advantage Under Fire: Public Criticism and Implications*, _ J. GEN. INTERN. MED. _ (2024) (co-authored with Eli Y. Adashi and Daniel G. Aaron)

*The National Physician Shortage: The Imperative of Congressional Action*, 137 AM. J. MED. 1030 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The State of Maternal and Infant Health: An Unrelenting Crisis*, 33 J. WOMEN'S HEALTH 1604 (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*A Whole-of-Government Approach to Addressing the U.S. Maternal Health Crisis*, 33 J. WOMEN'S HEALTH _ (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Declining U.S. Fertility and Births Rates: A Shrinking Nation*, 32 J. WOMEN'S HEALTH _ (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*The Right to Contraception Act: A Present-Day Imperative*, 34 J. WOMEN'S HEALTH _ (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*New Minimum Staffing Standards for Nursing Homes: An Overdue Directive*, _ J. GEN. INTERN. MED. _ (2024) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

*Workplace Violence in Health Care: An Overdue OSHA Standard in the Making*, 36 J. HEALTH CARE FOR THE POOR & UNDERSERVED 715 (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony).

*The National Medical Supply Chain: Clear and Present Danger*, _ J. GEN. INTERN. MED. _ (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony).

*Maternity Care Deserts: Key Drivers of the National Maternal Health Crisis*, 38 J. AM. BOARD FAM. MED. 165 (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony).

*The Dr. Lorna Breen Health Care Provider Protection Reauthorization Act*, _ J. WOMEN'S HEALTH _ (2025) (co-authored with Eli Y. Adashi)

The Unsettled PREEMIE Reauthorization Act and the Recalcitrant Challenge of Preterm Births, 115 Am. J. Pub. H. _ (2025) (co-authored with Eli Y. Adashi and Daniel P. O'Mahony)

**Book Chapters**

*Was the Medicaid Expansion Coercive?*, *in* THE AFFORDABLE CARE ACT DECISION: PHILOSOPHICAL AND LEGAL IMPLICATIONS 253 (Fritz Allhoff and Mark Hall, eds. 2014)

*The Relationship Between Bioethics and U.S. Health Law*, *in* THE OXFORD HANDBOOK OF U.S. HEALTH CARE LAW (I. Glenn Cohen et al eds., 2015-2016)

*On the Human Right to Health: Statistical Lives, Contingent Persons, and Other Difficult Questions*, in HUMAN RIGHTS, DEMOCRACY, AND LEGITIMACY IN A WORLD OF DISORDER (Silja Voeneky & Gerald Neuman eds., Cambridge University Press, 2018)

*Health Law and Ethics*, in HEALTH SYSTEMS SCIENCE (Susan Skochelak, ed.; 2d edition, Elsevier 2019) (co-authored with Bill Sage and Allison Hoffman)

*Vaccine Tourism, Federalism, Nationalism*, *in* COVID-19 AND THE LAW: DISRUPTION, IMPACT AND LEGACY (I. Glenn Cohen, Abbe R. Gluck, Katherine Kraschel, and Carmel Shachar eds. 2023)

**(8) FOOD, DRUG, AND DEVICE LAW**

**Books**

DIGITAL HEALTH CARE OUTSIDE OF TRADITIONAL CLINICAL SETTINGS: ETHICAL, LEGAL, AND REGULATORY CHALLENGES AND OPPORTUNITIES (Cambridge University Press, 2024) (co-authored with Daniel B. Kramer, Julia Adler-Milstein, and Carmel Shachar)

FDA IN THE TWENTY-FIRST CENTURY: THE CHALLENGES OF REGULATING DRUGS AND NEW TECHNOLOGIES (Columbia University Press, 2015) (co-editor with Holly Fernandez Lynch)

**Law Journals**

*Make it Work! Breyer on Patents in the Life Sciences*, 128 HARV. L. REV. 481 (2014) (festschrift for Justice Breyer)

*Innovating Preemption or Preempting Innovation?*, 119 NORTHWESTERN L. REV. ONLINE 137 (2024) (co-authored with Carmel Shachar and David Simon)

**Medical, Philosophy, Public Health, Bioethics and other Journals**

*FDA Regulation of Mobile Health Technologies* 371 N. ENG. J. MED. 372 (2014) (co-authored with Nathan Cortez and Aaron Kesselheim)

*Reconsideration of the Lifetime Ban on Blood Donation by Men Who Have Sex With Men*, 311 JAMA 337 (2014) (co-authored with Eli Y. Adashi and Jeremy Feigenbaum)

*Influence, Integrity, and the FDA: An Ethical Framework*, 357 SCIENCE 876 (2017) (co-authored with Spencer Hey, Eli Y. Adashi, and Aaron Kesselheim)

*When Science and Politics Collide: Enhancing the FDA*, 364 SCIENCE 628 (2019) (co-authored with Eli Y. Adashi and Rohit Rajan)

*Pharmaceutical Companies, Human Rights, and the Alien Tort Statute*, 49 J LAW., MED. & ETHICS 500 (2021) (co-authored with Eli Y. Adashi and Tyler Giannini)

*A Divisive Ruling on Devices — Genus Medical Technologies v. FDA*, 385 N. ENG. J. MED. 2409 (2021) (co-authored with Eli Y. Adashi and Patricia J. Zettler)

*Deadly Legacy—The 510(k) Path to Medical Device Clearance*, 157 JAMA SURG. 185 (2022) (co-authored with Eli Y. Adashi and Katina M. Robison)

*At-Home Diagnostics and Diagnostic Excellence Devices vs General Wellness Products*, 327 JAMA 523 (2022) (co-authored with David Simon and Carmel Shachar)

*SARS-CoV-2 Laboratory-Developed Tests: Integrity Restored*, 327 JAMA 1229 (2022) (co-authored with Eli Y. Adashi)

*Expanding the Blood Pool: The Limitations of the FDA's Current MSM Blood Deferral*, 97 MAYO CLINIC PROC. 1424 (2022) (co-authored with Winston McCormick & Eli Y. Adashi)

*The FDA Struggle to Withdraw Makena: Problems With the Accelerated Approval Process*, 328 JAMA 2394 (2022) (co-authored with Daniel Aaron and Eli Y. Adashi)

*Assessing—and Extending—California's Insulin Manufacturing Initiative*, 329 JAMA 533 (2023) (co-authored with Jake Sherkow and Eli Y. Adashi)

*The FDA Modernization Act 2.0: Drug Testing in Animals is Rendered Optional*, 9 AM. J. MED. 853 (2023) (co-authored with with Eli Y. Adashi and Daniel P. O'Mahony)

*The FDA Initiative to Assure Racial and Ethnic Diversity in Clinical Trials*, 36 J. AM. B. FAM. MED. 366 (2023) (co-authored with Eli Y. Adashi)

