# Proposed Redacted Version of Exhibit 6 (Dkt. No. 1154-8)

In re Meta Pixel Healthcare Litigation
United States District Court for the Northern District of California
Case No. 3:22-cv-03580-WHO (VKD)

---

## EXPERT REPORT OF KATE BARASZ

---

## I.   BACKGROUND

1.     I'm a former business school professor who has studied consumers for nearly 20 years. After earning my BA in both Economics and Public Policy Studies from Duke University (Durham, NC) in 2006, I spent four years working as a consultant at Bain & Company (Atlanta, GA and Boston, MA), where — among other things — I conducted consumer research for a host of business-to-consumer (B2C) companies. In 2010, I enrolled in the Doctor of Business Administration (DBA) program at Harvard Business School (Boston, MA), where I studied consumer behavior in the Marketing Unit. Upon my graduation in 2016, I held tenure-track faculty positions at IESE Business School (Barcelona, Spain), Harvard Business School, and ESADE Business School (Barcelona, Spain), where I taught marketing courses to Master of Business Administration (MBA) students.

2.     During my academic career, I researched consumer decision-making with a specific focus on both consumer privacy and medical decision-making. I published regularly in top peer-reviewed journals in psychology, marketing, and general social sciences, as well as in practitioner-oriented outlets (e.g., *Harvard Business Review*). As is common practice within my field, I primarily used randomized controlled trials (i.e., "experiments") to observe consumers' general attitudes and behavior — a method that allows researchers to discern broad patterns that transcend individual differences. Consistent with this methodology, I will refer throughout the report to an "average consumer," a generalization that is based on empirical results and is grounded within the research methods I (and others) relied upon. Worth noting, both the actual experimental participants we recruited, as well as the resulting conceptualization of an "average consumer," align with what I understand the Court's definition of a "reasonable consumer" to be — someone with the level of sophistication of the general public.

3.     Throughout my time as a behavioral researcher, I pursued topics that involved protecting and enhancing consumer welfare; however, in the classroom, I found that teaching the practice of marketing often ran counter to these values — that there was too much emphasis on exploiting (rather than safeguarding) consumers' known vulnerabilities. In large part because of my own ethical concerns over this disconnect, I left academia in 2023. Instead, I opened two English bookshops in Barcelona, Spain, where I now spend my days interacting with (and still making observations about) the very consumers I spent two decades studying.

4.     My hourly rate is $750.00, and my fee is neither contingent on the results of this case nor contingent on the content of my opinion. I have never testified as an expert witness at trial or by deposition. My present opinion is limited to the scope of the assignments I have considered to date. The materials I relied upon are identified in the Appendix. I understand that Meta is continuing to produce information and documents and I may amend my conclusions after access to additional infsormation. I may also submit additional opinions in this action at a later point in time.

5.     Attached as **Exhibit A** is a copy of my academic curriculum vitae, which includes additional education and employment experience and qualifications, as well as a list of publications I have authored.

6.     I reserve the right to amend my declaration upon receipt of any additional information that is made available to me.

## II.     MY ASSIGNMENT

7.     I was asked to provide my opinions on the following four questions:

- **Do Meta users care about maintaining their online privacy?**
- **Do Meta users have expectations about how their personal information is handled?**
- **Would Meta users expect a company like Meta to obtain their personal information from partners who were not allowed to share it?**
- **What effect would Meta's transparency and control tools — e.g.,** *Why Am I Seeing This Ad, Download Your Information,* **and** *Off-Facebook Activity* **— have on Meta users?**

## III.     MY OPINIONS

### A.     Meta users care about online privacy.

8.     A wealth of anecdotal and empirical evidence demonstrates that the average consumer cares about their online privacy — how their personal information is collected and disseminated, and the ends to which it is ultimately used. For instance, a recent Pew Research survey revealed that 81% of adults reported being concerned about how companies use the data

they collect about them.[1] Convergently, a Deloitte survey showed that 85% of respondents have taken specific actions to protect their online privacy.[2]

9.      However, the average consumer's behavior can sometimes appear at odds with these preferences. As a result of this well-documented "privacy paradox," consumers may simultaneously report wanting to safeguard personal information while acting in ways that seem to run counter to this very objective — e.g., voluntarily disclosing personal information (such as email addresses or phone numbers), posting personal photos, or sharing private updates on public platforms. To an observer, this could suggest that the average consumer is therefore unconcerned about their personal information; however, a robust body of consumer behavior research has concluded that this is less a reflection of relinquished privacy and more a consequence of overriding factors that encourage disclosure — even at the direct expense of privacy.[3]

10.      One such factor is a simple lack of awareness: in the complex online world, the average consumer does not truly understand how their personal information is being collected, disseminated, and used. Consequently, they disclose without fully accounting for the costs of such disclosure. This lack of awareness is reasonable; tracking methods are technically complex and effectively invisible to the average consumer, making it difficult for them to observe — let alone truly understand — how their personal information is being used. Moreover, this lack of awareness is difficult to counteract. Increasingly complex algorithms mean that many firms (including Meta) lack a precise grasp of all the different ways the very information they collect is ultimately used, making it impossible for the average consumer to overcome this awareness gap on their own.

11.      Another factor underlying the privacy paradox is a lack of agency in changing how data are collected and used: the average consumer can care deeply about safeguarding their privacy but lack (or believe they lack) the ability to do anything about it. For instance, many platforms require consumers to give wholesale consent to terms and conditions prior to use, without affording the ability to disable particular features. Further, even when platforms offer customizable privacy settings, many default to an "opt-out" policy (i.e., personal data are shared unless consumers take direct action to select otherwise), which can result in customizable

---

[1] https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/
[2] https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html
[3] https://hbr.org/2015/10/we-say-we-want-privacy-online-but-our-actions-say-otherwise

features being difficult to find and often onerous to use. (A personal example: when I navigated to my own Ad Preferences settings from the Facebook homepage, it took eight clicks — and the very explicit knowledge of where I was trying to go — to opt out of the default setting allowing Meta to use my personal information shared from its partners.)

12.     Therefore, as it pertains to this case, it is my opinion that:

a.     Meta users care about their online privacy. As Meta users are representative of the U.S. population at large — and the majority of the U.S. population at large reports caring a lot about online privacy — this is not a surprising conclusion. But results from Meta's own internal surveys corroborate this: a ████ of U.S. participants were ██

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████ **Exhibit B**

(PIXEL_HEALTH001317598).

b.     Meta's users are subject to the privacy paradox; therefore, Meta users' continued presence on the platform cannot be taken as evidence of nonexistent or mitigated privacy concerns. Instead, factors observed industry-wide — such as a lack of awareness about data usage, or a general belief that they cannot meaningfully protect their data — can explain why Meta users remain on the platform even in the face of privacy concerns. Indeed, ██████

████████████████████████████████████████████

██████████████████████████████████████████████

██  (On average, only ██████████████████████████ data collection examples that Meta asked about). *Id.*

c.     Meta users do not understand all the ways in which their personal data is collected, disseminated, and used; were they sufficiently and explicitly apprised of these practices, Meta users would object to (and opt-out of) many. As I discuss below, Meta users may be more focused on their on-platform privacy (e.g., the audience of other Facebook or Instagram users with whom their stories and updates are shared), and less aware — perhaps wholly unaware — of the myriad off-platform, third-party sites from which Meta is harvesting their personal information.

**B.** **Meta users have expectations and beliefs about how firms do and should handle their personal information. They care not only about *what* personal information is collected, but also *how* it is collected, disseminated, and used.**

13.    Whenever the average consumer faces a novel situation, they bring their own past experiences to bear, interpreting the new through the lens of the familiar. These "background beliefs" meaningfully shape the ways in which the average consumer makes inferences, how (and whether) they seek additional information, and the ways in which they interact with stimuli.

14.    The fact of these background beliefs is particularly relevant in the complex online sphere, where — as discussed above — a meaningful understanding of information flows and data tracking is elusive. In these situations, the average consumer overlays a gap in awareness about what *is happening* with an expectation about what *should be happening*. Indeed, in research that my colleagues and I conducted, we found that — when making sense of how information flows in the complicated (and often opaque) online world — the average consumer applies their own expectations about the offline world (p. 908)[4]:

> In the offline world, acceptable versus unacceptable flows of information are generally well established and agreed upon. A wealth of research shows that people inherently understand, and generally adhere to, implicit rules of communication. For instance, people are adept at complying to social rules of disclosure and penalize non-compliance. And, with respect to the sharing of personal information in particular, there are norms or "rules" that span across contexts. ...
>
> In offline contexts, there are strong norms with respect to appropriate flows of personal information, and violations of these norms can seem invasive.
>
> Although offline and online worlds differ greatly in the way personal information is gathered and used, we posit that when determining whether a given ad practice is acceptable, consumers turn to the offline world as a guidepost, where these norms – the ways in which individuals should behave in sharing personal information – are well established and well understood. Indeed, philosopher Helen Nissenbaum suggest that in orienting to the often bewildering online world, consumers look for "the contours of familiar social activities and structures."

---

[4] https://psycnet.apa.org/record/2019-23347-002

15.    Said differently, the average consumer expects the norms that govern their offline lives will also be upheld in the online sphere. Just as sharing someone else's personal information with another person — i.e., "talking behind one's back" — is a violation of social norms in the offline world, the average consumer also views such third-party information sharing as a norm violation in the online world.

