# Proposed Redacted Version of Exhibit 8 (Dkt. No. 1154-10)

# EXHIBIT 8

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

HIGHLY CONFIDENTIAL

**United States District Court**
**Northern District of California**
**San Francisco Division**

IN RE META PIXEL HEALTHCARE LITIGATION

Case No. 3:22-cv-3580-WHO

**REPORT OF HEALTH CAPITAL CONSULTANTS**

**September 9, 2025**

HIGHLY CONFIDENTIAL

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................ 3

II.   Preparer's Qualifications And Compensation ............................................................ 3

III.  Class Period .............................................................................................................. 4

IV.   Background ............................................................................................................... 4

    The Case ..................................................................................................................... 4

    Sources of Information ............................................................................................... 5

V.    Meta and the Meta Collection Tools ......................................................................... 5

    Meta ........................................................................................................................... 5

    Meta Collection Tools ................................................................................................ 6

    Health Information Collected ..................................................................................... 6

VI.   Analysis .................................................................................................................... 7

VII.  ANALYSIS -  THE VALUE OF THE HEALTH INFORMATION THAT
    META INTERCEPTED ............................................................................................ 7

    Quantification of Damages ........................................................................................ 8

        Income Approach .................................................................................................. 9

        Cost Approach ...................................................................................................... 9

        Market Approach .................................................................................................. 9

VIII. ANALYSIS - PROFITS THAT META GAINED FROM OBTAINING DATA .................. 11

    Revenue from Healthcare Providers .......................................................................... 12

    Revenue from Non-Healthcare Providers .................................................................. 13

    Total Health Advertising Revenue ............................................................................. 14

        Lower Bound Estimate ......................................................................................... 15

        Middle Bound Estimate ........................................................................................ 17

        Upper Bound Estimate ......................................................................................... 18

        Consideration of Expenses ................................................................................... 22

IX.   ANALYSIS – MARKET VALUE OF THE STORAGE SPACE TAKEN ........................... 23

X.    Summary and Conclusions ....................................................................................... 23

XI.   Certification ............................................................................................................. 24

XII.  Schedules and Appendicies ..................................................................................... 25

# I.     INTRODUCTION

Health Capital Consultants ("HCC") was retained by Simmons Hanly Conroy LLC, Cohen Milstein Sellers & Toll PLLC, Kiesel Law LLP, Gibbs Mura LLP, and Terrell Marshall Law Group PLLC, which represent the plaintiffs and proposed class in the above captioned case (the "Case"), against Meta Platforms, Inc. ("Meta" or "Defendant").

The Case is a proposed class action lawsuit brought by patients who are residents of various states and who allege that Meta's tracking and collection tools, including the Meta Pixel, Meta SDK, Meta Conversions API, and customer list uploads (collectively, the "Meta Collection Tools"), allow Meta to intercept patients' individually identifiable health information (the "health information") from Meta healthcare "Partner" (severally and collectively, the "Healthcare Partner(s)") websites and monetize the collected information for its own financial gain.

On behalf of HCC, I have been asked to:

1. Evaluate the feasibility of calculating the value of the health information that Meta intercepted from Meta Healthcare Partner websites;
2. Evaluate the feasibility of calculating the profits that Meta gained from obtaining data from Meta Healthcare Partner websites;
3. Calculate the value of the health information that Meta intercepted from Meta Healthcare Partner websites; and
4. Calculate the profits that Meta gained from obtaining data from Meta Healthcare Partner websites.

As detailed below, I have concluded that the health information that is subject to this Case has economic value, and it is possible to calculate the value of the health information that Meta intercepted from Meta Healthcare Partner websites. Based on publicly available information and discovery produced to date, I have structured a calculation, consistent with accepted methodology, of determining the value of this data, that indicates the health information transferred is comparable to $8.76 to $9.49 per month in web browsing information for which third parties are willing to pay individuals. This calculation may be refined if more information becomes available.

Further, as detailed below, I have concluded that it is possible to calculate the profits Meta gained from obtaining data from Meta Healthcare Partner websites. Based on publicly available information and discovery produced to date, I have structured a calculation, consistent with standard methodology, of determining the amount of these net profits. This calculation indicates that the upper-bound net profits (specific to health advertising) realized by Meta is estimated to be within the range of $137 million to $143 million per month; apportioning this range to the Classes results in an Upper Bound Estimate of $40.90 million to $42.63 million per month. This calculation may be refined if more information becomes available.

# II.     PREPARER'S QUALIFICATIONS AND COMPENSATION

I am the President of HCC, a national healthcare financial and economic consulting firm headquartered in St. Louis, Missouri.  I have over 30 years of experience providing valuation, transaction consulting, economic damages, and other services to a broad range of healthcare clients across the United States.

I have analyzed and appraised healthcare businesses and services in over 2,000 engagements for purposes such as mergers and acquisitions, joint ventures, and disputes. Additionally, I have substantial experience analyzing and valuing healthcare entities and physician compensation arrangements.

I hold a Master of Science in Health Administration (MHA) and a Master of Business Administration (MBA) from the University of Missouri at Columbia. I am a Fellow of the American College of Healthcare Executives (FACHE) and hold the Certified Valuation Analyst (CVA) designation from National Association of Certified Valuators and Analysts (NACVA), the Accredited Senior Appraiser (ASA) designation from the American Society of Appraisers, and the Accredited in Business Valuation (ABV) designation from the Association of International Certified Professional Accountants (AICPA).

I am the co-author of "The Adviser's Guide to Healthcare - 2nd Edition" [AICPA - 2015], numerous chapters in legal treatises and anthologies, and peer-reviewed and industry articles such as: The Guide to Valuing Physician Compensation and Healthcare Service Arrangements (BVR/AHLA); The Accountant's Business Manual (AICPA); Valuing Professional Practices and Licenses (Aspen Publishers); The Value Examiner (NACVA); Valuation Strategies; and, Business Appraisal Practice. Additionally, I have served as faculty before professional and trade associations such as the ASA; NACVA; the American Health Law Association (AHLA); the American Bar Association (ABA); the AICPA; the Institute of Business Appraisers (IBA); the Healthcare Financial Management Association (HFMA); and, the CPA Leadership Institute. I also serve on the Editorial Board of The Value Examiner and QuickRead, both of which are published by NACVA.

I have been qualified as an expert in state and federal courts and arbitration venues on damages and valuation matters. I have substantial experience calculating damages, including but not limited to measures such as lost profits, unlawful gains, and lost value. My full curriculum vitae is attached hereto as Appendix A, and a list of cases in which I have testified as an expert during the past four years is attached hereto as Appendix C.

### III.     CLASS PERIOD

The damages period in this Case ("Class Period") is June 17, 2018, to the date of this Report.

### IV.     BACKGROUND

*The Case*

As noted above, this Case is a proposed class action lawsuit against Meta,[1] brought by Plaintiffs Jane Doe I, Jane Doe IV, Jane Doe V, Jane Doe IX, Jane Doe X, John Doe II, and John Doe III ("Plaintiffs") on behalf of a proposed class of Americans, i.e., all Facebook users whose health information was obtained by Meta from their healthcare provider or covered entity through Meta Collection Tools.[2] I have reviewed the First Amended Consolidated Class Action Complaint that Plaintiffs filed in this Case, and I am generally familiar with their allegations against Meta,

---

[1]     First Amended Consolidated Class Action Complaint at 1, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-03580-WHO.
[2]     First Amended Consolidated Class Action Complaint at 93, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-03580-WHO.

HIGHLY CONFIDENTIAL

namely that Meta utilized the Meta Collection Tools to intercept Plaintiffs' and other patients' health information from their Healthcare Partners and monetized the collected information for its own financial gain. Meta has not shared that monetary gain with the Americans whose health information is being utilized for targeted advertising.

I understand that Plaintiffs seek to certify the following classes:

**The Patient Device Intrusion Class** – All Facebook users for whom Meta placed an _fbp cookie and/or used computing resources by sending data to Meta through their device and/or by computing Core Setup logic on their device while at a Healthcare Provider property.

**The Patient Status Button-Click Class** – All Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers.

**The Patient Health Information Class** – All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above.

**The Prescription Drug Information Class** – All Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta.

*Sources of Information*

I reviewed and evaluated information from a variety of sources. These sources include publicly available information, such as Meta earnings announcements and press releases, SEC filings, and other published information. I also reviewed materials produced by Meta as part of this Case, such as internal marketing presentations and internal evaluations of Meta's advertising revenue, along with private business and financial information and data.

I understand that Meta has produced documents and information to Plaintiffs as part of this Case's discovery process. I also understand certain of Plaintiffs' requests to Meta for additional information pertinent to Meta's revenue from the at-issue data remain outstanding. If new information bearing on the subject matter of my work becomes available, following the receipt of such information, I will update my analysis, if appropriate, and issue a subsequent report or modify my analysis or conclusions based on the receipt of that new information.

## V.    META AND THE META COLLECTION TOOLS

*Meta*

Meta Platforms, Inc., a public company headquartered in California that "build[s] technology that helps people connect and share, find and build communities, and grow businesses,"[3] operates Facebook, the world's largest social media company. Meta's revenue is derived almost entirely from selling targeted advertising, generating advertising revenues of approximately $160.633 billion, total

---

3    Meta 2024 10-K at 6.

HIGHLY CONFIDENTIAL

revenue of approximately $164.501 billion, and net income of $62.36 billion in 2024.[4] As a public company, Meta is worth approximately $1.88 trillion (the world's 6th most valuable company by market cap) and has approximately 2.518 trillion shares outstanding.[5]

Meta has a "Health" division that is dedicated to marketing to and servicing its Healthcare Partners, which include healthcare entities such as hospitals, insurance plans, and pharmaceutical companies that utilize the Meta Collection Tools "to advertise, market, or support their products and services."[6]

*Meta Collection Tools*

The Meta Collection Tools include "the Meta Pixel, Meta SDK, Meta Conversions API, and customer list uploads."[7]

Meta provides its Healthcare Partners (and other business partners) with the Meta Collection Tools that are embedded in partner apps and websites. The Meta Collection Tools transmits and captures information for Meta that identifies visitors to the Healthcare Partners' websites and information about their communications on those websites, and uses it for targeted advertising based on that visitor's online behavior. It is my understanding that, behind the scenes, Meta attempts to match the patient's online behavior to their Facebook user account.

*Health Information Collected*

The information gathered by the Meta Collection Tools embedded on various Healthcare Partners' webpages includes, but is not limited to, the following:

(1)     When a patient clicks to log in to the patient portal;
(2)     When a patient sets up or schedules an appointment;
(3)     When a patient pays a bill;
(4)     Communications inside the patient portal;
(5)     Diagnostic assessments;
(6)     Communications identifying patients' doctors, conditions, or treatments; and
(7)     Patients' communications with prescription drug websites/providers with whom they have a prescription.[8]

This information is then associated with personal identifiers, including IP addresses, cookies, and device identifiers.[9]

---

4    Meta 2024 10-K at 6, 72, 87.
5    This is Meta's "market cap" (market capitalization) or the share price multiplied by the number of shares outstanding. It is considered a "large cap" or company with a value over $10 billion. See https://companiesmarketcap.com/meta-platforms/marketcap/ (Accessed 8/28/25). The calculations are as of August 27, 2025. Per-Share prices closed at $747.38 on August 27, 2025.
6    First Amended Consolidated Class Action Complaint at 3, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO.
7    First Amended Consolidated Class Action Complaint at fn 1, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO.
8    First Amended Consolidated Class Action Complaint at 84, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO.
9    First Amended Consolidated Class Action Complaint at 45, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO.

## VI.    ANALYSIS

As set forth in the First Amended Consolidated Class Action Complaint, Meta's wrongful actions have caused, and continue to cause, Plaintiffs and Class Members damage, including at a minimum:

(1)    Statutory damages;
(2)    Compensatory damages;
(3)    Nominal damages;
(4)    General privacy damages; and
(5)    Disgorgement of unearned profits.[10]

I understand that Plaintiffs allege that Meta's conduct violates numerous federal and California laws. The health information at issue in this Case has actual, measurable monetary value. As detailed below, based on the information provided to me to date, along with the information that I independently obtained and reviewed, it is feasible to calculate the Class Members' economic damages as a result of Meta's unauthorized acquisition of health information without Plaintiffs' and Class Members' consent, consistent with the appropriate methodology for such calculations.

I also understand that Meta's alleged conduct – wrongfully and unlawfully transmitting, receiving, using, and selling Plaintiffs' and Class Members' health information without their consent for substantial profits – has led to Meta receiving unearned profits from monetizing Plaintiffs' health information. I am informed that California law generally allows plaintiffs to recover the net profits of defendants that are attributable to the alleged misconduct. I understand this to generally mean that in calculating net profits, Meta may be entitled to deduct marginal costs that it incurs in producing the gross revenues that would otherwise be subject to recovery. I further understand that those deductions do not extend to fixed costs, such as ordinary overhead, that would have been incurred in any event.[11] As detailed below, based on the information provided to me to date, along with the information that I independently obtained and reviewed, it is feasible to calculate the net profits that Meta earned from the Class Members' health information, consistent with the appropriate methodology for such calculations.

## VII.    ANALYSIS -
## THE VALUE OF THE HEALTH INFORMATION THAT META INTERCEPTED

The term "value" has many different meanings and definitions to different parties. Therefore, it is critical to appropriately define the standard of value to be employed in developing the valuation opinion. The standard of value defines the type of value to be determined and answers the question, "value to whom?" There are several standards of value that may be sought, including:

---

10  First Amended Consolidated Class Action Complaint at 399, 486, 504, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO.
11  *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1486-88 (2014); *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 894 (2010); Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) (the "Restatement"). Although I have referred to authorities like the Restatement in preparing this Report, I offer no legal opinions in this Case. My calculations follow a standard format for calculating profits as detailed in later sections of this Report. In the event I am directed to revise the calculations described in this Report, the nature of the calculation, my education, experience, and information related to Meta's revenues and costs relating to the use of the Meta Collection Tools to intercept health information will allow me to provide further analysis.

- Fair Market Value: Value from the perspective of a universe of potential willing buyers and sellers, i.e., rational investors. The Fair Market Value standard attempts to assess how the market perceives the value of the asset in question.
- Investment Value: Sometimes referred to as Strategic Value, this standard of value pertains to the asset's value to a particular party or purchaser. The value of an asset to certain parties—such as competitors, suppliers, or customers—is typically higher than it would be for a hypothetical rational third-party investor, due to the heightened expectations of return certainty and/or synergies.

Fair Market Value is impersonal, but Investment Value reflects the unique situation of a specific person or company, i.e., the value to Meta and to the Class Members. The standard of value that HCC utilized in this Case is Fair Market Value. Fair Market Value is defined as the most probable price that the data would bring if exposed for sale on the open market. Further, the Fair Market Value standard assumes a transaction in which a hypothetical willing buyer and a hypothetical willing seller are each acting prudently, knowledgeably, and that the price is not affected by any undue stimulus. In other words, Fair Market Value is the estimated price at which the data would change hands (value) between a willing buyer and a willing seller, without consideration of any benefits that may be received from a specific provider.

The three (3) general approaches for the valuation/appraisal of data are the Income Approach, Market Approach, and Cost Approach.

(1)    <u>Income Approach</u>

Income Approach based methodology measures the present value of anticipated future economic benefits that will accrue to a party or both parties to the subject data transaction.

(2)    <u>Cost Approach</u>

The underlying theory of the Cost Approach is that a prudent buyer would not pay more for the data received than the cost of producing a substitute with the same utility. Cost Approach based methods seek an indication of value by determining the current cost of providing or replacing the subject data considered.

(3)    <u>Market Approach</u>

Market Approach based methodology is premised on the foundation that reported prices of comparable data in the marketplace provide guidance to the value of the subject data.

*Quantification of Damages*

The health information that is subject to this Case has economic value. This is evident from the increasing frequency of healthcare data breaches,[12] the growing data broker industry market size

---

[12] The increasing frequency has been attributed to the high value of medical data, as medical record can fetch up to $1,000 (depending on the completeness of the information) on the black market. "The Five Biggest Challenges in Healthcare Security Right Now" By George V. Hulme, Bitdefender, August 18, 2021, https://www.bitdefender.com/en-us/blog/businessinsights/the-five-biggest-challenges-in-healthcare-security-right-now.

(measured by revenue),[13] and the number of companies (including, at one time, Meta) that have paid and/or do pay individuals in exchange for that individual's data.[14]

In quantifying damages, HCC considered the three generally accepted valuation approaches as set forth below:

Income Approach

The Income Approach quantifies value based on the amount of future income the data is expected to generate for the buyer.  Of the three approaches, the Income Approach (when it can be used) is one of the most widely used methods and can provide a suitable indication of economic value and is useful for estimating the upper bound value of the subject data.

An integral piece to derive a reliable value indication from the employment of the Income Approach is an accurate measure of the income, in monetary terms, that the data asset is expected to earn over its future useful life.  The value of the health information that is subject to this Case is dependent on the buyer's ability to leverage the data, making the data's intrinsic income-generating potential difficult to determine independently without extensive access to Meta's internal systems and financial documentation.  Further, it is difficult to isolate the future income stream contribution of the health information from the stream of the wider organization.  Therefore, the Income Approach, while considered, was not employed.

Cost Approach

The Cost Approach may be useful when establishing a minimum value for a data asset; however, it is rarely used to value data because the cost of developing something often does not accurately reflect its value.  In addition, the Cost Approach focuses mainly on the input costs of data assets and ignores the potential benefits and future value of data assets.  Therefore, the Cost Approach, while considered, was not employed.

Market Approach

While all data can have value, the amount of value will vary depending on the data's characteristics. The characteristics that affect the value of healthcare data can be largely organized into four main pillars:

- "Nature (data type, availability, exclusivity, granularity and source)
- Data quality, maturity and embedded analytic insight (is the data raw, curated, aggregated longitudinally, analyzed?)
- Complexity of data capture (open source or paid, auto-collected or not?)
- Use/application (The data's potential impact, limitations on its use)."[15]

---

13  "Data Broker Market Size, Share & Trends Analysis Report By Data Category (Consumer Data, Business Data, Health Data, Financial Data, Location Data), By Data Type, By Pricing, By End-use, By Region, And Segment Forecasts, 2025 – 2033" Grand View Research, https://www.grandviewresearch.com/industry-analysis/data-broker-market-report.
14  *See* Schedule 5.
15  "How we can place a value on health care data" By Pamela Spence, EY, July 10, 2019, https://www.ey.com/en_gl/insights/life-sciences/how-we-can-place-a-value-on-health-care-data#:~:text=Valuation%20approaches%20to%20consider,insights%20gained%20from%20the%20data).

