# Proposed Redacted Version of Exhibit 11 (Dkt. No. 1154-13)

# EXHIBIT 11

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

Page 1

1                UNITED STATES DISTRICT COURT

2                          FOR THE

3                NORTHERN DISTRICT OF CALIFORNIA

4

    IN RE META PIXEL HEALTHCARE LITIGATION, ) Case No.
    3:22-cv-3580-WHO (VKD)

5    _____ )

6

7           VIDEOTAPED DEPOSITION OF GRAHAM MUDD

8                   Palo Alto, California

9               Wednesday, February 26, 2025

10

11

12           REPORTED BY: Derek L. Hoagland

13                   CSR No. 13445

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1              UNITED STATES DISTRICT COURT

2                      FOR THE

3            NORTHERN DISTRICT OF CALIFORNIA

4

      IN RE META PIXEL HEALTHCARE LITIGATION, ) Case No.
   3:22-cv-3580-WHO (VKD)

5    _____ )

6

7

8

9

10    Videotaped Deposition of GRAHAM MUDD, taken before Derek

11    L. Hoagland, a Certified Shorthand Reporter for the

12    State of California, commencing at 9:08 a.m., Wednesday,

13    February 26, 2025, at GIBSON DUNN, 310 University

14    Avenue, Palo Alto, California 94301.

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   APPEARANCES:
 2
 3   COUNSEL FOR PLAINTIFFS IN THE PUNITIVE CLASS
     COHEN MILSTEIN SELLERS & TOLL
 4   88 Pine Street
     14th Floor
 5   New York, New York 10005
     BY:  ERIC A. KAFKA, ESQ.
 6        212.220.2914
          ekafka@cohenmilstein.com
 7        -- and --
     BY:  JENNA WALDMAN, ESQ.
 8        202.408.4600
          jwaldman@cohenmilstein.com
 9        -- and --
     BY:  SHIREEN HAMDAN, PARALEGAL (Via Zoom)
10
     -- AND --
11
     TERRELL MARSHALL LAW GROUP PLLC
12   936 North 34th Street
     Suite 300
13   Seattle, Washington 98103
     BY:  RYAN TACK-HOOPER, ESQ. (Via Zoom)
14        206.816.6603
          rtack-hooper@terrellmarshall.com
15
16   COUNSEL FOR META AND THE WITNESS
     GIBSON DUNN & CRUTCHER LLP
17   One Embarcadero Center
     Suite 2600
18   San Francisco, California 94111
     BY:  ELIZABETH MCCLOSKEY, ESQ.
19        415.393.4622
          emccloskey@gibsondunn.com
20        -- and --
     BY:  MATTHEW REAGAN, ESQ.
21        415.393.8265
          mreagan@gibsondunn.com
22
23   ALSO PRESENT
     NIKKI SOKOL IN-HOUSE COUNSEL FOR META
24   SHIREEN HAMDAN
     CAMERON TUTTLE, VIDEOGRAPHER
25
```

Page 7

1  with the noticing attorney.

2           MR. KAFKA:  This is Eric Kafka for the

3  plaintiffs in the punitive class.  I'm with the law firm

4  of Cohen Milstein Sellers & Toll.  With me here in

5  person also is Jenna Waldman for the plaintiffs in the

6  punitive class.  She's also from the law firm of Cohen

7  Milstein Sellers & Toll.  I believe it's possible that

8  at some point today via Zoom that Shireen Hamdan, who is

9  a paralegal at my firm Cohen Milstein may join, and also

10  possible that Ryan Tack-Hooper who is an attorney also

11  representing the plaintiffs' punitive class from Terrell

12  Marshall may join.

13           MS. McCLOSKEY:  Elizabeth McCloskey of Gibson

14  Dunn, on behalf of defendant Meta and the witness,

15  Mr. Mudd.  With me is my colleague at Gibson Dunn, Matt

16  Reagan and also with us is Nikki Stitt-Sokol of Meta.

17           THE VIDEOGRAPHER:  Will the court reporter

18  please introduce yourself and administer the oath to the

19  witness.

20           THE REPORTER:  Yes.  My name is Derek Hoagland.

21           And per new rules, my CSR is 13445.

22           (Whereupon, the deponent is

23           duly sworn by the court reporter.)

24  ///

25  ///

