Proposed Redacted
Version of Exhibit 16
(Dkt. No. 1154-17)

# EXHIBIT 16

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN FRANCISCO DIVISION

4    IN RE META PIXEL HEALTHCARE   ) Case No.  3:22-cv-3580-WHO (VKD)
     LITIGATION                    )
5                                  )
                                   )
     _____  )
6                                  )
     This Document Relates to:     )
7    All Actions.                  )
     _____  )
8

9            CONFIDENTIAL VIDEOTAPED 30(b)(6) DEPOSITION OF

10                           FRED LEACH

11                      Palo Alto, California

12                     Monday, May 16, 2025

13

14

15                REPORTED BY: Derek L. Hoagland

16                      CSR No. 13445

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 2

1                     UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                        SAN FRANCISCO DIVISION

4    IN RE META PIXEL HEALTHCARE   ) Case No.  3:22-cv-3580-WHO (VKD)

     LITIGATION                     )

5                                   )

     _____ )

6                                   )

     This Document Relates to:      )

7    All Actions.                   )

     _____ )

8

9

10

11        VIDEOTAPED 30(b)(6) Deposition of Fred Leach, taken

12        before Derek L. Hoagland, a Certified Shorthand Reporter

13        for the State of California, commencing at 9:44 a.m.,

14        Monday, May 16, 2025, at Gibson Dunn & Crutcher, LLP,

15        310 University Avenue, Palo Alto, California 94301.

