# Proposed Redacted Version of Exhibit 56 (Dkt. No. 1154-55)

# EXHIBIT 56

## FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

| **Bates Number** | PIXEL_HEALTH000834324-PIXEL_HEALTH000834325 | PIXEL_HEALTH000834326 |
| --- | --- | --- |
| **Custodian** | Mudd, Graham | Mudd, Graham |
| **Sent Date** | 6/8/2021 1:43 PM | 12/31/9999 4:00 PM |
| **Create Date** | 6/8/2021 1:43 PM | 12/31/9999 4:00 PM |
| **Last Modified Date** | 6/8/2021 1:43 PM | 12/31/9999 4:00 PM |
| **Received Date** | 6/8/2021 1:43 PM | 12/31/9999 4:00 PM |
| **Author** | | |
| **Filename** | RE: 3P Review Doc | PIXEL_HEALTH000834326.pdf |
| **Email From** | Ayan Kayal <ark@fb.com> | |
| **Email Recipients** | Graham Mudd <gmudd@fb.com>;Jill Barzilay <jbarzilay@fb.com> | |
| **Email CC** | | |
| **Email BCC** | | |
| **DOCDATE** | | |
| **File Path** | /PROJECT_PIXELHEALTH_EMAIL_PXLLIT_20240104-144155.7z/PROJECT_PIXELHEALTH_EMAIL_PXLLIT_20240104-144155/PXLLIT-0000562/Mudd_Graham/EMAILS-CHATS/20140414-20230331_FULL/PXLLIT-0000163_001/PXLLIT-0000163_GMudd_PP_WC_Graham Mudd_2_30261/PXLLIT-0000163_GMudd_PP_WC_Graham Mudd_2_21_1.pst/Top of Personal Folders/Inbox | /PIXEL_HEALTH000834326.pdf |

Message

| | |
|---|---|
| **From:** | Ayan Kayal█████████████ |
| **Sent:** | 6/8/2021 1:43:15 PM |
| **To:** | Graham Mudd [gmudd@fb.com]; Jill Barzilay████████████ |
| **Subject:** | RE: 3P Review Doc |
| **Attachments:** | Data Usage Packages - Master Doc (A_C Priv).pdf |

# Redacted - Privileged

**From:** Graham Mudd <gmudd@fb.com>
**Sent:** Tuesday, June 8, 2021 10:48 AM
**To:** Ayan Kayal█████████    Jill Barzilay█████████
**Subject:** Re: 3P Review Doc

# Redacted - Privileged

**From:** Ayan Kayal █████████
**Date:** Tuesday, June 8, 2021 at 10:28 AM
**To:** Jill Barzilay████████████Graham Mudd <gmudd@fb.com>
**Subject:** RE: 3P Review Doc

# Redacted - Privileged

**From:** Jill Barzilay█████████
**Sent:** Tuesday, June 8, 2021 9:35 AM
**To:** Graham Mudd <gmudd@fb.com>; Ayan Kayal█████████
**Subject:** Re: 3P Review Doc

+ @Ayan Kayal ─ **Redacted - Privileged**

**From:** Graham Mudd <gmudd@fb.com>
**Date:** Tuesday, June 8, 2021 at 12:33 PM
**To:** Jill Barzilay█████████
**Subject:** Re: 3P Review Doc

Hey there,

I'd really like to share but I'm concerned about **Redacted - Privileged** If you want to ask legal **Redacted - Privileged**
**Redacted - Privileged**  please feel free.  Happy to share if we can make it work!

G.



**From:** Jill Barzilay ▉▉▉▉▉▉▉▉
**Date:** Tuesday, June 8, 2021 at 7:56 AM
**To:** Graham Mudd <gmudd@fb.com>
**Subject:** 3P Review Doc

Hi Graham,

Great seeing you yesterday!

You mentioned yesterday that the doc for the Mark review when the team proposed moving away from 3P data without consent was one of the best that you've ever seen – is that something you could share? I'd love to read it for my own knowledge of "what good looks like"

Related, we are doing a discussion at the NA product leadership offsite where I expect this to come up – Ning will be there, so wanted to see if you'd like to join as well (Tulika and Meera will be there, but your perspective on this could be valuable also – if not, we can punt to your Q&A).

Thanks!
Jill

    PIXEL_HEALTH000834325

**Goal for Today**: Check in on our ads strategy re: signal loss and make a decision on additional actions and public stances that we can take to help people and our business.