*Patient-Assistance Programs, Kickbacks, and the Courts*, 388 N. ENGL. J. MED. 2407 (2023) (co-authored with Jacob. T. Elberg and Eli Y. Adashi)

*Lawsuits Over the Price of Insulin—State Efforts for Insulin Access*. 184 JAMA INTERN MED. 9 (2024) (co-authored with Daniel G. Aaron and Eli Y. Adashi)

*Food and Drug Omnibus Reform Act: A Critical Course Correction*, 99 MAYO CLINIC PROCEEDINGS 869 (2024) (co-authored with Aditya Narayan and Eli Y. Adashi)

*Checks and Balances on FDA's Authority*, 332 JAMA 705 (2024) (co-authored with Holly Fernandez Lynch and Peter Lurie)

*The US FDA's New Rule for Regulating Laboratory-Developed Tests*, 5 JAMA HEALTH F. e242917 (2024) (co-authored with Daniel G. Aaron and Eli Y. Adashi)

**(9) PSYCHEDELICS AND THE LAW**

**Law Journals**

*Patents on Psychedelics: The Next Legal Battlefront of Drug Development*, HARV. L. REV. F. (Feb 20, 2022), https://harvardlawreview.org/2022/02/patents-on-psychedelics-the-next-legal-battlefront-of-drug-development/ (co-authored with Mason Marks)

*Microdosing Psychedelics Under Local, State, and Federal Law*, 103 B.U. L. REV. 573 (2023) (co-authored with Mason Marks, David Angelatos, & Jonathan Perez-Reyzin)

*Psychedelics, Psychosocial Support, and Psychotherapy: Why It Matters for the Law, Ethics, and Business of Medical Psychedelic Use*, 93 FORDHAM LAW REVIEW 393 (2024)

**Medical, Philosophy, Public Health, Bioethics and other Journals**

*Psychedelic Therapy: A Roadmap for Wider Acceptance and Utilization*, 27 NATURE MED. 1669 (2021) (co-authored with Mason Marks)

*Pressing Regulatory Challenges for Psychedelic Medicine*, 380 SCIENCE 347 (2023) (co-authored with Amy L. McGuire, Holly Fernandez Lynch, and Lewis A. Grossman)

*How Should the FDA Evaluate Psychedelic Medicine?*, 389 N. ENGL. J. MED. 389 (2023) (co-authored with Mason Marks)

*Introducing Psychedelics to End-Of-Life Mental Healthcare*, 1 NATURE MENTAL HEALTH 920 (2023) (co-authored with Mason Marks, Brent Kious and Carmel Shachar)

*Essentials of Informed Consent to Psychedelic Medicine*, 81 JAMA PSYCHIATRY 611 (2024) (co-authored with Mason Marks, Carmel Shachar, and Rebecca Brendel)

*Developing an Ethics and Policy Framework for Psychedelic Clinical Care: A Consensus Statement*, 7 JAMA NETWORK OPEN e2414650 (2024) (co-authored with Amy Mcguire, Dominic Sisti, et al)

*Psychedelic Medicine Exceptionalism*, 1 AM. J. BIOETHICS 6 (2025) (co-authored with Mason Marks)

**(10) AI/DIGITAL HEALTH/BIG DATA**

**Books**

BIG DATA, HEALTH LAW, AND BIOETHICS (Cambridge University Press, 2018) (co-edited with Holly Fernandez Lynch, Effy Vayena, and Urs Gasser)

RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW (Elgar Publishing, 2024) (co-edited with Barry Solaiman)

**Law Journals**

*Cops, Docs, and Code: A Dialogue Between Big Data in Health Care and Predictive Policing*, 51 U.C. DAVIS L. REV. 437 (2017) (co-authored with Harry Graver)

19

*Informed Consent and Medical Artificial Intelligence: What to Tell the Patient?*, 108 GEORGETOWN L. J. 1426 (2020) (symposium)

*The Algorithmic Explainability "Bait and Switch,"* 108 MINN L. REV. 857 (2023) (co-authored with Boris Babic)

*Locating Liability for Medical AI*, 73 DEPAUL
L. REV. 339 (2024) (co-authored with W. Nicholson Price II) (invited as part of Clifford Tort Symposium 2023)

*Towards Responsible Quantum Technology: Safeguarding, Engaging and Advancing Quantum R&D*, 15 HASTINGS SCI. & TECH. L.J. 63 (2024) (co-authored with Mauritz Kop, Mateo Aboy, Eline De Jong, Urs Gasser, Timo Minssen, Mark Brongersma, Teresa Quintel, Luciano Floridi, and Raymond Laflamme)

## Medical, Bioethics and Other Journals

*The Legal and Ethical Concerns That Arise From Using Complex Predictive Analytics In Health Care*, 33 HEALTH AFF. 1139 (2014) (co-authored with Bernard Lo, Ruben Amarasingham, and Anand Shah)

*Consensus Statement on Electronic Health Predictive Analytics: A Guiding Framework*, eGEMS Vol. 4, Issue 1 (2016) (co-authored with Ruben Amarasingham, Anne-Marie J. Audet, and many others)

*Your Money or Your Patient's Life? Ransomware and Electronic Health Records*, 167 ANNALS OF INT. MED. 587 (2017) (co-authored with Sharona Hoffman and Eli Y. Adashi)

*HIPAA and Protecting Health Information in the 21st Century*, 320 JAMA 231 (2018) (co-authored with Michelle Mello)

*The Ethics of Smart Pills and Self-Acting Devices: Autonomy, Truth-Telling, and Trust at the Dawn of Digital Medicine*, 9 AJOB 38 (2018) (co-authored with Craig M. Klugman, Laura B. Dunn, and Jack Schwartz)

*Response to Open Peer Commentaries on "The Ethics of Smart Pills and Self-Acting Devices: Autonomy, Truth-Telling, and Trust at the Dawn of Digital Medicine"*, 9 AJOB W4 (2018) (co-authored with Craig M. Klugman, Laura B. Dunn, and Jack Schwartz)

*Machine Learning in Medicine: Addressing Ethical Challenges*, 15 PLOS MED e1002689 (2018) (co-authored with Effy Vayena and Alessandro Blasimme)

*Privacy in the Age of Medical Big Data*, 25 NATURE MED. 37 (2019) (co-authored with W. Nicholson Price II)

*Big Data, Big Tech, and Protecting Patient Privacy*, 322 JAMA 1141 (2019) (co-authored with Michelle Mello)

*Ethical and Legal Issues of Ingestible Electronic Sensors*, 2 NATURE ELECTRONICS 329 (2019) (co-authored with Sara Gerke, Helen Yu & Timo Minssen)