16.    To prove this, our research used both inductive and deductive methods to show that the average consumer has expectations about their personal information along two distinct dimensions: (1) how their information can be shared, and (2) what kind of information can be gathered.

17.    On the first dimension, we determined that the average consumer is sensitive to how their personal information flows — i.e., who collects it and with whom they share it. In a series of studies, we compiled a list of 30 data collection practices that Facebook and Google acknowledge using. We measured how acceptable the average consumer found these practices to be, and then assessed which types of practices were similar to one another — i.e., what did the "most acceptable" (or "least acceptable") practices have in common. Our data show that the average consumer is significantly more comfortable with firms using information that was directly shared with the platform ("first-party sharing") than data acquired outside the platform ("third-party sharing"). More concretely, acceptable practices included sources like "Facebook pages...that I have visited" and "Another company's website that I've logged into using my Facebook ID"; unacceptable practices included sources like "My past browsing history on another company's website" and "Another company's website that I've logged in without using my Facebook ID."

18.    On the second dimension, we found that the average consumer is sensitive to the ways in which their personal information is collected — i.e., whether it was explicitly disclosed or implicitly inferred. While the average consumer views explicitly disclosed information (e.g., something stated on one's Facebook profile) as fair game, so to speak, they view that same information implicitly gleaned (e.g., traits inferred based on Facebook usage) as inherently more off-limits. For instance, the average consumer will not object to Facebook serving up targeted ads based on her relationship status (e.g., divorced) if she had disclosed that fact in her Facebook profile, but find it unacceptable had those same ads been based on a relationship status that was inferred based on Facebook search histories. Consequently, the average consumer views the

7

exact same information (e.g., one's being divorced) differently depending on how it was obtained.

19.    Finally, the average consumer has different expectations depending on content of the information: the more sensitive the information, the less the average consumer expects (or accepts) that it is collected, disseminated and used — particularly in unacceptable ways.  Indeed, the average consumer values their sensitive data (e.g., health information) more highly than non-sensitive data (e.g., basic observable demographics) and expects to be compensated accordingly for its exchange. [5]

20.    These academic findings align with Meta's own internal documentation.  First, Meta knew that its users were ███████████████████████ For instance, in its own internal survey, respondents were ████████████████████████ ███████████████████████████ of U.S. respondents ticked the box: ████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ ███████████████████ Further, only ██████████████████████████ ███████████████████████ **Exhibit B** (PIXEL_HEALTH001317598).

21.    Second, Meta ████████████████████ ████████████. In the same internal survey, only █████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████ outlined in **Exhibit C** (PIXEL_HEALTH000703922), which Meta users would have found significantly more off-limits.) And all of this is consistent with Meta's own internal acknowledgement that there are situations in which █████████████████████████

[5] https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust

██████████████████████ **Exhibit D** (PIXEL_HEALTH 291336). More simply, there is just some data that shouldn't be shared.

22. Taken together, these findings have the following implications for this case:

a. By default, Meta users would not have expected the company was gathering information from and sharing information with third-party sites in the manner that it was. Because of this background belief, Meta users would not have had reason to seek additional information to verify this assumption, nor explored ways to prevent it from happening. This lack of awareness — rather than an indifference to online privacy — can explain why Meta users may not have taken more active steps to safeguard their personal information.

b. Had they been aware of the ways in which their information was being shared, Meta users would have found Meta's practices unacceptable. Because information was (a) shared between third-parties (i.e., from Meta users to healthcare providers to Meta, rather than directly between Meta users and Meta), (b) inferred (i.e., gleaned from actions taken on a healthcare provider's website rather than expressly disclosed), and (c) particularly sensitive (i.e., was *protected* health information), its collection, dissemination, and use would have violated Meta users' implicit expectations and norms.

c. The _fbp cookie, specifically, transmits information in ways that Meta users would find objectionable: when interacting directly with their healthcare provider, Meta users would neither expect nor find it acceptable for Meta to be involved in the information flow.

23. In sum, knowing that Meta users *care about* how information is shared and obtained, it follows that Meta users should *know about* how information is shared and obtained before reasonably consenting to its disclosure. If these factors have been undisclosed, obscured, or otherwise misrepresented, it is my opinion that Meta users cannot be said to have had a meaningful opportunity to make an informed decision about whether and how to share personal information.

**C.** **Meta users would not have expected Meta to obtain their personal information from partners who did not have the legal right to share it. Moreover, had such a breach occurred, Meta users would have expected Meta to take active steps to stop or correct it.**

24.    In an ideal world, terms and conditions clauses would be sufficient to impart a full and complete understanding of how consumers' personal information is being used — i.e., the "cost" of using a given platform. From this, the average consumer could then make their own decisions about whether that cost is worth the benefit.

25.    In reality, however, terms and conditions policies do little to bridge the gap in consumers' awareness about how their data are used. While consumers must consent to firms' policies before using their services, it's widely acknowledged that such consent tends to be nominal and perfunctory in nature. Given the volume of sites visited and platforms used, it would be nearly impossible to expect the average consumer to thoroughly review each firm's terms and conditions; indeed, one research paper estimated that Americans would spend 54 billion hours annually reading the privacy policy on every website they visited.[6]

26.    Yet even upon fully reading through a company's terms and conditions, the average consumer can still lack a full understanding of how their personal information is used. Terms and conditions clauses are rife with technical terms that the average consumer finds unfamiliar[7] and are often written in ways that are unreadable to a lay person.[8] In fact, many consumers don't even understand the premise of such terms and conditions, erroneously believing that the mere existence of a "privacy policy" means their information is thus kept private.[9]

27.    Moreover, it's important to consider how the average consumer makes inferences about what, exactly, they are consenting to. As discussed above, the background beliefs that the average consumer brings to a given situation can materially change how they interpret it.

28.    Specifically pertaining to this case, consider how Meta users' own experience with the platform informs their background beliefs about Meta's terms and conditions. In order "for [Meta's] Products to work,"[10] Meta users are *required* to provide an email address or phone

---

[6] https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf
[7] https://petsymposium.org/popets/2021/popets-2021-0038.pdf
[8] https://bclawreview.bc.edu/articles/320/files/63a92425205eb.pdf
[9] https://www.nytimes.com/2018/08/20/opinion/20Turow.html
[10] https://www.facebook.com/privacy/policy/

10

number. In these interactions, Meta users learn — through doing — that a lack of compliance triggers a lack of functionality. Therefore, upon reading that Meta "require[s] partners to have lawful rights to collect, use and share your data before providing any data to us"[11] — a partnership arrangement that is both largely unfamiliar and invisible to Meta users — Meta users will interpret this through the lens of their own previous experience: that a partner's lack of compliance would likewise trigger a lack of functionality. Said differently, Meta users would have reasonably believed that if Meta's partners did *not* have the right to share their personal information, the transmission of such information would be automatically and proactively blocked.

29.    Meta users would also have reasonably believed that if such information *hadn't been* blocked, Meta would have taken resolute actions to correct the breach. Again, Meta users' own experience with Meta would have a direct bearing on this belief. Within the Facebook platform (i.e., among Facebook users), Meta users encounter misuse protections that are both prominent (e.g., readily available "Report a post" buttons) and resolute: Meta assures its users that "When something gets reported to Facebook, we'll review it and take action on anything we determine doesn't follow our Community Standards."[12] Therefore, when making inferences about Meta's misuse protections outside of the platform (i.e., among Meta Partners) — protections that are necessarily unobservable, but analogous to those encountered within the platform — Meta users would reasonably conclude that Meta would take similarly resolute protective actions to correct the breach.

30.    Therefore, it is reasonable to expect that Meta users would have formed expectations about what, exactly, they consented to that deviated meaningfully from what was ultimately delivered. This could be true for both Meta users who read and Meta users who did not read the full terms and conditions.

---

[11] **Exhibit E**  (PIXEL_HEALTH000419237), Facebook Data Policy 1/25/2022

[12] https://www.facebook.com/help/messenger-app/103796063044734

**D.**     **Platforms can take actions that directly influence the degree to which the average consumer is concerned about privacy. Thus, to the extent that Meta's transparency and control tools *(i.e., Why Am I Seeing This Ad, Download Your Information,* and *Off-Facebook Activity)* lower its users' concerns about privacy — but do not offer corresponding protections — Meta users may be worse off.**

31.     As discussed above, my research demonstrated that the average consumer holds systematic beliefs about what constitutes acceptable (versus unacceptable) data collection practices. As this same research also showed, disclosing acceptable practices can have distinctly positive outcomes for firms: when the average consumer was told that their personal information was collected via acceptable means, they were less concerned about privacy and more likely to engage with ads.

32.     This is consistent with a broader body of research that documents the ways in which platforms can directly influence the average consumer's privacy concerns — with outcomes that materially benefit the firm. For instance, a Massachusetts Institute of Technology (MIT) researcher demonstrated that giving the average consumer a higher degree of control over their personal information made them less concerned about privacy, and consequently made them more likely to click on personalized ads.[13] A research group from Carnegie Mellon University showed that the average consumer preferred websites that concisely and transparently displayed privacy policy information, and was even willing to pay more to purchase through such sites.[14] As this group acknowledged, businesses may "manage their privacy strategies in ways that not only fulfill government best practices and self-regulatory recommendations, but also maximize profits" (p. 33). Thus, taken together, there is a broad understanding that (a) platforms can directly influence the average consumer's privacy concerns via levers like transparency and control, and (b) that such actions can have measurable upside for firms.