The market and utility for personal data is much larger than for health data, but an individual's health data is worth 10 to 20 times more than their credit card number on the black market. This is because it contains highly sensitive information and can often be used for a longer period of time than credit cards before the illicit use is detected.[16]

The Market Approach methodology performed for the estimate of the Fair Market Value of the health information that Meta Intercepted (i.e., the Class Members' economic damages as a result of Meta's wrongful actions) is as follows:

(1)    Identification/Selection of Comparable Transactions

Consumer data is valuable to companies who wish to profit from increased customer knowledge and targeted advertising. One way these companies obtain this data is by offering programs or services that allow them to track an individual's browsing information.  There are a number of companies that compensate individuals for their browsing information data.  In those instances:

a.    An individual proactively chooses to share their data (primarily browsing history) with a company in exchange for monetary compensation;

b.    A company protects an individual's data from being distributed or added to databases in exchange for monetary compensation from the individual; and

c.    A company prevents targeted advertising to an individual in exchange for monetary compensation from the individual.

As noted above, the valuation standard of Fair Market Value is defined as the most probable price that the subject interest (in this case, the health information) should bring if exposed for sale on the open market, and assumes that the buyer and the seller are each acting prudently with a reasonable equivalence of knowledge, and that the price is not affected by any undue stimulus or coercion.[17]

As set forth on the attached Schedule 1, there are 25 comparable transactions whereby individuals were compensated for their personal browsing information. These instances include and reflect real-world, arm's-length transactions on the open market and the seller (i.e., the data owner) has knowledge that their browsing history is being tracked and data is being shared with the buyer. Therefore, the prices reflected by these transactions indicate a reliable proxy comparable for the Fair Market Value of the health information that Meta intercepted, which includes a specific type of browsing information.

---

16    "The Value of Personal Medical Information: Protecting Against Data Breaches" By Laurie Zabel, CHC, CPC, NAHAM Connections, National Association of Healthcare Access Management, https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information#:~:text=Personal%20medical%20data%20is%20said,telephone%20numbers%20and%20medical%20conditions.

17    "Healthcare Valuation" By Robert James Cimasi, Vol., 2, John Wiley & Sons: Hoboken, NJ (2024), p. 18.

(2)    Restating Transactional Compensation to a Standardized Metric

The identified and selected transaction prices were restated to a per-user, per-month rate, including incentive payments (Column D) and excluding incentive payments (Column E). Additionally, transactions prices outside of one standard deviation of the mean (average) were considered to be outliers and were excluded from further analysis.

(3)    Indication of the Fair Market Value of the health information

From the 25 data transactions listed on the attached Schedule 1, the average, median, minimum, and maximum monthly values of browsing information were calculated (excluding outliers). The mean (arithmetic average) and the median (50th percentile) are summary measures used to describe the most "typical" value in a set of values. Statisticians sometimes refer to the mean and median as measures of central tendency. The median and mean payment amounts from the comparable transactions (including incentive payments) are $8.76 and $9.49 per user, per month, respectively.

Pursuant to the Market Approach methodology described above, the indicated Fair Market Value of browsing information is between $8.76 and $9.49 per user, per month. It is my opinion that, because it also includes browsing information, the value of the health information unlawfully collected by Meta in this case is comparable to $8.76 and $9.49 per month in web browsing information that third parties are willing to pay in recorded market transactions. This monthly rate would need to then be multiplied by the number of months in which a Class Member visited a Healthcare Partner's website that contained the Meta Collection Tools and used the Healthcare Partner's web properties (e.g., utilizing the patient portal, communicating with a provider).

## VIII.    ANALYSIS - PROFITS THAT META GAINED FROM OBTAINING DATA

It is my understanding that Plaintiffs allege several claims that permit disgorgement of profits as a remedy for each of the Classes.[18]

In this Case, the amount of disgorgement is measured by the profit that accrued to Meta from the provision of the Meta Collection Tools to their Healthcare Partners for use on the Healthcare Partners' websites. Specifically, the economic benefits that accrued to Meta (i.e., the profits) can be estimated from Meta's own data, information, and analysis regarding their offsite (i.e., on websites other than Facebook) advertising revenue during the Class Period.

Externally, Meta reports its advertising revenue in total and on a per-user basis across all marketing classifications. Meta's average revenue per user (ARPU)/average revenue per person

---

[18]    Note that while the Healthcare Provider Class and Prescription Drug Class are specifically discussed herein, particularly as applies to the apportionment of Meta's profits, the disgorgement of profits applies to the Device Intrusion Class (i.e., the first class identified above in Section IV) as well.

(ARPP) metric[19] is reported in its 10-K filings, as well as in various other earnings reports.[20] See attached Schedule 4 for a summary of Meta's reported total advertising revenue and ARPU/ARPP, both worldwide and in the U.S. and Canada, from 2017 to 2024, and Schedule 5 for a summary of Meta's reported active users, both worldwide and in the U.S. and Canada, from 2017 to 2024.

Internally, Meta appears to have a number of advertising groups or segments, e.g., Scaled, In-Market,[21] that report different types of advertising revenue (although the differences between the groups are unclear and have not been explained by Meta) by different classifications[22] and metrics (pixel, ad campaign, partner, etc.). As explained below, Plaintiffs have obtained through discovery some information regarding the advertising revenue Meta obtained in the Health classification.

It is my understanding that Meta derives revenue from the at-issue data that Plaintiffs claim Meta wrongfully obtained. More specifically, I understand that Meta receives revenue from both healthcare providers and non-healthcare providers for whom it serves ads on health-related topics based on inferences it makes from the at-issue data (i.e., patients' health information Meta collects from the Healthcare Partners).

*Revenue from Healthcare Providers*

To calculate the revenue Meta derived from healthcare providers, I would add the total revenue Meta has recorded for each of the healthcare provider websites, apps, and advertisers at issue in this Case.

However, I understand from Plaintiffs' counsel that Meta has not yet produced sufficient information to complete this calculation.

I also understand that Meta referenced the following three documents when asked by Plaintiffs' counsel to produce "total advertising revenues" from healthcare providers:

- PIXEL_HEALTH001373346 is named adsexport3 and contains 8 columns.
- PIXEL_HEALTH001315318 is named adsexport2a and contains 25 columns.
- PIXEL_HEALTH001315319 is named adsexport2b and contains 8 columns.

However, it is not clear from the face of these documents how they relate to total advertising revenues from healthcare providers. The documents appear to provide totals for more than a million ad campaigns. If necessary, I could and will tally the totals, but it does not seem to me to be the most efficient way for the information to be produced. Further, these three documents do not contain all information I would need to be able to make a final calculation.

---

19  Average Revenue Per User (ARPU) was historically defined by Meta in its 10-Ks as total revenue in a given geography during a given quarter, divided by the average of the number of Monthly Average Users (MAUs) in the geography at the beginning and end of the quarter. While ARPU includes all sources of revenue, the number of MAUs used in this calculation only includes Facebook and Messenger users, as the share of revenue from Facebook/Messenger MAUs represents the substantial majority of their total revenue. Starting the first quarter of 2024, Meta updated this term to Average Revenue Per Person (ARPP) and recast ARPP in its 2024 10-K for prior periods for comparative purposes. Meta defines ARPP as its Family of Apps (Facebook and Messenger plus Instagram, Threads, and WhatsApp) revenue during a given quarter, divided by the average of the number of Daily Active People (DAP) at the beginning and end of the quarter.

20  https://investor.atmeta.com/financials/.

21  *See, e.g.,* PIXEL_HEALTH000677540 (7.05.22_NA Scaled Weekly Report_EOQ.xlsx), PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx).

22  I understand that, over time, Meta has changed its classification system used for key words/topics in advertising. For the sake of consistency, I refer to the latest classification system, ███ except where another system is explicitly referenced in Meta's produced documentation.

First, I would need to know the source of the information to determine if there is additional information that would be helpful in making a calculation beyond simply adding the totals together.

Second, I would need an explanation of each column (data fields). For example, it appears that a column named ███████████ contains total revenue for each row. If true, I would need confirmation of that fact. If not, I would need to know the column that identifies the revenue.

Third, I would need a spreadsheet that includes all healthcare providers at issue in this Case (excluding non-healthcare providers). It is my understanding that the parties are discussing the full scope of healthcare providers and that the current production includes some information from non-healthcare providers.

Until Meta produces this additional information or provides these explanations, I will not be able to complete this task.

*Revenue from Non-Healthcare Providers*

The other part of my calculation measures revenue reasonably attributable to Meta's use of the at-issue data in serving health-related ads for non-healthcare providers.[23]

I understand that Plaintiffs requested from Meta information that would allow for this calculation.[24] However, Meta objected to the request, and Plaintiffs filed a motion to compel an answer to the request, which included a proposed methodology for this calculation: (1) identify health ad revenue; (2) apportion it to at-issue data/conduct; and (3) subtract costs, if applicable.[25]

I also understand that Meta responded to Plaintiffs' request for information as follows:

"As a result of [Meta's] complex ad delivery process, considering all eligible ads each time there is an opportunity for an ad impression, Meta cannot respond to Interrogatory No. 18 as drafted or conceived. Meta ████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████ As such, Meta ████████████ ████████████████████████████████████████████████████ This is in part due to the complex nature of Meta's relevant machine learning models and ad ranking system, and in part because the delivery of a particular ad is not based on only information related to that ad. Instead, an ad is only delivered after it has been ranked against all other ads running on Meta's platforms at that point in time. In other words, the delivery of one ad to one user is based on how that user would receive all other eligible ads."[26]

---

23  It is my understanding that Plaintiffs engaged technical experts to explain how the at-issue data is used to serve ads for non-healthcare providers.
24  Interrogatory No. 18.
25  Dkt. 1009.
26  Meta's Response to Interrogatory No. 18.

I also understand Meta stated that it would "produce data that can be used to prepare a very rough estimate or approximation of the potential relative impact (or lack thereof) that Business Tool data containing allegedly potentially sensitive health data had on the delivery of ads on Meta's systems. Specifically, such an approximation may be accomplished through expert discovery by comparing the number of total signals at issue (the events that plaintiffs allege reflect sensitive health information) with the total number of signals that Meta would have considered in its ads delivery system."[27]

It is my opinion that Meta's proposed replacement methodology for estimating profit has no support in any known methodology of calculating profit because more applicable/representative data should be available to Meta, i.e., revenue specific to Health. Meta's proposed methodology does not consider that revenue obtained from health-related advertisements derived in whole, or in part, from healthcare provider websites are likely to have a higher relative value than non-health advertisements. For example, an advertisement related to cancer treatment, if acted upon, could lead to thousands or tens of thousands of dollars in revenue for the advertisers while an advertisement for an ordinary consumer product might lead to revenue of less than $100. As a result, the advertiser seeking to obtain cancer patients would be willing to spend significantly more per ad than the advertiser who is selling the relatively inexpensive consumer product.

*Total Health Advertising Revenue*

Given that I am currently unable to calculate the revenue from healthcare providers and non-healthcare providers, as discussed above, in the alternative, I determined that the total revenue that Meta gained from the at-issue data that Plaintiffs claim Meta wrongfully obtained may also be reasonably estimated from calculating the total health advertising revenue received by Meta. In making this calculation of total health advertising revenue, there are two aspects to consider, as set forth above: (1) Meta obtains revenue directly from healthcare providers; and (2) Meta (as I understand it and describe briefly above) derives revenue from health-related advertising that it serves on behalf of non-healthcare providers based on inferences that it makes about Class Members from health information that it collects on healthcare provider websites and apps. I do not offer an opinion on how those inferences occur in Meta's systems. Instead, I understand that Plaintiffs have retained technical experts for that purpose. I simply aim to provide a reasonable approximation of the total profits Meta wrongfully received.

There are multiple ways that the total profits may be reasonably estimated. Several include:

(1)     The calculation of the amount of overall advertising revenue generated by Meta in the U.S. in its healthcare provider and prescription drug advertising verticals. This calculation may result in a lower bound estimate of the total profits.

(2)     The calculation of the amount of revenue generated by the specific Pixel IDs within the ███████████████████████ classification of "healthcare provider." This calculation may result in a middle bound estimate of the total profits.

(3)     The calculation of the amount of overall health advertising revenue generated by Meta in the U.S. based on its general classification of "health" domains. This calculation may result in an upper bound estimate of the total profits.

I have estimated each in turn below.

---

27     Meta's Response to Interrogatory No. 18.

<u>Lower Bound Estimate</u>

The lower bound may be estimated by the amount of total advertising revenue generated by Meta in the U.S. in its healthcare provider and prescription drug advertising verticals. I consider this the lower bound estimate because I understand these amounts may be under-inclusive in that they do not include thousands of healthcare providers that Meta classified through its ▮▮▮▮ systems.

Meta produced information from different sources for various timeframes during 2017-2022 specific to these advertiser verticals, but I understand Meta has not subsequently updated that production.

Meta produced information indicating that:



(1)    In 2017, the Health Systems and Practitioners vertical had Scaled Health revenue of ▮▮▮▮▮▮▮ of the total Scaled Health vertical), and the Prescription vertical had total Scaled Health revenue of ▮▮▮▮▮▮▮% of the total Scaled Health vertical).[28]

(2)    In 2018, the Health Systems and Practitioners vertical had Scaled Health revenue of ▮▮▮▮▮▮▮ of the total Scaled Health vertical), and the Prescription vertical had total Scaled Health revenue of ▮▮▮▮ million ▮▮▮▮ of the total Scaled Health vertical).[29]

(3)    In 2019, the Health Systems and Practitioners vertical had Scaled Health revenue of ▮▮▮▮▮▮▮ of the total Scaled Health vertical), and the Prescription vertical had total Scaled Health revenue of ▮▮▮▮ million (▮▮▮▮ of the total Scaled Health vertical).[30]

(4)    In 2020, the Health Systems and Practitioners vertical had Scaled Health revenue of ▮▮▮▮▮, and the Pharma/Prescription vertical had total Scaled Health revenue of ▮▮▮▮.[31]

(5)    From July 1, 2021 to September 17, 2021, the Health Systems and Practitioners vertical had quarter-to-date (QTD) Scaled Health revenue of ▮▮▮▮▮, and the Prescription vertical had QTD Scaled Health revenue of ▮▮▮▮▮.[32] This accounted for ▮▮▮▮ of the overall Health vertical Scaled revenue (which reported QTD revenue of ▮▮▮▮▮) each.

(6)    In Q4 2021, the Health Systems and Practitioners vertical had QTD Scaled revenue of ▮▮▮▮▮, the Residential, Long-term Care Facilities and Outpatient Care Centers vertical had QTD Scaled revenue of ▮▮▮▮▮, and the Prescription vertical had QTD Scaled revenue of ▮▮▮▮▮.[33] This accounted for ▮▮▮▮ and ▮▮▮▮ of the overall Health vertical Scaled revenue (which reported QTD Scaled revenue of ▮▮▮▮▮▮), respectively.

---

28    PIXEL_HEALTH000433949 (1NA Health_1qg6mhFnZuMmXmYssG6IKGiHTp8y-OC7n.pptx, Slide 9).

29    PIXEL_HEALTH000433949 (1NA Health_1qg6mhFnZuMmXmYssG6IKGiHTp8y-OC7n.pptx, Slide 9).

30    PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slide 25);
      PIXEL_HEALTH000433949 (1NA Health_1qg6mhFnZuMmXmYssG6IKGiHTp8y-OC7n.pptx, Slide 9).

31    PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slides 8-9, 25).
      Note that the sub-vertical title appears to be shortened (but not different) in this source.

32    PIXEL_HEALTH000521256 (NA Scaled Revenue Report Q3'21 - 9.20.21.xlsx, "Revenue Sub-Verticals" tab).

33    PIXEL_HEALTH000521402 (NA Scaled Revenue Report Q4'21 - EOQ.xlsx, "Revenue Sub-Verticals" tab).

HIGHLY CONFIDENTIAL

(7)    Total 2021 Scaled Health revenue for the Health Systems vertical was reported elsewhere as ▮▮▮▮ of Scaled Health), and total Prescription revenue was reported as ▮▮▮▮ of Scaled Health).[34] Total 2021 In-Market Health Pharma revenue was ▮▮▮▮ of In-Market Health); 2021 In-Market Health Systems revenue was not reported in the source.[35]

(8)    In Q1 2022, the Health Systems and Practitioners vertical had QTD revenue of ▮▮▮▮ the Residential, Long-term Care Facilities and Outpatient Care Centers vertical had QTD Scaled revenue of ▮▮▮▮, and the Prescription vertical had QTD revenue ▮▮▮▮[36] This accounted for ▮▮▮▮ and ▮▮ of the overall Health vertical revenue (which reported QTD revenue of ▮▮▮▮ million), respectively.

Notably, it appears from the documents produced by Meta that some health sub-classifications, including Prescription Drug, produce both Scaled and In-Market Revenue.[37] It appears these two revenue numbers should be summed in order to approximate the total Health Revenue for the applicable sub-classification.

The estimation of the lower bound is a simple calculation: The total of the Scaled Health revenue and the In-Market Revenue achieved in the U.S. in the "Healthcare Provider" and "Prescription Drug" sub-classifications within these advertiser verticals for each year during the Class Period. However, as noted above, Meta has not produced any advertising revenue for the "Healthcare Provider" and "Prescription Drug" sub-classifications beyond Q1 2022, which I would need to complete the calculation. Obtaining more recent revenue figures would result in a more accurate estimation of the lower bound, in part because, as set forth above and exemplified in the below chart that was produced as part of an internal Meta Health marketing/advertising presentation, the revenue that Facebook generated from Health-related ads appears to have grown during the Class Period:[38]

**Exhibit 1:**



34  PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slides 6, 25). Note that the titles of the sub-verticals appear to be shortened (but not different) in this source. Also note, 2021 Pharmaceutical Scaled Revenue was reported elsewhere in the same source as ▮▮▮▮ (see Slide 58).

35  PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slide 18).

36  PIXEL_HEALTH000369674 (NA Scaled Revenue Report Q1'22 - 03.31.22_EOQ.xlsx, "Revenue Sub-Verticals" tab).

37  *See, e.g.,* PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slides 18-19).

38  PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slide 15).

HIGHLY CONFIDENTIAL

Nevertheless, as set forth in the attached Schedule 2, utilizing the information and data that has been produced to date results in a total Lower Bound Estimate of **$29.19 million per month for** all Classes during the Class Period, and specifically:

(1)    A Lower Bound Estimate for the Patient Button-Click Class and Patient Health Information Class of **$8.26 million per month** during the Class Period.

(2)    A Lower Bound Estimate for the Prescription Drug Information Class of **$20.93 million per month** during the Class Period.

To the extent that this Lower Bound Estimate captures extra revenue (i.e., revenue not at issue in this Case), I believe it is nevertheless a conservative estimate because it does not capture the added value to Meta from this type of targeted advertising model that results in more time spent by a user on Facebook.

<u>Middle Bound Estimate</u>

The Middle Bound Estimate apportions Facebook's monthly U.S. revenue for Health to the at-issue domains and associated Pixel IDs that Plaintiffs have been able to identify through their independent investigation within the ████ classification that captured the at-issue data.