```
1          MS. McCLOSKEY:  Object to form.  Calls for
2     speculation.  Vague and ambiguous.
3          THE DEPONENT:  Pixel one of the wit- -- can you
4     repeat, please?
5     BY MR. KAFKA:
6     Q.    Could pixel data be used for online behavioral
7     advertising?
8          MS. McCLOSKEY:  Object to form.  Vague and
9     ambiguous.  Calls for speculation.
10         THE DEPONENT:  Yes.  Yes, it could.
11    BY MR. KAFKA:
12    Q.    And what is the organic news feed ranking?
13         MS. McCLOSKEY:  Object to form.
14         THE DEPONENT:  So news feed was the sort of
15    primary content consumption, what we have -- surface
16    place on -- in the Facebook app, you know, where you
17    would see stories about friends and family and whatever
18    is going on in the world, and that -- those stories are
19    ranked by what, you know, sort of Facebook believes is
20    most interesting or engaging to you, was it -- does that
21    answer your question?  I am now sort of --
22    BY MR. KAFKA:
23    Q.    It does.  It does.
24    A.    Okay.
25    Q.    And this document reflects a proposal to use
```

1       ████████████████████████████████ data for the

2   organic news feed ranking, right?

3            MS. McCLOSKEY:  Object to form.  Vague and

4   ambiguous.

5            THE DEPONENT:  That's what it -- yes, that's

6   what it seems to say.  I haven't read the whole

7   document, but I think that's the gist of it from my

8   take.

9   BY MR. KAFKA:

10  Q.      Did you ever approve that proposal?

11           MS. McCLOSKEY:  Object to form.

12           THE DEPONENT:  I don't recall what the decision

13  we made on that.

14           MR. KAFKA:  Can we go to Exhibit 102.

15           (Exhibit No. 102 marked for identification.)

16  BY MR. KAFKA:

17  Q.      And Mr. Mudd, do you recognize the document

18  Bates labeled Pixel Health 000864790.  It is a series of

19  emails that you received in the course of your

20  employment at Facebook?

21  A.      Yeah.

22           MS. McCLOSKEY:  Object to form.

23           THE DEPONENT:  The numbers -- oh, those are

24  pages, yeah, I do.  I see that.  Yep.

25  ///

Page 88

1    BY MR. KAFKA:

2    Q.      And could you go to the email from Ura

3    Kostesich.  Do you know how to pronounce her name?

4    A.      I don't -- I don't even remember.

5    Q.      I am going to call her Ura K.

6    A.      Okay.

7    Q.      Can you go to the email from Ura K. at 864793?

8    A.      Yeah, I'm there.  Middle of the page, yeah.

9    Q.      And do you see that Ura K. Writes:

10           "Hi, Graham and John" -- let me back up.  You

11   see that Ura sent that email on February 19th, 2019, at

12   6 p.m., right?

13   A.      Yes.

14   Q.      Okay.  She writes -- and do you see it was sent

15   to you and to John Ide, right?

16   A.      I see that.

17   Q.      Who's John Ide?

18   A.      John Ide was a product strategy team lead, and I

19   think at the time a member of the ads leadership team as

20   well.

21   Q.      You and John, you believe, both served together

22   on the ads leadership team in February 2019?

23   A.      It is my assumption, but I, you know, don't

24   have -- I don't know for sure, but the fact that -- I am

25   reasonably certain.

1    Q.       Okay.  She writes:

2             "Hi, Graham and John.  Several ███████████

     ███████████████████████████████████████████████████

     █████████████████████████████████████████

5             Do you see that?

6    A.       Mm-hmm.

7    Q.       It says:

8                      █████████████████████████████

     ███████████████████████████████████████████████████

     ███████████████████████████████████████████

     ███████████████████████████████████████

     ██████████████████      ███████████████████████████

     ███████████████████████████████████████████████████

     ██████████████████████████████████████████████

     ██████████████████████████████████      ████████████

     █████████████████████████████████████████████

     ███████████████████████████████████████████████████

     ████████████████████████████

19   A.       Okay.

20   Q.       And do you remember the issue that Ura K. was

21   talking about?

22   A.       I do.

23   Q.       Okay.  Let me go now to 792.  And here is

24   another email from Ura K. on February 21st which is two

25   days later.  And by the way, the subject here is "Re:

Page 90

1    ████████████████████████████████

2    ████████████████

3           Do you see that?

4    A.      Mm-hmm.

5    Q.      It shows Graham, Rob, Dan, Nadir; and I know we

6    discussed earlier Rob Goldman; I know we discussed

7    earlier Dan Levy; who is Nadir Joshua?

8    A.      Nadir was Rob's business lead, which is kind of

9    akin to a chief of staff.

10   Q.      Okay.  And it says:

11            ████████████████████████████

12   ████████████████████████████████████

13   ████████████████████  This decision is aligned

14   with privacy, signals, product, and data team --

15   principles teams.  Also, make sure that there's no

16   direct competition and fair exchange to the extent that

17   can be measured today.  Looking for your thoughts as

18   this will set precedent for number of other FB products

19   looking to get more ██████████████████████

20   ████████████

21            Do you see that?

22   A.      Mm-hmm.

23            MS. McCLOSKEY:  I just want to note that you

24   missed a couple words in there, but I don't know that it

25   changed the significance of the sentence.

1          MR. KAFKA:  Thank you.  Thank you, Counsel.

2    BY MR. KAFKA:

3    Q.      And then there's another email from Ura K. at

4    March 5th, 2019, to you, Nadir Joshua, Rob Goldman, Dan

5    Levy, and John Ide.

6          Do you see that?

7    A.      I see that.

8    Q.      And she writes:

9          ████████    ███████████████████

    ███████████████████████████████████████

    ███████████████████████████████████████

    ███████████████████████████████

13         Do you see that?

14   A.      Mm-hmm.

15   Q.      So does this refresh your recollection that you

16   ███████████████████████████████████████

    █████████████████████████████████

18         MS. McCLOSKEY:  Object to form.  Assumes facts.

19         THE DEPONENT:  It -- it -- it's -- it doesn't --

20   I don't -- I still don't remember this -- approving

21   this, but it's -- it appears that I did, so yeah, but I

22   don't have that memory.

23   BY MR. KAFKA:

24   Q.      Do you have any reason to believe you did not

25   approve it?