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 3
 1      APPEARANCES:
 2      COUNSEL FOR PLAINTIFFS AND THE PUNITIVE CLASS
        SIMMONS HANLY CONROY
 3      One Court Street
        Alton IL 62002
 4      BY:  JAY BARNES, ESQ.
             618.693.3104
 5           jaybarnes@simmonsfirm.com
 6      -- AND --
 7      GIBBS MURA LAW GROUP
        1111 Broadway Suite 2100
 8      Oakland CA 94607
        BY:  HANNAH JENSEN, ESQ.
 9           hj@classlawgroup.com
10      -- AND --
11      KIESEL LAW LLP
        8648 Wilshire Blvd
12      Beverly Hills CA 90211
        BY:  JEFFREY KONCIUS, ESQ.
13           310.854.4444
             koncius@kiesel.law
14
        COUNSEL FOR DEFENDANT AND WITNESS
15      GIBSON DUNN & CRUTCHER, LLP
        One Embarcadero Center, Suite 2600
16      San Francisco, California 94111
        BY:  KYLAH TURNER, ESQ.
17           415.393.8226
             kturner@GibsonDunn.com
18           -- and --
        BY:  TAYLOR BERNSTEIN, ESQ.
19
        -- AND --
20
        LATHAM & WATKINS, LLP
21      555 Eleventh Street, NW, Suite 1000
        Washington DC 20004
22      BY:  ANDREW CLUBOK, ESQ.
             202.637.3309
23           andrew.clubok@lw.com
24      ALSO PRESENT
        Nikki Stitt-Sokol, in-house Counsel at Meta
25      Vinny Bezera, Videographer
```

Page 8

1    appearances and affiliations for the record, beginning

2    with the noticing attorney.

3            MR. BARNES:  Thank you.  Jay Barnes,

4    Simmons Hanly Conroy, Hannah Jensen, Gibbs Mura Law

5    Group, and Jeffrey Koncius of the Kiesel Law Firm here

6    on behalf of the plaintiffs and the punitive class.

7            MR. CLUBOK:  Good morning.  Andrew Clubok from

8    Latham & Watkins LLP on behalf of the defendant and

9    witness.

10            MS. TURNER:  Kylah Turner of Gibson Dunn &

11    Crutcher.  And also, my colleague Taylor Bernstein is on

12    Zoom.

13            MS. STITT-SOKOL:  Nikki Stitt-Sokol, Director

14    and Associate General Counsel at Meta Platforms, Inc.

15            THE VIDEOGRAPHER:  Will the court reporter

16    please introduce yourself and swear in the witness.

17            THE REPORTER:  Yes.  My name is Derek Hoagland.

18    My CSR is 13445.

19            MR. BARNES:  Thank you.

20            Mr. Leach, I am going to hand you what we're

21    going to mark as Exhibit 634.

22            (Exhibit No. 634 marked for identification.)

23            (Whereupon, the deponent is duly sworn by the

24    court reporter.)

25    ///

CONFIDENTIAL

Page 44

1    language on pages 29 and 30 that Meta believes makes a

2    difference in its testimony about the disclosure?

3           MR. CLUBOK:  Objection to the form of the

4    question.

5           THE DEPONENT:  I think this one is a bit easier

6    to understand from -- it looks less like a, you know,

7    legal paragraph and more like something -- like a

8    website you might read.  So I think it is a bit easier

9    to understand.

10   BY MR. BARNES:

11   Q.     Okay.  Anything else?

12   A.     No.

13   Q.     Okay.  Did you review Meta's cookie statement in

14   preparation for today's deposition?

15          You can put that exhibit aside.

16   A.     The whole --

17   Q.     Yeah, for now.

18   A.     -- five-pound -- five-pound 636?

19          MR. BARNES:  Yeah, put 636 aside.  I'm going to

20   hand you what we're going to mark as Exhibit 637.

21          (Exhibit No. 637 marked for identification.)

22          MR. BARNES:  Counsel, it's the -- we have the

23   black-and-white version.  He gets the fancy color

24   version.

25          MR. CLUBOK:  This one?

Page 45

1          MR. BARNES:  Correct.

2          MR. CLUBOK:  Thanks.

3    BY MR. BARNES:

4    Q.     Is it Meta's belief that the cookie statement is

5    part of its contract with users?

6    A.     I think we require users to accept the cookie

7    statement in order to use our services, so yes.

8    Q.     Can you -- can you please show the jury

9    specifically in the cookie statement where Meta obtained

10   consent to collect, process, or use information from

11   healthcare providers?

12          Let me pause, and I'm going to restate the

13   question.  I'm going to make a representation about this

14   exhibit, same representation as the prior two.  This is

15   a combined -- this is all of the cookie policies Meta

16   produced combined into a single exhibit.

17          With that preface, can you please show the jury

18   specifically in the cookie statement where Meta obtained

19   consent to collect, process, or use information from

20   healthcare providers?

21          MR. CLUBOK:  Objection to the form of the

22   question.

23          THE DEPONENT:  So in the exhibit, let's go to 3

24   of 67.  "Advertising, Recommendations, Insight and

25   Measurement," that's the heading.

CONFIDENTIAL

Page 46

1          "We use cookies to help us show ads and to make

2     recommendations for businesses and other organizations

3     to people who may be interested in the products,

4     services, or causes they promote."

5     BY MR. BARNES:

6     Q.      Where would a person who is a patient of the

7     healthcare provider look at that to understand that Meta

8     is collecting, processing, and using information

9     associated with communications with their healthcare

10    provider?

11          MR. CLUBOK:  Objection to the form of the

12    question.

13          THE DEPONENT:  Again, I can't specify sort of

14    how any individual person would respond or what

15    inferences they would make, but I think it's pretty

16    clear that this is a pretty broad encompassing statement

17    that would include healthcare providers.  I think that

18    they would pretty clearly fall under the category of

19    businesses and other organizations, which talks about

20    products, services, and causes.

21    BY MR. BARNES:

22    Q.      Is there anything, in Meta's estimation, that

23    this paragraph would not cover?

24          MR. CLUBOK:  Objection to the form of the

25    question.

CONFIDENTIAL

Page 47