**TLDR**:There were multiple proposals being developed related to ads and data usage. This review consolidates those. The first from ABP proposes changing individually identifiable third party data from opt out to opt in. The second from Policy is a 'clear the decks' proposal that includes the ABP proposal as well as a first party data opt-out and a subscription that removes ads. The revenue impact of each is highly dependent on what you believe will happen with the platforms and regulations . . . as well as how much you believe our moves impact those future changes.

**Context**

We are 14 months into the rearguard strategy for signal loss. Given the continued platform and regulatory changes it's worthwhile to check in.

The strategy (as we wrote at the Feb 2020 Board meeting - full text in appendix):



This strategy is working. Our main business metrics are at record highs (revenue, ad score, active advertisers). We just raised the long range plan significantly. And the long term (2024+) forecasted negative impact of signal loss is now nearly ▮ of our prior forecasts primarily due to our own mitigations (not because the long term state of signal loss is more favorable). And Apple's motivations are now questioned.

Ads has a history of worrying that '*the end of the business as we know it is just around the corner*'. While this doesn't make for great sleep, it is a healthy trait that motivated us to accelerate many of the key mitigations (conversions API, ad formats innovation, and new technology like transfer learning, etc.). We still worry that we are in a major transition centered on privacy/data use . . . where the tailwinds, specifically from COVID accelerating businesses online, have masked the future headwinds. After all, the regulation

1

and platform changes won't stop . . . 1st party data and machine learning are/will be next. However, ABP believes that the measurable trends that we observe don't suggest that we need to 'burn the ships' in our current ads business. Not everyone agrees.

Here's where we are on the strategy:

| ORIGINAL STRATEGY (Feb 2020) | STATUS (Apr 2021) |
|---|---|
| **1. "Control our destiny"** | |
| • Defense: Protect revenue by helping advertisers onboard and use their most valuable offsite signals | Resilient revenue is up from ███ ■■ ███<br>Conversions API is driving (including partnership with Shopify) |
| • Offense: Scale onsite signals that can augment or eventually replace offsite signals (eg, Shops) | Growing new ad formats (click to message; lead ads; shop ads) |
| **2. Rearguard action on ecosystem and regulatory changes** | |
| • Don't sacrifice revenue needlessly | Building products in anticipation of likely legal requirements (basic ads in EU; HUD, etc.)<br><br>Not publicly announcing any "one way doors" |
| • Be proactive where it helps or where there are real public issues | Project Orange re: Apple is working<br>Defense of the business model / personalized ads marketing<br>Privacy-Enhancing Technology<br>COMING LATER: Defense of algorithms/machine learning |

Today's review is about an opportunity to *"be proactive where it helps or where there are real public issues"*.

**Options\***

- **Option 1: Status Quo** - Make changes as required by law or platforms. Known issues included in the preliminary 2021 LRP.
- **Option 2: ABP Recommendation** - Make third party data that is individually identifiable OPT IN (assumes no consent required to anonymize data). Timing is to be determined.

2

PIXEL_HEALTH000834326_0001

- **Option 3: Policy Recommendation** - Option 2 plus test a first party data control that is OPT OUT, and announce that we plan to test Subscriptions that let people opt out of ads altogether. Note this will effectively commit us to launching some type of first party data control globally in the next few years. Timing to be determined.

*\*See GTM section on Page 10 for message framing*
The tables below summarize the options and definitions.



|  | 3PD Individually Identified | 3PD Anonymized (for specific purposes) | 1PD | Subscriptions |
|---|---|---|---|---|
| Option 1: Status Quo Based on 2021 Prelim LRP | | | | |
| Option 2: ABP Recommendation | | | | |
| Option 3: Policy Recommendation | | | | |

**Definitions:**

| Product Option | Definition |
|---|---|
| 3PD | **Individually Identifiable:** Global opt-in for <u>retention or use</u> of individually-identifiable 3PD for all purposes, <u>**excluding**</u> security, fraud, and some integrity purposes. This data includes Data File Custom Audiences (DFCA). Can retain data in |