*How Does Emerging Patent Case Law in the US and Europe Affect Precision Medicine?*, 37 NATURE BIOTECH. 1118 (2019) (co-authored with Mateo Aboy, Kathleen Liddell, Cristina Crespo, Johnathon Liddicoat, Sara Gerke & Timo Minssen)

*Potential Liability for Physicians Using Artificial Intelligence*, 322 JAMA 1765 (2019) (co-authored with W. Nicholson Price II and Sara Gerke)

*Algorithms on Regulatory Lockdown in Medicine*, 366 SCIENCE 1202 (2019) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Ethical and Legal Aspects of Ambient Intelligence in Hospitals*, 323 JAMA 601 (2020) (co-authored with Serena Yeung and Sara Gerke)

*The European Artificial Intelligence Strategy: Implications and Challenges for Digital Health*, 7 LANCET DIGITAL HEALTH e376 (2020) (co-authored with Theodoros Evgeniou, Sara Gerke, and Timo Minssen)

*Digital Smartphone Tracking for COVID-19: Public Health and Civil Liberties in Tension,* 323 JAMA 2371 (2020) (co-authored with Lawrence O. Gostin and Daniel J. Weitzner)

*The Need for a System View to Regulate Artificial Intelligence/Machine Learning-Based Software as Medical Device*, 3 NPJ DIGITAL MED. 53 (2020) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Regulatory, Safety, and Privacy Concerns of Home Monitoring Technologies During COVID-19*, 26 NATURE MED. 1176 (2020) (co-authored with Sara Gerke, Carmel Shachar, and Peter R. Chai)

*Regulatory Responses to Medical Machine Learning*, 7 J. LAW & BIOSCI. Isaa002 (2020) (co-authored with Timo Minssen, Sara Gerke, Mateo Aboy, and Nicholson Price)

*Ethical and Legal Aspects of Remote Monitoring of Medical Devices*, 98 MILBANK Q. 1257 (2020) (co-authored with Sara Gerke and Daniel B. Kramer)

*Invited Perspective: How Much Can Potential Jurors Tell Us about Liability for Medical AI?*, 62 J. NUCL. MED. 15 (2020) (co-authored with W. Nicholson Price II and Sara Gerke)

*When Machine Learning Goes Off the Rails*, HARVARD BUSINESS REVIEW (Jan-Feb 2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Artificial Intelligence and Liability in Medicine: Balancing Safety and Innovation*, 98 MILBANK Q. 629 (2021) (co-authored with Sara Gerke, George Maliha, and Ravi Parikh)

*Digital Health Passes in the Age of COVID-19: Are "Vaccine Passports" Lawful and Ethical?*, 325 JAMA 1933 (2021) (co-authored with Lawrence O. Gostin & Jana Shaw)

*Beware Explanations from AI in Health Care*, 373 SCIENCE 284 (2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Direct-to-Consumer Medical Machine Learning and Artificial Intelligence Applications*, 3 NATURE MACHINE INTELLIGENCE 283 (2021) (co-authored with Boris Babic, Sara Gerke, and Theodoros Evgeniou)

*Beyond Security Patches: Fundamental Incentive Problems in Health Care Cybersecurity*, 2 JAMA HEALTH FORUM e212969 (2021) (co-authored with Genevieve P. Kanter and Jack Kufhal)

*Sharing Clinical Notes: Potential Medical-Legal Benefits and Risks*, 327 JAMA 717 (2021) (co-authored with Charlotte Blease & Sharona Hoffman)

*Emerging Ethical Considerations for the Use of Artificial Intelligence in Ophthalmology*, 2 OPTHALMOLOGY SCI. 100141 (2022) (co-authored with Nicholas G. Evans, Danielle M. Wenner, Duncan Purves, Michael F. Chiang, Daniel S.W. Ting, and Aaron Y. Lee)

*How NFTs Could Transform Health Information Exchange*, 375 SCIENCE 500 (2022) (co-authored with Kristin Kostick-Quenet, Kenneth D. Mandl, Timo Minssen, Urs Gasser, Isaac Kohane, and Amy McGuire)

21

*Mitigating Racial Bias in Machine Learning*, 50 J. LAW, MED. & ETHICS 50, 92 (2022) (co-authored with Kristin M. Kostick-Quenet, Sara Gerke, Bernard Lo, James Antaki, Faezah Movahedi, Hasna Njah, Lauren Schoen, Jerry E. Estep,and J.S. Blumenthal-Barby)

*The Hospital-At-Home Presents Novel Liabilities for Physicians, Hospitals, Caregivers, and Patients*, 28 NATURE MED. 438 (2022) (co-authored with David A. Simon, Celynne Balatbat & Anaeze C. Offodile II)

*Ethics-By-Design: Efficient, Fair and Inclusive Resource Allocation Using Machine Learning*, 9 J. L. & BIOSCI. (2022) (co-authored with Theodore P Papalexopoulos, Dimitris Bertsimas, Rebecca R Goff, Darren E Stewart, and Nikolaos Trichakis)

*"I'd Feel Like Someone Was Watchin' Me… Watching for a Good Reason": Perceptions Of Data Privacy, Access, And Sharing in the Context of Real-Time Prep Adherence Monitoring Among HIV-Negative MSM with Substance Use*, 26 AIDS & BEHAV. 2981 (2022) (co-authored with Georgia R. Goodman, Anna Kikut, Maria J. Bustamante, Lizette Mendez, Yassir Mohamed, Carmel Shachar, Sara Gerke, Edward W. Boyer, Rochelle K. Rosen, Kenneth H. Mayer, Conall O'Cleirigh and Peter R. Chai)

*When Is a Change Significant? The Update Problem of Apps in Medical and Behavioral Research*, 44 ETHICS & HUM. RES. 2 (2022) (co-authored with Carmel Shachar, Sara Gerke, Walker Morrell, Aaron Kirby, and Barbara E. Bierer)

*Skating The Line Between General Wellness Products and Regulated Devices: Strategies and Implications,* 9 J. L. & BIOSCI. (2022) (co-authored with David A Simon and Carmel Shachar)

*Should Alexa Diagnose Alzheimer's?: Legal and Ethical Issues with At-Home Consumer Devices*, 3 CELL REP. MED. 100692 (2022) (co-authored with Barbara Evans, David A Simon and Carmel Shachar)

*Unsettled Liability Issues for "Prediagnostic" Wearables and Health-Related Products*, 328 JAMA 1391 (2022) (co-authored with David A Simon and Carmel Shachar)

*Hospital-at-Home: Multistakeholder Considerations for Program Dissemination and Scale*, 100 MILLBANK Q. 673 (2022) (co-authored with Kushal T. Kadakia, Celynne A. Balatbat, Albert L. Siu, Consuelo H. Wilkins, Victor J. Dzau and Anaeze C. Offodile)

*Navigating a Path Toward Routine Recording in the Operating Room*, 278 ANN. SURG. e474 (2023) (co-authored with Alexander Langerman et al.)