33.     Meta appears to understand this dynamic. Indeed, their own internal survey results corroborate it: ██████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████ **-Exhibit B** (PIXE_LHEALTH00l 317598). To this end, Meta has launched three tools aimed at influencing its users' privacy concerns: *Why*

---

[13] https://journals.sagepub.com/doi/10.1509/jmr.10.0355
[14] https://www.heinz.cmu.edut-acquisti/papers/acquisti-onlinepurchasing-privacy.pdf

*am I Seeing this Ad?* (WAIST), *Download Your Information* (DYI), and *Off-Facebook Activity* (OFA). Transparency and control are front and center; Meta expressly tells its users that these tools are "part of our ongoing investment in giving people more context and control across Facebook,"[15] and, as OFA's homepage advertises, "You see it. You control it."[16] The express goal of assuaging Meta users' privacy concerns is also made explicit: "By stepping up our transparency…we aim to help people feel more secure and increase our accountability."[17]

34.     Such efforts may seem like a win-win for both the firm and the average consumer; however, the benefit to the average consumer is wholly predicated on transparency being truthful and control being meaningful. Absent this, firms can reap the benefit of *appearing* transparent and offering consumers control while not *actually* delivering true transparency or control. For instance, if a firm simply discloses "acceptable" data collection practices — but does not, in actuality, collect data in "acceptable" ways — the average consumer's privacy concerns are falsely allayed. Likewise, if initiatives enhance consumers' *perceived* control over personal information without concurrently providing *actual* control, the average consumer can be misled.

35.     Therefore, while Meta's transparency and control tools may appear to be in the best interest of Meta users, given my own review of these initiatives and my understanding of how they work, I believe that they are misleading Meta users in several meaningful ways:

a.     *Why Am I Seeing This Ad? (WAIST)*: When Meta serves an ad, it purports to give users the opportunity to view an explanation about why they are being shown the ad through a tool called Why Am I Seeing This Ad? or WAIST. However, it appears that Meta's WAIST disclosures do not actually offer accurate accounts of its ad delivery. As stated in Meta's response to Interrogatory No. 18,

**Exhibit F**. Therefore, these disclosures seem to be loose approximations of an underlying reason at best, though many appear to be entirely irrelevant distractions. (To use a personal example, I was recently served an Instagram ad for a curly hair styling product, which I was told was based on my interactions "with ads about books &

---

[15] https://about.fb.com/news/2019/03/why-am-i-seeing-this/, accessed July 15, 2025

[16] https://www.facebook.com/off-facebook-activity, accessed August 21, 2025

[17] https://about.fb.com/news/2023/02/increasing-our-ads-transparency/, accessed August 21, 2025

literature, education and travel." It is, of course, somewhat difficult to believe that these interactions — and not the fact of my own curly hair — drove the ad delivery.)

This presents a two-fold problem. First, WAIST provides an answer that is incorrect because Meta admits that it cannot determine with specificity why an ad was shown, which is misleading, in and of itself. In other words, the *false* answer to "why am I seeing this ad?" never reveals that the data were obtained through third-party websites or inferred from browsing histories; the false answer always presents a positive explanation that Meta users will find acceptable. Therefore, as currently configured, WAIST ads appear to disarm Meta users' privacy concerns — or, to use Meta's own terminology, "help people feel more secure" — without delivering actual transparency. Said differently, Meta benefits from *appearing* transparent while *behaving* deceptively.

        b.    *Download Your Information (DYI)*: To replicate and assess the Meta user's experience, I used the DYI tool on two Facebook accounts (my own and a family member's). On its surface, the tool seems to offer transparency and, where applicable, the ability to control privacy settings. However, it is my opinion that this tool (a) disproportionately focuses Meta users on information they already find acceptable to have collected (i.e., first-party data, explicitly disclosed), and (b) omits information that Meta users would find highly *unacceptable* to have collected — i.e., the very information such users would want to control.

        i.    Upon downloading their information, Meta users can open the "start_here.html" document, in which they encounter eight categories of personal data: *Your Facebook activity*, *Personal information*, *Connections*, *Logged information*, *Security and login information*, *Apps and websites off of Facebook*, *Preferences*, and *Ads information*. Each category has one or more subcategories beneath it, for a total of 52 subcategories. (For example, *Your Facebook activity* includes 27 subcategories for things such as "Posts: posts you've shared on Facebook" or "Places: a list of places you've created.")

Of the eight categories, only two — *Apps and websites off of Facebook* and *Ads information* (each of which includes only one subcategory) — address personal information that was collected off-platform. Consequently, of the 52 subcategories of information that Meta users encounter when opening the DYI tool, fewer than 4% address the personal information that Meta users find most sensitive or objectionable to have collected. Said another way, Meta has

configured DYI such that over 96% of the tool's interface is dedicated to showing its users the personal information they already find it acceptable for Meta to possess.

Given Meta's business model and the importance of the third-party data collection, it stands to reason that far more than 4% of the information Meta possesses about any given user was collected off-platform — i.e., in ways that Meta users find unacceptable. It is therefore my opinion that DYI presents information in a way that *disproportionately* focuses Meta users on "acceptable" data, with the effect of minimizing or diluting that which Meta users find unacceptable.

ii.    In addition to minimizing its salience, it is my opinion that Meta presents unacceptably-collected information in ways that minimize its offensiveness. For instance, clicking "Advertisers using your activity or information" produces a roster of all the advertisers who have uploaded or used a list containing a given user's identity. (My own list contained 2,412 such advertisers.) At best, this feature lacks context (e.g., what does it even mean to be included on a list?) and any meaningful opportunity for control (e.g., how does one get *off a* list?); at worst, it sanitizes and obscures the actual practices underlying it.

Consider **Exhibit G** (PIXEL_HEALTH000939293). As this shows, the lists that advertisers upload are often enormously sensitive, with explicitly private health data often included right in the file names. Meta users might be uncomfortable to learn they were on a list from advertisers like Yuma Regional Medical Center or Mount Carmel Health, but be downright appalled to learn those advertisers' lists were titled ████████████████████████ ████████████████████████████

Taken together, disproportionately focusing Meta users on acceptable practices — while turning their attention away from unacceptable ones — means that Meta again benefits from *appearing* transparent while *behaving* deceptively.

c.    *Off-Facebook Activity (OFA)*: To replicate and assess the Meta user's experience, I used the OFA tool on two Facebook accounts (my own and a family member's). The tool offers a way for its users to supposedly see and manage what Meta knows about them. However, in my opinion, this tool also falls short of providing meaningful control.

First, by default, Meta users automatically "Connect Future Activity." In other words, privacy is relinquished unless Meta users "opt-out." This default is telling. It is common knowledge that the average consumer exhibits a status quo bias — i.e., will stick with an initial

default setting rather than take active steps to change it, particularly if not prompted to explicitly — and therefore setting the default to "share" means that most Meta users will, inevitably, share. If OFA's intent were to afford Meta users actual control over their information, an opt-out policy — buried at least eight clicks from the site's homepage — would be an unlikely choice.

Second, clicking "Your activity off Meta technologies" reveals a list of websites a user has visited, but fails to fully reveal what, precisely, was shared between Meta and its partners. Meta users *can* learn that Meta knows they visited UVA Health, but *cannot* learn that Meta knows they visited https://uvahealth.com/services/mental-health/obsessive-compulsive-personality-disorder. **Exhibit H** (Session Data). Moreover, Meta's own internal records indicate that a ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████ **Exhibit I** (PIXEL HEALTH000416800). Thus, as is true for DYI, the OFA tool appears to opportunistically minimize that which Meta users will find objectionable.

36. To conclude, we know that platforms can lessen the average consumer's privacy concerns via levers like enhanced transparency and control, which can then directly benefit the firm. This benefit may be direct and measurable (e.g., better ad performance[18],[19] or an increased willingness to pay[20]), but it can also be more indirect and intangible — such as increasing the average consumer's trust in the hopes that they become more passive and permissive in managing their own personal data. Indeed, one Meta employee acknowledged this latter dynamic explicitly: ██████████████████████████████████████ ████████████████████████████████████████████████████████ **Exhibit I** (PIXEL HEALTH000416800). Said differently, increasing Meta users' trust — via transparency and control tools — should have the advantage of getting users to allow Meta's tracking technologies to function unencumbered.

37. Therefore, against all these facts, it is not clear to me that Meta's three transparency and control tools — *Why am I seeing this ad, Download Your Information,* and *Off-Facebook Activity* — deliver on the promise of making Meta users better off.