I understand from Plaintiffs' counsel that Meta has, within its ████ classification system, 13 Health sub-classifications:

(1)    Healthcare Providers
(2)    Patient Portal
(3)    Health Coverage
(4)    Mental Health Condition
(5)    Substance Use Disorder
(6)    Suicide & Self-Injury
(7)    Sexual & Reproductive Care
(8)    Abortion
(9)    Illness or Injury
(10)   Medication and Prescription
(11)   Body Dysmorphia & Eating Disorder
(12)   Genetic Data
(13)   Pregnancy & Childbirth

I understand that Meta ████████████████████████████ but, as of the date of this report, has not produced the revenue it received within, and specific to, each of these ████ classifications. However, if Meta produces revenue figures for each pixel, I would be able to total the revenue received by Meta for the Pixel IDs associated with each of the Health ████ classifications to estimate the Middle Bound of the total revenue.

---

39    *See, e.g.,* PIXEL_HEALTH001315318, PIXEL_HEALTH001315319, PIXEL_HEALTH001373346; DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES, Response to Interrogatory No. 17 (referencing PIXEL_HEALTH000939290, PIXEL_HEALTH000939291); Deposition of Manish Singhal, April 2, 2025, Ex. 211. Notably, I was informed by Plaintiffs' counsel that Meta has revised its taxonomies and classifications during the Class Period, but previously Meta had a category/classification called "Protected Health Information."

It appears from Meta's Health classifications and descriptions that above classifications (1) through (9) align with Plaintiffs' Patient-Button-Click Class and Patient Health Information Class, and above classification (10), "Medication and Prescription," aligns with Plaintiffs' Prescription Drug Information Class. Therefore, if Meta produces its revenue figures during the Class Period for each pixel associated with these Health ██████ classifications, I would be able to calculate a total revenue for each Class to estimate the Middle Bound of the total revenue.

To the extent that this Middle Bound Estimate captures extra revenue (i.e., revenue not at issue in this Case), I believe it is still a conservative estimate because it does not capture: (1) the added value to Meta from this type of targeted advertising model that results in more time spent by a user on Facebook, or (2) health-based advertisements that it serves for non-healthcare providers based on inferences that it derives in whole or in part from the health information it collects from healthcare providers in this Case.

Upper Bound Estimate

The below snapshot, taken from a document Meta produced, on its face, reports the amount of revenue that Facebook receives daily from health-related ██████ classifications, which I have been informed is another name for a classification system that includes the health-related ██████ classifications described above.[40] I consider this the Upper Bound Estimate because it accounts for revenues for health-based advertising from some non-healthcare providers.

**Exhibit 2:**



It is my understanding, from the face of the document, that the two overarching columns denote 1 day of global revenue for Meta and 1 day of global revenue for Meta outside of Facebook's

---

40    PIXEL_HEALTH001332991. The sensitive, non-Health ██████ classifications are redacted.

site (i.e., offsite). In other words, **Facebook generates revenue in excess of** ███████ **per day** from displaying targeted ads for "health" advertisers.

I understand that the metadata on the above-referenced document indicates that it was created on August 4, 2023. I also understand the above-referenced document is limited to health-related advertisers (including non-healthcare providers) and, because of that, this calculation would not capture all health-related advertising revenue that Meta captured in whole or in part from health information collected from healthcare providers.[41] For example, Walmart may not be classified as a health-based advertiser, but it may also purchase health-related advertisements from Meta. Thus, any revenue that Meta obtained from Walmart for those health-related advertisements would not be included in this total. To make that calculation, Meta would need to produce the total revenue associated with advertisements on the health-related Ads Topics that Plaintiffs identified to Meta in Interrogatory No. 18. This information would help establish additional revenues beyond those directly collected from healthcare providers.

I will need additional information to provide a final calculation that captures Meta's monetization of health information collected from healthcare providers to serve health-related advertisements for non-healthcare providers. The additional information would include the types of underlying documents necessary to make the calculation that Plaintiffs requested in Interrogatory No. 18 and related documents. First, I would need Meta's total revenues from advertisements in the health-related categories identified by Plaintiffs in the exhibits attached to Interrogatory No. 18. Second, I would need documents to apportion the percentage of ███████████████████ that were derived from healthcare provider data as opposed to non-healthcare provider data. For example, it would be helpful if Meta preserved data sufficient to identify the percentage of ███████████ ██████ that came from various sources. Third, I would need additional information about Exhibit 2 above with the 1d Global Offsite revenue for "HEALTH." In the absence of the additional information, I will make my best reasonable approximation with the data I have been provided.

With the information and documents available to me at this time, my methodology for calculating economic benefits that accrued to Meta from the provision of the Meta Collection Tools to their Healthcare Partners for use on the Healthcare Partners' websites starts from the amount of ███████████ cited in the above Exhibit 2 as the global offsite revenue generated in the Health classification in one day. That number is then adjusted to (1) convert the global revenue figure to a U.S. revenue figure and (2) convert the daily revenue figure to a monthly figure. As discussed below, this methodology is used in two ways: (1) adjusting by U.S. users and (2) adjusting by U.S. advertising percentage for healthcare providers in the healthcare provider verticals (see attached Schedule 3). This measure does not capture additional revenue that Meta received from "health" ads shown on behalf of non-healthcare providers that were based in whole or in part on inferences that Meta made about class members from their communications with healthcare providers.

It is notable that the revenue that Facebook generated from Health ads appears to have grown during the Class Period. In fact, a 2023 "CFS H2 Roadmap" document produced by Meta references

---

[41] I understand that Meta produced this document on the last day of fact discovery in this case, withheld other documents associated with it as privileged, and produced a data flow diagram in the same batch that visualizes a process to ████████████████ ███████ I have been informed that ███████████ was an internal code name for a proposal that was eventually called Core Setup and that Core Setup eventually truncated URLs that Meta received from the Pixel on health websites—e.g. www.hospital.org/cancer-treatment would be shortened to www.hospital.org—but did not "anonymize the event."

HIGHLY CONFIDENTIAL

its ███ Healthcare book of business whose campaign's spend tends to be █████████████."[42] This ███████ figure, as of 2023, is more than █████ the 2021 figure illustrated in the above Exhibit 1.

Attached Schedule 3 scales this global offsite revenue to U.S. Facebook users; as calculated on the attached schedule, **approximately $143 million of Facebook's Monthly Offsite Revenue for Health may be attributed to U.S. users**, including, but not limited to, the Class Members.

The second method I utilized to calculate Meta's Health Revenue from healthcare providers attributable to U.S. Facebook Users was to scale the 1d of Global Offsite Health Revenue ($10.8 million) based on the percent of Meta's Total Advertising Revenue that comes from U.S. and Canadian users. Attached Schedule 4 calculates the proportion of Meta's Total Advertising Revenue worldwide that is attributable to the U.S. and Canada (approximately 47% during the Class Period) and Schedule 3 multiplies the 1d of Global Offsite Health Revenue global offsite revenue to U.S. & Canada by that percentage. As calculated on the attached Schedule 3, under this methodology, **approximately $137 million of Facebook's Monthly Offsite Revenue for Health may be attributed to U.S. users**, including, but not limited to, the Class Members. Although this estimation is the upper bound, it is still likely conservative because Meta's proportion of U.S. advertising revenue related to health may be larger than its proportion for other forms of advertising due to more restrictive European laws, e.g., the General Data Protection Regulation (GDPR).[43]

As noted above, the meta-date of document reporting ███████ for 1 day of global health revenue for Facebook (Exhibit 2) indicated it was in 2023, but the specific date of the calculation was not provided. However, another source from 2022 appears to corroborate the calculation. Messaging between Manish Singhal and Tobias Wooldridge on July 17, 2022, appear to discuss the percent of Facebook revenue attributable to the Health classification.[44] As set forth more fully in the attached Schedule 6, recreating Mr. Singhal's calculations results in █████ of Facebook revenue attributable to the health-related classifications. Applying █████ to Meta's worldwide Total Advertising Revenue results in approximately █████████ for 1 day of global health revenue for Facebook according to 2021 revenue figures. That ██████████ daily total advertising revenue attributable to Health, calculated in the attached Schedule 6, is within 8% of the █████████ figure in Exhibit 2. It is also worth noting that this █████ calculated figure is also relatively close to the Health Global Offsite Revenue as a percent of Grand Total Global Revenue ██████) cited in the table above.[45] Based on this, it is my assumption that the time period of the revenue reported in Exhibit 2 is around 2022.

To apportion this Current Upper Bound Estimate to each of the classes, I averaged the percentage of the total Health advertising revenue generated by Meta in the U.S. to its "Healthcare Provider" and "Prescription Drug" subclassifications within the Health-related Vertical classification, i.e., the subclassifications most closely mirroring the classes that Plaintiffs seek to certify. The percentages, where reported by Meta, are noted in the Lower Bound Estimate section above and in attached Schedule 2.

---

42   PIXEL_HEALTH0009945614. Notably this is the only document HCC has seen where Meta calculates ███████████████ and indicates that Meta can (and does) █████████████
43   *See, e.g.*, PIXEL_HEALTH001189530-43; Meta 2024 10-K at 10.
44   Deposition of Tobias Wooldridge, January 31, 2025, 138:1-141:8, Ex. 17 (PIXEL_HEALTH000109611-12).
45   PIXEL_HEALTH001332991.

HIGHLY CONFIDENTIAL

According to the information Meta has produced to date, the "Healthcare Provider" vertical classification represented by the "Health Systems & Practitioners" vertical in the marketing materials produced by Meta represented an average of ██ of the total Health vertical revenue.[46] Further, the "Prescription Drug" vertical in those produced marketing materials represented an average of ██ of the total Health vertical revenue.[47]

I applied those above percentages to the Current Upper Bound Estimate range to apportion the Upper Bound Estimate to the Classes, which results in an Upper Bound Estimate of **$40.90 million to $42.63 million per month** for all Classes during the Class Period. Further, I apportioned the Upper Bound Estimate range to the Patient Button-Click Class, Patient Health Information Class, and the Prescription Drug Information Class. This calculation results in:

(1)    An Upper Bound Estimate for the Patient Button-Click Class and Patient Health Information Class of **$17.57 million to $18.32 million per month** during the Class Period.

(2)    An Upper Bound Estimate for the Prescription Drug Information Class of **$23.33 million to $24.31 million per month** during the Class Period.

My Current Upper Bound Estimate of Facebook's monthly Offsite Health Revenue from healthcare providers attributable to U.S. users rely on a number of assumptions that I had to make in the absence of Meta producing requested documents and information (which are noted above).

For example, I have been informed that:

(1)    Meta health vertical classifications were under-inclusive;

(2)    The ████████ classifications are more precise and comprehensive;

(3)    The ████████ / day document (Exhibit 2) indicates it was based on ████ classifications;

(4)    The ████████ / day document (Exhibit 2) was produced in a "family" of documents that also included a flow chart that appears to outline a proposal to ████ ████ ; and

(5)    Meta's counsel has informed Plaintiffs' counsel that Meta will provide Plaintiffs with additional information about the ████████ / day document and how that total was calculated.

When I receive that information, I will update my calculation, which may increase or decrease upon learning more about it. However, should one or more of these assumptions be found to be incorrect, my methodology would not change, and the correct assumption or data figure would simply replace the incorrect assumption or data figure.

Further, there are some limitations to the Current Upper Bound Estimate:

(1)    The estimation of Meta's proportion of U.S. advertising revenue related to health may be underestimated, for the reasons stated above. However, should Meta produce

---

46    See Schedule 2, Column J
47    See Schedule 2, Column K

data that apportions its advertising revenue related to health in the U.S. specifically, I could utilize that figure, which would likely result in a more accurate Upper Bound Estimate.

(2)     The number of members in each class is currently indeterminate, so calculating a figure per Class Member is premature. However, it is my understanding that Plaintiffs have identified tables in Meta's databases from which aggregate events for relevant healthcare provider Pixels can be calculated going back to 2018; and that Meta will produce additional data for the proposed class after class certification.

(3)     Both methods utilized assume that the entire health-related ██████ classification revenue is subject to Meta's alleged wrongful actions, although this is likely not correct. However, it is my understanding that Meta ████████████████████ ████████████████████████████████████████l, and all of these metrics can be tracked by classification (e.g., Health) because Meta assigns classifications to the advertisements that it serves,[48] so it may be possible to further refine this estimate without changing my methodology.

(4)     The monthly figures resulting from the employment of the two methods do not account for the apparent increase in Health advertising revenue Meta experienced during the Class Period. However, should Meta produce Health revenue by month or year, I could adjust the monthly amount to devise an average monthly amount that considers how that monthly amount changed during the Class Period without changing my methodology.

If I had information regarding the composition of the Class and the amount of revenue attributed to these specific Class Members during each month and/or year of the Class Period, then I could more accurately determine the revenue Meta received as a result of their wrongful actions by calculating the amount of revenue per Class Member for each month and/or year of the Class Period. In addition, this amount does not yet capture the revenues from non-healthcare providers for whom Meta served health ads. That added value that may be attributed to those Class Members during the Class Period would be a portion of the difference between the total "HEALTH" revenues and the proportionate allocation of it to healthcare providers (which difference is $96.36 million to $100.4 million, as calculated on the attached Schedule 3, Line 25). However, I would need more information to make that calculation.

<u>Consideration of Expenses</u>

The above estimations calculate revenue from the at-issue data that Plaintiffs claim Meta wrongfully obtained. As alluded to above, the amount of disgorgement can be determined by the net profits realized by Meta (specific to health advertising), calculated as revenue minus expenses. Although Meta reports expenses in its annual 10-K filings,[49] Meta's corporate representative testified that he does not know of any expenses associated with health-related ██████ classification revenue generated by the Meta Collection Tools.[50] Therefore, the revenues that Meta received as a result of their wrongful actions is simply reduced by $0 in associated expenses. Should I receive information proving that Meta had expenses associated with the health revenue generated by the

---

48     *See, e.g.,* PIXEL_HEALTH001315318, PIXEL_HEALTH001315319, PIXEL_HEALTH001373346; DEFENDANT META PLATFORMS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIFTH SET OF INTERROGATORIES, Response to Interrogatory No. 17 (referencing PIXEL_HEALTH000939290, PIXEL_HEALTH000939291); Deposition of Manish Singhal, April 2, 2025, Ex. 211.
49     *See, e.g.,* Meta 2024 10-K at 60, 94.
50     30(b)(6) Deposition of David Abdul-Malak, May 21, 2025, 55:7-14.

Meta Collection Tools, I would replace the $0 expense figure currently considered in my methodology for the health advertising expense proven by Meta, without changing my methodology.

## IX.    ANALYSIS – MARKET VALUE OF THE STORAGE SPACE TAKEN

In addition, I understand that Plaintiffs intend to seek compensation via the market value of the storage space taken by the _fbp cookie and computing power of their devices utilized by Meta, as measured by Dr. Shafiq and multiplied by the total number of events that occurred.[51] However, because Meta has not yet produced information about the total number of events from the healthcare provider domains, I am not yet able to make that calculation.

## X.    SUMMARY AND CONCLUSIONS

As detailed above, I have concluded that the health information that is subject to this Case has economic value, and it is feasible to calculate the value of the health information that Meta intercepted from Meta Healthcare Partner websites. Based on publicly available information and discovery produced to date, I have structured a calculation, consistent with accepted methodology, of determining the value of this data, that indicates the health information Meta intercepted is comparable to $8.25 to $9.87 per month in web browsing information for which third parties are willing to pay. This calculation may be refined as discovery continues and as more information becomes available.

Further, as detailed above, I have concluded that it is feasible to calculate the profits Meta gained from obtaining data from Meta Healthcare Partner websites. Based on publicly available information and discovery produced to date, I have structured a calculation, consistent with standard methodology, of determining the amount of these net profits. This calculation indicates that the upper-bound net profits (specific to health advertising) realized by Meta is estimated to be within the range of $137 million to $143 million per month; apportioning this range to the Classes results in an Upper Bound Estimate of $40.90 million to $42.63 million per month. This calculation may be refined as discovery continues and as more information becomes available.

All opinions and conclusions set forth in this report are made within a reasonable degree of certainty for experts in the field of economic damages.

---

[51]    *See* Expert Report of Zubair Shafiq, Opinion #7.

HIGHLY CONFIDENTIAL

# XI.    CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have performed no other services, as an appraiser or in any other capacity, regarding the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- I have no bias with respect to the subject of this report or to the parties involved with this Matter.
- I have been qualified as a healthcare economic, financial and valuation expert in Federal and State courts.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- HCC is being compensated in this Matter for the development of this report, as well as for any additional requested services, e.g., deposition and trial preparation and testimony, based upon actual hours spent at HCC's standard hourly rates. My hourly rate is $600.  In addition to my time, HCC will also bill for the actual time that other members of HCC's staff spend on this Matter, at my direction, at hourly rates ranging from $100 to $500.  Finally, HCC is being reimbursed for any out-of-pocket expenses at HCC's cost. Payment of the fees and expenses is not contingent upon the outcome of this Matter.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of any of the parties to the Matter, the amount of the value or calculated opinion(s), the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this report.
- I have the requisite training and experience to complete this engagement as set forth in my qualifications as attached in Appendix A of this report.  Further, HCC staff assisted me with the development of this report, and worked at my direction.

I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath.