```
 1          MS. McCLOSKEY:  Object to form.  Calls for
 2     speculation.
 3          THE DEPONENT:  No, I don't think I do.
 4     BY MR. KAFKA:
 5     Q.       You don't have any reason to believe Ura was
 6     lying about a conversation with you?
 7     A.       No, I don't think so.  I don't have any reason
 8     to believe that.
 9     Q.       Thank you.
10          MR. KAFKA:  Let's go to the next exhibit then.
11          (Exhibit No. 103 marked for identification.)
12          THE DEPONENT:  Okay.  Any area you want me to
13     focus on?
14     BY MR. KAFKA:
15     Q.       Yeah.  Could you look at page 430475.  And it
16     says -- today:
17          "Today, approximately ███████████████
██  ████████████████████████████████████████
██  ██████████████████████████████████████████████
██  ████████████████████████
21          Do you see that?
22     A.       I do.
23     Q.       How -- how would you be able to calculate that
24     number?
25          MS. McCLOSKEY:  Object to form.  Calls for
```

1          MS. McCLOSKEY:  Should we take a quick break?

2     It's been an hour.

3          MR. KAFKA:  That's fine.  Yeah.

4          THE VIDEOGRAPHER:  Okay.  We're going off the

5     record.  The time is 11:32 a.m.

6          (A recess transpires.)

7          THE VIDEOGRAPHER:  We're back on the record.

8     The time is 11:56 a.m.

9          MR. KAFKA:  Welcome back, Mr. Mudd.  We are

10    going to hand to you what's being marked as Exhibit 105.

11          (Exhibit No. 105 marked for identification.)

12    BY MR. KAFKA:

13    Q.    Mr. Mudd, does this document appear to be to you

14    an ads leadership team update regarding first party

15    cookies with the Facebook Pixel from September of 2018?

16          MS. McCLOSKEY:  Object to form.

17          THE DEPONENT:  It appears to be.

18    BY MR. KAFKA:

19    Q.    And do you see in the second paragraph, it

20    states:

21          "To mitigate the website signal loss from

22    third-party cookie blocking, we will enable advertisers

23    ████████████████████████████████████████████████████

   ██ ██████████████████████████████████████████████████

   ██ ████████████████████████████████████████████

Page 100

1    ██████████████

2            Do you see that?

3    A.      I see that.

4    Q.      Do you remember this conversation at Facebook?

5            MS. McCLOSKEY:  Object to form.  Assumes facts.

6            THE DEPONENT:  Not specifically.

7    BY MR. KAFKA:

8    ████      ██████████████████████████████████

     ████████████████████████████████████████████

     ████  ███████████

11           MS. McCLOSKEY:  Object to form.  Assumes facts.

12           THE DEPONENT:  I do remember those

13   conversations.

14   BY MR. KAFKA:

15   Q.      Do you remember those conversations occurring at

16   ads leadership team meetings?

17           MS. McCLOSKEY:  Object to form.

18           THE DEPONENT:  I don't.

19   BY MR. KAFKA:

20   Q.      Can you explain the difference between a

21   first-party cookie and a third-party cookie to me?

22           MS. McCLOSKEY:  Object to form.

23           THE DEPONENT:  Yes.  I will try.  A first-party

24   cookie would be set by the website that a user is at so

25   if I go to Nike.com, a Nike.com cookie would be

1    considered a first-party cookie.

2         If Nike has pixels on its website from any

3    number of ad platforms, it's -- they -- if the browser

4    so allows, those -- those pixels could read a -- a

5    cookie from a different domain at that point, at that

6    moment, and that would be considered, in that case, a

7    third-party cookie because it wasn't from the domain

8    being visited.  Is that --

9    BY MR. KAFKA:

10   Q.    And do you see the next paragraph, it says:

11        "We anticipate PR and communications to be the

12   biggest risks.  Consumers make the overriding their

13   choice not to be tracked."

14        Do you see that?

15   A.    I see that.

16   Q.    Do you recall you personally taking a position

17   on this proposal of ███████████████████████

     ██  ████████████████████

19        MS. McCLOSKEY:  Object to form.

20        THE DEPONENT:  I don't recall taking a position.

21   I don't recall the specific discussion so I don't

22   remember what my position on it was, to be honest.

23   BY MR. KAFKA:

24   Q.    Do you recall whether Facebook did ultimately

25   implement ███████████████████████████████████

1           MS. McCLOSKEY:  Object to form.

2           THE DEPONENT:  I -- yes, I do recall that we did

3    ultimately implement that change.

4    BY MR. KAFKA:

5    ██      ████████████████████████████████████

     ███████████████████████████████████████████

     ███████████████████

8           MS. McCLOSKEY:  Object to form.

9           THE DEPONENT:  Did it then or does it now?  Is

10   that what you are asking.

11   BY MR. KAFKA:

12   Q.    Well, let me start with did it concern you then?

13   A.    I don't remember.

14          MS. McCLOSKEY:  Object to form.

15   BY MR. KAFKA:

16   Q.    Does it concern you now?

17          MS. McCLOSKEY:  Object to form.

18          THE DEPONENT:  Anything that -- that doesn't

19   meet with the consumer's expectation, reasonable

20   expectation, I suppose, of privacy, is a concern to me;

21   and I -- I think that the practice of treating what used

22   to be third-party cookies as first-party cookies in a

23   context like this, generally, you know, is -- is -- is

24   problematic.

25          MR. KAFKA:  Let's go to the next exhibit, which

Page 179

1  indicate a person's health status regardless of whether

2  it would be used in ads?

3          MS. McCLOSKEY:  Object to form.  Asked and

4  answered.

5          THE DEPONENT:  I had personal discussions with

6  industry folks, clients, and press.  I didn't -- I don't

7  have recollection of personal discussions with

8  regulators.  That was a very specific, you know, sort of

9  job function that I didn't have.

10          Now, did I look after the general, you know,

11  sort of strategy on all of this, yeah, I did.  But,

12  like, folks on the policy team would have engaged with

13  the FTC or whomever the regulators were.  I just didn't

14  do it.

15  BY MR. KAFKA:

16  Q.      So let's push regulators aside.

17  A.      Okay.

18  Q.      Did you hear concerns in 2019 or around then --

19  A.      Mm-hmm.

20  Q.      -- from industry clients or press that related

21  to Facebook receiving data that could indicate a

22  person's health status regardless of whether it was used

23  in advertisements?

24          MS. McCLOSKEY:  Object to form.  Asked and

25  answered.  Vague.

26

Page 180

1          THE DEPONENT:  Yes, I did.

2    BY MR. KAFKA:

3    Q.      And among industry, who did you hear those

4    concerns from, to the best of your recollection?

5          MS. McCLOSKEY:  Object to form.

6          THE DEPONENT:  It -- it would have been, you

7    know, agencies or industry bodies, you know, you can

8    imagine like trade groups and so forth; and it would

9    typically have happened after there was press.  They --

10   you know, they would ask us what's going on with this

11   issue that we see in the press, and so forth.

12   BY MR. KAFKA:

13   Q.      Do you remember any specific clients who raised

14   those concerns with you?

15          MS. McCLOSKEY:  Object to form.

16          THE DEPONENT:  I don't.

17   BY MR. KAFKA:

18   Q.      Okay.  And do you rem- -- and did you remember

19   any press who you discussed concerns about Facebook's

20   receipt of data that could indicate a person's health

21   status?

22          MS. McCLOSKEY:  Object to form.  Assumes facts.

23          THE DEPONENT:  There were -- there were press

24   articles that were sent to me, the Wall Street Journal

25   articles, with any question we've talked about.  I did

26

Page 181

1    dozens, probably hundreds of interviews with press over

2    the years, and I don't remember which ones were for this

3    issue specifically that.  You know, this is one of

4    dozens of issues, so I can't connect that dot

5    specifically.

6    BY MR. KAFKA:

7    Q.     Do you remember if you spoke to the Wall Street

8    Journal about this issue?

9    A.     I don't think that I did, but I am not certain.

10    Q.     Okay.  Let's go -- let's go down to "product

11    options."

12    A.     Same doc?  We are in 112.

13    Q.     Yeah, 112.

14    A.     Okay.

15    Q.     And do you see once again there is a category of

16    ████████████████████████

17    A.     Yep.

18    Q.     And do you see the example one again ████████

19    ██████████████████████████████████████████

20    ██████████████████████████

21    A.     Yes.

22    Q.     Okay.  And when you go to page 2, and the

23    █████████████████, do you see that the same three

24    options that were listed in 111 with respect to

25    █████████████ are also listed in 112?

26

1   A.      So I am on -- in the table on the second page.

2   Where do you want to direct me to look for that?

3   Q.      Yeah, let's go to column B.

4   A.      Okay.

5   Q.      And it states:

6   ██████████████████████████████████

▉   ████████████████ --

8   A.      Oh.

9   Q.      ██████████████████████████████████

▉   ████████████████

11  A.      Yes, I see that.

12  Q.      So would you agree that that is the same option

13  that was listed as option 2 in Exhibit 111?

14  A.      Okay.  Give me a sec.  Yes, I think that's

15  right.

16  Q.      And do you see in row 5 on page 2, it says:

17  ████████████████████████████████████████

▉   ████████████

19          Do you see that in Exhibit 112?

20          MS. McCLOSKEY:  Sorry.  Where is that Eric?

21          MR. KAFKA:  Row 5, near the top of the second

22  page of Exhibit 112.

23          MS. McCLOSKEY:  Row 5.  I see row 5 on -- oh, I

24  see.  Okay.  On the second page.

25