```
 1              THE DEPONENT:  I think it's primarily focused on
 2      advertising and businesses and other entities that
 3      would -- would advertise, so there are lots of entities
 4      that don't fit under that grouping that wouldn't be
 5      covered.
 6      BY MR. BARNES:
 7      Q.     Okay.  With respect to advertisers, can you
 8      identify any advertiser who Meta believes this would not
 9      cover, any type -- sorry.  Any type of advertiser whom
10      Meta believes this would not cover?
11      A.     No.
12      Q.     By agreeing to these -- this cookie policy, it
13      is Meta's belief that users have written Meta a blank
14      check to collect information from advertisers?
15              MR. CLUBOK:  Objection to the form of the
16      question.
17              THE DEPONENT:  No.  Advertisers are required to
18      comply with the laws in their jurisdiction, even the
19      norms, I believe, in our commercial terms of their -- of
20      their industry for what they collect and what they send,
21      not just -- not just to Meta, but to -- to anyone, and
22      then we have commercial terms that requires -- that
23      additionally requires that.  So in no way, shape, or
24      form does this indicate any sort of blank check.
25      ///
```

CONFIDENTIAL

Page 49

```
 1      BY MR. BARNES:

 2      Q.      I apologize.  From Facebook, rather than Meta?

 3              MR. CLUBOK:  Objection to the form of the

 4      question.

 5              THE DEPONENT:  I am -- so this cookie policy

 6      talks about how to use cookies, and that it's used in

 7      association with various aspects of advertising, but

 8      there's also an aspect of site features and services,

 9      that they can be part of different websites, different

10      performance aspects of the websites.  And so, you know,

11      subject to the businesses implementing everything

12      properly, users, when they're using Meta's services,

13      agree to the cookie policy.

14              MR. CLUBOK:  At some point when --

15              MR. BARNES:  Perfect.  Thank you.  Let's take a

16      break.

17              THE VIDEOGRAPHER:  This is the end of Media

18      No. 1.  We are off the record at 10:42 a.m.

19              (A recess transpires.)

20              THE VIDEOGRAPHER:  This is the beginning of

21      Media No. 2.  We are back on the record at 11:06 a.m.

22              MR. BARNES:  Welcome back, Mr. Leach.  You

23      stated just before we went back on the record here that

24      you wanted to add something.  So go ahead.