3

|  | identifiable form for security/fraud if it's targeted to cases where there's reason to suspect a violation (not all traffic), and if data is segregated/access restricted, and not used for other purposes. Explicitly, this is not a collection control. |
|---|---|
|  | **Anonymized:** Data can be collected for users who do not opt in to individual data and used for measurement or to build/improve models if it is immediately aggregated and anonymized and for this new data, we do not have access to new individually identifiable data and cannot associate new data with specific people or devices.<br><br>A public announcement would be a commitment to launch the 3PD consent, although timing of the launch and specifics about its scope could be less firm. |
| 1PD | The baseline assumption is that the 1PD control is Basic Ads, a product concept that was approved for building in the January privacy conversations. Basic Ads currently relies solely on three input tiers: demographic data (age, gender, location), a small set of interests the user can control, and data about a user's ad interactions. Data about the user's ad interactions can only be used to default the set of interests applied to a user and as labels to train models. No other data from this user can be used for optimization purposes, though a limited set of additional inputs can be used for security/fraud, some TBD integrity purposes, and measurement. To be clear, this control does not mean zero use of first party data for ads.<br><br>A public announcement would be a commitment to explore a 1PD control as opposed to explicitly committing to Basic Ads. This would give us some flexibility in exploring a different approach to the 1PD control if we desired, but it would essentially lock us into launching some type of 1PD control globally in the next couple of years. |
| Subscriptions | There have been multiple versions of subscriptions considered in the past. For the purposes of this discussion, we are referring to a no-ads subscription that provides controls to turn off ads and all data use for advertising. It would be priced at ▮▮▮ ▮▮ ▮▮▮ (and we assume would increase at the same rate as Ads ARPU).<br><br>A public announcement would be a commitment to explore/test subscriptions. We believe that this would not necessarily commit us to fully launch a subscription product globally. For example, if there wasn't a lot of adoption of a reasonably designed product, it would be reasonable to not move forward. |

## ABP Recommendation

Our strategy states to be "proactive where it helps or where there are real public issues." Our recommendation to make third party data that is individually identifiable OPT IN (assumes no consent required to anonymize data) stems from the belief that it will: (1) Create a better product experience and relationship with people and that it (2) Lowers the chances of a potential downside scenario.

4

**What has Changed?** Our privacy conversations in December did not explicitly discuss our stance on third-party data. Since those conversations, we have gained more clarity on what we expect to happen with 3PD



### Reason #1: The Product Experience
ABP teams believe that moving 3PD to an opt-in status is the right thing to do for people, Facebook and our customers:

- **People:** A great product experience in this space means that data usage should be understandable and/or intuitive to consumers. Today, people do not understand how and why we have access to 3rd party data and, as a result, are increasingly distrustful. Putting this practice explicitly in front of consumers gives them a chance to understand it and for them to make an informed choice.
    - ○ A major company CMO called this "having an adult relationship" with people where they can make an informed decision. And agreed that Apple's current industry standard is not 'informed'. She volunteered to rally the industry with us.
- **Customers:** Moving to an opt-in model for 3PD will require advertisers to make potentially disruptive changes, such as gathering consent from their customers and implementing privacy enhancing technologies (PET) to support sharing data with us. Changes like these are inevitable, but can be made much less disruptive to the degree we can be clear about our long term direction and work with clients collaboratively over a longer time period. The last few changes we've made on this (CCPA, etc.) have been made quickly and would be far better with more planning.
- **Facebook:** Direction of travel in both regulatory and platform realms is for user-level 3PD to be available only by consent. By proactively moving in this direction we can develop the value propositions and consent flows that will help us drive opt-in. In addition, we can more effectively influence the standards of consent (with Google, W3C and regulators) if we embrace the importance of consent for 3rd party data.

### Reason #2: The Downside Scenarios
There are a number of scenarios that are significantly worse than both our current situation or our proposal (Option 2). These scenarios are laid out in the more detailed analysis below.

- We expect that the long-term incremental impact of our proposal is ▮ revenue loss. Given this  in terms of avoidance of the downside scenario for this proposal to be worthwhile.

5

Facebook's public stance here would help consolidate the industry around support for individual consent. While Google has not announced their platform stance on consent yet, their browser/app store is facing pressure from Apple to shore up privacy. ▇▇

▇▇▇▇▇▇     ▇▇▇ ▇▇  ▇▇ ▇     ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇      . Taking a stand helps us head off this scenario.

**Policy Recommendation**  (Policy's full proposal and rationale)

Obtaining consent for 3PD is a worthwhile privacy improvement, but it's seen as something we already have to do -- so it will not materially change our situation or better position us to shape our future obligations. To do that, we need a package of changes that "clears the deck" by addressing the range of concerns we're hearing about our business model. Such a strategy -- which includes **3PD consent**, **1PD control**, and **subscriptions** -- would give us a more credible platform for pushing back on misleading attacks by Apple and Google and for responding to privacy criticism, and because (unlike 3PD alone) it responds to each of the key concerns we're hearing about our impact on people and society.