*HIPAA is a Misunderstood and Inadequate Tool for Protecting Medical Data*, 29 NATURE MED. 1900 (2023) (co-authored with Carmel Shachar, Romain Cadario, and Carey K. Morewedge)

*The Challenges for Regulating Medical Use of ChatGPT and Other Large Language Models*, 330 JAMA 315 (2023) (co-authored with Timo Minssen and Effy Vayena)

*What Should ChatGPT Mean for Bioethics*, 23 AM. J. BIOETHICS 8 (2023)

*How AI Can Learn from the Law: Putting Humans in the Loop Only on Appeal*, 6 NPJ DIGITAL MED. 160 (2023) (co-authored with Boris Babic, Sara Gerke, Qiong Xia, Theodoros Evgeniou & Klaus Wertenbroch)

*AI as a Mental Health Therapist for Adolescents*, 177 JAMA PEDIATR. 1253 (2023) (co-authored with Doug J Opel & Brent M Kious)

*Navigating the New Risks and Regulatory Challenges of GenAI*, HARV. BUS. REV. (2023) (co-authored with Theodoros Evgeniou & Martin Husovec)

*Using Digital Technologies to Diagnose in the Home: Recommendations from A Delphi Panel*, 7 NPJ DIGITAL MED. 18 (2024) (co-authored with David A. Simon, Sara Raza & Carmel Shachar)

*The Health Risks of Generative AI-Based Wellness Apps*, 30 NATURE MED. 1269 (2024) (co-authored with Julian De Freitas)

*The EU AI Act: Implications for U.S. Health Care*, 1 N. ENGL. J. MED. AI (2024) (co-authored with Timo Minnsen and Sebastian Porsdam Mann)

*Synthetic Health Data: Real Ethical Promise and Peril*, 54 HASTINGS CENTER REPORT 8 (2024) (co-authored with Daniel Susser et al.)

*Ten Principles for Responsible Quantum Innovation*, 9 QUANTUM SCI AND TECH (2024) (co-authored with Mauritz Kop et al.)

*Guidelines For Ethical Use and Acknowledgement of Large Language Models in Academic Writing*, 6 NATURE MACHINE INTELLIGENCE 1272 (2024) (co-authored with Sebastian Porsdam Mann et al.)

*Artificial Intelligence In Health and Health Care: Priorities for Action*, 44 HEALTH AFF. _ (2025) (co-authored with Michael Matheny et al.)

*Disclosure, Humanizing, and Contextual Vulnerability of Generative AI Chatbots*, 2 NEJM AI (2025) (co-authored with Julian De Freitas)

*Environment scan of generative AI infrastructure for clinical and translational science*, 2 NPJ HEALTH SYSTEMS _ (co-authored with Betina Idnay et al.)

*Ambient Listening—Legal and Ethical Issues*, 8 JAMA NETW. OPEN e2460642 (co-authored with Julie Ritzman, and Richard F. Cahill)

*Regulation of Health and Health Care Artificial Intelligence*, 333 JAMA 1769 (2025) (co-authored with Michelle Mello)

*A General Framework for Foverning Marketed AI/ML Medical Devices.* 8 NPJ DIG. MED. 328 (2025) (co-authored with Boris Babic, Ariel Stern, Yiwen Li & Melissa Ouellet)

*Medical AI and Clinician Surveillance — The Risk of Becoming Quantified Workers*, 392 N. ENGL. J. MED. 2289 (2025) (co-authored with Ifeoma Ajunwa and Ravi B. Parikh)

*Unregulated Emotional Risks of AI Wellness Apps*, 7 NATURE MACH. INTEL. 813 (2025) (co-authored with Julian De Freitas)

*Quantum Technology Governance: A Standards-First Approach*, 389 SCIENCE 575 (2025) (co-authored with Mateo Aboy, Urs Gasser and Mauritz Kop)

## Book Chapters

*Is There a Duty to Share Health Care Data?*, *in* BIG DATA, HEALTH LAW, AND BIOETHICS 209 (I. Glenn Cohen, Holly Fernandez Lynch, Effy Vayena, and Urs Gasser eds., Cambridge University Press 2018)

*A Doctor's Touch: What Big Data in Health Care Can Teach Us About Predictive Policing, in* POLICING AND ARTIFICIAL INTELLIGENCE (John L.M. McDaniel and Ken G. Pease eds., Routledge, 2020) (co-authored with Harry Graver)

23

*Ethical and Legal Challenges of Artificial Intelligence-Driven Healthcare*, *in* ARTIFICIAL INTELLIGENCE IN HEALTHCARE 295 (Adam Bohr & Kaveh Memarzadeh eds., Elsevier 2020) (co-authored with Sara Gerke and Timo Minssen)

*The Ethics and Laws of Medical Big Data*, *in* THE CAMBRIDGE HANDBOOK OF LIFE SCIENCE, INFORMATION TECHNOLOGY AND HUMAN RIGHTS 48 (Marcello Ienca et al. eds., Cambridge University Press 2021) (co-authored with Hrefna D. Gunnarsdóttir, Timo Minssen and Sara Gerke)

*Liability for Use of Artificial Intelligence in Medicine*, *in* RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW (Barry Solaiman & I. Glenn Cohen eds, 2024) (co-authored with W. Nicholson Price II & Sara Gerke)

*The Development, Implementation, and Oversight of Artificial Intelligence in Health Care: Legal and Ethical Issues*, *in* I HANDBOOK OF BIOETHICAL DECISIONS 441 (Erick Valdés & Juan Alberto Lecaros eds., Springer 2023) (co-authored with Sara Gerke & Jenna Becker)

*Assessing Public and Private Rights of Action to Police Health Data Sharing*, *in* THE LAW AND ETHICS OF DATA SHARING IN HEALTH SCIENCES 33 (Marcelo Corrales Compagnucci et al. eds 2024) (co-authored with Carmel Shachar & David Simon)

*Medical AI and Tort Liability*, *in* ARTIFICIAL INTELLIGENCE IN MEDICINE: FROM ETHICAL, SOCIAL, AND LEGAL PERSPECTIVES 89 (Joseph J.Y. Sung and Cameron Stewart eds. 2024) (co-authored with Andrew Slottje and Sara Gerke)

*A Framework for Health, AI, and the Law*, *in* RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW 1 (Elgar Publishing, 2024) (Barry Solaiman and I. Glenn Cohen eds 2024) (co-authored with Barry Solaiman)

*Artificial Intelligence and the Law of Informed Consent*, *in* RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW 167 (Elgar Publishing, 2024) (Barry Solaiman and I. Glenn Cohen eds 2024) (co-authored with Andrew Slottje)