---

[18] https://psycnet.apa.org/record/2019-23407-002
[19] https://journals.sagepub.com/doi/10.1509/jmr.10.0355
[20] https://www.heinz.cmu.edukacquisti/papers/acquisti-onlinepurchasing-privacy.pdf

Dated: September 7, 2025                    Respectfully submitted,

DocuSigned by:

Katherine Barasz

07E4321D09E84EE

Kate Barasz

**APPENDIX**
**Materials Relied Upon**

| Doc ID | Description/Title |
|---|---|
| n/a | First Amended Consolidated Class Action Complaint |
| PIXEL_HEALTH0000000 57 | How the Meta Pixel works - Wiki |
| PIXEL_HEALTH0000188 84 | 7/16/2020 email from Rez to Costell re: Pixel Events + SSAPI (Deposition Exhibit 71) |
| PIXEL_HEALTH0001139 24 | Unfiltered ButtonText field in Custom Data (Deposition Exhibit 202) |
| PIXEL_HEALTH0009392 93 | Look-alike audience sample (Deposition Exhibit 496) |
| PIXEL_HEALTH0002913 36 | "Options" (original filename: 290382188_737052497577507_7172025849747631442_n.png) |
| PIXEL_HEALTH0003488 49 | 9/12/2019 email from Hammon re: Health Systems: Sub-Vertical Overview and attachment called HSVS_WIP1_Health Systems 9.9.19.pptx (Deposition Exhibit 55) |
| PIXEL_HEALTH0004207 65 | Identity Matching in Layman's Terms - Wiki |
| PIXEL_HEALTH0005658 37 | Pixel Overview - Wiki |
| PIXEL_HEALTH0006856 09 | Receiving and Storing Signals (Deposition Exhibit 43) |
| PIXEL_HEALTH0007039 22 | Uptravi Activating on Facebook: Media & Strategy Considerations (Deposition Exhibit 125) |
| PIXEL_HEALTH0007354 33 | Excel file with domain names and vertical classifications |
| PIXEL_HEALTH0008756 89 | OBA Opt-Out - Wiki |
| PIXEL_HEALTH0008784 22 | ████████ ████ |
| PIXEL_HEALTH0008885 21 | Automatic Events and Automatic Advanced matching Description (Deposition Exhibit 388) |
| PIXEL_HEALTH0009546 82 | January 13, 2023 letter and subpoena response to New York Attorney General |
| PIXEL_HEALTH0012545 13 | Upcoming Enhancements to the Facebook Pixel (Deposition Exhibit 384) |
| PIXEL_HEALTH0013175 98 | 20161216 Country profiles and data tables vSC |
| n/a | Session Data (Deposition Exhibit 2) |
| n/a | UVA Health Website Screenshot (Deposition Exhibit 3) |
| PIXEL_HEALTH0004156 45 | Cookies Policy (1/30/2015) |
| PIXEL_HEALTH0004158 68 | Cookies Policy (4/18/2016) |

| Doc ID | Description/Title |
|---|---|
| PIXEL_HEALTH0004159 89 | Cookies Policy (5/26/2016) |
| PIXEL_HEALTH0004159 83 | Cookies Policy (3/20/2017) |
| PIXEL_HEALTH0008720 82 | Cookies Policy (6/8/2021) |
| PIXEL_HEALTH0004159 76 | Cookies Policy (4/4/2018) |
| PIXEL_HEALTH0004168 15 | Cookies Policy (10/5/2020) |
| PIXEL_HEALTH0008720 72 | Cookies Policy (3/9/2018) |
| PIXEL_HEALTH0004184 33 | Cookies Policy (6/23/2021) |
| PIXEL_HEALTH0004192 30 | Cookies Policy (1/4/2022) |
| PIXEL_HEALTH0004214 35 | Cookies Policy (10/5/2022) |
| PIXEL_HEALTH0008650 47 | Cookies Policy (6/16/2023) |
| PIXEL_HEALTH0007355 64 | Cookies Policy (12/12/2023) |
| PIXEL_HEALTH0005657 70 | Data Policy (1/1/2015) |
| PIXEL_HEALTH0004139 03 | Data Policy (1/30/2015) |
| PIXEL_HEALTH0011795 30 | Data Policy (9/29/2016) |
| PIXEL_HEALTH0011798 58 | Data Policy (4/19/2018) |
| PIXEL_HEALTH0011634 28 | Data Policy (8/21/2020) |
| PIXEL_HEALTH0004171 67 | Data Policy (1/11/2021) |
| PIXEL_HEALTH0004192 37 | Data Policy (1/4/2022) |
| PIXEL_HEALTH0004199 48 | Privacy Policy (7/26/2022) |
| PIXEL_HEALTH0004212 81 | Privacy Policy (1/1/2023) |
| PIXEL_HEALTH0008651 31 | Privacy Policy (6/15/2023) |
| PIXEL_HEALTH0008650 58 | Privacy Policy (12/27/2023) |
| PIXEL_HEALTH0007355 82 | Privacy Policy (6/26/2024) |
| n/a | Privacy Policy (https://www.facebook.com/privacy/policy/version/8810742435690564/) (11/14/2024) |

19

| Doc ID | Description/Title |
|---|---|
| n/a | Privacy Policy (https://www.facebook.com/privacy/policy/) (6/16/2025) |
| PIXEL_HEALTH0004139 08 | Terms of Service (1/30/2015) |
| PIXEL_HEALTH0011798 75 | Terms of Service (4/19/2018) |
| PIXEL_HEALTH0000003 77 | Terms of Service (7/31/2019) |
| PIXEL_HEALTH0004167 19 | Terms of Service (10/9/2020) |
| PIXEL_HEALTH0004168 95 | Terms of Service (10/22/2020) |
| PIXEL_HEALTH0004187 46 | Terms of Service (1/4/2022) |
| PIXEL_HEALTH0004199 31 | Terms of Service (7/26/2022) |
| n/a | Terms of Service (https://www.facebook.com/terms/) (1/1/2025) |
| PIXEL_HEALTH0003004 40 | Your Off-Facebook Activity, Activity received from kaiserpermanente.org (Jane Doe IV) |
| PIXEL_HEALTH0003004 40 | Your Off-Facebook Activity, Activity received from Maryland Health Connection (Jane Doe IV) |
| PIXEL_HEALTH0003004 40 | Your Off-Facebook Activity, full list (Jane Doe IV) |
| PIXEL_HEALTH0003004 39 | Your Off-Facebook Activity, full list (Jane Doe V) |
| PIXEL_HEALTH0003004 39 | Advertisers using your activity or information (Jane Doe V) |
| PIXEL_HEALTH0003004 39 | Your Off-Facebook Activity, Activity received from medstarhealth.org (Jane Doe V) |
| n/a | Introducing the New Access Your Information (https://about.fb.com/news/2021/01/introducing-the-new-access-your-information/) |
| n/a | Learn what categories of information are available to export from your Facebook profile _ Facebook Help Center (https://www.facebook.com/help/930396167085762/?helpref=related_arti cles) |
| n/a | Review your activity off Meta technologies _ Facebook Help Center (https://www.facebook.com/help/2207256696182627?helpref=faq_conte nt) |
| n/a | Why am I seeing ads from an advertiser on Facebook? (https://www.facebook.com/help/794535777607370/) |
| n/a | Why Am I Seeing This? We Have an Answer for You (https://about.fb.com/news/2019/03/why-am-i-seeing-this/) |
| PIXEL_HEALTH0004168 00 | OFA-Identity Gap Reduction (Deposition Exhibit 642) |
| n/a | Deposition of Jane Doe IV |
| n/a | Deposition of Jacob Ginn |
| n/a | Deposition of Nanette Hector |
| n/a | Deposition of Jennifer Huntley |

| Doc ID | Description/Title |
| --- | --- |
| n/a | Deposition o f Joribelle Anne Molina |
| n/a | Deposition of Timothy Shockley |
| n/a | Deposition of Jane Doe IX |
| n/a | Defendant Meta Platforms, Inc.'s Supplemental Responses and Objections to Plaintiffs' Fifth Set of Interrogatories |

EXHIBIT A

# KATE BARASZ

## EDUCATION

*Doctor of Business Administration, Marketing*                    May 2016
Harvard Business School, Boston, MA

*Bachelor of Arts, Economics* and *Public Policy Studies*            May 2006
Graduation with Distinction in Economics
Duke University, Durham, NC

## ACADEMIC EMPLOYMENT

*Associate Professor of Marketing (with tenure)*        July 2020 – August 2023
ESADE Business School, Barcelona, Spain

*Assistant Professor of Marketing*                    July 2019 – June 2020
Harvard Business School, Boston, MA

*Visiting Assistant Professor of Marketing*            July 2018 – June 2019
Harvard Business School, Boston, MA

*Assistant Professor of Marketing*                    July 2016 – June 2019
IESE Business School, Barcelona, Spain

## NON-ACADEMIC EMPLOYMENT

*Co-Owner and Co-Founder*                        Sept 2023 – Present
Backstory Bookshop, Barcelona, Spain

*Consultant*                                July 2006 – June 2010
Bain & Company, Boston, MA and Atlanta, GA

## HONORS AND AWARDS

Wyss Award for Excellence in Doctoral Mentoring, Harvard Business School, 2020
"The 40 Best Business Professors Under 40," Poets & Quants, 2018
Finalist for Best Individual Paper, Society for Consumer Psychology, 2018
AMA-Sheth Foundation Doctoral Consortium Fellow, 2014
Dean's Commendation for Distinguished Teaching Performance, Harvard Extension, 2014
Wyss Doctoral Research Award, Harvard Business School, 2014