Respectfully submitted,

HEALTH CAPITAL CONSULTANTS

By:    _Todd A. Zigrang_
    _____
    Todd A. Zigrang, MBA, MHA, FACHE, CVA, ASA, ABV
    President

## XII.    SCHEDULES AND APPENDICIES

|  |  | Description |
|---|---|---|
| **Schedule** | **1** | Valuation of Data Values  – Market Approach |
| **Schedule** | **2** | Disgorgement Calculation – Lower Bound Estimate |
| **Schedule** | **3** | Disgorgement Calculation – Current Upper Bound Estimate |
| **Schedule** | **4** | Facebook Advertising Revenue, 2017-2024 |
| **Schedule** | **5** | Facebook Active Users, 2017-2024 |
| **Schedule** | **6** | Reconciliation of PIXEL_HEALTH000109611 & Facebook Global Offsite Revenue |

|  |  | Description |
|---|---|---|
| **Appendix** | **A** | Curriculum Vitae - Todd A. Zigrang |
| **Appendix** | **B** | Documents Received and Considered |
| **Appendix** | **C** | Todd A. Zigrang Litigation Testimony Experience |

HIGHLY CONFIDENTIAL

# Schedules

Schedules



**In Re Meta Pixel Healthcare Litigation**
Valuation of Data Values - Market Approach

**Schedule 1**

| | A | B | C | D | E |
|---|---|---|---|---|---|
| | **Data Being Transacted** | **Date of Estimate** | **Amount** | **Amount Adjusted to a Per User Per Month Rate** (1) | **Amount Adjusted to a Per User Per Month Rate (without incentive pymts)** (2) |
| 1 | Reklaim, fka Killi, Tier 3 "Intermediate" payout to users for providing data (3) | 2020 | Base Rate of $1/month | $1.00 | $1.00 |
| 2 | Reklaim, fka Killi, Tier 2 "Pro" payout to users for providing data (3) | 2020 | Base Rate of $2/month | $2.00 | $2.00 |
| 3 | Reklaim, fka Killi, Tier 1 "Elite" payout to users for providing data (3) | 2020 | Base Rate of $3/month | $3.00 | $3.00 |
| 4 | Reklaim by Killi, payment to users for installation of browser extension and sharing demographic profile, device information, shopping, answering surveys (7) | 2025 | $10/week in cryptocurrency or gift cards | $43.33 | $43.33 |
| 5 | Google Screenwise Meter: Installation of Browser Extension Only (4) | 2012 | Up to $20 for 1 year of participation | $1.67 | $1.67 |
| 6 | Google Screenwise Meter: Hardware monitoring (data collector router installed on home network + browser extension) "browsing time, duration, and mode" (4)(18) | 2012 | $100 initially + $20/month up to 1 year | $28.33 | $20.00 |
| 7 | Caden, phone application that shares data with participant's permission (5) | 2025 | $10/month | $10.00 | $10.00 |
| 8 | Permission Research, payment for installation of software to share computer usage and browsing habits (5) | 2025 | $10 for installation + $10 per month | $10.83 | $10.00 |
| 9 | Connecting six accounts like Twitter and Tumblr to Datacoup (6) | 2017 | $1.10/week | $4.77 | $4.77 |
| 10 | Neilsen Computer and Mobile Panel, which pays users to download the app and passively collect data about your internet data (5) | 2025 | Up to $60/year | $5.00 | $5.00 |
| 11 | The Embee Mobile Performance Meter, a data collection app that runs in the background and passively collects data on network performance and how you use your phone. (7) | 2025 | $3-$12/month in Amazon gift cards | $7.50 | $7.50 |
| 12 | UpVoice, a passive app that tracks your activity on social feeds like Facebook, Twitter, YouTube, LinkedIn, and Amazon (7) | 2025 | $93 and up in rewards in their first year of participation | $7.75 | $7.75 |
| 13 | SavvyConnect, a passive data collection app that runs in the background and collects information about searches, online shopping, entertainment, and how you use other apps. (7) | 2025 | Up to $180/year | $15.00 | $15.00 |
| 14 | EU Subscription for no-ad Facebook/Instagram (through Facebook/Instagram) (8) | 2025 | €5.99/month for 1 account, €4/month for each additional account | $6.95 | $6.95 |
| 15 | EU Subscription for no-ad Facebook/Instagram (through Apple App/Google Play Store) (8) | 2025 | €7.99/month for 1 account, €5/month for each additional account | $9.27 | $9.27 |
| 16 | Monthly amount paid by Datacoup to consumers for access to social media accounts and credit card transaction data (9) | Unknown | $8/month | $8.00 | $8.00 |
| 17 | Annual cost to have your data kept out of databases by reputation.com (9)(10) | 2012 | $99/year | $8.25 | $8.25 |
| 18 | YouGov Panel - Market Research Surveys (11) | 2021 | <$100/year after continuous participation | $8.25 | $8.25 |
| 19 | Facebook Research App (newer version) (12) | 2019 | $10 Amazon gift card for Participants who leave Facebook Research App on/installed for 15-22 days out of 30 days | $10.00 | $10.00 |
| 20 | Facebook Research App (older version) (13) | 2013 | $5 for consent, $15 to Install & Activate, $5 incentive per month (Cohort B) | $11.67 | $5.00 |
| 21 | Facebook Research App (older version) (13) | 2013 | $5 for consent, $10 to Install & Activate, $7.50 incentive per month (Cohort A) | $12.50 | $7.50 |
| 22 | EU Subscription for no-ad Instagram (14)(15) | 2023 | $14/month | $14.00 | $14.00 |
| 23 | Facebook Research App (newer version) (16) | 2017-2018 | $15 Amazon gift code for Participants who leave Facebook Research App on/installed for 27 out of 30 days | $15.00 | $15.00 |
| 24 | Facebook Research App (newer version) (12) | 2019 | $20 Amazon gift card for Participants who leave Facebook Research App on/installed for 23+ days out of 30 days | $20.00 | $20.00 |
| 25 | Bandwidth Sharing with Honeygain (i.e., browsing history) (17) | 2025 | $0.02/GB (up to $30/month) | $30.00 | $30.00 |
| 26 | Average (19) | | | $11.76 | $10.93 |
| 27 | Standard Deviation (20) | | | $9.77 | $9.43 |
| 28 | **Average (Excluding Outliers)** (21) | | | $9.49 | $9.04 |
| 29 | **Median (Excluding Outliers)** (22) | | | $8.76 | $8.13 |
| 30 | **Minimum (Excluding Outliers)** (23) | | | $2.00 | $1.67 |
| 31 | **Maximum (Excluding Outliers)** (24) | | | $20.00 | $20.00 |

HCC
HEALTH CAPITAL CONSULTANTS

**In Re Meta Pixel Healthcare Litigation** <span style="color:red">HIGHLY CONFIDENTIAL</span>    **Schedule 1**
Valuation of Data Values - Market Approach

Notes:

1 Amount in Column C, adjusted to a per user per month rate.  This rate includes and apportions out any one-time, non-recurring payments (e.g., install and activate incentive payment, consent payment).

2 Amount in Column C, adjusted to a per user per month rate.  This rate does not include any one-time, non-recurring payments (e.g., install and activate incentive payment, consent payment).

3 This is a "Blanket Opt In," where Killi's clients will get all of the data. Was established in response to the promulgation of the General Data Protection Regulation (GDPR), which requires companies to obtain permission from consumers
  before sharing their data with others.  "This company will pay you to share your data. Is it worth it?" By David Lazarus, Los Angeles Times, December 1, 2020, https://www.latimes.com/business/story/2020-12-01/column-privacy-money-for-data-sharing.

4 The program, which allowed Google to record every single site that anyone visits while connected to your WiFi, officially ended in November 2020.
  "Google Screenwise pays opt-in users for expanded web tracking" By Dante D'Orazio, The Verge, February 8, 2012, https://www.theverge.com/2012/2/8/2785751/google-screenwise-panel-web-monitoring-knowledge-networks.
  "Google will stop peddling a data collector through Apple's back door" By Zack Whittaker, Josh Constine, and Ingrid Lunden, January 30, 2019, https://techcrunch.com/2019/01/30/googles-also-peddling-a-data-collector-through-apples-back-door/.

5 "14 Real Ways to Get Paid for Your Data: Up to $500 a Year" By Nick Loper, last updated January 6, 2025, Side Hustle Nation, https://www.sidehustlenation.com/get-paid-for-your-data/.

6 Datacoup has paid its customers $8 a month in exchange for accessing the customers' social media accounts, such as Facebook and Twitter, and their credit-card and debit-card transaction records.
  "How much is  your personal data really worth?" By Kate Fane, Vice, August 22, 2017, https://www.vice.com/en/article/how-much-is-is-your-personal-data-really-worth/.

7 The Nielsen Computer and Mobile Panel is a program where people earn rewards for allowing Nielsen to anonymously collect data about their online and mobile device usage. Participants install Nielsen's software on their devices,
  which then collects data about how they use the internet and apps. In return, participants can earn points redeemable for gift cards and other rewards.
  "Get Paid For Your Data | 11 Best Data Collection Apps for 2025" By Bobby Hoyt and Ariel Gardner, Millennial Money Man, January 15, 2025, https://millennialmoneyman.com/get-paid-for-your-
  data/#:~:text=Make%20up%20to%20$50/year%20in%20passive%20income&text=It%20works%20by%20downloading%20the,you%20can%20redeem%20for%20cash.

8 Euro dollar amount converted to USD at current conversion rate. "About subscription for no ads" Facebook, https://www.facebook.com/help/262038446684066.

9 Datacoup has since shut down.
  "What Are Data Brokers – And What Is Your Data Worth? [Infographic]" WebFX Team, https://www.webfx.com/blog/internet/what-are-data-brokers-and-what-is-your-data-worth-infographic/.

10 "A Vault for Taking Charge of Your Online Life" By Natasha Singer, The New York Times, December 8, 2012, https://www.nytimes.com/2012/12/09/business/company-envisions-vaults-for-personal-data.html?pagewanted=all.

11 No browser metering included.
   Source: PIXEL_HEALTH000486349.

12 Plus referral fee, per "Facebook pays teens to install VPN that spies on them" By Josh Constine, TechCrunch, January 29, 2019, https://techcrunch.com/2019/01/29/facebook-project-atlas/.
   Source: PIXEL_HEALTH001284347.

13 Source: PIXEL_HEALTH001284081.

14 Users no longer see sponsored posts, but the subscription does not stop suggested posts or data collection (Meta just does not use data for ads).
   "I Tried Meta's Ad-Free Instagram Subscription. This Is What It Was Like." By Nicole Nguyen, The Wall Street Journal, November 19, 2023, https://www.wsj.com/tech/personal-tech/i-paid-14-for-a-month-of-ad-free-instagramwas-it-worth-it-bd098391.

15 "Meta Plans to Charge $14 a Month for Ad-Free Instagram or Facebook" By Sam Schechner, The Wall Street Journal, October 3, 2023, https://www.wsj.com/tech/meta-floats-charging-14-a-month-for-ad-free-instagram-or-facebook-5dbaf4d5.

16 Source: PIXEL_HEALTH001219572.

17 Honeygain, https://r.honeygain.me/SIDEHUSTLE.

18 "Google Screenwise panel will pay you to track your every move online" By Billy Steele, engadget, February 8, 2012,
   https://www.engadget.com/2012-02-08-google-screenwise-panel-pays-to-track-browsing.html#:~:text=If%20you're%20looking%20to,or%20leave%20at%20any%20time.

19 Calculated as the average of Lines 1 through 25.

20 The calculated standard deviation of payment amounts reported in Lines 1 through 25.

21 Calculated as the Average of Lines 1 through 25, excluding Outliers, i.e., values greater than 1 standard deviation (Line 27) from the overall average (Line 26).

22 Calculated as the Median of Lines 1 through 25, excluding Outliers, i.e., values greater than 1 standard deviation (Line 27) from the overall average (Line 26).

23 Calculated as the Minimum amount in Lines 1 through 25, excluding Outliers, i.e., values greater than 1 standard deviation (Line 27) from the overall average (Line 26).

24 Calculated as the Maximum amount in Lines 1 through 25, excluding Outliers, i.e., values greater than 1 standard deviation (Line 27) from the overall average (Line 26).



**In Re Meta Pixel Healthcare Litigation**
Disgorgement Calculation - Lower Bound Estimate

**Schedule 2**

|  | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Year | Total Advertising Revenue | | | | | | Healthcare Provider Class Total (1) | Prescription Drug Class Total (2) | % of Scaled Health Vertical | |
|  |  | Healthcare Provider Class | | | | Prescription Drug Class | | | | | |
|  |  | Health Systems & Practitioners | | Residential, Long-term Care Facilities and Outpatient Care Centers | | Prescription Drug | | | | Healthcare Provider Class | Prescription Drug Class |
|  |  | Scaled | In-Market | Scaled | In-Market | Scaled | In-Market | | | | |
| 1 | 2018 (3) | | | | | | | | | | |
| 2 | 2019 (3) | | | | | | | | | | |
| 3 | 2020 (4) | | | | | | | | | | |
| 4 | 2021 (5) | | | | | | | | | | |
| 5 | 2022 (Q1) (6) | | | | | | | | | | |
| 6 | 2022 (Annualized) (7) | | | | | | | | | | |
| 7 | Total (8) | | | | | | | | | | |
| 8 | Annual Average (9) | | | | | | | | | | |
| 9 | Monthly Average (10) | | | | | | | | | | |
| 10 | Total Lower Bound Estimate | | | | | | | | | | |

**Notes:**

N/R = Not Reported

1 HCC assumed that the Healthcare Provider Class included both the Health Systems & Practitioners and the Residential, Long-term Care Facilities and Outpatient Care Centers verticals. Calculated as the sum of Columns B through E.

2 HCC assumed that the Prescription Drug Class included the Prescription Drug vertical. Calculated as the sum of Columns F and G.

3 PIXEL_HEALTH000433949 (1NA Health_1qg6mhFnZuMmXmYssG6IKGiHTp8y-OC7n.pptx, Slide 9).
Residential, Long-term Care Facilities and Outpatient Care Centers Revenue for Q4 2021 ▇▇▇ is decreased by the reported Year-on-Two-Year Growth ▇▇▇ to determine the Q4 2019 Revenue ▇▇▇ Further the Q4 2019 Revenue is annualized by multiplying by 4. Source: PIXEL_HEALTH000521402 (NA Scaled Revenue Report Q4'21 - EOQ.xlsx, "Revenue Sub-Verticals" tab).

4 PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slides 8-9, 25).
Residential, Long-term Care Facilities and Outpatient Care Centers Revenue for Q4 2021 ▇▇▇ is decreased by the reported Year-on-Year Growth ▇▇▇, to determine the Q4 2020 Revenue ▇▇▇ Further the Q4 2020 Revenue is annualized by multiplying by 4. Source: PIXEL_HEALTH000521402 (NA Scaled Revenue Report Q4'21 - EOQ.xlsx, "Revenue Sub-Verticals" tab).
Prescription Drug Revenue for 2021 ▇▇▇ is decreased by the reported Year-on-Year Growth ▇▇▇ to determine the 2020 Revenue ▇▇▇ Source: PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slides 14).

5 PIXEL_HEALTH000246943 (GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1).pptx, Slides 6, 8, 9, 14, 25). Note that the titles of the sub-verticals appear to be shortened (but not different) in this source. Also note, 2021 Pharmaceutical Scaled Revenue was reported elsewhere in the same source as ▇▇▇ (see Slide 58).
Residential, Long-term Care Facilities and Outpatient Care Centers Revenue for Q4 2021 ▇▇▇) is annualized by multiplying it by 4. Source: PIXEL_HEALTH000521402 (NA Scaled Revenue Report Q4'21 - EOQ.xlsx, "Revenue Sub-Verticals" tab).

6 PIXEL_HEALTH000369674 (NA Scaled Revenue Report Q1'22 - 03.31.22_EOQ.xlsx, "Revenue Sub-Verticals" tab).

7 Total 2022 revenue estimated from Q1 2022 revenue. Calculated as Line 5 × 4.

8 Total revenue for the revenue figures Meta produced for the Class Period. Calculated as the sum of Lines 1, 2, 3, 4, & 6.

9 The average annual advertising revenue amounts based on the years of the Class Period. Calculated as the average of Lines 1, 2, 3, 4, & 6.

10 The average monthly advertising revenue amounts based on the years of the Class Period. Calculated as Line 8 ÷ 12 months.

11 The total Lower Bound Estimate on a per month basis for all Classes. Calculated as the sum of Line 9 Columns H and I.



**In Re Meta Pixel Healthcare Litigation**                                                                **Schedule 3**
Disgorgement Calculation - Current Upper Bound Estimate

**Table 1: Calculation of Facebook's Health Vertical Revenue Attributable to U.S. Facebook Users**

| | A | | B |
|---|---|---|---|
| 1 | 1d of Global Offsite Revenue (HEALTH) | (1) | |
| 2 | U.S. Users as % of Global Users | (2) | |
| 3 | U.S. & Canada Average Revenue Per User (ARPU) as % of Worldwide ARPU | (3) | |
| 4 | 1d of Offsite Revenue (HEALTH) attributable to U.S. Users | (4) | |
| 5 | **1m of Offsite Revenue (HEALTH) attributable to U.S. Users** | (5) | |
| 6 | % of Scaled Health Vertical Attributable to Healthcare Providers Class | (6) | |
| 7 | **1m of Offsite Revenue (HEALTH) attributable to Healthcare Providers Class** | (7) | |
| 8 | % of Scaled Health Vertical Attributable to Prescription Drug Class | (8) | |
| 9 | **1m of Offsite Revenue (HEALTH) attributable to Prescription Drug Class** | (9) | |

**Table 2: Calculation of U.S. Facebook Users**

| | A | | B |
|---|---|---|---|
| 10 | # Worldwide Daily Active Users (as of 3/31/2023) | (10) | 2,037,000,000 |
| 11 | # U.S. & Canada Daily Active Users (as of 3/31/2023) | (11) | 200,000,000 |
| 12 | # U.S. Users (as of early 2023) | (12) | 175,000,000 |
| 13 | # Canada Users (as of early 2023) | (13) | 20,650,000 |
| 14 | U.S. Users as % of Global Users | (14) | 8.59% |

**Table 3: Calculation of Facebook's Health Vertical Revenue Attributable to U.S. Advertising Revenue**

| | A | | B |
|---|---|---|---|
| 15 | 1d of Global Offsite Revenue (HEALTH) | (15) | |
| 16 | U.S. & Canada Total Advertising Revenue as a Percent of Worldwide Total Advertising Revenue | (16) | |
| 17 | Percent of U.S. & Canada Users who are U.S. Users | (17) | |
| 18 | 1d of Offsite Total Advertising Revenue attributable to U.S. | (18) | |
| 19 | **1m of Offsite Total Advertising Revenue attributable to U.S.** | (19) | |
| 20 | % of Scaled Health Vertical Attributable to Healthcare Providers Class | (6) | |
| 21 | **1m of Offsite Revenue (HEALTH) attributable to Healthcare Providers Class** | (20) | |
| 22 | % of Scaled Health Vertical Attributable to Prescription Drug Class | (8) | |
| 23 | **1m of Offsite Revenue (HEALTH) attributable to Prescription Drug Class** | (21) | |
| 24 | **Range of 1m of Offsite Revenue (HEALTH) attributable to all Classes during the Class Period** | (22) | |
| 25 | **Range of 1m of Offsite Revenue (HEALTH) currently unable to attribute to any Class Members during the Class Period** | (23) | |



HIGHLY CONFIDENTIAL

**In Re Meta Pixel Healthcare Litigation**    **Schedule 3**
Disgorgement Calculation - Current Upper Bound Estimate

**Notes:**

1  Source: PIXEL-HEALTH001332991. HCC assumes that "Offsite" = not on Facebook site.

2  U.S. Users as % of Global Users calculated in Table 2, Line 14.

3  Meta acknowledges in its 2019 10-K that "Our revenue and ARPU in regions such as United States & Canada and Europe are relatively higher primarily due to the size and maturity of those online and mobile advertising markets." Further, health advertising is restricted in some countries, e.g., those European Union countries subject to the General Data Protection Regulation (GDPR). Therefore, HCC considered the average of the ARPU generated in US/Canada as a percentage of Worldwide ARPU during the Class Period for which data was available, i.e., July 2018 through March 2023.