```
 1    BY MR. KAFKA:
 2    Q.      Yeah.  So let me just ask it again, yeah.
 3            Do you see in Exhibit 112, on page 2, row 5, it
 4    says:
 5            ████████████████████████████████████████
 6    █  █████████
 7    A.      Yes.
 8    Q.      And do you agree with me that that is the same
 9    option that is listed as option 1 in Exhibit 111?
10    A.      Yeah, I do.
11    Q.      Okay.  And --
12            MS. McCLOSKEY:  I am -- object to form.  It's
13    not identical.
14            THE DEPONENT:  Right.  One says "On client
15    side."  And the other says ████████████████  But
16    yeah.  So I mean, is that what you ^ --
17            MS. McCLOSKEY:  So misstates the evidence.
18            Yes, that's what I am taking issue --
19            MR. KAFKA:  Counsel, please, you can make an
20    objection prior to the witness testifying; but please
21    don't -- please don't do it afterwards.
22            MS. McCLOSKEY:  Well, I --
23            MR. KAFKA:  Okay.  Let me --
24            MS. McCLOSKEY:  I didn't catch that you had
25    misstated the evidence and so I didn't want the record
26
```

1   to reflect that the language was identical when it is

2   not identical.

3          MR. KAFKA:  Okay.  I didn't say "language."  I

4   said -- so -- so could the court reporter read back the

5   question.

6          (Pending question read.)

7          MS. McCLOSKEY:  Object to form.  Misstates the

8   evidence.

9          THE DEPONENT:  I -- I don't know the legal --

10  the legal technicality here.  What I am saying is the

11  words are not identically the same.  I believe that the

12  option that is being referred to is the same.

13  BY MR. KAFKA:

14  Q.      Thank you.

15          Now let's go to row 6.

16  A.      Okay.

17  Q.      It states:

18  ████████████████████████████████████████

19  A.      Mm-hmm.

20  Q.      Do you see that on page 2 of Exhibit 112, at row

21  6?

22  A.      Yes.

23  Q.      And putting aside whether the precise language

24  is the same, would you agree with me that it's the same

25  option listed as option 3 in Exhibit 111?

26

Page 188