25              THE DEPONENT:  Yeah.  So going back to 636, we
```

CONFIDENTIAL

Page 50

1    were talking about the differences in the policies over

2    time, and I recalled something, and then I went back and

3    had a chance to check it.  So we can just go to -- let's

4    go to -- I think it's 14 of 362.  It should be the same.

5    And it's -- I'll wait until you get there.

6            MR. BARNES:  Let's wait on your counsel, too.

7            MR. CLUBOK:  Thank you.

8            MR. BARNES:  I'm ready.  He's ready.

9            THE DEPONENT:  Okay.  So it's the section that

10   starts:

11           "Partners receive your data when you visit or

12   use their services or through third parties they work

13   with.  We require each of these partners to have lawful

14   rights to collect, use, and share your data before

15   providing any data to us."

16           So I'll pause there.

17           And then if we go to 30 of 362, that's the one

18   where we -- so this is -- so this one is, I believe,

19   2022.  In the paragraph that's right above, "What if you

20   don't let us collect certain information," I'll read the

21   two sentences there.

22           "These partners collect your information when

23   you visit their site or app or use their services, or

24   through other businesses or organizations they work

25   with.  We require partners to have the right to collect,

CONFIDENTIAL

Page 51

1    use, and share your information before giving it to us."

2           And so the distinction between the two is that

3    in 2022, the word "lawful" is removed, and by not

4    qualifying right with lawful right, it's a more

5    expansive requirement for partners.  So it would, like,

6    have to respect industry norms or other kinds of rights.

7    That's the clarification.

8    BY MR. BARNES:

9    Q.     Okay.  Thank you for that clarification.

10   Let's -- staying on topic 27, I'm going to hand you what

11   we're going to mark as Exhibit 638.

12           (Exhibit No. 638 marked for identification.)

13           MR. BARNES:  The type is small.  And, Counsel,

14   you will see that there's a handwritten Bates number on

15   the bottom.  That's because in printing, somehow the

16   Bates number got removed.

17           And, Mr. Leach, you will see that as well.  I'll

18   tell you the type is small because that's how it was

19   produced.

20   BY MR. BARNES:

21   Q.     Do you recognize this document, Mr. Leach?

22   A.     I think I've seen it before.  I'm going to have

23   trouble placing exactly where it goes.

24   Q.     Okay.  Did you review this document in

25   preparation for today's testimony?

CONFIDENTIAL

1    details about them.  The behavioral information doesn't

2    necessarily convey anything more than, again, just the

3    behavior.

4    BY MR. BARNES:

5    Q.    Is it Meta's testimony that a healthcare

6    provider is better able to identify the people who go to

7    their website without logging in than Meta is?

8         MR. CLUBOK:  Objection to the form of the

9    question.

10         THE DEPONENT:  There's a broad kind of --

11         MR. CLUBOK:  Also, by the way, way outside the

12    scope.

13         THE DEPONENT:  So "identify" is probably the

14    operative word there.  Meta can connect behavior on the

15    Internet from its -- its users back to a Meta profile.

16    That's -- that's it.  That's the -- that's the

17    identification.  And so there are broader connotations

18    of identification, and Meta can't go beyond that.  I

19    don't know about all of the capabilities that -- that

20    any other advertiser could have.  They could potentially

21    have -- you know, if I'm logged out on a website,

22    sometimes I go back to the website, the website says,

23    "Hi, Fred," so -- but I'm not logged in.  So when I

24    click on something, then I've got to log back in.  So --

25    and that I may be a very different sort of persona and

CONFIDENTIAL

Page 60

1    person on that website than I am on one of Meta's

2    properties.

3              So Meta is great at identifying its users, but I

4    would not say that Meta's better at identifying,

5    generally, people than -- than the advertiser is because

6    there's just -- there's to many different ways to go

7    about identifying.  Meta strictly focuses on identifying

8    connecting behavior to its users.

9    BY MR. BARNES:

10   Q.      Okay.  I want to go back to the first question.

11             With respect to row 1, is it Meta's testimony

12   that the filter should apply to this URL, yes or no?

13   A.      The filter has a number of domains that are

14   restricted, and so without consulting that, I think

15   there's a reasonable chance that that domain could be on

16   that list.  But, again, it would also -- I point you to

17   the fact that the filter applies to the information

18   that's sent and merely visiting a website, seeking

19   information, is -- is not sensitive information.

20   Q.      Okay.  So let's try this again.  Let's -- let's

21   assume that hartfordhospital.org was on the list of

22   domains for which the filter would apply.  Would -- or

23   based on the About Sensitive Health Information page,

24   should the filter apply to portions of the URL in row 1

25   or not?

CONFIDENTIAL

Page 131

1     seeks to honor the commitments that it makes to its

2     users.

3     BY MR. BARNES:

4     Q.     Let's go to topic 33, please, which is labeled

5     "Contract."

6              MR. BARNES:  Do you want to take a break?

7              MR. CLUBOK:  Well, I was thinking about it.

8              MR. BARNES:  Yeah, let's do it.  Let's do it.

9              MR. CLUBOK:  If you're switching topics, then it

10    wouldn't be bad.

11             MR. BARNES:  Let's take a break.

12             MR. CLUBOK:  Thanks.  Appreciate it.

13             THE VIDEOGRAPHER:  This is the end of media

14    No. 3.  We are off the record at 2:10 p.m.

15             (A recess transpires.)

16             THE VIDEOGRAPHER:  This is the beginning of

17    Media No. 4.  We are back on the record at 2:22 p.m.

18    BY MR. BARNES:

19    Q.     Mr. Leach, we are going to move on to topic 33.

20    Can you please identify for the jury all actions Meta

21    took to require partners to have lawful rights or the

22    right to share user data before providing any data to

23    Meta?

24    A.     Yeah.  The privacy policy clearly discloses its

25    use of data, including data sent by third parties, and

CONFIDENTIAL

Page 132

1    then also the terms of service that govern the use of

2    Facebook Messenger and the other products, features,

3    apps, services, technology, and software, that Meta

4    offers.  And there are various other communications

5    about it.

6    Q.      And, for the record, you're reading from the

7    notebook again.  Is that correct?

8    A.      I looked at the notebook, read a couple of

9    items, but did not -- I would say half of it was just

10   from top of my head.

11   Q.      Okay.  Fair enough.

12           Okay.  Is there anything else you can identify

13   for the jury about actions Meta took to require partners

14   to have lawful rights or the right to share data before

15   providing any data to Meta?

16   A.      So there's -- again, there's the terms of

17   service, there's the business tools, there's all of the

18   things that we have covered previously.  We have

19   filtration systems that we have put in over time, block

20   lists.  We've got core setup.  We've got all of those

21   sort of different layers that over time have improved

22   the way that we have been helping advertisers, you know,

23   continually understand and reinforce what they shouldn't

24   send to us, and then, in some cases, augmenting that

25   with technology to block things that we think shouldn't

CONFIDENTIAL

Page 133

1    be coming in.

2    Q.    Let me go to the second bullet point there.

3          Can you please identify for the jury all actions

4    Meta took to employ dedicated teams around the world,

5    work with external service providers, partners, and

6    other relevant entities and develop advanced technical

7    systems to detect potential misuse, harmful conduct

8    towards others, and situations where Meta may be able to

9    help support or protect the community, including to

10   respond to reports of potentially violating conduct --

11   conduct -- content?

12         MR. CLUBOK:  Objection to the form of the

13   question.

14         THE DEPONENT:  So again, there are some elements

15   of the terms of service that really govern this.  We

16   have, as -- as it notes, kind of teams around the world

17   that work with advertisers.  We have partnerships with

18   folks that work with external service providers, as well

19   as other, you know, trade entities.  You know, we talked