# Redacted - Privileged

**What has changed?** Even since our last discussion on these issues in 2020, the belief that we're not proactively addressing concerns (in addition to concerns around the WA policy update and recent scraping incident) has led to a push for sweeping restrictions (e.g. EDPB Guidelines, CCPA, DMA and DSA) that go beyond requiring transparency and 3PD controls. This pressure started in Europe, but we're seeing new proposals spread globally, including in California, India, South Korea, South Africa, and Latin America, and we expect more to follow. These new proposals include measures like consent for -- or bans on -- personalized advertising altogether and consent or other data processing restrictions that go beyond ads (and could affect future investments like XR and AI). We're also experiencing heightened calls for Facebook to be broken up, driven by the belief that nothing short of that will change our practices.

**Clearing the decks.** The best chance we have to shift this dynamic is to "clear the decks" by making meaningful changes (outlined in detail here) that combat attacks by Apple and Google on our privacy practices and address many of the concerns we hear (e.g. that we put profits over people, that our platform is purposefully polarizing to keep people engaged so we can serve more ads, and that our ads are manipulative and can reinforce discrimination and bias). An announcement focused solely on **3PD** consent will not be

6

enough. Simplifying our use of **1PD** for ads and providing clearer transparency and control will help with some data use concerns, but it will <u>not</u> fundamentally shift perception because 1PD restrictions are the clear direction of travel already (and even Basic Ads will be viewed by some stakeholders as not going far enough).

Allowing people to **subscribe** and turn off display of ads is the only option under consideration that addresses the broader range of concerns we're hearing. A subscription offering also



if we launch subscriptions in markets where we also launch Basic Ads. Finally, subscription is

# Redacted - Privileged

Legal Recommendation

# Redacted - Privileged

*Note on Litigation.* | **Redacted - Privileged**

# Redacted - Privileged

7

PIXEL_HEALTH000834326_0006

# Redacted - Privileged

8

CONFIDENTIAL

PIXEL_HEALTH000834326_0007

# Redacted - Privileged

9

CONFIDENTIAL

# Redacted - Privileged

10

CONFIDENTIAL

PIXEL_HEALTH000834326_0009

# Redacted - Privileged

11

CONFIDENTIAL

PIXEL_HEALTH000834326_0010

# Redacted - Privileged

Stakeholder Viewpoints

Based on the numbers below:
- In order to take the ABP Recommendation (Option #2), you have to believe
  - a) That our public stance reduces the likelihood that we end up in the downside scenario by even just a little bit (since ███████████████ ). Or
  - b) That we would get to design and control the prompt on our own terms (or influence industry standards for it) which will be better for people and thus have higher opt in
- In order to take the Policy Recommendation (Option #3), you have to believe (1) subscriptions is more likely to be positive to revenue and (2) the downside scenario is highly likely (e.g. 75% or more) and that our public stance is likely to reduce the likelihood of the downside scenario by around 35%. If you think that the downside scenario is unlikely (e.g. less than 25% likelihood), then from a revenue perspective, it is probably not worthwhile to take the recommendation.



12



13

CONFIDENTIAL



14

CONFIDENTIAL



\* Includes                revenue impact due to subscriptions. Assumes            based on comparable products. Impact range would widen with higher adoption depending on ads ARPU of adopters.

\*\* The impact of 3PD aggregated data requiring consent has not been factored in. We do not yet have a methodology to determine this number.

Taking a public stance can influence outcomes despite our recent history. It has in other industries:

- The establishment of the ESRB content ratings systems adopted by video game producers allowed the industry to avoid federal legislation or regulation. It was adopted to address concerns around violent content in video games, and to address the threat of legislation. In 2009, in the FTC's report to Congress, the agency lauded the program, calling it "the strongest" self-regulatory program. The FTC periodically uses mystery shoppers to test the program's effectiveness, but has continued to support it.
- Facebook has found it difficult to modify Apple's stances at all, but others in the industry appear to have more influence. We had pointed out issues with supporting advertisers who did not have their own domain, and suggested public suffixes as a solution. Apple did not respond to our feedback, but as others came onboard, particularly Shopify, Apple decided to support public suffixes. Working with others in the industry conceivably leads to more influence over Apple.