*Liability for Use of Artificial Intelligence in Medicine*, *in* RESEARCH HANDBOOK ON HEALTH, AI AND THE LAW 150 (Elgar Publishing, 2024) (Barry Solaiman and I. Glenn Cohen eds 2024) (co-authored with Sara Gerke and W. Nicholson Price II)

## (11) OTHER PROJECTS

### Books

H20 FREE CIVIL PROCEDURE TEXTBOOK, available at **http://brk.mn/cohencivpro**

IDENTIFIED V. STATISTICAL LIVES: ETHICAL, LEGAL, AND MEDICAL PERSPECTIVES (co-editor with Nir Eyal and Norman Daniels and contributing a chapter, Oxford University Press, 2015)

### Law Journals

*Rationing Legal Services*, 5 J. L. ANALYSIS 221 (2013)

*This is Your Brain on Human Rights: Moral Enhancement and Human Rights*, 9 LAW AND ETHICS OF HUMAN RIGHTS 1 (2015) (symposium, Human Rights and Human Minds)

### Medical, Philosophy, Public Health and Bioethics Journals

*Effect of Patient and Therapist Factors on Suicide Risk Assessment*, 39 DEATH STUD. 433 (2015) (co-authored with NC Berman, A. Stark, A. Cooperman, and S. Wilhelm)

*Clinical Decision Making Regarding Suicide Risk: Effect of Patient and Clinician Age*, 40 DEATH STUD. 269 (2016) (co-authored with NC Berman, ES Tung, N Matheny, and S. Wilhelm)

*Effect of a Legal Prime on Clinician's Assessment of Suicide Risk,* 40 DEATH STUD. 61 (2016) (co-authored with NC Berman, A Sullivan, and S. Wilhelm)

*Designing Development Programs for Non-Traditional Antibacterial Agents*, 10 NATURE COMM. 3416 (2019) (co-authored with John H. Rex, Holly Fernandez Lynch, Jonathan J. Darrow and Kevin Outterson)

**Book Chapters**

*Litigation and the Statistical v. Identified Lives Issue: On Standing, Ripeness, and Class Actions*, in IDENTIFIED V. STATISTICAL LIVES: ETHICAL, LEGAL, AND MEDICAL PERSPECTIVES (I. Glenn Cohen, Nir Eyal, and Norman Daniels eds., 2015)

**(11) PRE-FELLOWSHIP WORK**

Case Comment*, Supreme Court of New Jersey Holds that Preembryo Disposition Agreements Are Not Binding When One Party Later Objects*, *J.B. v. M.B.*, 115 HARV. L. REV. 701 (2001)

*Note, Gore, Gibson, and Goldsmith: The Evolution of Internet Metaphors in Law and Commentary*, 16 HARV. J. L. TECH. 265 (2002) (co-authored with Jonathan Blavin)

*Note, The Price of Everything, the Value of Nothing: Reframing the Commodification Debate*, 117 HARV. L. REV. 689 (2003)

*Therapeutic Orphans, Pediatric Victims? The Best Pharmaceuticals for Children Act and Existing Pediatric Human Subject Protection*, 58 FOOD & DRUG L. J. 661 (2003)

*Negotiating Death: ADR and End of Life Decision-making*, 9 HARV. NEGOTIATION L. REV. 253 (2004) (awarded a CPR Institute for Dispute Resolution Award of Excellence)

*Negotiating in the Shadow of Death*, DISPUTE RESOLUTION MAGAZINE 12 (Fall 2004)

**OP-EDS AND WRITING FOR PUBLIC AUDIENCES**

*Mississippi's Ambiguous Personhood Amendment*, New York Times, Oct 31, 2011, available at http://www.nytimes.com/2011/10/31/opinion/mississippis-ambiguous-personhood-amendment.html (co-written with Jonathan Will)

*Guatemalans Used in Experiments Deserve Compensation,* New York Times, July 4, 2011, available at http://www.nytimes.com/2012/07/05/opinion/guatemalans-used-in-experiments-deserve-compensation.html?_r=1&adxnnl=1&adxnnlx=1345907160-K8WS0SLJalIknr/t6qtBmg (co-written with Holly Lynch)

*The Flawed Basis Behind Fetal-pain Abortion Laws*, Washington Post, Aug 1, 2012, available at http://www.washingtonpost.com/opinions/the-flawed-basis-behind-fetal-pain-abortion-laws/2012/08/01/gJQAS0w8PX_story.html?hpid=z4

*It is Time for the U.S. to Cover IVF (for Gays and Lesbians too)*, Huffington Post, March 18, 2013, available at http://www.huffingtonpost.com/dov-fox/it-is-time-for-the-us-to-_b_2900323.html

*Some Insurance Companies Ask Their Customers to Cross the Border for Care*, The New Republic, July 7, 2014 (co-authored with Adam Teicholz), available at http://www.newrepublic.com/article/118546/some-insurance-companies-ask-customers-cross-border-care

*Nudging the FDA*, The American Interest, Vol. 10, No. 2, October 17, 2014 (co-authored with William Nicholson Price II), available at http://www.the-american-interest.com/2014/10/17/nudging-the-fda/

*New Blood Donor Policy, Same Gay Stigma,* New York Times, May 21, 2015 (co-authored with Eli Y. Adashi), available at http://www.nytimes.com/2015/05/21/opinion/new-blood-donor-policy-same-gay-stigma.html?ref=opinion&_r=1)

*The Non-Spaces of Medical Tourism*, 40 Harvard Design Magazine, Spring 2015, available at http://www.harvarddesignmagazine.org/issues/40/the-non-spaces-of-medical-tourism

*How is it Even Possible For Sofia Vergara's Embryos to Sue Her? A Harvard Law Prof Weighs In*, Refinery 29, Dec. 8, 2016, available at http://www.refinery29.com/2016/12/132368/sofia-vergara-embryo-lawsuit-explained

*When NFL Calls the Doctor*, Boston Globe, Nov. 17, 2016 (co-authored with Holly Fernandez Lynch and Chris Deubert), available at https://www.bostonglobe.com/opinion/2016/11/17/when-nfl-calls-doctor/ZXmx9C3zAFBScgXGZb22gL/story.html

*Artificial Wombs are Coming. They Could Completely Change the Debate over Abortion*, Vox, Aug. 23, 2017, available at https://www.vox.com/the-big-idea/2017/8/23/16186468/artificial-wombs-radically-transform-abortion-debate

*Smart Pills Can Transmit Data to Your Doctors, But What About Privacy?*, New Scientist, Sept.19, 2018 (co-authored with Alex Pearlman), available at https://www.newscientist.com/article/2180158-smart-pills-can-transmit-data-to-your-doctors-but-what-about-privacy/