## ACADEMIC PUBLICATIONS
(*denotes equal contribution)

Kim, Tami, **Kate Barasz**, Leslie K. John, and Michael I. Norton, "Calculators for Women: When Identity Appeals Provoke Backlash," accepted at *Journal of the Association for Consumer Research.*

Prinsloo, Emily, **Kate Barasz**, Leslie K. John, and Michael I. Norton (2022), "Opportunity Neglect: An Aversion to Low-Probability Gains," *Psychological Science.*

Prinsloo, Emily, **Kate Barasz**, and Peter Ubel (2022), "Motivated Inferences of Price and Quality in Healthcare Decisions," *Journal of the Association for Consumer Research.*

**Barasz, Kate**, and Tami Kim (2022), "A Field Guide to People-Watching," *Current Opinion in Psychology.*

Hagerty, Serena F., **Kate Barasz**, and Michael I. Norton (2021), "Economic Inequality Shapes Judgments of Consumption," *Journal of Consumer Psychology.*

Engeler, Isabelle*, and **Kate Barasz*** (2021), "From Mix-and-Match to Head-to-Toe: How Brand Combinations Affect Observer Inferences," *Journal of Consumer Research.*

**Barasz, Kate**, and Tami Kim (2021), "Choice Perception: Making Sense (and Nonsense) of Others' Choices," *Current Opinion in Psychology.*

Hagerty, Serena F., Ryan Burke, Linda M. Isbell, **Kate Barasz**, and Peter Smulowitz (2021), "Patient Perceptions of Diagnostic Certainty at Discharge and Patient Satisfaction in the ED," *Academic Emergency Medicine.*

**Barasz, Kate**, and Serena F. Hagerty (2021), "Hoping for the Worst? A Paradoxical Preference for Bad News," *Journal of Consumer Research.*

Kim, Tami, **Kate Barasz**, and Leslie K. John (2021), "Consumer Disclosure," *Consumer Psychology Review*.

Hagerty, Serena F. and **Kate Barasz** (2020), "Inequality in Socially Permissible Consumption," *Proceedings of the National Academy of Sciences of the United States of America.*

**Barasz, Kate**, Tami Kim, and Ioannis Evangelidis (2019), "I Know Why You Voted for Trump: (Over)inferring Motives Based on Choice," *Cognition.*

Kim, Tami, **Kate Barasz**, and Leslie K. John (2019), "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research.*

**Barasz, Kate**, and Peter A. Ubel (2018), "Unhealthy Consumerism: The Challenge of Trading off Price and Quality in Healthcare," *Behavioural Public Policy.*

**Barasz, Kate**, Leslie K. John, Elizabeth A. Keenan, Michael I. Norton (2017), "Pseudo-Set Framing," *Journal of Experimental Psychology: General*.

**Barasz, Kate**, Tami Kim, and Leslie K. John (2016), "The Role of (Dis)similarity in (Mis)predicting Others' Preferences," *Journal of Marketing Research*.

John, Leslie K., **Kate Barasz**, and Michael Norton (2016), "Hiding Personal Information Reveals the Worst," *Proceedings of the National Academy of Sciences of the United States of America*.

## PRACTITIONER PUBLICATIONS

John, Leslie K., Tami Kim, and Kate Barasz (January/February 2018), "Ads that Don't Overstep: How to Make Sure You Don't Take Personalization Too Far," *Harvard Business Review (Print Edition)*.

Barasz, Kate (November 15, 2017), "Research: If You Position Your Products as a Set, People are More Likely to Buy Them All," *Harvard Business Review (Digital Article)*.

## COURSE MATERIALS

Barasz, Kate, and Eva Ascarza, "Time Out: The Evolution from Media to Markets," Harvard Business School Case 520-073

Barasz, Kate, and John Gourville, "Apex Ski Boots," Harvard Business School Case 520-013

Barasz, Kate, "Apex Ski Boots," Harvard Business School Teaching Note 520-085

## INVITED PRESENTATIONS

| | |
|---|---|
| University of Connecticut | Feb 2019 |
| London Business School | Jan 2019 |
| Yale School of Management | Sept 2018 |
| Harvard Business School | Mar 2018 |
| ESADE Business School | Feb 2018 |
| University of Southern California | Sept 2015 |
| SDA Bocconi School of Management | July 2015 |
| ESADE Business School | July 2015 |
| IESE Business School | July 2015 |
| City University London | June 2015 |

## CONFERENCE PRESENTATIONS
(Excludes coauthor presentations; *denotes equal authorship)

Engeler, Isabelle*, and Kate Barasz*, "Mix-and-Match vs. Head-to-Toe: How Brand Combinations Affect Observer Inferences. *"*
- European Marketing Academy, 2019 (Hamburg, Germany)
- American Marketing Association CBSIG Conference, 2019 (Bern, Switzerland)
- Association for Consumer Research, 2018 (Dallas, TX)

Barasz, Kate, Tami Kim, and Ioannis Evangelidis, "I Know Why You Voted for Trump: (Over)inferring Motives Based on Choice."
- Association for Consumer Research, 2018 (Dallas, TX)
- Society for Consumer Psychology, 2018 (Dallas, TX)
- Barasz, Kate, and Serena Hagerty, "When Bad News is Good."
- Society for Judgment and Decision Making, 2015 (Chicago, IL)
- Association for Consumer Research, 2019 (Atlanta, GA)

Barasz, Kate, Tami Kim, and Leslie K. John, "The Role of (Dis)similarity in (Mis)predicting Others' Preferences."
- Association for Consumer Research, 2015 (New Orleans, LA)
- Society for Consumer Psychology, 2015 (Phoenix, AZ)
- Society for Judgment and Decision Making, 2014 (Long Beach, CA)
- Behavioral Decision Research in Management, 2014 (London, UK)

Barasz, Kate, Leslie K. John, Elizabeth A. Keenan, Michael I. Norton (2017), "Pseudo-Set Framing."
- Behavioral Decision Research in Management, 2014 (London, UK)
- Society for Judgment and Decision Making, 2013 (Toronto, ON)

## TEACHING

| | |
|---|---|
| Marketing Planning & Implementation (MBA), ESADE | Spring 2021 |
| Marketing Strategy (Masters in International Management), ESADE | Spring 2021 |
| First-Year Marketing (MBA), Harvard Business School | Fall 2019 |
| First-Year Marketing (MBA), Harvard Business School | Fall 2018 |
| Capstone Project (MBA business challenge), IESE Business School | Spring 2018 |
| Marketing Management I (MBA core), IESE Business School | Fall 2017 |
| Capstone Project (MBA business challenge), IESE Business School | Spring 2017 |
| Marketing Management I (MBA core), IESE Business School | Fall 2016 |
| Consumer Behavior, Harvard Extension School | Fall 2014 |

**SERVICE**

*Co-Editor*

Special issue of *Current Opinion in Psychology*
("People-Watching: Interpersonal Perception and Prediction," 2022)

*Editorial Review Board*

International Journal of Research in Marketing

*Reviewer*

Behavioural Public Policy
Journal of the Association for Consumer Research
Journal of Consumer Research
Journal of Experimental Psychology: General
Journal of Marketing
Journal of Marketing Research
Journal of Personality and Social Psychology
International Journal of Research in Marketing
Management Science
Organizational Behavior and Human Decision Processes
Organization Science
Psychological Science

*Co-Organizer*

Doctoral Consortium, Society for Consumer Psychology (Puerto Rico, March 2023)
Behavioral Insights Group Doctoral Workshop (Harvard, August 2019)

*Doctoral Student Mentorship*

Serena Hagerty, Harvard Business School
Emily Prinsloo, Harvard Business School

**PROFESSIONAL AFFILIATIONS**

American Marketing Association
Association for Consumer Research
Society for Consumer Psychology
Society for Judgment and Decision Making

# EXHIBIT E

The California Consumer Privacy Act is effective as of January 1, 2020. California residents can learn more about their privacy rights here.



- What kinds of information do we collect?
- How do we use this information?
- How is this information shared?
- How do the Meta Companies work together?
- How can I manage or delete information about me?
- How do we respond to legal requests or prevent harm?
- How do we operate and transfer data as part of our global services?
- How will we notify you of changes to this policy?
- Privacy notice for California residents
- How to contact us with questions

Facebook Ads Controls

Privacy Basics

Cookies Policy

Terms

More Resources
View a printable version of the Data Policy
Interactive Tools
Minors and Safety
Facebook Privacy Page
Facebook Safety Page
Facebook Site Governance Page
EU-U.S. Privacy Shield and Swiss-U.S. Privacy Shield Notice

*The Facebook company is now Meta. We've updated our Terms of Use, Data Policy, and Cookies Policy to reflect the new name on January 4, 2022. While our company name has changed, we are continuing to offer the same products, including the Facebook app from Meta. Our Data Policy and Terms of Service remain in effect, and this name change does not affect how we use or share data. Learn more about Meta and our vision for the metaverse.*

# Data Policy

This policy describes the information we process to support Facebook, Instagram, Messenger and other products and features offered by Meta Platforms, Inc. (Meta Products or Products). You can find additional tools and information in the Facebook Settings and Instagram Settings.