   See Schedule 4, Line 34.

4  Calculated as Line 1 × Line 2 x Line 3.

5  Line 4 × 365 days ÷ 12 months.

6  Percentage of Scaled Health Vertical Attributable to Healthcare Providers Class (see Schedule 2, Column J, Line 9).

7  1 month of Offsite Revenue (HEALTH) attributable to Healthcare Providers Class (Line 5 x Line 6).

8  Percentage of Scaled Health Vertical Attributable to the Prescription Drug Class (see Schedule 2, Column K, Line 9).

9  1 month of Offsite Revenue (HEALTH) attributable to Prescription Drug Class (Line 5 x Line 8).

10  Source: Meta 2023 10-K. See Schedule 5, Column B, Line 25.
   Starting in 2024, Meta made changes to the way it reports users and audience reach data. Therefore, HCC utilized 2023 user data. Specifically, HCC utilized Meta user data as of 3/31/23, to most closely align with the Data Reportal source that stated its data was from "early 2023."

11  Source: Meta 2023 10-K. See Schedule 5, Column D, Line 25.
   Starting in 2024, Meta made changes to the way it reports users and audience reach data. Therefore, HCC utilized 2023 user data. Specifically, HCC utilized Meta user data as of 3/31/23, to most closely align with the Data Reportal source that stated its data was from "early 2023."

12  Source: https://datareportal.com/reports/digital-2023-united-states-of-america?rq=Digital%202023%3A% 20United%20States

13  Source: https://datareportal.com/reports/digital-2023-canada

14  Line 12 ÷ Line 10.

15  Source: PIXEL-HEALTH001332991. HCC assumes that "Offsite" = not on Facebook site.

16  The proportion of daily worldwide Total Advertising Revenue attributed to U.S. and Canadian Facebook Users. Calculated as Total Advertising Revenue (Worldwide) divided by Total Advertising Revenue (US & Canada). HCC considered the average of the US/Canada proportion of worldwide Total Advertising Revenue during the alleged damages period, i.e., July 2018 through March 2023 (see Schedule 4, Line 33).

17  As between the US and Canada, the proportion of offsite total advertising revenue attributable to US users. Calculated as Schedule 3, Line 12, ÷ Line 11.

18  Calculated as Line 15 × Line 16 x Line 17.

19  1 month of Offsite Total Advertising Revenue attributable to US (Line 18 × 365 days ÷ 12 months).

20  1 month of Offsite Revenue (HEALTH) attributable to Healthcare Providers Class (Line 19 x Line 20).

21  1 month of Offsite Revenue (HEALTH) attributable to Prescription Drug Class (Line 19 x Line 22).

22  Range of 1 month of Offsite Revenue (HEALTH) attributable to all Classes during the Class Period (sum of Lines 21 and 23, as well as sum of Lines 7 and 9).

23  Range of 1 month of Offsite Revenue (HEALTH) that I am currently unable to attribute to any Class Member during the Class Period (Difference of Line 19 and 24, as well as the difference of Line 5 and 24).



**In Re Meta Pixel Healthcare Litigation**    HIGHLY CONFIDENTIAL    **Schedule 4**
Facebook Advertising Revenue, 2017-2024

<u>**Table 1:  Quarterly Revenue**</u>

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | **Time Period** | **Total Advertising Revenue (Worldwide)** | **Increase/ Decrease in Total Advertising Revenue (Worldwide)** | **Total Advertising Revenue (US & Canada)** | **US/Canada Total Advertising Revenue % of Worldwide Total Advertising Revenue** | **Average Revenue Per User (ARPU) Worldwide** | **Family of Apps (FoA) Average Revenue Per Person (ARPP) Worldwide** | **Average Revenue Per User (ARPU) US & Canada** | **US/Canada ARPU % of Worldwide ARPU** |
| | | **(1)** | **(2)** | **(1)** | **(3)** | **(4)** | **(5)** | **(4)** | **(6)** |
| 1 | QTR ENDING 3/31/2017 | $7,857,000,000 | | $3,851,000,000 | 49% | $4.23 | | $17.07 | 404% |
| 2 | QTR ENDING 3/31/2018 | $9,164,000,000 | 17% | $4,450,000,000 | 49% | $4.73 | | $19.38 | 410% |
| 3 | QTR ENDING 9/30/2017 | $10,142,000,000 | 11% | $4,912,000,000 | 48% | $5.07 | | $21.20 | 418% |
| 4 | QTR ENDING 12/31/2017 | $12,779,000,000 | 26% | $6,271,000,000 | 49% | $6.18 | | $26.76 | 433% |
| 5 | QTR ENDING 3/31/2018 | $11,795,000,000 | -8% | $5,559,000,000 | 47% | $5.53 | | $23.59 | 427% |
| 6 | QTR ENDING 6/30/2018 | $13,038,000,000 | 11% | $6,137,000,000 | 47% | $5.97 | | $25.91 | 434% |
| 7 | QTR ENDING 9/30/2018 | $13,539,000,000 | 4% | $6,547,000,000 | 48% | $5.09 | | $27.61 | 453% |
| 8 | QTR ENDING 12/31/2018 | $16,640,000,000 | 23% | $8,246,000,000 | 50% | $7.37 | | $34.86 | 473% |
| 9 | QTR ENDING 3/31/2019 | $14,912,000,000 | -10% | $7,203,000,000 | 48% | $6.42 | | $30.12 | 469% |
| 10 | QTR ENDING 6/30/2019 | $16,624,000,000 | 11% | $7,952,000,000 | 48% | $7.05 | | $33.27 | 472% |
| 11 | QTR ENDING 9/30/2019 | $17,383,000,000 | 5% | $8,317,000,000 | 48% | $7.26 | | $34.55 | 476% |
| 12 | QTR ENDING 12/31/2019 | $20,736,000,000 | 19% | $10,021,000,000 | 48% | $8.52 | | $41.41 | 486% |
| 13 | QTR ENDING 3/31/2020 | $17,440,000,000 | -16% | $8,379,000,000 | 48% | $6.95 | | $34.18 | 492% |
| 14 | QTR ENDING 6/10/2020 | $18,321,000,000 | 5% | $9,069,000,000 | 50% | $7.05 | | $36.49 | 518% |
| 15 | QTR ENDING 9/30/2020 | $21,221,000,000 | 16% | $9,988,000,000 | 47% | $7.89 | | $39.63 | 502% |
| 16 | QTR ENDING 12/31/2020 | $27,187,000,000 | 28% | $13,150,000,000 | 48% | $10.14 | | $53.56 | 528% |
| 17 | QTR ENDING 3/31/2021 | $25,439,000,000 | -6% | $11,897,000,000 | 47% | $9.27 | | $48.03 | 518% |
| 18 | QTR ENDING 6/30/2021 | $28,580,000,000 | 12% | $13,366,000,000 | 47% | $10.12 | | $53.01 | 524% |
| 19 | QTR ENDING 9/30/2021 | $28,276,000,000 | -1% | $13,094,000,000 | 46% | $10.00 | | $52.34 | 523% |
| 20 | QTR ENDING 12/31/2021 | $32,639,000,000 | 15% | $15,062,000,000 | 46% | $11.57 | | $60.57 | 524% |
| 21 | QTR ENDING 3/31/2022 | $26,998,000,000 | -17% | $12,024,000,000 | 45% | $9.54 | | $48.29 | 506% |
| 22 | QTR ENDING 6/30/2022 | $28,152,000,000 | 4% | $12,788,000,000 | 45% | $9.82 | | $50.25 | 512% |
| 23 | QTR ENDING 9/30/2022 | $27,237,000,000 | -3% | $12,766,000,000 | 47% | $9.41 | | $49.13 | 522% |
| 24 | QTR ENDING 12/31/2022 | $31,254,000,000 | 15% | $15,005,000,000 | 48% | $10.86 | $10.68 | $58.77 | 541% |
| 25 | QTR ENDING 3/31/2023 | $28,101,000,000 | -10% | $12,710,000,000 | 45% | $9.62 | $9.47 | $48.85 | 508% |
| 26 | QTR ENDING 6/30/2023 | $31,498,000,000 | 12% | $14,131,000,000 | 45% | $10.63 | $10.42 | $53.53 | 504% |
| 27 | QTR ENDING 9/30/2023 | $33,643,000,000 | 7% | $14,956,000,000 | 44% | $11.23 | $10.93 | $56.11 | 500% |
| 28 | QTR ENDING 12/31/2023 | $38,706,000,000 | 15% | $17,784,000,000 | 46% | $13.12 | $12.33 | $68.44 | 522% |
| 29 | QTR ENDING 3/31/2024 | $35,635,000,000 | -8% | $15,451,000,000 | 43% | | $11.20 | | |
| 30 | QTR ENDING 6/30/2024 | $38,329,000,000 | 8% | $16,593,000,000 | 43% | | $11.89 | | |
| 31 | QTR ENDING 9/30/2024 | $39,885,000,000 | 4% | $17,389,000,000 | 44% | | $12.29 | | |
| 32 | QTR ENDING 12/31/2024 | $46,783,000,000 | 17% | $20,982,000,000 | 45% | | $14.25 | | |
| 33 | Average 7/1/2018 - 3/31/2023 | | | (7) | 47% | | | | |
| 34 | Average 7/1/2018 - 3/31/2023 | | | | | | | (8) | 502% |



**In Re Meta Pixel Healthcare Litigation**
Facebook Advertising Revenue, 2017-2024

HIGHLY CONFIDENTIAL

**Schedule 4**

**Table 2:  Annual Revenue**

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | **Time Period** | **Total Advertising Revenue (Worldwide)** | **Increase/ Decrease in Total Advertising Revenue (Worldwide)** | **Total Advertising Revenue (US & Canada)** | **US/Canada Total Advertising Revenue % of Worldwide Total Advertising Revenue** | **Average Revenue Per User (ARPU) Worldwide** | **Family of Apps (FoA) Average Revenue Per Person (ARPP) Worldwide** | **Average Revenue Per User (ARPU) US & Canada** | **US/Canada ARPU % of Worldwide ARPU** |
| | | (1) | (2) | (1) | (3) | (4) | (5) | (4) | (6) |
| 33 | 2017 | $39,942,000,000 | | $19,484,000,000 | 49% | $20.21 | | $84.41 | 418% |
| 34 | 2018 | $55,013,000,000 | 38% | $26,489,000,000 | 48% | $24.96 | | $111.97 | 449% |
| 35 | 2019 | $69,655,000,000 | 27% | $33,493,000,000 | 48% | $29.25 | | $139.35 | 476% |
| 36 | 2020 | $84,169,000,000 | 21% | $40,586,000,000 | 48% | $32.03 | | $163.86 | 512% |
| 37 | 2021 | $114,934,000,000 | 37% | $53,419,000,000 | 46% | $40.96 | | $206.44 | 522% |
| 38 | 2022 | $113,642,000,000 | -1% | $52,583,000,000 | 46% | $39.63 | | $206.44 | 521% |
| 39 | 2023 | $131,948,000,000 | 16% | $59,581,000,000 | 45% | $44.60 | $43.15 | $226.93 | 509% |
| 40 | 2024 | $160,633,000,000 | 22% | $70,415,000,000 | 44% | | $49.63 | | |

**Notes:**

Sources: Meta 10-Ks for 2017 through 2024; Meta Quarterly Earnings Slides and Earnings Releases, available at: https://investor.atmeta.com/financials/; https://www.businessofapps.com/data/facebook-statistics.

Because of the changes to how Meta reports users/people and revenue, as well as which apps and regions are included in those calculations, HCC supplemented the 2024 10-K with the additional information noted above.

1 Meta notes in its 10-K that "Our advertising revenue is generated by displaying ad products on Facebook, Instagram, Messenger, and third-party affiliated websites or mobile applications."

   However, Meta also notes that "While ARPU includes all sources of revenue, the number of MAUs used in this calculation only includes users of Facebook and Messenger as described in the definition of MAU above. Revenue from users who are not also Facebook or Messenger MAUs was not material."

2 The percentage increase/decrease in Total Advertising Revenue worldwide from the prior year.

3 The percentage of worldwide Total Advertising Revenue attributable to US & Canada. Calculated as Column D ÷ Column B.

4 Average Revenue Per User (ARPU) is defined by Meta as "Total revenue in a given geography during a given quarter, divided by the average of the number of MAUs in the geography at the beginning and end of the quarter. While ARPU includes all sources of revenue, the number of MAUs used in this calculation only includes users of Facebook and Messenger as described in the definition of MAU above." Meta notes that "While the share of revenue from users who are not also Facebook or Messenger MAUs has grown over time, we estimate that revenue from users who are Facebook or Messenger MAUs represents the substantial majority of our total revenue."

5 Meta updated their definition of Average Revenue Per Person (ARPP), fka Average Revenue Per User (ARPU), beginning in the first quarter of 2024, and recast ARPP in its 2024 10-K for prior periods for comparative purposes. ARPP is defined by Meta as "our FoA revenue during a given quarter, divided by the average of the number of DAP at the beginning and end of the quarter." Although Meta changed its reporting in its 10-Ks in 2024, it reported FoA ARPP in its earning slides prior to then. Therefore, reported ARPP prior to 2024 was obtained from Meta's quarterly earnings slides.

   Meta also notes that annual worldwide ARPP in a given year (e.g., 2024) is represented by the sum of quarterly ARPP during such period.

6 US & Canada Average Revenue Per User (APRU) as a percentage of Worldwide APRU. Calculated as Column H ÷ Column F.

   Meta acknowledges that "Our revenue and ARPU in regions such as United States & Canada and Europe are relatively higher primarily due to the size and maturity of those online and mobile advertising markets."

7 Average percentage of worldwide Total Advertising Revenue attributable to US & Canada. during the period 7/1/2018 through 3/31/2023 (average of Column E, Lines 7 through 25).

8 Average US & Canada Average Revenue Per User (APRU) as a percentage of Worldwide APRU during the period 7/1/2018 through 3/31/2023 (average of Column I, Lines 7 through 25).



**In Re Meta Pixel Healthcare Litigation**    Schedule 5

Facebook Active Users, 2017-2024

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | Facebook Only | | | | | | | Proportion of Worldwide FoA DAPs who are Facebook DAUs |
| | Quarter Ending | Daily Active Users (DAUs) Worldwide | Monthly Active Users (MAUs) Worldwide | Daily Active Users (DAUs) US & Canada | Monthly Active Users (MAUs) US & Canada | Proportion of DAUs in US & Canada | Proportion of MAUs in US & Canada | Daily Active People (DAPs) Worldwide | |
| | | (1) | (2) | (1) | (2) | (3) | (4) | (5) | (6) |
| 1 | 3/31/2017 | 1,284,000,000 | 1,936,000,000 | 182,000,000 | 234,000,000 | 14% | 12% | | |
| 2 | 6/30/2017 | 1,325,000,000 | 2,006,000,000 | 183,000,000 | 236,000,000 | 14% | 12% | | |
| 3 | 9/30/2017 | 1,368,000,000 | 2,072,000,000 | 185,000,000 | 239,000,000 | 14% | 12% | | |
| 4 | 12/31/2017 | 1,401,000,000 | 2,129,000,000 | 184,000,000 | 239,000,000 | 13% | 11% | | |
| 5 | 3/31/2018 | 1,449,000,000 | 2,196,000,000 | 185,000,000 | 241,000,000 | 13% | 11% | | |
| 6 | 6/30/2018 | 1,471,000,000 | 2,234,000,000 | 185,000,000 | 241,000,000 | 13% | 11% | | |
| 7 | 9/30/2018 | 1,495,000,000 | 2,271,000,000 | 185,000,000 | 242,000,000 | 12% | 11% | | |
| 8 | 12/31/2018 | 1,523,000,000 | 2,320,000,000 | 186,000,000 | 242,000,000 | 12% | 10% | 2,030,000,000 | 75% |
| 9 | 3/31/2019 | 1,562,000,000 | 2,375,000,000 | 186,000,000 | 243,000,000 | 12% | 10% | 2,100,000,000 | 74% |
| 10 | 6/30/2019 | 1,587,000,000 | 2,414,000,000 | 187,000,000 | 244,000,000 | 12% | 10% | 2,140,000,000 | 74% |
| 11 | 9/30/2019 | 1,623,000,000 | 2,449,000,000 | 189,000,000 | 247,000,000 | 12% | 10% | 2,200,000,000 | 74% |
| 12 | 12/31/2019 | 1,657,000,000 | 2,498,000,000 | 190,000,000 | 248,000,000 | 11% | 10% | 2,260,000,000 | 73% |
| 13 | 3/31/2020 | 1,734,000,000 | 2,603,000,000 | 195,000,000 | 253,000,000 | 11% | 10% | 2,360,000,000 | 73% |
| 14 | 6/10/2020 | 1,785,000,000 | 2,701,000,000 | 198,000,000 | 256,000,000 | 11% | 9% | 2,470,000,000 | 72% |
| 15 | 9/30/2020 | 1,820,000,000 | 2,740,000,000 | 196,000,000 | 255,000,000 | 11% | 9% | 2,540,000,000 | 72% |
| 16 | 12/31/2020 | 1,845,000,000 | 2,797,000,000 | 195,000,000 | 258,000,000 | 11% | 9% | 2,600,000,000 | 71% |
| 17 | 3/31/2021 | 1,878,000,000 | 2,853,000,000 | 195,000,000 | 259,000,000 | 10% | 9% | 2,720,000,000 | 69% |
| 18 | 6/30/2021 | 1,908,000,000 | 2,895,000,000 | 195,000,000 | 259,000,000 | 10% | 9% | 2,760,000,000 | 69% |
| 19 | 9/30/2021 | 1,930,000,000 | 2,910,000,000 | 196,000,000 | 261,000,000 | 10% | 9% | 2,810,000,000 | 69% |
| 20 | 12/31/2021 | 1,929,000,000 | 2,912,000,000 | 195,000,000 | 262,000,000 | 10% | 9% | 2,820,000,000 | 68% |
| 21 | 3/31/2022 | 1,960,000,000 | 2,936,000,000 | 196,000,000 | 263,000,000 | 10% | 9% | 2,870,000,000 | 68% |
| 22 | 6/30/2022 | 1,968,000,000 | 2,934,000,000 | 197,000,000 | 264,000,000 | 10% | 9% | 2,880,000,000 | 68% |
| 23 | 9/30/2022 | 1,984,000,000 | 2,958,000,000 | 197,000,000 | 266,000,000 | 10% | 9% | 2,930,000,000 | 68% |
| 24 | 12/31/2022 | 2,000,000,000 | 2,963,000,000 | 199,000,000 | 266,000,000 | 10% | 9% | 2,960,000,000 | 68% |
| 25 | 3/31/2023 | 2,037,000,000 | 2,989,000,000 | 200,000,000 | 269,000,000 | 10% | 9% | 3,020,000,000 | 67% |
| 26 | 6/30/2023 | 2,064,000,000 | 3,030,000,000 | 202,000,000 | 270,000,000 | 10% | 9% | 3,070,000,000 | 67% |
| 27 | 9/30/2023 | 2,085,000,000 | 3,049,000,000 | 203,000,000 | 271,000,000 | 10% | 9% | 3,140,000,000 | 66% |
| 28 | 12/31/2023 | 2,110,000,000 | 3,065,000,000 | 205,000,000 | 272,000,000 | 10% | 9% | 3,190,000,000 | 66% |
| 29 | 3/31/2024 | | | | | | | 3,240,000,000 | |
| 30 | 6/30/2024 | | | | | | | 3,270,000,000 | |
| 31 | 9/30/2024 | | | | | | | 3,290,000,000 | |
| 32 | 12/31/2024 | | | | | | | 3,350,000,000 | |



**In Re Meta Pixel Healthcare Litigation**
Facebook Active Users, 2017-2024

HIGHLY CONFIDENTIAL

**Schedule 5**

**Notes:**

Sources: Meta 10-Ks for 2017 through 2024, https://www.businessofapps.com/data/facebook-statistics.