```
 1   A.      Yeah.
 2   ██      ████    ████████████████████████████
 3   A.      Yes.
 4   Q.      What does it mean?
 5   ██      ████████████████████████████████
     ██  ██████████████████████████████████████
     ██  ████████████████████████████████████
     ██  █████████████████████████████████████████
     ██    ██████████████████████████████
10   Q.      And "H2" means second half of the year
11   generally?
12   A.      Yeah.
13           MS. McCLOSKEY:  Object to form.
14           THE DEPONENT:  That's correct.
15   BY MR. KAFKA:
16   Q.      And when you look in column F for timeline, was
17   there any timeline proposed for the ██████████████
     ██  ████████████████████████████  option?
19   A.      I don't see it in this document.
20   Q.      And when you look at Exhibit 112, do you see any
21   proposed timeline for the █████████████████████████
     ██    ██████████████  option?
23           MS. McCLOSKEY:  Where are you?
24           MR. KAFKA:  No. 6.
25           THE DEPONENT:  I don't see anything there.  I
26
```

Page 189

1    want to point out that these are options solving the

2    same problem, so it would be very unlikely that you

3    would do one or the other.  These are mutually exclusive

4    options.

5    BY MR. KAFKA:

6    Q.    Okay.  So just to be clear:  You would only do

7    one or the other, right?

8    A.    I -- I mean, that is my take on this, so I

9    just -- it seems like you are inferring that there is

10   something missing here and I am not so sure that that's

11   the case, but I am -- you direct me however you like.

12   Q.    Well, Mr. Mudd, I guess what I -- for -- what I

13   just wanted to understand is -- actually I don't need to

14   ask anything else.

15        Let's just, sitting here right now before we

16   look at any other documents, you don't recall which

17   option if any was selected, right?

18        MS. McCLOSKEY:  Object to form.

19        THE DEPONENT:  I don't recall which one we

20   pursued.

21        MR. KAFKA:  Okay.

22        THE DEPONENT:  What I will say is that I think

23   row 4 seems to be the one that was recommended, and it

24   also seems to be the most conservative of the

25   approaches.

26

Page 190

1   BY MR. KAFKA:

2   Q.      And why do you think it's the most conservative?

3           MS. McCLOSKEY:  Object to form.  Calls for

4   speculation.

5           THE DEPONENT:  Because we are ███████████

    ██ ██████████████████████████████████████████.

7   BY MR. KAFKA:

8   Q.      But when you say "conservative," I guess to look

9   at it this way, which one would be the most ████████

    ██ ███████████████████████████████████

11          MS. McCLOSKEY:  Object to form.  Calls for

12  speculation.

13          THE DEPONENT:  Row 4.

14          MR. KAFKA:  Thank you.

15          Could we go to the next exhibit.  This is going

16  to be Exhibit No. 113.

17          THE DEPONENT:  Done with this thing?

18          MR. KAFKA:  Done.  Not unless you want to see it

19  again.  It hurts my eyes.

20          (Exhibit No. 113 marked for identification.)

21  BY MR. KAFKA:

22  Q.      Take -- take your time to review the document.

23  A.      Okay.  Thanks.

24          Okay.  I think at a high level, I have got it.

25  Q.      Okay.  Let's go -- just for the record, this

26

1    A.      Yes.

2    Q.      And you wrote:

3            "3, If there's more detail, I can read and stay

4    up to date on.  Please shoot me a link.  Also happy to

5    connect live if easier."

6    A.      Yes.

7    Q.      And can you read for me the last paragraph in

8    your November 6, 2019, 7:33 a.m. email?

9    A.      Yes.

10           "Unsolicited suggestion:  Should we consider

11   ████████████████████████████████████████████████

     ███████████████████████████████████████████

     ████████████████████    ██████████████████████

     ██████████████████████████████████████████████

     █████████████    ████████████████████████████

     ████████████████████    Thanks, Graham."

17   Q.      And then, do you see that Natalie responds to

18   you at 8:03 a.m. on November 6, 2019:

19           "Lieu chen mentioned this to me the other day,

20   though I am not working on this.  Okay to loop her in

21   here?"

22   A.      I see that.

23   Q.      And do you see that you wrote at 8:12 a.m.,

24   "Sure!"

25   A.      Yes.

26

1    Q.      And now do you see that Hiral wrote:

2            "On recommendation, yes, ████████████████

     ██████████████████████████████████████.  This went

4    to ██████████████

5    A.      Mm-hmm.

6    Q.      "We had planned ████████ and they didn't agree.

7    It's time to resurface the change."

8    A.      Yep.  I see that.

9    Q.      So does this refresh your recollection that

10   there was a recommended proposal to ████████████████

     ████████████████████████████████████████████

12   did not agree?

13           MS. McCLOSKEY:  Object to form.  Calls for

14   speculation.

15           THE DEPONENT:  That's what this email indicates.

16   BY MR. KAFKA:

17   Q.      Do you have any reason to believe that's

18   incorrect?

19           MS. McCLOSKEY:  Object to form.  Calls for

20   speculation.

21           THE DEPONENT:  I don't have any reason to

22   believe it's incorrect.

23   BY MR. KAFKA:

24   Q.      And do you remember at all the reasons why the

25   ads leadership team would disagree with that approach?

26

1          MS. McCLOSKEY:  Object to form.  Calls for

2     speculation.  Lacks foundation.  Vague.

3          THE DEPONENT:  I would only be speculating.  I

4     don't know.

5     BY MR. KAFKA:

6     Q.     Do you think the ads leadership team made a

7     mistake?

8          MS. McCLOSKEY:  Object to form.  Calls for

9     speculation.  Vague and ambiguous.

10         THE DEPONENT:  Hard to put myself back in the

11    shoes that, you know, we were wearing back then, so it's

12    a -- that's a really tough question to answer.  You

13    know, if you asked me today, I -- that's a different

14    question, but I -- you know, back -- did we make a

15    mistake then?  Knowing what we knew?  I am not -- I am

16    not entirely sure.

17    BY MR. KAFKA:

18    Q.     Sitting here today, do you think the ads

19    leadership team made a mistake?

20         MS. McCLOSKEY:  Object to form.

21         THE DEPONENT:  I think that's the same question.

22    I think to a degree at least -- because you are saying

23    did the ads leadership team make a mistake -- if I could

24    make this decision myself today, I would ███████████

      ███████████ but that's knowing all the things I know now.

26

Page 229

1    it.

2    Q.      Okay.  It doesn't -- you are the custodian, I

3    don't --

4    A.      That's fair.

5    Q.      An author -- okay.  So let's -- let me can this:

6    Have you seen this document before?

7    A.      I don't remember it.

8    Q.      It says on the first page, which is 484.

9    A.      Okay.

10   Q.      "Cross-family review, third-party data usage,

11   3PD proposal, and how it fits the ads/signals strategy."

12   A.      Okay.

13   Q.      And then it says "Scheduled for MZ review,