20   earlier about the measurement council, and many of those

21   folks are on various trade entities, whether it be the

22   Association of National Advertisers in the United States

23   or other similar entities around the world.  We have

24   also put together the internal resources for developers,

25   the data use security guide about how to best use the

CONFIDENTIAL

Page 134

1    business tools, and -- yeah.

2    BY MR. BARNES:

3    Q.      You test -- stated a second ago, trade entities

4    and the measurement council with various entities.

5           Are there any healthcare providers on those

6    trade entities or the measurement counsel?

7    A.      With the measurement counsel, I don't know if

8    there are.  I don't believe there are specific

9    healthcare advertisers.  There's representation from the

10   major agency holding companies who certainly are engaged

11   with healthcare providers of the various trade

12   associations around the world.  I can't say specific

13   who's on their enrollment lists.  I would have to

14   believe that the Association of National Advertisers

15   includes at least one healthcare provider, if not

16   several.

17   Q.      I would have to believe, you would acknowledge

18   you're speculating and you don't know the list?

19          MR. CLUBOK:  Objection to the form of the

20   question.

21          THE DEPONENT:  I -- I do not know the list of

22   all of the advertisers on the various trade bodies.

23   What I'm referencing, though, is they're very fairly

24   well-known trade bodies.  And, you know, healthcare in

25   the United States is a -- is a well-known part of our

CONFIDENTIAL

Page 135

1    society, and so, sure, speculating that the two overlap.

2    But I'm not too worried about the speculation.

3    BY MR. BARNES:

4    Q.    Do you have any relationships -- does Meta

5    maintain relationships with the American Hospital

6    Association?

7    A.    I am not aware of any engagements there, but

8    it's possible.

9    Q.    33C, is there anything else the jury should be

10   aware of regarding discussions or agreements with

11   healthcare providers regarding the use of the Pixel on

12   healthcare provider websites?

13        MR. CLUBOK:  Objection to the form of the

14   question.

15        THE DEPONENT:  I think we've covered everything.

16   BY MR. BARNES:

17   Q.    All right.  Let's move on to topic 18.

18        Question 1 for topic 18 is:  Please identify all

19   settings or controls that are relevant for class member

20   consent.

21   A.    So we've talked about one of them, the off-Meta

22   technologies that was formerly known as off-Facebook

23   activity.  And it allows users to control their

24   disconnect off Facebook activity that's been or would be

25   associated with their Facebook account historically

CONFIDENTIAL

1   ████████████████████████████████████

█       ████████    And then they're also not eligible for

3   automatic advanced matching.

4   Q.      When did the restriction on automatic --

5   automatic advanced matching occur?

6   A.      My understanding is that that was from the

7   initial rollout of automatic advanced matching.

8   Q.      Does Meta agree that subscribed button click

9   communications relating -- were being sent from

10  healthcare provider domains to Meta in June of 2022?

11  A.      The -- that feature was not blocked in sensitive

12  verticals until 2023.  I don't have specific information

13  about it being provided in June of '22.

14  Q.      Let me back up to core setup.

15          Meta agrees core setup still sends the domain

16  name, correct?

17  A.      Correct.

18  Q.      Does core setup still send the subdomain name?

19  A.      Can you be specific about what you mean by sub?

20  Q.      By sub, I mean information that -- I --

21  A.      Let me help.

22  Q.      Yeah.

23  A.      I will help on a couple things.

24          So the domain name is all that's sent.

25  There's -- so, for example, a subdomain, sometimes I --

CONFIDENTIAL

Page 294

1                           REPORTER'S CERTIFICATE

2

3      STATE OF CALIFORNIA            )    ss.

4      I, DEREK L. HOAGLAND, CSR #13445, State of California,

5      do hereby certify:

6      That prior to being examined, the witness named in the

7      foregoing proceeding was by me sworn to testify to the

8      truth, the whole truth and nothing but the truth;