More examples can be found at:

Go-To-Market Specifics (IF we choose one of the options)

**External Announcement Approach**

If we select Option 2, our go-to-market will be                                    . We'll target an announcement at the end of H1 and try to secure support from influential advertisers and industry groups. Our goal would be to communicate our shift towards opt-in for user-level third party data so that we can prepare our customers and influence industry standards for consent and privacy enhancing technologies. If we select Option 3, our go-to-market will be                                and the announcement will occur in H2. In this case, our goal would be significantly more ambitious -- to begin to 'turn the page' on our privacy reputation with all audiences.

15

**Potential Key Messages (Not Final)**

- Personalized ads improve the lives of people and especially small businesses that use them to connect with their customers. But with every personalized ad we deliver, people need to feel comfortable with the information that informs it.  At Facebook, we believe data practices and technology must shift to meet people's evolving privacy expectations. Today, we're announcing steps we're taking to evolve our advertising privacy practices through 2021 and beyond.
- **Put people in charge:** To give you more control over the ads you see on Facebook, we will start asking upfront if you want your ads personalized with your information from other websites, apps or businesses. There's been an option to turn this off in ad settings since 2016. But now we won't use this information to personalize the ads you see unless you allow us. *[Addition if we go with option 3] We'll also give you more control over how your activity on Facebook affects the ads you see, and for people who do not wish to see any ads at all, we will test a new subscription version of Facebook.* We know this shift will impact the millions of businesses that rely on our services to make money, so we're committed to working with the industry to make this change in a manner that's thoughtful and causes the least amount of disruption as possible  over the next year.
- **Make marketing more private:** We're investing in new technologies that protect people's privacy by allowing data to be aggregated and anonymized so it doesn't reveal anyone's identity, but can still be useful for machine learning and measurement. This will build on the progress we've already made in this area, like our private matching proposal that leverages double-blind matching technology to deliver insights to third parties without either entity sharing data that can be used to identify an individual person.
- **Build together:** We represent a slice of the ecosystem and need strong partnerships with advertisers, developers, publishers and other platforms to move the industry forward. So, we're working with industry groups, like the IAB and WFA, as well as policymakers, academics and privacy experts around the world to develop shared standards and expectations, which includes open sourcing frameworks that the industry can leverage to develop their own privacy solutions.

**Potential Hard Questions**

**Q: Isn't this change what Apple was trying to achieve with iOS14?**
We have never argued for maintaining the status quo. In fact, we built industry leading privacy controls into our products years ago, and we give consumers real choice and control in how their data is used. But we believe industry collaboration is critical to evolving and improving privacy in ways that limit the collateral damage to small businesses and the ecosystem of free services that people depend on. We want to set clear expectations and provide adequate notice about changes that will have a significant impact on the millions of businesses that rely on our services. Moreover, we want to give people the opportunity to make informed choices about how their information is used. Unfortunately, Apple has taken a different approach by making unilateral decisions without industry

16

consultation. And we don't consider their prompt a real consumer choice given the framing (they don't even use it for their own products!). We hope they are able to address the ongoing uncertainty about their policy and significant impact on small businesses around the world.

**Q: How does reducing 3rd party data availability support small businesses?**
Small businesses also need to meet evolving consumer expectations around privacy. We are making these changes to empower people with agency over how their information is used, while also ensuring that small businesses can continue to rely on personalized ads for people that allow it. We believe that this is the future direction of the ad-supported internet and are committed to continuing to support small businesses' ability to rely on ad-supported business models. We understand how important it is to them.

Appendix

## 3PD Control Experience

Today, we have more than half a dozen 3PD choices that the users can make, which is already a problem, but a contained problem due to the current opt-out model outside of EU. Some of them are controlled by other parties (e.g. CCPA, iOS14), but even narrowing down to choices we administer, we have three: 3PD surface control, Off-Facebook activity, and ePD cookie control.

Moving to opt-in model implies that we must decide exactly which choice we're presenting the users. And if we make that choice more data restrictive, as a thumb rule it renders any existing less data-restrictive choices obsolete, and we can sunset them, leading to a cleaner product and simpler systems. For example, if our opt-in model offers a choice equivalent to the 3PD control, then we can sunset the (arguably less data-restrictive) 'account association disabled' (AAD) control within Off-Facebook activity.

Our current working proposal for this choice is indeed landing closer to the 3PD control, because preserving privacy-enhanced measurement is critical for the ads product. This is not final yet, and needs to overcome remaining disagreements between ABP, Privacy and the XFN. Pending that, a quick summary of ABP's proposal:
- No use of individually identified data without consent, except for 'integrity' and 'privacy-preserving measurement'.
- 'Integrity' - to be defined.
- 'Privacy-preserving measurement' - refers to a secure computing environment which does not leak individually identified data, and its only outputs are sufficiently anonymized and/or aggregated.