*Creating Eggs and Sperm From Stem Cells: The Next Big Thing in Assisted Reproduction?*, Stat News, June 5, 2019 (co-authored with Alex Pearlman), available at https://www.statnews.com/2019/06/05/creating-eggs-sperm-stem-cells/

*Protect the Doctors and Nurses Who Are Protecting Us,* New York Times, April 1, 2020, (co-authored with Andrew M. Crespo and Douglas B. White), available at https://www.nytimes.com/2020/04/01/opinion/coronavirus-ventilators-doctors.html

*Maximizing Use Of Claims Data To Address COVID-19: We Need To Revisit Gobeille v. Liberty Mutual,* Health Affairs Blog, Aug 8, 2020 (co-authored with Carme Shachar and Sara Gerke), available at https://www.healthaffairs.org/do/10.1377/hblog20200805.788636/full/

*Can AI Fairly Decide Who Gets an Organ Transplant?*, Harvard Business Review, December 1, 2020 (co-authored with Boris Babic, Sara Gerke, Theodoros Evgeniou, and Nikos Trichakis), available at https://hbr.org/2020/12/can-ai-fairly-decide-who-gets-an-organ-transplant

*'Authorization' Status is a Red Herring when it Comes io Mandating Covid-19 Vaccination*, STAT News, April 5, 2021 (co-authored with Dorit R. Reiss and Carmel Shachar), available at https://www.statnews.com/2021/04/05/authorization-status-covid-19-vaccine-red-herring-mandating-vaccination/

*Can Your Employer Require that You Get Vaccinated? It Depends Where You Live*, TIME, Aug 2, 2021, available at https://time.com/6086537/covid-19-vaccine-employer-required/

26

*Cruise Ship Vaccine Mandates are Great. The Latest Ruling for Them Wasn't*, The Washington Post, Aug 11, 2021, available at https://www.washingtonpost.com/outlook/2021/08/11/cruise-ship-vaccine-mandate-decision-first-amendment/  (co-authored with Christopher Robertson)

*The Danger of the Supreme Court Undercutting Biden's Vaccination Rules*, TIME, Jan. 10, 2022, available at https://time.com/6138247/supreme-court-bidens-vaccination-rules/ (co-authored with Carmel Shachar)

*What The Supreme Court's Abortion Reversal Means for In Vitro Fertilization*, THE BOSTON GLOBE, June 30, 2022, available at https://www.bostonglobe.com/2022/06/30/opinion/what-supreme-courts-abortion-reversal-means-vitro-fertilization/ (co-authored with Judith Daar and Eli Y. Adashi)

*The Family Glitch, Premium Stacking, and the Need to Revisit Health Care Reform*, HEALTH AFFAIRS FOREFRONT, Nov. 17, 2022, available at https://www.healthaffairs.org/content/forefront/family-glitch-premium-stacking-and-need-revisit-health-care-reform (co-authored with Carmel Shachar James René Jolin and Eli Y. Adashi)

*Beyond HIPAA: The FTC's Increasing Focus On Protecting Health Data*, HEALTH AFFAIRS FOREFRONT, Aug 31, 2023, available at https://www.healthaffairs.org/content/forefront/beyond-hipaa-ftc-s-increasing-focus-protecting-health-data (co-authored with Carmel Shachar and Eli Y. Adashi)

*With the National Uninsured Rate at a Record Low, Focus on Maintaining the Gains*, HEALTH AFFAIRS FOREFRONT, Oct 19, 2023, available at https://www.healthaffairs.org/content/forefront/national-uninsured-rate-record-low-focus-maintaining-gains (co-authored with Carmel Shachar and Eli Y. Adashi)

*Preimplantation Polygenic Risk Score Testing Is Unvalidated and Unregulated*, HEALTH AFFAIRS FOREFRONT, Oct 30, 2023, available at https://www.healthaffairs.org/content/forefront/preimplantation-polygenic-risk-score-testing-unvalidated-and-unregulated (co-authored with Daniel P. O'Mahony and Eli Y. Adashi)

*For Physician-Assisted Suicide In Massachusetts, Uncertainty Remains Post-Kligler*, HEALTH AFFAIRS FOREFRONT, Dec 20, 2023, available at https://www.healthaffairs.org/content/forefront/physician-assisted-suicide-massachusetts-uncertainty-remains-post-kligler (co-authored with Konstantin Tretyakov and Eli Y. Adashi)

*Congress' Failure To Address Violence Against Health Care Workers*, HEALTH AFFAIRS FOREFRONT, Feb 2, 2024, available at https://www.healthaffairs.org/content/forefront/health-care-violence-epidemic-and-congress-s-failure-act?utm_medium=social&utm_source=twitter&utm_campaign=forefront&utm_content=o%27mahony (co-authored with Daniel P. O'Mahony and Eli Y. Adashi)

*Developing Drugs For A Developing Climate*, HEALTH AFFAIRS FOREFRONT, July 11, 2024, available at https://www.healthaffairs.org/content/forefront/developing-drugs-developing-climate (co-authored with David Simon)

*A Guide to Managing Interconnected AI Systems*, HARVARD BUSINESS REVIEW, Dec 16, 2024, https://hbr.org/2024/12/a-guide-to-managing-interconnected-ai-systems (co-authored with Theodoros Evgeniou and Martin Husovec)

*The Overdue Imperative Of Cross-Racial Pulse Oximeters*, HEALTH AFFAIRS FOREFRONT, Jan 14, 2025, available at https://www.healthaffairs.org/content/forefront/overdue-imperative-cross-racial-pulse-oximeters (co-authored with Eli Y. Adashi and Daniel O' Mahony)

*Threats To Health Care Fraud Enforcement From The US Supreme Court*, HEALTH AFFAIRS FOREFRONT, March 17, 2025, available at https://www.healthaffairs.org/content/forefront/threats-health-care-fraud-enforcement-us-supreme-court (co-authored with Jacob T. Elberg and Eli Y. Adashi)

*Data Deletion Rights Must Be a Priority in Privacy Legislation*, BLOOMBERG, Aug 21, 2025, available at https://news.bloomberglaw.com/us-law-week/data-deletion-rights-must-be-a-priority-in-privacy-legislation (co-authored with Guillermo Astudillo)

## LAW SCHOOL COURSES

Reproductive Technology and Genetics: Legal and Ethical Issues (Spring '08, Spring '09, Spring '10, Spring '11, Spring '17, Spring '21)

Civil Procedure (Fall '08, Fall '09, Fall '10, Fall '11, Fall '13, Fall '14, Fall '15, Fall '16, Fall '17, Fall '18, Fall'19, Fall '20, Fall '21, Fall '22, Fall '23, Fall '24)