 Return to top

## What kinds of information do we collect?

To provide the Meta Products, we must process information about you. The types of information we collect depend on how you use our Products. You can learn how to access and delete information we collect by visiting the Facebook Settings and Instagram Settings.

### Things you and others do and provide.

- **Information and content you provide.** We collect the content, communications and other information you provide when you use our Products, including when you sign up for an account, create or share content, and message or communicate with others. This can include information in or about the content you provide (like metadata), such as the location of a photo or the date a file was created. It can also include what you see through features we provide, such as our camera, so we can do things like suggest masks and filters that you might like, or give you tips on using camera formats. Our systems automatically process content and communications you and others provide to analyze context and what's in them for the purposes described below. Learn more about how you can control who can see the things you share.

    - Data with special protections: You can choose to provide information in your Facebook profile fields or Life Events about your religious views, political views, who you are "interested in," or your health. This and other information (such as racial or ethnic origin, philosophical beliefs or trade union membership) could be subject to special protections under the laws of your country.

- **Networks and connections.** We collect information about the people, accounts, hashtags and Facebook groups, and Pages you are connected to and how you interact with them across our Products, such as people you communicate with the most or groups you are part of. We also collect contact information if you choose to upload, sync or import it from a device (such as an address book or call log or SMS log history), which we use for things like helping you and others find people you may know and for the other purposes listed below.

- **Your usage.** We collect information about how you use our Products, such as the types of content you view or engage with; the features you use; the actions you take; the people or accounts you interact with; and the time, frequency and duration

PIXEL_HEALTH000419237

of your activities. For example, we log when you're using and have last used our Products, and what posts, videos and other content you view on our Products. We also collect information about how you use features like our camera.

- **Information about transactions made on our Products.** If you use our Products for purchases or other financial transactions (such as when you make a purchase in a game or make a donation), we collect information about the purchase or transaction. This includes payment information, such as your credit or debit card number and other card information; other account and authentication information; and billing, shipping and contact details.

- **Things others do and information they provide about you.** We also receive and analyze content, communications and information that other people provide when they use our Products. This can include information about you, such as when others share or comment on a photo of you, send a message to you, or upload, sync or import your contact information.

**Device Information**

As described below, we collect information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products, and we combine this information across different devices you use. For example, we use information collected about your use of our Products on your phone to better personalize the content (including ads) or features you see when you use our Products on another device, such as your laptop or tablet, or to measure whether you took an action in response to an ad we showed you on your phone on a different device.

Information we obtain from these devices includes:

- **Device attributes:** information such as the operating system, hardware and software versions, battery level, signal strength, available storage space, browser type, app and file names and types, and plugins.

- **Device operations:** information about operations and behaviors performed on the device, such as whether a window is foregrounded or backgrounded, or mouse movements (which can help distinguish humans from bots).

- **Identifiers:** unique identifiers, device IDs, and other identifiers, such as from games, apps or accounts you use, and Family Device IDs (or other identifiers unique to Meta Company Products associated with the same device or account).

- **Device signals:** Bluetooth signals, and information about nearby Wi-Fi access points, beacons, and cell towers.

- **Data from device settings:** information you allow us to receive through device settings you turn on, such as access to your GPS location, camera or photos.

- **Network and connections:** information such as the name of your mobile operator or ISP, language, time zone, mobile phone number, IP address, connection speed and, in some cases, information about other devices that are nearby or on your network, so we can do things like help you stream a video from your phone to your TV.

- **Cookie data:** data from cookies stored on your device, including cookie IDs and settings. Learn more about how we use cookies in the Facebook Cookies Policy and Instagram Cookies Policy.

**Information from partners.**

Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have

PIXEL_HEALTH000419238

the rights to provide us with your information.

Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.

To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy.

 Return to top

# How do we use this information?

We use the information we have (subject to choices you make) as described below and to provide and support the Meta Products and related services described in the Meta Terms and Instagram Terms. Here's how:

**Provide, personalize and improve our Products.**
We use the information we have to deliver our Products, including to personalize features and content (including your ads, Facebook News Feed, Instagram Feed, and Instagram Stories) and make suggestions for you (such as groups or events you may be interested in or topics you may want to follow) on and off our Products. To create personalized Products that are unique and relevant to you, we use your connections, preferences, interests and activities based on the data we collect and learn from you and others (including any data with special protections you choose to provide); how you use and interact with our Products; and the people, places, or things you're connected to and interested in on and off our Products. Learn more about how we use information about you to personalize your Facebook and Instagram experience, including features, content and recommendations in Meta Products; you can also learn more about how we choose the ads that you see.

- **Information across Meta Products and devices:** We connect information about your activities on different Meta Products and devices to provide a more tailored and consistent experience on all Meta Products you use, wherever you use them. For example, we can suggest that you join a group on Facebook that includes people you follow on Instagram or communicate with using Messenger. We can also make your experience more seamless, for example, by automatically filling in your registration information (such as your phone number) from one Meta Product when you sign up for an account on a different Product.

- **Location-related information:** We use location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near-to provide, personalize and improve our Products, including ads, for you and others. Location-related information can be based on things like precise device location (if you've allowed us to collect it), IP addresses, and information from your and others' use of Meta Products (such as check-ins or events you attend).

- **Product research and development:** We use the information we have to develop, test and improve our Products, including by conducting surveys and research, and testing and troubleshooting new products and features.

- **Ads and other sponsored content:** We use the information we have about you-including information about your interests, actions and connections-to select and personalize ads, offers and other sponsored content that we show you. Learn more about how we select and personalize ads, and your choices over the data we use to select ads and other sponsored content for you in the Facebook Settings and Instagram Settings

PIXEL_HEALTH000419239

you in the Facebook Settings and Instagram Settings.

**Provide measurement, analytics, and other business services.**
We use the information we have (including your activity of our Products, such as the websites you visit and ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services, and understand the types of people who use their services and how people interact with their websites, apps, and services. Learn how we share information with these partners.

**Promote safety, integrity and security.**
We use the information we have to verify accounts and activity, combat harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of our Products, and promote safety and security on and off of Meta Products. For example, we use data we have to investigate suspicious activity or violations of our terms or policies, or to detect when someone needs help. To learn more, visit the Facebook Security Help Center and Instagram Security Tips.

**Communicate with you.**
We use the information we have to send you marketing communications, communicate with you about our Products, and let you know about our policies and terms. We also use your information to respond to you when you contact us.

**Research and innovate for social good.**
We use the information we have (including from research partners we collaborate with) to conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health and well-being. For example, we analyze information we have about migration patterns during crises to aid relief efforts. Learn more about our research programs.

 Return to top

## How is this information shared?

Your information is shared with others in the following ways:

**Sharing on Meta Products**

**People and accounts you share and communicate with**
When you share and communicate using our Products, you choose the audience for what you share. For example, when you post on Facebook, you select the audience for the post, such as a group, all of your friends, the public, or a customized list of people. Similarly, when you use Messenger or Instagram to communicate with people or businesses, those people and businesses can see the content you send. Your network can also see actions you have taken on our Products, including engagement with ads and sponsored content. We also let other accounts see who has viewed their Facebook or Instagram Stories.

**Public information** can be seen by anyone, on or off our Products, including if they don't have an account. This includes your Instagram username; any information you share with a public audience; information in your public profile on Facebook; and content you share on a Facebook Page, public Instagram account or any other public forum, such as Facebook Marketplace. You, other people using Facebook and Instagram, and we can provide access to or send public information to anyone on or off our Products, including in other Meta Company Products, in search results, or through tools and APIs. Public information can also be seen, accessed, reshared or downloaded through third-party services such as search engines, APIs, and offline media such as TV, and by apps, websites and other services that integrate with our Products.

PIXEL_HEALTH000419240

Learn more about what information is public and how to control your visibility on Facebook and Instagram.

### Content others share or reshare about you

You should consider who you choose to share with, because people who can see your activity on our Products can choose to share it with others on and off our Products, including people and businesses outside the audience you shared with. For example, when you share a post or send a message to specific friends or accounts, they can download, screenshot, or reshare that content to others across or off our Products, in person or in virtual reality experiences such as Facebook Spaces. Also, when you comment on someone else's post or react to their content, your comment or reaction is visible to anyone who can see the other person's content, and that person can change the audience later.

People can also use our Products to create and share content about you with the audience they choose. For example, people can share a photo of you in a Story, mention or tag you at a location in a post, or share information about you in their posts or messages. If you are uncomfortable with what others have shared about you on our Products, you can learn how to report the content.

### Information about your active status or presence on our Products.

People in your networks can see signals telling them whether you are active on our Products, including whether you are currently active on Instagram, Messenger or Facebook, or when you last used our Products.

### Apps, websites, and third-party integrations on or using our Products.

When you choose to use third-party apps, websites, or other services that use, or are integrated with, our Products, they can receive information about what you post or share. For example, when you play a game with your Facebook friends or use a Facebook Comment or Share button on a website, the game developer or website can receive information about your activities in the game or receive a comment or link that you share from the website on Facebook. Also, when you download or use such third-party services, they can access your public profile on Facebook, and any information that you share with them. Apps and websites you use may receive your list of Facebook friends if you choose to share it with them. But apps and websites you use will not be able to receive any other information about your Facebook friends from you, or information about any of your Instagram followers (although your friends and followers may, of course, choose to share this information themselves). Information collected by these third-party services is subject to their own terms and policies, not this one.