Because of the changes to how Meta reports users/people and revenue, as well as which apps and regions are included in those calculations, HCC supplemented the 2024 10-K with the additional information noted above.

1 Daily Active Users (DAUs) is defined by Meta as "A registered and logged-in Facebook user who visited Facebook through our website or a mobile device, or used our Messenger application (and is also a registered Facebook user), on a given day."

2 Monthly Active Users (MAUs) is defined by Meta as "A registered and logged-in Facebook user who visited Facebook through our website or a mobile device, or used our Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement. MAUs are a measure of the size of our global active user community on Facebook."

3 Proportion of Worldwide Daily Active Users (DAUs) located in the US and Canada. Calculated as Column D ÷ Column B.

4 Proportion of Worldwide Monthly Active Users (DAUs) located in the US and Canada. Calculated as Column E ÷ Column C.

5 Daily Active People DAP) is defined by Meta as "a registered and logged-in user of Facebook, Instagram, Messenger, and/or WhatsApp (collectively, our "Family" of products) who visited at least one of these Family products through a mobile device application or using a web or mobile browser on a given day."

6 Proportion of Family of Apps (FoA) Daily Average People (DAP) who are Daily Average Users (DAUs) of Facebook specifically. Calculated as Column B ÷ Column H.



**In Re Meta Pixel Healthcare Litigation**                                                                                    **Schedule 6**
Reconciliation of PIXEL_HEALTH000109611 & Facebook Global Offsite Revenue

**Table 1: Manish Singhal's Calculation (as of 7/14/2022)**

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |

**Table 2: Isolation of Pipeline Fix**

| | |
|---|---|
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |

**Table 3: Comparison of Table 2, Line 11 with Facebook Total Advertising Revenue**

| | A | B |
|---|---|---|
| 12 | Facebook Total Advertising Revenue 2021 (Worldwide) (5) | |
| 13 | Facebook Total Advertising Revenue 2022 (Worldwide) (6) | |
| 14 | Facebook Total Advertising Revenue 2021 attributable to Health (Worldwide) (7) | |
| 15 | Facebook Total Advertising Revenue attributable to Health 2022 (Worldwide) (8) | |
| 16 | 1d Facebook Total Advertising Revenue 2021 attributable to Health (Worldwide) (9) | |
| 17 | 1d Facebook Total Advertising Revenue attributable to Health 2022 (Worldwide) (10) | |

Notes:
1 Source: Deposition of Tobias Wooldridge, January 31, 2025, 138:1-141:8, Ex. 17 (PIXEL_HEALTH000109611-12).
2 Because Line 7 includes both Updating Vertical and the Pipeline Fix, the Pipeline Fix was removed to isolate the percentage associated with Updating Vertical. Calculated as Line 7 - Line
3 Because Line 9 includes both More Exhaustive List and the Pipeline Fix, the Pipeline Fix was removed to isolate the percentage associated with More Exhaustive List. Calculated as Line
4 The percent total of each of the isolated tasks, i.e., Production, Pipeline Fix Only, Updating Vertical Only, and More Exhaustive List Only. Calculated as the sum of Lines 5, 6, 8, and 10.
5 See Schedule 4, Column B, Line 37.
6 See Schedule 4, Column B, Line 38.
7 The amount of Facebook Total Advertising Revenue that may be attributable to Health in 2021, per Manish Singhal's calculation. Calculated as Line 11 × Line 12.
8 The amount of Facebook Total Advertising Revenue that may be attributable to Health in 2022, per Manish Singhal's calculation. Calculated as Line 11 × Line 13.
9 Converting the 2021 annual advertising revenue to a daily advertising revenue rate. Calculated as Line 14 ÷ 365.
10 Converting the 2022 annual advertising revenue to a daily advertising revenue rate. Calculated as Line 15 ÷ 365.



HIGHLY CONFIDENTIAL

# Appendices



# CURRICULUM VITAE

**APPENDIX A**

HIGHLY CONFIDENTIAL



*Todd A. Zigrang,*
**MBA, MHA, FACHE, CVA, ASA, ABV**
**President**

 **tzigrang@healthcapital.com**

 **(800) FYI-VALU [394-8258]**

 **1807 Park 270 Drive, Suite 110**
**St. Louis, MO 63146**

 **www.healthcapital.com**

 **Follow me on LinkedIn**



*Providing Solutions in an*
*Era of Healthcare Reform*

**Todd A Zigrang, MBA, MHA, FACHE, CVA, ASA, ABV,** is the President of **HEALTH CAPITAL CONSULTANTS** (HCC), where he focuses on the areas of valuation and financial analysis for hospitals, physician practices, and other healthcare enterprises. Mr. Zigrang has over 30 years of experience providing valuation, financial, transaction and strategic advisory services nationwide in over 2,500 transactions and joint ventures involving acute care hospitals and health systems; physician practices; ambulatory surgery centers; diagnostic imaging centers; accountable care organizations, managed care organizations, and other third-party payors; dialysis centers; home health agencies; long-term care facilities; and, numerous other ancillary healthcare service businesses. Mr. Zigrang is also considered an expert in the field of healthcare compensation for physicians, executives and other professionals.

Mr. Zigrang is the co-author of "*The Adviser's Guide to Healthcare - 2nd Edition*" [AICPA - 2015], numerous chapters in legal treatises and anthologies, and hundreds of peer-reviewed and industry articles such as: *The Guide to Valuing Physician Compensation and Healthcare Service Arrangements* (BVR/AHLA); *The Accountant's Business Manual* (AICPA); *Valuing Professional Practices and Licenses* (Aspen Publishers); *Valuation Strategies; Business Appraisal Practice*; and, *NACVA QuickRead*. Additionally, Mr. Zigrang has served as faculty before professional and trade associations such as the American Society of Appraisers (ASA); the National Association of Certified Valuators and Analysts (NACVA); the American Health Lawyers Association (AHLA); the American Bar Association (ABA); the Association of International Certified Professional Accountants (AICPA); the Physician Hospitals of America (PHA); the Institute of Business Appraisers (IBA); the Healthcare Financial Management Association (HFMA); and, the CPA Leadership Institute. He also serves on the Editorial Board of *The Value Examiner* and *QuickRead*, both of which are published by NACVA.

Mr. Zigrang holds a Master of Science in Health Administration (MHA) and a Master of Business Administration (MBA) from the University of Missouri at Columbia. He is a Fellow of the American College of Healthcare Executives (FACHE) and holds the Certified Valuation Analyst (CVA) designation from NACVA. Mr. Zigrang also holds the Accredited in Business Valuation (ABV) designation from AICPA and the Accredited Senior Appraiser (ASA) designation from the American Society of Appraisers, where he has served as President of the St. Louis Chapter. He is also a member of the America Association of Provider Compensation Professionals (AAPCP), AHLA, AICPA, NACVA, NSCHBC, and, the Society of OMS Administrators (SOMSA).

## *For more information please visit:*
## *www.healthcapital.com*

## PUBLISHED BOOKS

- Second Edition The Adviser's Guide to Health Care, American Institute of Certified Public Accountants (AICPA), November 2015.

## CHAPTERS IN LEGAL TREATISES & ANTHOLOGIES

- "*Joint Ventures in Office-Based Endovascular Centers*," a chapter in Office-Based Endovascular Centers, co-authored by Jessica Bailey-Wheaton, Esq., Bhagwan Satiani, MD, MBA, DFSVS, FACHE, FACS, and Nicolas Mouawad, MD, MPH, MBA, FSVS, FRCS, FACS, Elsevier, Inc., 2020.

- "*Chapter 20: The Threshold of Commercial Reasonableness*," a chapter in BVR/AHLA Guide to Valuing Physician Compensation and Healthcare Service Arrangements, Second Edition , Business Valuation Resources, LLC, 2017.

- "*Chapter 10: Medical Practice Valuation in a Changing Marketplace*," a chapter in Valuing Specific Assets in Divorce, Wolters Kluwer, 2016.

- "*Medical Malpractice and Tort Reform: Urgent Crisis or Red Herring?*," Risk Management, Liability Insurance, and Asset Protection Strategies for Doctors and Advisors: Best Practices from Leading Consultants and Certified Medical Planners, CRC Press, 2015.

- "Capital Formation and Value Metrics of ACOs," a chapter in The ACO Handbook: A Guide to Accountable Care Organizations, Second Edition, AHLA, 2015.

- "*Chapter 32: Medical Practice Valuation in a Changing Marketplace*," a chapter in Valuing Professional Practices and Licenses: A Guide for the Matrimonial Practitioner, Fifth Edition, Aspen Publishers, 2014.

- "*Healthcare and Small to Mid-Size Businesses*," a chapter in The Accountant's Business Manual: A Two-Volume Service, Linda Prentice Cohen, 2014.

- "*The Valuation of Health Care Professional Practices*," a chapter in The Valuation Handbook: Valuation Techniques from Today's Top Practitioners, John Wiley & Sons, 2009.

- "*Valuation of Hospitals in a Changing Reimbursement and Regulatory Environment*," a chapter in Healthcare Organizations: Financial Management Strategies, David Marcinko, M.D., Ed. STP Specialty Technical Publishers, 2008.

- "*Research and Financial Benchmarking in the Healthcare Industry*," Healthcare Organizations: Financial Management Strategies, David Marcinko, M.D., Ed. STP Specialty Technical Publishers, 2007.

- "*Healthcare Industry Research and its Application in Financial Consulting*," chapter in supplement to Financial Planning for Physicians and Healthcare Professionals 2002, David Marcinko, M.D., Ed. Aspen Publishers, 2002.



## PUBLISHED ARTICLES

- "*Valuation of Freestanding Emergency Departments (Part II of II)*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, July/August 2025.
- "*Healthcare Spending Projected to Exceed $8.5 Trillion by 2033*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 9, 2025.
- "*The Perfect Healthcare Storm*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 2, 2025.
- "*Valuation of Freestanding Emergency Departments (Part I of II)*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, May/June 2025.
- "*Hospital Finances Held Steady*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 9, 2025.
- "*Role of Private Equity in Vascular Care*" Co-authored by Bhagwan Satiani MD, MBA, DFSVS, FACHE, FACS, and Jessica Bailey-Wheaton, Esq., Journal of Vascular Surgery - Vascular Insights, April 5, 2025.
- "*Fast and Furious: Healthcare Policy Edition*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, March 27, 2025.
- "*Recent Court Actions Provide Insight into Future of Healthcare Fraud and Abuse Laws*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, January/February 2025.
- "*Highlights of the 2025 Medicare Physician Fee Schedule*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, February 5, 2025.
- "*Medicare Advantage Plans Face Headwinds*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, Fourth Quarter 2024.
- "*Valuation Standards in Healthcare*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, September/October 2024.
- "*Multispecialty Surveys for Physician Compensation Released*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, October 9, 2024.
- "*Federal Judge Strikes Down Ban on Noncompete Agreements*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, September 24, 2024.
- "*2025 Proposed Physician Payment Rule*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, August 7, 2024.
- "*Corporate Entrants Find Challenges in Health Care*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, Third Quarter 2024.
- "*SCOTUS Rejects Chevron Deference*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 31, 2024.
- "*Federal Regulators Launch Inquiry into PE-Backed Healthcare Deals*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, May 2024.
- "*DOJ Announces Record-Breaking Fraud and Abuse Settlement*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, May 29, 2024.
- "*Congress Increases 2024 Medicare Physician Pay*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, May 22, 2024.



HIGHLY CONFIDENTIAL **APPENDIX A**

## PUBLISHED ARTICLES

- "*2024 Healthcare Industry Outlook*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, March/April 2024.
- "*OPPS Final Rule Issued by CMS*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, March 13, 2024.
- "*MPFS Final Rule Cuts Physician Payments*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, February 14, 2024.
- "*2024 Healthcare Industry Outlook*" Co-authored by Jessica Bailey-Wheaton, Esq., NSCHBC News, February 13, 2024.
- "*CMS Proposes Updates to 2024 Physician Fee Schedule*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, December 20, 2023.
- "*CMS Proposes Updates to 2024 Medicare Outpatient Prospective Payment System*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, December 13, 2023.
- "*Generative AI in Healthcare - Valuation Considerations*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, November/December 2023.
- "*Valuing Healthcare Data*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, July/August 2023.
- "*MedPAC Recommends Increasing Hospital and Physician Payments for 2024*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 19, 2023.
- "*The COVID-19 Public Health Emergency Officially Ends*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 12, 2023.
- "*Corporate Moved in Healthcare*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, June 2023.
- "*Physician Acquisitions Accelerate*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, June 2023.
- "*2022 M&A in Review*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 19, 2023.
- "*Public Health Emergency Will End in May 2023*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 19, 2023.
- "*Valuation of Healthcare Start-Ups*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, March/April 2023.
- "*CMS Proposes Modernizing Prior Authorizations*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, March 2023.
- "*FTC Proposes Banning Non-Compete Clauses*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, March 2023.
- "*FTC Proposes Banning Non-Compete Clauses*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, First Quarter 2023.
- "*Valuation of Remote Patient and Therapeutic Monitoring*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, November/December 2022.
- "*Law Introduced to Stop Medicare Sequestration*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, November 16, 2022.

## PUBLISHED ARTICLES

- "*What Healthcare Provisions are Included in the Inflation Reduction Act?* " Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, October 19, 2022.
- "*Physician Compensation Surveys: Is the "New Normal" Here?*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, July/August 2022.
- "*Update on 2023 Proposed Healthcare Payment Rules*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, August 3, 2022.
- "*Healthcare Compensation Plans: Current Challenges and Novel Approaches*" ACHE Frontiers of Health Services Management, Summer 2022.
- "*Declining Popularity and Uncertain Outlook for SPACs*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 6, 2022.
- "*Vertical Integration and Physician Income*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, June 2022.
- "*Study: Vertical Integration Not Financially Beneficial for Physicians*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, April/May 2022.
- "*2021 Healthcare M&A in Review*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 6, 2022.
- "*Most Physician Compensation Plans Still Productivity-Based*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, April 2022.
- "*Valuation of Telemedicine: Technology*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, March/April 2022.
- "*Study Finds Most Physician Plans to be Productivity-Based*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, March 16, 2022.
- "*MedPAC Recommends Payment Updates for 2023*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, March 2022.
- "*Valuation of Telemedicine: Competition*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, January/February 2022.
- "*CMS Innovation Center Launches Bold New Strategy*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, December 2021/January 2022.
- "*Valuation of Telemedicine: Regulatory*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, November/December 2021.
- "*Valuation of Telemedicine: Reimbursement*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, September/October 2021.
- "*Update on 2022 Healthcare Payment Rules*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, October 6, 2021.
- "*Recent Settlement Highlights Importance of FMV Physician Compensation*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, September 1, 2021.
- "*Valuation of Telemedicine: Introduction*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, July/August 2021.
- "*Are Disappointing Healthcare PE Deals a Sign to Come?*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 8, 2021.

## PUBLISHED ARTICLES

- "*Telemedicine's Post-Pandemic Outlook*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, June/July 2021.
- "*What is Behind the Soaring Popularity of Healthcare SPACs: An Alternative to the IPO*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, May 6, 2021.
- "*Valuation of Senior Healthcare - Part III of III*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, March/April 2021.
- "*The Future of Health Care Under President Biden*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, April/May 2021.
- "*Changes to Stark Law's Foundational Terminology*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, March 17, 2021.
- "*Valuation of Senior Healthcare - Part II of III*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, January/February 2021.
- "*Hospitals Increasingly Seek Physicians as CEOs*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, December 2020 / January 2021.
- "*Should surgeons consider partnering with private equity investors?*" Co-authored by Jessica Bailey-Wheaton, Esq., and Bhagwan Satiani, MD, American Journal of Surgery, December 2020.
- "*New Study Examines PE's Impact on Hospital Performance*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, September 2020.
- "*Valuation of Senior Healthcare - Part I of III*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, September/October 2020.
- "*Valuations at Center of False Claims Act Lawsuit*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, May/June 2020.
- "*The Path to Successful Utilization of Alternative Payment Models*" Co-authored by Jessica Bailey-Wheaton, Esq., and Khaled J. Klele, Esq., The Health Lawyer, June 2020.
- "*Valuation of Ambulatory Surgery Centers (ASCs): Technology (Part V of V)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, May 13, 2020.
- "*Valuation of Ambulatory Surgery Centers (ASCs): Regulatory (Part IV of V)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, May 6, 2020.
- "*Valuation of Ambulatory Surgery Centers (ASCs): Reimbursement (Part III of V)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 29, 2020.
- "*Healthcare Valuation Implications of COVID-19*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, March/April 2020.
- "*COVID-19 Financial Resources for Physicians*" Co-authored by Jessica Bailey-Wheaton, Esq., and Bhagwan Satiani, MD , Journal of Vascular Surgery, April 30, 2020.
- "*Valuation of Ambulatory Surgery Centers (ASCs): Competition (Part II of V)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 22, 2020.
- "*Valuation of Ambulatory Surgery Centers (ASCs): Introduction (Part I of V)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 15, 2020.