14   April 20th."  So does that mean that this issue was

15   scheduled for review with Mark Zuckerberg?

16          MS. McCLOSKEY:  Object to form.  Calls for

17   speculation.

18          THE DEPONENT:  That would be my guess.

19   BY MR. KAFKA:

20   Q.      Well, do you recall if there was a meeting with

21   Mark Zuckerberg in April of 2021, about moving away from

22   third-party data without consent?

23          MS. McCLOSKEY:  Object to form.  Calls for

24   speculation.

25          THE DEPONENT:  I don't recall the date.  I

26

Page 230

1    recall the topic of the discussion, and I do recall it

2    going to Mark.  It may have been April, I don't know.

3    It may have been April, I don't know.

4    BY MR. KAFKA:

5    Q.     Do you believe it was in 2021?

6           MS. McCLOSKEY:  Object to form.

7           THE DEPONENT:  Yes.

8    BY MR. KAFKA:

9    Q.     And did you participant in an in-person

10   discussion regarding this issue with Mr. Zuckerberg?

11          MS. McCLOSKEY:  Object to form.

12          THE DEPONENT:  I don't think it was in person.

13   I think this was during COVID.

14   BY MR. KAFKA:

15   Q.     Okay.  This gets to some of my earlier about

16   the -- the -- so putting aside whether it was Zoom --

17   A.     Ah, okay.  Sorry.

18   Q.     -- or -- or in person -- no, that's fair, in

19   person or telephone call, do you believe that you

20   participated in a meeting that Mark Zuckerberg attended

21   in 2021, regarding a proposal to move away from

22   third-party data without consent?

23          MS. McCLOSKEY:  Object to form.

24          THE DEPONENT:  Yes.

25

Page 231

1  BY MR. KAFKA:

2  Q.      And who do you recall -- well, do you believe

3  that meeting was on Zoom?

4  A.      That's my recollection.  Yeah, I -- I am quite

5  certain that that's the case.  I can't imagine we were

6  in person at that point in time.

7  Q.      And who do you recall attending that meeting?

8  A.      I am really hazy here.

9          MS. McCLOSKEY:  Object to form.  Calls for

10  speculation.

11          THE DEPONENT:  I definitely remember Dan Levy

12  was there.  Or Levy.  I don't remember anyone else.  Oh,

13  no, that's not true.  I remember Alex Schultz was there.

14  BY MR. KAFKA:

15  Q.      So on the Zoom, there was you, Mark Zuckerberg,

16  Dan Levy, and Alex Schultz?

17  A.      And a number of others, I just don't recall the

18  specifics.  It's like less of a memory when you are not

19  in person; you know what I mean?

20  Q.      No, I get it.

21  A.      Like squares on a TV.

22  Q.      But do you remember if there were attorneys at

23  the meeting?

24  A.      I don't recall.

25  Q.      Okay.  And you state, oh, no I'm sorry, not you

26

Page 232

1    state.  It states in the document:

2         "Goal for today, approve a public stance to use

3    opt-in consent for individually viable third-party data

4    and no new consent requirement for anonymized

5    third-party data."

6         Do you see that?

7         MS. McCLOSKEY:  Object to form.

8         THE DEPONENT:  Yes, I see that.

9    BY MR. KAFKA:

10   Q.    And do you see where it says:

11        "The strategy (as we wrote at the Feb 2020 board

12   meeting, full text in the appendix) 1" -- let me back

13   up.

14        Do you see where that's written?

15   A.    I see it.

16   Q.    Are you aware of a -- of a February 2020

17   Facebook board of directors meeting where signal's loss

18   was discussed?

19        MS. McCLOSKEY:  Object to form.  Calls for

20   speculation.

21        THE DEPONENT:  I wasn't in the room.  So I don't

22   know what was discussed.  I think we previously reviewed

23   a document that was prepared for that meeting.  I --

24   that's -- that's pretty much the extent of my knowledge.

25

Page 233

1    BY MR. KAFKA:

2    Q.      And other than the members of the board of

3    directors, can you identify anyone else who attended

4    that meeting?

5            MS. McCLOSKEY:  Object to form.  Misstates the

6    testimony.  The witness hasn't testified that the board

7    of director members were all there.

8            THE DEPONENT:  I don't -- I don't know who was

9    in the room.

10   BY MR. KAFKA:

11   Q.      And I know this is an obvious question; but Mark

12   Zuckerberg is a member of the Facebook board of

13   directors, right?

14           MS. McCLOSKEY:  Object to form.

15           THE DEPONENT:  That's correct.

16   BY MR. KAFKA:

17   Q.      Let me go to the bottom of page 485 which is

18   really the second page.

19   A.      Sorry, I was distracted.  Where would you like

20   me?

21   Q.      This is the bottom of page 485, which is the

22   second base -- page.

23   A.      Okay.  Got it.

24   Q.      And it says there:

25           "We want to change to opt-in consent for

26

Page 241

1    think I would have said it was very important.

2    BY MR. KAFKA:

3    Q.      Okay.  And then it says:

4            "For those users who don't opt in, our goal will

5    be to work with the industry to develop

6    privacy-enhancing technologies which allow us to use

7    data in ways that don't connect new info to users'

8    profiles."

9            Do you see that?

10   A.      I see it.

11   Q.      And you were familiar with this potential plan

12   in 2021?

13           MS. McCLOSKEY:  Object to form.  Vague and

14   ambiguous.

15           THE DEPONENT:  Did you say "April"?

16   BY MR. KAFKA:

17   Q.      In 2021?

18   A.      Yes.

19   Q.      I am not going to get hung up on the month.  And

20   then do you see where it says -- hold on, let me skip a

21   few pages.  I am going to go now to -- could you go to

22   the page that ends in 11025.

23   A.      Yep.

24   Q.      And do you see it says:

25           "We are considering a recommendation to Zuck to

26

Page 242

1  effectively move all third-party data to a consent-only

2  model from people at least for things that are

3  individually identifiable.  We currently opt these as

4  opt-as now.  We would switch to make them opt-ins."

5          Do you see that?

6  A.      Yes.

7  Q.      And you are aware that that was a recommendation

8  that Facebook was considering making to Mark Zuckerberg

9  in 2021?

10          MS. McCLOSKEY:  Object to form.  Lacks

11  foundation.  Calls for speculation.

12          THE DEPONENT:  Yeah.  Yeah.

13  BY MR. KAFKA:

14  Q.      And sitting -- before we look at any other

15  documents, do you know if that recommendation was made

16  to him?

17          MS. McCLOSKEY:  Object to form.

18          THE DEPONENT:  Yes, it was.

19  BY MR. KAFKA:

20  Q.      Okay.  Let's go to 030.

21  A.      030.  Do you see it states that:

22          "Graham, let's say you already have a ton of

23  ████████████████████████████████████████    ████████

   ████████████████████████████████████████████████████

   ██████████████████████    ████████████████████████████

26

Page 247

1   A.      I mean, I have no idea.

2   Q.      Do you see there's a -- if you go to 325,

3   there's an email from Jill Barzilay on June 8th, 2021,