9      That said proceeding was taken down by me by stenotype

10     at the time and place therein stated and thereafter

11     transcribed under my direction into computerized

12     transcription.

13     I further certify that I am not of counsel nor attorney

14     for nor related to the parties hereto, nor am I in any

15     way interested in the outcome of this action.

16     In compliance with section 8016 of the Business and

17     Professions Code, I certify under penalty of perjury

18     that I am a certified shorthand reporter with license

19     number 13445 in full force and effect.

20     Witness my hand this July 1, 2025.

21

22                         DEREK L. HOAGLAND, CSR #13445

23

24

25

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | Case No. 22-cv-03580 |

## ERRATA SHEET FOR THE TRANSCRIPT OF
## JUNE 16, 2025 DEPOSITION OF FRED LEACH

| Page(s) | Line(s) | Change | Reason |
|---|---|---|---|
| 1 | 9 | **From:** "30(b)(6)"<br>**To:** "30(b)(6) and 30(b)(1)" | Clarification |
| 2 | 11 | **From:** "30(b)(6)"<br>**To:** "30(b)(6) and 30(b)(1)" | Clarification |
| 8 | 23-24 | The language in lines 23-24 should be before the text that appears in lines 19-22. | Mistranscription |
| 49 | 6 | **From:** "how to"<br>**To:** "how we" | Mistranscription |
| 81 | 11 | **From:** "business management"<br>**To:** "business manager" | Mistranscription |
| 82 | 6 | **From:** "office Facebook activity"<br>**To:** "Off-Facebook Activity" | Typographical |
| 82 | 25 | **From:** "Yentow Lee"<br>**To:** "Yantao Li" | Mistranscription |
| 83 | 22 | **From:** "WAISTE, W-A-I-S-T-E"<br>**To:** "WAIST, W-A-I-S-T" | Mistranscription |
| 84 | 20 | **From:** "Yentow Lee"<br>**To:** "Yentao Li" | Mistranscription |
| 107 | 19 | **From:** "snot"<br>**To:** "not" | Typographical |
| 112 | 18-20 | **From:** "THE DEPONENT.: ....Do you mean..."<br>**To:** MR. BARNES: "Do you mean you're not aware -- by not aware, of, do you mean..." | Clarification |
| 118 | 14 | **From:** "Pixel Health 0015335011"<br>**To:** "PIXEL  HEALTH001335011" | Mistranscription |
| 119 | 17 | **From:** "DIY"<br>**To:** "DYI" | Mistranscription |
| 120 | 11 | **From:** "DIY"<br>**To:** "DYI" | Mistranscription |
| 138 | 2 | **From:** "back to topic"<br>**To:** "back to the topic" | Typographical |
| 138 | 21 | **From:** "consent state is"<br>**To:** "consent settings are" | Mistranscription |

| Page(s) | Line(s) | Change | Reason |
|---------|---------|--------|--------|
| 139 | 7 | **From:** "WAISTE"<br>**To:** "WAIST" | Typographical |
| 139 | 14 | **From:** "WAISTE"<br>**To:** "WAIST" | Typographical |
| 139 | 15 | **From:** "WAISTE"<br>**To:** "WAIST" | Typographical |
| 157 | 13 | **From:** "course setup"<br>**To:** "Core Setup" | Mistranscription |
| 158 | 4 | **From:** "▮▮▮▮▮▮▮▮"<br>**To:** ▮▮▮ | Typographical |
| 158 | 24 | **From:** subscribed button clicks"<br>**To:** "SubscribedButtonClicks" | Typographical |
| 159 | 8 | **From:** subscribed button clicks"<br>**To:** "SubscribedButtonClicks" | Typographical |
| 163 | 9 | **From:** "custom list"<br>**To:** "customer list" | Mistranscription |
| 174 | 3 | **From:** "handled"<br>**To:** "had all" | Mistranscription |
| 176 | 18 | **From:** "WAISTE"<br>**To:** "WAIST" | Typographical |
| 176 | 21 | **From:** "WAISTE"<br>**To:** "WAIST" | Typographical |
| 177 | 8 | **From:** "WAISTE"<br>**To:** "WAIST" | Typographical |
| 192 | 15 | **From:** "They are truly"<br>**To:** "They are not truly" | Mistranscription |
| 219 | 11 | **From:** "THE DEPONENT"<br>**To:** "MR. BARNES" | Mistranscription |
| 227 | 18 | **From:** "PXFNDS"<br>**To:** "PXFN, DS" | Typographical |
| 245 | 3 | **From:** "fall"<br>**To:** "follow" | Mistranscription |
| 245 | 17 | **From:** "question"<br>**To:** "camera" | Mistranscription |
| 248 | 25 | **From:** "Angeli Diya"<br>**To:** "Anjali Dahiya" | Typographical |
| 251 | 24 | **From:** "@angeli"<br>**To:** "@anjali" | Typographical |
| 251 | 24 | **From:** "Angeli to lead -- "should"<br>**To:** "Anjali Dahiya --"to lead—should" | Typographical |
| 252 | 18 | **From:** "Jimmy"<br>**To:** "Jamie" | Mistranscription |
| 256 | 5-6 | **From:** "of the science team"<br>**To:** "of the data science team" | Mistranscription |
| 262 | 19 | **From:** "kind of happy"<br>**To:** "going to happen" | Mistranscription |

## <u>CERTIFICATE OF DEPONENT</u>

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed by:

_Fred Leach_
1549FE5F29E74C8...

Fred Leach

04-Aug-2025 | 5:43 PM BST

Date