17

If this stands, then the potential to consolidate 3PD controls is probably limited to sunsetting AAD. Converging on a total collection control (e.g. ePD) allows significantly more consolidation, but will critically hurt measurement and the ads product.

## Sizing Assumptions

| Scenario | Key Assumptions for After Google Platform Changes |
|---|---|
| **Option 1: Status quo based on 2021 Prelim LRP** | -3pd opt-in rate: ▮ Apple US / EU, ▮ Apple ROW, 50% Google.<br>-3pd opt out impact ▮ value loss post-mitigation<br>-1pd opt-in rate ▮ opt-in EU, BR, IN.<br>-1pd opt out impact: ▮ incremental value loss (over 3PD impact) |
| **Option 2: ABP recommendation** | Same as Option 1, but timing for 3pd consent may be sooner than LRP |
| **Option 3: Policy Recommendation** | -3pd: Same as Option 2<br>-1pd opt-in rate: ▮ opt in globally (▮ opt out, similar to OFA), ▮ opt-in EU, BR, IN<br>-1pd opt out impact ▮ incremental value loss (over 3PD impact)<br>-Subscriptions: See below* |
| **Downside case** | -3pd: same as Option 1, except 0% opt in for Google.<br>-3pd aggregated data: impact not sized<br>-1pd opt-in rate: ▮ opt in covering ▮ of global revenue<br>-1pd opt out impact: ▮ incremental value loss (over 3PD impact) |

18

\*Subscription Impact Assumptions



Legal Assessment & Recommendation (same as above)

## **Redacted - Privileged**

*Note on Litigation.* **Redacted - Privileged**

# **Redacted - Privileged**

19

CONFIDENTIAL

# **Redacted - Privileged**

20

CONFIDENTIAL

# Redacted - Privileged

21

CONFIDENTIAL

PIXEL_HEALTH000834326_0020

# **Redacted - Privileged**

22

CONFIDENTIAL

PIXEL_HEALTH000834326_0021

# Redacted - Privileged

3PD Control Launch Timing Commitment



23

CONFIDENTIAL

## Our Strategy (as written in Feb 2020 for the Board Meeting)

Our overall ads strategy remains focused on increasing the value that we provide to advertisers through outcome-optimized and efficient ad spend. The strategy to mitigate the technology and regulatory changes has two parts:

1. "Control our destiny" by making our revenue resilient (to 3rd party platform changes) and defensible

1. **Defense:** ████ █████ █████ ████ ██ ███████ ██ █.
   a. Advertisers will continue to have data about their customers and business outcomes that they need to use for marketing purposes, even if the technologies and policies that govern that data evolve.
   b. Migrate advertisers to use our resilient offsite data tracking technology (e.g. direct APIs). Scale adoption through highest spend advertisers that can integrate (e.g. Netflix) as well as through partnerships with commerce platforms (e.g. Shopify) for advertisers that do not have in-house technical resources.
   c. **Redacted - Privileged**

2. **Offense:** ████ █████ ██ ██ █ ████ ████.
   a. In parallel, build new products that generate similar interactions across the marketing funnel for each Ad Objective natively within the Family of Apps (e.g. Lead Generation Ads are now ~██ onsite, where they were ██ offsite 2 years ago). By default, use of onsite data is resilient and defensible because people are logged in and using our apps directly.
   b. Invest in products that provide utility to people, where that utility value aligns with business value (e.g. In-app browser auto-fill, Messenger receipts, Instagram Shopping, Native Checkout in Ads, Travel, Collections, etc.)
   c. Enable businesses and advertisers to share value with people (find deals/discounts/coupons, loyalty programs), so there is an incentive to transact.

2. "Rearguard" action on ecosystem and regulatory changes

1. **Don't sacrifice revenue needlessly.** Avoid making unnecessary unilateral privacy moves that limit the use of offsite data that advertisers rely on now.
   a. Engage the ecosystem in compliant ways (Google/Apple, regulators, publishers, advertisers, industry groups such as W3C) to highlight important advertiser and publisher use cases (e.g. view-through attribution, anti-fraud) and possible solutions.

2. **Be proactive where it helps (2.1.a.) or where there are real public issues**
   a.
   b. **Redacted - Privileged**

24