Health Law Policy, Biotechnology, and Bioethics Workshop (Fall/Spring '09-'10, '10-'11. '11-'12, '12-'13, '13-'14, '14-'15, '16-'17, Fall '17, Fall '18, Fall '19, Fall '20, Fall '21, Fall '22, Fall '23, Fall '24) (co-taught with others in some years)

Bioethics and Health Law: Selected Topics (Winter Term '19, Winter Term '20, Winter Term '21)

Writing Group: Health Law, Bioethics, FDA Law (Spring '21, Fall/Spring '21-22, Fall/Spring '22-23; Fall/Spring '23-24)

Psychedelic Law and Policy (Spring '24, Fall '24 ) (co-taught with Mason Marks)

Lawyers, Doctors, Ethics, and Professionalism (Spring '14, '15) (co-taught with Dr. Rebecca Brendel)

Freshman Seminar: Bioethics through Film: An Exploration of the Law and Ethics of Medicine (Fall '16)

## ASYNCHRONOUS ONLINE COURSES

Introduction to American Civics: Presented by Zero- L, available at https://www.edx.org/course/zero-l-presents-introduction-to-american-civics (course creator for free online course launched Summer '20)

Zero- L, available at https://online.law.harvard.edu/ (course creator for online course launched wide in Summer '20 has been used at over 120 law schools)

Bioethics: The Law, Medicine, and Ethics of Reproductive Technologies and Genetics, available at https://www.edx.org/course/bioethics-law-medicine-ethics-harvardx-hls4x (free online course launched Fall '16 which has educated more than 97,000 students)

## JUDICIAL CLERKSHIP

HON. MICHAEL BOUDIN, U.S. COURT OF APPEALS FOR THE FIRST CIRCUIT, Law Clerk, 2003-2004

## LEGAL WORK EXPERIENCE

HARVARD LAW SCHOOL, PETRIE-FLOM CENTER FOR HEALTH LAW POLICY, BIOTECHNOLOGY, AND BIOETHICS, Academic Fellow & Lecturer On Law, 2006-2008
　　　　Conducted and presented research relating to health law and bioethics. Taught a seminar at law school in the spring of 2008 on legal and ethical issues related to reproductive technology and genetics.

UNITED STATES DEPARTMENT OF JUSTICE, ATTORNEY GENERAL'S HONORS PROGRAM, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., Attorney, 2004-2006
> Briefed and argued cases in the Circuit Courts defending the United States and acts of Congress. Drafted briefs in the U.S. Supreme Court in conjunction with the Solicitor General's Office. Advised the Attorney General, the Solicitor General, and other units of the Justice Department on numerous legal matters.

DAVIS, POLK & WARDWELL, New York, Summer Associate, Summer 2002

U.N., INTERNATIONAL CRIMINAL TRIBUNAL FOR RWANDA, Tanzania & Rwanda, Legal Intern, Summer 2001

## LITIGATION EXPERIENCE

Served as amicus counsel in:

> Whole Woman's Health v. Hellerstedt, 579 U.S. 582 (2016) (brief with Melissa Murray and Jessie B. Hill)
> Association for Molecular Pathology v. Myriad Genetics, Inc., 569 U.S. 576 (2013), brief on behalf of Dr. Eric Lander (discussed extensively at oral argument by the Justices)

Served as lead counsel in the following cases before the U.S. Courts of Appeals while at the Justice Department:
> Doe v. FAA, 432 F.3d 1259 (11th Cir. 2005)
> Landes v. Tartaglione, 153 Fed. Appx. 131 (3d Cir. 2005)
> Branham v. Snow, 392 F.3d 896 (7th Cir. 2005) (rehearing petition only)
> Avalos-Galvan v. Gonzales, 170 Fed. Appx. 501 (9th Cir. 2006)
> Goodin v. U.S. Postal Inspection Service, 444 F.3d 998 (8th Cir. 2006)
> Luna Tech, Inc. v. Bureau of Alcohol, Tobacco and Firearms, 183 Fed. Appx. 863 (11th Cir. 2006)
> Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290 (D.C. Cir. 2006)
> Silva v. Gonzales, 463 F.3d 68 (1st Cir. 2006)
> Strolberg, et al., v. Akal Securities, Inc., et al., 210 Fed. Appx. 683 (9th Cir. 2006)
> Wilson, et al. v. MVM, et al., 475 F.3d 166 (3d Cir. 2007)
> In re Reynoso, 477 F.3d 1117 (9th Cir. 2007)
> Frahm v. United States, 492 F.3d 258 (4th Cir. 2007)

Served as counsel in the following cases before the U.S. Courts of Appeals and U.S. Supreme Court while at the Justice Department:
> City of Rancho Palos Verdes v. Abrams, 544 U.S. 113 (2005)
> Cobell v. Norton, 428 F.3d 1070 (D.C. Cir. 2005)
> In re Kempthorne, 449 F.3d 1265 (D.C. Cir. 2006)
> Cobell v. Kempthorne, 455 F.3d 301 (D.C. Cir. 2006)
> Cobell v. Kempthorne, 455 F.3d 317 (D.C. Cir. 2006)
> U.S. ex rel. Battle v. Board of Regents for Georgia, 468 F.3d 755 (11th Cir. 2006)
> Walton v. U.S. Marshals Service, et al., 476 F.3d 723 (9th Cir. 2007)
> Abigail Alliance v. Eschenbach, 495 F.3d 695 (D.C. Cir. 2007) (rehearing petition only)

I have also been a signatory to many amicus briefs and served as an expert witness or advisor in several cases.

## BAR

Admitted to the New York Bar in January 2004. Admitted to practice in the First, Third, Fourth, Fifth, Seventh, Eighth, Ninth, and D.C. Circuits.

## FELLOWSHIPS

Radcliffe Institute for Advanced Studies Fellowship, 2012-2013 (awarded to 50 out of 950 applicants from across the world and all disciplines and professions)

Greenwall Faculty Scholar in Bioethics, 2012-2015 ($400,000 in funding to devote time to research, awarded to two leading young scholars in bioethics).