Devices and operating systems providing native versions of Facebook and Instagram (i.e. where we have not developed our own first-party apps) will have access to all information you choose to share with them, including information your friends share with you, so they can provide our core functionality to you.

*Note: We are in the process of restricting developers' data access even further to help prevent abuse. For example, we will remove developers' access to your Facebook and Instagram data if you haven't used their app in 3 months, and we are changing Login, so that in the next version, we will reduce the data that an app can request without app review to include only name, Instagram username and bio, profile photo and email address. Requesting any other data will require our approval.*

### New owner.

If the ownership or control of all or part of our Products or their assets changes, we may transfer your information to the new owner.

### Sharing with Third-Party Partners

We work with third-party partners who help us and improve our Products or who use Meta Business Tools to grow their businesses, which makes it possible to operate our companies and provide free services to people around the world. We don't sell any of your information to anyone, and we never will. We also impose strict restrictions on how our partners can use and disclose the data we provide.

PIXEL_HEALTH000419241

Here are the types of third parties we share information with:

**Partners who use our analytics services.**

We provide aggregated statistics and insights that help people and businesses understand how people are engaging with their posts, listings, Facebook Pages, videos and other content on and off the Meta Products. For example, Facebook Page admins and Instagram business profiles receive information about the number of people or accounts who viewed, reacted to, or commented on their posts, as well as aggregate demographic and other information that helps them understand interactions with their account or Facebook Page.

**Advertisers.**

We provide advertisers with reports about the kinds of people seeing their ads and how their ads are performing, but we don't share information that personally identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us permission. For example, we provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience. We also confirm which ads led you to make a purchase or take an action with an advertiser.

**Measurement partners.**

We share information about you with companies that aggregate it to provide analytics and measurement reports to our partners.

**Partners offering goods and services in our Products.**

When you subscribe to receive premium content, or buy something from a seller in our Products, the content creator or seller can receive your public information and other information you share with them, as well as the information needed to complete the transaction, including shipping and contact details.

**Vendors and service providers.**

We provide information and content to vendors and service providers who support our business, such as by providing technical infrastructure services, analyzing how our Products are used, providing customer service, facilitating payments or conducting surveys.

**Researchers and academics.**

We also provide information and content to research partners and academics to conduct research that advances scholarship and innovation that support our business or mission, and enhances discovery and innovation on topics of general social welfare, technological advancement, public interest, health and well-being.

**Law enforcement or legal requests.**

We share information with law enforcement or in response to legal requests in the circumstances outlined below.

Learn more about how you can control the information about you that you or others share with third-party partners in the Facebook Settings and Instagram Settings.

 Return to top

# How do the Meta Companies work together?

Facebook and Instagram share infrastructure, systems and technology with other Meta Companies (which include WhatsApp and Oculus) to provide an innovative, relevant, consistent and safe experience across all Meta Company Products you use. We also process information about you across the Meta Companies for these purposes, as permitted by applicable law and in accordance with their terms and policies. For example, we process information from

PIXEL_HEALTH000419242

WhatsApp about accounts sending spam on its service so we can take appropriate action against those accounts on Facebook, Instagram or Messenger. We also work to understand how people use and interact with Meta Company Products, such as understanding the number of unique users on different Meta Company Products.

 Return to top

# How can I manage or delete information about me?

We provide you with the ability to access, rectify, port and erase your data. Learn more in your Facebook Settings and Instagram Settings.

We store data until it is no longer necessary to provide our services and Meta Products, or until your account is deleted - whichever comes first. This is a case-by-case determination that depends on things like the nature of the data, why it is collected and processed, and relevant legal or operational retention needs. For example, when you search for something on Facebook, you can access and delete that query from within your search history at any time, but the log of that search is deleted after 6 months. If you submit a copy of your government-issued ID for account verification purposes, we delete that copy 30 days after review, unless otherwise stated. Learn more about deletion of content you have shared and cookie data obtained through social plugins.

When you delete your account, we delete things you have posted, such as your photos and status updates, and you won't be able to recover that information later. Information that others have shared about you isn't part of your account and won't be deleted. If you don't want to delete your account but want to temporarily stop using the Products, you can deactivate your account instead. To delete your account at any time, please visit the Facebook Settings and Instagram Settings.

 Return to top

# How do we respond to legal requests or prevent harm?

We access, preserve and share your information with regulators, law enforcement or others:

- In response to a legal request (like a search warrant, court order or subpoena) if we have a good faith belief that the law requires us to do so. This may include responding to legal requests from jurisdictions outside of the United States when we have a good-faith belief that the response is required by law in that jurisdiction, affects users in that jurisdiction, and is consistent with internationally recognized standards.

- When we have a good-faith belief it is necessary to: detect, prevent and address fraud, unauthorized use of the Products, violations of our terms or policies, or other harmful or illegal activity; to protect ourselves (including our rights, property or Products), you or others, including as part of investigations or regulatory inquiries; or to prevent death or imminent bodily harm. For example, if relevant, we provide information to and receive information from third-party partners about the reliability of your account to prevent fraud, abuse and other harmful activity on and off our Products.

Information we receive about you (including financial transaction data related to purchases made on our Products) can be accessed and preserved for an extended period when it is the subject of a legal request or obligation, governmental investigation, or investigations of possible violations of our terms or policies, or otherwise to prevent harm. We also retain information from accounts disabled for terms violations for at least a year to prevent repeat abuse or other term violations.

PIXEL_HEALTH000419243

 Return to top

# How do we operate and transfer data as part of our global services?

We share information globally, both internally within the Meta Companies, and externally with our partners and with those you connect and share with around the world in accordance with this policy. Your information may, for example, be transferred or transmitted to, or stored and processed in the United States or other countries outside of where you live for the purposes as described in this policy. These data transfers are necessary to provide the services set forth in the Meta Terms and Instagram Terms and to globally operate and provide our Products to you. We utilize standard contract clauses, rely on the European Commission's adequacy decisions about certain countries, as applicable, and obtain your consent for these data transfers to the United States and other countries.

 Return to top

# How will we notify you of changes to this policy?

We'll notify you before we make changes to this policy and give you the opportunity to review the revised policy before you choose to continue using our Products.

 Return to top

# Privacy notice for California residents

If you are a California resident, you can learn more about your consumer privacy rights by reviewing the California Privacy Notice.

 Return to top

# How to contact us with questions

You can learn more about how privacy works on Facebook and on Instagram. If you have questions about this policy, you can contact us as described below.

Contact Us

You can contact us online or by mail at:

Meta Platforms, Inc.
ATTN: Privacy Operations
1601 Willow Road
Menlo Park, CA 94025

Date of Last Revision: January 4, 2022

PIXEL_HEALTH000419244

PIXEL_HEALTH000419245

Filed under seal

pursuant to protective order.

EXHIBIT F

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*admitted pro hac vice*)          ELIZABETH K. MCCLOSKEY, SBN 268184
lgoldman@gibsondunn.com                                              emccloskey@gibsondunn.com
DARCY C. HARRIS (*admitted pro hac vice*)            ABIGAIL A. BARRERA, SBN 301746
dharris@gibsondunn.com                                               abarrera@gibsondunn.com
200 Park Avenue                                                      One Embarcadero Center, Suite 2600
New York, NY 10166                                                   San Francisco, CA 94111
Telephone:     (212) 351-4000                                        Telephone:    (415) 393-8200
Facsimile:     (212) 351-4035                                        Facsimile:    (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | Case No. 3:22-cv-03580-WHO (VKD) |
| This Document Relates To: | CLASS ACTION |
| All Actions | **DEFENDANT META PLATFORMS, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES** |

**PROPOUNDING PARTY:  PLAINTIFFS**

**RESPONDING PARTY:    META PLATFORMS, INC.**

**SET NO.:      FIVE**

Defendant Meta Platforms, Inc. ("Meta"), by and through the undersigned attorneys, and pursuant to Federal Rules of Civil Procedure ("Federal Rules") 26 and 33, and the Civil Local Rules of the U.S. District for the Northern District of California ("Local Rules"), hereby provides the following supplemental responses and objections (the "Supplemental Responses") to Plaintiffs' Fifth Set of Interrogatories (each an "Interrogatory," and together, the "Interrogatories"), dated December 20, 2024, as follows.

Meta provides these Supplemental Responses subject to and without waiving the responses and objections contained in its initial responses dated January 21, 2025.  Meta likewise provides these Supplemental Responses subject to the Preliminary Statement, General Objections, Objections to

Gibson, Dunn & Crutcher LLP

DEFENDANT META PLATFORMS, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES – CASE NO. 3:22-cv-03580-WHO (VKD)

1  Definitions, and Objections to Instructions in its initial responses and incorporates them by reference

2  as if asserted herein.