## PUBLISHED ARTICLES

- "*Medicare Alternative Payment Models: What Choices Are Available to Physicians?*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, April/May 2020.
- "*Antitrust Scrutiny of Physician Practice Acquisitions Intensifies*" Co-authored by Jessica Bailey-Wheaton, Esq., AHLA's Antitrust Practice Group Briefing, March 25, 2020.
- "*Healthcare Valuation Implications of the Stark Law Proposed Rule*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, January/February 2020.
- "*Proposed Stark Regulations: Small Step Forward*" Co-authored by Jessica Bailey-Wheaton, Esq., and Bhagwan Satiani, MD, MBA, DFSVS, FACHE, FACS, Physician Leadership Journal, February 13, 2020.
- "*ASCs and Office-Based Laboratories: Valuation Distinctions and Considerations Part II: Considerations*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, November/December 2019.
- "*ASCs and Office-Based Laboratories: Valuation Distinctions and Considerations Part I: Distinctions*" Co-authored by Jessica Bailey-Wheaton, Esq., The Value Examiner, September/October 2019.
- "*Proposed Stark Law Changes: Health Care Industry Implications*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, December 2019/January 2020.
- "*Rural Health Clinics: Fair Market Value Considerations (Part Five of a Five-Part Series)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, August 28, 2019.
- "*Rural Health Clinics: Fair Market Value Considerations (Part Four of a Five-Part Series)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, August 22, 2019.
- "*Rural Health Clinics: Fair Market Value Considerations (Part Three of a Five-Part Series)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, August 15, 2019.
- "*Rural Health Clinics: Fair Market Value Considerations (Part Two of a Five-Part Series)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, August 8, 2019.
- "*Rural Health Clinics: Fair Market Value Considerations (Part One of a Five-Part Series)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, July 24, 2019.
- "*Increasing Utilization of Non-Traditional Patient Care Sites: Opportunities for Physicians*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, June 2019.
- "*Hospitalist Pilot Model Sparks Controversy*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, May 2019.
- "*Private Equity Investment in the Healthcare Industry: Private Equity's Fast and Furious Entry into Healthcare (Part Three of a Three-Part Series)*" NACVA QuickRead, May 30, 2019.
- "*Private Equity Investment in the Healthcare Industry: Private Equity's Fast and Furious Entry into Healthcare (Part Three of a Three-Part Series)*" The Value Examiner, March/April 2019.
- "*Home Health and Hospice Enterprises: Fair Market Value Considerations (Part Two of a Two-Part Series)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 25, 2019.
- "*Home Health and Hospice Enterprises: Fair Market Value Considerations (Part One of a Two-Part Series)*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, April 17, 2019.



HIGHLY CONFIDENTIAL **APPENDIX A**

## PUBLISHED ARTICLES

- "*Private Equity Investment in the Healthcare Industry: Past, Present, and Future (Part Two of a Three-Part Series)*" The Value Examiner, January/February 2019.
- "*Private Equity Investment in the Healthcare Industry: The Fundamentals of Private Equity (Part One of a Three-Part Series)*" The Value Examiner, November/December 2018.
- "*The Due Diligence Imperative: Conclusion (Part Six of a Six-Part Series)*" The Value Examiner, September/October 2018.
- "*The Due Diligence Imperative: Conclusion (Part Six of a Six-Part Series)*" NACVA QuickRead, October 31, 2018.
- "*The Due Diligence Imperative: Technology (Part Five of a Six-Part Series)*" NACVA QuickRead, September 13, 2018.
- "*The Due Diligence Imperative: Competition (Part Four of a Six-Part Series)*" The Value Examiner, May/June 2018.
- "*The Due Diligence Imperative: Competition (Part Four of a Six-Part Series)*" NACVA QuickRead, August 9, 2018.
- "*Trade Secrets: Considerations for Fair Market Value*" NACVA QuickRead, July 26, 2018.
- "*Management Services Agreements: Considerations for Fair Market Value*" Co-authored by Jessica Bailey-Wheaton, Esq., NACVA QuickRead, June 28, 2018.
- "*The Due Diligence Imperative: Healthcare Regulatory Environment (Part Three of a Six-Part Series)*" The Value Examiner, March/April 2018.
- "*U.S. Healthcare Overhaul Update*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, May 2018.
- "*Corporatized Medicine: Time for Doctor Unions?*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, May 2018.
- "*Beyond FMV: Commercial Reasonableness of Physician Compensation Post-MACRA*" Co-authored by John Chwarzinski, MSF, MAE, and Jessica Bailey-Wheaton, Esq., Business Valuation Review, Vol. 37, Issue 1, Spring 2018.
- "*Legislature Considers Bill to Modernize Telehealth Use*" Co-authored by Jessica Bailey-Wheaton, Esq., St. Louis Metropolitan Medicine, April/May 2018.
- "*The Due Diligence Imperative: Healthcare Reimbursement Environment (Part Two of a Six Part Series)*" The Value Examiner, January/February 2018.
- "*The Due Diligence Imperative: Healthcare Reimbursement Environment (Part Two of a Six Part Series)*" NACVA QuickRead, March 22, 2018.
- "*CMS to Review Stark Law*" Co-authored by Jessica Bailey-Wheaton, Esq., AHLA Practice Group Alert, February 2, 2018.
- "*The State Of Value-Based Reimbursement Initiatives*" Co-authored by Jessica Bailey-Wheaton, Esq., AHLA Practice Group Alert, February 1, 2018.
- "*Physician Manpower Utilization: What does the expanding role of non-physician providers mean for the medical profession?*" Co-authored by Jessica Bailey-Wheaton, Esq., Chicago Medicine, February 2018.



## PUBLISHED ARTICLES

- "*The Due Diligence Imperative for the Valuation of Healthcare Enterprises, Assets, and Services (Part One of a Six Part Series)*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Value Examiner, November/December 2017.

- "*Medicaid Expansion and Implications on Hospital Finances and Viability*" Co-authored by Jessica Bailey-Wheaton, Esq., AHLA Practice Group Alert, January 23, 2018.

- "*Changing Demographics of the Physician Workforce*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Chicago Medicine, Volume 120 Issue 12, December 2017.

- "*Valuation of Compensation for Physician Services: Medical Director Compensation*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, NACVA QuickRead, November 9, 2017.

- "*Valuation of Compensation for Physician Services: Medical Director Compensation*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Value Examiner, September/October 2017.

- "*Valuation of Compensation for Physician Services: Physician On-Call Services*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Value Examiner, July/August 2017.

- "*Valuation of Compensation for Physician Services: Physician On-Call Services*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, NACVA QuickRead, August 30, 2017.

- "*Seeking Enhanced Patient Care Outcomes - Better evidence-based care from IT-driven population health management*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, St. Louis Metropolitan Medicine, June/July 2017.

- "*House Votes to Repeal and Replace Obamacare When It Really Matters*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, and Jessica Bailey-Wheaton, Esq., ABA Health eSource, May 2017.

- "*Valuation of Compensation for Physician Services: Clinical Services*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Value Examiner, March/April 2017.

- "*Benefits of Technology - Clinical and Administrative Tasks Get a Boost*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Chicago Medicine, April 2017.

- "*S-Corporation Valuation Debate - The Impact of Cecil V. Commissioner*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Value Examiner, January/February 2017.

- "*The Four Pillars of Healthcare: Part IV Technological Advancements in the Healthcare Industry*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Value Examiner, January/February 2017.

- "*Four Pillars of Healthcare Valuation: Competition*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Value Examiner, November/December 2016.



## PUBLISHED ARTICLES

- "*Valuing Healthcare Services - An Overview of the Many Components of Physician Compensation*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Chicago Medicine, January 2017.

- "*Telemedicine Services Through the Four Pillars of Health Care Value*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, St. Louis Metropolitan Medicine, June/July 2016.

- "*The Essential Correlation Between Capital Formation and the Building Of Value Metrics in ACOs*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, The Journal of Health Care Finance, Fall 2015.

- "*Valuation of Healthcare Intangible Assets in the Absence of Positive Net Cash Flows*" Co-authored by Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, John R. Chwarzinski, MSF, MAE, and Jonathan T. Wixom, MBA, Business Valuation Review, Vol. 34, Issue 3, 2015.

- "*Utilization of the Asset/Cost Based Approach In Appraising Outpatient Enterprises, Part 4 of 4*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, NACVA QuickRead, September 23, 2015.

- "*The Utilization of the Market Approach: In Appraising Outpatient Enterprises (Part 3 of 4)*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, NACVA QuickRead, September 16, 2015.

- "*Utilizing the Income Approach to Appraise Outpatient Enterprises: An In-Depth Series on Healthcare Valuation, Part 2 of 4*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, NACVA QuickRead, September 2, 2015.

- "*Determination of the Appropriate Standard of Value: An In-Depth Series on Healthcare Valuation, Part 1 of 4*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, NACVA QuickRead, August 26, 2015.

- "*Regulatory Environment of the Healthcare Industry in an Era of Reform*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Business Appraisal Practice, June 26, 2015.

- "*Appropriate Use of Extraordinary Assumptions and Hypothetical Conditions*" Co-authored by John R. Chwarzinski, MSF, MAE, NACVA QuickRead, June 10, 2015.

- "*The Imperative of Considering the Concept of Highest and Best Use in Healthcare Valuation (Part 2 of 2)*" Co-authored by Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, NACVA QuickRead, April 1, 2015.

- "*The Imperative of Considering the Concept of Highest and Best Use in Healthcare Valuation (Part 1 of 2)*" Co-authored by Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, NACVA QuickRead, March 25, 2015.

- "*Reimbursement Environment of the Healthcare Industry in an Era of Reform*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Business Appraisal Practice, November 3, 2014.

- "*The Threshold of Commercial Reasonableness*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, NACVA QuickRead, June 25, 2014.



HIGHLY CONFIDENTIAL **APPENDIX A**

## PUBLISHED ARTICLES

- "*Healthcare Reform: Implications for the Valuation Profession*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Business Appraisal Practice, Fourth Quarter 2013.
- "*Valuing Intangible Assets in Exempt Healthcare Organizations*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Valuation Strategies, January/February 2013.
- "*Valuation in the Era of Healthcare Reform - Part I: Valuation of Healthcare Enterprises, Assets, and Services in a Changing Reimbursement and Regulatory Environment*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Business Valuation Alert, Volume 11, Issue 4, October 2010.
- "*Valuation in the Era of Healthcare Reform: A Brief Primer on the Impact of Recent Legislation*" Co-authored by Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, and Anne P. Sharamitaro, Esq., Business Appraisal Practice, Second Quarter 2010.



## PROFESSIONAL COURSES TAUGHT

- "*Valuation Implications of the 2020 Compensation Surveys*" Co-presented with Roger Logan, and Joseph Wolfe, Esq., American Health Law Association (January 13, 2022).
- "*Valuing Telehealth Services*" Co-presented with Jessica Bailey-Wheaton, Esq., Business Valuation Resources (April 27, 2021).
- "*Stark and AKS Final Rules: Overview and Impact*" Co-presented with Jessica Bailey-Wheaton, Esq., Jim Daniel, Esq. and, Jason Centolella, Esq. (December 18, 2020).
- "*Valuing Rural Health Clinics*" Co-presented with Jessica Bailey-Wheaton, Esq., Business Valuation Resources (March 25, 2020).
- "*The Due Diligence Imperative in the Era of Value-Based Reimbursement*" Co-presented with Jessica Bailey-Wheaton, Esq., Business Valuation Resources (August 26, 2019).
- "*Commercial Reasonableness of Physician Compensation - Analytical Update with MACRA*" National Association of Certified Valuators and Analysts (NACVA) and Consultants' Training Institute (CTI) (October 1, 2018).
- "*An Exploration of Recent Trends, Industry Guidance and Developing Best Practices*" Co-presented with Alex T. Krouse, JD, Roger W. Logan, MS, CPA/ABV, ASA, CMPE, Robert A. Wade, Esq., and Tina Hogeman, MT, MS, CPA, CHFP, CMPE, American Health Lawyers Association (February 7, 2018).
- "*Physician Compensation Methods*" CPA Leadership Institute (November 28, 2017).
- "*Commercial Reasonableness of Physician Compensation Analytical Update with MACRA*" Co-presented with Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, National Association of Certified Valuators and Analysts (NACVA) and Consultants' Training Institute (CTI) (July 25, 2017).
- "*The Valuation of Intangible Assets in the Absence of Positive Cash Flows*" National Association of Certified Valuators and Analysts (NACVA) and Consultants' Training Institute (CTI) (November 8, 2016).
- "*Is Orange the New Black? The Role of Commercial Reasonableness in Government Enforcement Actions and Settlements*" American Health Lawyers Association, 2016 in Review: Traveling the Road to Value-Based Payment in a Regulatory Enforcement Minefield, Part II (October 26, 2016).
- "*Valuation of Healthcare Intangible Assets & Intellectual Property*" Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (May 12, 2016).
- "*Impact of Competitive Forces*" Co-presented with Roger Strode, Esq., American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG), Multidisciplinary Advanced Education in Healthcare Valuation Program, St. Louis, MO (May 6, 2016).
- "*Regulatory Environment of the Healthcare Industry*" Co-presented with Mark L. Mattioli, Esq., American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG), Multidisciplinary Advanced Education in Healthcare Valuation Program, St. Louis, MO (May 6, 2016).
- "*Valuation of Healthcare Tangible Personal Property*" Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (April 7, 2016).



## PROFESSIONAL COURSES TAUGHT

- "*Business Valuation of Healthcare Enterprises and Services (and Interests Therein)*" American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (March 10, 2016).

- "*Valuation of Healthcare Real Estate & Real Property*" American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (February 18, 2016).

- "*Valuation of Intangible Assets & Intellectual Property*" Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (January 28, 2016).

- "*Valuation of Healthcare Tangible Personal Property*" American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (November 12, 2015).

- "*Business Valuation of Healthcare Enterprises and Services (and Interests Therein)*" American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (October 30, 2015).

- "*Healthcare Reimbursement Environment in an Era of Healthcare Reform*" Co-presented with John M. Kirsner, Esq., American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG), Las Vegas, NV (October 16-17, 2015).

- "*Technology Development*" Co-presented with Hal Katz, Esq., American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG), Las Vegas, NV (October 16-17, 2015).

- "*Impact of Competitive Forces*" Co-presented with Jack M. Beal, Esq., American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG), Las Vegas, NV (October 16-17, 2015).

- "*Regulatory Environment of Healthcare Industry*" Co-presented with John M. Kirsner, Esq., American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG), Las Vegas, NV (October 16-17, 2015).

- "*Valuation of Healthcare Real Estate & Real Property*" American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (September 24, 2015).

- "*Valuation of Intangible Assets & Intellectual Property*" Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (September 3, 2015).

- "*Valuation of Healthcare Tangible Personal Property*" Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (August 6, 2015).

- "*Business Valuation of Healthcare Enterprises and Services (and Interests Therein)*" American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (July 9, 2015).

- "*Valuation of Healthcare Real Estate & Real Property*" American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (June 25, 2015).

- "*Valuation of Healthcare Intangible Assets & Intellectual Property*" Co-presented with Ray Rath, ASA, CFA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG), Multidisciplinary Advanced Education in Healthcare Valuation Program (February 19, 2015).

- "*Intangible Assets in Healthcare Entities: Value or No Value?*" Co-presented with Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, Consultants' Training Institute (CTI) (December 4, 2014).



HIGHLY CONFIDENTIAL **APPENDIX A**

## PROFESSIONAL COURSES TAUGHT

- "*Valuation of Intangible Assets & Intellectual Property*" Co-presented with Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (November 20, 2014).
- "*Business Valuation of Healthcare Enterprises and Services (and Interests Therein)*" Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, American Society of Appraisers (ASA) Healthcare Special Interest Group (HSIG) (August 21, 2014).
- "*Physician Compensation Methods*," CPA Leadership Institute Webinar (December 18, 2013).
- "*Valuation of Healthcare Entities and Assets - The Impact of 2010 Legislation*" CPA Leadership Institute Webinar (October 23, 2013).
- "*Physician Compensation Methods*" CPA Leadership Institute Webinar (July 17, 2013).
- "*Valuation of Healthcare Entities and Assets - The Impact of 2010 Legislation*" CPA Leadership Institute Webinar (June 6, 2013).
- "*Physician Compensation Arrangements: Fair Market Value and Commercial Reasonableness*" CPA Leadership Institute Webinar (October 2, 2012).
- "*Hospital-Physician Alignment: Options and Strategic Implications*" Co-presented with Anne P. Sharamitaro, Esq., CPA Leadership Institute Webinar (August 2, 2012).
- "*Controlling Healthcare Costs Through Accountable Care Organizations*" Co-presented with Anne P. Sharamitaro, Esq., CPA Leadership Institute Webinar (July 31, 2012).
- "*Valuation of Healthcare Entities and Assets- The Impact of 2010 Legislation*" Co-presented with Anne P. Sharamitaro, Esq., CPA Leadership Institute Webinar (June 13, 2012).
- "*Valuing Physician and Executive Compensation Arrangements: Fair Market Value & Commercial Reasonableness Thresholds*" Co-presented with Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, Physician Hospitals of America (PHA), New Orleans, LA (September 24, 2009).
- "*Valuation of Medical Practices in a Changing Regulatory and Reimbursement Environment*" Co-presented with Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, The Institute of Business Appraisers - Education Course #1011, Cleveland, OH (November 8, 2006).



## LECTURES AND PRESENTATIONS

- "*Healthcare Regulatory Updates: Mid-Year Review and Implications for 2022 and Beyond*" NSCHBC 2025 Consultants Retreat (January 10, 2025).
- "*Healthcare Valuation: Industry Updates & What to Expect in 2025*" Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2024 Business Valuation & Financial Litigation Super Conference (December 13, 2024).
- "*Hot Topics in Healthcare Compensation Valuation*" Texas Society of CPAs (TXCPA), TXCPA's 2024 Advanced Healthcare Conference (July 16, 2024).
- "*Valuing Physician Compensation*" Panel Discussion, American College of Surgeons, 2024 Leadership and Advocacy Summit (April 18, 2024).
- "*Healthcare Valuation: Industry Updates & What to Expect in 2024*" Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2023 Business Valuation & Financial Litigation Super Conference (December 14, 2023).
- "*Valuing Management Service Organizations and their Services*" 2023 Healthcare Services Investment Conference (November 16, 2023).
- "*Regulatory Updates in Healthcare Valuation*" Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2023 Business Valuation & Financial Litigation Super Conference (July 13, 2023).
- "*Valuing Accountable Care Organizations (ACOs)*" American Association of Integrated Healthcare Delivery Systems, 2023 Spring Managed Care Forum (April 27, 2023).
- "*Telehealth Services Transactions: Establishing & Scaling*" Co Presented with Khaled Klele, Esq., and Rebecca Gwilt, Esq., American Health Law Association, 2023 AHLA Healthcare Transactions Conference (April 17-19, 2023).
- "*Valuing Healthcare Startups*" Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2022 Business Valuation & Financial Litigation Hybrid & Virtual Super Conference (December 15, 2022).
- "*Valuation of Value-Based Care Arrangement Compensation*," Co-presented with Jessica Bailey-Wheaton, Esq., St. Louis Area Health Lawyers Association (November 11, 2022).
- "*Healthcare Regulatory Updates: Mid-Year Review and Implications for 2022 and Beyond*," Co-presented with Jessica Bailey-Wheaton, Esq., NSCHBC 2022 Annual Conference (June 8, 2022).
- "*Due Diligence Issues for Buyers and Sellers of Urgent Care Centers*," Co Presented with Khaled Klele, Esq., BRI Network, 2022 Urgent Care Centers Conference (March 29, 2022).
- "*COVID-19 Healthcare Valuation Implications*" Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Hybrid & Virtual Super Conference (December 17, 2021).
- "*Valuation of Physician Compensation*," Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 22, 2021).
- "*Technological Advancements in the Healthcare Industry*," Co-presented with Rebecca E. Gwilt, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 22, 2021).