4   to you, Graham Mudd.

5           Do you see that?

6   A.      Uh-huh.

7   Q.      And there's a subject "3P review doc"?

8   A.      Uh-huh.

9   Q.      It says, "Hi, Graham.  Great seeing you

10  yesterday."  And who's Jill Barzilay?

11  A.      She was in product marketing, she didn't report

12  to me but, you know, she was on a sort of sister team of

13  mine, to mine.

14  Q.      Okay.  It says:

15          "You mentioned yesterday that the doc for the

16  Mark review when the team proposed moving away from the

17  3P data without consent was one of the best you have

18  ever seen.  Is that something you could share?  I would

19  love to read it for my own knowledge of what good looks

20  like."

21          Related -- actually strike that.

22          Do you see the paragraph I just read that ends

23  with "What good looks like"?

24  A.      Uh-huh.  Yeah.

25  Q.      And then, could you read me your response to

26

Page 248

1   Ms. Barzilay on June 8th, 2021, at 12:33 p.m.?

2   A.      At 12:33, correct?

3   Q.      12:33, correct, yes.

4   A.      Okay.  Sorry.

5           "Hi, there.  I would really like to share but I

6   am concerned about" -- redacted.  "If you want to ask

7   legal" -- redacted, redacted, "please feel free, happy

8   to share if we can make it work."

9   Q.      Okay.  Now, we discussed that you attended a

10  Zoom meeting with Mark Zuckerberg and other Facebook

11  employees in 2021 --

12  A.      Mm-hmm.

13  Q.      -- about the proposal to move away from

14  third-party data without consent.

15          Do you recall what decision was made in that

16  meeting?

17          MS. McCLOSKEY:  Object to form.

18          THE DEPONENT:  At a high level, the decision was

19  to do that, was to move away from third-party data.  It

20  was a somewhat like sort of muddled decision if I recall

21  correctly, I don't really -- like it wasn't like a clear

22  emphatic yes this is the plan, we are doing that, no

23  doubt about it.  And so there were follow-ups

24  afterwards, you know, to sort of chart the -- that was a

25  big decision to chart the path forward, and we were

26

1    likely going to check in with him again, and so forth,

2    and so I -- that's kind of my -- my recollection of it.

3    BY MR. KAFKA:

4    Q.    And when you say "check in with him again," you

5    mean check in with Mark Zuckerberg again, correct?

6          MS. McCLOSKEY:  Object to form.

7          THE DEPONENT:  My assumption was that before

8    a -- the full sort of trigger was pulled on that kind of

9    decision, that that's the kind of thing that we would.

10   I don't recall if we did.

11   BY MR. KAFKA:

12   Q.    And when you left Facebook in 2022 --

13   A.    Uh-huh.

14   Q.    -- had Facebook implemented a system where no

15   third-party data could be shared through the pixel

16   without consent?

17         MS. McCLOSKEY:  Object to form.

18         THE DEPONENT:  Certainly not, like, completely.

19   There were certain signals, certain situations where

20   that was implemented; but it wasn't a uniform decision

21   applied globally to all data.

22   BY MR. KAFKA:

23   Q.    Well, let me put it this way:  When you left

24   Facebook in 2022, was the requirement that users would

25   have to provide opt-in consent for third-party data

26

1    about them to be sent to Facebook through the pixel?

2          MS. McCLOSKEY:  Object to form.  Vague and

3    ambiguous.

4          THE DEPONENT:  Across the board?  If that's what

5    you are asking, no.

6    BY MR. KAFKA:

7    Q.    Okay.  And was the ABP proposal that we

8    discussed earlier, was that implemented in 2022?

9          MS. McCLOSKEY:  Object to form.

10          THE DEPONENT:  No, not wholly.

11    BY MR. KAFKA:

12    Q.    And is that proposal, to your knowledge, been

13    implemented today wholly at Facebook?

14          MS. McCLOSKEY:  Object to form.  Calls for

15    speculation.

16          THE DEPONENT:  I don't believe so, but I don't

17    know.

18    BY MR. KAFKA:

19    Q.    Do you believe that ABP's proposal on opting

20    consent should have been implemented in 2021 or '22?

21    A.    ██████████████████████████████████████████████

    ██    ████████████████████████████████  Yeah, I -- it's a

23    massive undertaking.

24    Q.    Do you think it should have been implemented

25    already at Facebook?

26

Page 251

1      MS. McCLOSKEY:  Object to form.  Calls for
2  speculation.  Vague.
3      THE DEPONENT:  I think if -- I can't make a call
4  on timing for this.  I believe the industry is in a
5  state of transition and that the right place for it to
6  end and maybe the sort of stable equilibrium is that
7  place.  It's a massive change for this industry, for
8  Facebook, and for everybody else.
9      The reason I started the company I did was
10  because I wanted to build technologies that would move
11  us in that direction, so obviously I believed that
12  that's the end state that we should and that I want us
13  to selfishly and, you know, for other -- and because I
14  think that's the right end state.
15      But as I said, it's a massive undertaking, a
16  massive change; and I don't know that I could say it
17  certainly would not have been reasonable to say this
18  should have happened the month after a decision like
19  this -- it's just -- that's just farcical.  You know,
20  could it happen in next year, the year after that, five
21  years from now, I hope so.
22  BY MR. KAFKA:
23  Q.    Do you remember anything that Mark Zuckerberg
24  said in that meeting about opt-in consent for
25  third-party data?
26

Page 252

1    A.      I don't.

2    Q.      Do you remember what his view was at that

3    meeting about opt-in consent for third-party data?

4           MS. McCLOSKEY:  Object to form.  Calls for

5    speculation.  Vague and ambiguous.

6           THE DEPONENT:  Specifically, no.  I mean, we

7    emerged from that, as I mentioned, with a direction as

8    opposed to maybe a decision.  We wouldn't have emerged

9    from that if he disagreed with -- with that direction if

10   he disagreed with it, but I don't know what he said.  I

11   don't remember his specific reaction or his opinion.

12   BY MR. KAFKA:

13   Q.      And do you know Mark Zuckerberg's current

14   opinion on opt-in consent for third-party data such as

15   the pixel?

16   A.      No idea.

17          MS. McCLOSKEY:  Object.  Object to form.  Calls

18   for speculation.

19          THE DEPONENT:  No idea.

20          MR. KAFKA:  With that, I have no further

21   questions.  I do want to say I guess two things.  First

22   of all, there was a folder referenced about -- and we

23   will talk about this later -- about signal documents we

24   believe should have been produced, and I also believe

25   that this document that was withheld on privilege,

26

Page 262

1                    REPORTER'S CERTIFICATE

2

3      STATE OF CALIFORNIA            )    ss.

4      I, DEREK L. HOAGLAND, CSR #13445, State of California,

5      do hereby certify:

6      That prior to being examined, the witness named in the