Pierre Elliot Trudeau Foundation Fellow, 2020-2023 (one of our fellows selected by one of Canada's leading foundations to act as "outstanding public educators, dynamic professors and intellectual guides to Scholars over a three-year program cycle" focused on technology and ethics)

Hastings Center, Fellow, 2016-Present (recognition of the leading bioethics scholars in the world by the Hastings Center)

**MAJOR GRANTS AND GIFTS**

Project Co-Lead, Football Players Health Study at Harvard (multi-year multi-million dollar study on the health of NFL Players including concussions) (2012-2017)

Project Co-Lead, Ethics and Law, Regulatory Foundations, Ethics, and Law Program of Harvard Catalyst | The Harvard Clinical and Translational Science Center (multi-million dollar multi-year NIH funded project to improve translational research and ethically reduce barriers to research), (2013-present)

Co-Investigator, Patient-Centered Outcomes Research Oversight Study (PCOROS) (aims to understand Key ethical barriers to the oversight of patient-centered outcomes research through mixed methods empirical research with investigators, IRBs, and patient groups.) (2015-2018)

Co-Investigator, Advancing Collaborative Genetic Research: Ethical and Policy Challenges (seeks to develop appropriate ethical frameworks and regulatory parameters for research with biospecimens by publishing a book based on a conference of national thought leaders) (2015-2018)

Project Lead, Precision Medicine, Artificial Intelligence, and the Law (PMAIL) (provides a comparative analysis of the law and ethics of black-box personalized medicine, explaining the shortcomings of the current innovation policy landscape in Europe and the US, and providing a comprehensive examination of various policy options to better harness the potential of black-box medicine, supported by a Novo Nordisk Foundation-grant for a Collaborative Research Programme grant agreement number NNF17SA027784) (2018-2023).
Work expanded to included include polygenic risk scores, advanced medical computing, quantum technology as part of International Collaborative Bioscience Innovation & Law Programme (Inter-CeBIL), supported by a Novo Nordisk Foundation-grant for a Collaborative Research Programme grant agreement number NNF23SA0087056 (2023-2028)

Project Lead, Diagnosing in the Home: The Ethical, Legal, and Regulatory Challenges and Opportunities of Digital Home Health (develop scholarship, guidelines, and proposed regulations for the ethical implementation of digital products that support clinical diagnosis in patients' homes, supported by a grant from the Gordon and Betty Moore Foundation (grant agreement number 9974) (2020-2024)

Project Lead, The Project on Psychedelics Law and Regulation (POPLAR) (Project to study safety, innovation, and equity in psychedelics research, commerce, and therapeutics, supported by a generous gift from the Saisei Foundation) (2021-2025)

Project Lead, Gracias Family Psychedelics Research Initiative and Bootcamp in Ethics Regulation Fund at Harvard Law School (Project to study how the therapeutic use of psychedelics interfaces with law and ethics and support training for emerging leaders in the space) (2023-Present)

**JOURNALS AND OTHER AFFILIATIONS**

30

Co-Editor in Chief, The Journal of Law and the Biosciences, an Oxford University Press peer-reviewed journal (2013-present)

Editorial Board of the American Journal of Bioethics (2015-present)

Editorial Board of the Lancet, Digital Health (2020-present)

Peer reviewer for the American Society for Bioethics and Humanities, the New England Journal of Medicine, The Lancet, The Hastings Center Report, The American Journal of Bioethics, Law and Contemporary Problems, Law and Philosophy, the American Journal of Public Health and Bioethics

Committee Member, OPTN/UNOS Ethics Committee (2018-2023)

Committee Member, National Academies of Medicine, Committee on Emerging Science, Technology, and Innovation in health and medicine (2019-present)

Committee Member, National Academies of Science, Engineering, and Medicine, Committee on Issues in Organ Donor Intervention Research Committee on Emerging Science, Technology, and Innovation in health and medicine (2016-2017)

Committee Member, Ethics Committee for the American Congress of Obstetricians and Gynecologists (ACOG) (2016-2020)

Committee Member, Steering Committee for Ethics for the Canadian Institutes of Health Research (CIHR) (2015-2018)

Board Member of the American Association of Law Schools, Law, Medicine, and Health Care Section Executive Committee (2009-2012)

Board member of the Institutional Review Board for Fenway Community Health (2007-2010)

NY and Massachusetts Civil Procedure Bar Review lecturer for Themis bar review (2011-2017)


**CURRENT BOARD WORK**

Member (2021-present), Board of Trustees, New England Donor Services

Member (2021-present), Bioethics Council, Bayer

Member (2020-2024) and Chair (2024-present), Ethics Advisory Board, Illumina


**BLOGGING, TWEETING, Etc**

I tweet @CohenProf

I am a founder of and blogger at Bill of Health (http://blogs.law.harvard.edu/billofhealth/).  The Greenbag Publication "The Post" has selected my 2012 blogging on abortion and personhood amendments for its "exemplary legal writing" award in the blog category http://journaloflaw.us/5%20The%20Post/The%20Post%20home.html.

I gave a Tedx talk.

[This CV is current as of Sept 5, 2025]

## APPENDIX B – MATERIALS CONSIDERED

1. Remediated ██████████████ Exemplars
    a. Blue Cross Blue Shield
    b. Cigna
    c. Maryland Health Connection
    d. Kaiser Permanente
    e. MedStar Health
    f. Biktarvy
    g. Banner Health
    h. University of Miami
    i. Goshen Health

2. Meta/Facebook Privacy & Data Policies
    a. PIXEL_HEALTH000735582
    b. PIXEL_HEALTH000865131
    c. PIXE_HEALTH000865058
    d. PIXEL_HEALTH000421281
    e. PIXEL_HEALTH001179858
    f. PIXEL_HEALTH000419948
    g. PIXEL_HEALTH001179530
    h. PIXEL_HEALTH001163428
    i. PIXEL_HEALTH000417167
    j. PIXEL_HEALTH000419237
    k. PIXEL_HEALTH000413903
    l. PIXEL_HEALTH000565770

3. Meta/Facebook Terms of Service & Statement of Rights and Responsibilities
    a. PIXEL_HEALTH000419931
    b. PIXEL_HEALTH001179875
    c. PIXEL_HEALTH000416719
    d. PIXEL_HEALTH000418746
    e. PIXEL_HEALTH000416895
    f. PIXEL_HEALTH000413908
    g. PIXEL_HEALTH000000377

4. Court Filings
    a. Declaration of Richard M. Smith In Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. 49)
    b. First Amended Consolidated Class Action Complaint (Dkt. 336)
    c. January 29, 2024 Order on Motion to Dismiss and Strike (Dkt. 417)
    d. September 7, 2023 Order on Motion to Dismiss (Dkt. 316)

e.  Declaration of Jason "Jay" Barnes Attaching Megataxon Documents as Exhibits (Dkt. 630-10)
f.  September 13, 2024 Joint Discovery Dispute Letter (Dkt. 630-5)
g.  September 13, 2024 Joint Discovery Dispute Letter (Dkt. 630-7)
h.  Declaration of Dr. Atif Hashmi Regarding Use of Pixel Data and Various Tables (Dkt. 630-9)

5.  Deposition Transcripts & Exhibits
    a.  Jane Doe I
    b.  Jane Doe IV
    c.  Jane Doe V
    d.  Jane Doe IX
    e.  Jane Doe X
    f.  John Doe II
    g.  John Doe III

6.  Plaintiffs' Fifth Set of Interrogatories to Defendant Meta Platforms, Inc.

7.  Expert Report of Zubair Shafiq, PhD, dated September 9, 2025