3  **INTERROGATORIES**

4  **INTERROGATORY NO. 18:**

5      Set forth with specificity the Profits, on a monthly basis from 2017 to present, attributable to

6  Health Advertising Revenue from non-Healthcare Providers.

7  **CONFIDENTIAL - SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**

8      Meta restates and incorporates its Preliminary Statement, General Objections, Objections to

9  Definitions, and Objections to Instructions as though fully set forth in this Response. Meta further

10  objects to this Interrogatory on the following additional grounds:

11      (A)    Meta objects to this Interrogatory as vague and ambiguous in its use of the phrases "set

12  forth," "with specificity," and "attributable to Health Advertising Revenue from non-Healthcare

13  Providers."

14      (B)    Meta objects to this Interrogatory to the extent it seeks information that is irrelevant to

15  the claims in, or defenses to, this action and is disproportionate to the needs of the case, including to

16  the extent this Interrogatory seeks information that does not relate to Healthcare Provider web

17  properties' transmission of allegedly sensitive health information to Meta. Meta is not required to

18  respond to Requests that seek information that is not relevant to any party's claim or defense. Fed. R.

19  Civ. P. 26(b)(1); *see Wong v. Alameda Cnty.*, 2020 WL 6460530, at *2 (N.D. Cal. Nov. 3, 2020); *C & C*

20  *Jewelry Mfg., Inc. v. West*, 2011 WL 768642, at *1 (N.D. Cal. Feb. 28, 2011).

21      (C)    Meta objects that this Interrogatory embeds multiple discrete parts and sub-parts that

22  count against the number of interrogatories permitted under Federal Rule of Civil Procedure 33(a)(1).

23  In particular, this Interrogatory includes numerous sub-parts (i.e., calculations of "Profits" "on a

24  monthly basis from 2017 to present" "attributable to Health Advertising Revenue from non-Healthcare

25  Providers"). Meta objects that plaintiffs have already exceeded the number of interrogatories permitted

26  under Federal Rule of Civil Procedure 33(a)(1).

27      (D)    Meta objects to this Interrogatory to the extent it seeks information beyond that required

28  by the Court's May 6, 2025 order. Dkt. 1015 at 5. Meta will only provide the information the Court

Gibson, Dunn &
Crutcher LLP

2

DEFENDANT META PLATFORMS, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIFTH SET OF INTERROGATORIES – CASE NO. 3:22-cv-03580-WHO (VKD)

1  ruled was permissible in the context of the parties' dispute.  *See id.* ("The Court appreciates that Meta

2  may not have some or all of the information called for by this interrogatory, or that an answer might

3  only be available as a product of expert discovery.  If this is the case, Meta may so state in its further

4  response to Interrogatory No. 18.").

5       (E)    Meta objects to this Interrogatory as vague, ambiguous, and overbroad in its use of the

6  phrase "Health Advertising Revenue."

7       Subject to and without waiving the foregoing objections, and subject to the ongoing nature of

8  discovery in this action, Meta responds as follows:

9       Meta does not maintain the data requested by this overbroad interrogatory, nor does it track

10  profits or revenue "attributable to Health Advertising Revenue from non-Healthcare Providers" in the

11  ordinary course of business.  As such, there is no reasonably accessible information on which to base

12  a response.  Moreover, this interrogatory misunderstands and misconstrues the process by which ads

13  are delivered on Meta's platforms.

14       *Overview of Meta's Ad Delivery System.*  Meta's processes for determining how to serve ads

15  involve ad auctions that consider billions of data points and interactions within and among machine

16  learning (ML) models that are constantly evolving in real time.   Each time there is an opportunity to

17  display an ad to a user—otherwise known as an ad request—an auction takes place to determine which

18  ad to display.

19       The ad delivery process predicts for each advertisement eligible for delivery, the value of the

20  ad to the advertiser (which ads are most likely to achieve the business objectives the advertiser has

21  chosen for their advertising), and the value of each advertisement to the user (the ad's ability to provide

22  positive, relevant, long term satisfactory experiences for users). Together, this is referred to as an ad's

23  "total value."

24       Ads that win auctions and are then displayed by Meta have the highest total value relative to

25  other remaining ads competing in ad auctions for specific users. As a result, whether an ad is delivered

26  to a specific user does not reflect a binary determination as to whether that user will or will not be

27  interested in the ad. Nor does it necessarily reflect which ad has the highest monetary bid (and would

28  thus generate the greatest revenue for Meta). Instead, it depends on how much total value the delivery

Gibson, Dunn &
Crutcher LLP

3

DEFENDANT META PLATFORMS, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIFTH SET OF INTERROGATORIES – CASE NO. 3:22-cv-03580-WHO (VKD)

process predicts each ad will generate for both the particular user and the advertiser, as compared to the other ads competing for the limited space on a user's screen at a specific moment in time. Billions of auctions take place every day.

Once an ad request is received, indicating that a user has space available for a new ad, Meta's ad delivery process determines which ads are eligible to be shown to the user and applies a series of machine learning models to analyze which ads (1) are most likely to provide valuable and relevant experiences for the user and, (2) allow advertisers to achieve the business objectives they have chosen for their advertising.

Meta's ad ranking models rank eligible ads and push a narrower set of ads to the next set of models. This process is generally referred to as multi-stage ad ranking. Throughout each ranking step, ads are ranked based on total value. Each successive phase of the ad ranking process computes the total value that an ad would deliver with increasing levels of granularity.

The final ranking step of the ad delivery process is the ad auction described above. To seek to maximize value for users and advertisers, the winner of the auction is the ad with the highest total value. The ad auction determines which particular ad—of all the considered ads a user is eligible to see—to show a user at a given point in time.

As a result of this complex ad delivery process, considering all eligible ads each time there is an opportunity for an ad impression, Meta cannot respond to Interrogatory 18 as drafted or conceived. Meta cannot determine which specific data points were used to deliver particular ads, nor can Meta determine with any specificity which particular data points influenced that process. As such, Meta cannot determine which ads were delivered based on "a match to a Health Inference" that was "generated in whole or in part using Pixel-generated Health Information." This is in part due to the complex nature of Meta's relevant machine learning models and ad ranking system, and in part because the delivery of a particular ad is not based on only information related to that ad. Instead, an ad is only delivered after it has been ranked against all other ads running on Meta's platforms at that point in time. In other words, the delivery of one ad to one user is based on how that user would receive all eligible ads.

Gibson, Dunn &
Crutcher LLP

4

DEFENDANT META PLATFORMS, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
PLAINTIFFS' FIFTH SET OF INTERROGATORIES – CASE NO. 3:22-cv-03580-WHO (VKD)

1    Although Meta cannot produce the revenue information requested above, Meta can produce

2  data that can be used to prepare a very rough estimate or approximation of the potential relative impact

3  (or lack thereof) that Business Tool data containing alleged potentially sensitive health data had on the

4  delivery of ads on Meta's systems.   Specifically, such an approximate apportionment may be

5  accomplished through expert discovery by comparing the number of total signals at issue (the events

6  that plaintiffs allege reflect sensitive health information) with the total number of signals that Meta

7  would have considered in its ad delivery system.  Before the close of discovery, Meta plans to produce

8  information that Meta's expert may use to conduct such an approximation.

9

10    DATED: May 23, 2025                        Respectfully submitted,

11                                              **GIBSON, DUNN & CRUTCHER LLP**

12                                              By: */s/ Lauren R. Goldman*
                                                _____
13                                                  Lauren R. Goldman (*pro hac vice*)

14                                              *Attorneys for Defendant Meta Platforms, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Filed under seal

pursuant to protective order.

EXHIBIT G

| Bates Number | PIXEL_HEALTH000939293 |
| --- | --- |
| Custodian | Unspecified Custodian |
| Create Date | 9999-12-31 16:00:00 |
| Title | |
| Author | |
| Filename | PIXEL_HEALTH000939293_ATTORNEYS' EYES ONLY.csv |



EXHIBIT OH
496
7369537  Sm
5-14-25
PENGAD 800-631-6989

PIXEL_HEALTH010593293.csv | Excerpt

| | | |
|---|---|---|
| 1/16/2025 | | Allergan, Inc |
| 1/16/2025 | | Merck & Co Inc |
| 1/16/2025 | | H. LEE MOFFITT CANCER CENTER & RESEARCH INSTITUTE |
| 1/16/2025 | | Neurelis, Inc |
| 1/16/2025 | | Huntsworth |
| 1/16/2025 | | TAKEDA |
| 1/16/2025 | | JCB Inc |
| 1/16/2025 | | Dermavant Sciences, Inc |
| 1/16/2025 | | Online Ad Account I.P |
| 1/16/2025 | | ASTRAZENECA PHARMACEUTICALS LP |
| 1/16/2025 | | Neurelis, Inc |
| 1/16/2025 | | TAKEDA |
| 1/16/2025 | | Eton Pharmaceuticals |
| 1/16/2025 | | Gilead |
| 1/16/2025 | | Mount Carmel Health |
| 1/16/2025 | | Amgen |
| 1/16/2025 | | JCB Inc |
| 1/16/2025 | | Allergan, Inc |
| 1/16/2025 | | Yuma Regional Medical Center |
| 1/16/2025 | | Allergan, Inc |
| 1/16/2025 | | Avanir Pharmaceuticals Inc. |
| 1/16/2025 | | North Memorial Health |
| 1/16/2025 | | Blueprint Medicines Corporation |
| 1/16/2025 | | Vertex Pharmaceuticals |
| 1/16/2025 | | Avanir Pharmaceuticals Inc. |

HIGHLY CONFIDENTIAL -AEO