## LECTURES AND PRESENTATIONS

- "*Development of a Commercial Reasonableness Opinion*," Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 22, 2021).

- "*Competitive Forces in the Healthcare Industry*," Co-presented with Jason Centolella, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 22, 2021).

- "*Stark Law Modernization: The Healthcare Valuation Implications*," Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 21, 2021).

- "*The Valuation of Healthcare Enterprises in a Changing Reimbursement Environment*," Co-presented with Lisa G. Han, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 21, 2021).

- "*The Due Diligence Imperative in the Era of Value Based Reimbursement*," Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 21, 2021).

- "*Regulatory Overview for Valuation Professionals*," Co-presented with John M. Kirsner, Esq., National Association of Certified Valuators and Analysts (NACVA), 2021 Business Valuation & Financial Litigation Super Conference (June 21, 2021).

- "*Regulatory Overview for Valuation Professionals*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Financial Valuation Virtual Conference (December 8, 2020).

- "*Regulatory Overview for Valuation Professionals*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Financial Valuation Virtual Conference (November 17, 2020).

- "*Grab a Seat at the Table: Strategic Planning and Tools for Physicians and Group Practices*," Co-presented with Sarah Swank, Esq., Khaled Klele, Esq., and, Monique Anawis, MD, American Bar Association (ABA), ABA Physicians Legal Issues: Healthcare Delivery & Innovation Virtual Conference (September 25, 2020).

- "*COVID-19 Healthcare Valuation Implications*," Co Presented with Daniel J. Chen, MSF, CVA, National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (August 4, 2020).

- "*Technological Advancements in the Healthcare Industry*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (August 4, 2020).

- "*COVID-19 Healthcare Valuation Implications*," Co Presented with Daniel J. Chen, MSF, CVA, National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 16, 2020).

- "*Technological Advancements in the Healthcare Industry*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 16, 2020).



## LECTURES AND PRESENTATIONS

- "*Development of a Commercial Reasonableness Opinion*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 16, 2020).

- "*Competitive Forces in the Healthcare Industry*," Co Presented with Roger D. Strode, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 16, 2020).

- "*Stark Law Modernization - The Healthcare Valuation Implications*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 15, 2020).

- "*The Valuation of Healthcare Enterprises in a Changing Reimbursement Environment*," Co Presented with Lisa G. Han, Esq., 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 15, 2020).

- "*The Due Diligence Imperative in the Era of Value-Based Reimbursement*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 15, 2020).

- "*Regulatory Overview for Valuation Professionals*," Co-presented with John Kirsner, Esq., National Association of Certified Valuators and Analysts (NACVA), 2020 Business Valuation and Financial Litigation Virtual Super Conference (June 15, 2020).

- "*The Due Diligence Imperative in the Era of Value-Based Reimbursement*," Co Presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts (NACVA), 2019 Financial Valuation SuperConference (December 11, 2019).

- "*The Path to Successful Utilization of Alternative Payment Models*," Co Presented with Khaled Klele, Esq., and Latoya Caprice Dawkins, Esq., American Bar Association (ABA), 17th Annual Washington Health Law Summit (December 9, 2019).

- "*The Due Diligence Imperative in the Era of Value-Based Reimbursement*," Co-presented with Jessica Bailey-Wheaton, Esq., Missouri Society of Certified Public Accountants (MOCPA), Missouri Society of CPAs Health Care Conference (October 17, 2019).

- "*Regulatory Updates*," Co-presented with Jessica Bailey-Wheaton, Esq., NSCHBC 2019 Annual Conference (June 14, 2019).

- "*The Due Diligence Imperative in the Era of Value-Based Reimbursement*," Co-presented with Jessica Bailey-Wheaton, Esq., NACVA and CTI's Annual Consultants' Conference (June 6, 2019).

- "*Private Equity's Fast and Furious Entry into Healthcare*," Co-presented with Joy Hord, Esq., North Carolina Medical Group Management Association (NCMGMA) Annual Conference (May 9, 2019).

- "*Healthcare Valuation - A Healthcare Reform Update*," Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts, Consultants' Training Institute , NACVA and the CTI's Financial Valaution SuperConference (December 11, 2018).

- "*Healthcare Valuations: The New, the Old, and the Ugly*," Lsa Cribben, CPA/ABV, ASA, CMA, American Institute of Certified Public Accountants (AICPA), AICPA Forensic and Valuation Conference (November 5, 2018).



HIGHLY CONFIDENTIAL   **APPENDIX A**

## LECTURES AND PRESENTATIONS

- "*Tax Cuts & Jobs Act of 2017 - What does the Tax Reform Bill Mean for the Healthcare Industry?*" Missouri Society of Certified Public Accountants (MOCPA), Missouri Society of CPAs Health Care Conference (October 18, 2018).

- "*Conversations with the Masters*," National Association of Certified Valuators and Analysts, Consultants' Training Institute, 2017 NACVA Financial Valuation SuperConference (December 13, 2017).

- "*Commercial Reasonableness of Physician Compensation - Analytical Update with MACRA*," National Association of Certified Valuators and Analysts, Consultants' Training Institute, 2017 NACVA Financial Valuation SuperConference (December 13, 2017).

- "*Hot Topics in Healthcare Valuation*," Co-presented with Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, Missouri Society of Certified Public Accountants (MOCPA), MOCPA's Healthcare Conference (September 28, 2017).

- "*Commercial Reasonableness of Physician Compensation - Analytical Update with MACRA*," Co-presented with Jessica Bailey-Wheaton, Esq., National Association of Certified Valuators and Analysts, Consultants' Training Institute, NACVA and the CTI's 2017 Annual Consultants' Conference (June 8, 2017).

- "*Accountable Care Organizations: Creation, Capitalization, and Contracting*," Co-presented with Barry S. Herrin, CHPS, FAHIMA, FACHE, Esq., and Belinda P. Coleman, Georgia Association of Healthcare Executives, Georgia ACHE Chapter Panel Discussion (September 22, 2016).

- "*Can't See the Forest for the Trees: The Misapplication of Economic Theory to the Increasing Regulatory Trend Against Vertical Healthcare Integration*," National Association of Certified Valuators and Analysts, Consultants' Training Institute (CTI), NACVA and CTI's Annual Consultants' Conference (June 9, 2016).

- "*How to put Clinically Integrated Networks to Work in an Era of Value Based Reimbursement*," Co-presented with Lisa G. Han, Esq., and Roger W. Logan, ASA, CPA, MS, American College of Healthcare Executives (ACHE), 2016 Congress on Healthcare Leadership (March 18, 2016).

- "*The Imperative of Considering the Concept of Highest and Best Use in Healthcare Valuation*," National Association of Certified Valuators and Analysts, Consultants' Training Institute, Exit Planning, Transaction Advisory Service, and Healthcare Valuation Conference (November 18, 2015).

- "*Application & Implementation of ACO Waivers and Ongoing Compliance Issues*," Accountable Care Expos, LLC, Midwest Accountable Care Expo 2015 (August 13, 2015).

- "*Hot Topics in Healthcare Valuation*," Co-presented with Roger D. Strode, Esq., American Bar Association, ABA Physicians Legal Issues Conference (June 11, 2015).

- "*Four Pillars of Healthcare Value in an Era of Reform*," Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Healthcare Financial Management Association (HFMA), HFMA Annual Joint Spring Conference (May 13, 2015).

- "*Capital Formation of Accountable Care Organizations*," Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, Accountable Care Expos, LLC, Midwest Accountable Care Expo (August 27, 2014).



## LECTURES AND PRESENTATIONS

- "*Four Pillars of Healthcare Value in an Era of Reform*," American Society of Appraisers (ASA) Western New York Chapter (May 13, 2014).
- "*Four Pillars of Healthcare Value in an Era of Reform*," Co-presented with Robert James Cimasi, MHA, ASA, FRICS, MCBA, CVA, CM&AA, St. Louis Business Valuation Roundtable (November 13, 2013).
- "*ACOs: Value Metrics and Capital Planning for Long-Term Care*," The Senior Living Forum (May 2, 2013). "How to Prepare and Plan for New Reimbursement Models," Greater St. Louis Chapter: Future of Health Care Reimbursement Annual Insurance Payer Panel Program (March 26, 2013).
- "*Cutting Edge Challenges in Determining FMV for Hospital-Physician Arrangements and Transactions*," New Jersey Hospital Association (NJHA), (December 11, 2012).
- "*Business Case for Episode of Care Management*," Healthcare Financial Management Association (HFMA), HFMA Greater St. Louis Missouri Healthcare Executive Group Discussion (September 11, 2012).
- "*Accountable Care Organizations: Physician Integration/Affiliation/Development Strategies and Capital Planning*," 2012 National CPA Health Care Advisors Association (HCAA) Spring Conference (May 3, 2012).
- "*A Primer for Research and Benchmarking Methods for Healthcare Financial Consulting Projects*," 2012 National CPA Health Care Advisors Association (HCAA) Spring Conference (May 3, 2012).
- "*Accountable Care Organizations: Development Strategies and Capital Planning*," Co-presented with Anne P. Sharamitaro, Esq., Decatur Memorial Hospital Research Day (October 19, 2011).
- "*Accountable Care Organizations: Developing Strategies for Successful Implementation*," Infocast Executive Education Series (October 3, 2011).
- "*Healthcare M&A*," Association for Corporate Growth (May 26, 2011).
- "*Hospital-Physician Alignment Seminar*," Co-presented with Scott A. Edelstein, Esq., and Mary C. Reed, Infocast Executive Education Series (March 9-10, 2011).
- "*Hospital - Physician Alignment*," Co-presented with Scott A. Edelstein, Esq., and Mary C. Reed, Infocast Executive Education Series (February 16-17, 2011).
- "*Value Drivers for Surgical Hospital Joint Ventures and Mergers in the Wake of Healthcare Reform*," Physicians Hospitals of America (PHA), 2010 PHA Annual Conference (September 23, 2010).
- "*Physician-Hospital Relationships in a Changing Regulatory Environment*," McDonough District Hospital (June 16, 2010).
- "*A Primer for Research Methods for Valuation Projects*," Co-presented with Anne P. Sharamitaro, Esq., (Author: Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA), ASA St. Louis Chapter 049, (February 6, 2009).
- "*Effect of Healthcare Regulatory and Policy Planning on Dental Practices*," Practice Valuation Study Group, Practice Valuation Study Group Conference (October 4, 2008).
- "*In the Eye of the Beholder: The Valuation of Surgical Hospitals in a Changing Reimbursement and Regulatory Environment*," Co-presented with Anne P. Sharamitaro, Esq., (Author: Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA), Physician Hospital of America (PHA), 2007 PHA Annual Conference (September 13, 2007).

## LECTURES AND PRESENTATIONS

- "*Making Sense of Performance Transformation Methodologies*," Missouri HEG/ACHE (May 24, 2007).
- "*The Specialty Hospital Moratorium: The Impact on Physician Ownership of Specialty Surgical Hospitals*," Co-presented with Robert James Cimasi, MHA, ASA, MCBA, FRICS, CVA, CM&AA, Healthcare Financial Management Association (HFMA), HFMA Regional Joint Meeting (September 16, 2004).
- "*Business and Industry Research, Application to Valuation Engagements: The Internet and Other Sources*," Co-presented with Tim Alexander, MLS, St. Louis Business Valuation Roundtable (July 12, 2000).

## QUOTATIONS AND CITATIONS

- Levin Associates "*The Future of Medicare Advantage: How Private Equity and Key Investments Can Drive Change*" (April, 2025).
- NACVA/CTI "*Around the Valuation World*" (February 10, 2025).
- NACVA/CTI "*Around the Valuation World*" (December 13, 2024).
- NACVA/CTI "*Around the Valuation World*" (August 19, 2024).
- Value Add "*PE Ownership Bears Some Blame for the Healthcare Cyberattack Crisis*" (September, 2023).
- NACVA/CTI "*Around the Valuation World*" (October 16, 2023).
- Levin Associates "*What Is Value-Based Care?*" (September, 2023).
- Healthcare Executive "*The Question of Private Equity*" (January, 2023).
- NACVA/CTI "*Around the Valuation World*" (August 18, 2022).
- NACVA/CTI "*Around the Valuation World*" (October 18, 2021).
- NACVA/CTI "*Around the Valuation World*" (June 24, 2021).
- NACVA/CTI "*Around the Valuation World*" (May 17, 2021).
- NACVA/CTI "*Around the Valuation World*" (August 21, 2017).
- The Ambulatory M&A Advisor  "*Defining the Quality of Earnings Assessment for a Prospective Buyer*" (November 9, 2016).
- The Ambulatory M&A Advisor  "*Dealing with an Increase in Purchase Price During Due Diligence*" (October 21, 2016 ).
- The Ambulatory M&A Advisor "*Using New Debt to Increase the Value of your Business*" (August 19, 2016).
- NACVA/CTI "*Around the Valuation World*" (January 25, 2016).



HIGHLY CONFIDENTIAL    **APPENDIX B**

## DOCUMENTS AND MATERIALS RECEIVED

(1)  07.05.22_NA Scaled Weekly Report_EOQb

(2)  1NA Health_1

(3)  2025.05.23 Metas Supplemental Responses and Objections to Fifth Set of Interrogatories

(4)  Apple bans Facebook's Research app that paid users for data _ TechCrunch

(5)  Brooks v. Thomson Reuters - Expert Report

(6)  David Abdul-Malak Depo Transcript - 05-21-2025

(7)  David Abdul-Malak Depo Transcript - 05-21-2025 (errata)

(8)  Decl of Richard Smith ISO Pltf Motion for Preliminary Injunction

(9)  Defendant Metas Responses and Objections to Plaintiffs Interrogatories, Set 5

(10)  Deposition of Fred Leach - 06-16-2025

(11)  [Dkt. 1009] Sealed - Joint Letter Brief re Non-HCP Revenue - UNDER SEAL w EX (Meta's highlighted redactions)

(12)  Exhibit 17 - Tobias Wooldridge - 01-31-2025

(13)  Exhibit 211 - Manish Singhal - 04-02-2025

(14)  Facebook has been paying teens $20 a month for total access to their phone activity _ The Verge

(15)  Facebook Pixel _ [Doc 335] Redacted -- First Amended Consolidated Class Action Complaint; Demand for Jury Trial; Appendix A

(16)  Facebook Pixel _[Doc 889] Revised Protective Order

(17)  FORM 10-K 2022

(18)  GBG Health Summit 2022_1pccogmp1gufRLE0cFYCiH9C9f8aav-9-pAccxO3yDo4 (1)

(19)  HSVS_WIP1_ Health Systems 9.9.19

(20)  In re Healthcare - F. Leach Deposition Errata

(21)  Meta Platforms, Inc. 10-k filed on 1.30.2025

(22)  Meta Viewpoints

(23)  Mtn for Class Cert (Redacted Kreisman Dec)

(24)  NA Scaled Revenue Report Q1'22 - 02.14.22b

(25)  NA Scaled Revenue Report Q1'22 - 03.31.22_EOQb

(26)  NA Scaled Revenue Report Q3'21 - 9.20.21b

(27)  NA Scaled Revenue Report Q4'21 - EOQb

(28)  PIXEL_HEALTH000486323

(29)  PIXEL_HEALTH000486349

(30)  PIXEL_HEALTH000703008 Topic 34 Healthcare Pixel and CAPI 09AUG22_BPO_Data_Pack_For_Health_Account_Planning_v2 (1)

(31)  PIXEL_HEALTH000734746

(32)  PIXEL_HEALTH000874416

(33)  PIXEL_HEALTH000876014

(34)  PIXEL_HEALTH000917627 - SCD analysis

(35)  PIXEL_HEALTH000939290_ATTORNEYS' EYES ONLY

(36)  PIXEL_HEALTH000939291_ATTORNEYS' EYES ONLY

(37)  PIXEL_HEALTH000945613



HIGHLY CONFIDENTIAL **APPENDIX B**

## DOCUMENTS AND MATERIALS RECEIVED

(38)   PIXEL_HEALTH001219565

(39)   PIXEL_HEALTH001219566

(40)   PIXEL_HEALTH001219572

(41)   PIXEL_HEALTH001284080

(42)   PIXEL_HEALTH001284163

(43)   PIXEL_HEALTH001284219

(44)   PIXEL_HEALTH001284346

(45)   PIXEL_HEALTH001284349

(46)   PIXEL_HEALTH001315318 - adsexport2a

(47)   PIXEL_HEALTH001315319 - adsexport2b

(48)   PIXEL_HEALTH001332991

(49)   PIXEL_HEALTH001373346 - adsexport3

(50)   PIXEL_HEALTH000150197

(51)   PIXEL_HEALTH001332991 (whole family)

(52)   Plaintiffs Fifth Set of Interrogatories to Defendant Meta Platforms Inc. (re Damages)

(53)   Tobias Wooldridge - 01-31-2025

(54)   VA Mason _ Declaration of Gary D. Olsen ISO Motion for Class Certification



HIGHLY CONFIDENTIAL

**List of All Matters in which Todd A. Zigrang Provided Deposition & Trial/Arbitration Testimony in the Past 4 Years**    APPENDIX C

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | **Case** | **Trial/ Alternative Dispute Resolution** | **Venue** | **Case Number** | **Date of Todd Zigrang Deposition Testimony** | **Date of Todd Zigrang Trial/Arbitration Testimony** |
| 1 | Zachary D. Saltman v. Washington Hospital Center Corporation | Trial | Superior Court of the District of Columbia Civil Division | 2021 CA 000821 M | 4/7/2023 | N/A |
| 2 | Dr. Seela Ramesh v. Endo-Surgical Center of Florida, LLC, Dr. Harinath Sheela, and Dr. Srivinas Seela | Arbitration | American Health Law Association | Claim No. 6750 | N/A | 7/18/2023 |
| 3 | Oaktree Medical Centre, PC, Fort, As Trustee v. Kibbey, et al | Trial | U.S. Bankruptcy Court, District of South Carolina | 19-05155-hb | 8/14/2023 | N/A |
| 4 | Richard Benedikt, MD v. DX Partners LP and Diagnostic Imaging Mangement, LLC | Arbitration | The American Arbitration Association | 01-23-0000-9029 | 12/5/2023 | 1/30/2024 |
| 5 | Physician Partners, LLC v. MHC Holdings, Inc. | Arbitration | AHLA Arbitration (Florida) | AHLA Case No. 7788 | 8/19/2025 | N/A |