7      foregoing proceeding was by me sworn to testify to the

8      truth, the whole truth and nothing but the truth;

9      That said proceeding was taken down by me by stenotype

10     at the time and place therein stated and thereafter

11     transcribed under my direction into computerized

12     transcription.

13     I further certify that I am not of counsel nor attorney

14     for nor related to the parties hereto, nor am I in any

15     way interested in the outcome of this action.

16     In compliance with section 8016 of the Business and

17     Professions Code, I certify under penalty of perjury

18     that I am a certified shorthand reporter with license

19     number 13445 in full force and effect.

20     Witness my hand this 13th day of March, 2025.

21

22                        DEREK L. HOAGLAND, CSR #13445

23

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | Case No. 22-cv-03580 |

**ERRATA SHEET FOR THE TRANSCRIPT OF THE FEBRUARY 26, 2025,**
**DEPOSITION OF GRAHAM MUDD**

| Page(s) | Line(s) | Change | Reason |
|---|---|---|---|
| 11 | 18 | **From:** "more than a million in" **To:** "more than a million dollars in" | Mistranscription |
| 14 | 4 | **From:** "Grant" **To:** "Graham" | Mistranscription |
| 15 | 5 | **From:** "advocacy" **To:** "advocates" | Mistranscription |
| 17 | 18 | **From**: "R vision" **To:** "our vision" | Typographical |
| 19 | 7-8 | **From:** "R vision" **To:** "our vision" | Typographical |
| 21 | 13 | **From:** "whole cost" **To:** "whole cloth" | Mistranscription |
| 26 | 12 | **From:** "industry employees" **To**: "industry employs" | Mistranscription |
| 43 | 1 | **From:** "What" **To:** "While" | Mistranscription |
| 49 | 2 | **From:** "may be" **To:** "maybe" | Mistranscription |
| 51 | 5 | **From:** "Matt Itima" **To:** "Matt Idema" | Typographical |
| 51 | 5 | **From:** "Matthieu Itima" **To:** "Matthew Idema" | Typographical |
| 51 | 6 | **From:** "Tyma Taylor" **To:** "Ty Ahmad-Taylor" | Typographical |
| 51 | 12 | **From:** "Matt Itima" **To:** "Matt Idema" | Typographical |
| 63 | 5 | **From:** "John Ide" **To**: "John Eide" | Typographical |
| 63 | 7 | **From:** "John Ide" **To:** "Ning Lee" | Typographical |
| 81 | 21 | **From:** "a joy" **To:** "Ajoy" | Typographical |

1

| 88 | 2-3 | **From:** "Ura Kostesich"<br>**To:** "Yura Kostiukevych" | Typographical |
|----|-----|----|----|
| 88 | 5 | **From:** "Ura"<br>**To:** "Yura" | Typographical |
| 88 | 7 | **From:** "Ura"<br>**To:** "Yura" | Typographical |
| 88 | 9 | **From:** "Ura"<br>**To:** "Yura" | Typographical |
| 88 | 11 | **From:** "Ura"<br>**To:** "Yura" | Typographical |
| 88 | 15 | **From:** "John Ide"<br>**To**: "John Eide" | Typographical |
| 88 | 17 | **From:** "John Ide"<br>**To**: "John Eide" | Typographical |
| 88 | 18 | **From:** "John Ide"<br>**To**: "John Eide" | Typographical |
| 89 | 20 | **From:** "Ura"<br>**To:** "Yura" | Typographical |
| 89 | 224 | **From:** "Ura"<br>**To:** "Yura" | Typographical |
| 91 | 3 | **From:** "Ura"<br>**To:** "Yura" | Typographical |
| 92 | 5 | **From:** "Ura"<br>**To:** "Yura" | Mistranscription |
| 94 | 18 | **From:** "analogous"<br>**To;** "anonymous" | Mistranscription |
| 120 | 12 | **From:**<br>**To:** ██████████ | Mistranscription |
| 120 | 15 | **From:**<br>**To:** ██████████ | Mistranscription |
| 120 | 20 | **From:**<br>**To:** ██████████ | Mistranscription |
| 121 | 5 | **From:**<br>**To:** ██████████ | Mistranscription |
| 123 | 16 | **From:** "94806"<br>**To:** "954806" | Mistranscription |
| 129 | 25 | **From:** "be identified"<br>**To:** "we identified" | Mistranscription |
| 130 | 10 | **From:** "AC prayer"<br>**To:** "A/C priv" | Mistranscription |
| 134 | 2 | **From:** "is not a real"<br>**To:** "does not reveal" | Mistranscription |
| 159 | 1 | **From:** "writ at large"<br>**To:** "was at large" | Mistranscription |
| 159 | 9 | **From:** "VR"<br>**To:** "via our" | Mistranscription |
| 159 | 24 | **From:** "EVP"<br>**To:** "EDPB" | Mistranscription |

| 173 | 3 | **From**: "Signals – Ad leadership alt updates, A/C Priv"<br>**To**: "Signals – Ads Leadership (ALT) Updates – A/C Priv" | Mistranscription |
|---|---|---|---|
| 173 | 23-24 | **From**: "dePauly, Tom hand opened your conversation"<br>**To**: "Deepali Tamhane opened your conversation" | Typographical |
| 174 | 3 | **From**: "del Pauly"<br>**To**: "Deepali" | Typographical |
| 194 | 20 | **From**: "PAI"<br>**To**: "PII" | Typographical |
| 196 | 25 | **From**: "Alley (PR)s, manages"<br>**To**: "All (PR) mentioned that" | Mistranscription |
| 198 | 19 | **From**: "Lieu chen"<br>**To**: "Lu'chen" | Typographical |
| 202 | 20-21 | **From**: "Clem Acklemay Ageen, Mary Ku, Tau Backlin, and George Lee"<br>**To**: "Clem Akomea-Agyn, Mary Ku, Tao Baecklund, and George Lee" | Typographical |
| 203 | 22 | **From**: "what officially role."<br>**To**: "what official role." | Mistranscription |
| 205 | 13 | **From**: "wholistic"<br>**To**: "holistic" | Typographical |
| 205 | 18 | **From**: "Trust hearing"<br>**To**: ███████ | Typographical |
| 206 | 1-2 | **From**: "if we knew them from the three years were more."<br>**To**: "if we knew them for three years, we would give them more." | Mistranscription |
| 207 | 1 | **From**: "wholistic"<br>**To**: "holistic" | Typographical |
| 207 | 11 | **From**: "wholistic"<br>**To**: "holistic" | Typographical |
| 211 | 6 | **From**: "Try and keep it simple."<br>**To**: "Tried to keep it simple." | Mistranscription |
| 212 | 16 | **From**: "Fred, I took a swag at estimating the true"<br>**To**: "Fred Leach, I took a swag at estimating the true" | Mistranscription |
| 217 | 23 | **From**: "MT"<br>**To**: "MZ" | Mistranscription |
| 224 | 8 | **From**: "coms"<br>**To**: "communications" | Mistranscription |
| 223 | 20 | **From**: "Chin-Mae"<br>**To**: "Chinmay" | Typographical |
| 224 | 5 | **From**: "Chin-Mae"<br>**To**: "Chinmay" | Typographical |

| 225 | 15 | **From**: "Chin-Mae"<br>**To**: "Chinmay" | Typographical |
| 226 | 10 | **From**: "Chin-Mae"<br>**To**: "Chinmay" | Typographical |
| 227 | 9-10 | **From**: "Chin-Mae"<br>**To**: "Chinmay" | Typographical |
| 242 | 22-243:2 | **From**: "Graham, let's say you already have a ton of first-party data, this is pretty material data. We are saying material change for you to match to FB right now, we use CA to do. And then I think what we are saying at min, we would have to ask a user, to comes suggesting data and using if for marketing."<br>**To**: "Graham: Let's say you already have a ton of 1st party data, this is a pretty material data. We are saying material change for you to match that to FB right now, we use CA to do that. I think what we are saying at min, we would have to as a user, 'are you comfortable with us digesting data and using it for Marketing.'" | Mistranscription |
| 244 | 2-6 | **From**: "What we have to commit to a user is nothing to associate individually without your permission."<br>**To**: "What we have to commit to a user is nothing gets associated with you individually without your permission" | Mistranscription |

## CERTIFICATE OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed by:

*Graham Mudd*

1C9B6FE6B516459

Graham Mudd

28-Apr-2025 | 7:04 PM BST

_____

Date