# Proposed Revised Redacted Version of Appendix Volume 13

# (Dkt. No. 1251-14)

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

**LATHAM & WATKINS LLP**
ANDREW B. CLUBOK (*pro hac vice*)
andrew.clubok@lw.com
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200

MELANIE M. BLUNSCHI, SBN 234264
melanie.blunschi@lw.com
KRISTIN I. SHEFFIELD-WHITEHEAD, SBN 304635
kristin.whitehead@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8129
Facsimile: (415) 393-8095

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE META PIXEL HEALTHCARE LITIGATION

This Document Relates to

All Actions

Case No. 3:22-cv-03580-WHO

**APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**VOLUME 13 – PAGE NOS. 3694-4477**

<u>**FILED UNDER SEAL**</u>

Date: April 22, 2026
Time: 2:00 p.m.
Courtroom 2, 17th Floor

Date Action Filed: June 17, 2022
Honorable William H. Orrick III

## APPENDIX INDEX


| Document | Page Numbers |
|---|---|
| **Volume 1** | |
| **Declaration of Tobias Wooldridge** | 1–17 |
| **Exhibit 1** – Meta's Business Tools Terms in effect from June 17, 2018 through December 9, 2025 | 25–75 |
| **Exhibit 2** – Meta's Customer List Custom Audiences Terms in effect from June 17, 2018 through December 9, 2025 | 76–85 |
| **Volume 2** | |
| **Exhibit 3** – Meta's Commercial Terms in effect from June 17, 2018 through December 9, 2025 | 86–128 |
| **Exhibit 4** – *About prohibited information* (PIXEL_HEALTH000735684) | 129–133 |
| **Declaration of Daniel Rampton** | 133–137 |
| **Declaration of Christopher Weil** | 138–142 |
| **Declaration of Abigail A. Barrera** | 143–173 |
| **Exhibit 5** – Excerpts from the deposition of Jenny Streets on March 25, 2025 | 176–183 |
| **Exhibit 6** – Excerpts from the deposition of Plaintiff Jane Doe IX on March 28, 2025 | 184–230 |
| **Exhibit 7** – Excerpts from the deposition of Plaintiff John Doe III on April 4, 2025 | 231–275 |
| **Exhibit 8** – Excerpts from the deposition of Plaintiff Jane Doe I on April 17, 2025 | 276–324 |
| **Exhibit 9** – Excerpts from the deposition of Plaintiff Jane Doe X on April 18, 2025 | 325–431 |
| **Exhibit 10** – Excerpts from the deposition of Plaintiff Jane Doe IV on April 22, 2025 | 432–475 |
| **Exhibit 11** – Excerpts from the deposition of Plaintiff Jane Doe V on April 30, 2025 | 476–554 |
| **Exhibit 12** – Excerpts from the deposition of Plaintiff John Doe II on May 1, 2025 | 555–598 |
| **Exhibit 13** – Excerpts from the deposition of plaintiffs' expert Hal Singer on October 24, 2025 | 599–605 |
| **Exhibit 14** – Excerpts from the deposition of plaintiffs' expert Kathleen Vohs on October 28, 2025 | 607–617 |
| **Exhibit 15** – Excerpts from the deposition of plaintiffs' expert Richard Smith on November 3, 2025 | 618–633 |
| **Exhibit 16** – Excerpts from the deposition of plaintiffs' expert Todd Zigrang on November 6, 2025 | 634–639 |
| **Exhibit 17** – Excerpts from the deposition of plaintiffs' expert Zubair Shafiq on November 19, 2025 | 640–648 |

| Document | Page Numbers |
|---|---|
| **Exhibit 18** – Meta's Terms of Service, effective April 19, 2018 (PIXEL_HEALTH000415905) | 649–664 |
| **Volume 3** | |
| **Exhibit 19** – Meta's Terms of Service, effective July 31, 2019 (PIXEL_HEALTH000414961) | 665–684 |
| **Exhibit 20** – Meta's Terms of Service, effective October 1, 2020 (PIXEL_HEALTH000416719) | 685–695 |
| **Exhibit 21** – Meta's Terms of Service, effective October 22, 2020 (PIXEL_HEALTH000416895) | 696–708 |
| **Exhibit 22** – Meta's Terms of Service, effective January 1, 2022 (PIXEL_HEALTH000418746) | 709–721 |
| **Exhibit 23** – Meta's Terms of Service, effective July 26, 2022 (PIXEL_HEALTH000419931) | 722–739 |
| **Exhibit 24** – Meta's Terms of Service, effective January 1, 2025 | 740–753 |
| **Exhibit 25** – Meta's Data Policy, effective September 29, 2016 (PIXEL_HEALTH000414004) | 754–759 |
| **Exhibit 26** – Meta's Data Policy, effective August 21, 2020 (PIXEL_HEALTH000416644) | 760–769 |
| **Volume 4** | |
| **Exhibit 27** – Meta's Data Policy, effective January 11, 2021 (PIXEL_HEALTH000417167) | 770–778 |
| **Exhibit 28** – Meta's Data Policy, effective January 4, 2022 (PIXEL_HEALTH000419237) | 779–788 |
| **Exhibit 29** – Meta's Privacy Policy, effective July 26, 2022 | 789–866 |
| **Exhibit 30** – Meta's Privacy Policy, effective January 1, 2023 | 867–944 |
| **Exhibit 31** – Meta's Privacy Policy, effective June 15, 2023 | 945–1044 |
| **Exhibit 32** – Meta's Privacy Policy, effective December 27, 2023 | 1045–1144 |
| **Exhibit 33** – Meta's Privacy Policy, effective June 26, 2024 | 1145–1245 |
| **Exhibit 34** – Meta's Privacy Policy, effective November 14, 2024 | 1246–1338 |
| **Exhibit 35** – Meta's Privacy Policy, effective June 16, 2025 | 1339–1371 |
| **Exhibit 36** – Meta's Cookies Policy, effective April 4, 2018 (PIXEL_HEALTH000415857) | 1372–1380 |
| **Exhibit 37** – Meta's Cookies Policy, effective October 5, 2020 (PIXEL_HEALTH000416815) | 1381–1386 |
| **Exhibit 38** – Meta's Cookies Policy, effective June 23, 2021 (PIXEL_HEALTH000418433) | 1387–1397 |
| **Exhibit 39** – Meta's Cookies Policy, effective January 4, 2022 (PIXEL_HEALTH000419230) | 1398–1404 |
| **Exhibit 40** – Meta's Cookies Policy, effective October 5, 2022 (PIXEL_HEALTH000421435) | 1405–1411 |
| **Volume 5** | |
| **Exhibit 41** – Meta's Cookies Policy, effective June 16, 2023 | 1412–1423 |

| Document | Page Numbers |
|---|---|
| **Exhibit 42** – Meta's Cookies Policy, effective December 12, 2023 | 1423–1438 |
| **Exhibit 43** – Zoomlite Meta Case Study (PIXEL_HEALTH001247780) | 1439–1443 |
| **Exhibit 44** – Braccialetti Aua Meta Case Study (PIXEL_HEALTH001247784) | 1444–1447 |
| **Exhibit 45** – Karla and Co. Meta Case Study (PIXEL_HEALTH001247787) | 1448–1452 |
| **Exhibit 46** – Partner AnalyticaHouse + Advertiser Ipekyol Meta Case Study (PIXEL_HEALTH001247796) | 1453–1456 |
| **Exhibit 47** – Partner Goodway Group + Advertiser TACORI Meta Case Study (PIXEL_HEALTH001247799) | 1457–1460 |
| **Exhibit 48** – Partner Roas Hunter + Advertiser Bruna Meta Case Study (PIXEL_HEALTH001247802) | 1461–1464 |
| **Exhibit 49** – Partner Yatter + Advertiser StreamYard Meta Case Study (PIXEL_HEALTH001247805) | 1465–1468 |
| **Exhibit 50** – Partner Apache Digital, Part of LLYC + Advertiser Havaianas Meta Case Study (PIXEL_HEALTH001247808) | 1469–1472 |
| **Exhibit 51** – Fossil Meta Case Study (PIXEL_HEALTH001247820) | 1473–1476 |
| **Exhibit 52** – Hyundai Motor America Meta Case Study (PIXEL_HEALTH001247823) | 1477–1480 |
| **Exhibit 53** – Wind Creek Bethlehem Meta Case Study (PIXEL_HEALTH001247829) | 1481–1484 |
| **Exhibit 54** – RIMOWA Meta Case Study (PIXEL_HEALTH001247832) | 1485–1488 |
| **Exhibit 55** – Partner Disruptive Digital + Advertiser Yardzen Meta Case Study (PIXEL_HEALTH001247835) | 1489–1492 |
| **Exhibit 56** – Chappell Digital Marketing + Oak & Eden Meta Case Study (PIXEL_HEALTH001247841) | 1493–1496 |
| **Exhibit 57** – Partner Elogia + Advertiser Sophie & Lucie Meta Case Study (PIXEL_HEALTH001247844) | 1497–1500 |
| **Exhibit 58** – Partner Adyogi + Advertiser Kushal's Fashion Jewelry Meta Case Study (PIXEL_HEALTH001247847) | 1501–1504 |
| **Exhibit 59** – Hourglass Cosmetics Meta Case Study (PIXEL_HEALTH001247850) | 1505–1508 |
| **Exhibit 60** – *About Core Setup* (PIXEL_HEALTH000876877) | 1509–1510 |
| **Volume 6** | |
| **Exhibit 61** – Data Use & Security Guide for Meta's Business Tools and Customer List Custom Audiences (PIXEL_HEALTH000626095) | 1514–1626 |
| **Volume 7** | |
| **Exhibit 62** – Email with subject line "Re: Your pixel's events are potentially violating Facebook's Business Tools Terms," dated September 14, 2020 (PIXEL_HEALTH000012725) | 1627–1632 |

| Document | Page Numbers |
| --- | --- |
| **Exhibit 63** – Email with subject line "Re: Netsertive \| Pixel Event Flag," dated October 22, 2020 (PIXEL_HEALTH000154142) | 1633–1644 |
| **Exhibit 64** – Email with subject line "Your pixel's events are potentially violating Facebook's Business Tools Terms," dated October 22, 2020 (PIXEL_HEALTH000019003) | 1645–1647 |
| **Exhibit 65** – Email with subject line "Your pixel's events are potentially violating Facebook's Business Tools Terms," dated November 4, 2020 (PIXEL_HEALTH000003500) | 1648–1652 |
| **Exhibit 66** – Email with subject line "Re: Question on behalf of Client regarding Pixels," dated November 12, 2020 (PIXEL_HEALTH000013275) | 1653–1657 |
| **Exhibit 67** – Email with subject line "Your pixel's events are potentially violating Facebook's Business Tools Terms," dated November 18, 2020 (PIXEL_HEALTH000019168) | 1658–1661 |
| **Exhibit 68** – Email with subject line "Re: Urgent Q: Hashing," dated November 18, 2022 (PIXEL_HEALTH000507938) | 1662–1664 |
| **Exhibit 69** – 2020.08.04 "MBG: Signals Integrity Questions & Feedback" (PIXEL_HEALTH000216392) | 1665–1667 |
| **Exhibit 70** – 2023.09.25 "SHARING HEALTH DATA?" post in MBG: Pixel Questions & Feedback (PIXEL_HEALTH001238832) | 1668–1671 |
| **Exhibit 71** – 2023.10.16 post from Nick Coccia MBG: Pixel Questions & Feedback (PIXEL_HEALTH001238839) | 1672–1674 |
| **Exhibit 72 –** 2023.11.13 Post from Sinead Collins in MBG: Pixel Questions & Feedback (PIXEL_HEALTH001238841) | 1675–1679 |
| **Exhibit 73** – 2024.01.30 Post from Camille Peggs-Dargan in MBG: Pixel Questions & Feedback (PIXEL_HEALTH001238846) | 1680–1683 |
| **Exhibit 74** – 2024.08.29 Post from Emma Fabre in MBG: Signals Integrity Questions & Feedback (PIXEL_HEALTH001238751) | 1684–1686 |
| **Exhibit 75** – "MBG: Pixel Questions & Feedback" dated January 11 (PIXEL_HEALTH000218754) | 1687–1688 |
| **Exhibit 76** – "MBG: Pixel Questions & Feedback" dated April 6 (PIXEL_HEALTH000218946) | 1689–1690 |
| **Exhibit 77** – January 29 Post from Samantha Ellis in Third Party (3P) Additional Data Sharing Restrictions (PIXEL_HEALTH001238827) | 1691–1696 |
| **Exhibit 78** – Defendant Meta Platform, Inc.'s Meta's First Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, dated August 18, 2023 | 1697–1705 |
| **Exhibit 79** – Defendant Meta Platform, Inc.'s Meta's Third Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, dated October 27, 2023 | 1706–1714 |
| **Exhibit 80** – Defendant Meta Platform, Inc.'s Meta's Sixth Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, dated November 22, 2024 | 1715–1721 |

| Document | Page Numbers |
|---|---|
| **Exhibit 81** – Defendant Meta Platform, Inc.'s Eighth Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, dated August 7, 2025 | 1722–1729 |
| **Exhibit 82** – Defendant Meta Platform, Inc.'s Meta's Ninth Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, dated October 31, 2025 | 1730–1737 |
| **Exhibit 83** – Defendant Meta Platform, Inc.'s Meta's Responses and Objections to Plaintiffs' Third Set of Interrogatories, dated December 20, 2024 | 1738–1754 |
| **Exhibit 84** – Plaintiff Jane Doe IV's Second Supplemental Responses and Objections to Meta Platforms, Inc.'s First Set of Interrogatories, dated October 29, 2024 | 1755–1815 |
| **Exhibit 85** – Plaintiff John Doe II's Second Supplemental Responses and Objections to Meta Platforms, Inc.'s First Set of Interrogatories, dated October 29, 2024 | 1816–1878 |
| **Exhibit 86** – Plaintiff Jane Doe I's Responses and Objections to Meta Platforms, Inc.'s Second Set of Interrogatories, dated January 6, 2025 | 1879–1892 |
| **Exhibit 87** – Plaintiff Jane Doe IV's Responses and Objections to Meta Platforms, Inc.'s Second Set of Interrogatories, dated January 6, 2025 | 1893–1906 |
| **Exhibit 88** – Plaintiff Jane Doe V's Responses and Objections to Meta Platforms, Inc.'s Second Set of Interrogatories, dated January 6, 2025 | 1907–1920 |
| **Exhibit 89** – Plaintiff Jane Doe IX's Responses and Objections to Meta Platforms, Inc.'s Second Set of Interrogatories, dated January 6, 2025 | 1921–1934 |
| **Exhibit 90** – Plaintiff Jane Doe X's Responses and Objections to Meta Platforms, Inc.'s Second Set of Interrogatories, dated January 6, 2025 | 1935–1948 |
| **Exhibit 91** – Plaintiff John Doe II's Responses and Objections to Meta Platforms, Inc.'s Second Set of Interrogatories, dated January 6, 2025 | 1949–1962 |
| **Exhibit 92** – Plaintiff John Doe III's Responses and Objections to Meta Platforms, Inc.'s Second Set of Interrogatories, dated January 6, 2025 | 1963–1976 |
| **Exhibit 93** – Plaintiff Jane Doe V's Third Supplemental Responses and Objections to Meta Platforms, Inc.'s First Set of Interrogatories, dated May 30, 2025 | 1977–2041 |
| **Exhibit 94** – Plaintiff Jane Doe IX's Amended Second Supplemental Responses and Objections to Meta Platforms, Inc.'s First Set of Interrogatories, dated May 30, 2025 | 2042–2103 |

| **Document** | **Page Numbers** |
|---|---|
| **Exhibit 95** – Plaintiff Jane Doe X's Amended Second Supplemental Responses and Objections to Meta Platforms, Inc.'s First Set of Interrogatories, dated May 30, 2025 | 2104–2166 |
| **Exhibit 96** – Plaintiff John Doe III's Third Supplemental Responses and Objections to Meta Platforms, Inc.'s First Set of Interrogatories, dated May 30, 2025 | 2167–2228 |
| **Exhibit 97** – Plaintiff Jane Doe I's Third Supplemental Responses and Objections to Meta Platforms, Inc.'s First Set of Interrogatories, dated June 6, 2025 | 2229–2295 |
| **Exhibit 98** – MyChart Access Logs for Plaintiff John Doe II (PLTFS00001519) | 2296–2322 |
| **Exhibit 99** – Plaintiff Jane Doe X's Group Posts and Comments introduced as Exhibit 311 at Jane Doe X's Deposition (PLTFS00009722) | 2323–2335 |
| **Exhibit 100** – Excerpt from dismissed Plaintiff Jane Doe XI's Download Your Information/Download Your Data *Ads Preferences*, produced by Meta at PIXEL_HEALTH000300433 | 2336–2364 |
| **Exhibit 101** – Excerpt from Plaintiff Jane Doe IV's Download Your Information/Download Your Data Ads *Advertisers you've interacted with*, produced by Meta at PIXEL_HEALTH000300440 | 2365–2371 |
| **Exhibit 102** – Excerpt from Plaintiff Jane Doe XI's Download Your Information/Download Your Data *Advertisers you've interacted with*, produced by Meta at PIXEL_HEALTH000300435 | 2372–2374 |
| **Exhibit 103** – Excerpt from Plaintiff Jane Doe V's Download Your Information/Download Your Data *Advertisers you've interacted with*, produced by Meta at PIXEL_HEALTH000300439 | 2375–2379 |
| **Exhibit 104** – Excerpt from dismissed Plaintiff Jane Doe VI's Download Your Information/Download Your Data *Advertisers you've interacted with*, produced by Meta at PIXEL_HEALTH000300438 | 2380–2383 |
| **Exhibit 105** – July 16, 2015 Facebook Post from Plaintiff Jane Doe IV's Public Facebook Page, introduced as Exhibit 319 at Jane Doe IV's Deposition | 2384–2386 |
| **Exhibit 106** – November 9, 2016 Facebook Post from Plaintiff Jane Doe IV's Public Facebook Page, introduced as Exhibit 320 at Jane Doe IV's Deposition | 2387–2388 |
| **Exhibit 107** – September 10, 2015 Facebook Post from Plaintiff Jane Doe IV's Public Facebook Page, introduced as Exhibit 328 at Jane Doe IV's Deposition | 2389–2390 |
| **Exhibit 108** – March 23, 2021 Facebook Post from Plaintiff Jane Doe V's Public Facebook Page, introduced as Exhibit 418 at Jane Doe V's Deposition | 2391–2399 |

| Document | Page Numbers |
| --- | --- |
| **Volume 8** | |
| **Exhibit 109** – Excerpt from Plaintiff Jane Doe V's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300439, introduced as Exhibit 419 at Jane Doe V's Deposition | 2400–2401 |
| **Exhibit 110** – Excerpt from Plaintiff Jane Doe V's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300439, introduced as exhibit 420 at Jane Doe V's Deposition | 2402–2403 |
| **Exhibit 111** – Excerpt from Plaintiff Jane Doe V's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300439, introduced as exhibit 421 at Jane Doe V's Deposition | 2404–2405 |
| **Exhibit 112** – Excerpt from Plaintiff Jane Doe V's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300439, introduced as Exhibit 422 at Jane Doe V's Deposition | 2406–2407 |
| **Exhibit 113** – March 15, 2016 Facebook Post from Plaintiff Jane Doe V's Public Facebook Page, introduced as Exhibit 423 at Jane Doe V's Deposition | 2408–2409 |
| **Exhibit 114** – Excerpt from Plaintiff Jane Doe V's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300439, introduced as Exhibit 424 at Jane Doe V's Deposition | 2410–2411 |
| **Exhibit 115** – August 22, 2018 Facebook Post from Plaintiff Jane Doe V's Public Facebook Page, introduced as Exhibit 425 at Jane Doe V's Deposition | 2412–2423 |
| **Exhibit 116** – August 23, 2018 Facebook Post from Plaintiff Jane Doe V's Public Facebook Page, introduced as Exhibit 426 at Jane Doe V's Deposition | 2424–2426 |
| **Exhibit 117** – December 12, 2019 Facebook Post from Plaintiff Jane Doe V's Public Facebook Page, introduced as Exhibit 427 at Jane Doe V's Deposition | 2427–2431 |
| **Exhibit 118** – Excerpt from Plaintiff Jane Doe V's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300439, introduced as Exhibit 428 at Jane Doe V's Deposition | 2432–2433 |
| **Exhibit 119** – August 8, 2023 Facebook Post from Plaintiff Jane Doe IX's Public Facebook Page, introduced as Exhibit 160 at Jane Doe IX's Deposition | 2434–2435 |

| **Document** | **Page Numbers** |
|---|---|
| **Exhibit 120** – Excerpt from Plaintiff Jane Doe IX's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300449, introduced as Exhibit 180 at Jane Doe IX's Deposition | 2436–2438 |
| **Exhibit 121** – Excerpt from Plaintiff Jane Doe X's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000688104 | 2439–2443 |
| **Exhibit 122** – Excerpt from Plaintiff John Doe III's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300442, introduced as Exhibit 253 at John Doe III's Deposition | 2444–2445 |
| **Exhibit 123** – Excerpt from Plaintiff John Doe III's Download Your Information/Download Your Data, produced by Meta at PIXEL_HEALTH000300442, introduced as Exhibit 254 at John Doe III's Deposition | 2446–2450 |
| **Exhibit 124** – John Doe II, [redacted] | 2451–2456 |
| **Exhibit 125** – John Doe II, [redacted] | 2457–2459 |
| **Exhibit 126** – John Doe II, [redacted] | 2460–2461 |
| **Exhibit 127** – Declarations of Lisa Badeau (Brigham and Women's Hospital), Steven Singer (Dana-Farber Cancer Institute), and Misty Hathaway (Massachusetts General Hospital) submitted in support of Defendants' Opposition to Plaintiffs' Renewed Motion for a Preliminary Injunction in *Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651 (Suffolk Super. Ct.) | 2462–2494 |
| **Exhibit 128** – Declaration of Darla Vote (Deaconess Illinois Red Bud Regional Hospital), dated June 2, 2025 | 2495–2498 |
| **Exhibit 129** – Declaration of Rob Suárez (BCBS CareFirst), dated May 5, 2025 | 2500–2502 |
| **Exhibit 130** – Declaration of Venkat R. Koshanam (Maryland Health Benefit Exchange), dated May 27, 2025 | 2503–2505 |
| **Exhibit 131** – Declaration of Kelsey Frederick (Abbeville General Hospital), dated May 29, 2025 | 2506–2511 |
| **Exhibit 132** – Declaration of Joseph Hanes (UW Health), dated May 30, 2025 | 2512–2524 |

| Document | Page Numbers |
|---|---|
| **Exhibit 133** – Declaration of Charles Gaddy (Atrium Health), dated June 3, 2025 | 2525–2528 |
| **Exhibit 134** – Declaration of Diana L. Richardson (Lawrence General Hospital), dated June 6, 2025 | 2529–2533 |
| **Exhibit 135** – Declaration of James LaCorte (Blue Cross Blue Shield of North Carolina), dated June 10, 2025 | 2534–2537 |
| **Exhibit 136** – Declaration of Melissa Watson (Providence Portland Medical Center), dated June 13, 2025 | 2538–2543 |
| **Exhibit 137** – Declaration of Jose Quiroz (Ray County Hospital and Healthcare), dated July 8, 2025 | 2544–2546 |
| **Exhibit 138 –** Cigna Online and Mobile Privacy Notice, revised August 2014 | 2547–2555 |
| **Exhibit 139** – Sharp Healthcare Terms of Use, November 20, 2021 | 2556–2559 |
| **Exhibit 140** – Brigham and Women's Hospital Privacy Policy, March 28, 2018 | 2560–2568 |
| **Exhibit 141** – Mount Sinai Privacy Policy, July 26, 2018 | 2569–2575 |
| **Exhibit 142** – Gilead Website Privacy Statement, last updated May 15, 2018 | 2576–2580 |
| **Exhibit 143** – Northwestern Medicine Digital Privacy Policy as of May 29, 2019, effective December 3, 2018 | 2581–2594 |
| **Exhibit 144** – BIDMC Website Terms and Conditions of Use, June 27, 2019 | 2595–2603 |
| **Exhibit 145** – Abbeville General Privacy Policy, May 3, 2020 | 2604–2608 |
| **Exhibit 146** – Adventist Health Website Privacy Policy, August 8, 2020 | 2609–2613 |
| **Exhibit 147** – Gilead Privacy Statement, updated April 30, 2021 | 2614–2627 |
| **Volume 9** | |
| **Exhibit 148** – BIDMC About Our Privacy Policy, September 22, 2022 | 2628–2631 |
| **Exhibit 149** – Essentia Health Website Privacy Policy & Terms of Use (Patient), effective September 28, 2022 | 2631–2640 |
| **Exhibit 150** – Gilead Privacy Statement, effective December 19, 2022 | 2641–2675 |
| **Exhibit 151** – Brigham and Women's Hospital Website Consent and Privacy Policy, last revised September 27, 2021 | 2676–2685 |
| **Exhibit 152** – Currax Pharmaceuticals LLC Privacy Policy, December 8, 2023 | 2686–2690 |
| **Exhibit 153** – Blue Cross Blue Shield of Illinois Website Terms of Use and Privacy Statement, last updated February 15, 2024 | 2691–2696 |
| **Exhibit 154** – Gilead Consumer Health Data Privacy Policy, effective March 12, 2024 | 2697–2705 |
| **Exhibit 155** – Southern Illinois Healthcare Digital Privacy Policy, effective January 31, 2024 | 2706–2714 |

| Document | Page Numbers |
|---|---|
| **Exhibit 156** – MetLife U.S. Cookie Policy, updated May 21, 2024 | 2715–2720 |
| **Exhibit 157** – Sutter Health's Privacy Policy, effective October 25, 2024 | 2721–2734 |
| **Exhibit 158** – Cigna Healthcare Website Privacy Notice, updated February 11, 2025 | 2735–2746 |
| **Exhibit 159** – Mount Sinai Privacy Policy, downloaded September 2, 2025 | 2747–2755 |
| **Exhibit 160** – Currax Pharmaceuticals LLC Privacy Policy, posted October 21, 2024 | 2756–2787 |
| **Exhibit 161** – Essentia Health Website Privacy Policy, September 26, 2020 | 2788–2791 |
| **Exhibit 162** – Email subject line "Update on Facebook / Meta Pixel," dated March 28, 2023, produced by non-party Adventist Health System/West at AdventistHealth_MetaSubp000040 | 2792–2793 |
| **Exhibit 163** – Email with subject line "RE: AH Website Security Inquiry – Meta Pixel," dated June 17, 2022, produced by non-party Adventist Health System/West at AdventistHealth_MetaSubp000047 | 2794–2799 |
| **Exhibit 164** – "Review potentially violating health ads" page from Adventist Health Pixel (Primary)'s Meta Business Account, produced by non-party Adventist Health System/West at AdventistHealth_MetaSubp001570 | 2800–2801 |
| **Exhibit 165** – Email titled "You've sent potentially violating health data to Meta," produced by non-party Adventist Health System/West at AdventistHealth_MetaSubp001571 | 2802–2803 |
| **Exhibit 166** – "Conversions API Gateway" on Adventist Health Pixel (Primary)'s Data Sources page, produced by non-party Adventist Health System/West at AdventistHealth_MetaSubp001693 | 2804–2805 |
| **Exhibit 167** – "Notice of a Privacy Matter" from Atrium Health, produced by non-party The Charlotte-Mecklenburg Hospital Authority d/b/a Atrium Health at CMHA_000017 | 2806–2809 |
| **Volume 10** | |
| **Exhibit 168** – Blue Shield of California's Online and mobile privacy notice, effective March 15, 2022, produced by non-party California Physicians' Service dba Blue Shield of California at Blue Shield_000001 | 2810–2942 |
| **Volume 11** | |
| **Exhibit 169** – Email with the subject line "FW: BCBS NC/Meta," dated July 20, 2023, produced by non-party Blue Cross Blue Shield North Carolina at BCBSNC00075 | 2943–2947 |
| **Exhibit 170** – Email with the subject line "FW: BCBS NC/Meta" and dated July 24, 2023, produced by non-party Blue Cross Blue Shield North Carolina at BCBSNC00104 | 2948–2954 |

| Document | Page Numbers |
|---|---|
| **Exhibit 171** – "How It Works," produced by non-party Blue Cross Blue Shield North Carolina at BCBSNC00110 | 2955–2956 |
| **Exhibit 172** – *Costco Wholesale Corporation Your Privacy Rights*, last updated May 10, 2021, produced by non-party Costco Wholesale Company at COSTCO_META_SUBPOENA 000016 | 2957–2966 |
| **Exhibit 173** – *Currax Pharmaceuticals, LLC Global Privacy Policy*, dated October 21, 2024, produced by non-party Currax Pharmaceuticals, LLC at CUR0000039 | 2967–2970 |
| **Exhibit 174** – Email with subject "Re: Information in your data may go against Meta Business Tools Terms," dated October 11, 2023, produced by non-party Currax Pharmaceuticals, LLC at CUR0000188 | 2971–2974 |
| **Exhibit 175** – Email with subject line "Re: strike 2 and 3 subject," dated October 11, 2023, produced by non-party Currax Pharmaceuticals, LLC at CUR0000191 | 2975–2979 |
| **Exhibit 176** – *Agreement for Agency Services*, dated July 1, 2015, produced by non-party Humana Inc. at HUMANA_000018 | 2980–2998 |
| **Volume 12** | |
| **Exhibit 177** – *Agreement for Agency Services*, dated April 1, 2021, produced by non-party Humana Inc. at HUMANA_000036 | 2999–3034 |
| **Exhibit 178** – *Schedule 001*, dated May 3, 2021, produced by non-party Humana Inc. at HUMANA_000071 | 3035–3053 |
| **Exhibit 179** – April 1, 2025 responses of non-party NYC Health + Hospitals to Meta Platform, Inc.'s March 3, 2025 subpoena | 3054–3096 |
| **Exhibit 180** – Email with subject line "Re: ARS TECHNICA: Facebook is receiving sensitive medical information from hospital websites," dated June 17, 2022, produced by non-party The Ohio State University Wexner Medical System at OSU003172 | 3097–3099 |
| **Exhibit 181** – Email with subject line "Rush Copley Sent You Instructions on Setting up Facebook Pixel," dated July 25, 2016, produced by non-party Rush University System for Health at RUSH_000048 | 3100–3121 |
| **Exhibit 182** – Letter from WakeMed to its patients, dated October 2022, produced by non-party WakeMed Health & Hospitals for Health at WAKEMED 0080 | 3122–3124 |
| **Exhibit 183** – Adobe Analytics Webpage, downloaded November 20, 2025 | 3125–3130 |
| **Exhibit 184** – Google Analytics Tools & Solutions for Your Business, downloaded December 3, 2025 | 3131–3138 |
| **Exhibit 185** – LinkedIn Insight Tag, downloaded November 20, 2025 | 3139–3143 |
| **Exhibit 186** – June 8, 2018 Letter from Facebook to Chairman John Thune, downloaded December 3, 2025 | 3144–3373 |

| Document | Page Numbers |
|---|---|
| **Exhibit 187** – Adventist Health Men's Mental Health Campaign Ad Launched November 2025, downloaded December 3, 2025 | 3374–3376 |
| **Exhibit 188** – Kaiser Permanente Flu Shot Ads Launched November 2025, downloaded December 3, 2025 | 3377–3380 |
| **Exhibit 189** – U.S. Dep't of Health & Hum. Servs., *Use of Online Technologies by HIPAA Covered Entities and Business Associates* (last reviewed June 26, 2024), downloaded December 3, 2025 | 3381–3400 |
| **Exhibit 190** – "haleyandevan.com," downloaded December 7, 2025 | 3401–3407 |
| **Exhibit 191** – "ynotudesigns.com," downloaded December 7, 2025 | 3408–3411 |
| **Exhibit 192** – "zymology21.com," downloaded December 7, 2025 | 3412–3417 |
| **Exhibit 193** – "yoga-doc.com," downloaded December 7, 2025 | 3418–3423 |
| **Exhibit 194** – *On Health*, Houston Methodist, downloaded December 1, 2025 | 3424–3437 |
| **Exhibit 195** – *Health*, Johns Hopkins, downloaded December 1, 2025 | 3438–3441 |
| **Exhibit 196** – Massachusetts General Hospital home page, downloaded December 1, 2025 | 3442–3447 |
| **Exhibit 197** – *Mount Sinai Today*, downloaded December 1, 2025 | 3448–3457 |
| **Exhibit 198** – *Health Matters*, New York Presbyterian, downloaded December 1, 2025 | 3458–3465 |
| **Exhibit 199** – *Health Beat*, UPMC, downloaded December 1, 2025 | 3466–3471 |
| **Exhibit 200** – *About advanced matching for web*, Meta Business Help Center, downloaded December 1, 2025 | 3472–3478 |
| **Exhibit 201** – "atasteforlifewithzarela.com," March 17, 2022 | 3479–3486 |
| **Exhibit 202** – Sam Schechner, *You Give Apps Sensitive Personal Information. Then They Tell Facebook*, The Wall Street Journal (Feb. 22, 2019) | 3487–3496 |
| **Exhibit 203** – Todd Feathers, *et al.*, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022) | 3497–3503 |
| **Exhibit 204** – Brandon Vigliarolo, *Oops, web trackers may have leaked 3 million patients' info*, The Register (Oct. 20, 2022) | 3504–3507 |
| **Exhibit 205** – Jessica Lyons, *96% of US hospital websites share visitor info with Meta, Google, data brokers*, The Register (Apr. 11, 2024) | 3508–3512 |
| **Exhibit 206** – Brigette Hanaker, *Facebook may illegally learn some health information from users*, Top Class Actions (September 29, 2023) | 3513–3519 |
| **Exhibit 207** – January 16, 2024 Facebook post in a Facebook group titled "HIV SUPPORT GROUP," downloaded on December 1, 2025 | 3520–3526 |
| **Exhibit 208** – January 20, 2024 Facebook post in a Facebook group titled "Diabetes support group," downloaded on December 1, 2025 | 3527–3530 |
| **Exhibit 209** – May 7, 2024 Facebook post in a Facebook group titled "Kaiser Permanente SUCKS," downloaded on December 1, 2025 | 3531–3536 |

| Document | Page Numbers |
|---|---|
| **Exhibit 210** – August 29, 2024 Facebook post in a Facebook group titled "HUMANA INSURANCE SUCKS!!!," downloaded on December 1, 2025 | 3537–3540 |
| **Exhibit 211** – September 17, 2024 Facebook post in a Facebook group titled "Bariatric Surgery & Gastric Sleeve Support Group," downloaded on December 1, 2025 | 3541–3544 |
| **Exhibit 212** – April 21, 2025 Facebook post in a Facebook group titled "Weight Watchers New Plan 2025," downloaded on December 1, 2025 | 3545–3547 |
| **Exhibit 213** – October 11, 2025 Facebook post in a Facebook group titled "GallBladder and Gallstones Support Group," downloaded on December 1, 2025 | 3548–3550 |
| **Exhibit 214** – October 15, 2025 Facebook post in a Facebook group titled "POTS Syndrome Dysautonomia Support & Community Group!," downloaded on December 1, 2025 | 3551–3556 |
| **Exhibit 215** – October 28, 2025 Facebook post in a Facebook group titled "Pneumonectomy Support Group," downloaded on December 1, 2025 | 3557–3559 |
| **Exhibit 216** – November 1, 2025 Facebook post in a Facebook group titled "Spinal Fusion Back Surgery Support Group," downloaded on December 1, 2025 | 3560–3567 |
| **Exhibit 217** – November 16, 2025 Facebook post in a Facebook group titled "Medicare Questions and Answers," downloaded on December 1, 2025 | 3568–3570 |
| **Exhibit 218** – November 18, 2025 Facebook post in a Facebook group titled "Psoriasis and Psoriatic Arthritis Peer Support," downloaded on December 1, 2025 | 3571–3577 |
| **Exhibit 219** – Excerpt from event data that was associated with Plaintiff Jane Doe I's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000791266 | 3577–3593 |
| **Exhibit 220** – Excerpt from event data that was associated with Plaintiff Jane Doe V's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000791266 | 3594–3602 |
| **Exhibit 221** – Excerpt from event data that was associated with Plaintiff Jane Doe X's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000791266 | 3603–3635 |
| **Exhibit 222** – Excerpt from event data that was associated with Plaintiff John Doe II's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000791266 | 3636–3644 |
| **Exhibit 223** – Excerpt from event data that was associated with Plaintiff John Doe III's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000791266 | 3645–3653 |

| Document | Page Numbers |
|---|---|
| **Exhibit 224** – Excerpt from ads viewed data associated with Jane Doe I's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000781616 | 3654–3656 |
| **Exhibit 225** – Excerpt from ads viewed data associated with Jane Doe IV's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000781617 | 3657–3671 |
| **Exhibit 226** – Excerpt from ads viewed data associated with Jane Doe V's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000781619 | 3672–3680 |
| **Exhibit 227** – Excerpt from ads viewed data associated with Jane Doe X's Facebook and Instagram accounts, produced by Meta at PIXEL_HEALTH000781623 | 3681–3693 |
| **Volume 13** | |
| **Expert Report of On Amir** | 3694–3939 |
| **Expert Report of Paul Schwartz** | 3940-4017 |
| **Expert Report of John R. Hauser** | 4018-4137 |
| **Expert Report of Steven Tadelis** | 4138-4243 |
| **Expert Report of Georgios Zervas** | 4244-4477 |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | Case No. 3:22-cv-3580-WHO-VKD |

# EXPERT REPORT OF ON AMIR, PH.D.

**DECEMBER 8, 2025**

**TABLE OF CONTENTS**


I. Introduction ....................................................................................................1

A. Qualifications ....................................................................................................1

B. Allegations ....................................................................................................2

C. Assignment ....................................................................................................4

II. Summary of Opinions ....................................................................................................5

III. Empirical Findings of the Portal, Provider Website, and Prescription Surveys ....................7

A. Survey Design and Methodology ....................................................................................8

1. Survey Overview .................................................................... 8
2. Adherence to Survey Best Practices ........................................................ 14
3. Fielding of the Portal, Provider Website, and Prescription Surveys.............. 16

B. Analysis and Results ....................................................................................................17

1. Portal Survey.................................................................... 17
2. Provider Website Survey .................................................................... 20
3. Prescription Survey .................................................................... 24
4. Sensitivity Analyses .................................................................... 27

IV. Dr. Barasz Fails to Acknowledge Consumer Heterogeneity and Relies on Studies That Cannot Be Used to Draw Conclusions About This Case ..........................................27

A. Summary of Dr. Barasz's Opinions ....................................................................................29

B. Consumers Have Heterogeneous Expectations, Understandings, and Perceptions of Online Privacy ....................................................................................31

1. Consumer Expectations and Perceptions Vary Substantially in the Studies Dr. Barasz Cites .................................................................... 33
2. Dr. Barasz Dismisses a Meaningful Segment of Consumers Who Are Comfortable Sharing Data or Trading Privacy for Benefits .......................... 38

C. Findings from the Studies Dr. Barasz Cites Cannot Be Used to Draw Conclusions About This Case....................................................................................42

1. The Cited Survey Populations Are Not Representative................................ 42
2. A Number of the Studies Predate the Proposed Class Period........................ 44

D. Dr. Barasz Failed to Conduct Empirical Research Specific to the Facts of this Case....................................................................................46

V. Dr. Vohs Fails to Acknowledge Perspectives in the Literature that Do Not Support Her Opinions....................................................................................48

A. Summary of Dr. Vohs's Opinions ....................................................................................49


A13-3695

B. Dr. Vohs Fails to Apply Accepted Standards for Conducting Narrative Literature Reviews ....51

C. Dr. Vohs's Opinions Rely on a Narrative Literature Review That Cannot Be Used to Draw Conclusions About This Case ....55

1. Dr. Vohs Fails to Consider Context When Examining and Interpreting the Studies in Her Narrative Literature Review .... 56
2. Dr. Vohs Fails to Acknowledge the Stated Limitations of the Studies in Her Narrative Literature Review .... 66

D. Dr. Vohs's Opinions Fail to Account for Substantial Heterogeneity Across Consumers ....68

1. Consumers Do Not Share a Uniform View of What They Consider to be "Sensitive" Health Information .... 69
2. Consumers Do Not Share Uniform Expectations About How Their Health Information is Used and By Whom .... 76

# I. INTRODUCTION

## A. Qualifications

1. I am the Wolfe Family Presidential Endowed Chair in Life Sciences, Innovation, and Entrepreneurship, and Professor of Marketing at the Rady School of Management, University of California, San Diego. I have been a professor of marketing for the past 23 years. I received my Ph.D. in Management Science and Marketing from the Massachusetts Institute of Technology in 2003. From 2003 to 2005, I was an Assistant Professor of Marketing at Yale University. In 2005, I moved to help found the Rady School of Management at UC San Diego, where I was the first founding member of the marketing department and have served as an associate dean of academic programs. I am currently the Senior Associate Dean of Faculty and Research.

2. I have taught Marketing Management, Pricing, Consumer Behavior, Business Analytics, Marketing Strategy, Market Research, Applied Market Research, Lab to Market, New Venture Design, and Data Driven Decision Making at the MBA and Executive levels, as well as many specific programs for major corporations (both nationally and internationally). I have also taught MBA Marketing Management courses at Northwestern University's Kellogg School of Management, Yale School of Management, Recanati School of Business of Tel Aviv University, IDC Herzelia, and Cheung Kong Graduate School of Business in Shanghai, China. I have further taught Ph.D. level courses in Consumer Decision Making at UC San Diego, Yale School of Management, and INSEAD.

3. I have consulted with numerous companies in many industries on topics relating to market analysis, market research, business strategy, customer insights, branding, customer analysis, new product launches, pricing, promotions, and customer relationship management. I am also the Chief Behavioral Science Officer at Fiverr, Inc., and serve on the advisory boards of several companies.

4. I have published numerous highly cited and award-winning articles in leading marketing, management, and psychology journals, and I am often invited to lecture in leading business school and professional meetings. I have also designed and conducted hundreds of consumer and user surveys, both for my academic research and for consulting work. My professional qualifications are described further in my curriculum vitae, which is attached as **Appendix A**.

5. I have also served as an expert witness in several cases. **Appendix B** lists matters where I have testified as an expert witness.

6. I am being compensated in this action at the rate of $1,150 per hour. In addition, I receive compensation based on the professional fees of Analysis Group, Inc., a financial and economic consulting firm, which has provided support in the preparation of this report under my direction and supervision. My compensation is not contingent upon my findings, the testimony I may give, or the outcome of this litigation.

### B. Allegations

7. Plaintiffs in this litigation are Facebook users who bring this action on behalf of themselves and other Facebook users. Plaintiffs claim that Meta Platforms, Inc. ("Defendant" or "Meta") has acquired their confidential health information from purported healthcare providers using what they call Meta's "collection tools"[1] and that this violates federal and state law.[2] Plaintiffs claim that when an individual uses a website

---

[1] Plaintiffs identify Meta's at-issue "Collection Tools" to include "Meta Pixel, SDK, CAPI, and Custom Uploads." I understand "Custom Uploads" is not a term Meta uses, but that it refers to customer lists uploaded by advertisers. I understand these lists are not The Meta Business Tools, but for simplicity, the references to "Meta Business Tools" in my report include data sent through all the methods Plaintiffs include in their motion for class certification. See Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, United States District Court for the Northern District of California, San Francisco Division, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025 ("Motion for Class Certification"), p. 14; "Create a Customer List Custom Audience," Meta, https://www.facebook.com/business/help/170456843145568, last accessed on December 8, 2025; "The Meta Business Tools," Meta, https://www.facebook.com/business/help/331509497253087, last accessed on December 8, 2025.

[2] Complaint, ¶ 5 ("Plaintiffs are Facebook users who allege that Meta acquires their confidential health information from their healthcare providers and covered entities in violation of federal and state laws.").

A13-3698

or application of a healthcare provider that uses a Meta Business Tool,[3] the Meta Business Tool transmits aspects of their "communications" to Meta.[4] Examples of these "communications" include (but are not limited to) the following:[5]

a. Having a patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from healthcare providers;

b. Having a communication or fact identifying a doctor, condition, or treatment obtained by Meta from healthcare providers; or

c. Having communications with a prescription drug website for which they have a prescription obtained by Meta.

8. Plaintiffs also claim that "Meta collects the transmitted identifiable health information and uses 'cookies' to match it to Facebook users, allowing its healthcare Partners and others to target advertisements both on and off Facebook."[6]

9. "Plaintiffs seek to certify four classes for a Class Period of June 17, 2018 to the present,"[7] ("Proposed Class Period") three of which focus on the information Meta allegedly collected:[8]

---

3 Healthcare apps and websites are those for alleged healthcare providers that use Meta Business Tools, "including the Meta Pixel or Meta Audience Network tools 'to advertise, market, or support their products and services.'" See Complaint, ¶ 3. In this report, I offer no opinion on whether the websites and apps implicated in this lawsuit—which I understand have not been fully identified—are healthcare providers.

4 Complaint, ¶ 6 ("[T]he Meta [Business] Tools transmit the content of their communications to Meta, including, but not limited to: (1) signing-up for a patient portal; (2) signing-in or -out of a patient portal; (3) taking actions inside a patient portal; (4) making, scheduling, or participating in appointments; ( 5) exchanging communications relating to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions; (6) conduct a search on the Meta health partner website; and (7) other information that qualifies as 'personal health information' under federal and state laws."). See also Motion for Class Certification, pp. 2-3.

5 Motion for Class Certification, p. 13. I understand from counsel for Meta that the alleged at-issue data has changed relative to the communications listed in the Complaint.

6 Complaint, ¶ 13.

7 Motion for Class Certification, p. 13.

8 Motion for Class Certification, p. 1 ("Plaintiffs seek certification of three classes that focus on the information Meta collected, and a fourth class focusing on Meta's intrusion onto their devices."). The opinions in this report concern the first three classes, which focus on information Meta allegedly collected, and do not concern the fourth class, which focuses on Meta's alleged intrusions onto Plaintiffs' devices.

a. "***The Patient Status Button-Click Class*** – All Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers."[9]

b. "***The Patient Health Information Class*** – All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above."[10]

c. "***The Prescription Drug Information Class*** – All Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta."[11]

10. Hereafter, I refer to these three proposed classes collectively as the "Proposed Classes."

### C. Assignment

11. I have been asked by counsel for Meta to assess U.S. Facebook users' expectations related to information shared by healthcare providers' and prescription drug companies' websites. In accordance with this assignment, I conducted three surveys specific to the facts of this matter, each related to one of the three Proposed Classes described above. In addition, I have been asked to assess certain opinions presented in expert reports by Dr. Kathleen Vohs[12] and Dr. Kate Barasz.[13]

12. The documents and other evidence that I have considered in forming my opinions are listed in **Appendix C**. I understand that there may be further information produced in this matter. Should additional relevant documents or information be made available to me, I reserve the right to adjust or supplement my opinions as appropriate. I also reserve the

---

9 Motion for Class Certification, p. 13.

10 Motion for Class Certification, p. 13.

11 Motion for Class Certification, p. 13.

12 Expert Report of Dr. Kathleen D. Vohs, September 6, 2025 ("Vohs Report").

13 Expert Report of Kate Barasz, September 7, 2025 ("Barasz Report").

right to address any attempted rebuttal of my opinions. I further reserve the right to use demonstratives and/or illustrative aids to help explain my findings in any trial testimony I may give.

## II. Summary of Opinions

13. On the basis of my review of the information identified above, the results of the three surveys I conducted, and my education, training, and professional experience, I have reached the following opinions:

a. The results of the three surveys I conducted provide contemporaneous empirical data about U.S. Facebook users' expectations regarding the sharing of information related to online interactions with patient portals, healthcare provider websites, and prescription drug company websites. I find that a majority of survey respondents reported that they would not be surprised to see social media advertisements related to their online interactions with healthcare websites. This suggests that U.S. Facebook users generally expect or understand that some information may be shared about their online interactions with healthcare websites, and that this information could be used for purposes of targeted advertising on social media. Moreover, these expectations vary substantially among U.S. Facebook users, such that no one expectation level describes all users. These results contradict Plaintiffs' assertion that a reasonable consumer would not expect their online data to be used in this way. (**Section III**).

b. Dr. Barasz fails to acknowledge consumer heterogeneity, relies on studies that cannot be used to draw conclusions about this case, and fails to conduct empirical research specific to this case.

i. Dr. Barasz's sources do not support her broad conclusions. The research she cites does not purport to draw broad conclusions about the "average consumer" or about what a "reasonable consumer" would or would not believe. Instead, her anecdotes and references to literature ignore research results demonstrating significant consumer heterogeneity, and she

A13-3701

dismisses a meaningful segment of consumers who would be comfortable sharing certain elements of their private data or giving up some level of privacy in exchange for certain benefits. (**Section IV.B**).

ii. It is scientifically inappropriate to draw conclusions from the studies Dr. Barasz cites about the alleged issues in this case. The respondent populations and context of these studies differ meaningfully from the Proposed Class Members and the context of the allegations in this matter. (**Section IV.C**).

iii. Dr. Barasz's opinions lack an empirical foundation as she failed to test any of her hypotheses empirically within the context of this matter. For example, Dr. Barasz draws conclusions based solely on her personal experience. Not only is this methodology decidedly not scientific, it is also not representative of the experience of any member of the Proposed Classes. (**Section IV.D**).

c. Dr. Vohs's opinions rely on a "narrative literature review" of academic research on consumers' views on sharing their health information. However, her review does not follow accepted academic standards and, as a consequence, offers a biased presentation of the literature, failing to account for context, study limitations, and the substantial heterogeneity in consumer views on sharing their health information.

i. Dr. Vohs's narrative literature review was not conducted according to the accepted academic standards of such a review. She did not use an established search database to identify relevant articles, she did not memorialize any terms she used to identify relevant articles, and she did not use a well-defined selection for the 27 articles she decided to include, out of the more than 100 articles she came across (**Section V.B**).

ii. Dr. Vohs's literature review inappropriately generalizes and overstates the breadth and relevance of her conclusions. Based on my review of the

A13-3702

literature that Dr. Vohs cites, many of these studies were not designed to address the questions at issue in this case and involve contexts, populations, and time periods that differ meaningfully from this case. Dr. Vohs fails to critically evaluate the limitations of the studies she cites in her review, even though many of the studies caution that their findings relate to specific populations, settings, or methods, such that Dr. Vohs's broad generalizations are not supported. (**Section V.C**).

iii. Dr. Vohs presents a one-size-fits-all set of consumer beliefs and expectations. Her report obscures the substantial heterogeneity documented not only in the literature that she omits from her report, but also in the very studies that she cites. Properly interpreted, these studies demonstrate that consumers do not have uniform beliefs about what they consider to be "sensitive" information and do not have uniform expectations for how their information will be used. Moreover, contrary to Dr. Vohs's assertion that "health information" is sacred, consumers' expectations about the sharing of such information vary substantially, and people would trade-off the risks of sharing such data for certain benefits under certain conditions. (**Section V.D**).

## III. Empirical Findings of the Portal, Provider Website, and Prescription Surveys

14. In accordance with my assignment, I designed and conducted three surveys to assess (1) Facebook users' expectations regarding the sharing of information related to activities in a patient portal (the "Portal Survey"), (2) Facebook users' expectations regarding the sharing of information related to their online search activities on healthcare providers' websites (the "Provider Website Survey"), and (3) Facebook users' expectations regarding the sharing of information related to their visits to the websites of prescription drugs for which they have a prescription (the "Prescription Survey"). In designing the

surveys and analyzing the results, I followed professional standards and best practices for conducting survey research.[14]

15. While Dr. Barasz and Dr. Vohs hypothesize about how a reasonable or average consumer might feel about these issues, neither conducted empirical research to test how actual consumers view the specific issues in this case.[15] In contrast, the surveys I conducted provide contemporaneous empirical data about U.S. Facebook users' expectations with regard to three key issues in this case. I find that a majority of survey respondents reported that they would not be surprised to see social media advertisements related to their online interactions with healthcare websites, and that there is substantial heterogeneity in the degree to which respondents would or would not be surprised at their data being shared. These results contradict Plaintiffs' assertion that a reasonable or average consumer would not expect their online data to be used in this way.

### A. Survey Design and Methodology

#### 1. Survey Overview

16. The three surveys employed similar designs, varying only in certain screening criteria and in the hypothetical scenario being tested. I tailored the screening criteria and hypothetical scenario of each survey to align to each of the Proposed Classes, which I describe further in the subsections below. The survey questionnaires and screenshots of the surveys as they appeared to respondents are presented in **Appendices D–I**.

17. For each survey, I employed screening questions to restrict the sample to the survey's target population, based on the definitions of the Proposed Classes. In each survey, respondents were required to be U.S. residents age 18 or older who indicated that they

---

14 My survey approach adhered to the survey research guidelines outlined in the "Reference Guide on Survey Research" (a chapter of the *Reference Manual on Scientific Evidence*) and in the *Manual for Complex Litigation*, sources that are foundational for litigation survey design. See Diamond, Shari S., "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence*, 3rd Edition, The National Academies Press, 2011, pp. 359–423 ("Diamond (2011)"); *Manual for Complex Litigation*, 4th Edition, Federal Judicial Center, 2004.

15 Vohs Report, ¶¶ 3–4; Barasz Report, ¶ 7.

have a Facebook account and have engaged in at least one online interaction with a healthcare website (specific to the Proposed Classes) within the past three months.[16]

18. For each survey's main question, I presented respondents with a hypothetical scenario in which they were asked to imagine that they suffered from allergies, engaged in a specific online activity, and then sometime later saw a targeted advertisement on social media connected to that online activity. Respondents were then asked, "Which of the following options best characterizes your response" and were presented with a sliding scale with two endpoints labeled "I **would** be surprised to see social media advertisements related to the [website(s) I visited / prescription drug I looked at online]" and "I **would** **<u>not</u>** be surprised […]."[17] Respondents indicated their answer by moving the slider to any point on the scale or by selecting a "Don't know / Unsure" answer option. If a respondent had no opinion about whether or not information related to their specified online activities may be shared for purposes such as targeted advertising on social media, they could leave the slider at the midpoint of the scale.

19. Each survey empirically tested U.S. Facebook users' expectations related to information sharing about their engagement in certain online activities on healthcare websites. I understand that a relevant element of Plaintiffs' allegations is whether and to what extent members of the Proposed Classes would expect that information related to their online activities on certain purportedly health-oriented websites may be shared. The degree to which survey respondents indicated they would or would not be surprised to see related social media advertisements is indicative of respondents' expectations with regard to information sharing related to their online activities on healthcare websites.[18]

---

16 The online activities varied across the Portal Survey, Provider Website Survey, and Prescription Survey to align with each survey's target population as described further below. For the full screeners as seen by respondents, see **Appendix E** (Portal Survey Screenshots), **Appendix G** (Provider Website Survey Screenshots), and **Appendix I** (Prescription Survey Screenshots).

17 The starting position of the slider was always set at the midpoint of the scale, and the labels of the two endpoints were randomly rotated across respondents to avoid order effects.

18 Fiesler, Casey and Blake Hallinan, "'We Are the Product': Public Reactions to Online Data Sharing and Privacy Controversies in the Media," *CHI'18: Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems*, April 2018, pp. 1-13, at p. 9 ("[C]ommenters who did express concern or outrage tended to have two things in common: (1) they felt that the companies had some obligation to safeguard their privacy and/or provide better information, and (2) the revelation of how their data was used surprised them."); Niu, Xi et al., "Surprise Me If You Can: Serendipity in Health Information," *CHI'18: Proceedings of the 2018 CHI*

Specifically, if a respondent selects a point on the scale closer to "would be surprised," then that indicates they would likely not expect their information to be shared. On the other hand, if a respondent selects a point on the scale closer to "would not be surprised," then that indicates they would likely expect some information to be shared, manifesting in social media advertisements related to their online activities. The degree of surprise or not, i.e., the distance from the mid-point towards the endpoint, reflects the conviction or strength of expectations. Variation in this measure thus reflects heterogeneity in beliefs or expectations.

### a. Portal Survey

20. The survey questionnaire for the Portal Survey is included as **Appendix D**. Screenshots of the Portal Survey as seen by respondents are included as **Appendix E**.[19]

21. **Target Population and Sample.** To align the survey population with the proposed Patient Status Button-Click Class definition,[20] the target population of the Portal Survey was U.S. residents 18 years of age or older who have a personal Facebook account and have done at least one of the following activities in the past three months: (1) logged into a healthcare provider's online portal, (2) made an appointment with a healthcare provider online, (3) paid a medical bill online, or (4) taken a diagnostic assessment on a healthcare provider's website.

22. **Design.** For the Portal Survey, respondents were presented with the following scenario: "You visit your healthcare provider's website and log into your patient portal to make an appointment. Sometime later, you are scrolling through social media and notice an

*Conference on Human Factors in Computing Systems*, April 2018, pp. 1-12, at p. 2 ("By contrast, surprise (on which we base our serendipity recommender) is a measure of how strongly an item violates expectations.").

19 The screenshots for all three surveys are representative of the survey as seen by respondents but, as discussed in **Section III.A.2**, I randomly rotated the scale labels and randomized the order of answer options for closed-ended questions across respondents.

20 The proposed Patient Status Button-Click Class is defined as "All Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers." Motion for Class Certification, p. 13.

A13-3706

advertisement for your healthcare provider." **Figure 1** below shows the specific scenario, question, and answer options for the Portal Survey.

**Figure 1**
**Representation of Portal Survey**




### b. Provider Website Survey

23. The survey questionnaire for the Provider Website Survey is included in **Appendix F**. Screenshots of the Provider Website Survey as seen by respondents are included as **Appendix G**.[21]

24. **Target Population and Sample.** To align the survey population with the proposed Patient Health Information Class definition,[22] the target population of the Provider Website Survey was U.S. residents 18 years of age or older who have a personal Facebook account and have done at least one of the following activities in the past three

---

[21] The screenshots are representative of the survey as seen by respondents but, as discussed in **Section III.A.2**, I randomly rotated the scale labels and randomized the order of answer options for closed-ended questions across respondents.

[22] The proposed Patient Health Information Class is defined as "All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above." Motion for Class Certification, p. 13.

**A13-3707**

months: (1) browsed online for a healthcare provider, or (2) researched a medical condition or treatment online.

25. **Design.** For the Provider Website Survey, respondents were randomly assigned to one of two groups: a "Patients Group" and a "Non-Patients Group." I understand from counsel that whether or not an individual was a patient of the healthcare provider's website may be a relevant consideration; I therefore tested two scenarios. Respondents in the Patients Group were presented with the following scenario: "You search on your healthcare provider's website for ways to treat allergies. Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider." Respondents in the Non-Patients Group were presented with a slightly different scenario: "You search and browse general healthcare provider websites for ways to treat allergies. Sometime later, you are scrolling through social media and notice an advertisement for a healthcare provider whose website you visited." **Figure 2** below shows the specific scenario, question, and answer options for respondents in the Patients Group of the Provider Website Survey, and **Figure 3** below shows the specific scenario, question, and answer options for respondents in the Non-Patients Group.

**Figure 2**
**Representation of Provider Website Survey – Patients Group**

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You search on your healthcare provider's website for ways to treat allergies.

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

I **would** be surprised to see social media advertisements related to the website I visited.

I **would** not be surprised to see social media advertisements related to the website I visited.

☐ *Don't know / Unsure*

**Figure 3**
**Representation of Provider Website Survey – Non-Patients Group**




### c. Prescription Survey

26. The survey questionnaire for the Prescription Survey is included in **Appendix H**. Screenshots of the Prescription Survey as seen by respondents are included in **Appendix I**.[23]

27. **Target Population and Sample.** To align the survey population with the proposed Prescription Drug Information Class definition,[24] the target population of the Prescription Survey was U.S. residents 18 years of age or older who have a personal Facebook account and have browsed the website of a drug for which they had a prescription in the past three months.

28. **Design.** For the Prescription Survey, respondents were presented with the following scenario: "Your healthcare provider writes you a drug prescription for your allergies.

[23] The screenshots are representative of the survey as seen by respondents but, as discussed in **Section III.A.2**, I randomly rotated the scale labels and randomized the order of answer options for closed-ended questions across respondents.

[24] The proposed Prescription Drug Information Class is defined as "All Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta." Motion for Class Certification, p. 13.

After receiving the prescription, you visit the prescription drug's website to learn about it. Sometime later, you are scrolling through social media and notice an advertisement for the same prescription drug." **Figure 4** below shows the specific scenario, question, and answer options for the Prescription Survey.

**Figure 4**
**Representation of Prescription Survey**

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. Your healthcare provider writes you a drug prescription for your allergies. After receiving the prescription, you visit the prescription drug's website to learn about it.

Sometime later, you are scrolling through social media and notice an advertisement for the same prescription drug. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

I **would** be surprised to see social media advertisements related to the prescription drug I looked at online.

I **would** **not** be surprised to see social media advertisements related to the prescription drug I looked at online.

☐ *Don't know / Unsure*

### 2. Adherence to Survey Best Practices

29. I designed the surveys in accordance with best practices for surveys used in litigation, including to avoid "demand artifacts." Demand artifacts arise when the methodology and survey suggest to respondents that they should provide a particular response that is "demanded" by the survey. In such situations, respondents "are motivated to try to confirm what they believe to be the experimental hypothesis," and therefore change their response from what they would have done in the real world.[25] To avoid demand artifacts, I phrased the main question using neutral language to avoid leading respondents to a particular answer.[26] I also provided a "Don't Know / Unsure" answer option for

---

25 Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol.1 (4), March 1975, pp. 20–30.

26 Jacoby (2012) states that a "balanced" question "gives balanced and explicit emphasis to the neutral as well as affirmative and negative positions. See Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?," in

A13-3710

appropriate questions and instructed respondents not to guess.[27] To avoid order effects, which is the tendency for the order of response options to influence answers, I randomly rotated the scale labels and randomized the order of answer options for closed-ended questions.[28] I implemented additional survey best practices to ensure high quality responses. I discuss several of these best practices below.

30. **Double-blind Methodology.** The surveys did not provide respondents with any information that would identify the objective of the survey at any time before, during, or after their completion of the survey. Because they were administered online by a computer program, there was no way for a survey administrator (i.e., the computer) to provide any unscripted cues indicating the sponsor or purpose of the study. Well-designed web-based surveys are recognized for providing reliable data because they generate high response rates, elicit truthful answers because of their anonymous nature, and do not introduce potential interviewer bias.[29]

31. **Follow-up Questions.** To assess any potential effects of respondents' potential awareness of the surveys' context, I asked respondents follow-up question(s) related to their awareness of data privacy litigation at the end of the survey. Specifically, I first asked respondents if they were or were not "aware of any lawsuits related to data

---

*Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* American Bar Association, eds. Shari S. Diamond and Jerre B. Swann, 2012, pp. 261–284 ("Jacoby (2012)"), at p. 275 ("Consider the following question: "'Do any of these items come from the same company as the first item I showed you?' Aside from being a question that can be answered with a mere yes or no, because this question presents only the affirmative side of the issue, it is a leading question […]. A more balanced question would be 'Do any of these items come from the same company as the first item I showed you, or do none of these items come from the same company as the first item I showed you?'").

[27] Diamond (2011), at p. 390 ("[T]he survey can use a quasi-filter question to reduce guessing by providing 'don't know' or 'no opinion' options as part of the question […]. By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply."). See **Appendix D**, pp. 2–7; **Appendix F**, pp. 2–8; **Appendix H**, pp. 2–7.

[28] Diamond (2011), at p. 396 ("To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated […]. If [different orders] are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the [different orders] will provide a reasonable estimate of response level.").

[29] Diamond, Shari S. and Roger Tourangeau, "Internet Surveys for Evaluating Trademark Infringement and Deceptive Advertising," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, eds. Shari S. Diamond and Jerre B. Swann, 2012, pp. 287–306.

privacy."[30] I then asked any respondents who indicated they were aware to "describe the lawsuit(s) [they] were aware of" in an open-ended text box.[31]

32. **Pretests.** I conducted 8 pretest interviews for each of the surveys to ensure that respondents could navigate the survey, understood the questions, and could not guess the purpose of the study.[32] Pretest respondents completed a version of the survey online while sharing their screen with moderators who were also blind to the purpose of the study. After pretest respondents completed the survey, the moderators asked them a series of follow-up questions regarding the questions and stimuli used in the study. The pretest moderator instructions used to pretest the surveys are included in **Appendix J**. As a result of these pretests, some of the pretest respondents expressed that they were not immediately able to distinguish the difference between the two endpoint labels of the sliding scale in the main question, Q1. To avoid any possible confusion in the final survey, I added emphasis to the distinguishing words, "would" and "would not," in the endpoint labels.

### 3. Fielding of the Portal, Provider Website, and Prescription Surveys

33. Respondents for all three surveys were recruited by Research Results, a market-research and consumer panel company.[33] At my direction, Research Results targeted an audience of people aged 18 or older in the U.S., balancing the inbound sample for each survey on age, gender, and region to national demographics based on the American Community Survey from 2024.[34]

---

30 See **Appendix D**, p. 7; **Appendix F**, p. 8; **Appendix H**, p. 7.

31 See **Appendix D**, p. 7; **Appendix F**, p. 8; **Appendix H**, p. 7.

32 Pretesting is recommended "as a way to increase the likelihood that questions are clean and unambiguous," with interviewers "observ[ing] the respondents for any difficulties they may have with the questions and probe for the source of any such difficulties so that the questions can be rephrased if confusion or other difficulties arise." Pretest respondents are not included in the final sample. See Diamond (2011), at pp. 388–389.

33 Research Results is trusted by "some of the most well-known MR [(Market Research)] companies, publishing houses, and Fortune 500 corporations." See "Our Clients," *Research Results*, https://researchresults.com/our-clients/, last accessed on December 8, 2025.

34 "American Community Survey S0101 Age and Sex," *United States Census Bureau*, https://data.census.gov/table/ACSST1Y2024.S0101?g=010XX00US_020XX00US1,2,3,4&moe=false, last accessed on December 8, 2025.

34. I included a number of quality control measures in my survey designs, including reCAPTCHA to ensure real respondents, digital fingerprinting to ensure unique participation,[35] and red herring answer options and attention check questions to ensure attentiveness.[36]

35. A total of 400 respondents completed my Portal Survey, 801 respondents completed my Provider Website Survey (randomly assigned to either the Patients Group or Non-Patients Group), and 400 respondents completed my Prescription Survey. The response rates and completion rates for my Portal Survey, Provider Website Survey, and Prescription Survey are provided in **Exhibits 1a**–**1c**, respectively. Demographics of respondents who completed my Portal Survey, Provider Website Survey, and Prescription Survey are provided in **Exhibits 2a**–**2c**, respectively.

## B. Analysis and Results

### 1. Portal Survey

36. As described above, the Portal Survey assessed U.S. Facebook users' expectations related to information sharing about activities in a patient portal. If a respondent selected a point on the scale closer to "would be surprised," then they likely would not expect the portal-related information to have been shared. On the other hand, if a respondent selected a point on the scale closer to "would not be surprised," then they likely expect information is shared in a way that results in social media advertisements related to their online portal activity. I analyzed the distribution of responses along the sliding scale presented in Q1. Respondents' selections on the sliding scale were converted to a numerical scale ranging

[35] Digital fingerprinting are tools that look at markers such as IP address, operating system, and possible VPN usage to ensure the same respondent does not take the same survey multiple times. See "Quality," *Research Results*, https://researchresults.com/quality/, last accessed on December 5, 2025.

[36] For example, I included the following red herring answer options: any respondent who selected that they signed up for a rice cooker subscription in QS8 (which asked: "Which of the following activities, if any, have you done in the **past 3 months**?") or have a personal account with MAD Magazine in QS9 (which asked: "For which of the following, if any, do you currently have a personal account?") was terminated from the surveys. See, e.g., **Appendix D**, pp. 4–5; **Appendix F,** pp. 4–5; **Appendix H**, pp. 4–5; **Exhibits 1a**–**1c**.

A13-3713

from 1 ("would be surprised") to 99 ("would not be surprised"). **Figure 5** below shows the distribution of responses to Q1 along this scale.

**Figure 5**
**Distribution of Responses to Q1 of Portal Survey**[37]




37. As shown in **Figure 5** above, most respondents selected a point on the scale corresponding to a value greater than 50 out of 99, which reflects that their response was to move the slider from the midpoint (where it started) closer to "not surprised" rather than to "surprised." Accordingly, I categorize respondents who selected a point corresponding to greater than 50 as "not surprised," and respondents who selected a point corresponding to 50 or less as "surprised." Based on this categorization, 70.8% of respondents were not surprised to see social media advertisements related to the website

[37] **Figure 5** shows the distribution of responses to Q1 excluding respondents who selected "Don't know / Unsure." A value of 1 represents the "surprised" endpoint of the slider while a value of 99 represents the "not surprised" endpoint.

A13-3714

they visited sometime after they log into a patient portal.[38] Moreover, approximately 41.0% of respondents selected a point corresponding to greater than 80 on the slider scale, indicating that they hold a strong expectation that they may see social media advertisements related to the website they visited after logging into their patient portal.[39]

38. Similarly, the average value selected by respondents on the slider scale was 67.5 and the median was 77.0. Both measures suggest that respondents tended toward being "not surprised."[40]

39. **Figure 5** also shows that there is substantial variation among respondents' expectations. Even though most respondents were not surprised, the distribution of expectations across the full range of the slider scale suggests substantial heterogeneity regarding the strength of expectation in both the "surprised" and "not surprised" directions. For example, among those who indicated they were not surprised, approximately 37.5% selected a point corresponding to 60–80 on the scale and 58.0% selected a point corresponding to 81–99.[41] Among respondents who indicated they were surprised, approximately 45.5% selected a point corresponding to 20–40 on the scale and 47.5% selected a point corresponding to 1–19.[42]

40. The results of my Portal Survey demonstrate that most U.S. Facebook users are not surprised to see social media advertisements related to their healthcare provider whose website they visited when they log into a patient portal. This suggests that U.S. Facebook users generally expect or understand that some information may be shared about

---

[38] **Backup Exhibit 3a**. The 95% confidence interval around the "not surprised rate" of 70.8% is 66.0–75.2%. Among all respondents, the mean selected point on the scale corresponded to 67.5, with a standard deviation of 30.9. See backup calculations.

[39] In contrast, only 11.8% of respondents selected a point corresponding to less than 20 on the slider scale. See backup calculations.

[40] **Backup Exhibit 4a**. I conducted a one-sample t-test to test whether the average response to Q1 was significantly different from 50 and a Wilcoxon signed-rank test to test whether the median response to Q1 was significantly different from 50. The p-values for both tests were $<0.0001$, showing that the average and median responses to Q1 are statistically significantly different from 50.

[41] See backup calculations. The remaining respondents who indicated they were not surprised selected a point corresponding to a value between 51–59 on the scale.

[42] See backup calculations. The remaining respondents who indicated they were surprised selected a point corresponding to a value between 41–50 on the scale.

activities in a patient portal on their healthcare provider's website, and that this information could be used for purposes of targeted advertising on social media. Moreover, expectations vary substantially among U.S. Facebook users, such that no one expectation level describes all users.

### 2. Provider Website Survey

41. As described above, the Provider Website Survey assessed U.S. Facebook users' expectations related to information sharing about searching and browsing a healthcare provider's website. As before, if a respondent selected a point on the scale closer to "would be surprised," then they likely would not expect their information to be shared. On the other hand, if a respondent selected a point on the scale closer to "would not be surprised," then they likely expect some information to be shared in a way that results in social media advertisements related to their online activity. I analyzed the distribution of responses along the sliding scale presented in Q1. Respondents' selections on the sliding scale were converted to a numerical scale ranging from 1 ("would be surprised") to 99 ("would not be surprised"). **Figures 6** and **7** below show the distribution of responses to Q1A and Q1B along this scale, for the Patients Group and Non-Patients Group respectively.

**Figure 6**
**Distribution of Responses to Q1A of Provider Website Survey – Patients Group[43]**




[43] **Figure 6** shows the distribution of responses to Q1A in the Patients Group of the Provider Website Survey excluding respondents who selected "Don't know / Unsure." A value of 1 represents the "surprised" endpoint of the slider while a value of 99 represents the "not surprised" endpoint.

A13-3717

**Figure 7**
**Distribution of Responses to Q1B of Provider Website Survey – Non-Patients Group[44]**




42. As shown in **Figures 6** and **7** above, most respondents in both the Patients Group and Non-Patients Group selected a point on the scale corresponding to greater than 50 out of 99, which reflects that their response was to move the slider from the midpoint (where it started) closer to "not surprised" rather than to "surprised." Accordingly, I categorize respondents who selected a point corresponding to greater than 50 as "not surprised," and respondents who selected 50 or less as "surprised." Based on this categorization, 80.5% of respondents in the Patients Group and 77.3% in the Non-Patients Group were not surprised to see social media advertisements related to the healthcare providers' websites they browsed.[45] Moreover, approximately 50.9% of respondents in the Patients Group

44 **Figure 7** shows the distribution of responses to Q1B in the Non-Patients group excluding respondents who selected "Don't know / Unsure." A value of 1 represents the "surprised" endpoint of the slider while a value of 99 represents the "not surprised" endpoint.

45 **Backup Exhibit 3b**. For respondents in the Patients Group, the 95% confidence interval around the "not surprised rate" of 80.5% is 76.3–84.3%. Among Patients Group respondents, the mean selected point on the scale corresponded to 73.2, with a standard deviation of 27.7. For respondents in the Non-Patients Group, the 95% confidence interval around the "not surprised rate" of 77.3% is 72.8–81.3%. Among Non-Patients Group

A13-3718

and 52.5% in the Non-Patients Group selected a point corresponding to greater than 80 on the slider scale, indicating that they hold a strong expectation that they may see social media advertisements related to the healthcare provider website they browsed.[46]

43. For respondents in the Patients Group, the average value selected on the slider scale was 73.2 and the median was 82.0. Both measures suggest that respondents tended toward being "not surprised."[47] Similarly, for respondents in the Non-Patients Group, the average value selected on the slider scale was 74.0 and the median was 83.0.[48] Both measures suggest that respondents tended toward being "not surprised."[49]

44. **Figures 6** and **7** also show that there is substantial variation among respondents' expectations. Even though most respondents were not surprised, the distribution of expectations across the full range of the slider scale suggests substantial heterogeneity regarding the strength of expectation in both the "surprised" and "not surprised" directions. For example, among those who indicated they were not surprised in the Patients Group, approximately 32.2% selected a point corresponding to 60–80 on the scale and 63.2% selected a point corresponding to 81–99.[50] Among respondents in the Patients Group who indicated they were surprised, approximately 50.7% selected a point corresponding to 20–40 on the scale and 44.9% selected a point corresponding to 1–19.[51]

---

respondents, the mean selected point on the scale corresponded to 74.0, with a standard deviation of 28.3. See backup calculations.

46 See backup calculations. In contrast, only 7.7% of respondents in the Patients Group and 8.3% of respondents in the Non-Patients Group selected a point corresponding to less than 20 on the slider scale.

47 **Backup Exhibit 4b**. I conducted a one-sample t-test to test whether the average response to Q1 was significantly different from 50 and a Wilcoxon signed-rank test to test whether the median response to Q1 was significantly different from 50. The p-values for both tests were <0.0001, showing that the average and median responses to Q1 are statistically significantly different from 50.

48 **Backup Exhibit 4b**. The averages for the Patients and Non-Patients Groups are not statistically different, as a two-sample t-test returns a p-value of 0.67.

49 I conducted a one-sample t-test to test whether the average response to Q1 was significantly different from 50 and a Wilcoxon signed-rank test to test whether the median response to Q1 was significantly different from 50. The p-values for both tests were <0.0001, showing that the average and median responses to Q1 are statistically significantly different from 50. See **Backup Exhibit 4b**.

50 See backup calculations. The remaining respondents in the Patients Group who indicated they were not surprised selected a point corresponding to a value between 51–59 on the scale.

51 See backup calculations. The remaining respondents in the Patients Group who indicated they were surprised selected a point corresponding to a value between 41–50 on the scale.

Similarly, among those who indicated they were not surprised in the Non-Patients Group, approximately 29.1% selected a point corresponding to 60–80 on the scale and 68.0% selected a point corresponding to 81–99.[52] Among respondents in the Non-Patients Group who indicated they were surprised, approximately 51.3% selected a point corresponding to 20–40 on the scale and 43.4% selected a point corresponding to 1–19.[53]

45. The results of my Provider Website Survey demonstrate that most U.S. Facebook users are not surprised to see social media advertisements related to healthcare providers' websites they have browsed. This suggests that U.S. Facebook users generally expect or understand that some information may be shared about their searching and browsing activities on healthcare providers' websites, and that this information could be used for purposes of targeted advertising on social media. Moreover, expectations vary substantially among U.S. Facebook users, such that no one expectation level describes all users.

### 3. Prescription Survey

46. As described above, the Prescription Survey assessed U.S. Facebook users' expectations related to information sharing about browsing the website of a drug for which they have a prescription. If a respondent selects a point on the scale closer to "would be surprised," then they likely would not expect their information to be shared. On the other hand, if a respondent selects a point on the scale closer to "would not be surprised," then they likely expect information is shared in a way that results in social media advertisements related to their online activity. I analyzed the distribution of responses along the sliding scale presented in Q1. Respondents' selections on the sliding scale were converted to a numerical scale ranging from 1 ("would be surprised") to 99 ("would not be surprised"). **Figure 8** below shows the distribution of responses to Q1 along this scale.

52 See backup calculations. The remaining respondents in the Non-Patients Group who indicated they were not surprised selected a point corresponding to a value between 51–59 on the scale.

53 See backup calculations. The remaining respondents in the Non-Patients Group who indicated they were surprised selected a point corresponding to a value between 41–50 on the scale.

A13-3720

**Figure 8**
**Distribution of Responses to Q1 of Prescription Survey**[54]




47. As shown in **Figure 8** above, most respondents selected a point on the scale corresponding to a value greater than 50 out of 99, which reflects that their response was to move the slider from the midpoint (where it started) closer to "not surprised" rather than to "surprised." Accordingly, I categorize respondents who selected a point corresponding to greater than 50 as "not surprised," and respondents who selected 50 or less as "surprised." Based on this categorization, 64.3% of respondents indicated they were "not surprised" to see social media advertisements related to the prescription drug website they visited.[55] Moreover, approximately 39.0% of respondents selected a point corresponding to greater than 80 on the slider scale, indicating that they hold a strong

[54] **Figure 8** shows the distribution of responses to Q1 excluding respondents who selected "Don't know / Unsure." A value of 1 represents the "surprised" endpoint of the slider while a value of 99 represents the "not surprised" endpoint.

[55] **Backup Exhibit 3c**. The 95% confidence interval around the "not surprised rate" of 64.3% is 59.3–69.0%. See backup calculations.

A13-3721

expectation that they may see social media advertisements related to the prescription drug website they visited.[56]

48. Similarly, the average value selected by respondents on the slider scale was 62.8, and the median was 74.0. Both measures suggest that respondents tended toward being "not surprised."[57]

49. **Figure 8** also shows that there is substantial variation among respondents' expectations. Even though most respondents were not surprised, the distribution of expectations across the full range of the slider scale suggests substantial heterogeneity regarding the strength of expectation in both the "surprised" and "not surprised" directions. For example, among those who indicated they were not surprised, approximately 35.4% selected a point corresponding to 60–80 on the scale and 60.7% selected a point corresponding to 81–99.[58] Among respondents who indicated they were surprised, approximately 53.7% selected a point corresponding to 20–40 on the scale and 40.3% selected a point corresponding to 1–19.[59]

50. The results of my Prescription Survey demonstrate that many U.S. Facebook users are not surprised to see social media advertisements related to the prescription drug website they visited. This suggests that U.S. Facebook users generally expect or understand that information may be shared about their activities on the website of a drug for which they have a prescription, and that this information could be used for purposes of targeted advertising on social media. Moreover, expectations vary substantially among Facebook users, such that no one expectation level describes all of them.

---

56 In contrast, only 13.5% of respondents selected a point corresponding to less than 20 on the slider scale. See backup calculations.

57 **Backup Exhibit 4c**. I conducted a one-sample t-test to test whether the average response to Q1 was significantly different from 50 and a Wilcoxon signed-rank test to test whether the median response to Q1 was significantly different from 50. The p-values for both tests were <0.0001, showing that the average and median responses to Q1 are statistically significantly different from 50.

58 See backup calculations. The remaining respondents who indicated they were not surprised selected a point corresponding to a value between 51-59 on the scale.

59 See backup calculations. The remaining respondents who indicated they were surprised selected a point corresponding to a value between 41-50 on the scale.

#### 4. Sensitivity Analyses

51. For each survey, I conducted several sensitivity analyses to further evaluate the stability of my conclusions and to assess whether my conclusions are sensitive to changing the selection criteria for the survey sample. Specifically, I analyzed the results for the following sensitivities:

- Excluding respondents who reported in a follow-up question that they were aware of litigation related to data privacy;[60]
- Excluding respondents identified as "laggers";[61] and
- Stratified by gender, age, and region.[62]

52. None of these sensitivity analyses change the nature of my conclusions. In each case, I find similar results.

## IV. Dr. Barasz Fails to Acknowledge Consumer Heterogeneity and Relies on Studies That Cannot Be Used to Draw Conclusions About This Case

53. In this section, I address the Barasz Report's four opinions regarding whether Facebook users care about their online privacy, their expectations about how their information is handled, whether they would expect Meta to obtain data from healthcare-related websites, and whether Meta's transparency and control tools make Meta users better off.

54. In **Section IV.A,** I provide an overview of Dr. Barasz's opinions.[63]

---

60 Respondents were first asked QF1 ("Prior to this survey, were you or were you not aware of any lawsuits related to data privacy?"), and those who indicated there were "aware of at least one lawsuit" were asked to provide an open-ended response to "describe the lawsuit(s)" in QF2. These open-ended responses were reviewed to identify respondents who provided a description related to health or medical information, or to this litigation in particular. See **Appendix D**, p. 7; **Appendix F**, p. 8; **Appendix H**, p. 7. See also **Backup Exhibits 5a–5c**.

61 Laggers were identified as respondents whose completion time in seconds was at or above the 95th percentile for each survey. See **Backup Exhibits 6a–6c**.

62 See **Backup Exhibits 3a–3c** and **4a–4c**.

63 Dr. Barasz's opinions respond to the following questions: (1) "Do Meta users care about maintaining their online privacy?," (2) "Do Meta users have expectations about how their personal information is handled?," (3) "Would Meta users expect a company like Meta to obtain their personal information from partners who were

55. Next, in **Section IV.B**, I discuss the heterogeneity in consumers' expectations and perceptions related to online privacy as well as Dr. Barasz's dismissal of a meaningful segment of consumers. For example, some consumers would be comfortable sharing certain elements of their personal data, and many consumers may be generally comfortable giving up some level of privacy in exchange for certain benefits. Dr. Barasz largely ignores evidence to this effect, and overlooks literature demonstrating this consumer heterogeneity.

56. In **Section IV.C**, I explain how Dr. Barasz relies on studies that are inapplicable to this case. For example, Dr. Barasz relies on several studies that predate the Proposed Class Period and studies using a survey population that is neither representative of the U.S. population nor Facebook users. Generally, Dr. Barasz's attempts to generalize the findings of the studies she relies on are flawed, and it is scientifically inappropriate to draw conclusions from those studies to the alleged issues in this specific case.

57. Finally, in **Section IV.D**, I discuss how Dr. Barasz's opinions lack a proper scientific methodology, and resemble hypotheses rather than scientifically grounded conclusions. Her opinions lack an empirical foundation, as she failed to test any of her hypotheses empirically within the context of the facts of this case.

58. As I discuss in the following subsections, Dr. Barasz does not assess how many consumers hold beliefs and expectations regarding the specific issues in this case, and the degree to which they hold them. Instead, her anecdotes and references to literature ignore research results demonstrating significant consumer heterogeneity, and represent, at best, hypotheses based on studies that cannot be used to draw scientifically valid conclusions about the alleged issues and context of this specific case. Beyond forming hypotheses, Dr. Barasz did not conduct her own empirical research to answer the questions raised in

not allowed to share it?," (4) "What effect would Meta's transparency and control tools…have on Meta users?" Barasz Report, ¶ 7.

A13-3724

her assignment.[64] As described earlier in this report, in contrast to Dr. Barasz, my opinion is based on proper empirical evidence relevant to this specific case.

### A. Summary of Dr. Barasz's Opinions

59. Dr. Barasz's assignment was to opine on: (1) whether Facebook users "care about maintaining their online privacy," (2) whether Facebook users "have expectations about how their personal information is handled," (3) whether Facebook users "expect a company like Meta to obtain their personal information from partners who were not allowed to share it," and (4) what effect "Meta's transparency and control tools… have on Meta users."[65]

60. According to Dr. Barasz, Facebook users care about their privacy and have expectations about what and how their personal information is collected, regardless of whether they have read any of the terms and conditions presented.[66] Dr. Barasz also claims that Facebook users would not have expected the company to gather their information from healthcare apps and websites that "did not have the legal right to share it," and that users expect Meta to take protective actions should there be a breach of personal information.[67] Finally, Dr. Barasz also claims that the "transparency and control tools" do not make Facebook users better off.[68]

61. To support her opinions, Dr. Barasz relies on "anecdotal and empirical evidence," including past surveys on the general population and academic literature.[69] For example:

64 In this section, I discuss several studies cited by Dr. Barasz. The fact that I do not discuss a particular study or assertion in the Barasz Report should not be interpreted as agreement with it.

65 Barasz Report, ¶ 7.

66 Barasz Report, ¶ 30 ("Meta users would have formed expectations about what, exactly, they consented to that deviated meaningfully from what was ultimately delivered. This could be true for both Meta users who read and Meta users who did not read the full terms and conditions.").

67 Barasz Report, Section III.C header.

68 Barasz Report, ¶¶ 37.

69 Barasz Report, ¶ 8 ("A wealth of anecdotal and empirical evidence demonstrates that the average consumer cares about their online privacy – how their personal information is collected and disseminated, and the ends to which it is ultimately used.").

a. Among other sources cited in her report, Dr. Barasz relies on her own prior research paper examining the effect of ad transparency on ad effectiveness, which was published over seven years ago and was conducted for an entirely different purpose outside of the context of this case.[70] She applies this paper to argue that consumers expect offline norms to apply to online scenarios and therefore have "expectations about their personal information."[71] In an attempt to tie this research back to Meta, she cites to what she mistakenly claims was Meta's "own internal survey" and asserts that "Meta knew that its users were largely uncomfortable with third-party data sharing."[72] However, the cited survey was not conducted by Meta, and Dr. Barasz acknowledged in her deposition that she incorrectly presumed that this was a Meta survey.[73] The survey was conducted by World Economic Forum ("WEF"), comScore, and McKinsey & Company in 2016, and includes a sample of respondents that even the authors acknowledged "may not be fully representative of the broader general online population."[74] Moreover, Dr. Barasz acknowledged in deposition that she is not a survey expert and could not assess the methodology of this survey beyond having an understanding of question format.[75]

---

70 Kim, Tami, Kate Barasz, and Leslie K. John, "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research*, Vol. 45, May 2018, pp. 906–932 ("Kim, Barasz, et al. (2018)").

71 Dr. Barasz states that when forming "expectations about their personal information," "the average consumer applies their own expectations about the offline world," and that "just as sharing someone else's personal information with another person," they also view "third-party information sharing as a norm violation in the online world." Barasz Report, ¶¶ 14–16. See also Kim, Barasz, et al. (2018).

72 Barasz Report, ¶ 20.

73 Deposition of Kate Barasz, Ph.D., November 6, 2025 ("Barasz Deposition"), pp. 114:17–115:2 ("Q. So the survey that you relied on in your report, Exhibit B, which is Exhibit 703, was actually a survey that was conducted by the World Economic Forum with McKinsey and Company and comScore, not by Meta; correct? A. Yes. Q. You didn't know that until today; right? A. I did not."). See also World Economic Forum et al., "End-User Perspectives on Digital Media Survey: Summary Report," *World Economic Forum*, January 2017 ("WEF Report").

74 WEF Report, p. 36.

75 Barasz Deposition, pp. 89:13–90:11 ("Q. Okay. So just taking a step back, you said the standards for determining whether a survey is accurate is different than an experiment, you described the factors that are needed for an experiment to be accurate. For a survey to be accurate, you just talked about it needing to be a representative sample to make sure you have people across income levels, education, et cetera. Are there other factors that are needed to ensure a survey is accurate? MR. MURA: Object to form. A. My methodology and my background is not in survey work. So I -- yes, is the short answer. I can't tell you all of them, because this

A13-3726

b. Additionally, to review Meta's "transparency and control tools," which include "Why Am I Seeing This Ad," "Download Your Information," and "Off Facebook Activity," Dr. Barasz used her personal Facebook account and a family member's Facebook account to examine the tool options.[76] She did not examine historical versions or conduct research on how these tools appeared for different people at different points in time, or for different people based on their location as she did not examine the Meta tools as they appear to U.S. consumers.[77]

### B. Consumers Have Heterogeneous Expectations, Understandings, and Perceptions of Online Privacy

62. Dr. Barasz's opinions are tied to a construct she calls the "average consumer."[78] To Dr. Barasz, the "average consumer" is "a generalization that is based on empirical results and is grounded within the research methods [she] (and others) relied upon."[79] Dr. Barasz further explains that the "conceptualization of an 'average consumer' align[s] with what

---

isn't my area of expertise. But I do understand how to -- oftentimes survey questions and experiment questions are similar in nature and form. And so I can speak to the question format. But I can't really speak to the selection of individuals for surveys.").

76 See, e.g., Barasz Report, Section III.D, ¶ 35.b ("To replicate and assess the Meta user's experience, I used the DYI tool on two Facebook accounts (my own and a family member's).").

77 Dr. Barasz only reviewed the tools as they appear in Europe and acknowledged that she did not know whether the materials appeared differently for users outside Europe, including in the U.S. Barasz Deposition, pp. 272:20–274:8 ("Q. Your review of the transparency and control tools offered by Meta is based on your personal Facebook and Instagram accounts and the account of one of your family members; right A. That's right. Q. You didn't review any historical versions of those tools; right? A. No. But I believe that it was included in -- I believe I reviewed something, maybe the DYI, from one or more of the named plaintiffs as well. But my full evaluation of the tool was based on myself and my family member. Q. Do you know how the tools changed over time, if at all? A. No. Q. Do you know if they looked different for different people? [...] A. I think it depends a bit on which tool we are talking about. So for example, I know that why am I seeing this ad, the WAIST tool has changed over time, because it doesn't look like it did when we started our research. I know that, for example, when I turned off my OFA sharing, my start here. [My] HTML dashboard said different things than my family members did who have not turned that off. So I know that it changes depending on that. It is my assumption that because I was accessing it in the EU, it might have shown me more information rather than less. But that's -- overall they looked fairly consistent between myself and my family members.").

78 See, e.g., Barasz Report, ¶ 19 ("Indeed, the average consumer values their sensitive data (e.g., health information) more highly than non-sensitive data (e.g., basic observable demographics) and expects to be compensated accordingly for its exchange."), ¶ 31 ("As this same research also showed, disclosing acceptable practices can have distinctly positive outcomes for firms: when the average consumer was told that their personal information was collected via acceptable means, they were less concerned about privacy and more likely to engage with ads.").



79 Barasz Report, ¶ 2.

[she] understand[s] the Court's definition of a 'reasonable consumer' to be — someone with the level of sophistication of the general public."[80]

63. Dr. Barasz's sources do not support her broad conclusions. The research she cites does not purport to draw broad conclusions about the "average consumer" or about what a "reasonable consumer" would or would not believe. Even when these studies report mean values, drawing conclusions from an "average consumer" based on numerical averages cannot by itself result in meaningful conclusions about the Proposed Classes. For example, if a classroom of ten students includes five who score 100% on an exam and five who score 0%, the average is 50%. In this example, only considering the average of 50% masks the fact that it is composed of two different groups of students with vastly different scores. By presuming that there is an average consumer that may (or may not) represent a certain fraction "of the general public," Dr. Barasz fails to acknowledge the substantial heterogeneity demonstrated in the relevant population; in fact, she stated that she is "agnostic" to such variation.[81] In doing so, Dr. Barasz ignores substantial differences in expectations, understanding, and opinions between population members. Dr. Barasz's opinions fall short on two crucial points: (1) she ignores that the literature she cites acknowledges heterogeneity in consumer expectations; and (2) she fails to provide any empirical basis to support a conclusion that her "average consumer" reflects any Proposed Class member, let alone all of them.

80 Barasz Report, ¶ 2.

81 Barasz Deposition, pp. 81:2–82:13 ("Q. So throughout your report, when you say average consumer, you are referring to the court's definition of a reasonable consumer? A. I am referring to an average consumer as conceptualized in consumer behavior research, which as far as I understand is consistent and aligns with the court's definition of a reasonable consumer. Q. Do all average consumers have the same preferences? […] A. No. Q. Do all average consumers have the same expectations? […] A. No. Q. Do all average consumers have the same privacy preferences? A. No, but I would also like to just clarify what I am answering. We don't look at what people's privacy preferences are. We understand how their privacy preferences change as a function of a given environment, a given set of stimuli, et cetera. And so because of the way experiments work, I am confident saying that if you dropped an average person into one control group or one treatment group, we should expect to see the outcomes that we have published about. Q. So you -- you would agree, though, that people generally have different privacy expectations; right? A. Yes. But I am agnostic to that in my research.").

A13-3728

### 1. Consumer Expectations and Perceptions Vary Substantially in the Studies Dr. Barasz Cites

64. The empirical studies Dr. Barasz relies on do not support the existence of a representative "average consumer." Instead, her own sources consistently reveal substantial variation in consumers' expectations, awareness, and comfort with data practices—variation that her report does not acknowledge. Her opinions also fail to acknowledge that consumer expectations will vary based on the specific context and information provided, and she makes no attempt to examine how the studies she relies upon apply to the facts of this case. As a result, her opinions fail to provide a reliable, relevant assessment of the expectations of U.S. Facebook users. In contrast, as discussed in Section III, I designed and conducted three empirical studies specifically tailored to the facts of this case and with the goal of assessing the expectations of U.S. Facebook users. Based on the results of these studies, I find, among other things, the distribution of expectations among Facebook users suggests substantial heterogeneity in the strength of expectations regarding the sharing of information related to their online activities on healthcare websites.

65. Dr. Barasz claims that "the average consumer values their sensitive data (e.g., health information) more highly than nonsensitive data (e.g., basic observable demographics) and expects to be compensated accordingly for its exchange."[82] However, the study Dr. Barasz cites in support of this claim provides a more nuanced picture.[83] Morey et al. (2015) finds that "[t]he value assigned [to different types of data] varied widely among individuals,"[84] indicating substantial heterogeneity in consumers' privacy preferences. In deposition, Dr. Barasz even testified that she had no reason to dispute this variation

---

[82] Barasz Report, ¶ 19.

[83] The Morey et al. (2015) study, published in the *Harvard Business Review*, surveyed 900 respondents in five countries (United States, United Kingdom, Germany, China, and India). The authors examined "awareness of how [respondents'] data was collected and used, how they valued different types of data, their feelings about privacy, and what they expected in return for their data." Morey, Timothy et al., "Customer Data: Designing for Transparency and Trust," *Harvard Business Review*, May 2015, https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust, last accessed on December 5, 2025 ("Morey et al. (2015)").

[84] Morey et al. (2015).

among individuals or across data types.[85] Yet in her report, Dr. Barasz overlooks the full spectrum of results in Morey et al. (2015), which shows that U.S. respondents valued data on their health history *less* than their web browsing and web search history data and were willing to pay substantially more to protect their government identification and credit card information than any other type of data.[86] According to the valuations presented in Morey et al. (2015), U.S. respondents also valued health history and demographic information at approximately the same level, which Dr. Barasz overlooks when drawing her comparison.[87] Taken together, these results undermine Dr. Barasz's implication that health information is a uniquely sensitive category for *all* "reasonable" consumers.

66. Dr. Barasz also claims that "Meta users do not understand all the ways in which their personal data is collected, disseminated, and used" and that "Meta users may be more focused on their on-platform privacy… and less aware – perhaps wholly unaware – of the myriad off-platform, third party sites from which Meta is harvesting their personal information."[88] Such a claim is directly contradicted by the results of my surveys in **Section III**, which find that the majority of respondents reported that they would not be surprised to see social media advertisements related to their online interactions with patient portals, healthcare provider websites, and prescription drug company websites. This suggests that U.S. Facebook users generally expect or understand that some information may be shared about their online interactions with healthcare websites.

67. Other results in studies cited by Dr. Barasz similarly demonstrate meaningful variation in consumer perceptions and engagement and undermine her hypotheses and

---

[85] Barasz Deposition, pp. 206:22-212:22 ("Q. Let's take a look at the next page or page 7. Actually, let['s] first look at page 6 where it says in the second -- can you read the sentence in the second full paragraph? A. To see how much consumers value their data? Q. Yes. A. To see how much consumers value their data, we did conjoint analysis to determine what amount of survey participants would be willing to pay to protect different types of information. We used purchasing parity rather than exchange rates to convert all amounts to U.S. dollars. Though the value assigned varied widely among individuals, we were able to determine an effect and median by country for each data type. Q. Any reason to dispute that the value assigned varied widely among individuals? A. No. Q. And the next sentence, the next paragraph says, The responses revealed significant differences from country to country and from one type of data to another. Any reason to dispute that responses varied significantly from data -- one type of data to another? A. No.").

[86] Morey et al. (2015), Figure "Putting a Price on Data."

[87] Morey et al. (2015), Figure "Putting a Price on Data."

A13-3730

[88] Barasz Report, ¶ 12.

conceptualization of an "average consumer." For example, for a different question in the Morey et al. (2015) study, the authors find heterogeneity in consumer awareness: 23% of respondents knew they were sharing web searches, 18% knew they were sharing communication history, and 14% knew they were sharing web-surfing history.[89]

68. Another study cited by Dr. Barasz, Tsai et al. (2010), finds that study participants did not behave in an "average" or uniform way.[90] The authors examined users' awareness and engagement with privacy information presented in simulated web search results.[91] This study did not seek to represent the "average" or "reasonable" consumer, as it was "designed to target individuals concerned with privacy rather than the population at large." The study therefore screened out 12.5% of respondents who perceived online shopping to involve "little or no privacy risk," demonstrating heterogeneity in the level of privacy concern.[92] Even among those who had expressed concern with privacy, behavior was not uniform. Among participants who were shown privacy information, 92% of participants noticed the icons rating the site's privacy policies, but only 32% read the privacy reports.[93] Further, only 60% of participants who were shown privacy icons

---

89 For this question, the authors reported percentages for the entire sample and did not report numbers for U.S. respondents only. See Morey et al. (2015), Figure "In the Dark About Data."

90 Tsai, Janice Y. et al., "The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study," *Information Systems Research*, Vol. 22 (2), February 2010, pp. 254–268 ("Tsai et al. (2010)").

91 Tsai et al. (2010), at p. 258 ("We used the Privacy Finder search engine to test the impact of prominent privacy information on purchasing behavior. Our study consisted of three parts: (1) an online concerns survey to determine what types of privacy concerns and products to include in the experimental part of the study (§4.1); (2) an online shopping experiment to investigate how the prominent display of privacy information affects the purchase behavior of privacy-minded users (§4.2); and (3) a post-experiment interview.")

92 Tsai et al. (2010), at p. 259 ("Our study was designed to target individuals concerned with privacy rather than the population at large: we assumed that our search interface would be helpful to people with some online privacy concerns. We calculated a 'risk score' for each participant and used it to screen out those who perceived online shopping to involve little or no privacy risk. Based on this requirement, we screened out 12.5% of the total respondents.").

93 Tsai et al. (2010), at p. 265 ("In the 'privacy information' condition, 92% noticed the icons (95% CI = 74%–99%), and 32% of participants read the privacy reports (95% CI = 15%–53.5%)."); at p. 258 ("In our experiment, we compared the way users currently obtain privacy policy information (a link to a privacy policy on the merchant's site) to a method in which privacy information was made more prominent and accessible, with search engine results presenting privacy icons. In all conditions, participants could still access privacy policies as they normally would—by clicking on the privacy policy link on a particular merchant's site."); at p. 261 ("Privacy icons and links to privacy reports were presented to [the Privacy Information] group. Participants in this condition were given a search engine key that highlighted the presence of gray box icons indicating a high or low privacy 'rating calculated based on our analysis of the site's computer readable privacy policy.'").

reported that "privacy information influenced the sites they visited and the sites from which they purchased,"[94] implying that even when provided with the same information, consumers engaged with and reacted differently to privacy policies.[95] Because Tsai et al. (2010) intentionally excluded participants with low privacy concern—individuals Plaintiffs do not exclude from their Proposed Classes—the study's findings cannot be generalized to the Proposed Classes. Additionally, the heterogeneity observed in this privacy-attentive sample likely understates the full range of variation in the Proposed Classes. Taken together, the findings from Morey et al. (2015) and Tsai et al. (2010) show variation in awareness and engagement that is inconsistent with the notion of a representative "average consumer."

69. Additional studies relied upon by Dr. Barasz further demonstrate heterogeneity in consumers' expectations and general understanding regarding privacy. Tang et al. (2021), for example, show that users' understanding of common privacy-related technical terms varies substantially: across 20 technical terms, respondents' (correct) understanding of privacy terms varied between approximately 16% and 87%—far from a uniform understanding of privacy-related terms and concepts.[96] Although the authors report an average rate of understanding of 39.6%, this value is far from the upper and lower rate of understanding determined by the study and thus not useful in characterizing the range present across *all* consumers and terms.[97] In effect, Dr. Barasz's claim, that the "average consumer" finds technical terms unfamiliar,[98] fails to capture the nuance that consumers'

94 Tsai et al. (2010), at p. 265 ("In the exit survey, 60% of the participants in the privacy condition reported that privacy information influenced the sites they visited and the sites from which they purchased (95% CI = 38.7%–78.9%).").

95 Although Dr. Barasz cites this study as evidence that "the average consumer preferred websites that concisely and transparently displayed privacy policy information and was even willing to pay more to purchase through such sites," these results support that transparency does not benefit all consumers equally. Barasz Report, ¶ 32.

96 Tang, Jenny et al., "Defining Privacy: How Users Interpret Technical Terms in Privacy Policies," *Proceedings on Privacy Enhancing Technologies*, Vol. 2021 (3), July 2021, pp. 70–94, at p. 76–77.

97 Tang, Jenny et al., "Defining Privacy: How Users Interpret Technical Terms in Privacy Policies," *Proceedings on Privacy Enhancing Technologies*, Vol. 2021 (3), July 2021, pp. 70–94, at pp. 76 ("Across our main study, respondents answered on average 39.57% of questions correctly, 49.01% of questions incorrectly, and answered 'I don't know' for 11.41% of questions.").

98 Barasz Report, ¶ 26 ("Terms and conditions clauses are rife with technical terms that the average consumer finds unfamiliar.").

understanding of such terms varies substantially. Moreover, she cites this study to make a general claim about consumer understanding, not tied to the specific facts of this case. Contrary to Dr. Barasz's opinion that the hypothetical "average consumer" is a reasonable way to describe the members of the Proposed Classes in this case, the findings in the literature she cites demonstrate that consumers' expectations and understandings of privacy-related concepts vary substantially depending on the specific language used.

70. Evidence from the WEF survey—the survey Dr. Barasz incorrectly characterizes as Meta's "internal" survey—further demonstrates that consumer expectations and comfort with data practices are heterogeneous and often vary meaningfully from any overall average. In the WEF survey, 43% of U.S. consumers agreed that they "would actively engage in trading or bartering elements of [their] online presence in return for value-added content or services that would be free of charge."[99] Among those willing to make that trade, substantial proportions selected specific data types they would be willing to provide—for example, website browsing history (30%), online search terms (21%), online advertisements accessed (29%), online music streamed (33%), and even personal health data (15%).[100] This is echoed by a Pew Research survey conducted in 2023, another study cited by Dr. Barasz, which finds that a substantial proportion of consumers place low value on their online privacy and trust companies to properly manage their data.[101] Overall, these findings show that consumers differ widely in their privacy

---

99 WEF Report, p. 52, Table 30.

100 WEF Report, p. 53, Table 31. When discussing results on Table 12 of the WEF survey, Dr. Barasz claims (without citing any support) that 20–30% is very small. See Barasz Deposition, p. 162:3-25 ("Q. You have said a few times that 20 percent, 29 percent is an extremely low number. What is the threshold percent that you would consider meaningful and would have an impact on your opinion? A. I don't have a specific number in mind. Q. If 50 percent of people feel a certain way, would that be meaningful to you? A. I think it would -- I think it would be hard to see the evidence presented here in this -- I am referring to the Exhibit 703. And knowing what we do about consumer behavior, I think it would be difficult to look at this and have one number meaningfully move the needle. And so if I saw it was 50 percent, but all the other statistics still held, I would still believe that most people care about their privacy and feel like it is being inadequately served."). WEF Report, p. 42, Table 12.

101 29% of U.S. consumers stated that they felt [online] privacy was "not that big of a deal to them" and 21% were "confident those who have access to their personal information will do what is right." McClain, Colleen et al., "How Americans View Data Privacy," *Pew Research Center*, October 18, 2023, https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/, last accessed on December 8, 2025. Dr. Barasz cited this study to support the following sentence in her report: "For instance, a recent Pew Research survey revealed that 81% of adults reported being concerned about how companies use the data they collect about them." Barasz Report, ¶ 8.

expectations, comprehension, and comfort levels—undermining any claim that a representative "average" or uniform consumer preference or expectation exists.

71. Finally, Dr. Barasz's own past study does not support her opinion that "the *average consumer* is significantly more comfortable with firms using information that was directly shared with the platform ('first-party-sharing') than data acquired outside the platform ('third-party-sharing')."[102] Although the study's results show a higher *average* acceptance of first-party practices, the underlying responses reflect wide variability: average acceptance of third-party practices was near the middle of the scale, and respondents' answers were spread across the range rather than clustered at that average, indicating that many respondents did not, in fact, disagree with the practice.[103] Dr. Barasz and her coauthors expressly acknowledge this heterogeneity, noting that "consumers have idiosyncratic, preconceived notions of how firms ought to handle their personal data."[104] They also recognize that "consumer attitudes about the collection and use of personal information have changed over time," and that "consumers may adapt to the idea that they are being targeted" in advertising.[105] These admissions by Dr. Barasz herself acknowledge that consumer preferences are neither uniform nor stable, directly contradicting the notion of a representative "average consumer" that is the basis of her report.

### 2. Dr. Barasz Dismisses a Meaningful Segment of Consumers Who Are Comfortable Sharing Data or Trading Privacy for Benefits

72. When Dr. Barasz does encounter evidence showing differences in consumer expectations, perceptions, and comfort, in many instances she adopts a one-sided approach and dismisses the views of a meaningful portion of consumers who express some degree of

102 Barasz Report, ¶ 17 (emphasis added).

103 The mean acceptance rating for third-party practices was 3.05 on a seven-point scale, with a standard deviation of 1.80. Kim, Barasz, et al. (2018), at p. 911.

104 Kim, Barasz, et al. (2018), at p. 908. Additionally, Kim, Barasz, et al. (2018) explicitly measure "individual differences in platform trust to test its moderating role" in ad effectiveness, implying that levels of trust are heterogeneous across consumers. Kim, Barasz, et al. (2018), at p. 918.

105 Kim, Barasz, et al. (2018), at p. 920.

comfort with data sharing or who are willing to give up some privacy under certain conditions.[106] For example, the WEF survey, which she erroneously characterizes as Meta's "own internal survey,"[107] shows that meaningful numbers of respondents indicated that they were comfortable with the following scenarios: "Your personal data and digital footprint information being sold to third parties for marketing purposes" (20%) and "Your personal data and digital footprint information being used to personalize the content, products, services and digital advertising you are exposed to" (28%).[108] At the same time, she ignores other results in the same study, which show that 28% to 46% of U.S.-based respondents report being comfortable with companies collecting and analyzing their use of a wide range of digital services.[109] Yet Dr. Barasz characterizes these similar figures as not a meaningful portion of U.S. adults.[110] Even if the WEF survey were representative of Facebook users—which it is not[111]—her interpretation would disregard the views of millions of U.S. Facebook users, which is inconsistent with her use of a representative "average consumer" perspective.

---

106 In deposition, Dr. Barasz claimed (without citing any evidence) that 20–29% is very small. Barasz Deposition, p. 162:3–25 ("Q. You have said a few times that 20 percent, 29 percent is an extremely low number. What is the threshold percent that you would consider meaningful and would have an impact on your opinion? A. I don't have a specific number in mind. Q. If 50 percent of people feel a certain way, would that be meaningful to you? A. I think it would -- I think it would be hard to see the evidence presented here in this -- I am referring to the [WEF survey]. And knowing what we do about consumer behavior, I think it would be difficult to look at this and have one number meaningfully move the needle. And so if I saw it was 50 percent, but all the other statistics still held, I would still believe that most people care about their privacy and feel like it is being inadequately served."). See also WEF Report, p. 43, Table 12. See also Barasz Deposition, p. 149:11–18 ("Q. And based on the Pew research you relied on, you saw that 29 percent of adults are not concerned about their privacy; right? A. A minority of people reported being unconcerned about their privacy as asked in that question, which I would suggest is vague and not very specific."), p. 161:23–24 ("A. Because I think 20 percent is an extremely low number.").

107 As I discussed in **Section IV.A**, Dr. Barasz incorrectly described this study as Meta's "own internal survey."

108 WEF Report, p. 43, Table 12.

109 WEF Report, p. 42, Table 11.

110 See Barasz Deposition, p. 130:11–131:12 ("Q. You don't think 30 percent or 29 percent of U.S. adults is a meaningful portion of U.S. adults? A. I do not. […] Q. And you think you can ignore 29 percent of people who don't think privacy is a big deal in coming to your opinions? […] A. I don't think that changes the story at all.").

111 As noted in the WEF study, respondents were recruited through global online panels and restricted to individuals ages "15–69 [who] own an[d] actively [use] internet-connected" devices at least weekly—criteria that have no relation to Facebook users or the Proposed Classes. As explained in **Section IV.C**, even if all respondents were Facebook users, the survey still would not be representative of Facebook users. See WEF Report, p. 36.

**A13-3735**

73. Dr. Barasz's opinions do not acknowledge further details from the WEF study highlighting aspects of consumer heterogeneity and preferences. First, numerous questions in the WEF study appear to employ a so-called Likert scale, which presents respondents with answer options on a scale between two opposite ends. For example, the WEF study asks "How comfortable are you with…" and offers different levels of comfort as answer options.[112] The Likert scale-based results in the WEF study display substantial heterogeneity. For instance, Dr. Barasz ignores that according to the WEF study, a meaningful proportion of participants (31%) *preferred* that their data be "collected, analyzed, stored, and linked to [their] identity"[113] to allow these users to enjoy a personalized experience. Furthermore, the WEF study finds that nearly half of respondents (43%) were willing to trade elements of their online presence (in other words, their privacy) for free value-added services, including trading information on their browsing history, online purchase history, online music streamed, and online ads accessed.[114] These findings show that a meaningful proportion of consumers is willing to share data under certain conditions, contradicting Dr. Barasz's claim that, if better informed, "users would object to (and opt-out of) many" such practices.[115]

74. The notion that a substantial portion of consumers is comfortable with certain forms of data sharing and willing to trade privacy for benefits can also be observed in other studies. For example, Morey et al. (2015), discussed above in the context of consumer heterogeneity, report that "72% of Americans are reluctant to share information with businesses because they 'just want to maintain [their] privacy,'" indicating that 28% of Americans do not hold that view.[116] Morey et al. (2015) also consider consumer benefits of data sharing, and state that "consumers appreciate that data sharing can lead to products and services that make their lives easier and more entertaining, educate them,

112 The WEF report defines comfortable as equal to "[r]espondents who selected 'Somewhat comfortable' or 'Very comfortable.'" WEF Report, pp. 6, 42, Table 11.

113 WEF Report, p. 33.

114 WEF Report, p. 52–53, Tables 30–31.

115 Barasz Report, ¶ 12.c ("Meta users do not understand all the ways in which their personal data is collected, disseminated, and used; were they sufficiently and explicitly apprised of these practices, Meta users would object to (and opt-out of) many.").

A13-3736

116 Morey et al. (2015).

and save them money."[117] In effect, despite some reluctance towards data sharing, the benefits are substantial enough such that "[n]either companies nor their customers want to turn back the clock on these technologies," with the "development and adoption of products that leverage personal data continu[ing] to soar."[118] Further, an EY survey finds that in 2020, 65% of consumers "would share [their] medical history with a medical institution (public or private) if it improved [their] healthcare experience," and 39% "would share [their] online search history with a large tech company in return for more personalized search results and/or online experiences."[119] These studies demonstrate that consumers routinely make context-specific trade-offs, varying their willingness to share volunteered, behavioral, or inferred data depending on the intended use (e.g., improving services, personalization, or third-party marketing).[120] Dr. Barasz even testified that she made these trade-offs herself, as she saw value in continuing to use Instagram despite her concerns with Facebook.[121]

75. Dr. Barasz's own past research also supports that there is a tradeoff between privacy and personalization which varies at the individual level. For example, in the second of Kim, Barasz et al. (2018)'s five experiments, they asked participants to rank their preference for privacy versus personalization on a scale of one to ten, with the final score coded "such that higher values represented higher relative concerns for privacy."[122] Although

---

117 Morey et al. (2015).

118 Morey et al. (2015). For example, data sharing enables personalized advertising, which consumers may find more relevant and in line with their interests. See also Kim, Barasz, et al. (2018), at p. 908 ("[…] well targeted ads are objectively more personalized; thus, they should by definition be more relevant and interesting to consumers. They can also facilitate the potential discovery of new products uniquely suited to consumers' needs, wants, and interests […].").

119 These statistics were reported for the global sample. EY, "Has Lockdown Made Consumers More Open to Privacy?," *EY Global Consumer Privacy Survey 2020*, 2020 ("EY Report"), p. 21, Figure 8.

120 Morey et al. (2015), Figure "Swapping Value for Data."

121 Barasz Deposition, pp. 278:11–279:5 ("Q. And you said you stopped using Facebook in 2017 or 2018, because you disagreed with their policies and the adtech exchange of information, but you were still using Instagram for several years after that; right? A. Yes. Q. And you didn't have your business yet? A. That's right. Q. So why did you continue using Instagram when you deactivated your Facebook account because of concerns over adtech? A. Social reasons. Q. So your -- the value in using Instagram for you overrode your privacy concerns with respect to Instagram, but not for Facebook? A. Yeah, I guess you could say that.").

122 Kim, Barasz, et al. (2018), at p. 912 ("To assess our proposed mediator, we asked participants: 'In order to provide more personalized recommendations for you, marketers need to gather more information about you. In other words, when receiving an advertisement, there is a tradeoff between maintaining your privacy and enjoying the benefits of greater personalization. Upon seeing the above ad, which factor is more important to

A13-3737

mean scores for each of the three groups considered exceeded five out of ten, consistent with a preference for privacy over personalization, the relatively large standard deviations indicate that a sizable subset of respondents rated below five, revealing the opposite preference.[123] As such, it is misleading for Dr. Barasz to characterize all consumers' data-sharing preferences using the averages produced in the study because the study itself shows that consumer preferences vary. She and her coauthors even acknowledged that these preferences are "likely to be multiply determined and may differ by context."[124]

### C. Findings from the Studies Dr. Barasz Cites Cannot Be Used to Draw Conclusions About This Case

76. Aside from the fact that Dr. Barasz overlooks crucial information in the studies she cites in her report, it is scientifically inappropriate to draw conclusions from those studies about the alleged issues in this specific case. Specifically, the respondent populations and context of these studies differ meaningfully from the Proposed Class Members and the context of the allegations in this matter.

#### 1. The Cited Survey Populations Are Not Representative

77. As a general guideline, when designing a survey, "[t]he target population should consist of all elements (i.e., individuals or other units) whose characteristic or perceptions the survey is intended to represent."[125] However, the studies that Dr. Barasz cites were not designed for the questions at issue in this case, and Dr. Barasz does not show that their

you when evaluating a targeted ad?' on a 10-point scale (1='Privacy is more important to me' to 10='Personalization is more important to me'). We reverse-coded this item such that higher scores represented higher relative concern for privacy.").

123 The mean responses for the three survey groups considered were 7.47, 6.75, and 6.97, with standard deviations of 2.43, 2.49, and 2.64, respectively. Kim, Barasz, et al. (2018), at p. 913 ("Specifically, privacy concerns were higher in the cross-website condition (M=7.47, SD=2.43) relative to both the within-website (M=6.75, SD=2.49; $t(298)=-2.51$, p=.01) and baseline conditions (M=6.97, SD=2.64; t(293)=1.67, p=.09).").

124 Kim, Barasz, et al. (2018), at p. 919 ("Our research suggests that the effectiveness of targeted advertising was driven in part by consumers' relative concern for their privacy over their interest in personalization. However, the relationship between ad transparency and ad effectiveness is likely to be multiply determined and may differ by context.").

125 Diamond (2011), at p. 376.

A13-3738

corresponding survey populations, tailored for other purposes, are representative of U.S. Facebook users or the Proposed Classes.

78. For example, Dr. Barasz cites the WEF survey as evidence of how "Meta users" feel about data sharing,[126] yet the respondent sample on which the WEF survey relies is not a population of U.S. Facebook users.[127] The WEF survey explains that respondents were recruited through *global* online panels and restricted to individuals whose ages range from "15–69 [who] own an[d] actively [use] internet-connected" devices at least weekly.[128,129] Dr. Barasz does not provide any evidence or reasoning that these criteria are adequate to target U.S. Facebook users or the Proposed Classes. Specifically, the WEF survey did not screen for Facebook use, nor did it screen for interactions with patient portals, healthcare provider websites, and prescription drug company websites, which are central to the allegations in this case.

79. The study by Tang et al. (2021), also relied upon by Dr. Barasz, is similarly problematic as a foundation for conclusions about members of the Proposed Classes. The authors fielded their study exclusively on Amazon Mechanical Turk ("MTurk")[130] and report that

126 Barasz Report ¶ 12.a ("[A] majority of U.S. participants were not comfortable with scenarios like having personal data sold to third parties for marketing purposes (80%), using personal data to personalize content and ads (72%), and having data stored by online browsers (71%) or social media networks (67%).") (emphasis removed).

127 WEF Report, p. 36 ("The final sample may not be fully representative of the broader general online population due to the likely tendency of online survey panels to have higher levels of understanding and comfort with the concepts presented in the survey.").

128 WEF Report, p. 36 ("All survey respondents fall in the age range 15-69, own an internet-connected TV, desktop/laptop, smartphone, tablet, or video game player, and actively use it at least once a week.").

129 Based on the WEF study, one can only conclude that Facebook and Instagram were the most and second most commonly used social media networks in the past six months among respondents (70% and 9%), respectively. WEF Report, p. 31 ("What are the top 3 most popular brands for each major type of digital media services or site examined?"). See also, Barasz Deposition, pp. 302:7–303:10 ("Q. Can you pull up Exhibit 704, please. A. Yes. Q. This was the World Economic Forum report? A. Yes. Q. Can you please turn to page 31? A. Yes. Q. Do you see where it says, USA digital media usage? A. I do, yes. Q. Can you please read the question right under that? A. What are the top three most popular brands for each page type of digital media services or site examined. Q. And do you see where it says social media networks? A. Yes. Q. And what is number 1? A. Facebook. Q. And what percentage is given there? A. 70. Q. And what is number 2? A. Instagram. Q. And what percentage? A. 9.").

130 MTurk "is an online labor market where requesters post jobs and workers choose which jobs to do for pay." It can be used to recruit participants in behavioral experiments, including surveys. Mason, Winter and Siddharth Suri, "Conducting Behavioral Research on Amazon's Mechanical Turk," *Behavioral Research Methods*, Vol. 44, 2012, pp. 1–23, at pp. 1, 10.

their sample was "younger than the overall U.S. population," noting that MTurk demographics "are not an exact match to the overall demographics of the United States."[131] Unlike my study, none of the survey's screening criteria relate to the populations at issue here: Tang et al. (2021) did not identify Facebook users, patient-portal users, individuals interacting with the sorts of websites at-issue in this case, or visitors to prescription-drug sites. Additionally, although Dr. Barasz cites her own prior study, Kim, Barasz et al. (2018), as evidence that enhanced transparency "can lessen the average consumer's privacy concerns,"[132] only two of the five experiments involved Facebook users; the remaining experiments relied on general MTurk samples without screening for Facebook usage.[133] Because the respondent populations in these studies are not tailored to U.S. Facebook users or the Proposed Classes, Dr. Barasz has not shown that their findings can be generalized to this case or used to support the conclusions she seeks to draw from them.

80. Other studies cited by Dr. Barasz are not representative of the members of the Proposed Classes in this matter. For example, the Morey et al. (2015) study surveyed "900 people in five countries–the United States, the United Kingdom, Germany, China, and India–whose demographic mix represented the general online population."[134] Morey et al. (2015) do not provide further details on the demographics and the sampling process, and Dr. Barasz does not provide evidence to show that this "general online population" from five countries is representative of U.S. Facebook users or the Proposed Classes.

### 2. A Number of the Studies Predate the Proposed Class Period

81. Several of the studies that Dr. Barasz cites were conducted prior to the start of the Proposed Class Period. For example, the surveys conducted by Morey et al. (2015) were

---

131 Tang, Jenny et al., "Defining Privacy: How Users Interpret Technical Terms in Privacy Policies," *Proceedings on Privacy Enhancing Technologies*, Vol. 2021 (3), July 2021, pp. 70–94, at p. 75 ("We observe briefly that the demographics of these user studies are not an exact match to the overall demographics of the United States. Notably, our sample population is younger … [and] also more male tha[n] the overall [U.S.] population.").

132 Barasz Report, ¶ 36.

133 Kim, Barasz, et al. (2018), at pp. 911–917.

134 Morey et al. (2015).

fielded in 2014 and the U.S. sample of the WEF survey was fielded in 2016,[135] and Dr. Barasz's own study, Kim, Barasz et al. (2018), was conducted over the course of 2016 to 2017.[136] Since that time, technologies have evolved and the environment in which consumers form preferences and expectations have changed. For example, Meta has introduced its Privacy Center along with features notifying users about changes to privacy policies through push notifications.[137] Additionally, an EY survey finds that the COVID-19 pandemic made 54% of consumers more aware of the personal data they share[138] and made 50% of consumers more willing to share personal data.[139] Similarly, Dr. Barasz acknowledges in her own study, Kim, Barasz et al. (2018), that "consumer attitudes about the collection and use of personal information have changed over time" such that "the invasive and unsavory practices of today may come to be seen as benign and acceptable," and that "consumers may adapt to the idea that they are being targeted."[140] Even if these studies capture attitudes specific to the contexts in which they were conducted, Dr. Barasz treats them as if they support broad conclusions about a representative "average consumer" during the Proposed Class Period, which they do not.

---

135 Morey et al. (2015); WEF Report, p. 36. In fact, out of the 12 studies and articles cited by Dr. Barasz, more than half were conducted or published before the start of the Proposed Class Period, with one study published as early as 2008. See, e.g., McDonald, Aleecia M. and Lorrie Faith Carnor, "The Cost of Reading Privacy Policies," *A Journal of Law and Policy for the Information Society*, Vol. 4 (3), 2008, pp. 543–568.

136 Kim, Barasz, et al. (2018), at p. 920 ("The first author conducted the collection of data for studies 1–4 during 2016 and 2017 following the procedures described; studies 5a and 5b were conducted by our field site in 2017.").

137 Protti, Michel, "Here's What You Need to Know About Our Updated Privacy Policy and Terms of Service," *Meta*, May 26, 2022, https://web.archive.org/web/20251005235837/https://about.fb.com/news/2022/05/metas-updated-privacy-policy/, last accessed on December 8, 2025. Meta has also invested more than $8 billion since 2019 to rebuild its privacy program. See also Protti, Michel, "Reflecting on Meta's $8 Billion Investment in Privacy," *Meta*, January 28, 2025, https://web.archive.org/web/20250625074641/https://about.fb.com/news/2025/01/meta-8-billion-investment-privacy/, last accessed on December 8, 2025.

138 This statistic was reported for the global sample. This number increases to 58% when considering only consumers in the Americas. EY Report, p. 10, Figure 3 ("More than half of consumers (54%) say that COVID-19 has made them more aware of the personal data they share than they were prior to the pandemic. [...] This rises to 58% among those in Asia-Pacific and the Americas.").

139 This statistic was reported for the global sample. EY Report, p. 5 ("Exactly half (50%) of consumers surveyed say that the pandemic has made them more willing to part with their personal data, especially if they know it is contributing to the research effort and/ or community wellness.").

A13-3741

140 Kim, Barasz, et al. (2018), at p. 920.

### D. Dr. Barasz Failed to Conduct Empirical Research Specific to the Facts of this Case

82. Dr. Barasz's opinions lack an empirical foundation as she failed to test any of her hypotheses empirically within the context of this matter.[141] Nonetheless, Dr. Barasz asserts that her construct of the "average consumer" is purportedly grounded in empirical results.[142] Yet she does not present empirical results relevant to this case; instead, she relies on surveys and studies she conducted years ago (for other purposes) in her own academic work. But the four questions raised in her assignment could each be tested using empirical, context-appropriate studies,[143] such as the surveys I conducted for this case. Dr. Barasz's failure to conduct any such studies weakens the reliability of her opinions.

83. For example, Dr. Barasz's claims about consumer understanding of Meta's data policy are subjective and unreliable. She claims that:

> "[…] Meta users will interpret [the data policy] through the lens of their own previous experience: that a partner's lack of compliance would likewise trigger a lack of functionality. Said differently, Meta users would have reasonably believed that if Meta's partners did not have the right to share their personal information, the transmission of such information would be automatically and proactively blocked."[144]

---

141 See, e.g., Barasz Deposition, p. 79:5–21 ("Q. Is there anything in your report that would enable another researcher to replicate the methodology you used to come to your conclusions? A. Can you rephrase that. Q. Yes. Would another researcher be able to replicate your methodology that you used in preparing your report here? A. Yes. Q. How would they do that? A. Well, again, I feel like we are talking about methodology as different from how I would conceptualize it. So we didn't follow a protocol, we didn't collect data. I think if many privacy researchers were asked these four questions, they would take a similar approach to what I did.").

142 Barasz Report, ¶ 2 ("Consistent with this methodology, I will refer throughout the report to an "average consumer," a generalization that is based on empirical results and is grounded within the research methods I (and others) relied upon. Worth noting, both the actual experimental participants we recruited, as well as the resulting conceptualization of an "average consumer," align with what I understand the Court's definition of a "reasonable consumer" to be — someone with the level of sophistication of the general public.").

143 The four questions are: (1) "Do Meta users care about maintaining their online privacy?," (2) "Do Meta users have expectations about how their personal information is handled?," (3) "Would Meta users expect a company like Meta to obtain their personal information from partners who were not allowed to share it?," (4) "What effect would Meta's transparency and control tools […] have on Meta users?" Barasz Report, ¶ 7.

144 Barasz Report, ¶ 28.

84. Yet this claim reflects the belief and interpretation of only one individual, herself. Dr. Barasz offers no empirical evidence to show how U.S. Facebook users actually interpret this language, and she conducted no testing of consumer beliefs or expectations to substantiate this conclusion.

85. Dr. Barasz's lack of empirical analysis is also evident in her review of Meta's transparency and control tools ("Why Am I Seeing This Ad?," "Download Your Information," and "Off-Facebook Activity"). Her only assessment of these tools consisted of an anecdotal review of her own Facebook account and that of a family member.[145] Again, this assessment reflects the belief and interpretation of only one individual, herself. Her claims about how Meta users would interpret these tools are thus unreliable, as they are based only on her own subjective interpretation. As she acknowledged in deposition, her approach cannot substitute for a systematic evaluation.[146]

86. Dr. Barasz's personal experience is not only not empirical evidence, it is likely not representative of the experience of any member of the Proposed Classes. Dr. Barasz resides in the European Union,[147] and she conducted her review in 2025. She made no attempt to assess whether or how Meta's transparency and control tools appeared differently toa broad set of U.S. users or whether they have changed since 2018, the start

---

145 Barasz Report, Section III.D, ¶¶ 35.b–35.c ("To replicate and assess the Meta user's experience, I used the DYI tool on two Facebook accounts (my own and a family member's). […] . To replicate and assess the Meta user's experience, I used the OFA tool on two Facebook accounts (my own and a family member's).").

146 Dr. Barasz admitted in her deposition that she did not follow a methodology in drawing conclusions for her report. Barasz Deposition, p. 79:5–21 ("Q. Is there anything in your report that would enable another researcher to replicate the methodology you used to come to your conclusions? A. Can you rephrase that. Q. Yes. Would another researcher be able to replicate your methodology that you used in preparing your report here? A. Yes. Q. How would they do that? A. Well, again, I feel like we are talking about methodology as different from how I would conceptualize it. So we didn't follow a protocol, we didn't collect data. I think if many privacy researchers were asked these four questions, they would take a similar approach to what I did."), p. 74:4–17 ("Q. Do other people in your field use the methodology that you used in putting together your report to draw conclusions about the average consumer? A. I wouldn't say that there was a methodology per -- per se. Methodology in my world would be very specific to the type of research that one does. So in this case compiling -- compiling opinions and a list of conclusions isn't really a methodology. So people rely on methodologies like running experiments, doing survey analysis, using big datasets. I wouldn't call writing a report a methodology.").

147 Barasz Report, ¶ 3 ("Instead, I opened two English bookshops in Barcelona, Spain, where I now spend my days"); Barasz Deposition, p. 274:3–5 ("It is my assumption that because I was accessing it in the EU, it might have shown me more information rather than less.").

of the Proposed Class Period. Dr. Barasz further admitted that the tools did not even appear the same between the two accounts she reviewed, underscoring that her subjective interpretation is not generalizable to broader populations.[148] Dr. Barasz conducted no empirical research to assess how consumers actually perceived or experienced these tools. As a result, her conclusions regarding Meta's transparency and control tools are subjective and unreliable.

87. To go beyond formulating hypotheses as to how consumers might perceive the circumstances and context in this matter, I conducted my own surveys and assessed U.S. Facebook users' expectations with respect to the data sharing allegations in this case, as described above in **Section III**. My findings invalidate Dr. Barasz's hypotheses pertaining to U.S. Facebook users' privacy expectations, and I found that a majority of respondents reported that they would not be surprised to see social media advertisements related to their online activities on healthcare websites, and that there is substantial heterogeneity in the degree to which respondents expect their data to be shared.

## V. Dr. Vohs Fails to Acknowledge Perspectives in the Literature that Do Not Support Her Opinions

88. In this section, I evaluate Dr. Vohs's opinions on consumer beliefs and expectations. I first provide an overview of Dr. Vohs's opinions in **Section V.A.** Next, in **Section V.B**, I describe Dr. Vohs's "narrative literature review" and explain how it presents a biased and incomplete view of the academic research on the questions she was asked to address, including ignoring studies that contradict her central opinions. In **Section V.C**, I explain

148 Barasz Deposition, pp. 272:20–274:8 ("Q. Your review of the transparency and control tools offered by Meta is based on your personal Facebook and Instagram accounts and the account of one of your family members; right? A. That's right. Q. You didn't review any historical versions of those tools; right? A. No. But I believe that it was included in -- I believe I reviewed something, maybe the DYI, from one or more of the named plaintiffs as well. But my full evaluation of the tool was based on myself and my family member. Q. Do you know how the tools changed over time, if at all? A. No. Q. Do you know if they looked different for different people? [...] A. I think it depends a bit on which tool we are talking about. So for example, I know that why am I seeing this ad, the WAIST tool has changed over time, because it doesn't look like it did when we started our research. I know that, for example, when I turned off my OFA sharing, my start here. [My] HTML dashboard said different things than my family members did who have not turned that off. So I know that it changes depending on that. It is my assumption that because I was accessing it in the EU, it might have shown me more information rather than less. But that's -- overall they looked fairly consistent between myself and my family members.").

that many of the studies that Dr. Vohs relies on were not designed to address the questions at issue and involve populations, contexts, and time periods that differ meaningfully from the context of this case. Finally, in **Section V.D**, I show that Dr. Vohs's narrative literature review overlooks evidence of substantial heterogeneity in consumer beliefs and expectations that are evident in those studies. In contrast to Dr. Vohs's opinions, these studies show that consumers have highly variable beliefs on what they consider to be "sensitive" information and expectations on how their "health information" will be used. I even note that Dr. Vohs's own analysis at times contradicts her conclusions: determining that "health information" is sacred, but later discussing the conditions under which people would trade-off the risks of sharing for benefits is a logical flaw.

### A. Summary of Dr. Vohs's Opinions

89. Dr. Vohs was asked to provide opinions on two questions.[149] First, "[d]o people think of health information as more sensitive than other data?"[150] Second, "[w]ould people agree and find it acceptable for communications with their healthcare providers to be: [c]ollected by a social media company?[;] [u]sed for marketing?[;] [u]sed to help a social media company train their AI models?"[151] Dr. Vohs opines yes to the first question and no to the second.[152]

90. Dr. Vohs states that she relied on a "narrative literature review" as the basis for her opinions.[153] She reaches five conclusions based on her narrative literature review of 27 academic articles:

---

149 Vohs Report, ¶ 2.

150 Vohs Report, ¶ 2.

151 Vohs Report, ¶ 2.

152 Vohs Report, ¶ 5 ("As I explain below, consumers view health information as sensitive information, more so than other information. Consumers, on the whole, would not agree nor find it acceptable for communications with their healthcare providers to be used by a social media company, for marketing purposes, or to help a social media company train their AI models.").

153 Deposition of Kathleen D. Vohs, Ph.D., October 28, 2025, ("Vohs Deposition"), p. 72:15–25 ("Q. What materials did you rely on in preparing your report, setting aside generalized expertise? A. The papers cited in

A13-3745

a. "Empirical evidence supports the conclusion that people think of health information as more sensitive than other information."[154]

b. "People have high trust in healthcare provider websites as an extension of the patient-healthcare provider relationship and as suggested by cues as to the ownership of the website (e.g., ending in .org)."[155]

c. "When deciding whether to allow their health information to be shared, patients weigh the potential benefits of what sharing could provide for them (e.g., better treatment and health outcomes) versus the harms that could befall them. Patients' paramount concern is that their sacred health information will not be kept confidential."[156]

d. "People would not agree, nor would they find it []acceptable for communications with their healthcare provider to be shared with a social media company for marketing or other profit-seeking purposes (including training AI models)."[157]

e. "There are meaningful consequences to patients feeling that their health information is not kept confidential."[158] And "when patients do not trust that their health information is confidential, their health outcomes can suffer."[159]

---

the Reference section. Q. Thank you. How did you select the articles cited in the Reference section for this report? A. I conducted a narrative literature review. Is that your whole answer? A. It can be, yeah. Yeah.").

154 Vohs Report, ¶ 52.

155 Vohs Report, ¶ 53.

156 Vohs Report, ¶ 54.

157 Vohs Report, ¶ 55. Note that Dr. Vohs seems to mistakenly use the word "unacceptable" instead of "acceptable" in this concluding sentence. In an earlier paragraph in her report, she states "[c]onsumers, on the whole, would not agree nor find it *acceptable* for communications with their healthcare providers to be used by a social media company, for marketing purposes, or to help a social media company train their AI models." Vohs Report, ¶ 5 (emphasis added). Dr. Vohs also corrected this sentence in her deposition. See Vohs Deposition, 248:6–248:19 ("Q. Okay. And you see the reference to 'unacceptable'? You see that? A. Uh-huh. I do. Q. Should that be 'acceptable'? Is that an error? A. Yeah, that is an error. Q. So should -- should it read 'acceptable'? A. Yes. It should read 'People would not agree, nor would they find it acceptable, for communications with their healthcare provider to be shared with a social media company for marketing or other profit-seeking purposes, including training AI models.'").

158 Vohs Report, ¶ 56.



159 Vohs Report, ¶ 50.

### B. Dr. Vohs Fails to Apply Accepted Standards for Conducting Narrative Literature Reviews

91. As described above, Dr. Vohs relies on what she refers to as a "narrative literature review" to reach her conclusions.[160] A narrative literature review is a comprehensive synthesis of previously published literature on a particular topic or question of interest.[161] Dr. Vohs's own description makes it clear that her approach was neither comprehensive nor conducted according to accepted standards in the research field. She notes that "[i]n a narrative literature review you have a research question in mind and you survey the relevant literature to assess what kind of articles pertain to it, and then you read those articles and assess what they have to say."[162]

92. There are three accepted types of literature reviews:[163] narrative review, qualitative systematic review,[164] and quantitative systematic review (meta-analysis).[165] Although

---

[160] Vohs Deposition, p. 72:15–25 ("Q. What materials did you rely on in preparing your report, setting aside generalized expertise? A. The papers cited in the Reference section. Q. Thank you. How did you select the articles cited in the Reference section for this report? A. I conducted a narrative literature review. Is that your whole answer? It can be, yeah. Yeah.").

[161] Green, Bart N. et al., "Writing Narrative Literature Reviews for Peer-Reviewed Journals: Secrets of the Trade," *Journal of Chiropractic Medicine*, Vol. 5 (3), 2006, pp. 101–117 ("Green et al. (2006)"), at p. 103 ("*Narrative overviews*, also known as *unsystematic narrative reviews*, are comprehensive narrative syntheses of previously published information […] This type of literature review reports the author's findings in a condensed format that typically summarizes the contents of each article.") (emphasis in original); Hecker, Jörg and Neringa Kalpokas, "What is a Narrative Literature Review?," *ATLAS.ti*, https://atlasti.com/guides/literature-review/narrative-literature-review, last accessed on December 8, 2025 ("A narrative literature review provides a comprehensive overview of the literature on a specific topic. They are descriptive and often used to summarize, interpret, and critically evaluate the current state of knowledge in a particular field.").

[162] Vohs Deposition, p. 73:1–9 ("Q. You conducted a narrative literature review? A. Yes. Q. What is a narrative literature review? A. In a narrative literature review you have a research question in mind and you survey the […] relevant literature to assess what kind of articles pertain to it, and then you […] read those articles and assess what they have to say.").

[163] Green et al. (2006), at pp. 102–103 ("The three basic types of literature reviews are narrative reviews, qualitative systematic reviews, and quantitative systematic reviews (meta-analyses).").

[164] **Qualitative systematic review** is a "type of literature review that employs detailed, rigorous and explicit methods. […] Authors of systematic reviews attempt to obtain all original (primary) research studies published on the topic under study by searching in multiple databases, performing hand searches and contacting authors of previously published research. Additionally, authors will attempt to locate articles that may not have been published because the results of the study did not support the research hypothesis." Green et al. (2006), at p. 104.

[165] **Quantitative systematic review (meta-analysis)** is a "systematic review that critically evaluates each paper and statistically combines the results of the studies […] to make an objective science out of research synthesis." Green et al. (2006), at pp. 104–105.

narrative literature reviews typically require less qualitative and quantitative evidence than the other two types of literature reviews, articles on conducting appropriate narrative literature reviews often discuss common pitfalls of an ad-hoc approach to conducting such reviews and best practices to minimize the risk of bias from such an approach.[166]

93. One common concern with narrative literature reviews is the potential for bias, particularly an author's tendency to selectively present or interpret evidence.[167] Baumeister and Leary (1997), in a guide on writing narrative literature reviews, explain that a lack of structured approach to a narrative literature review could lead to a selective review of evidence, in which the author of the review includes only material that fits one particular position and ignores the rest, leaving the reader unaware of material that would weaken or contradict the author's position.[168] Other common mistakes in narrative literature reviews include a "lack of critical appraisal," i.e., failure to scrutinize the weaknesses and flaws of the evidence, and "blurring assertion and proof," i.e., failure to distinguish between merely "citing someone who stated an idea and citing someone who provided empirical support for it."[169]

---

166 Sukhera, Javeed, "Narrative Reviews: Flexible, Rigorous, and Practical," *Journal of Graduate Medical Education* Vol. 14 (4), 2022, pp. 414–417, at p. 414 ("Unlike systematic reviews, narrative reviews offer researchers the ability to synthesize multiple points of view and harness unique review team perspectives, which will shape the analysis."); Green et al. (2006), at p. 104 ("Because of the rigorous methods employed in conducting qualitative systematic reviews, they are a more powerful evidence-based source to garner clinical information than narrative reviews").

167 Baumeister, Roy F., and Mark R. Leary, "Writing Narrative Literature Reviews," *Review of General Psychology*, Vol. 1 (3), 1997, pp. 311–320 ("Baumeister and Leary (1997)"), at p. 319; ("Although literature reviews are less subject than empirical investigations to capitalizing on chance, they are probably more susceptible to the danger of confirmation bias. […] At worst, the author may be operating as an 'intuitive lawyer' rather than in a scientist mode. […] A less bad but still unfortunate pattern is that of selective critique [where] the author covers all the relevant evidence, […] but then applies more rigorous methodological standards to the contrary evidence[.])"; Green et al. (2006), at p. 102; "Types of Literature Reviews," *University of Toronto Library*, September 19, 2025, https://guides.hsict.library.utoronto.ca/c.php?g=705263, last accessed on December 8, 2025 ("Although the reviews may be conducted by topic experts, due to preconceived ideas or conclusions, they could be subject to bias.").

168 Baumeister and Leary (1997), at p. 319 ("Selectivity in a literature review can take several forms. At worst, the author may be operating as an 'intuitive lawyer' rather than in a scientist mode, in the sense of trying to make a case for one particular position or conclusion. This could lead him or her to cover only material that fits that view and ignore the rest.").

169 Baumeister and Leary (1997), at pp. 317–318 ("Often, however, authors of literature reviews neglect to [point out and assess […] flaws and weaknesses]. One reason authors neglect critique is that they are trying to build a case for a particular argument, and so they searched the literature and presented the results so as to make that point most convincingly.").

94. In a guide to writing narrative literature reviews for peer-reviewed journals, Green et al. (2006) similarly caution against presenting an "opinion oriented argument […] rather than objective conclusions based upon the literature reviewed."[170] They further caution against a subjective approach that "lacks explicit criteria for inclusion and leads to a biased review" and one that fails to consider differences in the context of studies, including the study population. Green and his co-authors note that failure to do so can lead to "faulty conclusions or incorrect information." [171]

95. To minimize the risk of bias and faulty conclusions from narrative literature reviews, scholars have outlined several guidelines for conducting them. Green et al. (2006) describe the core elements of narrative reviews and offer recommendations for best practices. They advise that authors: (i) begin a literature search using one of the common electronic databases such as PubMed, Database of Abstracts of Reviews of Effects (DARE), or Cochrane Database of Systematic Reviews, noting it is "usually necessary to search at least two databases […] to provide a reasonable breadth and depth on a topic"; (ii) set specific parameters for the search terms; and (iii) identify the selection criteria that led to the inclusion or exclusion of articles.[172] Similarly, an article on conducting narrative reviews by Sukhera (2022) advises that "[a]uthors should carefully outline how researchers conducted analyses and how they determined that sufficient analysis and interpretation was achieved."[173] Baumeister and Leary (1997) highlight the importance of

[170] Green et al. (2006), at p. 103 ("Authors must be careful to avoid a common pitfall of the overview design, which is to present an opinion oriented argument based upon a myriad of references, rather than objective conclusions based upon the literature reviewed.").

[171] Green et al. (2006), at p. 104 ("Usually the number of sources employed to find the literature are incomplete, possibly creating an insignificant knowledge base from which to draw a conclusion. In this rather unsystematic approach, selection of information from primary articles is usually subjective, lacks explicit criteria for inclusion and leads to a biased review. The author's interpretation and synthesis of information should take into account major differences between studies, such as if patients samples in one study are completely different than in another or that research designs are not comparable. Without identifying these differences, one takes the risk of providing faulty conclusions or incorrect information.").

[172] Green et al. (2006), pp. 101–117, at pp. 107–109.

[173] Sukhera, Javeed, "Narrative Reviews: Flexible, Rigorous, and Practical," *Journal of Graduate Medical Education,* Vol. 14 (4), 2022, pp. 414–417, at p. 415.

a critical examination of studies in the review, including "a deliberate search for contrary evidence" or a "critical appraisal" of counterexamples.[174]

96. Dr. Vohs's approach to her narrative literature review does not follow these guidelines. In her deposition testimony, Dr. Vohs testified that she:

a. Did not use an established literature search database (such as PubMed or Web of Science) to identify relevant articles, relying instead on searches using web browsers like Google;[175]

b. Could not recall, and did not memorialize, any of the search terms she used to identify an initial set of studies for her review;[176] and

c. Did not utilize a well-defined selection criteria for identifying the 27 academic studies that she selected to include in her report among the "over 100 articles" that she came across, aside from "a quick evaluation from the title and abstract of its relevance."[177]

---

174 Baumeister and Leary (1997), at p. 319 ("Ideally, a literature reviewer should spend some time searching for counterexamples or domains of evidence that would seem to contradict the main conclusions and patterns. These can be included in the article as separate sections and given the same critical appraisal as the supporting evidence. If there are important exceptions to the general patterns and conclusions, the literature review is strengthened by acknowledging them, and theory can be built further by recognizing moderators and boundary conditions. If the exceptions are merely apparent and do not on close inspection contradict the main pattern, the manuscript is strengthened by pointing them out. Thus, either way, a literature review can be improved by a deliberate search for contrary evidence.").

175 Vohs Deposition, pp. 188:10–189:1 ("Q. Which databases did you search in when you were doing your narrative literature review? […] THE WITNESS: I mean, I am using just general – it's really, like, inputting information into a web browser and then papers come up. They are not in -- did you say databases? They are not really in databases, but the databases are sometimes where you have to go to fetch the articles, but that's more, you know, exercise in retrieval. It's not as if I was using a specific database and then doing the searches within it.").

176 Vohs Deposition, p. 74:14–16 ("Q. What search terms did you use? A. Oh goodness. I would not even be able to tell you now.").

177 Vohs Deposition, pp. 76:16–77:12 ("Q. How many articles, roughly, do you recall reviewing as part of the narrative literature review? A. Oh, goodness. I don't even think I could tell you. I don't even know how many are listed here. Q. Would you say it's in the hundreds in terms of the number of articles you reviewed before you selected which you would rely on for your report? A. What do you mean by 'reviewed'? Q. Read some of. A. Hundreds, no. Q. More than 100? A. I mean, I am trying to remember. I have never thought of my search process in that way of the number of articles that I have reviewed. But there is probably over – there is probably over 100 articles that I came across and did a quick evaluation from the title and abstract of its relevance.").

97. As I discuss in **Sections V.C** through **V.E** below, Dr. Vohs's lack of adherence to these industry practices results in a biased presentation of literature that omits studies and findings that contradict her generalized conclusions about consumer beliefs and expectations regarding health data. In her narrative literature review, Dr. Vohs repeatedly recasts nuanced findings into generalized, population-wide claims (e.g., that "[c]onsumers on the whole, would not agree nor find it acceptable" for their information to be used in specified ways), without evaluating how different contexts can lead to variations in consumers' willingness to share information.[178] Dr. Vohs's report obscures the substantial heterogeneity documented not just in the empirical literature that she omits from her report, but also in the very studies she cites therein. She also fails to critically evaluate the studies included in her review and overlooks the studies' explicit limitations.

### C. Dr. Vohs's Opinions Rely on a Narrative Literature Review That Cannot Be Used to Draw Conclusions About This Case

98. Narrative literature reviews that do not account for differences in the study contexts and that fail to critically evaluate studies included in the review can lead to "faulty conclusions or incorrect information."[179] Dr. Vohs commits both errors in her review.

99. In this section, I show that Dr. Vohs fails to consider the context of the studies cited in her narrative literature review, and whether these studies can be appropriately generalized to the context of this case. I also highlight how Dr. Vohs does not acknowledge the limitations that these studies' own authors identify. These critical flaws in her literature review cause Dr. Vohs to inappropriately generalize and overstate the breadth and relevance of her conclusions and their applicability to the specific context of this case.

100. In contrast, as discussed in **Section III**, I designed and conducted three empirical studies specifically tailored to the context of this case and with the goal of assessing the

---

178 Vohs Report, ¶ 5.

179 Green et al. (2006), at p. 104 ("The author's interpretation and synthesis of information should take into account major differences between studies, such as if patients samples in one study are completely different than in another or that research designs are not comparable. Without identifying these differences, one takes the risk of providing faulty conclusions or incorrect information. All of these potential pitfalls are avoidable if the author is aware of them and takes the appropriate steps to avoid them.").

expectations of U.S. Facebook users. My three empirical studies suggest that in the context specific to the online activities on healthcare websites, there is substantial heterogeneity in the strength of expectations regarding the sharing of information. These results contradict Dr. Vohs's conclusions regarding people's expectations for the sharing of their information that she developed based on a biased and incomplete narrative literature review.

#### 1. Dr. Vohs Fails to Consider Context When Examining and Interpreting the Studies in Her Narrative Literature Review

101. Individuals' beliefs and expectations about privacy and willingness to share data depend on context. Beliefs and expectations in the contexts specified in Plaintiffs' Complaint and Motion for Class Certification may be different from those in the specific settings highlighted in studies used in Dr. Vohs's literature review. In Thomadsen, Rooderkerk, Amir et al. (2018), my co-authors and I define context as the "factors that have the potential to shift the choice outcome by altering the process by which the decision is made."[180] As relevant to the matters at-issue in this case, "context" covers factors such as locations, activities, consumption environments, social network within which a choice is made (e.g., a family), decisions of others, the presence of default options, and habits. Each of these factors can impact a consumer's choice and behavior.[181]

102. The Proposed Classes describe a context where U.S. Facebook users interact with healthcare apps and websites in settings such as clicking a button to book medical appointments, searching health conditions on a public website, or visiting a website about a prescribed drug. Dr. Vohs acknowledges that context matters, for example, in

[180] Thomadsen, Raphael, Rooderkerk, Robert P., Amir, On et al., "How Context Affects Choice," *Customer Needs and Solutions*, Vol. 5 (1–2), March 2018, pp. 3–14, at p. 3.

[181] Thomadsen, Raphael, Rooderkerk, Robert P., Amir, On et al., "How Context Affects Choice," *Customer Needs and Solutions*, Vol. 5 (1–2), March 2018, pp. 3–14, at p. 5 ("While many papers have focused on a narrow set of contextual phenomena (such as choice set composition effects in marketing), we believe there are many ways by which contexts affect choices. For example, locations, activities, and consumption environments can trigger habits and other automatic processes to impact choice […]. The social network within which a choice is made (e.g., a family) may change the decision context. Habits form as consumers repeat responses and learn mental associations between features of the performance context and rewards. Decisions of others might shape ones' decisions, or the presence of default options may affect ones' choices.").

A13-3752

understanding what health information is and what it entails.[182] Thus, Dr. Vohs's generalization of consumers' behavior in specific contexts to the context of this case is inappropriate.

103. Dr. Vohs's review omits studies showing that context matters. Existing literature not cited by Dr. Vohs's review shows that, depending on the context, consumers can have preferences different than what Dr. Vohs asserts in her report. For example, the literature on the "privacy paradox," the empirically observed disconnect between individuals' stated privacy concerns and their actual behavior related to protecting (or not protecting) their privacy, underscores the importance of context and trade-offs in understanding consumer perceptions regarding data sharing.[183] For example, a review of 51 studies on the privacy paradox by Kokolakis (2017) reports that "the diverse research results [on the privacy paradox] are explained [in part by] different contexts."[184] Below, I highlight specific examples showing that even the studies cited in Dr. Vohs's narrative literature review highlight the importance of considering context. Individuals' willingness to share health-related data depends heavily on context, including the perceived benefits of sharing, the type of data, the identity of the recipient, and the purpose of use, and that consumers' attitudes and behavior can vary substantially across settings and populations. Some of the literature cited by Vohs also show that high degrees of stated privacy concerns can coexist with substantial data sharing, and individuals' stated privacy concerns alone do not reliably predict whether people will decline to share information in

[182] Vohs Deposition, p. 63:14–17 ("Q. What other information would you need? A. I would need lots of information about what is the context, what is the consumer's understanding, and so on."), p. 231:8–17 ("Q. What additional information would you need to determine whether the text of Exhibit 685 is health information? […] THE WITNESS: I mean, lots of factors could -- lots of factors could be relevant here as to whether this is health information.").

[183] Kokolakis, Spyros, "Privacy Attitudes and Privacy Behavior: A Review of Current Research on the Privacy Paradox Phenomenon," *Computers & Security*, Vol. 64, 2017, pp. 122–134, at p. 122 ("Surveys show that privacy is a primary concern for citizens in the digital age. On the other hand, individuals reveal personal information for relatively small rewards, often just for drawing the attention of peers in an online social network. This inconsistency of privacy attitudes and privacy behaviour is often referred to as the "privacy paradox.").

[184] Kokolakis, Spyros, "Privacy Attitudes and Privacy Behavior: A Review of Current Research on the Privacy Paradox Phenomenon," *Computers & Security*, Vol. 64, 2017, pp. 122–134, at p. 122 ("We analyse studies that provide evidence of a paradoxical dichotomy between attitudes and behaviour and studies that challenge the existence of such a phenomenon. The diverse research results are explained by the diversity in research methods, the different contexts and the different conceptualisations of the privacy paradox.").

practice. Accordingly, conclusions about how "people in general" think or behave with respect to health-related data cannot reliably be applied to the facts of this case from studies examining a different context for a different respondent population.

104. Below I highlight three of the reasons why the studies Dr. Vohs relies on to form her opinions examine consumer beliefs, expectations, and behavior in contexts that cannot be generalized to the context of this case.

a. First, the studies that Dr. Vohs relies on examine consumer behavior in specialized contexts that are different from those of the Proposed Classes.

b. Second, several studies that Dr. Vohs relies on include populations across geographies and population groups that are unlikely to be representative of U.S. Facebook users.

c. Third, several studies that Dr. Vohs relies on predate the proposed Class Period, the COVID-19 pandemic, and more recent technological developments in health-related spaces.

I discuss each of these points in turn below.

### a. The Studies in Dr. Vohs's Narrative Literature Review Examine Consumers Behaviors in Contexts Different from the Proposed Classes

105. The studies Dr. Vohs relies on for her opinions examine consumer beliefs and expectations in specialized contexts that differ from a U.S.-based Facebook user interacting with health websites.

106. For example, to support her opinion that "[t]here are meaningful consequences to patients feeling that their health information is not kept confidential" and that "when patients do not trust that their health information is confidential, their health outcomes can suffer,"[185] Dr. Vohs relies on two studies, Caine and Hanania (2012) and DePuccio et al. (2020),

185 Vohs Report, ¶¶ 50, 56.

examining patients in a very specific and different context, that is specialized to patients in clinical or hospital settings. Below I summarize the significant difference between the context of these two studies and the context of this case.

a. Caine and Hanania (2012) is a study on a small sample of thirty adults, the majority (70%) of whom were older than 45 years old,[186] receiving healthcare in central Indiana with health records in the Indiana Health Information Exchange containing what the authors characterized as "highly sensitive health information,"[187] including information on domestic violence, genetics, mental health, sexual health including sexually transmitted diseases (STDs), and substance abuse.[188] Of the thirty study participants, "13% reported not having used computers at all, and 21% of those who had some computer experience had never used the internet."[189] The findings in the study were based on a "card-sort task" in which participants were asked to choose which broad hypothetical category of electronic medical records (on cards) they would share with potential recipients (also on cards), in a list of recipients that is limited to medical providers (e.g., primary physicians, nurses, emergency medicine), pharmacists, and other organizations such as health insurance companies and government agencies. [190]

---

[186] Caine, Kelly and Rima Hanania, "Patients Want Granular Privacy Control Over Health Information in Electronic Medical Records," *Journal of the American Medical Informatics Association*, Vol. 20 (1), January 2013, pp. 7–15 ("Caine and Hanania (2013)"), at p. 9 ("Mean age of the participants was 45.93 (SD=11.95), with the majority of participants (70%) aged >45 years.").

[187] Caine and Hanania (2013), at p. 8 ("Thirty adults receiving healthcare in central Indiana were recruited for the study. Patients fulfilled the following criteria: they were current or recent patients with health records in the Indiana Health Information Exchange, particularly those with highly-sensitive health information (as discussed below), with as wide a range of demographics (age, race, and socioeconomic status) as possible.").

[188] Caine and Hanania (2013), at p. 8 ("In this study, we used the definition of sensitive information listed in the National Committee on Vital and Health Statistics'(NCVHS) recommendations [...] This letter listed five categories of health information that are considered by NCVHS to contain sensitive information: domestic violence, genetic information, mental health information, reproductive/sexual health (including sexual activity, sexual orientation, sexually transmitted disease, adoptions, abortions, and infertility), and substance abuse.").

[189] Caine and Hanania (2013), at p. 10 ("Participants' demographic characteristics [...] Mean age of the participants was 45.93 (SD=11.95), with the majority of participants (70%) aged >45 years. This might be a reflection of the fact that we targeted a population of participants with sensitive health information. [...] However, there was a range of computer experience; 13% reported not having used computers at all, and 21% of those who had some computer experience had never used the internet.").

[190] Caine and Hanania (2013), at pp. 8–9 ("A card-sort task was used to assess patients' preferences for sharing EMR [electronic medical records] data with a variety of potential recipients. Participants chose which EMR items (on cards) they would share with which recipients (also on cards). The *recipient* card set contained 14

Dr. Vohs fails to explain how a study of 30 patients receiving healthcare in central Indiana examining their willingness to share "highly sensitive health information" with a medical provider in a hypothetical scenario can be generalized to the broader group of members of the Proposed Classes. She also does not mention that the authors of this study focused on a specific definition of what they deemed "highly sensitive health information" that covers data different than the many types of data at issue in this case. Finally, Dr. Vohs does not explain to what extent the insights from this study exceed a mere exploratory value, and how she would draw scientifically valid conclusions to the case at hand.

b. DePuccio et al. (2020) is based on a "survey administered to patients hospitalized at a large academic medical center." [191] For the very specific context of this study, the survey included 3,292 hospitalized patients "with two or more chronic conditions" at the Ohio State University Wexner Medical Center.[192] Dr. Vohs fails to explain how a study that relies on a non-representative sample of hospitalized patients with multiple chronic illnesses from one hospital in the state of Ohio applies to members of the Proposed Classes, or to what extent the insights from this study exceed a mere exploratory value relevant to the context and the stated goals of the study.

---

possible recipients of EMR data, including various types of healthcare providers and non-healthcare-related individuals. The *item* card set contained 11 types of health information items that could exist in an EMR, including all the sensitive information items.").

[191] DePuccio, Matthew J. et al., "Patients' Perceptions About Medical Record Privacy and Security: Implications for Withholding of Information During the COVID-19 Pandemic," *Journal of General Internal Medicine*, Vol. 35 (10), July 2020, pp. 3122–3125 ("DePuccio et al. (2020)"), at p. 3122 ("Data for the present study came from a survey administered to patients hospitalized at a large academic medical center (AMC) enrolled in a pragmatic randomized controlled trial (RCT).").

[192] DuPuccio et al. (2020) lists McAlearney et al. (2016) as the source of their data. According to McAlearney et al. (2016), "[o]ur proposed 4-year study uses a mixed-methods research (MMR) approach to evaluate a randomized controlled trial studying the effectiveness of a High Tech intervention (MCB, the inpatient portal), and an accompanying High Touch intervention (training patients to use the portal to manage their care and conditions) in a sample of hospitalized patients with two or more chronic conditions." McAlearney, AS et al., "High Touch and High Tech (HT2) Proposal: Transforming Patient Engagement Throughout the Continuum of Care by Engaging Patients with Portal Technology at the Bedside," *JMIR Research Protocols*, Vol. 5 (4), November 2016, e221, at p. 1.

A13-3756

107. To support her conclusion that "[p]eople have high trust in healthcare provider websites as an extension of the patient-healthcare provider relationship,"[193] Dr. Vohs primarily relies on Mainous III et al. (2024).[194] The context of Mainous III et al. (2024) was to evaluate the relationship between "uncertainty among experts in healthcare recommendations" and "trust in health entities for accurate health information."[195] The authors of this study measured *trust in medical experts as sources of information* through responses to the question of "[i]n general, how much would you trust information about cancer from a doctor, government health agency, or scientists?"[196] Clearly, this study is based on a particular context of trust as it relates to uncertainty among experts in healthcare recommendations, not trust in healthcare providers to keep patient health information confidential. This study is therefore not relevant to the context or Proposed Classes in this case. In fact, as pointed out by Iott et al. (2020), another study that Dr. Vohs herself relies on, trust in healthcare providers is a complex concept shaped by a variety of factors, such as the individuals' gender, age, education level, and race. The authors of the study state that patient trust in physicians is "a multi-dimensional perception influenced by patient, physician, and situational factors" and that "the dimensions of trust matter differently for different groups."[197] The context of the

---

193 Vohs Report, ¶ 53.

194 Vohs Report, ¶ 17 ("There are several reasons why consumers have such high trust in healthcare provider websites. First and most fundamentally, people view the healthcare provider's website as an extension of the healthcare provider him- or herself. Consumers have high trust in their healthcare provider, which recent studies confirm. One nationally-representative study of more than 5800 Americans showed that 95% reported having high trust in their physician when it comes to health information (Mainous *et al.*, 2024).").

195 Mainous III, Arch G. et al., "Conflict Among Experts in Health Recommendations and Corresponding Public Trust in Health Experts," *Frontiers in Medicine*, Vol. 11 (1430263), July 2024, pp. 1–5 ("Mainous III et al. (2024)"), at p. 1 ("Objective: To evaluate public perceptions of conflict and uncertainty among experts in healthcare recommendations and association with decreased trust in health entities for accurate health information.").

196 Mainous III et al. (2024), at p. 2 ("The study measured trust in medical experts from the question 'In general, how much would you trust information about cancer from a doctor, government health agency, or scientists?' For each of the options, the respondents answered their amount of trust with each entity as 'Not at all,' 'a little,' 'some' or 'a lot.'").

197 Iott, Bradley E. et al., "Trust and Privacy: How Patient Trust in Providers is Related to Privacy Behaviors and Attitudes," *AMIA Annual Symposium Proceedings Archive*, March 2020, pp. 487–493, at p. 487 ("Patient trust in physicians, a multi-dimensional perception, can potentially remedy the issue. Patient trust in physicians is influenced by patient, physician, and situational factors, and can facilitate disclosure and use of health IT […] Systematic disparities in patient trust in physicians also exist, though again the dimensions of trust matter differently for different groups.").

interaction between the patient and their healthcare provider is an important factor to consider when it comes to evaluating trust in healthcare professionals. For example, asking patients to reflect on their trust in information about a chronic illness communicated by their long-standing healthcare provider in an office visit is a fundamentally different context from asking a patient to assess their trust in information they view or encounter on a website.

108. Finally, Dr. Vohs presents her own research on "brand image" to claim that "ending a website address with .org (versus .com) makes brands seem warmer and more caring" and that because "websites are representations of […] overall brand[s]," "people have high trust in healthcare provider websites."[198] However, the results of Dr. Vohs's 2010 article are based on samples of students from Stanford University who, among other experiments, evaluated low-stake consumer products, such as a "messenger bag made by Mozilla" and "three ecofriendly laptop bags sold by World of Good," under different conditions (e.g., .org versus .com domain-names) and different endorsements from news outlets that varied in perceived credibility. The participants of this study "rated their perceptions of the organization's competence […] and warmth" as well as their hypothetical willingness to buy.[199] Dr. Vohs ignores that her cited research reflects the context of survey respondents reacting to scenarios around brand image of low-stakes products, a substantially different context from trust in healthcare provider websites. The context of Dr. Vohs's own research on brand image is not relevant to the context of the Proposed Classes in this case, which undermines the validity of Dr. Vohs's opinions.

---

198 Vohs Report, ¶¶ 18–19 ("A second reason that people have high trust in healthcare provider websites is because brands' websites are representations of the overall brand […] My own research on brand image shows that merely ending a website address with .org (versus .com) makes brands seem warmer and more caring.").

199 Aaker, Jennifer et al., "Nonprofits Are Seen as Warm and For-Profits as Competent: Firm Stereotypes Matter," *Journal of Consumer Research,* Vol. 37 (2), August 2010, pp. 224–237, at pp. 227–229.

A13-3758

### b. Dr. Vohs Examines Consumers That Are Unlikely to be Representative of Facebook Users in the U.S.

109. Dr. Vohs also relies on studies from a wide range of geographies and population groups that, in many cases, are unlikely to be representative of Facebook users in the U.S.[200] Focusing on the behavior of representative users is important because studies show that consumer beliefs and expectations vary substantially across cultures and demographic groups.[201] For example, a cross-country study of attitudes towards data sharing (that has been cited by Plaintiffs' expert Dr. Barasz in her expert report), finds that "awareness [of data sharing] varied by country," as well as the value assigned to certain data types.[202] Different age groups and genders also exhibit varying levels of awareness and willingness to share data. A 2020 survey on consumer privacy found that individuals under 40 years old are more likely to invest time into understanding how companies use their data, and to share their data.[203] A literature review by Moon (2017) finds that 35% of the studies she reviewed showed that men are more open to data sharing than women.[204]

---

200 Generally, survey samples should be representative of the population of interest. See Diamond (2011), at p. 376 ("One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent.").

201 See, e.g., Moon, Lisa, "Factors Influencing Health Data Sharing Preferences of Consumers: A Critical Review," *Health Policy and Technology*, Vol. 6 (2), January 2017.

202 Morey et al. (2015) ("To find out whether consumers grasped what data they shared, we asked, 'To the best of your knowledge, what personal information have you put online yourself, either directly or indirectly, by your use of online services?' While awareness varied by country—Indians are the most cognizant of their data trail and Germans the least—overall the survey revealed an astonishingly low recognition of the specific types of information tracked online. On average, only 25% of people knew that their data footprints included information on their location, and just 14% understood that they were sharing their web-surfing history too.").

203 EY Report, p. 11 ("Millennials (53%) and Generation Z (47%) are more likely than Generation X (43%) and Baby Boomers (35%) to regularly take the time to understand how a company uses their personal data by reading available materials. […] For example, 50% of Millennials and 42% of Generation Z are open to sharing their search histories with a large tech company in return for more personalized search results and online experiences, compared with just 23% of Baby Boomers. And in the past six months, 45% of Millennials and 49% of Generation Z have always or often shared COVID-19 health data with an organization, compared with just 21% of Baby Boomers.").

204 Moon (2017) reviewed descriptive statistics for 17 articles (three with bivariate analysis and 14 with multivariate analysis). Six (two with bivariate analysis and four with multi-variate analysis) contained evidence that the male gender was affirmatively associated with data sharing preferences. Moon, Lisa, "Factors Influencing Health Data Sharing Preferences of Consumers: A Critical Review," *Health Policy and Technology*, Vol. 6 (2), January 2017, at p. 6 ("Bivariate analysis in three studies found statistically significant descriptive factors associated with affirmative data sharing preferences including: white non-Hispanic [one cited article],

110. Dr. Vohs fails to consider differences in behavior between the demographic groups in the studies she cites and fails to make the connection with members of the Proposed Classes. For example, DePuccio et al. (2020), a study that Dr. Vohs cites, reports heterogeneous results across social groups, as they reported that "Black patients were generally more likely to withhold information compared with White patients. The study also reported that patients who were older, married, employed, and in good mental health and who had healthcare coverage were less likely to keep information from their provider."[205] In another example, Dr. Vohs relies on Liu and Shi (2021) as evidence that consumers trust health websites owned by organizations more than those owned by commercial entities.[206] However, this study exclusively surveyed Chinese participants from three urban areas in the Zhejiang province.[207] Similarly, Dr. Vohs cites a study by Kharlamov et al. (2023) which analyzes only U.K. residents' intentions to share health data.[208]

111. Additionally, Dr. Vohs relies on Biasiotto et al. (2023) to support her assertion that "patients value privacy protections when it comes to sharing their digital health

---

male gender [two cited articles], education [one cited article], children in the household [one cited article], income level [two cited articles] and internet use [two cited articles]. Multi-variate analysis completed in fourteen studies yielded a list of descriptive characteristics associated with affirmative data sharing references including: age < 40 and age > 65 [five cited articles], white non-Hispanic [two cited articles], number of children in household [one cited article], education level (some college) [four cited articles], employment status (employed) [one cited article], income > 100,000 [two cited articles], male gender [four cited articles], internet use [three cited articles] and regular users of the health care system [two cited articles].")

205 DePuccio et al. (2020), at p. 3122 ("Conversely, for patients who were confident about the privacy of their medical information, the odds of keeping information from their provider was approximately half of those who were not confident. Black patients were generally more likely to withhold information compared with White patients. Patients who were older, married, employed, and in good mental health and who had healthcare coverage were less likely to keep information from their provider.").

206 Vohs Report, ¶ 20. Notably, as with numerous other articles Vohs cites, this study had nothing to do with trust as it relates to privacy/confidentiality.

207 Liu, Liyun and Lizheng Shi, "Does the Ownership of Health Websites Matter? A Cross-Sectional Study on Chinese Consumer Behavior," *International Journal of Medical Informatics*, Vol. 152 (104485), May 2021, p. 2 ("We conducted a cross-sectional survey using stratified sampling in 3 cities of different income levels in Zhejiang Province.").

208 Kharlamov, Alexander et al., "Data Sharing Decisions: Perceptions and Intentions in Healthcare," *Strategic Change*, Vol. 32 (6), October 2023, pp. 223–237, at p. 227 ("Following a small pilot with 30 individuals to test the instrument, the main data collection of 129 respondents was undertaken using the online survey platform SurveyGizmo. Respondents were recruited via the snowball effect that was started on social media and by direct emails to the authors' contacts in the UK.").

information."[209] Dr. Vohs does not acknowledge that, first, this study "was administered to a sample of European residents in 12 European countries,"[210] and, second, the authors of this study stated this factor as a "limitation of the generalizability of the results to Europe."[211] Such limitation would also apply to generalizing the results of the study to the members of the Proposed Classes who are Facebook users in the U.S.[212]

#### c. Many Studies in Dr. Vohs's Narrative Literature Review Predate the Start of the Proposed Class Period and the COVID-19 Pandemic

112. Many of the studies cited by Dr. Vohs predate the start of the Proposed Class Period. As discussed above in **Section IV.C.2**, there have been meaningful evolutions in online technologies and the environment in which consumers form expectations.

113. Out of the 27 academic studies cited in Dr. Vohs's report, 12 of them (approximately 44%) predate the start of the Proposed Class Period in 2018, and 7 of them (approximately 26%) are more than ten years old. These issues in Dr. Vohs' literature review are especially pertinent to the second question that Dr. Vohs addresses in her report: whether people would "agree and find it acceptable for communications with their healthcare providers to be: [c]ollected by a social media company? [u]sed for marketing? [u]sed to help a social media company train their AI models?"[213] Consumer attitudes on these topics are highly dynamic. As I discuss above, technological developments over the past decade have shifted individuals' views on digital data storage, online

---

209 Vohs Report, ¶ 41.

210 Biasiotto, Roberta et al., "Public Preferences for Digital Health Data Sharing: Discrete Choice Experiment Study in 12 European Countries," *Journal of Medical Internet Research*, Vol. 25 (e47066), November 2023, pp. 1–16 ("Biasiotto et al. (2023)"), at p. 2 ("A discrete choice experiment survey was administered to a sample of European residents in 12 European countries (Austria, Denmark, France, Germany, Iceland, Ireland, Italy, the Netherlands, Norway, Spain, Sweden, and the United Kingdom) from August 2020 to August 2021.").

211 Biasiotto et al. (2023), at p. 12.

212 Dr. Vohs also cites to studies that are based on populations in a very specific setting that are not representative of the Proposed Classes, such as hospitalized patients in one medical center and enrolled in a randomized controlled trial. See, e.g., DePuccio et al. (2020), at p. 3122 ("Data for the present study came from a survey administered to patients hospitalized at a large academic medical center (AMC) enrolled in a pragmatic randomized controlled trial (RCT).").

213 Vohs Report, ¶ 2.

communication, and risks and benefits of sharing or tracking health information. Studies conducted more than ten years ago may reflect beliefs and attitudes formed in a fundamentally different environment before the widespread use of mobile health apps and large-scale AI systems and the COVID-19 pandemic.[214]

114. Nonetheless, Dr. Vohs relies on these decade-old studies to base her opinions on the attitudes of consumers, including members of the Proposed Classes, towards online data sharing in the present day. Because those studies were conducted in a different technological and social environment, they describe past attitudes, and Dr. Vohs has not attempted to explain their relevance to the Proposed Class Period. In other words, along with the other flaws noted above, Dr. Vohs primarily relies on studies that may reflect, among other things, outdated consumer perceptions compared to the perceptions of the members of the Proposed Classes.

#### 2. Dr. Vohs Fails to Acknowledge the Stated Limitations of the Studies in Her Narrative Literature Review

115. As I have discussed above throughout **Section V.C**, authors of the studies that Dr. Vohs relies on acknowledge various limitations of their research and the conclusions that can be drawn from it. Dr. Vohs fails to acknowledge these stated limitations and instead draws broad generalizations that the authors themselves caution against. Many of the studies included in her review expressly caution that their findings relate to the specific populations, settings, methods, or scenarios they examine, and therefore should not be interpreted as reflecting the views or behaviors of all consumers in the real-world, including online environments. These stated limitations are repeatedly observed across the studies relied upon by Dr. Vohs for her broad opinions, including studies restricted to

---

214 There have been significant developments in privacy policy regulations and digital data storage in recent years, such as cloud computing, blockchain, cryptography and encryption techniques. Such developments have shifted people's views on digital data storage, communication, and willingness to share or track health data online. Nowrozy, Raza et al., "Privacy Preservation of Electronic Health Records in the Modern Era: A Systematic Survey," *ACM Computing Surveys*, Vol. 56 (8), April 2024, pp. 1–37, at p. 1 ("We surveyed 130 studies on EHRs, privacy-preserving techniques, and tools that were published between 2012 and 2022, aiming to preserve the privacy of EHRs. [...] Our findings suggested that the usage of access control, blockchain, cloud-based, and cryptography techniques is common for EHR data sharing.").

hospitalized patients,[215] studies focusing on specific sub-populations,[216] studies involving non-U.S. populations,[217] and studies examining consent scenarios known to diverge from actual behavior due to the privacy paradox.[218]

116. Dr. Vohs's choice to omit any discussion, let alone any analysis, of the limitations in the studies she cites reflects a well-documented pitfall of narrative literature reviews. As Baumeister and Leary (1997) posit, "conclusions are limited by the weaknesses and flaws of the evidence," and failing to acknowledge these limitations risks "overstating the case," a potentially "serious […] and self-defeating error in approach."[219]

117. When viewed in tandem, the study authors' own stated limitations of the studies, along with the qualified and nuanced discussion about and their conclusions, show that the evidence Dr. Vohs relies on cannot reliably support broad, sweeping claims about how "people in general" think, feel, or behave in response to the alleged data practices in this case.

---

215 For example, as mentioned in **Section V.C.1**, DePuccio et al. (2020) is limited to "perceptions of [hospitalized] patients from a single [academic medical center]." DePuccio et al. (2020), at p. 3122.

216 For example, as discussed in **Section V.C.2**, In their discussion of the limitations of their study, Mainous III et al. (2024) and Campos-Castillo and Anthony (2015) note that the cross-sectional design limits their ability to infer causal relationships. Mainous III et al. (2024), at p. 4 ("There are several limitations to our study. […] [T]he cross-sectional design inhibits causal inference."); Campos-Castillo, Celeste and Denise L. Anthony, "The Double-Edged Sword of Electronic Health Records: Implications for Patient Disclosure," *Journal of The American Medical Informatics Association*, Vol. 22 (e1), July 2014, pp. e130–e140, at p. e137 ("[T]he cross-sectional design as well as the measure of having ever withheld information from a provider limits our ability to infer causal relationships. The question's wording does not permit temporal ordering of the event in relation to covariates or whether information was withheld from the same provider using an EHR.").

217 For example, as discussed in **Section V.C.2**, Biasiotto et al. (2023)'s sample consists of 5,015 European residents in 12 European countries. See Biasiotto et al. (2023), at p. 2.

218 Kassam, Iman et al., "Patient Perspectives and Preferences for Consent in the Digital Health Context: State-of-the-art Literature Review," *Journal of Medical Internet Research,* Vol. 25 (e42507), 2023 ("Kassam et al. (2023)"), at p. 10 ("[A]s with privacy research […] more than half the studies […] relied on hypothetical scenarios to understand participants' consent conditions. Although these studies generate insights that can inform how to approach consent for digital health initiatives, they only represent intentions rather than behaviors. They are subject to the privacy paradox[.]").

A13-3763

219 Baumeister and Leary (1997), at pp. 317–318.

### D. Dr. Vohs's Opinions Fail to Account for Substantial Heterogeneity Across Consumers

118. Dr. Vohs asserts broad, population-wide generalizations about how the "average person" thinks and behaves and characterizes consumers as if they share a uniform set of beliefs and perceptions about health information, data privacy, and willingness to share certain data. However, Dr. Vohs's broad conclusions ignore findings in the literature, including in the studies she cites, that show substantial variation in consumers' beliefs about the sensitivity of health information and their expectations about data use or sharing. Dr. Vohs does not grapple with the implications of these findings to her opinions and instead reaches broad-sweeping conclusions about the beliefs and expectations of "people" or "consumers" as if they are an undifferentiated, monolithic group. To the contrary, the results of my surveys in **Section III** demonstrate, among other things, substantial heterogeneity in the degree to which respondents would or would not be surprised at their data being shared, based on the distribution of expectations among U.S. Facebook users.

119. Dr. Vohs's one-size-fits-all representation of consumer beliefs and expectations is at odds with the broader empirical research and studies upon which she relies. As I explain in **Section V.D.1**, the academic literature documents substantial variation in what individuals regard as "sensitive" health information, in how they interpret broad categories such as "communications with healthcare providers," and in whether and how they view health as a "sacred value." Likewise, as I discuss in **Section V.D.2**, consumers' expectations and beliefs about the use and sharing of health information vary substantially, showing that their willingness to share information depends, among other things, on the type of data, the purpose and perceived benefits of use, and the identity of the entities involved. Together, these findings in literature show that the "average person" or the "general consumer" construct that Dr. Vohs advances in her report lacks empirical support.

### 1. Consumers Do Not Share a Uniform View of What They Consider to be "Sensitive" Health Information

120. A central premise of the Vohs Report is that health, and by extension "health information" and "communications with […] healthcare providers," constitutes a "sacred" value that, as such, is insulated from ordinary "secular" trade-offs.[220] On this basis, Dr. Vohs expresses that all health information is categorically more sensitive than other types of information, that people would respond with moral contempt if they perceived attempts to "secularize" it, and that people would object to the monetization of health-related information.[221] These claims are contradicted by the results of my surveys in **Section III**, which find that the majority of respondents reported that they would not be surprised to see social media advertisements related to their online activities on healthcare websites.[222] The findings of my surveys suggest that, regardless of preferences towards monetization of information, U.S. Facebook users generally expect or understand that their information may be shared about their online activities on healthcare websites, and that this information could be used for purposes of targeted advertising on social media.

121. To support her claims, Dr. Vohs relies on two academic articles, Tetlock et al. (2000) and McGraw et al. (2012).[223] Both articles, which are also subject to the criticisms laid out in

[220] Vohs Report, ¶¶ 11–12 ("***Health is a sacred value***. People treat health differently than many other areas of life, insofar as health is treated as a sacred value […]. Sacred values include not only health but religion, love, death, and privacy. Sacred values are considered incompatible with secular values, and are immune to trade-offs, comparisons, and monetization.").

[221] Vohs Report, ¶¶ 12–13 ("When people encounter attempts to commoditize a sacred value, such as health, they react with moral contempt. Moral contempt includes anger and derision as well as the desire to punish those who initiated the commoditization. […] One study tested the idea that health is considered a sacred value and therefore should not be monetized.").

[222] Specifically, my Portal Survey finds that 70.8% of respondents were not surprised to see social media advertisements related to the website on which they interacted with a patient portal, my Provider Website Survey finds that 80.5% of respondents in the Patients Group and 77.3% in the Non-Patients Group were not surprised to see social media advertisements related to the healthcare providers' websites they searched and browsed, and my Prescription Survey finds that 64.3% of respondents were "not surprised" to see social media advertisements related to the prescription drug website they visited. See **Section III.B**. All of these values are significantly greater than 50% as none of their confidence intervals include 50%. Additionally, based on the results of these studies, I find the distribution of expectations among Facebook users suggests substantial heterogeneity in the strength of expectations regarding the sharing of information related to their online activities on healthcare websites.

A13-3765

[223] Vohs Report, ¶¶ 11–14.

**Section V.C**, examine peoples' reactions to specific, stylized, and morally challenging contexts that do not address privacy issues at all, such as value-based pricing of life-saving drugs,[224] the allocation of scarce medical resources in choosing whose lives to save, or selling of human body parts for medical transplant operations.[225] However, neither study supports Dr. Vohs's suggestion that consumers uniformly view health as sacred. For example, Tetlock et al. (2000) acknowledge that "the actual choices people make may belie high-sounding proclamations that the sacred value is assigned infinite weight."[226] The authors also found in their study of respondents by political affiliation that "[t]aboo trade-offs triggered . . . scarcely a flicker of annoyance from libertarians."[227] Similarly, McGraw et al. (2012) explicitly point to the existence of "variation in what things various groups hold sacred and how they uphold their values."[228] Regardless, it is important to note that neither of these articles discuss consumers' expectations around privacy at all.

---

224 McGraw, Peter A. et al., "From the Commercial to the Communal: Reframing Taboo Trade-Offs in Religious and Pharmaceutical Marketing," *Journal of Consumer Research*, Vol. 39 (1), June 2012, pp. 157–173. ("Two hundred and thirty seven undergraduates were entered into a lottery in exchange for completing a web survey. They reviewed statements from the CEO of a pharmaceutical company who is considering raising prices on a popular drug to make up for R&D losses on another drug. Participants were randomly assigned to a condition where the price of either an anti-cholesterol or anti-wrinkle drug was raised because of losses on another similar drug.").

225 Tetlock, Philip E. et al., "The Psychology of the Unthinkable: Taboo Trade-Offs, Forbidden Base Rates, and Heretical Counterfactuals," *Journal of Personality and Social Psychology*, Vol. 78 (5), 2000, pp. 853–870, at p. 856–857 ("Respondents then judged two types of trade-offs: routine (secular-secular) and taboo (secular-sacred). […] The nine secular-sacred trade-offs included buying and selling of human body parts for medical transplant operations, surrogate motherhood contracts (paying someone to have a baby whom the buyer subsequently raises), adoption rights for orphans, votes in elections for political offices, the right to become a U.S. citizen, the right to a jury trial, sexual favors (prostitution), someone else to serve jail time to which the buyer had been sentenced by a court of law, and paying someone to perform military service that the buyer had a draft obligation to perform."); at p. 858 ("Robert can either save the life of Johnny, a five year old boy who needs a liver transplant, or he can save the life of an equally sick six year old boy who needs a liver transplant. […] Robert can save the life of Johnny, a five year old who needs a liver transplant, but the transplant procedure will cost the hospital $1,000,000 that could be spent in other ways, such as purchasing better equipment and enhancing salaries to recruit talented doctors to the hospital.").

226 Tetlock, Philip E. et al., "The Psychology of the Unthinkable: Taboo Trade-Offs, Forbidden Base Rates, and Heretical Counterfactuals," *Journal of Personality and Social Psychology*, Vol. 78 (5), 2000, pp. 853–870, at p. 853.

227 Tetlock, Philip E. et al., "The Psychology of the Unthinkable: Taboo Trade-Offs, Forbidden Base Rates, and Heretical Counterfactuals," *Journal of Personality and Social Psychology*, Vol. 78 (5), 2000, pp. 853–870 at p. 857.

228 McGraw, A. Peter et al., "From the Commercial to the Communal: Reframing Taboo Trade-Offs in Religious and Pharmaceutical Marketing," *Journal of Consumer Research*, Vol. 39 (1), June 2012, pp. 157–173, at p. 169.

122. Moreover, even if you were to accept, for the argument's sake, that some people view an unspecified notion of "health" as sacred in some contexts, one cannot conclude that all aspects of health prevail over other values irrespective of context, nor can one make the unfounded logical leap of using the alleged sacredness of "health" to assign sacred value characteristics to "health information." Despite being a central concept for her opinions, Dr. Vohs has not studied what "health information means to general consumers" and stated in deposition that she is not aware of any nationally recognized definition of the term.[229] It is unlikely that every small ailment, every health condition, and by extension every piece of information about one's health is considered to be beyond ordinary, and uniformly so.[230] In fact, people often make context-dependent trade-offs involving health, balancing it with costs, convenience, and medical benefits.[231] Similarly, scientific articles

[229] Vohs Deposition, p. 166:12–15 ("Q. Have you ever done any kind of study of what the term 'health information' means to general consumers? A. No, I haven't."); p. 166:21–25 ("Q. To your knowledge, is there any kind of nationally recognized definition of the term 'health information'? […] THE WITNESS: Not to my knowledge.").

[230] Revealed-preference evidence indicates that individuals evaluate health trade-offs and routinely accept health risks in exchange for benefits, including money, time, comfort, and convenience. These studies examine choices such as whether to install smoke detectors, wear seatbelts or bicycle helmets, smoke cigarettes, or live near environmental hazards, and find that individuals accept injury and mortality risks in exchange for modest benefits –small differences in purchase price, minor gains in comfort or convenience, or even just the few seconds required to fasten a belt or strap on a helmet. Viscusi, W. Kip et al., "The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World," *The Journal of Risk and Uncertainty*, Vol. 27 (1), 2003, pp. 5–76, at p. 24 ("Housing and product market decisions also reflect individual tradeoffs between mortality risk and money […]. Table 3 presents the results from eleven studies that evaluated the price-risk tradeoffs for seatbelt use, cigarette smoking, home fire detectors, automobile safety, bicycle helmets, and housing price responses to hazardous waste site risks. The studies in general find an implicit value of a statistical life on the same order of magnitude as the labor market studies, although they tend to be a little lower […]. In these studies, drivers', occupants', or riders' safety is traded off with the time to secure a seat belt or a child seat or to put on a helmet. The authors assume a given time cost—for example, Blomquist assumes that it takes 8 seconds to secure a seat belt."). Many people treat a wide range of health problems as minor, for example, everyday symptoms and mild illnesses are managed at home and never brought to a health professionals. Elliot, Alison et al., "Revisiting the Symptom Iceberg in Today's Primary Care: Results from a UK Population Survey," *BMC Family Medicine*, Vol. 12 (16), 2011, pp. 2–11 , at pp. 2, 4 ("A random sample of 30 GPs from Grampian, Scotland were sent a self-completion postal questionnaire asking them to rate the potential seriousness of each of the 25 symptoms being examined as either: A - a symptom not causing concern, usually indicative of trivial/self-limiting illness B - a symptom of moderate concern - neither trivial nor serious C - a symptom of concern that could be indicative of a serious condition or illness. […] For almost half of all symptoms reported respondents chose to do nothing at all over the two week period. Thirty-five per cent of symptoms resulted in the use of lay-care, usually OTC medicine use (25%). Twelve per cent of symptoms led to a consultation with a primary care health professional, usually the GP (8%). Prescription medicines were used for just over 10% of symptoms.").

[231] Wong, Yu-Ning et al., "Cancer Patients' Trade-offs Among Efficacy, Toxicity, and Out-of-Pocket Cost in the Curative and Noncurative Setting," *Medical Care*, Vol. 51 (9), September 2013, pp. 838–845, at p. 842–843 ("We found that patients expressed specific preferences for survival and low toxicity, and preference to avoid very large (-level) cost differences. They appeared to be less averse to moderate (2-level) differences in cost.

examining willingness to share health information with technology companies consistently find heterogeneous, context-dependent preferences, contrary to the belief that health information is uniformly "sacred," more sensitive than all other information, and therefore not sharable in any context.[232] In particular, the scientific literature shows that sizeable subsets of respondents are willing to share health-related data with for-profit or technology entities under specific conditions (e.g., when there are perceived personal or societal benefits).[233] In fact, Kassam et al. (2023), a study cited by Dr. Vohs, reviewed 75 studies on health data consent and determined that a majority of the studies found that participants were willing to provide consent to a third party to use their health data.[234] Another study found that participants were more willing to share electronic health record data than other kinds of digital information such as financial transactions.[235]

---

Patient characteristics also predicted preference for treatment efficacy, toxicity, and out-of-pocket cost. In all three scenarios, patients of higher socioeconomic status (SES) were more likely to focus on survival, whereas others appeared more willing to trade off survival for decreased out-of-pocket cost and toxicity. In the palliative scenario and adjuvant scenario 2, patients who expressed concerns about cost were more likely to choose the treatment with lower out-of-pocket costs, even if it came at the expense of worse survival or higher toxicity."); Case, Siobhan et al., "Older Adults' Recognition of Tradeoffs in Healthcare Decision Making," *Journal of the American Geriatric Society*, Vol. 63 (8), 2015, pp. 1658–1662, at p. 1663 ("After completing these exercises, almost all (88%) were able to describe either a medical decision they made in the past in which they faced a tradeoff or a future decision that would involve a tradeoff."); Hiligsmann, Mickaël et al., "Patients' Preferences for Osteoporosis Drug Treatment: A Discrete-Choice Experiment, *Arthritis Research & Therapy*, Vol. 16, 2014, pp. 1–9, at p. 1 ("[P]atients were willing to pay a personal contribution or to trade treatment efficacy for better levels of other attributes. Preferences for treatment attributes varied across patients and this highlights the importance of clinical decision-making taking individual preferences into account to improve osteoporosis care.").

[232] See, e.g., Olsen, Quita et al., "Worldwide Wiliness to Share Health Data High But Privacy, Consent and Transparency Paramount, A Meta-Analysis," *NPJ Digital Medicine*, Vol. 8 (540), 2025, pp. 1–13, at p. 1 ("Sixty-five articles reported a wide range (24–100%) of public willingness to share […]."); at p. 8 ("Within individual studies, the type of health data significantly influenced willingness to share with mental health and genetic data perceived as more sensitive than general health data and biospecimens.").

[233] See, e.g., Morey et al. (2015) ("[A]bout two-thirds of people are willing (and in some cases eager) to share data in exchange for their benefits."); Grande, David et al., "Consumer Willingness to Share Personal Digital Information for Health-Related Uses," *JAMA Network Open*, Vol. 5 (1), 2022, pp. 1–12, at pp. 5–6 ("[T]he 3 derived clusters differed most in their general willingness to share information and that less difference was found among their views about specific uses, users, information types, or disease conditions. For that reason, the clusters were labeled as an averse cluster (1155 respondents [32.5%]), an uncertain cluster (1589 [44.8%]), and an agreeable cluster (462 [13.0%]), to which might be added a never cluster (337 [9.5%]), representing the participants unwilling to share any information.").

[234] Kassam et al. (2023), at p. 1 ("68 (91%) [of the studies] found that participants were willing to provide consent; however, their consent behaviors and preferences were context-dependent.").

[235] Grande, David et al., "Consumer Willingness to Share Personal Digital Information for Health-Related Uses," *JAMA Network Open*, Vol. 5 (1), 2022, pp. 1–12, at p. 4 ("In comparison with health information from personal health care records (ie, EHRs), participants were less willing to share information about their finances from

123. The shortcomings associated with Dr. Vohs's framing of health as a sacred value are compounded by the fact that Dr. Vohs conflates "health information" and "communications with healthcare providers" as not only equivalent to a person's health but also well-defined and homogeneous concepts. In practice, however, "communications with healthcare providers" can refer to a wide range of interactions, including those not at-issue in this matter, such as discussions of diagnoses, treatment options, or sensitive symptoms, in settings that may be online or in-person.[236] By contrast, the "communications" Plaintiffs allege to be at-issue consist of technical events associated with online searches on websites and button clicks associated with patient portals, such as a user visiting a particular URL or clicking a button on a provider's website. Dr. Vohs's oversimplified use of the term "communication with healthcare providers" neither differentiates among these various forms of communications nor analyzes what types of communications are alleged to be at issue in this case. Instead, she treats all "communications with healthcare providers" as equivalent for purposes of her opinions.

124. The same ambiguity surrounding "communication with healthcare providers" applies to "health information" or "health data." The studies Dr. Vohs relies upon contain a wide array of definitions, methodologies, and, as discussed in **Section V.C.2**, context. They use inconsistent definitions of "health information," with some referring to a narrow set of specific electronic medical record fields (e.g., contact information, sexual health, or

financial institutions (coefficient, −0.56; 95% CI, −0.62 to −0.50), places they visit from public cameras (coefficient, −0.28; 95% CI, −0.33 to −0.22), communication with other people on social media (coefficient, −0.20; 95% CI, −0.26 to −0.15), and their search history from internet search engines (coefficient, −0.11; 95% CI, −0.17 to −0.06).").

[236] Guttman et al. (2021) defines communication in healthcare setting "as a reciprocal process of individuals sending and receiving precise and accurate information that forms and reforms one's attitudes, behaviors, and cognitions influenced by internal and external factors." They further explain that such communication can be altered by various elements, prompting them to list the following five different classes of barriers that can happen in patient-provider communication due to the wide variety of forms in which communication can take place: behavioral, cognitive, linguistic, environmental, and technological. See Guttman, Oren T. et al., "Dissecting Communication Barriers in Healthcare: A Path to Enhancing Communication Resiliency, Reliability, and Patient Safety," *Journal of Patient Safety*, Vol. 17 (8), December 2021, pp. e1465–1471, at e1465.

A13-3769

genetic information),[237] or data in the context of diabetes care,[238] while others acknowledge that "sensitive data" often differed between and within studies, and that "patient-defined classifications and data sharing preferences" continue to shape how information is classified.[239] Their methodologies likewise differ substantially, including patient surveys that ask which specific items from electronic medical records they would share and with whom,[240] analysis of results from a randomized controlled trial from other researchers,[241] surveys built around hypothetical scenarios,[242] and literature reviews that synthesize prior work.[243] Finally, the context of "health information" also varies widely. Some studies focus solely on patients within clinical settings,[244] some examine broader

237 Caine and Hanania (2013) examined patient sharing preferences for hypothetical items stored in their electronic medical record, and whether their preferences differed based on the sensitivity of the information. Their classification of "sensitive health information" followed the National Committee on Vital and Health Statistics, which includes domestic violence, genetic information, mental health information, reproductive or sexual health, and substance abuse. See Caine and Hanania (2013), at Table 1 and pp. 8–10.

238 Gupta, Ravi et al., "Consumer Views on Privacy Protections and Sharing of Personal Digital Health Information" *JAMA Network Open,* Vol. 6 (3), March 2023, pp. 1–13, at p.3. ("The scenarios were presented in the context of diabetes care, meaning that all scenarios reflected reusing data for the purposes of reducing the risk of diabetes.")

239 Baines, Rebecca et al., "Patient and Public Willingness to Share Personal Health Data for Third-Party or Secondary Uses: Systematic Review," *Journal of Medical Internet Research*, Vol. 26 (e50421), March 2024, pp. 1–19, at pp. 5–6 ("While sensitive data are often clearly defined in privacy regulations such as the General Data Protection Regulation, participant definitions of sensitive data often differed between and within studies […]. However, while similar categorizations of sensitive data types exist, diversity in patient-defined classifications and data sharing preferences persist.").

240 Caine and Hanania (2013), at p. 9 ("Participants sat at a table, and the researcher introduced the task by saying: 'In this card exercise, I will ask you what type of information in a medical record you would want to share with different potential recipients.").

241 DePuccio et al. (2020).

242 Biasiotto et al. (2023); Gupta, Ravi et al., "Consumer Views on Privacy Protections and Sharing of Personal Digital Health Information" *JAMA Network Open,* Vol. 6 (3), March 2023, pp. 1–13; Kassam et al. (2023).

243 Baines, Rebecca et al., "Patient and Public Willingness to Share Personal Health Data for Third-Party or Secondary Uses: Systematic Review," *Journal of Medical Internet Research*, Vol. 26 (e50421), March 2024, pp. 1–19; Moon, Lisa, "Factors Influencing Health Data Sharing Preferences of Consumers: A Critical Review," *Health Policy and Technology*, Vol. 6 (2), January 2017; Kassam et al. (2023); Cascini, Fidelia et al., "Health Data Sharing Attitudes Towards Primary and Secondary Use of Data: A Systematic Review," *eClinical Medicine*, Vol. 71 (102551), March 2024, pp. 1–42.

244 DePuccio et al. (2020); Caine and Hanania (2013).

patient populations that satisfy specific criteria,[245] and others use representative samples of the general population within one or several countries.[246]

125. The academic literature—including studies cited by Dr. Vohs—acknowledges and demonstrates that the perceptions around the sensitivity of health data are highly heterogeneous and context-dependent across consumers, yet Dr. Vohs treats this sensitivity of health data as if it were uniform. For example, Dr. Vohs maintains that "[c]onsumers have high trust in their healthcare provider."[247] However, the study she cites examines consumers' trust in recommendations from public health authorities, not consumers trusting their healthcare providers with their own information.[248] Moreover, to the point of heterogeneous and context-dependent preferences, the authors themselves explicitly note that a limitation of their study is that attitudes in other contexts (i.e., other diseases and health services) may differ.[249] Despite the authors' warning —and despite applying the results to the inverse flow of information, from consumers to healthcare providers—Dr. Vohs treats her cited studies' findings as if they applied uniformly to consumers' sensitivity around health data in the context of "communications with healthcare providers."[250]

---

245 Aaker, Jennifer et al., "Nonprofits Are Seen as Warm and For-Profits as Competent: Firm Stereotypes Matter," *Journal of Consumer Research,* 37(2), 2010, pp. 224–237; Iott, Bradley E. *et al.*, "Trust and Privacy: How Patient Trust in Providers is Related to Privacy Behaviors and Attitudes," *AMIA Annual Symposium Proceedings Archive*, March 2020, pp. 487–493; Kharlamov, Alexander et al., "Data Sharing Decisions: Perceptions and Intentions in Healthcare," *Strategic Change*, Vol. 32 (6), October 2023, pp. 223–237.

246 Campos-Castillo, Celeste and Denise L Anthony, "The Double-Edged Sword of Electronic Health Records: Implications for Patient Disclosure," *Journal of The American Medical Informatics Association*, Vol. 22 (e1), April 2015, pp. e130–e140; Mainous III et al. (2024); Biasiotto et al. (2023).

247 Vohs Report, ¶ 17.

248 Mainous III et al. (2024).

249 Mainous III et al. (2024), at p. 4 ("There are several limitations to our study. First, the question about trust in sources for accurate health information was asked in the context of information about cancer. Although there may be some specific attitudes related to cancer information that may not be reflected if the question were focused on another disease like diabetes it is important that the respondents framed their responses around a specific disease. This allowed them to think about information about a disease rather thana more general assessment of 'health information' which would likely be too broad. Moreover, attitudes toward preventative services like vaccinations, which became particularly controversial during COVID-19 may be different.").

250 Similar observations can be made about other studies that Dr. Vohs cites. Several of these studies are irrelevant, focus on highly specific contexts that are not generalizable, or examine sensitive electronic health records that are likely beyond the scope of the alleged data that was received. For example, Campos-Castillo and Anthony (2015) look at electronic health records, and use a survey measure that asked respondents whether any of their doctors or health care providers maintain their "medical information in a computerized system." Campos-

A13-3771

126. Empirical studies cited by Dr. Vohs show that privacy preferences are not uniform, fixed, or absolute, but instead depend on multiple factors, including the specific type of health information, the purpose for which it will be used, who is requesting or using the data, and the individual's own background and trust in institutions. For example, Baines et al. (2024) summarize academic research on patients' willingness to share health information (including for second-party and third-party uses) and explicitly acknowledges that "participant definitions of sensitive data often differed between and within studies," and concludes that "[a] universal definition of sensitive and nonsensitive data is therefore not available given variations in peoples' perspectives, health status, and experiences."[251] This directly contradicts any claim that consumers share a single definition of "sensitive" health information. Similarly, Caine and Hanania (2013) document considerable variation within and across households in perceptions of sensitivity (even regarding non-health-related data from the home environment), leading to "different ideal policies across households."[252] These findings from Dr. Vohs's own sources undermine her suggestion of a stable or universally shared view of what constitutes sensitive health information as well as whether "health information" is universally considered to be "more" sensitive than unidentified "other" information.

### 2. Consumers Do Not Share Uniform Expectations About How Their Health Information is Used and By Whom

127. Dr. Vohs claims that people form and hold stable and uniform expectations on how health information should be used and who should have access to it – particularly with respect to information being shared with technology or for-profit companies.[253] Dr. Vohs

---

Castillo, Celeste and Denise L. Anthony, "The Double-Edged Sword of Electronic Health Records: Implications for Patient Disclosure," *Journal of The American Medical Informatics Association*, Vol. 22 (e1), April 2015, pp. e130–e140, at p. e131.

[251] Baines, Rebecca et al., "Patient and Public Willingness to Share Personal Health Data for Third-Party or Secondary Uses: Systematic Review," *Journal of Medical Internet Research*, Vol. 26 (e50421), March 2024, pp. 1–19, at pp. 5–6.

[252] Caine and Hanania (2013), at p. 14.

[253] Vohs Report, ¶ 55 ("People's preferences regarding their health communications being shared with a social media company for profit-seeking purposes are clear. People would not agree, nor would they find it unacceptable for communications with their healthcare provider to be shared with a social media company for marketing or other profit-seeking purposes.").

observes that "[m]ultiple literature reviews… have examined people's preferences regarding commercial entities accessing their health information." Dr. Vohs asserts that these literature reviews result in the conclusion that "people find it unacceptable that their health information would be shared with pharmaceutical companies and other for-profit organizations."[254]

128. However, this proposition, similar to Dr. Vohs's earlier claims about the sacrality and sensitivity of health data, oversimplifies the reality of how individuals evaluate the sharing and use of health information in practice. A closer look at the studies cited in her report reveals evidence that individuals not only vary widely in what they consider acceptable use of their data, but that their consideration of what use is acceptable depends on conditions and circumstances in which data would be shared. Consequently, a more accurate and fair interpretation of the studies relied upon (and omitted) by Dr. Vohs show that consumer preferences regarding health information use are highly heterogeneous, context-based, and shaped by the perceived benefits, trust, privacy control mechanisms, and the identity of the data recipient and user. Therefore, Dr. Vohs's assertion of a categorical aversion to data use by for-profit or social media companies lacks empirical support.

129. First, Dr. Vohs's own sources show substantial heterogeneity in consumers' preferences and expectations around health data sharing. For example, Kassam et al. (2023) reviewed 75 studies on health data consent and, consistent with the idea of heterogeneous preferences across consumers, found that the degree of consent varied across contexts.[255] Similarly, Caine and Hanania (2012) showed that participants' preferences for sharing health data varied based on the data type and the potential recipient.[256]

---

254 Vohs Report, ¶ 39 ("Multiple literature reviews, combining numerous studies, have examined people's preferences regarding commercial entities accessing their health information. They conclude that people find it unacceptable that their health information would be shared with pharmaceutical companies and other for-profit organizations (Baines et al., 2024; Kassam et al., 2023).").

255 Kassam et al. (2023), at p. 1 ("68 (91%) [of the studies] found that participants were willing to provide consent; however, their consent behaviors and preferences were context-dependent.").

A13-3773

256 See Caine and Hanania (2013), at p. 11.

130. Second, the academic sources cited by Dr. Vohs also show that consumer willingness to share health data is shaped not only by context but also by how people perceive the tradeoffs involved—particularly the benefits of sharing versus potential privacy risks. For example, Kharlamov et al. (2023) stated that, "despite expressing high privacy concerns individuals have" and the perceived "dominance of risks over benefits," individuals "continue to share personal information" and "rarely opt out of healthcare data sharing."[257] Among the reasons the authors identified for this phenomenon is that the perceived usefulness and benefits of services outweigh concerns about privacy risks when consumers decide whether to share their data. Trinidad et al. (2020) find that one quarter to one-third of the participants of their study were either fairly or very comfortable with sharing health data with third-party commercial companies for companies' business purposes.[258] These findings challenge Dr. Vohs's conclusion that opposition to commercial or technological uses of health data is universal or inflexible and suggest that a sizeable number of people are willing to share health information with third-parties.

131. Further evidence comes from a national survey on consumers' attitudes regarding the "perceived benefits" of "the electronic sharing of health information among healthcare providers, patients, and other entities."[259] A majority of respondents were "very" or "somewhat" concerned about the privacy and security of electronic health records and

---

[257] Kharlamov, Alexander et al., "Data Sharing Decisions: Perceptions and Intentions in Healthcare," *Strategic Change*, Vol. 32 (6), October 2023, pp. 223–237, at p. 224.

[258] Trinidad, M. Grace et al., "The Public's Comfort with Sharing Health Data with Third-Party Commercial Companies," *Humanities & Social Sciences Communication*, Vol. 7 (140), November 2020, pp. 1–10, at p. 5 ("One quarter to one-third of participants indicated they were either fairly or very comfortable with each of the component questions in comfort with sharing health data [with] third-party commercial companies for business purposes (29.90% are comfortable with a third-party commercial company storing their DNA and health information, 31.02% are comfortable with a third-party commercial company sharing predictions about how they will respond to cancer treatment with insurance companies, and 24.39% are comfortable with a third-party commercial company selling de-identified health information to a pharmaceutical company).").

[259] Dimitropoulos, Linda et al., "Public Attitudes Toward Health Information Exchange: Perceived Benefits and Concerns," *The American Journal of Managed Care*, Vol. 17, December 2011, pp. 11–16, at pp. 12, 14 ("Of all respondents, 82% reported that they were 'very' (59%) or 'somewhat' concerned (23%) about the security of EHR[…]. Nearly 75% of respondents agreed that an EHR has benefits that outweigh any risk to privacy and security. Even among respondents who reported being 'somewhat' or 'very' concerned, a significant majority agreed that the benefits of HIE [(health information exchange)] outweigh the risks. Sixty percent of respondents reported they would be willing to allow physicians to share their information electronically for treatment, even if they may not be able to protect their privacy all of the time.").

A13-3774

health information exchange. Even so, roughly three-quarters agreed that the benefits of electronic records outweigh the risks and about 60% would permit electronic sharing for treatment even if their physicians could not always protect their privacy.[260] These results provide further evidence that privacy concerns do not translate into categorical refusal to share health information. Moreover, the results of my surveys in **Section III** find that the majority of respondents reported that they would not be surprised to see social media advertisements related to their online activities on healthcare websites.[261] This suggests that, regardless of potential privacy concerns, U.S. Facebook users generally expect or understand that some information may be shared about their online activities on healthcare websites, and that this information could be used for purposes of targeted advertising on social media. Moreover, expectations regarding information sharing vary substantially among U.S. Facebook users, such that no one expectation level describes all users.

[260] Dimitropoulos, Linda et al., "Public Attitudes Toward Health Information Exchange: Perceived Benefits and Concerns," *The American Journal of Managed Care*, Vol. 17, December 2011, pp. 11–16, at pp. 12, 14

[261] Specifically, my Portal Survey finds that 70.8% of respondents were not surprised to see social media advertisements related to the website on which they interacted with a patient portal, my Provider Website Survey finds that 80.5% of respondents in the Patients Group and 77.3% in the Non-Patients Group were not surprised to see social media advertisements related to the healthcare providers' websites they searched and browsed, and my Prescription Survey finds that 64.3% of respondents were not surprised to see social media advertisements related to the prescription drug website they visited. See **Section III.B**. All of these values are significantly greater than 50% as none of their confidence intervals include 50%.

Signed on the 8th day of December, 2025.

On Amir, Ph.D.
December 8, 2025

**Exhibit 1a**
**Portal Survey**
**Survey Response Statistics**

| Status | N | % of Total Starts |
|---|---|---|
| **Completed Survey** | **400** | **25.0%** |
| **Screened Out of Survey, due to:** | **1,050** | **65.6%** |
| *Failed reCaptcha* [1] | 52 | 3.2% |
| *Age or Gender* [2] | 21 | 1.3% |
| *State of residence* [3] | 13 | 0.8% |
| *Employment* [4] | 229 | 14.3% |
| *Failed "South" attention check* [5] | 35 | 2.2% |
| *Recent survey experience* [6] | 164 | 10.2% |
| *No qualifying online activity in past 3 months* [7] | 407 | 25.4% |
| *Selected red-herring "rice cooker subscription" option in QS8* [8] | 4 | 0.2% |
| *No personal Facebook account* [9] | 123 | 7.7% |
| *Selected red-herring "MAD Magazine" option in QS9* [10] | 2 | 0.1% |
| **Over Quota** [11] | **97** | **6.1%** |
| **Self Termination** [12] | **54** | **3.4%** |
| **Total Survey Starts** | **1,601** | **100.0%** |

**Notes:**

[1] Respondents who failed to correctly complete the reCaptcha task at the beginning of the survey were screened out of the survey.

[2] Respondents who provided an age or gender that did not match what Research Results had on file, selected either "Other" or "Prefer Not to Answer" when asked their gender, or selected "Under 18 years old" when asked their age were screened out of the survey (QS2 and QS3).

[3] Respondents who selected "Don't Know / Unsure" or "Prefer not to answer" in response to QS4 ("In which state do you live?") were screened out of the survey.

[4] Respondents who selected "A social media or technological platform," "A healthcare provider or medical office," "A law firm, legal services organization, or court," or "A marketing, market research, or advertising agency" in response to QS5 ("Have you or any member of your household ever worked for any of the following types of companies?") were screened out of the survey.

[5] Respondents who failed to select "South" in response to QS6 ("This question is to check your attention. Please select 'South' from the answer options below.") were screened out of the survey.

[6] Respondents who selected "Healthcare provider websites" in response to QS7 ("Have you taken any surveys in the last 30 days on any of these topics?") were screened out of the survey.

[7] Respondents who did not select at least one of "Logged into a healthcare provider's online portal," "Made an appointment with a healthcare provider online," "Paid a medical bill online," or "Taken a diagnostic assessment on a healthcare provider's website" in response to QS8 ("Which of the following activities, if any, have you done in the **past 3 months**?") were screened out of the survey.

[8] Respondents who selected the red-herring answer option "Signed up for a rice cooker subscription" in response to QS8 ("Which of the following activities, if any, have you done in the past 3 months?") were screened out of the survey.

[9] Respondents who did not select "Facebook" in response to QS9 ("For which of the following, if any, do you currently have a personal account?") were screened out of the survey.

[10] Respondents who selected the red-herring answer option "MAD Magazine" in response to QS9 ("For which of the following, if any, do you currently have a personal account?") were screened out of the survey.

[11] Respondents who started the survey after their gender/age/region quota was full were terminated.

[12] The completion rate is 99.8%, or: [total number of completes] / [total respondents who started the main questionnaire].

**Exhibit 1b**
**Provider Website Survey**
**Survey Response Statistics**

| Status | N | % of Total Starts |
|---|---|---|
| **Completed Survey** | **801** | **23.9%** |
| **Screened Out of Survey, due to:** | **2,346** | **69.9%** |
| *Failed reCaptcha* [1] | 97 | 2.9% |
| *Age or Gender* [2] | 33 | 1.0% |
| *State of residence* [3] | 16 | 0.5% |
| *Employment* [4] | 447 | 13.3% |
| *Failed "South" attention check* [5] | 118 | 3.5% |
| *Recent survey experience* [6] | 353 | 10.5% |
| *No qualifying online activity in past 3 months* [7] | 1,086 | 32.3% |
| *Selected red-herring "rice cooker subscription" option in QS8* [8] | 18 | 0.5% |
| *No personal Facebook account* [9] | 165 | 4.9% |
| *Selected red-herring "MAD Magazine" option in QS9* [10] | 13 | 0.4% |
| **Over Quota[11]** | **117** | **3.5%** |
| **Self Termination[12]** | **94** | **2.8%** |
| **Total Survey Starts** | **3,358** | **100.0%** |

**Notes:**

[1] Respondents who failed to correctly complete the reCaptcha task at the beginning of the survey were screened out of the survey.

[2] Respondents who provided an age or gender that did not match what Research Results had on file, selected either "Other" or "Prefer Not to Answer" when asked their gender, or selected "Under 18 years old" when asked their age were screened out of the survey (QS2 and QS3).

[3] Respondents who selected "Don't Know / Unsure" or "Prefer not to answer" in response to QS4 ("In which state do you live?") were screened out of the survey.

[4] Respondents who selected "A social media or technological platform," "A healthcare provider or medical office," "A law firm, legal services organization, or court," or "A marketing, market research, or advertising agency" in response to QS5 ("Have you or any member of your household ever worked for any of the following types of companies?") were screened out of the survey.

[5] Respondents who failed to select "South" in response to QS6 ("This question is to check your attention. Please select 'South' from the answer options below.") were screened out of the survey.

[6] Respondents who selected "Healthcare provider websites" in response to QS7 ("Have you taken any surveys in the last 30 days on any of these topics?") were screened out of the survey.

[7] Respondents who did not select at least one of "Browsed online for a healthcare provider" or "Researched a medical condition or treatment online" in response to QS8 ("Which of the following activities, if any, have you done in the **past 3 months**?") were screened out of the survey.

[8] Respondents who selected the red-herring answer option "Signed up for a rice cooker subscription" in response to QS8 ("Which of the following activities, if any, have you done in the past 3 months?") were screened out of the survey.

[9] Respondents who did not select "Facebook" in response to QS9 ("For which of the following, if any, do you currently have a personal account?") were screened out of the survey.

[10] Respondents who selected the red-herring answer option "MAD Magazine" in response to QS9 ("For which of the following, if any, do you currently have a personal account?") were screened out of the survey.

[11] Respondents who started the survey after their gender/age/region quota was full were terminated.

[12] The completion rate is 99.3%, or: [total number of completes]/[total respondents who started the main questionnaire].

**Exhibit 1c**
**Prescription Survey**
**Survey Response Statistics**

| Status | N | % of Total Starts |
|---|---|---|
| **Completed Survey** | **400** | **12.7%** |
| **Screened Out of Survey, due to:** | **2,508** | **79.8%** |
| *Failed reCaptcha* [1] | 83 | 2.6% |
| *Age or Gender* [2] | 39 | 1.2% |
| *State of residence* [3] | 5 | 0.2% |
| *Employment* [4] | 403 | 12.8% |
| *Failed "South" attention check* [5] | 90 | 2.9% |
| *Recent survey experience* [6] | 131 | 4.2% |
| *No qualifying online activity in past 3 months* [7] | 1,670 | 53.1% |
| *Selected red-herring "rice cooker subscription" option in QS8* [8] | 10 | 0.3% |
| *No personal Facebook account* [9] | 69 | 2.2% |
| *Selected red-herring "MAD Magazine" option in QS9* [10] | 8 | 0.3% |
| **Over Quota[11]** | **164** | **5.2%** |
| **Self Termination[12]** | **71** | **2.3%** |
| **Total Survey Starts** | **3,143** | **100.0%** |

**Notes:**

[1] Respondents who failed to correctly complete the reCaptcha task at the beginning of the survey were screened out of the survey.

[2] Respondents who provided an age or gender that did not match what Research Results had on file, selected either "Other" or "Prefer Not to Answer" when asked their gender, or selected "Under 18 years old" when asked their age were screened out of the survey (QS2 and QS3).

[3] Respondents who selected "Don't Know / Unsure" or "Prefer not to answer" in response to QS4 ("In which state do you live?") were screened out of the survey.

[4] Respondents who selected "A social media or technological platform," "A healthcare provider or medical office," "A law firm, legal services organization, or court," or "A marketing, market research, or advertising agency" in response to QS5 ("Have you or any member of your household ever worked for any of the following types of companies?") were screened out of the survey.

[5] Respondents who failed to select "South" in response to QS6 ("This question is to check your attention. Please select 'South' from the answer options below.") were screened out of the survey.

[6] Respondents who selected "Prescription Drug Websites" in response to QS7 ("Have you taken any surveys in the last 30 days on any of these topics?") were screened out of the survey.

[7] Respondents who did not select "Browsed the website of a drug for which I had a prescription" in response to QS8 ("Which of the following activities, if any, have you done in the past 3 months?") were screened out of the survey.

[8] Respondents who selected the red-herring answer option "Signed up for a rice cooker subscription" in response to QS8 ("Which of the following activities, if any, have you done in the past 3 months?") were screened out of the survey.

[9] Respondents who did not select "Facebook" in response to QS9 ("For which of the following, if any, do you currently have a personal account?") were screened out of the survey.

[10] Respondents who selected the red-herring answer option "MAD Magazine" in response to QS9 ("For which of the following, if any, do you currently have a personal account?") were screened out of the survey.

[11] Respondents who started the survey after their gender/age/state quota was full were terminated.

[12] The completion rate is 100%, or: [total number of completes]/[total number of respondents who started the main questionnaire].

**Exhibit 2a**
**Portal Survey**
**Demographics of Survey Completes**

| Demographic | N | % Total |
|---|---|---|
| **Gender:**[1] | | |
| *Male* | 189 | 47.3% |
| *Female* | 211 | 52.8% |
| **Age:**[2] | | |
| *18-29 years old* | 58 | 14.5% |
| *30-39 years old* | 66 | 16.5% |
| *40-49 years old* | 73 | 18.3% |
| *50-59 years old* | 72 | 18.0% |
| *60 years or older* | 131 | 32.8% |
| **Region:**[3] | | |
| *Northeast* | 59 | 14.8% |
| *Midwest* | 103 | 25.8% |
| *South* | 161 | 40.3% |
| *West* | 77 | 19.3% |
| **Total Survey Completes** | **400** | **100.0%** |

Notes:

[1] Respondents were asked their gender in QS3 ("Are you…?") and matched to the panel dataset.

[2] Respondents were asked their age in QS2 ("What is your age?") and matched to the panel dataset.

[3] Respondents were asked the state in which they currently reside in QS4 ("In which state do you live?") and were categorized into census regions by Research Results.

**Exhibit 2b**
**Provider Website Survey**
**Demographics of Survey Completes**

| Demographic | N | % Total |
|---|---|---|
| **Gender:**[1] | | |
| *Male* | 377 | 47.1% |
| *Female* | 424 | 52.9% |
| **Age:**[2] | | |
| *18-29 years old* | 116 | 14.5% |
| *30-39 years old* | 168 | 21.0% |
| *40-49 years old* | 163 | 20.3% |
| *50-59 years old* | 161 | 20.1% |
| *60 years or older* | 193 | 24.1% |
| **Region:**[3] | | |
| *Northeast* | 130 | 16.2% |
| *Midwest* | 179 | 22.3% |
| *South* | 329 | 41.1% |
| *West* | 163 | 20.3% |
| **Total Survey Completes** | **801** | **100.0%** |

**Notes:**

[1] Respondents were asked their gender in QS3 ("Are you…?") and matched to the panel dataset.

[2] Respondents were asked their age in QS2 ("What is your age?") and matched to the panel dataset.

[3] Respondents were asked the state in which they currently reside in QS4 ("In which state do you live?") and were categorized into census regions by Research Results.

**Exhibit 2c**
**Prescription Survey**
**Demographics of Survey Completes**

| Demographic | N | % Total |
|---|---|---|
| **Gender:**[1] | | |
| *Male* | 204 | 51.0% |
| *Female* | 196 | 49.0% |
| **Age:**[2] | | |
| *18-29 years old* | 79 | 19.8% |
| *30-39 years old* | 67 | 16.8% |
| *40-49 years old* | 72 | 18.0% |
| *50-59 years old* | 82 | 20.5% |
| *60 years or older* | 100 | 25.0% |
| **Region:**[3] | | |
| *Northeast* | 64 | 16.0% |
| *Midwest* | 88 | 22.0% |
| *South* | 163 | 40.8% |
| *West* | 85 | 21.3% |
| **Total Survey Completes** | **400** | **100.0%** |

**Notes:**

[1] Respondents were asked their gender in QS3 ("Are you…?") and matched to the panel dataset.

[2] Respondents were asked their age in QS2 ("What is your age?") and matched to the panel dataset.

[3] Respondents were asked the state in which they currently reside in QS4 ("In which state do you live?") and were categorized into census regions by Research Results.

# APPENDIX A

# CURRICULUM VITAE

# *On Amir*

Rady School of Management
University of California, San Diego
Wells Fargo Hall
9500 Gilman Drive, MC 0553
La Jolla, CA 92093-0553
(858) 534-2023
oamir@ucsd.edu

---

## *Education*

Ph.D., Management Science, Marketing, Massachusetts Institute of Technology
B.S., Computer Science, Israeli Open University, Tel Aviv

## *Academic Employment*

| | |
|---|---|
| 2024 - present | Senior Associate Dean for Faculty and Research |
| 2020 – present | Wolfe Family Presidential Endowed Chair in Life Sciences, Innovation, and Entrepreneurship,<br>Professor of Marketing<br>Rady School of Management, University of California, San Diego, |
| 2018 - 2021 | Associate Dean of Programs<br>Rady School of Management, University of California, San Diego |
| 2018 – 2020 | Professor of Marketing<br>Rady School of Management, University of California, San Diego |
| 2010 – 2017 | Associate Professor of Marketing<br>Rady School of Management, University of California, San Diego |
| 2012 – 2013 | Visiting Associate Professor of Marketing<br>Kellogg School of Management, Northwestern University |
| 2011 – 2012 | Visiting Professor of Marketing<br>Arison School of Management, IDC |
| 2005 – 2010 | Assistant Professor of Marketing<br>Rady School of Management, University of California, San Diego |
| 2003 – 2005 | Assistant Professor of Marketing<br>School of Management, Yale University |

## *Other Employment*

| | |
|---|---|
| 2018 - present | Chief Behavioral Science Officer, Fiverr, Inc. |

1991 – 1999 Israeli Air Force

---

***Publications***

Evan Weingarten, Andrea Morales, & On Amir (2024). The Evolving Field of Consumer Research Through the Lens of its Top Journals, *Marketing Letters*.

Ariel Fridman, On Amir, & Karsten Hansen (2024). Dominance Effects in the Wild, *Journal of Consumer Research*, 50 (6), April, 1117–1135

* Einhorn Award, honorable mention, 2023.

Alicea Lieberman, On Amir, & Ziv Carmon (2023). The entrenchment effect: Why people persist with less-preferred behaviors, *Organization Behavior and Human Decision Processes*, September (178).

Jean Zhang & On Amir (2023). Consumer Pandemic Coping: A Stage Model of Covid-19 Response, *Journal of the Association of Consumer Research*, April, 165-175.

Evan Weingarten, Kristen Duke, Wendy liu, Rrebecca Hamilton, On Amir, Gil Apple, Moran Cerf, Joe Goodman, Andrea Morales, Ed O'Brian, Jordi Quidbach, & Monic Sun (2023). What Makes People Happy? Decoupling the Experiential-Material Continuum, *Journal of Consumer Psychology*, February 33 (1), 97-106.

David Leonard, Laura F. DeFina, Carolyn E. Barlow, Jeffrey Drope, On Amir, Ayelet Gneezy, Shay Tzafrir, Karen G. Chartier, & Mahmoud Qadan (2022). Cardiorespiratory Fitness and Depression Symptoms among Adults During the COVID-19 Pandemic: Cooper Center Longitudinal Study, *Preventive Medicine Reports*, 30, December.

Coby Morvinski, Matt J. Lupoli, & On Amir (2022). Social Information Decreases Giving in Late-stage Fundraising Campaigns. *PLOS-ONE,*17(12), 1-20.

Karen B. Aharon, Avital Gershfeld-Litvin, On Amir, Irene Nebutovsky, & Robert Klempfner (2022). Improving Cardiac Rehabilitation Patient Adherence via Personalized Interventions, *PLOS-ONE, August 29,* 1-15.

Kristen Duke & On Amir (2022). The Importance of Selling Formats: When Integrating Purchase and Quantity Decisions Increases Sales, *Marketing Science,* 1-23.

Alicea Lieberman, Juliana Schroeder, & On Amir (2022). A Voice Inside My Head: The Psychological and Behavioral Consequences of Auditory Technologies, *Organization Behavior and Human Decision Processes*, 170.

Coby Morvinski, Silvia Saccardo, & On Amir (2022). Mis-Nudging Morality, *Management Science*, 1-11.

Alicea Lieberman, Andera Morales, & On Amir (2021). Tangential Immersion: Increasing Consumer Persistence, *Journal or Consumer Research*, 1-23.

Elanor Williams, Allie Lieberman, & On Amir (2021). Perspective Neglect: Inadequate Perspective Taking Limits Coordination, *Judgment and Decision Making*, 16 (4), 898-931.

**A13-3785**

Weingarten, Evan, Michael W. Meyer, Amit Ashkenazi, & On Amir (2020). Experts Outperform Technology in Creative Markets, *She Ji: The Journal of Design, Economics, and Innovation*.

Alicea Lieberman , Kristen Duke, & On Amir (2019). How Incentive Framing Can Harness the Power of Norms, *Organizational Behavior & Human Decision Processes*.

Kristen E. Duke & On Amir (2019). Guilt Dynamics: Consequences of Temporally Separating Decisions and Actions, *Journal of Consumer Research*, 45 (6), 1254-1273.

* Winner of the 2019 Ferber Award

On Amir, Nina Mazar, & Dan Ariely (2019). Replicating the Effect of Moral Standards Accessibility on Dishonesty, Author's Response to the Replication Process, *Advances in Methods and Practices in Psychological Science*.

Raphael Thomadsen, Robert P. Rooderkerk, On Amir, Neeraj Arora, Bryan Bollinger, Karsten Hansen, Leslie John, Wendy Liu, Aner Sela, Vishal Singh, K. Sudhir, & Wendy Wood (2018). How Context Affects Choice, *Customer Needs and Solutions*, 1-2, 3-14.

Kristen Duke, Kelly Goldsmith, & On Amir (2018). Is the Preference for Certainty Always so Certain?, *Journal of the Association of Consumer Research*, 3(1), 63-80.

Coby Morvinski & On Amir (2018). Liking Goes with Liking: An Intuitive Congruence between Preference and Prominence, *Journal of Experimental Psychology: Learning, Memory, and Cognition*.

Daniella Kupor, Wendy Liu, & On Amir (2017). The Effect of an Interruption on Risk Decisions, *Journal of Consumer Research*, 44 (6), 1205–1219.

Andrea Morales, On Amir, & Leonard Lee (2017). A Tutorial in Consumer Research: Keeping it Real in Experimental Research – Understanding When, Where, and How to Enhance Realism and Measure Consumer Behavior, *Journal of Consumer Research*, 44 (2), 465–476.

Kerem Shuval, Tammy Leonard, Jeffrey Drope, David L. Katz, Alpa V. Patel, Melissa Maitin-Shepard, On Amir, & Amir Grinstein, (2017). Physical Activity Counseling in Primary Care: Insights from Public Health & Behavioral Economics, *CA: A Cancer Journal for Clinicians*, 67(3), 233-244.

Coby Morvinski, On Amir, & Eitan Muller (2017). "Ten Million Readers Can't Be Wrong!," or Can They? On the Role of Information About Adoption Stock in New Product Trial, *Marketing Science*, 36(2), 290-300.

On Amir and Orly Lobel (2014). How Non-Competes Stifle Performance, *Harvard Business Review*, 92 (1/2), p.26.

On Amir and Orly Lobel (2013). Driving Performance: A Growth Theory of Non-Compete Law, *Stanford Technology Law Review*, 16 (3), spring.

On Amir and Orly Lobel (2012). Liberalism and Lifestyle: Informing Regulatory Governance with Behavioral Research, *European Journal of Risk Regulation*, 1, 17-25.

Kelly Goldsmith and On Amir (2010). Can Uncertainty Improve Promotions, *Journal of Marketing Research*, December, 1070-1077.

Leonard Lee, On Amir, and Dan Ariely (2009). In Search of Homo Economicus: Cognitive Noise and the Role of Emotion in Preference Consistency, *Journal of Consumer Research*, 36, 173-187.

Anastasiya Pocheptsova, On Amir, Ravi Dhar, and Roy Baumeister (2009). Deciding without Resources: Psychological Depletion and Choice in Context, *Journal of Marketing Research*, June, 46 (3), 344-355.

On Amir and Dan Ariely (2008). Resting on Laurels: The Effects of Discrete Progress Markers as SubGoals on Task Performance and Preferences, *Journal of Experimental Psychology: Learning, Memory, & Cognition*, 34 (5), 1158-1171.

On Amir and Orly Lobel (2008). Stumble, Predict, Nudge: How Behavioral Economics Informs Law and Policy, *Columbia Law Review*, December, 2098-2138.

Nina Mazar, On Amir, and Dan Ariely (2008). The Dishonesty of Honest People: A Theory of Self-Concept Maintenance, *Journal of Marketing Research*, November, 45 (6), 633-644, (lead article).

*Media coverage: NY Times Science section (Nov. 20th, 2007)

*HBR Breakthrough Ideas for 2008.

*Winner of the 2012 William F. O'Dell award.

Nina Mazar, On Amir, and Dan Ariely (2008). More Ways to Cheat – Expanding the Scope of Dishonesty, *Journal of Marketing Research*, November, 45 (6), 651-653.

On Amir and Jonathan Levav (2008). Preference construction versus choice construction: The instability of preferences learned in context. *Journal of Marketing Research*, April, 145-158.

On Amir, Ziv Carmon, and Dan Ariely (2008). The Dissociation between Monetary Assessments and Predicted Utility, *Marketing Science*, 27 (6), 1055-1064.

On Amir and Dan Ariely (2007). Decisions by Rules: The Case of Unwillingness to Pay for Beneficial Delays. *Journal of Marketing Research*, February, 142-152.

On Amir, Dan Ariely, Alan Cooke, David Dunning, Nicholas Epley, Botond Koszegi, Donald Lichtenstein, Nina Mazar, Sendhil Mullainathan, Drazen Prelec, Eldar Shafir, Jose Silva (2005). Behavioral Economics, Psychology, and Public Policy. *Marketing Letters* (Special Issue for the Sixth Choice Symposium), 16:3/4, 443-454.

***Other Publications***

Alicia Lieberman, Andrea C. Morales, and On Amir (2019). Beyond the Lab: Using Data from the Field to Increase Research Validity, in Handbook of Research Methods in Consumer Psychology, Frank R. Kardes, Paul M. Herr, and Nobert Schwarz, Editors, Routledge.

"Psychology of Pricing: How to Price Your Products Effectively," The To Do List, May 23rd, 2019.

"Is the Mind like a Muscle?" Scientific American, Mind, online edition.

**A13-3787**

"Making Consumption Decisions by Following Personal Rules" (2005), In Inside Consumption: Frontiers of Research on Consumer Motives, Goals, and Desires. Ratti Ratneshwar & David Mick (eds.), Routledge Press. (with Dan Ariely & Orly Lobel)

On Amir & Ariely Dan (2001) e-Rationality: Rationality in Electronic Environments. In S.M. Broniarczyk, & K. Nakamoto, Advances in Consumer Research, 24. Provo, UT.

On Amir (2004) Alternative Decision Processes in Consumption: Personal Rules, Rationales, and Identity Maintenance, Advances in Consumer Research, XXXI, 26.

---

### *Selected Research in Progress*

The Impact of Linguistic Structure on Judgment Confidence and Source Attitude (with Giulia Maimone and Uma Karmarkar) – Under review at Journal or Marketing

How Product Unavailability Leads to Choice of Lesser Alternatives—The Role of Hedonic Aggregation (With Jean Zhang and Gal Smitizsky) – Under review

The most Influential Age Hypothesis: Does the Self Cause Predictable Preferences (with Nina Mazar) – revision invited Management Science.

Reference Escalation in Sequential Choice (with Coby Morvinski and Evan Weingarten) – Under review

My Experience or My Expectations: The Effect of Expectations as Reference Points on Evaluations of Experiential Purchases (with Amar Cheema, Davide Proserpio, and Stephanie Tully) – under review.

Risk Aversion as Self Control (with Orly Lobel and Kelly Goldsmith)

Driving Pro-Environmental Choice (with Elizabeth A. Keenan and Ayelet Gneezy)

Risk Management for the Future: Age, Risk, and Choice Architecture (with Orly Lobel)

---

### *Honors and Awards*

MSI Research Award: "Do Experts Outperform Artificial Intelligence? The Case of Logo Design," # 4000657, 2019
MSI Research Award: "Quantity Integration," #4000477, 2018
MSI Research Award: "New Product Adoption," #4-1842, 2014
Robert Woods Johnson Foundation research grant for Healthy Choices.
MSI Junior Scholars 2009
"Most Valuable Professor Award," voted by the Flex MBA class of 2007
"Most Valuable Professor Award," voted by the Fulltime MBA class of 2007
MSI Research Award: "Motivating Discounts: Price Motivated Consumer Reasoning", #4-1273, 2004
AMA - Sheth Doctoral Consortium Fellow, 2002

A13-3788

MSI Research Award: "Information Aversion: Indecision, Procrastination, and Consumer Choice Online", #4-1141, 2001
CS Holding Fellowship, 2001
Walter A Rosenblith Fellowship, 2000

---

***Conference presentations and Invited Talks***

University of California, Berkeley, Haas (2015, 2023)
University of Toronto, Rotman (2015)
University of Southern California, Marshal (2014, 2022)
University of Southern California, Psychology (2013)
University of Pennsylvania, Wharton (2007, 2013)
University of Chicago, Booth (2013)
Northwestern University, Kellogg (2012)
Interdisciplinary Center, Arison (2011)
Stanford University, GSB (2009, 2023)
Columbia University, GSB (2009)
University of California, San Diego, Psychology (2005, 2006, 2007, 2008)
University of California, San Diego, Economics (2008)
Erasmus University (2008)
University of Melbourne (2007)
Hebrew University (2007)
Washington University, St. Louis (2007)
University of San Diego, School of Law (2006)
University of California, Los Angeles, Anderson (2004)
University of California, Riverside, Anderson (2015, 2023)
Yale University, Psychology (2004)
INSEAD (2004, 2015)
Johns Hopkins University (2017)
NUS (2018)
Ben Gurion University (2018)
HKU (2019)
CUHK (2019)
MIT (2019)
NYU (2009, 2023)
Monash University (2023)

Association for Consumer Research, 2001, 2003, 2004, 2006, 2007, 2013, 2015, 2016, 2022, 2023
Society of Consumer Psychology, 2004, 2005, 2008, 2012, 2014, 2015, 2016, 2017, 2020
Society for Judgement and Decision Making, 2003, 2005, 2006, 2011, 2015, 2016, 2019, 2023
Behavioral Decision Making Research in Management, 2002, 2006, 2008, 2014, 2016, 2018
FUR, IESE, 2008

Marketing in Israel, 2002, 2003, 2005
Northeastern Marketing Consortium 2003
Coller Conference of Behavioral Economics 2008, 2009, 2017, 2018, 2019, 2021
DMEP 2019
Winter SJDM 2022, 2023
Colorado Winter Conference on Marketing and Cognition 2023

---

***In the Media***

Loud budgeting – Ask the experts. WalletHub, September 1, 2025.
Social media and bad TV suck up our time. Here's why we can't break the habit. USA Today, July 25, 2025.
Cheapest cars to insure – Ask the experts. WalletHub, February 2, 2025.
Personal loans – Ask the experts. WalletHub, April 24, 2024.
What does it say about car insurance companies that so many have celebrity endorsers? WalletHub, January 23, 2024.
What's behind the Stanley Cup craze? A San Diego marketing professor explains, NBC 7, January 16, 2024.
2023 iPhone Survey: More than 1 in 5 Americans think that the new iPhone is worth going into debt, WalletHub, September 13, 2023.
San Diego is Climbing the Ranks of Most Expensive Cities in the World. Here's Why, NBC 7, December 8, 2022.
Research Reveals How To Persuade Consumers To Use And Buy More, Forbes, November 22, 2022.
Capital One Savor Review: Tasty Rewards for Dining & Entertainment, WalletHub, July 1, 2022
Decision Making Traps and Tips for Negotiators, CIIAN, December, 2021
2021's Best Things to Buy on Black Friday, WalletHub, November 19, 2021
'That's not true.' San Diego doctors tackle COVID misinformation sown during county meeting. San Diego Union Tribune, October 6, 2021
You could be one of three San Diegans who just won $50,000 in the state's vaccine lottery. San Diego Union Tribune, June 4, 2021.
California's vaccine incentives program – KPBS, May 2021.
San Diego health systems ask for fewer vaccine doses, turn down extra amid supply glut. San Diego Union Tribune, May 10, 2021.
2021's Best Pleaces for Valentine's Day. WalletHub, February 2, 2021.
We're getting closer to having a Covid-19 vaccine. Hold onto that mask, though. San Diego Union Tribune, October 25, 2020
Psychology of Pricing: How to Price you Products Effectively, The Do List, May 23, 2019
The Celebrity of Legalized Cannabis, Pacific San Diego, May 20, 2019
Marines may ditch 'The Few, the Proud' slogan, San Diego Union Tribune, October 11, 2016
The free-shipping wars have begun, San Diego Union Tribune, October 2013
The Young and The Promising, TheMarker magazine, 2011
Consumer Emotional Reactions to Changing Gas Prices, Ch. 10 News, August 2008
Jogging Down the Comeback Trail, San Diego Union Tribune, August 2007
A13-3790 Big Business and the Consumer, Jeremy Seville Comedy Hour, WealthTV 2007

Social Marketing, San Diego Union Tribune, May 2007
Trends in E-commerce, San Diego Business Journal, July 2006
Dating websites, San Diego Union Tribune, April 2006
Database marketing, Campus Technology, November 2005
Christmas shopping, Hartford Courant, December 2004

---

***Service***

| | |
|---|---|
| *PhD Committee* | Uzma Khan, Yale SOM, 2005<br><br>Michael Liersch, UCSD Psychology, 2007<br>Elizabeth Keenan, UCSD, 2015<br>Coby Morvinski, UCSD, 2015 (Chair)<br>Charles Lin, UCSD Economics, 2015<br>Kristen Duke, UCSD (Chair)<br>Alicea Lieberman, UCSD (Chair) |
| *Conferences* | Program committee for: SCP, ACR, BDRM, SJDM<br>Conference Chair: SCP 2017 |

***Reviewer***

Journal of Marketing Research
Marketing Science
Journal of Experimental Psychology: General
Journal of Economic Psychology
Journal of Consumer Research
American Economic Review
Journal of Consumer Psychology
Memory and Cognition
Psychology and Marketing
Cognition
Journal of Behavioral Decision Making
Organizational Behavior and Human Decision Processes
Psychological Science
Journal of Personality and Social Psychology
Management Science
Journal of Economic Behavior and Organizations
Science

***Member***

Association for Consumer Research

Association for Consumer Psychology
Society for Judgment and Decision Making
American Psychological Society
American Marketing Association

---

***Teaching Experience***

Marketing Management (MBA, Executive)
Analytics in the wild (MBA, Executive)
Consumer Behavior (MBA, Executive)
Market Research (MBA, Executive)
Applied Market Research (Undergraduate, MBA, Executive)
Social Psychology (teaching fellow, Harvard)
E-Commerce Strategy (Executive)
Data Driven Decision Making (Executive)
Customized Executive Programs
Pricing (Executive)
Lab to Market (MBA, Executive)
Intro to Business (Graduate)
Branding (Executive)

***Consulting and Executive Teaching Experience***

Electronic Arts, HP Inc., Fiverr, Illumina, AAA, USAA, Cubic Corporation, Zimmer Dental, Life Technologies / Thermo Fisher, Intuit, WellBeat, Keiser Permanente, HP Software, Sony Entertainment, Applied Biosystems, Kumbaya App, Joyned, Marble, Themis-Tech, Flare, Arborknot.

# APPENDIX B

# PRIOR TESTIMONY

## APPENDIX B

## PRIOR TESTIMONY

*Town of Apple Valley v. Apple Valley Ranchos Water Company*, CIV-DS-1600180, California Superior Court, San Bernardino. Retained by defendant. Deposed.

*Arechiga v. Kellwood Company/Vince LLC*, Case No. BC500988, Superior Court of California, County of Los Angeles. Retained by defendant. Deposed.

S*an Diego County Credit Union v. Citizens Equity First Credit Union*, 3:18-CV-00967- GPC-MSB, United States District Court for the Southern District of California. Retained by defendant. Deposed & court testimony.

*Yamagata v. Reckitt Benckiser LLC.* Case No. 3:17-cv-03529-VC, United States District Court for the Northern District of California. Retained by defendant. Deposed.

*Warner Records, Inc., et al. v. Charter Communications, Inc*., Case No.: 1:19-cv-00874, United States District Court for the District of Colorado. Retained by plaintiffs. Report submitted. Deposed.

*BBK Tobacco & Foods, LLP, an Arizona, limited liability partnership, d/b/a HBI International, v. Central Coast Agriculture, Inc*., a Delaware corporation. Case No. CV-19-05216-PHX-MTL, United States District Court, District of Arizona, Retained by plaintiff. Report submitted. Deposed.

*ICLEEN ENTWICKLUNGS-UND VERTRIEBSANSTALT FÜR UMWELTPRODUKTE, a Liechtenstein corporation; and IQAIR NORTH AMERICA, INC., a California corporation, v. BLUEAIR AB, a Sweden corporation; and BLUEAIR, INC. a Delaware corporation.* Case No. 2:21-cv-02236-DSF-ADSx, United States District Court for the Central District of California. Retained by plaintiffs. Report submitted.

*UMG Recordings, Inc., et al. v. Bright House Networks*, LLC, Case No.: 8:19-cv-00710, United States district court for the middle district of Florida, Tampa Division. Retained by plaintiffs. Report submitted.

*Chasom Brown, et al. v. GOOGLE LLC*, Case No. 4:20-cv-03664-YGR-SVK, United States district court for the northern district of California. Retained by defendant. Report submitted & deposed.

*Max Story and Nancy Murrey-Settle v. Heartland Payment Systems*, LLC., Case No. 3:19-cv-00724, United States District Court, Middle District of Florida, Jacksonville Division. Retained by defendant. Report submitted. Deposed.

*Andrea Campbell, in her official capacity as ATTORNEY GENERAL v. UBER TECHNOLOGIES, INC. and LYFT, INC.*, C.A. No. 2084CV01519-BLS1, Superior Court of the Commonwealth of Massachusetts for the County of Suffolk. Retained by defendant. Report submitted. Deposed. Court testimony.

*Commissioner of Competition v. Cineplex Inc*., CT-2023-003, Competition Tribunal, Ottawa CA. Retained by defendant. Report submitted. Court testimony.

*Capital One 360 Savings Account Interest Rate Litigation*, Case No. 1:24-md-03111-DJN-LRV, United States District Court Eastern District of Virgina Alexandria Division. Retained by defendant. Report submitted. Deposed.

**A13-3794**

*The State of Texas v. Google LLC,* Cause No. CV58999, District Court of Midland County, Texas, 385 Judicial District, Retained by Google. Report Submitted.

*Zesty Paws LLC, v. Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary Sciences, Inc.*, Case No.: 1:23-cv-10849, United Stats District Court Southern District of New York. Retained by defendant. Report submitted & deposed.

*Philips North America LLC. and Philips RS North America LLC. v. SoClean, INC. and DW Management Services, LLC.*, Master Docket No. 22-MC-00152-JFC, United States District Court for the Western District of Pennsylvania. Retained by Counterclaim-Plaintiffs. Report submitted. Deposed.

*State of New Mexico v. Facebook, Inc.*, No. D-101-CV-2021-00132, State of New Mexico, County of Santa Fe, First Judicial District. Retained by defendant. Report submitted & deposed.

*Mayanna Berrin, individually, and on behalf of all others similarly situated v. Delta Air Lines, Inc.*, Case No. 2:23-cv-04150-MEMF-MRW, United States District Court Central District of California. Retained by defendant. Report submitted.

# APPENDIX C

# MATERIALS CONSIDERED

## MATERIALS CONSIDERED

**Legal Documents**

Deposition of Kate Barasz, Ph.D., November 6, 2025.

Deposition of Kathleen D. Vohs, Ph.D., October 28, 2025.

Expert Report of Dr. Kathleen D. Vohs, September 6, 2025 (and Materials Cited Therein).

Expert Report of Dr. Kate Barasz, September 7, 2025 (and Materials Cited Therein).

First Amended Consolidated Class Action Complaint, *In Re Meta Pixel Healthcare Litigation*, United States District Court for the Northern District of California, San Francisco Division, Case No. 3:22-cv-3580-WHO-VKD, October 10, 2023.

Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, United States District Court for the Northern District of California, San Francisco Division, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025.

**Bates Stamped Documents**

PIXEL_HEALTH001317598.

**Academic Literature and Textbooks**

Aaker, Jennifer et al., "Nonprofits Are Seen as Warm and For-Profits as Competent: Firm Stereotypes Matter," *Journal of Consumer Research*, Vol. 37 (2), 2010, pp. 224–237.

Angst, Corey M. and Agarwal, Ritu, "Adoption of Electronic Health Records in the Presence of Privacy Concerns: The Elaboration Likelihood Model and Individual Persuasion," *MIS Quarterly*, Vol. 33 (2), 2009, pp. 339–370.

Baines, Rebecca et al., "Patient and Public Willingness to Share Personal Health Data for Third-Party or Secondary Uses: Systematic Review," *Journal of Medical Internet Research*, Vol. 26 (e50421), March 2024, pp. 1–19.

Baumeister, Roy F., and Mark R. Leary, "Writing Narrative Literature Reviews," *Review of General Psychology*, Vol. 1 (3), 1997, pp. 311–320.

Benoliel, Uri and Shmuel I. Becher, "The Duty to Read the Unreadable," *Boston College Law Review*, Vol. 60, December 2, 2019, pp. 2255–2295.

Biasiotto, Roberta et al., "Public Preferences for Digital Health Data Sharing: Discrete Choice Experiment Study in 12 European Countries," *Journal of Medical Internet Research*, Vol. 25 (e47066), November 2023, pp. 1–16.

Birkhäuer, Joanna et al., "Trust in the Health Care Professional and Health Outcome: A Meta-Analysis," *PLOS One*, Vol. 12 (2), February 2017, pp. 1–13.

Caine, Kelly and Rima Hanania, "Patients Want Granular Privacy Control Over Health Information in Electronic Medical Records," *Journal of the American Medical Informatics Association*, Vol. 20 (1), January 2013, pp. 7–15.

Campos-Castillo, Celeste and Denise L. Anthony, "The Double-Edged Sword of Electronic Health Records: Implications for Patient Disclosure," *Journal of the American Medical Informatics Association*, Vol. 22 (e1), April 2015, pp. e130–e140.

Cascini, Fidelia et al., "Health Data Sharing Attitudes Towards Primary and Secondary Use of Data: A Systematic Review," *eClinicalMedicine*, Vol. 71 (102551), March 2024, pp. 1–42.

Case, Siobhan et al., "Older Adults' Recognition of Tradeoffs in Healthcare Decision Making," *Journal of the American Geriatric Society*, Vol. 63 (8), 2015, pp. 1658–1662.

DePuccio, Matthew J. et al., "Patients' Perceptions About Medical Record Privacy and Security: Implications for Withholding of Information During the COVID-19 Pandemic," *Journal of General Internal Medicine*, Vol. 35 (10), July 2020, pp. 3122–3125.

Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359–423.

Diamond, Shari S. and Roger Tourangeau, "Internet Surveys for Evaluating Trademark Infringement and Deceptive Advertising," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, 2012, pp. 287–306.

Dimitropoulos, Linda et al., "Public Attitudes Toward Health Information Exchange: Perceived Benefits and Concerns," *The American Journal of Managed Care*, Vol. 17, December 2011, pp. 11–16.

Elliot, Alison et al., "Revisiting the Symptom Iceberg in Today's Primary Care: Results from a UK Population Survey," *BMC Family Practice*, Vol. 12 (16), 2011, pp. 2–11.

Esmaeilzadeh, Pouyan, "Healthcare Consumers' Opt-In Intentions to Health Information Exchanges (Hies): An Empirical Study," *Computers in Human Behavior*, Vol. 84, 2018, pp. 114–129.

Fiesler, Casey and Blake Hallinan, "'We Are the Product': Public Reactions to Online Data Sharing and Privacy Controversies in the Media," *CHI'18: Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems*, April 2018, pp. 1–13.

Grande, David et al., "Consumer Willingness to Share Personal Digital Information for Health-Related Uses," *JAMA Network Open*, Vol. 5 (1), 2022, pp. 1–12.

Green, Bart N. et al., "Writing Narrative Literature Reviews for Peer-Reviewed Journals: Secrets of the Trade," *Journal of Chiropractic Medicine*, Vol. 5 (3), 2006, pp. 101–117.

Gupta, Ravi et al., "Consumer Views on Privacy Protections and Sharing of Personal Digital Health Information," *JAMA Network Open*, Vol. 6 (3), March 2023, pp. 1–13.

Guttman, Oren T. et al., "Dissecting Communication Barriers in Healthcare: A Path to Enhancing Communication Resiliency, Reliability, and Patient Safety," *Journal of Patient Safety*, Vol. 17 (8), December 2021, pp. e1465–1471.

Hiligsmann, Mickaël et al., "Patients' Preferences for Osteoporosis Drug Treatment: A Discrete-Choice Experiment," *Arthritis Research & Therapy*, Vol. 16, 2014, pp. 1–9.

Iott, Bradley E. et al., "Trust and Privacy: How Patient Trust in Providers is Related to Privacy Behaviors and Attitudes," *AMIA Annual Symposium Proceedings Archive*, March 2020, pp. 487–493.

Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, 2012, pp. 261–284.

Kassam, Iman et al., "Patient Perspectives and Preferences for Consent in the Digital Health Context: State-of-the-art Literature Review," *Journal of Medical Internet Research*, Vol. 25 (e42507), 2023, pp. 1–18.

Kharlamov, Alexander et al., "Data Sharing Decisions: Perceptions and Intentions in Healthcare," *Strategic Change*, Vol. 32 (6), October 2023, pp. 223–237.

Kim, Tami et al., "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research*, Vol. 45, May 2018, pp. 906–932.

Kokolakis, Spyros, "Privacy Attitudes and Privacy Behavior: A Review of Current Research on the Privacy Paradox Phenomenon," *Computers & Security*, Vol. 64, 2017, pp. 122–134.

Kruse, Clemens S. et al., "The Effect of Patient Portals on Quality Outcomes and Its Implications to Meaningful Use: A Systematic Review," *Journal of Medical Internet Research*, Vol. 17, 2015, pp. 1–8.

Lee, Joy L. et al., "Communication About Health Information Technology Use Between Patients and Providers," *Journal of General Internal Medicine*, Vol. 35(9), 2020, pp. 2614–2620.

Liu, Liyun and Lizheng Shi, "Does the Ownership of Health Websites Matter? A Cross-Sectional Study on Chinese Consumer Behavior," *International Journal of Medical Informatics*, Vol. 152 (104485), May 2021, pp. 1–8.

Madanian, Samaneh et al., "Patients' Perspectives on Digital Health Tools," *PEC Innovation*, Vol. 2 (100171), 2023, pp. 1–8.

Mainous III, Arch G. et al., "Conflict Among Experts in Health Recommendations and Corresponding Public Trust in Health Experts," *Frontiers in Medicine*, Vol. 11 (1430263), July 2024, pp. 1–5.

*Manual for Complex Litigation*, 4th Edition, *Federal Judicial Center*, 2004.

Mason, Winter and Siddharth S. Suri, "Conducting Behavioral Research on Amazon's Mechanical Turk," *Behavioral Research Methods*, Vol. 44, 2012, pp. 1–23.

Mayer, Roger C. et al., "An Integrative Model of Organizational Trust," *Academy of Management Review*, Vol. 20, 1995, pp. 709–734.

McAlearney, A. S. et al., "High Touch and High Tech (HT2) Proposal: Transforming Patient Engagement Throughout the Continuum of Care by Engaging Patients with Portal Technology at the Bedside," *JMIR Research Protocols*, Vol. 5 (4), November 2016, pp. 1–15.

McDonald, Aleecia M. and Lorrie Faith Cranor, "The Cost of Reading Privacy Policies," *A Journal of Law and Policy for the Information Society*, Vol. 4 (3), 2008, pp. 543–568.

McGraw, A. Peter et al., "From the Commercial to the Communal: Reframing Taboo Trade-Offs in Religious and Pharmaceutical Marketing," *Journal of Consumer Research*, Vol. 39 (1), June 2012, pp. 157–173.

Moon, Lisa, "Factors Influencing Health Data Sharing Preferences of Consumers: A Critical Review," *Health Policy and Technology*, Vol. 6 (2), January 2017.

Niu, Xi et al., "Surprise Me If You Can: Serendipity in Health Information," *CHI'18: Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems*, April 2018, pp. 1–12.

Nowrozy, Raza et al., "Privacy Preservation of Electronic Health Records in the Modern Era: A Systematic Survey," *ACM Computing Surveys*, Vol. 56 (8), April 2024, pp. 1–37.

Olsen, Quita et al., "Worldwide Willingness to Share Health Data High But Privacy, Consent and Transparency Paramount, A Meta-Analysis," *NPJ Digital Medicine*, Vol. 8 (540), 2025, pp. 1–13.

Sawyer, A. G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1 (4), March 1975, pp. 20–30.

Sukhera, Javeed, "Narrative Reviews: Flexible, Rigorous, and Practical," *Journal of Graduate Medical Education*, Vol. 14 (4), 2022, pp. 414–417.

Tang, Jenny et al., "Defining Privacy: How Users Interpret Technical Terms in Privacy Policies," *Proceedings on Privacy Enhancing Technologies*, Vol. 2021 (3), July 2021, pp. 70–94.

Tetlock, Philip E. et al., "The Psychology of the Unthinkable: Taboo Trade-Offs, Forbidden Base Rates, and Heretical Counterfactuals," *Journal of Personality and Social Psychology*, Vol. 78 (5), 2000, pp. 853–870.

Thomadsen, Raphael et al., "How Context Affects Choice," *Customer Needs and Solutions*, Vol. 5 (1–2), March 2018, pp. 3–14.

Trinidad, M. Grace et al., "The Public's Comfort with Sharing Health Data with Third-Party Commercial Companies," *Humanities & Social Sciences Communication*, Vol. 7 (140), November 2020, pp. 1–10.

Tsai, Janice Y. et al., "The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study," *Information Systems Research*, Vol. 22 (2), February 2010, pp. 254–268.

Tucker, Catherine E., "Social Networks, Personalized Advertising, and Privacy Controls," *Journal of Marketing Research*, Vol. 51 (5), October 2014, pp. 546–562.

Turow, Joseph et al., "The Tradeoff Fallacy: How Marketers Are Misrepresenting American Consumers and Opening Them Up to Exploitation," *SSRN Working Paper 2820060*, 2015, pp. 1–24.

Viscusi, W. Kip et al., "The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World," *The Journal of Risk and Uncertainty*, Vol. 27 (1), 2003, pp. 5–76.

Walther, Joseph B. et al., "The Effect Of Top-Level Domains and Advertisements on Health Website Credibility," Journal of Medical Internet Research, Vol. 6 (3), 2004, pp. 1–10.

Wang, Yuchao et al., "Health Privacy Information Self-Disclosure in Online Health Community," *Frontiers in Public Health*, Vol. 8 (602792), 2021, pp. 1–15.

Wong, Yu-Ning et al., "Cancer Patients' Trade-offs Among Efficacy, Toxicity, and Out-of-Pocket Cost in the Curative and Noncurative Setting," *Medical Care*, Vol. 51 (9), September 2013, pp. 838–845.

**<u>Publicly Available Documents</u>**

"American Community Survey S0101 Age and Sex," *United States Census Bureau*, https://data.census.gov/table/ACSST1Y2024.S0101?g=010XX00US_020XX00US1,2,3,4&moe=false, last accessed on December 8, 2025.

"Create a Customer List Custom Audience," *Meta*, https://www.facebook.com/business/help/170456843145568, last accessed on December 6, 2025.

Deloitte, "New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era," *Deloitte*, December 2, 2024, https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html, last accessed on December 8, 2025.

EY, "Has Lockdown Made Consumers More Open to Privacy?," *EY Global Consumer Privacy Survey 2020*, https://www.ey.com/content/dam/ey-unified-site/ey-com/en-gl/insights/consulting/documents/ey-data-privacy-report-v2.pdf, last accessed on December 4, 2025.

Health Forum LLC., "Fast Facts on U.S. Hospitals," *AHA Statistics*, 2025, https://www.aha.org/statistics/fast-facts-us-hospitals, last accessed on December 8, 2025.

Hecker, Jörg and Neringa Kalpokas, "What is a Narrative Literature Review?," *ATLAS.ti*, https://atlasti.com/guides/literature-review/narrative-literature-review, last accessed on December 8, 2025.

John, Leslie K., "We Say We Want Privacy Online, But Our Actions Say Otherwise," *Harvard Business School*, October 16, 2015, https://hbr.org/2015/10/we-say-we-want-privacy-online-but-our-actions-say-otherwise, last accessed on December 8, 2025.

McClain, Colleen et al., "How Americans View Data Privacy," *Pew Research Center*, October 18, 2023, https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/, last accessed on December 8, 2025.

Morey, Timothy et al., "Customer Data: Designing for Transparency and Trust," *Harvard Business Review*, May 2015, https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust, last accessed on December 5, 2025.

"Our Clients," *Research Results*, https://researchresults.com/our-clients/, last accessed on December 8, 2025.

Protti, Michel, "Here's What You Need to Know About Our Updated Privacy Policy and Terms of Service," *Meta*, May 26, 2022, https://web.archive.org/web/20251005235837/https://about.fb.com/news/2022/05/metas-updated-privacy-policy/, last accessed on December 8, 2025.

Protti, Michel, "Reflecting on Meta's $8 Billion Investment in Privacy," *Meta*, January 28, 2025, https://web.archive.org/web/20250625074641/https://about.fb.com/news/2025/01/meta-8-billion-investment-privacy/, last accessed on December 8, 2025.

"Quality," *Research Results*, https://researchresults.com/quality/, last accessed on December 5, 2025.

"The Meta Business Tools," *Meta*, https://www.facebook.com/business/help/331509497253087, last accessed on December 8, 2025.

Turow, Joseph, "Let's Retire the Phrase 'Privacy Policy'," *The New York Times*, August 20, 2018, https://www.nytimes.com/2018/08/20/opinion/20Turow.html, last accessed on December 8, 2025.

"Types of Literature Reviews," *University of Toronto Library*, September 19, 2025, https://guides.hsict.library.utoronto.ca/c.php?g=705263, last accessed on December 8, 2025.

World Economic Forum et al., "End-User Perspectives on Digital Media Survey: Summary Report," *World Economic Forum*, January 2017, https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf, last accessed on December 4, 2025.

**A13-3802**

# APPENDIX D
# PORTAL SURVEY
# SURVEY QUESTIONNAIRE

**Portal Survey Instrument**

**Survey Programmer Instructions**

**LEGEND:**

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**

*Notes to respondent in italics*

**FORMAT:** The survey consists of the following sections:

| |
|---|
| Introduction & Screening (questions labeled QS) |
| Main Survey Questions (questions labeled Q) |
| Follow-Up Questions (questions labeled QF) |

## Overview

**[NATIONAL 18+ SAMPLE]**

**[PANEL MEMBERS SHOULD BE MATCHED TO THE U.S. CENSUS 2024 AMERICAN COMMUNITY SURVEY ON AGE, GENDER, AND REGION. THAT IS, THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]**

**[TARGET 400 COMPLETES]**

**[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]**

**[FORCE RESPONSES TO ALL QUESTIONS]**

**[NO SURVEY TITLE AND NO QUESTION NUMBER TO BE DISPLAYED TO RESPONDENTS]**

**[DIGITAL FINGERPRINTING SHOULD BE USED TO AVOID REPEAT PARTICIPATION.]**

**[TEXT FOR TERMINATES: "**Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time**."]**

**[ROTATE ORDER OF YES/NO ANSWERS IN THE FIRST INSTANCE OF A YES/NO QUESTION. USE THE SAME ORDER FOR ALL OTHER YES/NO QUESTIONS. NOTE THAT YES AND NO ARE NOT EXPLICITLY STATED IN THE ANSWER OPTIONS.]**

**A13-3804**

## Introduction and Screening

QS0. Please check the box below if you are human.

**[INSERT CAPTCHA]**

QS1. Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

**[NEXT PAGE]**

QS2. What is your age? *(Select only one option)*

**[ROTATE ORDER, AS IS AND REVERSE; KEEP** "Prefer not to answer" **LAST]**

- ⦿ Under 18 years old **[TERMINATE]**
- ⦿ 18 – 29 years old
- ⦿ 30 – 39 years old
- ⦿ 40 – 49 years old
- ⦿ 50 – 59 years old
- ⦿ 60 years or older
- ⦿ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**[TERMINATE IF AGE DOES NOT MATCH THE VALUE PASSED BY PANEL PROVIDER]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS3. Are you…? *(Select only one option)*

**[ROTATE ORDER, AS IS AND REVERSE; KEEP "**Other**" AND "**Prefer not to answer**" IN ORDER LAST]**

- ⦿ Male
- ⦿ Female
- ⦿ Other **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⦿ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**A13-3805**

**[TERMINATE IF GENDER DOES NOT MATCH THE VALUES PASSED BY PANEL PROVIDER]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS4. In which state do you live? *(Select only one option)*

**[DROP DOWN MENU OF 50 STATES + DISTRICT OF COLUMBIA; HIDDEN VARIABLE FOR REGION; DETERMINE US CENSUS REGION BASED ON STATE SELECTED. ADD "**Prefer not to answer**" AND "**Don't know / Unsure**" OPTIONS BELOW DROP DOWN MENU]**

- ⦿ Prefer not to answer **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; TERMINATE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

**[THOSE WHO ARE ASKED S5 SHOULD BE BALANCED TO THE CENSUS ON AGE, GENDER, AND REGION]**

QS5. Have you or any member of your household ever worked for any of the following types of companies? *(Select all that apply)*

**[RANDOMIZE LIST; KEEP "**None of the above**" LAST]**

- ❒ A social media or technological platform **[TERMINATE]**
- ❒ An academic institution
- ❒ A construction company
- ❒ A clothing retailer
- ❒ A real estate agency
- ❒ A car dealership
- ❒ A fitness center
- ❒ A healthcare provider or medical office **[TERMINATE]**
- ❒ A law firm, legal services organization, or court **[TERMINATE]**
- ❒ A gas or utility company
- ❒ A marketing, market research, or advertising agency **[TERMINATE]**
- ⦿ None of the above **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS6. This question is to check your attention. Please select "South" from the answer options below. *(Select only one option)*

**A13-3806**

**[RANDOMIZE ORDER; KEEP** "None of the above" **AND** "Don't know / Unsure" **IN ORDER LAST]**

- ⦿ North
- ⦿ East
- ⦿ South
- ⦿ West
- ⦿ None of the above **[ANCHOR SECOND TO LAST]**
- ⦿ Don't know / Unsure **[ANCHOR LAST]**

**[TERMINATE IF** "South" **IS NOT SELECTED]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT** "Please select an answer."**]**

**[NEXT PAGE]**

QS7. Have you taken any surveys in the last 30 days on any of these topics? *(Select all that apply)*

**[RANDOMIZE ORDER; KEEP** "None of the above" **AND** "Don't know / Unsure" **IN ORDER LAST]**

- ❒ Sporting goods or outdoor gear
- ❒ Advertisements on TV
- ❒ Gas stations
- ❒ Clothing, shoes, or accessories
- ❒ Healthcare provider websites **[TERMINATE]**
- ❒ Video games
- ❒ Cosmetics or beauty products
- ❒ Shopping at retail stores
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT** "Please select an answer."**]**

**[NEXT PAGE]**

QS8. Which of the following activities, if any, have you done in the **past 3 months**? *(Select all that apply)*

**[RANDOMIZE ORDER; KEEP** "None of the above" **AND** "Don't know / Unsure" **IN ORDER LAST]**

- ❒ Attended an online class at an academic institution
- ❒ Shopped for clothes, shoes, or accessories online
- ❒ Browsed online for an apartment to rent
- ❒ Watched an exercise video
- ❒ Played a video game
- ❒ Watched a movie on a streaming platform
- ❒ Browsed online for hotel reservations for your vacation

A13-3807

- ❒ Browsed online for flight tickets for your vacation
- ❒ Signed up for a rice cooker subscription **[RED HERRING; TERMINATE]**
- ❒ Logged into a healthcare provider's online portal
- ❒ Made an appointment with a healthcare provider online
- ❒ Paid a medical bill online
- ❒ Taken a diagnostic assessment on a healthcare provider's website
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[TERMINATE IF AT LEAST ONE OF "**Logged into a healthcare provider's online portal," "Made an appointment with a healthcare provider online,**" "**Paid a medical bill online,**" OR "**Taken a diagnostic assessment on a healthcare provider's website**" IS NOT SELECTED]**

QS9. For which of the following, if any, do you currently have a personal account? *(Select all that apply)*
**[RANDOMIZE ORDER; KEEP "**None of the above**" AND "**Don't know / Unsure**" IN ORDER LAST]**

- ❒ Facebook
- ❒ Instagram
- ❒ X
- ❒ Bluesky
- ❒ Apple News+
- ❒ Substack
- ❒ The New York Times
- ❒ The Washington Post
- ❒ USA Today
- ❒ MAD Magazine **[RED HERRING; TERMINATE]**
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[TERMINATE IF "**Facebook**" IS NOT SELECTED]**

**[NEXT PAGE]**

**[RECORD IF THE RESPONDENT QUALIFIES OR NOT. FOR NON-QUALIFYING RESPONDENTS, DISPLAY PANEL'S TERMINATION PAGE.]**

**A13-3808**

## Main Survey

Q1. Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You visit your healthcare provider's website and log into your patient portal to make an appointment.

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

(*Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure"*)

(*The "Continue" button will appear once a response is selected.*)

**[RANDOMIZE SLIDER AS SHOWN AND REVERSE. INITIAL STARTING POSITION OF SLIDER SHOULD BE THE CENTER OF THE SCALE]**



I **would** be surprised to see social media advertisements related to the website I visited.

I **would** **<u>not</u>** be surprised to see social media advertisements related to the website I visited.

⊙ Don't know / Unsure

**[CONTINUE BUTTON SHOULD APPEAR ONLY AFTER A RESPONSE IS SELECTED]**

**[NEXT PAGE]**

A13-3809

## Follow-Up Questions

QF1. Prior to this survey, were you or were you not aware of any lawsuits related to data privacy? *(Select only one option)*

**[RANDOMIZE** "I am aware of at least one lawsuit" **AND** "I am **not** aware of any lawsuits"**; KEEP "**Don't know / Unsure**" LAST]**

- ⦿ I am aware of at least one lawsuit
- ⦿ I am **not** aware of any lawsuits
- ⦿ Don't know / Unsure

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[IF RESPONDENT SELECTS "**I am aware of at least one lawsuit,**" SHOW QF2, OTHERWISE GO TO PANEL 'THANK YOU' PAGE.]**

**[NEXT PAGE]**

QF2. You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of:
(*Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure."*)

| |
|---|
| |

**[OPEN-ENDED TEXT BOX, LIMITED TO 1000 CHARACTERS. ADD "**Don't know / Unsure**" OPTION BELOW TEXT BOX]**

**[REQUIRE AT LEAST 4 CHARACTERS; IF ENTRY IS LESS THAN 4 CHARACTERS, SHOW ERROR "**Please be thorough in your response.**"]**

- ⦿ Don't know / Unsure **[EXCLUSIVE]**

**[IF NO RESPONSE IS PROVIDED, DISPLAY TEXT "**Please type a response or select "Don't know / Unsure."**"]**
**[NEXT PAGE]**

**[GO TO PANEL 'THANK YOU' PAGE]**

**A13-3810**

# APPENDIX E

# PORTAL SURVEY

# SURVEY SCREENSHOTS

# DESKTOP

## QS0




A13-3812

# DESKTOP

## QS1


0%

Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue »

**A13-3813**

# DESKTOP

**QS2**




A13-3814

# DESKTOP

**QS3**




A13-3815

# DESKTOP

**QS4**




**A13-3816**

# DESKTOP

## QS5

34%

Have you or any member of your household ever worked for any of the following types of companies?
*(Select all that apply)*

- ☐ A healthcare provider or medical office
- ☐ A gas or utility company
- ☐ A clothing retailer
- ☐ A real estate agency
- ☐ A construction company
- ☐ A law firm, legal services organization, or court
- ☐ A social media or technological platform
- ☐ A marketing, market research, or advertising agency
- ☐ A fitness center
- ☐ An academic institution
- ☐ A car dealership
- ☐ None of the above

Continue »

# DESKTOP

## QS6

42%

This question is to check your attention. Please select "South" from the answer options below.
*(Select only one option)*

- South
- North
- East
- West
- None of the above
- Don't know / Unsure

Continue »

A13-3818

# DESKTOP

**QS7**



51%

Have you taken any surveys in the last 30 days on any of these topics?

*(Select all that apply)*

- ☐ Clothing, shoes, or accessories
- ☐ Sporting goods or outdoor gear
- ☐ Gas stations
- ☐ Cosmetics or beauty products
- ☐ Video games
- ☐ Shopping at retail stores
- ☐ Advertisements on TV
- ☐ Healthcare provider websites
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3819**

# DESKTOP

## QS8

60%

Which of the following activities, if any, have you done in the **past 3 months**?
*(Select all that apply)*

- ☐ Watched an exercise video
- ☐ Browsed online for hotel reservations for your vacation
- ☐ Watched a movie on a streaming platform
- ☐ Paid a medical bill online
- ☐ Browsed online for an apartment to rent
- ☐ Logged into a healthcare provider's online portal
- ☐ Browsed online for flight tickets for your vacation
- ☐ Taken a diagnostic assessment on a healthcare provider's website
- ☐ Shopped for clothes, shoes, or accessories online
- ☐ Played a video game
- ☐ Signed up for a rice cooker subscription
- ☐ Attended an online class at an academic institution
- ☐ Made an appointment with a healthcare provider online
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3820**

# DESKTOP

## QS9

69%

For which of the following, if any, do you currently have a personal account?
*(Select all that apply)*

- ☐ X
- ☐ Instagram
- ☐ USA Today
- ☐ The New York Times
- ☐ Bluesky
- ☐ Facebook
- ☐ MAD Magazine
- ☐ Substack
- ☐ The Washington Post
- ☐ Apple News+
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

A13-3821

# DESKTOP

## Q1




A13-3822

# DESKTOP

**QF1**


88%
Prior to this survey, were you or were you not aware of any lawsuits related to data privacy?
(Select only one option)
I am aware of at least one lawsuit
I am not aware of any lawsuits
Don't know / Unsure
Continue »

# DESKTOP

**QF2 (If "I am aware of at least one lawsuit" was selected in QF1)**


97%

You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure.")*

Don't know / Unsure

Continue »

A13-3824

# DESKTOP

**Panel Thank you Page**

Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

A13-3825

# MOBILE

**QS0**

0%

Please check the box below if you are human.

I'm not a robot

reCAPTCHA is changing its terms of service.
Take action.

reCAPTCHA
Privacy - Terms

Continue »

# MOBILE

**QS1**

0%

Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the

# MOBILE

**QS1 (contd.)**

answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue »

# MOBILE

**QS2**

8%

What is your age?

*(Select only one option)*

- 60 years or older
- 50 – 59 years old
- 40 – 49 years old
- 30 – 39 years old
- 18 – 29 years old
- Under 18 years old
- Prefer not to answer

Continue »

A13-3829

# MOBILE

**QS3**

16%

Are you...?

*(Select only one option)*

- Male
- Female
- Other
- Prefer not to answer

Continue »

**A13-3830**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## MOBILE

**QS4**

25%

In which state do you live?

*(Select only one option)*

Select one...

☐ Prefer not to answer

☐ Don't know / Unsure

Continue »

A13-3831

# MOBILE

**QS5**

34%

Have you or any member of your household ever worked for any of the following types of companies?

*(Select all that apply)*

- ☐ A social media or technological platform
- ☐ A law firm, legal services organization, or court
- ☐ An academic institution
- ☐ A gas or utility company
- ☐ A construction company
- ☐ A marketing, market research, or advertising agency

**A13-3832**

# MOBILE

**QS5 (contd.)**

- ☐ A marketing, market research, or advertising agency
- ☐ A fitness center
- ☐ A car dealership
- ☐ A healthcare provider or medical office
- ☐ A clothing retailer
- ☐ A real estate agency
- ☐ None of the above

Continue »

**A13-3833**

# MOBILE

**QS6**

42%

This question is to check your attention. Please select "South" from the answer options below.

*(Select only one option)*

- East
- North
- South
- West
- None of the above
- Don't know / Unsure

Continue »

**A13-3834**

# MOBILE

**QS7**

51%

Have you taken any surveys in the last 30 days on any of these topics?

*(Select all that apply)*

- ☐ Clothing, shoes, or accessories
- ☐ Healthcare provider websites
- ☐ Video games
- ☐ Shopping at retail stores
- ☐ Gas stations
- ☐ Sporting goods or outdoor gear
- ☐ Cosmetics or beauty products
- ☐ Advertisements on TV

**A13-3835**

# MOBILE

**QS7 (contd.)**

- ☐ Video games
- ☐ Shopping at retail stores
- ☐ Gas stations
- ☐ Sporting goods or outdoor gear
- ☐ Cosmetics or beauty products
- ☐ Advertisements on TV
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3836**

# MOBILE

**QS8**

60%

Which of the following activities, if any, have you done in the past 3 months?

*(Select all that apply)*

- ☐ Paid a medical bill online
- ☐ Taken a diagnostic assessment on a healthcare provider's website
- ☐ Browsed online for flight tickets for your vacation
- ☐ Attended an online class at an academic institution
- ☐ Browsed online for an apartment to rent
- ☐ Signed up for a rice cooker subscription

A13-3837

# MOBILE

**QS8 (contd.)**

- ☐ Logged into a healthcare provider's online portal
- ☐ Watched a movie on a streaming platform
- ☐ Shopped for clothes, shoes, or accessories online
- ☐ Browsed online for hotel reservations for your vacation
- ☐ Played a video game

# MOBILE

**QS8 (contd.)**

- ☐ Watched an exercise video
- ☐ Made an appointment with a healthcare provider online
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

A13-3839

# MOBILE

**QS9**

69%

For which of the following, if any, do you currently have a personal account?

*(Select all that apply)*

- ☐ Instagram
- ☐ USA Today
- ☐ MAD Magazine
- ☐ The New York Times
- ☐ Facebook
- ☐ X
- ☐ Apple News+

# MOBILE

**QS9 (contd.)**

- ☐ Bluesky
- ☐ Substack
- ☐ The Washington Post
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3841**

# MOBILE

**Q1**

80%

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You visit your healthcare provider's website and log into your patient portal to make an appointment.

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

**A13-3842**

# MOBILE

**Q1 (contd.)**

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

| | |
|---|---|
| I **would** be surprised to see social media advertisements related to the website I visited. | I **would <u>not</u>** be surprised to see social media advertisements related to the website I visited. |

☐ *Don't know / Unsure*

A13-3843

# MOBILE

**QF1**

88%

Prior to this survey, were you or were you not aware of any lawsuits related to data privacy?

*(Select only one option)*

- I am **not** aware of any lawsuits
- I am aware of at least one lawsuit
- Don't know / Unsure

Continue »

**A13-3844**

# MOBILE

**QF2 (If "I am aware of at least one lawsuit" was selected in QF1)**

97%

You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure.")*

☐ Don't know / Unsure

Continue »

**A13-3845**

# MOBILE

**Panel Thank you Page**

Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

A13-3846

# APPENDIX F
# PROVIDER WEBSITE SURVEY
# SURVEY QUESTIONNAIRE

**Provider Website Survey Instrument**

**Survey Programmer Instructions**

**LEGEND:**

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**

*Notes to respondent in italics*

**FORMAT:** The survey consists of the following sections:

| |
|---|
| Introduction & Screening (questions labeled QS) |
| Main Survey Questions (questions labeled Q) |
| Follow-Up Questions (questions labeled QF) |

## Overview

**[NATIONAL 18+ SAMPLE]**

**[PANEL MEMBERS SHOULD BE MATCHED TO THE U.S. CENSUS 2024 AMERICAN COMMUNITY SURVEY ON AGE, GENDER, AND REGION. THAT IS, THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]**

**[TARGET 800 COMPLETES]**

**[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]**

**[FORCE RESPONSES TO ALL QUESTIONS]**

**[NO SURVEY TITLE AND NO QUESTION NUMBER TO BE DISPLAYED TO RESPONDENTS]**

**[DIGITAL FINGERPRINTING SHOULD BE USED TO AVOID REPEAT PARTICIPATION.]**

**[TEXT FOR TERMINATES: "**Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time**."]**

**[ROTATE ORDER OF YES/NO ANSWERS IN THE FIRST INSTANCE OF A YES/NO QUESTION. USE THE SAME ORDER FOR ALL OTHER YES/NO QUESTIONS. NOTE THAT YES AND NO ARE NOT EXPLICITLY STATED IN THE ANSWER OPTIONS.]**

**A13-3848**

## Introduction and Screening

QS0. Please check the box below if you are human.

**[INSERT CAPTCHA]**

QS1. Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

**[NEXT PAGE]**

QS2. What is your age? *(Select only one option)*

**[ROTATE ORDER, AS IS AND REVERSE; KEEP** "Prefer not to answer" **LAST]**

- ⦿ Under 18 years old **[TERMINATE]**
- ⦿ 18 – 29 years old
- ⦿ 30 – 39 years old
- ⦿ 40 – 49 years old
- ⦿ 50 – 59 years old
- ⦿ 60 years or older
- ⦿ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**[TERMINATE IF AGE DOES NOT MATCH THE VALUE PASSED BY PANEL PROVIDER]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS3. Are you…? *(Select only one option)*

**[ROTATE ORDER, AS IS AND REVERSE; KEEP "**Other**" AND "**Prefer not to answer**" IN ORDER LAST]**

- ⦿ Male
- ⦿ Female
- ⦿ Other **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⦿ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**A13-3849**

**[TERMINATE IF GENDER DOES NOT MATCH THE VALUES PASSED BY PANEL PROVIDER]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS4. In which state do you live? *(Select only one option)*

**[DROP DOWN MENU OF 50 STATES + DISTRICT OF COLUMBIA; HIDDEN VARIABLE FOR REGION; DETERMINE US CENSUS REGION BASED ON STATE SELECTED. ADD "**Prefer not to answer**" AND "**Don't know / Unsure**" OPTIONS BELOW DROP DOWN MENU]**

- ⦿ Prefer not to answer **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; TERMINATE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

**[THOSE WHO ARE ASKED S5 SHOULD BE BALANCED TO THE CENSUS ON AGE, GENDER, AND REGION]**

QS5. Have you or any member of your household ever worked for any of the following types of companies? *(Select all that apply)*

**[RANDOMIZE LIST; KEEP "**None of the above**" LAST]**

- ❒ A social media or technological platform **[TERMINATE]**
- ❒ An academic institution
- ❒ A construction company
- ❒ A clothing retailer
- ❒ A real estate agency
- ❒ A car dealership
- ❒ A fitness center
- ❒ A healthcare provider or medical office **[TERMINATE]**
- ❒ A law firm, legal services organization, or court **[TERMINATE]**
- ❒ A gas or utility company
- ❒ A marketing, market research, or advertising agency **[TERMINATE]**
- ⦿ None of the above **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer**."]**

**[NEXT PAGE]**

QS6. This question is to check your attention. Please select "South" from the answer options below. *(Select only one option)*

**A13-3850**

**[RANDOMIZE ORDER; KEEP** "None of the above" **AND** "Don't know / Unsure" **IN ORDER LAST]**

- ⦿ North
- ⦿ East
- ⦿ South
- ⦿ West
- ⦿ None of the above **[ANCHOR SECOND TO LAST]**
- ⦿ Don't know / Unsure **[ANCHOR LAST]**

**[TERMINATE IF** "South" **IS NOT SELECTED]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT** "Please select an answer."**]**

**[NEXT PAGE]**

QS7. Have you taken any surveys in the last 30 days on any of these topics? *(Select all that apply)*

**[RANDOMIZE ORDER; KEEP** "None of the above" **AND** "Don't know / Unsure" **IN ORDER LAST]**

- ❒ Sporting goods or outdoor gear
- ❒ Advertisements on TV
- ❒ Gas stations
- ❒ Clothing, shoes, or accessories
- ❒ Healthcare provider websites **[TERMINATE]**
- ❒ Video games
- ❒ Cosmetics or beauty products
- ❒ Shopping at retail stores
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT** "Please select an answer."**]**

**[NEXT PAGE]**

QS8. Which of the following activities, if any, have you done in the **past 3 months**? *(Select all that apply)*

**[RANDOMIZE ORDER; KEEP** "None of the above" **AND** "Don't know / Unsure" **IN ORDER LAST]**

- ❒ Attended an online class at an academic institution
- ❒ Shopped for clothes, shoes, or accessories online
- ❒ Browsed online for an apartment to rent
- ❒ Watched an exercise video
- ❒ Played a video game
- ❒ Signed up for a rice cooker subscription **[RED HERRING; TERMINATE]**
- ❒ Browsed online for a healthcare provider

- ❒ Researched a medical condition or treatment online
- ❒ Paid a bill online
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[TERMINATE IF AT LEAST ONE OF "**Browsed online for a healthcare provider**" OR "**Researched a medical condition or treatment online**" IS NOT SELECTED]**

QS9. For which of the following, if any, do you currently have a personal account? *(Select all that apply)*
**[RANDOMIZE ORDER; KEEP "**None of the above**" AND "**Don't know / Unsure**" IN ORDER LAST]**

- ❒ Facebook
- ❒ Instagram
- ❒ X
- ❒ Bluesky
- ❒ Apple News+
- ❒ Substack
- ❒ The New York Times
- ❒ The Washington Post
- ❒ USA Today
- ❒ MAD Magazine **[RED HERRING; TERMINATE]**
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[TERMINATE IF "**Facebook**" IS NOT SELECTED]**

**[NEXT PAGE]**

**[RECORD IF THE RESPONDENT QUALIFIES OR NOT. FOR NON-QUALIFYING RESPONDENTS, DISPLAY PANEL'S TERMINATION PAGE.]**

**A13-3852**

## Main Survey

**[RANDOMLY ASSIGN RESPONDENTS TO 1 OF 2 GROUPS, EACH CONSISTING OF 400 RESPONDENTS**

- **GROUP A: PATIENTS**
- **GROUP B: NON-PATIENTS]**

**[SHOW RESPONDENTS IN GROUP A Q1A ONLY, THEN GO TO QF1; SHOW RESPONDENTS IN GROUP B Q1B ONLY, THEN GO TO QF1]**

Q1A. Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You search on your healthcare provider's website for ways to treat allergies.

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

(*Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure"*)

(*The "Continue" button will appear once a response is selected.)*

**[RANDOMIZE SLIDER AS SHOWN AND REVERSE. INITIAL STARTING POSITION OF SLIDER SHOULD BE THE CENTER OF THE SCALE]**



I **would be** surprised to see social media advertisements related to the website I visited.

I **would <u>not</u>** be surprised to see social media advertisements related to the website I visited.

⊙ Don't know / Unsure

**[CONTINUE BUTTON SHOULD APPEAR ONLY AFTER A RESPONSE IS SELECTED]**

**[NEXT PAGE]**

**A13-3853**

Q1B. Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You search and browse general healthcare provider websites for ways to treat allergies.

Sometime later, you are scrolling through social media and notice an advertisement for a healthcare provider whose website you visited. Which of the following options best characterizes your response?

(*Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure"*)

(*The "Continue" button will appear once a response is selected.)*

**[RANDOMIZE SLIDER AS SHOWN AND REVERSE. INITIAL STARTING POSITION OF SLIDER SHOULD BE THE CENTER OF THE SCALE]**



I **would be** surprised to see social media advertisements related to the websites I visited.

I **would <u>not</u>** be surprised to see social media advertisements related to the websites I visited.

⊙ Don't know / Unsure

**[CONTINUE BUTTON SHOULD APPEAR ONLY AFTER A RESPONSE IS SELECTED ]**

**[NEXT PAGE]**

**A13-3854**

## Follow-Up Questions

QF1. Prior to this survey, were you or were you not aware of any lawsuits related to data privacy? *(Select only one option)*

**[RANDOMIZE** "I am aware of at least one lawsuit" **AND** "I am **not** aware of any lawsuits"**; KEEP "**Don't know / Unsure**" LAST]**

- I am aware of at least one lawsuit
- I am **not** aware of any lawsuits
- Don't know / Unsure

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[IF RESPONDENT SELECTS "**I am aware of at least one lawsuit,**" SHOW QF2, OTHERWISE GO TO PANEL 'THANK YOU' PAGE.]**

**[NEXT PAGE]**

QF2. You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of: (*Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure."*)

| |
|---|
| |

**[OPEN-ENDED TEXT BOX, LIMITED TO 1000 CHARACTERS. ADD "**Don't know / Unsure**" OPTION BELOW TEXT BOX]**

**[REQUIRE AT LEAST 4 CHARACTERS; IF ENTRY IS LESS THAN 4 CHARACTERS, SHOW ERROR "**Please be thorough in your response.**"]**

- Don't know / Unsure **[EXCLUSIVE]**

**[IF NO RESPONSE IS PROVIDED, DISPLAY TEXT "**Please type a response or select "Don't know / Unsure."**"]**
**[NEXT PAGE]**

**[GO TO PANEL 'THANK YOU' PAGE]**

**A13-3855**

# APPENDIX G
# PROVIDER WEBSITE SURVEY
# SURVEY SCREENSHOTS

# DESKTOP

**QS0**




A13-3857

# DESKTOP

## QS1

0%

Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue »

# DESKTOP

## QS2




**A13-3859**

# DESKTOP

## QS3


15%
Are you...?
(Select only one option)
Female
Male
Other
Prefer not to answer
Continue »

# DESKTOP

**QS4**




A13-3861

# DESKTOP

## QS5

32%

Have you or any member of your household ever worked for any of the following types of companies?
*(Select all that apply)*

- ☐ A real estate agency
- ☐ A gas or utility company
- ☐ A clothing retailer
- ☐ A law firm, legal services organization, or court
- ☐ A construction company
- ☐ An academic institution
- ☐ A healthcare provider or medical office
- ☐ A car dealership
- ☐ A social media or technological platform
- ☐ A fitness center
- ☐ A marketing, market research, or advertising agency
- ☐ None of the above

Continue »

# DESKTOP

## QS6




A13-3863

# DESKTOP

## QS7



48%

Have you taken any surveys in the last 30 days on any of these topics?
*(Select all that apply)*

- ☐ Shopping at retail stores
- ☐ Video games
- ☐ Cosmetics or beauty products
- ☐ Gas stations
- ☐ Sporting goods or outdoor gear
- ☐ Advertisements on TV
- ☐ Clothing, shoes, or accessories
- ☐ Healthcare provider websites
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

A13-3864

# DESKTOP

## QS8

57%

Which of the following activities, if any, have you done in the **past 3 months**?
*(Select all that apply)*

- ☐ Browsed online for a healthcare provider
- ☐ Attended an online class at an academic institution
- ☐ Signed up for a rice cooker subscription
- ☐ Researched a medical condition or treatment online
- ☐ Browsed online for an apartment to rent
- ☐ Watched an exercise video
- ☐ Paid a bill online
- ☐ Played a video game
- ☐ Shopped for clothes, shoes, or accessories online
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3865**

# DESKTOP

## QS9

65%

For which of the following, if any, do you currently have a personal account?
*(Select all that apply)*

- ☐ MAD Magazine
- ☐ Facebook
- ☐ The Washington Post
- ☐ USA Today
- ☐ X
- ☐ Instagram
- ☐ The New York Times
- ☐ Bluesky
- ☐ Substack
- ☐ Apple News+
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

# DESKTOP

## Q1A (Patients Group)

81%

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You search on your healthcare provider's website for ways to treat allergies.

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

I **would** **not** be surprised to see social media advertisements related to the website I visited.

I **would** be surprised to see social media advertisements related to the website I visited.

☐ *Don't know / Unsure*

A13-3867

# DESKTOP

### Q1B (Non-Patients Group)



81%

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You search and browse general healthcare provider websites for ways to treat allergies.

Sometime later, you are scrolling through social media and notice an advertisement for a healthcare provider whose website you visited. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

I **would** **not** be surprised to see social media advertisements related to the websites I visited.

I **would** be surprised to see social media advertisements related to the websites I visited.

☐ *Don't know / Unsure*

A13-3868

# DESKTOP

## QF1




A13-3869

# DESKTOP

**QF2 (If "I am aware of at least one lawsuit" was selected in QF1)**




A13-3870

# DESKTOP

**Panel Thank you Page**

Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

A13-3871

# MOBILE

**QS0**

0%

Please check the box below if you are human.

I'm not a robot

reCAPTCHA is changing its terms of service. Take action.

reCAPTCHA

Privacy - Terms

Continue »

A13-3872

# MOBILE

**QS1**

0%

Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the

# MOBILE

**QS1 (contd.)**

answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue »

# MOBILE

**QS2**

7%

What is your age?

*(Select only one option)*

- 60 years or older
- 50 – 59 years old
- 40 – 49 years old
- 30 – 39 years old
- 18 – 29 years old
- Under 18 years old
- Prefer not to answer

Continue »

A13-3875

# MOBILE

**QS3**

15%

Are you...?

*(Select only one option)*

- Female
- Male
- Other
- Prefer not to answer

Continue »

**A13-3876**

# MOBILE

**QS4**

24%

In which state do you live?

*(Select only one option)*

Select one...

☐ Prefer not to answer

☐ Don't know / Unsure

Continue »

A13-3877

# MOBILE

**QS5**

32%

Have you or any member of your household ever worked for any of the following types of companies?

*(Select all that apply)*

- ☐ An academic institution
- ☐ A clothing retailer
- ☐ A construction company
- ☐ A gas or utility company
- ☐ A marketing, market research, or advertising agency
- ☐ A social media or technological platform

**A13-3878**

# MOBILE

**QS5 (contd.)**

- ☐ A healthcare provider or medical office
- ☐ A car dealership
- ☐ A real estate agency
- ☐ A fitness center
- ☐ A law firm, legal services organization, or court
- ☐ None of the above

Continue »

A13-3879

# MOBILE

**QS6**

40%

This question is to check your attention. Please select "South" from the answer options below.

*(Select only one option)*

- West
- East
- South
- North
- None of the above
- Don't know / Unsure

Continue »

**A13-3880**

# MOBILE

**QS7**

48%

Have you taken any surveys in the last 30 days on any of these topics?

*(Select all that apply)*

- ☐ Advertisements on TV
- ☐ Gas stations
- ☐ Clothing, shoes, or accessories
- ☐ Healthcare provider websites
- ☐ Video games
- ☐ Cosmetics or beauty products
- ☐ Sporting goods or outdoor gear
- ☐ Shopping at retail stores

**A13-3881**

# MOBILE

**QS7 (contd.)**

- ☐ Clothing, shoes, or accessories
- ☐ Healthcare provider websites
- ☐ Video games
- ☐ Cosmetics or beauty products
- ☐ Sporting goods or outdoor gear
- ☐ Shopping at retail stores
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

A13-3882

# MOBILE

## QS8

57%

Which of the following activities, if any, have you done in the **past 3 months**?

*(Select all that apply)*

- ☐ Paid a bill online
- ☐ Watched an exercise video
- ☐ Browsed online for an apartment to rent
- ☐ Shopped for clothes, shoes, or accessories online
- ☐ Played a video game
- ☐ Signed up for a rice cooker subscription

A13-3883

# MOBILE

**QS8 (contd.)**

- ☐ Played a video game
- ☐ Signed up for a rice cooker subscription
- ☐ Browsed online for a healthcare provider
- ☐ Researched a medical condition or treatment online
- ☐ Attended an online class at an academic institution
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3884**

# MOBILE

**QS9**

65%

For which of the following, if any, do you currently have a personal account?

*(Select all that apply)*

- ☐ Instagram
- ☐ X
- ☐ Facebook
- ☐ Substack
- ☐ Bluesky
- ☐ MAD Magazine
- ☐ Apple News+

**A13-3885**

# MOBILE

**QS9 (contd.)**

- ☐ The Washington Post
- ☐ USA Today
- ☐ The New York Times
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3886**

# MOBILE

**Q1A (Patients Group)**

81%

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You search on your healthcare provider's website for ways to treat allergies.

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

# MOBILE

**Q1A (Patients Group) (contd.)**

Sometime later, you are scrolling through social media and notice an advertisement for your healthcare provider. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

| | |
|---|---|
| I **would** **not** be surprised to see social media advertisements related to the website I visited. | I **would** be surprised to see social media advertisements related to the website I visited. |

☐ *Don't know / Unsure*

A13-3888

# MOBILE

**Q1B (Non-Patients Group)**

81%

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. You search and browse general healthcare provider websites for ways to treat allergies.

Sometime later, you are scrolling through social media and notice an advertisement for a healthcare provider whose website you visited. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*



A13-3889

# MOBILE

**Q1B (Non-Patients Group) (contd.)**

Sometime later, you are scrolling through social media and notice an advertisement for a healthcare provider whose website you visited. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

| | |
|---|---|
| I **would** **not** be surprised to see social media advertisements related to the websites I visited. | I **would** be surprised to see social media advertisements related to the websites I visited. |

☐ *Don't know / Unsure*

A13-3890

# MOBILE

**QF1**

89%

Prior to this survey, were you or were you not aware of any lawsuits related to data privacy?

*(Select only one option)*

- I am **not** aware of any lawsuits
- I am aware of at least one lawsuit
- Don't know / Unsure

Continue »

**A13-3891**

# MOBILE

**QF2 (If "I am aware of at least one lawsuit" was selected in QF1)**

97%

You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure.")*

☐ Don't know / Unsure

Continue »

A13-3892

# MOBILE

**Panel Thank you Page**

## Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

A13-3893

# APPENDIX H
# PRESCRIPTION SURVEY
# SURVEY QUESTIONNAIRE

**Prescription Survey Instrument**

**Survey Programmer Instructions**

**LEGEND:**

**[PROGRAMMER NOTES IN BOLD CAPS AND BRACKETS]**

*Notes to respondent in italics*

**FORMAT:** The survey consists of the following sections:

| |
|---|
| Introduction & Screening (questions labeled QS) |
| Main Survey Questions (questions labeled Q) |
| Follow-Up Questions (questions labeled QF) |

## Overview

**[NATIONAL 18+ SAMPLE]**

**[PANEL MEMBERS SHOULD BE MATCHED TO THE U.S. CENSUS 2024 AMERICAN COMMUNITY SURVEY ON AGE, GENDER, AND REGION. THAT IS, THE SCREENER SHOULD BE APPLIED TO A SAMPLE REPRESENTATIVE OF THE GENERAL POPULATION IN THE UNITED STATES SO THAT THE FINAL SAMPLE IS REPRESENTATIVE OF THE TARGET POPULATION FOR THE SURVEY (BASED ON ACTUAL QUALIFICATION).]**

**[TARGET 400 COMPLETES]**

**[DISABLE THE BROWSER'S "BACK" BUTTON AND DO NOT SHOW A "BACK" BUTTON WITHIN THE SURVEY]**

**[FORCE RESPONSES TO ALL QUESTIONS]**

**[NO SURVEY TITLE AND NO QUESTION NUMBER TO BE DISPLAYED TO RESPONDENTS]**

**[DIGITAL FINGERPRINTING SHOULD BE USED TO AVOID REPEAT PARTICIPATION.]**

**[TEXT FOR TERMINATES: "**Thank you for your interest in our study. We are no longer looking for people who match your characteristics. We appreciate your time.**"]**

**[ROTATE ORDER OF YES/NO ANSWERS IN THE FIRST INSTANCE OF A YES/NO QUESTION. USE THE SAME ORDER FOR ALL OTHER YES/NO QUESTIONS. NOTE THAT YES AND NO ARE NOT EXPLICITLY STATED IN THE ANSWER OPTIONS.]**

**A13-3895**

## Introduction and Screening

QS0. Please check the box below if you are human.

**[INSERT CAPTCHA]**

QS1. Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

**[NEXT PAGE]**

QS2. What is your age? *(Select only one option)*

**[ROTATE ORDER, AS IS AND REVERSE; KEEP** "Prefer not to answer" **LAST]**

- ⦿ Under 18 years old **[TERMINATE]**
- ⦿ 18 – 29 years old
- ⦿ 30 – 39 years old
- ⦿ 40 – 49 years old
- ⦿ 50 – 59 years old
- ⦿ 60 years or older
- ⦿ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**[TERMINATE IF AGE DOES NOT MATCH THE VALUE PASSED BY PANEL PROVIDER]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS3. Are you…? *(Select only one option)*

**[ROTATE ORDER, AS IS AND REVERSE; KEEP "**Other**" AND "**Prefer not to answer**" IN ORDER LAST]**

- ⦿ Male
- ⦿ Female
- ⦿ Other **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⦿ Prefer not to answer **[ANCHOR LAST; TERMINATE]**

**A13-3896** **[TERMINATE IF GENDER DOES NOT MATCH THE VALUES PASSED BY PANEL]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS4. In which state do you live? *(Select only one option)*

**[DROP DOWN MENU OF 50 STATES + DISTRICT OF COLUMBIA; HIDDEN VARIABLE FOR REGION; DETERMINE US CENSUS REGION BASED ON STATE SELECTED. ADD "**Prefer not to answer**" AND "**Don't know / Unsure**" OPTIONS BELOW DROP DOWN MENU]**

- ⦿ Prefer not to answer **[ANCHOR SECOND TO LAST; TERMINATE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; TERMINATE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

**[THOSE WHO ARE ASKED S5 SHOULD BE BALANCED TO THE CENSUS ON AGE, GENDER, AND REGION]**

QS5. Have you or any member of your household ever worked for any of the following types of companies? *(Select all that apply)*

**[RANDOMIZE LIST; KEEP "**None of the above**" LAST]**

- ❐ A social media or technological platform **[TERMINATE]**
- ❐ An academic institution
- ❐ A construction company
- ❐ A clothing retailer
- ❐ A real estate agency
- ❐ A car dealership
- ❐ A fitness center
- ❐ A healthcare provider or medical office **[TERMINATE]**
- ❐ A law firm, legal services organization, or court **[TERMINATE]**
- ❐ A gas or utility company
- ❐ A marketing, market research, or advertising agency **[TERMINATE]**
- ⦿ None of the above **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS6. This question is to check your attention. Please select "South" from the answer options below. *(Select only one option)*

**[RANDOMIZE ORDER; KEEP "**None of the above**" AND "**Don't know / Unsure**" IN ORDER LAST]**

- ⦿ North

A13-3897

- ⦿ East
- ⦿ South
- ⦿ West
- ⦿ None of the above **[ANCHOR SECOND TO LAST]**
- ⦿ Don't know / Unsure **[ANCHOR LAST]**

**[TERMINATE IF "**South**" IS NOT SELECTED]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS7. Have you taken any surveys in the last 30 days on any of these topics? *(Select all that apply)*

**[RANDOMIZE ORDER; KEEP "**None of the above**" AND "**Don't know / Unsure**" IN ORDER LAST]**

- ❒ Sporting goods or outdoor gear
- ❒ Advertisements on TV
- ❒ Gas stations
- ❒ Clothing, shoes, or accessories
- ❒ Prescription Drug Websites **[TERMINATE]**
- ❒ Video games
- ❒ Cosmetics or beauty products
- ❒ Shopping at retail stores
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[NEXT PAGE]**

QS8. Which of the following activities, if any, have you done in the **past 3 months**? *(Select all that apply)*
**[RANDOMIZE ORDER; KEEP "**None of the above**" AND "**Don't know / Unsure**" IN ORDER LAST]**

- ❒ Attended an online class at an academic institution
- ❒ Shopped for clothes, shoes, or accessories online
- ❒ Browsed online for an apartment to rent
- ❒ Watched an exercise video
- ❒ Played a video game
- ❒ Signed up for a rice cooker subscription **[RED HERRING; TERMINATE]**
- ❒ Browsed the website of a drug for which I had a prescription
- ❒ Paid a bill online
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer."**]**

**[TERMINATE IF "**Browsed the website of a drug for which I had a prescription**" IS NOT SELECTED]**

**[NEXT PAGE]**

QS9. For which of the following, if any, do you currently have a personal account? *(Select all that apply)*
**[RANDOMIZE ORDER; KEEP "**None of the above**" AND "**Don't know / Unsure**" IN ORDER LAST]**

- ❒ Facebook
- ❒ Instagram
- ❒ X
- ❒ Bluesky
- ❒ Apple News+
- ❒ Substack
- ❒ The New York Times
- ❒ The Washington Post
- ❒ USA Today
- ❒ MAD Magazine **[RED HERRING; TERMINATE]**
- ⦿ None of the above **[ANCHOR SECOND TO LAST; EXCLUSIVE]**
- ⦿ Don't know / Unsure **[ANCHOR LAST; EXCLUSIVE]**

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer."**]**

**[TERMINATE IF "**Facebook**" IS NOT SELECTED]**

**[NEXT PAGE]**

**[RECORD IF THE RESPONDENT QUALIFIES OR NOT. FOR NON-QUALIFYING RESPONDENTS, DISPLAY PANEL'S TERMINATION PAGE.]**

A13-3899

## Main Survey

Q1. Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. Your healthcare provider writes you a drug prescription for your allergies. After receiving the prescription, you visit the prescription drug's website to learn about it.

Sometime later, you are scrolling through social media and notice an advertisement for the same prescription drug. Which of the following options best characterizes your response?

(*Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure"*)

(*The "Continue" button will appear once a response is selected.*)

**[RANDOMIZE SLIDER AS SHOWN AND REVERSE. INITIAL STARTING POSITION OF SLIDER SHOULD BE THE CENTER OF THE SCALE]**



I **would** be surprised to see social media advertisements related to the prescription drug I looked at online.

I **would** **not** be surprised to see social media advertisements related to the prescription drug I looked at online.

- ⊙ Don't know / Unsure

**[CONTINUE BUTTON SHOULD APPEAR ONLY AFTER A RESPONSE IS SELECTED]**

**[NEXT PAGE]**

A13-3900

## Follow-Up Questions

QF1. Prior to this survey, were you or were you not aware of any lawsuits related to data privacy? *(Select only one option)*

**[RANDOMIZE** "I am aware of at least one lawsuit" **AND** "I am **not** aware of any lawsuits"**; KEEP "**Don't know / Unsure**" LAST]**

- ⊙ I am aware of at least one lawsuit
- ⊙ I am **not** aware of any lawsuits
- ⊙ Don't know / Unsure

**[IF NO RESPONSE IS SELECTED, DISPLAY TEXT "**Please select an answer.**"]**

**[IF RESPONDENT SELECTS "**I am aware of at least one lawsuit,**" SHOW QF2, OTHERWISE GO TO PANEL 'THANK YOU' PAGE.]**

**[NEXT PAGE]**

QF2. You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of:
(*Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure."*)

**[OPEN-ENDED TEXT BOX, LIMITED TO 1000 CHARACTERS. ADD "**Don't know / Unsure**" OPTION BELOW TEXT BOX]**

**[REQUIRE AT LEAST 4 CHARACTERS; IF ENTRY IS LESS THAN 4 CHARACTERS, SHOW ERROR "**Please be thorough in your response.**"]**

- ⊙ Don't know / Unsure **[EXCLUSIVE]**

**[IF NO RESPONSE IS PROVIDED, DISPLAY TEXT "**Please type a response or select "Don't know / Unsure."**"]**
**[NEXT PAGE]**

**[GO TO PANEL 'THANK YOU' PAGE]**

**A13-3901**

# APPENDIX I
# PRESCRIPTION SURVEY
# SURVEY SCREENSHOTS

# DESKTOP

## QS0




A13-3903

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# DESKTOP

## QS1



0%

Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue »

# DESKTOP

## QS2




A13-3905

# DESKTOP

## QS3




A13-3906

# DESKTOP

## QS4




A13-3907

# DESKTOP

## QS5

30%

Have you or any member of your household ever worked for any of the following types of companies?
*(Select all that apply)*

- ☐ A construction company
- ☐ An academic institution
- ☐ A real estate agency
- ☐ A car dealership
- ☐ A social media or technological platform
- ☐ A gas or utility company
- ☐ A clothing retailer
- ☐ A marketing, market research, or advertising agency
- ☐ A fitness center
- ☐ A law firm, legal services organization, or court
- ☐ A healthcare provider or medical office
- ☐ None of the above

Continue »

# DESKTOP

## QS6


37%

This question is to check your attention. Please select "South" from the answer options below.
*(Select only one option)*

- North
- East
- West
- South
- None of the above
- Don't know / Unsure

Continue »

A13-3909

# DESKTOP

## QS7




A13-3910

# DESKTOP

## QS8


53%

Which of the following activities, if any, have you done in the **past 3 months**?
*(Select all that apply)*

- ☐ Watched an exercise video
- ☐ Attended an online class at an academic institution
- ☐ Played a video game
- ☐ Signed up for a rice cooker subscription
- ☐ Paid a bill online
- ☐ Shopped for clothes, shoes, or accessories online
- ☐ Browsed online for an apartment to rent
- ☐ Browsed the website of a drug for which I had a prescription
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

# DESKTOP

## QS9

61%

For which of the following, if any, do you currently have a personal account?

*(Select all that apply)*

- ☐ The New York Times
- ☐ MAD Magazine
- ☐ Bluesky
- ☐ Facebook
- ☐ Instagram
- ☐ X
- ☐ Substack
- ☐ Apple News+
- ☐ The Washington Post
- ☐ USA Today
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

# DESKTOP

## Q1


82%

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. Your healthcare provider writes you a drug prescription for your allergies. After receiving the prescription, you visit the prescription drug's website to learn about it.

Sometime later, you are scrolling through social media and notice an advertisement for the same prescription drug. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

I **would** be surprised to see social media advertisements related to the prescription drug I looked at online.

I **would** **not** be surprised to see social media advertisements related to the prescription drug I looked at online.

☐ *Don't know / Unsure*

A13-3913

# DESKTOP

## QF1




A13-3914

# DESKTOP

### QF2 (If "I am aware of at least one lawsuit" was selected in QF1)


97%

You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure.")*

Don't know / Unsure

Continue »

**A13-3915**

# DESKTOP

## Panel Thank You Page




A13-3916

# MOBILE

**QS0**

0%

Please check the box below if you are human.

I'm not a robot

reCAPTCHA is changing its terms of service. Take action.

reCAPTCHA
Privacy - Terms

Continue »

**A13-3917**

# MOBILE

**QS1**

0%

Thank you for participating in our study. Your opinions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please don't guess. Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less

# MOBILE

**QS1 (contd.)**

Simply indicate this in your response by selecting the "Don't know / Unsure" option. There are no right or wrong answers.

Your answers will be kept in strict confidence.

If you wear glasses or corrective lenses when using a desktop computer, laptop computer, mobile phone, or tablet, please wear them throughout the survey.

Please do not use the "Back" button of your browser while taking the survey. This survey will take less than 10 minutes of your time. When you are ready to get started, please select the "Continue" button.

Continue »

A13-3919

# MOBILE

**QS2**

7%

What is your age?

*(Select only one option)*

- Under 18 years old
- 18 – 29 years old
- 30 – 39 years old
- 40 – 49 years old
- 50 – 59 years old
- 60 years or older
- Prefer not to answer

**A13-3920**

# MOBILE

**QS2 (contd.)**

- ○ 18 – 29 years old
- ○ 30 – 39 years old
- ○ 40 – 49 years old
- ○ 50 – 59 years old
- ○ 60 years or older
- ○ Prefer not to answer

Continue »

A13-3921

# MOBILE

## QS3

15%

Are you...?

*(Select only one option)*

- Male
- Female
- Other
- Prefer not to answer

Continue »

A13-3922

# MOBILE

**QS4**

22%

In which state do you live?

*(Select only one option)*

Select one...

☐ Prefer not to answer

☐ Don't know / Unsure

Continue »

**A13-3923**

# MOBILE

## QS5

30%

Have you or any member of your household ever worked for any of the following types of companies?

*(Select all that apply)*

- ☐ A real estate agency
- ☐ A law firm, legal services organization, or court
- ☐ A marketing, market research, or advertising agency
- ☐ A car dealership
- ☐ A social media or technological platform
- ☐ A construction company
- ☐ A healthcare provider or medical office

**A13-3924**

# MOBILE

**QS5 (contd.)**

- ☐ A gas or utility company
- ☐ A fitness center
- ☐ A clothing retailer
- ☐ An academic institution
- ☐ None of the above

Continue »

A13-3925

# MOBILE

## QS6

37%

This question is to check your attention. Please select "South" from the answer options below.

*(Select only one option)*

- South
- East
- West
- North
- None of the above
- Don't know / Unsure

Continue »

A13-3926

# MOBILE

## QS7

45%

Have you taken any surveys in the last 30 days on any of these topics?

*(Select all that apply)*

- ☐ Shopping at retail stores
- ☐ Gas stations
- ☐ Video games
- ☐ Sporting goods or outdoor gear
- ☐ Clothing, shoes, or accessories
- ☐ Advertisements on TV
- ☐ Cosmetics or beauty products
- ☐ Prescription Drug Websites

A13-3927

# MOBILE

**QS7 (contd.)**

- ☐ Video games
- ☐ Sporting goods or outdoor gear
- ☐ Clothing, shoes, or accessories
- ☐ Advertisements on TV
- ☐ Cosmetics or beauty products
- ☐ Prescription Drug Websites
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

**A13-3928**

# MOBILE

## QS8

53%

Which of the following activities, if any, have you done in the past 3 months?

*(Select all that apply)*

- ☐ Paid a bill online
- ☐ Watched an exercise video
- ☐ Browsed the website of a drug for which I had a prescription
- ☐ Signed up for a rice cooker subscription
- ☐ Attended an online class at an academic institution
- ☐ Browsed online for an apartment to rent

**A13-3929**

# MOBILE

**QS8 (contd.)**

- ☐ Attended an online class at an academic institution
- ☐ Browsed online for an apartment to rent
- ☐ Shopped for clothes, shoes, or accessories online
- ☐ Played a video game
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

A13-3930

# MOBILE

**QS9**

61%

For which of the following, if any, do you currently have a personal account?

*(Select all that apply)*

- ☐ USA Today
- ☐ Substack
- ☐ The Washington Post
- ☐ Apple News+
- ☐ Instagram
- ☐ Facebook
- ☐ The New York Times
- ☐ Bluesky

**A13-3931**

# MOBILE

**QS9 (contd.)**

- ☐ Bluesky
- ☐ MAD Magazine
- ☐ X
- ☐ None of the above
- ☐ Don't know / Unsure

Continue »

# MOBILE

## Q1

82%

Please imagine allergy season is approaching and you suffer from allergies. You want to proactively take action to manage your allergies. Your healthcare provider writes you a drug prescription for your allergies. After receiving the prescription, you visit the prescription drug's website to learn about it.

Sometime later, you are scrolling through social media and notice an advertisement for the same prescription drug. Which of the following options best characterizes your response?

*(Please click and/or drag the slider to the point on the scale that best characterizes your response. If you don't know or don't have an opinion, please select "Don't know / Unsure")*

*(The "Continue" button will appear once a response is selected.)*

A13-3933

# MOBILE

**Q1 (contd.)**

| | |
|---|---|
| I **would** not be surprised to see social media advertisements related to the prescription drug I looked at online. | I **would** be surprised to see social media advertisements related to the prescription drug I looked at online. |

☐ *Don't know / Unsure*

A13-3934

# MOBILE

**QF1**

89%

Prior to this survey, were you or were you not aware of any lawsuits related to data privacy?

*(Select only one option)*

- I am <u>not</u> aware of any lawsuits
- I am aware of at least one lawsuit
- Don't know / Unsure

Continue »

A13-3935

# MOBILE

**QF2 (If "I am aware of at least one lawsuit" was selected in QF1)**

97%

You indicated that you were aware of at least one lawsuit related to data privacy. Please describe the lawsuit(s) you were aware of:

*(Please type in your response. If you do not know the answer or are unsure, please select "Don't know / Unsure.")*

☐ Don't know / Unsure

Continue »

A13-3936

# MOBILE

**Panel Thank You Page**

Survey Completed - Thank You

Thank you for taking our survey. Your efforts are greatly appreciated!

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# APPENDIX J

# PRETEST MODERATOR INSTRUCTIONS

**Pretest Moderator Instrument**

Hello [NAME]. Thank you for agreeing to help us with our survey pretest. I will be on the Teams call with you the entire time while you are taking the survey. Please feel free to "think out loud" or bring up anything you would like while you are taking the survey. There is no correct or incorrect way to take this survey. Please be thorough in your responses and take as much time as you need. We would like you to approach this exercise as realistically as possible.

You can begin the survey whenever you are ready.

**[AFTER THE RESPONDENT ANSWERS THE MAIN QUESTION, ASK:]**

Q0. Can you explain your understanding of what the previous question was asking you?

**[ASK THE FOLLOWING QUESTIONS AFTER THE RESPONDENT HAS FINISHED THE SURVEY.]**

Q1. Can you describe the issues you had, if any, while taking the survey?

Q2. Did you think any questions were unclear? If so, which ones and why?

Q3. Did you think any answer options were unclear? If so, which ones and why?

Q4. Can you describe whether or not the language guiding you through the survey was clear and easy to understand?

Q5. Were there any terms in the survey that you had trouble understanding? If so, which ones?

Q6. What do you think might be the purpose for conducting this survey?

Q7. What makes you think so?

Q8. Is there anything else you would like to say about the survey?

Thank you very much for your time. We greatly appreciate your help, and we will ensure that you get credit for taking this survey.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: META PIXEL HEALTHCARE LITIGATION | Case No. 3:22-cv-3580-WHO-VKD |

**EXPERT REPORT OF PAUL SCHWARTZ, J.D.**

**DECEMBER 8, 2025**

**TABLE OF CONTENTS**

**I. QUALIFICATIONS AND ASSIGNMENT....................1**

A. Professional Qualifications and Experience....................1

B. Allegations....................2

C. Assignment....................4

**II. SUMMARY OF OPINIONS....................5**

**III. PROFESSOR COHEN'S OPINIONS ABOUT HIPAA COMPLIANCE ARE UNSUPPORTED AND OVERLY BROAD....................8**

A. Overview of Professor Cohen's Report....................9

B. Overview of HIPAA's Purpose and Reach....................13

1. Introduction to HIPAA's Three Provisions and the HIPAA Privacy Rule....................14

2. HIPAA Privacy Rule Applicability: Defining PHI, Covered Entities, and Business Associates....................18

3. The HIPAA Privacy Rule's Intentional Limits....................27

C. Professor Cohen's Conclusion that the HIPAA Privacy Rule Applies to All At-Issue Data Is Unsupported....................29

1. Professor Cohen Ignores Variability in Websites and Apps, Developers' Configurations of the Meta Business Tools, and User Browser Settings That Determine if the HIPAA Privacy Rule Applies to Transmitted Data....................31

2. Professor Cohen Ignores That an Individualized Assessment of the Context Behind Online Activity Is Necessary to Determine if the HIPAA Privacy Rule Applies to Data Related to That Activity....................34

**IV. PROFESSOR COHEN'S BROAD CONCLUSIONS ABOUT THE APPLICABILITY OF THE HIPAA PRIVACY RULE TO THE AT-ISSUE DATA CONTRADICT EXISTING FRAMEWORKS, RISK CONTRACTING CHAOS, AND THREATEN COMPLIANCE PARALYSIS....................46**

# I. QUALIFICATIONS AND ASSIGNMENT

## A. Professional Qualifications and Experience

1. My name is Paul Schwartz. I am the Jefferson E. Peyser Professor of Law and Co-Director of the Berkeley Center for Law & Technology at the University of California, Berkeley School of Law.

2. I am an expert on information privacy and information law, including the Health Insurance Portability and Accountability Act (HIPAA). My research focuses on how the law regulates and shapes information technology. I have taught and written on this topic for over three decades. Most recently, I have taught three courses—Information Privacy Law, Topics in Privacy & Security Law, and Cybersecurity Law—that cover a variety of topics in health care privacy, including HIPAA. My publications are on a wide array of privacy topics, including health care privacy; the intersection of trade law and privacy; telecommunications surveillance; data security breaches; financial privacy; European data protection law; and comparative privacy law. These articles have appeared in leading law journals such as the *Harvard Law Review*, *Yale Law Journal*, *Stanford Law Review*, *Columbia Law Review*, and *The University of Chicago Law Review.*

3. I have also authored many books on privacy law, including a leading casebook, *Information Privacy Law* (8th edition, 2024) and the guide, *Privacy Law Fundamentals* (7th edition, 2024), each with Daniel Solove. *Information Privacy Law* is used in courses at more than fifty law schools and covers a variety of topics, including health privacy and HIPAA. I was also a co-reporter of the American Law Institute's *Data Privacy Law Principles* (2020). This project identified principles for regulating data privacy and for duties, responsibilities, and best practices for entities that process

A13-3942

personal data.

4. Further details about my expert qualifications are included in **Appendix A** to this report. In addition, my curriculum vitae is attached to this report as **Appendix B**. A list of my trial and deposition testimony from the last five years is attached to this report as **Appendix C**.

### B. Allegations

5. Plaintiffs allege that "Meta knowingly obtains health information about patients and their communications throughout the United States without their consent, despite its contractual promises to the contrary."[1] Plaintiffs claim that Meta "collects consumer data through a suite of Business Tools: the Meta Pixel, SDK, CAPI, and custom list uploads"[2] and that "Meta's interception, dissemination, and use of individually identifiable health information not only violates federal and state law but also […] erodes the confidential nature of the provider-patient relationship[.]"[3] Specifically, Plaintiffs claim that Meta "encourages healthcare providers and covered entities to install the Meta Collection Tools on their website and applications, even though the type of information collected by Meta Collection Tools on a healthcare provider or [C]overed [E]ntity's website and application will foreseeably include HIPAA-protected

1 Plaintiffs' Notice of Motion and Motion for Class Certification, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO-VKD (N.D. Cal. Sept. 9, 2025) ("Motion for Class Certification"), p. 1.

2 Motion for Class Certification, p. 2. Plaintiffs rename the Pixel, SDK, CAPI, and custom list uploads as Meta Collection Tools, however, I will continue to refer to these as the Meta Business Tools in this report. I understand the term "custom list uploads" used by Plaintiffs is not a term Meta uses and understand it to refer to "customer list uploads," which are not Meta Business Tools, but customer lists uploaded by developers. *See Create a Custom Data List Audience,* Meta*,* https://www.facebook.com/business/help/170456843145568; *The Meta Business Tools*, Meta, https://www.facebook.com/business/help/331509497253087. *See also* footnote 14.

3 First Amended Consolidated Class Action Complaint, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO-VKD (N.D. Cal. Oct. 10, 2023) ("Complaint"), ¶ 22.

A13-3943

information[.]"[4] HIPAA is the Health Insurance Portability and Accountability Act of 1996.[5] Plaintiffs claim that HIPAA and its regulations "prohibit the transmittal of individually identifiable health information by tracking technology like the Meta Pixel without the patient's authorization and other protections like a [B]usiness [A]ssociate agreement with the recipient of the patient data."[6]

6. Plaintiffs seek to certify four classes for the period June 17, 2018 to the present, including a "Patient Status Button-Click Class" and a "Patient Health Information Class," defined as:[7]

i. *The Patient Status Button-Click Class:* "All Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers."

ii. *The Patient Health Information Class:* "All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above."

---

4 Complaint, ¶ 312. Plaintiffs' complaint defined Meta Collection Tools to be "the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, Meta Graph API, server-to-server transmissions, and any other similar collection tools," which they narrowed in their Motion for Class Certification to "the Meta Pixel, SDK, CAPI, and Custom Uploads." *See* Complaint, ¶ 1, footnote 1, Motion for Class Certification, p. 14. The opinions in my report apply to the Meta Pixel, SDK, CAPI, and customer list uploads, which I refer to as the Meta Business Tools.

5 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

6 Complaint, ¶ 18.

7 Motion for Class Certification, p. 13. The complaint defines a single proposed Class: "All Facebook users whose health information was obtained by Meta from their healthcare provider or covered entity through Meta Collections Tools." Complaint, ¶ 353. In their Motion for Class Certification, Plaintiffs state that "[t]hese proposed class definitions are, together, narrower than (if not coextensive with) the class definition in the operative complaint […] and thus the Court can consider certifying them without requiring an amendment to the complaint." Motion for Class Certification, p. 13, footnote 4.

7. In addition to these two proposed classes, Plaintiffs also seek to certify a "Prescription Drug Information Class," defined as "All Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta," and a "Patient Device Intrusion Class," defined as "All Facebook users for whom Meta placed an _fbp cookie and/or used computing resources by sending data to Meta through their device and/or by computing Core Setup logic on their device while at a Healthcare Provider property."[8] Professor Ivan Glenn Cohen, whose opinions I was asked to assess, does not address any issues pertaining to the "Prescription Drug Information Class" and the "Patient Device Intrusion Class" in his report.[9] In his report and deposition, Professor Cohen also explicitly stated that his opinion does not cover pharmaceutical companies.[10] Accordingly, my opinions do not address these two proposed classes.

### C. Assignment

8. I have been asked by counsel for Meta in this matter to review and assess Professor Cohen's opinions related to the application of the HIPAA regulations, including the

8 Motion for Class Certification, p. 13.

9 Expert Report of I. Glenn Cohen, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO-VKD (N.D. Cal. Sep. 9, 2025) ("Cohen Report"), ¶ 9 ("I have been retained by counsel for Plaintiffs to opine on whether the use of Meta Collection Tools on Health Care Provider websites and apps in the manner alleged by Plaintiffs in this case violates medical ethics."), ¶ 90 ("I have examined two categories of information at issue in this case, which I sometimes refer to collectively as the 'Communications': (1) Pixel Button Clicks from Health Care Provider Web-Properties and (2) communications related to physicians, treatments, and conditions from Health Care Provider Web-Properties.").

10 Cohen Report, ¶ 9 footnote 7; Deposition of Ivan Glenn Cohen, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO (N.D. Cal. Nov. 12, 2025) ("Cohen Deposition"), pp. 409:23–410:2 ("A: As we began our conversation here today, I reminded you that my expert report and my analysis is limited to healthcare providers, not pharmaceutical companies. I haven't formed an opinion as to pharmaceutical companies.").

HIPAA Privacy Rule,[11] to Meta's Business Tools and the data transmissions at issue in this case, as well as the potential repercussions of adopting Professor Cohen's opinions. The fact that I do not address Professor Cohen's other opinions does not mean that I agree with them.

9. A list of the documents that I have considered in reaching my opinions is attached as **Appendix D** to this report. I reserve the right to supplement and/or modify this report if additional relevant information becomes available.

10. I have been assisted by professionals at Analysis Group, Inc. ("AG"), an economic research and consulting firm, working under my direction and supervision. I am being compensated at an hourly rate of $1,190 for my work in this matter. My compensation is not contingent on the nature of my opinions or the outcome of the case.

## II. SUMMARY OF OPINIONS

11. Based on my professional experience, research, review of relevant case information, and review of Professor Cohen's report, I have reached the following opinions.

12. **Opinion 1:** Professor Cohen's expansive reading of HIPAA and the HIPAA Privacy Rule is inconsistent with the purpose, structure, and limits of HIPAA. HIPAA is not a general-purpose health privacy statute, nor was it designed to regulate all entities that touch health-adjacent information, as Professor Cohen appears to suggest. Instead, Congress enacted HIPAA with the pragmatic goal of making health care delivery more

[11] In **Section III.B.1**, I provide a detailed description of HIPAA and the HIPAA Privacy Rule developed by HHS. The HIPAA Privacy Rule "protects a subset of individually identifiable health information, known as protected health information or PHI [Protected Health Information], that is held or maintained by covered entities or their business associates acting for the covered entity." *See What Health Information Is Protected by the Privacy Rule?*, NIH, https://privacyruleandresearch.nih.gov/pr_07.asp.

efficient and increasing the number of individuals with health insurance. Its primary provisions are related to the "portability" of information (representing the "P" in HIPAA), tax incentives, and administrative simplification. To be sure, HIPAA does provide protections for privacy, but only as it concerns the transmission of a specific type of information, Protected Health Information (PHI), by "Covered Entities," defined as "health plans, health care clearinghouses, and health care providers," and by certain kinds of entities associated with Covered Entities, known as "Business Associates." These carefully circumscribed limits make clear that HIPAA and the HIPAA Privacy Rule are designed with the goal of enhancing the efficient delivery of health care while providing context-specific administrative safeguards related to data use and disclosure for Covered Entities and their Business Associates. HIPAA was never intended to be a universal statutory or ethical mandate for the privacy of health-related or health-adjacent data. *See* **Section III.B**.

13. **Opinion 2:** Professor Cohen's opinions rest on an unsupported assumption that all of the alleged data transmissions from health care provider websites and apps that he addressed in his report (the "At-Issue Data"[12]) constitute PHI under the HIPAA Privacy Rule. However, determination of whether or not the Privacy Rule applies to any particular data requires an individualized, context-specific analysis that Professor Cohen has not conducted. Such an analysis must consider, among other factors, the specific data at issue, the nature of the entity transmitting the information, the entity's configuration of Meta's Business Tools, and website visitors' browser settings. In addition, it is necessary

---

[12] *See* ¶ 31 for the definition of "At-Issue Data" in this report, which encompasses the "two categories of information" that Professor Cohen considered in developing his report: (i) Pixel Button Clicks and (ii) communications related to physicians, treatments, and conditions.

to consider the motivation for each website visitor's online activity to determine whether it relates to the health of an identifiable individual, as is required for data to qualify as PHI under the HIPAA Privacy Rule. Professor Cohen's own publications acknowledge the distinction between PHI and generic, health-adjacent information. A recent court ruling likewise recognizes that not all browsing-related information associated with medical providers' websites constitutes PHI under the HIPAA Privacy Rule. In reaching his opinion, Professor Cohen fails to account for important variation across the websites and apps at issue in this case, their configuration of the Meta Business Tools, and website users' browser settings that impact what data is transmitted. Nor does he acknowledge that individualized assessment of the context behind each visitor's interactions with a website or app is necessary to determine whether data associated with that activity constitutes PHI under the HIPAA Privacy Rule, and therefore whether the Privacy Rule applies. Professor Cohen has not conducted the individualized, context-specific analysis necessary to determine whether the HIPAA Privacy Rule applies to any specific data point within the At-Issue Data. *See* **Section III.C**.

14. **Opinion 3:** Applying Professor Cohen's expansive reading of the HIPAA Privacy Rule without a careful, fact-specific analysis would lead to regulatory and contractual chaos and would promote an incoherent privacy policy relating to health-related and health-adjacent data. Such a broad application of the HIPAA Privacy Rule would impose the Privacy Rule's Business Associate obligations on virtually every vendor and service provider to Covered Entities that touches even potentially health-adjacent data. The consequences would include requiring Covered Entities to negotiate thousands of additional Business Associate Agreements (BAAs), dramatically expanding obligations

for subcontractors, and creating compliance paralysis. The result would be an incoherent and unworkable regulatory framework that would undermine, rather than advance, the efficient functioning of the health care system that HIPAA was enacted to support. *See* **Section IV**.

## III. PROFESSOR COHEN'S OPINIONS ABOUT HIPAA COMPLIANCE ARE UNSUPPORTED AND OVERLY BROAD

15. In this section, I evaluate Professor Cohen's opinions concerning the HIPAA Privacy Rule's applicability to Meta's Business Tools and the data transmissions at issue in this case. Professor Cohen argues that alleged data transmissions at issue in this case violate the HIPAA Privacy Rule.[13] Therefore, it is necessary to evaluate the applicability of the Privacy Rule to the alleged data transmissions.

i. First, I provide a brief overview of Professor Cohen's report and opinions and summarize the framework that he uses to reach his conclusions related to HIPAA. *See* **Section III.A**.

ii. Second, I outline HIPAA's structure and purpose and explain the specific scope and conditions under which the HIPAA Privacy Rule applies. I explain that HIPAA and the HIPAA Privacy Rule were never intended to be general-purpose health privacy laws, nor were they designed to regulate all entities that touch health-adjacent information, as Professor Cohen appears to suggest. Instead, the HIPAA Privacy Rule is meant to provide context-specific administrative safeguards related to data use and disclosure for Covered Entities and their

[13] *See* Cohen Report, ¶ 24.

Business Associates. *See* **Section III.B**.

iii. Third, I show the unsupported nature of Professor Cohen's judgment that the transmissions of At-Issue Data that he addressed in his report categorically involve HIPAA-prohibited disclosure of PHI. To determine whether or not a website or app transmitted PHI to Meta requires individualized inquiry, including of the nature of the websites and apps transmitting the data; the actual data transmitted; and the context behind the user's online activity. Professor Cohen has not conducted the requisite individualized inquiry. In the absence of such inquiry, it is impossible to determine whether a data transmission involves PHI. *See* **Section III.C**.

### A. Overview of Professor Cohen's Report

16. Professor Cohen was asked by Plaintiffs' counsel to "opine on whether the use of Meta Collection Tools on Health Care Provider websites and apps in the manner alleged by Plaintiffs violates medical ethics."[14] Professor Cohen does not allege that Meta is a Health Care Provider (or "Covered Entity" under the HIPAA Privacy Rule), and the chief focus of his opinion is on Health Care Providers, not Meta.

17. Professor Cohen defines Health Care Provider, as used in his report, as "persons and entities that provide health care services to patients, including hospitals, doctors, nurses, and others who work for healthcare provider entities, but not health insurers or

[14] Cohen Report, ¶ 9. I understand that Professor Cohen uses the term "Meta Collection Tools" to mean "the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, Meta Graph API, server-to-server transmissions, and any other similar collection tools" as described in the Complaint, ¶ 1 (footnote 1). Plaintiffs' Class Certification Motion focuses on four specific tools: the Meta Pixel, SDK, CAPI, and customer list uploads. *See* Class Certification Motion, p. 2. I refer to these four tools as the Meta's Business Tools throughout this report.

prescription drug companies."[15] Professor Cohen asserts that he has reviewed the "Megataxon" categories that Meta allegedly uses to "internally classif[y] entities from whom it obtains information via [the] Meta Business Tools" and that these categories "converge with entities [he] would generally categorize as Health Care Providers."[16] However, I understand that in their Motion for Class Certification, Plaintiffs have alleged more than 650,000 domains to be at issue, many of which do not appear to fall under Professor Cohen's definition of a Health Care Provider, such as bcbs.com and aetnamedicare.com (health insurers), and haleyandevan.com (a wedding website), and some of which appear to be outside the United States, such as pfizercareersuk.com.[17] Professor Cohen acknowledged in his deposition that his opinion applies only to entities that "provide healthcare services to patients […] but not health insurers or prescription drug companies," meaning that it appears that the entities Plaintiffs allege to be at issue sweep more broadly than the entities to which his opinions apply.[18] For the purposes of this Report, I focus on Professor Cohen's definition of Health Care Providers.

18. Professor Cohen considered "two categories of information" in developing his report: (1) Pixel Button Clicks, which he defines as "communications that indicate a patient has clicked to [. . .] schedule an appointment, [. . .] log into a patient portal, [. . .] complete a

---

15 Cohen Report, ¶ 9 footnote 7.

16 Cohen Report, ¶ 9 footnote 7.

17 *See* Motion for Class Certification, pp. 13–14, Exhibits 60, 72, 73, with examples at Exhibits 72(g) row 13, 72(h) row 148, 72(a) row 370,630, 72(c) row 25,713.

18 Cohen Deposition, p. 92:15–22 ("By saying 'healthcare providers,' as we previously discussed in my previous answer, the healthcare providers I'm talking about is how I defined them for purposes of this particular report, which means entity that provide healthcare services to patients, including hospitals, doctors, nurses, and others who work for healthcare provider entities, but not health insurers or prescription drug companies.").

health assessment, [. . .] or pay a bill"[19]; and (2) "[c]ommunications related to physicians, treatments, and conditions,"[20] which Professor Cohen identifies as URLs reflecting searches for information about physicians or other members of a health care team, health conditions or a particular disease, or diagnostics or treatments.[21] I will refer to these categories collectively as the "At-Issue Data."

19. In developing his opinion, Professor Cohen relies on "Principlism," a medical ethics framework developed by Tom L. Beauchamp and James F. Childress.[22] This framework centers on "four fundamental principles," namely (a) respect for autonomy; (b) beneficence; (c) nonmaleficence, and (d) justice (and equity).[23]

20. In drawing on this framework, Professor Cohen identifies "common ethical precepts" from various codes of ethics applicable to medical providers, including the Hippocratic Oath, the American Medical Association (AMA) Code of Ethics, and the American Nursing Association (ANA) Code of Ethics for Nurses. He also draws on "legal rules and government guidance applicable to Health Care Providers," such as the HIPAA

---

19 I note that Professor Cohen's definition of Pixel Button Clicks corresponds to the data at issue in Plaintiffs' proposed Patient Status Button-Click Class. *See* Motion for Class Certification, p. 13. However, Professor Cohen's definition is narrower than that offered in Plaintiffs' motion for class certification, which includes "a button click on or navigating to a patient portal login, logout, or signup; scheduling or checking-in for an appointment for a doctor/provider; bill payment, bill lookup, or signing up for bill payment; and accessing/completing a health risk assessment/quiz." *See* Motion for Class Certification, footnote 5.

20 I note that Professor Cohen's definition of "[c]ommunications related to physicians, treatments, and conditions" corresponds to the data at issue in Plaintiffs' proposed Patient Health Information Class. *See* Motion for Class Certification, p. 13.

21 Cohen Report, ¶¶ 90–92.

22 Cohen Report, ¶ 17, citing Tom L. Beauchamp & James F. Childress, Principles of Biomedical Ethics (8th ed. 2019).

23 Cohen Report, ¶ 21. Beauchamp and Childress concede that there are other potential bases for medical ethics. Tom L. Beauchamp & James F. Childress, *Moral Theories*, *in* Principles of Biomedical Ethics 23 (8th ed. 2019) ("Competition exists among the four types of normative theory explored in this chapter, and conflicting conceptions continue regarding what these theories imply for biomedical practice. […] We have maintained that no reason exists to consider one type of theory inferior to or derivative from another[.]").

Privacy Rule regulations themselves and guidance related to HIPAA from the U.S. Department of Health and Human Services ("HHS").[24] Professor Cohen uses these sources along with Beauchamp and Childress's "four fundamental principles" of medical ethics to "derive more specific guidance" for his medical ethics assessment.[25]

21. As part of his analysis, Professor Cohen reaches several conclusions about the HIPAA Privacy Rule's applicability to the At-Issue Data. Professor Cohen concludes that the At-Issue Data constitutes the "kinds of information protected under professional codes of conduct, HIPAA, and the foundational ethical principles of privacy and confidentiality as a whole."[26] As a consequence, he determines that the alleged transmission of the At-Issue Data to Meta "violates prevailing standards of medical ethics"[27] and does not comply with the HIPAA Privacy Rule.[28] Specifically, Professor Cohen opines that:

i. The transmission of the At-Issue Data represents "a clear departure" from the "principle that non-deidentified patient information should remain within the confines of the treatment relationship," which is reflected, among other sources, in the HIPAA Privacy Rule;[29]

ii. "Health Care Providers' use of the Meta Collection Tools in the manner alleged [...] plainly violates data minimization obligations set out by [...] HIPAA;"[30]

---

[24] Cohen Report, ¶¶ 16–19, 21.

[25] Cohen Report, ¶ 21.

[26] Cohen Report, ¶ 94.

[27] Cohen Report, ¶ 24.

[28] Cohen Report, ¶ 24.

[29] Cohen Report, ¶ 24(a).

[30] Cohen Report, ¶ 24(b).

iii. The transmission of the At-Issue Data "fall[s] squarely outside the bounds of […] HIPAA's de-identification provision;"[31]

iv. Website privacy policies, terms and conditions, and similar disclosures "do[] not constitute a valid written authorization under the HIPAA Privacy Rule" and the transmission of the At-Issue Data does not "comply with HIPAA;"[32] and

v. "[U]nder the facts alleged by Plaintiffs, Meta constitutes a [B]usiness [A]ssociate for which no BAA was entered into, in violation of the HIPAA Privacy Rule."[33]

22. Professor Cohen also offers other opinions on medical ethics issues, including opinions related to principles of "autonomy," "beneficence," "nonmaleficence," and "justice and equity."[34] My report does not address Professor Cohen's medical ethics opinions.

**B. Overview of HIPAA's Purpose and Reach**

23. HIPAA and its implementing regulations, including the HIPAA Privacy Rule, were enacted to provide a pragmatic approach to facilitating the flow of health care information with the goal of improving the efficiency of health care delivery and promoting health insurance coverage among Americans. While HIPAA includes provisions to protect privacy, these protections apply only to a specific type of information held and shared by defined entities within the health care system. These carefully circumscribed limits make clear that HIPAA is a practical, sector-specific

[31] Cohen Report, ¶ 24(c). Professor Cohen's opinions are limited to "Pixel Button Clicks and communications related to physicians, treatments, and conditions" (the At-Issue Data).

[32] Cohen Report, ¶ 24(d).

[33] Cohen Report, ¶ 24(d).

[34] *See* Cohen Report, ¶¶ 24–55.

regulation—not, as Professor Cohen seems to suggest, a general-purpose health privacy law that can be applied without a careful analysis to determine whether a particular data point or transmission falls within its limits.

24. In this section, I trace HIPAA's legislative history and outline its structure and purpose, with particular attention to the defined limits on its privacy-related provisions—context which was not addressed in Professor Cohen's report. This discussion is crucial to an accurate understanding of HIPAA as a law intended primarily to promote the portability and exchange of health information—not privacy.

### *1. Introduction to HIPAA's Three Provisions and the HIPAA Privacy Rule*

25. Congress enacted HIPAA in 1996.[35] The statute has the "goals of making health care delivery more efficient and increasing the number of Americans with health insurance coverage."[36] Note that the primary goal of HIPAA is not to regulate privacy, but to "improve portability and continuity of health insurance coverage in the group and individual markets, to combat waste, fraud, and abuse in health insurance and health care delivery, to promote the use of medical savings accounts, to improve access to long-term care services and coverage, [and] to simplify the administration of health insurance."[37] From its inception, HIPAA contained three main provisions: (i) the portability provision; (ii) the tax provision; and (iii) the administrative simplification

35 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, Title I, 110 Stat. 1936 (1996).

36 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 63 (Nat'l Acads. Press 2009).

37 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, Title I, 110 Stat. 1936 (1996).

provision.[38]

26. First, as the "P" in its title states, HIPAA is a law about "health care ***portability***."[39] HIPAA's portability provision[40] prevents "individuals from losing health care coverage due to a preexisting condition when changing to a new employer's health plan,"[41] and provides "new rights that allow individuals to enroll for health coverage when they lose other health coverage, get married or add a new dependent."[42] This provision addressed the fact that before HIPAA, many individuals who had employer-provided health insurance could not leave their jobs because they would lose their health insurance coverage—a phenomenon known as "job lock."[43] HIPAA's portability provision also aims to improve health insurance coverage among unemployed and self-employed individuals by making it easier for them to purchase health insurance without an employer.[44] These measures serve the goal of increasing the number of individuals with health insurance.

38 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 63 (Nat'l Acads. Press 2009).

39 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("[…] to improve *portability* and continuity of *health insurance coverage*[,] […] [t]his Act may be cited as the 'Health Insurance Portability and Accountability Act of 1996'.") Emphasis added.

40 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, Title I, 110 Stat. 1936, 1939 (1996).

41 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 153 (Nat'l Acads. Press 2009).

42 *Fact Sheet: The Health Insurance Portability and Accountability Act*, U.S. Dep't of Labor (Dec. 2004), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/hipaa-archived-version.

43 Steve Alder, *How Does HIPAA Improve Healthcare?*, HIPAA J. (Oct. 7, 2022), https://www.hipaajournal.com/how-does-hipaa-improve-healthcare/.

44 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 153 (Nat'l Acads. Press 2009).

27. Second, HIPAA's tax provision[45] seeks to make health insurance more affordable by modifying existing tax laws.[46] Although HIPAA does not directly regulate the price of health insurance, it provides "tax breaks and other tax incentives to reduce health care costs."[47] Here, too, the aim is to increase the number of individuals with health insurance.

28. Third, the administrative simplification provision[48] "standardize[s] the use of electronic health information" and enhances administrative efficiency by imposing uniform codes for health diagnoses and services.[49]

29. Due to the increase in electronic transmission of health information that was expected to follow the enactment of HIPAA, Congress anticipated a need for regulation to promote privacy of health information.[50] When HIPAA was enacted, however, Congress could not agree on the contents of these health privacy safeguards.[51] The original HIPAA legislation set a three-year deadline for Congress to enact health privacy legislation, along with a provision granting the HHS Secretary the authority to issue privacy

---

45 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, Title III, 110 Stat. 1936, 2039 (1996).

46 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 154 (Nat'l Acads. Press 2009).

47 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 154 (Nat'l Acads. Press 2009).

48 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, Title II, 110 Stat. 1936, 1971 (1996).

49 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 63, 245 (Nat'l Acads. Press 2009).

50 *See, e.g.,* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 264, 110 Stat. 1936, 2033 (1996); *Summary of the HIPAA Privacy Rule*, 1–2, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

51 Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 264, 110 Stat. 1936, 2033 (1996). *See also Summary of the HIPAA Privacy Rule*, 1–2, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

regulations should Congress fail to enact such a law by the end of that period.[52] After Congress missed that deadline, HHS developed the HIPAA Privacy Rule.[53] The rule went through several iterations before the final version was issued in 2002.[54]

30. While the HIPAA Privacy Rule was designed to regulate use and disclosure of PHI, it was also carefully constructed to promote useful and desirable data sharing within the health system. In creating HIPAA, one of Congress's objectives was to "improve the efficiency of, and decrease costs within, the health care system by supporting a transition to standardized electronic administrative and financial transactions."[55] Congress recognized the potential risks associated with transmission of electronic data as well as its benefits, such as administrative efficiency and potential improvements to the health system from use of that electronic data. It tasked HHS with creating safeguards for data privacy while facilitating legitimate use of health information.[56]

31. In enacting HIPAA, Congress demonstrated its appreciation of the importance of continued access to health records for research and other purposes. For example, Congress "wanted to ensure that implementation of the HIPAA Privacy Rule would not

---

52 For the provision in question, *see* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 264, 110 Stat. 1936, 2033 (1996). For a discussion, *see Cong. Rsch. Serv., The Health Information Technology for Economic and Clinical Health (HITECH) Act* 4 (updated Apr. 27, 2009).

53 45 C.F.R. § 160 and 45 C.F.R. § 164. *See also The HIPAA Privacy Rule*, U.S. Dep't Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

54 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 64 (Nat'l Acads. Press 2009). For a helpful concise history, *see* Steve Alder, *HIPAA History*, HIPAA J. (Apr. 2, 2025), https://www.hipaajournal.com/hipaa-history/.

55 *The HIPAA Privacy Rule: Overview and Issues*, Cong. Rsch. Serv. (Sep. 10, 2024), https://www.congress.gov/crs_external_products/IF/PDF/IF12759/IF12759.1.pdf.

56 *The HIPAA Privacy Rule: Overview and Issues*, Cong. Rsch. Serv. (Sep. 10, 2024), https://www.congress.gov/crs_external_products/IF/PDF/IF12759/IF12759.1.pdf.

impede researchers' continued access to such data."[57] Indeed, HHS states that:

> A major goal of the Privacy Rule is to assure that individuals' health information is properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well being. The Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing.[58]

32. This language reflects Congress's recognition of the tradeoff between efficiency and privacy. Congress's focus on enhancing the efficient operation of the health care system demonstrates that the HIPAA Privacy Rule was designed as a targeted administrative safeguard for the health care system, not as a general health care privacy law. Congress decided to task HHS with designing balanced safeguards for health data rather than absolute prohibitions on data transfer that would hinder the workings of the health care system.

*2. HIPAA Privacy Rule Applicability: Defining PHI, Covered Entities, and Business Associates*

33. As Daniel Solove and I state in our casebook, *Information Privacy Law*, "[m]any people mistakenly assume that the HIPAA regulations apply to all people or entities that have access to an individual's health information."[59] But the HIPAA Privacy Rule and its accompanying regulations do not create a general federal privacy law for health care information, let alone a general internet privacy law for health-related or health-adjacent

---

57 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 64 (Nat'l Acads. Press 2009).

58 *Summary of the HIPAA Privacy Rule*, 4, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

59 Daniel J. Solove & Paul M. Schwartz, Information Privacy Law 453 (Aspen Publ'g 8th ed. 2024).

information as Professor Cohen's opinions suggest.

34. As I discuss below, the HIPAA Privacy Rule regulates the transmission of a specific type of information, PHI, by "Covered Entities"[60] and by certain kinds of entities associated with Covered Entities, known as "[B]usiness [A]ssociate[s]."[61] Professor Cohen acknowledges these definitions in his report.[62] Still, I repeat them here to anchor my evaluation because understanding the precise boundaries of the HIPAA Privacy Rule is crucial to recognizing the flaws in Professor Cohen's opinions and the risks of broadly applying the Privacy Rule without a careful analysis of its applicability to each at-issue transmission as I will explain in **Section III.C and Section IV**.

*a) HIPAA's Definition of PHI*

35. There are two critical terms for personal data in the HIPAA universe. These are **Protected Health Information ("PHI")** and **Individually Identifiable Health Information ("IIHI")**. The relationship between PHI and IIHI is demonstrated in an illustrative image in the following **Figure 1** below.

---

60 45 C.F.R. § 160.102.

61 45 C.F.R. § 160.102. *See also* Daniel J. Solove & Paul M. Schwartz, Information Privacy Law 453 (Aspen Publ'g 8th ed. 2024).

62 Cohen Report, ¶¶ 58–60, 62–63.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 1**
**Illustration of the Classifications of Data as IIHI and PHI[63]**




36. The HIPAA Privacy Rule defines PHI as a subset of IIHI that is transmitted or maintained in any form.[64] Therefore, data must meet the requirements of IIHI to be considered PHI.

37. The HIPAA Privacy Rule limits the definition of IIHI to information created or received by a health care provider, health plan, employer, or health care clearinghouse that satisfies two distinct conditions.[65]

i. First, the information must relate to (1) "the past, present, or future physical or

---

[63] The figure is based in part on Sarah Badahman, *The ABCs of HIPAA Protected Health Information, Plus a Free PHI Decision Tree*, HIPAAtrek, (Jun. 5, 2019), https://hipaatrek.com/hipaa-protected-health-information-phi/.

[64] 45 C.F.R. § 160.103.

[65] 45 C.F.R. § 164.501; 45 C.F.R. § 160.103.

A13-3961

mental health or condition of an individual;" (2) "the provision of health care to an individual;" or (3) "the past, present, or future payment for the provision of health care to an individual;"[66] and

ii. Second, the information must either identify the individual or there must be a "reasonable basis to believe the information can be used to identify the individual."[67]

38. Unless both conditions are met, the information will not qualify as IIHI and thus not as PHI. In other words, any information that does not relate to an individual's health, the provision of health care, or a health care-related payment for the individual, and/or does not or cannot be reasonably used to identify that individual is not considered PHI under HIPAA. Information is considered PHI only when both criteria are satisfied.[68]

39. As HHS summarizes, "[t]he Privacy Rule protects all 'individually identifiable health information' held or transmitted by a Covered Entity or its Business Associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this information 'protected health information' (PHI)."[69] It is PHI that is subject to the Privacy Rule and to HIPAA safeguards.

---

66 45 C.F.R. § 160.103.

67 45 C.F.R. § 165.514.

68 *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the HIPAA Privacy Rule*, U.S. Dep't of Health & Hum. Servs. (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

69 *Summary of the HIPAA Privacy Rule*, 2, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf. Emphasis removed.

*b) Covered Entities and Business Associates*

40. The Privacy Rule applies only to specific entities—Covered Entities and their Business Associates.[70] Hence, understanding the HIPAA Privacy Rule's narrow and specific definitions of Covered Entities and their Business Associate(s) is essential to identifying the facts and context that must be evaluated to determine whether the Privacy Rule applies to any given data transmission.

*(1) Covered Entities*

41. The HIPAA Privacy Rule explicitly defines three types of Covered Entities: (i) health plans, (ii) health care providers, and (iii) health care clearinghouses.[71] HIPAA generally regulates these entities only when they are U.S.-based.[72]

42. A **health plan** is defined as "an individual and group plan that provides, or pays the cost of, medical care,"[73] such as "health, dental, vision, and prescription drug insurers."[74] Health plans provided by the government (such as Medicare and/or Medicaid), private-sector employers, or other entities that pay for the cost of medical care, such as

---

70 45 C.F.R. § 160.102.

71 45 C.F.R. § 160.103.

72 *See, e.g., Is HIPAA Only in the U.S.?*, Feather (May 28, 2025), https://askfeather.com/resources/is-hipaa-only-in-the-us ("However, it's crucial to note that HIPAA only applies to 'covered entities' in the U.S., which includes healthcare providers, health plans, and healthcare clearinghouses."). These covered entities must, moreover, be involved in a limited range of transactions as set out in Sec. 1173(a) of the Social Security Act, which HIPAA explicitly references. *See* 45 C.F.R. § 160.103; *see also* 42 U.S.C. § 1320d-2(a). These transactions relate to matters such as health claims, enrollment in a health plan, eligibility for a health plan, health claim status. HIPAA is, therefore, to be interpreted as law that presumptively lacks extraterritorial application. *See, e.g*., Morrison v. National Bank Limited, 561 U.S. 247 (2010); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 268–272 (2012).

73 45 C.F.R. § 160.103.

74 *Summary of the HIPAA Privacy Rule*, 2, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf . Professor Cohen's report notes expressly that it does not reach "health insurers." Cohen Report, ¶ 9, footnote 7.

churches, are all considered Covered Entities.[75]

43. **Health Care Provider** is defined in the Privacy Rule as:

i. "a provider of services," which is defined as a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or a fund; or

ii. "a provider of medical or health services," defined, for example, as physicians' services, hospital services, diagnostic services, and screening tests—such as for colorectal or prostate cancer or glaucoma, among others; or

iii. "any other person or organization who furnishes, bills, or is paid for health care in the normal course of business."[76]

44. HHS's guidance summarizing the HIPAA Privacy Rule has a similar definition, including "[e]very health care provider, regardless of size, who electronically transmits health information in connection with certain transactions," such as claims, benefit

---

75 *Summary of the HIPAA Privacy Rule*, 2, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf . As I noted above, footnote 18, Professor Cohen does not consider health insurers to be Health Care Providers for the purposes of his assessment. There are also HIPAA exceptions for smaller employer group health plans and certain types of government funded-programs. For example, certain small employer group health plans—specifically those with fewer than 50 participants and that are not administered by a third-party administrator—are exempt. In addition, some government-funded programs that provide health benefits are not classified as health plans for HIPAA purposes if their primary purpose is something other than providing or paying for health care (such as programs providing social services or financial support). *Summary of the HIPAA Privacy Rule*, 2, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

76 45 C.F.R. § 160.103, 42 U.S.C § 1395.x(u), 42 U.S.C § 1395.x(r), and 42 U.S.C § 1395.x(s). References to U.S.C. incorporated into quote. Funds apply only to purposes described in 42 U.S.C § 1395.f(g) and 42 U.S.C § 1395.n(e).

A13-3964

inquiries, and referral requests.[77] This summary includes "providers of services (e.g., institutional providers such as hospitals)," "providers of medical or health services (e.g., non-institutional providers such as physicians, dentists, and other practitioners) as defined by Medicare," and "any other person or organization that furnishes, bills, or is paid for health care."[78]

45. **Health care clearinghouses** are defined as "entities that process nonstandard information they receive from another entity into a standard (i.e., standard format or data content) or vice versa."[79] HHS notes that in most cases, health care clearinghouses will only receive IIHI when they are "providing these processing services to a health plan or health care provider as a Business Associate."[80] Health care clearinghouses include entities such as "billing services, repricing companies, community health management information systems, and value-added networks and switches if these entities perform clearinghouse functions."[81]

---

77 *Summary of the HIPAA Privacy Rule*, 3, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

78 *Summary of the HIPAA Privacy Rule*, 3, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

79 *Summary of the HIPAA Privacy Rule*, 3, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf. More precisely, 45 C.F.R. § 160.103 defines a health care clearinghouse as "a public or private entity, including a billing service, repricing company, community health management information system or community health information system, and value-added networks and switches, that does either of the following functions: (1) Processes or facilitates the processing of health information received from another entity in a nonstandard format or containing nonstandard data content into standard data elements or a standard transaction. (2) Receives a standard transaction from another entity and processes or facilitates the processing of health information into nonstandard format or nonstandard data content for the receiving entity."

80 *Summary of the HIPAA Privacy Rule*, 2, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

81 *Summary of the HIPAA Privacy Rule*, 3, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

*(2) Business Associates*

46. A **"Business Associate"** is a "person or entity that performs certain functions or activities that involve the use or disclosure of protected health information [PHI] on behalf of, or provides services to, a covered entity."[82] Business Associates are subject to the HIPAA Privacy Rule regulations.

47. Simply providing services to a Covered Entity is not enough, however, to make a vendor or service provider a Business Associate. The HIPAA Privacy Rule limits the definition of Business Associate to cover only entities that perform certain carefully enumerated services. To be identified as a Business Associate, a vendor or service provider must either:

i. Create, maintain, or transmit PHI in performing **a HIPAA-regulated function**, "including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities […], benefit management, practice management, and repricing," on behalf of a Covered Entity (or an organized health care arrangement);[83] or

ii. Provide "**legal, actuarial, accounting, consulting, data aggregation […], management, administrative, accreditation, or financial services**" to or for a Covered Entity (or an organized health care arrangement), where provision of that service involves the disclosure of PHI from such Covered Entity or arrangement, or from another Business Associate of that Covered Entity or

[82] *Business Associates*, U.S. Dep't of Health & Hum. Servs. (May 24, 2019), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html.

[83] 45 CFR § 160.103. *See also Summary of the HIPAA Privacy Rule*, 3, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

A13-3966

arrangement, to the vendor or service provider.[84]

48. Therefore, to be considered a Business Associate, an entity must perform a HIPAA-regulated function or legal, actuarial, accounting, consulting, data aggregation, management, administrative, accreditation or financial services for a Covered Entity. Critically, HHS states that entities whose functions and services "do not involve the use or disclosure of protected health information" are not Business Associates.[85] In other words, if the data that an entity handles is not PHI, that entity is not a Business Associate.

49. The HIPAA Privacy Rule requires Covered Entities and their Business Associates to enter into a Business Associate Agreement ("BAA"). A BAA must include specified written safeguards for PHI, delineate permitted and required uses and disclosures of PHI, and allocate compliance duties between the Covered Entity and the Business Associate.[86] Both parties are subject to oversight and enforcement by HHS under the

84 45 CFR § 160.103. Reference to § 164.501 omitted. Data aggregation "with respect to protected health information created or received by a business associate in its capacity as the business associate of a covered entity" is defined in § 164.501 of 45 CFR § 160.103 as "the combining of such protected health information by the business associate with the protected health information received by the business associate in its capacity as a business associate of another covered entity, to permit data analyses that relate to the health care operations of the respective covered entities."

85 *Summary of the HIPAA Privacy Rule*, 3, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

86 Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research 160–161 (Nat'l Acads. Press 2009).

HIPAA Privacy Rule.[87]

### 3. *The HIPAA Privacy Rule's Intentional Limits*

50. The careful limitations on the applicability of the HIPAA Privacy Rule demonstrate that the Privacy Rule's protections are context-specific administrative safeguards for Covered Entities and their Business Associates, not universal statutory or ethical mandates.[88]

51. Consistent with this view, several government agencies, including HHS and the U.S. Government Accountability Office ("GAO"), have clarified that HIPAA's mandate is narrow and that the HIPAA Privacy Rule is not intended to govern all entities handling personal data or to be used as a comprehensive health privacy framework. HHS HIPAA guidance states that the Privacy Rule "set[s] national standards for the protection of health information, *as applied to the three types of covered entities*: health plans, health care clearinghouses, and health care providers who conduct certain health care transactions electronically."[89] Similarly, in a 2022 report investigating data breaches, the GAO noted that the Privacy Rule "establishes national standards for safeguarding PHI"

---

[87] *See Covered Entities and Business Associates*, U.S. Dep't of Health & Hum. Servs. (Aug. 21, 2024), https://www.hhs.gov/hipaa/for-professionals/covered-entities/index.html ("The HIPAA Rules apply to covered entities and business associates. […] a covered entity under HIPAA must comply with the Rules' requirements to protect the privacy and security of health information […] business associates are directly liable for compliance with certain provisions of the HIPAA Rules"); *see also Direct Liability of Business Associates*, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/factsheet/index.html ("In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health (HITECH) Act, making business associates of covered entities directly liable for compliance with certain requirements of the HIPAA Rules.").

[88] In a 2019 article, Professor Cohen acknowledges that HIPAA's relevance to entities is context-dependent. *See* W. Nicholson Price II & I. Glenn Cohen, Privacy in the Age of Medical Big Data, 25 *Nat. Med.* 37, 4 (2019) ("U.S. privacy law treats health data differently depending on how they are created and who is handling the data—that is, who is the custodian.").

[89] *General Overview of Standards for Privacy of Individually Identifiable Health Information,* 1, U.S. Dep't of Health & Hum. Servs. (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/overview.pdf. Emphasis added.

as defined in the Privacy Rule: "individually identifiable health information transmitted or maintained by a [C]overed [E]ntity or its [B]usiness [A]ssociate."[90]

52. To illustrate this point, consider two popular ways in which health data are currently collected: (1) activity trackers, such as Garmin and Fitbit, and (2) software that creates a personal health ecosystem, such as Apple Health, which can track personal health data across a variety of devices. Activity trackers and personal health ecosystems collect a wide amount of personal information: these include fitness activity; pulse rate; the duration and quality of sleep; blood oxygen, heart rate, and more. Depending on the service and devices involved, individuals can also manually add information, such as their medications and daily mood.[91] But the HIPAA Privacy Rule does not necessarily apply to these wearable technologies or services.[92]

53. Rather, whether data collected by these devices and software is covered under the HIPAA Privacy Rule depends on the context for which the data is maintained.[93] If the data is transmitted to Covered Entities such as health care practitioners, then the data

---

90 *Electronic Health Information: HHS Needs to Improve Communications for Breach Reporting*, 2 n.6, U.S. Gov't Accountability Off. (May 27, 2022), https://www.gao.gov/assets/gao-22-105425.pdf.

91 *See, e.g.*, Muhammad Tuhin, *How Wearables Are Redefining Fitness and Health*, Science News Today (Mar. 27, 2025), https://www.sciencenewstoday.org/how-wearables-are-redefining-fitness-and-health.

92 In a 2020 article, Professor Cohen reached the same conclusion, "[…] [HIPAA] also does not cover *health* (as opposed to health *care*) data generated by a myriad of people or products other than the patient. It does not cover user-generated information about health, such as the use of a blood-sugar-tracking smartphone app or a set of Google searches about particular symptoms and insurance coverage for serious disorders. And it certainly does not cover the huge volume of data that is not about health at all, but permits inferences about health—such as when the information about a shopper's Target purchases famously revealed her pregnancy […] We are already entering a future where traditional health care spaces, HIPAA's 'covered entities,' are being supplanted in the health data space by behemoths like Google, Apple, or IBM—all of which operate outside of HIPAA's regime." *See* W. Nicholson Price II & I. Glenn Cohen, Privacy in the Age of Medical Big Data, 25 *Nat. Med.* 37, 5 (2019). *See also HIPAA for Physical Therapists*, WebPT (Feb. 6, 2023), https://www.webpt.com/guides/hipaa.

93 Tyler Howard, *Does HIPAA Apply to Wearable Health Technology?*, MedSafe (Dec. 1, 2023), https://medsafe.com/hipaa-compliance/does-hipaa-apply-to-wearable-health-technology/.

might be considered PHI and be regulated under the HIPAA Privacy Rule.[94] Conversely, if the data is maintained only for personal use and remains, for example, on personal devices or is shared with an app like Strava (a social network app focused on fitness),[95] then the HIPAA Privacy Rule does not apply. Therefore, to determine if the HIPAA Privacy Rule applies to any given data, it is necessary to analyze which entity received the data and for what purpose. As I discuss below, Professor Cohen has not conducted such an analysis.

### C. Professor Cohen's Conclusion that the HIPAA Privacy Rule Applies to All At-Issue Data Is Unsupported

54. Professor Cohen asserts that "Health Care Providers violate [the HIPAA Privacy Rule] when using the Meta Collection Tools in the ways alleged by Plaintiffs."[96] That assertion relies on his assumption that the At-Issue Data constitutes "the kinds of information protected under […] HIPAA […]."[97] In other words, Professor Cohen concludes that all of the At-Issue Data is PHI, yet he has not conducted any analysis to determine whether each alleged transmission (or even whether any one specific alleged transmission) involves PHI.[98]

55. As I have described above in **Section III.B**, for data to be considered IIHI (and

---

94 Kristen Lee, *Wearable Health Technology and HIPAA: What Is and Isn't Covered*, TechTarget (Jul. 24, 2015), https://www.techtarget.com/searchhealthit/feature/Wearable-health-technology-and-HIPAA-What-is-and-isnt-covered.

95 *See, e.g.,* Steve Knopper, *The Social-Media Platform That Makes You Tell the Truth*, New York Times (Nov. 25, 2025), https://www.nytimes.com/2025/11/25/magazine/strava-running-social-media.html.

96 Cohen Report, ¶ 24.

97 Cohen Report, ¶ 94.

98 Cohen Deposition, 166:12–19 ("Q. You haven't conducted any empirical analysis of what type of data were collected and transmitted for each proposed class member in this case, correct? A. I have not personally. I have relied on kind of the allegations and discussions of the assumed facts in Paragraph 15.).

therefore, whether it can be PHI), it must (i) relate to "the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual,"[99] and (ii) either identify the individual, or there must be a "reasonable basis to believe the information can be used to identify the individual."[100]

56. Professor Cohen bases his opinions on two types of information: (i) Pixel Button Clicks (which Professor Cohen defines as data showing that a person clicked to schedule an appointment, log in to a patient portal, complete a health assessment, or pay a bill); and (ii) communications related to physicians, treatments, and conditions (which Professor Cohen describes as URLs revealing a physician name, medical condition, or diagnostic test or treatment).[101] Although he describes them separately, he concludes that both types of information involve:

> IIHI under HIPAA because they (1) are created or received by a health care provider; (2) '[r]elate[] to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual'; and (3) either (a) identify an individual or (b) there is a reasonable basis to believe they can be used to identify an individual.[102]

57. But to determine whether or not all of this At-Issue Data is IIHI (and therefore, whether it can be PHI) requires individualized inquiry into the nature of the website or app transmitting the data, what data the website or app transmitted to Meta, and the context

---

[99] 45 C.F.R. § 160.103.

[100] 45 C.F.R. § 165.514.

[101] Cohen Report, ¶¶ 90–92.

A13-3971

[102] Cohen Report, ¶ 94.

of the online activity that is associated with that data. In the absence of such an inquiry, the At-Issue Data cannot be de facto classified as IIHI.

58. Professor Cohen failed to conduct that individualized inquiry. First, Professor Cohen fails to account for important variation, for example, across the websites and apps at issue in this case, their configuration of the Meta Business Tools, and website users' browser settings that impact what data is transmitted. Such factors influence whether the HIPAA Privacy Rule applies to any transmission. Second, Professor Cohen ignores that an individualized assessment of the context of each visitor's interactions with a website or app is necessary to determine whether data associated with that activity constitutes IIHI under the HIPAA Privacy Rule, and therefore whether the Privacy Rule applies.

1. *Professor Cohen Ignores Variability in Websites and Apps, Developers' Configurations of the Meta Business Tools, and User Browser Settings That Determine if the HIPAA Privacy Rule Applies to Transmitted Data*

59. As discussed above, the HIPAA Privacy Rule applies only to Covered Entities and their Business Associates and only to data that meets the limited definition of PHI. Therefore, to determine if the Privacy Rule applies to each alleged transmission of At-Issue Data, it is necessary to conduct, among others, (i) an evaluation of whether each website and app transmitting data constitutes a Covered Entity under the HIPAA Privacy Rule; and (ii) an assessment of what data each website and app transmits. Professor Cohen fails to conduct that analysis, rendering his HIPAA analysis incomplete.

60. First, Professor Cohen does not analyze whether each of the entities whose website or app Plaintiffs have identified is a Covered Entity under the HIPAA Privacy Rule. I understand that Plaintiffs' Motion for Class Certification identifies hundreds of

thousands of alleged health care entities that allegedly used one or more of Meta's Business Tools, including entities that do not appear to be Covered Entities under the Privacy Rule, such as haleyandevan.com, zymology21.com, and ynotudesigns.com.[103] Some of the alleged health care entities also appear to not be based in the United States, such as biohealth-uk.com.[104] Thus, they are highly unlikely to be Covered Entities under the HIPAA Privacy Rule.[105] Professor Cohen assumes away that complexity, limiting his analysis to cover only "persons and entities that provide health care services to patients, including hospitals, doctors, nurses, and others who work for healthcare provider entities"[106] without ever acknowledging that the websites and apps at issue in this litigation extend far beyond those categories, including to entities outside of the United States.[107] Nor does Professor Cohen provide any methodology for how he would identify the non-healthcare provider entities identified by Plaintiffs that would fall outside the scope of his opinions.

61. Second, Professor Cohen does not analyze how individual developers configure Meta's Business Tools, which is necessary to understand what data their websites and apps may have transmitted to Meta and whether any given data meets the definition of PHI. I

103 *See* Motion for Class Certification, Exhibit 72(c) row 25,713, Exhibit 72(a) row 506,427, Exhibit 72(a) row 502,823. haleyandevan.com is a wedding website; zymology21.com is a website for a bar located in San Diego, California, and ynotudesigns.com is a website for an information technology services company located in Mumbai, India.

104 *See* Motion for Class Certification, Exhibit 72(a) row 51,335.

105 *See, e.g., Is HIPAA Only in the U.S.?*, Feather (May 28, 2025), https://askfeather.com/resources/is-hipaa-only-in-the-us ("However, it's crucial to note that HIPAA only applies to 'covered entities' in the U.S., which includes healthcare providers, health plans, and healthcare clearinghouses."). *See also* **Section III.B.2.b.1**.

106 Cohen Report, ¶ 9, footnote 7.

107 Professor Cohen acknowledged in his deposition that his opinion does not apply to non-US entities. *See* Cohen Deposition 106:18–24 ("Q. What would be your basis for your opinion applying to a South Korean surgeon providing healthcare services in South Korea? […] A. I think I said the opposite, that I didn't think my opinion as currently written reaches that case. I'm not sure it does."). *See also* Cohen Deposition, 104:10–108:5.

understand that developers can customize Meta's Business Tools and that how they configure the Meta Business Tools controls what data is transmitted to Meta.[108] Therefore, Professor Cohen relies on the unfounded assumption that the developers of all of the at-issue websites and apps under his consideration had configured Meta's Business Tools to transmit PHI to Meta. Similarly, Professor Cohen fails to consider that website visitors can choose to decline cookies or configure browser settings to limit transmissions of data associated with their activity online.[109] Therefore, even if one were to assume for the sake of argument that a Covered Entity had programmed its website to transmit information that would otherwise meet the definition of PHI to Meta through its use of the Meta Business Tools, one must also consider the effect of website visitor's browser settings on data transmissions. Of course, there can be no violation of the HIPAA Privacy Rule if a website never completed a transmission of PHI.

---

108 *See, e.g., About Standard and Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005 ("There are two categories of events you can share: standard and custom."); *Specifications for Meta Pixel Standard Events*, Meta, https://www.facebook.com/business/help/402791146561655 (instructing developers that configuring the Pixel into their own website code that "[w]ithin your Meta Pixel code […] paste the standard event code that's relevant to your page […] You'll need to do this for every page you want to track."). *About Standard and Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005 ("Custom events: These are actions not covered by standard events […] Sharing customer events helps optimize for conversions and build audiences.").

109 *See, e.g.*, *Manage Cookies in Microsoft Edge: View, Allow, Block, Delete and Use,* Microsoft Support, https://support.microsoft.com/en-us/windows/manage-cookies-in-microsoft-edge-view-allow-block-delete-and-use-168dab11-0753-043d-7c16-ede5947fc64d ("If you don't want third party sites to store cookies on your PC, you can block cookies."); *Delete, Allow and Manage Cookies in Chrome*, Google Chrome Help, https://support.google.com/chrome/answer/95647?co=GENIE.Platform%3DDesktop&hl=en-GB#zippy=%2Callow-or-block-third-party-cookies ("You can allow or block third-party cookies by default."). For example, some website visitors may also use virtual private networks ("VPNs"), which can mask an IP address from various web technologies, preventing any data associated with their online activity from being identified with them. *See, e.g., What Is a VPN?*, Microsoft Azure, https://azure.microsoft.com/en-us/resources/cloud-computing-dictionary/what-is-vpn ("A VPN, which stands for virtual private network, establishes a digital connection between your computer and a remote server owned by a VPN provider, creating a point-to-point tunnel that encrypts your personal data, masks your IP address, and lets you sidestep website blocks and firewalls on the internet. This ensures that your online experiences are private, protected, and more secure.").

62. In sum, determining whether any of the data transmission at issue in this case is regulated by the HIPAA Privacy Rule requires (among other things) an analysis of the nature of each at issue website and app to determine if it meets the definition of a Covered Entity, as well as an assessment of each entity's configuration of the Meta Business Tools on its website or app, and each website visitor's browser settings to determine whether any data transmitted to Meta might meet the definition of PHI. Professor Cohen ignored the need to conduct this analysis, rendering his opinion that transmission of the At-Issue Data violates the HIPAA Privacy Rule incomplete and unsupported.

#### 2. *Professor Cohen Ignores That an Individualized Assessment of the Context Behind Online Activity Is Necessary to Determine if the HIPAA Privacy Rule Applies to Data Related to That Activity*

63. As I have discussed above in **Section III.B**, the HIPAA Privacy Rule's regulations make clear that data can only be considered IIHI (and therefore, PHI) if it "relates to" an individual's health, health care, or payment for health care.[110] But that alone is not enough for data to constitute IIHI. To meet the definition of IIHI, the data must also identify the individual or there must be a reasonable basis to believe that the information could be used to identify the individual.[111]

64. Context matters when determining whether information related to online activity constitutes PHI—both to determine whether the information relates to health, health care, or payment for health care, and to determine whether the data can reasonably be

[110] 45 C.F.R. § 160.103.

[111] 45 C.F.R. § 160.103.

used to identify the individual whose health information is reflected in the data.

65. Professor Cohen ignored the need to engage in this careful analysis, concluding instead that all of the At-Issue Data constitutes IIHI under the HIPAA Privacy Rule.[112] As previously noted, the At-Issue Data are "[c]ommunications related to physicians, treatments, and conditions" (which he defines as URLs revealing searches for information related to members of a health care team, health conditions, or diagnostics or treatments) and Pixel Button Clicks (which he defines as data reflecting that a person clicked to schedule an appointment, log in to a patient portal, complete a health assessment, or pay a bill).[113] This conclusion about the At-Issue Data is unsupported; Professor Cohen cannot determine that all data in these categories constitutes IIHI without considering the context behind each online action associated with each data transmission.

#### a) *Context Is Crucial to Determining Whether Data Reflecting Online Searches Constitutes PHI*

66. Professor Cohen concluded that data reflecting online searches for information related to physicians and other members of a health care team, health conditions, or diagnostics or treatments constitutes IIHI under the HIPAA Privacy Rule, making it "the kind[] of information protected under […] HIPAA […]."[114]

67. But data reflecting merely that a website visitor viewed information about a medical

112 Cohen Report, ¶ 94.

113 Cohen Report, ¶¶ 90–92, 94.

114 Cohen Report, ¶¶ 92, 94.

condition, treatment, or physician does not constitute IIHI.[115] Individuals may visit a particular webpage related to a medical condition, treatment, or health care provider for a variety of reasons, including wanting to learn more about a diagnosis for their friend, or completing research for an academic assignment. Someone might even seek medical information out of simple curiosity. For example, fans of "Breaking Bad," the legendary TV crime series, might seek medical information online when wondering about Walter White, a main character on the show, and his treatments (spoiler alert) for Stage III lung cancer and their side effects.

68. Professor Cohen acknowledged in his report that data associated with browsing for reasons other than concern for one's health is not PHI and thus does not fall under the HIPAA Privacy Rule. Professor Cohen quotes from an HHS guidance document that explains that "PHI is *not* implicated, however, if 'a student were writing a term paper on the changes in the availability of oncology services […] because the collection and transmission of information showing that the student visited a hospital's webpage listing the oncology services provided by the hospital would not constitute a disclosure of PHI, even if the information could be used to identify the student.'"[116] Professor Cohen reiterated the same point in his deposition, stating that data associated with browsing related to research for a book report "does not relate to the health information of an individual" and is "a good example of something that HHS regards as outside the bound

[115] *See, e.g.*, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html; 45 C.F.R. § 160.103.

[116] Cohen Report, ¶ 81.

of the HIPAA violation."[117]

69. Therefore, without establishing each individual website visitor's purpose for browsing, it is impossible to tell whether the data associated with a visit to a webpage is PHI because it is impossible to tell whether the data bears any relationship with any identifiable person's health or health care.

70. Take an example from the Complaint. Plaintiffs allege that data associated with Plaintiff Jane Doe I's online activity was transmitted to Meta, listing URLs including "https://www.rush.edu/treatments/mammogram" and "https://www.rush.edu/services/general-neurology-services."[118] But those URLs do not provide any direct information about Jane Doe I's health. She could have navigated to those pages for any number of reasons, including simple curiosity. Without knowing why Jane Doe I was browsing, it is impossible to say whether information associated with that browsing relates to her health, as is required for it to constitute IIHI or PHI.[119]

71. It may be possible to make an inference (correctly or incorrectly) about a person's health status based on their online activity. For example, one could incorrectly infer that someone is suffering from lung cancer if they research information about treatments for lung cancer, even if they were simply motivated to do so out of curiosity after watching "Breaking Bad." But that does not make the resulting data from the research IIHI. The HIPAA Privacy Rule requires that IIHI "relate to" a person's health, health care, or payment for health care—it is not enough that data might support some inference about

---

[117] Cohen Deposition, p. 321:2–17.

[118] Complaint, p. 6.

[119] *See* 45 C.F.R. § 160.103.

a person's health status. [120]

72. Although Professor Cohen claims in his report that "even *incorrect* inferences from private information" represent a "privacy violation," he never suggests in his report that information that merely supports an inference (whether correctly or incorrectly) is sufficient for that information to be considered IIHI—and therefore potentially PHI—under the HIPAA Privacy Rule.[121] Multiple publications by Professor Cohen acknowledge this distinction between PHI and generic, health-adjacent information. These publications recognize that the HIPAA Privacy Rule does not cover information that merely permits inferences about health.

73. First, Professor Cohen wrote in a co-authored 2018 article that HIPAA "does not touch the huge volume of data that is not directly about health but permits inferences about health."[122]

74. Second, in a 2019 article with a different co-author, Professor Cohen refers to Electronic Health Records (EHR) and explains that "HIPAA […] would not be implicated, for example, if Google identified individuals by linking EHR data without HIPAA identifiers to internet data of consumers who visited the University of Chicago hospital and searched online for information about particular medical conditions or if a social

---

[120] *See* 45 C.F.R. § 160.103.

[121] Cohen Report, ¶ 104.

[122] I. Glenn Cohen & Michelle M. Mello, HIPAA and Protecting Health Information in the 21st Century, 320 *JAMA* E1, E1–E2 (2018).

A13-3979

media company linked such EHR data to a user's posts about a hospital stay."[123]

75. Finally, in 2020, in "Privacy in the Age of Medical Big Data," Professor Cohen outlines what HIPAA does and does not cover:

> HIPAA does not cover health care data generated outside of covered entities and business associates, such as health care related information recorded by life insurance companies. It […] also does not cover *health* (as opposed to health *care*) data generated by a myriad of people or products other than the patient. It does not cover user-generated information about health, such as the use of a blood-sugar-tracking smartphone app or a set of Google searches about particular symptoms and insurance coverage for serious disorders. And it certainly does not cover the huge volume of data that is not about health at all, but permits inferences about health, such as when the information about a shopper's Target purchases famously revealed her pregnancy.[124]

Professor Cohen reiterated this analysis in deposition while describing a figure from the article that depicts the volume of data covered by HIPAA compared to the volume of user-generated health information. Professor Cohen described this figure as "an attempt to try to show, perhaps with some artistic license here, that there are [ ] large swaths of things not covered by HIPAA."[125]

76. In his deposition, Professor Cohen testified that when he wrote the 2019 "Privacy in the

---

[123] I. Glenn Cohen & Michelle M. Mello, Big Data, Big Tech, and Protecting Patient Privacy, 322 *JAMA* 1141, 1141 (2019). From this article, I understand the authors use the term "HIPAA identifiers" to reference the list of 18 types of identifiers that HHS has noted may qualify as information that could identify a person. *See* also *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the HIPAA Privacy Rule*, U.S. Dep't of Health & Hum. Servs. (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[124] W. Nicholson Price II & I. Glenn Cohen, Privacy in the Age of Medical Big Data, 25 *Nat. Med.* 37, 5 (2019).

[125] Professor Cohen acknowledged that HIPAA covers a narrow set of information. *See* Cohen Deposition, pp. 361:17–362:5 ("Q. And this is a demonstrative of the health information generated by HIPAA-covered entities versus health information not covered by HIPAA entities, non-health information in which inferences about health are based and user generated health information; is that right? A. Correct. Q. And that top, that iceberg top is what is actually covered by HIPAA, correct? A. That is correct. It's an attempt to try to show, perhaps with some artistic license here, that there are a large swaths of things not covered by HIPAA.").

A13-3980

Age of Medical Big Data" article, he "wasn't aware of these kinds of tracking technologies" and that he "learned about them later, largely from media coverage and from this case."[126] Meta Pixel technologies predate the article by several years,[127] and Professor Cohen does not explain why the opinion articulated in his publication would not apply to data transmitted through Meta Pixel technologies.

77. A recent legal decision similarly highlights the need to consider the context of a data transmission to assess whether the HIPAA Privacy Rule applies. In *American Hospital Association et al. v. Xavier Becerra, et al.* (*AHA v. Becerra*), the U.S. District Court for the Northern District of Texas held that HHS had exceeded its administrative authority in its bulletin on the "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates" ("HHS Bulletin").[128] The district court voided the part of this HHS Bulletin stating that data associated with browsing on a healthcare provider's webpage is IIHI under the HIPAA Privacy Rule, as long as the browsing was motivated by the individual's own healthcare—even if the data was not accompanied by

---

[126] Cohen Deposition pp. 275:10–276:2.

[127] *See*, *e.g.*, Cecile Ho, *Announcing Facebook Pixel*, Meta, October 14, 2015, https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ ("Today we're announcing the Facebook pixel, a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website.").

[128] American Hospital Association v. Becerra, 738 F. Supp. 780 (N.D. Texas 2024). *See also Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

Professor Cohen relies on this Bulletin to support his report, but he ignores the impact of the *Becerra* decision entirely. He states, "[E]ven assuming *arguendo* that the *Becerra* decision was correct, it has no bearing on my analysis and opinions." Cohen Report, footnote 61. But he never engages with the text or reasoning of the *Becerra* decision.

And Professor Cohen's reliance on the Bulletin is misplaced for another reason as well. While HHS bulletins are guidance documents that provide interpretation of law, as HHS itself has conceded, they should not "impose obligations on regulated parties that are not already reflected in duly enacted statutes or regulations lawfully promulgated under them." Department of Health and Human Services Good Guidance Practices, 85 Fed. Reg. 235, 78770 (Dec. 7, 2020).

A13-3981

information that would explain why the individual was browsing.[129]

78. The logic of the court in *AHA v. Becerra* is compelling. As the *Becerra* district court concluded, "[w]ithout knowing a particular query relates to a category of information [covered by HIPAA], metadata from a [public webpage] search cannot constitute IIHI."[130] It cannot constitute IIHI—and hence, also cannot be PHI—because the HIPAA Privacy Rule only covers information that "relates to" an individual's health, receipt of health care, or payment for health care and identifies the individual.[131] But there is no way of knowing whether information that simply reflects a visit to a webpage "relates to" these required matters and "identifies" those visitors that are visiting the webpage for their health care needs. As the *Becerra* district court explained, a recipient of browsing data could not reasonably use that data "to identify an individual or their health condition" because "[t]here's a missing ingredient of subjective intent. […] And *that* information is not received." The court added, "[i]f a covered entity's [public website] greets visitors with a dropdown box requesting their subjective motive for visiting the page, that would be one thing […]. But absent such an admittedly bizarre scenario, the [metadata] cannot become IIHI as unambiguously defined."[132]

79. Thus, publications from Professor Cohen as well as a recent court decision underscore the importance of carefully evaluating the specific context and intent behind online activity in determining whether the HIPAA Privacy Rule reaches a particular data transmission. Data associated with a visit to a webpage cannot be assumed to reveal an

---

[129] American Hospital Association v. Becerra, 738 F. Supp. 780, 789–790 (N.D. Texas 2024).

[130] American Hospital Association v. Becerra, 738 F. Supp. 780, 802 (N.D. Texas 2024).

[131] American Hospital Association v. Becerra, 738 F. Supp. 780, 801 (N.D. Texas 2024).

[132] American Hospital Association v. Becerra, 738 F. Supp. 780, 803 (N.D. Texas 2024).

individual's PHI or IIHI without assessing the reasons for that visit. As the *Becerra* district court stated, "[w]ithout knowing information that's never received—i.e., the visitor's subjective motive—the resulting [browsing] metadata could never identify that individual's PHI."[133]

80. While Professor Cohen's approach and opinions in this matter appear to ignore that context is essential in assessing whether the HIPAA Privacy Rule applies to a given data point, his deposition testimony supports the need for individualized assessment. Professor Cohen testified that "the mere visiting to a web page that doesn't relate to individuals' past present or future health or healthcare payment or healthcare is not covered by HIPAA. So we have to have a way to determine whether [the website visit] relates to the individual's past, present, or future health, healthcare or payment for healthcare, to determine whether HIPAA has been activated."[134]

81. Even though Professor Cohen recognized the need to undertake this inquiry in his deposition, he never conducted any analysis to reach this determination for any of the data allegedly transmitted in this case. Instead, he assumed without any inquiry into the context of any data transmission that the data constituted IIHI under the HIPAA Privacy Rule, rendering his analysis fundamentally flawed, unsupported, and incomplete.

*b) Context Is Relevant to Determining Whether Data Associated With Online Activity On Healthcare Websites Can Reasonably Be Used to Identify the Person Whose Health Is At Issue*

82. Again, to constitute IIHI (and therefore, also PHI) under the HIPAA Privacy Rule, data

[133] American Hospital Association v. Becerra, 738 F. Supp. 780, 803 (N.D. Texas 2024).

[134] Cohen Deposition, p. 343:16–24.

must identify the individual or there must be a reasonable basis to believe that the information could be used to identify the individual. The HIPAA Privacy Rule regulations note that information that is not accompanied by certain identifiers "of the individual or of relatives, employers, or household members of the individual" is not IIHI.[135]

83. Professor Cohen failed to consider the many instances in which the At-Issue Data—assuming that it relates to a person's health at all, and assuming that it is accompanied by information identifying the person engaging in the online activity—might be about online activity taken on behalf of someone other than the person visiting the website or app. In these circumstances, the data would not be IIHI because it could not reasonably be used to identify the individual whose health status is reflected in the data.

84. Consider the deposition testimony of Plaintiff Jane Doe X, who works for a health care provider and testified that she helped patients at her workplace find information concerning their health care on her own device.[136] That information would not be IIHI if it did not include any information that could reasonably be used to identify those patients (i.e., those individuals whose health care information may be reflected in Jane Doe X's online activity).

85. The same reasoning applies to Pixel Button Click data, which Professor Cohen defines to include data reflecting that a person clicked to "schedule an appointment," "log into a patient portal," "complete a health assessment," or "pay a bill."[137] For example, consider

---

[135] 45 C.F.R. § 164.514.

[136] Deposition of Jane Doe X, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO (Apr. 18, 2025), at 31:4–32:13; 229:10–14; 264:15–265:14.

[137] Cohen Report, ¶ 91. *See also* Motion for Class Certification, p. 13.

data associated with a person completing a health assessment on their own device on behalf of a friend while discussing and explaining symptoms that the friend might be experiencing. The resulting data would likely not be IIHI, because it may not include any information to identify the friend (whose data is entered into the assessment). Or, consider a person helping an elderly neighbor manage their care—data generated by the helper on their own device would likely not be IIHI, because it may not include any information to identify the neighbor.

86. Professor Cohen's opinions never acknowledge the need to conduct a careful, context-specific analysis to assess whose health information, if anyone's, is reflected in a given data transmission and whether the data could be used to identify that person. Such an analysis is required to determine whether the data meets HIPAA's definition of IIHI. Other factors to be analyzed relate to the context of the data transmission discussed above in **Section III.C.1**, including whether the transmitter of data meets the HIPAA Privacy Rule's definition of a Covered Entity.

87. This analytical gap and disconnect from any consideration of the actual data transmissions at issue in this case are also apparent in Professor Cohen's analogy comparing entities using the Meta Business Tools to a "hospital system that invites a lurker who worked for a third party into its physical place to surreptitiously observe patients."[138] In building this analogy, Professor Cohen assumes that Meta is like his hypothetical "lurker" who is assumed to have complete information about a given individual somewhere in a hospital, including, first, whether or not that person is a

[138] Cohen Report, ¶ 149.

patient at the hospital, and, second, all test results, recording of health history, and services paid pertaining to that individual.[139]

88. This assumption, however, is just as unfounded for Professor Cohen's hypothetical "lurker" in the physical world as it is for Meta in the online environment. For example, in reality, even if the "lurker" observes an individual in a medical facility asking questions of hospital staff, that "lurker" would not know whether that person is a patient and whether that person is inquiring about their own medical condition, someone else's, or simply asking questions out of curiosity. Similarly, if the "lurker" observes an individual requesting information about an appointment at the front desk, that "lurker" would not know whether the person is scheduling appointment for oneself or for someone else. Instead, such additional and identifying information would necessarily be inferred by the physical world "lurker" of Professor Cohen's analogy. As discussed above, however, the HIPAA Privacy Rule does not treat information as PHI merely because someone could potentially use that information to draw inferences about a person's health status.

89. We now turn to the online environment, the second dimension of Professor Cohen's thought experiment involving a "lurker." Similar to the physical world, in the online environment, a "URL revealing a search for information about a health condition or a particular disease"[140] does not become PHI simply because it might be used to infer something about the website user.[141] Likewise, when a website visitor clicks on button

[139] Cohen Report, ¶ 149.

[140] Cohen Report, ¶ 149.

A13-3986

[141] *See* **Section III.C.2.a**.

to schedule an appointment,[142] that information does not automatically become PHI because additional information is required to know whether that appointment is for that website visitor or for someone else. Thus, Professor Cohen's analogy fails in the physical world just as it does in the online world—he assumes that the At-Issue Data transmissions are PHI without acknowledging that such a determination cannot be made without individualized inquiry into the specific context, the content, the sender, and the receiver of those data.

## IV. PROFESSOR COHEN'S BROAD CONCLUSIONS ABOUT THE APPLICABILITY OF THE HIPAA PRIVACY RULE TO THE AT-ISSUE DATA CONTRADICT EXISTING FRAMEWORKS, RISK CONTRACTING CHAOS, AND THREATEN COMPLIANCE PARALYSIS

90. In his report, Professor Cohen reaches broad conclusions about the HIPAA Privacy Rule's applicability to the data transmissions in this case. He states that the At-Issue Data is "protected under […] HIPAA"[143] and that "Meta constitutes a business associate for which no BAA was entered into, in violation of the HIPAA Privacy Rule."[144]

91. Professor Cohen reaches these conclusions without conducting any case-specific analysis. As explained in **Section III.C**, Professor Cohen fails to consider the context of each data transmission, as is necessary to determine whether it meets the definition of PHI under the HIPAA Privacy Rule.

92. Professor Cohen's opinion that Meta constitutes a Business Associate under the HIPAA Privacy Rule is also unsupported. Professor Cohen never identifies what functions Meta

---

142 Cohen Report, ¶ 149.

143 Cohen Report, ¶ 94.

144 Cohen Report, ¶ 141.

A13-3987

performs for websites or how these functions would meet the Privacy Rule's carefully circumscribed definition for Business Associate, which, as described above in **Section III.B.2**, is limited only to entities that perform a specific set of enumerated services on behalf of Covered Entities. As Professor Cohen admitted in his deposition, his opinion was not based on any case-specific analysis of Meta's activities—instead, it was grounded entirely in non-binding HHS guidance.[145]

93. If one were to accept Professor Cohen's invitation to impose HIPAA Privacy Rule obligations without careful consideration of whether both the data at issue and the entities involved in a data transmission fall within HIPAA's carefully circumscribed boundaries, the result would be to dramatically expand the HIPAA Privacy Rule's scope. HHS has clearly stated that the Privacy Rule was designed to facilitate the flow of information "needed to provide and promote high quality health care and to protect the public's health and well being."[146] Imposing its obligations outside of this scope would have many negative practical consequences by unduly limiting the flow of information.

94. Professor Cohen himself recognizes the risk of excessive privacy regulation. In a 2019 co-authored article, Professor Cohen states:

> [L]imits on data access can bring their own harms. The basic harm of privacy overprotection is the brakes it puts on data-driven innovation. Privacy protections limit both data aggregation,

---

[145] Cohen Deposition, pp. 379:23–380:5 ("Q: You don't provide any analysis of how those statutes or the HHS guidelines [related to Business Associate status] apply to Meta in this case in your report, correct? […] A: I think it's fair to say that I'm relying on the analysis provided by HHS, which seems directly applicable to this case to me, but I'm not going beyond that.").

HHS has noted that its guidance documents should not "impose obligations on regulated parties that are not already reflected in duly enacted statutes or regulations lawfully promulgated under them." Department of Health and Human Services Good Guidance Practices, 85 Fed. Reg. 235, 78770 (Dec. 7, 2020).

[146] *Summary of the HIPAA Privacy Rule*, 1, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

> whether in the creation of longitudinal records or in the collation of data from different sources at the same time, and innovative data use.[147]

By Professor Cohen's own reasoning, an overly expansive interpretation of the HIPAA Privacy Rule would reduce operational efficiency across the health care system and threaten to sacrifice the benefits associated with "innovative data use."[148]

95. There are three major negative implications of applying the HIPAA Privacy Rule to a data transmission without considering whether the data and entities at issue fall within the Privacy Rule's defined limits: (i) it contradicts existing HIPAA frameworks; (ii) it risks contracting chaos; and (iii) it threatens compliance paralysis. I will now discuss each of these.

96. The first problem with expanding the application of the HIPAA Privacy Rule without careful consideration of its defined limits is that it contradicts HIPAA's existing framework and how it is currently and correctly applied. Professor Cohen's approach of imposing HIPAA Privacy Rule obligations on all transmissions of At-Issue Data without conducting any analysis of the context surrounding each transmission would effectively transform HIPAA into a general health privacy statute or even a general internet-privacy law. But, as explained in **Section III.B**, the purpose of the HIPAA Privacy Rule specifically, and of HIPAA generally, is to safeguard PHI maintained by Covered Entities and Business Associates to streamline access to and improve the provision of care. Applying the HIPAA Privacy Rule to data transmissions without considering whether the data and entities at issue fall within the Privacy Rule's defined limits

---

[147] W. Nicholson Price II & I. Glenn Cohen, Privacy in the Age of Medical Big Data, 25 *Nat. Med.* 37, 9 (2019).

[148] W. Nicholson Price II & I. Glenn Cohen, Privacy in the Age of Medical Big Data, 25 *Nat. Med.* 37, 9 (2019).

effectively extends the Privacy Rule beyond this context to incorporate new kinds of information and new kinds of entities, which would distort the purpose of HIPAA.

97. The second implication of Professor Cohen's broad application of the HIPAA Privacy Rule is the risk of contracting chaos that could impair the efficient operations of the health care system. By failing to assess whether the At-Issue Data and the entities involved in the transmission of that data fall within the Privacy Rule's carefully circumscribed boundaries, Professor Cohen's broad conclusions about HIPAA's applicability to the At-Issue Data would effectively expand HIPAA's scope to a broader set of Business Associates.

98. For example, Professor Cohen appears to suggest that any third-party vendor or service provider that might receive health-adjacent data is a Business Associate, as he concludes without any case-specific analysis that Meta "constitutes a business associate."[149] If one were to take Professor Cohen's approach and impose Business Associate obligations on any entity that receives data from a Covered Entity without first confirming that the services the entity provides qualify it to meet the HIPAA Privacy Rule's definition for Business Associate, health care providers would be forced to negotiate thousands of additional BAAs, even with vendors or service providers that do not meet the definition of Business Associate.

99. Expanding the need for BAAs would lead to significant contracting burdens. For example, on average, modern hospitals each rely on approximately 1,300 external

[149] Cohen Report, ¶ 141 ("Thus, the transmissions of the Communications to Meta does not comply with HIPAA or the other applicable standards set out above and violate the core ethical requirement of informed consent. Relatedly, under the facts alleged by Plaintiffs, Meta constitutes a [B]usiness [A]ssociate for which no BAA was entered into, in violation of the HIPAA Privacy Rule.").

vendors and service providers.[150] And negotiating a BAA is not a mere formality. Although HHS offers a model BAA template on its website, parties often negotiate additional terms.[151] These terms could include potentially onerous obligations, including requiring vendors and service providers to carry certain insurance, prohibiting data transmission outside of the United States, and other requirements.[152] Because the HIPAA Privacy Rule also requires that Business Associates negotiate BAAs with subcontractors, the contract burdens would swell even more as each putative Business Associate would need to maintain a BAA with all of its subcontractors.[153]

100. The third implication of applying HIPAA Privacy Rule obligations without engaging in careful analyses to ensure that the At-Issue Data transmissions fall within the Privacy Rule's limits is the risk of compliance paralysis. The HIPAA Privacy Rule imposes a range of obligations on regulated entities, and compliance can be extremely costly.[154] Applying these obligations outside of the Privacy Rule's defined scope would cause unintended inefficiency on a broad swath of the U.S. economy.

101. To illustrate, when HHS implemented updates to the HIPAA Privacy Rule in 2013, it

---

150 Sal Petriello, *A Critical Operation: Managing Vendor Relationships in Healthcare, Patient Safety & Quality Healthcare* (May 17, 2022), https://www.psqh.com/analysis/a-critical-operation-managing-vendor-relationships-in-healthcare/; *Most Common Types of Hospital RFPs*, Definitive Healthcare (Sep. 9, 2025), https://www.definitivehc.com/resources/healthcare-insights/most-common-types-hospital-rfps.

151 *Business Associate Contracts*, U.S. Dep't of Health & Hum. Servs. (Jan. 25, 2012), https://www.hhs.gov/hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html.

152 Kim Stanger, *Business Associate Agreements: Requirements and Suggestions*, Holland & Hart (Oct. 19, 2023), https://www.hollandhart.com/business-associate-agreements-requirements-and-suggestions.

153 *Business Associate Contracts*, U.S. Dep't of Health & Hum. Servs. (Jan. 25, 2012), https://www.hhs.gov/hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html.

154 Steve Alder, *How Much Does HIPAA Compliance Cost?*, HIPAA J. (March 13, 2025), https://www.hipaajournal.com/how-much-does-hipaa-compliance-cost/.

estimated that the Rule would cover more than 700,000 Covered Entities and 250,000 to 500,000 Business Associates of Covered Entities, with a total regulatory cost of $114 million to $225.4 million.[155] The number of at-issue websites and apps identified by Plaintiffs in this case alone exceeds 650,000. Imposing HIPAA Privacy Rule obligations on each of these entities would likely impose costs far beyond those contemplated in HHS's estimate of the regulatory costs of the HIPAA Privacy Rule and dramatically increase the toll of both HIPAA compliance and regulatory oversight by HHS.

102. In sum, applying the HIPAA Privacy Rule to a data transmission without first carefully evaluating the context of that transmission to determine whether it falls within the Privacy Rule's defined limits would undermine one of the chief objectives of HIPAA, which is to enable regulated health care entities to access and transmit information needed to provide high quality health care to patients while increasing administrative efficiency. Imposing overly burdensome compliance and contracting obligations outside of the HIPAA Privacy Rule's limits has the potential to negatively impact health care innovation and health communication. The result would erode the efficient functioning of the health care system that HIPAA was enacted to protect and promote.

Paul Schwartz, J.D.
December 8, 2025

[155] *See* Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules Under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information Nondiscrimination Act; Other Modifications to the HIPAA Rules, 78 Fed. Reg. 5253, 5567 (Jan. 25, 2013). *See also* Motion for Class Certification, pp. 13–14, Exhibits 60, 72, 73.

**Appendix A**
**Expert Qualifications**
**Paul Schwartz, J.D.**

1. I am the Jefferson E. Peyser Professor of Law at the University of California at Berkeley School of Law in Berkeley, California. I am also a Co-Director of the Berkeley Center for Law and Technology ("BCLT").

2. I received my Juris Doctor degree from Yale Law School, where I served as a senior editor of the YALE LAW JOURNAL. My undergraduate studies were at Brown University, where I majored in history and English. After law school, I carried out post-graduate studies in data protection law at the Johann Wolfgang Goethe University in Frankfurt-am-Main, Germany, as a fellow of the Alexander von Humboldt Foundation.

3. I have written several books, including the leading casebook INFORMATION PRIVACY LAW (8th ed. 2024), which is used at over fifty law schools. Another book of mine is the guide, PRIVACY LAW FUNDAMENTALS (7th ed., 2024). This volume is published by the International Association of Privacy Professionals, which is a nonprofit organization "for professionals who work at the intersections of data, technology and humanity."[1] Daniel Solove is my co-author on both of these books.

4. Over fifty of my articles have appeared in leading law journals, such as the HARVARD LAW REVIEW, YALE LAW JOURNAL, STANFORD LAW REVIEW, COLUMBIA LAW REVIEW, UNIVERSITY OF CHICAGO LAW REVIEW, NEW YORK UNIVERSITY LAW REVIEW, UNIVERSITY OF PENNSYLVANIA LAW REVIEW, MICHIGAN LAW REVIEW, and CALIFORNIA

A13-3993

[1] *About the IAPP*, IAPP, https://iapp.org/about/.

LAW REVIEW. Among my recent articles are *The President's Authority Over Cross-Border Data Flows*, 173 U. PENN. L. REV. 1989 (2024) with Anupam Chander, and *Privacy and/or Trade*, 90 U. CHICAGO L. REV. 49 (2023) with Anupam Chander.

5. There are many ways of assessing scholarly influence. As a quantitative measure of the impact of my scholarship, Professor Brian Leiter in his well-regarded blog recently listed me as the ninth most cited professor in "law and technology" during the period of 2019-2023. Professor Leiter defines the field of law and technology in broad terms as including Internet law, information privacy, cybersecurity, and AI.

6. I am the recipient of awards and fellowships from several different foundations, including the American Academy in Berlin, the German Marshall Fund in Brussels, the Alexander von Humboldt Foundation, the Harry Simon Guggenheim Foundation, the German Academic Exchange Service, and the Fulbright Foundation.

7. My expert opinions have been solicited in matters in federal and state courts in the United States. Courts in the United States and other jurisdictions have cited my scholarship.

8. In Israel, the Supreme Court of Israel favorably cited a co-authored article of mine in Civil Appeal 8954/11 *Ploni v. Plonit,* para. 104 (April 4, 2014). The article is Paul M. Schwartz & Karl-Nikolaus Peifer, *Prosser's Privacy and the German Right of Personality: Are Four Privacy Rights Better than One Unitary Concept?*, 98 CALIFORNIA LAW REVIEW 1925 (2010). In its decision in *Ploni v. Plonit*, the Israeli Supreme Court relied on our analysis of the German Federal Constitutional Court's *Esra* opinion and decided to follow that High Court's approach to "personality rights" at the intersection of free expression and privacy interests. For more on this Israeli opinion, *see* Nili Cohen, *German Law in Israel Courts* 195, 213-214, in COMPARATIVE STUDIES IN THE

HUMANITIES (2018); Columbia University, Global Freedom of Expression, *Ploni v. Plonit*, at https://globalfreedomofexpression.columbia.edu/cases/plonit-vs-ploni/.

9. Many media outlets have quoted me on matters relating to privacy and cybersecurity. These include the New York Times, Washington Post, Wall Street Journal, Los Angeles Times, Forbes, and Law360.

10. I have testified before the U.S. Congress and served as an advisor to the Commission of the European Union and other international organizations.

11. I am a member of the American Law Institute ("ALI"); this honor, which is by election, is limited to a total of three thousand judges, lawyers, and legal scholars. Established in 1923, the ALI promotes the clarification and simplification of U.S. law and its adaptation to changing times.

12. On behalf of the ALI, I served as the co-reporter on the PRINCIPLES OF THE LAW, DATA PRIVACY. An ALI "reporter" is the legal scholar responsible for drafting the text of the principles or restatement project. Those in this role are termed "reporters"; their final published project is reported to the ALI, and is the result of a collaborative process among committees of Consultative Members, an Advisory Group, the ALI Board, and the members of the ALI. The Data Privacy project, in development since 2012, was approved in May 2019 by the membership of the ALI. After final editorial work, the ALI published the PRINCIPLES OF THE LAW, DATA PRIVACY in 2020. As a follow up to this project, Daniel Solove and I published an article, *ALI Data Privacy: Overview and Black Letter Text*, 68 U.C.L.A. LAW REVIEW 1252 (2022). This article provides background on the aims of this ALI project and an analysis of each of its privacy principles.

A13-3995

13. I served as Special Advisor to the National Research Council's pathbreaking study, FOR THE RECORD: PROTECTING ELECTRONIC HEALTH INFORMATION (1997). This study followed after the National Library of Medicine had identified "privacy and security as primary issues that need to be addressed in order to facilitate greater use of information technology within the health care sector."[2] The committee carried out a series of site visits to six organizations that collected, processed, and stored health information. The final report offered a series of recommendations that addressed needed privacy and security practices for health care organizations; mechanisms for creating an industry-wide infrastructure for improvement of privacy and security; and other issues.

14. My academic works on health care privacy include the Health Privacy chapters in INFORMATION PRIVACY LAW (8th ed. 2024) and PRIVACY LAW FUNDAMENTALS (8th ed. 2024). Other works of mine analyzing health care privacy are *European Data Protection Law and Medical Privacy*, in GENETIC SECRETS: PROTECTING PRIVACY AND CONFIDENTIALITY IN THE GENETIC ERA, 392 (Mark A. Rothstein, ed., 1997); *Privacy and the Economics of Personal Health Care Information,* 76 Texas Law Review 1 (1997); and *The Protection of Privacy in Health Care Reform*, Vanderbilt Law Review 295 (1995).

15. At Berkeley Law School, I have taught Information Privacy Law, Cybersecurity Law, Tort Law, Intellectual Property Law, and a seminar on Privacy and Cybersecurity Law. These classes cover issues of health privacy, including discussions of the Health Insurance Portability and Accountability Act (HIPAA); privacy and the media; privacy

[2] National Research Council, Computer Science of Telecommunications Board, For the Record: Protecting Electronic Health Information vii (1997).

and law enforcement; government records; financial data; consumer data, including biometric data; data security; education privacy; employment privacy; and international privacy law.

16. From 2013 to 2022, I was a Special Advisor in the privacy and cybersecurity practice at Paul Hastings LLP, a leading global law firm. In this role, I advised on client matters and identified important new areas of privacy and security law of relevance to the firm. I left Paul Hastings LLP in 2022 to establish my own consulting entity, Paul Schwartz Privacy LLC, which fulfilled a dream of mine to be in business for myself.

17. From approximately 2008 to the present, I have served on the Advisory Board of the Future of Privacy Forum ("FPF"). The FPF is a non-profit organization that serves as a catalyst for privacy leadership and scholarship, advancing principled data practices in support of emerging technologies.[3]

18. From approximately 2020 to 2025, I served as a board member at the Privacy Law Scholars Conference ("PLSC"). PLSC is "the premier academic conference of privacy, law, and technology scholars, researchers, and practitioners in the world. [PLSC] incubate[s] and critique[s] scholarship at the vanguard of the field of law and technology."[4]

19. From approximately 2003 to 2008, I served as the Independent Privacy Ombudsman at CLEAR. This company is a technology organization that operates biometric travel document verification systems at major airports. As Independent Privacy Ombudsman,

---

3 *About the Future of Privacy Forum*, Future of Privacy Forum, https://fpf.org/about/.

4 *Privacy Law Scholars Conference*, https://privacyscholars.org/.

my role was to answer consumer questions about privacy and security. I was also to investigate any privacy or security incidents at the company; CLEAR gave me the power to operate in independence and to post any reports of mine on their website. My involvement with the company ended when it was sold to different owners.

20. From 2003 to 2011, I served as a member of the Trusted Computing Advisory Board ("TCAAB") at Microsoft. The TCAAB was composed of approximately seventeen (give or take, depending on the year) leading academic and corporate professionals specializing in the fields of security, privacy policy and technology, each with a significant track record of achievement in a particular field.[5] The TCAAB advised Microsoft on its trusted computing initiative and other privacy, cybersecurity, and computing issues.

21. Each year, I help organize numerous privacy and security events. At Berkeley Law, as a Co-Director of the Berkeley Center for Law & Technology, I organize an annual fall privacy lecture that is given by a distinguished academic. In November 2025, Professor Lior Strahilevitz of the University of Chicago Law School delivered the 18th lecture in this series. He spoke on the topic of "Blanket Opt-Outs."

22. Along with Daniel Solove, I organize an additional four privacy events. Two of these are through the rubric of the "Privacy + Security Forum," and two are called the "Privacy Law Salon." Held in the Fall and Spring in Washington, D.C. over three days, the Privacy + Security Forum features some 800 to 900 attendees listening to experts speaking on a wide range of topics. This conference offers rigorous deep dive sessions for seasoned

[5] *Microsoft's Trustworthy Computing Academic Advisory Board Enters Its Fifth Year*, Microsoft (February 26, 2008), https://news.microsoft.com/2008/02/26/microsofts-trustworthy-computing-academic-advisory-board-enters-its-fifth-year/.

thought leaders. As for the Privacy Law Salon, it is held over two days in Washington, D.C. (Fall) and Miami, Florida (Winter). At the Privacy Law Salon, experienced professionals share their ideas on privacy and security.

**Appendix B**
**Expert CV**
**Paul Schwartz, J.D.**

# PAUL M. SCHWARTZ


Jefferson E. Peyser Professor of Law
U.C. Berkeley School of Law
Law School Building # 7200
Berkeley, California 94720-7200
website: www.paulschwartz.net

Tel: 510-643-0352
Fax: 510-643-2673
email: pschwartz@law.berkeley.edu
twitter: @paulmschwartz


**EDUCATION:**

Yale Law School, J.D., June 1985
YALE LAW JOURNAL, Volume 94, Senior Editor

Brown University, B.A. 1981, *magna cum laude*
Honors in history and English, *Phi Beta Kappa*

**PUBLICATIONS**
**BOOKS:**

PRIVACY LAW FUNDAMENTALS (IAPP, 7th edition, 2024) (Daniel J. Solove, co-author)

INFORMATION PRIVACY LAW (ASPEN, 8th ed., 2024) (Daniel J. Solove, co-author)

PRINCIPLES OF THE LAW, DATA PRIVACY, AMERICAN LAW INSTITUTE (2020) (co-reporter with Daniel J. Solove)

INFORMATION PRIVACY STATUTES AND REGULATIONS, 2010-2011 (ASPEN PUBLISHERS, 2008) (Daniel J. Solove, co-editor)

ON-LINE SERVICES, DATA PROTECTION LAW AND PRIVACY: REGULATORY RESPONSES (Official Pub.of the European Union, Brussels, 1998)(Joel R. Reidenberg, co-author). Study carried out for the Commission of the European Communities (DGXV) regarding on-line privacy in Belgium, France, Germany, and the United Kingdom.

A13-4000

DATA PRIVACY LAW (Michie Publishing/Lexis Law Publishing, 1996), with Joel R. Reidenberg, co-author

**ARTICLES, ESSAYS, CHAPTERS:**

*The President's Statutory Authority Over Cross-Border Data Flows*, 173 U. PENN. L. REV. 1989 (2024) with Anupam Chander, co-author

*Privacy Standing*, 104 B.U. L. REV 1795 (2024)

*Spiros Simitis as Data Protection Pioneer*, 1 G.W. J. LAW & TECH. (JOLT) 102 (2025)

*Privacy and/or Trade,* 90 UNIVERSITY OF CHICAGO LAW REVIEW 49 (2023), with Anupam Chander, co-author

*Resolving the Conflict Between Trade and Data Protection Law,* 9 European Data Protection Law Review 296 (2023) with Anupam Chander, co-author

*ALI Data Privacy Law: Overview and Black Letter Text,* 68 U.C.L.A. LAW REVIEW 1252 (2022), with Daniel Solove, co-author

*The Data Privacy Law of Brexit: Theories of Preference Change,* 22 THEORETICAL ISSUES IN LAW 111 (2021)

*Global Data Privacy Law,* 94 N.Y.U. LAW REVIEW 771 (2019)

*Data Localization Under the CLOUD Act and the GDPR,* 2019 COMPUTER LAW REVIEW INTERNATIONAL 1, with Karl-Nikolaus Peifer, co-author

*Legal Access to the Global Cloud,* 118 COLUMBIA LAW REVIEW 1681 (2018)

*Transatlantic Data Privacy Law*, 106 GEORGETOWN LAW JOURNAL 115 (2017) with Karl-Nikolaus Peifer, co-author. Selected as 2017-2018 "Privacy Paper for Policymakers" by the Future of Privacy Forum.

*Systematic Government Access to Private-Sector Data in Germany*, in BULK COLLECTION 61 (Fred H. Cate & James X. Dempsey, eds. Oxford University Press, 2017)

*Foreword*, DETERMANN'S CALIFORNIA PRIVACY LAW: PRACTICAL GUIDE AND COMMENTARY (2017)

Microsoft Ireland *and a Level Playing Field for U.S. Cloud Companies*, 15 PVLR 1549 (Aug. 1, 2016), reprinted at 16 World Data Production Report 7 (July 28, 2016)

*The Value of Privacy Federalism*, in SOCIAL DIMENSIONS OF PRIVACY 324 (Beate Roessler & Dorota Mokorsinska, eds., Cambridge University Press, 2015)

*Reconciling Personal Information in the European Union and United States*, 102 CALIFORNIA LAW REVIEW 877 (2014), with Daniel J. Solove, co-author

*The EU-US Privacy Collision: A Turn to Institutions and Procedures*, 126 HARVARD LAW REVIEW 1966 (2013)

*Privacy in the Cloud*, 161 UNIVERSITY PENNSYLVANIA LAW REVIEW 1623 (2013)

*Systematic Government Access to Private-Sector Data in Germany*, 2 INTERNATIONAL DATA PRIVACY LAW 289 (2012)

*Reforming the concept of personally identified information: U.S. privacy law and PII 2.0* (with Daniel Solove), in NEUE REGULIERUNGSSCHUB IM DATENSCHUTZRECHT? 55 (Rolf H. Weber & Florent Thouvenin, eds.), Schulthess Verlag (Switzerland)(2012).

*PII 2.0: Privacy and a New Approach to Personal Information,* Privacy and Security Law Report, 11 PVLR 142 (January 10, 2012), with Daniel J. Solove, co-author

*The PII Problem: Privacy and a New Concept of Personally Identifiable Information*, 86 N.Y.U. LAW REVIEW 1814 (2011), with Daniel Solove, co-author

*Regulating Data Mining in the United States and Germany: Constitutional Courts, the State, and New Technology*, 53 WILLIAM & MARY LAW REVIEW 351 (2011)

*Privacy, Ethics, and Analytics*, 9 IEEE SECURITY AND PRIVACY 66 (Nr. 3, May/June 2011)

*Data Protection Law and the Ethical Use of Analytics*, PRIVACY AND SECURITY LAW REPORT, 10 PVLR 70 (January 10, 2011)

*Prosser's* Privacy *and the German Right of Personality: Are Four Privacy Torts Better than One Unitary Concept, 98* CALIFORNIA LAW REVIEW *1925* (2010), with Karl-Nikolaus Peifer, co-author

*Managing Global Data Privacy*, 10 PRIVACY ADVISOR 14 (Number 1, Jan.-Feb. 2010)

*Preemption and Privacy: Against a Federal Privacy Law,* 118 YALE LAW JOURNAL 902 (2009)

*Warrantless Wiretapping, FISA Reform, and the Lessons of Public Liberty: A Comment on Holmes' Jorde Lecture*, 97 CALIFORNIA LAW REVIEW 407 (2009)

*From Victorian Secrets to Cyberspace Shaming, Review Essay,* 76 UNIVERSITY OF CHICAGO LAW REVIEW 1407 (2009)

*Keeping Track of Telecommunications Surveillance*, 52 COMMUNICATIONS OF THE ACM 24 (Sept. 2009)

*The Future of Tax Privacy*, 62 NATIONAL TAX JOURNAL 883 (2008)

*Reviving Telecommunications Surveillance Law*, 75 UNIVERSITY OF CHICAGO LAW REVIEW 287 (2008)

*Data Mining and Internet Profiling: Emerging Regulatory and Technological Approaches*, 75 UNIVERSITY OF CHICAGO LAW REVIEW 261 (2008), with Ira S. Rubinstein and Ronald D. Lee, co-authors

*Anonymous Disclsoure of Security Breaches*, with Edward J. Janger, co-author, in SECURING PRIVACY IN THE INTERNET AGE 221 (Anupam Chandler, Lauren Gelman & Margaret Jane Raden, eds., Stanford Law Books, 2008)

*Technological Change: Networked Intelligence and Information Privacy,* with Ronald D. Lee, co-author, in CIVIL LIBERTIES AND NATIONAL SECURITY: A HISTORICAL PERSPECTIVE 189 (Daniel Farber, ed., Russell Sage Foundation, 2008)

*Notification of Data Security Breaches*, 105 MICHIGAN LAW REVIEW 913 (2007), with Edward J. Janger, co-author

*Privacy Inalienability and Personal Data Chips,* in PRIVACY AND IDENTITY: THE PROMISE AND PERILS OF A TECHNOLOGICAL AGE (Katherine Strandburg & Daniela Stan Raicu, editors, Springer 2006)(abridged version of *Property, Privacy, and Personal Data*)

Review*, Beyond the War in Terrorism: Towards the New Information Network,*
*(Reviewing* PHILIP HEYMANN*,* TERRORISM, FREEDOM, AND SECURITY: WINNING WITHOUT WAR (2003), with Ronald D. Lee, co-author, 103 MICHIGAN LAW REVIEW 1446 (2005)

A13-4003

*Privacy Inalienability and the Regulation of Spyware*, 20 BERKELEY TECHNOLOGY LAW JOURNAL 1269 (2005)

*Property, Privacy, and Personal Data*, 117 HARVARD LAW REVIEW 2055 (2004)

*Evaluating Telecommunications Surveillance in Germany: The Lessons of the Max Planck Institute Study*, 73 GEORGE WASHINGTON LAW REVIEW 1244 (2004)

*Lochner* and *Eldred*: *Copyright Term Extension and Intellectual Property as Constitutional Property,* with William M. Treanor, co-author, 112 YALE LAW JOURNAL 2331 (2003)

Review, *The New Privacy, Oversight of the Poor, and Total Information Awareness* (Reviewing JOHN GILLIOM, OVERSEERS OF THE POOR: SURVEILLANCE, RESISTANCE AND THE LIMITS OF PRIVACY (2001)), with William Treanor, co-author, 101 MICHIGAN LAW REVIEW 2163 (2003)

*German and U.S. Telecommunications Privacy Law: Legal Regulation of Domestic Law Enforcement Surveillance*, 54 HASTINGS LAW JOURNAL 751 (2003)

*Voting Technology and Democracy*, 77 NEW YORK UNIVERSITY LAW REVIEW 625 (2002)

*The Gramm-Leach-Bliley Act, Information Privacy, and the Limits of Default Rules,* with Edward J. Janger, co-author, 86 MINNESOTA LAW REVIEW 1219 (2002)

*Vote.com and Internet Politics: A Comment on Dick Morris's Version of Internet Democracy*, 34 LOYOLA L.A. LAW REVIEW 1071 (2001)

*Testimony*, Senate Committee on Commerce, Science and Transportation, Hearing on Internet Privacy, July 11, 2001

*Beyond Lessig's* CODE *for Internet Privacy: Cyberspace Filters, Privacy-Control, and Fair Information Practices*, 2000 WISCONSIN LAW REVIEW 743

Comment, *Free Speech versus Information Privacy: Eugene Volokh's First Amendment Jurisprudence*, 52 STANFORD LAW REVIEW 1559 (2000)

*Internet Privacy and the State*, 32 CONNECTICUT LAW REVIEW 815 (2000). Lead article in symposium issue of the CONNECTICUT LAW REVIEW; the issue also contains five responses to my article.

A13-4004

*Charting a Privacy Research Agenda: Responses, Agreements, and Reflections*, 32 CONNECTICUT LAW REVIEW 929 (2000). Responding to the five scholars who commented on my article, *Internet Privacy and the State.*

*Democracy and Privacy in Cyberspace*, 52 VANDERBILT LAW REVIEW 1609 (1999)
*Privacy and the Economics of Personal Health Care Information*, 76 TEXAS LAW REVIEW 1 (1997)

*European Data Protection Law and Medical Privacy*, in GENETIC SECRETS: PROTECTING PRIVACY AND CONFIDENTIALITY IN THE GENETIC ERA 392 (Mark A. Rothstein, ed., Yale University Press, 1997)

*Privacy and Participation: Personal Information and Public Sector Regulation in the United States*, 80 IOWA LAW REVIEW 533 (1995)

*European Data Protection Law and Restrictions on International Data Flows*, 80 IOWA LAW REVIEW 471 (1995)

*The Protection of Privacy in Health Care Reform*, 48 VANDERBILT LAW REVIEW 295 (1995)

*Constitutional Change and Constitutional Legitimation: The Example of German Unification*, 31 HOUSTON LAW REVIEW 1027 (1994)

*Testimony* to Government Information, Justice, Transportation, and Agriculture Subcommittee of House Committee on Government Operations, House of Representatives, 103rd Congress, *reprinted in* FAIR HEALTH INFORMATION PRACTICES ACT OF 1994 (2d Session on H.R. 4077) 358 (1994)

*Data Processing and Government Administration: The Failure of the American Legal Response to the Computer*, 43 HASTINGS LAW JOURNAL 1321 (1992)

Book Review, *The Oversight of Data Protection*, 39 AMERICAN JOURNAL OF COMPARATIVE LAW 618 (1991)

Review Essay, *Baby M. in West Germany*, 89 COLUMBIA LAW REVIEW 347 (1989)

*The Computer in German and American Constitutional Law: Towards an American Right of Informational Self-Determination*, 37 AMERICAN JOURNAL OF COMPARATIVE LAW 675 (1989)

Note, *Parental Rights and the Habilitation Decision for Mentally Retarded Children*, 94 YALE LAW JOURNAL 1715 (1985)

A13-4005

**SHORTER WORKS- COLUMNS & OP-EDS:**

*Foreward,* DETERMANN'S CALIFORNIA PRIVACY LAW: PRACTICAL GUIDE AND COMMENTARY (5th ed., 2023)

*Preface: Privacy Law in the Pandemic Year*
*Korean Legislation Research Institute, Issue Brief: Data Protection (October 2020)*

*Illusions of consent and COVID-19 tracking apps*
IAPP Privacy Perspectives (May 19, 2020)

*Protecting privacy on COVID-19 surveillance apps*
IAPP Privacy Perspectives (May 8, 2020)

*Microsoft Ireland and a Level Playing Field for U.S. Cloud Companies*
15 PVLR 1549 (Aug. 1, 2016), reprinted at 16 World Data Production Report 7 (July 28, 2016)

*The Delayed Revolution in Digital Financial Services,* TechCrunch.com (April 9, 2016)

*Risk and High Risk: Walking the GDPR Tightrope*, IAPP Privacy Perspectives (March 29, 2016)

*Navigating the cloud: key regulatory issues to know,* DAILY JOURNAL, ASIA SUPPLEMENT (Oct. 22, 2014), with Behnam Dayanim

*Defining "Personal Data" in the European Union and United States*, 13 PVLR 1581 (Sept. 15 2014) with Daniel J. Solove, co-author, reprinted at 14 WORLD DATA PROTECTION REPORT 4 (Sept. 2014)

*Differing Privacy Regimes: A Mini-Poll on Mutual EU-U.S. Distrust*, IAPP PRIVACY PERSPECTIVES (July 22, 2014)

*The Battle for Leadership in Education Privacy Law*, SAFEGOV.ORG (Mar. 27, 2014) with Daniel Solove

*In Practice: The 'California Effect' on Privacy Law*, THE RECORDER, Jan. 2, 2014

*Testimony, Balancing Privacy and Opportunity in the Internet Age*, California Assembly Informational Hearing, Dec. 12, 2013

*Blog, What Is Personally Identifiable Information (PII)? Finding Common Ground in the EU and US*, CONCURRING OPINIONS (June 26, 2013) with Daniel Solove

A13-4006

*EU Privacy and the Cloud: Consent and Jurisdiction Under the Proposed Regulation*, 12 PVLR 718 (Apr. 28, 2013)

*Privacy Firsts at Berkeley Law*, SAN FRANCISCO CHRONICLE E5 (Feb. 25, 2012)

Blog, *PII 2.0*, TECHNOLOGY|POLICY|ACADEMICS (Jan. 16, 2012) with Daniel Solove

Blog, *Google Ngram and Information Privacy*, GOOGLE POLICY BY THE NUMBERS (Jan. 9, 2012)(Daniel J. Solove, co-author)

*Amend telecommunications surveillance laws*, SAN FRANCISCO CHRONICLE H6 (March 1, 2009)

Essay, *Bye to chads; hello to what?*, NATIONAL LAW JOURNAL A24 (June 11, 2001)

*Book Review, The Lawyer's Bookshelf*: You Say You Want a Revolution, By Reed E. Hundt (2000), NEW YORK LAW JOURNAL 2 (July 10, 2000)

*Book Review, The Lawyer's Bookshelf*: The Code Book, By Simon Singh (1999), NEW YORK LAW JOURNAL 2 (Dec. 21, 1999)

*American Data Protection Law Today*, RECUEIL DES COMMUNICATIONS/ COLLECTION OF PAPERS, Twelfth Annual Conference of Data Protection Commissioners (France, 1990), *reprinted in* TRANSNATIONAL DATA REPORT 20 (Netherlands 1990); Privacy Laws & Business 11 (October 1990) (England); and XII Conférence Internationale des Commissaires à la Protection des Données (France, 1990) (French translation)

*Recent Public Trends in West Germany*, PARTISAN REVIEW 235 (1987). Analysis of a debate among German historians about the contemporary meaning of the Holocaust.

**GERMAN LANGUAGE PUBLICATIONS:**

*Spiros Simitis als Datenschutz Pionier* (Spiros Simitis as Data Protection Pioneer), in SPIROS SIMITIS – SEIN VERMÄCHTNIS (Spiros Simitis – His Legacy) (Indra Spiecker gen. Döhmann & Manfred Weiss, eds., Nomos Publishing, 2024*)*

*Daten gegen Leistung: Konvergenz von kalifornischem Recht und DSGVO? ("Data for Services: A Convergence of California Law and the GDPR?"), 47* DATENSCHUTZ UND DATENSICHERHEIT 749 (Issue 12, Dec. 2023)

with Jürgen Kühling, co-author

*Datentreuhändermodelle – Sicherheit vor Herausgabeverlangen US-amerikanischer Behörden und Gerichte?,* COMPUTER UND RECHT 165 (3/2017) ("Data Fiduciary Model – Protection from Data Requests of U.S. Governmental Authorities and Courts?") with Karl-Nikolaus Peifer

*Zur Architektonik des Datenschutzes in den U.S.A.*, in DATENSCHUTZ IM DIGITALEN ZEITALTER – GLOBAL, EUROPÄISCH, NATIONAL (2015) ("The Architecture of Data Protection in the USA," in Data Protection in the Digital Age: Global, European, National)

*Referat*, in Verhandlung des 69. Deutschen Juristentages: München 2012, Band II/1, O73 (2013) (Presentation, in Proceedings of the 69th German Jurists' Forum)

*"Personenbezogene Daten" aus internationaler Perspektive*, (An International Perspective on "Personal Data"), ZEITSCHRIFT FÜR DATENSCHUTZ 97 (March 20, 2011)

*Kehrtwende beim Datenschutz* (Turning Point for Data Protection Law)(translation Al Sopot), BERLIN TAGESSPIEGEL, Sept. 5, 2002 (op-ed about privacy developments after 9/11)

*Das Übersetzen im Datenschutz: Unterschiede zwischen deutschen und amerikanischen Konzepten der "Privatheit"* (Translating the Legal Concept of "Privacy": Differences between American and German Approaches), 8 RECHT DER DATENVERARBEITUNG 8 (1992), *reprinted in* ÜBERSETZEN, VERSTEHEN, BRÜCKEN BAUEN (Erich Schmidt Press, Berlin, 1993)

*Die neuesten Entwicklungen im amerikanischen Datenschutzrecht* (New Trends in American Data Protection Law), 5 RECHT DER DATENVERARBEITUNG 153 (1989)

**EXPERT WITNESS & CONSULTING:**

Special Advisor, Privacy & Data Security Group, Paul Hastings LLP (June 2013 – 2022)

Expert cases include Gerling Global Reinsurance Corp v. Quackenbush, 2000 WL 777978 (E.D. Cal. 2002), *reversed* American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003). Worked on this case as part of an international team of lawyers assisting the State of California in defense of the Holocaust Insurance Relief Act (HIVRA). State statute required insurance companies to disclose to the State of California any involvement with insurance policies of Holocaust

A13-4008

victims. Provided affidavits and advice to California regarding German information privacy law and whether it prohibited compliance with HIVRA.

Other reported opinions on cases on which I worked as expert include: In re: Vitamins Antitrust Litigation, 2001 WL 1049433 (D.D.C. 2001); and VWAG v. Monceaux, 909 S.W. 2d 900 (Texas 1995).

Past clients include the Commission of the European Union, the State of California, Volkswagen AG, and other multinational corporations.

**GRANTS AND AWARDS:**

American Academy in Berlin, Berlin Prize Fellow, Germany, Fall 2002; German Marshall Fund, Transatlantic Fellow, Transatlantic Center, Brussels, Belgium, Spring 2003: Funded Research Project*: Post 9-11 Developments in Telecommunications Privacy Law in the U.S., Germany, and the European Union*

Other Grants and Awards: Thyssen Foundation, 2012 (with University of Cologne Law School); German Academic Exchange Award, 1997;
Harry Frank Guggenheim Foundation Fellowship, Spring 1995;
Fulbright Scholarship, 1991;
Alexander von Humboldt Scholar, 1986-1988.

**ADVISORY BOARDS:**

INTERNATIONAL JOURNAL OF LAW AND INFORMATION TECHNOLOGY, Oxford University Press, Editorial Board Member

INTERNATIONAL DATA PRIVACY LAW, Oxford University Press, Editorial Board Member

ZEITSCHRIFT FÜR DATENSCHUTZ (Data Protection Journal), Editorial Board Member

Future of Privacy Forum, Washington D.C., Board of Advisors

Trusted Computing Academic Advisory Board, (TCAAB), Microsoft Corporation, Redmond, Washington (Member, 2003-2011). The TWCAAB advises Microsoft on its trusted computing initiative and other policy and computing issues.

**PROFESSORSHIPS AND ACADEMIC POSITIONS:**

Co-Reporter, Data Privacy Principles Project, American Law

Institute, 2013 to 2020. Project approved May 2019 by ALI, finalized and published December 2020

Jefferson E. Peyser Professor of Law, University of California-Berkeley School of Law, Boalt Hall, 2014 to present

Professor of Law, University of California-Berkeley School of Law, Boalt Hall, 2006-2014

2004- Anita and Stuart Subotnick Professor of Law, Brooklyn Law School, 2006; Professor of Law, Brooklyn Law School, 1998-2004.

Professor of Law, University of Arkansas School of Law (Fayetteville), Fall 1995- Spring 1998. Associate Professor, 1992-1995, Assistant Professor, 1988- 1992.

Guest Scholar, Institute for Labor, Economic and Civil Law, Goethe University, Frankfurt/Main, Germany, Summer 1998, Summer 1997, Summer 1996, Summer 1995, Summer 1993, Summer 1992, Summer 1991, Summer 1990, Summer 1989.

Guest Professor, University of Nantes, School of Law & Political Science, Nantes, France, Summer 1993, Summer 1992.

**MEMBERSHIP, PROFESSIONAL SOCIETIES:**

American Law Institute, Elected 2005
New York Bar, Admitted September 2014
Arkansas Bar, Admitted February 1988

German Academic Exchange Alumni Association
Alexander von Humboldt Foundation Alumni Association
Phi Beta Kappa, Brown University, 1981

**Appendix C**
**Prior Testimony**
**Paul Schwartz, J.D.**

**2025**

- Safeguard Privacy, Honorarium, Keynote Interview, Interactive Advertising Bureau Event, San Diego,

- Expert Opinion, Pamela Herout, Claimant, v. Parking Revenue Recovery Services, Respondent, JAMS NO.: 5460001298, report filed September 15, 2025

- Expert Opinion, John Samuel Brooks, Claimant, v. Parking Revenue Recovery Services, Respondent, JAMS NO.: 5460001295, report filed August 17, 2025

- Expert Opinion, In re Municipal Parking Services Inc. DPPA Litigation, Case No: 3:24-cv-320-TKW-HT (U.S. District Court, Northern District of Florida, Pensacola Division), report filed May 5, 2025

- Patrick Calhoun v. Google Privacy Class Action, Case 4:20-cv-05146 (N.D. Cal.)

- Chrome Incognito Privacy Class Action (Brown v. Google)

**2024**

- Expert Opinion, Angela Hogan and B.H. v. Amazon.Com, Case No. 1:21-cv-03169 (U.S District Court, Northern District of Illinois, Eastern Division), report filed June 17, 2024

- Expert Opinion, Shpagat Ltd., et al. v. Meta Platforms, Inc., et al. (C.A. 26413-04-22, 27392-04-22), Central District Court in Lod, Israel, report filed May 28, 2024

- Preparation of Information Privacy Law Videos, Policyware

**2023**

- Shapira v. Facebook Ireland Limited, et al. (C.A. 10275-05-18), Central District Court in Lod, Israel, report filed Mary 26, 2023

- Expert Opinion, Yagoda v. Facebook, Inc. et al (C.A. 52486-03-18), Central District Court in Lod, Israel, report filed May 26, 2023

**2022**

- Calhoun v. Google, Case No. 4:20-cv-05146-YGR-SVK (U.S. District Court, Northern District of California),

- Expert Opinion, Brown v. Google, Case No 4:20-cv-036664-YGR- SVK (U.S. District Court, Northern District of California), report filed June 7, 2022

**2021**

- Expert Opinion, Calhoun v. Google, Case No. 4:20-cv-05146-YGR-SVK (U.S. District Court, Northern District of California), report filed December 21, 2021

## Appendix D
## Materials Considered

**Academic Articles and Books**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012).

Daniel J. Solove & Paul M. Schwartz, Information Privacy Law (Aspen Publ'g 8th ed. 2024).

I. Glenn Cohen & Michelle M. Mello, Big Data, Big Tech, and Protecting Patient Privacy, 322 *JAMA* 1141 (2019).

I. Glenn Cohen & Michelle M. Mello, HIPAA and Protecting Health Information in the 21st Century, 320 *JAMA* E1, (2018).

Sharyl J. Nass, et al., Beyond the HIPAA Privacy Rule: Enhancing Privacy, Improving Health Through Research (Nat'l Acads. Press 2009).

Tom L. Beauchamp & James F. Childress, Principles of Biomedical Ethics (8th ed. 2019).

Tom L. Beauchamp & James F. Childress, *Moral Theories*, *in* Principles of Biomedical Ethics 1 (8th ed. 2019).

W. Nicholson Price II & I. Glenn Cohen, Privacy in the Age of Medical Big Data, 25 *Nat. Med.* 37 (2019).

**Legal Documents**

Am. Hosp. Ass'n v. Becerra, 738 F. Supp. 780 (N.D. Tex. 2024).

Deposition of Ivan Glenn Cohen, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO (N.D. Cal. Nov. 12, 2025).

Deposition of Jane Doe X, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO (Apr. 18, 2025).

Expert Report of I. Glenn Cohen, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO-VKD (N.D. Cal. Sep. 9, 2025).

First Amended Consolidated Class Action Complaint, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO-VKD (N.D. Cal. Oct. 10, 2023).

Plaintiffs' Notice of Motion and Motion for Class Certification, In Re Meta Pixel Healthcare Litig., No. 3:22-cv-3580-WHO-VKD (N.D. Cal. Sept. 9, 2025).

Morrison v. Nat'l Bank Ltd., 561 U.S. 247 (2010).

**Government Documents**

42 U.S.C. § 1320d-2(a) (Standards to enable electronic exchange of data).

42 U.S.C. § 1395x(s) (Definitions of medical and other health services).

42 U.S.C. § 1395x(u) (Definition of a provider of health services).

42 U.S.C. § 1395n(e) (Procedure for payment to fund designated by medical staff or faculty of medical school).

42 U.S.C. § 1395f(g) (Conditions of payments to physicians for services rendered in teaching hospitals).

45 C.F.R. § 160 (General administrative requirements under HIPAA).

45 C.F.R. § 160.102 (HIPAA applicability).

45 C.F.R. § 160.103 (HIPAA definitions).

45 C.F.R. § 164 (Security and Privacy regulations under HIPAA).

45 C.F.R. § 164.501 (HIPAA Security and Privacy definitions).

45 C.F.R. § 164.514 (Requirements of uses and disclosures of protected health information).

*Cong. Rsch. Serv., The Health Information Technology for Economic and Clinical Health (HITECH) Act* (updated Apr. 27, 2009).

Department of Health and Human Services Good Guidance Practices, 85 Fed. Reg. 235 (Dec. 7, 2020).

Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules Under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information Nondiscrimination Act; Other Modifications to the HIPAA Rules, 78 Fed. Reg. 17 (Jan. 25, 2013).

**Publicly Available Materials**

*About Standard and Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005.

*Business Associate Contracts*, U.S. Dep't of Health & Hum. Servs. (Jan. 25, 2012), https://www.hhs.gov/hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html.

*Business Associates*, U.S. Dep't of Health & Hum. Servs. (May 24, 2019), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html.

Cecile Ho, *Announcing Facebook Pixel*, Meta, October 14, 2015, https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

*Covered Entities and Business Associates*, U.S. Dep't of Health & Hum. Servs. (Aug. 21, 2024), https://www.hhs.gov/hipaa/for-professionals/covered-entities/index.html.

*Create a Custom Data List Audience*, Meta, https://www.facebook.com/business/help/170456843145568.

*Delete, Allow and Manage Cookies in Chrome*, Google Chrome Help, https://support.google.com/chrome/answer/95647?co=GENIE.Platform%3DDesktop&hl=en-GB#zippy=%2Callow-or-block-third-party-cookies.

*Direct Liability of Business Associates*, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/factsheet/index.html.

*Electronic Health Information: HHS Needs to Improve Communications for Breach Reporting*, U.S. Gov't Accountability Off. (May 27, 2022), https://www.gao.gov/assets/gao-22-105425.pdf.

*Fact Sheet: The Health Insurance Portability and Accountability Act*, U.S. Dep't of Labor (Dec. 2004), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/hipaa-archived-version.

*General Overview of Standards for Privacy of Individually Identifiable Health Information*, U.S. Dep't of Health & Hum. Servs. (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/overview.pdf.

*Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the HIPAA Privacy Rule*, U.S. Dep't of Health & Hum. Servs. (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

*HIPAA for Physical Therapists*, WebPT (Feb. 6, 2023), https://www.webpt.com/guides/hipaa.

*Is HIPAA Only in the U.S.?*, Feather (May 28, 2025), https://askfeather.com/resources/is-hipaa-only-in-the-us.

Kim Stanger, *Business Associate Agreements: Requirements and Suggestions*, Holland & Hart (Oct. 19, 2023), https://www.hollandhart.com/business-associate-agreements-requirements-and-suggestions.

Kristen Lee, *Wearable Health Technology and HIPAA: What Is and Isn't Covered*, TechTarget (Jul. 24, 2015), https://www.techtarget.com/searchhealthit/feature/Wearable-health-technology-and-HIPAA-What-is-and-isnt-covered.

*Manage Cookies in Microsoft Edge: View, Allow, Block, Delete and Use,* Microsoft Support, https://support.microsoft.com/en-us/windows/manage-cookies-in-microsoft-edge-view-allow-block-delete-and-use-168dab11-0753-043d-7c16-ede5947fc64d.

*Most Common Types of Hospital RFPs*, Definitive Healthcare (Sep. 9, 2025), https://www.definitivehc.com/resources/healthcare-insights/most-common-types-hospital-rfps.

Muhammad Tuhin, *How Wearables Are Redefining Fitness and Health*, Science News Today (Mar. 27, 2025), https://www.sciencenewstoday.org/how-wearables-are-redefining-fitness-and-health.

Sal Petriello, *A Critical Operation: Managing Vendor Relationships in Healthcare, Patient Safety & Quality Healthcare* (May 17, 2022), https://www.psqh.com/analysis/a-critical-operation-managing-vendor-relationships-in-healthcare/.

Sarah Badahman, *The ABCs of HIPAA Protected Health Information, Plus a Free PHI Decision Tree*, HIPAAtrek, (Jun. 5, 2019), https://hipaatrek.com/hipaa-protected-health-information-phi/.

*Specifications for Meta Pixel Standard Events*, Meta, https://www.facebook.com/business/help/402791146561655.

Steve Alder, *HIPAA History*, HIPAA J. (Apr. 2, 2025), https://www.hipaajournal.com/hipaa-history/.

Steve Alder, *How Does HIPAA Improve Healthcare?*, HIPAA J. (Oct. 7, 2022), https://www.hipaajournal.com/how-does-hipaa-improve-healthcare/.

Steve Alder, *How Much Does HIPAA Compliance Cost?*, HIPAA J. (March 13, 2025), https://www.hipaajournal.com/how-much-does-hipaa-compliance-cost/.

Steve Knopper, *The Social-Media Platform That Makes You Tell the Truth*, New York Times (Nov. 25, 2025), https://www.nytimes.com/2025/11/25/magazine/strava-running-social-media.html.

*Summary of the HIPAA Privacy Rule*, U.S. Dep't of Health & Hum. Servs., https://www.hhs.gov/sites/default/files/privacysummary.pdf.

*The HIPAA Privacy Rule*, U.S. Dep't Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

*The HIPAA Privacy Rule: Overview and Issues*, Cong. Rsch. Serv. (Sep. 10, 2024), https://www.congress.gov/crs_external_products/IF/PDF/IF12759/IF12759.1.pdf.

*The Meta Business Tools*, Meta, https://www.facebook.com/business/help/331509497253087.

Tyler Howard, *Does HIPAA Apply to Wearable Health Technology?*, MedSafe (Dec. 1, 2023), https://medsafe.com/hipaa-compliance/does-hipaa-apply-to-wearable-health-technology/.

*Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

*What Is a VPN?*, Microsoft Azure, https://azure.microsoft.com/en-us/resources/cloud-computing-dictionary/what-is-vpn.

*What is the Brief History of Nurx Company?*, Canvas Business Model (Jul. 12, 2025), https://canvasbusinessmodel.com/blogs/brief-history/nurx-brief-history.

**THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | Case No. 11-cv-01846-WHO-LHK |

**EXPERT REPORT OF JOHN R. HAUSER, SC.D.**

December 9, 2025



HIGHLY CONFIDENTIAL

# Table of Contents

I. Qualifications ... 1

II. Assignment and Materials Considered ... 2

III. Summary of Opinions ... 4

IV. Overview of Choice-Based Conjoint and of the Singer Surveys ... 6

V. The Singer Surveys Are Fundamentally Flawed and Would Not Be Expected to Yield Reliable Results ... 11

A. The Singer Surveys Present Respondents with Unrealistic Scenarios That Are Fundamentally Disconnected from the Principles of CBC and That Creates Biases that Generate Unreliable Results ... 11

1. The Singer Surveys Are Fundamentally Flawed Because They Create Unrealistic Scenarios with Which Respondents Have No Experience ... 11

2. The Singer Surveys Ask Respondents to Consider Accepting Payment for Data, but there is Nothing at Stake, Rendering the Results of the Singer Surveys Unreliable ... 17

3. The Singer Surveys Create Biases that Exaggerate the Value of the At-Issue Data ... 20

4. The Singer Surveys Are More Similar to Contingent Valuation, a Methodology Scientific Research Has Found to Be Wholly Unreliable, Than to Market-Relevant Choice-Based Conjoint Analysis ... 24

B. The Singer Surveys Are So Confusing and Poorly Designed That They Fail to Meet the Scientific Standard for a Well-Designed Survey ... 28

1. The Quality of a CBC Survey Can Have a Large Impact on Its Results ... 28

2. A Framework to Evaluate the Design Flaws in the Singer Surveys ... 29

3. The Singer Surveys Are Confusing ... 32

4. The Singer Surveys Fail to Adopt Conjoint Best Practices Known to Increase Response Quality ... 40

5. The Singer Surveys Do Not Take Steps to Ensure a Representative Sample of Respondents ... 45

VI. The Results of the Singer Surveys Demonstrate that the Surveys Are Fundamentally Unreliable ... 47

VII. To the Extent that the Singer Surveys Mischaracterize Both the Alleged Misconduct and the At-Issue Data, They Cannot Be Used to Assess Alleged Harm ... 51

A13-4019

A. The Singer Surveys Describe the Alleged Misconduct as Facebook's Collection and Use of the At-Issue Data ....... 52

B. The Singer Surveys Have a Broad Description of the At-Issue Data and Omit Important Characteristics of the At-Issue Data ....... 53

C. The Singer Surveys Mischaracterize the Scenario in Which Facebook Receives the At-Issue Data ....... 55

VIII. Setting Aside the Many Flaws of the Singer Surveys, Dr. Singer's Estimates of WTA Show That There Is Substantial Heterogeneity Across Respondents and That Most Respondents Were Not Harmed ....... 57

A. Dr. Singer Ignores the Heterogeneity in Respondents' WTA ....... 57

B. According to Dr. Singer's Results, Most Survey Respondents Were Not Harmed ....... 59

C. Dr. Singer's Use of an Average to Summarize Respondents' WTA Is Illogical and Inappropriate ....... 61

A13-4020

## I. Qualifications

1. I am the Kirin Professor of Marketing at the Massachusetts Institute of Technology ("MIT") Sloan School of Management. The principal areas of my research and teaching at MIT have been in marketing management, new product and service development, consumer satisfaction, marketing research, research methodology (including survey research, experimental design, and field experiments), voice of the customer analysis, and competitive marketing strategy. My research includes the evaluation of consumer decision-making, product and service development, customized communications designed around customers' cognitive styles, and determination of relative feature preferences and implicit product valuations. I have evaluated the factors that influence consumer purchasing decisions, consumer preferences, and consumer impressions in a variety of matters related to pricing, distribution, and advertising.

2. I have testified as an expert for both plaintiffs and defendants on matters related to my research. For example, I have testified about marketing research, sales forecasting, product confusion, and other topics involving consumer behavior. My testimony history includes, but is not limited to, matters on behalf of SiriusXM, Dish Network, Comcast, TiVo, WE Woman's Entertainment, iHeartRadio, Louis Vuitton, Apple, Microsoft, Johnson & Johnson, MasterCard, and Procter & Gamble. I testified on behalf of the United States Department of Justice in its challenge to the proposed merger between AT&T and Time Warner. In addition, I have provided strategic market-research-based consulting to numerous consumer products, technology/software, and durable goods manufacturers, including American Airlines, Johnson & Johnson, IBM, Procter & Gamble, Fidelity Investments, Pacific Gas & Electric Company, Ford Motor Company, General Motors, and Chrysler.

3. I have served as Editor-in-chief of *Marketing Science* and have held senior editorial positions with *Management Science*, the *Journal of Marketing Research*, and the *Journal of Product Innovation Management*. I have received numerous awards for excellence in research and teaching in marketing. Some examples include the following: I was recognized by the American Marketing Association with the Paul D. Converse Award for "outstanding contributions to the development of the science of marketing." In 2001, I received the Parlin Award, which is a "preeminent national honor . . . [awarded for] outstanding leadership and

sustained impact on advancing the evolving profession of marketing research over an extended period of time," according to the American Marketing Association. In 2011, I received the Churchill Lifetime Achievement Award of the American Marketing Association for contributions to marketing research. In 2013, I was awarded the Buck Weaver Award by the Institute for Operations Research and the Management Sciences ("INFORMS") Society of Marketing Science ("ISMS"), for lifetime contributions to the theory and practice of marketing science. In 2016, I received a Doctor Honoris Causa, Erasmus School of Economics, Erasmus University. I am a Fellow of INFORMS and an Inaugural Fellow of ISMS. I have also served as President of ISMS, and earlier, as Secretary, as well as a Trustee of the Marketing Science Institute.

4. I am the co-author of two textbooks, *Design and Marketing of New Products* and *Essentials of New Product Management*, as well as more than 100 articles and papers, including articles on various methods used to determine the importance of product features (including intangible online product features) in consumer decision-making and methods to forecast consumer response under various scenarios. I have developed market research techniques that enable marketing researchers, experts, and business managers to predict the value of individual features in both existing and hypothetical products and to forecast consumer response. These methods include techniques that can be used in choice-based conjoint surveys and have been employed numerous times by academic researchers, as well as major international corporations. Many of these papers have been recognized with national and international awards.

5. My curriculum vitae is attached as **Appendix A**, and my testimony at deposition or trial within the last five years is attached as **Appendix B**.

## II. Assignment and Materials Considered

6. Plaintiffs allege that Defendant Meta Platforms, Inc. ("Meta") received certain patient data without users' consent through various healthcare providers' use of "Meta's Business Tools," such as the "Meta Pixel," which various entities, including healthcare providers, incorporated into their websites.[1] Plaintiffs seek to certify four classes, three of which are

[1] First Amended Consolidated Class Action Complaint, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 10, 2023 ("Complaint"), ¶¶ 1, 5–8, 174.

defined according to the different categories of data allegedly received by Meta (the "Proposed Classes").[2] In support of their claims, Plaintiffs submitted the expert report of Dr. Hal Singer (the "Singer Report").[3] In the Singer Report, Dr. Singer presents his analysis of damages to three of the four Proposed Classes based on three surveys, which I collectively refer to as the "Singer Surveys."[4]

7. I have been retained to review the Singer Report, to evaluate the Singer Surveys, and to assess the reliability of Dr. Singer's claims based on the surveys he conducted.

8. In forming my opinions in this matter, I considered academic literature; my own research and academic experience; the deposition of Dr. Singer;[5] case documents; supporting materials; and data. I include a list of materials I have considered in connection with my assignment as **Appendix C**. As a scientist, I will update or supplement my opinions and analyses if and as new information becomes available.

9. I am being compensated at my standard billing rate of $1,250 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked at my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

---

[2] Plaintiffs seek to certify four classes. I refer to the data that define the Proposed Classes collectively as the "At-Issue Data." *See* Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (VKD), September 30, 2025 ("Motion for Class Certification"), p. 13 ("1. The Patient Status Button-Click Class [which Dr. Singer abbreviates as 'PSBC']: – All Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers. 2. The Patient Health Information Class – All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above. 3. The Prescription Drug Information Class [which Dr. Singer often refers to as the 'Prescription Drug Class'] – All Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta. 4. The Patient Device Intrusion Class – All Facebook users for whom Meta placed an _fbp cookie and/or used computing resources by sending data to Meta through their device and/or by computing Core Setup logic on their device while at a Healthcare Provider property."). *See* Motion for Class Certification, p. 13. *See also* Expert Report of Hal J. Singer, Ph.D., September 9, 2025 ("Singer Report"), ¶ 5 ("Counsel for Plaintiffs has asked me to assess whether methods and data common to the PSBC, Patient Health Information, and Prescription Drug Classes, respectively, can reliably demonstrate economic injury and determine the quantum of damages resulting from the Challenged Conduct, taking Plaintiffs' allegations as given.").

[3] Singer Report.

[4] The three surveys presented in the Singer Report are the "PSBC Class Survey" (applicable to the Patient Status Button-Click Class), the "Patient Health Information Class Survey," and the "Prescription Drug Class Survey," with their names corresponding to the Proposed Class for which they were designed. *See* Singer Report, ¶ 53 ("In this section, I describe the three CBC surveys (one for each proposed Class) I conducted to quantify the impact of the Challenged Conduct on Class Members."). *See also* Singer Report, pp. 25 ("PSBC Class Survey …"), 29 ("Patient Health Information Class Survey …"), 30 ("Prescription Drug Class Survey …"). Dr. Singer does not offer an opinion regarding the Patient Device Intrusion Class.

[5] Deposition of Hal J. Singer, Ph.D., October 24, 2025 ("Singer Deposition").

## III. Summary of Opinions

10. **The Singer Surveys are fundamentally flawed because they presented respondents with an unrealistic scenario with which they are entirely unfamiliar.** Respondents likely do not have real-world experience with trading access to specific portions of their online activity data, like their "Healthcare Information," in exchange for monetary payments, which is the hypothetical scenario the Singer Surveys asked respondents to engage with. Respondents also likely have different assumptions about what information Meta already receives about them than what the Singer Surveys directed them to assume, and they likely care about different facets of Meta's services than those that the Singer Surveys are focused on. Coupled with the fact that Dr. Singer does not take steps to provide incentives to respondents to respond to the Singer Surveys as they would in the real-world, these unrealistic elements of the Singer Surveys mean that respondents were likely unable to respond in a way that reflects their true value for the At-Issue Data. For these reasons, the Singer Surveys also fail to meet the basic requirements to elicit reliable answers from respondents and instead create biases that render their results wholly unreliable.[6]

11. In addition to presenting an unrealistic and biased hypothetical trade-off, **the Singer Surveys are confusing and poorly designed**. The design quality of a survey can have large impacts on its results, especially for complicated and hypothetical settings like the ones used in the Singer Surveys. The Singer Surveys are worded and presented confusingly to respondents, and the Singer Surveys fail to adopt widely accepted best practices to increase response quality, such as identifying and excluding inattentive respondents. The Singer Surveys also do not take steps to ensure a representative sample. Based on a standard set of criteria commonly used to evaluate the design quality of conjoint surveys, the Singer Surveys fail to meet the scientific standard for a well-designed survey. The design flaws of the Singer Surveys are reflected in high survey attrition rates and evidence of substantial respondent confusion.[7]

12. The unrealistic scenario presented to respondents of **the Singer Surveys**, paired with critical design and execution flaws, unsurprisingly **produces fundamentally unreliable results**. Using the data and analyses from the Singer Surveys, nearly half of respondents in each survey

---

[6] *See* Section V.A.
[7] *See* Section V.B.

have preferences that are "irrational," i.e., their results indicate that, all else constant, respondents would prefer to receive a lower payment in exchange for their information rather than a higher payment. Additional analysis of Dr. Singer's estimates indicates that a large amount of survey noise is present in the Singer Surveys, meaning Dr. Singer is unable to rule out that the vast majority of his respondents exhibited irrational response patterns, and therefore he is unable to reliably quantify respondents' true value of the At-Issue Data (if any). Dr. Singer's unreliable results are also evident in the average results across respondents that Dr. Singer obtains for the three different Proposed Classes, which imply that a user would be willing to accept a lower payment to allow Facebook to access specific information about their personal diagnoses or symptoms, but the user would require a higher payment for more generic information about them having an online account on the website of a large hospital system.[8]

13. **To the extent that the Singer Surveys mischaracterize both the alleged misconduct and the At-Issue Data, the Singer Surveys cannot be used to assess the alleged harm associated with Plaintiffs' theories**. For example, the Singer Surveys make no distinction between access to and use of the At-Issue Data and instead inform respondents that their information would be collected *and* used by Meta. To the extent that the alleged misconduct is premised on data access, and not on all data that is accessed also being used, the Singer Surveys would not be able to assess consumer harm associated with the alleged misconduct. As another example, the Singer Surveys do not account for any changes over time in the At-Issue Data that Meta received as a result of the alleged misconduct. Additionally, the Singer Surveys describe certain elements, while selectively omitting related elements, of Meta's Data Policy in describing the hypothetical program.[9] To the extent that these or other aspects of the Singer Surveys mischaracterize the alleged misconduct or the At-Issue Data, the Singer Surveys cannot be used to identify the value members of the Proposed Classes would place on the At-Issue Data and cannot be used to assess the harm alleged by Plaintiffs.[10]

14. Setting aside the numerous flaws in the design and implementation of the Singer Surveys, **the results of the Singer Surveys demonstrate substantial heterogeneity and indicate that a**

---

[8] *See* Section VI.

[9] Dr. Singer utilized language from Meta's Data Policy, which I understand became known as Meta's Privacy Policy during the Class Period. Singer Deposition, Exhibit 676 ("Meta Data Policy"); Meta Privacy Policy, Case 3:22-cv-03580-WHO, Document 76-12, October 17, 2022.

[10] *See* Section VII.

**large fraction of members of each of the Proposed Classes was not actually harmed by the alleged misconduct as Dr. Singer describes because they do not place any value on the At-Issue Data**. While Dr. Singer claims that the average value for the At-Issue Data he calculates for the different Proposed Classes "pertains to all Class Members, regardless of individual preferences," the distribution of the values for the At-Issue Data that Dr. Singer (unreliably) calculates for each respondent shows substantial variation across respondents. The Singer Surveys imply that most respondents do not place any value on the At-Issue Data. Taking the results of the Singer Surveys at face value, Dr. Singer's results show that between 29 percent and 32 percent of respondents do not place any value on the At-Issue Data. Further, accounting for the statistical uncertainty in Dr. Singer's results (a standard practice when evaluating survey results), I find that the value placed on the At-Issue Data implied by the Singer Surveys are not statistically different than $0 for between 73 percent and 84 percent of the respondents. Dr. Singer caps a substantial number of respondent valuations for the At-Issue Data at $0 or $20, indicating that his model is unable to produce valid estimates that fall within the price range he provided to respondents in the Singer Surveys. Given Dr. Singer's decision to cap respondent valuations at $0 and $20, it is logically inconsistent for Dr. Singer to report average valuations.[11] It would have been logically consistent for Dr. Singer to use the median WTA rather than the average. Using the median does not cure the many flaws in the Singer Surveys, but had Dr. Singer based his damages estimates on the median valuation rather than the average valuation, Dr. Singer's unreliable estimates of respondents' "value" for the At-Issue Data (and any damages calculated using those values) would have been reduced by over 75 percent.[12]

## IV. Overview of Choice-Based Conjoint and of the Singer Surveys

15. In the Singer Report, Dr. Singer presents the Singer Surveys as following a methodology called "Choice-Based Conjoint" or "CBC." Dr. Singer claims that "[t]he results and subsequent

[11] The formula for the average is the sum of respondents' valuations divided by the number of respondents. This formula requires that Dr. Singer identify respondents' valuations. When he caps a valuation at $0 or $20, he does not know the valuation. He only knows it is less than $0 when capped at $0 and is more than $20 when capped at $20.

[12] *See* Section VIII.





HIGHLY CONFIDENTIAL

calculations flowing from the CBC survey are … a reliable estimate of Class Members' valuation of the At-Issue Data."[13]

16. CBC analysis is a tool in the field of marketing research used to analyze consumer preferences.[14] CBC analyses were initially developed to elicit consumer valuations of products and product features, for example, packaged food or carbonated beverages. In a CBC survey, respondents are asked to select among hypothetical products or services. The hypothetical products or services are described in the survey by their "attributes," or features that determine the key characteristics of the product (e.g., degree of sweetness, carbonation, flavor, etc.), as well as a price that consumers would pay to acquire the product or service. The specific value of an attribute is called the "level" of the attribute (e.g., if the attribute is "flavor," the levels could be "cola," "orange," "cherry," etc.). A set of attribute levels and price describing a specific hypothetical product choice in a CBC survey is called a "profile." In a CBC survey, respondents are presented with a set of product profiles (this is called a "choice task") and are asked to select one of those product profiles following specific instructions. Typically, respondents are told to consider that all non-specified attributes are constant across all profiles in a choice task. Respondents are typically presented with multiple choice tasks in the same survey. After a CBC survey is completed, statistical methods are used to process the responses and produce estimates of the underlying preferences driving respondents' choices. The estimates produced from a CBC survey are called "partworths" and represent the estimated utility value assigned to a specific level of an attribute (i.e., how much that attribute level contributes to a respondent's overall preference for a product or product feature).[15] Partworths are relative to one another rather than absolute. For example, the difference in the partworth for "cola" and the partworth for "cherry" indicates the utility to the customer of having a "cola" flavor rather than a "cherry" flavor beverage. The difference could be zero or even negative. Under appropriate assumptions regarding the ability of the survey to capture consumers' true preferences, the partworths derived

[13] Singer Report, ¶ 93 ("The results and subsequent calculations flowing from the CBC survey are therefore a reliable estimate of Class Members' valuation of the At-Issue Data."). *See also* Singer Report, ¶¶ 8, 105, 113. As explained in Section VII.C, Plaintiffs' definitions of the Proposed Classes, and therefore, of the At-Issue Data, contain a more limited set of healthcare and prescription data at issue relative to the definitions in the Singer Report and the Singer Surveys.

[14] Green, Paul E., and Vithala R. Rao, "Conjoint Measurement for Quantifying Judgmental Data," *Journal of Marketing Research* 8(3), 1971, pp. 355–363. My description of CBC in this paragraph summarizes the descriptions of CBC in the literature.

[15] Some analysis methods acknowledge the uncertainty in the estimations and rather than providing a single estimate, provide a probability distribution of the estimates.

from a properly designed and executed CBC can be used to generate estimates of how much each respondent is willing to pay ("WTP") for an attribute level relative to another attribute level (e.g., how much a respondent would be willing to pay for a cola flavored soda relative to a cherry flavored one).[16]

17. In the Singer Surveys, respondents were asked to suppose that Facebook is considering launching a pilot program "to directly pay users for access to additional information from partners,"[17] which Dr. Singer defines as advertisers, app developers, and publishers that use Meta Business Tools.[18] Respondents were shown a choice task with three hypothetical product profiles and an option labeled "I would not accept any of the offers shown here"[19] (the "outside option"). The product profiles are described by five attributes consisting of information types that Facebook would receive and use under the hypothetical pilot program: "financial information," "social media information," "fitness information," "education information," and either "healthcare information"[20] or "prescription information,"[21] as well as a "compensation" attribute.[22] No other attributes are used to describe the hypothetical profile and the Singer Surveys do not identify the levels of any other attributes that define the respondents' choices. Dr. Singer claims that he can use the "healthcare information" or "prescription information" attributes in his surveys to study respondents' valuation of the At-Issue Data.[23] For the three Singer Surveys, the descriptions of "healthcare information" or "prescription information" that Facebook may access and use in the hypothetical program are the following:

- For the Patient Status Button-Click Class in the PSBC Class Survey, "healthcare information" is defined as "The names and web addresses of the hospitals and health systems with which you have an online account and the

---

[16] Befurt, Rene, Felix Eggers, and John R. Hauser, "Supply Side Considerations When Using Conjoint Analysis in Litigation," in *Handbook of Marketing Analytics: Methods and Applications in Marketing, Public Policy, and Litigation*, Cheltenham, UK: Edward Elgar, 2024 (forthcoming) ("Befurt et al. (2024)"), pp. 1 ("[C]onjoint analysis has been used to establish that a product or service characteristic (attribute or attribute level) is important to consumers. Conjoint analysis has also been used to estimate consumers' willingness to pay for an attribute and to estimate how an attribute affects consumers' willingness to buy a product – the 'demand side.'"), 2–3 ("By asking consumers to compare product profiles and trade off product attributes, conjoint analysis provides preference data with which to apply statistical models to determine the relative value of a change in an attribute (often called a partworth) indicating how much consumers value attribute changes – often relative to price.").

[17] Singer Report, Appendix 5, p. 89, Appendix 6, p. 128, Appendix 7, p. 165.

[18] *See* Singer Report, Appendix 5, p. 84, Appendix 6, p. 123, Appendix 7, p. 160.

[19] Singer Report, Appendix 5, p. 90.

[20] Singer Report, Appendix 5, p. 92, Appendix 6, p. 131.

[21] Singer Report, Appendix 7, p. 168

[22] Singer Report, Appendix 5, p. 93, Appendix 6, p. 132, Appendix 7, p. 170.

[23] Singer Report, ¶ 95 ("I demonstrate the use of my survey results in estimating the value of the At-Issue Data … I use the broader term 'At-Issue Data' below to refer to Healthcare Information for the PSBC Class and Patient Health Information Class and Prescription Information for the Prescription Drug Class.").

names and web addresses of the healthcare providers with whom you make appointments or pay bills online."[24]

- For the Patient Health Information Class Survey, "healthcare information" is defined as "Information about your interactions with and on the websites and apps of your healthcare providers, including seeking information about doctors, health conditions, services, treatments, symptoms, or diagnoses."[25]
- For the Prescription Drug Class Survey, "prescription information" is defined as "Information about your interactions with or on prescription drug company websites and apps, including your requests for information about prescription drugs, conditions those drugs treat, side-effects, and payment options."[26]

18. I note that these descriptions differ from the descriptions of the At-Issue Data in the Proposed Class definitions provided by Plaintiffs in their Motion for Class Certification.[27] The product profiles also include a compensation value ranging from $0 to $20 and respondents are told that if they select a given option, they "will be eligible to receive [the compensation] payment each month [but they] will only be paid for months in which [they] visit a relevant partner website."[28] Each respondent was presented with ten choice tasks.

19. After completing his surveys and filtering out respondents that Dr. Singer identifies as confused and/or incomplete,[29] Dr. Singer uses statistical software to analyze respondents' answers and generate estimates of respondents' partworths.[30] The estimates of each individual respondent's partworths that Dr. Singer identifies reflect their average preferences across 10,000 "draws" of the partworths generated in a statistical methodology called a hierarchical Bayes Monte Carlo Markov Chain (MCMC) simulation.[31] Thus, Dr. Singer's statistical analyses produce a probability distribution of each respondent's partworths across all 10,000 draws. He summarizes each probability distribution for each respondent by calculating the average of the draws for that respondent, and then presents that average as an estimate of each respondent's partworths.[32] Then, for each respondent Dr. Singer uses the estimated partworths for that

---

[24] Singer Report, Exhibit 1.
[25] Singer Report, Exhibit 3.
[26] Singer Report, Exhibit 4.
[27] *See* Section VII.
[28] Singer Report, Appendix 5, p. 93.
[29] See further discussion of Dr. Singer's exclusions in Section V.B.3 below.
[30] Singer Report, ¶ 96 ("Once all responses from each CBC survey were recorded, I used standard statistical methods to calculate each respondent's 'utility' for every level of every feature.").
[31] Dr. Singer calls this a "Hierarchical Bayesian Method[]." *See* Singer Report, footnote 130 ("Sawtooth software uses standard Hierarchical Bayesian Methods to converge on the coefficients that represent the value of each attribute for each individual.").
[32] Singer Report, footnote 130 ("Sawtooth software uses standard Hierarchical Bayesian Methods to converge on the coefficients that represent the value of each attribute for each individual."); Singer Report Backup Materials, "E1_3994.ssi," "E1_6346.ssi,"

A13-4029



HIGHLY CONFIDENTIAL

respondent to calculate the respondent's willingness to accept (WTA).[33] I note that while the majority of CBC studies provide estimates of WTP for the attributes analyzed, which Dr. Singer acknowledged in his deposition,[34] Dr. Singer produces estimates of each respondent's individual WTA, which Dr. Singer defines as the dollar value that a given respondent would be willing to accept to allow Meta to receive their At-Issue Data.[35] Dr. Singer lastly calculates the average over all respondents in a survey of each respondent's WTA. Dr. Singer presents those averages (the arithmetic means for each of the three surveys' respondents' WTAs) as his estimate of damages per member of the Proposed Class, for each month in which their At-Issue Data "[was] accessed by Meta."[36] Dr. Singer reports an average WTA for the At-Issue Data of $5.94 for the PSBC Class, $3.83 for the Patient Health Information Class, and $3.71 for the Prescription Drug Information Class.[37] Dr. Singer does not opine on Plaintiffs' fourth Proposed Class, the Patient Device Intrusion Class. Dr. Singer claims that, if supplied with the number of months that the At-Issue Data were accessed by Meta for each member of the Proposed Classes, he could calculate aggregate damages for each Proposed Class by multiplying the number of months across all members of the Proposed Class by his calculated average WTA for each Proposed Class.[38]

---

"E1_7832.ssi." *See also* "HB Estimation Settings," *Sawtooth Software*, available at available at https://sawtoothsoftware.com/help/lighthouse-studio/manual/cbc-hb-estimation-settings.html, accessed on December 4, 2025 ("Save random draws[:] Check this box to save random draws to disk, in which case final point estimates of respondents' betas are computed by averaging each respondent's draws after iterations have finished. The default is *not* to save random draws (have the means and standard deviations for each respondent's draws accumulated as iteration progresses).") (emphasis removed).

[33] Typically, CBC Surveys are used to calculate the willingness to pay (WTP). Dr. Singer argues that willingness to accept (WTA) is the appropriate measure to be obtained from the Singer Surveys. WTA is the amount a respondent would accept in return for providing access to the respondent's information as defined in the Singer Surveys.

[34] Singer Deposition, pp. 47:15–48:8 ("Q. But you didn't -- your -- your assumption is that the -- that people aren't -- in almost all conjoint surveys that are in litigation or in the literature, the vast, vast majority are willingness to pay conjoint surveys, as opposed to willingness to accept; is that -- would you agree with that? A. I would say that if you step out of the privacy context or you step out of, say, the environmental context that -- and you're talking about products, then absolutely I will agree with you that -- that you'll tend to see many, many more willingness to pay studies than willingness to accept."), 54:6–15 ("Q. … Sitting here, based on whatever work you have already done to date in this case and whatever information your staff provided you, can you identify any data privacy case which a judge has accepted an expert's conjoint survey analysis using a WTA approach? A. Sitting here I can't offer you one, no.").

[35] Singer Report ¶ 104. *See also* Singer Report, ¶¶ 118 ("[M]y CBC applications estimate the supply curves of Class Members—that is, Facebook users' willingness to accept compensation to provide the relevant At-Issue Data under specified compensation terms—while holding constant Meta's quantity demanded."), 104 ("A more precise compensation level can be calculated using linear interpolation, which is commonly used in CBC surveys. A linear interpolation works by taking the utility-weighted average of $2.50 and $5.00 and using the linear relationship between the two discount levels ... Therefore, the required compensation for this respondent to be made whole and *accept* Meta's access to her At-Issue Data is $3.00.").

[36] Singer Report, ¶¶ 105, 113.

[37] Singer Report, Exhibit 6.

[38] Singer Report, ¶ 113 ("Using my methodology for calculating damages, if supplied with the number of months that each Class Member's At-Issue Data were accessed by Meta, I can formulaically calculate Class-wide damages to each Class.").

A13-4030



HIGHLY CONFIDENTIAL

## V. The Singer Surveys Are Fundamentally Flawed and Would Not Be Expected to Yield Reliable Results

20. The design of the Singer Surveys is fundamentally flawed. In this section, I discuss how the Singer Surveys present an unrealistic scenario disconnected from users' real-world experiences. For this reason, the surveys fail to meet the basic requirements for CBC surveys to elicit reliable answers from respondents and, as a result, the surveys create biases that render their results wholly unreliable. I also discuss how, even ignoring the issues caused by the surveys' unrealistic scenario, the Singer Surveys are so confusing and so poorly designed that their results are fundamentally unreliable.

### A. The Singer Surveys Present Respondents with Unrealistic Scenarios That Are Fundamentally Disconnected from the Principles of CBC and That Creates Biases that Generate Unreliable Results

#### 1. The Singer Surveys Are Fundamentally Flawed Because They Create Unrealistic Scenarios with Which Respondents Have No Experience

21. CBC surveys ask respondents to make choices among alternative hypothetical product or service profiles such that the respondents' choices accurately reflect how consumers would select products or services if the profiles were available in a real marketplace. For a CBC survey to be able to represent real-marketplace respondent choices, the CBC survey must be realistic and understandable to respondents. In particular, the scenarios presented to respondents in a CBC survey must mimic scenarios that consumers face in the real marketplace. Otherwise, respondents may not be able to make tradeoffs among hypothetical attributes and attribute levels that represent how consumers would make tradeoffs among attributes and attribute levels in a real marketplace.[39] In survey research terms, the survey would have no "external validity."[40]

22. Scientific research, including scientific research cited by Dr. Singer, has found that participants' market experience and familiarity with the product being tested are *essential* to the

---

[39] This phenomenon is referred to as "hypothetical bias," i.e. "a hypothetical setting does not motivate participants sufficiently reveal their 'true' preferences." *See* Ding, Min, Rajdeep Grewal, and John Liechty, "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research* 42(1), 2005, pp. 67–82 ("Ding et al. (2005)") at 76.

[40] Hauser, John R., Felix Eggers, and Matthew Selove, "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science* 38(6), 2019, pp. 1059–1081 ("Hauser et al. (2019)") at 1070 ("The ideal external validation is whether the CBC model predicts the choices consumers would make if the hypothetical profiles were to become real products in the marketplace.").

reliability of the results from a conjoint survey.[41] Specifically, researchers have found that, "stated preferences become problematic when the products are unfamiliar or incompletely described."[42] Researchers further indicate that for unfamiliar products and services, like those being evaluated by the Singer Surveys, "[e]ven the mention of an attribute can give it more prominence in a subject's mind than it would have in real shopping."[43] Daniel L. McFadden, a prominent American econometrician and Nobel laureate, emphasizes the importance of consumer familiarity with products, services, and attributes being assessed.[44] Despite this guidance from scientific research, the Singer Surveys asked respondents to make decisions that are fundamentally different from the types of decisions survey respondents are likely to make in the real world.

23. While conjoint analysis has been used to evaluate products with attributes that currently do not exist in the market (e.g., a mobile phone with a new type of camera), respondents in those surveys tend to be highly familiar with the category of the product they are asked to evaluate.[45] Further, best practices require that respondents in those surveys be shown prototypes, or extremely realistic pictures and models of the new product, to allow respondents to form valid expectations of the type of benefits associated with the new product feature.[46] Other attributes of the product should also be represented realistically. Similarly, best practices require that attribute levels (and the benefits respondents would accrue from each attribute level) are easy for

---

[41] *See* Ben-Akiva, Moshe, Daniel McFadden, and Kenneth Train, "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis," *Foundations and Trends in Econometrics* 10(1–2), 2019, pp. 1–144 ("Ben-Akiva et al. (2019)") at 12–15, 25 ("It is particularly important that subjects have familiarity with the products and features they are being asked to evaluate that is comparable to their real market experiences, as attention, context, and framing effects are particularly strong when subjects are asked to respond in unusual or unfamiliar circumstances.").

[42] Ben-Akiva et al. (2019), p. 14; McFadden, Daniel, "Stated Preference Methods and Their Applicability to Environmental Use and Non-Use Valuations," in *Contingent Valuation of Environmental Goods*, Edward Elgar Publishing, 2017, pp. 153–187 ("McFadden (2017)") at 162 ("Conjoint methods can be expected to be less reliable when the products are unfamiliar or incompletely described.").

[43] Ben-Akiva et al. (2019), p. 14.

[44] McFadden (2017), p. 161 ("Conjoint analysis methods can be expected to work relatively well for preferences among consumer market goods when the task is choice among a small number of realistic, relatively familiar, and fully described alternatives."). Dr. Singer specifically references Dr. McFadden and his work in CBC analysis. *See*, *e.g.*, Singer Report, ¶ 42 ("CBC analysis is grounded in economic modeling techniques pioneered by (among others) Nobel Prize-winning economist Daniel McFadden.").

[45] Ben-Akiva et al. (2019), p. 14 ("Familiarity may be a given when the CBC study is of ordinary household products such as cola drinks, but not when novel products or novel or highly technical product features are outside the subject's range of experience.").

[46] Ben-Akiva et al. (2019), pp. 12–15 ("Where possible, subjects should have an opportunity to 'test-drive' novel products. … In some cases, this can be accomplished with actual or mock-up working models of the offered products, or with computer simulation of their operation."); Hauser et al. (2019), p. 1070 ("The ideal external validation is whether the CBC model predicts the choices consumers would make if the hypothetical profiles were to become real products in the marketplace. But most hypothetical profiles will never be market tested. Instead, we mimic marketplace choices by creating a 'market' that approximates the marketplace as closely as feasible while controlling for unmodeled marketing actions.").

respondents to compare or measure. Without easy-to-compare attribute levels, respondents may place more weight on price than they would in a real marketplace because price remains the only tangible element of the survey.[47] Dr. Singer does not follow these best practices and, instead, presents unrealistic and unfamiliar scenarios, including attribute levels that are difficult to measure and compare, to respondents in his surveys.

24. **Firstly, the Singer Surveys ask respondents to make hypothetical choices in a hypothetical scenario unfamiliar to respondents**. Specifically, respondents are asked to suppose that Facebook is considering directly paying users for access to and use of additional information from partners, as shown in Exhibit 1.

***Exhibit 1: Screenshot from the Singer Surveys - Scenario***




Source: Singer Report, Appendix 5, p. 89, Appendix 6, p. 128, Appendix 7, p. 165

25. Such a hypothetical scenario is fundamentally different from the day-to-day experience of respondents using Facebook. In the real marketplace, users choose to engage with Facebook based on the perceived benefits they receive from its different features. However, respondents to the Singer Surveys were not presented with such scenarios and instead are faced with a decision on whether to sell information to Facebook with no guidance about how selling that information would impact their experience on Facebook. Dr. Singer has not identified any broadly known products or marketplaces in the real world similar to the one he describes in the Singer Surveys, where consumers can trade access to specific portions of their online activity data in exchange

[47] Ben-Akiva et al. (2019), pp. 13–14 ("CBC studies can forecast market demand relatively well when the subjects' task is choice among a small number of realistic, familiar, and fully described products."), 21 ("Prominence and ease of comparison are known to be factors that influence the attention subjects give to different aspects of decision problems; for example, market researchers sometimes report that subjects in their stated choices systematically place more weight on price relative to other product attributes than they do in real markets, perhaps because this dimension is clearly visible and comparisons are easy in a conjoint analysis menu.").

A13-4033



HIGHLY CONFIDENTIAL

for monetary payments. I am not aware of an analogous situation to the one presented in the Singer Surveys in real marketplaces that would be familiar to most Facebook users.[48] Even if some respondents might have some familiarity with services or experimental programs that compensate consumers for collecting extensive data across various websites and applications, it is unlikely that the majority of respondents to the Singer Surveys would have any familiarity with the scenario in the Singer Surveys.

26. The Singer Surveys describe the choices that respondents were asked to make in terms of five types of information that they may have never considered before as something they could sell (see Exhibit 2). Dr. Singer provides no evidence that, prior to the survey, respondents had ever thought about assigning a monetary value to such information. Because there is no market from which respondents could obtain a reference value for the At-Issue Data,[49] or to form pre-existing preferences about the types of information they were asked to consider, respondents were likely to resort to ad hoc decision rules that may be logically inconsistent, or that could change due to random factors that Dr. Singer is unable to control.[50]

---

[48] The closest example of which I am aware that could be considered related to Dr. Singer's survey scenario is data brokers who compensate consumers for collecting these consumers' extensive data across various websites and applications. For example, startups like Datacy have aimed to directly compensate consumers for their data. Datacy requires consumers to download its browser extension from the Chrome Web Store and set up a Datacy account before browsing for compensation. As consumers browse, watch, or shop under the Datacy browser, they will be "matched" with "communities," which allows users to earn rewards that can be cashed out to a PayPal or Stripe account once a certain minimum reward threshold has been passed. This is, again, a very different context. *See* "Consumer," *Datacy*, available at https://datacy.com/consumer, accessed on December 4, 2025. While other technology companies such as Google, and other data brokers, such as mobileXpression and Swash may have paid users for their online data, to my knowledge these contexts similarly differed from that of the Singer Surveys. For example, mobileXpression pays users to passively collect their data by tracking their usage through a virtual private network (VPN) and pays them in the form of electronic gift cards. *See* Josh Patoka, "Is MobileXpression Legit? My Honest Review," *Well Kept Wallet*, April 22, 2025, available at https://wellkeptwallet.com/mobilexpression-review/, accessed on December 4, 2025. Swash is a service that collects a user's data and "pools [their] data together with the other Swash members to create a Data Union." These data are then sold to data buyers, allowing users to "receive their share of the value generated." *See* "How Does Swash Work," *Swash*, available at https://support.swashapp.io/hc/en-us/articles/19218826721425-How-does-Swash-work, accessed on December 4, 2025.

[49] Dr. Singer acknowledges that "there is no explicit market price" for the information described in his surveys. *See* Singer Report, ¶ 61. Dr. Singer also cites academic research indicating that personal information is a "nonmarket commodit[y]." *See* Singer Report, footnote 41. Dr. Singer further acknowledged in his deposition that there is no market for the At-Issue Data. *See* Singer Deposition, p. 170:2–3 ("There's no market that precisely goes after the at-issue data.").

[50] *See* Ben-Akiva et al. (2019), pp. 22–23 ("Subjects seem to approach less familiar choice tasks as if they were school exams—they cast about for 'correct' answers by making inferences on what the experimenter is looking for. While some may use their responses to air opinions, most give honest answers, but not necessarily to the question posed by the experimenter. They may 'solve' problems other than recovering and stating their true preferences, indicating instead the alternative that seems the most familiar, the most feasible, the least cost, the best bargain, or the most socially responsible.").

***Exhibit 2: Screenshot from the Singer Surveys – Information Types***

DataTypes

Information Types:

- **Financial Information**: Information about your interactions with and on financial institution websites and apps, including seeking information about their services.
- **Social Media Information**: : Information about your interactions with and on social media networks *other than Facebook*, including the specific posts or videos you view on those social media networks.
- **Fitness Information**: Information about your interactions with or on fitness tracking platforms (for example, Strava), including recording exercise, as well as other information viewed on those platforms.
- **Education Information**: Information about your interactions with and on educational institution websites or apps, including through intermediary applications (for example, ProCare or Brightwheel), as well as actions you take on those websites or apps, including viewing information about their services or programs.
- **Healthcare Information**: Information about your interactions with and on the websites and apps of your healthcare providers, including seeking information about doctors, health conditions, services, treatments, symptoms, or diagnoses.

Each of these kinds of information will be designated "Access" or "No Access." If designated "Access," Facebook can observe and collect the associated information from its partners. If designated "No Access," Facebook cannot observe or collect the associated information from its partners.

If designated "Access," Facebook will automatically collect this information by tracking buttons you click and URLs you visit online. You do not have to self-report this information to Facebook.

Please assume for the purposes of this survey that you **do not** currently enable Facebook to access these types of information.

○ I understand

○ I do not understand

Back Next

Source: Singer Report, Appendix 6, p. 131

27. **Secondly, the Singer Surveys are unrealistic because they asked respondents to assume that they "do not currently enable Facebook to access these types of information."**[51] I understand that Facebook discloses to its users that it receives information from third parties.[52] To the extent some respondents were aware that such types of information are shared by third

[51] Singer Report, Appendix 5, p. 92, Appendix 6, p. 131, Appendix 7, p. 168 (additional emphasis added).

[52] Meta Data Policy, pp. 4–5 ("Advertisers, app developers, and publishers can send us information through Meta Business Tools they use…. These partners provide information about your activities off of our Products–including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services–whether or not you have an account or are logged into our Products."); Meta Cookies Policy, Case 3:22-cv-03580-WHO, Document 76-5, October 17, 2022, p. 4 ("Our business partners may also choose to share information with Meta from cookies set in their own websites' domains, whether or not you have a Facebook account or are logged in.").

parties with Facebook, the instructions of the Singer Surveys would be in conflict with the respondents' real marketplace experience.

28. Further, the instructions of the Singer Surveys are inconsistent with respect to whether Facebook already receives the At-Issue Data. Specifically, one section of the Singer Surveys told respondents that "[t]o provide the Meta Products, Meta must process information about you," and that "[o]ne type of information Meta collects is information from partners."[53] The Singer Surveys' instructions also explained that "partners provide information about your activities off of Meta's Products—including information about your device, the websites you visit … and how you use their services—whether or not you have an account or are logged into Meta's Products."[54] Despite such instructions, Dr. Singer next asked respondents to "assume that [they] do not currently enable Facebook to access" the five types of information attributes in the product profiles,[55] but he did not clarify to respondents how these two sets of instructions interact. Thus, by asking respondents to assume that website partners share information about their activities on third-party websites and then asking respondents to assume that website partners are do not share any of the types of information identified, the Singer Surveys are not only unrealistic, but also internally inconsistent.

29. **Thirdly, the product attributes in the Singer Surveys are fundamentally different from the attributes that are likely to be relevant in the real world.** Users' perceived benefits from Facebook's features (e.g., a personalized newsfeed, messaging services, photo storage, etc.) are likely to be key drivers of respondents' decisions to engage with the service, yet all of these attributes are absent from the Singer Surveys. Scientific research indicates that a well-designed CBC survey must include the attributes that are important in consumers' decision making.[56] The product profiles in the Singer Surveys do not correspond to complete products that consumers can evaluate in the same way respondents can evaluate products in the real marketplace. Instead, the profiles are described using a narrow set of attributes, all related to types of information that the user could supply to Facebook. The profiles do not include the attributes that could be

[53] Singer Report, Appendix 5, p. 83, Appendix 6, p. 122, Appendix 7, p. 159 (emphasis removed).
[54] Singer Report, Appendix 5, p. 84, Appendix 6, p. 123, Appendix 7, p. 160.
[55] Singer Report, Appendix 5, p. 92, Appendix 6, p. 131, Appendix 7, p. 168.
[56] Rao, Vithala R., *Applied Conjoint Analysis*, Berlin, Heidelberg: Springer, 2014, p. 43 ("[S]election of attributes and levels is a very crucial step in the design of conjoint studies. This step is as much an art as a science. The scientific aspects arise from an understanding of the consumer's choice process, more specifically salient attributes involved in the choice of an alternative by a majority of target consumers.").





HIGHLY CONFIDENTIAL

important drivers of a user's decisions to use Facebook (or even any information about Facebook whatsoever) in general, or in the artificial scenario presented in the Singer Surveys.[57] Dr. Singer's decision to ignore these important drivers of respondents' real-marketplace choices is likely to focus respondents on the information-based attributes, leading to unreliable and inflated estimates of WTA. This phenomenon is discussed further in Section V.A.3.

30. Further, the Singer Surveys did not present respondents with sufficient information about how providing access to the different information types in the product profiles might impact their experience on Facebook. While the Singer Surveys explained to respondents that the hypothetical program they were asked to consider would "improve the personalization of features and content (including your ads and Facebook News Feed),"[58] there was no explanation of how users' online experience (inside or outside of Facebook) would change due to the provision of the additional information Facebook would receive. The only tradeoff respondents were asked to consider was how much money the respondents would be paid for allowing access.

#### 2. The Singer Surveys Ask Respondents to Consider Accepting Payment for Data, but there is Nothing at Stake, Rendering the Results of the Singer Surveys Unreliable

31. A reliable CBC survey must provide mechanisms to ensure respondents carefully consider the consequences of their tradeoffs as closely as possible to the way they make decisions in the real world.[59] Without proper incentives for realism, especially in unfamiliar and unrealistic situations, it is extremely difficult for respondents to make tradeoffs among attribute levels and stated prices. To mitigate these concerns, researchers often find ways to give respondents incentives so that any tradeoffs among attribute levels and price are a realistic

---

[57] The profiles also do not make it clear what would happen if respondents chose not to provide Meta with access to their information. I discuss this further in Section V.B.3.

[58] Singer Report, Appendix 5, p. 89, Appendix 6, p. 128, Appendix 7, p. 165.

[59] Ding et al. (2005); Ding, Min, "An Incentive-Aligned Mechanism for Conjoint Analysis," *Journal of Marketing Research* 44(2), 2007, pp. 214–223 ("Ding (2007)"); Ding, Min, et al., "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48(1), 2011, pp. 116–127 ("Ding et al. (2011)"); Miller, Klaus M., et al., "How Should Consumers' Willingness to Pay Be Measured? An Empirical Comparison of State-of-the-Art Approaches," *Journal of Marketing Research* 48(1), 2011, pp. 172–184 ("Miller et al. (2011)"); Ben-Akiva et al. (2019); Befurt et al. (2024).

A13-4037



HIGHLY CONFIDENTIAL

representation of how respondents would make the same tradeoffs in a real marketplace.[60] Such incentives are particularly crucial in settings that are unfamiliar to respondents.[61]

32. Providing the right incentives for respondents to act as they would in the real world is called "incentive alignment."[62] To illustrate incentive alignment, imagine that consumers are faced with the choice of buying a phone with basic features for $300 or premium features for $600. If there is no incentive alignment, respondents in a CBC survey do not actually have to spend any money (as they would in the real marketplace) and may be more willingly select the more expensive phone in the survey, even if they would be more likely to select the less expensive phone in the real marketplace. Scientific research shows that even in familiar product markets, such as for smart watches, incentive alignment has a big effect on valuation estimates.[63] CBC surveys that include incentive alignment perform consistently better than those without incentive alignment when representing consumer choices in the real marketplace.[64] Estimated WTP, and hence, estimated WTA, can vary dramatically between incentive-aligned and non-incentive-aligned CBC surveys, even for surveys of familiar products. For example, when choosing among cleaning products, a non-incentive-aligned survey estimated respondents had a WTP that was 60% higher than in an incentive-aligned survey.[65]

---

[60] Ding et al. (2005), pp. 67 ("Experimental economics literature, with its emphasis on incentive alignment and hypothetical bias, suggests that more realistic incentive-aligned studies result in stronger out-of-sample predictive performance of actual purchase behaviors and provide better estimates of consumer preference structures than do hypothetical studies."), 68 ("[P]aying a respondent a fixed amount is not salient, because there is no relationship between the respondent's performance/actions and the reward (money) he or she receives. As a result, there is no reason to expect that the respondent's behavior during a study will be consistent with his or her behavior during a similar, real-world, economic activity.").

[61] Ding (2007), p. 214 ("Recently in marketing research, Ding, Grewal, and Liechty (2005) showed that data collected in such hypothetical settings have weaker external validity than data collected from incentive-aligned participants. They find that the incentive-aligned choice conjoint outperforms the hypothetical choice conjoint in out-of-sample predictions. In light of this literature, it seems critical that conjoint practitioners attempt to incorporate proper incentives into their studies so that participants are motivated to reveal their true preferences.").

[62] Ben-Akiva et al. (2019), p. 23 ("Incentive alignment[:] The idea behind incentives is that when subjects have a realistic chance of really getting what they say they prefer, and they understand this, they have a positive disincentive to misrepresent their preferences and risk getting an inferior outcome.").

[63] *See* Hauser et al. (2019), p. 1073 ("A common measure, hit rates, isolate a relative-partworth effect. As expected, hit rates are substantially improved for the realistic-image, incentive-aligned condition—hit rates increase from 24% to 39% (chance is 7.7%) for the validation task and from 64% to 77% (chance is 25%) for the estimation task.").

[64] Some examples of incentive aligned conjoint analyses include the "Chinese Dinner Special" experiment and the "Snack Combo" experiment. In both of these studies, conjoint survey participants had a chance to receive the dinner special or the snack combo corresponding to their survey answers. *See* Ding et al. (2005). In a further experiment, Ding (2007) established incentive alignment by incorporating a game into the survey. After the participant states her WTP for an item, a price is drawn at random. If that price is lower than the stated WTP, the participant has the option of purchasing the product at the randomly drawn price. *See* Ding (2007). In another example, Miller et al. (2011) elicited preferences from conjoint survey respondents about an "innovative cleaning product for high-tech equipment" and told participants that they would be obliged to purchase the product at the randomly drawn price if that price was below their stated WTP. *See* Miller et al. (2011). Similarly, Hauser et al. (2019) elicit conjoint preferences for smart watches and told respondents that 1 in 500 respondents would receive a smartwatch and/or cash, in line with their answers, for a combined value of $500. *See* Hauser et al. (2019), p. 1071.

A13-4038

[65] Miller et al. (2011), p. 177, Table 5.



HIGHLY CONFIDENTIAL

33. Incentive alignment is important in any CBC survey but particularly important in the analysis of products or services that are highly unfamiliar and hypothetical because respondents cannot easily imagine themselves in the specified transaction scenario.[66] The cleaning product surveys involved common products with which respondents were familiar and which were described by familiar attributes such as brand, color, durability, and cleaning power.[67] Differences in the results of a non-incentive-aligned survey and an incentive-aligned survey would be even more pronounced when studying less familiar or even unrealistic scenarios like those described in the Singer Surveys. Incentive alignment is also critical in situations where known psychological phenomena, such as the "privacy paradox" explained in Section V.A.3, can exaggerate the hypothetical bias of the CBC surveys.

34. There were no incentives in the Singer Surveys for respondents to make realistic tradeoffs to reveal their true preferences (to the extent that any respondents have such preferences). Given the highly unrealistic setting presented in the Singer Surveys, the absence of any incentive alignment mechanisms casts substantial doubt on the reliability of Dr. Singer's results.

35. While Dr. Singer claims that incentive alignment is "difficult in practice,"[68] in this case, I disagree. For example, Dr. Singer could have told respondents that one of 10 respondents would be selected at random. If a respondent was selected, then Dr. Singer would choose one of the choice tasks and provide that respondent with the chosen payment (or no payment, if the respondent selected the "I would not accept any of the offers shown here" option) for, say, twelve months. After the survey was completed, Dr. Singer could have provided respondents, or a subset of respondents, with the payment without any additional information being received, as long as the respondents believed during the survey that they were being offered the opportunity to provide access to their information for the stated compensation. Such an incentive structure would be consistent with the ethics requirements often evaluated by internal review boards.

---

[66] Miller et al. (2011), pp. 178 ("[B]oth hypothetical methods (i.e., OE and CBC) are significantly different from their incentive-aligned counterparts, indicating a hypothetical bias for product choice.").

[67] Miller et al. (2011), p. 174 ("We also conducted a pretest survey of 82 potential customers to identify five attributes associated with our cleaning product: (1) brand, (2) color, (3) durability, (4) cleaning power, and (5) price.").

[68] Singer Report, footnote 60 ("Conjoint studies sometimes attempt to create 'incentive alignment' mechanisms for their respondents by (for example) offering the respondent a positive probability that every stated choice will result in an actual transaction. Yet, as Professor McFadden and coauthors have noted, 'experimental evidence is that people have difficulty understanding, accepting, and acting on the incentives in these mechanisms. Thus, it can be quite difficult in practice to ensure incentive alignment in a CBC, or to determine in the absence of strong incentives whether subjects are responding truthfully.'").

There are a variety of other incentive-alignment mechanisms, well-documented in the scientific literature, from which Dr. Singer could have chosen.[69] I have personally used incentive alignment for both scientific research and science-based litigation studies.[70] Incentive alignment is feasible and, in Dr. Singer's case, necessary for the reliability of his WTA estimates.

### 3. The Singer Surveys Create Biases that Exaggerate the Value of the At-Issue Data

36. Because of the flaws in how Dr. Singer structured his surveys, participants in the Singer Surveys were likely influenced by three well-known biases that affect surveys involving non-market goods: the privacy paradox, focalism bias, and reference point bias. Given the characteristics of the Singer Surveys, these biases likely cause respondents to overstate the value of their WTA for the At-Issue Data, possibly dramatically. These biases are in addition to, and likely compounded by, other biases and unreliability discussed throughout this report.

37. Firstly, responses to the Singer Surveys are likely influenced by the privacy paradox. Scientific literature explains that expressed preference methods, where consumers state preferences directly or imply preferences based on their survey responses (such as in a CBC or a contingent valuation ("CV") survey setting), can yield unreliable results due to the "privacy paradox."[71] According to this well-established phenomenon, consumers often express a significant interest in privacy when asked about privacy in the abstract but behave in real marketplace settings as if their value for privacy is much lower.[72] For example, in a scientific experiment researchers found that participants stated high preferences for data privacy but then

[69] I detail one such mechanism in Ding et al. (2011), p. 124, where I leverage indemnity insurance in order to offer individual respondents a large and exciting prize aligned with their survey responses ("It was not feasible to guarantee $40,000 for an automobile plus cash to 1 of every 30 respondents. To address this problem, we bought prize indemnity insurance. For a fixed fee, we were able to offer to a chosen respondent a reasonable chance that he or she would get $40,000 toward an automobile (plus cash). The features and price (<$40,000) would be determined by the respondent's answers to one of the four sections of the survey.").

[70] *See*, *e.g.*, Ding et al. (2011); Hauser et al. (2019); Eggers, Felix, John R. Hauser, and Matthew Selove, "The Effects of Incentive Alignment, Realistic Images, Video Instructions, and Ceteris Paribus Instructions on Willingness to Pay and Price Equilibria," *Proceedings of the Sawtooth Software Conference*, 2016 ("Eggers et al. (2016)").

[71] Altuglu, Vildan, et al., "Estimating Harm in Invasion of Privacy and Data Breach Disputes," *International Comparative Legal Guide to: Class and Group Actions*, 2021, pp. 23–28 ("Altuglu et al. (2021)") at 25 ("An additional challenge for assessing damages in cases involving personal data is the so-called 'privacy paradox.' Research has found that although consumers frequently voice concern about protecting their privacy, they willingly reveal personal information in the actual marketplace. This disparity between consumers' attitudes toward privacy and actual behaviour naturally complicates any attempt at estimating an intrinsic value of data privacy.").

[72] Altuglu et al. (2021); Athey, Susan, Christian Catalini, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper* 23488, 2017 ("Athey et al. (2017)"), p. 2 ("Whereas people say they care about privacy, they are willing to relinquish private data quite easily when incentivized to do so.").

A13-4040



HIGHLY CONFIDENTIAL

made "privacy-decreasing decisions…regardless of stated preferences for privacy."[73] In another study about privacy and attitudes toward Facebook, researchers "detected little or no relation between participants' reported privacy attitudes and their likelihood of providing certain [private] information."[74]

38. The privacy paradox is likely to substantially influence the results of the Singer Surveys because of the non-market and unfamiliar nature of the choices the Singer Surveys presented to respondents—respondents are not accustomed to think about selling their information in the ways presented in the Singer Surveys. Because the Singer Surveys rely on hypothetical scenarios rather than real behavior tradeoffs, and do not provide any type of incentive alignment, respondents faced no tangible costs for expressing strong privacy preferences. As a result, respondents to the Singer Surveys were likely to overstate the importance of privacy attributes, a phenomenon that has been observed repeatedly in scientific literature studying the privacy paradox.[75]

39. Secondly, the Singer Surveys are likely affected by "focalism bias." Focalism bias in a CBC survey arises when respondents place disproportionate attention on an attribute included in the survey while neglecting the broader context or other attributes that would normally influence their real-world choices but were not fully described in the survey.[76] The Singer Surveys

[73] Athey et al. (2017), pp. 2, 6 ("We use the students' answers to divide the sample into high versus low taste for privacy from each one of the three audiences. According to the answers, 38% of students had high taste for privacy from their peers, 55% from intermediaries, and 42% from the government."). Incentives occurred in the form of offering some of the students pizza in exchange for the emails of their friends upon sign-up. Researchers randomized both the ordering of students' digital wallets and the amount of information provided about these wallets. This randomization was exploited by researchers to "test whether students' choices of wallets were consistent with their stated privacy goals." Finally, researchers randomly exposed some of the students to the possibility of using encryption to protect disclosure of information. *See also* Athey et al. (2017), pp. 1–2.

[74] Among respondents who expressed the highest level of privacy concern in the survey, 22 percent allowed their address to be seen by strangers on Facebook and nearly 40 percent provided their schedule of classes. *See* Acquisti, Alessandro, and Ralph Gross, "Imagined Communities: Awareness, Information Sharing, and Privacy on the Facebook," in *Privacy Enhancing Technologies: 6th International Workshop, PET 2006*, Berlin, Heidelberg: Springer, 2006, pp. 36–58 ("Acquisti and Gross (2006)") at 50–51.

[75] Athey et. al (2017), pp. 1 ("[W]e use data from the Massachusetts Institute of Technology digital currency experiment where every undergraduate student at MIT was offered in the fall of 2014 $100 in Bitcoin. The main focus of the experiment was establishing a cryptocurrency community at MIT. However, as part of the experiment, students had to make at least three digital privacy choices: Whether they wanted to disclose the contact details of their closest friends; whether they wanted to maximize the privacy of their transactions from the public, a commercial intermediary or the government; and whether they subsequently wanted to take additional actions to protect their transaction privacy when using Bitcoin."), 2 ("First, the effect small incentives have on disclosure may explain the privacy paradox: Whereas people say they care about privacy, they are willing to relinquish private data quite easily when incentivized to do so."); Acquisti and Gross (2006), pp. 37 ("[W]e combine survey analysis and data mining to study one such network, catered to college and high school communities: the Facebook (FB). We survey a representative sample of FB members at a US campus."), 48 ("In other words: privacy concerns may drive older and senior college members away from FB. Even high privacy concerns, however, are *not* driving undergraduate students away from it."), 51 ("Almost 16% of respondents who expressed the highest concern (7 on the Likert scale) for the scenario in which a stranger knew their schedule of classes and where they lived, provide nonetheless both pieces of information.").

[76] Befurt et al. (2024), p. 32 ("The expert should assure that the attributes are sufficiently salient to consumers in the marketplace and that the CBC task itself is not the primary driver of consumer awareness of the attributes of interest.").

include only one type of attribute (in addition to price), namely, different types of information that the respondent can sell to Facebook.[77] The choice tasks in the Singer Surveys ignore any benefits or product features that users might consider when deciding whether to engage with Facebook (in general, or in the specific scenario presented by the Singer Surveys),[78] or how those features would change based on the respondent's information access choices—including the purported "improvements" to the respondents' ads and Facebook News Feed.[79] Dr. Singer does not justify failing to include non-privacy attributes in his surveys or test the appropriateness of his decision to omit them. By forcing respondents to focus on privacy-specific features while ignoring other potentially important attributes, the Singer Surveys overemphasize the importance of privacy for respondent decisions. This unrealistic overemphasis likely biased respondents' attention towards privacy attributes and, in turn, likely resulted in exaggerated estimates of WTA.

40. Thirdly, the Singer Surveys suffer from "reference point bias." Reference point bias, also referred to as "anchoring" or "starting point bias," occurs when a respondent's stated preference is influenced by the initial value or reference point presented in a survey.[80] The Singer Surveys anchored respondents to specific dollar amounts (ranging from $0 to $20), as well as on the payment interval (monthly) provided. While Dr. Singer claims that he relies on estimates from the academic literature and market benchmarks, he does not provide a valid methodology to

---

[77] Singer Report, Exhibit 1, Exhibit 3, Exhibit 4.

[78] *See* Meta Data Policy, pp. 6–7 ("To create personalized Products that are unique and relevant to you, we use your connections, preferences, interests and activities based on the data we collect and learn from you and others (including any data with special protections you choose to provide); how you use and interact with our Products; and the people, places, or things you're connected to and interested in on and off our Products.").

[79] Singer Report, Appendix 5, p. 89, Appendix 6, p. 128, Appendix 7, p. 165

[80] Reference point bias can be traced back to Kahneman and Tversky (1979), who show that consumers form utility relative to a reference point that is different for gains and losses. Dr. Kahneman received a Nobel Prize for this and related work on behavioral economics. *See* Kahneman, Daniel, and Amos Tversky, "Prospect Theory: An Analysis of Decision under Risk," *Econometrica* 47(2), 1979, pp. 263–292 ("Kahneman and Tversky (1979)") at 288 ("In particular, we expect outcomes to be coded as gains or losses relative to a neutral reference point, and losses to loom larger than gains."). Building on this work, Dr. Richard Thaler interprets Prospect Theory with respect to marketing decisions. He provides many realistic situations in which consumers respond to a reference point with utility that is steeper in losses than in gains. *See* Thaler, Richard, "Mental Accounting and Consumer Choice," *Marketing Science* 4(3), 1985, pp. 199–214 ("Thaler (1985)") at 199 ("The development of the model starts with the mental coding of combinations of gains and losses using the prospect theory value function."), 205 ("Given the steepness of the loss function near the reference point, it is hedonically inefficient to code costs as losses, especially for routine transactions."). I note that this article was cited when Dr. Thaler received a Nobel Prize. Ben-Akiva et al. (2019) discuss biases stemming from anchoring in conjoint survey analysis. *See* Ben-Akiva et al. (2019), p. 23 ("However, even elicitation formats that are apparently reasonably close to a market experience, such as asking for the next choice from a menu if the first is unavailable, may generate inconsistent responses as a result of anchoring to the initial response."). *See also* Boyle, Kevin J., Richard C. Bishop, and Michael P. Welsh, "Starting Point Bias in Contingent Valuation Bidding Games," *Land Economics* 61(2), 1985, pp. 188–194 at 193 ("Thus, iterative bidding in the hypothetical market caused people to bid money that they would not have bid if the money were real. … We found that starting point bias existed in the three contingent valuation applications of the bidding game, but was not a problem in the simulated market application.").

justify his range from $0 to $20 per month. For instance, all but two of the studies he cites in his Appendix 3 present valuations ranging from a few cents to a few dollars.[81] One of the articles which, according to Dr. Singer, reports valuations of $11 to $17, involves a one-time "discount on commission fees from the financial portal for [the study subject's] first stock transaction,"[82] which, amortized over potentially multiple transactions over time, would amount to only a few cents per month, and not $20 as presented in the Singer Surveys. This same article, as well as the second article which, according to Dr. Singer, reports valuations of $8 to $20, relied on small sample sizes limited to students (some of whom resided outside of the U.S.), which the authors themselves conceded were not representative of any overall populations.[83] In deposition, Dr. Singer referred to a Google program called "Google Online Insights Study" as a market benchmark that informed his selection of values.[84] Google's Online Insights Study is a research program that paid participants "redeemable points worth up to $130 per year" to record the "ads [they] see and [their] activity on different websites," but the program did not involve monthly payments—instead involving a one-time $10 payment and smaller weekly payments.[85] In other words, there is no support for Dr. Singer's choice of a range between $0 and $20 per month.

41. Critically, because of reference point bias, respondents' answers depend on the specific values shown to them, and their responses are anchored by these numbers regardless of whether these values relate to their true preferences.[86] Dr. Singer's choice to present a monetary payment of $0 to $20 per month cued respondents to think about their value (if any) for their own information in a range of $0 to $20. Dr. Singer could have provided much smaller amounts of

---

[81] Singer Report, Appendix 3.

[82] Hann, Il-Horn et al., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems* 24(2), 2007, pp. 13–42 ("Hann et al. (2007)") at 41.

[83] Hann et al. (2007); Hann, Il-Horn et al., "Online Information Privacy: Measuring the Cost-Benefit Trade-off," *Proceedings of International Conference on Information Systems*, 2002.

[84] Singer Deposition, pp. 165:20–166:22 ("But what was the number that they gave you that you used as a starting point for assigning hypothetical values to the – the data? A. … I think that we borrowed three different sources of information. One was from those interviews. One was from the conjoint literature on privacy data and one was, I think, from a Google – product called Google Insight. … We used the value that Google is currently paying for a new program called Google Insight."); Errata Sheet for the October 24, 2025 Deposition of Hal Singer, December 1, 2025.

[85] "Online Insights Study," *Google*, captured by *Page Vault* on October 23, 2025, https://onlineinsightsstudy.google/signup/invitecode.

[86] Ben-Akiva et al. (2019), p. 28 ("CBC studies should when possible embed tests for response distortions that are commonly observed in cognitive experiments, such as anchoring to cues in the elicitation format, reference point or status quo bias, extension neglect, hypersensitivity to context, and shadowing from earlier questions and elicitations. While some of these cognitive effects also appear to influence market choices, many are specific to the CBC experience and have the potential to reduce forecasting accuracy.").

money (e.g., pennies),[87] or selected different payment intervals (e.g., yearly). Had he done so, the Singer Surveys would have likely produced a valuation for the At-Issue Data that would have been commensurate with the anchor points presented to respondents, such as a few pennies per year.

### 4. The Singer Surveys Are More Similar to Contingent Valuation, a Methodology Scientific Research Has Found to Be Wholly Unreliable, Than to Market-Relevant Choice-Based Conjoint Analysis

42. While Dr. Singer claims that his surveys are CBC surveys and similar to other CBC surveys used to estimate WTP for realistic products or services, the Singer Surveys more closely resemble a different methodology called contingent valuation ("CV"), which the scientific literature has consistently demonstrated to be wholly unreliable.[88]

43. CV was developed to assess preferences for products and services for which there is no market.[89] For example, CV might be used to assess a respondent's valuation of reducing pollution in a nearby lake. Many applications of CV (in particular, a kind of CV known as a "discrete-response" CV) resemble CBC in that respondents are given a scenario and a price and asked to make a choice among alternatives.[90] For example, a respondent might be asked how much they would need to be paid if they were to allow a solar farm to be built on wetlands in their town. The offered price would vary among respondents.[91] CV lacks reliable predictive accuracy in markets to measure reliability, due to CV's non-market good applications.

---

[87] Note that Dr. Singer cites studies where consumers give up data for a value as low as 5 cents. *See* Singer Report, footnote 81, citing Hann et al. (2007) ("Based on opinion surveys, Westin characterized 12 percent of the U.S. population as being 'privacy unconcerned': 'for 5 cents off, they will give you any information you want.").

[88] Dr. Singer appears to call one of his surveys a CV Survey. *See* Singer Report, footnote 117 ("Through the soft launch, I identified a redundancy in my screening criteria. I therefore removed the redundant question from the survey. Instead of asking respondents about their survey history, I implemented a lockout between surveys on the back end—that is, I imposed that respondents could not participate in more than one of my two CBC surveys and CV survey.").

[89] Kahneman, Daniel, and Jack L. Knetsch, "Valuing Public Goods: The Purchase of Moral Satisfaction," *Journal of Environmental Economics and Management* 22(1), 1992, pp. 57–70 ("Kahneman and Knetsch (1992)") at 57 ("There is substantial demand for a practical technique for measuring the value of non-market goods. Measures of value are required for cost-benefit assessments of public goods, for the analysis of policies that affect the environment, and for realistic estimates of environmental damages resulting from human action, such as oil spills. In recent years the contingent valuation method (CVM) has gained prominence as the major technique for the assessment of the value of environmental amenities.").

[90] Kahneman and Knetsch (1992), p. 57 ("The idea of CVM is quite simple: respondents are asked to indicate their value for a public good, usually by specifying the maximum amount they would be willing to pay to obtain or to retain it.").

[91] Haneman (1989) discusses applications of discrete-response CV surveys and how to analyze the data. Of note, Haneman requires that the WTP value be non-negative. Haneman, W. Michael, "Welfare Evaluations in Contingent Valuation Experiments with Discrete Response Data: Reply," *American Journal of Agricultural Economics* 71(4), 1989, pp. 1057–1061.

A13-4044

44. The Singer Surveys more closely resemble a CV methodology rather than a CBC methodology because the Singer Surveys asked respondents to make choices for a product for which Dr. Singer admits there is no market.[92] For example, a CV survey might ask respondents about non-market tradeoffs, such as how much they are willing to pay to prevent logging in a wilderness area.[93] Further, the choices described in the Singer Surveys are not complete (or even partial) products that consumers can evaluate in the same way they could in the real marketplace. Instead, the choice profiles in the Singer Surveys are limited to types of information that the user could supply to Facebook.[94] The choice profiles do not include any of the attributes that are likely to be important drivers of a respondent's decision to use a Facebook product in general, or in the specific scenario presented in the Singer Surveys. Like a CV survey, the profiles shown to respondents in the Singer Surveys ask respondents to indicate by their choices how much money they would need to be compensated in order to provide Facebook access to their information.[95] The Singer Surveys asked respondents to make these choices without varying, or even describing, other Facebook attributes (e.g., personalized newsfeed, messaging services, photo storage).

45. Understanding the relationship between CV and the Singer Surveys is critical because scientific research has found that CV suffers from several fatal flaws that make it "hopelessly" unreliable.[96]

46. Firstly, CVs are prone to hypothetical response bias, leading CV to misstate valuations. Hypothetical response bias is the bias that arises when a respondent answers a hypothetical question with which the respondent has no experience.[97] Valuations calculated based on these types of questions do not reflect how the respondent would act in a real-world situation or

[92] Singer Deposition, pp. 169:18–170:12 ("Q. There is no market for the specific at-issue data that you're aware of that you could have turned to use for your conjoint survey, correct? A. What I'll -- what I'll grant you is that there is no -- there's no precise market. There's no market that precisely goes after this at-issue data.").
[93] Diamond, Peter A., and Jerry A. Hausman, "Contingent Valuation: Is Some Number Better than No Number?" *The Journal of Economic Perspectives* 8(4), 1994, pp. 45–64 ("Diamond and Hausman (1994)") at 50–51 ("Diamond et al. (1993) asked for willingness-to-pay to prevent logging in one, two, and three particular wilderness areas.").
[94] Singer Report, Exhibit 1, Exhibit 3, Exhibit 4.
[95] Singer Report, Appendix 5, pp. 95–104, Appendix 6, pp. 134–143, Appendix 7, pp. 172–181.
[96] Hausman, Jerry, "Contingent Valuation: From Dubious to Hopeless," *Journal of Economic Perspectives* 26(4), 2012, pp. 43–56 ("Hausman (2012)") at 43 ("[R]espondents to contingent valuation surveys are often not responding out of stable or well-defined preferences, but are essentially inventing their answers on the fly, in a way which makes the resulting data useless for serious analysis.").
[97] Hausman (2012), p. 44 ("Hypothetical bias is the bias that arises in answering a hypothetical question with which the respondent has no market experience; put simply, what people say is different from what they do. When hypothetical questions are asked about willingness to pay, the results tend to be upward-biased. This fact is well-known.").

market.[98] WTA valuations calculated on this basis are uninformative for the respondent's actual WTA in the real marketplace.

47. Secondly, CV surveys (and non-standard CBC surveys that calculate WTA by asking respondents to receive a payment instead of paying a price) can lead to large differences between valuations for WTP and WTA despite standard rational-behavior theory suggesting they should be (approximately) the same.[99] One possible explanation for the differences that arise between measured WTP and WTA is related to the concept of "loss aversion."[100] Consumers often weigh prospective losses more heavily than prospective gains.[101] A significantly higher WTA compared to WTP may be a sign of the respondent's cognitive bias and/or an indication that "answers to contingent valuation surveys do not actually reflect stable or well-defined preferences but instead are opinions invented on the fly."[102] A methodology that yields such unstable preferences is fundamentally unreliable as a measure of real-marketplace consumer valuations.

48. Thirdly, CV suffers from an "embedding problem," where the assessed value of a good becomes arbitrary when WTP depends on whether respondents evaluate the good on its own or "embedded as part of a more inclusive package."[103] When researchers use CV methods to

---

98 *See* Diamond and Hausman (1994), p. 62 ("The absence of direct market parallels affects both the ability to judge the quality of contingent valuation responses and the ability to calibrate responses to have usable numbers."); Hausman (2012), p. 51 ("Such results support a conclusion that consumers did not reveal true preferences in the stated preference questionnaire and are instead, to some unknown extent, 'making-up' or 'inventing' their answers to a hypothetical situation with which they are unfamiliar.").

99 Hausman (2012), p. 46 ("Basic economic theory suggests that these two approaches should give (approximately) the same answer, but both supporters and skeptics of contingent value methods recognize that large and persistent disparities commonly arise in answers to contingent valuation surveys."). This can be traced back to the well-established economic concept of "Prospect Theory," described in a seminal paper by Nobel laureate Dr. Daniel Kahneman. *See* Kahneman and Tversky (1979), pp. 274 ("The remainder of the paper presents an alternative account of individual decision making under risk, called prospect theory. The theory is developed for simple prospects with monetary outcomes and stated probabilities, but it can be extended to more involved choices."), 288 ("In this analysis, readiness to purchase the positive prospect is equated to willingness to accept the corresponding mixed prospect.").

100 I note that, for measured WTP and WTA to be approximately the same absent "loss aversion," the CV or CBC survey must be reliable and respondents to the survey must understand the choice task.

101 Kahneman, Daniel, Jack L. Knetsch, and Richard H. Thaler, "Experimental Tests of the Endowment Effect and the Coase Theorem," *Journal of Political Economy* 98(6), 1990, pp. 1325–1348 at 1346 ("Loss aversion implies a marked asymmetry in the treatment of losses and forgone gains, which plays an essential role in judgments of fairness []. Accordingly, disputes in which concessions are viewed as losses are often much less tractable than disputes in which concessions involve forgone gains. Court decisions recognize the asymmetry of losses and forgone gains by favoring possessors of goods over other claimants, by limiting recovery of lost profits relative to compensation for actual expenditures, and by failing to enforce gratuitous promises that are coded as forgone gains to the injured party.").

102 Hausman (2012), p. 47 ("The most fundamental challenge to the contingent value method, and the strongest evidence that the answers to such surveys are invented in response to the questions, comes from concerns that are referred to as 'scope' and 'embedding.' Kahneman and Knetsch (1992) were the first to explore the 'embedding effect,' which demonstrates the nonexistence of preferences in a contingent valuation setting.").

103 Kahneman and Knetsch (1992), p. 58 ("The present article reports an experimental investigation of what is perhaps the most serious shortcoming of CVM: that the assessed value of a public good is demonstrably arbitrary, because willingness to pay for the same good can vary over a wide range depending on whether the good is assessed on its own or embedded as part of a more

A13-4046



HIGHLY CONFIDENTIAL

separately test valuations for a specific feature and that feature as part of a whole, they routinely find disparate value responses for the same feature.[104] For example, respondents were asked to value the prevention of killing 2,000, 20,000, and 200,000 birds. "The willingness-to-pay to solve this problem was roughly the same in all three cases."[105] The inconsistency introduced by the embedding problem renders the CV valuation results unreliable and highly dependent on how the researcher frames the question.[106] The Singer Surveys asked respondents to accept a monthly price for access to their information.[107] Embedding biases would suggest that respondents might accept a yearly or even a one-time price at the same rate. Notably, Dr. Singer does not provide any justification for choosing to frame the Singer Survey scenarios in terms of a monthly price. Nor does Dr. Singer do anything to ensure that his results are not skewed due to embedding biases. The potential for an embedding bias renders the Singer Surveys unreliable.

49. As a result of these flaws, the assessed value obtained from CV methods is known to be "demonstrably arbitrary."[108] Because the Singer Surveys closely resemble CV rather than a realistic CBC study, these flaws make the Singer Surveys inappropriate for the assessment of valuing the At-Issue Data or overall damages in this case.[109]

---

inclusive package."); Hausman (2012), p. 47 ("The most fundamental challenge to the contingent value method, and the strongest evidence that the answers to such surveys are invented in response to the questions, comes from concerns that are referred to as 'scope' and 'embedding.'… [T]he 'embedding effect,' … demonstrates the nonexistence of preferences in a contingent valuation setting.").

[104] Diamond and Hausman (1994), pp. 50–53. In describing the embedding effect, Diamond and Hausman note that "[w]ith a pattern of results that are inconsistent with the usual economic assumptions, two interpretations are always possible: the surveys were defective or the contingent valuation method as currently practiced does not measure with accuracy."

[105] Diamond and Hausman (1994), p. 51.

[106] Hausman (2012), pp. 48–49 ("My view is that until contingent valuation surveys can reliably pass the Diamond–Hausman adding-up test (or a similar test) to demonstrate that embedding is not present, the results do not indicate stable or coherent individual preferences. … For example, framing of questions can lead to very different results in contingent valuation studies.").

[107] Singer Report, ¶ 60 ("Respondents were informed that Facebook would provide monthly compensation in return for a series of data types they were instructed to assume Facebook does not currently access.").

[108] Kahneman and Knetsch (1992), p. 58 ("[T]he assessed value of a public good is demonstrably arbitrary, because willingness to pay for the same good can vary over a wide range depending on whether the good is assessed on its own or embedded as part of a more inclusive package.").

[109] Hausman (2012), p. 44 ("Contingent valuation does not provide a good basis for either informed policymaking or accurate damage assessments in judicial proceedings."). *See also* Diamond and Hausman (1994), p. 46 ("Surveys designed to test for consistency between stated willingness-to-pay and economic theory have found that contingent valuation responses are not consistent with economic theory.").

### B. The Singer Surveys Are So Confusing and Poorly Designed That They Fail to Meet the Scientific Standard for a Well-Designed Survey

50. The Singer Surveys suffer from an additional key flaw: the design of the surveys, or what CBC researchers call the "craft" of the survey, is so poor that the results obtained by Dr. Singer are fundamentally unreliable.

51. Scientific research, including my own, provides a set of criteria to evaluate the design quality of conjoint surveys.[110] Based on these criteria, the Singer Surveys fail to meet the scientific standard for a well-designed survey. The shortcomings of the Singer Surveys are so egregious that the results based on the Singer Surveys should not be considered scientifically reliable.

#### 1. The Quality of a CBC Survey Can Have a Large Impact on Its Results

52. The design of a CBC survey instrument can have a large impact on its results.[111] In my own research, for example, I have found that the difference in estimated WTPs between a survey instrument of low quality and one of high quality can be extremely large. For example, I found that respondents to a CBC survey instrument aimed at identifying a WTP for changing a watchband from metal to black for a smartwatch resulted in a WTP of $4 when the survey used text-based descriptions of the smartwatches (the low-quality approach), and a WTP of $132 when the survey instead showed respondents realistic images (the approach recommended by scientific researchers).[112]

53. In the Singer Surveys, the negative effects of poor survey design are potentially quite large because respondents in the Singer Surveys were asked to assume they will be paid for their information. Scientific research has found that settings where respondents are being paid rather than being asked to pay tend to produce larger estimates of WTA compared to the corresponding

[110] Befurt et al. (2024); Ben-Akiva et al. (2019); McFadden (2017).
[111] Befurt et al. (2024), pp. 13 ("Measured WTPs vary depending the quality of the market research (craft), including decisions by the expert on incentive alignment vs. no incentive alignment, realistic stimuli vs. text-only, dual-response vs one-shot outside options, types of instructions, animations, and focalism issues."), 18 ("Our data suggest that craft has a substantial effect on forecast WTP, price, and profit.").
[112] Eggers et al. (2016), Table 3, p. 13. Admittedly, other attributes may be less dramatic. The WTP for changing from a round to a rectangular watch face varies from $39 [text-based stimuli] to $103 [realistic stimuli] in this situation involving products that are well-known to consumers. The watchband illustration shows how large the effect of high-quality survey design can be even when products are well-known to consumers. Dr. Singer presents no evidence that the effect is not huge.

estimates of WTP that, in theory, should be the same—something that Dr. Singer admits.[113] Because the effects of survey design can have such a large impact on results, poorly designed CBC surveys produce unreliable results that are divorced from the WTP (or WTA in this case) that would represent respondents' judgments in the real marketplace.[114]

54. Further, scientific research shows that even for products and services with which consumers have familiarity, the ability of CBC to produce valid results requires consistency between the framing of the survey questions and respondents' behavior in real marketplaces.[115] Given the additional challenges of analyzing the At-Issue Data discussed in Section VI, it is imperative that the Singer Surveys are of the highest level of quality.

### 2. A Framework to Evaluate the Design Flaws in the Singer Surveys

55. The quality of a CBC survey is critical to the reliability of the WTP or WTA estimates it generates, especially in situations where the respondent is unfamiliar with the scenarios in the survey. To evaluate the Singer Surveys, I provide a checklist of criteria with which to evaluate whether CBC surveys are consistent with the best practices accepted by scientific researchers.[116] The checklist includes criteria that apply to CBC surveys generally as well as additional criteria that apply when market supply-side considerations are relevant to the use of the CBC survey. Dr. Singer argues that supply-side considerations (which in this case are the equivalent of what Dr. Singer refers to as demand-side considerations that would evaluate how users and providers of services like Meta interact in a market for the At-Issue Data to determine the value of the At-Issue Data, instead of just focusing on how *users* value the At-Issue Data), are not relevant for his estimates of damages. Dr. Singer proceeds to assume that demand is fixed when calculating

---

[113] Singer Report, ¶ 37 ("While a perfectly rational economic entity would have a WTA equal to its WTP, in practice there is typically a difference between the WTA and WTP valuations due to the 'endowment effect' whereby people place a greater value on things they already own."); Acquisti, Alessandro, Leslie K. John, and George Loewenstein, "What is Privacy Worth?" *The Journal of Legal Studies* 42(2), 2013, pp. 249–274 at 267–268 ("These results represent a WTA:WTP ratio of 5.47.").

[114] I note that any potential supply-side analysis (which, in this matter, would correspond to a demand-side analysis), would require an even higher-quality of survey to be informative. *See* Befurt et al. (2024), p. 45 ("WTP, [Price Equilibrium Method], and [Fixed Supply Pricing] price premia calculations are extremely sensitive to craft. In addition, craft directly affects the error term in the mixed-logit model, which, in turn, strongly affects the predicted price equilibria in the [Price Equilibrium Method]. Experts using CBC to calculate WTP, [Price Equilibrium Method], or [Fixed Supply Pricing] should focus on ensuring high-quality craft through study characteristics such as highly realistic stimuli, incentive alignment, and recalibration to the marketplace (external validity). … Supply-side calculations are sensitive to whether the CBC model is calibrated to the actual marketplace. This concern is particularly acute for [Price Equilibrium Method] calculations but applies to the reliability of WTP, [Price Equilibrium Method], and [Fixed Supply Pricing] calculations.").

[115] Ben-Akiva et al. (2019), p. 17 ("Reliable external calibration obviously requires consistency in the framing of study questions on real market behavior and the definitions used in collecting real market demand data.").

A13-4049

[116] *See* Befurt et al. (2024), Table 3.

WTA.[117] In this report, I do not address whether Dr. Singer's assumption of fixed demand is appropriate.

56. The criteria with which to evaluate a CBC survey are reproduced below in Exhibit 3. The Singer Surveys fail to meet the standards of a reliable CBC survey. Of the 24 criteria in Exhibit 3, three address supply-side issues that I do not address here. The Singer Surveys are acceptable (or even weak) on only four of the remaining 21 criteria (less than 20 percent). Because the Singer Surveys fail so many of the commonly accepted criteria for a reliable CBC survey, the Singer Surveys are unreliable and cannot provide a reliable estimate of the value of the At-Issue Data or of damages in this matter. I discuss some of these failures in additional detail in the sections that follow.

---

117 Singer Report, pp. 40–45 ("It is already known *exactly* what the overcharge is: Access to the At-Issue Data.").

## *Exhibit 3: The Singer Surveys Fail to Meet Criteria Used to Evaluate the Reliability of CBC Analyses*

| Issues | Criteria | Singer Surveys |
|---|---|---|
| **Panel A: Issues of craft for partworths for WTP, PEM, and FSP. Additional considerations for scale in PEM** | | |
| (1) Realism | Are the stimuli sufficiently realistic (pictures, videos), not just text only? | ✗ |
| (2) Incentive Aligned | Are respondents given appropriate incentives to tell the truth and think realistically? | ✗ |
| (3) Understanding the CBC Task | Are respondents trained appropriately to assure understanding of the CBC task? | ✗ |
| (4) Understanding Attributes | Are the attributes described in language consumers use? Do the consumers understand the attributes and the levels? | ✗ |
| (5) Focalism | Does the format, number of attributes, and description of the attributes avoid focusing consumers on at-issue attributes more so than would be the case in the marketplace? | ✗ |
| (6) Distraction Attributes | Are there sufficient distraction attributes? | ✗ |
| (7) Number of Attributes, Levels | Does the CBC study use enough, but not too many, attributes and attribute levels? | ✗ |
| (8) All Else Equal | Does the consumer understand what other attributes exist and are held constant in the CBC profiles? | ✗ |
| (9) Choice Tasks | Has the expert established an appropriate number of choice tasks and an appropriate number of profiles within each choice task? | ✓ |
| (10) Attention Checks | Are instructional manipulation checks used to assure consumers pay appropriate attention to the CBC task (and think realistically)? | Weak |
| (11) Bots | Does the questionnaire use methods to avoid "bot" and questionnaire farms? | ✗ |
| **Panel B: Issues in modeling the demand side for use in WTP, PEM, and FSP** | | |
| (1) Large WTPs and/or Outliers | Have steps been taken to avoid relying on individual-consumer WTPs that are unrealistically large or negative? | ✓ |
| (2) Appropriate Price Range | Has the analysis avoided forecasting either WTPs or prices outside the range in the CBC profiles? | ✓ |
| (3) Interactions | Has the analysis addressed any interactions between the at-issue attribute(s) and other attributes that are either explicit or implicit in the CBC study? | ✗ |
| (4) Target Sample | Is the target sample defined appropriately, especially for how the supply-side is modeled? If the focus is on WTP for at-issue products only, does the sample reflect that focus? | ✗ |
| **Panel C: Conceptual issues in the application of PEM and FSP** | | |
| (1) Validation of "as is" Predictions | Does the CBC model predict (fit) the marketplace in the "as is" world without overly relying on brand-specific constants? | Supply Side |
| (2) Competition on Non-Price Attributes | Has the expert assured that the competition in the marketplace is primarily on price and not primarily on non-price attributes or marketing actions? | Supply Side |
| (3) Funnel Issues | The CBC model assumes that consumers are aware of the products and attributes and that the products are available to all consumers. If this is not the case, has it been considered when modeling the price premia? | ✗ |
| **Panel E: Additional issues when applying FSP** | | |
| (1) Constant Supply Curve | Has the expert established the validity of the fundamental assumption of FSP that the supply curve is constant? | ✗ |
| (2) Grounded to "as is" Prices | If historical "as is" prices are used, do they really affect the price-premium calculations, or are FSP calculations relatively unaffected by "as is" prices? | Supply Side |
| (3) Theory of the Case | Does FSP match the theory of the case? | ✗ |
| (4) Median vs. Marginal Consumer | Has the expert examined whether the FSP price premia are close to the WTP of the median consumer (as is often the case)? If the expert argues the FSP price premia are based on the marginal consumer, has the expert established that the FSP simulations reflect the marginal consumer? | ✗ |
| (5) Outside Option | In FSP, the outside option represents other products in the market and generic options? Does the consumer understand how the outside option is interpreted and has the expert established that the interpretation of the outside option does not change in the "but for" world? | ✗ |
| (6) Target Population | Has the expert established that the demand curve for FSP represents consumers who purchased the at-issue product? Do consumers who purchased the at-issue product have the same partworths as those consumers who chose not to purchase the at-issue product? | ✗ |

Source: Singer Report and Backup Materials; Befurt et al. (2024)

Note: The table above summarizes whether the Singer Surveys meet commonly accepted criteria used to evaluate the reliability of CBC analyses. Dr. Singer's methodology effectively assumes fixed demand. From the perspective of the quality of CBC surveys, an assumption of fixed demand pricing requires that we use criteria labeled as fixed supply pricing (FSP). I therefore omit Panel D from Befurt et al. (2024) which focuses exclusively on a different methodology. A "✓" in the table above indicates that the Singer Surveys meet the given criterion, while a "✗" means they do not. "Weak" indicates that the Singer Surveys inadequately address the given criterion. "Supply Side" indicates that the criterion is relevant if the Singer Surveys are used to address supply-side issues, which would arise in a price equilibirum method (PEM). Dr. Singer does not discuss a real-world marketplace, competition in such a marketplace, or an "as is" price for the At-Issue Data. Therefore, if the supply side is determined to be relevant, the Singer Surveys would fail on these three criteria. Some of the issues with the Singer Surveys in Exhibit 3 are not analyzed in detail in my report but are nonetheless problematic.

A13-4051

### 3. The Singer Surveys Are Confusing

57. A critical design element of a CBC survey is that the scenario and choices that respondents are asked to consider must be understandable such that respondents can properly assess the tradeoffs they are asked to make. Dr. Singer acknowledges that CBC surveys should "approximat[e] consumer responses to a real-life setting."[118] Contrary to this goal, the Singer Surveys presented an unrealistic scenario, which likely made it difficult for respondents to understand the Singer Surveys in a meaningful way. In addition to the fundamental lack of realism and the unfamiliar nature of the choice scenarios,[119] the design flaws in the Singer Surveys likely produced additional confusion when respondents considered the choice tasks presented to them.

58. Firstly, the Singer Surveys did not describe with sufficient precision how respondents should have selected the different choice profiles offered to them. In particular, the survey instructions asked respondents which of the offers presented to them they would accept, if any.[120] These instructions, however, did not clarify that respondents should have chosen the option they preferred the most and only that option. It would be consistent with the instructions if respondents believed they should have chosen just any option they would accept. Both interpretations are valid interpretations of Dr. Singer's instructions, but they each have different implications for respondents' answers and how the data are to be analyzed.

59. Secondly, the Singer Surveys do not clarify the meaning of the "outside option." In every choice task shown to respondents in the Singer Surveys, one of the options available to the respondents was "I would not accept any of the offers shown here."[121] However, the Singer Surveys did not make clear to respondents the consequences of choosing that outside option. Respondents were not told, for example, whether their Facebook experience would be different if

---

[118] Singer Report, footnote 57 ("These drawbacks of traditional surveys can be addressed by using conjoint analysis, which allows approximating consumer responses to a real-life setting with its inherent trade-offs."). *See also* Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Washington, D.C.: Federal Judicial Center and National Research Council of the National Academies, 2011, pp. 359–423 ("Diamond (2011)") at 388 ("If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey.").

[119] *See* Section V.A.1.

[120] Singer Report, Appendix 5, p. 90, Appendix 6, p. 129, Appendix 7, p. 166, ¶ 60 ("Respondents were told how the survey would proceed, including that the upcoming portion of the survey (the Conjoint Module) would ask them to 'select the offer you would actually accept in real life' or to select the option to accept none of the offers.").

[121] Singer Report, Appendix 5, pp. 94–105, Appendix 6, pp. 134–143, Appendix 7, pp. 172–181, ¶ 70 ("Importantly, in every choice set, respondents were given a none-of-the-above ('I would not accept any of the offers shown here') option. Including such an outside option allows a researcher to identify the WTA of the marginal respondent.").

they chose that outside option. Whether a respondent chose the outside option depended critically on how they interpreted what the choice of the outside option meant to them. Dr. Singer provides no evidence that respondents' interpretations of these choices were consistent with his desired interpretation of the hypothetical scenario, or even consistent across respondents.

60. Thirdly, the Singer Surveys contain technical jargon and abbreviations that were not defined or explained to respondents. For example, the Singer Surveys described to respondents that "[a]dvertisers, app developers, and publishers can send Meta information through Meta Business tools they use, including Meta's social plug-ins (such as the Like button), Facebook Login, Meta's APIs and SDKs, or the Meta pixel."[122] The Singer Surveys also reference "Meta Products" once and the "Meta Pixel" several times but do not define them.[123]

61. The Singer Surveys could have defined these terms, or could have taken the approach used by Meta in its public disclosures for some of these terms by providing a hyperlink that leads to a definition,[124] but the Singer Surveys do not do so.[125] Even for instances where the Singer Surveys do define certain terms, those definitions often come several screens after the terms are first used.[126] By failing to sufficiently explain the terms used throughout the Singer Surveys, Dr. Singer introduced and exacerbated respondent confusion, which could have impacted the responses that respondents gave to the Singer Surveys.[127]

---

[122] Singer Report, Appendix 5, p. 84, Appendix 6, p. 123, Appendix 7, p. 160.

[123] Singer Report, Appendix 5, pp. 83–84, 86, Appendix 6, pp. 122–123, 125, Appendix 7, pp. 159–160, 162.

[124] Meta Data Policy. *See also* "Data Policy," *Facebook*, January 4, 2022, available at https://www.facebook.com/help/instagram/155833707900388/.%C2%A0/, accessed on December 4, 2025.

[125] Singer Report, Appendix 5, Appendix 6, Appendix 7.

[126] For example, the Singer Surveys ask respondents whether they understand that in order to "provide the Meta Products, Meta must process information about you. One type of information Meta collects is information from partners," but do not describe who or what a Meta partner is until the next survey screen. Similarly, the Singer Surveys state to respondents "[t]he offers that will be shown to you will include attributes within each of the following categories: Information Type[,] Compensation," but do not explicitly describe "Information Type" until the next screen and "Compensation" until two screens later. Dr. Singer also introduces the term "attributes" without a clear definition and offers examples of specific attributes in his survey two screens later. *See* Singer Report, Appendix 5, pp. 90–91, Appendix 6, pp. 129–130, Appendix 7, pp. 166–167 ("Each offer will have different attributes and offer different levels of compensation. … You will now be introduced to the attributes you'll see in each offer."); Singer Report, Appendix 5, p. 92; Appendix 6, p. 131 ("Information Types: Financial Information: The names and web addresses of financial institutions with which you have an online account. Social Media Information … Fitness Information … Education Information … Healthcare Information."); Singer Report, Appendix 7, p. 168 ("Information Types: … Prescription Information."); Singer Report, Appendix 5, p. 93; Appendix 6, p. 132, Appendix 7, p. 170 ("The compensation levels presented to you will range from $0.00 (no compensation) to $20.00.").

[127] Diamond, Shari S., and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Second Edition, Chicago, IL: American Bar Association, Section of Intellectual Property Law, 2022 ("Diamond and Swann (2022)"), p. 286 ("Poorly constructed questions (i.e., ones that are vague or excessively complex or that have multiple interpretations) do not necessarily introduce systematic bias into a survey but add harmful 'noise' or random error into the data. This, in turn, can compromise a survey's reliability and validity because it becomes difficult to know whether the results reflect a true signal (e.g., the presence or absence of confusion) or merely excessive background noise and poor measurement. To avoid this, surveys

A13-4053

62. Fourthly, the Singer Surveys place lengthy descriptions of key terms in the surveys (such as the definitions of the information attribute types) separately from respondents' choice tasks. When making their selections, respondents needed to recall the Singer Surveys' definitions of each of the attribute levels or navigate backwards to previous screens that described them.[128] Following survey design best practices, Dr. Singer could have made the definitions available to respondents throughout the choice tasks, for example by a clickable link to the definitions.[129] Given state-of-the-art technology, Dr. Singer also could have included pop-up definitions for key terms like the information type attributes when they appeared during choice tasks, so that descriptions would display whenever the respondent hovered over the term with their mouse. By including substantial detail in the instructions and early screens but not making such detail readily available in the choice task questions, the Singer Surveys placed a substantial cognitive burden on respondents.

63. Fifthly, based on the Appendices produced by Dr. Singer, it appears that the Singer Surveys may have displayed confusingly on respondents' screens. As shown in Exhibit 4 below, according to the screenshots Dr. Singer provides of his surveys, the labels of attributes in the stimuli do not line up horizontally with the levels of the attributes which describe each choice

should take care to avoid grammatical ambiguity, excessive complexity, vague quantifiers, and ***undefined terms.***.") (emphasis added). In the Conjoint Modules, the Singer Surveys also fail to define "intermediary applications" with which data on Education Information may be collected. Instead, Dr. Singer provides two specific examples of such applications with which respondents may or may not be familiar. *See* Singer Report, Appendix 5, p. 92, Appendix 6, p. 131, Appendix 7, p. 168 ("Education Information: The names and web addresses of any educational institutions with which you have an online account, including through intermediary applications (for example, ProCare, Brightwheel)."). The Singer Surveys also never clearly define "attributes," yet use this term frequently throughout the Conjoint Module. *See* Singer Report, Appendix 5, pp. 90–91, Appendix 6, pp. 129–130, Appendix 7, pp. 166–167 ("Each offer will have different attributes and offer different levels of compensation …, The offers that will be shown to you will include attributes within each of the following categories …. Other than the attributes within each of the above categories, please assume all other attributes are the same across all three offers.").

[128] In the Singer Surveys, Dr. Singer provides detailed definitions for the five different information types, which include Financial Information, Social Media Information, Fitness Information, Education Information, and either Healthcare Information or Prescription Information (depending on the survey). On this same survey screen, Dr. Singer describes the "Access" or "No Access" information type values and what they mean in this CBC survey. However, respondents must click to the next screen three times before arriving at the first choice task. *See* Singer Report, Appendix 5, pp. 92–95, Appendix 6, pp. 131–134, Appendix 7, pp. 166–172. Furthermore, the Singer Surveys describe the specific assumptions and design of the CBC survey, but then require respondents to click to the next question up to four times before arriving at the first choice task. *See* Singer Report, Appendix 5, pp. 90–95, Appendix 6, pp. 129–134, Appendix 7, pp. 166–172 ("For the following activity, please assume you receive an offer from Facebook to purchase access to additional information from partners…. In each exercise, you will be shown a set of three offers. Each offer will have different attributes and offer different levels of compensation. After carefully considering the options available to you, please select the offer you would actually accept in real life. If you would not accept any of the offers shown to you, please select the fourth option ('I would not accept any of the offers shown here.'). You will make a selection 10 times in this activity … please assume all other attributes are the same across all three offers.").

[129] Diamond and Swann (2022), p. 287 ("[U]nfamiliar terms or technical concepts should be clearly defined. Research suggests that definitions may be ignored if they are not provided directly in the question (e.g., if they are provided as a hyperlink). Thus, it is wise to include the definition in the question stem when possible.").

A13-4054

alternative.[130] For instance, the levels of the attributes for "Healthcare Information," "Access" or "No Access," appear between the attribute labels for two entirely different attributes: "Education Information" and "Fitness Information." There is misalignment for most of the attributes and attribute levels, including the "Monthly Compensation." Even the "Select" buttons are misaligned with the attribute labels and with one another. If Dr. Singer's Appendices are accurate, then to go through the choice tasks, respondents would have had to mentally align the different attribute labels with the potential attribute levels. Any misalignments increase the respondents' cognitive burden, perhaps substantially, and likely result in survey confusion.

***Exhibit 4: Screenshot from the Singer Surveys – Choice Task***




Source: Singer Report, Appendix 5, p. 95, Appendix 6, p. 134

64. Sixthly, the Singer Surveys do not include "warm-up" or practice questions.[131] Warm-up questions are choice tasks given to respondents before the actual experiment begins to familiarize them with the format and decision process. Scientific research recommends warm-up questions to allow respondents to become familiar with the decision scenario, choice-task format,

[130] I note that the example choice task Dr. Singer presents in Exhibit 2 of his report does not suffer from this flaw. It is not clear which version of the choice tasks respondents of the Singer Surveys were presented with. At a minimum, Dr. Singer's screenshots throughout his Appendices 5, 6, and 7 suggest that for at least some respondents the surveys did not display correctly. *See* Singer Report, Exhibit 2; Singer Report, Appendix 5, pp. 95–104, Appendix 6, pp. 134–143, Appendix 7, pp. 172–181.

[131] While the Singer Surveys ask questions confirming respondents' understanding of the survey, there are no practice choice task questions. Thus, respondents did not have the opportunity to "warm up" for the choice tasks in the Singer Surveys. *See* Singer Report, Appendix 5, pp. 89–94, Appendix 6, pp. 128–133, Appendix 7, pp. 165–170.

attributes, attribute levels, and the trade-off decisions before their actual data is recorded.[132] Warm-up questions reduce confusion with the survey mechanics.[133] Warm-up questions are absent from the Singer Surveys.

65. The presence of multiple confusing design elements in the Singer Surveys likely caused confusion among respondents. Confusion may have also caused respondents to provide low-quality responses, drop out of the survey early, or be eliminated by Dr. Singer's weak attention-check question.[134] Between 38 percent to 41 percent of respondents who started the CBC portion of the Singer Surveys did not complete the surveys for at least one of these reasons. See Exhibit 5. Completion rates are normally higher (and dropout rates lower), **especially** for short surveys such as the Singer Surveys.

---

[132] Hauser, John R., Songting Dong, and Min Ding, "Self-Reflection and Articulated Consumer Preferences," *Journal of Production Innovation Management* 31(1), 2014, pp. 17–32 ("Hauser et al. (2014)") at 26 ("Pretests indicated consumers felt the 9-profile warm-up was sufficient to introduce them to the features, the feature levels, and the task. This suggests that self-reflection learning is learning preferences and is more than simply learning the composition of the market. If these interpretations are correct, then they have profound implications for research to support product design. To identify enduring preferences, we must first ask respondents to complete a task that enables them to learn by self-reflection. For example, when consumers have the opportunity to self-reflect prior to articulating preferences, we see significant changes toward more rules addressing EPA mileage (more must-not-have low mileage) and fewer rules addressing crash test ratings (fewer must-not-have C3). Consumers change the relative importances of quality (Q5 increases), body types (mid-size SUVs increase), transmission (automatic decreases), and engine type (hybrid decreases). These changes are significant at $p < 0.05$. Other changes in brand, body type, quality, and transmission are marginally significant.").

[133] Hauser et al. (2014), p. 26 ("Pretests indicated consumers felt the 9-profile warm-up was sufficient to introduce them to the features, the feature levels, and the task."). *See also* McFadden (2017), p. 169 ("First, subjects have to get used to answering questions that may be difficult or intrusive, and learn that it is easier or more rewarding to be truthful than to prevaricate. Some of this is mechanical: practice with using a computer for an Internet-based conjoint survey, and moving through screens, buttons, and branches in a survey instrument.").

[134] Scientific literature demonstrates that when respondents are burdened with significant cognitive effort during surveys, their responses decrease in quality. *See* Kunz, Tanja, and Tobias Gummer, "Effects of Objective and Perceived Burden on Response Quality in Web Surveys," *International Journal of Social Research Methodology* 28(4), 2025, pp. 385–395 at 392 ("[W]e found consistent effects of perceived burden on response quality for all eight indicators. Thus, higher perceived burden is associated with lower response quality.").





HIGHLY CONFIDENTIAL

***Exhibit 5: Many Respondents Did Not Complete the Singer Surveys, A Result that is Consistent with Confusion[1]***

| | PSBC Class | | Patient Health Information Class | | Prescription Drug Class | |
|---|---|---|---|---|---|---|
| | Count | Share | Count | Share | Count | Share |
| Did Not Understand Attribute Levels[2] | 151 | 8% | 122 | 6% | 142 | 6% |
| Did Not Complete the Survey | 263 | 14% | 153 | 8% | 190 | 8% |
| Dropped Out[3] | 247 | 13% | 145 | 7% | 174 | 8% |
| Elected Not to Continue[4] | 16 | 1% | 8 | 0% | 16 | 1% |
| Failed Attention Check[5] | 388 | 20% | 512 | 25% | 518 | 23% |
| Total Repondents Excluded Due to Potential Confusion | 802 | 41% | 787 | 39% | 850 | 38% |

Source: Singer Report and Backup Materials

Note:

[1] This analysis includes respondents who qualified to participate in the Singer Surveys, defined by those who reached the "Intro" question. In the PSBC Class Survey, respondents who do not own and have never used a patient portal account are also excluded.

[2] Respondents were asked to review eight prompts and were asked to confirm they understood the information presented. For example, one of the eight prompts stated "Partners receive your data when you visit or use their services or through third parties they work with. Meta requires each of these partners to have lawful rights to collect, use and share your data before providing any data to Meta." Respondents who answered "I do not understand" or "I do not understand or I do not wish to proceed with this activity" to the prompts were excluded from the survey.

[3] This category captures all respondents who stopped answering the Singer Surveys and left it at any point after reaching the "Intro" question, including respondents who failed to answer any questions.

[4] Survey participants were asked twice throughout the survey to confirm that they would like to proceed. These questions ask "The activity will begin on the next screen. Do you wish to proceed," and "We ask that you take this survey without help from anyone else and that you complete the survey in one sitting, without stopping in the middle. Do you commit to doing this?" If they elected not to proceed at either of these questions, they were excluded from the survey.

[5] In the Singer Surveys respondents were asked "To show you are paying attention, please select 'I do not understand' below." Individuals who answered "I do understand" were excluded from the survey. This question is an attention-check question. It requires that respondents read the question carefully rather than simply read the potential answers. I discuss attention-check questions at length elsewhere in this report.

66. Between 6 percent and 8 percent of respondents who began the CBC portion of the Singer Surveys did not complete them because they answered that they did not understand the attribute levels as defined in the Singer Surveys. This is likely an underestimate because some respondents may have had one understanding when Dr. Singer intended another understanding (as illustrated by the examples in the previous paragraphs). In addition, between 8 percent and 14 percent of the respondents who began the CBC portion of the Singer Surveys did not complete the survey, either because they dropped out or elected not to continue with the survey. In my experience, completion rates are normally higher (and dropout rates lower) for short surveys such as the Singer Surveys, thus some portion of these percentages can likely be attributed to confusion. Finally, an additional 20 percent to 25 percent of the respondents who began the CBC portion of the Singer Surveys did not complete them because they failed a very

**A13-4057**

simple attention-check question,[135] suggesting that those respondents were not reading the provided descriptions and survey instructions carefully, which would exacerbate the level of confusion respondents felt when completing the Singer Surveys.

67. Of the respondents that did complete the Singer Surveys, some expressed confusion about the survey, either directly, or by displaying internal inconsistency in their responses. Dr. Singer asked respondents at the end of his surveys if the respondents had found any part of the survey confusing, or if the respondents had any comments about the survey. Between 4 percent and 5 percent of respondents who completed the surveys indicated they were confused by the Singer Surveys. See Exhibit 7. Respondents who indicated that they were confused had an opportunity to provide written commentary about what they found confusing. This written commentary, provided as part of the Singer Report backup materials, suggests that some additional respondents may have also been confused about elements of the Singer Surveys but chose not to "voice" their confusion. See Exhibit 6 for select commentary. While these respondents were excluded from Dr. Singer's final results, Dr. Singer does not address the underlying source of confusion about his surveys.

---

135 I discuss the simplicity of the attention-check question in more detail in Section V.B.4 below.

***Exhibit 6: Respondents' Written Commentary Demonstrated Confusion***

| | |
|---|---|
| **PSBC Class Survey** | |
| | "Just didn't really understand the questions very well" |
| | "The section where I had to pick a compensation package confusing" |
| | "What no access actually mean" |
| | "Unsure of what access to education and fitness meant." |
| | "Not sure how to get commpisated [sic]" |
| | "all of it. nothing made sense even reading your disclaimers [sic]" |
| **Patient Health Information Class Survey** | |
| | "The compensation listed was confusing. Who's being compensated?" |
| | "I found the lists and 'Select' questions com0letely confusing! [sic]" |
| | "Access or no access was confusing or complicated" |
| | "Ambiguous instructions 2. Overlapping answer choices 3. Unclear image references [sic]" |
| | "nstructions were not very clear [sic]" |
| | "The entire survey was confusing" |
| **Prescription Drug Class Survey** | |
| | "The understand/ I don't understand options. I understood what I was reading, but I expected to be asked my opinion." |
| | "Didn't understand the offers" |
| | "I didn't understand how much financial info would be accessed so I rejected all plans that access financed." |
| | "The education and prescription drug information. How do you receive this information?" |
| | "It was hard to know how much access FB would have and how often I would have to access the sites in order to receive compensation" |
| | "The format didn't allow me to choose. 'No access'" |

Source: Singer Report Backup Materials
Note: Quotes are respondents' answers to the question "Which part(s) of the survey or activity did you find confusing." The quotes above are directly taken from the Singer Survey Backup Materials: errors in grammar or form are those made by respondents.

68. Additional evidence of the lack of reliability of the Singer Surveys, which is likely a result of their confusing and flawed design, is the poor predictive ability of Dr. Singer's estimates. Dr. Singer evaluates whether his CBC model can "explain" or predict a respondent's choices better than a model in which respondents chose their answers randomly. In particular, he uses a measure he calls the root likelihood, or "RLH" which, intuitively, measures how likely each hypothetical profile that was chosen in a choice task was to be "predicted" by the CBC

A13-4059



HIGHLY CONFIDENTIAL

model to be chosen by a particular respondent.[136] Dr. Singer presented respondents with three hypothetical profiles in each of his choice tasks. With three alternatives, an RLH of 33% or less implies that the CBC model cannot even predict responses as well as a model that assumes the respondent chose randomly. Between 5 percent and 7 percent of the respondents were excluded because their choices among the hypothetical profiles were no more consistent than random, at best, according to Dr. Singer's RLH measure. See Exhibit 7.

***Exhibit 7: Dr. Singer Excludes Many Respondents Who Completed the Singer Surveys from his Analysis Due to Confusion or to Reasons Likely Related to Confusion***

| | PSBC Class | | Patient Health Information Class | | Prescription Drug Class | |
|---|---|---|---|---|---|---|
| | Count | Share | Count | Share | Count | Share |
| Total Excluded Respondents[1] | 132 | 12% | 191 | 16% | 261 | 19% |
| Excluded Due to Confusion[2] | 51 | 4% | 59 | 5% | 69 | 5% |
| Excluded Due to Internal Consistency[3] | 62 | 5% | 79 | 6% | 101 | 7% |

Source: Singer Report and Backup Materials
Note:
[1] Shares are relative to all respondents who completed the Singer Surveys. The counts and shares do not sum to the total share of respondents due to overlap between the categories and the unlisted 'Excluded Due to Speed' category.
[2] Respondents who answered "I found a part of the survey or activity confusing," to the question "Thank you for completeing the survey. Did you find any part of the survey or activity confusing, or do you have any comments for us about the survey?"
[3] Respondents with an internal goodness of fit parameter (RLH as calculated by Sawtooth) less than 0.33.

69. In total, between 12 percent and 19 percent of the respondents who completed the Singer Surveys were excluded due to confusion or lack of internal consistency. These percentages suggest that many respondents found the Singer Surveys to be confusing. While Dr. Singer excludes these respondents from his final results, he does not appear to address or mitigate the underlying causes of this confusion.

### 4. The Singer Surveys Fail to Adopt Conjoint Best Practices Known to Increase Response Quality

70. The Singer Surveys fail to follow CBC survey best practices that are known to increase response quality.

[136] The root likelihood is the geometric mean of the probability that is predicted for the hypothetical profile(s) that the respondent chose in the survey. For an intuitive explanation see Miklos Kremser, "How to Improve Your Survey Data Quality," *Sawtooth Software*, October 24, 2022, available at https://sawtoothsoftware.com/resources/blog/posts/Improve-Survey-Data-Quality-With-Root-Likelihood, accessed on December 4, 2025.

A13-4060

71. Firstly, to obtain respondents, Dr. Singer used a panel company that supplies respondents who have indicated that they are willing to answer web-based surveys. The use of a high-quality panel company is standard practice, and, with safeguards, such survey respondents can provide reliable data. However, at deposition Dr. Singer was unable to identify the panel that he used.[137] As a result, it is not possible to confirm the quality of the panel that Dr. Singer used. Dr. Singer also fails to provide any evidence that his panel was reliable or that the panel followed industry best practices to provide valid respondents. Such evidence is critical, considering the many issues that can affect lower-quality panels, such as fraudulent respondents, or bots.[138]

72. Secondly, Dr. Singer fails to appropriately identify and exclude inattentive respondents. When using online panels to conduct a survey, safeguards are critical because panel members are given monetary compensation (or some alternative "currency" such as points) for completing a survey. Some such online panel members, loosely labeled "professional respondents," answer surveys primarily for the pecuniary incentives they receive.[139] While a survey researcher can never eliminate all professional respondents and, admittedly some professional respondents might pay attention to the survey questions, one necessary safeguard is to identify and eliminate as many professional and/or inattentive respondents as feasible.

73. One way to eliminate inattentive respondents is with instructional manipulation checks ("IMCs"). IMCs are often called "attention-check" questions. An IMC asks the respondent a question in such a way that requires that the respondent read the question carefully. For example, an IMC might have a two-sentence preamble that then asks the respondent to choose "Lenovo" from a list of portable computers. If the respondent reads the question carefully, the respondent will answer "Lenovo." If the respondent does not read the question carefully, the respondent is likely to choose randomly or to choose the portable computer that the respondent is using to answer the question. Typically, such IMCs will have a sufficient number of response

---

[137] Singer Deposition, pp. 409:16–410:19 ("Q. [] What's the name of the company that actually provided the panel [] via Sawtooth [] for your surveys? A. I don't know the name of the panel sitting here. … Q. But you didn't identify in your report ever the company that actually provided the panel? A. Sitting here, I don't recall doing that, no.").

[138] Diamond and Swann (2022), pp. 292 ("Other concerns, particularly those relating to the quality of data collection itself and the verifiability of panel participants, can be addressed through a wide variety of quality-control measures. Some of those measures were developed and are implemented by the online panel providers; others are embedded in the questionnaires drafted by the researchers themselves."), 295 ("One can still use online panels to reach the people, but the researcher must rely heavily on unbiased screening questions and think very carefully about who is present in the sample provider's panel. There are proper ways of screening for such people [] but this is an easy mistake to make in the online context.") (emphasis removed).

[139] *See* Baker, Reg, et al., "AAPOR Report on Online Panels," *Public Opinion Quarterly* 74(4), 2010, pp. 711–781 at 720 ("'Professionals' [] do lots of surveys and generally will not respond unless there is an incentive.").

A13-4061



HIGHLY CONFIDENTIAL

options such that there is a low probability that an inattentive respondent will pass the IMC by choosing randomly. Dr. Singer used an IMC, but it is much weaker than the IMCs I have seen in my professional experience or that are used in the scientific literature.[140] Dr. Singer's IMC is extremely short and contains only two options.[141] As a result, approximately 50 percent of the respondents who answered randomly would have gotten his IMC correct by chance alone.[142] Best practices often pair an IMC with another question to eliminate inattentive respondents. There are no other such questions in the Singer Surveys. Weak IMCs are less likely to identify inattentive respondents as the cognitive requirement on respondents is trivial. An IMC with two options, like the one Dr. Singer employed, allows too many inattentive respondents through by chance alone.

74. Thirdly, the Singer Surveys asked respondents to choose among three hypothetical profiles and a confusing fourth outside option of "I would not accept any of these offers shown here."[143] In the Singer Surveys, when a respondent chose "I would not accept any of these offers shown here" in a choice task, the respondent provided no information about his or her preferences among the three profiles offered. Dr. Singer only knows that the "outside option" is preferred. A more appropriate format, known as "dual response," first asks respondents to choose the most favored of the three options and only then asks the respondent to decide whether to accept the favored option or to choose the outside option.[144] A dual response format is particularly important in the Singer Surveys because respondents are not familiar with the type of

[140] For example, in a seminal article on IMCs, the exemplar IMC was: "Most modern theories of decision making recognize the fact that decisions do not take place in a vacuum. Individual preferences and knowledge, along with situational variables can greatly impact the decision process. In order to facilitate our research on decision making we are interested in knowing certain factors about you, the decision maker. Specifically, we are interested in whether you actually take the time to read the directions; if not, then some of our manipulations that rely on changes in the instructions will be ineffective. So, in order to demonstrate that you have read the instructions, please ignore the sports items below, as well as the continue button. Instead, simply click on the title at the top of this screen (i.e., 'sports participation') to proceed to the next screen. Thank you very much." Oppenheimer, Daniel M., Tom Meyvis, and Nicolas Davidenko, "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology* 45(4), 2009, pp. 867–872 at 868.

[141] Singer Report, Appendix 5, p. 88, Appendix 6, p. 127, Appendix 7, p. 164.

[142] As I discussed in Section V.B.3 above, between 20 percent and 25 percent of respondents failed even this weak IMC.

[143] Singer Report, ¶ 70 ("Importantly, in every choice set, respondents were given a none-of-the-above ('I would not accept any of the offers shown here') option. Including such an outside option allows a researcher to identify the WTA of the marginal respondent.").

[144] Wlömert, Nils, and Felix Eggers, "Predicting New Service Adoption with Conjoint Analysis: External Validity of BDM-Based Incentive Aligned and Dual-Response Choice Designs," *Marketing Letters* 27(1), 2016, pp. 195–210 ("Wlömert and Eggers (2016)") at 197 ("Under the DR choice format, respondents first select the most preferred concept in a forced-choice task (excluding no-choice) and indicate whether they would actually purchase the selected alternative in a second step[.] Separating the selection decision from the purchase decision in this way offers three potential conceptual benefits. First, it can be hypothesized that the DR procedure corrects for the underselection of the no-choice option because it increases the salience of the purchase decision[.] Second, consumers cannot opt out of making a trade-off decision by selecting the no-choice option if choosing between the alternatives requires cognitive effort. Third, the DR process yields preference information even if none of the alternatives would be purchased.").

profile being presented. By forgoing the opportunity for respondents to think carefully about the implications of the hypothetical profiles, the Singer Surveys fail to measure critical information about how respondents make tradeoffs across the attributes in the surveys, and likely unreliably estimated the proportion of respondents that would have chosen the outside option (which would in turn impact Dr. Singer's estimates of WTA).[145]

75. Fourthly, Dr. Singer fails to identify and evaluate respondents who have taken too many surveys in recent months or weeks prior to completing the Singer Surveys. While such respondents may or may not answer differently, best practice is to examine potential sensitivity. Had he identified such respondents, Dr. Singer could have examined whether such respondents provide the same or different answers from other respondents and, in doing so, eliminate unreliable respondents. Dr. Singer does not attempt to identify such respondents and provides no data with which to examine the issue. Indeed, Dr. Singer removed from the Singer Surveys a question about respondents' survey history.[146]

76. Respondents who wish to take as many surveys as possible for compensation, have a monetary incentive to answer screener questions by choosing more options than those that represent their true behavior. Best practices to identify or eliminate such respondents include "red herring" or "decoy" options in survey question responses to eliminate or identify professional respondents.[147] For the Singer Surveys, Dr. Singer could have included a simple red herring option in Screener Question #1 (asking respondents what social media accounts they have). He could have given respondents a non-existent, but realistic social media option in the response options. Respondents who are seeking to answer many surveys have incentives to check many boxes in Screener Question #1 because they believe it will allow them to continue

---

[145] According to scientific literature, relative to standard single-response CBC surveys, dual response CBC surveys increase both predictive accuracy and percent of respondents who select the outside option in a WTP scenario. *See* Wlömert and Eggers (2016), p. 195 ("The results demonstrate that IA-CBC and DR-CBC both increase the predictive accuracy."), Table 7.

[146] Singer Report, footnote 117 ("Through the soft launch, I identified a redundancy in my screening criteria. I therefore removed the redundant question from the survey. Instead of asking respondents about their survey history, I implemented a lockout between surveys on the back end—that is, I imposed that respondents could not participate in more than one of my two CBC surveys and CV survey."). Dr. Singer's "lockout" eliminates respondents from taking two or more of his surveys, but does not identify "professional" respondents.

[147] "Conducting an Online Survey? How to Make Sure You Don't Get Bad Data," *KS&R*, 2020, available at http://www.ksrinc.com/thought-leadership/pdf/KSR_Online_Data_Integrity.pdf, accessed on December 4, 2025 ("Add 'red herring' answer choices. Including answer choices that are not legitimate options – i.e., non-existent products, retailers, medical conditions – is very effective in identifying 'bad' survey takers."). I note that "Decoy" in this sentence refers to a response option that is a realistic-sounding, but non-existent, social media service, with the goal of identifying or eliminating professional respondents. Dr. Singer uses "decoy" in a different context. He identifies decoys as information types outside of the At-Issue Data "to avoid focusing the respondent's attention solely on health information, which could lead some respondents to respond inauthentically." *See* Singer Report, ¶ 61.

with the survey. A red herring or decoy question would likely help eliminate many unreliable respondents

77. Fifthly, since the advent of large-language models (LLMs) such as ChatGPT, there is evidence that many respondents are not real people but rather LLMs (bots). Some sources estimate that 30 percent or more of panel-sourced respondents are now LLMs or use LLMs to answer surveys.[148] A study of 3,600 responses from each of six leading sources of respondents by RepData found that 29% of the respondents were likely fraudulent respondents.[149] Dr. Singer did not check for the potential that LLMs (bots) are masquerading as respondents. Dr. Singer did not even appear to include a simple CAPTCHA (Completely Automated Public Turing test to tell Computers and Humans Apart). CAPTCHAs are standard practice to eliminate many bots. Moreover, recent scientific literature underscores that increasingly intelligent, human-like, and context-aware LLMs pose a threat to online survey research. In one study, an autonomous synthetic respondent evaded "a comprehensive suite of data quality checks, including instruction-following tasks, logic puzzles, and 'reverse shibboleth' questions designed to detect nonhuman actors" and achieved "a 99.8% pass rate on 6,000 trials of standard attention checks."[150] Dr. Singer's failure to impose even the most basic safeguards against bots is even more problematic when considering how sophisticated modern LLMs have become.

78. Sixthly, Dr. Singer did not ask respondents if they are aware of the litigation in this matter. Researchers typically ask a litigation-awareness question for at least two reasons. One reason is to identify potential "demand artifacts"—when respondents alter their responses based on cues about what they think the researcher expects or wants to find, rather than expressing

---

[148] Zhang, Simone, Janet Xu, and AJ Alvero, "Generative AI Meets Open-Ended Survey Responses: Research Participant Use of AI and Homogenization," *Sociological Methods & Research* 54(3), 2025, pp. 1197–1242 at 1197 ("In an original survey of research participants recruited from a popular online platform for sourcing social science research subjects, 34 percent reported using LLMs to help them answer open-ended survey questions."); "Rep Data Launches Market Research Industry's First-Ever 'No-Fly' Suppression List to Eradicate Bad Actors," *Rep Data*, June 25, 2025, available at https://repdata.com/blog/rep-data-launches-market-research-industrys-first-ever-no-fly-suppression-list-to-eradicate-bad-actors/, accessed on December 4, 2025 ("Steven Snell, PhD, Head of Research at Rep Data, conducted a study using 1,928 respondents from a variety of prevalent sample sources…. 31% of responses were fraudulent, and worse yet, 26% were classified as 'good-looking fraud' meaning there would have been no way to detect the poor quality through either human-supervised or AI-focused data cleaning.").

[149] "See Our Research on Research – June 2025 Research: Analyzing Survey Fraud across 3,600 Respondents from 6 Different Sources," *Rep Data*, available at https://repdata.com/research-on-research, accessed on December 4, 2025.

[150] Westwood, Sean J., "The Potential Existential Threat of Large Language Models to Online Survey Research," *Proceedings of the National Academy of Science* 122(47), 2025, e2518075122, p. 1 ("The synthetic respondent generates internally consistent responses by maintaining a coherent demographic persona and a memory of its prior answers, producing plausible data on psychometric scales, vignette comprehension tasks, and complex socioeconomic trade-offs. Furthermore, its open-ended text responses are linguistically sophisticated and stylistically calibrated to the level of education of its assigned persona. Critically, the agent can be instructed to maliciously alter polling outcomes, demonstrating an overt vector for information warfare. More subtly, it can also infer a researcher's latent hypotheses and produce data that artificially confirms them.").

their true preferences.[151] Another reason is that if respondents are aware of the litigation in this matter, they might have incentives to answer in a way to increase their own potential compensation. Coupled with the lack of incentive alignment, such potential biases could be severe and render the Singer Surveys unreliable.

### 5. The Singer Surveys Do Not Take Steps to Ensure a Representative Sample of Respondents

79. Because CBC surveys are typically used to project estimates for prospective consumers and their preferences through the survey sample, researchers must ensure that the survey sample is "representative," or suitable for extrapolation to the larger population from which the sample is drawn. While Dr. Singer acknowledges the importance of using a representative sample,[152] he fails to show that his approach produces a representative sample, or even a sample of respondents whose demographics match the demographics of the members of the Proposed Classes targeted by each of his surveys.

80. Dr. Singer claims that his survey sample is representative because "[his] respondents were randomly selected with respect to the attribute of interest; that is, respondents were not selected with consideration towards attitudes surrounding privacy or social media."[153] This assertion ignores basic general survey and CBC principles. As an extreme example, suppose that the panel from which respondents to the Singer Surveys were drawn only included respondents who are between 40 and 50 years old, and suppose that respondents between 40 and 50 years old value privacy more than respondents who are between 18 and 39 years old or older than 50 years.[154] Dr. Singer incorrectly argues that by filtering to only those respondents who use

[151] Hauser et al. (2019), p. 1069 ("We followed standard survey design principles … to assure that … the manipulation of craft between respondents was not subject to demand artifacts."); Diamond and Swann (2022), p. 259 ("[T]he natural reaction of at least some of the people, some of the time, is to try to use clues presented in the survey to figure out what is the right (i.e., the correct or desired) answer. The result is that some of the respondents, at least some of the time, may respond differently to the stimulus (i.e., the trademark or advertisement) than they would respond to the same stimulus in the real world[.] ... Such guessing can be a primary component of what is called 'noise' or more precisely 'survey artifacts.'"), footnote 103 ("The court also found that the back-to-back format was leading, in that the questions likely generated demand effects by suggesting the existence of a connection that respondents would not have made on their own."). I note that "demand artifacts" can also be referred to as "demand effects" or "survey artifacts."

[152] Singer Report, footnote 125 ("This means that it is incumbent on the researcher who uses an internet panel to establish representativeness by providing affirmative evidence of the representativeness of their sample.").

[153] Singer Report, ¶ 92.

[154] Dr. Singer acknowledges that age may be correlated with views on the value of data privacy, and that he did not sample his survey respondents based on any demographics. Singer Deposition, pp. 133:12–134:5 ("Q. Isn't it pretty widely reported in the peer-reviewed literature, even in many of the articles you cite, that – and sort of kind of known, without being an expert, that

A13-4065

Facebook, his surveys could somehow overcome the bias that is introduced by sampling only respondents between 40 and 50 years old.[155] Notably, Dr. Singer admitted that respondents with different demographics may have substantially different preferences about privacy.[156]

81. Best practices in survey design involve different methods to address the representativeness of the sample. For instance, using a methodology called "click-balancing," a researcher could ask respondents to state their demographic information and use those data to select the sample of respondents that begins the survey.[157] If the panel was high quality then this click-balancing methodology would result in a survey population that would be representative of the US population.[158] Then, by using the survey's screening questions the researcher can identify the members of the relevant target population.[159] If the researcher's screening questions select for demographics that are deemed critical to establishing the inbound sample's representativeness, the result of this process is, in expectation, a final sample that is representative of the target population.[160] Dr. Singer, however, has not provided any analysis or

---

younger people tend to place less value on their data privacy than older people in this country? A. I – I believe I've read that, but – but, again, I would not try to quota match on age in my survey…. I'm not really inclined to go back and do the match on age with the Facebook population.").

155 Singer Deposition, pp. 105:17–106:9 ("[D]id you try to survey a representative sample of what you expected to be the known class members, assuming the class is certified as the plaintiffs have requested? A. Close… I'm concerned about one dimension of representativeness among the – among Facebook users, is that I want to get a respondent pool that is representative in this dimension of attitudes and preferences towards accessing or denying access to their healthcare information… [T]hat's the dimension of representativeness that I'm trying to – to capture."), 321:8–21 ("[W]hat I wanted to do as an initial filter is I wanted you to be in the U.S. I wanted you to be a Facebook user. And then for Class 1 [the Patient Status Button-Click Class], I wanted you to engage in certain types of activities that were consistent with Class 1.").

156 Singer Deposition, pp. 108:3–109:17 ("Q. Do any peer-reviewed articles that you've reviewed suggest that women may be relatively more or less concerned about data privacy than men? … A. So it -- it is reasonable to -- to believe that women might care more about this.").

157 Diamond and Swann (2022), p. 310 ("In essence, click balancing is a form of sample matching that partially corrects for selection and nonresponse bias by insisting that those beginning the screening process match some predefined demographic characteristics (generally census representation) while not making firm assumptions about the demographics of the post-screened sample. This method, implemented by panel providers, involves real-time monitoring of the attributes of respondents who are actually clicking on the invitation to begin the study.").

158 Diamond and Swann (2022), pp. 308–309 ("Since online panels are not themselves representative of any particular population, survey researchers must rely on quotas or a process known as 'click-balancing' to achieve an appropriately weighted sample. … In the case of a [] survey, for example, where the universe is the 'general consuming public of the United States,' quotas can be set up to ensure that the gender, age, and geographic location of survey respondents track U.S. census data."), 310 ("Click-balancing ensures that the sample of people who start the survey are a representative microcosm of a specified population.").

159 Such screening can also be used to test for inattentive respondents because respondents provide demographic information when they join a panel. The expert can check "sign-up" demographics provided by the panel against "in-survey" demographics from the screening questions to identify inattentive respondents. Dr. Singer does not balance on demographics and does not compare sign-up demographics to in-sample demographics. Failure to employ these simple precautions renders Dr. Singer's sample to be unreliable.

160 Diamond and Swann (2022), p. 310 ("[T]he final sample of respondents who 'survive' the screening questions will be aligned with the attributes of the target population, even though these attributes were unknown to the researcher in advance or pre-programmed into the survey as quotas. Put another way, this methodology allows the researcher to ensure that the sample starting the survey is properly representative ('balanced') and the percentage of respondents completing the survey (and having any particular demographic characteristics) is determined by the case-specific screening questions and not by a predetermined quota.").

evidence showing that either his inbound samples or his final samples were representative. Critically, since Dr. Singer does not know which panel he used, he cannot provide information about whether the panel attempted to be representative of any relevant population.[161]

## VI. The Results of the Singer Surveys Demonstrate that the Surveys Are Fundamentally Unreliable

82. The unrealistic scenario presented to respondents of the Singer Surveys, paired with critical design and execution flaws, produce fundamentally unreliable results. Specifically, for nearly half of respondents in each survey, Dr. Singer's reported partworths indicate that the respondents' preferences are "irrational," i.e., that, all other things constant, respondents would prefer to receive a lower payment in exchange for their information rather than a higher payment. Dr. Singer argues that such irrational partworths are to be expected.[162] Additional analysis of Dr. Singer's estimates indicates there is substantial "noise" (i.e., large error rates) in the Singer Survey results, and thus, it can only be concluded with statistical certainty that some of these respondents in the Singer Surveys were indeed irrational.

83. Having examined the respondents in the Singer Surveys who are irrational based on the partworths reported by Dr. Singer, I examine the respondents that are rational based on the partworths reported by Dr. Singer. Using Dr. Singer's estimated partworths, approximately one half of respondents are rational in the sense that the respondents prefer a higher price compared to a lower price, keeping all other things constant. Using statistical tests that are analogous to those used to test irrationality, it is not possible to rule out that the vast majority of his respondents exhibited irrational response patterns. In other words, of the approximately one-half of respondents in the Singer Surveys that are deemed rational by the partworths reported by Dr. Singer, the respondents' preferences for price are not rational at standard statistical levels of confidence. Combining the respondents deemed rational and the respondents deemed irrational by the partworths reported by Dr. Singer, almost all respondents in the Singer Surveys cannot be considered rational to a reasonable degree of statistical confidence. The lack of statistical

---

[161] Singer Deposition, pp. 409:16–410:19 ("Q. [] What's the name of the company that actually provided the panel [] via Sawtooth [] for your surveys? A. I don't know the name of the panel sitting here. … Q. But you didn't identify in your report ever the company that actually provided the panel? A. Sitting here, I don't recall doing that, no.").

[162] Singer Report, ¶ 90 ("In any survey, some respondents may express preferences counter to expectations of economic rationality.").





HIGHLY CONFIDENTIAL

confidence is likely due to the substantial noise in Dr. Singer's estimates of the partworths. Thus, the Singer Surveys are unreliable for the purpose of quantifying respondents' true value of the At-Issue Data (if any). I provide more detail on the statistical tests in the following paragraphs.

84. A basic principle of the theory underlying CBC is that people generally have "rational" or consistent preferences. In the context of the Singer Surveys, one way to examine rationality or irrationality of respondents' preferences is by examining the partworths estimated by Dr. Singer for the different price attribute levels in the Singer Surveys. Rational partworths imply that an option that is strictly more valuable to a respondent has a higher (or equal) partworth than an option that is less valuable to a respondent. Holding other things constant, a respondent with rational preferences would prefer to receive a higher payment relative to a lower payment in exchange for access to the respondent's information. When we compare the partworth for a higher payment to the partworth for a lower payment, the partworth pair is irrational if the partworths for a respondent imply that the respondent would prefer to receive a lower payment in exchange for the respondent's information rather than a higher payment for the respondent's information, all else equal as implied by the CBC model.

85. While Dr. Singer claims that "[i]n any survey, some respondents may express preferences counter to expectations of economic rationality" and that "some purportedly 'irrational' responses are to be expected in real-world surveys,"[163] the results of the Singer Surveys, as reported by Dr. Singer, indicate that <u>nearly half</u> of the respondents in each survey appear to have partworths reflecting irrational preferences. Exhibit 8 shows that, taking Dr. Singer's results as given, between 48 percent and 54 percent of respondents appear to show irrational preferences—that is, according to Dr. Singer's results, these respondents would prefer less money over more money in exchange for their information, all else equal. For 46 percent to 52 percent of respondents in the Singer Surveys, Dr. Singer reports partworths that would be consistent with rational preferences. The proportion of irrational respondents based on Dr. Singer's reported results suggests fundamental issues with his approach.

86. Dr. Singer's methodology, as all survey methodologies, produces estimates that are affected by statistical uncertainty resulting from the facts that (1) the Singer Surveys rely on a

---

[163] Singer Report, ¶ 90.

sample of respondents who answered 10 choice tasks and (2) for every respondent, there is uncertainty in the estimates of that respondent's partworths. Because statistical uncertainty is an inherent element of survey analyses, it is standard practice to account for it when performing survey-based analyses. When Dr. Singer computes WTA for a respondent, he does not appear to examine this statistical noise even though the software he uses to analyze his data provides the means to do so. Statistical analysis of Dr. Singer's results is crucial because there is likely substantial noise in the data obtained from the Singer Surveys as a result of the many flaws in the Singer Surveys I have described in this report.

87. When I take into account the substantial statistical noise in Dr. Singer's estimates, I find that Dr. Singer's approach does not allow for any conclusions to be drawn about respondent valuations of the At-Issue Data. Exhibit 8 shows that, of the 48 to 54 percent of respondents who appeared to show irrational preferences based on the partworths reported by Dr. Singer, the data establish statistically significant evidence for irrationality for only 0.8 percent to 2.2 percent of the respondents.[164] Exhibit 8 also shows that, of the 46 to 52 percent of respondents for whom Dr. Singer reported partworths that would be consistent with rational preferences, the data establish statistically significant evidence for rationality for less than 0.1 percent to 1.1 percent of the respondents.[165] Based on the two sets of statistical tests, there is sufficient substantial noise in the Singer Surveys such that Dr. Singer cannot conclude with statistical certainty that the respondents are either rational or irrational. The substantial survey noise in the Singer Surveys renders the Singer Surveys unreliable and indicates that the Singer Surveys are unable to reliably quantify respondents' true value of the At-Issue Data (if any).

---

[164] To be conservative, these results include a Bonferroni correction. If I do not apply a Bonferroni correction, I find that the proportion of irrational respondents with statistically significant irrational preferences is 5.3 percent for the Patient Status Button Click Class, 8.0 percent for the Patient Health Information Class, and 4.3 percent for the Prescription Drug Information Class. *See* Exhibit 8 and Workpaper 1 for additional details.

[165] To be conservative, these results do not include a Bonferroni correction. If I apply a Bonferroni correction, I find that the proportion of rational respondents with statistically significant rational preferences is <0.1 percent for the Patient Status Button Click Class, <0.1] percent for the Patient Health Information Class, and <0.1 percent for the Prescription Drug Information Class. *See* Exhibit 8 and Workpaper 1 for additional details.

A13-4069

***Exhibit 8: Nearly Half of the Respondents to the Singer Surveys Demonstrated Irrational Preferences***

| | PSBC Class | Patient Health Information Class | Prescription Drug Class |
|---|---|---|---|
| **Share of Singer Survey Respondents with:** | | | |
| Irrational Preferences Based On Dr. Singer's Estimates[1] | 48% | 49% | 54% |
| Statistically Significant Irrational Preferences[2] | 0.8% | 2.2% | 1.5% |
| **Share of Singer Survey Respondents with:** | | | |
| Rational Preferences Based On Dr. Singer's Estimates[1] | 52% | 51% | 46% |
| Statistically Significant Rational Preferences[3] | <0.1% | 1.1% | 0.4% |

Source: Singer Report and Backup Materials

Note:

[1] A respondent is classified as having irrational preferences if the average partworths reported by Dr. Singer for that respondent show that the partworth from a given compensation level is lower than the partworth from a lower compensation level. For example, if a respondent's partworth from receiving a compensation of $5.00 is lower than the partworth from receiving a compensation of $2.50, this respondent would be classified as having irrational preferences. This classification considers all possible pairs for the compensation levels in the Singer Surveys. If a respondent is not classified as having irrational preferences based on Dr. Singer's estimates, then the respondent is classified as having rational preferences based on Dr. Singer's estimates.

[2] I rely on Dr. Singer's backup materials to calculate the proportion of respondents whose results demonstrate preferences that are irrational beyond a standard threshold of statistical significance. The estimate of each individual respondent's WTA that Dr. Singer identifies is based on a respondent's average preference across 10,000 "draws" of partworths from the hierarchical Bayes Monte Carlo Markov Chain (MCMC). I compare the partworths Dr. Singer's results generate for each adjacent price pair in each of these draws. For example, I compare the partworth of $0 to the partworth of $2.50. If the partworth for $2.50 is smaller than the partworth for $0, this implies that, for that draw, the respondent prefers the lower compensation to the higher compensation. Because there are seven potential compensation levels, there are six adjacent partworth pairs. To be conservative, I take into account that I am simultaneously testing six partworth pairs by applying a Bonferroni correction so that a partworth pair is only statistically significantly irrational if it is irrational at the Bonferroni significance level (0.05/6). In other words, to be statistically significant, a pair is irrational if it is irrational in 9,917 or more of the 10,000 draws. A respondent is classified as significantly irrational if at least one of their six partworth pairs is significantly irrational. If I do not apply a Bonferroni correction, I find that the proportion of irrational respondents with statistically significant irrational preferences is 5.3 percent for the Patient Status Button Click Class, 8.0 percent for the Patient Health Information Class, and 4.3 percent for the Prescription Drug Information Class. *See* Workpaper 1.

[3] I similarly rely on Dr. Singer's backup materials to calculate the proportion of respondents whose results demonstrate preferences that are rational beyond a standard threshold of statistical significance by testing adjacent partworth pairs for those respondents whose results demonstrate rational preferences based on Dr. Singer's estimates. For example, I compare the partworth of $0 to the partworth of $2.50. If the partworth for $0 is smaller than or equal to the partworth for $2.50, this implies that, for that draw, the respondent rationally prefers the higher compensation to the lower compensation. Because there are seven potential compensation levels, there are six adjacent partworth pairs. To be conservative (in favor of finding Dr. Singer's partworths to be rational), I do not take into account that I am simultaneously testing six partworth pairs by not applying a Bonferroni correction. In other words, to be statistically significant, a pair is rational if it is rational in 9,500 or more of the 10,000 draws, corresponding to a significance level of 0.05. A respondent is classified as significantly rational if all six partworth pairs are significantly rational. If I apply a Bonferroni correction, I find that the proportion of rational respondents with statistically significant rational preferences is <0.1 percent for the Patient Status Button Click Class, <0.1 percent for the Patient Health Information Class, and <0.1 percent for the Prescription Drug Information Class. *See* Workpaper 1.

88. Additional evidence of the unreliability of the Singer Surveys is that the average WTA results Dr. Singer obtains for the three different Proposed Classes are unintuitive when compared with one another. Specifically, Dr. Singer finds that respondents in his PSBC Class Survey (for the Patient Status Button-Click Class) have a substantially higher average WTA of $5.94 than respondents in the Patient Health Information Class Survey or the Prescription Drug Class

Survey, which have average WTAs of $3.83 and $3.71, respectively.[166] Based on the descriptions of the information to be shared with Facebook that Dr. Singer provided to respondents, this result appears to be unintuitive and contrary to Plaintiffs' allegations because it implies that users place a higher value on generic information about hospitals and health systems (specifically, "names and web addresses of the hospitals and health systems with which [users] have an online account and the names and web addresses of the healthcare providers with whom [they] make appointments or pay bills online"[167]) than the value they place on more specific information about their diagnoses and prescriptions (specifically, "[i]nformation about [users'] interactions with and on the websites and apps of [their] healthcare providers, including seeking information about doctors, health conditions, services, treatments, symptoms, or diagnoses"[168]; or "[i]nformation about [users'] interactions with or on prescription drug company websites and apps, including [their] requests for information about prescription drugs, conditions those drugs treat, side-effects, and payment options"[169]). That is, Dr. Singer's results imply that a user would be willing to accept $3.83 to allow Facebook to access information about their personal diagnoses or symptoms, but would require a payment of $5.94 for information about them having an account on the website of a large hospital system. Dr. Singer provides no rationale for this unintuitive result.

## VII. To the Extent that the Singer Surveys Mischaracterize Both the Alleged Misconduct and the At-Issue Data, They Cannot Be Used to Assess Alleged Harm

89. The Singer Surveys informed respondents that their information would be collected *and used* by Meta. The Singer Surveys also omit certain elements of Meta's Data Policy in describing the At-Issue Data, instructed respondents to assume that the information type attributes are not currently being collected by Meta partners, and did not provide respondents with any information about the extent to which the At-Issue Data is collected by other third parties. To the extent that these or other aspects of the Singer Surveys mischaracterize the alleged misconduct or the At-Issue Data, the Singer Surveys cannot be used to identify the value

[166] Singer Report, Exhibit 6.
[167] Singer Report, Appendix 5, p. 92.
[168] Singer Report, Appendix 6, p. 131.
[169] Singer Report, Appendix 7, p. 168.

members of the Proposed Classes would place on the At-Issue Data and cannot be used to assess the harm alleged by Plaintiffs.

### A. The Singer Surveys Describe the Alleged Misconduct as Facebook's Collection and Use of the At-Issue Data

90. The Singer Surveys informed respondents that Meta would collect *and use* the information to which they choose to provide access. Specifically, the Singer Surveys indicated to respondents multiple times throughout the surveys that Meta would *use* the information to which respondents chose to provide access. For example, after completing screening questions, the Singer Surveys informed respondents of the following:

> How does Meta use this information?
>
> **Meta uses the information it collects from partners to:**
>
> - **Provide, personalize, and improve Meta's products.** Meta uses the information it has to deliver Meta's Products, including to personalize features and content (including your **ads** and **Facebook News Feed**) and make suggestions for you (such as **groups** or **events** you may be interested in or topics you may want to follow) on and off Meta's Products.
> - **Provide measurement, analytics, and other business services.** Meta uses the information it has (including your activity off of its Products, such as the websites you visit and ads you see) to help advertisers and other partners measure the effectiveness and distribution of their ads and services.[170]
>
> Suppose that, in order to *improve* the personalization of features and content (including your **ads** and **Facebook News Feed**), Facebook is considering launching a pilot program to directly pay users for access to additional information from partners. **The remainder of this survey will ask you to consider this program.**[171]

91. As a result, the respondents of the Singer Surveys were asked to make choices about whether to provide Meta with access to their information based on the assumption that Meta would both collect *and use* their information. It is entirely plausible that respondents' valuation

---

[170] Singer Report, Appendix 5, p. 86, Appendix 6, p. 125, Appendix 7, p. 162 (Singer's original emphasis is preserved as bold and italics. Additional emphasis is added as underline.).

[171] Singer Report, Appendix 5, p. 89, Appendix 6, p. 128, Appendix 7, p. 165 (Singer's original emphasis is preserved as bold and italics. Additional emphasis is added as underline.).

of the information with which they chose to provide Meta with access would be different if their information was only being collected and not used by Meta.

92. However, the Plaintiffs' definitions of the Proposed Classes do not include use of the At-Issue Data, only its transmission to Meta.[172] To the extent that the alleged misconduct only pertains to Meta's receipt of the At-Issue Data, regardless of whether Meta thereafter uses that data, the Singer Surveys would be inappropriate to rely on to identify respondents' value of the transmission of the At-Issue Data (as opposed to its transmission *and* use). Further, respondents may place a lower value on the possibility of Meta using their information compared to the certainty of Meta using their information. Because the Singer Surveys tell respondents that Meta would *certainly* use their information, it would be inappropriate to rely on the Singer Surveys to identify how respondents value the At-Issue Data, even if the alleged misconduct in this matter included *potential* use by Meta of the At-Issue Data.

### B. The Singer Surveys Have a Broad Description of the At-Issue Data and Omit Important Characteristics of the At-Issue Data

93. The Singer Surveys describe the At-Issue Data in each survey as follows:

- For the Patient Status Button-Click Class in the PSBC Class Survey, "Healthcare Information" is defined as "The names and web addresses of the hospitals and health systems with which you have an online account and the names and web addresses of the healthcare providers with whom you make appointments or pay bills online."[173]
- For the Patient Health Information Class Survey, "Healthcare Information" is defined as "Information about your interactions with and on the websites and apps of your healthcare providers, including seeking information about doctors, health conditions, services, treatments, symptoms, or diagnoses."[174]
- For the Prescription Drug Class Survey, "Prescription Information" is defined as "Information about your interactions with or on prescription drug company websites and apps, including your requests for information about prescription drugs, conditions those drugs treat, side-effects, and payment options."[175]

94. Plaintiffs' definitions of the Proposed Classes contain a more limited set of healthcare and prescription data at issue relative to Dr. Singer's definitions. For example, the definition of

[172] Motion for Class Certification, p. 13.
[173] Singer Report, Exhibit 1.
[174] Singer Report, Exhibit 3.
[175] Singer Report, Exhibit 4.





HIGHLY CONFIDENTIAL

the Patient Health Information Class includes only information identifying "a doctor, condition, or treatment," and does not include information about services, symptoms, or diagnoses as described in Dr. Singer's Patient Health Information Class Survey.[176] Similarly, the definition of the Prescription Drug Information Class includes only "communications with a prescription drug website for which they have a prescription," and does not include prescription drugs, conditions, side-effects, and payment options as included in Dr. Singer's definition.[177] To the extent that the alleged misconduct in this matter only pertains to this more limited set of healthcare and prescription data, and to the extent that the "communications" from the Proposed Class definitions do not include the broader set of information in Dr. Singer's definitions, the Singer Surveys would be inappropriate to rely on to identify how respondents value the At-Issue Data (as opposed to the broader set of information defined in the Singer Surveys). Dr. Singer admitted he is unable to distinguish if respondents to his surveys focused on the elements of his descriptions that match the definitions of the Proposed Classes, or on the elements that do not match them.[178]

95. Additionally, the descriptions of the At-Issue Data in the Singer Surveys do not account for any changes over time in the data that Meta received. For example, Plaintiffs claim the web addresses (i.e., URLs) that Meta allegedly received contained potentially sensitive data about Plaintiffs' conditions or treatments (for example, someone who "visited a [web]page about breast health").[179] However, I understand that Meta implemented additional mitigations during the Class Period, such as the "Core Setup" feature launched in late 2023. I understand that Core

---

[176] Motion for Class Certification, p. 13; Singer Report, Appendix 6, p. 131; Singer Deposition, pp. 341:20–342:5 ("Q. In your definitions for the patient health class -- patient health information class, you included sharing information relating to, looks like, services, symptoms and diagnoses, even though those were not included in the plaintiffs' proposed class definition, correct? A. Correct."). I note that in addition to testing a different type of At-Issue Data in his Patient Health Information Survey than what the Proposed Class involves, Dr. Singer failed to match the types of technologies discussed in his survey instructions to the technologies described in Plaintiff's Motion for Class Certification. *See* Singer Report, Appendix 5, p. 84, Appendix 6, p. 123, Appendix 7, p. 160 (each describing the "Meta Business Tools" being discussed in the surveys as "including Meta's social plug-ins (such as the Like button), Facebook Login, Meta's APIs and SDKs, or the Meta pixel."); Motion for Class Certification, p. 2 ("Meta collects consumer data through a suite of Business Tools: the Meta Pixel, SDK, CAPI, and custom list uploads.").

[177] Motion for Class Certification, p. 13; Singer Report, Exhibit 4.

[178] Singer Deposition, pp. 342:17–343:16 ("Q. [] In either your pretesting questionnaire or in any feedback you got from the survey in any part of it, whether it's in the comments section or if there was post-interview debriefs or anything like that, were you ever able to tell whether or not people were focusing, for example, on symptoms or diagnoses as particularly sensitive information they might value more in protecting as opposed to, say, what doctor they're visiting or what -- even what health condition they have? A. No, I -- I don't -- there's nothing in my study that would allow me to do a decomposition of that sort. We've asked them -- we asked my survey respondents to assume that any or all of these information types you -- you have control over and now we're asking you to -- to relinquish that control through compensation.").

[179] Complaint, ¶ 88. *See also* Motion for Class Certification, pp. 2–3 ("The information Meta intercepted also includes … a full-string URL that contains health information. For example, Meta's production of classwide data showed that it intercepted—and processed—the following communications … medstarhealth.org/blog/heart-palpitations-emergency-care … medstarhealth.org/services/diabetes … medstarhealth.org/services/ulcerative-colitis.").

Setup is designed to prevent the transmission of specific kinds of information to Meta, such as custom parameters and the portion of URLs following the domain name (e.g., the URL https://jaspersmarket.com/clothes/summer/dresses?item=10 would be restricted to *https://jaspersmarket.com/*) from Pixels with certain data source categories (e.g., Pixels associated with a health domain).[180] The Singer Surveys do not account for any changes over time in what data was allegedly received and simply tell respondents that Meta would receive "Healthcare Information" or "Prescription Information" based on a static definition.[181] For example, the Singer Surveys instruct respondents that if they provide "Access" to an information type, then "Facebook will receive… the web address where the button is located (e.g., 'www.example.com/log-in-page'), and the destination of the button (e.g., 'www.example.com/logged-in')" or the "URLs you visit online."[182] To the extent that the nature of the web addresses Meta received became less detailed over time in such a way that they no longer revealed such information, the Singer Surveys would be inappropriate to rely on to identify how respondents value the At-Issue Data.

### C. The Singer Surveys Mischaracterize the Scenario in Which Facebook Receives the At-Issue Data

96. The hypothetical Facebook program described in the Singer Surveys differs from how Facebook receives the At-Issue Data in two critical ways.

97. Firstly, while the descriptions of the hypothetical program in the Singer Surveys match excerpts from Meta's Data Policy, they omit certain information from the Meta Data Policy that could have impacted how respondents understood the hypothetical scenario presented by the Singer Surveys.[183] For example, Dr. Singer omits sections of the Meta Data Policy that explain that Meta uses the information it collects to promote safety, integrity, and security, communicate

[180] Defendant Meta Platforms, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (VKD), December 20, 2024, pp. 14–15 ("Meta may turn on the Core Setup data restrictions for a Business Tool if Meta 'has determined that the data source falls under a data source category that requires core setup's data restrictions.' Meta works to categorize data sources, such as websites and apps, based on the topics related to the data source and the products and/or services provided. … 'When a data source is categorized under a category with restrictions, [Meta] may limit or fully restrict the ability to share event data with us via the Meta Business Tools.'").

[181] Singer Report, Appendix 5, Appendix 6, Appendix 7.

[182] Singer Report, Appendix 6, p. 92, Appendix 7, p. 131, Appendix 8, p. 168.

A13-4075

[183] *See* Meta Data Policy.



HIGHLY CONFIDENTIAL

with its users, and research and innovate for social good.[184] Dr. Singer also omits certain descriptions of how Meta uses information for the purposes of providing, personalizing, and improving its products in a way that benefits its users.[185] Finally, Dr. Singer omits elements of the Meta Data Policy which provide links so that users can learn more details about how information is used by Meta.[186] Omitting sections and additional information, to which users in the real marketplace have access, is likely to affect respondents' willingness to share their information with Meta and the value respondents would place on the information relative to the value members of the Proposed Classes place on these data in the real marketplace.

98. Secondly, the Singer Surveys failed to inform respondents that the At-Issue Data may also be collected by other third parties, diminishing the novelty or incremental privacy impact.[187] For example, website activity data may be collected by Google,[188] or by multiple other advertising and analytics firms.[189] To the extent these data are also collected by third parties, knowledge of this fact is likely to reduce respondents' perception of the exclusivity and control

[184] For example, Dr. Singer omits "We use the information we have to verify accounts and activity, combat harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of our Products, and promote safety and security on and off of Meta Products. For example, we use data we have to investigate suspicious activity or violations of our terms or policies, or to detect when someone needs help. To learn more, visit the Facebook Security Help Center and Instagram Security Tips;" "We use the information we have to send you marketing communications, communicate with you about our Products, and let you know about our policies and terms. We also use your information to respond to you when you contact us;" and "We use the information we have (including from research partners we collaborate with) to conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health and well-being. For example, we analyze information we have about migration patterns during crises to aid relief efforts. Learn more about our research programs." *See* Meta Data Policy, pp. 6–7; Singer Report, Appendix 5, p. 86, Appendix 6, p. 125, Appendix 7, p. 162.

[185] For example, Dr. Singer omits "To create personalized Products that are unique and relevant to you, we use your connections, preferences, interests and activities based on the data we collect and learn from you and others (including any data with special protections you choose to provide); how you use and interact with our Products; and the people, places, or things you're connected to and interested in on and off our Products," from the description he provides for Meta using information it collects to provide, personalize, and improve its products. *See* Meta Data Policy, p. 5; Singer Report, Appendix 5, p. 86, Appendix 6, p. 125, Appendix 7, p. 162.

[186] For example, Dr. Singer omits "Learn how we share information with these partners" from the description he provides for Meta using information it collects to provide measurement, analytics, and other business services and "**Learn more about how we use information about you to personalize your Facebook and Instagram experience, including features, content and recommendations in Meta Products; you can also learn more about how we choose the ads that you see**" from the description he provides for Meta using information it collects to provide, personalize, and improve its products. *See* Meta Data Policy, pp. 5–6 (emphasis added); Singer Report, Appendix 5, p. 86, Appendix 6, p. 125, Appendix 7, p. 162.

[187] Singer Report, Appendix 5, Appendix 6, Appendix 7.

[188] "[GA4] Set up Analytics for a Website and/or App," *Google Help*, available at https://support.google.com/analytics/answer/9304153, accessed on December 4, 2025 ("[S]et up Google Analytics for your website or app by creating a Google Analytics 4 property, adding a data stream, and adding your Google Analytics code.").

[189] "Conversion Tracking," *Microsoft Advertising*, available at https://about.ads.microsoft.com/en/tools/performance/conversion-tracking, accessed on December 4, 2025 ("Track what your customers are doing after they click on your ad. Universal Event Tracking (UET) is a powerful tool that records what customers do on your website. By creating one UET tag and placing it across your website, Microsoft Advertising will collect data that allows you to track conversion goals and target audiences with remarketing lists."); "How Analytics Data Is Collected," *Adobe*, May 30, 2023, available at https://experienceleague.adobe.com/en/docs/analytics-learn/tutorials/intro-to-analytics/analytics-basics/how-analytics-data-is-collected, accessed on December 4, 2025 ("[T]his code is deployed there, and so when the page comes up, this code runs. And what does it do? Well, it kind of wraps up everything in a nice bow, meaning it grabs some information about the browser and the environment and some of the custom things that you might be putting into the code, and it wraps it up in a nice package, and it sends it to Adobe.").

over the At-Issue Data they would allow Meta to access in the hypothetical scenario presented in the Singer Surveys. Knowledge of this fact is likely to decrease Dr. Singer's estimates of respondents' WTA.

99. Dr. Singer acknowledged in deposition that the nature of the description of the At-Issue Data has "repercussions" on other elements of his surveys.[190] It follows, and I agree, that the description of the At-Issue Data can influence the results of the Singer Surveys. Thus, to the extent that the Singer Surveys mischaracterize the At-Issue Data, it is inappropriate to rely on the Singer Surveys to determine the value of the At-Issue Data.

## VIII. Setting Aside the Many Flaws of the Singer Surveys, Dr. Singer's Estimates of WTA Show That There Is Substantial Heterogeneity Across Respondents and That Most Respondents Were Not Harmed

100. Dr. Singer claims that he is able to calculate a common measure of harm for members of the Proposed Classes that is based on the value they place upon the At-Issue Data.[191] But even ignoring the fatal flaws of the Singer Survey (described in Sections V, VI, and VII of this report), Dr. Singer's own results show that (1) the value of the At-Issue Data he estimated is not common across members of the Proposed Class, (2) that the majority of respondents to his surveys were not harmed as he describes because they do not place any value on the At-Issue Data, and (3) that his use of an average to summarize the heterogeneity across survey respondents was illogical and inappropriate.

### A. Dr. Singer Ignores the Heterogeneity in Respondents' WTA

101. Dr. Singer claims that the average WTA he calculates for the different Proposed Classes "pertains to all Class Members, regardless of individual preferences,"[192] but his own data belies

---

[190] Singer Deposition, pp. 336:11–337:5 ("Q. Are you saying that you would apply your same conjoint methodology to try to analyze damages for this fourth proposed class? A. Not verbatim. But the -- the structure that I lay out, if you -- if you, again, toggle between 1, 2 and 3 in my report, you'll see it's very similar design. What I'm changing largely is my description of the at-issue data. And then of course I have -- that has repercussions. I have to also change the nature of the decoy attributes.").

[191] *See* Singer Report, ¶ 39 ("I demonstrate that CBC analysis can be used to calculate economic injury and assess aggregate damages to Class Members—that is, the value to Class Members of the relevant At-Issue Data accessed in excess of the Agreement Data—using data and methods common to all Class Members within each Class.").

[192] Singer Report, ¶ 112 ("Holding Meta's demand curve fixed, the value of the At-Issue Data is equal to the change in WTA between 'No Access' and 'Access' (the required Compensation). Importantly, this value pertains to all Class Members, regardless of individual preferences. In market-based terminology, this value represents the market equilibrium price for Meta's access to the Healthcare Information. Although individual preferences may be heterogeneous, the underlying value is not.").

this claim. Dr. Singer presents a single damages figure for each Proposed Class per month, equal to the average WTA he calculated across the WTAs he calculates for each respondent in his surveys.[193] Setting aside that the WTAs that Dr. Singer estimates for each respondent are themselves unreliable, Dr. Singer's use of an average WTA across respondents masks substantial differences in the WTAs that Dr. Singer calculates for each respondent in his surveys[194]—as shown in Exhibit 9. To the extent Dr. Singer claims that members of the Proposed Classes were "harmed according to the value they place on the At-Issue Data," such harm is not common across potential members of the Proposed Classes.[195]

[193] Singer Report, ¶ 105 ("Having calculated every respondent's individual required Compensation to be made whole, the final step to determine WTA across the full sample is to aggregate the required Compensation and change in valuation for all respondents in the survey. I do this computation by averaging the required Compensation across all respondents, consistent with the literature on privacy valuation, as detailed in Appendix 3.").

[194] The median, if used, although preferable, would also mask the substantial heterogeneity in the estimated WTAs.

[195] Singer Report, ¶ 8.

***Exhibit 9: The Singer Surveys Show that Respondents Vary Substantially in their WTA for the At-Issue Data***




Source: Singer Report and Backup Materials

Note: This chart shows the distribution of the WTA for individual respondents to the Singer Surveys calculated according to Dr. Singer's methodology. I present the distribution of WTA for members of the Proposed Patient Status Button-Click (PSBC) Class in blue. I present the distribution of WTA for members of the Proposed Patient Health Information Class in red. I present the distribution of WTA for members of the Proposed Prescription Drug Class in green. The histogram displays willingness to accept in bins of equal width, except for 0 and 20, which have their own respective bins. Estimates in the "Exactly $0.00" bin are capped by Dr. Singer at $0. Estimates in the "Exactly $20.00" bin are capped by Dr. Singer at $20.

### B. According to Dr. Singer's Results, Most Survey Respondents Were Not Harmed

102. Not only is there no single WTA common to all survey respondents, Dr. Singer's results, as reported in his backup calculations, imply that many respondents place a $0 value on the At-Issue Data. According to Dr. Singer's estimates, between 29 and 32 percent of respondents had a WTA of $0—indicating that they would freely accept to have Meta's Partners share the At-Issue Data with Meta. See Exhibit 10.

***Exhibit 10: The Singer Surveys' Results Show that Many Respondents Were Not Harmed***

| | PSBC Class | Patient Health Information Class | Prescription Drug Class |
|---|---|---|---|
| Respondents for Which Dr. Singer Estimates $0 WTA | 291 | 331 | 362 |
| Share of Total Respondents | 29% | 32% | 32% |

Source: Singer Report and Backup Materials
Note: The shares expressed are relative to the total number of respondents per survey that Dr. Singer uses to calculate his average Willingness-To-Accept.

103. Dr. Singer's results understate the share of respondents for which he provides no evidence that they were harmed by the alleged misconduct because Dr. Singer incorrectly claims that he cannot account for statistical significance in his estimates.[196] As I explain in Section VI, it is standard practice to account for statistical significance when producing survey-based estimates. Further, Dr. Singer acknowledged the uncertainty inherent in his results and admitted that his partworth estimates contain errors.[197] Testing for the statistical significance of Dr. Singer's WTA estimates is critical because a WTA that is not statistically significantly different from $0 indicates that there is no evidence to support the claim that such a respondent was harmed by the alleged misconduct. For example, Dr. Singer may report that a respondent in his Patient Health Information Class Survey has a WTA of $0.50; however, such a result may be caused by sampling error, other types of survey noise, or by the inherent uncertainty in estimating partworths. WTAs that are not statistically significantly different from zero, even when Dr. Singer reports a positive value, indicate that there is not sufficient evidence to rule out the possibility that the true WTA for certain respondents is zero, and thus such respondents suffered no harm under Dr. Singer's damages framework.

104. Using information about the statistical uncertainty in Dr. Singer's estimates, which I obtained from his backup materials, I tested the statistical significance of his results. As shown in Exhibit 11, I find that between 73 percent and 84 percent of respondents in the Singer Surveys

[196] Singer Deposition, p. 456:10–17 ("Q. And you just can't say to a reasonable degree of certainty up to how many of the potential 29 percent or so are preferring access as opposed to -- A. No, I'm just saying that we can't say with statistical confidence what the willingness to accept is of any individual respondent, including these 29 percent.").

[197] Singer Deposition, p. 457:9–21 ("Q. You can't rule out, based on the work you did, that maybe as many as 29 percent in the proposed PSBC class actually prefer access to the at-issue data, correct? A. I -- I can't rule it out and -- and I can't rule in the 71 either. Right? We -- these are very -- for each individual respondent, there's a lot of uncertainty around what -- what their utilities look like. We have ten observations per. So we're getting these partworths with -- with a lot of error in both directions.").

show no evidence of harm from the alleged misconduct because they have a WTA that, once sampling uncertainty is accounted for, is $0 or statistically indistinguishable from $0.

***Exhibit 11: After Accounting for Uncertainty in the Results of the Singer Surveys, the Majority of Respondents Show No Evidence of Harm***

| | PSBC Class | Patient Health Information Class | Prescription Drug Class |
|---|---|---|---|
| Respondents with WTA statistically indistinguishable from 0 | 738 | 831 | 944 |
| Share of total survey respondents | 73% | 80% | 84% |

Source: Singer Report and Backup Materials
Note: Statistical significance is based on a two-tailed test and is calculated as whether the credible interval containing the central 95% of the distribution of an individual respondent's WTA excludes $0. The distribution of individual respondents' WTA is calculated based on 10,000 "draws" of each respondent's partworths produced by the statistical software used by Dr. Singer. For each of these draws, respondents' individual WTAs are calculated according to Dr. Singer's methodology.

### C. Dr. Singer's Use of an Average to Summarize Respondents' WTA Is Illogical and Inappropriate

105. By capping his estimates of WTA at $0 and $20, Dr. Singer renders his calculation of an average WTA across respondents meaningless.

106. As shown in Exhibit 12, Dr. Singer capped the estimates of WTA for between 46 percent and 49 percent of respondents. Capping a respondent's WTA means that if a respondent's actual WTA falls outside of Dr. Singer's offered compensation range (either by being below $0 or above $20), then Dr. Singer assigns that respondent a WTA value of $0 or $20—instead of measuring that respondent's true WTA. The fact that Dr. Singer capped such a large number of respondents' WTAs suggests that Dr. Singer's model is incapable of generating valid estimates of respondent preferences—likely because the respondents were confused by the survey and could not reliably answer the CBC questions (or that the compensation ranges in the survey were confusing or inappropriate).[198] If a respondent's WTA is capped at (at most) $0, the Singer Surveys can, at best, estimate that the respondent's WTA is at or below $0. Similarly, if a respondent's WTA is capped at $20, the Singer Surveys can, at best, estimate that the

[198] Ben-Akiva et al. (2019), pp. 11 ("A choice-based conjoint (CBC) study offers a consumer a series of menus of alternative products with profiles giving levels of their attributes, including price, and asks the subject to choose the most preferred product in each menu. The menus of products and their descriptions are designed to realistically mimic a market experience where a consumer can choose among various competing products."), 20 ("Menus and their framing that are unlike familiar real market menus can jar the subject and invite cognitive framing that differs from the frames that express preferences and drive choices in market settings.").

respondent's WTA is at or above $20. The calculation of an average requires that all of the WTAs in the average be quantified (rather than below or above a range). However, if a WTA is capped, Dr. Singer is admitting that the WTA is outside the range of his data and that he can only provide a range (less than or equal to $0 or greater than or equal to $20). Because Dr. Singer cannot quantify a large percentage of the WTAs that he uses to calculate his average WTAs, it is inconsistent (and counter to logic) to simultaneously cap the WTAs in the Singer Surveys and then use the average WTA to calculate the value of the At-Issue Data across respondents.

***Exhibit 12: Nearly Half of Respondents to the Singer Surveys Had a Capped WTA Estimate***

| | PSBC Class | Patient Health Information Class | Prescription Drug Class |
|---|---|---|---|
| Capped at $0 | 29% | 32% | 32% |
| Capped at $20 | 21% | 14% | 13% |
| **Total Capped Respondents** | **49%** | **46%** | **46%** |

Source: Singer Report and Backup Materials
Note: An individual respondent is capped at $0 if, according to Dr. Singer's simulation methodology, a respondent gains utility by allowing Facebook access to their data or if the respondent has a negative value for compensation. An individual respondent is capped at $20 if, according to Dr. Singer's methodology, the respondent does not gain sufficient utility by allowing Facebook access to their data at any of the predetermined discrete dollar values offered in the survey, those being $0, $2.50, $5, $7.50, $10, $15, and $20.

107. Given the substantial number of respondents that have a WTA capped at $0 or $20, it would have been more appropriate for Dr. Singer to use the median WTA to summarize the distribution of WTA. The median is a robust statistic that is consistent with capping WTA at $0 or $20. Because the median is the middle estimate (50 percent of the WTAs are above and 50 percent of the WTAs are below the median), the median only requires that Dr. Singer estimate that a WTA is above, below, or equal to the median.[199] As shown in Exhibit 13, using the median rather than the average WTA would reduce Dr. Singer's estimates of damages per month by over 75 percent. To the extent that Dr. Singer's calculation of total damages is based on the estimated WTAs, total damages would also be reduced by the same magnitude.

[199] If the median is one of the caps, then we can only make a less-than-or-equal-to or a greater-then-or-equal-to summary of the respondents WTA. Median statistics rely on the partworths estimated from the Singer Surveys and are thus unreliable for the reasons highlighted elsewhere in this report. Furthermore, medians alone do not summarize the considerable heterogeneity in the WTAs estimated based on the Singer Surveys.

***Exhibit 13: The WTA Estimates from the Singer Surveys Are Substantially Lower When Based on Median WTAs Rather Than Averages***

| | PSBC Class | Patient Health Information Class | Prescription Drug Class |
|---|---|---|---|
| **Average** | | | |
| Average | $5.94 | $3.83 | $3.71 |
| Lower 95% Bound | $5.45 | $3.42 | $3.33 |
| Upper 95% Bound | $6.43 | $4.25 | $4.10 |
| **Median** | | | |
| Median | $1.45 | $0.77 | $0.80 |
| Lower 95% Bound | $0.96 | $0.36 | $0.41 |
| Upper 95% Bound | $1.94 | $1.18 | $1.18 |
| **Overestimate (%)** | 76% | 80% | 79% |

Source: Singer Report and Backup Materials
Note: I report average and median of individual damage estimates as well as 95% confidence intervals for each Proposed Class using the methodology from the Singer Report and backup materials. The percent reduction in Dr. Singer's damages estimates is based on comparing the median individual damage estimate to the average.

108. Dr. Singer provides no justification for the use of the average WTA rather than the median, even though the use of the average as a summary of the distribution of WTAs of different individuals is logically inconsistent with the use of caps at $0 and $20. I note, however, that while the median is logically consistent with Dr. Singer's use of caps at $0 and $20, the data upon which the median is based is unreliable for the reasons provided in this report, thus the median itself is also unreliable.[200]



John Hauser

December 9, 2025

[200] I note that, even if Dr. Singer had used the median rather than the average WTA, the comparisons among his three surveys remain unintuitive as I discussed in Section VI above. The median WTAs are much smaller than the average WTAs, but the estimated median WTAs remain higher for the PSBC Class Survey (for the Patient Status Button Click-Class) than for the Patient Health Information Class Survey or the Prescription Drug Class Survey. *See* Exhibit 13.

A13-4083



HIGHLY CONFIDENTIAL

*ACADEMIC VITA*
# John R. Hauser

*Address*

MIT Sloan School of Management
Massachusetts Institute of Technology, E62-538
Cambridge, Massachusetts 02142
(617) 253-2929
https://mitmgmtfaculty.mit.edu/jhauser/

*Education*

Sc.D. M.I.T., 1975, Operations Research Dissertation: "A Normative Methodology for Predicting Consumer Response to Design Decisions: Issues, Models, Theory and Use."

Advisor: John D. C. Little. Committee members: Glen L. Urban and Moshe Ben-Akiva.

S.M. M.I.T., 1973, Civil Engineering (Transportation Systems Division)

S.M. M.I.T., 1973, Electrical Engineering

S.B. M.I.T., 1973, Electrical Engineering
Joint Thesis (S.M.'s and S.B.): "An Efficient Method to Predict the Impacts of Operating Decisions for Conventional Bus Systems." Advisor: Nigel Wilson.

*Honorary Degree*

Doctor Honoris Causa, Erasmus School of Economics, Erasmus University, Dies Natalis 2016.

*Lifetime Achievement Awards*

Buck Weaver Award 2013, INFORMS Society of Marketing Science (ISMS). This award recognizes lifetime contributions to the theory and practice of marketing science.

Parlin Award 2001, The American Marketing Association describes this award as "the oldest and most distinguished award in the marketing research field."

Converse Award 1996, the American Marketing Association, for "outstanding contributions to the development of the science of marketing."

Churchill Award 2011, the American Marketing Association, Market Research Special Interest Group, for "Lifetime achievement in the academic study of marketing research."

Fellow of the Institute for Operations Research and Management Science (INFORMS)

Inaugural Fellow of the INFORMS Society of Marketing Science (ISMS)

Highly Cited Researcher (ISI Web of Science), Since 2006.

Wall of Distinction at the Louis E. Dieruff High School in Allentown PA. Inducted 2024.

*Awards for Published Papers*

| | |
|---|---|
| INFORMS Society of Marketing Science<br><br><br>(formerly The Institute of Management Science) | John D.C. Little Best-paper Award 2020, Finalist<br>ISMS Long Term Impact Award, 2019, Finalist<br>ISMS Long Term Impact Award, 2018, Finalist<br>ISMS Long Term Impact Award, 2017, Finalist<br>ISMS Long Term Impact Award, 2012, Finalist<br>ISMS Long Term Impact Award, 2011, Finalist<br>John D.C. Little Best-paper Award, 2015, Finalist<br>John D.C. Little Best-paper Award, 2009, Finalist<br>John D.C. Little Best-paper Award, 2003, First Place<br>John D.C. Little Best-paper Award, 1998, Finalist<br>John D.C. Little Best-paper Award, 1994, Finalist<br>John D.C. Little Best-paper Award, 1993, First Place<br>John D.C. Little Best-paper Award, 1990, Honorable Mention<br>Best paper in Marketing Sciences Literature, 1984, Honorable mention.<br>Best Paper in Marketing Sciences Literature, 1983, First Place.<br>Best Paper in Marketing Sciences Literature, 1982, First Place.<br>Two published articles were cited in 2007 as one of "the top 20 marketing science articles in the past 25 years. |
| American Marketing Association: | Explor Award (Leadership is on-line market research), 2004, First-Place<br>Finalist, Paul Green Award for contributions to marketing research, 2004<br>MSI Award for Most Significant Contribution to Practice of Marketing in 1996.<br>Finalist, O'dell Award for best paper in the *Journal of Marketing Research*, published in 1986, awarded in 1991.<br><br>One of the top 50 most prolific marketing scholars (top journals) in the last 25 years (1982-2006). Total articles, rate of publication, and author-adjusted rate. |
| Product Development Management Assoc. | Best Paper Award, Finalist, 2003.<br>Best Paper Award, Finalist, 2002.<br>One of ten most-cited papers in the *Journal of Product Innovation Management*.<br>One of the top articles in educational citations in the last twenty years. |
| European Marketing Academy | Best Paper in *IJRM*, Finalist, 2014 |
| Sawtooth Software Conference | Best Presentation and Paper, 2006; Runner-up, 2008, Honorable Mention, 2016. |
| European Society of Marketing Research | Best Paper at Rome conference, September 1984. |
| Emerald Management Reviews | 2010 Citation of Excellence (top 50 of 15,000 published papers in 2009) |
| Doctoral Consortia Faculty | American Marketing Association, 1979, 1984, 1985, 1986, 1988, 1989, 1991, 1993, 1995, 1997, 1998, 2001, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2012, 2013, 2014.<br><br>INFORMS Society of Marketing Science, 2002 (founding member), 2003, 2004, 2012, 2014, 2015, 2017, 2018.<br><br>European Marketing Academy, 1985 |

*Awards, Teaching*

| | |
|---|---|
| MIT Sloan School of Management: | Nominated for Excellence in Teaching Award 2000, 2007, 2008, 2020<br>Named "Outstanding Faculty" by *Business Week Guide to the Best Business Schools* (1995). |

| | |
|---|---|
| | Excellence in Teaching Award 1994 (Awarded by the Master's Student class). |

*Awards for Thesis Supervision*

| | |
|---|---|
| American Marketing Association (PhD): | Winner John Howard Dissertation Award (2010, Matt Selove, Committee)<br>Co-winner John Howard Dissertation Award (2005, Olivier Toubia)<br>1st Place (1981, Ken Wisniewski)<br>Honorable Mention (1979, Patricia Simmie). |
| INFORMS (PhD) | ISMS Doctoral Dissertation Proposal Award (2016, Artem Timoshenko)<br>Finalist for the Frank Bass Award (2019, Artem Timoshenko, awarded 2023)<br>Winner of the Frank Bass Award (2004, Olivier Toubia, awarded 2005)<br>Winner of the Frank Bass Award (1989, Abbie Griffin, awarded 1995) |
| MIT Sloan School of Management (PhD): | 1st Place (1987, Peter Fader) |
| MIT Sloan School of Management (Master's): | 1st Place (1991, Jon Silver and John Thompson)<br>1st Place (1983, Steve Gaskin)<br>Honorable Mention (1982, Larry Kahn). |
| Marketing Science Institute | MSI Alden G. Clayton Doctoral Dissertation Proposal Competition 2017, Artem Timoshenko |

*Awards, Other*

| | |
|---|---|
| M.I.T. Great Dome Award | September 2023 |
| Who's Who in America | Since 1997 |
| Who's Who in Management Science | Since 2000 |
| Who's Who in Economics | Since 2003 |
| Who's Who in Finance and Business | Since 2009 |
| Harvard Business School: | Marvin Bower Fellow, 1987 - 1988. |
| National Science Foundation Fellowship: | 1971 - 1974. |
| M.I.T. | National Scholar, 1967 - 1971. |
| Honor Societies: | Tau Beta Pi, Eta Kappa Nu, Sigma Xi |

*Directorships, Trustee, Advisory Board*

| | |
|---|---|
| 2016 – 2024 | Founder, Board of Directors, Hyper Morphing Technologies, B.V. |
| 1988 – Present | Founder, Board of Directors, then Senior Product Development Consultant at Applied Marketing Science, Inc. |
| March 2003 – July 2009 | Trustee, Marketing Science Institute |

*Academic Appointments*

| | |
|---|---|
| January 1989 - Present | Kirin Professor of Marketing<br>MIT Sloan School of Management<br>Massachusetts Institute of Technology<br>Cambridge, Massachusetts 02142 |
| July 2024 – June 2025 | Head, Marketing Group |
| July 2017 – June 2023 | Head, Marketing Group |
| January 2020-June 2020 | Acting Area Head, Management Science Area and member of Governance Committee |
| July 2010 – June 2011 | Head, Marketing Group |
| July 2005 – June 2009 | Area Head, Management Science Area |
| July 1988 – June 2003 | Head, Marketing Group |
| September 1993 - May 2000 | Co-Director, International Center for Research on the Management of Technology |
| September 1997 - May 2000 | Research Director, Center for Innovation in Product Development |
| June 2001 – June 2006 | Virtual Customer Initiative Leader, Center for Innovation in Product Development |
| July 1984 - January 1989 | Professor of Management Science<br>MIT Sloan School of Management<br>Massachusetts Institute of Technology<br>Cambridge, Massachusetts 02142 |
| July 1987 - June 1988 | Marvin Bower Fellow<br>Harvard Business School<br>Harvard University<br>Cambridge, Massachusetts 02163 |
| March 1985 - May 1985 | Visiting Lecturer<br>European Institute of Business Administration<br>Fontainebleau, FRANCE |
| September 1980 - June 1984 | Associate Professor of Management Science<br>MIT Sloan School of Management<br>Massachusetts Institute of Technology<br>Cambridge, Massachusetts 02142 |
| September 1975 - August 1980 | Assistant Professor of Marketing and of Transportation<br>(granted tenure and promoted in 1980)<br>Graduate School of Management and Transportation Center<br>Northwestern University<br>Evanston, Illinois 60201 |

*Teaching Interests*

Marketing Management, New Product and Service Development, Competitive Marketing Strategy, Marketing Models, Measurement and Marketing Research, Research Methodology, Marketing Analytics.

*Research Interests*

Consumer decision measurement: conjoint analysis, non-compensatory methods, adaptive methods, machine-

learning methods, strategic importance of accuracy. Product forecasting: information acceleration, really-new products, incentive-aligned games. Consumer behavior: cognitive simplicity in decision making and in dynamic models, theory-based models, vivid stimuli. Morphing: website, banner, product assortment. Voice of the customer methods, defensive and competitive strategy, new product development, experimental and quasi-experimental methods.

*Books*

Hauser, John R. and Glen L. Urban (2016), *From Little's Law to Marketing Science: Essays in Honor of John D. C. Little*, MIT Press: Cambridge MA.

This is an edited volume that serves as a Festschrift to honor the lifetime achievements of John D. C. Little.

Urban, Glen L. and John R. Hauser (1993), *Design and Marketing of New Products, 2E*, Prentice-Hall.

A comprehensive text that integrates advanced, state-of-the-art techniques to provide graduate-level students and marketing professionals with an understanding of the techniques and an operating ability to design, test, and implement new products and services.

This text has been honored by being selected for both the Prentice-Hall International Series in Management and the Series in Marketing. It has been adopted at a number of major universities. In a 1988 survey it was identified the 1980 version as the most widely used new product textbook at the graduate level.

The revision includes new material on designing for quality, reduced cycle times, prelaunch forecasting, quality improvement, defensive and competitive strategy, value mapping, the integration of marketing and engineering, new issues of organization, customer satisfaction, and new international examples. It is available in Korean and is being translated into Japanese and Chinese. Many current texts draw heavily from our material.

Third most cited work in the *Journal of Product Innovation*, 1984-2004. (Cited May 2010.)

Urban, Glen L., John R. Hauser, and Niki Dholakia (1986), *Essentials of New Product Management*, Prentice Hall.

This is an undergraduate textbook which presents the essential concepts but written for a non-technical audience. It has been translated to Japanese and has sold well in Japan.

Hauser, John R. (1986), *Applying Marketing Management: Four Simulations*, Scientific Press.

This mini-text and software package contains four tutorial exercises for marketing management concepts. With this package students learn positioning, competitive strategy, new product development, and life cycle forecasting while using the personal computer to simulate marketing management problems. A detailed instructor's manual and transparency masters are also available. It is available in Japanese.

Hauser, John R. (1989), *ENTERPRISE: An Integrating Management Exercise*, Scientific Press.

This mini-text and software package contains a comprehensive competitive simulation. Students compete in six markets by making marketing and production decisions. A detailed instructor's manual and administrative software is also available. It is available in Japanese.

*Journal Editor*

*Marketing Science*, Editor-in-Chief for Volumes 8, 9, 10, 11, 12, and 13 (1989-1994). Four issues per year including periodic editorials and journal management. Processed about 120 new papers per year. Special Editor for issues on the Theory and Practice of Marketing (2014) and Big Data (2016).

*Journal Publications (available on https://mitmgmtfaculty.mit.edu/jhauser/, download or link to journal)*

*Citations Reports:* Google Scholar: 35,694 citations, H-index of 66. Visited December 21, 2024.

Liberali, Gui, Eric Boersma, Hester Lingsma, Jasper Brugts, Diederik Dippel, Jan Tijssen, John R. Hauser (2025), "Real-time Adaptive Randomization of Clinical Trials," *Journal of Clinical Epidemiology*, 178.

Burnap, Alex, John R. Hauser, Artem Timoshenko (2023), "Product Aesthetic Design: A Machine Learning Augmentation," *Marketing Science*, 42(6):1029-1056.

Dzyabura, Daria, Siham El Kihal, John R. Hauser, and Marat Ibragimov (2023), "Leveraging the Power of Images in Predicting Product Return Rates, " *Marketing Science* 42(6):1125-1142.

Proserpio, Davide, John R. Hauser, Tomomichi Amano, Alex Burnap, Tong Guo, Dokiun Lee, Xiao Liu, Randall Lewis, Kanishka Misra, Eric Schwarz, Artem Timoshenko, Lilei Xu, Hema Yoganarasimhan (2020), "Soul and Machine (Learning)" *Marketing Letters*, 31:393–404.

Urban, Glen L., Artem Timoshenko, Paramveer Dhillon, and John Hauser (2020), "Cutting Through the Hype of Deep Learning," *MIT Sloan Management Review*, Winter, 71-76.

Hauser, John R., Felix Eggers, and Matthew Selove (2019), "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, 38, 6, 1059-1081.

Dzyabura, Daria and John R. Hauser (2019), "Recommending Products When Consumers Learn their Preferences," *Marketing Science*, 38, 3, 417-441.

Timoshenko, Artem and John R. Hauser (2019), "Identifying Customer Needs from User-Generated Content," *Marketing Science*, 38, 1, 1-20.

Finalist, John D. C. Little Award for Best Article in the Marketing Sciences Literature, 2020.

Lin, Song, Juanjuan Zhang, and John R. Hauser (2015), "Learning from Experience, Simply," *Marketing Science*, 34, 1, (January-February), 1-19.

Finalist, John D. C. Little Award for Best Article in the Marketing Sciences Literature, 2015.

Hauser, John R., Guilherme Liberali, and Glen L. Urban (2014), "Website Morphing 2.0: Switching Costs, Partial Exposure, Random Exit, and When to Morph," *Management Science*, 60, 6, (June), 1594–1616.

Hauser, John R. (2014), "Consideration-Set Heuristics," *Journal of Business Research,* 67 (8), 1688-1699.

Urban, Glen L., Guilherme Liberali, Erin MacDonald, Robert Bordley, and John R. Hauser (2014), "Morphing Banner Advertisements," *Marketing Science*, 33, 1.

Hauser, John R., Songting Dong, and Min Ding (2014), " Self-Reflection and Articulated Consumer Preferences," *Journal of Product Innovation Management*, 31, 1, 17-32.

Liberali, Guilherme, Glen L. Urban, and John R. Hauser (2013), " Competitive Information, Trust, Brand Consideration, and Sales: Two Field Experiments " *International Journal for Research in Marketing*, 30, 2, (June), 101-113.

Finalist, IJRM Best Paper Award, 2014.

Dzyabura, Daria and John R. Hauser (2011), "Active Machine Learning for Consideration Heuristics," *Marketing Science*, 30, 5, (September-October), 801-819.

**A13-4089**

Hauser, John R. (2011), "A Marketing Science Perspective on Recognition-Based Heuristics (and the Fast and Frugal Paradigm)," *Judgment and Decision Making*, 6, 5, (July), 396-408.

Ding, Min, John Hauser, Songting Dong, Daria Dzyabura, Zhilin Yang, Chenting Su, and Steven Gaskin (2011), "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research*, 48, (February), 116-127.

Hauser, John R., Olivier Toubia, Theodoros Evgeniou, Daria Dzyabura, and Rene Befurt (2010), "Disjunctions of Conjunctions: Cognitive Simplicity and Consideration Sets," *Journal of Marketing Research*, 47, (June), 485-496.

Urban, Glen L., John R. Hauser, Guilherme Liberali, Michael Braun, and Fareena Sultan (2009), "Morph the Web to Build Empathy, Trust, and Sales," *Sloan Management Review*, 50, 4, (Summer), 53-61.

Hauser, John R., Glen L. Urban, Guilherme Liberali, and Michael Braun (2009), "Website Morphing," *Marketing Science.*, 28, 2, (March-April), 202-224. Lead article with commentaries by Andrew Gelman, John Gittins, and Hal Varian. Includes rejoinder.

Finalist, John D. C. Little Award for Best Article in the Marketing Sciences Literature, 2009.

Finalist, INFORMS Society for Marketing Science Long Term Impact Award, 2017, 2018, 2019

2010 Emerald Management Reviews Citation of Excellence for one of best articles published in the top 400 business and management journals in 2009. (Top 50 of 15,000 articles.)

Toubia, Olivier, John R. Hauser and Rosanna Garcia (2007), "Probabilistic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Theory and Application," *Marketing Science*, 26, 5, (September-October), 596-610.

Co-winner, American Marketing Association, John Howard Dissertation Award, 2005

Yee, Michael, Ely Dahan, John Hauser, and James Orlin (2007), "Greedoid-Based Non-compensatory Two-Stage Consideration-then-Choice Inference," *Marketing Science*, 26, 4, (July-August), 532-549.

First Place, American Marketing Association Explor Award, 2004

Toubia, Olivier and John R. Hauser (2007), "On Managerial Efficient Designs," *Marketing Science*, 26, 6, (November-December), 851-858.

Garcia, Rosanna, Paul Rummel, and John R. Hauser (2007), "Validating Agent-Based Marketing Models Using Conjoint-Analysis," *Journal of Business Research*, 60, 8, (August), 848-857.

Hauser, John R., Gerald Tellis, and Abbie Griffin (2006), "Research on Innovation: A Review and Agenda for Marketing Science," *Marketing Science*, 25, 6, (November-December), 687-717.

Cited by Thomson Reuters' Essential Science Indicators as a Fast-Breaking Paper in Economics and Business in April 2009.

Cited in 2014 by the *International Journal of Research in Marketing* as one of the top 10 impactful articles published in *Marketing Science* during 2004-2012.

Hauser, John R. and Olivier Toubia (2005), "The Impact of Utility Balance and Endogeneity in Conjoint Analysis," *Marketing Science*, 24, 3, (Summer), 498-507.

Glen L. Urban and John R. Hauser (2004), "'Listening-In' to Find and Explore New Combinations of Customer Needs," *Journal of Marketing*, 68, (April), 72-87.

Toubia, Olivier, John R. Hauser, and Duncan Simester (2004), "Polyhedral Methods for Adaptive Choice-based Conjoint Analysis," *Journal of Marketing Research*, 41, 1, (February), 116-131.

Finalist, Paul Green Award for contributions to the practice of marketing research.

Toubia, Olivier, Duncan I. Simester, John R. Hauser, and Ely Dahan (2003), "Fast Polyhedral Adaptive Conjoint Estimation," *Marketing Science*, 22, 3, (Summer), 273-303.

First Place, John D. C. Little Award for Best Article in the Marketing Sciences Literature, 2003

First Place, Frank M. Bass Award for Best Article Based on a Dissertation, 2005.

Finalist, INFORMS Society for Marketing Science Long Term Impact Award, 2011

Finalist, INFORMS Society for Marketing Science Long Term Impact Award, 2012

Dahan, Ely and John R. Hauser (2002), "The Virtual Customer," *Journal of Product Innovation Management*, 19, 5, (September), 332-354.

Finalist, PDMA Best Paper Award in 2003.

Hauser, John R. (2001), "Metrics Thermostat," *Journal of Product Innovation Management*, 18, 3. (May), 134-153.

Finalist PDMA Best Paper Award in 2002.

Cited by the PDMA in 2007 as one of the top articles in the last twenty years in educational citations.

Simester, Duncan I, John R. Hauser, Birger Wernerfelt, and Roland Rust (2000), "Implementing Quality Improvement Programs Designed to Enhance Customer Satisfaction: Quasi-experiments in the United States and Spain," *Journal of Marketing Research*, 37, 1, (February), 102-112.

Hauser, John R. (1998), "Research, Development, and Engineering Metrics." *Management Science*, 44, 12, December, 1670-1689.

Hauser, John R. and Gerry Katz (1998), "Metrics: You Are What You Measure!" *European Management Journal*, 16, 5, (October), 516-528. Highlighted in "A Round-up of Important Articles from Business Periodicals," in *Mastering Management Review* published by the *Financial Times*.

Hauser, John R., Duncan I. Simester, and Birger Wernerfelt (1997), "Side Payments in Marketing," *Marketing Science*, 16, 3, 246-255.

Finalist, John D. C. Little Award for Best Article in the Marketing Sciences Literature, 1997.

Urban, Glen L., John R. Hauser, William J. Qualls, Bruce D. Weinberg, Jonathan D. Bohlmann and Roberta A. Chicos (1997), "Validation and Lessons from the Field: Applications of Information Acceleration," *Journal of Marketing Research*, 34, 1, (February), 143-153.

Hauser, John R. and Florian Zettelmeyer (1997), "Metrics to Evaluate R, D&E," *Research Technology Management*, 40, 4, (July-August), 32-38.

Griffin, Abbie, and John R. Hauser (1996), "Integrating Mechanisms for Marketing and R&D," *Journal of Product Innovation Management*, 13, 3, (May), 191-215.

One of ten most-cited papers in the *Journal of Product Innovation Management* (JPIM 24, 3, 2007, p.209)

Hauser, John R., Duncan I. Simester, and Birger Wernerfelt (1996), "Internal Customers and Internal Suppliers," *Journal*

*of Marketing Research,* 33, 3, (August), 268-280.

Urban, Glen L., Bruce Weinberg and John R. Hauser (1996), "Premarket Forecasting of Really-New Products," *Journal of Marketing,* 60,1, (January), 47-60. Abstracted in the Journal of Financial Abstracts, 2, 23A, (June) 1995.

1996 MSI Award for the most significant contribution to the advancement of the practice of marketing.

Hauser, John R., Duncan I. Simester, and Birger Wernerfelt (1994), "Customer Satisfaction Incentives," *Marketing Science*, 13, 4, (Fall), 327-350.

Finalist, John D. C. Little Award for Best Article in the Marketing Sciences Literature, 1994.

Hauser, John R., Glen L. Urban, and Bruce Weinberg (1993), "How Consumers Allocate their Time When Searching for Information," *Journal of Marketing Research,*30, 4, (November), 452-466.

Hauser, John R. (1993), "How Puritan Bennett Used the House of Quality," *Sloan Management Review*, 34, 3, (Spring), 61-70. Reprinted in *Taiwan Philips News* (in Chinese), 23, 1, (Feb), 1994.

Griffin, Abbie and John R. Hauser (1993), "The Voice of the Customer," *Marketing Science*, 12, 1, (Winter), 1-27.

First-place, John D. C. Little Award for Best Article in Marketing Sciences Literature, 1993.

First Place, Frank M. Bass Award for Best Article Based on a Dissertation, 1995.

Cited in 2007 by the INFORMS Society of Marketing Science as one “of the top 20 marketing science articles in the past 25 years.

Cited in 2014 by the *International Journal of Research in Marketing* as one of the top 10 academically most impactful marketing science papers.

Griffin, Abbie and John R. Hauser (1992), "Patterns of Communication Among Marketing, Engineering, and Manufacturing -- A Comparison between Two New Product Teams," *Management Science*, 38, 3, (March), 360-373.

One of the 500 most-cited articles in the first 50 years of *Management Science*.

Urban, Glen. L., John. R. Hauser, and John. H. Roberts (1990), "Prelaunch Forecasting of New Automobiles: Models and Implementation," *Management Science*, 36, 4, (April), 401-421. Reprinted in *Modeling for Management, Vol. 1*, George P. Richardson, ed., Dartmouth Publishing Co., Hampshire England.

INFORMS (TIMS) Finalist, Best Article in Marketing Science Literature, 1990.

Hauser, John R. and Birger Wernerfelt (1990), "An Evaluation Cost Model of Consideration Sets," *Journal of Consumer Research*, 16, (March), 393-408.

Hauser, John R. and Birger Wernerfelt (1989), "The Competitive Implications of Relevant-Set/Response Analysis," *Journal of Marketing Research*, 26, 4, (November), 391-405.

Hauser, John R. and Don Clausing (1988), "The House of Quality," *Harvard Business Review*, 66, 3, (May-June), 63-73. Reprinted in *The Product Development Challenge*, Kim B. Clark and Steven C. Wheelwright, eds., Harvard Business Review Book, Boston MA 1995. Reprinted in *IEEE Engineering Management Review*, 24, 1, Spring 1996. Translated into German and published in Hermann Simon and Christian Homburg (1998), *Kunderzufriedenheit*, (Druck and Buchbinder, Hubert & Co.: Gottingen, Germany).

Fader, Peter and John R. Hauser (1988), "Implicit Coalitions in a Generalized Prisoner's Dilemma," *Journal of Conflict Resolution*, 32, 3, (September), 553-582.

Hauser, John R. (1988), "Competitive Price and Positioning Strategies," *Marketing Science*, 7, 1, (Winter), 76-91.

Hauser, John R. (1986), "Agendas and Consumer Choice," *Journal of Marketing Research*, 2, 3, (August), 199-212. (Includes unpublished appendix containing "Proofs of Theorems and Other Results.") Reprinted in Gregory S. Carpenter, Rashi Glazer, and Kent Nakamota (1997), *Readings on Market-Driving Strategies, Towards a New Theory of Competitive Advantage,* (Reading, MA: Addison-Wesley Longman ,Inc.)

Finalist, 1991 American Marketing Associations O'dell Award for Best Paper in *JMR* (5-year lag)

Hauser, John R. and Glen L. Urban (1986), "Value Priority Hypotheses for Consumer Budget Plans," *Journal of Consumer Research*, 12, 4, (March), 446-462.

Eliashberg, Jehoshua and John R. Hauser (1985), "A Measurement Error Approach for Modeling Consumer Risk Preference," *Management Science*, 31, 1, (January), 1-25.

Hauser, John R., and Steven P. Gaskin (1984), "Application of the `DEFENDER' Consumer Model," *Marketing Science*, 3, 4, (Fall), 327-351. Reprinted (in French) in *Recherche et Applications on Marketing*, Vol. 1, April 1986, pp. 59-92.

Urban, Glen L., P. L. Johnson and John R. Hauser (1984), "Testing Competitive Market Structures," *Marketing Science*, 3, 2, (Spring), 83-112.

INFORMS (TIMS) Finalist, Best Article in Marketing Science Literature, 1984.

Hauser, John R. (1984), "Consumer Research to Focus R&D Projects" *Journal of Product Innovation Management*, 1, 2, (January), 70.84.

Hauser, John R., and Steven M. Shugan (1983), "Defensive Marketing Strategy," *Marketing Science*, 2, 4, (Fall), 319-360.

INFORMS (TIMS) Best Article in Marketing Science Literature, 1983.

Cited in 2007 by the INFORMS Society of Marketing Science as one “of the top 20 marketing science articles in the past 25 years.

Republished in 2008 as one of eight “classic” articles in *Marketing Science*.

Cited in 2014 by the *International Journal of Research in Marketing* as one of the top 10 academically most impactful marketing science papers.

Hauser, John R., and Kenneth J. Wisniewski (1982), "Application Predictive Test, and Strategy Implications of a Dynamic Model of Consumer Response," *Marketing Science*, 1, 2, (Spring), 143-179.

Hauser, John R., and Kenneth J. Wisniewski (1982), "Dynamic Analysis of Consumer Response to Marketing Strategies," *Management Science*, 28, 5, (May), 455-486.

INFORMS (TIMS) Best Article in Marketing Science Literature, 1982.

Tybout, Alice M. and John R. Hauser (1981), "A Marketing Audit Using a Conceptual Model of Consumer Behavior: Application and Evaluation," *Journal of Marketing*, 45, 3, (Summer), 81-101.

Hauser, John R., and Patricia Simmie (1981), "Profit Maximizing Perceptual Positions: An Integrated Theory for the Selection of Product Features and Price," *Management Science*, 27, 2, (January), 33-56.

One of the 500 most-cited articles in the first 50 years of *Management Science*.

Hauser, John R., Frank S. Koppelman and Alice M. Tybout (1981), "Consumer-Oriented Transportation Service

Planning: "Consumer Analysis and Strategies," *Applications of Management Science*, 1, 91-138.

Hauser, John R., and Steven M. Shugan (1980), "Intensity Measures of Consumer Preference," Operation Research, 28, 2, (March-April), 278-320.

Hauser, John R., and Frank S. Koppelman (1979), "Alternative Perceptual Mapping Techniques: Relative Accuracy and Usefulness, *Journal of Marketing Research*, 16, 4, (November), 495-506.

Hauser, John R., and Glen L. Urban (1979), "Assessment of Attribute Importances and Consumer Utility Functions: von Neumann-Morgenstern Theory Applied to Consumer Behavior," *Journal of Consumer Research*, 5, (March), 251-262.

Koppelman, Frank S. and John R. Hauser (1979), "Destination Choice Behavior for Non-Grocery Shopping Trips," *Transportation Research Record*, 673, 157-165.

Hauser, John R. (1978), "Consumer Preference Axioms: Behavioral Postulates for Describing and Predicting Stochastic Choice," *Management Science*, 24, 13, (September), 1331-1341.

Hauser, John R. (1978), "Testing the Accuracy, Usefulness and Significance of Probabilistic Models: An Information Theoretic Approach," *Operations Research*, 26, 3, (May-June), 406-421.

Hauser, John R. and Glen L. Urban (1977), "A Normative Methodology for Modeling Consumer Response to Innovation," *Operations Research*, 25, 4. (July-August), 579-619.

*Published Notes and Commentaries (available on https://mitmgmtfaculty.mit.edu/jhauser/, download or link to journal)*

Feinberg, Fred, John R. Hauser, John H. Roberts, and Juanjuan Zhang (2025), “The Legacy of John Little for Marketing Science,” *Marketing Science*, forthcoming.

Hauser, John R. (2016), “The Marketing Science Revolution and Subsequent Evolution,” *103rd Dies Natalis of Erasmus University*, November 2016.

Hauser, John R. (2017), “Phenomena, Theory, Application, Data, and Methods all Have Impact,” *Journal of the Academy of Marketing Sciences*, 45:7-9.

Chintagunta, Pradeep, Dominique Hanssens, John R. Hauser (2016), “Marketing Science and Big Data,” *Marketing Science*, 35, 1, 1-2.

Hauser, John R. (2016), “Paul E. Green: An Applications’ Guru,” in Vithala Rao and V. Srinivasan, Eds., *Paul Green’s Legends Volume: Conjoint Analysis Applications*, (Newbury Park, CA: Sage Publications). Forthcoming.

Hauser, John R. (2016), “Perspectives on Paul E. Green,” in Vithala Rao and V. Srinivasan, Eds., *Paul Green’s Legends Volume: Paul Green’s Contributions to Conjoint Analysis – Early Years,* (Newbury Park, CA: Sage Publications). Forthcoming.

Sunil Gupta, Dominique Hanssens, John Hauser, Donald Lehmann, and Bernd Schmitt (2014), “Theory and Practice in Marketing Special Section in Marketing Science,” *Marketing Science*, 33, 1.

Chintagunta, Pradeep, Dominique Hanssens, John R. Hauser, Jagmohan Singh Raju, Kannan Srinivasan, and Richard Staelin (2013), “*Marketing Science*: A Strategic Review,” *Marketing Science,* 33, 1, (January-February).

Hauser, John R. (2011), “New Developments in Product-Line Optimization,” *International Journal on Research in Marketing*, 28, 26-27. Commentary on papers by Michalek, Ebbes, Adigüzel, Feinberg, and Papalambros, “Enhancing Marketing with Engineering,” and Tsafarakis, Marinakis, and Matsatsinis, “Particle Swarm Optimization for Optimal Product Line Design.”

Hauser, John R. and Steven M. Shugan (2007), "Comments on 'Defensive Marketing Strategy,'" *Marketing Science*, 27, 1, (January-February), 85-87.

Rangaswamy, Arvind, Jim Cochran, Tülin Erdem, John R. Hauser, and Robert J. Meyer (2007), "Editor-in-Chief Search Committee Report: The Digital Future is Here," *Marketing Science*, 27, 1, (January-February), 1-3.

Hauser, John R. (2006), "Twenty-Five Years of Eclectic Growth in Marketing Science," *Marketing Science* (invited commentary), 25, 6, (November-December), 557-558.

Hauser, John R., Greg Allenby, Frederic H. Murphy, Jagmohan Raju, Richard Staelin, and Joel Steckel (2005), "Marketing Science – Growth and Evolution," *Marketing Science*, 24, 1, (Winter), 1-2, invited editorial.

Hauser, John R., Scott Carr, Barbara Kahn, James Hess, and Richard Staelin (2002), "Marketing Science: A Strong Franchise with a Bright Future," *Marketing Science*, 21, 1, (Winter), invited editorial.

Hauser, John R. (1984), "Price Theory and the Role of Marketing Science," *Journal of Business*, Vol. 57, No. 1, (January), S65-S72.

Hauser, John R. (1980), "Comments on 'Econometric Models of Probabilistic Choice Among Products'," *Journal of Business*, 53, 3, Part 2, (July 1980), S31-S34.

*Papers in Edited Volumes and/or Proceedings (most are available on https://mitmgmtfaculty.mit.edu/jhauser/, download or link to journal)*

Eggers, Felix and John R. Hauser (2024), "Empirical Generalizations about Predictive Accuracy in Choice Experiments," *Advances in Consumer Research*, 52, forthcoming.

Befurt, Rene, Felix Eggers, and John R. Hauser (2024), "Supply Side Considerations When Using Conjoint Analysis in Litigation," *Handbook of Marketing Analytics: Methods and Applications in Marketing, Public Policy, and Litigation* (Edward Elgar), Natalie Mizik and Dominique Hanssens, Eds.

Hauser, John R., Chengfeng Mao, and James Li (2023), "Artificial Intelligence and User-generated Data are Transforming how Firms come to Understand Customer Needs," *Review of Marketing Research*, K. Sudhir and Olivier Toubia, eds, Volume 20, 147–167.

Hauser, John R. (2022), "Reflections on a Career as a Marketing Engineer," *Foundations and Trends in Marketing. Reflections of Eminent Marketing Scholars*, Chapter 24, 116-121/

Eggers, Felix, John R. Hauser, Matthew Selove (2016), "The Effects of Incentive Alignment, Realistic Images, Video Instructions, and Ceteris Paribus Instructions on Willingness to Pay and Price Equilibria," forthcoming, *Proceedings of the Sawtooth Software Conference*, Park City, Utah, September 28-30, 2016.

Honorable Mention, Best Paper at Sawtooth Software Conference, 2016.

Timoshenko, Artem and John R. Hauser (2016). "Mining and Organizing User-Generated Content to Identify Attributes and Attribute Levels," forthcoming, *Proceedings of the Sawtooth Software Conference*, Park City, Utah, September 28-30, 2016.

Hauser, John R. (2016), "Comments on "How Many Options? Behavioral Responses to Two Versus Five Alternatives Per Choice" by Martin Meissner, Harmen Oppewal, And Joel Huber, *Proceedings of the Sawtooth Software Conference*, Park City, Utah, September 28-30, 2016.

Liberali, Gui, John R. Hauser, and Glen L. Urban (2017), "Morphing Theory and Applications," *Handbook of Marketing Decision Models* (New Edition, 2017), International Series in Operations Research & Management Science published by Springer Science and Business Media, Berend Wierenga and Ralf van der Lans, Editors.

Selove, Matthew and John R. Hauser (2010), "How Does Incorporating Price Competition into Market Simulators

Affect Product Design Decisions?" *Proceedings of the Sawtooth Software Conference*, Newport Beach, CA, Oct 6-8, 2010.

Hauser, John R. and Glen L. Urban (2009), "Profile of John D. C. Little," in Saul I. Gass and Arjang A. Assad eds. *Profiles in Operations Research,* (New York, NY: Springer).

Ding, Min, Steven Gaskin, and John Hauser (2009), "A Critical Review of Non-compensatory and Compensatory Models of Consideration-Set Decisions," *2009 Sawtooth Software Conference Proceedings*, Delray, FL, March 23-27, 2009, 207-232.

Runner-up, Best Paper at Sawtooth Software Conference, 2009.

Gaskin, Steven, Theodoros Evgeniou, Daniel Bailiff, John Hauser (2007), "Two-Stage Models: Identifying Non-Compensatory Heuristics for the Consideration Set then Adaptive Polyhedral Methods Within the Consideration Set," *Proceedings of the Sawtooth Software Conference* in Santa Rosa, CA, October 17-19, 2007.

Hauser, John R. and Ely Dahan (2010), "New Product Development," in Rajiv Grover, Ed., *Essentials of Marketing Management,* (Englewood Cliffs, NJ: Prentice Hall), forthcoming January 2011.

Toubia, Olivier, Theodoros Evgeniou, and John Hauser (2007), "Optimization-Based and Machine-Learning Methods for Conjoint Analysis: Estimation and Question Design," in Anders Gustafsson, Andreas Herrmann and Frank Huber, Eds, *Conjoint Measurement: Methods and Applications*, 4E, (New York, NY: Springer). 231-258.

Hauser, John R., Ely Dahan, Michael Yee, and James Orlin (2006), "`Must Have` Aspects vs. Tradeoff Aspects in Models of Customer Decisions," *Proceedings of the Sawtooth Software Conference* in Del Ray Beach, FL, March 29-31, 2006

Best Paper at the Sawtooth Software Conference, 2006.

Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," *Advances in Market Research and Modeling: Progress and Prospects,* Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), 141-168.

Dahan, Ely and John R. Hauser (2003), "Product Management: New Product Development and Launching," *Handbook of Marketing*, Barton Weitz and Robin Wensley, Eds, Sage Press, (June), 179-222.

Hauser, John R. (1997), "The Role of Mathematical Models in the Study of Product Development," *Proceedings of the 14th Paul D. Converse Awards Conference*, University of Illinois, Champaign-Urbana, IL, 72-90.

Swanson, Derby A. and John R. Hauser (1995), "The Voice of the Customer: How Can You Be Sure You Know What Customers Really Want?" *Proceedings* of the 1st Pacific Rim Symposium of Quality Function Deployment, MacQuarie University, NSW Australia, February 15-17.

Little, John D. C., Leonard M. Lodish, John R. Hauser, and Glen L. Urban (1993), "Comment on `Marketing Science's Pilgrimage to the Ivory Tower' by Hermann Simon," in *Research Traditions in Marketing*, Gary L. Lilien, Bernard Pras, and Gilles Laurent, eds, (Kluwer), 45-51.

Hauser, John R. (1986), "Theory and Application of Defensive Strategy" in *The Economics of Strategic Planning,* Lacy G. Thomas, ed., (Lexington Books, D. C. Heath & Co.: Lexington, MA), 113-140. Reprinted by the Marketing Science Institute.

Hauser, John R. (1985), "The Coming revolution in Marketing Theory," in R. Russell, ed., *Marketing in an Electronic Age*, (Harvard Business School Press: Boston, MA), 344-363.

Hauser, John R. and Glen L. Urban (1984), "Consumer Durables: Actual Budgets Compared to Value Priority Model - Preliminary Results and Managerial Implications," *Proceedings* of the ESOMAR-Congress, Rome, Italy,

A13-4096

(September).

Best Paper at ESOMAR Rome Conference, 1984.

Hauser, John R., John H. Roberts and Glen L. Urban (1983), "Forecasting Sales of a New Consumer Durable: A Prelaunch Modeling and Measurement Methodology," *Advances and Practices of Marketing Science*, Fred S. Zufryden, ed., (The Institute of Management Science: Providence, RI), 115-128.

Hauser, John R., and Glen L. Urban (1982), "Prelaunch Forecasting of New Consumer Durables: Ideas on a Consumer Value-Priority Model," in A. D. Shocker and R. Srivastava, eds., *Analytic Approaches to Product and Market Planning*, Vol. 2, (Marketing Science Institute: Cambridge Massachusetts), 276-296.

Hauser, John R. (1982), "Comments on 'A Survey of Experimental Market Mechanisms for Classical Environments'," *Research in Marketing, Supplement 1: Choice Models for Buyer Behavior*, L. McAlister, ed., (JAI Press: Greenwich, CT), Spring, 49-56.

Hauser, John R. (1981), "Comments on 'Violations of Regularity and the Similarity Hypothesis by Adding Asymmetrically Dominated Alternatives to the Choice Set'," *Proceedings of the Special Conference on Choice Theory*, Joel Huber, ed., (Duke University: Durham, NC), June.

Hauser, John R., and Frank S. Koppelman (1979), "An Empirical Comparison of Techniques to Model Consumer Perceptions and Preferences," in A. D. Shocker, ed., *Analytic Approaches to Product and Marketing Planning*, (Marketing Science Institute: Cambridge, Massachusetts), 216-238.

Tybout, Alice M., John R. Hauser, and Frank S. Koppelman (1977), "Consumer-Oriented Transportation Planning: An Integrated Methodology for Modeling Consumer Perceptions, Preferences and Behavior," *Advances in Consumer Research*, Vol. 5, (Chicago, Illinois), October.

Hauser, John R. and Steven M. Shugan (1977), "Extended Conjoint Analysis with Intensity Measures and Computer Assisted Interviews: Applications to Telecommunications and Travel, " *Advances in Consumer Research*, Vol. 5, (Chicago, Illinois), October.

Hauser, John R. and Frank S. Koppelman (1977), "Designing Transportation Services: A Marketing Approach." *Proceedings of the Transportation Research Forum*, (Atlanta, GA), October, 638-652.

Hauser, John R. and Peter R. Stopher (1976), "Choosing an Objective Function Based on Modeling Consumer Perceptions and Preferences," *Proceedings of the International Conference on Cybernetics and Society*, (Washington, D.C.), November, 26-31.

*Magazine Article, Etc. (most available for download on https://mitmgmtfaculty.mit.edu/jhauser/)*

Hauser, John R (2017). "How companies like United and Wells Fargo can win back consumer trust." *The Conversation*, April 19, 2017.

Chintagunta, Pradeep, Dominique Hanssens, John R. Hauser (2016), “Marketing and Data Science: Together the Future is Ours,” forthcoming, *The GfK Marketing Intelligence Review,* Special Issue on Data Science, November 2016

Hauser, John R., Abbie Griffin, and Steve Gaskin (2011), “The House of Quality,” *Wiley International Encyclopedia of Marketing*, (Chichester, West Sussex UK: John Wiley & Sons, Ltd.).

Abbie Griffin, Steve Gaskin, Robert Klein, Gerry Katz, and John R. Hauser (2009), “The Voice of the Customer,” *Wiley International Encyclopedia of Marketing*, (Chichester, West Sussex UK: John Wiley & Sons, Ltd.).

Hauser, John R. (2002), “Marketing Makes a Difference,” *Marketing Management*, (January/February), 11, 1, 46-47.

Hauser, John R. (2000), “Going Overboard on Platforms,” *AMS Voices,* 8.

Hauser, John R. (1997), “The Problem with Pinball,” *AMS Voices,* 4.

Hauser, John R. (1996), "You Are What You Measure," *AMS Voices*, 1.

Hauser, John R. (1995), "Internal Customers," *Insight*, 4, 1.

Hauser, John R. (1994), "Quality Function Deployment," *Marketing Encyclopedia for the Year 2000*, Jeffrey Heilbrunn, ed., American Marketing Association, Chicago, IL, 60606.

Hauser, John R. (1993), "Are Customer-Satisfaction Programs Profitable? *Insight*, 3.

Hauser, John R. (1988), "Customer Driven Engineering," *Design News*, (July 18), p. 50.

Hauser, John R. and Robert L. Klein (1988), "Without Good Research, Quality is a Shot in the Dark," *Marketing News*, Vol. 22, No. 1, January 4. Page 1.

Hauser, John R. (1986), "`Defender' Helps Mature Brands Ward off New Foes," *Marketing Educator*, 5, 3, (Fall), 5.

*Working Papers (most available for download on https://mitmgmtfaculty.mit.edu/jhauser/)*

Timoshenko, Artem, Chengfeng Mao, and John R. Hauser (2025), “Supervised Finetuned LLMs Extract Customer Needs as well as Professional Analysts, but Vanilla LLMs do not. (Cambridge, MA: MIT Sloan School of Management).

Ibragimov, Marat, Siham El Kihal, and John R. Hauser (2024), “ From Click to Purchase to Return: Website Browsing and Product Returns,” Cambridge, MA: MIT Sloan School of Management). Under review at *Marketing Science.*

Ethics Case: Hauser, John R. (2022), "Cartominyx -- Ethics of Drug and Vaccine Testing"

Burnap, Alex and John R. Hauser (2023), "Predicting “Design Gaps” in the Market: Deep Consumer Choice Models under Probabilistic Design Constraints," (Cambridge, MA: MIT Sloan School of Management). In draft.

*Classic Working Papers (Support published papers with additional information)*

Braun, Michael, Clarence Lee, Glen L. Urban, and John R. Hauser (2009), “Does Matching Website Characteristics to Cognitive Styles Increase Online Sales?,” (Cambridge, MA: MIT Sloan School of Management).

Zettelmeyer, Florian and John R. Hauser (1995), "Metrics to Evaluate R&D Groups: Phase I, Qualitative Interviews," Working Paper, International Center for Research on the Management of Technology, MIT, Cambridge, MA, 02142.

Hauser, John R. (1991), "Comparison of Importance Measurement Methodologies and their Relationship to Consumer Satisfaction," (Cambridge, MA: MIT Sloan School of Management).

Shugan, Steven M. and John R. Hauser (1978), „Designing and Building a Marketing Research Information System,“ Working Paper, Northwestern University, Evanston, IL.

*Research in Progress*

Voice of the Customer: The Next Generation (with Artem Timoshenko, Carmel Dibner, and Kristyn Corrigan)

Meta-analysis of predictive ability in conjoint analysis (with Felix Eggers)

Identifying feasible design gaps using big data and deep learning (with Alex Burnap)

Fractional updating for multi-arm bandit approaches to the design of randomized medical clinical trials (with Gui Liberali and Bob Rombach)

Identifying new opportunities for product development by inferring attributes and their importance from user-generated content (with Chengfeng Mao).

Identifying story arcs and their implications in online advertising (with Madhav Kumar and Nina Wang)

*Research Reports (not otherwise listed)*

Hauser, John R. (1996), “R&D Metrics: An Annotated Bibliography,” ICRMOT Working Paper, M.I.T., Cambridge, MA 02142. (June) Also available as a Marketing Science Institute Working Paper (November).

Hauser, John R. and Greg Cirmak (1987), "Consumer Driven Engineering for the CHEK Automobiles," Information Resources, Inc. Report to General Motors, Inc. Details the results of a major study on consumer perceptions and preferences of luxury automobiles. April.

Hauser, John R. (1983), "Critique of Market Studies for Cellular Radio Telephone. Affidavits before the FCC evaluating market studies, June and September.

Hauser, John R. (1983), "Forecasts of Demand and Cellular Radio Telephone. Affidavits before the FCC for five major and nine minor markets. June and April.

Hauser, John R., and J. Bertan (1982), "Auto Show Interviews," Internal Report to Buick Division of General Motors, June.

Hauser, John R., and Kenneth J. Wisniewski (1981), "Monitoring the Implementation of Innovative Transportation Services, Phase I: Final Report," Technical Report to the Urban Mass Transit Administration, Research Grant IL-11-0012, May.

Hauser, John R. and Kenneth J. Wisniewski (1979), "Consumer Analysis for General Travel Destinations," Technical Report, Transportation Center, Northwestern University, March.

Hauser, John R. and Steven M. Shugan (1978), "Designing and Building a Market Research Information System," Technical Report, Transportation Center, Northwestern University, February.

Hauser, John R. (1978), "Forecasting and Influencing the Adoption of Technological Innovations," Technical Report, Transportation Center, Northwestern University, October.

Hauser, John R., Alice M. Tybout and Frank S. Koppelman (1978), "Consumer-Oriented Transportation Services Planning: The Development and Implementation of a Questionnaire to Determine Consumer Wants and Needs," Technical Report, Transportation Center, Northwestern University, October.

Tybout, Alice M., Frank S. Koppelman and John R. Hauser (1977), "Consumer Views of Transportation in Evanston: A Report Based on Focus Group Interviews," Technical Report, Transportation Center, Northwestern University, June.

Koppelman, Frank S., John R. Hauser and Alice M. Tybout (1977), "Preliminary Analysis of Perceptions, Preferences, Beliefs and Usage of Transportation Services for Travel to Downtown Evanston," Technical, Report, Transportation Center, Northwestern University, May.

Hauser, John R. (1977), "Results of the Focus Group Interviews for Shared Ride Auto Transit," Cambridge Systematics Consultant's Report, May.

Hauser, John R. (1976), "Report on the Applicability of Attitudinal research for Improving the Effectiveness of Transportation Demand Models," Position Paper commissioned by Cambridge Systematics, Inc., April.

Wilson, Nigel, R. W. Weissberg and John R. Hauser (1976), "Advanced Dial-a-Ride Algorithms--Final Report," M.I.T. Department of Civil Engineering Technical Report, April.

Hauser, John R., et al. (1974), "The Chemung County Transit Survey." Volunteers in Technical Assistance (a division of VISTA) publication for Chemung County, NY, June. (Includes analysis of transportation options based on the results of the survey designed and implemented by the technical team.)

Hauser, John R. (1974), "A Cost Model for RTS (Rochester, NY) Conventional Bus Routes," M.I.T., Department of Civil Engineering Report, January.

Hauser, John R. (1973), "An Efficient Model for Planning Bus Routes in Communities with Populations Between 20,000 and 250,000," M.I.T., Operations Research Center Working Paper OR-029-993, November.

*Research Grants*

| | |
|---|---|
| July 2007 – June 2008 | Understanding Non-compensatory Decision Making for Consideration Decisions (under Consortium with MIT Center for eBusiness and General Motors, Inc.) |
| June 2000 – May 2006 | Center for Innovation in Product Development, MIT, Initiative Leader, Virtual Customer. |
| January 2001 – May 2002 | eBusiness Center at MIT. Design and Delivery of Online Promotions. (with John Little, Duncan Simester, and Glen Urban). |
| January 1997 – May 2000 | Center for Innovation in Product Development, Engineering Research Center Grant from the National Science Foundation. Research Director. In addition, research grants for non-monetary incentives, procurement metrics, and virtual customer methods. |
| June 1999 – May 2000 | "Metrics Thermostat," International Center for Research on the Management of Technology (Principal Investigator). |
| June 1999- May 2001 | "New Product Metrics at Ford and the US Navy," Center for Innovation in Product Development |
| June 1999- May 2001 | "Lean Sustainment Metrics at the USAF," Lean Sustainment Initiative at MIT |
| June 1994 - May 1999 | "Metrics to Value R&D," International Center for Research on the Management of Technology (Principal Investigator). General topic. Detailed proposals were for various aspects of the problem. |
| June 1991 - May 1994 | "Customer Needs, Customer Satisfaction, Sales, and Profit: Providing the Right Incentives to Engineering and R&D," International Center for Research on the Management of Technology (co-Principal Investigator with Birger Wernerfelt) |
| January 1990 - June 1992 | "Information Acceleration and Preproduction Forecasting of New Autos, Phases I and II." General Motors Electric Vehicle Project. (Associate) |
| December 1988 - June 1990 | "Improved Methodologies to Measure Consumer Needs," Procter & Gamble Company. (Principal Investigator) |

A13-4100

| | |
|---|---|
| September 1981 - December 1985 | "Prelaunch Forecasting System for New Consumer Durables and Its Applications to Auto Purchases," General Motors, Buick Division (co-Principal Investigator with Glen L. Urban). |
| January 1981 - May 1981 | "Marketing Approaches in Travel Demand," United Parcel Service Grant (Faculty Advisor). |
| January 1979 - August 1980 | "Monitoring the Implementation of Innovative Public Transportation Services" from University Research Program of the Urban Mass Transportation Administration (Principal Investigator). |
| July 1975 - September 1977 | "Consumer-Oriented Transportation Service Planning." from the Program of University Research, U.S. Department of Transportation (Faculty Associate). |
| September 1977 - January 1978 | "Consumer-oriented Transportation Service: Modification and Evaluation" from Program of University Research, USDOT (Faculty Associate). |
| May 1976 - September 1978 | "Enhancement of Communications with a Small Scientific Community Using Slow-Scan Televideo Terminals and Voice-Grade Telephone Lines" from the National Science Foundation (Faculty Associate). |
| January 1976 - December 1976 | "A Method for Assessing Pricing and Structural Changes on Transport Mode Use," U.S. Department of Transportation (Faculty Associate). |
| September 1976 - June 1977 | "Prediction of Urban Recreational Demand" from the National Science Foundation (Faculty Consultant). |

*Invited Lectures (Outside the MIT Sloan School)*

Emory University Goizueta Business School, February 9, 2024. “Multi-arm Bandits for Medical Testing.”

The Wroe Alderson Virtual Symposium 2021, Wharton School, the University of Pennsylvania, May 25, 2021. “An Enjoyable Journey into the Future”

Whitman School of Management, Syracuse University, Syracuse, NY, April 14, 2021, “Aesthetics in Product Design.”

Northeastern University Seminar Series, Boston, MA, November 11, 2019, "Product Recommendations when Consumers Learn their Preferences." (joint research with Daria Dzyabura).

Carnegie Mellon University, April 8, 2016, “The Effect of Precision on Strategic Positioning.”

University of North Carolina, Kenan-Flagler Business School, Marketing Department. March 7, 2014. “Learning from Experience, Simply.”

Marketing Science Institute, November 2012, “Panel Discussion: Perspectives on Big Data from Marketing Scholars,” Cambridge, MA.

Wharton School, University of Pennsylvania, April 2009, “Website Morphing”

Max Planck Institute for Human Development, Center for Adaptive Behavior and Cognition, Summer Institute on Bounded Rationality in Psychology and Economics, August 2006, “Greedoid-Based Non-Compensatory Consider-then-Choice Inference.”

Northwestern University, Evanston, IL, April 2006, “Greedoid-based Non-compensatory Inference.”

University of Michigan, Seminar Series, October 2004, “Table Stakes: Non-compensatory Consideration-then-

Choice Inference."

Management Roundtable Special Conference on "Taking the Voice of the Customer to the Next Level," Boston, MA October 2004, "The Virtual Customer."

Marketing Science Institute Research Generation Conference, Atlanta, GA, May 2004, "New Products/Innovation," (with Gerry Tellis).

Marketing Science Institute Conference on Emerging Approaches for Successful Innovation, Chicago, IL, May 2003, "'Listening-In' to Find Unmet Customer Needs and Solutions."

University of California at Los Angeles, "Polyhedral CBC (and other fun stuff), February 2003

New York University, "Polyhedral Methods," March 2003.

Industrial Liaison Program – Research Directors' Conference, April 2002, "The Virtual Customer."

University of Maryland, "Polyhedral Methods for Conjoint Analysis," March 2002.

Marketing Science Institute Trustees Meeting on Marketing Outside the Silo, Boston, MA, April 2002, "Challenges and Visions for Marketing's Role in Product Development Processes."

Managing Corporate Innovation -- ILP Symposium celebrating ten years of Management of Technology Research at MIT. "Dealing with the Virtual Customer: Fast Web-based Customer Input." April 2001

Epoch Foundation, Cambridge, MA, October 2000, "The Virtual Customer."

Yale University Research Seminar in Marketing, New Haven, CN, March 2000, "Metrics Thermostat."

Analysis Group Economics Seminar, Boston, MA, December 1999, "The Use of Marketing Research in Litigation." Also New York, NY, March 2000 and Washington, D. C., March 2002.

Boston Chapter of the Society for Concurrent Engineering, Waltham, MA, October 1999, "Metrics Thermostat."

University of Michigan DuPont Distinguished Speakers' Series, Ann Arbor, MI, March 1998, "New Product Metrics."

Kirin Brewery Co. Limited, Tokyo, JAPAN, December 1998, "You Are What You Measure!" and "Scientific Studies of the Voice of the Customer."

NEC Corporation, Tokyo, JAPA, December 1998, "Scientific Studies of the Voice of the Customer."

University of California at Los Angeles, Los Angeles, CA, February 1997, "Research, Development, and Engineering Metrics"

Stanford University, Stanford, CA, December 1996, "Metrics to Value R, D &E"

University of California at Los Angeles, Los Angeles, CA, February 1997, "Research, Development, and Engineering Metrics"

Duke University, Durham, NC, "Internal Customers and Internal Suppliers," Nov. 1995.

University of Minnesota, Minneapolis, MN, "Voice of the Customer," "Internal Customers and Captive Suppliers," May 1995.

Winter Retreat, University of Florida, Gainesville, FL, "Internal Customers and Captive Suppliers," December 1993.

A13-4102

Product Development Association - Boston, "Design and Marketing of New Products II: Advances in Product Development Management over the Last 13 Years," May 1993.

3M, Minneapolis, MN, "Incentives to Encourage a Long-term Perspective and a Customer Focus," Workshop on "Towards a World-class Research, Development, and Engineering Organization," November 1992.

Baxter Health Care, Orange County, CA, "The Voice of the Customer," August 1992.

TIMS College on the Practice of Management Science (*New Directions in Management Science*), Cambridge, MA: "The Voice of the Customer," October 1991.

IBM, Inc., Boca Raton, FL: "Voice of the Customer for Performance Graphics," May 1991.

Kirin Brewery Company, Ltd. Tokyo, JAPAN: "New Product Development" and "Customer Satisfaction and Customer Needs," April 1991.

American Iron and Steel Institute, Detroit, MI: "Satisfying the Customer -- Technical Issues," February 1991.

Warner Lambert, Inc., Mountain Laurel, PA: "Communication Among R&D and Marketing," October 1990.

Digital Equipment Corporation, Maynard, MA: "Voice of the Customer," May 1990.

Life Insurance Marketing and Research Association, Inc.: 31st Research Planning Conference, Boston, MA, "The House of Quality." June 1989.

University of Illinois: "Customer Driven Engineering." April, 1988.

Marketing Science Institute and IBM Thornwood Educational Facility: Quality through Customer Driven Engineering." April, 1988.

Harvard Business School: "Customer Driven Engineering: Integrating Marketing and Engineering." February, 1988.

Vanderbilt University: "Competitive Price and Advertising Strategies" and "Customer Driven Engineering." October, 1988.

Columbia University: "Price, Positioning, and Advertising Games: To Equilibrate of Not, Does it Pay to be Smart?" May, 1987.

New York Marketing Modelers' Club: "Would You Really Rather Have a Buick? Prelaunch Forecasting of New Automobiles," May 1987.

M.I.T. Applied Economics: "Competitive Product Selection and Advertising Models." April, 1987.

Northwestern University: "Agendas and Consumer Choice," August, 1986.

AMA Faculty Consortium on Marketing Strategy at the University Tennessee, Knoxville. "Defender: Analyses for Competitive Strategy," July, 1986.

Ohio State University: "Defensive and Competitive Strategy." May, 1986.

Boston University: "Research in Competitive Strategy." November, 1985.

Midwest Electronics Association, Minneapolis, MN: "New Products for High-Tech Firms." October, 1985.

University of Pennsylvania: "Agendas and Consumer Choice," August, 1985.

Herstein Institute, Vienna Austria: "Competitive Strategy," May, 1985.

Cadbury-Schweppes, Birmingham, England: "New Product Development and Defensive Strategy." May, 1985.

Rhone-Poulenc and Aluminum Pechiney, Paris, France: "New Product Development." April, 1985.

University of Michigan: "Defensive and Competitive Strategy." February, 1985.

Marketing Science Institute Special Mini-Conference: "Defensive Marketing Strategies for Consumer Firms." September 1983.

University of Chicago, Graduate School of Business, Chicago, IL. "Agendas and Consumer Choice," May 1984.

European Institute for Business Administration (INSEAD), Fontainebleau, FRANCE. "Agendas and Consumer Choice," June 1984.

University of Connecticut. "Defensive Marketing: Theory, Measurement, and Models," April, 1983.

University of Osaka, JAPAN "Defensive Marketing: Theory, Measurement, and Models," August, 1983.

Kao Soap, Ltd., Tokyo, JAPAN: "Defensive Marketing," August, 1983.

Johnson & Johnson, K. K., Tokyo, JAPAN: "Defensive Marketing," August, 1983.

Analog Devices, Inc., Norwood, MA. "New Product Development," May, 1982.

University of Rochester Research Seminar, "Prelaunch Forecasting of New Consumer Durables," April 1982.

Frito-Lay R & D Laboratory, Dallas, TX, "Marketing and R & D for New Products," October 1981.

University of California at Los Angeles Research Seminar, "Defensive Marketing Strategies," July, 1981.

Purdue University Research Seminar, "Product Realization," October 1979.

Stanford University Research Seminar, "Product Realization," October 1979.

Elrick and Lavidge, Inc., Chicago, Illinois, "Product Realization," October 1979.

Booz, Allen and Hamilton, Inc., Chicago, Illinois, "New Service Planning for Hospitals," April 1979.

Cornell University Research Seminar, "Intensity Measures of Consumer Preference," February 1979.

University of Rochester Research Seminar, "Product Realization: Synthesis of Marketing and Economic Theory," December 1978.

Region VI Center of Health Planning, New Orleans, LA, "Finding the Linkage Through Marketing, August 1978.

Nebraska Hospital Association, Kearney, NE, "Hospital Marketing Surveys," May 1978.

Executive Development Group, Waterloo Management Education Centre, Toronto, Ontario, Canada, "Designing New Industrial Products," February 1978.

Academic Update, Xavier University Graduate Program in Hospital and Health Administration, Cincinnati, OH, "Designing Hospital Services: A Marketing Approach," October 1977.

A13-4104

The Hospital Marketing Workshop, Ireland Educational Corporation, Chicago, Illinois, "Analyzing the Hospital Markets," January 1977 and May 1977.

Association for College Unions - International, 1976 Fall Conference in Green Bay, WI, Keynote Speech - "Designing Successful Services: A Marketing Approach," October 1976.

University of Chicago, Graduate School of Business, Research Seminar, "Testing Probabilistic Models," April 1976.

Council for the Advancement and Support of Education, Conference on Marketing Alumni Program, New York, NY, Keynote Speech, February 1976.

*Presentations at Professional Meetings (No published proceedings, some co-presented or presented by co-author[s]*)*

2024 ISMS Marketing Science Conference, Sydney, Australia, June 27-29, 2024
- "Custom-tuned LLMs vs. Professional Analysts for Identifying Customer Needs" with Chengfeng Mao* and Artem Timoshenko.
- "Structural Evolution of Ad Design: Computational Analysis of 40 Years of Super Bowl Ads" with Madhav Kumar and Nina Yang.*

2024 Association of Consumer Research Conference, Paris France, September 25-29, 2024, "Empirical Generalizations about Predictive Accuracy in Choice Experiments" with Felix Eggers*.

2023 ISMS Early-Career Scholars Camp (Faculty Presenter), Duke University October 28, 2023
- "Innovation, Product Development, and Brand Management" with Natalie Mizik, Koen Pauwels, and Vanitha Narayanan
- "Modeling Unstructured Data" with Vrinda Kadiyala, Lan Luo, and K. Sudhir

2023 ISMS Marketing Science Conference, Miami FL, June 8-10, 2023,
- "Customer Search and Product Returns" with Marat Ibragimov* and Siham El Kihal
- "Discovering "Product Gaps" in the Market Using Machine Learning" with Alex Burnap
- "Competitive Landscape Analysis and Innovation Ideation with Generative Language Models" with Chengfeng Mao*

2023 MIT Machine Intelligence for Manufacturing and Operations: AI Accelerate Impact, May 9, 2023 MIT Media Lab. Topical panel: Generative AI in Manufacturing and Operations with Kalyan Veeramachaneni, Manoj Kothiyal, and Mark Gorenberg.

2022 Conference on Artificial Intelligence, Machine Learning, and Business Analytics, Harvard Business School, December 16, 2022. (Plenary talk), John R. Hauser*, "Saving Lives with Multi-arm Bandits: Real-time Adaptation of Clinical Trials."

2022 ISMS Marketing Science Conference June 16-18, 2022, hosted by Chicago Booth, the University of Chicago Business School (Virtual).
- "Leveraging the Power of Images in Managing Product Return Rates: Now with Interpretable Machine-Learned Features" with Daria Dzyabura, Siham El Kihal, and Marat Ibragimov.
- "Discovering 'Product Gaps' in The Market" with Alex Burnap*
- "Consumer Search and Product Returns" with Siham El Kihal and Marat Ibragimov*

11th Workshop on Consumer Search and Switching Costs, NYU Stern, September 2-3, 2022. Marat Ibragimov*, John R. Hauser, and Siham El Kihal, "Consumer Search and Product Returns."

2021 INFORMS Marketing Science Conference (Virtual), Simon Business School, the University of Rochester, June 2021. "Identifying Profitable and Feasible 'Design Gaps' for New Products" with Alex Burnap.*

2020 Conference on Artificial Intelligence, Machine Learning, and Business Analytics (Virtual), Temple University, December 11-12, 2020. "Identifying Profitable and Feasible Design Gaps for New Products" with Alex Burnap*.

2020 INFORMS Marketing Science Conference (Virtual), Duke University, June 2020.

- "Leveraging the Power of Images in Managing Product Return Rates" with Daria Dzyabura, Siham El Kihal*, and Marat Ibragimov.
- "Design Gaps: Using Deep Learning to Balance Consumer Demand and Engineering Costs" with Alex Burnap*

2019 New England Marketing Conference (NEMC), Cambridge, MA, October 11, 2019. "Issues in Ensuring That Marketing is a Viable Discipline Over the Next Decade."

2019 11th Triennial Invitational Choice Symposium, Cambridge, MD, May 29-June 1, 2019.

- "Leveraging the Power of Images in Predicting Product Return Rates. Joint research with Daria Dzyabura, Siham El Kihal, and Marat Ibragimov.
- "Design and Evaluation of Product Aesthetics: A Human-Machine Hybrid Approach." Joint research with Alex Burnap* and Artem Timoshenko.

Smarter Choices for Better Health, Erasmus Initiative Conference, Rotterdam, NL, November 22, 2019, "Morphing Randomized Controlled Trials." Joint research with Gui Liberali.*

2019 ISMS Marketing Science Conference, Rome, Italy, June 20-22, 2019, "Generating and Testing Product Design Aesthetics: A Human-Machine Hybrid Approach." Joint research with Alex Burnap* and Artem Timoshenko.

Theory + Practice in Marketing Conference, Columbia Business School, New York, NY, May 16-18, 2019, "Leveraging the Power of Images in Predicting Product Return Rates. Joint research with Daria Dzyabura, Siham El Kihal*, and Marat Ibragimov.

2018 INFORMS Doctoral Consortium, Temple University, Philadelphia, PA. June 13, 2018. "Big Data and Machine Learning."

2018 INFORMS Marketing Science Conference, Temple University, Philadelphia, PA. June 14-16, 2018.

- John R. Hauser*, "Marketing Science's Field Guide to Machine Learning and Algorithms." Plenary Panel.
- John R. Hauser*, "Digital Marketing Applications of AI and Deep Learning," Panel Discussion
- Alex Burnap*, Artem Timoshenko, and John R. Hauser, "Deep Learning to Predict Consumer Aesthetic Preferences and Augment Product Designers"
- Artem Timoshenko* and John R. Hauser, "Combining Machine Learning and Human Judgment to Identify Customer Needs—New Tests and Applications"
- Gui Liberali* and John R Hauser, "Morphing Randomized Controlled Trials"

2017 INFORMS Doctoral Consortium, University of Southern California, Los Angeles, CA. June 7, 2017. "Machine learning applications for customer-oriented recommendation systems and the voice of the customer."

2017 INFORMS Marketing Science Conference, University of Southern California, Los Angeles, CA. June 8-10, 2017.

- Daria Dzyabura and John R. Hauser*, "Recommending Products When Consumers Learn Their Preferences."
- Felix Eggers* and John R. Hauser, "Precision Matters: How Craft in Conjoint Analysis Affects Price and Positioning Strategies."
- Artem Timoshenko* and John R. Hauser, "Identifying Customer Needs from User Generated Content."

Dies Natalis Academic Symposium, Erasmus University, Rotterdam, The Netherlands, November 8, 2016, "Recommending Products When Consumers Learn their Preferences." Based on research with Daria Dzyabura.

Erasmus Centre for Marketing and Innovation, Econometric Workshop, Erasmus University, Rotterdam, The Netherlands, "Strategic Implications of Precision in Conjoint Analysis. Based on research with Felix Eggers.

2016 Paul D. Converse Symposium, University of Illinois, Champaign, IL, April 21-23, 2016, "Academic Achievements of Steven M. Shugan, Converse Winner."

A13-4106

2016 INFORMS Marketing Science Conference, Shanghai, China. June 16-18, 2016, Xinyu Cao*, T. Tony Ke, John R. Hauser, Juanjuan Zhang, "Competing for Limited Attention on Social Media."

2015 INFORMS Marketing Science Conference, Baltimore MD, June 2015. Songting Dong, John Hauser*, Min Ding, Lixin Huang, and Holger Dietrich, "The Sleuth Game: Predicting Consumer Response to as-yet-unspecified Product Features for Really New Products."

AMA/Sheth Foundation Doctoral Consortium, Northwestern University, Evanston, IL, June 2014, "Bridging Empircs and Practice."

2014 INFORMS Marketing Science Consortium, Emory University, Atlanta GA, June 2014, "Learning from Experience Simply."

AMA Summer Educators' Conference, San Francisco, CA, August 1-3, 2014. Guilherme Liberali,* Hauser, John R., and Glen L. Urban "Recent Advances in Morphing Theory: Challenges and Opportunities for Research."

2014 INFORMS Marketing Science Conference, Atlanta, GA, June 2014. Aliaa Atwi* and John R. Hauser, "Exploration vs. Exploitation in Rapid Coupon Personalization."

AMA Sheth Foundation Doctoral Consortium 2013, University of Michigan, Ann Arbor, MI, June 6-9. "Managing Your Career (as a Marketing Academic)."

AMA Summer Educators' Conference, Boston MA August 9-11, 2013. Panel on "Academic Integrity in the Publication Process" with Robert Meyer, Richard Lusch, John Hauser.*

10th Marketing Dynamics Conference, The University of North Carolina at Chapel Hill, May 30 – June 1, 2013. Song Lin*, Juanjuan Zhang, and John Hauser, "Learning from Experience, Simply."

Joint Statistical Meetings 2013, Montreal, Ontario, August 2013. Song Lin*, Juanjuan Zhang, and John Hauser, "Learning from Experience, Simply."

2012 AMA Sheth Foundation Doctoral Consortium, Foster School of Business, University of Washington, June 2012, Panel: 10 Steps to Successful Publishing.

2012 INFORMS Marketing Science Conference, Boston, MA, June 2012.

- Song Lin*, Juanjuan Zhang, and John R. Hauser, "Learning from Experience, Simply."
- Glen L. Urban, Guilherme Liberali, Erin MacDonald, Robert Bordley, and John R. Hauser*, "Morphing Banner Advertising"
- Matt Selove* and John R. Hauser, "The Strategic Importance of Accuracy in Conjoint Design."
- Panel: Research Opportunities at the Marketing/Operations Interface

The 2012 Theory & Practice in Marketing (TPM) Conference on Marketing Strategy, Harvard University, Boston, MA. May 2-3, 2012. Glen L. Urban, Guilherme Liberali, Erin MacDonald, Robert Bordley, and John R. Hauser*, "Morphing Banner Advertising."

New England Marketing Conference, Cambridge, MA, October 28, 2011. Gui Liberali, Glen L. Urban and John R. Hauser*, "Providing Unbiased Competitive Information to Encourage Trust, Consideration, and Sales: Two Field Experiments."

Yale School of Management, Center for Customer Insight, The Customer Insights Conference, New Haven, CT, May 12-14, 2011. John R. Hauser and Matthew Selove*, "The Strategic Importance of Accuracy in the Relative Quality of Conjoint Analysis."

2010 INFORMS Marketing Science Conference, Cologne, Germany, June 2010 (*indicates primary presenter if not me)

A13-4107

- Liberali, Guilherme*, John R. Hauser, and Glen L. Urban, "Optimal Time-to-Morph and Cognitive Costs of Morphing."
- Liberali, Guilherme, Glen L. Urban, and John R. Hauser, "Do Competitive Test Drives and Product Brochures Improve Sales?"
- Urban, Glen L.*, Jong Moon Kim, Erin MacDonald, John R. Hauser and Daria Dzyabura, "Developing Consideration Rules for Durable Goods Markets."

2010 Advanced Research Techniques Forum, San Francisco, CA, June 6-9, 2010, "Unstructured Direct Elicitation of Non-compensatory and Compensatory Decision Rules," with Min Ding, Songting Dong*, Daria Dzyabura (listed as Silinskaia), Zhilin Yang, Chenting Su, and Steven Gaskin.

2009 AMA Sheth Foundation Doctoral Consortium, J. Mack Robinson College of Business, Georgia State University, June 2009. E-Commerce and Digital Marketing Topics.

2009 INFORMS Marketing Science Conference, Ann Arbor, MI, June 2009 (* indicates primary presenter if not me)

- "An Empirical Test of Incentive-Compatible Direct Elicitation of Heuristic Decision Rules for Consideration and Choice," with Min Ding, Songting Dong, Daria Dzyabura, Zhilin Yang, Chenting Su, and Steven Gaskin
- "Adaptive Profile Evaluation to Identify Heuristic Decision Rules in "Large" and Challenging Experimental Designs," with Daria Dzyabura (formerly Silinskaia)* and Glen L. Urban.
- "Morphing Websites in the Presence of Switching Costs," with Guilherme Liberali* and Glen L. Urban.
- "Continuous-Time Markov-Process with Misclassification: Modeling and Application to Auto Marketing," with Glen L. Urban* and Guilherme Liberali.
- "An Incentive-Aligned Sleuthing Game for Survey Research," with Min Ding*
- "Would You Consider a Buick Even if It Were #1 in JD Power?" with Erin MacDonald* and Glen Urban
- "Cognitive Simplicity and Consideration Sets," with Rene Befurt*, Daria Dzyabura, Olivier Toubia, and Theodoros Evgeniou
- "John D. C. Little, a Pioneer in Marketing Science (Festschrift paper)," with Glen L. Urban

2008 INFORMS Marketing Science Conference, Vancouver, B.C., June 2008 (* indicates primary presenter if not me)

- "Cognitive Styles and Website Design," with Michael Braun, Glen L. Urban, and Clarence Lee.
- Modeling Cognitive Complexity to Predict Consideration Sets," with Daria Dzyabura (formerly Silinskaia)*, Theodoros Evgeniou, Olivier Toubia, and Rene Befurt.
- "Morphing Websites to Match Individual Cognitive Styles," with Michael Braun*, Glen L. Urban, and Guilherme Liberali

Sawtooth Software Conference, Delray, FL, March 2009, "A Critical Review of Non-compensatory and Compensatory Models of Consideration-Set Decisions," with Min Ding and Steven Gaskin

AMA Doctoral Consortium, Robert J. Trulaske, Sr. College of Business, University of Missouri, June 2007, "Looking Ahead: Directions for Scholarly Research in Marketing" and "Building Teaching Effectiveness: Stimulating Student Interest."

Sawtooth Software Conference, Santa Rosa, CA, October 2007, "Two-Stage Models: Identifying Non-Compensatory Heuristics for the Consideration Set then Adaptive Polyhedral Methods Within the Consideration Set," with Steven Gaskin, Theodoros Evgeniou, Daniel Bailiff.

AMA Advance Research Technologies Forum, Sante Fe, New Mexico, June 2007, "Two-Stage Models: Identifying Non-Compensatory Heuristics for the Consideration Set then Adaptive Polyhedral Methods Within the Consideration Set," with Steven Gaskin, Theodoros Evgeniou, and Daniel Bailiff.

AMA Doctoral Consortium, W. P. Carey School of Business, Arizona State University, May 2007, "Consideration The New Battlefield in Product Development."

Agent-based Models of Market Dynamics and Consumer Behaviour, University of Surrey, Guildford, UK, January 2006, "Co-opetition for the Diffusion of Resistant Innovations: A Case Study in the Global Wine Industry using an Agent-based Model." with Rosanna Garcia. Also presented at the American Marketing Association's Advanced Research Techniques (ART) Forum in June 2006 at Monterrey CA.

AMA Doctoral Consortium, University of Maryland, College Park, MD, July 2006, "Creating Value: Products and Brands."

2006 Marketing Science Conference, University of Pittsburgh, Pittsburgh, PA, June 2006, "A Truth-telling Sleuthing Game for Survey Research," with Min Ding.

2006 Marketing Science Conference, University of Pittsburgh, Pittsburgh, PA, June 2006, On Managerially Efficient Experimental Designs, with Olivier Toubia.

Sawtooth Software Conference on Conjoint Analysis, Delray Beach, FL, March 2006, "Must Have" Aspects vs. Tradeoff Aspects in Models of Customer Decisions," with Michael Yee, James Orlin, Ely Dahan.

AMA Doctoral Consortium, University of Connecticut, Storrs CT, June 2005, "The Virtual Customer."

2005 Marketing Science Conference, Emory, Atlanta, GA, June 2005, "Direct, Nonparametric Product Optimization Using Interactive Genetic Algorithms," with Kamal Malek and Kevin Karty.

2005 Marketing Science Conference, Emory, Atlanta, GA, June 2005, "Non-Deterministic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Application to the Diffusion of the New Wine Cork," with Olivier Toubia and Rosanna Garcia.

2005 Marketing Science Conference, Emory, Atlanta, GA, June 2005, "Greedoid-Based Non-compensatory Two-Stage Consideration-then-Choice Inference," with Michael Yee, Jim Orlin, and Ely Dahan.

2004 Marketing Science Doctoral Consortium, Rotterdam, The Netherlands, June 2004, "Research that Has Impact."

2004 Marketing Science Conference, Rotterdam, The Netherlands, June 2004, "Improving Choice-Based Polyhedral Methods by Taking Response Error into Account," with Olivier Toubia.

2004 Marketing Science Conference, Rotterdam, The Netherlands, June 2004, "The Dream Versus Reality of CRM," with Glen L. Urban, Eric Bradlow, and, Mahesh Kumar.

2004 Marketing Science Conference, Rotterdam, The Netherlands, June 2004, "Non-compensatory Consideration-then-Choice Adaptive Conjoint Analysis," with Michael Yee and James Orlin.

AMA Doctoral Consortium, Texas A&M University, College Station, TX, June 2004, "Virtual Customer Initiative."

AMA Advanced Research Techniques Forum, June 2004, "Conjoint Adaptive Ranking Database System (CARDS)," with Ely Dahan, James Orlin, and Michael Yee.

AMA Doctoral Consortium, University of Minnesota, Minneapolis, MN, June 2003, "The Review Process."

2003 Marketing Science Doctoral Consortium, University of Maryland, June 2003, "Roots of Marketing Science Thought," with John Little.

2003 Marketing Science Conference, University of Maryland, June 12-15, 2003, "Individual-level Adaptation of Choice-Based Conjoint Questions: More Efficient Questions and More Accurate Estimation," (with Olivier Toubia and Duncan Simester).

2003 Marketing Science Conference, University of Alberta, Canada, June 28, 2002, "Configurators, Utility Balance, and Managerial Use," (with Duncan Simester and Olivier Toubia).

2002 Marketing Science Doctoral Consortium, University of Alberta, Canada, "Helping Managers Structure and Make Decisions," June 27, 2002. (Founding Consortium).

2002 Marketing Science Conference, University of Alberta, Canada, June 28, 2002, "Adaptive Choice-Based Conjoint Analysis with Polyhedral Methods," (with Duncan Simester and Olivier Toubia*).

Advances in Marketing Research and Modeling: The Academic and Industry Impact of Paul E. Green, Wharton, Philadelphia, PA, May 2002, "New Methods of Data Collection and Estimation Using Polyhedral Estimation Techniques."

Production and Operations Management Society (POMS) Conference 2002 - High Tech POM, San Francisco, CA, April 2002, "The Virtual Customer," (with Ely Dahan*).

Product Development Association (PDMA) International Research Conference, Santa Clara, CA, October 2001, "The Virtual Customer," (with Ely Dahan*).

New England Marketing Conference, Cambridge, MA, September 2002, "Fast Polyhedral Adaptive Conjoint Estimation," (with Ely Dahan, Duncan Simester, and Olivier Toubia).

2001 Marketing Science Conference, Wiesbaden, Germany, July 2001, "Empirical Test of Web-based Conjoint Analysis Including ACA, Efficient Fixed Designs, Polyhedral Methods, and Hybrid Methods," (with Ely Dahan, Duncan Simester, and Olivier Toubia*)

2001 Marketing Science Conference, Wiesbaden, Germany, July 2001, "Evaluation of Fast Polyhedral Adaptive Conjoint Estimation," (with Duncan Simester and Olivier Toubia).

The 12th Annual Advanced Research Techniques Forum, Amelia Island, Florida, June 2001, "The Virtual Customer: Communication, Conceptualization, and Computation," (with Ely Dahan*).

AMA Doctoral Consortium, University of Miami, June 2001, "Role of Technology in Marketing."

2000 Marketing Science Conference, UCLA, June 2000, "Applications of the Metrics Thermostat."

2000 Marketing Science Conference, UCLA, June 2000, "The Virtual Customer." (with Ely Dahan and Duncan Simester).

Marketing Science Institute Marketing Metrics Workshop, Washington, D.C. October 1999, "Metrics for New Product Development: Making Agency Theory Practical," Plenary Speaker.

1999 Marketing Science Conference, Syracuse, NY, May 1999, “Balancing Customer Input, Speed to Market, and Reduced Cost in New Product Development: What is the Most Profitable Strategy”

ICRMOT Conference on Technology Alliances and New Product Development: A Cross-cultural Perspective, Mishima, JAPAN, December 1998, “You Are What You Measure!”

AMA Doctoral Consortium, Athens, Georgia, August 1998, “Quantitative Advances in Marketing Models.”

AMA Winter Educators’ Conference, Austin, TX, February 1998 (Plenary Speaker), “New Challenges in the Marketing-Product Development Interface.”

AMA Doctoral Consortium, Cincinnati OH, August 1997, "Working with Industry."

1997 Marketing Science Conference, Berkeley CA, March 1997, “Cultivating Technological Managers for

Customer Expertise."

Marketing Science Institute Conference on Interfunctional Interfaces: The Management of Corporate Fault Zones, Palo Alto, CA, December 1996, "Multi-Stage Modeling of R&D/Marketing Interfaces in New Product Development."

1997 Marketing Science Conference, Berkeley CA, March 1997, "Cultivating Technological Managers for Customer Expertise."

Envisioning the Future on Internet Marketing: Research and Strategy Implications, M.I.T., September 1996, "Agents and Intermediaries: Roles, Trust, and Value."

1996 Marketing Science Conference. "Can R&D be Evaluated on Market-Driven Criteria?" (with Florian Zettelmeyer). University of Florida, Gainesville, March 1996

"Information Acceleration," (with Glen Urban, William Qualls, Bruce Weinberg, Jon Bohlmann, and Roberta Chicos). Wharton Conference on Innovation in Product Development, Philadelphia, PA, May 1995.

"Metrics by Which Managers Evaluate R&D Groups," (with Florian Zettelmeyer). Association of Consumer Research, Boston, MA, October 1994.

"Satisfying the Internal Customer," (with Birger Wernerfelt and Duncan Simester) Marketing Science Conference, University of Arizona, Tucson, AZ, March 1994.

"Customer-Satisfaction Based Incentive Systems," AMA Educator's Conference, Boston, MA, August 1993.

"Marketing in the 1990s: Emerging Issues," AMA Doctoral Consortium, University of Illinois, August 1993.

"Quality Function Deployment and the Voice of the Customer," Pharmaceutical Management Science Association, Phoenix AZ, May 1993.

"In a World of Active Time-constrained Customers, How Can a Firm be the Great Communicator," (with Birger Wernerfelt), Marketing Science Conference, Washington University, St. Louis, MO, March 1993.

"Customer Needs, Customer Satisfaction, Sales, and Profit," (with Birger Wernerfelt, Ronit Bodner, and Duncan Simester), ORSA/TIMS Joint National Conference, San Francisco, CA, November 1992.

"Customer Satisfaction and Employee Rewards," (with Birger Wernerfelt, Ronit Bodner, and Duncan Semester), Marketing Science Conference, London, England, June 1992.

"Information Acceleration and Preproduction Forecasting of Electric Autos," (with Glen L. Urban and Bruce Weinberg), Marketing Science Conference, London, England, June 1992.

"The Voice of the Customer and Customer Satisfaction," ORSA/TIMS Joint National Meeting, Anaheim, CA, October 1991.

"Modeling Marketing Phenomena," AMA Doctoral Consortium, University of Southern Calif. August 1991.

"Relationship of Satisfaction to Customer Needs and to Market Share," 1st Congress on Customer Satisfaction and Market-Driven Quality, American Marketing Association, Orlando FL, May 1991.

"Time Flies When You're Having Fun: How Consumers Allocate Their Time When Evaluating Products" (with Bruce Weinberg, Glen Urban, and Miguel Villas-Boas), Marketing Science Conference, Wilmington, DL, March 1991.

"Information Acceleration and Preproduction Forecasting of New Autos," (with Glen Urban, and Bruce Weinberg), Marketing Science Conference, Wilmington, DL, March 1991.

"Beyond Quality Function Deployment," ORSA/TIMS Joint National Meeting, Philadelphia, PA October 1990. (Conference-wide Tutorial)

"Competitive Marketing Strategies," Operations Research 1990 (Osterreichische Gesellschaft fur Operations Research), Vienna, Austria, August 1990. (Invited Speaker)

"New Product Development: A Quantitative Analysis of Interfunctional Communication" (with Abbie Griffin), Marketing Science Conference, Urbana, IL, March 1990.

"Integrated Product Development: New Methodological Developments" (with Abbie Griffin), Marketing Science Conference, Durham, N.C., March 1989.

"Customer Driven Engineering" (with Gregory Cirmak and Robert Klein), ORSA/TIMS Joint National Meeting, Washington, D.C., April 1988.

"Competitive Advertising and Pricing in Duopolies" (with Birger Wernerfelt), Marketing Science Conference, Seattle, Washington, March 1988.

"Customer Driven Engineering" (with Abbie Griffin), Marketing Science Conference, Seattle, Washington, March 1988.

"Customer Needs," Visions of Design Practices for the Future, Newton, MA, October 1987.

"Effective Strategies in Oligopoly" (with Peter Fader), ORSA/TIMS Joint National Meeting, Miami Beach, Florida, November 1986.

"Competitive Strategy Contest: Result and Analysis" (with Peter Fader), Marketing Science Conference, Dallas, TX, March 1986.

"The PC as a Tool to Teach Complex Marketing Science Concepts," Marketing Science Conference, Dallas, TX, March 1986.

"The Coming Revolution in Marketing Theory," Plenary Speaker, European Marketing Conference, Bielefeld, West Germany. April 1985.

"Defensive Strategy" Confer. on Economics of the Firm, Universite de Paris X, Nanterre, France, April 1985.

"Competitive Marketing Strategies" Marketing Science Conference, Nashville, Tennessee, March 1985.

"Developing New Product Management: Past Progress, Current Efforts, Current Needs" (Panel) Marketing Science Conference, Nashville, Tennessee, March 1985.

"Testing Competitive Marketing Structures: Theory and Applications" (with Glen Urban) ORSA/TIMS Joint National Meeting, Dallas, TX November 1984.

"Competitive Strategy," ORSA/TIMS Joint National Meeting, Dallas, Texas, November 1984.

"Forecasting Automobile Sales: An Application of a Value Priority Algorithm," (with Glen Urban, John Roberts and John Dabels), TIMS XXVI International Meeting, Copenhagen, Denmark, June 1984.

"Consumer Durables: The Actual Consumer Budgets Compared to the Value Priority Model," (with Glen Urban), Marketing Science Conference, Chicago, Illinois, March 1984.

"Defensive Strategy Models: Application and Predictive Text," (with Steven Gaskin, and Karl Irons) ORSA/TIMS Joint National Meeting, Orlando, Florida, November 1983.

"New Product Research: Focus on Defensive strategies," Roundtable Program, ORSA/TIMS Joint National Meeting, Orlando, FL, November 1983.

"Intensity of Preference," (with Steven Shugan) ORSA/TIMS Joint National meeting, San Diego, CA, October 1982.

"Measurement Error Theories for von Neumann-Morgenstern Utility Functions," (with Jehoshua Eliashberg) ORSA/TIMS Joint National Meeting, San Diego, CA, October 1982.

"Consumer Preference Models: Axioms and Statistics," ORSA/TIMS Joint National Meeting, Houston, Texas, October 1981.

"Economic Models of Consumer Behavior," (panel discussion), ORSA/TIMS Joint National Meeting, Houston, Texas, October 1981.

"Defensive Marketing Strategies, Part II," (with Steven Shugan), ORSA/TIMS Joint National Meeting, Houston, Texas, October 1981.

"Agendas and Choice Probabilities," (with Amos Tversky), Association of Consumer Research, St. Louis, Missouri, October 1981, and Special Conference on Choice Theory, Durham, North Carolina , June 1981.

"Strategic Response to Competitive New Products," (with Steven Shugan), ORSA/TIMS Joint National Meeting, Toronto, Ontario, Canada, May 1981.

"Applications of a Dynamic Semi-Markov Model of Consumer Choice," (with Ken Wisniewski), ORSA/TIMS Joint National Meeting, Colorado Springs, Colorado, November 1980.

"Models of Consumer Behavior," (panel discussion), ORSA/TIMS joint National Meetings, Colorado Springs, Colorado, November 1980.

"Dynamic Semi-Markov Models of Consumer Behavior," (with Ken Wisniewski) TIMS International Conference on Marketing, Paris, June 1980.

"Profit Maximizing Perceptual Positioning," (with Patricia Simmie) TIMS International Conference on Marketing, Paris, June 1980.

"An Error Theory for von Neumann-Morgenstern Utility Assessment," (with Jehoshua Eliashberg), ORSA/TIMS Joint National Meeting, Washington, D.C., May 1980.

"Defender: Defensive Strategies Against New Products" (with Steven Shugan), ORSA/TIMS Second Special Interest Conference on Marketing Measurement and Analysis, Austin, Texas, March 1980.

"Adaptive Control of New Product Launches," (with Ken Wisniewski), ORSA/TIMS Joint National Meeting, Milwaukee, Wisconsin, October 1979.

"The Value of Up-front Research in New Products," (with Glen Urban), TIMS International Meeting, Honolulu, Hawaii, June 1979.

"Methods for Computing Probabilities of Choice," (with Steven Shugan), TIMS International Meeting, Honolulu, Hawaii, June 1979.

"Forecasting and Improving the Adoption of New High Technology Products," (with Pat Lyon), ORSA/TIMS Joint National Meeting, New Orleans, Louisiana, May 1979.

"A Methodology for Product Realization: Multi-method Procedures," (with Patricia Simmie), ORSA/TIMS Joint

National Meeting, Los Angeles, California, November 1978.

"Searching for Marketing Segments" (with Ken Wisniewski), ORSA/TIMS Joint National Meeting, New York, New York, May 1978.

"P.A.R.I.S.: An Interactive Market Research System," (with Steven Shugan), ORSA/TIMS Joint National Meeting, New York, New York, May 1978.

"Extended Conjoint Analysis," (with Steven Shugan), ORSA/TIMS Joint National Meeting, Atlanta, Georgia, November 1977.

"Consumer Preference Functions: Theory, Measurement, Estimation , and Application," (with Steven Shugan), ORSA/TIMS Joint National Meeting, Atlanta, Georgia, November 1977.

"Measuring Consumer Preferences for Health Care Plans," (with Glen Urban), ORSA/TIMS Joint National Meeting, San Francisco, California, May 1977.

"Improved Transportation Design with Consumer Response Models: An AMTRAK Example" (with Frank Koppelman), ORSA/TIMS Joint National Meeting, Miami, Florida, November 1976.

"A Comparison of Statistical and Direct Multiattribute Utility Assessment Procedures," (with Glen Urban), ORSA/TIMS Joint National Meeting, Las Vegas, Nevada, November 1985.

"Measuring Consumer Preferences: An Axiomization for Describing Choice," ORSA/TIMS Joint National Meeting, Las Vegas, Nevada, November 1975.

"Modeling Consumer Response to Innovations," (1) Milwaukee Chapter of ORSA/TIMS, November 1985; (2) Chicago Chapter of ORSA/TIMS, December 1975.

"Modeling Decisions of Choice Among Finite Alternatives: Applications to Marketing and to Transportation Demand Theory," ORSA/TIMS Joint National Meeting, San Juan, Puerto, Rico, October 1974.

"An Efficient Model for Planning Bus Routes in Medium Sized Communities," ORSA/TIMS Joint National Meeting, San Diego, CA, November 1973.

*Professional Affiliations*

The Institute for Operations Research and Management Science (INFORMS)

INFORMS Society of Marketing Science (ISMS)

American Marketing Association

Product Development and Management Association, Certified New Product Development Professional

*Professional Services*

President, INFORMS Society of Marketing Science (January 2014 –December 2015). President-elect (a board position, January 2012 – December 2013). Past-President (a board position, January 2016 – December 2017).

Secretary, INFORMS Society of Marketing (January 2002 – December 2005). Founding Officer.

Advisory Council, INFORMS College of Marketing (1994 - 2002)

Council of The Institute of Management Sciences (TIMS, 1987 - 1989)

Associate Editor for Marketing, *Management Science*, (1980 - 1981)

Department Editor for Marketing, *Management Science*, (1982 - 1988)

Editor-in-Chief, *Marketing Science*, (1989 - 1994)

Editor, Special Issue on Big Data, *Marketing Science*, 2016. Senior Editor, Practice Papers, *Marketing Science*, 2016-2018. Associate Editor, Special Issue on the Theory and Practice of Marketing, *Marketing Science*, 2014.

Editorial Advisory Board, *Sloan Management Review* (2000-2002).

Associate Editor, *Journal of Marketing Research* (April 2006 – June 2009). First time in journal history that Associate Editors had been appointed.

Associate Editor, *Journal of Marketing Research* (2020 – 2021, on hiatus at my request)

Senior Advisory Board, *Journal of Marketing Research* (July 2009 – 2016). First time such an advisory board was formed. Advisory Board (July 2020 to present.)

Advisory Board, *Marketing Science* (2010 – 2024).

Advisory Board, *Journal of Product Innovation Management* (2011 – 2018)

Emeritus Editorial Board, *Marketing Science* (includes active reviewing of papers).

Editorial Boards, *Marketing Science*, (1980 – 1988, Editor 1989-1995, 2003- 2008, including acting Area Editor), *Journal of Product Innovation Management* (1997 - 2010), *Journal of Marketing* (2005- 2008, outstanding reviewer 2006), *European Management Journal* (advisory, 1998 - 2002), *International Journal for Research in Marketing* (2007 – 2014).

*Conference Chairman:* Conference Chair, Profitable Customer-Driven Organizations: Developing the Blueprint, Management Roundtable, May 1994.

*Segment Chairman:* Yale School of Management, Center for Customer Insight, The Customer Insights Conference, New Haven, CT. May 12-14, 2011. New Product Innovations.

Non-traditional Models of Consumer Preference and Choice, Adaptive Preference and Estimation, Optimizing Product Design and Customer Targeting, Obtaining Information from or About Consumers (Atlanta, GA, 2005, co-chair four sessions)

TIMS International Meeting, Copenhagen, Denmark, June 1984 (two sessions).

TIMS College of Marketing, Houston, Texas, October 1981 (twelve sessions).

TIMS College of Marketing, Milwaukee, Wisconsin, October 1979 (five sessions).

American Marketing Association Educator's Conference, Chicago, Illinois, August 1978, (three sessions).

INFORMS Marketing Science Conference, Atlanta GA, June 2005 (four sessions)

*Session Chairman:* *INFORMS (Previously named ORSA or TIMS)*

Virtual Customer Initiative (Rotterdam, The Netherlands, 2004)

New Approaches to Mapping (University of Maryland, 2003)

The Virtual Customer (University of Alberta, Canada 2002)

The Virtual Customer (Wiesbaden, Germany 2001)

Building Competitive Advantage Through Product Quality and R&D (Gainesville, FL 1996)

Customer Satisfaction and Its Role in Global Competition (San Francisco, CA 1992)

Competitive R&D (Washington, D.C., April 1988)

Competitive Marketing Strategy, (St. Louis, Michigan, November 1987)

Competition in Multiattributed Spaces (Atlanta, Georgia, November 1985).

Marketing: Consumer Measurement (Copenhagen, Denmark, June 1984)

Marketing: Dynamic Structures (Copenhagen, Denmark, June 1984)

Product Policy (Orlando, Florida, November 1983)

Product Policy (San Diego, California, October 1982)

New Product Introduction and Defense in Competitive Environments, (Detroit, Michigan, April 1982)

New Product and Product Policy Models, (Houston, Texas, October 1981)

New Product Models (Toronto, Ontario, Canada, May 1981)

Models of Consumer Behavior (Colorado Springs, Colorado, November 1980)

New Product Realization and Selection (Los Angeles, California, November 1978).

*Session Chairman:* *Association of Consumer Research*

Mathematical Theories of Consumer Behavior (St. Louis, Missouri, October 1981)

*Committee Memberships*

Editor Selection Committee, *Marketing Science*, INFORMS College of Marketing, 2001 (chair), 2004 (chair), 2007.

Editor Selection Committee, *Journal of Marketing Research,* American Marketing Association, 1999.

Conference Steering Committee, Duke Invitational Symposium on Choice Modeling and Behavior, June 1993.

Editor Selection Committee, *Management Science,* TIMS.

Founding Committee for *Marketing Science*, TIMS College of Marketing, (1979 - 1982).

Management Science Roundtable, TIMS, (1982 - 1988)

Marketing Strategy Steering Committee, Marketing Science Institute, (1983 - 1984).

Organizing Committee for Conference on Economics of the Firm, April 1985, Universite de Paris X Nanterre.

Organizing Committee for 1985 Conference in Bielefeld, West Germany, European Marketing Academy.

Publications Committee (1980 - 1982), Operations Society of America.

Scientific Committee for 1986 Conference in Helsinki, Finland.

Student Affairs Committee (1978 - 1979), Operations Society of America.

*Litigation Consulting (on behalf of, *deposition testimony, †court, commission, or arbitration testimony)*

ABC, Inc., American Broadcasting Company, Inc., and Disney Enterprises, Inc., Plaintiffs, v. Dish Network L.L.C. and Dish Network Corp., (Preliminary Injunction)

Joseph Adinolfe, et al., v. United Technologies Corp., d/b/a Pratt & Whitney (class action, damages)* †

Alcatel-Lucent USA Inc. v. Amazon.com, Inc. et al. (Patent Infringement)* †

Allergan, Inc. Engagement. (Off-label Prescriptions)

Amarte v. Kendo (trademark infringement).

American Express Travel Related Services, Inc. v. Visa USA, Inc., et. al. (Evaluation of marketing research) *

In Re American Express Anti-Steering Rules Antitrust Litigation (II) (Evaluation of marketing research)*

American Multi-Cinema, Inc. v. American Movie Classics Company, Inc., et. al. (Confusion)

Amway v. Procter & Gamble (Damages)*

Garth A. Anderson, et al. v. American Family Insurance Company (Class Action) *

Anoush Cab, Inc., et al. v. Uber Technologies, Inc., Rasier, LLC (damages) †

Apple, Inc. v. Samsung Electronics Company, Ltd, et al. (Patent infringement, two cases) ** †††

Arendi S.A.R.L v. Apple Inc.* (patent infringement)

Dane Ashely Burce Tress v. FCA Canada, Inc. and FCA US LLC. (Class action)*

Atlantic Recording Corporation, et. al. v. XM Satellite Radio, Inc. (Copyright infringement).

Ariza, Et Al. v. Luxottica Retail North America (class action)*

Axcan Scandipharm, Inc. V. Global Pharmaceuticals and Impax Laboratories, Inc. (False Advertising)

Avaya Inc. v. SNMP Research International, C.A. (Damages) *

Berlex v. Biogen, Inc. (Damages)*

Blue Mountain Arts, Susan Polis Schutz, and Stephen Schutz v. Hallmark Card, Inc. (Trade Dress)

James And Lisa Camenson, et al.; v. Milgard Manufacturing Inc., et. al. (Class action)

CBS Corporation, CBS Broadcasting Inc., CBS Studios Inc., and Survivor Productions, LLC. v. and DISH Network Corporation, DISH Network L.L.C. (damages).

Clearchannel Communications, Inc. (v. SoundExchange) in the Webcasting IV. (Rate setting) *†

Comm-Tract Corp. v. Northern Telecom, Inc. (Advice only)

Comcast Cable Communications. LLC v. Sprint Communications Company (Patent Infringement)*

Computer Aid, Inc. v. Hewlett Packard (damages)*

Dayna Craft, et al. v. Philip Morris Companies, Inc. and Philip Morris Inc. (Class Action).*

Creative Laboratories, Inc. v. Apple Computer, Inc. (Intellectual Property)

CTC Communications Corporation v. Bell Atlantic Corporation (Damages)

Eagle Harbor Holdings LLC, and Mediustech LLC, v. Ford Motor Company (Patent infringement).

A13-4117

Anne Elkind And Sharon Rosen, et al. v. Revlon Consumer Products Corporation, Inc. (Class Action)

EPD v. Curtis (Product Confusion)†

FCA Canada Inc. and FCA US LLC, re Canadian Class Actions re Diesel Fuel Emissions, specifically, Shane Witham, et al. v. FCA Canada Inc., FCA US LLC, and FIAT Chrysler Automobiles N.V. (Class Action)†

Fox Broadcasting Company, Inc., Twentieth Century Fox Film Corp., and Fox Television Holdings. Inc., Plaintiffs, v. Dish Network L.L.C. and Dish Network Corp., (Preliminary Injunction, Damages)*

FTC v. Intuit, Inc. (False Advertising)* †

Stephen S. Gallagher, et. al. v. State Farm Mutual Automobile Insurance Company, et al. (Class Action)

Geico v. Google and Overture Services (Yahoo), Inc. (Trademark Infringement)

In Re: General Motors, LLC Ignition Switch Litigation (non-testifying expert)

Gillette v. S. C. Johnson (Patent Infringement)

Gyrodata, Inc. v. Atlantic Inertial Systems Inc (“AIS”), et al. (consulting expert)

Heublein vs. Seagrams and Gallo (Liability)

Hewlett-Packard, Inc. v. Factory Mutual Insurance Company (Insurance Coverage)*

IMS Health Incorporated v. Symphony Health Solutions Corporation, Source Healthcare Analytics, LLC, and ImpactRx, Inc., C.A. No. 1:13-cv-2071-GMS (D. Del.). (Patent infringement, technical expert.)

Intel v. Advanced Micro Devices (Damages)*

J. B. D. L. Corp. d/b/a, Beckett Apothecary v. Wyeth-Ayerst Laboratories, Inc. and American Home Products Corporation, (Class Action)

Jerry Jacobs, et. al. v. Osmose Inc., et. al. (Class Action)*

Jay Kordich, et. al. v. Salton Maxim Housewares, Inc., et. al. (Trademark)†

In RE J.P. Morgan Chase Cash Balance Litigation (Class Action)*

Michael Kors, Inc. v. Costco Wholesale Corporation (False Advertising, Damages)*

L.A. Taxi Cooperative, Inc. et al. v. Uber Technologies, Inc.; Rasier, LLC; and Rasier-CA, LLC. (False Advertising)*.

Lending Tree, Inc. v. The Gator Corporation (Intellectual Property)

Lotus v. Borland (Damages)*

Louis Vuitton Malletier, S. A. v. Hyundai Motor America (Trademark Infringement)*

Malden Transportation, Inc. et al. vs. Uber Technologies, Inc., Rasier, LLC*† (damages). See also Anoush.

Marvin Lumber and Cedar Company v. PPG Industries, Inc., et. al. (Survey Design)

MasterCard International, Inc. v. First National Bank of Omaha (Product Confusion)*

Mayo Foundation v. Mayo Health Facilities (Product Confusion)†

Mead Johnson Nutritionals v. unnamed party (False Advertising)

Merck & Co. (Lanham Act Advice)

In Re Microsoft Corporation Antitrust Litigation (Multi-district Litigation)*

Millennium Laboratories, Inc. v. Ameritox, Ltd. (False Advertising)

Scott Miller, et al. v. Fuhu, Inc. and Fuhu Holdings, Inc. (Class Certification)*

MillerCoors, LLC v. Anheuser-Busch Companies, LLC. (False Advertising) *

A13-4118

National Association of Broadcasters v. SoundExchange in Webcasting V (Rate Setting) *†

Pacific Bell Telephone Company in New Regulatory Framework Review of Customer Satisfaction before the California Public Utility Commission†

Luciano F. Paone v. Microsoft Corporation (Patent Infringement)*

Walter Peters, et al. v. Apple, Inc. (Class Action)*

Pfizer Consumer Healthcare (Lanham Act Advice)

Playtex v. Procter & Gamble (Claims Substantiation)*†

Procter & Gamble v. Amway (Liability and Damages)*†

Procter & Gamble v. Haugan, et. al. (Liability and Damages)†

Putnum Fund Trustees, (Investment Fraud, advice on market research)

Ram Broadcasting, Inc. (Cellular Telephone Filings)

RealPlayer, Inc. v. Microsoft Corporation (Anti-trust)

Roberts et. al. v. Enterprise Rent-a-Car Company of Boston, Inc. (Class Action)

The Republic of Columbia v. Diageo North America, et al. (Anti-trust).

St. Clair Intellectual Property Consultants, Inc. v. Research in Motion, Ltd. and General Imaging Co. (Patent infringement)

Curt Schlesinger and Peter Lore, on behalf themselves and the Certified Class, Plaintiffs, v. Ticketmaster (Class action, false advertising, confusion)*

Barbara Schwab, et. al. v. Philip Morris, USA (Class Action)*

SoundExchange, Inc. v. iHeart Media (2015) and the National Association of Broadcasters (2020), In the Matter of Determination of Rates and Terms for Digital Performance in Sound Recordings and Ephemeral Recordings. Web IV, V. (Rate Setting). 2015*†, 2020*†

SoundExchange, Inc. v. Sirius Satellite Radio, Inc. and XM Satellite Radio, Inc.: In the Matter of Adjustment of Rates and Terms for Preexisting Subscription Services and Satellite Digital Radio Services. SDARS I, II, and III. (Rate setting) 2007*†. 2012*†. 2017*†.

Sprint Communications Company L.P. et al. v. Comcast Cable Communications, LLC. et al. (Damages)*

Spotify v. Royalty Rates Holders for Making and Distributing Phonerecords. In the Matter of Determination of Royalty Rates and Terms for Making and Distributing Phonerecords (*Phonerecords IV*). (Rate setting) 2021

State of Colorado, et. al. v. Warner Chilcott Holdings Company III, Ltd., et. al. (Anti-trust)* †

State of Florida and Plaintiff States Antitrust Litigation for Disposable Contact Lenses (Survey Analysis)†

State of Washington v. Comcast, et al. (False Advertising)* †

Stipic, et. al. v. Behr Process Corporation and Masco International (Class Action)*

Straumann Company v. Lifecore Biomedical, Inc. (Product Confusion)*

Sun Microsystems, Inc. v. Microsoft Corporation (Anti-trust).

Symphony Health Solutions Corporation v. IMS Medical Radar (Technical Expert)*.

Takada Pharmaceuticals USA, Inc. v. Par Pharmaceutical Companies, Inc. Par Pharmaceutical, Inc., Amneal Pharmaceuticals, LLC, Watson Laboratories, Inc. West-Ward Pharmaceutical Corp., Hikma Americas

PLC. (Patent Infringement).

Charles Tillage et al. v. Comcast Corporation (Class Action)*

Tivo, Inc. v. Echostar Communications Corporation, et. al* (Patent Infringement)

Tropicana Products, Inc. v. Vero Beach Groves, Inc. (Lanham Act)† (Declaration accepted as court testimony.)

United States of America Department of Justice v. AT&T Inc., DirecTV Group Holdings, LLC, And Time Warner Inc.* †

Wal-Mart Stores, Inc (and other retailers) v. Mastercard International, Inc. (Liability and Damages, Anti-trust)*

We Media, Inc. v. We: Women's Entertainment, LLC. (Product Confusion)*.

Yahoo Holdings, Inc., et al. v. Mozilla Corporation (customer satisfaction) *

Olua Zakaria, et al. v. Gerber Products Co. d/b/a Nestle Nutrition, Nestle Infant and Nestle Nutrition North America (class action, damages)*.

*Marketing, Marketing Research, and Product Development Consulting Not Otherwise Listed*

American Home Foods, Inc.; American Airlines; American Hospital Supply Corporation; Analog Devices, Inc; Andersen Consulting, Inc. (Accenture), Applied Marketing Science, Inc.; A.T.&T.; Avon; Barton-Aschmann Associates; Baxter Cardiovascular Group, Booz Allen Hamilton, Inc., Cambridge Systematics, Inc.; Chrysler, LLC; Colgate-Palmolive; Costello Associates, Inc.; Economics' Laboratories, Inc.; Elrick and Lavidge, Inc.; Evanston Hospital; Evanston, Illinois and Schaumburg, Illinois (Transportation Planning); Fiat Chrysler Automobiles, Fidelity Investments; Ford Motor Company; French's Inc., G.D. Searle, Inc.; General Foods, Inc.; General Motors, Inc., Buick Division, Chevrolet Division, Marketing and Product Planning; Gillette; IBM, Inc.; Information Resources, Inc.; Intel, Inc., Johnson & Johnson; Kodak; Macromedia, Inc., Management Decision Systems, Inc.; M/A/R/C, Inc.; Merck, Inc., Navistar International, Inc.; Pacific Gas and Electric Company, Pepsi-Cola, Inc.; Polaroid; Procter & Gamble Company; Product Genesis, Inc.; RAM Broadcasting, Inc.; Regional Transportation Authority; Richardson-Vicks, Inc.; Southern Company Services, Inc.; Time-Life Books; Volunteers in Technical Assistance, and Wyeth-Ayerst Laboratories, Inc. Co-founder, senior product development consultant, Applied Marketing Science, Inc., Affinnova, Inc.

*M.I.T. or MIT Sloan Committee Work*

Associated Faculty Committee to Review the Organizational Learning Center (MIT Sloan), 1995.

Building Committee for the E51 Expansion, MIT Sloan, 1992, Ad Hoc.

Center for Innovation in Product Development

Leader, Virtual Customer Initiative, 2000 - 2006

Research Director, 1997 – 2000

Center for Transportation Studies, 1981 - 1982.

Master of Science in Transportation Committee.

Committee on the Masters in Analytics, 2014-2016.

Committee on the Undergraduate Program, 2003 – 2005.

Committee to Investigate Sloan-Logo Research Notes (MIT Sloan, chair), 2001-2002.

Dean's Consultation Committee (MIT Sloan), 2008-2009.

Dean Search Committee (MIT Sloan), 1993.

Executive Educational Programs Committee (MIT Sloan), 1983 – 1985, 1998-1999, 2007.

Faculty Admissions Committee, 2004-2009.

Faculty Council (MIT Sloan), 1999.

International Center on Research for the Management of Technology (MIT Sloan).

Co-Director, (1993 - 2000).

Joint Steering Committee (1990 - 1993).

Management Science Area, MIT Sloan School of Management.

Area Head, (2005- 2009).

Chairman of Subcommittee on Peer Group Comparisons, (1981 - 1982).

Committee on Management Science Curriculum Redesign, (1982 - 1983).

Marketing Group Head (1986, 1988 – 2003, 2010-2011, 2019-2023, 2024-2025).

Marketing PhD Admissions, Head (2015-2016), Committee (2022-2023)

Management of Technology Program Committee (MIT Sloan), (2001- 2003).

Master's Program Committee, MIT Sloan, (1980 – 1987, 2007 – 2015).

Ad hoc committee to develop a Marketing, Operations and Strategy Track (2011-2012).

Ad hoc committee to understand gender issues in class participation (2015-2016)

Chairman: Subcommittee on Placement, (1981 - 1982).

Core Curriculum Implementation Committee (1992-1994).

Core Curriculum Reassessment Committee (1991-1992).

Subcommittee on Admissions, Special Consideration, (2007 – 2009).

Subcommittee on Course Ratings (2011).

Subcommittee on Entrepreneurship and Innovation Evaluation (Chair, 2008).

Subcommittee on Fellowship Awards (2014-2015)

Subcommittee on the Management Science Core, (1982 - 1983).

Subcommittee on Tracks (2008-2009).

Subcommittee on Strategy Curriculum (2009).

MIT Sloan Committee on Educational Technology, 2004 – 2006.

Operations Research Center

Admissions Committee, (1981 - 1982).

Associated Faculty (1980 – 2000).

Operations Research Committee (2001- 2003).

President's Committee (1984).

Organization Committee for the New MIT Sloan Building, E62, (2007- 2009).

Personnel and Policy Committee, MIT Sloan (Executive Committee, 2005 – 2009, 2013-2014).

Chair of ad hoc committees for reappointment, promotion, and tenure (1983 - 2022).

Member of ad hoc committees for reappointment, promotion, and tenure (1981 - 2022).

Sloan Appreciation Awards Committee (2013-2014)

Symposium Director, Marketing Center, MIT Sloan School, M.I.T., (1981 - 1982).

Zannetos Dissertation Award Committee, MIT Sloan, (1981-82, 1996-97, chair 1997-1998).

*M.I.T. Subjects Taught (often multiple sections)*

| | |
|---|---|
| 15.810, Marketing Management (Core) | Spring 1990, 1991, 1992, 1993, 1994, 1995, 1997, 1998, 1999, 2001, 2004, 2005. 2006, 2018. Fall 1999, 2006, 2007, 2008, 2011, 2012, 2013, 2014, 2015. (Teaching awards listed on page 2 of vita.). Retitled Marketing Innovation in 2018. |
| 15.812, Marketing Management (UG) | Fall 1981, 1982, 1984, 1985, 1986. Spring 1981, 1984, 2006, 2018. Retitled Marketing Innovation in 2018. |
| 15.813, Marketing Management in Public Sector | Fall 1980. |
| 15.814, Marketing Innovation | Spring 2019, 2020 |
| 15.8141, Marketing Innovation (UG) | Spring 2019, 2020 |
| 15.814, Marketing Mgmt (Mgmt of Technology) | Fall 1988, 1993, 1999, 2001. |
| 15.820, Advanced Marketing Management | Spring 1990 |
| 15.821, Listening to the Customer | Spring 2021, 2022, 2023. 2025. |
| 15.828, New Product Development | Spring 1981, 1982, 1989; Fall 1982, 1984; 1985. |

| | |
|---|---|
| 15.838, Ph.D. Seminar (Various Topics) | Spring 1986, 1997, 2002, 2006, 2011, 2013, 2014, 2015, 2016, 2021. |
| 15.839, Marketing and Statistics Workshop | Spring 1982; Fall 1982, 1984. |
| 15.TH4, Thesis Project on Competitive Strategy | Spring 1985, 1986. |
| CS.113, Core Ethics: Ethics in Marketing | Fall 2014, 2015, 2016, 2017, 2019. |
| CS.108, Core Ethics: Ethics in Drug and Vaccine Tests | Fall 2020, 2021 |

Summer Session, ILP, and External Executive

A.T.&T Course on New Product Development, 1986.

European Institute for Business Administration (INSEAD) European Marketing Programme, 1985.

Greater Boston Area Executive Program, 1982, 1983.

M.I.T. Civil Engineering, Demand Theory, 1980, 1981, and 1982.

M.I.T. ILP, Marketing Strategy and Models in the Information age, 1983.

M.I.T., Management of R&D, 1989, 1990, 1991, 1992, 1993, 1994. 1995, 1996, 1997, 1998, 1999.

M.I.T. Marketing Science Symposium, 1981, 1982, 1983, 1984, 1985, 1986, 1987, 1988.

M.I.T./M.I.P. Executive Program, 1992.

M.I.T. New Product Development, 1997.

*Pedagogical Developments.*

In 2024, I completely redesigned 15.821: Listening to the Customer to reflect the ability of generative AI to augment qualitative methods to extract customer needs.

In 2022, I developed a case to introduce students to randomized control testing in drug development so that we could discuss the ethical issues.

In 2021, I redesigned a course on listening to the customer, including entirely new sessions updated with new material and new case studies.

In 2020, I developed a realistic case to help students learn to use conjoint analysis while designing a new dormitory for MIT.

In 2017-2019, I headed an effort to redesign the basic marketing course with further consideration of redesigning the entire marketing curriculum.

In 2012, I redesigned the core curriculum in marketing to reflect new developments in marketing analytics, big data, and new media.

In 1990 and 1991, Prof. John D. C. Little and I redesigned the core curriculum in Marketing Management and taught the course to the entire Master's class.

In the 1991-1992 I was part of a committee of six faculty members that redesigned the core curriculum at the Sloan School. I supervised the voice-of-the-customer analyses of students and recruiters and encouraged the committee to design a program that these customers would find exciting. The new core was implemented in the 1993-1994

academic year. Student satisfaction increased significantly.

*Teaching Notes*

Note on Defensive Marketing Strategy (2005, for 15.810, Marketing Management)

Note on Product Development (2055, for 15.810, Marketing Management)

Note on the Voice of the Customer (2018 for 15.814, Marketing Innovation)

Note on Consumer Behavior (2015, for 15.810, Marketing Management)

Note on Life Cycle Diffusion Models (2005, for 15.810, Marketing Management)

Note on Engineering Product Design (2006, for 15.810, Marketing Management)

Note on Conjoint Analysis (2018, for 15.814, Marketing Innovation)

*M.I.T. Thesis Supervision*

(a) *MIT Sloan School of Management, Master's Theses*

Hafiz Adamjee (joint with John Scaife), "The Face of the Customer: The Use of Multimedia in Quality Function Deployment," - (1993). This product was subsequently commercialized and was a finalist for the *New Media* Invision 1994 Multimedia award at COMDEX/Spring '94.

Ramay Akras, "Competitive Strategy in the Marketing of Small DDP Computers: An Analysis of Emerging Price and Product Position Patterns," - (1986).

Frederic Amerson, "Strategic Marketing Simulation: Improvements to the Enterprise Integrating Exercise," - (1989).

Sébastien Andrivet (Sloan Fellows Program), “Customer research, customer-driven design, and business strategy in Massively Multiplayer Online Games,” – (2007)

Andrew Anagnos (joint with Karen Van Kirk), "A Framework for Analyzing Quality in the News Media," - (1991)

Allen Aerni, "Measurement of Customer Satisfaction," - (1994).

Joel Berez, "An Investigation of Decision Hierarchies" - (1981).

Harel Beit-on, "Competitive Strategy for Small Business Jet Aircraft," - (1985).

Willy Biberstein (SDM Program), "Framework for Customer Interaction Throughout the Automotive Product Development Process," (February 2002).

Andre Borschberg (joint with Webb Elkins), "Defensive Marketing Strategy: Its Application to a financial Decision Support System" - Reader (1983).

Philippe Bosquet, "European Airline Deregulation: Defining Air France's Strategy for the 1990's," - Reader (1989)

Jill A. Christians, (joint with Cheryl M. Duckworth), "Expectations and Customer Satisfaction: A Market Research Study for Plimoth Plantation," Reader (1994).

Poh-Kian Chua (MOT Program), “R,D&E Metrics: Shaping the Outcomes of Your R,D&E Investment,” – (1998).

Leslie K. Cooper, "The Structure of Recruiter Needs at the Sloan School of Management: A Quantitative

Assessment," - (1992).

Teruyuki Daino (Sloan Fellows Program), "How a Leading Company Can Overcome a Competitive Challenge: A Case Study of Anheuser-Busch Company." – (1998).

Laura E. Donohue, "Software Product Development: An Application of the Integration of R&D and Marketing via Quality Function Deployment" - (1990)

Cheryl M. Duckworth (joint with Jill A. Christians), "Expectations and Customer Satisfaction: A Market Research Study for Plimoth Plantation," Reader (1994).

Webb Elkins (joint with Andre Borschberg), "Defensive Marketing Strategy: Its Application to a Financial Decision Support System" - Reader (1983).

Rasheed El-Moslimany (LFM Program), "Getting Value from the Value Chain: Comfort Choice," Co-Advisor. (June 2002)

Merve Ergez (Master of Science in Management Studies), Strategic Scent Selection: A Marketing Research Study for Olivita Brand," (June 2014).

Julio Faura (MOT Program), "Contribution to Web-based Conjoint Analysis for Market Research," (2000).

Richard Feldman, "Decision Support Systems for Forecasting Communications in the Home," - Reader (1985).

Anders T. Fornander, "The Continuing Operating System Battle in the Personal Computer Industry," - Reader (1994).

Carl Frank (MOT Program), "Metrics Thermostat for Strategic Priorities in Military System Acquisition Projects," (2000).

Mihaela Fulga, "Competitive Pricing and Positioning Strategies in the Dating Service Market," - (1986).

Steven P. Gaskin, "Defender: Test and Application of a Defensive Marketing Model" - (1986). 1st Place, Brooks Award.

Peter N. Goettler, "A Pre-market Forecasting Model of New Consumer Durables: Development and Application," - Reader (1986).

Patti N. Goldberger, "Competitive Strategy in the Market for Running Shoes," - (1985).

Akhil Gupta, "The Personal Computer Industry: Economic and Market Influences on Product Positioning Strategies," - (1986).

Michael Halloran (joint with Marc Silver), "Defensive Marketing Strategy: Empirical Applications" - (1983).

Carla Heaton, "Competitive Strategy in the Facsimile Market," - (1985).

Judith Hee, "Determining Manufacturer's Coupon Strategies" - Reader (1981).

Jonathan E. Higginson, "Understanding Dependencies in Research and Development at the Charles Stark Draper Laboratory." - (1997).

Scott D. Hill, "Correlation of Core Competencies with Market-Driven or Self-Guided Research," - (1995).

Dan Isaacs, "Competitive Pricing and Positioning Strategies in the Imported Beer Marketing," - (1986).

Francois Jacques, "Marketing Strategies in Innovative Industries: The Case of Package/Document Delivery Services," - Co-Advisor (1985).

Lawrence Kahn, "Competitive Positioning: A Study of Recruiter's and Employer's Perceptions of the Sloan School of Management" - (1982). Honorable mention Brooke's Thesis Prize.

D. Darcy Kay, "Competitive Strategy for Anti-arthritic Drugs" - (1985).

Young Joo Kim (MOT Program), "R&D Management Applications of The Dynamic Metrics Framework" – (1998)

Priya Kher (Systems Design and Management Program), "Using Application Generated Data to Provide Personalized User Experience in Software Applications" – (2018)

Sidney A. Kriger, "The Effect of Quality Function Deployment on Communications of the New Product Development Teams," - (1989)

Yasuke Kume, "New Marketing Strategy of Telecommunications in Japan" - Reader (1981).

Elvind Lange, "Measuring Market Response to Marketing Mix Variables Using Dynamic Modeling and Its Implications for Brand Strategy" - Reader (1981).

Stephen P. Langhans, "Defensive Marketing Strategy: A Consumer Semi-Durable Case Example" - (1983).

In-Kyu Lee, "Evaluating System for the Upstream Center of R&D for being Market-Oriented in a Consumer Electronics Company," - (1995).

Michael Leslie (joint with Joel Wachtler), "A Methodology for Making International Marketing Mix Decisions," - Reader (1985).

Kit Mee Lim, "Competitive Strategy among Companies Offering Credit Cards," - Reader (1985).

James A. Lutz, "Competitive Marketing Strategy in the CAD Marketplace," - (1985).

Larry D. Lyons, "Forecasting the Impact of Competitive Entries on Sales of a New Consumer Durable" - Reader (1984).

Arpita Majundar (SDM Program), "Strategic Metrics for Product Development at Ford Motor Company," - (2000).

Catherine E. Manion, "A Survey of Customer Satisfaction Incentive Systems for Salespersons," - (1993).

Maureen E. Matamoros, "Information Overload," – Reader (1986).

Meghan McArdle (LFM Program), "Internet-based Rapid Customer Feedback for Design Feature Tradeoff Analysis," – co-Advisor (2000)

Fernando Motta, "Competitive Strategy Among Panamanian Banks," - (1985).

Neil Novich, "Price and Promotion Analysis Using Scanner Data" - Reader (1981).

Kenji Nozaki, "Marketing and Technology Strategy for the Japanese Architectural Design Company," - (1989).

Seiji Nozawa, "Voice of the Customer Analysis in the Japanese Beer Market." - (1997).

Minho Park (MOT Program), "R&D Matrix at LG Electronics." - (1997)

Stephen Pearse, "Production and Sales Forecasting: A Case Study and Analysis" - Reader (1982).

Ning P. Peng, "An Exploration of the Impact and Success of Customer Satisfaction Programs," - (1994).

Homer Pien (MOT Program), "Competitive Advantage through Successful Management of R&D." - (1997)

Susan B. Poulin, "Defensive Strategy in the Automatic Test Equipment Industry" (1984).

Jill W. Roberts, "MBA Recruiters' Needs: Voice of the Customer Analysis," - (1992).

Lisa Gayle Ross, "A Voice of the Customer Analysis of M.B.A. Schools: The Student Segment," - (1992). Lisa was a runner-up for the George Hay Brown Marketing Scholar of the Year in 1992.

Tamaki Sano, "Strategy for Kirin as a Global Brand" – (2009) Sloan Fellow.

John Scaife (joint with Hafiz Adamjee), "The Face of the Customer: The Use of Multimedia in Quality Function Deployment," - (1993). See award listed under Adamjee.

Paul E. Schoidtz, "Advertising, Price, and Positioning Equilibria," - (1986).

Hongmei Shang, "A Simulation Analysis of Optimal Task Assignment for Growing Managers from R&D Labs," – (February 2000).

Rosemarie Shield, "Competitive Pricing and Positioning Strategies in the Chromatographic Instruments Market," - , (1986).

Jon Silver (joint with John C. Thompson, Jr.), "Beta-binomial Analysis of Customer Needs -- Channels for Personal Computers," - (1991). 1st Prize, Brooks Award.

Marc Silver (joint with Michael Halloran), "Defensive Marketing Strategy: Empirical Applications" - (1983).

Lisa Silverman, "An Application of New Product Growth Modeling to Automobile Introductions" - (1982).

Sheryl Sligh, "An Assessment of the Analog Modem Market," - (1991).

Jamie Smith, "Industrial Buying Process of Pension Funds for Real Estate," - (1982).

Yoshihito Takahashi (MOT), "Analysis of Strategy in an Ethical Drug Industry," – Reader ( 2000).

Genevieve Tchang, "A Methodology for Planning and Evaluating External Relations at Business Schools" - Reader (1982).

John C. Thompson, Jr. (joint with Jon Silver), "Beta-binomial Analysis of Customer Needs -- Channels for Personal Computers," - (1991). 1st Place, Brooks Award.

V. Mullin Traynor, "The Dissemination and Adoption of New Technology: Control Data's Computer-Based Training System, Plato, and the Electric Utilities" - (1982).

Karen Van Kirk (joint with Andrew Anagnos), "A Framework for Analyzing Quality in the News Media," - (1991)

Joel Wachtler (joint with Michael Leslie), "A Methodology for Making International Marketing Mix Decisions," - Reader (1985).

Tamao Watanabe, "Customer Analysis of the U.S. Cardiovascular Drug Market: Focusing on Physician's Drug Choice" - (1991)

Stephen L. Weise, "Expert Decision Support Systems for Marketing Management," – Reader (1986).

Nancy Werner, "Competitive Price and Positioning in the Integrated Office Automation Systems Market" - (1986).

Julie Wherry, "Pre-Test Marketing: Its Current State in the Consumer Goods Industry and Its Effect on Determining a Networked Good." - (2006).

Ali Yalcin, "The Potentials and Limitations of Customer Satisfaction Indices in Captive Customer-Supplier Environments," - (1995)

Sandra Yie, "The Core Curriculum at Sloan: Establishing a Hierarchy of Needs," - (1992).

Judy Young, "Responsive Marketing Strategy at AT&T" - (1982).

(b) *Aeronautics S.M. Theses*

Keith Russell (LSI), "Reengineering Metrics Systems for Aircraft Sustainment Teams: A Metrics Thermostat for Use in Strategic Priority Management," (February 2001).

(c) *Electrical Engineering, S.B. and M.Eng. Theses*

Chan, Christine W. Y. (M. Eng), "Measuring Non-Monetary Incentives Using Conjoint Analysis," Co-Advisor (1999).

Emily Hui (M.Eng.), "Application of Polyhedral Conjoint Analysis to the Design of Sloan's Executive Education Programs." June 2003.

Brian T. Miller (S. B.), "A Verification of Price Equilibria Based on Non-Zero Conjectural Variation," (1986).

Nina Yang (M. Eng.), "Examining Interactivity in Television Ads as an Effect of Social Media Brand Presence," (expected 2024)

(d) *Mechanical Engineering, Master's Theses*

Burt D. LaFountain, "An Empirical Exploration of Metrics for Product Development Teams" – (1999)

Tina Savage, "The Virtual Customer: A Distributed Methodology for Linking Product Design and Customer Preferences." Co-Advisor (1998).

(e) *Operations Research Center, Master's Theses*

Jeffrey Moffit (ORC), " Applying the Metrics Thermostat to Naval Acquisitions for Improving the Total Ownership Cost – Effectiveness of New Systems," (2001)

Olivier Toubia (ORC), "Interior-point Methods Applied to Internet Conjoint Analysis," (February 2001), Co-Advisor.

(f) *Urban Studies, Master's Theses*

Marijoan Bull, "Affirmative Fair Housing Marketing" - Committee Member (1982).

Barry Cosgrove, "Marketing Analysis for the Brockton Area Transportation Authority" – Committee Member (1981).

(g) *MIT Sloan School of Management, Ph.D. Theses (Universities listed are last known appointment)*

Makoto Abe, "A Marketing Mix Model Developed from Single Source Data: A Semiparametric Approach." Committee member (August 1991). Abe is on the faculty at the University of Tokyo.

Cao, Xinyu, “Consumer Inattention, Uncertainty, and Marketing Strategy.” Committee member (June 2018). Cao on the faculty at New York University.

Daria Dzyabura, “Essays on Machine Learning in Marketing (tentative title),” Chairman (June 2012). Dzyabura is on the faculty at the New Economic School in Russia.

Peter Fader, "Effective Strategies in Oligopolies," Chairman (February 1987). Sloan School of Management, Zannetos Prize, 1st Place. Fader is on the faculty at the University of Pennsylvania.

Fred Feinberg, "Pulsing Policies for Aggregate Advertising Models" Committee Member (August 1988). Feinberg is on the faculty of the University of Michigan.

Dave Godes, " Friend or Foe? The Relationship Between Learning and Incentives and two additional essays in marketing," (June 2000), Committee Member. Primary advisor on listed essay. Zannetos Prize, 1st Place. Godes is on the faculty of the University of Maryland.

Abbie Griffin, "Functionally Integrated New Product Development: Improving the Product Development Process Through Linking Marketing and Technology Development," Chairman. (June 1989). Griffin is on the faculty at the University of Utah and was editor of *Journal of Product Innovation Management* from 1997-2003 Frank Bass Dissertation Award (INFORMS).

Ibragimov, Marat, “Product Returns Management in Online Retail,” Ibragimov is on the faculty at Emory University.

Gurumurthy Kalyanaram, "Empirical Modeling of the Dynamics of the Order of Entry Effect on Market Share, Trial Penetration and Repeat Purchases for Frequently Purchased Consumer Goods," Committee Member (March 1989). G. K. was on the faculty at the University of Texas, Dallas.

Eriko Kitazawa, "Customer Satisfaction at Japanese Utility Franchises," Committee Member (1996).

Li, Xitong, “Using Web Data and Services: Technology, Theory, and Evidence,” Co-chairman (2014). Li is on the faculty at HEC Paris.

Eleanor (Nell) Putnam-Farr, “The Effects of Framing on Enrollment and Participation – Field Experiments Using Different Recruitment Language.” June 2015. Putnam-Farr joined Yale University as a post-doctoral fellow. She is on the faculty at Rice University.

John H. Roberts, "A Multiattributed Utility Diffusion Model: Theory and Application to the Prelaunch Forecasting of Autos". Committee Member (February 1984). Roberts is on the faculty at the London Business School and the Australian Graduate School of Management.

Matt Selove, “The Strategic Importance of Accuracy in Conjoint Design,” Committee Member (June 2010). Selove joined the faculty at the University of Southern California. He is now on the faculty at the Chapman University. John Howard Dissertation Award (AMA), 2010.

Duncan I. Simester, "Analytical Essays on Marketing," Committee Member, (June 1993). Sloan School of Management, Zannetos Prize, Honorable Mention. Simester is on the faculty of M.I.T.

Artem Timoshenko, "Essays on Machine Learning in Marketing (June 2019)," Timoshenko is on the faculty of Northwestern University. Finalist Frank Bass Award (ISMS) 2023.

Olivier Toubia, “New Approaches to Idea Generation and Consumer Input in the Product Development Process,” (June 2004). Toubia is on the faculty of Columbia University. Frank M. Bass Dissertation Award (ISMS) 2005, John Howard Dissertation Award (AMA), 2005. ISMS Long-term Impact Award 2016.

Miguel Villas-Boas, "On Promotions and Advertising Policies: A Strategic Approach." Committee member (February 1991). Villas-Boas is on the faculty at the University of California, Berkeley.

Bruce Weinberg, "An Information-Acceleration-Based Methodology for Developing Preproduction Forecasts for Durable Goods: Design, Development, and Initial Validation." Committee Member. (August 1992). Weinberg was on the faculty at the University of Massachusetts, Amherst.

Florian Zettelmeyer, "Three Essays on Strategic and Organizational Uses of Information in Marketing." Committee Member. Zettelmeyer is on the faculty of Northwestern University.

(h) *Civil Engineering, Ph.D. Thesis*

Karla Karash (Ph.D.), "An Application of the Lens Model in Measuring Retail Attractiveness and the Effects of Transportation Programs" - Committee Member (August 1983). Karash was at the MBTA.

(j) *Mechanical Engineering, Ph.D. Thesis*

Javier Gonzalez-Zugasti (Mechanical Engineering, Ph.D.), "Models for Product Family Design and Selection," (June 2000), Committee Member.

(k) *Operations Research Center, Ph.D. Thesis*

Michael Yee (Operations Research, Ph.D.), "Inferring Non-Compensatory Choice Heuristics," (June 2006), Co-Advisor. Yee is at MIT's Lincoln Laboratories.

(l) *Post-doctoral Fellows, MIT Sloan School of Management*

Rene Befurt, now a partner at the Analysis Group, Inc.

Alex Burnap, now on the faculty at Yale University

Gui Liberali, now on the faculty at Erasmus University

*Northwestern University Ph.D. Thesis Supervision (1975 - 1980 Academic Years)*

Steven M. Shugan, "A Descriptive Stochastic Preference Theory and Dynamic Optimization: Applications Toward Predicting Consumer Choice' Chairman (September 1977). Shugan is on the faculty at the University of Florida and was editor of *Marketing Science* for six years.

Patricia Simmie, "Product Realization: Theory, Models, and Application" - Chairman (June 1979), American Marketing Association Dissertation Prize, Honorable Mention. Simmie was at York University.

Ken J. Wisniewski, "A Semi-Markov Theory of Consumer Response: New Theoretical Properties, Simulation Testing, and Empirical Application" Chairman (June 1981). American Marketing Association Dissertation Prize, First Place. Wisniewski was on the University of Chicago.

**Expert Testimony**

**Testimony by John R. Hauser in the Previous Five Years**

In the Matter of Intuit Inc., a corporation, Docket No. 9408, Before the Federal Trade Commission. Deposition testimony, January 25, 2023. Trial testimony, April 4, 2023.

Walter Peters, et al. v. Apple, Inc, Case No. 19STCV21787, Superior Court for the State of California, County of Los Angeles. Virtual deposition, September 8, 2022.

In the Matter of: Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords IV), Docket No. 21-CRB-0001-PR (2023-2027), Before the United States Copyright Royalty Judges, Library of Congress, Washington, D.C. Declaration, October 13, 2021.

Charles Tillage et al. v. Comcast Corporation, Case No. 3:17-cv-06477-VC-DMR, United States District Court, Northern District of California, San Francisco Division. Deposition testimony, May 27, 2021.

Dane Ashley Bruce Tress vs. FCA US LLC and FCA Canada Inc., QBG 469 of 2018. Cross-Examination testimony, April 12, 2021.

Suzie's Brewery Company v. Anheuser-Busch Companies, LLC and Anheuser-Busch InBev Worldwide, Inc, Case No. 3:21-cv-178-SI, United States District Court, For the District of Oregon. Declaration, March 24, 2021.

Arendi S.A.R.L v. Apple Inc., Case No. 12-1596-LPS, United States District Court, District of Delaware. Deposition testimony, January 15, 2021.

In the Matter of Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances (Web V) before United States Copyright Royalty Board, Library of Congress, Washington, DC, Docket No. 19-CRB-0005-WR(2021-2025). Deposition testimony, February 21, 2020. Trial testimony, August 26-27, 2020.

Allegra, et al. v. Luxottica Retail North America d/b/a LensCrafters, Case No. 1:17-cv-05216-PKCRLM, US District Court Eastern District of New York, Brooklyn Division. Deposition testimony, January 10, 2020.

Shane Witham and Robert Maginnis vs. FCA Canada Inc., FCA US LLC, Robert Bosch GMBH and Robert Boshch LLC, CV-17-567691-00CP, Ontario Superior Court of Justice, Cross-Examination testimony, December 6, 2019.

MillerCoors, LLC. v. Anheuser-Busch Companies, LLC., Case No. 10-cv-218, United States District Court for the District of Wisconsin. Deposition testimony, October 29, 2019.

Anoush Cab, Inc. et al v. Uber Technologies, Inc., Rasier, LLC, Case No. 1:17-cv-110142-NMG, United States District Court, District of Massachusetts. Deposition testimony, January 30, 2019. Trial testimony, July 31, 2019 and August 1, 2019.

Malden Transportation, Inc. et al v. Uber Technologies, Inc., Rasier, LLC, Case No. 1:16-cv-12538-NMG, United States District Court, District of Massachusetts. Deposition testimony, January 30, 2019. Trial testimony, July 31, 2019 and August 1, 2019.

State of Washington v. Comcast Cable Communications Management, LLC; Comcast Cable Communications, LLC; and Comcast of Colorado/Florida/Michigan/New Mexico/Pennsylvania/Washington, LLC, Case No. 16-2-18224-1 SEA, State of Washington King County Superior Court. Deposition testimony, August 9, 2018. Trial testimony, January 14, 2019.

# List of Materials Considered

## Books

Acquisti, Alessandro, and Ralph Gross, "Imagined Communities: Awareness, Information Sharing, and Privacy on the Facebook," in *Privacy Enhancing Technologies: 6th International Workshop, PET 2006*, Berlin, Heidelberg: Springer, 2006, pp. 36–58

Befurt, Rene, Felix Eggers, and John R. Hauser, "Supply Side Considerations When Using Conjoint Analysis in Litigation," in *Handbook of Marketing Analytics: Methods and Applications in Marketing, Public Policy, and Litigation*, Cheltenham, UK: Edward Elgar, 2024 (forthcoming)

Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Washington, D.C.: Federal Judicial Center and National Research Council of the National Academies, 2011, pp. 359–423

Diamond, Shari S., and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Second Edition, Chicago, IL: American Bar Association, Section of Intellectual Property Law, 2022

McFadden, Daniel, "Stated Preference Methods and Their Applicability to Environmental Use and Non-Use Valuations," in *Contingent Valuation of Environmental Goods*, Edward Elgar Publishing, 2017, pp. 153–187

Rao, Vithala R., *Applied Conjoint Analysis*, Berlin, Heidelberg: Springer, 2014

## Academic Articles

Acquisti, Alessandro, Leslie K. John, and George Loewenstein, "What is Privacy Worth?" *The Journal of Legal Studies* 42(2), 2013, pp. 249–274

Altuglu, Vildan, et al., "Estimating Harm in Invasion of Privacy and Data Breach Disputes," *International Comparative Legal Guide to: Class and Group Actions*, 2021, pp. 23–28

Athey, Susan, Christian Catalini, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *NBER Working Paper* 23488, 2017

Baker, Reg, et al., "AAPOR Report on Online Panels," *Public Opinion Quarterly* 74(4), 2010, pp. 711–781

Ben-Akiva, Moshe, Daniel McFadden, and Kenneth Train, "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis," *Foundations and Trends in Econometrics* 10(1–2), 2019, pp. 1–144

Boyle, Kevin J., Richard C. Bishop, and Michael P. Welsh, "Starting Point Bias in Contingent Valuation Bidding Games," *Land Economics* 61(2), 1985, pp. 188–194

Diamond, Peter A., and Jerry A. Hausman, "Contingent Valuation: Is Some Number Better than No Number?" *The Journal of Economic Perspectives* 8(4), 1994, pp. 45–64

Ding, Min, "An Incentive-Aligned Mechanism for Conjoint Analysis," *Journal of Marketing Research* 44(2), 2007, pp. 214–223

Ding, Min, et al., "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48(1), 2011, pp. 116–127

Ding, Min, Rajdeep Grewal, and John Liechty, "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research* 42(1), 2005, pp. 67–82

Eggers, Felix, John R. Hauser, and Matthew Selove, "The Effects of Incentive Alignment, Realistic Images, Video Instructions, and Ceteris Paribus Instructions on Willingness to Pay and Price Equilibria," *Proceedings of the Sawtooth Software Conference*, 2016

Green, Paul E., and Vithala R. Rao, "Conjoint Measurement for Quantifying Judgmental Data," *Journal of Marketing Research* 8(3), 1971, pp. 355–363

Haneman, W. Michael, "Welfare Evaluations in Contingent Valuation Experiments with Discrete Response Data: Reply," *American Journal of Agricultural Economics* 71(4), 1989, pp. 1057–1061

Hann, Il-Horn et al., "Online Information Privacy: Measuring the Cost-Benefit Trade-off," *Proceedings of International Conference on Information Systems*, 2002

Hann, Il-Horn et al., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems* 24(2), 2007, pp. 13–42

Hauser, John R., Felix Eggers, and Matthew Selove, "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science* 38(6), 2019, pp. 1059–1081

Hauser, John R., Songting Dong, and Min Ding, "Self-Reflection and Articulated Consumer Preferences," *Journal of Production Innovation Management* 31(1), 2014, pp. 17–32

Hausman, Jerry, "Contingent Valuation: From Dubious to Hopeless," *Journal of Economic Perspectives* 26(4), 2012, pp. 43–56

Kahneman, Daniel, and Amos Tversky, "Prospect Theory: An Analysis of Decision under Risk," *Econometrica* 47(2), 1979, pp. 263–292

Kahneman, Daniel, and Jack L. Knetsch, "Valuing Public Goods: The Purchase of Moral Satisfaction," *Journal of Environmental Economics and Management* 22(1), 1992, pp. 57–70

Kahneman, Daniel, Jack L. Knetsch, and Richard H. Thaler, "Experimental Tests of the Endowment Effect and the Coase Theorem," *Journal of Political Economy* 98(6), 1990, pp. 1325–1348

Kunz, Tanja, and Tobias Gummer, "Effects of Objective and Perceived Burden on Response Quality in Web Surveys," *International Journal of Social Research Methodology* 28(4), 2025, pp. 385–395

Miller, Klaus M., et al., "How Should Consumers' Willingness to Pay Be Measured? An Empirical Comparison of State-of-the-Art Approaches," *Journal of Marketing Research* 48(1), 2011, pp. 172–184

Oppenheimer, Daniel M., Tom Meyvis, and Nicolas Davidenko, "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology* 45(4), 2009, pp. 867–872

Thaler, Richard, "Mental Accounting and Consumer Choice," *Marketing Science* 4(3), 1985, pp. 199–214

Westwood, Sean J., "The Potential Existential Threat of Large Language Models to Online Survey Research," *Proceedings of the National Academy of Science* 122(47), 2025, e2518075122

Wlömert, Nils, and Felix Eggers, "Predicting New Service Adoption with Conjoint Analysis: External Validity of BDM-Based Incentive Aligned and Dual-Response Choice Designs," *Marketing Letters* 27(1), 2016, pp. 195–210

Zhang, Simone, Janet Xu, and AJ Alvero, "Generative AI Meets Open-Ended Survey Responses: Research Participant Use of AI and Homogenization," *Sociological Methods & Research* 54(3), 2025, pp. 1197–1242

**Publicly Available Sources**

"[GA4] Set up Analytics for a Website And/or App," *Google Help*, available at https://support.google.com/analytics/answer/9304153, accessed on December 4, 2025

"Conducting an Online Survey? How to Make Sure You Don't Get Bad Data," *KS&R*, 2020, available at http://www.ksrinc.com/thought-leadership/pdf/KSR_Online_Data_Integrity.pdf, accessed on December 4, 2025

"Consumer," *Datacy*, available at https://datacy.com/consumer, accessed on December 4, 2025

"Conversion Tracking," *Microsoft Advertising*, available at https://about.ads.microsoft.com/en/tools/performance/conversion-tracking, accessed on December 4, 2025

"Data Policy," *Facebook*, January 4, 2022, available at https://www.facebook.com/help/instagram/155833707900388/.%C2%A0/, accessed on December 4, 2025

"HB Estimation Settings," *Sawtooth Software*, available at available at https://sawtoothsoftware.com/help/lighthouse-studio/manual/cbc-hb-estimation-settings.html, accessed on December 4, 2025

"How Analytics Data Is Collected," *Adobe*, May 30, 2023, available at https://experienceleague.adobe.com/en/docs/analytics-learn/tutorials/intro-to-

analytics/analytics-basics/how-analytics-data-is-collected, accessed on December 4, 2025

"How Does Swash Work," *Swash*, available at https://support.swashapp.io/hc/en-us/articles/19218826721425-How-does-Swash-work, accessed on December 4, 2025

"Online Insights Study," *Google*, captured by *Page Vault* on October 23, 2025, https://onlineinsightsstudy.google/signup/invitecode

"Rep Data Launches Market Research Industry's First-Ever 'No-Fly' Suppression List to Eradicate Bad Actors," *Rep Data*, June 25, 2025, available at https://repdata.com/blog/rep-data-launches-market-research-industrys-first-ever-no-fly-suppression-list-to-eradicate-bad-actors/, accessed on December 4, 2025

"See Our Research on Research – June 2025 Research: Analyzing Survey Fraud across 3,600 Respondents from 6 Different Sources," *Rep Data*, available at https://repdata.com/research-on-research, accessed on December 4, 2025

Josh Patoka, "Is MobileXpression Legit? My Honest Review," *Well Kept Wallet*, April 22, 2025, available at https://wellkeptwallet.com/mobilexpression-review/, accessed on December 4, 2025

Miklos Kremser, "How to Improve Your Survey Data Quality," *Sawtooth Software*, October 24, 2022, available at https://sawtoothsoftware.com/resources/blog/posts/Improve-Survey-Data-Quality-With-Root-Likelihood, accessed on December 4, 2025

**Legal Documents**

Meta Cookies Policy, Case 3:22-cv-03580-WHO, Document 76-5, October 17, 2022

Meta Privacy Policy, Case 3:22-cv-03580-WHO, Document 76-12, October 17, 2022

First Amended Consolidated Class Action Complaint, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 10, 2023

Defendant Meta Platforms, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (VKD), December 20, 2024

Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (VKD), September 30, 2025

**Depositions**

Deposition of Hal J. Singer, Ph.D., October 24, 2025, with Exhibits

Errata Sheet for the October 24, 2025 Deposition of Hal Singer, December 1, 2025

**Expert Reports**

Expert Report of Hal J. Singer, Ph.D., September 9, 2025, with Backup Materials and Appendices

Errata Sheet for the September 9, 2025 Expert Report of Hal J. Singer, Ph.D.

| | |
|---|---|
| IN RE: META PIXEL HEALTHCARE LITIGATION | Case No. 3:22-cv-2580-WHO-VKD |

**REBUTTAL REPORT OF STEVEN TADELIS**

**December 9, 2025**

## Table of Contents


I. Introduction ..... 1

A. Qualifications ..... 1

B. Case Background ..... 3

C. Assignment ..... 5

II. Executive Summary ..... 5

III. Plaintiffs Fail to Account for Different Types of Website Visitor Engagement in This Matter ..... 7

A. Some Online Activity Is Consistent with Unintentional Visits Due to Misclicks and Quickbacks ..... 7

B. Some Healthcare Providers Offer "Proxy Access" That Allows Website Visitors to Access Information on Behalf of Others ..... 15

IV. Dr. Barasz's Opinions Fail to Engage with the Privacy Paradox and Contradict Both Academic Research and the Behavior of Plaintiffs ..... 18

A. Dr. Barasz Fails to Consider Heterogeneity in Privacy Valuations and Implications of the Privacy Paradox and Thus Misinterprets Proposed Class Members' Continued Use of Meta Services ..... 19

1. Heterogeneity in privacy preferences means that individuals differ in the extent to which they care about privacy ..... 19

2. Dr. Barasz incorrectly infers that Proposed Class Members' continued use of Meta services reflects a lack of awareness or agency ..... 25

B. Dr. Barasz Fails to Substantiate Her Opinions About Proposed Class Members' Expectations Regarding What Information About Them Was Transmitted and How ..... 31

1. Dr. Barasz fails to acknowledge that some individuals are aware of and comfortable with online sharing of data ..... 31

2. By not identifying the At-Issue Data, Dr. Barasz misinterprets the sources she cites in her report ..... 33

V. Dr. Singer's Actual Damages Estimates Are Unreliable ..... 37

A. Dr. Singer Applies His Survey Results Without Accounting for Changes in Pixel Technology and the Real-World Behavior of Plaintiffs ..... 39

1. Dr. Singer's analysis fails to adapt to the changing nature of Meta's data filters and mitigation systems ..... 39

2. Dr. Singer's analysis fails to account for information freely shared with Meta by Proposed Class Members ..... 40

B. Dr. Singer's Analysis of the Market Equilibrium Price Is Incomplete and Contradicted by Basic Economic Principles Applied to Personal Information ..... 43

1. Dr. Singer does not calculate the market equilibrium price for Meta's access to the At-Issue Data ..... 44

2. Dr. Singer selectively invokes market-pricing principles without any economic basis to justify disregarding differences in individuals' willingness to accept ........ 46

3. Dr. Singer's assumption that there is a single market price for data for each Proposed Class does not reflect reality ........ 48

C. Dr. Singer's Analysis Depends on Information Not Available in His Report and on Undisclosed "Analytical and Statistical Methods" ........ 50

VI. Mr. Zigrang's Damages Estimates Are Unreliable ........ 51

A. Mr. Zigrang Does Not Properly Implement His "Market Approach" Methodology for the Valuation of the At-Issue Data ........ 51

1. Mr. Zigrang fails to tailor his analysis of "comparable transactions" to the data relevant to each Proposed Class ........ 52

2. Mr. Zigrang's "comparable transactions" are inappropriate proxies for the Fair Market Value because the nature of the "comparable transactions" is different than the data allegedly transmitted to Meta ........ 54

3. Mr. Zigrang's methodology fails to identify and count the number of months that his monthly compensation estimate should be applied to for each Proposed Class Member in each of the Proposed Classes ........ 60

4. Mr. Zigrang's "comparable transactions" are inappropriate proxies for the Fair Market Value of the At-Issue Data for several other reasons ........ 60

B. Mr. Zigrang's Profit Disgorgement Methodologies are Based on an Inaccurate and Naïve Understanding of How Meta's Ad Delivery Works and How Its Auction Design Impacts Revenues ........ 65

1. Mr. Zigrang fails to tailor his profit disgorgement methodologies to the data relevant to each Proposed Class ........ 67

2. Mr. Zigrang's methodology overestimates damages because it misunderstands how a change in an advertiser's "total value" for an ad slot could affect Meta's revenue, if at all ........ 67

# I. Introduction

## A. Qualifications

1. I am a Professor of Economics, Business and Public Policy, and the Sarin Chair in Leadership and Strategy at the Haas School of Business, University of California, Berkeley. I received an undergraduate degree in Economics from the University of Haifa and a master's in Economics from the Technion-Israel Institute of Technology, both in Israel. I received a Ph.D. in Economics from Harvard University in 1997. After completing my Ph.D., I joined Stanford University as an Assistant Professor of Economics, and in 2005 I moved to the University of California, Berkeley, where I still teach today. A copy of my curriculum vitae, which includes a list of my testimony for the last four years and a list of my publications, is attached as **Appendix A**.

2. My academic specialty lies in economics, including analyses related to digital advertising and marketing strategies. I have published multiple academic articles in leading scientific, economics, and marketing journals, including *Science*, *Science Advances*, the *American Economic Review*, the *Journal of Political Economy*, *Econometrica*, the *Quarterly Journal of Economics*, the *RAND Journal of Economics*, and *Marketing Science*. My published, peer-reviewed research includes analyses of consumer behavior, including website interactions in the form of clickstream data.[1] I also have worked extensively, in both my academic research and industry positions, on research topics analyzing data generated by pixel events and clickstream data, including page views, ad impressions, clicks, misclicks, quickbacks, and conversions. I have conducted large-scale experiments on several social media and e-commerce platforms to study variations in consumer behavior in response to paid search ads, including an analysis of how the use of Meta Pixel and Conversions API affects advertisers' returns on online advertising.[2] I have also analyzed the impact of digital

---

[1] *See, for example*, Blake, Thomas, Chris Nosko and Steven Tadelis, "Consumer Heterogeneity and Paid Search Effectiveness: A Large-Scale Field Experiment," *Econometrica*, Vol. 83, No. 1, January 2015 ("Blake et al. (2015)"), pp. 155-174. Clickstream data refers to the detailed record of a website visitor's interactions on a website, capturing their sequence of clicks, pages visited, time spent, and navigation paths to illustrate their journey through the site.

[2] Blake et al. (2015); Tadelis, Steven et al., "Learning, Sophistication, And The Returns to Advertising: Implications For Differences in Firm Performance," *National Bureau of Economic Research*, No. w31201, *Working Paper*, April 2023 ("Tadelis et al. (2023)").

advertising privacy regulations on outcomes such as market structure and prices.[3] Some of this work resulted in academic publications that help uncover aspects of consumer online behavior such as search costs,[4] responses to price obfuscation,[5] bargaining behavior,[6] user behavior in online auctions,[7] and responses to online advertising.[8]

3. I am the author of two books on game theory and microeconomic theory, have served as co-editor of the *Journal of Law, Economics and Organization*, and have served on the editorial boards of the *American Economic Journal: Microeconomics*, the *American Economic Review*, the *California Management Review*, and the *International Journal of Industrial Organization*.

4. During the 2011-2013 academic years, I was on leave of absence from the Haas School of Business at eBay Research Labs as Senior Director of Economics, where I hired and led a team of research economists focused on the economics of e-commerce, with particular attention to creating better matches of buyers and sellers; reducing market frictions by increasing trust and safety in eBay's marketplace; understanding the underlying value of different advertising and marketing strategies; evaluating how buyers behave in online auctions; and exploring the market benefits of different pricing structures. During the 2016-2017 academic year, I was on leave of absence from the Haas School of Business to serve

3 Deisenroth, Daniel et al., "Digital Advertising and Market Structure: Implications for Privacy Regulation," *National Bureau of Economic Research*, No. w32726, *Working Paper*, July 2024 ("Deisenroth et al. (2024)").

4 Blake, Thomas, Chris Nosko and Steven Tadelis, "Returns to Consumer Search: Evidence from eBay," *Proceedings of the 2016 ACM Conference on Economics and Computation (EC '16)*, July 2016 ("Blake et al. (2016)"), pp. 531-545.

5 Blake, Tom, Sarah Moshary, Kane Sweeney and Steven Tadelis, "Price Salience and Product Choice," *Marketing Science*, Vol. 40, No. 4, May 2021 ("Blake et al. (2021)"), pp. 619-636.

6 Backus, Matthew, Thomas Blake and Steven Tadelis, "On the Empirical Content of Cheap-Talk Signaling: An Application to Bargaining," *Journal of Political Economy*, Vol. 127, No. 4, June 2019 ("Backus et al. (2019)"), pp. 1599-1628; Backus, Matthew, Thomas Blake, Brad Larsen and Steven Tadelis, "Sequential Bargaining in the Field: Evidence from Millions of Online Bargaining Interactions," *The Quarterly Journal of Economics*, Vol. 135, No. 3, February 2020 ("Backus et al. (2020)"), pp. 1319-1361.

7 Backus, Matthew, Thomas Blake, Dimitriy Masterov and Steven Tadelis, "Expectation, Disappointment, and Exit: Evidence on Reference Point Formation from an Online Marketplace," *Journal of the European Economic Association*, Vol. 20, No. 1, February 2022 ("Backus et al. (2022)"), pp. 116-149.

8 Blake et al. (2015); Larsen, Bradley J. et al., "Counter-Stereotypical Messaging and Partisan Cues: Moving the Needle on Vaccines in a Polarized United States," *Science Advances*, Vol. 9, No. 29, July 2023 ("Larsen et al. (2023)"); Deisenroth et al. (2024).

as Vice President of Economics and Market Design at Amazon.com, Inc., where I led a team of economists who applied economics and data science to optimize pricing and operations. Until February 2021, I was an Amazon economist fellow (and later Amazon Scholar), helping the company use a wide range of applied research in economics and market design.

5. I am being compensated for my services in this matter at my current hourly rate of $1,350. In addition, I receive compensation based on the professional fees of Analysis Group, an economics consulting firm, which has assisted me in the preparation of this report. Neither my compensation nor that of Analysis Group is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

6. In formulating my opinion, I considered the materials listed in **Appendix B** of this report.

7. My work on this matter is ongoing, and I may review additional materials or conduct further analysis, including but not limited to analyzing any additional expert reports or testimony offered in this litigation. My analysis and opinions are based on the information currently available to me. If additional information or materials become available, I reserve the right to amend, supplement, or revise my analyses and opinions as appropriate.

### B. Case Background

8. Plaintiffs allege that Meta obtains health information through what they define as Meta Collection Tools (hereinafter referred to as "The Meta Business Tools") when individuals (who Plaintiffs allege are patients communicating with their healthcare providers) visit hundreds of thousands of healthcare provider domains and apps.[9] Plaintiffs claim that "the named plaintiffs—and all class members—were injured by Meta using its Business Tools

---

[9] Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025 ("Motion for Class Certification"), pp. 1, 14, Exhibit 60, Exhibit 72, Exhibit 73. Plaintiffs identify the Meta "Collection Tools at-issue [as] the Meta Pixel, SDK, CAPI, and Custom Uploads." I understand "Custom Uploads" is not a term Meta uses. I understand this term refers to customer lists uploaded by advertisers, which are not The Meta Business Tools, but for simplicity, the references to The Meta Business Tools in my report include data sent through all the methods Plaintiffs include in their motion. "Create a Customer List Custom Audience," *Meta*, available at https://www.facebook.com/business/help/170456843145568; "The Meta Business Tools," *Meta*, available at https://www.facebook.com/business/help/331509497253087.

to intercept plaintiffs' health information without plaintiffs' consent when plaintiffs were communicating with their healthcare providers."[10]

9. This matter includes four separate proposed classes (together, the "Proposed Classes"), which Plaintiffs define as:[11]

   a. The Patient Status Button-Click Class – All Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers.

   b. The Patient Health Information Class – All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above.

   c. The Prescription Drug Information Class – All Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta.[12]

   d. The Patient Device Intrusion Class – All Facebook users for whom Meta placed an _fbp cookie and/or used computing resources by sending data to Meta through their device and/or by computing Core Setup logic on their device while at a Healthcare Provider property.

10. Plaintiffs define the Class Period for each Proposed Class as from June 17, 2018 to the present.[13]

---

[10] Motion for Class Certification, p. 17.

[11] Motion for Class Certification, p. 13.

[12] Plaintiffs define the "Prescription Drug Information Class" in their Motion for Class Certification. However, Plaintiffs' expert Dr. Singer refers to this as the "Prescription Drug Class." I refer to both as the Prescription Drug Information Class for consistency in this report. See Motion for Class Certification, p. 13; Class Certification Report of Hal J. Singer, Ph.D., *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 23, 2025 ("Singer Report"), ¶ 2 ("I understand three such classes include: [...] (3) Facebook users whose activity on pharmaceutical websites for which they have a prescription was obtained via the Meta Collection Tools (the 'Prescription Drug Class.').").

A13-4144

[13] Motion for Class Certification, p. 13.

11. I refer to the data allegedly transmitted to Meta by web and app developers using The Meta Business Tools, as described in Plaintiffs' four Proposed Classes above, collectively as the "At-Issue Data" throughout this report. As I discuss in the sections below, Plaintiffs' experts do not define or identify the specific At-Issue Data.

### C. Assignment

12. I have been asked to consider how different types of website visitor engagement affect the personal information, if any, transmitted by developers through The Meta Business Tools. I have also been asked to evaluate the expert reports of Dr. Kate Barasz,[14] Dr. Hal J. Singer,[15] and Mr. Todd Zigrang[16] (together, "Plaintiffs' experts").

13. I am not offering an opinion on whether Plaintiffs can or have established liability on their claims. To the extent this report does not address certain opinions put forth by Plaintiffs' experts, it does not mean that I agree with those opinions.

## II. Executive Summary

14. I have reached the following opinions:

15. First, some website visitor activity on websites of the allegedly at-issue healthcare entities likely reflects unintentional visits. An analysis of the data produced in this matter shows website visitor activity on the websites of the at-issue healthcare entities that is consistent with "misclicks" and "quickbacks," which reflect instances in which an individual does not engage meaningfully with a website. I discuss this in **Section III.A**.

16. Second, some website visitor activity likely reflects individuals interacting with healthcare provider websites on behalf of others. Multiple at-issue healthcare entities identified by Plaintiffs provide "proxy portals," and recent surveys of healthcare providers have documented that individuals accessing others' information on healthcare provider websites is common. I discuss this in **Section III.B**.

---

14 Expert Report of Kate Barasz, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 7, 2025 ("Barasz Report").

15 Singer Report.

16 Report of Health Capital Consultants, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025 ("Zigrang Report").

17. Third, Dr. Barasz claims that Meta users care uniformly about maintaining their online privacy and interprets their use of Meta's services as evidence that users are unaware of how their data are used. In doing so, she fails to account for differences in individuals' privacy preferences, misinterprets sources that she relies on, and ignores the implications of the well-known privacy paradox. I discuss this in **Section IV**.

18. Fourth, Dr. Singer fails to reliably demonstrate injury and estimate damages using common methods and data. Dr. Singer's proposed methodology fails to consider (i) meaningful changes in Meta's data policies; and (ii) the behavior of individuals, including the Proposed Class Members, who freely share the At-Issue Data with Meta. I discuss this in **Section V.A**.

19. Fifth, Dr. Singer incorrectly assumes a single value for the At-Issue Data for each of the Patient Status Button-Click, Patient Health Information, and Prescription Drug Information Classes. He uses widgets to illustrate his calculation and the analogy is telling: it ignores the significant differences in information allegedly shared about Proposed Class Members and the corresponding variation in value of such information. Dr. Singer attempts to gloss over these differences by selectively invoking the economic concept of a "market equilibrium price." Yet he does not actually calculate such a price because he fails to account for the demand side in the *but-for world*. I discuss this in **Section V.B**.

20. Sixth, Dr. Singer proposes multiplying an estimate of per member per month harm by the number of months that each Proposed Class Member's At-Issue Data were allegedly accessed by Meta. Yet he identifies no methodology for determining the number of months at issue. Without such data, regardless of the other flaws in his approach, Dr. Singer cannot apply his methodology to calculate damages. I discuss this in **Section V.C**.

21. Seventh, Mr. Zigrang's damages methodology that purports to calculate the "Fair Market Value" of the At-Issue Data using "comparable transactions" contradicts his own professed standard and contradicts standard valuation practices. Mr. Zigrang fails to tailor his analysis of "comparable transactions" to the data relevant to each Proposed Class, and he fails to evaluate whether the nature of the data in his "comparable transactions" differs from the nature of the data allegedly transmitted to Meta. Mr. Zigrang does not define the data that was transmitted to Meta for any Proposed Class, and he further acknowledged in

deposition that he does not know what data makes up the At-Issue Data at all, let alone what data are specific to each Proposed Class. Mr. Zigrang's proposed "comparable transactions" are not, in fact, comparable to the At-Issue Data. In fact, some of his "comparable transactions" do not even reflect compensation for data. Further, Mr. Zigrang makes no attempt to account for any differences between those transactions and the At-Issue Data. I discuss this in **Section VI.A**.

22. Last, Mr. Zigrang's proposed disgorgement methodology to calculate the profits that Meta allegedly earned from using the At-Issue Data are based on an inaccurate and naïve understanding of how Meta's ad delivery works and how its auction design impacts revenues. Mr. Zigrang incorrectly assumes that absent access to the At-Issue Data, Meta's ad revenues would be zero, effectively assuming that The Meta Business Tools are the only source via which Meta receives information. I discuss this in **Section VI.B**.

## III. Plaintiffs Fail to Account for Different Types of Website Visitor Engagement in This Matter

23. Website visitors interact with websites in different ways. These differences include the specific webpages they visit, the time they spend on those webpages, and the information they enter. In addition to how a developer incorporates The Meta Business Tools code, how a website visitor interacts with a site can determine whether data are transmitted via the developer's use of The Meta Business Tools—such as the Meta Pixel—and what, if any, personal information the data contain.

24. Both Plaintiffs and their experts fail to consider how different types of website visitor engagement affect the personal information, if any, transmitted through developers' use of The Meta Business Tools. In this section, I highlight several types of website visitor engagement—misclicks, quickbacks, and the use of proxy access—and explain their implications for the alleged harm to the Proposed Class Members.

### A. Some Online Activity Is Consistent with Unintentional Visits Due to Misclicks and Quickbacks

25. Plaintiffs and their experts do not consider the potential impact of two common behaviors on websites: "misclicks" and "quickbacks." A misclick refers to an instance in which a

website visitor unintentionally clicks on a website.[17] A quickback occurs when a website visitor navigates to a webpage and quickly exits the page either by closing the browser or returning to the previous webpage.[18] Together, misclicks and quickbacks reflect instances in which a website visitor did not meaningfully engage with a website. In such instances, it is unlikely that the website visitor would have shared data with the website that would constitute healthcare information, and, in turn, it is unlikely that the website developer would have sent At-Issue Data to Meta.

26. A website visitor who engages with a website through a misclick or quickback, however, may be included as a Proposed Class Member when a website sends event data to Meta via The Meta Business Tools. Two of Plaintiffs' Proposed Classes—the Patient Health Information and Prescription Drug Information Classes—are defined broadly enough to capture website visitors whose inclusion in the Proposed Classes is based solely on misclicks or quickbacks.[19]

27. Website visitors may unintentionally visit a website for several reasons, meaning such visits could be included in a developer's data transmissions to Meta despite the website visitor's lack of meaningful engagement. Simonov and Hill (2021) found that website visitors who search for a focal brand and click on paid links of competing brands, for example, are associated with much higher quickback rates relative to those clicking on the

---

17 *See*, *for example*, Tolomei, Gabriele, Mounia Lalmas, Ayman Farahat and Andrew Haines, "You Must Have Clicked on this Ad by Mistake! Data-Driven Identification of Accidental Clicks on Mobile Ads with Applications to Advertiser Cost Discounting and Click-Through Rate Prediction," *International Journal of Data Science and Analytics*, Vol. 7, April 2018 ("Tolomei et al. (2018)"), pp. 53-66, at p. 54 ("There are three *types* of clicks: *Accidental click*[:] The user clicks on the ad, likely by mistake, reaches the ad landing page, and immediately bounces back; the user spends no time on the landing page." (emphasis in original)).

18 *See*, *for example*, Simonov, Andrey and Shawndra Hill, "Competitive Advertising on Brand Search: Traffic Stealing and Click Quality," *Marketing Science*, Vol. 40, No. 5, August 2021 ("Simonov and Hill (2021)"), pp. 923-945 at p. 930 ("To examine the quality of competitors' clicks, we use the metric of a 'quick back' (a return to Bing in less than 30 seconds), which is commonly employed in the industry to indicate a click's 'success' (Odijk et al. 2015) and is highly correlated with conversion probability (Goldman and Rao 2016).").

19 Motion for Class Certification, p. 13 ("2. The Patient Health Information Class – All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above. 3. The Prescription Drug Information Class – All Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta.").

A13-4148

focal brand's links.[20] The authors attribute this behavior in part to customer confusion, where website visitors mistakenly click on a competitor's link rather than the intended link. A 2015 study documented that website visitors "struggle" to find relevant information and over 40 percent of first and second search queries result in a "quick-back click" based on an analysis of millions of Bing search sessions.[21]

28. For example, consider a website visitor who is looking for information about when to get a seasonal flu shot and searches the internet for "when to get a flu shot" with the intention of reaching a national news information page about flu shots. **Figure 1** provides an example of internet search results for "when to get a flu shot," showing that the top result is a sponsored (paid) link to the CVS website, before a link to NBC News. CVS is one of the at-issue healthcare entities listed in Exhibit 72 of Plaintiffs' Motion for Class Certification, but NBC News is not.[22] If, in this example, a Meta Pixel event is associated with an individual who misclicks the sponsored link to the CVS flu shot webpage, then my understanding is that the individual may be included in the Patient Health Information Class, even though the individual was attempting to reach a different website and CVS was not transmitting any allegedly sensitive information about them.[23]

---

[20] Simonov and Hill (2021), at p. 930 ("Although competitors are able to siphon off large volumes of the focal brand's traffic, there are several reasons to doubt the quality of these clicks. Competitive advertising is often argued to be confusing and misleading for consumers, with clicks on competitors' links made by mistake. […] To examine the quality of competitors' clicks, we use the metric of a 'quick back' (a return to Bing in less than 30 seconds), which is commonly employed in the industry to indicate a click's 'success' [] and is highly correlated with conversion probability[.] Competitors' clicks on brand search suffer from high quick-back rates; taking a raw average across all clicks on competitors' paid links in the random flight and regular data, only 53.3% and 79.7% of clicks on competitors' paid links are 'successful' (do not result in a quick back) versus 93% and 93.4% for clicks on the focal brand's paid link.").

[21] Odijk, Daan, Ryen W. White, Ahmed Hassan Awadallah and Susan T. Dumais, "Struggling and Success in Web Search," *CIKM '15: Proceedings of the 24th ACM International on Conference on Information and Knowledge Management*, October 2015 ("Odijk et al. (2015)"), pp. 1551-1560, at p. 1551 ("Web searchers sometimes struggle to find relevant information."), p. 1554 ("Figure 5 shows the change in the number of clicks in successful and unsuccessful tasks. We observe that for the first and second query, just over 40% of the tasks have a quick-back click.").

[22] Motion for Class Certification, Exhibit 72, tab Ex72a RDTT-HCP, row 107,636 ("cvs.com"). NBC News does not appear in the Motion for Class Certification Exhibits 60, 72, and 73 or in Complaint Appendix A.

[23] I am providing this internet search as an example but have no opinion on whether activity related to a flu shot would meet Plaintiffs' criteria. Plaintiffs define the Patient Health Information Class as "All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above." *See* Motion for Class Certification, p. 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 1: Example Internet Search Result for "when to get the flu shot"[24]**




29. Named Plaintiffs' testimony also includes examples of misclicks. Plaintiff Jane Doe X, for instance, testified to [redacted]

24 Search result for "when to get the flu shot" on Google Chrome browser on October 27, 2025. "When to Get the Flu Shot," *Google*, available at https://www.google.com/search?q=when+to+get+the+flu+shot.

A13-4150

[redacted].[25] In either case, I understand that Jane Doe X's click should not be included in Plaintiffs' Prescription Drug Information Class. But absent her testimony, there is no classwide way to determine whether similar clicks constitute At-Issue Data. Both Jane Doe X and the hypothetical individual researching flu shots above may be swept into Plaintiffs' Proposed Classes and awarded the same damages as all other Class Members.

30. There is no standard accepted rule in the academic literature to determine whether a website visitor visited a website unintentionally. Researchers often use dwell time—the amount of time a website visitor spends on a site—as a proxy for engagement.[26] The threshold dwell time to identify a quickback ranges from less than 10 seconds to less than 30 seconds, depending on several factors, including the page topic, readability level, and length of the content. A threshold dwell time of less than 3 seconds has been used to identify a misclick.[27] Longer dwell time is not necessarily evidence of a website visitor meaningfully

---

25 Deposition of Plaintiff Jane Doe X, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 18, 2025 ("Jane Doe X Deposition"), p. 315:5-17 ("[redacted]

26 *See, for example*, Tolomei et al. (2018), p. 53 ("The time a user spends on a web page, referred as *dwell time*, varies considerably by user and type of content. Still, for a given web page, dwell time can be used as an effective *proxy* of engagement with its content[.]" (emphasis in original)).

27 *See, for example*, Kim, Youngho, Ahmed Hassan, Ryen W. White and Imed Zitouni, "Modeling Dwell Time to Predict Click-Level Satisfaction," *WSDM '14: Proceedings of the 7th ACM International Conference on Web Search and Data Mining*, February 2014 ("Kim et al. (2014)"), pp. 193-202, at p. 193 ("A popular heuristic for reducing [noise in clicks] is to only consider clicks with long dwell time, usually equaling or exceeding 30 seconds. […] However, having a single threshold value assumes that users need a fixed amount of time to be satisfied with any result click, irrespective of the page chosen. In reality, clicked pages can differ significantly. Pages have different topics, readability levels, content lengths, etc. All of these factors may affect the amount of time spent by the user on the page."); Simonov and Hill (2021), at p. 923 ("To examine the quality of competitors' clicks, we use the metric of a 'quick back' (a return to Bing in less than 30 seconds), which is commonly employed in the industry to indicate a click's 'success' [] and is highly correlated with conversion probability[.]"); Odijk et al. (2015), at p. 1553 ("Quick-back clicks describe result clicks with a dwell time of less than ten seconds."); Kaplan, Yohay, Naama Krasne, Alex Shtoff and Oren Somekh, "Unbiased Filtering of Accidental Clicks in Verizon Media Native Advertising," *CIKM '21: Proceedings of the 30th ACM International Conference on Information & Knowledge Management*, November 2021 ("Kaplan et al. (2021)"), pp. 3878-3887, at p. 3879 ("In particular, accidental clicks (AC) are clicks with relative short dwell-time (e.g., below 3 seconds) indicating the user has probably clicked on the ad by accident.").

engaging with the website, but instead may reflect, for example, difficulty in understanding the page or the page length.[28]

31. I use the samples of data from Meta's Offsite Signals table (henceforth the "Offsite Signals data") produced in this matter to analyze the potential likelihood of misclicks and quickbacks.[29] As outlined in produced documents in this case, the Offsite Signals data sample contains events sent to Meta via The Meta Business Tools by at least some of the set of over 650,000 at-issue healthcare entities' websites.[30] The data are available for a non-consecutive set of 48 dates between July 23, 2022 and April 13, 2023.[31] For each event, the Offsite Signals data includes, among other fields, an identifier for the event (*trace_id*), the date and time of the event (*event_time*), a session identifier (*session_id*), and event data (*e.g.*, *custom_data_json*).[32]

32. Using these data, I estimated the duration of website visitors' active engagement with the alleged healthcare provider websites, which I refer to as the "duration of measurable activity." This measure represents the span of time during which website visitors performed observable actions that led to the transmission of event data. I calculated the duration of measurable activity as the difference between the earliest and latest event timestamps (i.e., *event_time*) within each session ID. I also calculated the share of sessions with only a single

28 *See, for example*, Kim et al. (2014), at p. 193 ("Pages have different topics, readability levels, content lengths, etc. All of these factors may affect the amount of time spent by the user on the page.").

29 Meta, "Offsite Signals Data," PIXEL_HEALTH_CWD00000131-610; Meta, "Introducing offsite_signals Table," September 2020, PIXEL_HEALTH000288627-631, at 627 ("Previously, any analysis of the events a business was sending across different sources would require duplicate effort to query the corresponding tables ('ads_pixel_traffic', 'app_events', and 'ads_data_set_matched_events_table' respectively), which all have wildly different schema, though the events stored in them are actually very similar. This post introduces the 'offsite_signals' table, where all the offsite events data will be logged.").

30 *See* Motion for Class Certification, Exhibit 60, Exhibit 72; First Amended Consolidated Class Action Complaint, Appendix A, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 10, 2023 ("Complaint, Appendix A"). For purposes of this report, I refer to healthcare providers and prescription drug suppliers that Plaintiffs allege to have shared information with Meta via The Meta Business Tools as "at-issue healthcare entities." I do not opine on the inclusion of any of the at-issue healthcare entities. Meta Pixel Healthcare Production Cover Letter, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, December 18, 2024.

31 Plaintiffs' Selection of Random Days for Sample from (1) ads_pixel_traffic, (2) offsite_signals, (3) offsite_signals_pipe_msa, and (4) app_events, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, August 29, 2024. *See also* Meta, "Offsite Signals Data," PIXEL_HEALTH_CWD00000131-610.

32 Meta, "offsite_signals," PIXEL_HEALTH000110510.

event. A single-event session means that the website visitor took only one action (such as a page load or click) for which Meta received data, and no additional event data were received for that session.[33] In other words, the website visitor did not engage with the site in a manner that led to a second event being received by Meta within the same session.

33 Observing only a single event and no additional events often suggests the website visitor had minimal measurable interaction beyond loading the page. However, this inference is conditional on the pixel being implemented reliably and no external issues (*e.g.*, script delays, tracking failures) interfering with event capture. *See, for example*, Au, Brian, "Calculating Bounces & Bounce Rate in Adobe Customer Journey Analytics: Options and Implications," *Adobe experience League*, September 25, 2024, available at https://experienceleaguecommunities.adobe.com/t5/adobe-analytics-blogs/calculating-bounces-amp-bounce-rate-in-adobe-customer-journey/ba-p/706446 ("[A]nalysts can identify instances where users have minimal interaction with the site or platform. In practical terms, […] when a user's entire session consists of a solitary event. For example, this could be a user landing on a page and immediately leaving without any further interaction. The simultaneity of the Session Start and Session End indicators for this lone event marks such minimal engagement scenarios. This approach […] provides a broad perspective on user behavior, capturing various scenarios where interaction is limited to a single touchpoint. However, the effectiveness of this method can vary depending on the specific nature of the implementation and the typical user journey it facilitates.").

**Figure 2: Distribution of Duration of Measurable Activity, Offsite Signals Data**[34]




**Notes:**
[1] Sessions are counted by unique values of the variable *session_id* and can contain multiple events, identified by the variable *trace_id*. Duration of measurable activity is the maximum range of time values in the variable *event_time* across events associated with a session, measured in seconds ("s") or minutes ("m"). Percentage labels represent the share of sessions in the sample data.
[2] The data are limited to pixel identifiers (the variable *data_source_id*) corresponding to domains listed in the Motion for Class Certification.

33. **Figure 2** shows that among the sample of Offsite Signals data, 75 percent of sessions were brief, with a duration of measurable activity of less than 30 seconds, the threshold that academic literature commonly describes as being consistent with quickbacks. Approximately 63 percent reflected single-event sessions, with an additional 12 percent for multi-event sessions that reflect measurable activity that lasted between 0 and 30 seconds.[35]

---

[34] Meta, "Offsite Signals Data," PIXEL_HEALTH_CWD00000131-610; Motion for Class Certification, Exhibit 60, Exhibit 72, Exhibit 73; Complaint, Appendix A.

[35] *See* **Figure 2**. 12 percent reflects the sum of the shares of sessions with durations of measurable activity of less than 3 seconds, 3 to 10 seconds, 10 to 20 seconds, and 20 to 30 seconds. 3 + 4 + 3 + 2 = 12 percent.

A13-4154

34. As discussed above, very short durations of measurable activity are consistent with unintended activity, during which it is likely that some website visitors did not enter any personal information, health-related or otherwise, on the website. The high prevalence of such short sessions suggests that it is unlikely all Proposed Class Members shared At-Issue Data with at-issue healthcare entities, and that those entities were thus unlikely to have transmitted such information to Meta through their use of The Meta Business Tools code. To establish whether all Proposed Class Members shared data with an at-issue healthcare entities' website, which were then transmitted to Meta as At-Issue Data, requires individualized inquiry.

### B. Some Healthcare Providers Offer "Proxy Access" That Allows Website Visitors to Access Information on Behalf of Others

35. In addition to determining whether and what information any Proposed Class Member might have shared, individualized inquiry is needed to determine *whose* information, if any, was shared. One way someone else's information might be captured is using proxy access.

36. Healthcare providers increasingly allow authorized individuals to view or manage another person's information through patient portals. "Proxy access" refers to patient portals on healthcare provider websites designed to allow designated representatives to access someone else's information.[36] Through proxy access, authorized representatives may also schedule, view, and manage appointments for the patient, in addition to accessing health information.[37] Many healthcare provider intake and scheduling forms ask respondents who they are seeking care for, and offer options such as "myself," "my child," or "someone

---

[36] *See, for example*, "Request or Provide Proxy Access to Another Person's MyChart Account," *My Chart*, available at https://www.mychart.org/Help/proxy ("You can request 'proxy access' to your family member's account or give access to your account to a family member or caregiver. If you have proxy access to someone's account, you can see their healthcare information, as well as your own, from within the same MyChart account.").

[37] *See, for example*, "MyChart Proxy Access," *Main Line Health*, available at https://www.mainlinehealth.org/patient-services/patient-portals/proxy-access ("With proxy access, you'll have access to another user's: […] Upcoming and past appointments, including the ability to schedule appointments[.]").

A13-4155

else."[38] Because proxy access affects who is interacting with healthcare provider websites, it has direct implications for assessing what personal information, if any, was transmitted to Meta.

37. Several of the healthcare providers at issue in this matter allow proxy access. For example, MedStar Health provides proxy access that allows a person other than the patient, such as a spouse, parent, legal guardian, or other authorized representative, to view and make requests regarding the patient's medical records through the MedStar Health Patient Portal.[39]

38. As a second example, Sutter Health allows proxy access through its My Health Online (MHO) portal, enabling one adult to view and manage another adult's or a minor's records under certain conditions. Patients can grant proxy access directly through their MHO account by selecting the "Manage Friend and Family Access" option and inviting another website visitor, who must accept the invitation.[40]

39. As a third example, Kaiser Permanente provides proxy access through its "Act For a Family Member" feature, which allows authorized adults, caregivers, or parents/guardians to access a member's health information online. An adult member may voluntarily permit another adult or caregiver to view their online member account. This authorization enables designated proxies to manage aspects of the members' healthcare.[41]

---

38 *See*, *for example*, "Contact Us," *Meaningful Connections Counseling*, available at https://www.meaningfulconnectionscounseling.com/contact-us.html (offering options for "My Child" and "Someone Else") and "Pediatric Mental Health Care That's Proven to Work," *Handspring*, available at https://www.handspringhealth.com/ (offering a button "For My Child").

39 "Frequently Asked Questions," *MedStar Health*, available at https://www.medstarhealth.org/patient-portal/faqs ("What is proxy access? - Proxy access allows a person other than the patient to have access to and make requests on behalf of another patient. […] Can I view a family member's (e.g., child, parent, spouse) health record in The MedStar Health Patient Portal? - Parents/legal guardians, husbands/wives, personal representatives, etc. may request "proxy access" to the medical records of their child, spouse, parent, etc.").

40 "Proxy Access," *Sutter Health*, available at https://www.sutterhealth.org/patient-resources/my-health-online/proxy-access.

41 "Health Record Access Update," *Kaiser Permanente*, available at https://healthy.kaiserpermanente.org/washington/support/health-record-access-update.

40. These healthcare providers are not unique in their use of proxy access. A recent 2020 study of 102 hospitals in the United States found that 69 offered proxy access.[42] Another 2021 study of more than 3,000 adolescent patients at three healthcare provider entities in California found that between 64% to 76% of parents accessed their adolescent's patient portal account.[43] A third study of almost 10,000 diabetes patients in California found that 46% of patients shared passwords or used other informal proxy measures to grant access to others.[44] Such common use of proxy access or other sharing of credentials suggests that the At-Issue Data transmitted to Meta may not contain information about the website visitors themselves.

41. The real-world behavior of Plaintiffs provides evidence of this dynamic. Plaintiff Jane Doe V testified to having logged in to her mother's account on her medical provider's website.[45] Plaintiff John Doe II testified to likely having booked a doctor's appointment for his husband.[46]

42. I do not offer an opinion on whether the use of proxy access constitutes a violation. I am not aware of any produced data in this matter that would identify instances of proxy access.

---

[42] Latulipe, Celine et al., "Security and Privacy Risks Associated With Adult Patient Portal Accounts in US Hospitals," *JAMA Internal Medicine*, Vol. 180, No. 6, June 2020 ("Latulipe et al. (2020)"), pp. 845-849.

[43] Ip, Wui et al., "Assessment of Prevalence of Adolescent Patient Portal Account Access by Guardians," *JAMA Network Open*, Vol. 4, No. 9, September 2021 ("Ip et al. (2021)").

[44] Semere, Wagahta et al., "Secure Messaging with Physicians by Proxies for Patients with Diabetes: Findings from the ECLIPPSE Study," *Journal of General Internal Medicine*, Vol. 34, August 2019 ("Semere et al. (2019)"), pp. 2490-2496, at p. 2494.

[45] Deposition of Plaintiff Jane Doe V, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 30, 2025 ("Jane Doe V Deposition"), p. 166:7–21 ("Q. Did you ever log into your mother's account? A. Yes. Q. When did you that, would you log in from the website or an app? A. From the website. Q. How often would you log into your mother's [redacted] account? A. I think I logged in there one time. Q. When was that? A. I believe 2022. Q. Why did you log into your mother's [redacted] account? A. Because she had surgery and I was her health care POA, and she didn't know how to log into the account, so I had to set it up for her.").

[46] Deposition of Plaintiff John Doe II, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, May 1, 2025 ("John Doe II Deposition"), pp. 124:22–125:12 ("Q. Have you ever booked a doctor's appointment for someone other than yourself? […] A. I'm not certain. I can't recall. Likely, but I can't sit here right now and say yes. I don't -- I likely have, but I can't recall. Q. So you likely booked a doctor's appointment for someone. Would that have been for your husband? A. Likely, yes. Q. Have you ever booked a doctor's appointment for anyone other than your husband? A. No. Q. If you [redacted] was it likely through [redacted] A. Yes.").

A13-4157

If the court finds that claim elements are met or alleged injury to Proposed Class Members may differ due to proxy access, determining its use would require individualized inquiry.

## IV. Dr. Barasz's Opinions Fail to Engage with the Privacy Paradox and Contradict Both Academic Research and the Behavior of Plaintiffs

43. Dr. Barasz was asked to provide opinions on four questions. I address two of the questions on which she opines: (1) whether Meta users care about maintaining their online privacy, and (2) whether they have expectations about how companies handle their personal information.[47] With regard to the first question, Dr. Barasz concludes that Meta users care about their online privacy;[48] with regard to the second, she concludes that Meta users could not have consented to sharing personal information if they did not know how that information was obtained and shared.[49]

44. Dr. Barasz's first opinion that Meta users uniformly care about their online privacy is unsupported and incorrect. In particular, Dr. Barasz fails to account for well-documented variances between individuals regarding their privacy preferences. She also ignores extensive research regarding the complex, individualized explanations for what is known as the "privacy paradox," yet she opines that Meta users nevertheless remain users of its services because they lack awareness of how their data are used.

45. Dr. Barasz's second opinion that Meta users could not have consented to sharing personal information is also unsupported and contradicted by even her own source materials. Dr. Barasz fails to clearly identify the At-Issue Data and misinterprets materials she cites in her report, leading to a speculative conclusion regarding Meta users' expectations of how their personal information is shared.

---

47 Barasz Report, ¶ 7. Dr. Barasz was also asked whether Meta users expect a company like Meta to obtain their personal information from partners who were not allowed to share it and to address what effect Meta's transparency tools such as *Why Am I Seeing This Ad*, *Download Your Information*, and *Off-Facebook Activity* would have on users. I do not address these opinions in this report. The fact that I do not address her other opinions does not mean I agree with them.

48 Barasz Report, ¶ 12(a).

49 Barasz Report, ¶ 23.

### A. Dr. Barasz Fails to Consider Heterogeneity in Privacy Valuations and Implications of the Privacy Paradox and Thus Misinterprets Proposed Class Members' Continued Use of Meta Services

46. Dr. Barasz's opinion that Meta users uniformly care about online privacy ignores key issues that undermine her conclusion. First, academic research, including studies Dr. Barasz relies upon, show substantial variation in privacy preferences across individuals. As Dr. Barasz acknowledges,[50] determining how much any Proposed Class Member values privacy would require an in-depth, individual analysis. Second, Dr. Barasz's claim that individuals act contrary to their stated privacy interests solely because they are unaware of their disclosures or lack agency, ignores alternative explanations identified in the privacy paradox literature.

#### *1. Heterogeneity in privacy preferences means that individuals differ in the extent to which they care about privacy*

47. Academic research—including survey findings—and the real-world behavior of Plaintiffs shows that individuals' privacy preferences vary along multiple dimensions. First, privacy preferences differ across individuals; for example, they may vary by generation or personal values. Second, the same individual may weigh privacy differently across data types. Dr. Barasz fails to account for the fact that assessing preferences and expectations requires individual inquiry into both the specific information shared by or about an individual and the individual's privacy preferences for that type of information.

---

50 Expert Deposition of Katherine Barasz, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, November 6, 2025 ("Barasz Deposition"), pp. 166:19–167:22 ("Q. And that would be a complex thing to determine for a specific person? A. It would be complex, and I don't think it is a binary answer. Q. What do you mean by that? A. I think that even amidst varying degrees of privacy concern, people can be more and less pro -- protective of different types of information. So even someone who, for example, in your example among the 29 percent who said they are not concerned about their privacy, if you ask them specifically would you be okay with Meta collecting data while you are on your healthcare user's website, my guess is that a fair number of those 29 percent would say no, we are not okay with that. So I think it very much depends on what kind of information you are talking about. Q. Okay. So there is increased complexity, because specific people have different views about different things and because specific people might feel differently about different data types. Did I get that right? A. Yes.").

a. Heterogeneity in privacy preferences across individuals

48. Academic and industry research consistently shows that individuals differ in their attitudes toward privacy. Studies, including work by Dr. Barasz's advisor, Dr. Leslie K. John,[51] find large dispersion in individuals' privacy preferences,[52] and commonly categorize individuals into three general groups: "fundamentalists," who place a high value on data privacy; "pragmatists," who are willing to exchange personal information for benefits; and "unconcerned," who prioritize convenience regardless of privacy policies.[53] The distribution of these preferences has remained relatively stable over time, with about a quarter fundamentalists, roughly half pragmatists, and the remainder unconcerned.[54]

---

[51] Barasz Deposition, p. 22:9–20 ("Q. How much of your research would you say involved analyzing the privacy expectations of consumers? A. […] I would say that I worked with Leslie John who was my adviser and then colleague. […] And she is one of the foremost experts in the field on privacy. So while I have a few papers on privacy, much of my Ph.D. program was spent with someone who focuses on privacy.").

[52] *See, for example,* Acquisti, Alessandro, Leslie K. John and George Loewenstein, "What is Privacy Worth?," *The Journal of Legal Studies*, Vol. 42, No. 2, June 2013, pp. 249-274 at p. 267 ("Shoppers implicitly assigned dramatically different values to the privacy of their data depending on the framing of the choice between gift cards with different privacy features. The number of subjects willing to reject cash offers for their data was both significant in absolute terms and much larger in relative terms when they felt that their data would be, by default, protected ($10 endowed condition) than when they believed that their data would be, by default, revealed ($12 endowed condition)."). There are also differences across sex and age. *See* Prince, Jeffrey T. and Scott Wallsten, "How Much Is Privacy Worth Around The World And Across Platforms?," *Journal of Economic & Management Strategy*, Vol. 31, 2022 ("Prince and Wallsten (2022)"), pp. 841-862, at p. 844 ("We also find consistent differences by sex in privacy valuations. Across platforms, data types, and countries, women value privacy more than men do. Similarly, older people value privacy more highly than younger people.").

[53] *See, for example,* "US Data Privacy: What the Consumer Really Thinks," *Global Data and Marketing Alliance*, 2022, available at https://globaldma.com/wp-content/uploads/2022/03/GDMA-US-Data-Privacy-2022.pdf, p. 6. See also "Data Privacy: What the Consumer Really Thinks," *Data & Marketing Association*, June 2018, available at https://marketing.acxiom.com/rs/982-LRE-196/images/DMA-REP-DataPrivacy-US.pdf, p. 6; Kumaraguru, Ponnurangam and Lorrie Faith Cranor, "Privacy Indexes: A Survey of Westin's Studies," *Institute for Software Research International*, December 2005 ("Kumaraguru and Cranor (2005)"), pp. 5, 13–14; Hann, Il-Horn, Kai-Lung Hui, Sang-Yong Tom Lee and Ivan P.L. Png, "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems*, Vol. 24, No. 2, 2007 ("Hann et al. (2007)"), pp. 13-42 at p. 21.

[54] As of 2022, 21 percent of the U.S. consumers were fundamentalists, 48 percent were pragmatists, and 31 percent were unconcerned. "US Data Privacy: What the Consumer Really Thinks," *Global Data and Marketing Alliance*, 2022, available at https://globaldma.com/wp-content/uploads/2022/03/GDMA-US-Data-Privacy-2022.pdf, p. 7. This is a result of shift towards the share of unconcerned individuals. In the mid to late 1990s, the distribution was 25 percent, 55 percent, and 20 percent, respectively. Kumaraguru and Cranor (2005), pp. 13–14. In 2000 to 2001, the split among the different privacy conscious consumers was 25 percent, 63 percent, and 12 percent, respectively. Hann et al. (2007), p. 32. In 2017, the shares were 24 percent, 58 percent, and 18 percent, respectively. "Data Privacy: What the Consumer Really Thinks," *Data & Marketing Association*, June 2018, available at https://marketing.acxiom.com/rs/982-LRE-196/images/DMA-REP-DataPrivacy-US.pdf, p. 6.

49. These trends are consistent in magnitude with findings in the Pew Research Center study, *How Americans View Data Privacy*, which is cited by Dr. Barasz in her report.[55] That study found that for 29 percent of U.S. adults "privacy is not that big of a deal."[56] Although this figure represents almost a third of the U.S. adult population, Dr. Barasz explained that she considers that—without citing any support—"a very small percentage."[57] In her deposition, Dr. Barasz agreed that "people generally have different privacy expectations" but stated that she was "agnostic" to variations in privacy expectations across individuals in her research, which focused on comparing "averages" across individuals.[58]

50. Consumers' privacy valuations also differ across generations. For example, a 2016 World Economic Forum survey (the "WEF Survey")—which Dr. Barasz admittedly mistook in her report as Meta's own internal survey[59]—found that 57 percent of Baby Boomers in the

55 Barasz Report, Footnote 1.

56 McClain, Colleen, Michelle Faverio, Monica Anderson and Eugenie Park, "How Americans View Data Privacy," *Pew Research Center*, October 18, 2023, available at https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/, p. 12.

57 Barasz Deposition, pp. 129:4–130:5 ("Q. Let's take a look at page 12 of the PDF in Exhibit 706 -- sorry, 707. Do you see where it says in the middle of the page, Percent of U.S. adults who say that when thinking about managing their privacy online they feel dot, dot, dot? A. Yes. Q. And then it says for U.S. adults, which is the top line, 29 percent feel that privacy is not that big of a deal for them. Do you see that? A. I do, yes. Q. And you didn't cite that result or acknowledge it in your report; right? A. That in my opinion is a very small percentage. Q. It is still about a third, almost a third of all U.S. adults; right? A. In my opinion this is not a compelling statistic that counteracts what I have already written about. Q. Why? A. Because it is a minority of participants, and it runs counter to everything we know about consumer privacy.").

58 Barasz Deposition, p. 122:12–18 ("Q. What one person considers private might be different from what other person considers private; right? A. Yes. Q. So the meaning of online privacy can also vary person to person? A. Yes."), pp. 81:2–82:13 ("Q. So throughout your report, when you say average consumer, you are referring to the court's definition of a reasonable consumer? A. I am referring to an average consumer as conceptualized in consumer behavior research, which as far as I understand is consistent and aligns with the court's definition of a reasonable consumer. Q. Do all average consumers have the same preferences? […] A. No. Q. Do all average consumers have the same expectations? […] A. No. Q. Do all average consumers have the same privacy preferences? A. No, but I would also like to just clarify what I am answering. We don't look at what people's privacy preferences are. We understand how their privacy preferences change as a function of a given environment, a given set of stimuli, et cetera. And so because of the way experiments work, I am confident saying that if you dropped an average person into one control group or one treatment group, we should expect to see the outcomes that we have published about. Q. So you -- you would agree, though, that people generally have different privacy expectations; right? A. Yes. But I am agnostic to that in my research.").

59 Barasz Deposition, pp. 114:17–115:2 ("Q. So the survey that you relied on in your report, Exhibit B, which is Exhibit 703, was actually a survey that was conducted by the World Economic Forum with McKinsey and Company and comScore, not by Meta; correct? A. Yes. Q. You didn't know that until today; right? A. I did not.").

A13-4161

U.S. preferred to have no information collected and therefore receive no personalized experience, compared to only 37 percent of Generation Z/Millennials.[60] Similarly, a 2022 Data & Marketing Association survey (the "DMA Survey")[61] found that 41 percent of U.S. respondents over the age of 65—but only 9 percent of those between 25 and 34—were privacy fundamentalists.[62]

51. Differences in privacy attitudes are also illustrated by Plaintiffs. For example, Plaintiff Jane Doe V testified that information posted on social media is "not private anymore."[63] In contrast, Plaintiff Jane Doe X testified that she considered discussion of her health issues sensitive and private.[64] One cannot properly assess the preferences and expectations of Proposed Class Members without accounting for the large differences in individuals' privacy expectations, something Dr. Barasz fails to consider. Dr. Barasz does not explain

---

60 *See* "Shaping the Future Implications of Digital Media for Society," *World Economic Forum*, January 2017, available at https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf, pp. 33, 44. The question users were asked their preference on was: "Your activity data may be collected, analysed and stored by different companies to provide you with a personalized online user experience (e.g. targeted advertisements, product recommendations, etc.). For each option, please select your preference with the level of data collection and use. Please select one response." Respondents were provided three options: "Prefer to have none of my information collected, analyzed, and stored; therefore, I would not have a personalized user experience"; "Prefer that my information is collected, stored and linked to my identity, for the personalization of my user experience, including what ads and marketed products/services I see"; and "Prefer that my information is collected, analysed and stored, but not linked to my identity; therefore, there would still be some personalization of my user experience, including what ads and marketed products/services I see."

61 The study was undertaken in partnership with Acxiom and Foresight Factory. "US Data Privacy: What the Consumer Really Thinks," *Global Data and Marketing Alliance*, 2022, available at https://globaldma.com/wp-content/uploads/2022/03/GDMA-US-Data-Privacy-2022.pdf, pp. 29–32.

62 "US Data Privacy: What the Consumer Really Thinks," *Global Data and Marketing Alliance*, 2022, available at https://globaldma.com/wp-content/uploads/2022/03/GDMA-US-Data-Privacy-2022.pdf, p. 7.

63 Jane Doe V Deposition, p. 33:8–18 ("Q. Do you consider that information that you post on social media, do you consider that to be private? A. Yes. But it's not because it's public, so -- it's not privacy once you put it on the Internet. Because I want, you know, people to see my picture of me and my grandkids, you know. Q. So when you post information on the Internet, you no longer consider it to be private? A. Yeah, but I -- but I decided to put it on there, so it's not private anymore if I decide to put it on there.").

64 Jane Doe X Deposition, p. 195:20–23 ("Q. Do you consider the [redacted] test to reflect sensitive information? […] A. Yeah."), pp. 196:25–197:12 ("Q. Okay. In the -- at the bottom of the post, where it refers to [redacted] Q. Do you consider that information to be private? […] A. Yeah, but I chose to share it to people that I wanted to share it with. Still doesn't give anybody the right to take my information, especially my personal health information.").

how her approach of analyzing an "average consumer" or a "reasonable consumer" would account for such large differences.[65]

b. Heterogeneity in privacy preferences across and within data types

52. Academic literature shows that people's willingness to share data varies by the type of data, with individuals more willing to share information they view as less sensitive.[66] This variation is further complicated by the lack of consensus on what constitutes sensitive information, a point Dr. Barasz acknowledged in her deposition. Although Dr. Barasz testified that people differ in what they consider sensitive and in how protective they are of different types of information, her report does not account for these differences.[67] Plaintiffs' own testimony also illustrates these differences. Plaintiff Jane Doe V does not consider her email, phone number or Facebook ID to be private information,[68] and she was comfortable sharing on Facebook information about her hospital visits,[69] medical

---

65 Barasz Deposition, p. 81:2–10 ("Q. So throughout your report, when you say average consumer, you are referring to the court's definition of a reasonable consumer? A. I am referring to an average consumer as conceptualized in consumer behavior research, which as far as I understand is consistent and aligns with the court's definition of a reasonable consumer.").

66 Chua, Hui Na, Jie Sheng Ooi and Anthony Herbland, "The Effects of Different Personal Data Categories on Information Privacy Concern and Disclosure," *Computers & Security*, Vol. 110, August 2021 ("Chua et al. (2021)"), pp. 1-20, at p. 4 ("Studies (Bansal and Gefen, 2010; Malhotra et al., 2004; Milne et al., 2017) also found that the more sensitive a piece of information, the lower the disclosure intention, which indicates a necessity to design studies to examine and differentiate characteristics of personal information.").

67 Barasz Deposition, pp. 166:19–167:3 ("Q. And that would be a complex thing to determine for a specific person? A. It would be complex and I don't think it is a binary answer. Q. What do you mean by that? A. I think that even amidst varying degrees of privacy concern, people can be more and less pro -- protective of different types of information."), p. 167:16–22 ("Q. Okay. So there is increased complexity because specific people have different views about different things and because specific people might feel differently about different data types. Did I get that right? A. Yes.").

68 Jane Doe V Deposition, pp. 33:19–34:6 ("Q. Do you consider your email to be sensitive? A. In what way? What do you mean? Q. Do you consider your email to be private? A. No. Q. Do you consider your phone number to be private? A. No. Q. Do you consider your Facebook ID number to be private? A. Private from like -- be more specific. Private from everybody? Q. Yes. A. No.").

69 Jane Doe V Deposition, pp. 74:2–75:2 ("Q. […T]his is a picture of you in a hospital bed, is that right? A. Yes. Q. And you checked in at the emergency room at [redacted], correct? A. Yes. […] Q. And you wanted everyone to know that you had a [redacted] A. I wanted people to pray for me, yes. Q. And you said you were comfortable with Facebook knowing the things you posted on Facebook, correct? A. Yeah, I felt comfortable."), pp. 88:24–90:18 ("Q. Exhibit 423 is another publicly available post […]. Do you see here that you checked into CMC emergency department on March 15th, 2016? A. Uh-huh. […] Q. Can you read the post please? […] A. In the ER for five hours and still had twelve people ahead of me, so I left. […] Q. And you were comfortable with the public and Facebook knowing that you were at the [redacted] emergency department in March of 2016? A. Yes.").

A13-4163

procedures,[70] health status,[71] medication,[72] and weight loss.[73] She did, however, view her doctor's name as private.[74] In contrast, Plaintiff Jane Doe I does not consider the name of her treatment provider to be private.[75]

53. These differences imply that some Proposed Class Members may have had no privacy concerns about the information allegedly shared with Meta, depending on the nature of the information and their individual privacy preferences. They also imply that each individual Proposed Class Member's privacy concerns may vary across different types of At-Issue Data. Determining whether, and to what extent, transmission of information about any Proposed Class Member was or was not consistent with their expectations requires individual inquiry into both the specific information shared for that individual and that individual's privacy preferences and expectations for transmission of that type of information. Dr. Barasz testified to being "agnostic" to such differences in privacy

---

70 Jane Doe V Deposition, pp. 77:22–78:6 ("Q. […] Can you read the post you made that starts with, [redacted]. Q. So you were comfortable with the public and Facebook knowing that you were going in for a procedure that day, correct? A. Yes.").

71 Jane Doe V Deposition, pp. 86:11–25 ("Q. This is a document produced in this case […]. Can you please read this post? [redacted]. Q. So, again, you were comfortable with your Facebook friends and Facebook knowing your [redacted]; is that correct? […] A. Yes.").

72 Jane Doe V Deposition, pp. 82:11–83:21 ("Q. And then on the next day, July 16th, 2009, you posted again. Can you read that post? A. [redacted] Q. And these were all posts that you were comfortable sharing with Facebook and your Facebook friends, correct? […] A. Yeah. I posted it, so I was comfortable posting it, yes."), p. 92:7–12 ("Q. And you were comfortable with Facebook and your Facebook friends knowing that you were taking [redacted], correct? […] A. Yes.").

73 Jane Doe V Deposition, p. 91:1–19 ("Q. […] And this is a post that you made on your [account name] account on September 26th, 2016, correct? A. Yes. Q. Can you read the post, please? A. [redacted] Q. So you were comfortable sharing with Facebook and your Facebook friends in September of 2016 that you were trying to lose weight, correct? A. Yes.").

74 Jane Doe V Deposition, p. 34:16–18 ("Q. If you see a certain doctor, do you consider the name of that doctor without more to be private? A. Definitely, yes.").

75 Deposition of Plaintiff Jane Doe I, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 17, 2025 ("Jane Doe I Deposition"), pp. 289:19–290:1 ("Q. So in this public Google review, you stated that [name of massage therapist] was your massage therapist, acupuncturist, and Chinese medicine practitioner; correct? A. Yes. Q. That wasn't information that you considered private? A. No.").

preferences and failed to consider such variations in privacy preferences as part of her opinion.[76]

### 2. *Dr. Barasz incorrectly infers that Proposed Class Members' continued use of Meta services reflects a lack of awareness or agency*

54. Dr. Barasz acknowledges the "privacy paradox," in which individuals express strong privacy concerns but behave inconsistently with those stated preferences.[77, 78] Nevertheless, she claims that Meta users continue to use Meta's services and post private health information because they are either unaware of how their data are used or because they believe they lack agency over that use.[79] This inference is not supported. Instead, it disregards well-documented literature on the privacy paradox and the substantial research providing multiple and varied explanations for it. This omission reflects a broader lack of methodology in her approach.

55. Dr. Barasz centers her opinions about Meta users' privacy preferences on the results of the WEF Survey of approximately 1,100 U.S. respondents conducted before the start of the

---

76 Barasz Deposition, pp. 81:2–82:13 ("Q. So throughout your report, when you say average consumer, you are referring to the court's definition of a reasonable consumer? A. I am referring to an average consumer as conceptualized in consumer behavior research, which as far as I understand is consistent and aligns with the court's definition of a reasonable consumer. Q. Do all average consumers have the same preferences? […] A. No. Q. Do all average consumers have the same expectations? […] A. No. Q. Do all average consumers have the same privacy preferences? A. No, but I would also like to just clarify what I am answering. We don't look at what people's privacy preferences are. We understand how their privacy preferences change as a function of a given environment, a given set of stimuli, et cetera. And so because of the way experiments work, I am confident saying that if you dropped an average person into one control group or one treatment group, we should expect to see the outcomes that we have published about. Q. So you -- you would agree, though, that people generally have different privacy expectations; right? A. Yes. But I am agnostic to that in my research.").

77 Barasz Report, ¶ 9 ("However, the average consumer's behavior can sometimes appear at odds with these preferences. As a result of this well-documented 'privacy paradox,' consumers may simultaneously report wanting to safeguard personal information while acting in ways that seem to run counter to this very objective—e.g., voluntarily disclosing personal information (such as email address or phone numbers), posting personal photos, or sharing private updates on public platforms.").

78 *See, for example,* Kokolakis, Spyros, "Privacy Attitudes and Privacy Behaviour: a Review of Current Research on the Privacy Paradox Phenomenon," *Computers & Security*, Vol. 64, 2017 ("Kokolakis (2017)"), pp. 122-134; Athey, Susan, Christian Catalini and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *National Bureau of Economic Research*, No. w23488, *Working Paper*, June 2017 ("Athey et al. (2017)").

79 Barasz Report, ¶¶ 9–11.

A13-4165

Class Period.[80] Dr. Barasz interprets respondents' stated privacy concerns together with Meta users' continued use of Meta's services as evidence that Meta users are unaware of how their data are used.[81]

56. The privacy paradox implies that people routinely share information they claim to value as private, revealing a disconnect between stated preferences and actual behavior. Studies show that individuals expressing strong privacy concerns are no less likely than others to share information on sites like Facebook or to provide location data to apps.[82] Researchers across disciplines have offered multiple explanations.[83] One reason, as I discussed in the previous section, is the lack of consensus on what constitutes sensitive information. Another economic reason is the "privacy calculus," in which individuals weigh the perceived costs of disclosing data against the perceived benefits they might receive in return.[84] Stating privacy concerns is costless, but even minimal costs—time, effort, or money—dissuade people from protecting their data, while benefits such as personalization

80 Barasz Report, Exhibit B. *See also* "Shaping the Future Implications of Digital Media for Society," *World Economic Forum*, January 2017, available at https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf, p. 36 (Showing fielding dates of August 30 through September 2, 2016 for the U.S. with 1,081 respondents in the U.S.).

81 Barasz Report, ¶ 12.

82 *See, for example,* Kokolakis (2017), at p. 125 ("Reynolds et al. (2011) in their study also found that there was little correlation between participants' broader concern about privacy on Facebook and their posting behaviour. Contrary to Tufekci (2008) they found that the portion of posts that were visible to a large audience appeared to be independent of general privacy attitude. Hughes-Roberts (2013), based on a questionnaire survey and an examination of participants' Facebook profiles, concluded that a general statement of user concern is not a valid indicator of privacy behaviour within the network. […] A study by Zafeiropoulou et al. (2013) specifically examined location data, which is a form of personal information increasingly used by mobile applications. Their survey also found evidence that supports the existence of privacy paradox for location data. Finally, Oomen and Leenes (2008) studied privacy risk perception in relation to the use of privacy enhancing technologies. Their survey data indicate that a high perception of privacy risk is an insufficient motivator for people to adopt privacy protecting strategies, while knowing these exist.").

83 *See* Kokolakis (2017) for a review of studies on the privacy paradox and Kokolakis (2017), Table 3 for the various reasons of the privacy paradox explained by these studies.

84 For a review of the literature documenting the privacy calculus, *see, for example*, Bleier, Alexander, Avi Goldfarb and Catherine Tucker, "Consumer Privacy and the Future of Data-Based Innovation and Marketing," *International Journal of Research in Marketing*, Vol. 37, No. 3, 2020 ("Bleier et al. (2020)"), pp. 466-480, at p. 474 ("Although certain innovation and marketing practices may cause privacy concerns, consumers might be willing to tolerate them if the perceived value they receive in return is sufficiently high (Sheehan & Hoy, 2000).").

or community access motivate disclosure. Academic studies consistently document people trading personal information for surprisingly minor benefits.[85]

57. In her report, Dr. Barasz acknowledges that Meta users, like people generally, exhibit the privacy paradox.[86] Yet rather than viewing this pattern as a well-documented divergence between stated privacy preferences and actual behavior, Dr. Barasz interprets it as evidence that Meta users are unaware of how their information is collected and used, or that they lack agency to change this.[87] These are different interpretations of the same observed outcome: people continue to use Facebook and share personal information despite expressing privacy concerns. Indeed, as Dr. Barasz admitted in her deposition, when a person expresses concern about privacy yet voluntarily posts personal photos, updates, or other information online, it is difficult to determine whether the person does not actually value privacy or whether other considerations outweigh those stated concerns.[88] In her

85 *See, for example,* Lu, Yin, Bernard Tan and Kai-Lung Hui, "Inducing Customers to Disclose Personal Information to Internet Businesses with Social Adjustment Benefits," *International Conference on Information Systems (ICIS) 2004 Proceedings*, December 2004 ("Lu et al. (2004)"), pp. 571-582, at p. 572 ("[S]ome Internet businesses have offered social adjustment benefits in exchange for personal information from consumers. For example, America Online and Yahoo have solicited personal information from consumers through various forms of virtual communities, chat rooms, and bulletin boards that facilitate social interaction. By registering their personal information, eBay allows consumers to participate in online forums or face-to-face gatherings for focus-group discussions."); Smith, H. Jeff, Tamara Dinev and Heng Xu, "Information Privacy Research: An Interdisciplinary Review," *MIS Quarterly*, Vol. 35, No. 4, December 2011 ("Smith et al. (2011)"), pp. 989-1015, at pp. 1001–1002 ("Following the notion of privacy calculus, 'individuals are assumed to behave in ways that they believe will result in the most favorable net level of outcomes' […]. Scholars have identified three major components of benefits of information disclosure including financial rewards, personalization, and social adjustment benefits. Recent privacy studies provide empirical evidence that compensating consumers through financial rewards can foster their information disclosure […]. In terms of the value of personalization, Chellappa and Sin (2005) found that it can override privacy concerns: 'the consumers' value for personalization is almost two times […] more influential than the consumers' concerns for privacy in determining usage of personalization services'"); Athey et al. (2017), at p. 15 ("[Results are] consistent with many students caring about privacy and security, but then falling back to the most convenient options when additional effort is required[.]").

86 Barasz Report, ¶ 9 ("However, the average consumer's behavior can sometimes appear at odds with these preferences. As a result of this well-documented 'privacy paradox,' consumers may simultaneously report wanting to safeguard personal information while acting in ways that seem to run counter to this very objective […]."), ¶ 12(b) ("Meta's users are subject to the privacy paradox; therefore, Meta users' continued presence on the platform cannot be taken as evidence of nonexistent or mitigated privacy concerns.").

87 Barasz Report, ¶¶ 12(b)–12(c).

88 Barasz Deposition, p. 151:6–16 ("Q. Okay. If a person acts in ways that run counter to privacy concerns, like voluntarily disclosing personal information, posting personal photos or sharing private updates on public platforms, how would you determine whether that person is actually not concerned about their privacy or whether there are overriding factors at play? […] A. That would be a difficult thing to determine.").

A13-4167

opinion, it would be "complex" to determine this on an individual basis, because "specific people have different views about different things and because specific people might feel differently about different data types."[89] This same logic applies to Meta users, including Proposed Class Members. At least as of the time their Motion for Class Certification was filed, six out of seven Plaintiffs continue to visit websites that they allege integrated The Meta Business Tools.[90] Illustrating the cost-benefit tradeoff, Plaintiffs also report continuing to use their healthcare providers' websites even after filing their complaint, "because it is the most effective way for [them] to receive treatment in a timely way."[91]

58. Similarly, Plaintiffs appear to have weighed the benefits of Meta's services. For example, Plaintiff Jane Doe IV testified that she purchased candles and perfumes based on ads she

---

89 Barasz Deposition, pp. 166:19–167:22 ("Q. And that would be a complex thing to determine for a specific person? A. It would be complex, and I don't think it is a binary answer. Q. What do you mean by that? A. I think that even amidst varying degrees of privacy concern, people can be more and less pro -- protective of different types of information. So even someone who, for example, in your example among the 29 percent who said they are not concerned about their privacy, if you ask them specifically would you be okay with Meta collecting data while you are on your healthcare user's website, my guess is that a fair number of those 29 percent would say no, we are not okay with that. So I think it very much depends on what kind of information you are talking about. Q. Okay. So there is increased complexity, because specific people have different views about different things and because specific people might feel differently about different data types. Did I get that right? A. Yes.").

90 *See, for example,* Declaration of Jane Doe I in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, ¶ 6 ("I am continuing to use my healthcare provider's website and/or app to obtain healthcare from my healthcare providers […]."); Declaration of John Doe II in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, ¶ 8 ("I currently use the WakeMed website and MyChart app, as well as the MetLife website to obtain healthcare from my healthcare providers […]."); Declaration of John Doe III in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, ¶ 5 ("I am continuing to use Providence's website to obtain healthcare from my healthcare provider […]."); Declaration of Jane Doe V in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, ¶ 5 ("I am continuing to use Blue Cross Blue Shield's website […]."); Declaration of Jane Doe IX in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, ¶ 5 ("I am continuing to use my healthcare provider's website and app to obtain healthcare from my healthcare providers […]."); Declaration of Jane Doe X in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, ¶ 5 ("I am continuing to use my healthcare provider's website and/or application to obtain healthcare from my healthcare providers […].").

91 *See, for example,* Declaration of Jane Doe I in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, ¶ 6.

saw on Facebook and Instagram.[92] Plaintiff Jane Doe V used Facebook to stay in touch with friends and family, and to inform them of a medical episode.[93] Plaintiff Jane Doe IX testified to using Facebook and Instagram as an influencer, posting publicly on these sites, and continuing to use Facebook to connect with friends and family.[94] Plaintiff Jane Doe X used Facebook to access the game FarmVille.[95]

59. Dr. Barasz also acknowledged engaging in similar "privacy calculus" when she described disabling her Facebook account while continuing to use Instagram, stating that she did so for "social reasons," which outweighed any of her purported privacy concerns.[96]

60. As Dr. Barasz acknowledged in her deposition, absent individualized inquiry one cannot reliably conclude whether a Meta user's behavior, such as publicly sharing information on Facebook or continuing use of Meta's services despite knowledge of the alleged data

---

92 Deposition of Plaintiff Jane Doe IV, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 22, 2025 ("Jane Doe IV Deposition"), p. 172:12–21 ("Q. Have you bought anything based on an ad that you saw on Facebook? A. Of course. Q. Have you ever bought anything based on ads you've clicked on in Instagram? A. Probably have. Q. Can you think of anything in particular that you've bought after you clicked on the ad from Facebook? A. Candles. Like smell -- fragrance stuff.").

93 Jane Doe V Deposition, p. 45:13–19 ("Q. And why did you sign up for your first Facebook account? […] A. To stay in touch with people, pretty much. My -- my children and relatives and friends and family. Just to stay in touch with people."), pp. 74:22–75:2 ("Q. And you wanted everyone to know that you had a [redacted] A. I wanted people to pray for me, yes. Q. And you said you were comfortable with Facebook knowing the things you posted on Facebook, correct? A. Yeah, I felt comfortable.").

94 Deposition of Plaintiff Jane Doe IX, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, March 28, 2025 ("Jane Doe IX Deposition"), p. 152:8-11 ("Q. How have you shared your [redacted] publicly? A. Through videos and just talking about it. Q. Where did you post those videos? A. YouTube, Facebook, Instagram, TikTok, and that's it."), p. 166:19–23 ("Q. What platforms do you use for your work as an influencer? A. The one that I use now is YouTube the most. Q. Have you used Facebook and Instagram? A. Yes."), p. 163:6–11 ("Q. Why did you sign up for a Facebook account in 2015? A. To connect with friends and family. Q. Do you continue to use Facebook to connect with friends and family? A. Not as much, but I do.").

95 Jane Doe X Deposition, pp. 108:25–109:9 ("Q. Why did you sign up for the Facebook account in the first place around 2009? A. 2009, that was -- that was the height of FarmVille. Everyone is playing FarmVille. So I wanted to be in on it. Q. And I -- I'm embarrassed to say, like, how did being on Facebook help with being in on FarmVille? A. Well, the game was only accessible through Facebook at the time.").

96 Barasz Deposition, pp. 278:5–279:5 ("Q. So I am asking about this time period between 2017, and then let's say 2021 to start. At that time you didn't have your business yet; right? A. Right. Q. And you said you stopped using Facebook in 2017 or 2018 because you disagreed with their policies and the adtech exchange of information, but you were still using Instagram for several years after that; right? A. Yes. Q. And you didn't have your business yet? A. That's right. Q. So why did you continue using Instagram when you deactivated your Facebook account because of concerns over adtech? A. Social reasons. Q. So your -- the value in using Instagram for you overrode your privacy concerns with respect to Instagram, but not for Facebook? A. Yeah, I guess you could say that.").

A13-4169

sharing, reflects low privacy concerns or other considerations.[97] In fact, the privacy paradox implies that even individualized inquiry may not fully resolve those questions, because individuals may express concern yet behave inconsistently with those stated beliefs. An illustrative example is Plaintiff Jane Doe V, who testified that she considered information about the hospitals she visited as private, yet also acknowledged publicly posting that same information on Facebook.[98] She is not unique. As discussed in **Section V.A.2**, several Plaintiffs exhibit similar divergences between their stated privacy concerns and their actual behavior.

61. Dr. Barasz's failure to engage with the academic literature on the privacy paradox, and her failure to distinguish among competing explanations for individuals' behavior, reflect a broader absence of any methodology in her approach. Dr. Barasz testified that in forming her opinions, she did not conduct a literature review[99] and that she "didn't follow a protocol."[100] As she put it, "[she] wouldn't say there was a methodology […] [because]

---

97 Barasz Deposition, p. 166:9–22 ("Q. And again, if a Meta -- let's say a specific Meta user is still on the platform, so continued presence on the platform, you wouldn't know for a specific user whether the continued presence on the platform was due to the privacy paradox, overriding factors or the fact that the person didn't care about their privacy; right? A. That's right. Q. And that would be a complex thing to determine for a specific person? A. It would be complex […].").

98 Jane Doe V Deposition, p. 34:13–15 ("Q. If you go to a certain hospital, do you consider simply the name of that hospital to be private[?] A. Yes."), pp. 74:2–75:2 ("Q. [T]his is a picture of you in a hospital bed, is that right? A. Yes. Q. And you checked in at the emergency room at [redacted], correct? A. Yes. […] Q. And you wanted everyone to know that you had a [redacted] A. I wanted people to pray for me, yes. Q. And you said you were comfortable with Facebook knowing the things you posted on Facebook, correct? A. Yeah, I felt comfortable."), pp. 89:4–90:18 ("Q. Do you see here that you checked into [redacted]t on March 15th, 2016? […] A. Yes. Q. Can you read the post please? […] A. In the ER for five hours and still had twelve people ahead of me, so I left. […] Q. And you were comfortable with the public and Facebook knowing that you were at the [redacted] in March of 2016? A. Yes.").

99 Barasz Deposition, pp. 79:22–80:5 ("Did you conduct a literature review? A. No, I did not. Q. How did you decide what articles and research studies to cite in your opinion? A. Familiarity with them from my time as an academic.").

100 Barasz Deposition, p. 79:10–21 ("Q. Yes. Would another researcher be able to replicate your methodology that you used in preparing your report here? A. Yes. Q. How would they do that? A. Well, again I feel like we are talking about methodology as different from how I would conceptualize it. So we didn't follow a protocol, we didn't collect data. I think if many privacy researchers were asked these four questions, they would take a similar approach to what I did.").

compiling opinions and a list of conclusions isn't really a methodology."[101] This admission confirms that her opinions rest on ad hoc observations rather than a systematic and rigorous analysis.

### B. Dr. Barasz Fails to Substantiate Her Opinions About Proposed Class Members' Expectations Regarding What Information About Them Was Transmitted and How

62. Dr. Barasz's opinion that Meta users have uniform expectations about how their information is used ignores key evidence that undermines her overall conclusion. First, she fails to establish what expectations Proposed Class Members actually had regarding the transmission of their At-Issue Data, and she ignores empirical evidence showing that people are aware of—and comfortable with—sharing data. Second, because she also fails to define what constitutes sensitive information or health information, Dr. Barasz misinterprets studies that she cites in her report.

#### *1. Dr. Barasz fails to acknowledge that some individuals are aware of and comfortable with online sharing of data*

63. In her report, Dr. Barasz states that Meta users have expectations and beliefs about what information Meta receives, as well as how that information is—and should be—collected, disseminated, and used. She concludes that "the average consumer is significantly more comfortable with firms using information that was directly shared with the platform […] than data acquired outside the platform."[102] She offers "past browsing history on another company's website" as an example of a source that is an "unacceptable practic[e]."[103]

64. Dr. Barasz's claim that individuals are more comfortable with firms using on-platform data than data received from third parties is irrelevant to whether individuals understand how firms use their data. In fact, she acknowledges that "at a high level, most people understand

---

101 Barasz Deposition, p. 74:4–13 ("Q. Do other people in your field use the methodology that you used in putting together your report to draw conclusions about the average consumer? A. I wouldn't say that there was a methodology per -- per se. Methodology in my world would be very specific to the type of research that one does. So in this case compiling -- compiling opinions and a list of conclusions isn't really a methodology.").

102 Barasz Report, ¶ 17.

103 Barasz Report, ¶ 17, quoting Kim, Tami, Kate Barasz and Leslie K. John, "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research*, Vol. 45, No. 5, February 2019 ("Kim et al. (2019)"), pp. 906-932.

A13-4171

that we are being tracked when we use the Internet"[104] and that there is a "decently high level of awareness that third-party analysis is happening."[105] Empirical evidence supports this. A survey conducted by DMA found that, as of 2017, almost two-thirds of U.S. respondents felt "more aware of how [their] data [were] used and collected than in the past."[106]

65. Dr. Barasz also downplays evidence documented in sources she cites that demonstrates that many people are aware of, and comfortable with, their data being shared online. For example, she cites the WEF Survey to note that 48 percent of U.S. respondents were not comfortable with their data being shared with third parties.[107] However, she disregards that the majority of respondents did not state they were uncomfortable with their data being shared, indicating many were comfortable with their data being shared. Similarly, she overlooks that 62 percent of U.S. respondents in the same survey were not uncomfortable with their data being used for personalized advertising.[108] The same survey also found that 29 percent of U.S. respondents were comfortable with having their use of browsers or apps

---

104 Barasz Deposition, p. 175:2–11 ("Q. So your guess is that what people -- people's awareness of third-party companies tracking and storing website browsing activity would depend on the type of websites they were browsing; is that right? […] A. I think that at a high level most people understand that we are being tracked when we use the Internet.").

105 Barasz Deposition, pp. 171:18–172:6 ("Q. So this table shows that 48 percent of U.S. respondents believed that more than half of their online presence was subject to third party analysis; correct? A. That is what it says, yes. Q. Would this mean that the average consumer understands that a majority of their online activity is analyzed by third parties? A. It would suggest there is a decently high level of awareness that third-party analysis is happening, yes, I agree with that.").

106 "Data Privacy: What the Consumer Really Thinks," *Data & Marketing Association*, June 2018, available at https://marketing.acxiom.com/rs/982-LRE-196/images/DMA-REP-DataPrivacy-US.pdf, pp. 7–8.

107 Dr. Barasz—without providing any support—further claims that this number "would certainly have been higher" if the same question was asked individually, rather than as part of a list. *See* Barasz Report, ¶ 20.

108 "Shaping the Future Implications of Digital Media for Society," *World Economic Forum*, January 2017, available at https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf, pp. 32, 43 (38% of respondents agreed with the statement "I'm not comfortable with my data being used for personalized advertising" in response to question "What are your reasons for not feeling comfortable with your individual activities being tracked, analysed and stored by companies, including third parties? Please select all that apply." This implies that the remaining 62% of respondents did not agree with this statement).

shared with third parties.[109] Finally, the WEF Survey reported that only 31 percent of U.S. respondents decided not to use, or to stop using, certain technologies, sites, or services because they believed the technologies did not provide adequate end-user control, while the remaining 69 percent continued using such technologies.[110]

### 2. *By not identifying the At-Issue Data, Dr. Barasz misinterprets the sources she cites in her report*

66. Dr. Barasz provides limited support for her claim that Meta users value "personal health information" more than other types of information. Moreover, this observation is irrelevant because Dr. Barasz does not explain how her sources relate to the At-Issue Data for Proposed Class Members allegedly transmitted to Meta.

67. To start, Dr. Barasz claims that "the average consumer values their sensitive data (e.g., health information) more highly than non-sensitive data (e.g., basic observable demographics)," citing a 2015 *Harvard Business Review* article.[111] But the study does not support her conclusion. In her deposition, she agreed that this article "actually shows that

[109] "Shaping the Future Implications of Digital Media for Society," *World Economic Forum*, January 2017, available at https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf, Table 11. Respondents were asked to select a response for each type of site, service, or internet-connected technology in response to the question "How comfortable are you with companies, including third parties, collecting, analysing and storing your use of each of the following?"

[110] "Shaping the Future Implications of Digital Media for Society," *World Economic Forum*, January 2017, available at https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf, Table 22. Respondents were asked to choose Yes/No answer to the question "Have you decided not to use, or to stop using, certain technologies, sites, or services because you believed it/they did not provide adequate end-user control?"

[111] Barasz Report, ¶ 19, citing Morey, Timothy, Theodore Forbath and Allison Schoop, "Customer Data: Designing for Transparency and Trust," *Harvard Business Review*, May 2015, available at https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust.

health information and observable demographics are […] valued the same in the U.S."[112] However, even if this study showed what Dr. Barasz claimed in her report, she does not demonstrate that the "Health history" data examined in the study is substantially similar or even related to the At-Issue Data.

68. Importantly, Dr. Barasz offers only a vague definition of "health information." She defines it as "[a]ny personal information that exists in a health context."[113] Yet her examples conflict. She considers researching a pharmaceutical drug to be "health information" but not if the same research is conducted for an academic paper.[114] Similarly, she does not view a visit to a healthcare provider's website as "health information" if the website visitor is neither a provider nor a patient of that healthcare provider.[115] She does not explain how either the healthcare provider who maintains the website or Meta could distinguish among these distinct uses or users, or determine whether someone logging into a patient portal did so for their own medical needs or as a proxy for someone else.

69. As another example, Dr. Barasz cites the WEF Survey to note that only 15 percent of U.S. respondents were willing to share "Personal health data (e.g., heart rate, sleeping patterns,

---

112 Barasz Deposition, pp. 210:10–210:19 ("Q. And based on this survey you relied on to support paragraph 19, United States consumers would pay the same amounts of money per person to protect health information and demographic information; right? A. That's what is here, yes. Q. The red circles are the same for both of those categories? A. Yes."), p. 212:17–22 ("Q. So that study that you cited in support of that statement does not support for U.S. users that U.S. consumers value health information more than demographics; right? A. Sure."). *See also* Morey, Timothy, Theodore Forbath and Allison Schoop, "Customer Data: Designing for Transparency and Trust," *Harvard Business Review*, May 2015, available at https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust. The figure "Putting a Price on Data" in the article shows circles of different sizes depending on the "approximate amount people say they would pay to protect each data type." The circles for "Health history" and "Demographic information" for the U.S. appear to be of the same, or similar, size.

113 Barasz Deposition, pp. 202:25–203:5 ("Q. And what is the definition of health information as you are using it in paragraph 19? A. Any personal information that exists in a health context.").

114 Barasz Deposition, p. 204:8–18 ("Q. Do you consider it medical information that someone researched a certain pharmaceutical drug? A. Yes. Q. What if that research was done in connection with an academic paper, for example, as opposed [to] for their own medical condition, would you consider that to be health information still? A. I would not consider that to be personal health information.").

115 Barasz Deposition, p. 237:3–9 ("Q. So if someone is visiting a website, not because they are a provider of that or a patient of that website's healthcare system, would that be health information? A. I guess I would not con --consider that health information.").

A13-4174

number of steps taken)" in exchange for free, value-added services.[116] Dr. Barasz then claims—without support—that the step count example used in the WEF Survey is "far less sensitive" than potential uses of certain At-Issue Data such as in "condition targeting."[117] In her deposition, she described "condition targeting" by referencing a Meta media strategy presentation containing a hypothetical example of an advertiser using "native interest" targeting, which is targeting based expressly on user's on-platform activity,[118] using terms such as "Pulmonary Hypertension Association" and "COPD: Journal of Chronic Obstructive Pulmonary Disease."[119] Yet neither the Pulmonary Hypertension Association nor the COPD: Journal of Chronic Obstructive Pulmonary Disease are part of Plaintiffs' at-issue healthcare entities list,[120] and Dr. Barasz does not attempt to link any of the presentation's content with the alleged At-Issue Data or make any connection between alleged "condition targeting" and the At-Issue Data transmitted to Meta.

70. Importantly, having an interest in such associations and journals does not imply that one has been diagnosed with the underlying condition; a physician specializing in COPD could just as easily follow these topics. In her deposition, Dr. Barasz admitted that Meta's

116 Barasz Report, ¶ 21, citing "Shaping the Future Implications of Digital Media for Society," *World Economic Forum*, January 2017, available at https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf.

117 Barasz Report, ¶ 21.

118 Deposition of Jenny Streets, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, March 25, 2025 ("Streets Deposition"), p. 39:5–14 ("Q. And so, it describes here -- it uses the phrase 'FB Native Interest Targeting.' Can you tell me what that phrase means? A. It means if someone engaged with running content to imply they're interested in running, that would be native on Facebook and interest targeting. Q. And so, that would mean they engaged with that content on platform; is that right? A. Correct.").

119 Barasz Report, ¶ 21 ("Worth mentioning, the personal health data specified in this example — e.g., step count — is far less sensitive than some of the health data Meta amassed and used, such as the 'condition targeting' outlined in Exhibit C (PIXEL_HEALTH000703922), which Meta users would have found significantly more off-limits."); Meta, "Uptravi Activating on Facebook: Media & Strategy Considerations," July 23, 2020, PIXEL_HEALTH000703922-984 at 945; Barasz Deposition, pp. 220:2-222:6 ("Q. What is your understanding of what condition targeting is? A. Do you have Exhibit C? […] Q. And what data on that slide is reflecting the condition charting that you are claiming was more sensitive than those other data points? A. So the native interest that are on the left most side.").

120 The website for the Pulmonary Hypertension Association is "phassociation.org" and the website for the COPD Journal of Chronic Obstructive Pulmonary Disease is "journal.copdfoundation.org." Neither URL is found in the exhibits to the motion for class certification. *See* Motion for Class Certification, Exhibit 60, Exhibit 72, Exhibit 73.

medical-condition targeting is based on *interest in* a condition, not on *having* the condition, something that Meta has no way of knowing.[121]

71. Plaintiffs' own behavior illustrates the difficulty of distinguishing interests from health status. Plaintiff Jane Doe X testified that she is both a patient and an employee of Adventist Health and uses the website in both capacities.[122] Numerous Plaintiffs also conducted web searches on behalf of family members, including on healthcare providers' websites. For instance, Plaintiff Jane Doe V searched for [redacted] for her mother;[123] Plaintiff John Doe III searched for health information for his wife or other family member;[124] Plaintiff Jane Doe I [redacted];[125] Plaintiff Jane Doe IV researched medications for her children and ran other health-related web

---

121 Barasz Deposition, pp. 225:5–226:18 ("Q. And it is possible that Meta is inferring who might be interested in seeing an ad, that doesn't necessarily mean the person they show the ad to has the condition at issue; right? A. There is a higher than likely -- a higher chance likelihood that they have it or else they wouldn't be able to claim specific targeting. Q. Well, let's take an example, I have kids, I might be researching something about a condition for my kid, and I might be interested in buying a product for them. That doesn't mean that I have the condition; right? A. That's right. Q. So it is possible that Meta could want to show me an ad for a product that might be -- I might be interested in for my kid, not for myself; right? A. That's right. Q. So Meta is not necessarily inferring that the people interested in these ads have the condition; right? […] A. I think that they are selling to healthcare providers and pharmaceuticals a population that is more interested in the condition than not. So a higher than chance likelihood that they will be interested in it, which means that they have some -- they have collected some information that would suggest that. Q. And again, what you just said was likelihood that they are interested in it, which could be for yourself or it could be for a family member or friend; right? A. It could be.").

122 Jane Doe X Deposition, pp. 288:13–289:7 ("Q. Why? Help me understand why, if you are a plaintiff in a lawsuit about what you believe to be the improper sharing of your data from your Adventist Health patient portal to Meta […] you continue to use the patient portal and provide information to it without making any changes to how it might be shared with the person that you're suing? […] A. […] And I continue to use the -- the website and the portal because number one, I work there. And lastly, I am a patient. So I check my records.").

123 Jane Doe V Deposition, pp. 109:9–110:1 ("Q. The next URL is [redacted]. […] Q. Are you claiming that this URL was shared with Meta? A. Yes. Q. What words in this URL do you claim reflect your health information, if any? A. [redacted] Q. Were you conducting this search on behalf of yourself or someone else? A. For someone else. Q. Who were you conducting this search for? A. My mother.").

124 Deposition of Plaintiff John Doe III, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 4, 2025 ("John Doe III Deposition"), p. 110:4–12 ("Q. Have you ever searched for health information about someone else on Providence's website? […] A. I may have. […] Q. What do you think you may have searched for? […] A. Something for my wife or another family member.").

125 Jane Doe I Deposition, p. 122:5–15 [redacted].

[redacted]

searches for her husband and aunt;[126] and Plaintiff John Doe II searched for health information on the WakeMed website for his husband.[127] Plaintiff Jane Doe V also interacted with a baby-related Facebook page; while not being pregnant at that time, she was interested because of pregnant relatives.[128] Dr. Barasz's broad definition of "health information" ignores that website visitors, including Plaintiffs, engage with medical websites in ways that are unrelated to their own health.

## V. Dr. Singer's Actual Damages Estimates Are Unreliable

72. Dr. Singer was asked to "assess whether methods and data common to the [Patient Status Button-Click], Patient Health Information, and Prescription Drug [Information] Classes, respectively, can reliably demonstrate economic injury and determine the quantum of damages resulting from the Challenged Conduct."[129]

73. Dr. Singer conducts a survey using a Choice-Based Conjoint ("CBC") model. He claims to calculate "every respondent's individual required Compensation to be made whole."[130] He then states that he could calculate aggregate damages following a multi-step process:

a. First, he calculates the "averag[e of] the required Compensation across all respondents."[131] He purports to express this average in "market-based

[126] Jane Doe IV Deposition, pp. 78:22–79:8 ("Q. Have you ever done research for medicines for your kids? A. Yes. Q. Have you ever done research for health-related issues for your kids on the internet? A. Yes. Q. Have you ever done health-related web searches for your husband? A. I have. Q. Have you ever done health-related web searches for other family members, like your aunt? A. I have done it for her once, yeah[.]").

[127] John Doe II Deposition, p. 123:4–11 ("Have you ever searched for health information on behalf of someone else on the WakeMed website? A. Not that I can recall. I probably have searched for things on WakeMed for [husband name], but -- so yes, I will say yes to that. Q. Is [husband's name] your husband? A. Yes.").

[128] Jane Doe V Deposition, pp. 72:15–73:7 ("Q. Okay. Do you see the fourth entry from the top where it says, [redacted] A. Yes. Q. And the date on that was January 19th, 2013. Do you see that? A. Yes. Q. Were you expecting a baby in January 2013? A. No. [redacted] A. Yes. Q. Why did you like that page in January of 2013 if you were not expecting a baby at that time? A. For my cousin. Q. Your cousin was expecting a baby at that time? A. Yes. Q. So you were interested in baby-related items because of your cousin? A. Uh-huh. And my daughter was pregnant, too.").

[129] Singer Report, ¶ 5. For the avoidance of doubt, in this report, I cite to errata version of the Singer Report submitted on October 23, 2025.

[130] Singer Report, ¶ 105.

[131] Singer Report, ¶ 105.

A13-4177

terminology" as "the market equilibrium price for Meta's access to Healthcare Information."[132]

b. Second, using this average, he claims to estimate the per-month values of At-Issue Data for each Proposed Class Member of the Patient Status Button Click Class ($5.94), the Patient Health Information Class ($3.83), and the Prescription Drug Information Class ($3.71).[133]

c. Third, Dr. Singer states that he can "formulaically calculate Class-wide damages to each Class" by multiplying these per-month estimates of value of At-Issue Data by "the number of months in which each individual Class Member's At-Issue Data were accessed by Meta."[134]

74. For the purposes of this report, I focus on Dr. Singer's application of the results of his CBC analysis, and not the implementation of the CBC methodology itself. I understand that Professor John Hauser is addressing the implementation of the CBC model.

75. In the remainder of this section, I explain three broad flaws in Dr. Singer's application of the results of his CBC analysis.

76. First, Dr. Singer's estimates are unreliable because they fail to account for changes in pixel technology over time and contradict the real-world behavior of Plaintiffs.

77. Second, Dr. Singer improperly equates his estimate of individuals' willingness-to-accept ("WTA") with a "market equilibrium price." His methodology cannot produce a "market equilibrium price," and he provides no explanation for how such a price could be calculated.

78. Third, Dr. Singer offers no method for calculating the number of months in which "each individual Class Member's At-Issue Data were accessed by Meta." Instead, he references

---

132 Singer Report, ¶ 112.

133 Singer Report, ¶ 106, Exhibit 6. Dr. Singer does not present an analysis of the value for the "The Patient Device Intrusion Class."

134 Singer Report, ¶ 113.

undisclosed "analytical and statistical methods" and admits he would need to rely on information not available in his report.[135]

### A. Dr. Singer Applies His Survey Results Without Accounting for Changes in Pixel Technology and the Real-World Behavior of Plaintiffs

#### 1. *Dr. Singer's analysis fails to adapt to the changing nature of Meta's data filters and mitigation systems*

79. Dr. Singer claims that his methodology calculates the compensation needed to make Proposed Class Members "whole."[136] The appropriate starting point for any such calculation is to identify the type and amount of information shared.[137] Academic research, including studies that Dr. Singer cites, shows that demanded compensation varies substantially by the type of data shared.[138] Thus, if different types of data about Proposed Class Members were shared over time or across individual members, the compensation they would demand would likely also vary. Dr. Singer's analysis assumes a fixed, uniform type of data was shared for all Proposed Class Members for the entire Proposed Class Period in each Proposed Class. He thus assumes a single uniform value for all Proposed Class Members in each Proposed Class, and cannot reliably account for these differences.

80. These differences across time and across individual members are directly relevant in this matter. As Dr. Zervas explains, Meta's systems designed to detect and prevent the receipt and use of potentially sensitive data sent by advertisers through their use of The Meta

---

135 Singer Report, Footnote 141.

136 Singer Report, ¶ 106 ("The results of the required Compensation and WTA calculations are shown in Exhibit 6 below. These results reveal that respondents representing the [Patient Status Button-Click] Class would require Compensation of $5.94 monthly to be made whole in return for Meta's access to the Healthcare Information described in the [Patient Status Button-Click] Class survey; respondents representing the Patient Health Information Class would require $3.83; and respondents representing the Prescription Drug Class would require $3.71.").

137 *See, for example,* Prince and Wallsten (2022), at p. 842 ("In this paper, we estimate how much people value a range of highly relevant aspects of privacy and how these values vary across countries, data types, and platforms. […] If privacy values differ across countries or regions, then acceptable rules and regulations may similarly differ across regions. […] Similarly, if people value the privacy of different types of data differently, then policy should probably also treat them differently.").

138 Prince and Wallsten (2022), at pp. 851–853.

Business Tools have changed and evolved over time.[139] Some of these systems specifically block or filter out potential health-related data.[140]

81. Dr. Singer's analysis fails to account for these technological changes, which affect the type and amount of information transmitted to Meta. While his conjoint-based study uses different prompts for the three Proposed Classes in his analysis,[141] he proposes a fixed monthly payment per Proposed Class Member that he would apply throughout the full Proposed Class Period. By assuming a fixed, uniform value for the multi-year Proposed Class Period for all Proposed Class Members, in each Proposed Class, his methodology cannot capture differences across members or time periods. Even assuming for the sake of argument that Dr. Singer's valuations were accurate at the start of the Proposed Class Period in June 2018, the type of information allegedly transmitted would have changed during the Class Period. Because Dr. Singer does not account for variation in the type or amount of information transmitted across members or over time, his estimates do not reliably capture the value of the At-Issue Data.

*2. Dr. Singer's analysis fails to account for information freely shared with Meta by Proposed Class Members*

82. Dr. Singer's analysis assumes that all Proposed Class Members require compensation to share certain broad categories of information with Meta.[142] This assumption is contradicted by both Dr. Singer's testimony as well as the evidence from Plaintiffs.

83. According to Dr. Singer, the "value of the At-Issue Data" "is equal to the change in WTA between 'No Access' and 'Access.'"[143] Dr. Singer acknowledged in deposition that by

---

139 *See* Expert Report of Georgios Zervas, Ph.D., *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, December 9, 2025 ("Zervas Report"), Sections IV.B-C. Plaintiffs also describe several of the Meta's data filters and mitigation systems. *See* Motion for Class Certification, p. 10 ("It wasn't until February 2023 that Meta began blocking certain patient portal events, and not until July 2024 did Meta begin Truncating URLs that the Pixel sends to Meta on health websites [...]").

140 *See* Zervas Report, Section IV.B.

141 *See* Singer Report, Exhibits 1, 3, 4.

142 Singer Report, ¶ 112 ("Holding Meta's demand curve fixed, the value of the At-Issue Data is equal to the change in WTA between 'No Access' and 'Access' (the required Compensation). Importantly, this value pertains to all Class Members, regardless of individual preferences.").

143 Singer Report, ¶ 112.

A13-4180

posting medical information, Proposed Class Members "would have surrendered that data without compensation."[144]

84. Many Plaintiffs also testified that they freely shared the same types of information they claim to be at issue, including by posting it on Facebook. The following examples show that Plaintiffs voluntarily posted information consistent with the At-Issue Data on Meta's services:

a. Plaintiff John Doe II testified that visiting a hospital or doctor's office is private information,[145] yet he [redacted].[146] He also agreed that information publicly posted would not be considered private and was shared voluntarily.[147]

b. Plaintiff Jane Doe IV admitted to posting about her medical visits, including to [redacted] Care – *see* **Figure 3**.[148] She also testified that her medical condition was, in her view, private, yet she voluntarily posted on social media about her having [redacted].[149]

---

144 Deposition of Hal J. Singer, Ph.D., *In Re Meta Pixel Healthcare*, Case No. 3:22-cv-3580-WHO-VKD, October 24, 2025 ("Singer Deposition"), pp. 153:11–154:3 ("Q. And fair to say that the way you use these phrases, if someone was to put what you call proprietary data, say, in a public Twitter account or other public distribution channel, that would be the relinquishment of control for no value? […] A. I think that with respect to the one particular thing that they post, right, which is a subset of the three classes of data that we are trying to value, then I think it's fair to say that they would have surrendered that data without compensation.").

145 John Doe II Deposition, p. 36:5–8 ("Q: Do you consider it private that you go to a hospital or a doctor's office? […] A. Yes.").

146 John Doe II Deposition, p. 93:12–14 ("Q. What did your comment say in this post? A. [redacted]").

147 John Doe II Deposition, p. 35:12–14 ("If it's publicly posted, then I would not necessarily consider that private, but I would have chosen to post that with my own free will.").

148 Jane Doe IV Deposition, p. 165:11–18 ("Q: A member of the public who viewed your Facebook page could see that you were at [redacted] correct? […] Correct.").

149 Jane Doe IV Deposition, p. 167:10–15 ("Q: The post marked as Exhibit 329 was made publicly by you on Facebook, correct? A. Correct. Q. And the post marked as Exhibit 329 describes the fact that you have [redacted] is that right? A. Correct."), pp. 168:3–169:13 ("Q. Right before you shared in this Facebook post that you had [redacted] did you consider that to be personal information? […] [A]. It is. However, again, it's just something I was comfortable sharing[.]").

A13-4181

**Figure 3: Plaintiff Jane Doe IV's Post on Facebook About Her Visit to [redacted]**

[redacted]

c. Plaintiff Jane Doe V posted on Facebook that she was a patient at [redacted] Hospital and [redacted] and confirmed that she was comfortable with Facebook having this information.[151]

d. Plaintiff John Doe III posted about [redacted] on Facebook and engaged with multiple Facebook pages related to [redacted]. They also confirmed that they were comfortable with other Facebook users, and Facebook itself, knowing that they had [redacted].[152]

---

150 Jane Doe IV Deposition, Exhibit 328.

151 Jane Doe V Deposition, p. 76:9–21 ("A: [redacted] Q. So you were comfortable with the public and Facebook knowing this detailed information about your health, correct? A. Yeah[.]").

152 John Doe III Deposition, pp. 161:1–165:7 ("Q. So you were comfortable with the public and Facebook knowing that you liked [redacted], right? […] [A.] Yes. […] You were comfortable with Facebook knowing that you linked the group [redacted], right? […] [A.] Yes. […] Q. And why were you posting this on Facebook? […] And you were referring to your [redacted] right? A. [redacted] I was, yes. […] Q. And you were comfortable telling everyone that [redacted]? […] A. Yes.").

e. Plaintiff Jane Doe X [redacted],[153] and shared her [redacted] on Facebook.[154]

85. The real-world behavior of Plaintiffs shows that, for at least some Proposed Class Members and for some data, the change in willingness-to-accept is zero because they have freely disclosed comparable information on their profiles without compensation. Yet Dr. Singer's analysis does not recognize or adjust for these uninjured Proposed Class Members.

### B. Dr. Singer's Analysis of the Market Equilibrium Price Is Incomplete and Contradicted by Basic Economic Principles Applied to Personal Information

86. Dr. Singer claims that it is unnecessary to calculate the change in the "market equilibrium price" of the At-Issue Data in the but-for world.[155] Below, I first summarize the concept of a market equilibrium price and then address Dr. Singer's claim that calculating the market equilibrium price is unnecessary.

87. A market equilibrium price is a foundational economic concept reflecting the intersection of buyers' willingness to pay for a good or service (demand) and sellers' willingness to accept in exchange (supply).[156] In any product market, differences in buyers' willingness to pay shape the demand curve, and differences in suppliers' willingness to accept shape

---

153 Jane Doe X Deposition, pp. 159:23–160:25 ("The second bold entry on the second page of Exhibit 311, which refers to the [redacted], includes a post that states: (As read): [redacted] ' Q. Did you write that? A. I believe so. Q. And were the -- were you, in fact, taking [redacted] A. Yes. Q. And were you sharing in this post when you usually [redacted]? A. I did share it, yeah, I -- in the post.").

154 Jane Doe X Deposition, pp. 195:20–196:7 ("Q. Do you consider the [redacted] to reflect sensitive information? […] A. Yes. Q. But you were willing to share images of the [redacted] you've [had] taken on this group, right? […] A. Yes, of course.").

155 Singer Report, ¶ 119 ("It warrants emphasizing that if *valuation* is the relevant investigation—as Plaintiffs allege—the parameter of interest is not the market equilibrium price that would have prevailed under distinct conditions, but the value from the perspective of Class Members. That is, Plaintiffs allege that damages must represent the harm Class Members actually suffered, not a theoretical difference in the market equilibrium price." (emphasis in original)).

156 Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2018, 8th Ed., p. 85 ("The intersection of the supply and demand curves determines the market equilibrium. At the equilibrium price, the quantity demanded equals the quantity supplied.").

the supply curve.[157] At a given price, buyers with a willingness to pay above that price purchase the good or service, and sellers with a willingness to accept below that price choose to sell it. The market equilibrium price is the price at which total supply equals total demand. Buyers and sellers whose valuations lie near the market equilibrium price are called "marginal" buyers and sellers, but the equilibrium price applies uniformly to all participants, marginal or not.[158]

88. Dr Singer argues that "Plaintiffs allege that damages must represent the harm Class Members actually suffered, not a theoretical difference in the market equilibrium price."[159] He therefore asserts that the "parameter of interest" is the value from the perspective of the Proposed Class—i.e., the average respondents' willingness-to-accept estimates from his CBC surveys. Yet he also claims to present an estimate of a "market equilibrium price," assuming that Meta's purported demand for At-Issue Data is fixed, as shown by the fixed (vertical) line in his Exhibit 8.[160]

89. I understand that whether Plaintiffs must consider Meta's demand and calculate a market equilibrium price is ultimately a legal question. If the Court determines that such an analysis is required, I explain below that Dr. Singer has not presented a methodology to calculate the change in the market equilibrium price. Moreover, there is no single market price for the At-Issue Data for any of the three Proposed Classes.

### 1. *Dr. Singer does not calculate the market equilibrium price for Meta's access to the At-Issue Data*

90. As I describe above, a market equilibrium price is determined by the intersection of users' willingness to accept (supply) and Meta's willingness to pay (demand). By treating Meta's

---

157 Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2018, 8th Ed., p. 135 ("Note the relationship between the height of the demand curve and the buyers' willingness to pay. At any quantity, the price given by the demand curve shows the willingness to pay of the *marginal buyer*, the buyer who would leave the market first if the price were any higher."), p. 140 ("At any quantity, the price given by the supply curve shows the cost of the *marginal seller*, the seller who would leave the market first if the price were any lower." (emphasis in original)).

158 *See*, *for example*, Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2018, 8th Ed., p. 135 ("At any quantity, the price given by the demand curve shows the willingness to pay of the *marginal buyer*, the buyer who would leave the market first if the price were any higher." (emphasis in original)).

159 Singer Report, ¶ 119.

160 Singer Report, ¶¶ 111–112 (citing Exhibit 8).

A13-4184

demand as fixed and only changing users' willingness to accept, Dr. Singer's analysis does not identify the point where supply and a non-vertical demand curve intersect. His approach implicitly assumes that Meta would purchase the same amount of At-Issue Data regardless of price, an assumption that contradicts basic economic principles.[161] As a result, his estimate cannot be interpreted as a market equilibrium price, or even as a meaningful market outcome.

91. Dr. Singer justifies this assumption by stating that "as a historic matter, the demand was fixed and Class Members have already supplied and cannot reclaim the At-Issue Data."[162] He claims that "[t]he relevant economic question is what compensation would have been required for Class Members to supply that quantity over the Relevant Period."[163] Dr. Singer confuses the outcome of the actual world with the market equilibrium price in the but-for world. The quantity of products supplied and purchased in the *actual world* is fixed "as a historical matter" because those transactions have already occurred. The quantity is not fixed "as a historical matter" in the but-for world because the but-for world did not occur.[164] The relevant question is therefore the price at which Meta would have purchased At-Issue Data in the *but-for world*, which in turn depends on the total quantity of data supplied and purchased.[165]

92. Dr. Singer's widget analogy is illustrative. He presents four owners of single-use widgets whose widgets are taken and states that they "can be made whole only through compensation for the widgets that were taken" and that "the quantity that the entity *would have taken* had they been aware of or had anticipated being responsible for the value is not

161 Dr. Singer's assumption is that Meta's demand for user information is perfectly inelastic, meaning that they would be willing to pay any price for the data they receive. This assumption is without basis and is inconsistent with the fact that Meta has other sources of information that overlap with the At-Issue Data.

162 Singer Report, ¶ 120.

163 Singer Report, ¶ 120.

164 *See*, *for example*, Weil, Roman L., Daniel G. Lentz and David P. Hoffman, *Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc., 2012, 5th Ed., Chapter 2, p. 5 ("[M]ost damages analyses require the use of assumptions and projections about what would have happened if the defendant had behaved differently.").

165 *See*, *for example*, Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2018, 8th Ed., p. 80 ("The equilibrium price and quantity depend on the position of the supply and demand curves. When some event shifts one of these curves, the equilibrium in the market changes, resulting in a new price and new quantity exchanged between buyers and sellers.").

relevant to the question of harm to the owners."[166] But this analogy underscores that Dr. Singer is not using an equilibrium-based framework: valuing the widgets solely from the owners' perspective excludes the entity's willingness to pay and therefore cannot represent a market equilibrium price.

93. In sum, Dr. Singer fails to calculate a market equilibrium price because he does not account for Meta's demand.

*2. Dr. Singer selectively invokes market-pricing principles without any economic basis to justify disregarding differences in individuals' willingness to accept*

94. Dr. Singer maintains that changes in the "market equilibrium price" are irrelevant because what matters is individuals' valuations. He applies the average (i.e., mean) of his estimated compensation across individuals and ignores differences in individual valuations that are necessary to assess Plaintiffs' theory of harm.[167] He claims that this average value "represents the market equilibrium price for Meta's access to the Healthcare Information" (or "Prescription Information") and further claims that "although the individual preferences may be heterogeneous, the underlying value is not."[168]

95. Dr. Singer's reasoning that "although the individual preferences may be heterogeneous, the underlying value is not" only holds under a market equilibrium framework. If—as Dr. Singer maintains—the relevant framework is individuals' valuations rather than a market equilibrium price, then relying on market equilibrium-based principles is irrelevant

166 Singer Report, ¶ 121 (emphasis in original).

167 Singer Report, ¶ 105 ("I do this computation by averaging the required Compensation across all respondents, consistent with the literature on privacy valuation, as detailed in Appendix 3.").

168 Singer Report, ¶ 112.

and inappropriate because it is a framework based on different assumptions.[169] A methodology based on individuals' valuations must be considered on its own merits, not on market equilibrium-based principles. Individuals' valuations inherently differ across Proposed Class Members, as Dr. Singer acknowledges.[170] Some Proposed Class Members may have been willing to provide their At-Issue Data without compensation and therefore would not have been harmed; for others who derived benefits from the personalized content enabled by data sharing that outweighed any potential cost, their valuations would actually be negative. This variation is also consistent with Professor Hauser's observation that a substantial portion of respondents in Dr. Singer's analysis reported a willingness-to-accept of at most zero dollars, while others reported a value of at least $20.[171] Given that individual preferences are heterogeneous, if Dr. Singer defines harm based on individuals' valuations, he has no basis to conclude that all Proposed Class Members (i.e., individual users) were harmed.

---

169 *See*, *for example*, Befurt, Rene, Felix Eggers and John R. Hauser, "Supply Side Considerations When Using Conjoint Analysis in Litigation," *(Forthcoming) Handbook of Marketing Analytics: Methods and Applications in Marketing, Public Policy, and Litigation*, May 2024, pp. 1-54 for a discussion of the assumptions underlying a model that assumes fixed supply (or demand, as applied to this matter), including p. 16 ("Price and sales are observed in the 'as is' world and are true by historical record. However, when predicting the price and quantities sold in the 'but for' world, the expert should decide whether and how to model how firms will adjust prices and quantities produced based on the interaction of demand (WTP) and the firm's ability to supply products. WTP can be an input to supply-side models, but WTP alone is not a supply-side model.") and p. 39 ("One fundamental assumption in [fixed supply pricing] is that the at-issue firm will supply exactly the same number of products in the 'but for' world as in the 'as is' world. This is an heroic assumption that is rarely tested. While the 'but for' world is, by definition, not observable, the expert might examine natural experiments where the firm changed its price, advertising, or product attributes to establish whether or not supply stayed constant.").

170 Singer Deposition, p. 431:1–14 ("Q. […] And some people care more about that and so much that they're willing to give more data access and others probably care less about that and say if that's the price of getting a better product, I'd rather give less data access; is that fair? […] A. There's variation among the partworth and the implied willingness to accepts across all respondents. I'm agreeing with you. There -- there's always going to be variation."), pp. 433:14–434:2 ("Q. Well, each individual respondent has their own valuation of the data and their own valuation of the benefit they get by sharing data, right? […] A. I think that they have different valuations, yes. We're talking about people lined up along a supply curve. Everyone on that supply curve has a different willingness to accept.").

171 I understand Dr. Singer's survey imposed a lower bound of $0 and an upper bound of $20. *See* Expert Report of John R. Hauser, SC.D., *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, December 9, 2025 ("Hauser Report"), Section VIII.

### 3. *Dr. Singer's assumption that there is a single market price for data for each Proposed Class does not reflect reality*

96. Dr. Singer's presentation and conclusions are premised on the idea that At-Issue Data can be viewed as a single undifferentiated product that can be assessed with a common market price for that data. This is not correct because the At-Issue Data are not a single undifferentiated product. Academic research has long recognized the challenge of valuing personal data, such as the At-Issue Data, because such information is complex and highly variable. As one survey of the literature explains, the interplay of privacy and personal information exhibits "peculiar characteristics" and does not function like a standard market, in part because no recognized market for personal data exists:

> For most products and services that economists traditionally study, the way to address these questions is generally self-evident: the market captures the accurate price of privacy and personal data, reflecting the reservation prices of different buyers (data holders) and sellers (data subjects). However, there is yet no open, recognized market for personal data in which data subjects themselves can participate.[172]

97. The value of personal data can depend on many factors, including individual preferences, whether the information is shared with others, and the tradeoff disclosure and the timing and magnitude of benefits the individual may receive in return.[173]

98. Dr. Singer's claim that the "required Compensation […] *pertains to all Class Members*, regardless of personal preferences" is at odds with basic economic principles regarding personal information.[174] He admitted in his testimony that no standard market exists for

---

172 Acquisti, Alessandro, Curtis Taylor and Liad Wagman, "The Economics of Privacy," *Journal of Economic Literature*, Vol. 54, No. 2, 2016 ("Acquisti et al. (2016)"), pp. 442-492, at pp. 446–447.

173 Spiekermann, Sarah, Rainer Böhme, Alessandro Acquisti and Kai-Lung Hui, "The Challenges of Personal Data Markets and Privacy," *Electronic Markets*, Vol. 25, No. 2, January 2015 ("Spiekermann et al. (2015)"), pp. 161-167, at pp. 5–6 ("Another economic challenge associated with personal data markets relates to how to value personal information. Due to context-dependence and contingencies that affect the costs and benefits arising from the protection or the sharing of personal information, evaluating personal data is notoriously difficult. Numerous experimental economic studies have attempted to capture price tags for personal data items […], but it is hard to map these data points into a consistent picture, due to heuristics and biases which may significantly affect individuals privacy choices, including in fact their valuations of their personal data[.] This task becomes even more difficult if one tries to crosscheck against prices in advertising or credit markets. [references omitted]."); Acquisti et al. (2016), at pp. 446–447.

174 Singer Report, ¶ 112 (emphasis in original).

A13-4188

the At-Issue Data,[175] yet he ignores the many factors that drive variation in value across individuals. Instead, he assumes that all At-Issue Data associated with Proposed Class Members within each of the three Proposed Classes have the same value, rendering his estimates unreliable.[176]

99. Dr. Singer uses widgets—identical, standardized goods such as ball bearings—to illustrate Proposed Class Members' willingness-to-accept to supply their At-Issue Data. But this analogy does not apply here.[177] The information allegedly transmitted to Meta varies substantially across Proposed Class Members. For example, as discussed in **Section III.A**, more than half of all sessions in the Offsite Signals sample data are consistent with misclicks and quickbacks, in which it is unlikely the alleged At-Issue Data was sent to Meta.

100. Adapting Dr. Singer's widget illustration to the facts of this case reveals why it fails. A more accurate analogy is that some Proposed Class Members would be selling very different kinds of widgets. Some would be selling plain, nondescript widgets (i.e., members who did not engage meaningfully with the at-issue healthcare entities' websites) while others were selling ornate, detailed ones (i.e., members who meaningfully engaged with the at-issue healthcare entities' websites). Some would sell only a single widget (members who visited the at-issue healthcare entities' website only once), while others would sell boxes of mixed widgets (members who frequently visited different at-issue healthcare entities' websites). Some would be selling widgets that buyers already owned (members who had publicly shared the same information on social media). Still others would not sell any widget at all (members who visited the at-issue healthcare entities' websites but did not result in a transmission of At-Issue Data due to misclicks or quickbacks, or the nature of transmitted data differed depending on if the member visited the websites to pay a bill,

---

175 Singer Deposition, pp. 169:18–170:3 ("Q. There is no market for the specific at-issue data that you're aware of that you could have turned to to use for your conjoint survey, correct? A. What […] I'll grant you is that there is no – there's no precise market. There's no market that precisely goes after this at-issue data."), pp. 418:17–419:2 ("Q. […] There's no real-world market you're aware of for the particular data that -- or at-issue data that you were testing, correct? A. I think that's fair, that for this particular at-issue data, I -- I don't think that there's a -- there's a market for that yet.").

176 Singer Report, ¶ 112.

177 Singer Report, ¶ 121.

A13-4189

look for a physician, or search for reasons unrelated to their own healthcare). Importantly, the values of these widgets vary across all of these dimensions. Yet Dr. Singer's analysis implicitly assumes that all such widgets can be valued using a single price without regard to differences in the quantity, quality, or other reasons related to the sale of the widget.

### C. Dr. Singer's Analysis Depends on Information Not Available in His Report and on Undisclosed "Analytical and Statistical Methods"

101. Dr. Singer states that he can calculate damages "if [he is] supplied with the number of months that each Class Member's At-Issue Data were accessed by Meta."[178] Yet he identifies no methodology for determining the number of months for any Proposed Class Member, nor does he point to any data that could support such a calculation. Thus, even apart from the numerous other flaws in his approach, Dr. Singer's methodology is incomplete.

102. Dr. Singer also claims that he can "estimate the number of months in which each individual Class Member's At-Issue Data were accessed by Meta" using unspecified "standard analytic and statistical methods."[179] Yet he provides no details in his report or at his deposition about how such an estimate could be conducted.[180] He also does not explain whether—or how—he would obtain the information required to perform his calculation.

103. Dr. Singer's failure to provide a methodology for calculating the number of months each Proposed Class Member's At-Issue Data were accessed is a glaring omission, given his damages formula. Without explaining what he would do, what data he will rely on, where he would obtain that data, or what assumptions he would make, it is impossible to assess whether his undisclosed analysis is reliable. His unknown method cannot be tested. Nor

[178] Singer Report, ¶ 113.

[179] Singer Report, ¶ 113, Footnote 141.

[180] Dr. Singer claimed that he "expected to have received that information from counsel" but was not provided this information. Singer Deposition, pp. 427:13–428:9 ("Q. […I]n your report when you signed your name to it, it was true that the plaintiffs' counsel had provided you with a preliminary estimate of the number of months that individual class members' at-issue data was allegedly accessed by Meta, correct? A. It was not true. That was placeholder language that should have been clipped out because it was written at a time when we expected to have received that information from counsel. Counsel informed me that they did not get the data from Facebook and we should have clipped it out and it just was an oversight. Q. Okay. So they never, ever provided you with that; is that correct? A. Correct.").

can it be evaluated for acceptance in the academic literature, or assessed for any identifiable or measurable error rate.

## VI. Mr. Zigrang's Damages Estimates Are Unreliable

104. Mr. Zigrang was assigned four tasks. First, he was asked to assess the feasibility of calculating "the value of the health information that Meta intercepted from Meta Healthcare Partner websites" and, if feasible, to calculate that value. Next, he was asked to assess the feasibility of calculating "the profits that Meta gained from obtaining data from Meta Healthcare Partner websites" and, if feasible, to calculate those profits.[181]

105. Mr. Zigrang's conclusions regarding both the value of the At-Issue Data and Meta's alleged profits from "obtaining" the At-Issue Data are not based on properly implemented methodologies.

### A. Mr. Zigrang Does Not Properly Implement His "Market Approach" Methodology for the Valuation of the At-Issue Data

106. Mr. Zigrang concludes that it is possible to calculate the value of data Meta allegedly intercepted from healthcare provider websites and proposes to estimate the "Fair Market Value" of that data using a "market approach."[182] He defines Fair Market Value as "the value from the perspective of a universe of potential willing buyers and sellers," and "the most probable price that the data would bring if exposed for sale on the open market."[183] Although Mr. Zigrang's description of a market-based approach is reasonable in concept, his actual implementation is flawed. He identifies 25 supposedly "comparable transactions" to estimate his "Fair Market Value" and (incorrectly) claims that individuals were compensated for their data in each of these "comparable transactions."[184] He further asserts that these transactions "include and reflect real-world, arm's-length transactions on the open market and the seller (i.e., the data owner) has knowledge that their browsing history is being tracked and data is being shared with the buyer" and thus provide a "reliable

181 Zigrang Report, p. 3.

182 Zigrang Report, p. 10.

183 Zigrang Report, p. 8.

184 Zigrang Report, p. 10, Schedule 1.

A13-4191

proxy comparable for the Fair Market Value" of the At-Issue Data.[185] Using the average and median from these supposedly "comparable transactions," Mr. Zigrang estimates a value of $8.76 to $9.49 for the At-Issue Data per class member per month, applied uniformly across all Proposed Class Members, regardless of whether they are a member of the Patient Status Button-Click Class, Patient Health Information Class, or Prescription Drug Information Class and regardless of what data are specifically at-issue for each Proposed Class.[186]

107. Mr. Zigrang does not properly implement a comparable transaction analysis in connection with his Fair Market Value valuation. One problem is that he fails to tailor his analysis of "comparable transactions" to the data relevant to each Proposed Class. Another related problem is that he fails to evaluate whether the nature of the data in his "comparable transactions" differs from the nature of the data allegedly transmitted to Meta. A third problem is that Mr. Zigrang fails to present a methodology to count the number of months by which he proposes to multiply his monthly compensation estimate. I explain these and other problems with Mr. Zigrang's "comparable transactions" methodology in this section.

108. Given these flaws, there is no basis for using the payment amounts he identified—or any average or median of these values—as a proxy for Fair Market Value. Because the underlying transactions are not comparable, averaging such wildly different and likely non-representative figures cannot reasonably be applied to calculate the value of the At-Issue Data or purported harm for the three Proposed Classes.

*1. Mr. Zigrang fails to tailor his analysis of "comparable transactions" to the data relevant to each Proposed Class*

109. As I explained above in my discussion of Dr. Singer's analysis, the value of personal data can depend on many factors, including the preferences of individuals and the type of data.[187] The first step in assessing the value, if any, of any data transmitted to Meta therefore is to identify what data were allegedly transmitted. Each of the three Proposed

185 Zigrang Report, p. 10.

186 Zigrang Report, p. 11.

187 *See* **Section V.B**.

A13-4192

Classes that Mr. Zigrang was asked to address involve distinct types of data.[188] The Patient Health Information Class allegedly involves "at least one communication or fact identifying a doctor, condition, or treatment," the Prescription Drug Information Class allegedly involves "communications with a prescription drug website for which they have a prescription," and the Patient Status Button-Click Class allegedly involves "at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click" sent by an at-issue healthcare provider website to Meta.[189] It follows that the analysis for each Proposed Class must therefore be tailored to the data relevant to that class.[190]

110. Mr. Zigrang fails to tailor his analysis of "comparable transactions" to the data relevant to each (or any) Proposed Class. Mr. Zigrang's report fails to define the data that were transmitted to Meta for any Proposed Class, and he further acknowledged in deposition that he does not know what data makes up the At-Issue Data at all, let alone what data are specific to each Proposed Class.[191] By applying the same value estimates to each of the three classes he analyzes (i.e., Patient Status Button-Click, Patient Health Information, and Prescription Drug Information Classes), Mr. Zigrang's analysis assumes without basis that all Proposed Class Members from these classes allegedly valued different data sent to Meta the same way.

188 Mr. Zigrang did not conduct an analysis related to the Patient Device Intrusion Class. *See* Deposition of Todd Zigrang, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, November 6, 2025 ("Zigrang Deposition"), p. 252:17-22 ("Q. Did you do any work to determine whether you should perform any additional procedures related to apportionment or modification of your overall number as it relates to the device intrusion class? [...] A. I did not.").

189 Motion for Class Certification, p. 13.

190 Plaintiffs' definition of The Patient Device Intrusion Class in their Motion for Class Certification does not indicate that At-Issue Data is relevant to the identification of Proposed Class Members. *See, for example,* Motion for Class Certification, p. 13 ("The Patient Device Intrusion Class – All Facebook users for whom Meta placed an _fbp cookie and/or used computing resources by sending data to Meta through their device and/or by computing Core Setup logic on their device while at a Healthcare Provider property." (emphasis removed)).

191 Zigrang Deposition, p. 92:16–13 ("Q. Oh so you don't know what the word health information you use in here you're going to rely on Plaintiff definition for 'health information'; is that correct? […] A. That's correct. I am to opine on what my client is alleging."), p. 97:18–23 ("Q. So you don't know what other information gathered from the Meta collection tools from healthcare partners web pages may be included in addition to the 7 things listed here; correct? […] A. That's correct."), p. 120:5–11 ("Q. Have you seen any of the data underlying these categories of health information collected? A. I have not, no. Q. Have you seen any examples or samples of the data in this case? A. No.").

### 2. *Mr. Zigrang's "comparable transactions" are inappropriate proxies for the Fair Market Value because the nature of the "comparable transactions" is different than the data allegedly transmitted to Meta*

111. Mr. Zigrang identifies a set of purportedly comparable transactions in Schedule 1 of his report. As discussed above, he claims these real-world transactions serve as proxies for the value of the At-Issue Data for members of the three Proposed Classes.[192] For each of his 25 transactions, he extracts a dollar value from his chosen source and then uses these rates to compute average and median values.[193]

112. Any methodology that relies on "comparable transactions" to value the At-Issue Data must first establish that the data involved are truly comparable. Standard valuation practice requires that comparable transactions involve "very similar assets (ideally identical)" to the transaction being valued.[194] Mr. Zigrang himself acknowledges this principle by quoting "four pillars" that influence the value of data from an Ernst & Young article:[195]

> "• Nature (data type, availability, exclusivity, granularity and source)
> • Data quality, maturity and embedded analytic insight (is the data raw, curated, aggregated longitudinally, analyzed?)

---

192 Zigrang Report, p. 10.

193 Mr. Zigrang reports the average and median of the 25 "comparable transactions," which exclude outlier values and apportion incentive payments. He also presents average and median values that include outlier values and remove incentive payments. Incentive payments are typically one-time rewards that compensate users for completing initial steps, such as installing or activating the software or providing consent. These payments are distinct from recurring monthly payments that directly correspond to ongoing data sharing. Zigrang Report, Schedule 1, Notes 1–2 ("1 Amount in Column C, adjusted to a per user per month rate. This rate includes and apportions out any one-time, non-recurring payments (e.g., install and activate incentive payment, consent payment). 2 Amount in Column C, adjusted to a per user per month rate. This rate does not include any one-time, non-recurring payments (e.g., install and activate incentive payment, consent payment).").

194 *See, for example,* "International Valuation Standards," *International Valuation Standards Council*, January 31, 2025, available at https://viewpoint.pwc.com/dt/gx/en/ivsc/international_valuat/assets/IVS_effective_31_January_2025.pdf, p. 37 ("The valuer should choose comparable transactions within the following context: […] (b) evidence from transactions of very similar assets (ideally identical) provides a better indication of value than assets where the transaction prices require significant adjustments. […] Examples of common differences that could warrant adjustments may include, but are not limited to: (a) material characteristics (age, size, specifications, etc), (b) size adjustments […] (e) geographical location (location of the asset and/or location of where the asset is likely to be transacted/used) and the related economic and regulatory environments, […] (i) types of collateral, (m) ownership characteristics (eg, legal form of ownership, amount percentage held)."); Zigrang Report, pp. 9–11.

195 Zigrang Report, p. 9, quoting Spence, Pamela, "How We Can Place a Value on Health Care Data," *Ernst & Young*, July 19, 2019, available at https://www.ey.com/en_gl/insights/life-sciences/how-we-can-place-a-value-on-health-care-data.

• Complexity of data capture (open source or paid, auto-collected or not?)
• Use/application (The data's potential impact, limitations on its use)."

113. Despite invoking these "four pillars," Mr. Zigrang did not apply them in his analysis and failed to account for the differences between his purported comparable transactions and the At-Issue Data.[196] In fact, he repeatedly testified during his deposition that he does not know what the At-Issue Data are or what they mean.[197] This is a significant admission because, as a basic economic principle, one must understand the asset being valued in order to identify comparable transactions.[198] Mr. Zigrang omitted this critical step.

114. Had Mr. Zigrang evaluated and applied the four characteristic pillars, it would have revealed that his purported "comparable transactions" differ substantially from the At-Issue Data.

115. In the remainder of this section, I detail the many ways in which these purported "comparable transactions" differ from the At-Issue Data. **Table 1** below summarizes the type of data exchanged, if any, in each of Mr. Zigrang's 25 "comparable transactions."

---

[196] Zigrang Deposition, p. 144:5–19 ("Q. […] You did not actually do an assessment of how the at-issue data may have varied from the characteristics of the data in your comparable; right? […] A. That's not entirely true. […] So all that was considered, but, again, is not applicable based upon the market comparable transactions I utilize to quantify this value."), p. 144:20–145:1 (Q. So safe to say whether you actually looked at these pillars in connection with this case, they weren't relevant to you in connection with your valuation based on comparators of pure browsing data? A. I didn't say they weren't relevant, just they didn't rise to the level of impacting the value based upon the nature.").

[197] Zigrang Deposition, p. 92:6–13 ("Q. Oh so you don't know what the word health information you use in here you're going to rely on Plaintiff definition for health information; is that correct? […] A. That's correct. I am to opine on what my client is alleging."), p. 98:12–17 ("Q. So you don't know what other information gathered from the Meta collection tools from healthcare partners web pages may be included in addition to the 7 things listed here correct? … A. That's correct."), p. 120:6–11 ("Q. Have you seen any of the data underlying these categories of health information collected? A. I have not, no. Q. Have you seen any examples or samples of the data in this case? A. No.").

[198] Mr. Zigrang relies on the "Market Approach" for his comparable transactions analysis. This approach is a common valuation method premised on comparing the subject asset to other assets that are "sufficiently comparable" in nature and characteristics. Applying this method therefore requires a detailed understanding of the asset being valued so that adequate comparisons can be drawn. *See also* Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, John Wiley & Sons, Inc., 3rd Ed., p. 19 ("In relative valuation, the value of an asset is derived from the pricing of comparable assets, standardized using a common variable such as earnings, cash flows, book value, or revenues."); "Market Valuation Approach," *Corporate Finance Institute*, available at https://corporatefinanceinstitute.com/resources/valuation/market-approach-valuation/; Zigrang Report, pp. 9–11.

**Table 1: Type of Data Transmitted in the Transactions in Mr. Zigrang's Schedule 1**

| Company Name | Type of Data Transmitted (Schedule 1 Transaction #) |
|---|---|
| Reklaim, fka Killi | Device location, device information, app usage data, demographic details, and responses to survey questions (1, 2, 3, 4) |
| Google Screenwise | Web usage information, for example details on the websites visited (5, 6) |
| Caden | Personal data from websites such as Amazon, Netflix, and Uber (7) |
| Permission Research (ComScore) | Web browsing and app usage activities such as the websites visited, time spent on different websites, the applications used, videos streamed, etc. (8) |
| Datacoup | Online accounts (including Facebook, Google, Twitter, LinkedIn, Foursquare, Instagram, Tumblr, Last.fm and Meetup), debit and credit card transaction information (9, 16) |
| Nielsen | Internet usage, such as websites visited and time spent online (10) |
| Embee | Information such as phone call and internet browsing session durations, text message time stamps, battery life, and network speed (11) |
| UpVoice | Activity on accounts such as Facebook, Twitter, YouTube, LinkedIn, and Amazon, specifically capturing details on advertisements shown to users (12) |
| SavvyConnect | Information on individuals' internet searches, online shopping, and how they use specific apps (13) |
| EU Subscriptions for No-Ad Facebook & Instagram | Transaction concerns ad-free experience and not transmission of data (14, 15, 22) |
| Reputation | Transaction concerns removal of personal data from sites, and not transmission of data (17) |
| YouGov | Data transmitted via survey and polls (18) |
| Facebook Research App | Phone and web activity (19, 20, 21, 23, 24) |
| Honeygain | Transaction concerns sharing of internet bandwidth only, and not transmission of data (25) |

**Note**: The 25 "comparable transactions" included in Mr. Zigrang's Schedule 1 correspond to 14 companies and multiple transactions relate to the same company. The transaction number as provided in Mr. Zigrang's Schedule 1 is listed in the Type of Data Transmitted column. *See* **Appendix C** for sources.

**A13-4196**

116. First, many of the transactions Mr. Zigrang identifies as comparables do not involve compensation for data at all, or, at best, compensate individuals for data *and* other actions. For example, Honeygain compensates its users for sharing their unused internet bandwidth by routing traffic through their connection;[199] no personal data are exchanged. YouGov compensates its users for taking surveys and polls.[200] Killi compensates its users both for sharing data and for completing surveys.[201] In transactions involving Meta, users were compensated for the time required to install and activate the app and complete surveys, not for data sharing; users were compensated regardless of whether they provided data to Meta in these transactions.[202] Compensation tied to active participation reflects, at least in part, compensation for individuals' time and therefore the transactions cannot proxy for the At-Issue Data. Collectively, these examples account for nine of Mr. Zigrang's 25 "comparable transactions."

117. Second, none of Mr. Zigrang's 25 purported "comparable transactions" relate to healthcare information. Instead, they involve data from a wide range of digital activity, including social media interactions, web browsing, mobile app usage, and device-level metrics. For

199 "How Does Honeygain Work?," *Honeygain*, available at https://support.honeygain.com/hc/en-us/articles/4412690090898-How-does-Honeygain-work ("When you install the app, it securely utilizes your unused bandwidth for data intelligence tasks, such as web crawling and content delivery. Your privacy is protected, and you earn credits for the data shared. The app runs in the background, and you can convert your credits into real money once you reach the minimum payout threshold of $20.").

200 Weiss, R.J., "YouGov Review: Is It Legit? Here's Exactly How Much I Made," *The Ways to Wealth*, June 2, 2024, available at https://www.thewaystowealth.com/yougov-review/ ("YouGov is an international research and analytics firm based in the United Kingdom. Boasting a panel of over 9 million members across six countries, this research organization claims to be one of the world's largest research networks. How does YouGov gather its research information? One way is by rewarding survey participants with points that can be redeemed for cash and gift cards.").

201 "Killi Overview," *Insight Partners*, available at https://www.insightplatforms.com/platforms/killi/ ("Killi is a smartphone and tablet based app through which consumers share their data and take surveys in exchange for compensation. Data collected and shared through the app includes device location, profiling info such as demographics, device information (make, model, OS), app usage data and responses to survey questions.").

202 Deposition of David Abdul-Malak, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, May 21, 2025 ("Abdul-Malak Deposition"), p. 26:11–19 ("Q. If a person was being -- was using the Viewpoints app, were they paid to be a user of it, to respond to surveys, for example? […] A. Participants would have been paid for the actions they took and their time and participation."); Meta, "Email Chain between Maya Fitzgerald, Gal Cerf, Nivi Arunachalam, Erez Naveh," June 15, 2021, PL-EXPERT-ZIGRANG_002889-892, at 889 ("Complete the [Viewpoints] program to earn [1,000] points. The program should take about [20] minutes."); Meta Viewpoints, "Shaping Technology Together," PL-EXPERT-ZIGRANG_002592-597, at 594 ("Get rewarded for your participation […] You'll receive rewards for completing programs.").

example, Datacoup gathers information from its users' social media accounts and financial transactions,[203] while Google Screenwise and Permission Research collect data on websites visited, time spent online, and app engagement.[204] Embee and Reklaim receive device information, call durations, app activity, and demographic data,[205] and UpVoice collects data on its users' behavior on sites such as Facebook, YouTube, and others.[206] Mr. Zigrang acknowledged that "[n]one of [the 25 transactions] speaks specifically to health data exclusively."[207] As a result, these transactions cannot serve as proxies for the At-Issue Data allegedly transmitted to Meta.

203 Brewster, Tom, "Meet Datacoup – The Company That Wants to Help You Sell Your Data," *The Guardian*, September 5, 2014, available at https://www.theguardian.com/technology/2014/sep/05/datacoup-consumer-sell-data-control-privacy-advertising ("First, there's the main account page, where the user selects which online accounts they're happy for Datacoup to extract data from. These include Facebook, Google, Twitter, LinkedIn, Foursquare, Instagram, Tumblr, Last.fm and Meetup, which lets people easily organise meetings around special interests. It's also possible to share transaction data from credit and debit cards. Datacoup promises to do so securely and sharing this information will be rewarded with higher earnings.").

204 Marshall, Jack, "Google Pays Users for Browsing Data," *Digiday*, February 10, 2012, available at https://digiday.com/media/google-pays-users-for-browsing-data/ ("Google is building an opt-in user panel that will track and analyze people's online behaviors via an extension to its Chrome browser, called Screenwise. Users that install the plug-in will have the websites they visit and the ways in which they interact with them recorded, and they will then be paid with Amazon gift cards worth up to $25 a year in return."); Drake, Tom, "PermissionResearch Review: How It Works and How Much Can You Make?," *Get Rich Slowly*, November 15, 2020, available at https://www.getrichslowly.org/permissionresearch-review/ ("PermissionResearch is a market research program run by ComScore. It lets you share your online activities to help companies understand internet trends. […] When you join, you install software on your devices. This tracks your web browsing and app usage.").

205 Blake, Tom, "Mobile Performance Meter Review – Is It Legit & Worth Using?," *The Budget Diet*, available at https://www.thebudgetdiet.com/mobile-performance-meter ("Mobile Performance Meter is an app that pays you for running in the background of your phone. You don't have to interact with the app, answer surveys, or do anything to earn, so it essentially pays you to do nothing and for selling your data. According to Mobile Performance Meter, also known as Embee Mobile, the entire point of this app is to provide market research data for mobile carriers like Verizon and AT&T."); Hoyt, Bobby, "Get Paid for Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/ ("The Embee Mobile Performance Meter is another data collection app and it runs in the background and passively collects data on network performance and how you use your phone. It collects data for everything like duration of your phone calls, time and date of text message, battery life, duration of your internet browsing sessions, and network speed.").

206 Nathaniel, Tom, "Upvoice Review: $75 to Do Nothing?," *Lush Dollar*, September 11, 2023, available at https://lushdollar.com/upvoice-review/.

207 Zigrang Deposition, pp. 157:25–158:17 ("Q. Which, if any of these transactions involving [sic] health information as we defined it earlier on page 6 of your report? A. They do not specifically cite to health information […] Q. I'm not asking what your methodology is. I'm asking you which if any of these 25 transactions involving [sic] health data? A. None of them speaks specifically to health data exclusively.").

A13-4198

118. Rather than examining the differences between the data in his purported "comparable transactions" and the At-Issue Data, or attempting to adjust for those differences, Mr. Zigrang simply asserts that "an individual's health data is worth 10 to 20 times more than their credit card number on the black market."[208] This claim is misleading and inaccurate. Mr. Zigrang cites an article from the National Association of Healthcare Access Management stating that "personal medical data is said to be more than ten times as valuable as credit card information" because fraudulent billing using stolen medical information is harder to detect than fraudulent credit card charges.[209] This statistic is irrelevant here: the At-Issue Data are not being used to fraudulently bill providers, and none of Mr. Zigrang's purported "comparable transactions" focused on credit card information. Comparing medical information used in fraud schemes to stolen credit card information has no bearing on the value of the data allegedly transmitted to Meta or on the comparability of Mr. Zigrang's "comparable transactions."

119. For several of the transactions Mr. Zigrang identifies, the underlying sources provide no information about the type of data shared by individuals. For example, three of his purported comparable transactions involve the smartphone and tablet app Reklaim, which offers different compensation tiers, allegedly in exchange for data.[210] The source, however, does not specify what information individuals provide at any of the three tiers, making it impossible to compare these data to the At-Issue Data.[211] Nonetheless, Mr. Zigrang uses all three Reklaim tiers in his analysis without explaining whether any of them involve data substantially (or at all) similar to the At-Issue Data.

120. Despite the differences in why a company compensates its users, Mr. Zigrang includes all the above transactions in his analysis and assumes that the payments are comparable to compensation for the At-Issue Data. By ignoring the differences and making no

208 Zigrang Report, p. 10.

209 Zabel, Laurie, "The Value of Personal Medical Information: Protecting Against Data Breaches," *Naham*, available at https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information.

210 Zigrang Report, Schedule 1 (Transactions 1, 2, 3).

211 Lazarus, David, "This Company Will Pay You to Share Your Data. Is It Worth It?," *Los Angeles Times*, December 1, 2020, available at https://www.latimes.com/business/story/2020-12-01/column-privacy-money-for-data-sharing.

adjustments to account for them, his analysis is not credible according to even his own professed standard as well as accepted standard valuation practices.[212]

*3. Mr. Zigrang's methodology fails to identify and count the number of months that his monthly compensation estimate should be applied to for each Proposed Class Member in each of the Proposed Classes*

121. Mr. Zigrang states that he derived an estimated value between $8.76 and $9.49 "per user, per month" from comparable transactions and that "[t]his monthly rate would need to then be multiplied by the number of months in which a Class Member visited a Healthcare Partner's website."[213] As in Dr. Singer's analysis,[214] Mr. Zigrang provides no analysis, data, or methodology for determining how many months a Proposed Class Member actually interacted with a partner's website. Without identifying these months, or this methodology, it is impossible to apply his per-month estimates to calculate class-wide damages.

*4. Mr. Zigrang's "comparable transactions" are inappropriate proxies for the Fair Market Value of the At-Issue Data for several other reasons*

122. In addition to the problems outlined above, there are several other reasons why Mr. Zigrang's purported "comparable transactions" are not reliable proxies for the Fair Market Value of the At-Issue Data.

123. First, nine of Mr. Zigrang's 25 "comparable transactions" are anecdotal estimates gathered from blog posts and third-party websites that contain unverified, non-representative

212 "International Valuation Standards," *International Valuation Standards Council*, January 31, 2025, available at https://viewpoint.pwc.com/dt/gx/en/ivsc/international_valuat/assets/IVS_effective_31_January_2025.pdf, p. 37 ("Examples of common differences that could warrant adjustments may include, but are not limited to: (a) material characteristics (age, size, specifications, etc), (b) size adjustments … (e) geographical location (location of the asset and/or location of where the asset is likely to be transacted/used) and the related economic and regulatory environments, … (i) types of collateral, (m) ownership characteristics (eg, legal form of ownership, amount percentage held)."); Weil, Roman L., Daniel G. Lentz and David P. Hoffman, *Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc., 2012, 5th Ed., Chapter 10, pp. 21–22 ("[Adjustments to value] usually occur […] because the data or benchmarks used in models often lack a precise similarity to the subject asset.").

213 Zigrang Report, p. 11.

214 *See* **Section V.C**.

A13-4200

compensation figures, which are often overstated.[215] For example, he uses an estimated payment of $60 per year ($5 per month) for Nielsen, allegedly paid to individuals who download software that tracks their internet usage.[216] This estimate is from a blog post on sidehustlenation.com, which merely states that people could earn points that are "worth up to $60 per year."[217] The blog post author does not specify whether all individuals actually receive $60, or what information is collected. Mr. Zigrang nevertheless treats this anecdotal $60/year estimate—one *not* presented as an accurate approximation of compensation earned by all Nielsen users—as a valid proxy for all Proposed Class Members in each of the three Proposed Classes. Mr. Zigrang admitted in deposition that he relied on unverified online sources, including personal blog posts like sidehustle.com, and made no effort to confirm the accuracy or reliability of the information they contained.[218]

124. As another example, Mr. Zigrang relies on the website *Millennial Money Man* for compensation figures related to Reklaim and SavvyConnect. The post states that Reklaim users can earn points worth "up to $10 a week" for sharing demographic data, device information, and web browsing activity.[219] Mr. Zigrang again uses the maximum possible amount—equivalent to $43.33 per month—as a "comparable transaction" for all Proposed

---

215 *See* Zigrang Report, Schedule 1 (Transactions 4, 7-8, 10-13, 16, 22); Hoyt, Bobby, "Get Paid for Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/; Loper, Nick, "14 Real Ways to Get Paid for Your Data: Up to $500 a Year," *Side Hustle Nation*, available at https://www.sidehustlenation.com/get-paid-for-your-data/; Schechner, Sam, "Meta Plans to Charge $14 a Month for Ad-Free Instagram or Facebook," *The Wall Street Journal*, October 3, 2023, available at https://www.wsj.com/tech/meta-floats-charging-14-a-month-for-ad-free-instagram-or-facebook-5dbaf4d5.

216 Zigrang Report, Schedule 1; Loper, Nick, "14 Real Ways to Get Paid for Your Data: Up to $500 a Year," *Side Hustle Nation*, available at https://www.sidehustlenation.com/get-paid-for-your-data/.

217 Loper, Nick, "14 Real Ways to Get Paid for Your Data: Up to $500 a Year," *Side Hustle Nation*, available at https://www.sidehustlenation.com/get-paid-for-your-data/.

218 Zigrang Deposition, p. 170:21–25 ("Q. So you relied upon an article written by a columnist David Lazarus who he almost admitted he did not verify the accuracy of certain information related to the transaction right? A. That's correct."), p. 182:15–18 ("Q. Did you take any steps to verify whether this blog post accurately described the terms of using the Reclaim [sic] by Killi app? A. I did not."), p. 211:2–7 ("Q. I assume you didn't look at underlying terms and conditions, didn't speak to Caden and didn't do anything to vet the information in the Side Hustle article about Caden; correct? […] A. That's correct.").

219 Hoyt, Bobby, "Get Paid for Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/ ("Earn up to $10/week in cryptocurrency or gift cards […] The app has many different ways to get paid: Sharing your demographic profile […] Sharing information about your device […] Downloading and browsing through the Reklaim Chrome Extension.").

A13-4201

Class Members. The same blog post states that SavvyConnect users can earn "up to $180/year"—equivalent to $15 per month—for installing an app that collects data about searches, online shopping, entertainment, and other app activity.[220] Mr. Zigrang offers no support for his assumption that all SavvyConnect users receive these maximum payments. As such, these anecdotal, upper-bound estimates are not representative of the compensation on the sites themselves, let alone reliable proxies for the value of the At-Issue Data, and as Mr. Zigrang acknowledged, they could overestimate the payments received by individuals.[221]

125. Second, at least four of Mr. Zigrang's purported comparables do not compensate people directly in dollars. Reklaim, Nielsen, and the Facebook Research App (Transactions 4, 10, 19, and 24 in Mr. Zigrang's Schedule 1) require individuals to accumulate points redeemable for non-monetary payments such as gift cards or cryptocurrency when the individual has reached a certain points threshold.[222] The cash-equivalent value of these rewards depends on program rules and individuals' behavior, so assuming a one-to-one dollar conversion may not represent the actual cash-equivalent compensation.[223]

---

[220] Hoyt, Bobby, "Get Paid for Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/ ("You can earn up to $180 per year with SavvyConnect, making it one of the highest-paying data collection apps. You earn around $5/month per device, so installing on your phone, tablet, and desktop is $15/month multiplied by 12 months for $180/year."). The same blog post also reports a payment of "$93 and up" for UpVoice. Mr. Zigrang extrapolates this minimum amount as relevant to all users of UpVoice. In other words, he relies on upper bound figures in three instances (Nielsen, Reklaim and SavvyConnect), but on a lower-bound figure in only one instance (UpVoice).

[221] Zigrang Deposition, p. 208:13–16 ("Q. And by using an upper bound, you would agree you could be overestimating how much users on this site receive on average for using it; correct? A. Potentially.").

[222] Zigrang Report, Schedule 1 (Transactions 1, 2, 3, 10, and 18).

[223] *See, for example,* Hoyt, Bobby, "Get Paid for Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/ ("You can expect to get paid up to $10 a week in points, and the more you share on the app, the more you can earn. Remember Reklaim doesn't pay cash or PayPal, but you can convert [your] points for cryptocurrency or gift cards."); Loper, Nick, "14 Real Ways to Get Paid for Your Data: Up to $500 a Year," *Side Hustle Nation*, available at https://www.sidehustlenation.com/get-paid-for-your-data/ ("Nielson Computer and Mobile Panel […] Earn up to $60 in free Amazon gift cards every year."); Meta, "Statement of Work for Smartphone Usage Study," 2018, PIXEL_HEALTH001284346-348 at 347 ("Incentive […] $20 Amazon gift card […] $10 Amazon gift card").

126. Third, several platforms impose transaction fees when people redeem rewards. For example, Reklaim charges "a small fee" for PayPal or Venmo redemptions,[224] and Honeygain charges "USD 2.00 + 2% up to USD 3.00" to U.S. residents for PayPal cashouts.[225] By ignoring these fees and relying on upper bound payout amounts, Dr. Zigrang overstates actual compensation that would be received even if the underlying amounts were accurate.

127. Fourth, Mr. Zigrang provides no analysis comparing the *volume* of data shared in his "comparable transactions" with the volume of the At-Issue Data allegedly transmitted to Meta. In the case of SavvyConnect, compensation varies based on the number of devices the platform's app is installed on, and SavvyConnect provides monthly incentives only if it receives "at least 7 days of actual usage data (per device) per calendar month."[226] Yet Mr. Zigrang provides no basis for assuming that the dollar amounts individuals receive each month in his "comparable transactions" bear any relationship to the volume of the At-Issue Data transmitted by websites to Meta.

128. Fifth, at least nine of the transactions involve compensation available only for a short period, some of which were prior to the Proposed Class Period, and therefore do not offer

224 "Redeem Your Goal Now," *Reklaim*, available at https://www.reklaimyours.com/redeem ("Redeem your Reklaim rewards directly to your PayPal or Venmo account! Ensure your primary email on Reklaim matches your PayPal for seamless transactions. Please note, a small fee applies for this convenient cash-out option.").

225 "What Are the Payout Fees?," *Honeygain*, available at https://support.honeygain.com/hc/en-us/articles/4412743372690-What-are-the-payout-fees ("Please note that there are certain fees applied to payouts done using PayPal by our payout provider Tipalti. The fees are as follows: [] US resident USD 2.00 + 2% up to USD 3.00.").

226 "SavvyConnect Monthly Participation Requirements," *Survey Savvy*, available at https://surveysavvy.com/savvyconnect-requirements/.

A13-4203

a "fair market value."[227] For example, Mr. Zigrang includes an $8 per month Datacoup payment from a 2014 trial program compensating individuals for social media and credit card transactions data.[228] Datacoup later revised its compensation to $1.10 per week ($4.77 per month) in 2017.[229] Mr. Zigrang nevertheless uses both figures as separate transactions, including the higher trial rate that the company initially paid before establishing a customer base and determining that the "current demand in the marketplace" supported the lower compensation amount.[230]

129. Sixth, at least two of Mr. Zigrang's comparables were discontinued during the Proposed Class Period, including UpVoice, which shut down in 2022, and Google Screenwise, which was discontinued in 2020.[231] Like short-lived programs, these discontinued offerings likely did not correspond to a "fair market value" because the business model and compensation structure were not viable.

---

227 At least nine transactions were for compensation that was only offered for 3 years or less. *See, for example,* Zigrang Report, Schedule 1 (Transactions 7, 9, 14-15, 19-21 23-24); "Launch Day!," *Caden*, March 21, 2023, available at https://www.caden.io/blog-posts/caden-launch-day; Simonite, Tom, "Sell Your Personal Data for $8 a Month," *MIT Technology review*, February 12, 2014, available at https://www.technologyreview.com/2014/02/12/174259/sell-your-personal-data-for-8-a-month/; Fane, Kate, "How Much is Your Personal Data Really Worth?," *Vice*, August 22, 2017, available at https://www.vice.com/en/article/how-much-is-is-your-personal-data-really-worth/; "Facebook and Instagram to Offer Subscription for No Ads in Europe," *Meta*, November 12, 2024, available at https://about.fb.com/news/2024/11/facebook-and-instagram-to-offer-subscription-for-no-ads-in-europe/; Meta, "Statement of Work for Facebook Metered Panel," 2016, PIXEL_HEALTH001284080-083 at 081, 083; Meta, "Statement of Work for Smartphone Usage Study December 18, 2017," 2017, PIXEL_HEALTH001219572-577 at 572; Meta, "Statement of Work for Smartphone Usage Study," 2018, PIXEL_HEALTH001284346-348 at 347.

228 Zigrang Report, Schedule 1 (Transaction 16); Simonite, Tom, "Sell Your Personal Data for $8 a Month," *MIT Technology review*, February 12, 2014, available at https://www.technologyreview.com/2014/02/12/174259/sell-your-personal-data-for-8-a-month/.

229 Zigrang Report, Schedule 1 (Transaction 9); Fane, Kate, "How Much is Your Personal Data Really Worth?," *Vice*, August 22, 2017, available at https://www.vice.com/en/article/how-much-is-is-your-personal-data-really-worth/.

230 Davidson, Jacob, "Forget Facebook, Meet the Company That Will Pay You for Your Personal Data," *Money*, September 4, 2014, available at https://money.com/datacoup-facebook-personal-data-privacy/; Broek, Stef Van Den, "Datacoup: Selling Personal Data in the Age of Acxiom," *Masters Of Media*, September 16, 2014, available at https://mastersofmedia.hum.uva.nl/2014/09/datacoup-selling-personal-data-in-the-age-of-acxiom/ ("[E]very data attribute has a high, medium, or low value given to it. This value is determined by the current demand in the data marketplace for that attribute.").

231 "Reviews of UpVoice," *Chrome-Stats*, available at https://chrome-stats.com/d/ldemaeidicoeoppeeefcfcmnieobjdho/reviews?hl=en; Allison, Michael, "Google Winds Down Program that Let You Trade Usage Data for Gift Cards," *Android Central*, November 4, 2020, available at https://www.androidcentral.com/google-winds-down-its-screenwise-meter-app.

**A13-4204**

### B. Mr. Zigrang's Profit Disgorgement Methodologies are Based on an Inaccurate and Naïve Understanding of How Meta's Ad Delivery Works and How Its Auction Design Impacts Revenues

130. Mr. Zigrang claims to estimate alleged profits to be disgorged by using Meta's ad revenues associated with advertisers classified in internal Meta "health" sub-verticals and revenues from ads classified internally as "health."[232] He proposes three methodologies:

a. First, Mr. Zigrang presents what he characterizes as a "lower bound" estimate that relies on the total U.S. revenue from advertisers associated with select sub-verticals, which are categories defined and used internally by Meta.[233] From these ad revenues, Mr. Zigrang estimates disgorged profits to be $8.3 million per month for a "Healthcare Provider Class"—which Mr. Zigrang creates himself by combining the Patient Status Button-Click and Patient Health Information Classes[234]—and $20.9 million per month for the Prescription Drug Information Class.[235]

---

232 Zigrang Report, p. 14. Mr. Zigrang provides damages estimates that include Plaintiffs' Patient Device Intrusion Class, but he was not asked to provide apportioned damages for the class separate from the other three classes. Zigrang Report, Footnote 18 ("Note that while the Healthcare Provider Class and Prescription Drug Class are specifically discussed herein, particularly as applies to the apportionment of Meta's profits, the disgorgement of profits applies to the Device Intrusion Class (i.e., the first class identified above in Section IV) as well."); Zigrang Deposition, pp. 252:6–253:11 ("Q. Regarding that footnote, what's your understanding of how disgorgement of profits applies to the device intrusion class? [...] A. I understand that from the client that the entirety of the disgorgement may be applied to that class. [...] Q. Did you do any work to determine whether you should perform any additional procedures related to a portion meant or modification of your overall number as it relates to the device intrusion class? [...] A. I did not. Q. Do you know what would be disgorged for that class? [...] A. I do not. Q. Do you know how what would be disgorged is different for the other classes? [...] A. I do not. Q. Did you do any work to try and figure that out? [...] A. I was not requested outside the scope of my engagement.").

233 The three sub-verticals used by Mr. Zigrang are "Health Systems and Practitioners," "Residential, Long-term Care Facilities and Outpatient Care Centers," and "Prescription Drug," all of which fall within the "Health" vertical. *See* Zigrang Report, pp. 15–17, Schedule 2.

234 Zigrang Report, p. 17 ("A Lower Bound Estimate for the Patient Button-Click Class and Patient Health Information Class of $8.26 million per month during the Class Period."), Schedule 2.

235 Zigrang Report, p. 17 ("A Lower Bound Estimate for the Prescription Drug Information Class of $20.93 million per month during the Class Period."), Schedule 2.

A13-4205

b. Second, he proposes a "middle bound" estimate that would rely on all revenue associated with a set of pixel IDs and within a particular internal classification.[236] He provides no numerical estimates for this approach.[237]

c. Third, he presents an "upper bound" estimate based on ad revenues that are purportedly classified internally by Meta as health-related.[238] These are a single daily value for global revenue figures that Mr. Zigrang adjusts to approximate monthly U.S.-only revenues, resulting in estimates of $17.6 to $18.3 million per month for the combined Patient Status Button-Click and Patient Health Information Classes, and $23.3 to $24.3 million per month for the Prescription Drug Information Class.[239]

131. All three of Mr. Zigrang's methodologies assume that but for the alleged data sharing, Meta would not have received any revenue from the advertising sources he analyzed. This is not the correct way to calculate Meta's purported profits. The proper method is to compare profit in the actual world with profit in the but-for world where the alleged conduct is assumed not to have occurred.[240] Accordingly, if any profit earned in the actual world would still be earned in the but-for world, then there is no damage related to that profit. Mr. Zigrang's method instead presumes that absent the alleged data sharing, Meta users who received a health-related ad or an ad from a healthcare provider would not have been

236 Zigrang Report, p. 14.

237 Zigrang Report, p. 17.

238 Zigrang Report, pp. 14, 18.

239 Zigrang Report, pp. 19, 21.

240 Weil, Roman L., Daniel G. Lentz and David P. Hoffman, *Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc., 2012, 5th Ed., Chapter 2, p. 5 ("Plaintiffs often claim lost profits in business litigation, measured as the amount by which the plaintiff's actual earnings fall short of the earnings that would have occurred but for the defendant's illegal actions. Practitioners most often state this formula as the difference between but-for profits (i.e., those that the plaintiff would have earned but for the defendant's improper act) and actual profits. Disgorgement of a wrongdoer's ill-gotten gains or profits is often an alternative to a plaintiff's lost profits. More generally, most damages analyses require the use of assumptions and projections about what would have happened if the defendant had behaved differently.").

A13-4206

served any other profit-generating ad.[241] This assumption is wrong for several reasons. By failing to adjust for revenues Meta would have earned in the but-for world, Mr. Zigrang's methodology overstates Meta's purported profits from the alleged conduct.

*1. Mr. Zigrang fails to tailor his profit disgorgement methodologies to the data relevant to each Proposed Class*

132. As with his "comparable transactions," Mr. Zigrang fails to tailor his profit disgorgement methodologies to the data relevant to each Proposed Class. Mr. Zigrang reports estimates for "Patient [Status] Button-Click Class and Patient Health Information Class," but he does not report an estimate specific to each Proposed Class.[242] In deposition, Mr. Zigrang admitted that he did not estimate separate damages values for the two Proposed Classes.[243] By not providing a methodology to calculate alleged harm specific to each Proposed Class, Mr. Zigrang's analysis is incomplete.

*2. Mr. Zigrang's methodology overestimates damages because it misunderstands how a change in an advertiser's "total value" for an ad slot could affect Meta's revenue, if at all*

133. In this section, I explain how Meta's targeting, ad delivery, and auction design works. I then explain why Mr. Zigrang's misunderstanding of this process causes him to overstate his profit disgorgement estimate.

a. Overview of Meta's targeting, ad delivery, and auction design process

134. I understand ads on Meta's services are generally purchased and priced through one of two methods: (1) the ad auction, or (2) reservation (formerly known as Reach and

---

241 Mr. Zigrang alleges that Meta has "$0 in associated expenses" and equates ad revenues to profits. *See* Zigrang Report, p. 22 ("Although Meta reports expenses in its annual 10-K filings, Meta's corporate representative testified that he does not know of any expenses associated with health-related RDTT classification revenue generated by the Meta Collection Tools. Therefore, the revenues that Meta received as a result of their wrongful actions is simply reduced by $0 in associated expenses.").

242 Zigrang Report, pp. 17, 21 (reporting estimates for his "lower bound" and "upper bound").

243 Zigrang Deposition, pp. 289:23–290:1 ("Q. […] And I just want to know if you calculated the amounts for the patient health information class only? A. I did not.").

A13-4207

Frequency).[244] Under the auction method—the primary mechanism for purchasing Facebook ads—Facebook's auction determines both which ads are shown to which users and the price paid for those ad placements.[245]

135. Meta generally allocates and prices ads in auctions with multiple available slots using certain principles of a "Vickrey-Clarke-Groves" ("VCG") type auction, which I describe below.[246] Meta's algorithms determine how many ad slots to auction off for each active user, and the winning ads appear in sequence as the user scrolls down their Facebook Feed.[247] The first slot is the most likely to be viewed by the user and is therefore the most valuable; the second slot is less likely to be viewed and is less valuable, and so on. Typically, each slot goes to a different advertiser, resulting in multiple winners.

136. The principles of a VCG auction are designed to make it optimal for a bidder to bid their true maximum valuation for a slot. At a high level, Meta adopts certain principles of a VCG auction by applying the following general steps:[248]

a. First, advertisers select targeting criteria and bids (or budgets);

b. Second, advertisers' targeting criteria determine whether an advertiser participates in the auction for a given ad slot;

---

244 "Buy Ads on Facebook and Beyond with Any Budget," *Meta*, available at https://www.facebook.com/business/goals/buy-facebook-ads; Lang, Kirsti, "How to Run Facebook Ads: Beginner's Guide to Advertising on Facebook," *Buffer*, July 22, 2024, available at https://buffer.com/resources/facebook-ads-beginners-guide/.

245 "About Ad Auctions," *Meta*, available at https://www.facebook.com/business/help/430291176997542.

246 I understand that Meta's auction is based on certain principles of a VCG auction but is not a "pure" VCG auction design. My opinion is based on Meta applying certain principles of a VCG auction, not the precise design nor all features of a VCG auction.

247 Similarly, the winning ads will appear as users continue to use the platform and navigate various parts of Meta's services, including Facebook and Instagram. *See*, *for example*, "About Ad Placements Across Meta Technologies," *Meta*, available at https://www.facebook.com/business/help/407108559393196 ("Your ads will appear in the desktop Feed when people access the Facebook website on their computers. Your ads will appear in the mobile Feed when people use the Facebook app on mobile devices or access the Facebook website through a mobile browser.").

248 *See, for example,* Milgrom, Paul, *Putting Auction Theory to Work*, Cambridge University Press, 2004 at pp. 47–48.

A13-4208

c. Third, Meta's algorithms calculate the "total value" an ad will deliver to the relevant user and advertiser and the bids for participating advertisers are converted into "total values" (which I discuss in more detail below);[249]

d. Fourth, the participating advertisers in an auction are ranked according to their "total values;" the advertiser with the highest "total value" gets the most desired item (the top slot), the next highest value advertiser gets the second most desired item (the second slot), and so on;

e. Fifth, rather than pay their own bid amount (i.e., their maximum willingness to pay), each winning advertiser pays an amount that reflects how their presence in the auction impacts the other advertisers.[250]

137. When a bidder wins an ad slot, they displace other bidders who would otherwise have received that slot—and potentially bidders who would have won other slots, creating an "opportunity cost" or "displaced value" equal to the unrealized value of the displaced bidders. Economic theory proves that the VCG pricing rule—where a winner pays the displaced value rather than their own bid—incentivizes bidders to bid their true willingness to pay because there is no benefit to over- or under-state one's bid.[251] The VCG auction design generalized the more familiar "second-price" auction in which a seller offers a single item, bidders bid their true willingness to pay, and the winning price is based on the bid from the second-highest bidder, not the bid of the winning bidder. The VCG auction

[249] Facebook's ad auctions include some non-standard VCG features. For example, advertisers submit budgets and, optionally, bids. Facebook then converts these budgets/bids into "total values" for purposes of allocation and pricing, where the "total values" reflect not only how much advertisers benefit from showing an ad to a user but also the user experience associated with receiving an ad. *See, for example,* "About Ad Auctions," *Meta*, available at https://www.facebook.com/business/help/430291176997542.

[250] Milgrom, Paul, *Putting Auction Theory to Work*, Cambridge University Press, 2004, at pp. 47–48; Tadelis, Steven, *Game Theory: An Introduction*, Princeton University Press, 2013, at pp. 295–297.

[251] Milgrom, Paul, *Putting Auction Theory to Work*, Cambridge University Press, 2004, at pp. 47–51; Tadelis, Steven, *Game Theory: An Introduction*, Princeton University Press, 2013, at pp. 297–299.

can be used in auctions with multiple items—such as ad slots—allowing bidders to submit multiple bids while maintaining truth-telling as a dominant strategy.[252]

138. To illustrate, consider a simplified hypothetical auction that abstracts away from the "total value" concept and highlights the basic mechanics of a VCG auction. Imagine that four advertisers compete for two available ad slots, and each advertiser seeks at most one slot. As explained above, each advertiser values Slot 1 (the first ad slot shown to the user) more than Slot 2 (the second ad slot shown to the user). Suppose their valuations, which represent their maximum willingness to pay for each slot, are as described in **Table 2**, and that each advertiser submits a bid equal to their maximum valuation for a slot. Advertiser A, for example, submits a bid of $6.00 for Slot 1 and $4.50 for Slot 2.

252 Milgrom, Paul, *Putting Auction Theory to Work*, Cambridge University Press, 2004, p. 47 ("The VCG mechanisms are incentive-compatible direct mechanisms. [...] One appeal of incentive-compatible direct mechanisms is that they spare participants the need for elaborate strategic calculations: truthful reporting serves each participant's individual interest. Choosing dominant strategies as the solution concept, an incentive-compatible direct mechanism is one for which truthful reporting leads to as high a payoff as any other strategy for all possible types of opponents and all possible actions that these opponents may take. For example, as discussed in chapter 1, it is always optimal for a bidder in a second-price sealed-bid auction for a single good to bid his valuation. Moreover, this truthful bidding strategy is the only strategy that is always optimal, so it is a dominant strategy. Thus, the second-price auction is a dominant-strategy incentive-compatible direct mechanism.").

**Table 2: Simplified Example of a Two-Slot, Four-Advertiser Auction**

| | Slot 1 | Slot 2 |
|---|---|---|
| Advertiser A | **$6.00** | $4.50 |
| Advertiser B | $4.00 | **$3.00** |
| Advertiser C | $2.75 | $2.00 |
| Advertiser D | $1.50 | $1.00 |
| Winning Advertiser | A | B |
| Price | $3.00 | $2.00 |
| Price Formula | ($4.00 - $3.00) + $2.00<br><br>(Advertiser B's Net Value + Advertiser C's Value | $2.00<br><br>(Advertiser C's Value) |

139. Based on the values above, the slots will be allocated and priced as follows:

a. *Allocation*: The winners are determined by their bids, as represented by the values shown in **Table 2**. Thus, the advertiser with the highest bid—Advertiser A—wins Slot 1, and Advertiser B wins Slot 2. (Note that an advertiser wins at most one slot.)

b. *Pricing of Slot 1*: By winning Slot 1, Advertiser A displaces Advertiser B from winning Slot 1, thereby imposing a lost value of $1.00 on Advertiser B—equal to the value Advertiser B places on Slot 1 ($4.00), minus the value to Advertiser B of winning Slot 2 ($3.00). And because Advertiser B won Slot 2, Advertiser C was displaced from winning Slot 2, so Advertiser A's win also imposes a lost value of $2.00 on Advertiser C—equal to the value Advertiser C places on Slot 2 ($2.00), minus the value to Advertiser C of not winning any slot ($0). The price Advertiser A pays for Slot 1 is the sum of these displaced values, which is $3.00 (equal to $1.00 + $2.00).

A13-4211

c. *Pricing of Slot 2*: The price Advertiser B pays for Slot 2 is $2.00, which is the value lost by displacing Advertiser C from winning Slot 2.[253]

d. *Total Revenue from this Auction*: The total revenue is therefore the sum of the two prices paid by Advertisers A and B, which equals $3.00 + $2.00 = $5.00.

b. Targeting and ad delivery in Meta's auctions

140. In practice, Meta determines the winner of each ad auction among the participating advertisers using the calculated "total value" of each ad in the auction. The "total value" reflects the combined value that showing a particular ad to a particular user generates for both the user and the advertiser.[254] The "total value" is determined by a combination of factors that include (i) the advertiser's bid, representing the price they are willing to pay to achieve their optimization goal (illustrated in the simplified example above); (ii) the estimated action rate, which measures the likelihood that the ad will elicit the desired user response; and (iii) the estimated ad quality, which helps ensure a higher-quality user experience by favoring ads that are "relevant and useful."[255] Once Meta calculates total value using these components, the allocation and pricing process mirrors the one illustrated in the simplified example that relies only on advertisers' bids.

---

[253] Note that Advertiser B's presence has no impact on Advertiser A, because the latter had the highest values, and would therefore always win Slot 1 whether Advertiser B was present or not. In other words, Advertiser B's presence does not result in any displaced value for Advertiser A. Also note that no advertiser would have improved their outcome by setting a bid that differs from (*i.e.*, understates or overstates) their maximum willingness to pay for a slot. For example, if Advertiser A raised their bid above $6.00, then their outcome would not change because their bid does not affect their payment—regardless of whether Advertiser A bids $6.01 or $100.00, they would still win Slot 1, and their payment would remain equal to the sum of the displaced values for Advertisers B and C. Thus, Advertiser A's profit, equal to their valuation of Slot 1 minus their payment ($6.00 – $3.00 = $3.00), would not change, implying that Advertiser A would have no incentive to raise their bid from their true value of $6.00. Similarly, if Advertiser A lowered their bid from $6.00 to any value above $4.00, then their outcome would not change because their bid does not affect their payment, and they would still win the first slot. However, if Advertiser A reduced their bid from $6.00 to a value below $4.00, then they would lose the first slot to Advertiser B, and their profit under this scenario would equal their valuation of Slot 2, which is $4.00, minus the price they would pay, which is Advertiser C's displaced value of $2.00, resulting in a net profit of $2.00, which is less than what they receive from bidding their true willingness to pay of $6.00.

[254] "About Ad Auctions," *Meta*, available at https://www.facebook.com/business/help/430291176997542.

[255] "Best Practices to Improve Ad Quality and Performance," *Meta*, available at https://www.facebook.com/business/help/1767120243598011.

A13-4212

141. There are numerous ways in which Meta receives data which can be used to determine whether an ad slot meets an advertiser's targeting criteria and to calculate the "total value" for the ad. As relevant for this matter, At-Issue Data associated with Proposed Class Members are, at best, only one of the many inputs that Meta uses to facilitate targeting and determine the total value and deliver ads.[256]

142. Information to determine the participating advertisers and calculate "total value" for an ad slot may come from "first-party" data; or data generated through Meta's services. As reported in its current privacy policy, Meta describes that it may receive consumer health information—including health conditions, treatments, psychological behaviors, and medical diagnoses—from a variety of user activities on Meta's services like interactions with content or messages.[257]

143. For example, Facebook users may join Facebook groups focused on specific medical conditions. WebMD facilitates a number of groups on Facebook for Type 2 diabetes support, sickle cell disease support, and rheumatoid arthritis, among others.[258] Named Plaintiff Jane Doe X joined many of these groups and shared personal details about her health publicly with the members of those groups. She explained that she frequently joins Facebook groups to seek support for health-related problems such as [redacted] often "just click[ing] join, join, join" on any and all groups that appear when searching terms related to [redacted].[259] She also posted details about her health symptoms and current medications, as

[256] Zervas Report, Section VI.C.

[257] "Washington and Nevada Consumer Health Data Privacy Policy," *Meta*, March 31, 2024, available at https://www.facebook.com/privacy/policies/health/ ("Categories of Consumer Health Data that we may collect: • Information that identifies health conditions, status, treatment, symptoms, diseases, or diagnosis […]."); "Privacy Policy," *Meta*, available at https://mbasic.facebook.com/privacy/policy/printable/version/10052835831416190/.

[258] "WebMD's Facebook Health Communities," *WebMD*, available at https://www.webmd.com/facebook-groups.

[259] Jane Doe X Deposition, pp 158:14–159:6 ("Q. So the -- there is one entry that says: (As read): [redacted]. With no mention of it being private […] A. […] Well, when I join, like, these groups, so you will just type it on the Facebook search bar, right? And then multiple groups would come up, so then I would just click join, join, join."), 159:10–11 ("A. […] I saw three multiple, like, groups for -- for [redacted] then I just -- just joined.").

A13-4213

well as the date of related doctor appointments in those groups, even while knowing that they were public.[260]

144. As a second example, many people voluntarily provide health-related data to Meta through their activities with Meta's services. The most obvious example is that some users post about health information or events on their profiles. The Named Plaintiffs provide numerous examples of this, such as Plaintiff John Doe II, who posted on Facebook about their [redacted] and Plaintiff Jane Doe [redacted][262] Other examples include users liking, commenting on, or engaging with health-related content through Meta's services.

145. As a third example, each time a user clicks on a link in an ad on a Meta service, the user transmits to Meta their interest in that advertiser and the specific URL they would like to visit, based strictly on the user's actions with Meta's services.

146. As a fourth example, if a particular user searches for advice about managing blood sugar on Facebook or Instagram, or likes posts related to Ozempic, Meta may infer that the user is interested in or may be managing diabetes. Even in the absence of signals from the At-Issue Data, a user's behavior with Meta's services may provide analogous signals. As a result, an advertiser's total value may be high enough to win an auction, even if it does not send any data to Meta.

147. Mr. Zigrang does not address how participating advertisers are selected for an auction or how the total value is calculated for each participating advertiser. Instead, Mr. Zigrang

---

260 Jane Doe X Deposition, pp. 159:24–160:17 ("Q. [redacted] […]' Q. Did you write that? A. I believe so."), p. 159:7–9 ("A. […] And most of the time, like, these groups are private, and there are certain groups that are not private, I think. Like this one [redacted] […].").

261 John Doe II Deposition, p. 93:8–24 ("Q: […] this was uploaded December 1, 2019. […] What did your comment say in this post? A. [redacted] […] Q. And you posted that your husband had to [redacted] A. Correct.").

262 Jane Doe I Deposition, pp. 267:18–269:1, 265:1–266:24, 271:11–23, 272:3–273:6. *See also* **Section V.A.1**.

A13-4214

testified during his deposition that he understood all of Meta's relevant revenue to be generated from data transmitted through the Meta Pixel, that he did not receive any explanation of how the At-Issue Data were used by Meta in connection with its ad delivery mechanism, and that other signals unrelated to the At-Issue Data could have contributed to the revenues he attributed to the At-Issue Data.[263]

c. How a change in participating advertisers or change in advertisers' "total values" for an ad slot could affect Meta's revenue, if at all

148. Whether Meta's revenue for an ad slot would be different in a but-for world absent the use of At-Issue Data depends on how Meta's use of At-Issue Data would affect the set of ads participating in the auction and the total values of those ads.

149. To see how a change in participating advertisers could affect Meta's revenue, if at all, consider two alternative scenarios of the stylized example referenced in **Table 2** above. In the original scenario in **Table 2**, Advertisers A and B win their respective ad slots, together generating actual revenue of $5 under the VCG auction mechanism, while Advertisers C and D win no slots. The alternative scenarios below outline what would happen to Meta's revenues in the but-for world absent Meta's alleged use of At-Issue Data if advertisers either were not included in the auction or had lower total values. The scenarios demonstrate that Meta's revenue, and resulting profit, for an ad slot in the but-for world would still be positive—and could even be the same as in the actual world, even if some advertisers' bids were lower in the but-for world.

150. **Table 3** below shows one alternative scenario in which Advertiser D would not be included in an auction in the but-for world absent Meta's alleged use of At-Issue Data. Excluding Advertiser D would not change the outcome and Meta's revenues would remain $5. This example demonstrates that even if an advertiser is eliminated from bidding for an ad

---

263 Zigrang Deposition, pp. 269:5–9 ("A. Any revenue that I did not include in my analysis would not have been related to the Pixel data. My understanding is that the Pixel is what generates the majority of the healthcare revenue for Meta."), pp. 270:24–271:3 ("Q. Were you provided with an explanation on how the at-issue data was actually used by Meta in connection with its ad delivery technology? […] A. No, I did not receive an explanation."), pp. 271:11–15 ("Q. Is it possible that other factors unrelated to the at issue data could have influenced the net profits received by Meta during the class period? […] A. I'm sure it's possible."), pp. 280:10–281:5 ("Q. Are you familiar at all with how the ad delivery process uses signals? […] A. No, Counselor. […] Q. Let me ask; what do you know about signals at Meta? A. No, I don't.").

A13-4215

altogether, that does not mean that Meta's revenue, and resulting profit, would be negatively impacted.

**Table 3: Modified Auction Example Without Advertiser D**

| | Slot 1 | Slot 2 |
|---|---|---|
| Advertiser A | **$6.00** | $4.50 |
| Advertiser B | $4.00 | **$3.00** |
| Advertiser C | $2.75 | $2.00 |
| ~~Advertiser D~~ | ~~$1.50~~ | ~~$1.00~~ |
| Winning Advertiser | A | B |
| Price | $3.00 | $2.00 |
| Price Formula | ($4.00 - $3.00) + $2.00<br><br>(Advertiser B's Net Value + Advertiser C's Value) | $2.00<br><br>(Advertiser C's Value) |

151. **Table 4** below shows another alternative scenario in which Advertiser B would not be included in the auction in the but-for world absent Meta's alleged use of At-Issue Data. In this scenario, Advertiser C would replace Advertiser B in Slot 2, and Meta's revenue would drop from $5 to $2.75.[264]

264 By winning Slot 1, Advertiser A displaces Advertiser C, imposing a lost value of $0.75—the difference between Advertiser C's value for Slot 1 ($2.75) and Slot 2 ($2.00). Because Advertiser C then wins Slot 2, Advertiser D is displaced, incurring a lost value of $1.00—the difference between Advertiser D's value for Slot 2 ($1.00) and for no slot ($0). Advertiser A therefore pays $1.75 ($0.75 + $1.00), the total displaced value, while Advertiser C pays $1.00, the value lost by displacing Advertiser D. Total revenues are then $2.75.

**Table 4: Modified Auction Example Without Advertiser B**

| | Slot 1 | Slot 2 |
|---|---|---|
| Advertiser A | **$6.00** | $4.50 |
| ~~Advertiser B~~ | ~~$4.00~~ | ~~$3.00~~ |
| Advertiser C | $2.75 | **$2.00** |
| Advertiser D | $1.50 | $1.00 |
| Winning Advertiser | A | C |
| Price | $1.75 | $1.00 |
| Price Formula | ($2.75 - $2.00) + $1.00<br><br>(Advertiser C's Net Value + Advertiser D's Value) | $1.00<br><br>(Advertiser D's Value) |

152. The examples above show scenarios in which an advertiser would not be included in the but-for world absent Meta's alleged use of At-Issue Data. But it is also easy to imagine a scenario in which an advertiser would be included only in the but-for world—and not the actual world— due to the alleged transmission of At-Issue Data. For example, an advertiser might be excluded from an auction for a user's ad slot if the advertiser's targeting criteria excluded the user based on At-Issue Data. In this scenario, the advertiser would be included in the but-for world, and Meta's profits may be *higher* in the but-for world in some auctions through the participation of such advertisers.

153. In addition to the scenarios above in which the alleged transmission of At-Issue Data had a potential impact on which ads are considered in a given auction, the alleged transmission of At-Issue Data could instead affect the revenue Meta earns from a given ad slot by changing the calculated total values of the ads in a given auction. As discussed above, an advertiser's total value depends in part on Meta's estimated action rate—the likelihood that the ad will elicit the desired user response. Changes in these estimated action rates can affect auction outcomes and Meta's resulting revenue. Importantly, however, Meta's

A13-4217

revenue is affected only by changes in the estimated action rates for *displaced* advertisers. Changes in the estimated action rates for non-displaced advertisers would have no effect on Meta's revenue. Additionally, as suggested above, the presence (or absence) of At-Issue Data may result in either a higher or lower calculated total value.

154. Mr. Zigrang performs none of the analysis described above. He acknowledged in his deposition that he has little or no understanding of digital advertising.[265] He also acknowledged in his deposition that he does not understand Meta's ad delivery algorithm, including the auction design, and his profit estimates fail to account for how the system actually operates.[266] Rather than analyzing how Meta's ad delivery system functions in the but-for world, Mr. Zigrang includes all the revenue from the allegedly affected ads. An implication is that Meta would earn zero revenue from these ad slots in Mr. Zigrang's but-for world. By ignoring the revenue that Meta would still earn in the but-for world through this auction mechanism, Mr. Zigrang's methodology systematically overestimates Meta's profits that are conceivably attributable to the At-Issue Data.

265 Zigrang Deposition, pp. 257:15–258:1 ("Q. Do you or a member of your team who worked on this report have a background in advertising. A. No. Q. What about healthcare advertising? A. No. Q. Do you or a member of your team have a background in the marketing of consumer products or services? A. No."), p. 266:14–20 ("Q. Moving to the revenue generated by this technology, can you describe in your own words how you believe digital advertising revenues are generated by Meta? […] A. I don't have an understanding."), p. 258:2–5 ("Q. How familiar are you with the add delivery process used by Meta as it relates to that case? […] A. Not too familiar."), p. 258:15–18 ("Q. And do you have any understanding of how Meta delivers ads to patients based on the information it's receives? A. No."), p. 258:1-4 ("Q. Did you at all attempt to educate yourself on the algorithm Meta uses for ad delivery? […] A. No."), pp. 260:2–23 ("Q. Do you know what add targeting means as it relates to digital targeting generally? A. My understanding is targeted advertising is matching advert to individual or person that would have that interest. Q. Do you have any experience in how that process works? A. No. Q. An understanding how that process works? A. No. […] [D]o you know how advertisers on Meta select the targeting criteria for their audience? […] A. No. Q. Do you know the types of targeting that are available to advertisers using Meta digitizing system? […] A. No, that's outside the scope of my engagement.").

266 Zigrang Deposition, p. 261:5–18 ("Q. Aside from knowing the term 'auction process' is associated with Meta's ad delivery process, do you know how that auction process works at Meta? […] A. I do not. Q. Do you know how a winning bid in the auction is determined? […] A. I do not. Q. Did you attempt to look into this at all in connection with rendering your opinions? […] A. This wasn't applicable, no."), p. 264:20–23 ("Q. When you read this did you do any work to try and understand how Meta's complex ad delivery process worked? A. No."), pp. 265:24–266:6 ("Q. So as of when you received this you knew Meta had a machine learning model and ranking system for its, ads yet you did no work to better understand how that system works so that you could properly calculate the revenues that are associated with that system; correct? […] A. That's correct.").

A13-4218

155. Meta runs billions of ad auctions each day, and any user who triggers an auction is eligible to see ads from a wide range of advertisers for whom the user is in the target audience.[267] For any given slot, there may be millions of competing ads from advertisers across many industries.[268] Hence, contrary to Mr. Zigrang's assumption, if the health-related ads allegedly enabled by the At-Issue Data were absent in the but-for world, many other ads would have been served in their place, and Meta would earn revenues that are considerably above the zero-revenue assumption in Mr. Zigrang's analysis. Therefore, Mr. Zigrang's methodology overestimates damages.



Steven Tadelis, Ph.D.

[267] *See, for example,* "About Ad Auctions," *Meta*, available at https://www.facebook.com/business/help/430291176997542.

[268] *See, for example,* Meta ad revenue and advertiser verticals shown in Meta, "NA Scaled Revenue Report," March 31, 2022, PIXEL_HEALTH000369674.

# Appendix A

# Steven Tadelis – c.v.

Haas School of Business
University of California Berkeley
Berkeley, CA 94720

.
Email: stadelis "at" berkeley.edu
Homepage: `http://faculty.haas.berkeley.edu/stadelis/`

## Appointments

| | |
|---|---|
| 07/2015–present | Professor of Economics, Business and Public Policy,<br>UC Berkeley, Haas School of Business, CA |
| 03/2019–present | Sarin Chair in Strategy and Leadership |
| 03/2018–present | Luohan Academy, Committee Member of the Academy |
| 08/2017–02/2021 | Amazon Scholar, Amazon Inc., Seattle, WA |
| 07/2016–08/2017 | VP, Economics and Market Design, Amazon Inc., Seattle, WA |
| 07/2016–03/2019 | James J. and Marianne B. Lowrey Chair in Business, UC Berkeley |
| 07/2015–6/2016 | Joe Shoong Chair in International Business, UC Berkeley |
| 07/2005–06/2015 | Associate Professor of Business and Public Policy, UC Berkeley, Haas School of Business, CA |
| 08/2011–08/2013 | Sr. Director, Distinguished Economist, eBay Research Labs, San Jose, CA |
| 09/2012–12/2012 | Visiting Professor of Economics, Columbia University GSB, New York, NY |
| 01/2010–03/2010 | Visiting Professor of Economics, MIT Sloan School, Cambridge, MA |
| 11/2006–1/2009 | Associate Dean for Strategic Planning, UC Berkeley, Haas School of Business, CA |
| 09/2003 | Visiting Assistant Professor of Economics, Arizona State University, Tempe, AZ |
| 07/1997–06/2005 | Assistant Professor of Economics, Stanford University, Stanford, CA |

## Education

Harvard University, Cambridge, MA USA: M.A. Economics, 1994; Ph.D. Economics, 1997.

Technion, Haifa, Israel: M.Sc. Economics (with Special Honors), 1992

University of Haifa, Haifa, Israel: B.A. in Economics (with Special Honors), 1991

## Professional Affiliations

Research Network Fellow, Center for Economic Studies, ifo Institute (CESifo) 2017–present

Research Fellow, Centre for Economic Policy Research (CEPR), 2015–present

Research Associate, National Bureau of Economic Research (NBER), 2014–present

## Publications

### *Journal Articles*

1. "Transaction Cost Economics in the Digital Economy: A Research Agenda" with with Frank Nagle and Robert Seamans.
*Strategic Organization*, accepted.

2. "Communication, Learning, and Bargaining Breakdown: An Empirical Analysis" with with Matthew Backus and Tom Blake.
*Management Science*, accepted.

3. "Counter-stereotypical Messaging and Partisan Cues: Moving the Needle on Vaccines in a Polarized U.S." with Bradley J. Larsen, Timothy J. Ryan, Steven Greene, Marc J. Hetherington, and Rahsaan Maxwell. *Science Advances* 9(29) eadg9434 (2023). DOI:10.1126/sciadv.adg9434

4. "Raising the Bar: Certification Thresholds and Market Outcomes," with Xiang Hui, Maryam Saeedi and Giancarlo Spagnolo.
*American Economic Journal: Microeconomics.* 15(2):599–626 (2023).

5. "The Response of Consumer Spending to Changes in Gasoline Prices," with Michael Gelman, Yuriy Gorodnichenko, Shachar Kariv, Dmitri Koustas, Matthew D. Shapiro and Dan Silverman.
*American Economic Journal: Macroeconomics.* 15(2):129-60 (2023).

6. "Expectation, Disappointment, and Exit: Reference-Point Formation in a Marketplace," with Matthew Backus, Tom Blake and Dmitriy Masterov.
*Journal of the European Economic Association.* 20(1):116–149 (2022)

7. "Price Salience and Product Choice," with Tom Blake, Sarah Moshary and Kane Sweeney.
*Marketing Science.* 40(4):619-636 (2021)

8. "People Management Skills, Employee Attrition, and Manager Rewards: An Empirical Analysis," with Mitchell Hoffman.
*The Journal of Political Economy.* 129(1):243-285 (2021)

9. "Buying Reputation as a Signal of Quality: Evidence from an Online Marketplace," with Lingfang (Ivy) Li and Xiaolan Zhou.
*Rand Journal of Economics.* 51(4):965-988 (2020)

10. "How Individuals Respond to a Liquidity Shock: Evidence from the 2013 Government Shutdown," with Michael Gelman, Shachar Kariv, Matthew D. Shapiro and Dan Silverman.
*The Journal of Public Economics.* 189 (2020) 103917

11. "Sequential Bargaining in the Field: Evidence from Millions of Online Bargaining Interactions," with Matthew Backus, Tom Blake and Brad Larsen.
*The Quarterly Journal of Economics.* 135(3):1319–1361 (2020)

12. "On the Empirical Content of Cheap-Talk Signaling: An Application to Bargaining," with Matthew Backus and Tom Blake.
*The Journal of Political Economy.* 127(4):1599-1628 (2019)

13. "Reputation and Feedback Systems in Online Platform Markets,"
*Annual Review of Economics*, 8(1):321-340 (2016)

14. "Returns to Consumer Search: Evidence from eBay," with Tom Blake and Chris Nosko.
*17th ACM Conference on Electronic Commerce*, (EC 2016) pp.531-545 (2016)

15. "The Economics of Reputation and Feedback Systems in eCommerce Marketplaces,"
*IEEE Internet Computing*, 20(1):12-19 (2016)

16. "Canary in the e-Commerce Coal Mine: Detecting and Predicting Poor Experiences Using Buyer-to-Seller Messages," with Dmitriy Masterov and Uwe Mayer
*16th ACM Conference on Electronic Commerce*, (EC 2015) pp.12-19 (2015)

17. "Is Sniping A Problem For Online Auction Markets?," with Matthew Backus, Tom Blake and Dmitriy Masterov
*Proceedings of the 24th ACM International World Wide Web Conference*, (WWW24) pp.12-19 (2015)

18. "Information Disclosure as a Matching Mechanism: Theory and Evidence from a Field Experiment," with Florian Zettelmeyer
*American Economic Review*, 105(2):886-905 (2015)

19. "Consumer Heterogeneity and Paid Search Effectiveness: A Large Scale Field Experiment," with Chris Nosko and Tom Blake
*Econometrica*, 83(1):155-174 (2015)
**Finalist: 2016 ISMS/MSI Gary Lilien Marketing Science Practice Prize**

20. "Harnessing Naturally-Occurring Data to Measure the Response of Spending to Income," with Michael Gelman, Shachar Kariv, Matthew D. Shapiro and Dan Silverman
*Science*, 345(6193):212-215 (2014)

21. "Bidding for Incomplete Contracts: An Empirical Analysis," with Pat Bajari and Stephanie Houghton
*American Economic Review*, 104(4):1288-1319 (2014)

22. "Public Procurement Design: Lessons from the Private Sector,"
*International Journal of Industrial Organization*, 30(3):297-302 (2012)

23. "A Theory of Moral Persistence: Crypto-Morality and Political Legitimacy," with Avner Greif
*Journal of Comparative Economics*, 38(3):229-244 (2010)
**Recipient: Montias prize - best article published in JCE in 2010-2011**

24. "Contracting for Government Services: Theory and Evidence from U.S. Cities," with Jonathan Levin
*Journal of Industrial Economics*, 58(3):507-541 (2010)

25. "Auctions versus Negotiations in Procurement: An Empirical Analysis," with Pat Bajari and Rob McMillan
*Journal of Law, Economics and Organization*, 25(2):372-399 (2009)

26. "Seller Reputation," with Heski Bar-Isaac
*Foundations and Trends in Microeconomics*, 4(4):273-351(2008)

27. "The Innovative Organization: Creating Value through Outsourcing,"
*California Management Review*, 50(1):261-277 (2007)

28. "Profit Sharing and the Role of Professional Partnerships," with Jonathan Levin
*Quarterly Journal of Economics*, 120(1):131-172 (2005)

29. "Firm Reputations with Hidden Information,"
*Economic Theory*. 18(2):537-553 (2003)

30. "The Market for Reputations as an Incentive Mechanism,"
*The Journal of Political Economy*. 110(4):854-882 (2002)

31. "Complexity, Flexibility and the Make or Buy Decision,"
*American Economic Review Papers and Proceedings*.92(2):433-437 (2002)

32. "Incentives versus Transactions Costs: A Theory of Procurement Contracts," with Pat Bajari
*Rand Journal of Economics*, 32(3):387-407 (2001)

33. "What's in Name? Reputation as a Tradeable Asset,"
*American Economic Review.* 89(3):548-563 (1999)

34. "Pareto Optimality and Optimistic Stability in Repeated Extensive Form Games,"
*Journal of Economic Theory.* 69(2):270-299 (1996)

## *Book Chapters and Invited Papers*

35. "Reputation, Feedback and Trust in Online Platforms,"
in B. Heydari, O. Ergun, R. Dyal-Chand and Y. Bart (Eds.) *Reengineering the Sharing Economy: Design, Policy, and Regulation.* Cambridge University Press. (forthcoming)

36. "Bargaining in Online Markets," with Matthew Backus and Thomas Blake
in E. Karagözoğlu, K.B. Hyndman (Eds.) *Bargaining.* Palgrave Macmillan, Cham. (2022)

37. "Algorithmic Pricing: What Every Antitrust Lawyer Needs to Know," with David Smith
*The Price Point, Newsletter of the ABA Section of Antitrust Law's Pricing Conduct Committee.* 22(1):6-11 (2021)

38. "How Artificial Intelligence and Machine Learning Can Impact Market Design," with Paul R. Milgrom
in A. Agarwal, J. Gans and A. Goldfarb (Eds.) *The Economics of Artificial Intelligence: An Agenda.* University of Chicago Press. (2019)

39. "Two-Sided eCommerce Marketplaces and the Future of Retailing,"
in E. Baskar (Ed.) *Handbook on the Economics of Retail and Distribution.* Edward Elgar Publishing. (2016)

40. "Property Rights and Transaction Costs Theories,"
in Aghion, P., M. Dewatripont, P. Legros and L. Zingales (Eds.) *The Impact of Incomplete Contracts on Economics.* Oxford University Press. (2016)

41. "Transaction Cost Economics," with Oliver E. Williamson
in R. Gibbons and J. Roberts (Eds.) *Handbook of Organizational Economics.* Princeton University Press. (2012)

42. "Jonathan Levin: 2011 John Bates Clark Medalist," with Liran Einav
*Journal of Economics Perspectives*, 26(2), 207-222 (2012)

43. "A Tribute to Oliver Williamson: Williamson?s Contribution and Its Relevance to 21st Century Capitalism,"
*California Management Review*, 52(2):159-166 (2010)

44. "Incentives and Transaction Costs in Public Procurement,"
in C. Menard and M. Ghertman (Eds.) *Regulation, Deregulation & Reregulation.* Edward Elgar Publishing. (2009)

45. "Incentives and award procedures: competitive tendering vs. negotiations in procurement," with Patrick Bajari
in N. Dimitri, G. Piga and G. Spagnolo (Eds.) *Handbook of Procurement.*

*Working Papers and Papers Under Review*

46. "Digital Advertising and Market Structure: Implications for Privacy Regulation," with Daniel Deisenroth, Utsav Manjeer, Zarak Sohail, and Nils Wernerfelt, July 2024

47. "Learning, Sophistication, and the Returns to Advertising: Implications for Differences in Firm Performance " with Christopher Hooton, Utsav Manjeer, Daniel Deisenroth, Nils Wernerfelt, Nick Dadson, and Lindsay Greenbaum, April 2023

48. "The Economics of Algorithmic Pricing: Is collusion really inevitable?" with Kai-Uwe Kuhn. January 2018

49. "The Limits of Reputation in Platform Markets: An Empirical Analysis and Field Experiment," with Chris Nosko. February 2015

50. "The Power of Shame and the Rationality of Trust," March 2011

51. "A Costly Contracting Approach to the Organization of Production," with Jonathan Levin. December 2006

52. "Apprenticeships: Human Capital and Competitive Signaling in a Dynamic Labor market," with Antonio Rangel. December 2001

53. "Renegotiation in Agency Contracts: The Value of Information," with Ilya Segal. December 1996

*Books*

1. *Game Theory: An Introduction.* Princeton University Press, 2012.

2. *Solutions to Exercises: Microeconomic Theory, by A. Mas-Colell, M. Whinston and J.Green.* (with Chiaki Hara and Ilya Segal) Oxford University Press, 1996.

## Grants

Vaccine Confidence Fund Grant (Steven Greene, Marc Hetherington, Brad Larsen, Rahsaan Maxwell, and Timothy Ryan, co-PIs), 2021-2022

NSF grant: "Bilateral Bargaining through the Lens of Big Data," (Matt Backus, Brad Larsen and Matt Taddy, co-PIs), 2016-2018 (SES-1629060).

Sloan Foundation grant "Harnessing Naturally-Occurring Data to Study Financial Change of Older Americans," (Mathew D. Shapiro, PI; Daniel Silverman, Shachar Kariv, Steve Tadelis, co-PIs), 2014-2016

Sloan Foundation grant "Database Development Project," (Mathew D. Shapiro, PI; Daniel Silverman, Shachar Kariv, Steve Tadelis, co-PIs), 2012-2014

Yahoo! Faculty Research grant "'Shame and Reputation in Online Transactions," 2008

Research Bridging Grant, UC Berkeley "Identifying the Incentive Effects of Shame," 2007-2009

NSF CAREER grant: "The Organization and Reputation of Firms," 2003-2009 (SES-0239844).

NSF grant: "Market Monitoring and Organizational Form," 2002-2003 (SES-0214555).

NSF grant: "Reputation, Incentives, and Transaction Costs in Firms," 2000-2002 (SES-0079876).

NSF grant: "Reputation with Hidden Information," 1999-2000 (SBR-9818981).

## Honors, Awards, & Fellowships

Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, 2025

Fellow of the Econometric Society, elected 2020

Honorable Mention, Cheit Teaching Award, Full-Time MBA Program, 2010-2011

Montias prize - best article published in the Journal of Comparative Economics in 2010-2011

Barbara and Gerson Bakar Faculty Fellow, UC Berkeley Haas School of Business, 2008-2015

Honorable Mention, Cheit Teaching Award, Full-Time MBA Program, 2006-2007

Phi Beta Kappa Undergraduate Teaching Award, Stanford 2005.

Economics Department Advising Award, Stanford 2002.

National Fellow, Hoover Institution, 1999-2000.

Review of Economic Studies European Tour Speaker, May 1997

Alfred P. Sloan Doctoral Dissertation Fellowship, 1995-1996

Graduate Society Fellowship Term Time Award, Harvard University 1995-1996

Graduate Fellowship, Harvard University 1992-1994

Graduate Fellowship, Technion Graduate School 1991-1992

Merit Scholarship, University of Haifa 1988-1991

## Ph.D. Advising

*Principal or co-Principal Advisor (first placement in parenthesis):*

1. Nhat Le (2000); (Australian National University)
2. Ravi Singh (2003); (Harvard Business School)
3. Ales (Bobby) Filipi (2003); (Bates-White Consulting)
4. Navin Kartik (2004); (UC San Diego)
5. Peter Lorentzen (2007) (UC Berkeley)
6. Ian Larkin (2007) (Harvard Business School)
7. Marina Halac (2009) (Columbia Business School)
8. Rob Seamans (2009) (NYU Stern School of Business)
9. Constanca Esteves-Sorensen (2009) (Yale School of Management)
10. Victor Bennett (2010) (USC Marshall School of Business)
11. Sanny Liao (2010) (Private industry)
12. Vito Sciaraffia (2011) (UT Austin McComb Business School)
13. Amy Nguyen-Chyung (2013) (University of Michigan)
14. Orie Shelef (2013) (Stanford Institute for Economic Policy Research Post Doc)

15. Tarek Ghani (2015) (Washington University, St. Louis)
16. Yujin Kim (2016) (Shanghai University of Science and Technology)
17. Moshe Barach (2016) (Georgetown University)
18. Hyo Kang (2019) (University of Southern California)
19. Oren Reshef (2020) (Washington University, St. Louis)
20. Xin Chen (2020) (Singapore Management University)
21. Andres Gonzales (2021) (PUC, Chile)
22. Yunhao Huang (2025) (USC)
23. Mingduo Zhao (expected 2026)

*Committee member (first placement in parenthesis):*

1. Pablo Ruis-Verdu (2001); (U. Carlos III Spain)
2. Brent Goldfarb (2001); (U. of Maryland)
3. Hongbin Li (2001); (Chinese University of Hong Kong)
4. Luis Rayo (2002); (University of Chicago GSB)
5. David Miller (2004); (UC San Diego)
6. Brian Chen (2009) (Post-Doc at Stanford Law School)
7. Deepak Hegde (2010) (NYU Stern School of Business)
8. Asaf Plan (2010) (Post-Doc at University of Michigan)
9. Dylan Minor (2011) (Northwestern, Kellogg School of Management)
10. Maciej Kotowski (2011) (Harvard Kennedy School)
11. Mitchell Hoffman (2012) (University of Toronto)
12. Valentina Paredes (2013) (University of Chile)
13. Daniel Gross (2015) (Harvard Business School)
14. Christopher Whaley (2016) (RAND corporation)
15. Jordan Ou (2017) (Analysis Group)
16. Hsin-Tien Tiffany Tsai (National University of Singapore)
17. Alon Rubinstein (2023) (Postdoc, U-Penn Wharton)
18. Muhammad Zia Mehmood (2024) (Research Fellow at Princeton University)
19. Qianmiao (Michelle) Chen (2024) (DIME, World Bank)
20. Yikun Jiang (2025) (Purdue University)

## Professional Activities

**Referee for:** *American Economic Review; Quarterly Journal of Economics; Journal of Political Economy; Econometrica; Review of Economic Studies; Review of Economics and Statistics; Management Science; American Economic Journal: Microconomics; American Economic Journal: Applied Economics; Rand Journal of Economics; Games and Economic Behavior; International Economic Review; International Journal of Industrial Organization; Journal of Economic Theory; Journal of Law and Economics; Journal of Law Economics and Organization; Journal of Economics and Management Strategy; and more.*

### *Editor/co-Editor*

*Journal of Law, Economics and Organization,* 2011-2014

### *Editorial Boards/Associate Editor*

*American Economic Journal: Microeconomics,* 2019-2024

*California Management Review,* 2006-2016

*American Economic Review,* 2005-2008

*International Journal of Industrial Organization,* 2005-2008

### *Steering/Scientific/Program Committee Member*

16th Annual Federal Trade Commission Microeconomics Conference, Washington, D.C. November, 2023

23rd ACM Conference on Economics and Computation (EC'22), U. of Colorado Boulder, July 2022

20th ACM Conference on Economics and Computation (EC'19), Phoenix, June 2019

18th ACM Conference on Economics and Computation (EC'17), MIT, June 2017

17th ACM Conference on Economics and Computation (EC'16), Maastricht, July 2016

24th International World Wide Web Conference (WWW 2015), Florence, May 2015

15th ACM Conference on Economics and Computation (EC'14), Stanford, June 2014

Public Procurement and Sustainable Growth Conference, Venice, October 20-21, 2011

EARIE 2011, Stockholm, Sweden, Sept 1-3, 2011

First Interdisciplinary Symposium on Reputation Mechanisms in Online Communities, MIT, April 2003

### *Conference co-organizer*

"18th Annual Berkeley/Columbia/Duke/MIT/Northwestern IO Theory Conference," Berkeley, Nov 2019

"European Summer Symposium in Economic Theory," (ESSET), Gersenzee, Switzerland, July 2015

"Private and Public Sector Contracting," SITE, Stanford, summer 2004

"Incentives in Markets and Organizations," SITE, Stanford, summer 2003

"The Theory of Contracts," SITE, Stanford, summer 2000

"Contracts and Organizations," SITE, Stanford, summer 1999

"Contractual Incompleteness," SITE, Stanford, 1998

### *University Service*

Member, Committee on Courses of Instruction, UC Berkeley, 2023 - present

Group Chair, Business and Public Policy, Haas School of Business, July 2022 - present

Interviewer/evaluator, Regents' and Chancellor's Scholarship Program, 2016 - present

Member, Committee on Research, UC Berkeley, 2015 - 2016

Ph.D. Program Advisor, Business and Public Policy, Haas School of Business, July 2014 - July 2016

## Invited Presentations

### *Keynote Speaker*

13th Oligo Workshop, Cambridge Judge Business School, Cambridge, UK Jun 2-3, 2025

Paris IO Day, Paris, France November 25, 2024

The First ZEW Conference on Research with and within Organisations, Mannheim, German September 9-10, 2024

15th Paris Conference on Digital Economics, Paris, France March 21-22, 2024

16th Annual FTC Microeconomics Conference, Washington, D.C. USA, November 2-3, 2023

Berkeley-Padova-Paris Seventh Organizational Economics Workshop, Padova, Italy June 16-17, 2022

CESifo Area Conference on the Economics of Digitization, Munich, Germany November 30 - December 1, 2018

International Workshop on Competition, Regulation and Procurement, National Research University Higher School of Economics, Moscow, Russia, May 28-29, 2018

Conference on Auctions, competition, regulation, and public policy, Lancaster University, U.K., May 24-25, 2018

Online Platform Competition Conference, University of Florida, Florida, March 23, 2018

Industrial Organization, Regulation And Competition Policy In Israel, Hebrew University, Jerusalem, Israel December 28, 2017

Microsoft Research Digital Economics Conference 2017, Redmond, WA, October 20-21, 2017

15th ZEW Conference on The Economics of Information and Communication Technologies, Mannheim, Germany, June 23-24, 2017

INFORMS Conference on Information Systems and Technology, Nashville, TN, November 12-13, 2016

43rd EARIE Annual Conference, Lisbon, Portugal, August 26-28, 2016

International Conference on Game Theory and Multilateral Economic Cooperation, Xi'an, China, June 17-19, 2016

"4th Annual Lithuanian Conference on Economic Research," August 17-18, 2015, , Lithuania

"Eighth bi-annual Postal Economics conference: E-commerce, Digital Economy and Delivery services," April 3-4, 2014, Toulouse, France

"Public procurement and sustainable growth," conference, October 20-21, 2011, Venice, Italy

European School for New Institutional Economics, May 19-23, 2008, Corsica, France

"Public Private Partnerships," conference, December 7-8, 2007, The Sorbone, Paris, France

"Public services and Management: designs, issues and implications for local governance," conference, January 12-14th, 2006, Toulouse, France

*Recent Invited Conferences and Seminar Presentations*

**2024-2025**: The First ZEW Conference on Research with and within Organizations, Mannheim Germany (9/24); Yale (10/24); Stanford (10/24); Paris IO Day (11/24); Washington University (2/25); 13th Oligo Workshop, Cambridge Judge Business School, Cambridge, UK (6/25); Markets & Waves Conference, Lisbon Portugal (6/25)

**2022-2023**: NYU-Stern (03/23); ABA-Antitrust Spring Meetings (03/23); Penn-Wharton (04/23); Cal-Tech (04/23); UC-Davis (04/19); UC-Berkeley (04/23); Berkeley IO Seminar (05/23); Fifth Economics of Platforms Workshop, Capri IT (05/23); European University Institute, Florence IT (05/23); U. of Rome Tor Vergata (05/23); 14th Economics of Ads and Marketing Conference, Sofia, BG (06/23);

**2021-2022**: ACE Barcelona 2021 conference - Barcelona, Spain (11/21); 2022 Stigler Center Antitrust and Competition Conference, U-Chicago (04/22); Bocconi U. Milan IT (05/22); 19th session of the Institutional and Organizational Economics Academy, Corsica FR (05/22); 2022 USC Global Competition Law Thought Leadership Conference (06/22);

**2019-2020**: EARIE-Barcelona (08/19); Harvard-HBS (10/19); U.Toronto-Rotman (11/19); Northwestern-Kellogg (12/19); Hebrew U. - Jerusalem (12/19);

**2018-2019**: Melbourne Business Analytics Conference, Melbourne, Australia (07/18); Technology Policy Institute Aspen Forum, Aspen (08/18); FTC Hearing #3: Competition and Consumer Protection in the 21st Century, Arlington, VA (10/18); Monash U., Melbourne (04/19); Melbourne U., Melbourne (04/19); Canterbury U., Christchurch (04/19); UTS, Sydney (04/19); UNSW, Sydney (04/19); Boconni U., Milan (05/19); Collegio Alberto, Turin (05/19); HKUST IO workshop, Hong Kong (06/19); SUFE IO 2019 conference, Shanghai (06/19); ESSET Conference, Gersenzee, Switzerland (7/19)

**2017-2018**: Annual Reputation Symposium 2017, Oxford University, UK (08/17); NBER Economics of Artificial Intelligence Conference, Toronto (09/17); Carols III University, Madrid, Spain (10/17); CEMFI, Madrid, Spain (10/17); University of Melbourne Business School, Australia (11/17); MSI Conference, SF (02/18); Columbia University IO Seminar, NY (03/18); IJIO Conference, Indianapolis, (04/18); University of Indiana, Bloomington (04/18); Platform Economics Conference, Enaudi, Rome (04/18); ReStud Reunion Conference, Copenhagen (05/18); Third BCCP Conference and Policy Forum, Berlin, Germany (06/18); 2018 CPMD Workshop on Market Design, Sydney, AUstralia (06/18); BEET 2018 Conference, Columbia University (06/18);

**2016-2017**: UChicago Law School (11/16); Workshop on Data Ownership, Access and Trade, EU Commission, Brussels (03/17); Columbia University Law School (04/16); Santa Clara University (05/17); Technion, Israel (06/17); Theory of the Firm Conference, Oxford University, UK (06/17); CRESSE Conference, Crete (06/17);

## Teaching

*UC Berkeley*

**Managerial Economics** (Executive MBA program)

**Economic Analysis for Business Decisions** (1st year MBA core microeconomics)

A13-4229 **Incentives in Organizations** (PhD class in the business school)

**The Economics of Institutions** (PhD class in the business school)

**Contract Theory** (2nd year PhD class in the economics department)

**Economic Analysis for Business Decisions** (12-28 hour Executive Education module)

**Strategic Sourcing** (3 hour Executive Education module)

**Strategic Pricing** (3 hour Executive Education module)

*Stanford University*

**Contract Theory** (2nd year PhD class)

**Microeconomic Theory** (1st year PhD class)

**Game Theory and Economic Applications** (Undergraduate class)

**Intermediate Microeconomics** (Undergraduate class)

*Columbia University GSB - Visting Professor*

**Microeconomics**, Fall 2012 (MBA Core class)

*MIT Sloan School of Management - Visiting Professor*

**Strategic Thinking**, Spring 2010 (MBA elective class)

*Arizona State University - Visiting Assistant Professor*

**Contract Theory**, Fall 2003 (2nd year PhD class)

## Expert Witness Experience

*Depositions*

DZ Reserve v. Facebook, Inc., Case No. 3:18-cv-04978, United States District Court for the Northern District of California, deposed April 6, 2021.

Epic Games Inc. v. Google LLC, et al., Case No. 3:20-cv-05671-JD, United States District Court for the Northern District of California, deposed March 13, 2023.

Edible IP, LLC, et al. v. 1-800-Flowers.com, Inc., et al., Civil Action No. 1:20-cv-2405-VMC, The United States Court for the Northern District of Georgia Atlanta Division, deposed May 3, 2023

Rex - Real Estate Exchange, Inc., v. Zillow Group, Inc., Case No. C21-0312-TSZ, United States District Court Western District of Washington at Seattle, deposed May 30, 2023

Attorney General for the Commonwealth Of Massachusetts, v. UBER Technologies, Inc. and LYFT, Inc., C.A. No. 2084CV01519-BLS1, Superior Court of the Commonwealth Of Massachusetts for the County of Suffolk, deposed January 31, 2024.

Maximilian Klein, et al., on behalf of themselves and all others similarly situated, v. META Platforms, Inc., Case No. 3:20-CV-08570-JD, United States District Court for the Northern District of California, deposed March 1, 2024.

Commissioner of Competition v. Google LLC and Google Canada Corporation (CT-2024-010), Canada, deposed (cross examined) July 29, 2025.

A13-4230 Meta Pixel Tax Filing Cases, Case No. 3:22-cv-07557-PCP, United States District Court for the Northern District of California, deposed December 8, 2025.

### *Testimony*

Paid Search Engine Tools, LLC v. Google Canada Corporation, Google LLC and Alphabet Inc., Citation 2021 FC 1435, The Federal Court of Canada, testified at trial (remotely) June 29, 2021.

Rex - Real Estate Exchange, Inc., v. Zillow Group, Inc.,, Case No. C21-0312-TSZ, United States District Court Western District of Washington at Seattle, testified at trial (jury, in person) September 27, 2023.

Epic Games Inc. v. Google LLC, et al., Case No. 3:20-cv-05671-JD, United States District Court for the Northern District of California, testified at trial (jury, in person) November 28, 2023.

## Corporate Experience

### *Advisor to Corporations and Startups (2005 - current)*

Advise corporations and startups on matters related to market design, pricing, customer growth, trust and safety, and consumer behavior analyses.

### *Amazon, Seattle, WA, Amazon Scholar (2017-2021)*

Guide and support economic analysis for business decisions across the company

### *Amazon, Seattle, WA, VP Economics and Market Design (2016-2017)*

Lead and support economic analysis for business decisions across the company

Help recruit and build teams of economists

### *eBay Inc, San Jose, CA, Distinguished Economist - Research Consultant (2013-2017)*

Lead and conduct economic research and decision support for eBay

### *eBay Inc, San Jose, CA, Distinguished Economist/Senior Director (2011-2013)*

Lead and conduct economic research for eBay Research Labs (eRL)

Lead and support economic analysis for business decisions across the company

Recruit and build a team of economic researchers to grow eRL

### *Elbit LTD, Haifa, Israel - Sales and contracts manager (1990-1992)*

Estimate and analyze costs for small and large scale avionic and optronic military systems.

Prepare and submit management/cost proposals for governments and corporations.

Negotiate proposals and finalize contract clauses with customer representatives.

### *Elbit LTD, Haifa, Israel - Systems engineer, Avionics (1986-1990)*

Prepare technical proposals for avionic systems.

Characterize, design and develop avionic systems and test equipment.

Prepare development and maintenance documentation in accordance with US military specifications.

**APPENDIX B**

**MATERIALS CONSIDERED**

**Legal Documents**

Class Certification Report of Hal J. Singer, Ph.D., *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 23, 2025, and associated backup.

Declaration of Jane Doe I in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025.

Declaration of Jane Doe IX in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025.

Declaration of Jane Doe V in Support of Plaintiffs' Motion for Class Certification*, In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025.

Declaration of Jane Doe X in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025.

Declaration of John Doe II in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025.

Declaration of John Doe III in Support of Plaintiffs' Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025.

Deposition of David Abdul-Malak, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, May 21, 2025, and associated exhibits.

Deposition of Hal J. Singer, Ph.D., *In Re Meta Pixel Healthcare*, Case No. 3:22-cv-3580-WHO-VKD, October 24, 2025, and associated exhibits.

Deposition of Jenny Streets, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, March 25, 2025, and associated exhibits.

Deposition of Katherine Barasz, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, November 6, 2025, and associated exhibits.

Deposition of Plaintiff Jane Doe I, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 17, 2025, and associated exhibits.

Deposition of Plaintiff Jane Doe IV, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 22, 2025, and associated exhibits.

Deposition of Plaintiff Jane Doe IX, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, March 28, 2025, and associated exhibits.

Deposition of Plaintiff Jane Doe V, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 30, 2025, and associated exhibits.

Deposition of Plaintiff Jane Doe X, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 18, 2025, and associated exhibits.

Deposition of Plaintiff John Doe II, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, May 1, 2025, and associated exhibits.

Deposition of Plaintiff John Doe III, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, April 4, 2025, and associated exhibits.

Deposition of Todd Zigrang, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, November 6, 2025, and associated exhibits.

Expert Report of Georgios Zervas, Ph.D., *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, December 9, 2025.

Expert Report of John R. Hauser, SC.D., *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, December 9, 2025.

Expert Report of Kate Barasz, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 7, 2025, and associated backup.

First Amended Consolidated Class Action Complaint, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 10, 2023.

Meta Pixel Healthcare Production Cover Letter, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, December 18, 2024.

Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, and associated exhibits.

Plaintiffs' Selection of Random Days for Sample from (1) ads_pixel_traffic, (2) offsite_signals, (3) offsite_signals_pipe_msa, and (4) app_events, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, August 29, 2024.

Report of Health Capital Consultants, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, September 9, 2025, and associated backup.

**Bates-Stamped Documents**

Meta, "Email Chain between Maya Fitzgerald, Gal Cerf, Nivi Arunachalam, Erez Naveh," June 15, 2021, PL-EXPERT-ZIGRANG_002889-892.

Meta, "Offsite Signals Data," PIXEL_HEALTH_CWD00000131-610.

Meta, "offsite_signals," PIXEL_HEALTH000110510.

Meta Viewpoints, "Shaping Technology Together," PL-EXPERT-ZIGRANG_002592-597.

Meta, "Statement of Work for Facebook Metered Panel," 2016, PIXEL_HEALTH001284080-083.

Meta, "Statement of Work for Smartphone Usage Study," 2018, PIXEL_HEALTH001284346-348.

Meta, "Uptravi Activating on Facebook: Media & Strategy Considerations," July 23, 2020, PIXEL_HEALTH000703922-984.

Meta, "Introducing offsite_signals Table," September 2020, PIXEL_HEALTH000288627-631.

Meta, "NA Scaled Revenue Report," March 31, 2022, PIXEL_HEALTH000369674.

Meta, "Statement of Work for Smartphone Usage Study December 18, 2017," 2017, PIXEL_HEALTH001219572-577.

**Academic Articles**

Acquisti, Alessandro, Curtis Taylor and Liad Wagman, "The Economics of Privacy," *Journal of Economic Literature*, Vol. 54, No. 2, 2016, pp. 442-492.

Acquisti, Alessandro, Leslie K. John and George Loewenstein, "What is Privacy Worth?," *The Journal of Legal Studies*, Vol. 42, No. 2, June 2013, pp. 249-274.

Athey, Susan, Christian Catalini and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," *National Bureau of Economic Research*, No. w23488, *Working Paper*, June 2017.

Backus, Matthew, Thomas Blake and Steven Tadelis, "On the Empirical Content of Cheap-Talk Signaling: An Application to Bargaining," *Journal of Political Economy*, Vol. 127, No. 4, June 2019, pp. 1599-1628.

Backus, Matthew, Thomas Blake, Brad Larsen and Steven Tadelis, "Sequential Bargaining in the Field: Evidence from Millions of Online Bargaining Interactions," *The Quarterly Journal of Economics*, Vol. 135, No. 3, February 2020, pp. 1319-1361.

Backus, Matthew, Thomas Blake, Dimitriy Masterov and Steven Tadelis, "Expectation, Disappointment, and Exit: Evidence on Reference Point Formation from an Online Marketplace," *Journal of the European Economic Association*, Vol. 20, No. 1, February 2022, pp. 116-149.

Befurt, Rene, Felix Eggers and John R. Hauser, "Supply Side Considerations When Using Conjoint Analysis in Litigation," *(Forthcoming) Handbook of Marketing Analytics: Methods and Applications in Marketing, Public Policy, and Litigation*, May 2024, pp. 1-54.

Blake, Thomas, Chris Nosko and Steven Tadelis, "Consumer Heterogeneity and Paid Search Effectiveness: A Large-Scale Field Experiment," *Econometrica*, Vol. 83, No. 1, January 2015, pp. 155-174.

Blake, Thomas, Chris Nosko and Steven Tadelis, "Returns to Consumer Search: Evidence from eBay," *Proceedings of the 2016 ACM Conference on Economics and Computation (EC '16)*, July 2016, pp. 531-545.

Blake, Tom, Sarah Moshary, Kane Sweeney and Steven Tadelis, "Price Salience and Product Choice," *Marketing Science*, Vol. 40, No. 4, May 2021, pp. 619-636.

Bleier, Alexander, Avi Goldfarb and Catherine Tucker, "Consumer Privacy and the Future of Data-Based Innovation and Marketing," *International Journal of Research in Marketing*, Vol. 37, No. 3, 2020, pp. 466-480.

Chua, Hui Na, Jie Sheng Ooi and Anthony Herbland, "The Effects of Different Personal Data Categories on Information Privacy Concern and Disclosure," *Computers & Security*, Vol. 110, August 2021, pp. 1-20.

Deisenroth, Daniel, Utsav Manjeer, Zarak Sohail, Steven Tadelis and Nils Wernerfelt, "Digital Advertising and Market Structure: Implications for Privacy Regulation," *National Bureau of Economic Research*, No. w32726, *Working Paper*, July 2024.

Hann, Il-Horn, Kai-Lung Hui, Sang-Yong Tom Lee and Ivan P.L. Png, "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," *Journal of Management Information Systems*, Vol. 24, No. 2, 2007, pp. 13-42.

Ip, Wui, Samuel Yang, Jacob Parker, Austin Powell, James Xie, Keith Morse, Rachael C. Aikens, Jennifer Lee, Manjot Gill, Shravani Vundavalli, Yungui Huang, Jeannie Huang, Jonathan H. Chen, Jeffrey Hoffman, Cynthia Kuelbs and Natalie Pageler, "Assessment of Prevalence of Adolescent Patient Portal Account Access by Guardians," *JAMA Network Open*, Vol. 4, No. 9, September 2021.

Kaplan, Yohay, Naama Krasne, Alex Shtoff and Oren Somekh, "Unbiased Filtering of Accidental Clicks in Verizon Media Native Advertising," *CIKM '21: Proceedings of the 30th ACM International Conference on Information & Knowledge Management*, November 2021, pp. 3878-3887.

Kim, Tami, Kate Barasz and Leslie K. John, "Why Am I Seeing This Ad? The Effect of Ad Transparency on Ad Effectiveness," *Journal of Consumer Research*, Vol. 45, No. 5, February 2019, pp. 906-932.

Kim, Youngho, Ahmed Hassan, Ryen W. White and Imed Zitouni, "Modeling Dwell Time to Predict Click-Level Satisfaction," *WSDM '14: Proceedings of the 7th ACM International Conference on Web Search and Data Mining*, February 2014, pp. 193-202.

Kokolakis, Spyros, "Privacy Attitudes and Privacy Behaviour: a Review of Current Research on the Privacy Paradox Phenomenon," *Computers & Security*, Vol. 64, 2017, pp. 122-134.

Kumaraguru, Ponnurangam and Lorrie Faith Cranor, "Privacy Indexes: A Survey of Westin's Studies," *Institute for Software Research International*, December 2005.

Larsen, Bradley J., Timothy J. Ryan, Steven Greene, Marc J. Hetherington, Rahsaan Maxwell and Steven Tadelis, "Counter-Stereotypical Messaging and Partisan Cues: Moving the Needle on Vaccines in a Polarized United States," *Science Advances*, Vol. 9, No. 29, July 2023.

Latulipe, Celine, Syeda Fatema Mazumder, Rachel K. W. Wilson, Jennifer W. Talton, Alain G. Bertoni, Sara A. Quandt, Thomas A. Arcury and David P. Miller Jr, "Security and Privacy Risks Associated With Adult Patient Portal Accounts in US Hospitals," *JAMA Internal Medicine*, Vol. 180, No. 6, June 2020, pp. 845-849.

Lu, Yin, Bernard Tan and Kai-Lung Hui, "Inducing Customers to Disclose Personal Information to Internet Businesses with Social Adjustment Benefits," *International Conference on Information Systems (ICIS) 2004 Proceedings*, December 2004, pp. 571-582.

Odijk, Daan, Ryen W. White, Ahmed Hassan Awadallah and Susan T. Dumais, "Struggling and Success in Web Search," *CIKM '15: Proceedings of the 24th ACM International on Conference on Information and Knowledge Management*, October 2015, pp. 1551-1560.

Prince, Jeffrey T. and Scott Wallsten, "How Much Is Privacy Worth Around The World And Across Platforms?," *Journal of Economic & Management Strategy*, Vol. 31, 2022, pp. 841-862.

Semere, Wagahta, Scott Crossley, Andrew J. Karter, Courtney R. Lyles, William Brown III, Mary Reed, Danielle S. McNamara, Jennifer Y. Liu and Dean Schillinger, "Secure Messaging with Physicians by Proxies for Patients with Diabetes: Findings from the ECLIPPSE Study," *Journal of General Internal Medicine*, Vol. 34, August 2019, pp. 2490-2496.

Simonov, Andrey and Shawndra Hill, "Competitive Advertising on Brand Search: Traffic Stealing and Click Quality," *Marketing Science*, Vol. 40, No. 5, August 2021, pp. 923-945.

Smith, H. Jeff, Tamara Dinev and Heng Xu, "Information Privacy Research: An Interdisciplinary Review," *MIS Quarterly*, Vol. 35, No. 4, December 2011, pp. 989-1015.

Spiekermann, Sarah, Rainer Böhme, Alessandro Acquisti and Kai-Lung Hui, "The Challenges of Personal Data Markets and Privacy," *Electronic Markets*, Vol. 25, No. 2, January 2015, pp. 161-167.

Tadelis, Steven, Christopher Hooton, Utsav Manjeer, Daniel Deisenroth, Nils Wernerfelt, Nick Dadson and Lindsay Greenbaum, "Learning, Sophistication, And The Returns to Advertising: Implications For Differences in Firm Performance," *National Bureau of Economic Research*, No. w31201, *Working Paper*, April 2023.

Tolomei, Gabriele, Mounia Lalmas, Ayman Farahat and Andrew Haines, "You Must Have Clicked on this Ad by Mistake! Data-Driven Identification of Accidental Clicks on Mobile Ads with Applications to Advertiser Cost Discounting and Click-Through Rate

Prediction," *International Journal of Data Science and Analytics*, Vol. 7, April 2018, pp. 53-66.

**Books**

Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, John Wiley & Sons, Inc., 3rd Ed.

Mankiw, N. Gregory, *Principles of Economics*, Cengage Learning, 2018, 8th Ed.

Milgrom, Paul, *Putting Auction Theory to Work*, Cambridge University Press, 2004.

Tadelis, Steven, *Game Theory: An Introduction*, Princeton University Press, 2013.

Weil, Roman L., Daniel G. Lentz and David P. Hoffman, *Litigation Services Handbook: The Role of the Financial Expert*, John Wiley & Sons, Inc., 2012, 5th Ed.

**Public Documents**

"About Ad Auctions," *Meta*, available at https://www.facebook.com/business/help/430291176997542.

"About Ad Placements Across Meta Technologies," *Meta*, available at https://www.facebook.com/business/help/407108559393196.

"Best Practices to Improve Ad Quality and Performance," *Meta*, available at https://www.facebook.com/business/help/1767120243598011.

"Buy Ads on Facebook and Beyond with Any Budget," *Meta*, available at https://www.facebook.com/business/goals/buy-facebook-ads.

"Contact Us," *Meaningful Connections Counseling*, available at https://www.meaningfulconnectionscounseling.com/contact-us.html.

"Create a Customer List Custom Audience," *Meta*, available at https://www.facebook.com/business/help/170456843145568.

"Data Privacy: What the Consumer Really Thinks," *Data & Marketing Association*, June 2018, available at https://marketing.acxiom.com/rs/982-LRE-196/images/DMA-REP-DataPrivacy-US.pdf.

"Facebook and Instagram to Offer Subscription for No Ads in Europe," *Meta*, November 12, 2024, available at https://about.fb.com/news/2024/11/facebook-and-instagram-to-offer-subscription-for-no-ads-in-europe/.

"Frequently Asked Questions," *MedStar Health*, available at https://www.medstarhealth.org/patient-portal/faqs.

"Health Record Access Update," *Kaiser Permanente*, available at https://healthy.kaiserpermanente.org/washington/support/health-record-access-update.

"How Does Honeygain Work?," *Honeygain*, available at https://support.honeygain.com/hc/en-us/articles/4412690090898-How-does-Honeygain-work.

"International Valuation Standards," *International Valuation Standards Council*, January 31, 2025, available at https://viewpoint.pwc.com/dt/gx/en/ivsc/international_valuat/assets/IVS_effective_31_January_2025.pdf.

"Killi Overview," *Insight Partners*, available at https://www.insightplatforms.com/platforms/killi/.

"Launch Day!," *Caden*, March 21, 2023, available at https://www.caden.io/blog-posts/caden-launch-day.

"Market Valuation Approach," *Corporate Finance Institute*, available at https://corporatefinanceinstitute.com/resources/valuation/market-approach-valuation/.

"MyChart Proxy Access," *Main Line Health*, available at https://www.mainlinehealth.org/patient-services/patient-portals/proxy-access.

"Pediatric Mental Health Care That's Proven to Work," *Handspring*, available at https://www.handspringhealth.com/.

"Privacy Policy," *Meta*, available at https://mbasic.facebook.com/privacy/policy/printable/version/10052835831416190/.

"Proxy Access," *Sutter Health*, available at https://www.sutterhealth.org/patient-resources/my-health-online/proxy-access.

"Redeem Your Goal Now," *Reklaim*, available at https://www.reklaimyours.com/redeem.

"Request or Provide Proxy Access to Another Person's MyChart Account," *My Chart*, available at https://www.mychart.org/Help/proxy.

"Reviews of UpVoice," *Chrome-Stats*, available at https://chrome-stats.com/d/ldemaeidicoeoppeeefcfcmnieobjdho/reviews?hl=en.

"SavvyConnect Monthly Participation Requirements," *Survey Savvy*, available at https://surveysavvy.com/savvyconnect-requirements/.

"Shaping the Future Implications of Digital Media for Society," *World Economic Forum*, January 2017, available at https://www3.weforum.org/docs/WEF_End_User_Perspective_on_Digital_Media_Survey_Summary_2017.pdf.

"The Meta Business Tools," *Meta*, available at https://www.facebook.com/business/help/331509497253087.

"US Data Privacy: What the Consumer Really Thinks," *Global Data and Marketing Alliance*, 2022, available at https://globaldma.com/wp-content/uploads/2022/03/GDMA-US-Data-Privacy-2022.pdf.

"Washington and Nevada Consumer Health Data Privacy Policy," *Meta*, March 31, 2024, available at https://www.facebook.com/privacy/policies/health/.

"WebMD's Facebook Health Communities," *WebMD*, available at https://www.webmd.com/facebook-groups.

"What Are Data Brokers – And What Is Your Data Worth? [Infographic]," *WebFX*, available at https://www.webfx.com/blog/internet/what-are-data-brokers-and-what-is-your-data-worth-infographic/.

"What Are the Payout Fees?," *Honeygain*, available at https://support.honeygain.com/hc/en-us/articles/4412743372690-What-are-the-payout-fees.

"When to Get the Flu Shot," *Google*, available at https://www.google.com/search?q=when+to+get+the+flu+shot.

Allison, Michael, "Google Winds Down Program that Let You Trade Usage Data for Gift Cards," *Android Central*, November 4, 2020, available at https://www.androidcentral.com/google-winds-down-its-screenwise-meter-app.

Au, Brian, "Calculating Bounces & Bounce Rate in Adobe Customer Journey Analytics: Options and Implications," *Adobe experience League*, September 25, 2024, available at https://experienceleaguecommunities.adobe.com/t5/adobe-analytics-blogs/calculating-bounces-amp-bounce-rate-in-adobe-customer-journey/ba-p/706446.

Blake, Tom, "Mobile Performance Meter Review – Is It Legit & Worth Using?," *The Budget Diet*, available at https://www.thebudgetdiet.com/mobile-performance-meter.

Brewster, Tom, "Meet Datacoup – The Company That Wants to Help You Sell Your Data," *The Guardian*, September 5, 2014, available at https://www.theguardian.com/technology/2014/sep/05/datacoup-consumer-sell-data-control-privacy-advertising.

Broek, Stef Van Den, "Datacoup: Selling Personal Data in the Age of Acxiom," *Masters Of Media*, September 16, 2014, available at https://mastersofmedia.hum.uva.nl/2014/09/datacoup-selling-personal-data-in-the-age-of-acxiom/.

Davidson, Jacob, "Forget Facebook, Meet the Company That Will Pay You for Your Personal Data," *Money*, September 4, 2014, available at https://money.com/datacoup-facebook-personal-data-privacy/.

Drake, Tom, "PermissionResearch Review: How It Works and How Much Can You Make?," *Get Rich Slowly*, November 15, 2020, available at https://www.getrichslowly.org/permissionresearch-review/.

Fane, Kate, "How Much is Your Personal Data Really Worth?," *Vice*, August 22, 2017, available at https://www.vice.com/en/article/how-much-is-is-your-personal-data-really-worth/.

Hoyt, Bobby, "Get Paid for Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/.

Lang, Kirsti, "How to Run Facebook Ads: Beginner's Guide to Advertising on Facebook," *Buffer*, July 22, 2024, available at https://buffer.com/resources/facebook-ads-beginners-guide/.

Lazarus, David, "This Company Will Pay You to Share Your Data. Is It Worth It?," *Los Angeles Times*, December 1, 2020, available at https://www.latimes.com/business/story/2020-12-01/column-privacy-money-for-data-sharing.

Loper, Nick, "14 Real Ways to Get Paid for Your Data: Up to $500 a Year," *Side Hustle Nation*, available at https://www.sidehustlenation.com/get-paid-for-your-data/.

Marshall, Jack, "Google Pays Users for Browsing Data," *Digiday*, February 10, 2012, available at https://digiday.com/media/google-pays-users-for-browsing-data/.

McClain, Colleen, Michelle Faverio, Monica Anderson and Eugenie Park, "How Americans View Data Privacy," *Pew Research Center*, October 18, 2023, available at https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

Morey, Timothy, Theodore Forbath and Allison Schoop, "Customer Data: Designing for Transparency and Trust," *Harvard Business Review*, May 2015, available at https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust.

Nathaniel, Tom, "Upvoice Review: $75 to Do Nothing?," *Lush Dollar*, September 11, 2023, available at https://lushdollar.com/upvoice-review/.

Newton, Casey, "Facebook Will Shut Down its Controversial Market Research App for iOS," *The Verge*, January 30, 2019, available at https://www.theverge.com/facebook/2019/1/30/18203349/facebook-research-app-apple-shutdown.

Schechner, Sam, "Meta Plans to Charge $14 a Month for Ad-Free Instagram or Facebook," *The Wall Street Journal*, October 3, 2023, available at https://www.wsj.com/tech/meta-floats-charging-14-a-month-for-ad-free-instagram-or-facebook-5dbaf4d5.

Sheena, Jasmine, "Caden, the App That Pays Users Money to Share Their Data, Recently Soft-Launched," *Marketing Brew*, May 9, 2023, available at https://www.marketingbrew.com/stories/2023/05/09/caden-the-app-that-pays-users-money-to-share-their-data-recently-soft-launched.

Simonite, Tom, "Sell Your Personal Data for $8 a Month," *MIT Technology review*, February 12, 2014, available at https://www.technologyreview.com/2014/02/12/174259/sell-your-personal-data-for-8-a-month/.

Singer, Natasha, "A Vault for Taking Charge of Your Online Life," *New York Times*, December 8, 2012, available at https://www.nytimes.com/2012/12/09/business/company-envisions-vaults-for-personal-data.html?pagewanted=all.

Spence, Pamela, "How We Can Place a Value on Health Care Data," *Ernst & Young*, July 19, 2019, available at https://www.ey.com/en_gl/insights/life-sciences/how-we-can-place-a-value-on-health-care-data.

Weiss, R.J., "YouGov Review: Is It Legit? Here's Exactly How Much I Made," *The Ways to Wealth*, June 2, 2024, available at https://www.thewaystowealth.com/yougov-review/.

Zabel, Laurie, "The Value of Personal Medical Information: Protecting Against Data Breaches," *Naham*, available at https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information.

## APPENDIX C

## TABLE 1 SOURCES

1. Reklaim, fka Killi (1, 2, 3, 4)
   a. "Killi Overview," *Insight Partners*, available at https://www.insightplatforms.com/platforms/killi/.
2. Google Screenwise (5, 6)
   a. Marshall, Jack, "Google Pays Users for Browsing Data," *Digiday*, February 10, 2012, available at https://digiday.com/media/google-pays-users-for-browsing-data/.
3. Caden (7)
   a. Sheena, Jasmine, "Caden, the App That Pays Users Money to Share Their Data, Recently Soft-Launched," *Marketing Brew*, May 9, 2023, available at https://www.marketingbrew.com/stories/2023/05/09/caden-the-app-that-pays-users-money-to-share-their-data-recently-soft-launched.
4. Permission Research (ComScore) (8)
   a. Drake, Tom, "PermissionResearch Review: How It Works and How Much Can You Make?," *Get Rich Slowly*, November 15, 2020, available at https://www.getrichslowly.org/permissionresearch-review/.
5. Datacoup (9, 16)
   a. Brewster, Tom, "Meet Datacoup – The Company That Wants To Help You Sell Your Data," *The Guardian*, September 5, 2014, available at https://www.theguardian.com/technology/2014/sep/05/datacoup-consumer-sell-data-control-privacy-advertising.
6. Nielsen (10)
   a. Loper, Nick, "14 Real Ways to Get Paid for Your Data: Up to $500 a Year," *Side Hustle Nation,* available at https://www.sidehustlenation.com/get-paid-for-your-data/.
7. Embee (11)
   a. Blake, Tom, "Mobile Performance Meter Review – Is It Legit & Worth Using?," *The Budget Diet*, available at https://www.thebudgetdiet.com/mobile-performance-meter.
   b. Hoyt, Bobby, "Get Paid For Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/.

8. UpVoice (12)
    a. Hoyt, Bobby, "Get Paid For Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/.
9. SavvyConnect (13)
    a. Hoyt, Bobby, "Get Paid For Your Data | 11 Best Data Collection Apps for 2025," *Millennial Money Man*, January 15, 2025, available at https://millennialmoneyman.com/get-paid-for-your-data/.
10. EU Subscriptions for N-Ad Facebook & Instagram (14, 15, 22)
    a. "Facebook and Instagram to Offer Subscription for No Ads in Europe," *Meta*, November 12, 2024, available at https://about.fb.com/news/2024/11/facebook-and-instagram-to-offer-subscription-for-no-ads-in-europe/.
11. Reputation (17)
    a. "What Are Data Brokers – And What Is Your Data Worth? [Infographic]," *Web FX*, available at https://www.webfx.com/blog/internet/what-are-data-brokers-and-what-is-your-data-worth-infographic/.
    b. Singer, Natasha, "A Vault for Taking Charge of Your Online Life," *New York Times*, December 8, 2012, available at https://www.nytimes.com/2012/12/09/business/company-envisions-vaults-for-personal-data.html?pagewanted=all.
12. YouGov (18)
    a. Weiss, R.J., "YouGov Review: Is It Legit? Here's Exactly How Much I Made," *The Ways to Wealth*, June 2, 2024, available at https://www.thewaystowealth.com/yougov-review/.
13. Facebook Research App (19, 20, 21, 23, 24)
    a. Newton, Casey, "Facebook Will Shut Down Its Controversial Market Research App for iOS," *The Verge*, January 30, 2019, available at https://www.theverge.com/facebook/2019/1/30/18203349/facebook-research-app-apple-shutdown.
14. Honeygain (25)
    a. "How Does Honeygain Work?," *Honeygain*, available at https://support.honeygain.com/hc/en-us/articles/4412690090898-How-does-Honeygain-work.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE META PIXEL HEALTHCARE LITIGATION | Case No. 3:22-cv-03580-WHO (VKD) |

**EXPERT REPORT OF GEORGIOS ZERVAS, PH.D.**
**DECEMBER 9, 2025**

## TABLE OF CONTENTS

I. INTRODUCTION AND QUALIFICATIONS ........ 1
A. Qualifications ........ 1
B. Assignment ........ 2
C. Facts and Data Considered ........ 4
D. Summary of Plaintiffs' Allegations ........ 4
II. SUMMARY OF OPINIONS ........ 6
III. BACKGROUND ON RELEVANT TECHNOLOGIES ........ 9
A. Basics of Internet Communications ........ 9
B. Overview of Meta's Business Tools ........ 16
1. Meta Pixel ........ 16
2. Advanced Matching ........ 22
3. Conversions API ........ 25
4. Facebook SDK ........ 27
5. Customer List Uploads ........ 31
IV. META'S TECHNICAL MEASURES TO PREVENT THE TRANSMISSION AND USE OF POTENTIALLY SENSITIVE INFORMATION ........ 32
A. Source Classification ........ 33
B. Button Clicks and Automatic Events Blocking ........ 36
C. Meta's Filtration Systems ........ 40
1. Universal Filtering ........ 40
2. Health-Related Filtering ........ 42
D. Notifications ........ 46
E. Patient Portal Restrictions ........ 47
F. Core Setup ........ 48
G. Custom Event Registration ........ 53
H. Automatic Advanced Matching ........ 54
V. DEVELOPERS CHOOSE WHETHER AND HOW TO IMPLEMENT META'S BUSINESS TOOLS AND USERS HAVE CONTROLS THAT AFFECT DATA TRANSMISSION TO META AND META'S USE OR STORAGE OF THAT DATA ........ 55
A. Developers Choose Whether to Use Meta's Business Tools and Have Controls That Affect Data Transmission to Meta ........ 56

1. Developers Can Decide on Which Pages to Integrate the Meta Pixel, If Any ........ 56
2. Developers Can Decide Whether and Which Events to Transmit to Meta ........ 60
3. Developers Decide Whether and How to Implement Consent Mechanisms ........ 62
4. Developers Can Turn Off Transmission of First-Party Cookies Related to the Meta Pixel ........ 65
5. Developers Can Customize or Disable Advanced Matching ........ 69

B. Website Visitors Have Controls That Affect Data Transmissions to Meta ........ 69
1. Browsers Provide a Variety of Features That Website Visitors Can Use to Restrict the Meta Pixel ........ 70
2. Website Visitors Can Adjust Website-Specific Settings to Prevent the Transmissions of Certain Data ........ 78
3. Website Visitors' Prior Interactions with Meta Domains Can Affect Cookie Transmission and Matching ........ 82

C. Facebook Users Have Other Controls That Affect Meta's Use or Storage of Data ........ 83
1. Online Behavioral Advertising ("OBA") Controls ........ 84
2. Off-Meta Technologies ("OMT") Controls ........ 87

VI. DR. HASHMI'S ANALYSIS OF META'S SOURCE CODE IS UNRELIABLE ........ 89

A. Dr. Hashmi's Review of Meta's Systems Is Incomplete ........ 89

B. Dr. Hashmi's Claims About Meta's Receipt of Button-Related Information from Sensitive Domains Are Incomplete ........ 96

C. Dr. Hashmi's Opinion About How Meta's Servers Receive, Store, and Use Data Is Misleading ........ 98

VII. DR. SHAFIQ'S OPINIONS ARE FLAWED AND UNRELIABLE ........ 103

A. Opinion 1: Dr. Shafiq Fails to Provide a Reliable Method to Identify "All or Almost All" Healthcare Provider Websites and Apps ........ 103
1. Dr. Shafiq Fails to Establish That Meta's Megataxon System Would Identify All or Almost All "Healthcare Provider Websites" ........ 104
2. Dr. Shafiq Fails to Establish That Meta's RDTT Classifications Would Identify All or Almost All "Healthcare Provider Websites" ........ 112
3. Dr. Shafiq Fails to Establish That Meta's Other Classification Systems Would Identify All or Almost All "Healthcare Provider Websites" ........ 119
4. Dr. Shafiq Does Not Explain How the "Publicly Available Sources" He References Relate to the Meta Pixel or Other of Meta's Business Tools ........ 123

A13-4246

5. Dr. Shafiq Fails to Provide a Methodology to Combine the Classification and Lists Referenced in Opinion 1 of His Report ........ 124
6. Dr. Shafiq Fails to Provide a Reliable Method to Identify "All or Almost All" Healthcare Provider Apps ........ 126

B. Opinion 2: Dr. Shafiq Fails to Show That Meta's Matching System Can Accurately Identify Facebook Users from Offsite Data Transmitted to Meta ........ 127
1. Dr. Shafiq's Analysis Demonstrates That the Methods from the [redacted] System He Describes Cannot Reliably Match Event Data to Facebook Accounts Accurately ........ 127
2. Dr. Shafiq Misuses the Concept of Entropy to Imply, Incorrectly, That Information Collected by Meta Can Identify All Facebook Users That Would Be Part of a Proposed Class ........ 133
3. Dr. Shafiq Mischaracterizes Meta's Mapping Between SIDs and UIDs to Imply Incorrectly That Meta Can Link All Event Data to Facebook Accounts ........ 136

C. Opinion 3: Dr. Shafiq Fails to Provide a Reliable Method to Identify Patient Button Clicks, Health Information, or Prescription Drug Information ........ 137
1. Dr. Shafiq Fails to Provide a Reliable Method to Identify Button Clicks ........ 137
2. Dr. Shafiq Fails to Provide a Reliable Method to Identify Health Information and Prescription Drug Information in Full-String URLs ........ 157

D. Opinion 4: Dr. Shafiq Misrepresents Meta's Technical Measures That Prevent the Receipt or Use of Health Information ........ 161

E. Opinion 5: Dr. Shafiq's Assessment of Meta's Core Setup Is Unreliable ........ 165

F. Opinion 6: Dr. Shafiq's Analysis of the Transmission of Data to Meta's Servers Is Flawed ........ 171

G. Opinion 7: Dr. Shafiq's Opinion Concerning the Browser Storage and Computing Resources Used by the Meta Pixel Is Unreliable ........ 172

H. Opinion 8: Dr. Shafiq Fails to Show That Meta Can Reliably Identify the Location of All Users, Healthcare Providers' Website Servers, or Meta's Relevant Servers ........ 174

I. Opinion 9: Dr. Shafiq's Opinions Related to Data Lineage Are Misleading ........ 177

J. Opinion 10: Dr. Shafiq Fails to Provide a Reliable Method for Counting the Number of Proposed Class Members ........ 179

VIII. MR. SMITH'S OPINIONS ARE FLAWED AND UNRELIABLE ........ 181

A. Mr. Smith's Analyses Do Not Support That SubscribedButtonClick Events Were Transmitted to Meta After Website Visitors Logged into a Patient Portal .......... 181

B. Mr. Smith's Analyses Do Not Support His Conclusion That SubscribedButtonClick Events Were Commonly Transmitted to Meta from Healthcare Provider Webpages .......... 182

1. Mr. Smith's 17 SAZ Files Cannot Be Used to Reliably Assess "How Common It Was for the Meta Pixel to Send SubscribedButtonClick Events to Facebook from Web Pages of Healthcare Provider Web Sites" .......... 182
2. Mr. Smith's Analysis Improperly Relies on Developers' Misconfigured Integration of the Meta Pixel .......... 188

# I. INTRODUCTION AND QUALIFICATIONS

## A. Qualifications

1. I am an Associate Professor of Marketing at Boston University Questrom School of Business, a founding member of the Faculty of Computing & Data Sciences, a Director of Online Initiatives and Innovation for BU Virtual and the Faculty of Computing and Data Sciences ("CDS"), and Affiliated Faculty of the Department of Computer Science. I was also a visiting researcher at Microsoft Research New England. Prior to joining the Boston University faculty, I held various academic roles, including visiting scholar at the MIT Sloan School of Management, Simons Postdoctoral Fellow at Yale University, and affiliate at the Center for Research on Computation and Society at Harvard University's John A. Paulson School of Engineering and Applied Sciences. I am an associate editor of *ACM Transactions on Economics and Computation*, and I sit on the editorial review boards of *Marketing Science* and the *Journal of Marketing*. At Boston University, I teach the course Machine Learning for Business Analytics at the undergraduate and graduate levels.

2. My research combines methods from computer science and economics to study online marketplaces to understand their impact on consumer and firm behavior. I have conducted studies of online marketplaces such as Airbnb, Yelp, TripAdvisor, and Expedia. My work is empirical in nature and includes assembling and analyzing novel sources of data that I collect from these marketplaces to study their operation. I hold a Bachelor of Engineering and a Master of Science in Computer Science from Imperial College London, a Master of Arts in Interactive Media from London College of Communication, and a Ph.D. in Computer Science from Boston University. Before pursuing my Ph.D. in Computer Science, I ran a small information technology company. My C.V. is attached as **Appendix A**, and a list of my prior testimony in the last four years is attached as **Appendix B**.

3. I have experience with internet technologies, similar to those involved in this matter, including through professional and academic experience, and my work as an expert witness in other litigations, including testifying in a Federal Court trial.[1] I have analyzed web browsing session

[1] *See* **Appendix B** ("*Frasco et al. v. Flo Health, Inc., Google LLC, Meta Platforms, Inc., AppsFlyer, Inc., and Flurry, Inc.,* Case No. 3:21-cv-00757-JD ("Frasco et al. v. Flo Health et al.")").

data as part of my research.[2] I also have professional and academic experience, both writing and reviewing source code, including in the programming languages used in this case. In my prior work[3] as an expert witness, I have also explained modern third-party tools, like the Meta Pixel, Google Analytics, and Google Ads, that website developers may rely on, including what data may be transmitted as a result of the operation of these tools and how such data may be used for analytics and advertising services.[4]

4. I also have experience with the specific technologies at issue in this case through my work as an expert witness in another litigation. I submitted an expert report in the matter of *Angel McDaniel, et al. v. Meta Platforms, Inc.*, in the Superior Court of the State of California for the County of Santa Clara, Case No. 21-cv-383231. In that matter, I explained the Meta Pixel, including its purpose, how it functions, and why it is widely used across the Internet.

5. I am being compensated at the rate of $950 per hour for my time working on this case. Research and analysis for this report were also performed by Analysis Group, Inc. personnel, working under my direction and guidance. In addition, I receive a portion of the fees paid to Analysis Group, Inc. for its work. Neither my compensation nor Analysis Group's compensation is contingent on the nature of my findings or the outcome of this litigation.

### B. Assignment

6. I was retained by Gibson, Dunn & Crutcher, LLP and Latham & Watkins LLP ("Counsel") on behalf of Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta," "Facebook," or "Defendant") to provide expert testimony about the technical components in the matter of *In Re*

---

[2] *See, e.g.*, Armona, Luis et al., "Learning Product Characteristics and Consumer Preferences from Search Data," *Marketing Science*, Vol. 44, No. 4, December 10, 2024, pp. 838-855, p. 841 ("We make use of a session ID variable recorded by IE that captures the URLs visited by a single user during one continuous 'session' defined as continuous usage of their computer where the time between clicks is no more than 30 minutes"); Budak, Ceren et al., "Understanding Emerging Threats to Online Advertising," *EC '16: Proceedings of the 2016 ACM Conference on Economics and Computation*, July 21, 2016, pp. 561-578, p. 565 ("When a user visits any one of these top 10,000 retailers, we call that visit, along with all subsequent, uninterrupted visits on the same domain, a single shopping session").

[3] *See* **Appendix B**.

[4] *See*, *e.g*., **Appendix B** ("*Frasco et al. v. Flo Health et al*; *Brown et al. v. Google, LLC*, Case No. 4:20-cv-03664-YGR; *Calhoun et al. v. Google LLC, U.S.*, Case No. 5:20-cv-05146-YGR-SVK.").

*Meta Pixel Healthcare Litigation*, pending in the United States District Court for the Northern District of California, San Francisco Division, Master File No. 3:22-cv-3580-WHO (VKD).

7. On September 9, 2025, Zubair Shafiq, Atif Hashmi, and Richard M. Smith submitted expert reports on behalf of Plaintiffs ("Shafiq Report," "Hashmi Report," and "Supplemental Smith Declaration," respectively).[5] I refer to these reports and declarations collectively as "Plaintiffs' Expert Reports." I was asked to:

   a. Explain the technologies relevant to the opinions I offer in response to the opinions presented in Plaintiffs' Expert Reports.

   b. Explain Meta's technical measures developed to prevent the transmission or use of potentially sensitive information.

   c. Explain the settings and controls available to users and developers that determine what information is transmitted to Meta.

   d. Review Dr. Hashmi's report and assess whether his opinions are technically accurate and reliable and whether his supporting analysis of Meta's produced source code ("Source Code") is accurate, reliable, and comprehensive.[6]

   e. Review Dr. Shafiq's report and assess whether his opinions are technically accurate and reliable.[7] I was also asked to assess whether Dr. Shafiq provides a method that can be used to count the number of members in each of the proposed classes.

   f. Review Mr. Smith's supplemental declaration and assess whether his opinions are technically accurate and reliable.[8] I was also asked to determine whether Mr. Smith's

---

5 Expert Report of Zubair Shafiq, PhD, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580, September 9, 2025 ("Shafiq Report"); Expert Report of Dr. Atif Hashmi, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580, September 9, 2025 ("Hashmi Report"); Supplemental Declaration of Richard M. Smith, *John Doe, et al. v. Meta Platforms, Inc.*, Case No. 3:22-cv-03580-WHO, September 8, 2025 ("Supplemental Smith Declaration").

I note that Mr. Smith previously submitted an initial declaration on August 25, 2022. *See* Declaration of Richard M. Smith in Support of Plaintiffs' Motion for Preliminary Injunction, *John Doe, et al. v. Meta Platforms, Inc.*, Case No. 3:22-cv-3580-WHO, August 25, 2022 ("Initial Smith Declaration").

6 *See, e.g.*, Hashmi Report, ¶¶ 12-20.

7 *See, e.g.*, Shafiq Report, ¶¶ 1-12.

8 *See, e.g.*, Supplemental Smith Declaration, ¶¶ 3, 5, 8, 13.

analyses showed that SubscribedButtonClick events were transmitted to Meta after website visitors logged into a patient portal.

8. If I do not address specific topics or opinions in Plaintiffs' Expert Reports, that should not be construed as an implied agreement with those topics or opinions.

9. My work on this matter is ongoing, and I may update, refine, or revise my opinions, as well as form further opinions, if I review additional materials or conduct further analysis in this matter.

### C. Facts and Data Considered

10. A list of materials and other information that I have relied upon in forming my opinions is provided in **Appendix C**. This report and the opinions expressed herein are based on my training, professional experience, and analysis of the materials listed in **Appendix C**, and they reflect my current understanding of these materials.

### D. Summary of Plaintiffs' Allegations

11. I understand Plaintiffs have proposed the following classes ("Proposed Classes") for the period of June 17, 2018, to present ("Proposed Class Period") for certification:

   a. "The Patient Status Button-Click Class – All Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers[;]

   b. The Patient Health Information Class – All Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above[;]

   c. The Prescription Drug Information Class – All Facebook users whose communications with a prescription drug website for which they have a prescription were obtained by Meta[; and]

   d. The Patient Device Intrusion Class – All Facebook users for whom Meta placed an *_fbp* cookie and/or used computing resources by sending data to Meta through their device

and/or by computing Core Setup logic on their device while at a Healthcare Provider property."[9]

I refer to members of these four Proposed Classes as "Proposed Class Members."

12. According to Plaintiffs' Notice of Motion and Motion for Class Certification, Plaintiffs allege that "Meta knowingly obtains health information about patients and their communications throughout the United States without their consent, despite its contractual promises to the contrary."[10] Specifically, Plaintiffs claim that "Meta collects consumer data through a suite of Business tools: The Meta Pixel, SDK, CAPI, and customer list uploads."[11] The data that Plaintiffs claim the Meta Pixel "re-directs from a patient's device to Meta's servers has two important parts:" (1) "information Meta uses to identify the Facebook user associated with the communication […] including browser cookies, device IDs, and IP addresses,"[12] and (2) "the communication itself, such as a GET or POST request (the technical terms for a browser communication), the content of a button clicked, or the information contained in a form. [… It]

[9] Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (VKD), September 9, 2025 ("Motion for Class Certification"), p. 13. Plaintiffs define a "patient portal, medical appointment, bill payment, or diagnostic button click," as "a button click on or navigating to a patient portal login, logout, or signup; scheduling or checking-in for an appointment for a doctor/provider; bill payment, bill lookup, or signing up for a bill payment; and accessing/completing a health risk assessment/quiz." *See* Motion for Class Certification, p. 13, footnote 5.

I note that, in Plaintiffs' First Amended Consolidated Class Action Complaint, Plaintiffs propose a class of "[a]ll Facebook users whose health information was obtained by Meta from their healthcare provider or covered entity through Meta Collection tools," where Meta Collection Tools are defined as "the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, Meta Graph API, server-to-server transmissions, and any other similar collection tools." *See* First Amended Consolidated Class Action Complaint, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 10, 2023 ("Consolidated Complaint"), ¶¶ 353-354.

[10] Motion for Class Certification, p. 1. *See also* Consolidated Complaint, ¶ 5.

[11] Motion for Class Certification, p. 2. I note that, in the Consolidated Complaint, Plaintiffs allege that the "Meta Collection Tools" were "the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, the Meta Graph API, server-to-server transmissions, and any other similar collection tools." *See* Consolidated Complaint, ¶ 1.

[12] Motion for Class Certification p. 2. I note that, in the Consolidated Complaint, Plaintiffs allege that information transmitted to Meta "always includes information sufficient to uniquely identify a patient under federal law (such as IP address information and device identifiers that Meta associates with a patient's Meta account), and may also include a patient's demographic information, email address, phone number, computer ID address, or contact information entered as emergency contacts or for advanced care planning, along with information like appointment type and date, a selected physician, button and menu selections, the content of buttons clicked and typed into text boxes, and information about the substance, purport, and meaning of patient requests for information from their providers and other 'covered entities' under federal and state health privacy laws." *See* Consolidated Complaint, ¶ 8.

also includes content such as the text of a button clicked to log-in to a patient portal or request an appointment, or a full-string URL that contains health information."[13]

13. Plaintiffs further allege that Meta "ingest[s], process[es], and monetize[s] this health data as part of its centralized ad-targeting and other pipelines."[14] Specifically, Plaintiffs assert that Meta "seeks to identify the Facebook user whose data it received, using an identity matching system called [redacted] and "[a]fter matching the collected data to the user, Meta analyzes and categorizes the data […] to mine the data in real time so that it can be used for targeted ads and other business purposes."[15]

## II. SUMMARY OF OPINIONS

14. I have reached the following opinions based on my review of the information identified herein:

a. Meta has implemented technical measures to prevent the receipt and use of potentially sensitive data, including potentially health-related information, and these measures have evolved over time. *See* **Section IV**.

b. Website and app developers ("developers") decide whether to use Meta's Business Tools, and determine what data to send, how, and when. Website visitors also have access to various controls that determine whether and how data is transmitted to Meta. The different choices website visitors and developers make result in the transmission of different information that can vary by visitor, website, and over time. In addition, Facebook users have other controls that affect Meta's use or storage of data. *See* **Section V**.

c. Dr. Hashmi's conclusions based on his analysis of Meta's Source Code are unreliable or misleading for the following reasons:

---

13 Motion for Class Certification, p. 2. I note that, in the Consolidated Complaint, Plaintiffs claim that the patient information transmitted to Meta "includ[es], but [is] not limited to: (1) signing-up for a patient portal; (2) signing-in or -out of a patient portal; (3) taking actions inside a patient portal; (4) making, scheduling, or participating in appointments; (5) exchanging communications relating to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions; (6) conduct a search on the Meta health partner website; and (7) other information that qualifies as 'personal health information' under federal and state laws." *See* Consolidated Complaint, ¶ 6.

14 Motion for Class Certification, p. 3. *See also* Consolidated Complaint, ¶ 13.

15 Motion for Class Certification, p. 3. *See also* Consolidated Complaint, ¶ 13.

i. Dr. Hashmi failed to consider all relevant code and documentation related to Meta's technical measures that prevent the receipt and use of potentially sensitive information. *See* **Section VI.A**.

ii. Dr. Hashmi's conclusion that Meta did not filter Button Text information is misleading and fails to fully consider the evidence, which he himself references, that Meta has been blocking SubscribedButtonClick events—including Button Text data—for certain advertisers classified as sensitive since shortly after these events were first introduced. *See* **Section VI.B.**

iii. Dr. Hashmi's conclusion that Meta uses event data to "select advertisements for Meta's users" is incomplete and misleading.[16] Meta's advertising systems do not use event data if users opt out of personalized advertising. In addition, when event data is made available to Meta's advertising systems, the effect of each data point on ad delivery, if any, depends on numerous factors that make assessing the effect of each data point difficult or impossible. *See* **Section VI.C**.

d. Dr. Shafiq's opinions are flawed and unreliable for the following reasons:

i. Dr. Shafiq fails to establish that any of the classification systems that he references—in isolation or in combination—can accurately identify "all or almost all" healthcare provider websites and apps.[17] *See* **Section VII.A**.

ii. Dr. Shafiq fails to show that the methods he describes can accurately match offsite event data to Facebook users. *See* **Section VII.B**.

iii. Dr. Shafiq provides no reliable method for identifying "Patient Button Clicks," "Health Information," or "Prescription Drug Information."[18] *See* **Section VII.C**.

iv. Dr. Shafiq's assessment of the effectiveness of "Meta's Filter" is unreliable and based on both a flawed analysis and a misunderstanding of Meta's technical measures to prevent the receipt and use of potentially sensitive information. *See* **Section VII.D**.

---

16 *See, e.g.*, Hashmi Report, ¶ 20.

17 *See, e.g.*, Shafiq Report, ¶ 64.

18 *See, e.g.*, Shafiq Report, ¶ 126.

v. Dr. Shafiq's assessment of Core Setup is misleading as it misrepresents what Core Setup was designed to do and how it operates. *See* **Section VII.E**.

vi. Dr. Shafiq's analysis of the transmission of data to Meta's servers fails to consider that the timing of transmissions may vary by user and across websites. *See* **Section VII.F**.

vii. While Dr. Shafiq claims that the Meta Pixel consumes "measurable" computing resources,[19] he fails to define what "measurable" means and fails to consider that the impact of the resources used, if any, may vary by user. Dr. Shafiq also fails to consider that website developers—not Meta—choose whether to implement the Meta Pixel. *See* **Section VII.G**.

viii. Dr. Shafiq fails to demonstrate that he can reliably identify the geographic locations of users and healthcare provider servers. Further, Dr. Shafiq fails to provide a method to determine which of Meta's Points of Presence first receive event data at the time of a specific data transmission, rendering Dr. Shafiq's opinion that Meta knows its servers' locations misleading. *See* **Section VII.H**.

ix. Dr. Shafiq's data lineage opinion is misleading and does not reflect how Meta's advertising systems, and machine learning models more generally, operate. *See* **Section VII.I**.

x. Dr. Shafiq provides no reliable methods for counting the number of Proposed Class Members in each Proposed Class. *See* **Section VII.J**.

e. Mr. Smith's opinions are flawed and unreliable for the following reasons:

i. Mr. Smith fails to demonstrate that any SubscribedButtonClick events were transmitted to Meta's servers after logging into a patient portal, let alone whether "Meta acquires the patient status of individuals logging into the 'patient portals' of their providers."[20] *See* **Section VIII.A**.

---

19 *See, e.g.*, Shafiq Report, ¶ 181 ("The Meta Pixel consumes computing resources and it does so in a measurable way").

20 Supplemental Smith Declaration, ¶ 3.

ii. Mr. Smith's conclusion that SubscribedButtonClick events were commonly transmitted to Meta from healthcare provider webpages is based on particular examples that Mr. Smith selected that are unreliable for making such an assessment. *See* **Section VIII.B**.

## III. BACKGROUND ON RELEVANT TECHNOLOGIES

### A. Basics of Internet Communications

15. In this section, I describe some terms that are related to internet communication and are relevant to my opinions discussed in this report.

16. **Web browsers ("browsers")** are software applications that allow a user's device on a local network (*e.g.*, computer, mobile device, or laptop) to access information from the internet in the form of web pages and display these pages on the user's device.[21]

17. **Internet Protocol ("IP") addresses** are sequences of numbers that provide the network location of a device.[22] When multiple devices, regardless of user, are connected to the same network, they all share the same IP address.[23] Thus, an IP address may be associated with multiple users. Similarly, because a user can access the internet from multiple networks (*e.g.*, home, work, coffee shops, etc.), a user's internet activity may be associated with multiple IP addresses. IP addresses also can be dynamic, meaning they can change periodically as Internet Service Providers ("ISP") assign new addresses to network devices, which allows ISPs to manage a limited number of IP addresses more efficiently by reallocating unused IP addresses.[24]

---

[21] *See, e.g.*, "What is a web browser?," Mozilla Firefox, https://www.firefox.com/en-US/more/what-is-a-browser/("A web browser takes you anywhere on the internet. It retrieves information from other parts of the web and displays it on your desktop or mobile device").

[22] "Understand TCP/IP addressing and subnetting basics," Microsoft, January 15, 2025, https://learn.microsoft.com/en-us/troubleshoot/windows-client/networking/tcpip-addressing-and-subnetting ("An IP address is a 32-bit number. It uniquely identifies a host (computer or other device, such as a printer or router) on a TCP/IP network").

[23] *See*, *e.g.*, "IP Addresses," Branch, https://www.branch.io/glossary/ip-addresses/ ("On a WiFi network, every requesting device will inherit the IP address of the WiFi router. This means all users on the same WiFi will have the same IP address").

[24] *See, e.g.,* Gillis, Alexander S., "Dynamic IP Address," TechTarget, March 17, 2020, https://www.techtarget.com/whatis/definition/dynamic-IP-address ("When the internet was first conceived, the architects didn't foresee the need for an unlimited number of IP addresses. Consequently, there were not enough IP numbers to go around -- at least until the later advent of IPv6. To get around this problem, many ISPs limit the number of static IP addresses they allocate and economize on the remaining amount of IP addresses they possess

In addition, IP addresses can be "masked" (a device appears to be associated with a different IP address) when network requests are routed through another server by a Virtual Private Network ("VPN")[25] (*e.g.*, NordVPN, Surfshark, or ExpressVPN[26]) or proxy server[27] (*e.g.*, Apple's Private Relay[28]). These services replace IP addresses with IP addresses provided by the service, which can change over time and can even resolve to another state or country.[29] In 2019, at least

---

by temporarily assigning an IP address to a requesting Dynamic Host Configuration Protocol (DHCP) computer from a pool of IP addresses. This temporary IP address is a dynamic IP address"); Vigderman, Aliza and Gabe Turner, "Static vs. Dynamic IP Addresses," NordVPN, April 15, 2025, https://www.security.org/vpn/static-vs-dynamic-ip-address/ ("While static IP addresses remain the same, dynamic addresses change. […] To get a static IP address, you'll need to enter it manually in your device's settings. With dynamic IP addresses, you don't need to take any action, as they're assigned automatically").

25 *See, e.g.*, Corrons, Luis, "What is a VPN and what does it do?," Norton, April 9, 2024, https://us.norton.com/blog/privacy/what-is-a-vpn ("VPN stands for virtual private network—it's technology that encrypts your data when you use the internet, scrambling it so that strangers on the same network can't read it. A VPN creates a secure tunnel between your device and the internet to protect data during transmission. This secure tunnel helps VPNs disguise your IP address, mask your online activity (including links you click and files you download), and hide your physical location to help you access your favorite content"); Buxton, Oliver, "What does a VPN hide? 6 common identifiers VPNs disguise," Norton, February 21, 2025, https://us.norton.com/blog/privacy/what-does-a-vpn-hide ("a VPN can make some of your digital footprints virtually untraceable by hiding your IP address, location, browsing history, and even the files you download").

26 Tomaschek, Attila and Moe Long, "Best VPN Service for 2025: Our Top Picks in a Tight Race," CNET, October 9, 2025, https://www.cnet.com/tech/services-and-software/best-vpn/.

27 *See, e.g.*, Dutta, Nitul et al., *Cyber Security: Issues and Current Trends*, Vol. 995, Springer, 2022 Cyber Security: Issues and Current Trends, Princeton, NJ: Springer, 2022, p. 59 ("A proxy server is a normal server that acts as a gateway between the client and the Internet. If you are using a proxy, your network traffic will flow through the proxy server first and then it goes to the proxy Internet Service Provider (ISP), followed by the requested server").

28 *See*, *e.g.*, Hodge, Rae, "No, Apple's Private Relay is not a VPN, but you can still try it out with iOS 15," CNET, February 10, 2022, https://www.cnet.com/tech/services-and-software/no-apples-private-relay-is-not-a-vpn-but-you-can-still-try-it-out-with-ios-15/.

29 *See*, *e.g.*, Vigderman, Aliza and Gabe Turner, "Static vs. Dynamic IP Addresses," NordVPN, April 15, 2025, https://www.security.org/vpn/static-vs-dynamic-ip-address/ ("VPNs are virtual private networks that not only change your IP address but also encrypt your web traffic. They will replace your current IP address with another one that's either dynamic or static, depending on the VPN. […] The last option is proxy servers, which hide only your IP address"); Day, Brett, "What A VPN Hides (And What It Doesn't)," Forbes, September 26, 2025, https://www.forbes.com/advisor/business/software/what-does-vpn-hide/ ("a VPN masks the IP address that is assigned to you by your internet service provider (ISP), meaning you can be anonymous while online. With a VPN, you can trick snoopers […] into thinking you're located in another city or country. […] With a VPN, your IP address is masked and replaced with an IP address assigned by the VPN"); Hoory, Leeron, "What Is a Proxy Server?," Forbes, September 10, 2025, https://www.forbes.com/advisor/business/what-is-a-proxy-server/ ("'People use proxy servers to assume a geographic location, whether they are [physically] there or not,' Chris Mattmann, chief data and AI officer at UCLA, explains").

a quarter of Americans used a VPN service or proxy server when accessing the Internet.[30] By 2023, VPN usage alone rose to one-third of Americans.[31]

18. A **Uniform Resource Locator ("URL")** is the web address of an internet resource, such as a webpage.[32] As seen in **Figure 1**, URLs consist of a domain, a path, and, in some cases, parameters.[33]

a. The domain of a URL is the human-readable representation assigned by the Domain Name System ("DNS") to the numerical IP address of a website or server, so that users do not have to remember numeric IP addresses.[34] For example, *wikipedia.org* is a domain.

b. The path of a URL identifies the specific resource, such as a webpage, within a domain. For example, the domain *wikipedia.org* includes paths to individual articles, such as */wiki/URL*, which in the full URL *https://en.wikipedia.org/wiki/URL* leads to Wikipedia's article on URLs.[35]

---

30 25% of American Internet users used a VPN or proxy server in just the month prior to GlobalWebIndex's Q4 2019 survey of Internet users aged 16 to 64. *See* "VPN Advice You Can Trust," Top10VPN, https://www.top10vpn.com/ and "Understand any audience instantly," GWI, https://www.gwi.com/, p. 5.

31 Globytė, Ema, "NordVPN survey shows: A third of Americans use a VPN," NordVPN, June 28, 2023, https://nordvpn.com/blog/nordvpn-usage-survey-us/ ("The survey shows that VPN awareness and usage are above average in the U.S., making it one of the leading countries out of the 18 participating in the study. Two in three people (66.8%) in the U.S. know what a VPN is, with a third of Americans (33.0%) saying they use it. VPN usage has increased considerably since 2022, from just under a quarter (24.3%) to a third").

32 "What Is a URL?," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL ("A URL (Uniform Resource Locator) is the address of a unique resource on the internet. It is one of the key mechanisms used by browsers to retrieve published resources, such as HTML pages, CSS documents, images, and so on").

33 "What Is a URL?," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL ("A URL is composed of different parts, some mandatory and others optional. […] The domain indicates which Web server is being requested. Usually this is a domain name, but an IP address may also be used (but this is rare as it is much less convenient). […] /path/to/myfile.html is the path to the resource on the Web server. […] ?key1=value1&key2=value2 are extra parameters provided to the Web server. Those parameters are a list of key/value pairs separated with the & symbol").

34 "What is a domain name? | Domain name vs. URL," Cloudflare, https://www.cloudflare.com/learning/dns/glossary/what-is-a-domain-name/ ("A domain name is a string of text that maps to an alphanumeric IP address, used to access a website from client software. In plain English, a domain name is the text that a user types into a browser window to reach a particular website").

35 "What Is a URL?," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL ("Path to resource[:] /path/to/myfile.html is the path to the resource on the Web server").

c. A URL may contain only a domain and a path.[36] Different users who access the same URL may see the same content.[37] For instance, the URL *https://www.medstarhealth.org/services/womens-health* delivers the same content to both a medical student conducting academic research into women's health services and an individual seeking care information for a relative.

d. A URL may also include parameters in addition to the domain and path. The URL parameters can include details such as language preferences, session information, or search queries, depending on how the website's developers have implemented the functionality.[38] URL parameters may vary by user and over time. For example, as seen in **Figure 1**, *https://www.greenwichhospital.org/find-a-location#sort=relevancy&numberOfResults=25* is a URL where parameters

---

[36] "Dynamic URLs vs. static URLs," Google, September 22, 2008, https://developers.google.com/search/blog/2008/09/dynamic-urls-vs-static-urls ("A static URL is one that does not change, so it typically does not contain any URL parameters"). *See also* "URLs," VA.gov Design System, September 24, 2024, https://dev-design.va.gov/4152/components/url-standards/ ("URLs are a highly visible attribute of your content that improve user experience, accessibility, and search rankings by providing: the location of the content within your site; an indication of the priority of the content based on the depth (*i.e.*, number of sub-directories in the URL path) of the content; a high-level description of what the content is about; Information about how the content is related to other content within your site. A URL consists of a domain, sub-directories (optional), and a page name. […] URL parameters - also known as query strings - are values added to the end of a URL that filter or organize the information on a page. Parameters are used for a number of reasons - most commonly for pagination, anchoring, filtering or sorting data, indicating language, or searching").

[37] "Dynamic URLs vs. static URLs," Google, September 22, 2008, https://developers.google.com/search/blog/2008/09/dynamic-urls-vs-static-urls ("A static URL is one that does not change, so it typically does not contain any URL parameters. It can look like this: https://www.example.com/archive/january.htm. You can search for static URLs on Google by typing filetype:htm […] in the search field. Updating these kinds of pages can be time consuming, especially if the amount of information grows quickly, since every single page has to be hard-coded. This is why webmasters who deal with large, frequently updated sites like online shops, forum communities, blogs or content management systems may use dynamic URLs"); "Static URLs or Dynamic URLs," Netgains, August 8, 2011, https://www.netgains.org/static-urls-or-dynamic-urls/ ("In contrast, in Static URLs, the contents of the web page stay the same unless the changes are hard-coded into the HTML").

[38] "Static URLs or Dynamic URLs," Netgains, August 8, 2011, https://www.netgains.org/static-urls-or-dynamic-urls/ ("Google Webmaster blog once published an article discussing the static or dynamic Web site, which overturned this view. […] For example Google gave this example: www.example.com/article/bin/answer.foo?language=en&answer=3&sid=98971298178906&query=URL. In this URL, parameters will help Google understand the URL and Web content. For example, 'language' is followed by prompt language, 'answer' is followed by article number, session ID is certainly behind the 'sid'"). *See also* "URLs," VA.gov Design System, September 24, 2024, https://dev-design.va.gov/4152/components/url-standards/ ("URL parameters - also known as query strings - are values added to the end of a URL that filter or organize the information on a page. Parameters are used for a number of reasons - most commonly for pagination, anchoring, filtering or sorting data, indicating language, or searching").

"sort=relevancy" and "numberOfResults=25" change depending on the preferences users choose.

**Figure 1**
**Example of a Dynamic URL with Variable Parameters**[39]




19. **User-Agent information** is a string that may be transmitted within Hypertext Transfer Protocol ("HTTP") requests and can be used to identify the device, browser, and operating system sending the requests.[40] As a result, users can be associated with the same User-Agent if they use the same device, browser, and operating system. Additionally, User-Agent information alone would be unable to identify users across different devices. For example, a user who

[39] "Find a Location," Yale New Haven Health Greenwich Hospital, https://www.greenwichhospital.org/find-a-location#sort=relevancy&numberOfResults=25sort=relevancy&numberOfResults=25, accessed on December 3, 2025.

[40] "User-Agent Reduction," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Web/HTTP/Guides/User-agent_reduction ("The user agent (UA) string — available in the User-Agent HTTP header and in related API features such as Navigator.userAgent, Navigator.appVersion, and Navigator.platform — allows servers and network peers [to] identify the application, operating system, vendor, and/or version of the requesting user agent").

upgrades their smartphone or changes their browser would appear with different User-Agent information.[41]

20. **Cookies** are small text files that can be stored in browser memory and included in HTTP transmissions. Websites use cookies to, for example, recognize returning users, remember preferences, and maintain session information (such as login status or items in a shopping cart).[42]

   a. A domain can only access cookie values it has stored in a browser's memory and is prevented from accessing any cookie values stored in the browser's memory by any other domain.[43]

   b. Cookies can be categorized as either first- or third-party, depending on the context in which they are set or accessed. A cookie operates in a first-party context when its domain matches the domain the user is visiting.[44] First-party cookies are typically used for website-specific functionality, like remembering items in a user's shopping cart. For example, when a user visits a website with cookies enabled in their browser, the website may place cookies that

---

41 A request sent from a desktop using Firefox on Windows might include a User-Agent string such as Mozilla/5.0 (Windows NT 6.1; Win64; x64; rv:47.0) Gecko/20100101 Firefox/47.0, whereas the same user browsing from an iPhone using Safari would send Mozilla/5.0 (iPhone; CPU iPhone OS 13_5_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/13.1.1 Mobile/15E148 Safari/604.1. *See* "User-Agent header," MDN Web Docs, July 4, 2025, https://developer.mozilla.org/en-US/docs/Web/HTTP/Reference/Headers/User-Agent.

42 *See, e.g.*, "Everything you need to know about Internet cookies," Microsoft, April 25, 2023, https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies ("Cookies are bits of data that are sent to and from your browser to identify you. When you open a website, your browser sends a piece of data to the web server hosting that website").

43 *See*, *e.g.*, Barth, Adam, "HTTP State Management Mechanism," IETF, December 31, 2009, https://www.ietf.org/archive/id/draft-abarth-cookie-07.html ("When the user agent receives a Set-Cookie header, the user agent stores the cookie in its cookie store. When the user agent subsequently makes an HTTP request, the user agent consults its cookie store and includes the applicable, non-expired cookies in the Cookie header"); "Web Cookies Best Practices," Temple University, November 27, 2024, https://help.temple.edu/TDClient/277/Portal/KB/ArticleDet?ID=20217 ("The Domain attribute controls which domains can access the cookie. By default, this attribute is not set, limiting the cookie to the domain that created it"); Alam, Ayaan, "JavaScript Cookies," IntelliPaat, October 8, 2025, https://intellipaat.com/blog/javascript-cookies/ ("[L]et us discuss some of the common mistakes that you, as a beginner, can make when using JavaScript Cookies. […] 4. Assuming Cookies Work Across Subdomains Automatically[:] This is not the case; a cookie is only accessible to the domain that created it. A cookie set on example.com is not accessible on sub.example.com").

44 Merewood, Rowan, "Understanding cookies," web.dev, October 30, 2019, https://web.dev/articles/understanding-cookies ("Cookies that match the domain of the current site, that is, what's displayed in the browser's address bar, are referred to as first-party cookies").

it can later access and reuse (*e.g.*, to remember the user's login information or language preference). Because first-party cookies can only be accessed by the website the user is visiting, they cannot be used alone to track users across different websites.

c. A cookie operates in a third-party context when it is set or accessed by a domain other than the one the user is visiting.[45] For example, from the perspective of someone visiting *creonhcp.com*, *facebook.com* is a third-party domain. The *facebook.com* domain may set a cookie on a user's browser when that user visits *creonhcp.com*. Even if a cookie was set in a first-party context, it can be accessed in a third-party context when a website makes an HTTP request to that cookie's domain.

21. **Mobile applications ("mobile apps"** or **"apps")** are software programs that run on mobile devices, such as smartphones or tablets.[46] Mobile apps, as well as websites and user devices, can send and receive data over the internet through Application Programming Interfaces ("APIs"), which enable apps to communicate directly with external servers. App developers may rely on Software Development Kits ("SDKs") to implement functionalities like analytics and advertising.[47]

22. **An API** is a system of rules that allows communication between two separate software systems.[48] For example, when a user opens a weather app on a smartphone, the app itself may

---

[45] Merewood, Rowan, "Understanding cookies," web.dev, October 30, 2019, https://web.dev/articles/understanding-cookies ("Similarly, cookies from domains other than the current site are referred to as third-party cookies. This […] is relative to the user's context; the same cookie can be either first-party or third-party depending on which site the user is on at the time").

[46] *See, e.g.,* "What is Mobile Application Development?," Amazon Web Services, https://aws.amazon.com/mobile/mobile-application-development/ ("Mobile application development is the process of creating software applications that run on a mobile device, and a typical mobile application utilizes a network connection to work with remote computing resources").

[47] *See, e.g.,* "SDK vs. API: What's the difference?," IBM, https://www.ibm.com/think/topics/api-vs-sdk ("SDKs are part and parcel of mobile app development. They have many use cases: Programming language-specific SDKs like the JSON and Java Developer Kit (JDK) are used to develop programs in those languages in a streamlined, standardized way. Analytics SDKs from Google and others provide data about user behaviors, paths and actions").

[48] *See, e.g.*, Goodwin, Michael, "What is an API (application programming interface)?," IBM, https://www.ibm.com/think/topics/api ("An API, or application programming interface, is a set of rules or protocols that enables software applications to communicate with each other to exchange data, features and functionality. […] APIs are predefined interfaces that share only the necessary data and functions for specific queries. Servers do not have to fully expose data—APIs enable the sharing of small packets of data, relevant to the specific request").

not have all the weather data stored locally on the phone. In this case, the app can use an API to request information from a weather service server to display to the user when received.[49]

23. **Client-side** refers to operations that take place on a user's device, including a user's browser. An example of a client-side process is when a user clicks a dropdown menu that displays options, where the browser detects the user's action and updates the display without communicating with the server.[50]

24. **Server-side** refers to operations that take place on a server (such as Meta's servers). An example of a server-side process is when a user submits a login form—the server receives the credentials that the user inputs, verifies them against a database, and sends back a response indicating whether access is granted.[51]

## B. Overview of Meta's Business Tools

### *1. Meta Pixel*

25. Modern websites are developed through an iterative process, with web developers updating and modifying websites over time.[52] Developers can use tools developed by third parties.

---

49 *See, e.g.*, "API Web Service," National Weather Service, https://www.weather.gov/documentation/services-web-api ("The National Weather Service (NWS) API allows developers access to critical forecasts, alerts, and observations, along with other weather data"). *See also* Eldridge, Thomas, "What Is a Weather API?," Meteomatics, November 13, 2023, https://www.meteomatics.com/en/weather-api/what-is-a-weather-api/ ("A Weather API typically works over the web, using HTTP requests to communicate with the API server. When a request is made, the API fetches the requested data from its sources and returns it in a user-friendly format, often JSON or XML. This process allows for the easy integration of weather data into websites, mobile apps, and other software applications").

50 "What do client side and server side mean? | Client side vs. server side," Cloudflare, https://www.cloudflare.com/learning/serverless/glossary/client-side-vs-server-side/ ("In web development, 'client side' refers to everything in a web application that is displayed or takes place on the client (end user device). This includes what the user sees, such as text, images, and the rest of the UI, along with any actions that an application performs within the user's browser").

51 "What do client side and server side mean? | Client side vs. server side," Cloudflare, https://www.cloudflare.com/learning/serverless/glossary/client-side-vs-server-side/ ("Much like with client side, 'server side' means everything that happens on the server, instead of on the client"); "Introduction to the server side," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Learn_web_development/Extensions/Server-side/First_steps/Introduction ("A dynamic website is one where some of the response content is generated *dynamically*, only when needed […] Most of the code to support a dynamic website must run on the server. Creating this code is known as 'server-side programming' (or sometimes 'back-end scripting')").

52 Agile web development involves iterative processes and adaptive planning, focusing on collaboration among cross-functional teams to enable a flexible and rapid development process. This method prioritizes early and continuous delivery, adapting swiftly to changes and regular user feedback. *See, e.g.*, Torrecilla-Salinas, C. J. et al., "Estimating, planning, and managing Agile Web development projects under a value-based perspective,"

Developers can implement these tools via "tags" or "pixels," which are small segments of code (or "snippets") that developers can integrate into their websites.[53] The use of these snippets of code is a common practice in modern website development,[54] as they allow developers to implement complex functionalities on their websites without the costly and impractical process of developing them from scratch.[55] Developers can integrate and configure certain third-party code to transmit information, such as user actions that generate "events," and other information.

---

*Information and Software Technology*, Vol. 61, January 29, 2015, pp. 124-144, p. 125 ("Agile software development methodologies, with constant monitoring and measurement, and frequent intervention mainly based on the use of empirical processes, are turning into a solid alternative for organizations developing software to plan and estimate Web projects").

[53] *See*, *e.g.*, Davis, Matt, "Cookies, Pixels, and Tags: The Data Privacy Implications of Each," Osano, July 25, 2025, https://www.osano.com/articles/privacy-cookies-pixels-and-tags ("What Are Tags? Tags are small segments of code that execute when loading a website. Typically, they'll be HTML or JavaScript that describe an element or function on your website"). *See also* "Introduction to tagging and the Google tag," Google, https://developers.google.com/tag-platform/devguides ("Tagging is the process of adding snippets of code (called tags) to each page of your website so you can learn about the people who visit your site and how they interact with it").

[54] *See*, *e.g.*, "A Complete Guide on Securing Third-Party APIs in Mobile Apps," Virtual Spirit, March 7, 2023, https://virtualspirit.me/insights/169/a-complete-guide-on-securing-third-party-apis-in-mobile-apps ("In modern times, mobile and web development teams, as well as enterprises, are increasingly relying on various outsourced resources like open source code, outsourced development for their projects, etc. Third-party APIs, extensions, and applications are also becoming popular among them"); "What Is A Data Analytics Platform? Types, Benefits, & How To Choose," Datateer, https://www.datateer.com/blog/data-analytics-platform ("Web Analytics Platform […] By leveraging tools readily available, companies can quickly get a clear understanding of their web traffic and user experience"); "2024 State of Open Source Report," OpenLogic, 2024, https://www.openlogic.com/sites/default/files/pdfs/report-ol-state-of-oss-2024.pdf, p. 7 ("Open Source Software Usage: Did it Grow, Stay the Same, or Decline? 95% of respondents said their organizations either increased or maintained their use of open source software in the past year — and 33% said their usage increased significantly"); "2022 State of APIs," RapidAPI, 2022, https://stateofapis.com/ ("This year, we saw an increase in the usage of all types of APIs").

[55] For example, in addition to Meta, such tools are offered by Google (Google Analytics), LinkedIn (LinkedIn Insight Tag), Adobe (Adobe Analytics), and Contentsquare (DXP Software for Digital Marketing; AI Analytics). *See*, *e.g*, "Analytics & Data Analysis Features List - Analytics," Google Marketing Platform, https://marketingplatform.google.com/about/analytics/features/ ("Analytics helps you understand how people use your sites and apps, so you can take action to improve their experience"); "How Google Analytics works," Google, https://support.google.com/analytics/answer/12159447 ("Google Analytics is a platform that collects data from your websites and apps to create reports that provide insights into your business"); "Insight Tag," Linkedin, https://business.linkedin.com/marketing-solutions/insight-tag ("Power up your LinkedIn marketing[:] A simple code snippet added to your website can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences"); "Adobe Analytics," Adobe for Business, https://business.adobe.com/products/analytics/adobe-analytics.html ("Adobe uniquely brings together the entire data-to-insights-to-action workflow with a centralized system for data collection, processing, analysis, reporting, and output. This gives teams across your organization a deep understanding of their business, empowering them to make better decisions more quickly"); "Go from raw data to real decisions instantly," Content Square, https://contentsquare.com/solutions/teams/analytics/ ("All your behavioral, performance, and journey insights connected. Stop jumping between tools or waiting on exports. Here, you get everything in one place: clean behavioral data, retroactive analysis, experience signals, and built-in intelligence to help you find what matters, fast").

The provider of the third-party code may then use this information to provide services to the website's developers.[56] The Meta Pixel is one such snippet of code.

26. The Meta Pixel is publicly available and free to install.[57] Once developers accept Meta's Business Tools Terms, they can copy, customize, and integrate the Meta Pixel into their websites.[58] After developers integrate the Meta Pixel into their websites, they can configure it to generate and transmit data, including certain events associated with developer-selected user actions, to leverage Meta's analytics and advertising services.[59] Developers can use the Meta

---

[56] Google and LinkedIn use pixels. *See e.g.*, "How Google Analytics works," Google, https://support.google.com/analytics/answer/12159447 ("Google Analytics is a platform that collects data from your websites and apps to create reports that provide insights into your business. […] To measure a website, you first have to create a Google Analytics account. Then you need to add a small piece of JavaScript measurement code to each page on your site. Every time a user visits a webpage, the tracking code will collect pseudonymous information about how that user interacted with the page. […] When the measurement code collects data, it packages that information up and sends it to Google Analytics to be processed into reports. When Analytics processes data, it aggregates and organizes the data […] Once the data has been processed and stored in the database, it will appear in Google Analytics as reports"); "LinkedIn Insight Tag FAQs," LinkedIn, October 2025, https://www.linkedin.com/help/linkedin/answer/a427660 ("You can use the LinkedIn Insight Tag to track conversions, retarget website visitors, and learn aggregate insights about categories of members interacting with your ads. […] The LinkedIn Insight Tag enables the collection of data regarding members' visits to your website, including the URL, referrer, IP address, device and browser characteristics (User Agent), and timestamp. […] If you enable enhanced matching, you can also send emails associated with the respective visits. Those emails are hashed on the website before being sent to LinkedIn, to protect members' privacy"); "Add the LinkedIn Insight Tag to your website," LinkedIn, February 2025, https://www.linkedin.com/help/lms/answer/a418880 ("The LinkedIn Insight Tag is a piece of lightweight JavaScript code that you can add to your website to enable features like in-depth campaign reporting and website retargeting").

[57] "Set up and install the Meta Pixel," Meta, https://www.facebook.com/business/help/952192354843755 ("Requirements [:] You need a business website or app […] You or your developer must be able to update your website's code or the tag manager you use, if applicable, for manual pixel setup using code"). *See also* "Get answers to frequently asked questions about the Meta Pixel," Meta, https://www.facebook.com/business/tools/meta-pixel/help/ ("All you need to set up the Meta Pixel is a website and the ability to edit your website code"). *See also* "Facebook Pixel: What It Is and Why You Need It," SEO Digital Group, https://seodigitalgroup.com/facebook-pixel/ ("Installing the Facebook pixel is totally free!").

[58] "Meta Business Tools Terms," Meta, https://www.facebook.com/legal/technology_terms ("When you use any of the Meta Business Tools to send us or otherwise enable your collection of Business Tool Data […], these Business Tools Terms govern the use of that data unless other product terms apply. […] We may receive Business Tool Data that you collect as a result of your use of Meta ad products, in connection with advertising, matching, measurement and analytics. Those ad products include, but are not limited to, Meta Pixel, Conversions API, Facebook SDK for App Events, Offline Conversions and App Events API").

[59] *See*, *e.g.*, "Meta Pixel," Meta, https://developers.facebook.com/docs/meta-pixel/ ("The Meta Pixel is a snippet of JavaScript code that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion). Tracked conversions appear in the Ads Manager where they can be used to measure the effectiveness of your ads, to define custom audiences for ad targeting, for Advantage+ catalog ads campaigns, and to analyze that effectiveness [sic] of your website's conversion funnels"); "Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking ("The Pixel's base code must already be installed on every page where you want to track conversions"); "Facebook Pixel Events," Meta,

Pixel, for example, to learn what website elements users most frequently engage with, such as which webpages users visit the most, what buttons users most often click on a webpage, or what products users typically add to a website's shopping cart.[60] Depending on browser settings, developers' configurations of the Meta Pixel, and settings on the website on which the Meta Pixel is implemented, when a webpage integrates the Meta Pixel, the browser may initially load JavaScript from the *connect.facebook.net* domain,[61] and specified event data may be transmitted to the *facebook.com* domain.[62] These transmissions can include such information as IP addresses, HTTP transmission data (*e.g.*, headers and timestamps),[63] Meta Pixel ID, event data, and cookies.[64]

---

https://www.facebook.com/business/m/one-sheeters/facebook-pixel-events ("You or your web developer can implement the pixel directly on your website […] If you have the Facebook pixel installed on your website, you can use the Event Setup Tool for web"); "Use the Meta event setup tool for web," Meta, https://www.facebook.com/business/help/777099232674791 ("After you add Meta Pixel base code to your website, you can use the event setup tool to set up standard events and parameters without the need to code. Only standard events are available now, and not custom events"); "About standard and custom website events," Meta, https://www.facebook.com/business/help/964258670337005 ("Meta uses event data to show ads to people likely to be interested. Website events are actions people take on your website, such as making a purchase or adding an item to their cart").

60 *See*, *e.g.*, "About Meta Pixel," Meta, https://www.facebook.com/business/help/742478679120153 ("Once you've set up the Meta Pixel, the pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase").

61 *See*, *e.g.*, "Meta Pixel Get Started," Meta, https://developers.facebook.com/docs/meta-pixel/get-started/ ("The Meta Pixel is a snippet of JavaScript code that loads a small library of functions you can use to track Facebook ad-driven visitor activity on your website. […] The base Pixel code contains your Pixel's ID in two places and looks like this: […] s.parentNode.insertBefore(t,s)}(window […], 'https://connect.facebook.net/en_US/fbevents.js').

62 Specifically, transmissions that contain event information, rather than transmissions to *connect.facebook.net* which initiate a connection to Meta servers, are directed to Meta's servers access points at *facebook.com/tr*. *See*, *e.g.*, "Specifications for Meta Pixel standard events," Meta, https://www.facebook.com/business/help/402791146561655; [redacted] *See also* PIXEL_HEALTH000294831-837 at 832 ("Advertisers are also required to call fbq( 'init' , <pixel-id>); on their website. Upon doing so, the advertiser's website makes a request to https://connect.facebook.net/signals/config/<pixel-id> […]. The request gets pixel-specific configurations for plugins or other pixel-related things and appends it to the DOM").

63 *See*, *e.g.*, "Meta Pixel," Meta, https://developers.facebook.com/docs/meta-pixel/ ("The Meta Pixel can collect the following data: Http Headers – Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website").

64 "Meta Pixel," Meta, https://developers.facebook.com/docs/meta-pixel/ ("The Meta Pixel can collect the following data: Http Headers – Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website").

27. Developers can configure the Meta Pixel code to generate events in response to user actions of interest to them.[65] An event may include, among other types of data, an event name and event parameters (*i.e.*, additional information configured by developers, such as the price of an item being purchased).[66] Developers can use the Meta Pixel to generate three types of events:

a. Standard Events: These are events with predefined event names that web developers commonly wish to send (*e.g.*, the "AddToCart" event that Meta describes as "[a]dding an item to a shopping cart or basket").[67] Developers can choose which Standard Events to send either by editing their website source code or by using the Meta Event Setup Tool.[68] Although Standard Events have predefined names, developers can choose which website visitor actions will generate those events and can also add and customize optional

---

65 "About Meta Pixel," Meta, https://www.facebook.com/business/help/742478679120153 ("How the Meta Pixel works[:] Once you've set up the Meta Pixel, the pixel will log when someone takes an action on your website").

66 "About event parameters," Meta, https://www.facebook.com/business/help/308258403676519 ("Events are tied to actions people take in your app or on your website, like making a purchase. Parameters contain more detail about that action, like the value of a purchase"). *See also* "Meta Pixel Reference," Meta, https://developers.facebook.com/docs/meta-pixel/reference ("Standard events also support parameter objects with specific object properties, which allow you to include detailed information about an event").

67 "Specifications for Meta Pixel standard events," Meta, https://www.facebook.com/business/help/402791146561655.

68 To generate Standard Events, developers add the fbq('track') command in their website HTML code. Standard Events such as "PageView" can be disabled. *See* "Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking ("All standard events are tracked by calling the Pixel's fbq('track') function, with the event name, and (optionally) a JSON object as its parameters"); "Specifications for Meta Pixel standard events," Meta, https://www.facebook.com/business/help/402791146561655 ("**Your standard event code**: Within your Meta Pixel code, above the **</script>** tag, paste the standard event code that's relevant to your page, such as the Add To Cart code. You'll need to do this for every page you want to track") (emphasis in original); "Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking ("Standard events are predefined visitor actions that correspond to common, conversion-related activities, such as searching for a product, viewing a product, or purchasing a product"); "Meta Pixel Implementation for Single Page Applications," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/tag_spa/ ("Note: You can set *disablePushState* to *true* to stop sending *PageView* events on history state changes but it is not recommended"); "Use the Meta event setup tool for web," Meta, https://www.facebook.com/business/help/777099232674791 ("After you add Meta Pixel base code to your website, you can use the event setup tool to set up standard events and parameters without the need to code").

parameters containing additional information.[69] Thus, Standard Events may operate differently across websites depending on how developers configure them.[70]

b. Custom Events: These are events with names defined by website developers—not by Meta.[71] For example, developers may define a Custom Event that is generated when a website visitor clicks a website-specific "Share Promotion" button, and they can also decide to include optional parameters with these events.[72] This flexibility allows developers to tailor the Meta Pixel's functionality more specifically to their needs.

c. Automatic Events: These events are generated when website visitors take certain actions on websites that integrate the Meta Pixel without requiring developers to implement any additional code.[73] For example, when someone visits a website that has chosen to integrate

69 "Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking ("Standard events support parameters, which allow you to include an object containing additional information about an event, such as product IDs, categories, and the number of products purchased […] If our predefined standard events aren't suitable for your needs, you can track your own custom events, which also can be used to define custom audiences for ad optimization. Custom events also support parameters, which you can include to provide additional information about each custom event").

70 "Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking ("Standard events support parameters, which allow you to include an object containing additional information about an event, such as product IDs, categories, and the number of products purchased"); "Meta Pixel Reference," Meta, https://developers.facebook.com/docs/meta-pixel/reference ("Standard events also support parameter objects with specific object properties, which allow you to include detailed information about an event"); "Use the Meta event setup tool for web," Meta, https://www.facebook.com/business/help/777099232674791 ("To add [Standard Events] that don't show up in your suggested list, navigate your website as usual to find the buttons or webpages you want. Select Track new button or Track a URL and follow the onscreen instructions […] Select an event. 10. Set up parameters for your event").

Note that, in addition to the pre-defined Standard Events, the PageView event is part of the base code included when the Meta Pixel is installed. *See* "Specifications for Meta Pixel standard events," Meta, https://www.facebook.com/business/help/402791146561655 ("The page view event is included as part of your pixel base code. Page view tells you when someone lands on a web page with the pixel base code installed"). *See also* "Best practices for Meta Pixel standard event setup," Meta, https://www.facebook.com/business/help/2254103654917599 ("Note: The page view event is included as part of your pixel base code").

71 "About standard and custom website events," Meta, https://www.facebook.com/business/help/964258670337005 ("Custom events […] are actions not covered by standard events. You can assign a unique name to represent the action").

72 Developers can add optional parameters to both Standard and Custom Events. *See* "Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking ("Parameters are optional, JSON-formatted objects that you can include when tracking standard and custom events").

73 "About automatic events," Meta, https://www.facebook.com/business/help/1292598407460746 ("The Meta Pixel receives information about the actions, or events, that take place on your website. Automatic events are actions that your pixel receives from your website that don't require you to add any additional code. Your pixel receives

the Meta Pixel, the Meta Pixel may transmit event "Microdata," which contains information about the webpage's metadata, such as the page title and description.[74] While Automatic Events are sent by default, developers can choose to disable the Meta Pixel from sending these events.[75]

### 2. *Advanced Matching*

28. Developers have the option to use Advanced Matching, which is a feature of the Meta Pixel that enables developers to send hashed[76] customer information (*e.g.,* name and email address) along with event data to Meta. Advanced Matching allows Meta to better associate event data with a Facebook account, which can lead to improved ad performance and measurement for advertisers.[77]

29. Customer information is hashed on the website, meaning the information is converted into a string of numbers and letters within the user's browser before it is sent to Meta.[78] This process uses SHA-256, an industry-standard algorithm that transforms information using a one-way mathematical formula such that the transformed value cannot be reversed to reveal the original

---

these actions through visitor activity and by using information about your web page to understand context associated with these actions better").

[74] PIXEL_HEALTH000909571-573 at 571 ("Microdata events are a type of structured data that can be added to web pages to provide additional context and information about the content on the page. Microdata (page title, description, and other search-crawler accessible data) sent through the pixel contains freeform third-party data").

[75] "Meta Pixel Advanced," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/ ("To configure the Meta Pixel to not send this additional information […] add fbq('set', 'autoConfig', 'false', 'FB_PIXEL_ID') above the init call").

[76] I discuss hashing in further detail in **Section VII.E**.

[77] *See, e.g.*, "About advanced matching for web," Meta, https://www.facebook.com/business/help/611774685654668 ("With advanced matching, you can send us hashed customer information along with your Meta Pixel events, which can help you attribute more conversions and reach more people"). *See also* PIXEL_HEALTH000909502-518 at 502 ("What is Advanced Matching for Web? Advanced Matching can help advertisers optimize their ads to drive better results. With Advanced Matching, advertisers can send Meta hashed customer information along with their Meta Pixel events, which can help them attribute more conversions and reach more people").

[78] "Introduction to advanced matching for websites," Meta, https://www.facebookblueprint.com/student/path/211540/activity/205773 ("The customer information is hashed on the website before it is sent to Meta to help protect people's privacy. Meta uses one of the most advanced functions, which is called SHA-256"). *See also* "Hashing," National Institute of Standards and Technology, https://csrc.nist.gov/glossary/term/hashing ("[H]ashing [:] The process of using a mathematical algorithm against data to produce a numeric value that is representative of that data").

data in a computationally feasible manner.[79] After the matching process is completed, the hashed data used for matching is deleted from Facebook's servers.[80]

30. Meta provides two methods to enable Advanced Matching: automatic and manual.[81]

a. Developers can turn on automatic Advanced Matching through the Meta Pixel's Events Manager interface. Developers need to toggle the automatic Advanced Matching section to "ON" in order to activate this feature.[82] Additionally, as shown in **Figure 2**, developers choose which customer information they want to transmit to Meta for Advanced Matching.[83] As discussed in more detail below, in 2022, Meta disabled automatic Advanced Matching for Meta Pixels classified by Meta as health-related.[84]

[79] "Secure Hash Standard (SHS)," National Institute of Standards and Technology, August 2015, https://nvlpubs.nist.gov/nistpubs/FIPS/NIST.FIPS.180-4.pdf ("This Standard specifies secure hash algorithms, SHA-1, SHA-224, SHA-256, SHA-384, SHA512, SHA-512/224 and SHA-512/256. All of the algorithms are iterative, one-way hash functions that can process a message to produce a condensed representation called a message digest. […] The hash algorithms specified in this Standard are called secure because, for a given algorithm, it is computationally infeasible 1) to find a message that corresponds to a given message digest, or 2) to find two different messages that produce the same message digest"). *See also* "NIST's Policy on Hash Functions," National Institute of Standards and Technology, September 14, 2016, https://csrc.nist.rip/groups/ST/hash/policy.html ("Federal agencies may use these hash functions for all applications that employ secure hash algorithms. NIST encourages application and protocol designers to implement SHA-256 at a minimum for any applications of hash functions requiring interoperability").

[80] PIXEL_HEALTH000076206-212 at 212 ("After the matching process, all of the matching and non-matching hashes are deleted from Facebook's servers. The matching process generally completes in less than 48 hours. No further processing of the hashed values is performed beyond the match process").

[81] Declaration of Tobias Wooldridge, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-03580-WHO (VKD), December 2025 ("Wooldridge Declaration"), ¶ 11 ("There are two types of advanced matching: Manual Advanced Matching and Automatic Advanced Matching").

[82] "Set up automatic advanced matching in Meta Events Manager," Meta, https://www.facebook.com/business/help/1993001664341800 ("Set up automatic advanced matching for your website or mobile app […] 5. Below the **automatic advanced matching** section, click the toggle **ON**") (emphasis in original); Wooldridge Declaration, ¶ 11 ("To set up Automatic Advanced Matching, a developer does not need to further modify the code and can toggle it on and off in Meta Events Manager").

[83] "Set up automatic advanced matching in Meta Events Manager," Meta, https://www.facebook.com/business/help/1993001664341800 ("Set up automatic advanced matching for your website or mobile app[:] […] 6. Select **Show customer information parameters**. 7. Toggle **ON** the parameters you want to share from your website or app") (emphasis in original).

[84] 30(b)(6) Videotaped Deposition of Tobias Wooldridge, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO (VKD), April 28, 2025 ("Wooldridge 30(b)(6) Deposition"), 169:13-17 ("I believe in later 2022, Meta took steps to disable various features such as Automatic Advanced Matching for pixels within these [sensitive] verticals addressing an issue identified in a system previously").

**Figure 2**
**Automatic Advanced Matching**[85]




b. Manual Advanced Matching requires developers to add a snippet of code to the Meta Pixel.[86] Similar to automatic Advanced Matching, developers specify which parameters they want to use for manual Advanced Matching, but they do so using a snippet of code incorporated in their website code, as shown in **Figure 3**.[87]

---

85 I captured this snapshot from the Meta Events Manager, which is not publicly available and requires access to the advertising account associated with the transmitted events. A panel like this is accessible to anyone with access to the Meta Events Manager after creating an account. *See* "Set up and install the Meta Pixel," Meta, https://www.facebook.com/business/help/952192354843755 ("Set up the Meta Pixel and events on your website[:] 1. Go to **Meta Events Manager**. 2. Click **Connect data** and select **Web**. 3. Click **Connect**. 4. Enter a name for your pixel, then click **Create pixel**. This creates a new ID, viewable in Events Manager") (emphasis in original).

86 "Advanced Matching," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ ("Implementation[:] To use advanced matching, format the visitor's data as a JSON object and include it in the pixel base code fbq('init') function call as a third parameter").

87 "Advanced Matching," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ ("Be sure to place advanced matching parameters in the pixel base code or the values will not be treated as manual advanced matching values"); Wooldridge Declaration, ¶ 11 ("To set up Manual Advanced Matching, a developer must manually modify the Meta Pixel base code to pass website visitor information (such as an email address provided by a website visitor) as parameters in the Pixel initialization").

**Figure 31**
**Advanced Matching Keys Are Specified by Developers When Implementing Manual Advanced Matching[88]**

```
fbq('init', '283859598862258', {
  em: 'email@email.com',
  fn: 'first_name',
  ln: 'last_name'
  ...
});
```

*3. Conversions API*

31. Developers can transmit data to Meta using a server-to-server connection, known as Conversions API ("CAPI"), [89] and also known as Meta's Server-Side API.[90] As a result, CAPI data originates from a developer's server, rather than from a user's browser.[91]

32. To demonstrate the options available to developers through CAPI, I transmitted the Custom Event that I named "myEvent" (*see* **Figure 4**) directly to Meta's servers using CAPI.[92] To further illustrate the control available to developers, I transmitted this Custom Event the day I created it (December 1, 2025), but set the timestamp, "event_time," to show incorrectly that the

---

88 "Advanced Matching," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/.

89 *See* "About Conversions API," Meta, https://www.facebook.com/business/help/2041148702652965 ("The Conversions API is designed to create a direct and more reliable connection between marketing data (from your server, website platform, app or CRM) and Meta"); "Conversions API End-to-End Implementation," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation ("With the [Conversions] API, you can share data directly from your server, rather than through a browser").

90 "Meta Pixel and Conversions API," Adobe, https://commercemarketplace.adobe.com/apptrian-meta-pixel-and-conversions-api.html ("The Meta Conversions API (Facebook Conversions API / Facebook Server-Side API) (for web) allows advertisers to send web events from their servers directly to Meta (Facebook). Server-side events are linked to a pixel and are processed like browser pixel events. This means that server-side events are used in measurement, reporting, and optimization in the same way as browser pixel events").

91 "Conversions API," Meta, https://www.facebook.com/business/tools/conversions-api ("How is the Conversions API different from the Meta Pixel? While both provide the capability to gather and distribute customer data for targeted advertising, optimizing, and measuring ad campaigns, the Conversions API shares data directly from your servers"); Wooldridge Declaration, ¶ 9 ("While Event Data sent using the Meta Pixel or Facebook Software Development Kit is sent directly from a user's browser or device, CAPI allows developers to transmit data through a server-to-server connection. As a result, developers send CAPI data directly from their own servers, rather than from a user's browser or device").

92 *See* backup, "CAPI Testing."

event occurred 6 days prior to when the event was created (November 25, 2025).[93] I observed that after transmission, the event was displayed in the Meta Events Manager with the "event_time" value that I had specified (*see* **Figure 5**).

**Figure 4**
**Custom Event "myEvent" Transmitted Using CAPI[94]**

```
event = {
    "data": [
        {
            "event_name": "myEvent",
            "event_time": event_date,
            "action_source": "website",
            "user_data":{
                "fn": "628612b803c647a7de70f0306c6bbc489d8b75e6ffef150b70a1553a5a7abbeb", #jonathan
                "country": "79adb2a2fce5c6ba215fe5f27f532d4e7edbac4b6a5e09e1ef3a08084a904621", #us
            }
            }
    ]
    }
```

[93] I provide details on the transmissions using CAPI in **Appendix D**.

The "event_time" key may not be associated with a date more than 7 days prior to the transmission. *See* "Using the API," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/using-the-api/ ("event_time is the event transaction time. It should be sent as a Unix timestamp in seconds indicating when the actual event occurred. The specified time may be earlier than the time you send the event to Facebook. This is to enable batch processing and server performance optimization. The event_time can be up to 7 days before you send an event to Meta. If any event_time in data is greater than 7 days in the past, we return an error for the entire request and process no events. For offline and physical store events with physical_store as action_source, you should upload transactions within 62 days of the conversion").

[94] *See* backup, "CAPI Testing."

**Figure 52**
**Custom Event "myEvent" in the Meta Events Manager[95]**




*4. Facebook SDK*

33. Developers can use SDKs, including the Facebook SDK,[96] to help them develop mobile apps. SDKs are collections of third-party tools—such as debugging tools, compilers, code libraries, and development documentation—that facilitate app development.[97] Similar to the use of the Meta Pixel in website development, using SDKs to develop mobile apps is a common industry practice.[98] SDKs provide code modules that let developers add functionalities to their apps

---

95 I captured this snapshot from the Meta Events Manager, which is not publicly available and requires access to the advertising account associated with the transmitted events. A dashboard like this is accessible to anyone with access to the Meta Events Manager after creating an account. *See* "Set up and install the Meta Pixel," Meta, https://www.facebook.com/business/help/952192354843755 ("Set up the Meta Pixel and events on your website[:] 1. Go to Meta Events Manager. 2. Click Connect data and select Web. 3. Click Connect. 4.Enter a name for your pixel, then click Create pixel. This creates a new ID, viewable in Events Manager").

96 I note that Plaintiffs refer to a "Meta SDK" as one of the "Meta Business Tools" that they allege "collects customer data." *See* Motion for Class Certification, p. 2. *See also* Consolidated Complaint, ¶ 1. While the Complaint does not specify what SDK this refers to, I refer to the "Facebook SDK for Android" and "Facebook SDK for iOS" as the Facebook SDK collectively. *See* "Facebook SDK for Android," GitHub, https://github.com/facebook/facebook-android-sdk; "Facebook SDK for iOS," GitHub, https://github.com/facebook/facebook-ios-sdk.

97 "What is an SDK?," Amazon Web Services, https://aws.amazon.com/what-is/sdk/ ("A software development kit (SDK) is a set of platform-specific building tools for developers. You require components like debuggers, compilers, and libraries to create code that runs on a specific platform, operating system, or programming language. SDKs put everything you need to develop and run software in one place. Additionally, they contain resources like documentation, tutorials, and guides as well as APIs and frameworks for faster application development").

98 Sheharyar, "Integrating Third-Party SDKs for Enhanced App Features," Softwarehouse, March 11, 2025, https://softwarehouse.au/blog/integrating-third-party-sdks-for-enhanced-app-features/ ("In the competitive world of mobile app development, extending the functionality of your application is crucial for staying ahead. One effective way to achieve this is by integrating third-party Software Development Kits (SDKs)").

without having to build them from scratch.[99] By reusing existing, tested code, SDKs allow developers to incorporate app components more easily, which saves time, lowers development costs, and reduces errors.[100]

34. The Facebook SDK offers app developers tools they can use to connect their mobile apps with Meta's analytics and advertising services.[101] The Facebook SDK code is publicly available for anyone to review and use.[102] Once developers accept Meta's Business Tools Terms and complete a setup process, they can import the Facebook SDK library into their app's code and tailor the code to fit the app's needs, including selecting which functionalities they want to employ.[103]

---

99 *See, e.g.*, "What is an SDK?," Amazon Web Services, https://aws.amazon.com/what-is/sdk/ ("SDKs provide pre-built modules, components, packages, and tools for developers to build, test, and deploy software applications. They simplify developing, testing, and integration with other systems and services, code samples and tutorials, debugging tools, and code libraries").

100 *See, e.g.*, Haefliger, Stefan et al., "Code Reuse in Open Source Software," *Management Science*, Vol. 54, No. 1, January 2008, pp. 180-193, p. 180 ("Open source software developers reuse code because they want to integrate functionality quickly, because they want to write preferred code, because they operate under limited resources in terms of time and skills, and because they can mitigate development costs through code reuse"). *See also* Chung, Moonwon et al., "Impact of Modularity Design on Mobile App Launch Success," *Manufacturing & Service Operations Management*, Vol. 25, No. 2, 2023, pp. 756-774, p. 757 ("Mobile apps exhibit a highly modular product design, implemented through software development kits (SDKs), which are nonproprietary, modularized, pretested, and reusable codes that enable firms to add specific app features at a low cost"); "What is an SDK?," Amazon Web Services, https://aws.amazon.com/what-is/sdk/ ("SDKs reduce the time and resources needed to develop applications. By providing a library of pre-built components and tools, SDKs enable developers to quickly build out features and functionality. SDKs reduce the time and costs required to create new applications").

101 *See*, *e.g.*, "Facebook SDK for Android," GitHub, https://github.com/facebook/facebook-android-sdk ("This documentation describes how to integrate your Android app with Facebook to build engaging social apps by using the Facebook SDK for Android"); "Facebook SDK for iOS," GitHub, https://github.com/facebook/facebook-ios-sdk ("This open-source library allows you to integrate Facebook into your iOS app").

102 *See* "Facebook SDK for Android," GitHub, https://github.com/facebook/facebook-android-sdk; "Facebook SDK for iOS," GitHub, https://github.com/facebook/facebook-ios-sdk.

103 To set up the Facebook SDK, app developers generally need to register a Facebook Developer account, obtain a Facebook App ID, and generate a unique client token (*i.e.*, an identifier), which is used to access certain APIs. *See* "Getting Started with the Facebook SDK for Android," Meta, https://developers.facebook.com/docs/android/getting-started ("To get a Facebook App ID, configure your app's settings, and import the Facebook SDK for Android, click on the button below and follow the instructions. Quick Start for Android. Before [y]ou [s]tart [y]ou will need: Your Meta App ID[,] Your Meta App Client Token"); "Getting Started with the Facebook SDK for iOS," Meta, https://developers.facebook.com/docs/ios/getting-started ("Before [y]ou [s]tart [y]ou will need: A Meta Developer account[,] A Meta App ID[,] A Client Token[,] A project with UIKit App Delegate selected for Life Cycle"); "Meta Business Tools Terms," Meta, https://www.facebook.com/legal/technology_terms ("We may receive Business Tool Data that you collect as a result of your use of Meta ad products, in connection with advertising, matching, measurement and analytics.

35. Similar to the Meta Pixel, developers can configure their apps using code from the Facebook SDK to generate Standard Events, Custom Events, and Automatic Events.[104] Automatic Events transmitted using the Facebook SDK are limited to app installations, launches, in-app purchases, and Facebook SDK crash reports, and do not include button clicks.[105] After app developers modify their app's code to generate and transmit the events they want to create, the app generates the event data when app users take the corresponding actions. The app then caches the data on users' devices and transmits (or "flushes") the data to Meta once certain conditions are met.[106] App developers can either use the default flushing conditions defined by the Facebook SDK code or select their own specific settings.[107]

---

Those ad products include, but are not limited to, Meta Pixel, Conversions API, Facebook SDK for App Events, Offline Conversions and App Events API").

[104] "Meta App Events Overview," Meta, https://developers.facebook.com/docs/app-events/overview/ ("App Events allows you to track actions that occur in your mobile app or web page such as app installs and purchase events. […] There are three types of App Events: Automatically Logged Events - The Facebook SDK can automatically log app installs, app sessions, and in-app purchases. Standard Events - Popular events that Facebook has created for you. Custom Events - Events you create that are specific to your app").

[105] "Automatic App Event Logging," Meta, https://developers.facebook.com/docs/app-events/automatic-event-collection-detail/ ("When using the Facebook SDK, certain events in your app are automatically logged and collected for Facebook Events Manager unless you disable automatic event logging. […] There are three key events collected as part of the Automatic App Event Logging: App Install, App Launch, and Purchase. […] Facebook SDK Crash Report (For Facebook Use Only.) [:] If your app crashed due to the Facebook SDK, a crash report is generated and sent to Facebook when your app is restarted. This report contains no user data and helps Facebook ensure the quality and stability of the SDK. To opt out of logging this event, disable automatically logged events").

[106] "Storage array settings FAQ for SANtricity System Manager - What is cache flushing?," NetApp, June 19, 2025, https://docs.netapp.com/us-en/e-series-santricity/sm-storage/faq-storage-array-settings.html#what-is-cache-flushingwhat-is-cache-flushing ("When the amount of unwritten data in the cache reaches a certain level, the controller periodically writes cached data to a drive. This write process is called 'flushing'"). *See also* Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/ ("Events are not sent immediately when logged. They're cached and flushed out to the Facebook servers in a number of situations […]. The developer can call the setFlushBehavior method to force the flushing of events to only occur on an explicit call to the flush method").

[107] While app developers could change certain facets of the Facebook SDK through Facebook SDK settings, app developers cannot block logged data from being cached. Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/ ("Events are not sent immediately when logged. They're cached and flushed out to the Facebook servers in a number of situations […]. The developer can call the setFlushBehavior method to force the flushing of events to only occur on an explicit call to the flush method"); Facebook for Developers, "FBSDKAppEvents," Wayback Machine, September 24, 2021, https://web.archive.org/web/20210924053056/https://developers.facebook.com/docs/reference/ios/current/class/FBSDKAppEvents/ ("Events are not sent immediately when logged. They're cached and flushed out to the Facebook servers in a number of situations […]. The developer can set the flushBehavior on FBSDKAppEvents

36. Under the default settings of the Facebook SDK code, app event data is flushed if one of the following conditions is met: (1) 100 app events have been generated and the associated data has been cached in memory without being flushed; (2) 15 seconds have passed since the last flushing of app event data; or (3) the app has been reactivated after being on in the background of a user's device.[108] Developers can modify these conditions by adding instructions into their apps to flush the data at any point they choose.[109] In addition, devices are required to have internet access for flushing to occur.[110]

---

to force the flushing of events to only occur on an explicit call to the flush method"); "Android SDK Version Companion," Meta, https://developers.facebook.com/docs/reference/androidsdk/current/facebook/com/facebook/appevents/appeventslogger.companion.html/ ("setFlushBehavior […] Set the behavior that this AppEventsLogger uses to determine when to flush logged events to the server. This setting applies to all instances of AppEventsLogger").

[108] "Android SDK Version Flush Behavior," Meta, https://developers.facebook.com/docs/reference/androidsdk/current/facebook/com/facebook/appevents/appeventslogger.flushbehavior.html ("Flush automatically: periodically (every 15 seconds or after every 100 events), and always at app reactivation. This is the default value"). *See also* Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/ ("Events are not sent immediately when logged. They're cached and flushed out to the Facebook servers in a number of situations: when an event count threshold is passed (currently 100 logged events). when a time threshold is passed (currently 15 seconds). when an app has gone to background and is then brought back to the foreground"); Facebook for Developers, "FBSDKAppEvents," Wayback Machine, September 24, 2021, https://web.archive.org/web/20210924053056/https://developers.facebook.com/docs/reference/ios/current/class/FBSDKAppEvents/ ("Events are not sent immediately when logged. They're cached and flushed out to the Facebook servers in a number of situations: - when an event count threshold is passed (currently 100 logged events). - when a time threshold is passed (currently 15 seconds). - when an app has gone to background and is then brought back to the foreground").

[109] *See, e.g.*, Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/ ("The developer can call the setFlushBehavior method to force the flushing of events to only occur on an explicit call to the flush method"); Facebook for Developers, "FBSDKAppEvents," Wayback Machine, September 24, 2021, https://web.archive.org/web/20210924053056/https://developers.facebook.com/docs/reference/ios/current/class/FBSDKAppEvents/ ("The developer can set the flushBehavior on FBSDKAppEvents to force the flushing of events to only occur on an explicit call to the flush method").

[110] Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/ ("Events will be accumulated when the app is in a disconnected state, and sent when the connection is restored and one of the above 'flush' conditions are met"); Facebook for Developers, "FBSDKAppEvents," Wayback Machine, September 24, 2021, https://web.archive.org/web/20210924053056/https://developers.facebook.com/docs/reference/ios/current/class/FBSDKAppEvents/ ("Events will be accumulated when the app is in a disconnected state, and sent when the connection is restored and one of the above 'flush' conditions are met").

37. These different conditions, as well as the need for internet access, mean that the amount of time app event data spends in users' device caches may vary. For example, if a user's actions triggered the event data fewer than 100 times in 15 seconds and the user had a reliable internet connection, the user's event data would have remained in their device's cache for 15 seconds.[111] However, if that user was instead using the app when, for example, their device was on "airplane mode" or experiencing signal loss, the app event data would have remained in their device's cache until an internet connection was restored.[112]

*5. Customer List Uploads*

38. Developers may also choose to provide Meta with user information for matching through customer list uploads.[113] Customer list uploads do not involve transmitting data from a user's device; instead, developers directly provide the data to Meta.[114]

[111] Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/ ("Events are not sent immediately when logged. They're cached and flushed out to the Facebook servers in a number of situations: when an event count threshold is passed (currently 100 logged events). when a time threshold is passed (currently 15 seconds). when an app has gone to background and is then brought back to the foreground. Events will be accumulated when the app is in a disconnected state, and sent when the connection is restored and one of the above 'flush' conditions are met"); Facebook for Developers, "FBSDKAppEvents," Wayback Machine, September 24, 2021, https://web.archive.org/web/20210924053056/https://developers.facebook.com/docs/reference/ios/current/class/FBSDKAppEvents/ ("Events are not sent immediately when logged. They're cached and flushed out to the Facebook servers in a number of situations: - when an event count threshold is passed (currently 100 logged events). - when a time threshold is passed (currently 15 seconds). - when an app has gone to background and is then brought back to the foreground. + Events will be accumulated when the app is in a disconnected state, and sent when the connection is restored and one of the above 'flush' conditions are met").

[112] Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/ ("Events will be accumulated when the app is in a disconnected state, and sent when the connection is restored and one of the above 'flush' conditions are met"); Facebook for Developers, "FBSDKAppEvents," Wayback Machine, September 24, 2021, https://web.archive.org/web/20210924053056/https://developers.facebook.com/docs/reference/ios/current/class/FBSDKAppEvents/ ("Events will be accumulated when the app is in a disconnected state, and sent when the connection is restored and one of the above 'flush' conditions are met").

[113] "Customer list formatting guidelines for custom audiences," Meta, https://www.facebook.com/business/help/2082575038703844 ("A customer list is a file containing information about your customers, such as names and email addresses, which are called identifiers. We use identifiers to match your customers to Facebook and Instagram users").

[114] Wooldridge Declaration, ¶ 13 ("Developers can also upload their customer lists and use such lists for ad targeting through a feature called customer list custom audiences. Developers create these lists and may use them to target ads to Meta user accounts that match the data sent with customer lists or to 'lookalike' audiences of Facebook and Instagram accounts that interact with similar content as the Facebook and Instagram accounts matched to the

## IV. META'S TECHNICAL MEASURES TO PREVENT THE TRANSMISSION AND USE OF POTENTIALLY SENSITIVE INFORMATION

39. I understand that Meta's Business Tools Terms prohibit developers from transmitting to Meta what Meta describes as "sensitive" information.[115] In addition, Meta implemented technical measures to "prevent the receipt and use of potentially sensitive data."[116]

40. In this section, I provide an overview of these technical measures based on my review of the produced Source Code and relevant documents:

   a. I reviewed documents produced in this matter and identified those that I determined to be relevant to understanding how Meta's systems operate and how they evolved over time. In this process, I identified key code files (including relevant directories) that I used as starting points for my review. The relevant documents I identified are included in **Appendix C**.

   b. I conducted a review of Source Code files and the history of code changes ("Commit Logs").[117] More specifically, for each file I identified as relevant based on my document

---

developer's list. The use of customer lists does not involve the transmission of any Event Data"); PIXEL_HEALTH000299900 at 901 ("For datafile custom audiences, there is no rule processing - advertisers simply upload a list of identifiers, we match those identifiers against Facebook/Instagram and that is the audience").

115 "Meta Business Tools Terms," Meta, https://www.facebook.com/legal/technology_terms ("You represent and warrant that you will not share Business Tool Data with us that […]includes or is based on, directly or otherwise, health information, financial information, consumer report information, or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)"); Wooldridge Declaration, ¶ 17 ("The Business Tools Terms—formerly known as the Terms For Conversion Tracking, Custom Audiences From Your Website, and Custom Audiences From Your Mobile App—expressly prohibit developers from sending Meta health information or otherwise sensitive information (including any information defined as sensitive under applicable law) and require developers to warrant that they have the legal right to share any information they choose to share with Meta").

116 Wooldridge Declaration, ¶ 25 ("Meta has developed technical mechanisms intended to prevent the receipt and use of potentially sensitive data that developers may send in violation of Meta's terms, and made continuous improvements to these signals integrity systems").

117 The code files made available to me were provided as snapshots of code at a particular point in time or accompanied by a Mercurial version control system. In Mercurial logs, the core recorded unit is a commit (also referred to as a changeset or node). A commit captures the repository's state at a specific moment and includes several components, including node identifier (a unique identifier), datestamp (timestamp at the moment of recording), and commit messages (description explaining the change, providing essential context for understanding why the change was made). *See* "Mercurial SCM," Mercurial Developers, https://www.mercurial-scm.org/; "Glossary," Mercurial Developers, https://www.mercurial-scm.org/help/topics/glossary ("Changelog[:] A record of the changesets in the order in which they were added to the repository. This includes details such as changeset id, author, commit message, date, and list of changed files. Changeset[:] A snapshot of the state of the repository used to record a change. […] Changeset id[:] A SHA-1 hash that uniquely identifies a changeset. […] Commit[:] (Noun) A synonym for changeset. […] Revision[:] A state of the repository at some point in time. Earlier revisions can be updated to by using `hg update`").

review, I reconstructed the Commit Logs associated with that file,[118] which include relevant metadata such as the commit timestamps, accompanying messages, and the specific code files affected (*i.e.*, created, deleted, renamed, or modified). I reviewed each file I identified as relevant, including associated Commit Logs to identify the history of changes to those files. Since commit changes may affect multiple files, I also reviewed dependencies between files, allowing me to identify code interdependencies and other code files relevant to understanding Source Code.

41. I present an overview of my findings in this section. My rebuttal to Dr. Hashmi's conclusions regarding Meta's Source Code is provided in **Section VI**.

### A. Source Classification

42. As discussed below, Meta has developed technical measures designed to apply to Meta Business Tool IDs, apps, or domains that Meta associates with certain categories, including those categorized as health-related.[119] To implement these measures, Meta relies on a range of classification systems, which have evolved over time.

43. Meta's initial classification system was based on the sales vertical classification system, developed by Meta's sales team for categorizing ad accounts.[120] The classification system

---

[118] To extract a complete history of any particular file in the code repository, I used the following command: `hg log --follow -p --template "[insert template]" "[path to the file]"`. S*ee* "Template Usage," Mercurial Developers, https://repo.mercurial-scm.org/hg/help/templates; "Hg Log," Mercurial Developers, https://www.mercurial-scm.org/help/commands/log ("hg log[:] show revision history of entire repository of files […] By default this command prints revision number and changeset id, tags, non-trivial parents, user, date and time, and a summary for each commit. When the -v/–verbose switch is used, the list of changed files and full commit message are shown. […] Some examples: […] last 10 commits on the current branch: hg log -l 10 -b .").

To extract a version of a file associated with a particular revision number, I used the `hg cat` command.

[119] I do not opine on what constitutes health or health-related information. When referring to "health" or "health-related" data or information in relation to Meta's technical measures that I discuss in this report, I use this terminology in accordance with Meta's Source Code and technical documentation.

[120] Wooldridge 30(b)(6) Deposition, 30:1-16 ("Q. Does Meta agree that from 2017 to 2022 it had logic that should have disabled ButtonClicks and Microdata for healthcare websites but Meta's investigations revealed that its coverage was inadequate? […] A. So Meta had a system which disabled ButtonClicks for health advertisers that existed for -- you know, as I understand, since 2017. That system disabled ButtonClicks based on sales verticals."); PIXEL_HEALTH000884272-275 at 272 ("We disable automatic events (microdata and button clicks) and automatic Advanced Matching for pixels in sensitive verticals (healthcare, finance, etc.). Today we are leveraging the sales vertical classification to classify pixels in restricted verticals"); Video-Recorded Deposition Upon Oral Examination of Tobias Wooldridge, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO, January 31, 2025 ("Wooldridge Deposition"), 26:19-27: 7 ("Q. Let me pause you there, if I could, because let's talk about -- I want to -- like to talk about each of them in turn and not get combobulated

included, at least during a certain period, a "Healthcare Pharmaceuticals and Biotech Pharmaceutical Health" category.[121] To disable Automatic Events (*e.g.*, SubscribedButtonClicks) and automatic Advanced Matching for advertisers that Meta classified as potentially sensitive (*see* **Section IV.B**), Meta relied on sales vertical classifications.[122]

44. In 2019, Meta began developing a classification system based on a machine learning model trained on app and website metadata, referred to as the Signals Integrity System ("SIS") classification system.[123] The model classified apps (since October 2019) and websites (since January 2020) into "Prohibited," "Restricted" (*e.g.*, health), and "Neither" categories, which allows Meta to apply category-specific restrictions.[124]

---

with a bunch of things all at once. Okay. Why did you say that that option was very low-hanging fruit? […] A. Prior to this, Meta had a system which disabled certain functionality based on sales verticals, and so this would be an extension or addition to that system. Q. What do you mean by sales vertical? A. Meta has a large sales team. They divide themselves into different parts called verticals"), 29:8-13 ("The system in place -- the system in place looked at Pixels. Then looked at the ad account that earned those Pixels. And then based on the sales team that organizationally was responsible for that ad account applied limitations to Pixels such that certain functions were disabled for those Pixels.").

[121] Wooldridge Deposition, Exhibit 27; Videotaped Deposition of David Abdul-Malak taken by Plaintiffs pursuant to notice on May 21, 2025, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, May 21, 2025 ("Abdul-Malak Deposition"), 93:21-94:3 ("Q. Is there a health-related vertical? A. There is a vertical called Healthcare Pharmaceuticals and Biotech Pharmaceutical Health").

[122] Wooldridge 30(b)(6) Deposition, 30:12-20 ("So Meta had a system which disabled ButtonClicks for health advertisers that existed for -- you know, as I understand, since 2017. That system disabled ButtonClicks based on sales verticals. At some point, that system didn't or stopped enrolling new pixels. And so it continued to function at a diminished capacity for some period of time. Once Meta became aware of this, Meta promptly fixed that issue"); PIXEL_HEALTH000484906-908 at 906 ("We will disable automatic events (button clicks) and automatic Advanced Matching for pixels in sensitive verticals (healthcare, finance, etc.)").

[123] 89b8c89c8c86b6ab7ff0a3bd277d5161c02514b9, July 30, 2019.

*See also* Defendant Meta Platforms, Inc.'s Ninth Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-03580-WHO ("Meta's 9th Supplemental ROG Responses"), 3:28-4:3 ("Since at least 2019, Meta's Signals Integrity team has classified sources of Business Tool data using a model that predicts the applicability of the categories in a taxonomy. Among other things, these classifications are used to determine whether to block or filter out Business Tool data that Meta receives out of Meta's systems"). *See also* PIXEL_HEALTH000909602-623 at 606 ("SIS uses a combination of machine learning (ML) models to classify website domains and apps that send [Business Tool] data to Meta"); PIXEL_HEALTH000115367-369 at 367 ("classification for web and app[:] Input:[Web] Page Title, Page Description, BodyText, PageHTML, TranslatedText ..[App] App Name, Description, Developer, App Store Category, MegaTaxon prediction").

[124] *See e.g.*, fb13a63e89c74aa102625e4a5b4e2921841e846a, October 2, 2019 [redacted]

81506097be0cc2ac683f6c242bc1d220d660064c, January 23, 2020 [redacted]

45. The Safe Ads Experience ("SAE") classification system was added to operate with the Signals Integrity classification system in 2023 to identify domains and apps associated with categories like health.[125] The SAE system was rolled out for health domains by September 2023, unifying it with other classification systems in October 2023.[126]

46. In January 2025, Meta introduced the Restricted Data & Topics Taxonomy ("RDTT"), used to classify sources such as domains and apps to identify whether to apply Meta's blocking and

---

PIXEL_HEALTH000909602-623 at 605-606 ("Domain and app classifications fall into three broad categories, as below: Prohibited […] Restricted […] Neither prohibited nor restricted […] The classification of sources is used in enforcement"); PIXEL_HEALTH000149960-966 at 960 ("Signals Integrity App Classification Model Update (October)"); Wooldridge Declaration, ¶ 28 ("This model became operational for apps in October 2019 and was extended to websites in January 2020").

[125] 36aaf4e551bca78d3fcad09f2d28446861650943, June 28, 2023; 3c98bfd816f32cc29dc08285a921210da014a012, July 21, 2023; 86b6c2d19d76fdf239f0b79de0afc7b0654b9deb, July 21, 2023.

Video-Recorded Deposition Upon Oral Examination of Abhinav Anand, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO ("Anand Deposition"), 153:10-154:24 ("Q. Let's go to H1 2023 look-forward. What is the Safe Ads Experience Collaboration For Domain Classification? A. […] This is the source classification collaboration that was ongoing with the Safe Ads Experience team. […] Q. What is this document [reference to PIXEL_HEALTH001221838-850]? […] A. This document was a high level overview on what use case is. For source classification we can achieve by collaborating with Safe Ads Experiences and some of the limitations if we cannot achieve from other cases. Q. Why was it created? […] A. I recall working with Safe Ads Experience in the Explore, creating ML models in these categories. And I learned about their expertise briefly and then their taxonomy. And this was -- developers was created to create an awareness as my team about the using something, a model and a team that was already an expert instead of rebuilding the same thing within my team where we didn't have any expertise"); Wooldridge 30(b)(6) Deposition 66:24-67:15 ("Q. What is the difference between the SAE classification system for domains and megataxon? A. […] Independently, the SAE team maintains what was previously the Signals Integrity categorization systems, as well as improvements that have been built on top of that. And since then, that categorizes you know, were they more topical categorization that's more relevant to the policy it is enforcing"); PIXEL_HEALTH001220235 ("Signals Integrity maintains domain classification for advertisers in certain verticals and text classification systems for detecting potentially sensitive health data. This system has external dependency on other services, with maintenance overhead and has accuracy limitations. The team collaborated with the Safe Ads Experience team in R&P which is also working on similar classification problems, performed an assessment of overlap between the two systems and completed initial analysis on a few classification categories to determine relative accuracy. The findings of this study will help determine future onboarding to SAE classification for limited classification categories and reduce disparity in maintaining different solutions for the same problem"); PIXEL_HEALTH000884272-275 at 272 ("We will use Signals Integrity domain classification model along with SAE ML model classification to classify pixels in restricted verticals (health and finance)"); Wooldridge Declaration, ¶ 29 ("In 2023, Meta incorporated the Safe Ads Experience ('SAE') classification system alongside the classification system the Signals Integrity team began developing in 2019").

[126] PIXEL_HEALTH000947873-875 at 873, 874 ("We will use Signals Integrity domain classification model along with SAE ML model classification to classify pixels in restricted verticals (health and finance). It was able to classify ~88K pixels in restricted verticals."), ("Launch date: [...] 9/28 - Rollout GK to 100%").

6b8c213e0ae59892bde7d9e8e42a6b09b2b24187, August 8, 2023; a32af522ae6938e47a4d6413c77dda204ffe9d30, October 16, 2023; 353c3cd2653fc4519357f756550cd3187c70277b, October 20, 2023; e6938ee1fa350d66d9f725b4299dfe25e36b5bbd, October 19, 2023.

filtering measures.[127] The classification is based on website homepages and app store information.[128] As of October 2025, the RDTT classification contained four health-related categories: "GENERAL_HEALTH_AND_WELLNESS," "SPECIALIST_HEALTHCARE," "PATIENT_PORTAL," or "ADDICTION_AND_SELF_HARM."[129]

### B. Button Clicks and Automatic Events Blocking

47. Automatic Events, including button click events (referred to as SubscribedButtonClick events), were implemented in May 2017.[130] In August 2017, Meta began blocking the transmission of

[127] Meta's 9th Supplemental ROG Responses, 4:3-7 ("The taxonomy used by Signals Integrity for these purposes has changed over time. Meta's current version of the RDTT went into production for Signals Integrity source classification purposes in January 2025. This is the latest and current version of the taxonomy used for source classification for Signals Integrity purposes."); 4:23-5:1 ("Meta's source classifications under the current version of the RDTT for Signals Integrity purposes are generally persistent and additive, so once a source like a domain or app is assigned a health-related classification under the current version of the RDTT, that classification persists in Meta's Signals Integrity systems; Business Tool data associated with that domain or app that is sent to Meta after that health-related classification is assigned may be blocked or filtered out by Meta's Signals Integrity systems going forward. The classifications Meta uses for Signals Integrity purposes are stored in the tables domain_classification_sot and app_classification_sot.").

[128] Meta's 9th Supplemental ROG Responses, 5:2-12 ("When Meta receives Business Tool data associated with a new web domain or app, Meta first uses crawlers to crawl the website or app store page associated with the data source. These crawlers crawl the homepage of the domain of the URL associated with the event data received. For example, if Meta receives a Pixel fire associated with the URL https://topic.example.com/page, the crawlers will crawl the homepage at https://topic.example.com. These crawlers extract certain content from the HTML code, including the title of the page, the description of the page, and the body content of the page. The crawlers do not process images and do not visit subpages. The extracted content is then processed by the model, which generates outputs in the form of a confidence score on how applicable each of the leaf nodes in the current version of the RDTT is to the domain or app").

[129] Meta's 9th Supplemental ROG Responses, 4:14-15 ("With the current version of the RDTT, Signals Integrity now uses four new health-related categories: "GENERAL_HEALTH_AND_WELLNESS," "SPECIALIST_HEALTHCARE," "PATIENT_PORTAL," and "ADDICTION_AND_SELF_HARM.""); 5:9-14 ("The extracted content is then processed by the model, which generates outputs in the form of a confidence score on how applicable each of the leaf nodes in the current version of the RDTT is to the domain or app. For purposes of determining whether to block or filter Business Tool data associated with the domain or app out of Meta's systems as health-related, Meta's Signals Integrity systems classify the domain or app under a particular category if the sum of all leaf node confidence scores under that particular category is greater than a preset threshold.").

[130] 1385f630d744ebc31c9df0be7a16a09eaccccb56, January 20, 2017; 1235e8c7a413482ab8963bd44b30382b770e0b9a, December 15, 2016; 3b0f6b65e5a5d3f29337ac6886f3de207c6ff859, January 25, 2017 [redacted] 483caedd93485d66f0aa819cfa1a08071d3c5130, January 25, 2017.

PIXEL_HEALTH000473169-186 at 169 ("We are notifying advertisers a month in advance of making Facebook pixel enhancements default for all advertiser (changes will go live on May 20). The change is a prerequisite for the Automatic Setup feature in June 2017 as well as future improvements by the Delivery team. Summary of changes[:] The Facebook pixel will send button clicks, form field labels (although not the content of submitted

Automatic Events for advertisers classified in certain categories, such as health-related advertisers, based on the sales vertical classifications then in use.[131] Later, Meta began blocking the transmission of Automatic Events, including button click events, for data sources classified in certain categories such as health-related domains, based on SIS and SAE classifications (*see* **Section IV.A**).[132]

---

fields), and page metadata."), 170 ("Timeline[:] May 20, 2017: Start including the additional button click activity and page metadata by default for all Facebook pixels including those created before April 20th, except for any that have updated their base code").

131 The [redacted]. It waits [redacted] The script identifies ad accounts and pixels associated with sensitive industries such as financial services and health. *See, e.g.*, 5586a20efe60c76aac864028483f76e5f7936378, August 17, 2017 [redacted]

Wooldridge 30(b)(6) Deposition 46:22-47-3 ("Q. Mr. Wooldridge, was it Meta's policy to block SubscribedButtonClick transmissions from healthcare provider web-properties in the United States from 2017 to 2022? A. Again, Meta disabled the SubscribedButtonClick event for websites categorized in health verticals"); 38:12-20 ("Q. Mr. Wooldridge, does Meta agree that SubscribedButtonClick events should have been disabled for healthcare providers in the United States? A. Meta designed systems that were intended to disable this with a healthcare sales vertical, which should have largely included healthcare providers in the United States. And again, Meta identified an issue in that and fixed that issue promptly"); 86:9-18 ("Q. And from 2017 to 2022, Meta's systems to block SubscribedButtonClick communications from healthcare provider websites to Meta in the United States did not include anything relating to the Signals Integrity classifications; correct? […] A. As we described previously, that particular mechanism was based on sales vertical categorizations"); Wooldridge Declaration, ¶ 32 ("Meta implemented a system to prevent certain types of advertisers—including those classified as health-related—from sending Automatic Events, including button click events, in August 2017, after Automatic Events were first launched as an option for developers in May 2017"); Wooldridge Declaration, ¶ 7 ("In addition, developers can change these default settings at any time so that they do not send Automatic Events to Meta, and have been able to do so since the launch of that functionality in 2017").

132 Wooldridge 30(b)(6) Deposition, 102:5-13 ("The vertical categorization used to disable certain features was, again, based on sales vertical and consequently was not necessarily related to Meta's policies. This is one of the reasons Meta has since invested substantial resources into the Signals Integrity categorization system and leveraging that instead to disable the ButtonClick and Microdata events"); PIXEL_HEALTH000884272-275 at 272 ("We are proposing improvements in the (domain based) restricted verticals classification to disable Automatic events[:] - Leverage Signals Integrity and SAE ML model[;] -Improve the sales classification by matching more pixels to ad_accounts."; "We disable automatic events (microdata and button clicks) and automatic advanced matching for pixels in sensitive verticals (healthcare, finance, etc.). Today we are leveraging the sales vertical classification to classify pixels in restricted verticals. However, we have scope to improve the sales classification and include new technology via Machine learning domain classification. Signals Integrity system leverage ML domain/app classification to classify domain in restricted. Using the same to classify for restricted verticals will help bring two systems closer together and we explain externally the use of only one system for both use cases. End Desired state: We will stop classifying any new pixels via sales classification (still continue to use the previously classified pixels as restricted) and rely on ML models to classify new domains/pixels as restricted."; "Sales Classification Improvement. We are leveraging [redacted] get ad_account_id and business_id for the given pixel. [redacted] is the dump of [redacted]. Currently, 30% of the pixels from [redacted] don't have an ad account id and business id which is necessary to fetch the vertical and sub-vertical for the pixel. […] Because of this reason we were not able to classify ~1.5M pixels in

48. In 2020, Meta modified the sensitive verticals pipeline, and in doing so, changed its data source dependency.[133] As a result of this migration, although prior classifications remained intact, the sensitive verticals pipeline temporarily stopped enrolling new Meta Pixel IDs.[134]

49. Meta began rectifying the issue with the sensitive vertical pipeline in late 2022.[135] The rollout of this fix occurred in two phases. The first phase, initiated in October 2022, applied to Meta Pixel IDs in restricted verticals that were not already using Automatic Events and either automatic Advanced Matching or Event Setup Tool, thereby preventing them from using these features in the future.[136] The second phase was implemented in early 2023, where Automatic

---

restricted verticals. Leveraging ML classification. We will use Signals Integrity domain classification model along with SAE ML model classification to classify pixels in restricted verticals(health and finance). It was able to classify ~88K pixels in restricted verticals").

[133] 6173bce7010858ed3816359a1adc1bcfc8193797, August 26, 2020 [redacted]

Wooldridge 30(b)(6) Deposition, 30:12-20 ("A. So Meta had a system which disabled ButtonClicks for heath advertisers that existed for -- you know, as I understand, since 2017. That system disabled ButtonClicks based on sales verticals. At some point, that system didn't or stopped enrolling new pixels. And so it continued to function at a diminished capacity for some period of time. Once Meta became aware of this, Meta promptly fixed that issue").

[134] Wooldridge 30(b)(6) Deposition, 30:12-20 ("A. So Meta had a system which disabled ButtonClicks for heath advertisers that existed for -- you know, as I understand, since 2017. That system disabled ButtonClicks based on sales verticals. At some point, that system didn't or stopped enrolling new pixels. And so it continued to function at a diminished capacity for some period of time. Once Meta became aware of this, Meta promptly fixed that issue").

[135] a52b5086fdc3e42f50008565584f3af7e0485e86, September 29, 2022 [redacted]).

*See also* PIXEL_HEALTH000372832-837 at 833 ("Disable Pixel automatic events for sensitive verticals: We are disabling Automatic Events on Pixel globally for advertisers primarily in Health and Finance that may be inadvertently sending sensitive data. […] We have divided the effort into 2 phases: Phase 1 (target completion by end of Oct. '22)- disable the features for advertisers that are not currently using it; Phase 2 (target completion by end of Q1 '23)- disable the feature for advertisers that are using it and partner with BPM to develop a GTM that allows these advertisers time to transition to manual events").

[136] a52b5086fdc3e42f50008565584f3af7e0485e86, September 29, 2022; c9f4e72c4ce69da9e1f7dd39560f566281f977d8, October 18, 2022 [redacted]

1890169ee21f549db90b8b2ae3edec26844892f1, October 18, 2022 [redacted]

Wooldridge 30(b)(6) Deposition, 116:22-117:12 ("A. As I understand, when Meta became aware that the system that was disabling button clicks for health-categorized pixels based on the sales verticals was not working in the way it expected, it promptly fixed that system. And so the key thing here is that Meta took action in order to prevent those events from being transmitted to Meta in totality, which had the consequence that it would not be possible for them to be used in ads ranking. Q. After October of 2022; correct? A. A lot of the fix had rolled out

Events (including button clicks) and both automatic Advanced Matching and Event Setup Tool were disabled for all Meta Pixel IDs classified in sensitive verticals.[137]

50. To summarize, since shortly after implementing the SubscribedButtonClick events, Meta has had systems to block the transmission of those events for at least certain advertisers classified as health-related.

51. For over 75 percent of websites present in the produced data, SubscribedButtonClick events were not received by Meta's servers during periods when the Meta Pixel operated on those websites.[138] This could be the case either because those domains were blocked from sending SubscribedButtonClick events (*e.g.*, because they were classified as sensitive based on the SIS and/or SAE classification systems described above) or because the domains' developers chose to disable the transmission of Automatic Events themselves by modifying the Meta Pixel code (*see* **Section V.A.2**).

---

within October 2022. Yes"); Wooldridge Declaration, ¶ 36 ("Meta rolled out the first phase of a fix in October 2022, which fixed the issue for advertisers not using Event Setup Tool or Automatic Advanced Matching"). *See also* PIXEL_HEALTH000372832-837 at 833 ("Disable Pixel automatic events for sensitive verticals: We are disabling Automatic Events on Pixel globally for advertisers primarily in Health and Finance that may be inadvertently sending sensitive data. […] We have divided the effort into 2 phases: Phase 1 (target completion by end of Oct. '22)- disable the features for advertisers that are not currently using it; Phase 2 (target completion by end of Q1 '23)- disable the feature for advertisers that are using it and partner with BPM to develop a GTM that allows these advertisers time to transition to manual events").

137 9ce6fa8cc79bc286513393676c2ce1fc24dba677, March 16, 2023.

PIXEL_HEALTH000372832-837 at 833 ("Disable Pixel automatic events for sensitive verticals: We are disabling Automatic Events on Pixel globally for advertisers primarily in Health and Finance that may be inadvertently sending sensitive data. […] We have divided the effort into 2 phases: Phase 1 (target completion by end of Oct. '22)- disable the features for advertisers that are not currently using it; Phase 2 (target completion by end of Q1 '23)- disable the feature for advertisers that are using it and partner with BPM to develop a GTM that allows these advertisers time to transition to manual events").

138 In particular, in my analysis of the SubscribedButtonClick and other event data produced in this matter, I find that on the days for which both the Offsite Signals and Pixel Button Clicks or Inferred Website datasets were produced, of 1,347 websites that appear in the Offsite Signals data, 1,059 (over 75 percent) are not associated with any SubscribedButtonClick event in the corresponding Pixel Button Clicks and Inferred Website data. The dates on which both the Offsite Signals and Pixel Button Clicks or Inferred Website datasets were produced are included in the range December 28, 2022 to April 13, 2023 (inclusive). *See* backup, "sbc_domains."

### C. Meta's Filtration Systems

#### *1. Universal Filtering*

52. In October 2018, Meta implemented a "universal filtering" system designed to filter out potentially sensitive data (Meta's "Universal Filter").[139] The earliest version of this system operated by filtering out event and URL parameters that matched any of the prohibited terms from a blocklist.[140] Meta's Universal Filter applies to event and URL parameters sent by all domains, regardless of whether those domains are classified as belonging to sensitive verticals by the classification systems discussed above.[141]

53. Over time, Meta implemented additional systems to detect potentially sensitive data.[142] In November 2018, Meta's Universal Filter incorporated pattern matching (*i.e.,* regular expression

---

[139] *See e.g.,* 9ebc88471380a3e09dfb637e3be824d4ed4676f7, April 6, 2018; 21cd665468528c4aadc1d97ba5c614c62163192c, April 9, 2018.

Wooldridge Deposition, 266:16-24 ("Q. When did Meta first start developing, to the best of your understanding, integrity systems? A. I think Meta started developing integrity systems in 2018. Q. And what were the integrity systems that Meta began developing in 2018? A. The ones in 2018 were oriented around protecting and filtering out potentially identifiable information"); PIXEL_HEALTH000565826-828 at 826 ("Signals Integrity Detection system has a baseline filtering of potentially sensitive terms in PII, Finance, Health and other GDPR categories. The baseline filtering (also called Universal Filtering) is applied for Pixel, App & Offline events. The detection system also supports enhanced filtering where filtering is applied based on event source classification"). *See also* PIXEL_HEALTH000885210-229 at 222 ("Some subsystems do not require that a source has any classification […]; in other words, they can be applied to an event regardless of whether it originated from a domain or app classified as health, finance, or none […]. This is known as 'universal filtering'").

[140] 9ebc88471380a3e09dfb637e3be824d4ed4676f7, April 6, 2018; a4266b90074f1bdb7812646503bbf69dae4f2973, April 9, 2018; 21cd665468528c4aadc1d97ba5c614c62163192c, April 9, 2018.

[141] *See e.g.,* PIXEL_HEALTH000885210-229 at 222 ("Some subsystems […] can be applied to an event regardless of whether it originated from a domain or app classified as health, finance, or none […]. This is known as 'universal filtering'").

[142] Prior to mid-2023, all methods to detect potentially sensitive data were designed to operate in a "stateful" manner. The term "stateful" refers to the system's reliance on knowledge from prior detections to filter out the incoming data. *See, e.g.,* b50040a969c45a5fab086a87c60b243a03deb8f, November 16, 2018. Specifically, the stateful system operated by searching for potentially sensitive data in keys and values detected by Meta's systems, and subsequently, creating new filtration rules. *See* Wooldridge 30(b)(6) Deposition, 146:14-17 ("Q. And sorry. Let me back up. Prior to 2023, the filter was stateful filtering; is that correct? A. Predominantly, yes"); 146:18-147:13 ("Q. Okay. Now, let me go back to the question it was. Please explain the difference between stateful filtering versus stateless filtering, and why it matters. A. The stateful filtering system tried to detect that a particular key contained potentially unwanted values. So an example of that would be, if there is a parameter named, say, X, Y, Z, which doesn't have any meaning, but it has a value which is flagged as potentially unwanted, if this was seen several times, the system would register that this value should be blocked. And so it'd instruct both the client-side JavaScript before that data could be sent to Meta and the server-side code. If that data was somehow sent to Meta, such as if the advertiser or website owner had chosen to use the image tag pixel, which would mean the client-side filtering would not be possible, it would then remove it once it

or "regex") rules to detect and filter out potentially sensitive data in event and URL parameters beyond terms on the blocklist (*e.g.*, email addresses).[143] For example, if a particular custom parameter was determined to contain potentially sensitive information (*e.g.*, based on a regex rule `[A-Z0-9a-z._%+-]+@[A-Za-z0-9.-]+\\.[A-Za-z]{2,5}` that captures email address patterns[144]), that parameter would be filtered out server-side, prior to being stored and, potentially, used.[145] Meta expanded patterns used to detect potentially sensitive information by

---

reached Meta's server"). *See also* PIXEL_HEALTH000115741 ("Signals Integrity sensitive data detection system operates offline, meaning the 3rd party signals are first sent to Ads downstream systems before our current detection infra can see them. The detection infra uses following three different detection strategies at the moment with the detection outcome is stored as a state for <pixel, event_name> pair which is further used in our online stack during the enforcement phase").

[143] 0892cadbe1d928f0ebda336b777ab2d7eebaf0be, November 5, 2018; 0857b6e241c3c652fec62af6770f67581cd6b45c, December 4, 2018; a978ea5671833833d305edd8735155dfcb2f00c6, December 12, 2018; b84d4971162dd395b736d71d6e0a9ac991742907, October 18, 2018; b50040a969c45a5fab086a87c60b243a03deb8f7, November 16, 2018; fd7e40b3edce18469fac21f08cd89d699400119a, November 20, 2018; 4391672a1de928964e447fd2220353ce44396745, October 30, 2018; 88ae5502800e896014080ca93d2e31efa6dad13a, November 6, 2018; 937b3e1de3b85b60f634faae2c70b7592b6fd7d5, November 6, 2018.

Regular expression matching rules are a list of static, predefined rules used to identify data that follows recognizable patterns. For example, phone numbers, birthdays, email addresses, and credit card numbers often follow consistent formats. Regular expression rules are designed to match those formats—such as sequences of numbers that look like credit card numbers or text strings that look like email addresses—so the system can identify and filter them when the pattern is matched. *See* Anand Deposition, Exhibit 207 at slides 16-19 ("Sensitive Data Detection[:] What type are we filter[ing] PII (All sources)[,] UII (All sources)[,] Health (For health sources)[,] Financial (For financial sources)[.] What place where sensitive data is filtered[:] Custom Data[,] Event Name[,] URL path and parameters (Pixel only)[.] How[:] Scrubby service (Algorithm based UII dete[c]tion service) [for] UII[,] Regex Detector [for] PII, Financial Data[,] BII Service (Heuristic + ML) [for] PII[,] Restrict[ed] Data Detector (Keyword matching) [for] Health Data[, and] Signals Integrity Prediction Services (ML model) [for] Health Data"); PIXEL_HEALTH000565826-828 at 826 ("Universal Filtering[:] 1. Done using Regular Expression Rules Matching (Regex rules)[:] a. PII Category Terms[:] i. Email, Phone, SSN, Password, First Name, Last Name, Date of Birth, Password url[;] b. Finance category Terms[:] i. Credit Score, Credit (loan, limit, debt, etc.), Account/loan balance, SWIFT, IBAN[;] ii. Credit Card, Bank account number, PIN, Routing Number, CVC/CVV[,] iii. Additional financial terms […] e[.]g.[,] revenue, investments, refund").

[144] 0857b6e241c3c652fec62af6770f67581cd6b45c, December 4, 2018 [redacted] This pattern contains the elements required to identify a valid email address.

[145] 2041879099432233324c3932a546050bd4b8c26a9, November 16, 2018; b84d4971162dd395b736d71d6e0a9ac991742907, October 18, 2018; b50040a969c45a5fab086a87c60b243a03deb8f7, November 16, 2018; fd7e40b3edce18469fac21f08cd89d699400119a, November 20, 2018.

PIXEL_HEALTH000876876 at slide 40 ("SIS potentially sensitive data 'detection' operates by looking at parameters (key-value pairs) that can be found in event custom data and URL query parameters. If potentially sensitive data is detected, SIS potentially sensitive data 'enforcement' will occur for that parameter (this is called 'filtering')"). *See also* PIXEL_HEALTH000948084-087 at 086 ("This ent defines the keys which we need to

for example, accounting for alternative representations of the "@" symbol[146] and refining the detection patterns.[147]

54. The Universal Filter was further expanded by incorporating additional methods to detect potentially sensitive information, such as machine learning in March 2019;[148] implementing a system for identifying user-specific information using an algorithmic technique in October 2019;[149] implementing a method for detecting blood type in July 2020;[150] and adding thousands of health terms to filter out over time.[151]

### 2. *Health-Related Filtering*

55. Meta implemented additional detection and filtering systems that apply to domains and apps that Meta classifies as health-related based on the classification systems discussed above (*see* **Section IV.A**). Specifically, in 2019, Meta implemented a system designed to detect and filter

---

filter for PII/UII violation. ExpandedKeys – This is a vector field that defines the keys that we need to filter in custom data or url query parameters").

146 bd97c4a023c8678a006774b3a34cafb8cfbdb1f7, August 9, 2023.

147 565050e70953416c622614a3378b463a67038cdc, August 10, 2023.

148 24f338a7399bdd518ff73b0a5c98c4006935c533, March 14, 2019; 0311e8133392679d0eba7b44cc4e9f7b8e025f01, March 19, 2019.

149 191142ab7b05de8ee99d1de5acbe6b85df48724c, October 17, 2019; 77c2c04c5275a7960313cb4db89a81a572fa6644, October 17, 2019; 7a21ddd215e5116ce22d97171f68dd853c23aa35, October 17, 2019.

150 0c39486521cf4d5490cd6bc66d442465294b3747, July 9, 2020.

151 4625041dc498bbede99722822aaab16ff1ae7204, March 30, 2023 [redacted] 5f6ff291e2c32604d9e9a95c15d73d604544d024, August 29, 2023 [redacted] ae105683c428cb06727f4aefd573c69841a45571, September 8, 2023 [redacted].

PIXEL_HEALTH000565826-828 at 826-827 ("Below is a summary of the data types that are filtered under Universal & Enhanced Filtering. Universal Filtering[:] […] Done using exact keyword or value matching[:] […] Health Category terms in Hive table signals_integrity_blocklisted_terms_normalized (as of 10/3/2023)[:] i. Terms under HEALTH_MEDICAL_CONDITION (~1839 terms like autism, second trimester, septicemia etc)[,] ii. Terms under HEALTH_DATA (~1283 terms like revlimid, iloperidone, orlistat capsules etc)[,] iii. Terms under PRESCRIPTION (~1181 terms like maraviroc, triflupromazine, triphasil-28 etc)"); PIXEL_HEALTH001226464-471 at 464 ("Meta rolled out an extension of Blocklist terms to filter more Health, PII & Finance related keys under new online detectors. Rollout of these detectors began in September 2023 and they were launched in production fully by the first week of November 2023, with some additional configuration enhancements made thereafter."); PIXEL_HEALTH000885210-229 at 222 ("Universal filtering applies general detection and filtering for certain potential personal health data, potential personal financial data, and potential prohibited personal identifiers").

out data (*e.g.*, event and URL parameters) from such domains and apps that match any of approximately 71,000 terms on a blocklist that Meta determined may be associated with health, such as "height," "heart rate," and "Diabetes."[152]

56. In July 2020, Meta began detecting and filtering data predicted to be potentially health-related data by a machine learning model (*i.e.*, Signals Integrity Prediction Service or "SIPS").[153] The SIPS machine learning model predicts the probability that text (*e.g.*, in URL parameters) is associated with each category that the model is trained to predict (*e.g.*, "HEALTH"). The input (*e.g.*, a URL parameter value) text is assigned to the category that receives the highest

---

[152] The functionality of filter data was implemented in the SensitiveDataRestrictedDataDetector class, which operates by reading in the list of sensitive terms from [redacted] and contains functionality to search for each of those terms within event data (*i.e.*, event names, parameters, and URL query parameters) from sources associated with health domains. *See*, *e.g.,* b2a148425da6f4b158df3edf5b69ceb955b4fd03, December 6, 2019. *See also* 8aba354831494bf849863f84e8a79c27ba62f669, December 13, 2019;567c2ffa180033bc6f2de0a26946f29ba8c34d65, November 6, 2019; e77eb4217cd416dfe993244df6a440030e2a512c, November 6, 2019; 051c3cb0abbc89a3c6c05a1b20c1bd45eaa2896e, November 6, 2019;

PIXEL_HEALTH000000176; Wooldridge Deposition, 180:2-3 ("The health filter is applied to websites categorized as health").

[153] 347e5c330ab5a119c40627ef954aeed6b40ab0ea, July 1, 2020; 37b040d5179216d4bcda4b6bc6e2d65667fffda6, July 15, 2020.

probability,[154] and the data is filtered if the SIPS model assigns it to the HEALTH category with a sufficiently high probability.[155,156]

---

154 347e5c330ab5a119c40627ef954aeed6b40ab0ea, July 1, 2020; 5702b796b634edcfae1561269a79279678e94f6d, July 1, 2020; 062439643b3549bc0a0c28ed11428a4766e04f18, July 1, 2020; 6570c8550db0d46e5a22378fecd2dc67413153d7, July 1, 2020; 0c322cf1c5a46a43e37662a766391a3a943db389, June 8, 2020.

Anand Deposition, 89:13-25 ("Q. Can you speak to at a high level, of how [the Signals Integrity Prediction Service] worked? A. On a high level, my understanding was that for the sources which were classified as health, the event data properties, custom data properties query parameters were the input to the model. And model gave an outcome which was a confidences score. And models prediction with this given property is health or not. And that was a detection. And then for the detected key value pairs, our models outcome was taken into consideration. And for those predictions which were above a certain threshold, the filtering was applied").

155 c68cdf6deda76bc2e1e23b18f93e2f0ff35fa854, December 9, 2020; 52ab95277c87ac1015d0e7c82702abd8722b9e2f, November 19, 2020 ([redacted]

Anand Deposition, 89:13-25 ("Q. Can you speak to at a high level, of how [the Signals Integrity Prediction Service] worked? A. On a high level, my understanding was that for the sources which were classified as health, the event data properties, custom data properties query parameters were the input to the model. And model gave an outcome which was a confidences score. And models prediction with this given property is health or not. And that was a detection. And then for the detected key value pairs, our models outcome was taken into consideration. And for those predictions which were above a certain threshold, the filtering was applied").

156 In May 2023, Meta implemented a "stateless" system alongside the stateful system. Unlike a stateful system, a stateless system operates in real-time, detecting potentially sensitive data to make filtering decisions for each incoming event and URL data without relying on prior information about the source of the event and the potentially sensitive keys contained within it. Because the stateless system must run continuously and handle data instantly, only detectors that were less computationally intensive, such as the health data detector described above, were implemented in stateless form. More complex and resource-intensive detection algorithms, such as those based on machine learning, continued to operate in a stateful manner. *See* 96f3796d048797ff3f09e803ac434dfbb2e69e1a, May 30, 2023; 72d01018f915e550138660ce40dc2505f8dcf198, March 3, 2023; b44250b42ef02ffc30295477bd9e465f996adf17, April 4, 2023; 939297ff957caf06ad56da04463002b77401c705, April 9, 2023.

PIXEL_HEALTH000115741 ("Signals Integrity sensitive data detection system operates offline, meaning the 3rd party signals are first sent to Ads downstream systems before our current detection infra can see them. The detection infra uses following three different detection strategies at the moment with the detection outcome is stored as a state for <pixel, event_name> pair which is further used in our online stack during the enforcement phase"); Wooldridge 30(b)(6) Deposition, 148:5-10 ("Q. So then if stateful filtering -- what I'm hearing -- what I think I'm hearing is stateful filtering goes closer to the client side, but I thought my -- the understanding was that Meta moved from stateful to stateless filtering in 2023? A. Meta has both systems"); Wooldridge 30(b)(6) Deposition, 148:16-149:11 ("Q. And is that not possible with stateful filtering? A. In the way the stateful filters were designed, one of the things they do is they use heavier computation. So we just described the machine learning categorization that can be used to, you know, match things in a nonprecise way, such as if it's not an exact match of a key word on a blocked list or something to that effect. And so the stateful processing emits you to do more computationally expensive detection because it's not happening in real-time as events received by Meta. While the stateless filtering, generally it can only run less computationally expensive things. […] [T]he stateless filtering focuses on – it's just less computationally expensive, and therefore it's able to run in real-time but not have as much logic").

57. Meta filtered out these parameters server-side (*i.e.*, upon the data reaching Meta's servers). Starting in April 2020, Meta began blocking the transmission of unwanted custom data keys (*i.e.,* URL and custom parameters) client-side (*i.e.*, before any data reaches Meta's servers)—including potentially sensitive parameters from domains classified as health-related—in addition to filtering event and URL parameters server-side.[157] The list of unwanted keys from each source (*e.g.,* Meta Pixel ID) was determined by the detection systems, as described above.[158]

58. In September 2023, Meta expanded this system designed to prevent the transmission of certain potentially sensitive data using a dynamic blocking ("Dynablocking") system, which was rolled out in the first half of 2024.[159] The Dynablocking system designates certain parameters that may

---

[157] Wooldridge 30(b)(6) Deposition, 146:23-147:13 ("The stateful filtering system tried to detect that a particular key contained potentially unwanted values So an example of that would be, if there is a parameter named, say, X, Y, Z, which doesn't have any meaning, but it has a value which is flagged as potentially unwanted, if this was seen several times, the system would register that this value should be blocked. And so it'd instruct both the client-side JavaScript before that data could be sent to Meta and the server-side code. If that data was somehow sent to Meta, such as if the advertiser or website owner had chosen to use the image tag pixel, which would mean the client-side filtering would not be possible, it would then remove it once it reached Meta's server").

*See, e.g.,* cf840ddeafba6bc6886ec12dc9179ad43fc0e2ee, April 2, 2020; d9cf920598096d47c909606bc973dcdd91ba61b0, April 1, 2020.

Because CAPI transmissions originate from the developer's server, Meta cannot filter information contained in the events before receiving them. Instead, filtering may occur when the events reach Meta's servers.

[158] Wooldridge 30(b)(6) Deposition, 146:20-147:19 ("[Q.] Please explain the difference between stateful filtering versus stateless filtering, and why it matters. A. The stateful filtering system tried to detect that a particular key contained potentially unwanted values. So an example of that would be, if there is a parameter named, say, X, Y, Z, which doesn't have any meaning, but it has a value which is flagged as potentially unwanted, if this was seen several times, the system would register that this value should be blocked. And so it'd instruct both the client-side JavaScript before that data could be sent to Meta […] And so the -- one of the benefits of that stateful filtering is that, actually, you can go further to the source, actually prevent that data from being transmitted to Meta at an earlier process by saying, 'This key may be bad. Do not send it to Meta.'").

[159] Wooldridge 30(b)(6) Deposition, 145:4-20 ("A. […] Meta has continually added to the filtration systems. Another example of the filtration changes was adding additional terms as part of the escalation path or business source responsibility program. This particular filtering, essentially, if it triggered some number of times for a given advertiser, it would send them warnings. And if they did not address the problem and update their installation to no longer trigger this particular system would enable core setup for their pixel or domain. Q. When did that change take place? A. I believe a pilot for that change started in late '23. Q. Is it fully implemented today? A. That system was rolled out completely in '24, in H1 2024"); PIXEL_HEALTH001226464-471 at 464 ("Meta has developed an automated blocking mechanism designed to identify and dynamically block the transmission of a subset of previously filtered potentially sensitive keys identified in prior pixel fires ('Client Side Dyna-Blocking'). To pilot the efficacy of Client Side Dyna-Blocking, Meta leveraged the pilot population of 7946 Pixel IDs […]. Client Side Dyna-Blocking was enabled for this pilot population beginning on 2023-09-25, and will conclude on 2024-01-15").

contain potentially sensitive data as restricted for a particular Meta Business Tool ID.[160] These parameters are blocked client-side in case of the Meta Pixel and the Facebook SDK and server-side for CAPI, prior to any storage or use of that data.[161]

### D. Notifications

59. Since October 2018, Meta has also had a system to notify developers via email and in Events Manager that certain data they sent may not be compliant with Meta's Business Tools Terms.[162] The notifications also provide specific information about the affected data, such as where the

---

[160] PIXEL_HEALTH000876876 at slides 55-57 ("Dynamic blocking (or "dynablocking") is a feature that can designate certain parameters as restricted for a particular Business Tool (e.g. a Meta Pixel) when certain SIS potentially sensitive data detection thresholds are met").

[161] *See* 7c0aca098287c057c748a751a05dd0b69e06f29b, September 1, 2023; 66f582c9fa67879ba9bed934ab534bfac6a34ab8, September 1, 2023; 781065d38882c88f359f910ca6485c8c6730ba40, September 11, 2023; [redacted]

*See also* PIXEL_HEALTH000909602-623 at 610 ("When Meta receives a parameter that has been designated for dynablocking, that parameter will be discarded ('server-side dynablocking'). […] After an event is received, any parameters designated for dynablocking for that Business Tool will be discarded before SIS detection and filtering would even occur"), at 611 ("As it's loading, the Meta Pixel or App SDK can reference a list of parameters it has previously sent that have been designated for dynablocking. Parameters on the referenced list will not be transmitted to Meta"). *See also* PIXEL_HEALTH000876876 at slide 57 ("Dynamic blocking (or 'dynablocking') is a feature that can designate certain parameters as restricted for a particular Business Tool (e.g. a Meta Pixel) when certain SIS potentially sensitive data detection thresholds are met. These parameters may also be blocked from transmission to Meta (client-side functionality)").

[162] 54bc1526f16ff6c78d68bb9d16fda25616bd5c8d, November 19, 2020; b588f8329dc5146e8610c79aff5580b64da9b0e5, November 17, 2020; 5e67177f610796ad87b97f1a4c8505382353203c, May 21, 2018.

Wooldridge 30(b)(6) Deposition 49:23-50:8 ("Q. As I just described, Meta absolutely does not want [sensitive health information] data. Businesses should thoughtfully install the pixel, and businesses should not send this to Meta. Meta has taken additional steps above instructing businesses not to transmit this data to Meta, giving tools to facilitate them not transmitting this data to Meta. E-mailing them, if they potentially transmit unwanted data to Meta, and taking proactive steps to block them from transmitting this information to Meta"); Wooldridge Declaration, ¶ 43 ("Since Meta first launched its filtering systems in October 2018, when Meta's systems detect and filter out data they categorize as potentially sensitive, Meta sends notifications to the developer (1) via email and (2) in two locations in Meta's developer dashboard, called Events Manager"); PIXEL_HEALTH001238832-834. *See also* PIXEL_HEALTH000876876 at slide 21 ("Meta has processes for notifying developers about enforcement actions taken by SIS when PSD is filtered or data from a prohibited source is discarded").

potentially non-compliant data (*e.g.*, a URL parameter) was removed from (but not the content because it is blocked), and recommended steps to resolve the issue.[163]

60. When parameters associated with a given Business Tool are "dynablocked," the advertiser also receives warnings informing the advertiser that the parameter was blocked,[164] and instructions on how to avoid sending prohibited information in the future.[165]

### E. Patient Portal Restrictions

61. In early 2023, Meta implemented a system to discard Meta Pixel and CAPI events originating from URLs Meta predicted, based on a list of terms (*e.g.*, "patient portal," "patient-portal," "healthelife," and "mychart"), to be related to patient portals.[166] All event data

[163] *See, e.g.,* PIXEL_HEALTH000876898-899. *See also* Wooldridge Declaration, ¶ 43 ("These notifications inform the developer that Meta detected and blocked data that may not comply with Meta's terms; confirm that the removal may affect ad performance; and provide details about the affected data, including the location of the potentially violating information, steps the developer can take to address the issue, and an email address to contact with questions"); PIXEL_HEALTH000876876 at slide 62.

[164] *See, e.g.,* PIXEL_HEALTH000876876 at slide 60-62.

[165] PIXEL_HEALTH000909624-635 at 625 ("Dynablocking-triggered acknowledgements[:] Advertisers must acknowledge Meta's restrictions on sending potentially sensitive data when they review a parameter that has been dynablocked. They will receive email and in-product notifications detailing the specific parameters within their Business Tools setup that are subject to dynablocking […] Advertisers will then be pointed to a user interface in Events Manager which requires them to firstly acknowledge that they agree to not share potentially sensitive data with Meta, and then to review and fix blocked parameters. Once acknowledged, the advertisers may be provided an option to either confirm that they wish for Meta to continue blocking the parameter, or that they have reviewed and fixed the parameter and wish to unblock the parameter (if this option is not available, the parameter will remain blocked)"), 630 ("Once the user clicks the next button, the next screen provides context on why the parameters were blocked and what this means for their business. And they are provided with the options to either 'Unblock the parameter' or 'Keep blocking parameter'").

[166] d5f896fb155353b7b8b40997d888960e73c1a5b9, February 17, 2023; 6d29ee437a63aefb7ee1bdd4c7d89805635e46e5, January 26, 2023.

PIXEL_HEALTH000109836-838 at 836 ("Privacy Review: Proactive Blocking of URLs Containing patient portals such as 'MyChart' [February 9, 2023]"); PIXEL_HEALTH000686808-819 at 818 ("We will add additional detectors in www repository for regex match of words and URL[:] […] SignalsIntegrityPixelFromRestrictedEventsCheck [Newly Added] […] We will match the regex/substring on the firing HRL and referring URL(in phase 2) and see if that contains any of the keywords listed in dict of SV"). The "low level implementation" section of this document describes the SV_SIGNALS_INTEGRITY_RESTRICTED_EVENT_TERMS dictionary; *see* PIXEL_HEALTH000686808-819 at 818-819.

from these domains is discarded regardless of the content of the data.[167] Meta implemented a system to discard Meta SDK events originating from patient portal apps in January 2025.[168]

### F. Core Setup

62. In July 2023, Meta began an initial launch of "Core Setup," previously referred to as "Protected Data Mode."[169] Meta designed Core Setup to prevent data from certain Meta Pixel and App IDs, including custom parameters and everything in the URL after the domain, from being transmitted.[170] For CAPI, which operates server-to-server (*see* **Section III.B.3**), Meta removes

---

[167] PIXEL_HEALTH000109836-838 at 837 ("Enable blocking of event data sent from common health-related 'patient portals' (e.g. MyChart) […] This project will implement a mechanism to block events fired from health-related URLs. Initially, the blocking will occur server-side, whereby detection is performed by a regex/substring match on the firing URLs. Detection will take place in real time and will be implemented alongside existing Signals Integrity filtering. Data Processing Overview[:] 1. Pixel or CAPI event is sent to Meta 2. Check if the top level domain on the allowlist […] If no, check if the firing URL contains any of the following strings in its fully qualified domain name […], URL path, or query string: 1. 'mychart' 2. 'healthelife' 3. 'patient portal' 4. 'patient portal' .3 If yes, block the event from flowing any further into signals processing"). *See also* Wooldridge Declaration, ¶ 44 ("When Meta's system detected one of these URLs attempting to transmit data, Meta discarded all data from these domains").

[168] Wooldridge Declaration, ¶ 45 ("In January 2025, Meta implemented a similar system to discard all data sent using the Facebook Software Development Kit by apps categorized as patient portals client-side"); PIXEL_HEALTH001189530 at 532 ("Enforcement Type[:] […] Blocks all events from being shared to Meta via Pixel, App Events SDK, App Events API, and Conversions API ('Business Tools fully blocked')").

[169] PIXEL_HEALTH000874369-370 at 369 ("Core-setup formerly known as Protected Data Mode is a mode in which a pixel, app, CAPI, or offline setup can be placed in which restricts the amount of potentially sensitive data an advertiser can send to Meta. It limits potential risk from free-form data, urls, and automatic events"). *See also* PIXEL_HEALTH000877095-125 at 095 ("Beginning July 20, 2023, we are introducing core setup, which includes new capabilities to restrict certain types of data for Meta Business Tools").

[170] cbf075dbd44ae9d731930760391e749ef52739a6, June 8, 2023;
93d47fee477c142861ee3df000db921e16cc2e4, June 11, 2023;
e72aad22c0c97a2fc4427a71fc5dd297651517cc, June 15, 2023;
dec1e86844bea04039ff38ad75afd603d78d5d1, June 21, 2023;
4ea40994379a68452c2bf794a8b8a2d6444d90f6, June 22, 2023;
fe130bffb9b923bc670f663ef2a8f8bdc7b978d5, June 26, 2023.

Wooldridge Declaration, ¶ 46 ("Core Setup is designed to prevent the transmission of certain types of Event Data altogether—including Custom Parameters and everything in a URL after the domain—before it can even be sent via the Meta Pixel for website events or the Facebook Software Development Kit, and to remove it as soon as possible after it reaches Meta's servers when sent via CAPI"); PIXEL_HEALTH000876877 ("Core setup restricts the transmission of custom parameters and anything in a URL following the domain"); PIXEL_HEALTH000874369-370 at 369 ("Core-setup formerly known as Protected Data Mode is a mode in which a pixel, app, CAPI, or offline setup can be placed in which restricts the amount of potentially sensitive data an advertiser can send to Meta. It limits potential risk from free-form data, urls, and automatic events"). *See also* PIXEL_HEALTH000909602-623 at 612 ("ii. Client-side core setup functionality[:] As it's loading, the Meta Pixel or App SDK configuration can reflect that this Business Tool is enrolled in core setup. If it is, custom parameters and parts of the URL after the domain will not be transmitted to Meta").

the custom parameters from event data as soon as technically feasible, when it reaches Meta's servers but prior to any storage or use of that data.[171]

63. Core Setup's data restrictions are applied to an advertiser's Meta Business Tool ID or domain/app if the domain or app is restricted based on classification—such as a domain classified as health-related—or if a threshold percentage of events sent by the Business Tool are associated with a restricted domain or app (*i.e.*, "classification-based" enrollment).[172] A Meta Business Tool ID may also be enrolled in Core Setup if the Business Tool repeatedly sends data that Meta's system identifies as potentially sensitive data (*i.e.,* "escalation-based"

---

Core Setup also prevents the transmission of Automatic Events and disables Automatic Advanced Matching when in proactive enrollment (*i.e.,* when Meta has placed the data source in Core Setup). While SubscribedButtonClick events are not blocked in non-proactive enrollment, Meta filters button information. *See* PIXEL_HEALTH000874369-370 at 369 ("WHEN IN PROACTIVE-ENROLLMENT. Disables loading of Microdata and SubscribedButtonClick (SBC) features when in proactive enrollment. Microdata scrapes the page for page data and can send potentially sensitive information to Meta on page view. SubscribedButtonClick scrapes the form data and can contain potentially sensitive information about the page to Meta like button text. Disables Automatic Advanced Matching when in proactive enrollment. WHEN OPT-IN BUT NOT PROACTIVE-ENROLLMENT. SubscribedButtonClick is not blocked as to allow Automatic Advanced Matching; however, we filter out all button data. We use automatic advanced matching to get PII (first name, last name, etc.) from form fields on the page and include it with button click events. We allow this feature to continue to function, but we do not allow the button click event to contain things like button text or button information in it"). *See also* PIXEL_HEALTH000876884 at 884 ("Note: proactive-enrollment occurs when Meta has placed the data source in Core Setup, and does not occur when the advertiser opts-in to Core Setup").

171 83958caf192f07fbac1b4e9ffd4d81e5b6fea302, June 22, 2023; e17cf4703681624ba2c5aee0f4949f675d1cab9e, June 18, 2023.

PIXEL_HEALTH000909602-623 at 612 ("i. Server-side core setup functionality[:] After an event is received from a Business Tool configured to be in core setup, custom parameters and parts of the URL after the domain are discarded before SIS detection and filtering would even occur").

172 PIXEL_HEALTH000876876 at slide 51 ("Classification-based: A Business Tool may be enrolled in core setup due to association with health- or finance-classified sources, and individual events may have core setup applied if they originate from a health- or finance-classified domain"); PIXEL_HEALTH000877149-150 at 149 ("[Core Setup] is currently applied on a data source basis; however, we classify websites and not data sources. We apply core setup to data source if a majority of a data source's website traffic is coming from a website classified as a restricted domain (*i.e.* a health or finance domain). Changes[:] We will additionally apply core to client side based on the domain a pixel loads from in order to have full coverage on a domain. We will have redundant filtering on the server side which will be applied on an event-basis directly based off of the domain the event fired from."); Wooldridge Declaration, ¶¶ 47-48 ("Core Setup is a set of data restrictions that can be applied to a particular data source (a domain or app) by Meta or to a Business Tool ID by a developer or by Meta. Meta will turn on the Core Setup data restrictions for a data source (a domain or app) if that data source has received a classification, such as a health-related classification, that requires Core Setup's data restrictions, including data sources Meta classifies as relating to medical conditions, specific health statuses, or provider/patient relationships (for example, a wellness tracker for depression). Meta may also turn on the Core Setup data restrictions for a Business Tool ID if Meta determines that a significant percentage of data sent to Meta by that Business Tool ID comes from data sources (domains or apps) that have received a classification that requires Core Setup's data restrictions").

enrollment).[173] If a Meta Business Tool's parameters are "dynablocked" multiple times, the Meta Business Tool ID is placed in escalation-based Core Setup for a period of 90 days.[174] Developers cannot choose to remove their website or app from Core Setup once Meta has placed it there unless they go through an appeal process.[175] Developers cannot transmit Automatic Events, including SubscribedButtonClick events, from Meta Business Tool IDs or domains/apps placed in Core Setup.[176]

64. As of June 2024, developers can also voluntarily place their Meta Business Tool ID into Core Setup (*i.e.,* "self-directed").[177]

---

[173] PIXEL_HEALTH000876876 at slide 51 ("Escalation-based: A Business Tool may be enrolled in core setup due to repeatedly sending parameters that meet the SIS potentially sensitive data detection thresholds to be designated for dynablocking").

[174] Wooldridge 30(b)(6) Deposition, 145:6-14 ("Another example of the filtration changes was adding additional terms as part of the escalation path or business source responsibility program. This particular filtering, essentially, if it triggered some number of times for a given advertiser, it would send them warnings. And if they did not address the problem and update their installation to no longer trigger this particular system would enable core setup for their pixel or domain"); PIXEL_HEALTH000909624-635 at 626 ("Data sources from which Meta repeatedly detects parameters that meet the SIS potentially sensitive data detection thresholds for dynablocking (as set forth above), will go through an escalation process. Advertisers will receive tailored in-product notifications as they progress through the escalation stages, including the specific parameters subject to dynablocking. Each violation is followed by a cooling-off period (presently 15 days), allowing advertisers sufficient time to become informed about the types of data that should not be shared with Meta to prevent further escalation, and make necessary changes to their integration"; "Data sources that go through multiple escalation stages ('strikes'), will be placed in core setup automatically (presently upon the 4th 'strike'), and Meta will send notifications and in-product messaging to let advertisers know that their Business Tool is now subject to data restrictions. Their Business Tool will be subject to core setup for a required period (presently 90 days, after which the restrictions are lifted)"). *See also* PIXEL_HEALTH000909351-393 at 370 ("Placement into Core Setup[:] As a result of the escalation process, advertisers who exceed the strike limit will be notified that their data source as been placed into Core Setup for 90d").

[175] PIXEL_HEALTH000876891 ("As part of the appeal process, there are two methods for reviewing appeals: through human raters or through automation. Once an appeal request has been created, the user's inputs will be processed and then passed on to either the Automation framework or human raters for review. […] Upon completion of the review process, the appeal information will be updated based on the decision made. If the appeal is granted, the restricted data sets will be removed from the core setup state, However, if the appeal is denied, the data sets will remain in the core setup state").

[176] Wooldridge Declaration, ¶ 46 ("Core Setup also prevents the transmission of Automatic Events by developers to Meta"); PIXEL_HEALTH000876884 ("When in proactive-enrollment [:] Disables loading of Microdata and SubscribedButtonClick (SBC) features when in proactive enrollment. […] Note: proactive-enrollment occurs when Meta has placed the data source in Core Setup, and does not occur when the advertiser opts-in to Core Setup").

[177] PIXEL_HEALTH000876876 at slide 51 ("Self-directed: A Business Tool may be enrolled in core setup if an advertiser has chosen to turn it on in Meta Events Manager"); PIXEL_HEALTH000877126-145 at 126 ("As of [June] 17, 2024, we are thrilled to announce the global rollout of both Core Setup Opt In and Custom Event Registration features to 50% of all advertisers! […] We anticipate the full 100% general availability rollout to be completed on [June] 20, 2024, […]This update offers advertisers the option to configure their Business Tools

65. Meta Pixels in Core Setup operate by loading the "protecteddatamode" plugin.[178] I tested this by loading the *greenwichhospital.org* webpage and observing the plugins that load with the Meta Pixel; this observation is shown in **Figure 6**.

**Figure 6**
**The "ProtectedDataMode" Plugin Is Loaded by the Meta Pixel Incorporated on *greenwichhospital.org*[179]**

```
fbq.loadPlugin("protecteddatamode");
instance.optIn("2477227183574183O", "ProtectedDataMode", true);
```

66. Consistent with Core Setup functionality, for events transmitted when I interacted with *greenwichhospital.org*, the URLs were truncated to show just the domain level rather than the full path and query (*see* **Figure 7**), and those same transmissions omitted custom parameters (*see* **Figure 8**) before any data was sent to Meta.[180]

with Core Setup, limiting specific data such as custom parameters and certain URL components following the domain").

178 ce83d2a6dff9d19d7f197c2c302e53edb5a2cfc6, June 15, 2023; 9048d65d45564407aaadc9a1678edc7f4a1e9851, June 7, 2023.

PIXEL_HEALTH000000057-063 at 061 ("FBEvents plugins are useful for isolating features in FBEvents. We can send plugin configurations from WWW, add gatekeepers to plugins, and send data from WWW in general to plugins. All plugins use the event-listener pattern by hooking in functionality through an event-listener. […] Plugins are loaded via fbq(…) or fbq.loadPlugin(…). The init call to Meta Servers' response is injected via javascript and will call fbq.loadPlugin(…); in the advertiser's website"); PIXEL_HEALTH000874441-443 at 442 ("The FilterProtectedModeEvent a custom event that is triggered right before we send a pixel event to Meta. We added a listener to this event [redacted] removing the custom data if it does not exist inside the loaded standard parameter's definition").

179 *See* **Appendix D**; backup, "windows_chrome_greenwichhospital_default," which contains the relevant JavaScript file as text (2477227183574183O.txt).

180 As a part of my testing, I use the Chrome browser's console to run JavaScript code, meant to transmit a Standard Event with custom parameters, on the *greenwichhospital.org* website. I observe that while the event transmission occurs, custom parameters are dropped. For details on testing *see* **Appendix D**.

**Figure 7**
**Full URLs Are Not Transmitted Alongside the *dl* Parameter on *greenwichhospital.org*[181]**




---

[181] The URL parameter *dl* is meant to contain the URL of the page being visited. *See* backup, "windows_chrome_greenwichhospital_subpage.har."

A13-4300

**Figure 8**
**A Meta Pixel Placed into Core Setup Does Not Include Custom Parameters in Event Browser Transmissions[182]**




### G. Custom Event Registration

67. In June 2024, Meta implemented the custom event registration ("CER") process, which applies to the Meta Pixel, Facebook SDK, and CAPI.[183] This process requires certain advertisers, including health-classified advertisers, to either confirm that their Custom Events comply with Meta's Business Tools Terms or have those events blocked.[184] For advertisers in Core Setup,

182 For details on testing, *see* backup, "windows_chrome_greenwichhospital_customParameter.har."

183 [redacted] PIXEL_HEALTH000877126-145 at 126 ("As of Jun 17, 2024, we are thrilled to announce the global rollout of […] Custom Event Registration features to 50% of all advertisers! […] We anticipate the full 100% general availability rollout to be completed on Jun 20, 2024"); PIXEL_HEALTH000909519-523 at 519 ("We are releasing Custom Event Registration (CER) which encourages advertisers to confirm if their custom events comply with Meta's Business Tool terms or block them if they do not. CER is required for advertisers in core setup, a version of Business Tools that doesn't transmit freeform data to Meta. Advertisers in core setup will have their new custom events dropped unless they are confirmed in Events Manager and their pre-existing custom events will be auto-registered so that their pre-existing setups will not be affected. CER will be released for General Availability across Web, App, and Offline. We are also allowing advertisers to manually opt into core setup in Events Manager alongside CER's launch").

184 PIXEL_HEALTH000909519-523 at 519 ("We are releasing Custom Event Registration (CER) which encourages advertisers to confirm if their custom events comply with Meta's Business Tool terms or block them

which includes advertisers with a health-related classification,[185] newly-configured Custom Events are dropped unless these Custom Events are confirmed by the developer in Event Manager.[186] Once a developer confirms their custom events, Meta reviews the event names for potentially sensitive information, including information potentially related to health.[187] If any Custom Event name is found to contain potentially sensitive information, that Custom Event is blocked for all advertisers, not just the one who initially created that custom event, client-side for the Meta Pixel and Facebook SDK, and server-side for CAPI.[188]

### H. Automatic Advanced Matching

68. As discussed in **Section III.B.2**, automatic Advanced Matching is a Meta Pixel feature that allows advertisers to automatically send hashed customer information—such as names or email

---

if they do not"); Wooldridge Declaration, ¶ 52 ("When the developers of these websites and apps configure a new Custom Event, before the developer can use Event Data sent through that Custom Event to create ads, custom audiences, or for other advertising purposes, the developer must verify in Events Manager that it did in fact configure the Custom Event and that the Custom Event complies with Meta's Business Tools Terms. This process is shown in the screenshots below, which were produced by Meta in this case as PIXEL_HEALTH001365317.").

185 PIXEL_HEALTH000876876 at slide 51 ("Classification-based: A Business Tool may be enrolled in core setup due to association with health- or finance-classified sources, and individual events may have core setup applied if they originate from a health- or finance-classified domain").

186 d054925d391021dc6f4472f0c650125b27a70590, August 15, 202339ca22bc97a41f895f6286e9642bbea04eb5b491, April 11, 2023; [redacted]
PIXEL_HEALTH000909519-523 at 519-520 ("Advertisers in core setup will have their new custom events dropped unless they are confirmed in Events Manager and their pre-existing custom events will be auto-registered so that their pre-existing setups will not be affected. […] Advertisers for web, app, and offline that are enrolled in core setup will have their new custom events dropped until the advertisers confirms in Events Manager that the new event complies with Meta's business tool terms. Confirmed events are not exempt from Meta's Signals Integrity detection systems, and our systems will still block it if it is found to contain potentially sensitive data").

187 Wooldridge Declaration ¶ 53 ("After a developer confirms a Custom Event, Meta reviews the Custom Event name using human reviewers to check whether it includes potentially sensitive information, such as health-related information").

188 PIXEL_HEALTH000909519-523 at 520 ("Advertisers will have the choice to either confirm events if they comply with Meta's Business tool terms or block them if they do not. […] Confirmed events are not exempt from Meta's Signals Integrity detection systems, and our systems will still block it if it is found to contain potentially sensitive data"); PIXEL_HEALTH000877126-145 at 129 ("Going forward, we will be fully blocking events that have potentially sensitive event names. Events with potentially sensitive data, and events designated for blocking from CER will be blocked on the client-side (i.e., advertisers' websites and/or apps) when applicable, as well as on Meta's servers"); Wooldridge Declaration, ¶ 53 ("If Meta identifies that the Custom Event name includes potentially sensitive information, it blocks use of that Custom Event both for the specific developer that originally sent the Custom Event as well as all other developers with a health-related classification").

addresses—along with event data to Meta. The data is hashed in the user's browser using the industry-standard SHA-256 algorithm before transmission, meaning the information is converted into an alphanumeric string that is computationally infeasible to reverse before it is ever received by Meta's servers.

69. In 2022, Meta disabled automatic Advanced Matching for Meta Pixel IDs classified by Meta as health-related.[189]

70. To summarize, since 2018, Meta has been developing and expanding its systems aimed at preventing the receipt and use of potentially sensitive data. These systems consist of components (*e.g.,* blocklists, the health data detector, and the SIPS detector), which themselves have been expanded and updated at various points in time.

## V. DEVELOPERS CHOOSE WHETHER AND HOW TO IMPLEMENT META'S BUSINESS TOOLS AND USERS HAVE CONTROLS THAT AFFECT DATA TRANSMISSION TO META AND META'S USE OR STORAGE OF THAT DATA

71. Developers choose whether to use Meta's Business Tools and determine what data to send to Meta, how, and when. Developers and website visitors also have access to various controls that affect whether and how data is transmitted to Meta's servers. The different choices developers and website visitors make mean that the information transmitted to Meta varies by website, and may change depending on the visitor, website, and over time. In addition, Facebook users have other controls that affect Meta's use or storage of data.

---

[189] "About advanced matching for web," Meta, https://www.facebook.com/business/help/611774685654668 ("Businesses (including event data sources that they own, such as the Meta pixel) may not have certain features available to them if they're categorised as being in a restricted vertical. If you see a message in Meta Events Manager that says you're unable to use automatic advanced matching, this may be because your business is categorised as being in a restricted vertical. Examples of restricted verticals include industries such as banking, lending, financial services, insurance, pharmaceuticals and health. Automatic advanced matching may also be unavailable if your pixel is set up in an iframe or if you're using an IMG pixel. Businesses in restricted verticals can set up advanced matching manually instead"); PIXEL_HEALTH001220235 ("In light of the media scrutiny around potentially sensitive data transmission and collection, and regulatory inquiries, we started on exposure minimization work by reducing opportunities for advertisers in certain verticals (Health, Finance) to send us potentially sensitive information, even though we contractually prohibit advertisers from sending us such data"); PIXEL_HEALTH000484906-908 ("We disable automatic events (microdata and button clicks) and automatic advanced matching for pixels in sensitive verticals (healthcare, finance, etc.).").

f115eabb2d862b0bc152be26943f22ce17350124, February 6, 2022.

### A. Developers Choose Whether to Use Meta's Business Tools and Have Controls That Affect Data Transmission to Meta

72. As an initial point, developers decide whether to use Meta's Business Tools. In addition, the manner in which developers choose to configure their websites, apps, and Meta's Business Tools affects what data, if any, is transmitted to Meta. In particular, developers decide (1) on which webpages to integrate the Meta Pixel, if at all, (2) whether and which events are transmitted, including whether to disable the transmission of Automatic Events, (3) whether and how consent banners are implemented, (4) whether first-party cookies are used, and (5) whether and how Advanced Matching is implemented.

#### *1. Developers Can Decide on Which Pages to Integrate the Meta Pixel, If Any*

*73.* Developers may configure the Meta Pixel to operate only on selected pages by (1) omitting the Meta Pixel on certain pages or (2) if the Meta Pixel is implemented through a tag manager,[190] configuring the tag manager to block the Meta Pixel's functionality on certain webpages.[191] If a user navigates to a webpage without the Meta Pixel, no transmissions via the Meta Pixel will occur. As shown in **Figures 9**, **10**, and **11** below, *mgmc.org* has the Meta Pixel integrated on its homepage but not on the subpages *mgmc.org/about* or *mgmc.org/care/pregnancy-birth/preparing-baby/registration-insurance/register/*. Thus, depending on user controls, data may be transmitted to Meta's servers via the Meta Pixel when a visitor views the homepage, but not when a visitor views the "About" page or the "Birthways Pre-Registration" page.

---

[190] Tag managers are third-party services that allow developer to manage and deploy third-party business tools—such as the Meta Pixel or Google Analytics—on their websites without directly modifying the website's source code. *See, e.g.*, "About Google Tag Manager," Google, https://developers.google.com/tag-platform/tag-manager ("Use [Google] Tag Manager to manage tags (such as measurement and marketing optimization JavaScript tags) on your site. Without editing your site code, use Tag Manager to add and update Google Ads, Google Analytics, Floodlight, and third-party tags"); "Add the Meta Pixel with Google Tag Manager," Meta, https://www.facebook.com/business/help/1021909254506499 ("Add the Meta Pixel with Google Tag Manager").

[191] For instance, Google Tag Managers allow developers to manage tags on their websites, including the Meta Pixel. Through Google Tag Manager, developers can define specific rules to determine under what conditions the Meta Pixel loads or is blocked. *See* "Add the Meta Pixel with Google Tag Manager," Meta, https://www.facebook.com/business/help/1021909254506499 ("Add the Meta Pixel with Google Tag Manager […] You can do this by creating event-specific tags within Google Tag Manager (GTM). Each tag requires a trigger to determine when it fires"); "Firing triggers and trigger exceptions," Google Tag Manager Help, https://support.google.com/tagmanager/answer/7679318 ("A trigger exception […] can be used to block another trigger's ability to fire under certain conditions").

**Figure 93**
***mgmc.org* Integrates the Meta Pixel**[192]




192 *See* **Appendix D**; backup, "windows_chrome_mgmc_default.har."

A13-4305

**Figure 104**
***mgmc.org/about*** **Does Not Integrate the Meta Pixel**[193]




---

193 *See* **Appendix D**; backup, "windows_chrome_mgmc_subpage.har."

**Figure 115**
***mgmc.org/care/pregnancy-birth/preparing-baby/registration-insurance/register/***
**Does Not Integrate the Meta Pixel**[194]




74. In addition, developers' use of the Meta Pixel may vary over time, and they may choose to implement the Meta Pixel on their website or on specific webpages, or remove it, at any moment.[195] For instance, I observe that the produced event data does not contain any events associated with the domain *strosenh.org*, which is included in Plaintiffs' list of 1,844 domains, until April 12, 2023.[196] Likewise, there exist websites that implemented the Meta Pixel in the past but have since removed it, as stated by Mr. Smith in his deposition testimony[197] and by Dr. Shafiq in his report.[198]

194 *See* **Appendix D**; backup, "windows_chrome_mgmc_subpage_1.har."

195 Wooldridge Declaration, ¶ 8 ("Developers choose whether or not to incorporate code for Meta's Business Tools into their websites or apps, and are in control of if, when, and from which pages they transmit information. For example, developers can integrate the Meta Pixel code on certain webpages and not others, choose what Events to send, and change where the code is integrated and what Events are sent over time").

196 *See* backup, "strosenh_start_date."

197 Videotaped Deposition of Richard M. Smith, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO, November 3, 2025 ("Smith Deposition"), 113:2-6 ("A. Yeah, I think I only looked at the first 20 here. I am looking at paragraph 194, so I took the first 20 and these websites appeared to have removed the Meta Pixel").

198 Shafiq Report, footnote 164 ("Medstar Health had removed Meta Pixel at the time of my testing in 2025. I used the Meta Pixel archived by the Wayback Machine in 2020 to replay Meta Pixel's operation on Medstar Health's website").

### 2. *Developers Can Decide Whether and Which Events to Transmit to Meta*

75. As discussed in **Section III.B.1**, developers can decide whether and which Standard and Custom Events to send to Meta. If they choose to send these events, developers have the option to choose which user actions correspond to them.

76. In addition, since 2017, developers have had the option to disable the transmission of Automatic Events.[199] Developers can disable Automatic Events programmatically by adding the relevant configuration code, `fbq('set', 'autoConfig', false, 'FB_PIXEL_ID')`, to their website code, as shown in **Figure 12**.[200] This can be modified at any time, as developers may add or remove this configuration code.

[199] Wooldridge Declaration, ¶ 7 ("[D]evelopers can change these default settings at any time so that they do not send Automatic Events to Meta, and have been able to do so since the launch of that functionality in 2017").

[200] Facebook for Developers, "Pixel Code Reference," Wayback Machine, https://web.archive.org/web/20170827002341/https:/developers.facebook.com/docs/facebook-pixel/api-reference ("Automatic Configuration[:] Starting on **May 19, 2017**, the Facebook Pixel will be able to send button click data and page metadata from your website to improve your ads delivery and measurement with no further code changes required. If you'd like to configure the Facebook Pixel to Manual Only mode, you can add the line fbq('set', 'autoConfig', 'false'[,] 'FB_PIXEL_ID') above the init call in the Facebook Pixel Base code and the Facebook Pixel will no longer send this additional data") (emphasis in original). *See also* "Meta Pixel Advanced," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/ ("Automatic Configuration[:] The Meta Pixel will send button click and page metadata (such as data structured according to Opengraph or Schema.org formats) from your website to improve your ads delivery and measurement and automate your Pixel setup. To configure the Meta Pixel to not send this additional information, in the Meta Pixel Base code, add fbq('set', 'autoConfig', 'false', 'FB_PIXEL_ID') above the init call"); "About automatic events," Meta, https://www.facebook.com/business/help/1292598407460746 ("Automatic events are actions that your pixel receives from your website that don't require you to add any additional code. Your pixel receives these actions through visitor activity and by using information about your web page to understand context associated with these actions better").

**Figure 12**
**Developers Can Programmatically Disable Transmission of Automatic Events**[201]



```
<!-- Facebook Pixel Code -->
<script>
!function(f,b,e,v,n,t,s){
if(f.fbq)return;n=f.fbq=function(){n.callMethod?
n.callMethod.apply(n,arguments):n.queue.push(arguments)};if(!f._fbq)f._fbq=n;
n.push=n;n.loaded=!0;n.version='2.0';n.queue=[];t=b.createElement(e);t.async=!0;
t.src=v;s=b.getElementsByTagName(e)[0];s.parentNode.insertBefore(t,s)}(window,
document,'script','//connect.facebook.net/en_US/fbevents.js');
fbq('set', 'autoConfig', false, 'FB_PIXEL_ID');
// Line to enable Manual Only mode.
fbq('init', 'FB_PIXEL_ID');
//Insert Your Facebook Pixel ID below.
fbq('track', 'PageView');
</script>
<noscript>
<img height="1" width="1" style="display:none"src="https://www.facebook.com/tr?id=
</noscript>
<!-- End Facebook Pixel Code -->
```



77. As an example, **Figure 13** shows that the website *creonhcp.com* disables the transmission of Automatic Events with the code `fbq('set', 'autoConfig', 'false', '3712703615416126').`

[201] Facebook for Developers, "Pixel Code Reference," Wayback Machine, https://web.archive.org/web/20170827002341/https:/developers.facebook.com/docs/facebook-pixel/api-reference.

**Figure 13**
***creonhcp.com* Disables Automatic Events**[202]




### 3. *Developers Decide Whether and How to Implement Consent Mechanisms*

78. Developers can use a tag manager, a Consent Management Platform ("CMP"), website code, or other consent mechanisms to implement consent banners that can prevent the transmission of data to Meta before website visitors provide consent.[203] The functionality of consent

---

[202] *See* backup, "windows_chrome_creonhcp_default" which contains the relevant JavaScript file as text (VM127.txt).

[203] *See*, *e.g.*, "Meta Pixel General Data Protection Regulation," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/gdpr/ ("Cookie Consent[:] Businesses may want to implement code that creates a banner and requires affirmative consent (for example, an 'I agree' checkbox at the top of the page) to use the Pixel. If you already have a system in place that addresses this need, such as a tag manager, you can make this code optional. Use the following API to pause sending Pixel fires to Facebook, and once cookie consent is granted, send Pixel fires to Facebook. You need to call revoke on every page"). *See also* "Cookie Consent Resource,"

mechanisms may vary from website to website, geographically (*e.g.*, whether a website is inferred to be in California),[204] and over time, based on how developers configure their consent banner. Developers may choose not to configure a consent mechanism for their website, or may choose to configure one in either an "opt-out" or "opt-in" setup:

a. In an opt-out setup, website visitors who are presented with a consent banner may reject consent, and the browser then prevents any subsequent transmissions consistent with that choice.[205]

b. In an opt-in setup, data is not transmitted until a website visitor affirmatively consents to the transmission of data, as shown in **Figures 14** and **15**.

---

Meta, https://developers.facebook.com/docs/app-events/cookies/ ("There are a number of vendors and industry tools that can help with consent functionality. For example, consider working with a Consent Management Platform (CMP) provider, such as OneTrust or TrustArc"); "Consent Management Platforms: Emerging Trends and Insights," TrustArc, https://trustarc.com/resource/consent-management-platforms-trends-and-insights/ ("A Consent Management Platform (CMP) is software that enables organizations to collect, manage, and document user consent for data processing activities").

[204] Zey, Tyler, "How to Run Cookie Banners Only in Certain States (and Hide Them Everywhere Else)," Ours Privacy, September 5, 2025, https://oursprivacy.com/guides/auto-show-cookie-banner-on-region ("We'll build a cookie banner with two distinct behaviors: In California (CA): Shows the cookie banner, typically requires users to opt-in, and can disable page interaction until consent is given[.] All Other States: Hides the cookie banner by default (users can open it via a footer link) and defaults to opt-out mode").

[205] *See* backup, "windows_chrome_biktarvy_default.har."

**Figure 14**
***greenwichhospital.org* Does Not Allow the Browser to Transmit Information Before California-Based Website Visitor Opts In by Clicking "Accept" on the Consent Banner**[206]




206 *See* backup "windows_chrome_greenwichhospital_noSiteConsent.har."

A13-4312

**Figure 15**
***greenwichhospital.org* Does Allow the Browser to Transmit Information After California-Based Website Visitor Opts In by Clicking "Accept" on the Consent Banner**[207]




4. *Developers Can Turn Off Transmission of First-Party Cookies Related to the Meta Pixel*

79. As shown in **Figure 16**, developers incorporating the Meta Pixel on their websites can choose, through the Meta Events Manager, whether to use first-party cookies.[208] As shown in **Figures 17** and **18**, when developers disable first-party cookies, the *_fbp* cookie is not placed on the user's device and hence the cookie value that would have been associated with it is not included in transmissions.[209] The *_fbc* cookie contains the ClickID value, which is generated when a user clicks an ad on Facebook or Instagram, and can help developers better understand

[207] *See* backup, "windows_chrome_greenwichhospital_default.har." "Homepage," Yale New Haven Health Greenwich Hospital, greenwichhospital.org, accessed on October 17, 2025.

[208] "About cookie settings for the Meta Pixel," Meta, https://www.facebook.com/business/help/471978536642445 ("You can disable first-party cookies and use the Meta Pixel with third-party cookies only. With this option, your Meta Pixel will be less effective in reaching customers on Meta technologies and less accurate in measurement and reporting").

[209] *See* **Appendix D**; backup, "windows_chrome_tubular-bubblegum_default.har," and "windows_chrome_tubular-bubblegum_block1p.har."

A13-4313

ad performance.[210] If a user's website visit is not the result of an ad click from Facebook or Instagram, then no *_fbc* cookie will be transmitted, as is the case in **Figure 17** below.

**Figure 16**
**Developers Can Disable the Transmission of First-Party Cookies in Meta's Events Manager[211]**




[210] "ClickID and the fbp and fbc Parameters," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/ ("ClickID is a Meta-generated parameter that is passed with the URL of an advertiser's website when a user clicks an ad on Facebook and/or Instagram […] The formatted ClickID value must be of the form version.subdomainIndex.creationTime.<fbclid>").

[211] I obtained this snapshot from Meta's Events Manager, which is not publicly available and requires access to the advertising account associated with the Meta Pixel.

**Figure 17**
**Browser Transmissions When Developers Enable the Transmission of First-Party Cookies**[212]




212 To collect this information, my team, under my direction, created a website for testing purposes, which was incorporated with the Meta Pixel. *See* **Appendix D**; backup, "windows_chrome_tubular-bubblegum_default.har."

**Figure 18**
**Browser Transmissions When Developers Disable the Transmissions of First-Party Cookies**[213]




80. The *_fbp* cookie stores a value that contains the time the cookie was created and a randomly generated number.[214] Because the *_fbp* cookie is a first-party cookie whose values differ across websites for the same device, it cannot be used in isolation to match user browsing behaviors across different websites. To illustrate this behavior, I visited *biktarvy.com* and then, without clearing cookies, visited *abqhospital.com* in the same browsing session. As shown in **Figure 19,** the value associated with the *_fbp* cookie differs between the two websites.

---

[213] To collect this information, my team, under my direction, created a website for testing purposes, which was incorporated with the Meta Pixel. *See* **Appendix D;** backup, "windows_chrome_tubular-bubblegum_block1p.har."

[214] "ClickID and the fbp and fbc Parameters," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/ ("When the Meta Pixel is installed on a website, and the Pixel uses first-party cookies, the Pixel automatically saves a unique identifier to an _fbp cookie for the website domain if one does not already exist. The fbp event parameter value must be of the form version.subdomainIndex.creationTime.randomnumber").

A13-4316

**Figure 19**
***_fbp* Cookie Value on *biktarvy.com* and *abqhospital.com*[215]**

| Domain | *_fbp* Cookie Value |
|---|---|
| biktarvy.com | fb.1.1762532384115.137595630728186532 |
| abqhospital.com | fb.1.1762532454253.409213161408876095 |

### 5. *Developers Can Customize or Disable Advanced Matching*

81. As discussed in **Section III.B.2**, developers decide whether to implement automatic or manual Advanced Matching and which hashed customer information, if any, to transmit to Meta. Developers' choices determine whether Advanced Matching occurs and what identifiers, if any, are transmitted.

## B. Website Visitors Have Controls That Affect Data Transmissions to Meta

82. Website visitors can prevent transmission of data via the Meta Pixel in several ways, including by (1) using browser features that prevent certain data transmissions, (2) adjusting website-specific consent settings for the transmission of data to third parties, and (3) choosing whether or not to visit a Meta domain or to be logged in to a Facebook account.

215 *See* backup, "windows_chrome_abqhospital_defaultwithBiktarvy.har."

### *1. Browsers Provide a Variety of Features That Website Visitors Can Use to Restrict the Meta Pixel*

83. Modern browsers, such as Chrome,[216] Mozilla Firefox,[217] and Safari,[218] have a variety of controls, extensions, and browsing modes that allow website visitors to customize transmissions from their browsers. These features can also be used to control what data may be transmitted to Meta when a website has integrated the Meta Pixel, including allowing website visitors to prevent the website from transmitting any data to Meta.

#### *a. Website Visitors Can Enable Browser Extensions to Prevent the Transmission of Data to Meta*

84. The number of people using ad-blocking browser extensions in the U.S. has grown substantially over the last decade. For example, one estimate showed 16 percent of U.S. internet users used ad blockers in Q2 2015,[219] while another showed that, by Q1 2024, 32 percent of U.S. internet

---

[216] On March 1, 2010, Chrome introduced a range of privacy settings that let users, among other things, control whether websites can store cookies. *See* Mazor, Orit, "Windows Beta Update: Translate and content controls," Google, March 1, 2010, https://chromereleases.googleblog.com/2010/03/windows-beta-update-translate-and.html ("More content settings to let you control whether web sites can store cookies, load images, use plug-ins, run JavaScript or show pop-ups"). *See also* Holfelder, Wieland, "A polyglot Google Chrome beta, with new privacy features," Google Chrome Blog, March 1, 2010, https://chrome.googleblog.com/2010/03/polyglot-google-chrome-beta-with-new.html ("[Y]ou can now manage your privacy settings in the new 'Privacy' section of Chrome's Options dialog. From these settings, you can control how browser cookies, images, JavaScript, plug-ins, and pop-ups are handled on a site-by-site basis. For example, you can set up cookie rules to allow cookies specifically only for sites that you trust, and block cookies from untrusted sites").

[217] Mozilla Firebird (the predecessor to Firefox) introduced improved privacy options, including a one-click feature to clear all cookies and an advanced preferences panel with cookie whitelisting through the new "Cookie Exceptions" window. *See* "Mozilla Firebird 0.6 - Release Notes," Mozilla Firefox, December 6, 2013, https://website-archive.mozilla.org/www.mozilla.org/firefox_releasenotes/en-us/firefox/releases/0.6 ("Improved Privacy Options [:] With a single click (and a confirmation) you can clear all privacy data including form data, history, cache, cookies, etc"). *See also* "Mozilla Firebird 0.7 - Release Notes," Mozilla Firefox, December 6, 2013, https://website-archive.mozilla.org/www.mozilla.org/firefox_releasenotes/en-us/firefox/releases/0.7 ("Cookie whitelisting (through the new Cookie Exceptions window)"); "History of the Mozilla Project," Mozilla.org, April 21, 2008, https://www-archive.mozilla.org/about/history ("Mozilla Firebird renamed to Mozilla Firefox").

[218] As of 2018, all major browsers (Google Chrome, Apple Safari, Microsoft Edge, and Mozilla Firefox) allowed users to set up their cookie preferences. *See* Nield, David, "How to Lock Down What Websites Can Access on Your Computer," Wired, November 4, 2018, https://www.wired.com/story/how-to-lock-down-websites-permissions-access-webcam/ ("Apple Safari Privacy Settings […] Use the Block all cookies checkbox to stop all websites from saving all cookies, although this might prevent some sites from functioning correctly. More granular control is available via the Manage Website Data button: The subsequent dialog box lets you clear cookies from particular sites, or clear all the cookies that are saved on your laptop in one go").

[219] "The cost of ad blocking," PageFair and Adobe, 2015, https://gwern.net/doc/economics/advertising/2015-pagefair.pdf ("16% of the US online population blocked ads during Q2 2015").

users aged 16 to 64 used ad blockers.[220] In fact, the figures included in Mr. Smith's report indicate that he at times browses with an ad blocker enabled on his browser.[221]

85. Website visitors can install one of many browser extensions, such as Adblock Plus,[222] Facebook Container,[223] and uBlock Origin,[224] that can block certain data transmissions, including those sent to Meta's servers. For example, Adblock Plus is a browser extension that, since 2006, has served more than 60 million users of the extension across a variety of browsers and uses predefined filter lists to block communications with specific domains.[225] Because these lists include *connect.facebook.net/fbevents.js*, which is necessary for the Meta Pixel to function (*see*

---

220 "Ad Blocker Usage and Demographic Statistics," Backlinko, https://backlinko.com/ad-blockers-users#adblock-by-countryadblock-by-country ("Here's a list of all 53 countries that GWI analyzed, ranked by the percentage of ad blocker usage among internet users aged 16-64: […] USA [:] 32.2% […] As of Q1 2024, GWI estimates that **32.2%** of Americans use ad blockers. But there are other estimates too") (emphasis in original).

221 Initial Smith Declaration, ¶¶ 112-113.

222 "Adblock Plus and (a little) more," Adblock Plus, November 29, 2023, https://blog.adblockplus.org/blog/meet-adblock-plus-the-original-ad-blocker ("Adblock Plus is a free ad blocker extension that has been around since 2006").

223 "Facebook Container - Prevent Facebook from tracking you on other websites," Mozilla Firefox, June 24, 2025, https://support.mozilla.org/en-US/kb/facebook-container-prevent-facebook-tracking ("Facebook Container is a Firefox add-on that helps you set boundaries with Facebook and other Meta websites. This extension isolates Meta sites (including Facebook, Instagram, and Messenger) from the rest of the web to limit where the company can track you").

224 "uBlock Origin," uBlock, https://ublockorigin.com/ ("uBlock Origin is not just an 'ad block', it's a wide-spectrum content blocker").

225 "Adblock Plus and (a little) more," Adblock Plus, November 29, 2023, https://blog.adblockplus.org/blog/meet-adblock-plus-the-original-ad-blocker ("[Adblock Plus] ha[s] blocked hundreds of millions of ads since [2006] while serving more than 60 million users"); "About Adblock Plus," Adblock Plus, https://adblockplus.org/en/about ("Adblock Plus is a free extension that allows you to customize your web experience. You can block annoying ads, disable tracking and lots more. It's available for all major desktop browsers and for your mobile devices. […] Choose what you want to see when browsing the web by using filter lists to block unwanted elements, like ads or tracking […] Choose from pre-made, externally maintained filter lists, or create your own").

**Section III.B.1**), enabling Adblock Plus blocks data transmissions to Meta unless configured otherwise.[226] Adblock Plus is also available as an application for mobile devices.[227]

86. To demonstrate Adblock Plus' functionality, I visited the website *biktarvy.com* with Adblock Plus enabled in the Chrome browser. As seen in **Figure 20**, all requests to *connect.facebook.net* are blocked.

[226] Adblock Plus's default filter list "abp-filters-anti-cv.txt" is "designed to fight circumvention ads (including, in some cases, their tracking) and fix critical issues for Adblock Plus users." *See* "ABP Filters," Adblock Plus, November 06, 2025, https://easylist-downloads.adblockplus.org/abp-filters-anti-cv.txt ("connect.facebook.net^*/fbevents.js$third-party"); "ABP Filters Anti-CV," GitLab, August 03, 2018, https://gitlab.com/eyeo/anti-cv/abp-filters-anti-cv ("ABP Anti-Circumvention Filter List is enabled by default in Adblock Plus version 3.1 or higher").

[227] "About Adblock Plus," Adblock Plus, https://adblockplus.org/en/about ("Adblock Plus is a free extension that allows you to customize your web experience. You can block annoying ads, disable tracking and lots more. It's available for all major desktop browsers and for your mobile devices").

**Figure 20**
**Visit to *biktarvy.com* with AdBlock Plus Enabled on Chrome**[228]




*b. Website Visitors Can Adjust Browser-Specific Settings to Control the Transmissions of Third-Party Cookies to Meta*

87. Website visitors have a variety of browser options that restrict third-party cookies and, as a result, can prevent the transmission of third-party cookies to Meta, including via the Meta Pixel. Browsers such as Firefox and Safari block third-party cookies by default in regular browsing mode.[229] Although Chrome's and Edge's default modes allow both third- and first-party cookies,

228 For this test, I visited *biktarvy.com* with Adblock Plus enabled and clicked "Allow All" in the consent banner upon visiting the website. *See* **Appendix D**; backup, "windows_chrome_biktarvy_abp.har."

229 "Third-party cookies and Firefox tracking protection," Mozilla Support, May 13, 2025, https://support.mozilla.org/en-US/kb/third-party-cookies-firefox-tracking-protection ("Cross-site tracking cookies are now disabled by default for all Firefox users"); "Manage cookies and website data," Apple, https://help.apple.com/safari/mac/8.0/en.lproj/sfri11471.html ("By default, Safari accepts cookies and website data only from websites you visit").

website visitors can choose to block third-party cookies in regular browsing mode.[230] In these situations, event data will still be transmitted but not third-party cookies. Third-party cookies specific to Meta, which may be blocked in such cases, include *c_user, datr,* and *fr*. [231] These cookies are used for authentication, security, analytics, and advertising purposes.[232] As an example, I visited *biktarvy.com* using the Firefox browser in default regular browsing mode, and as shown in **Figure 21** below, I observed no third-party cookie transmissions.

---

230 "Delete, allow and manage cookies in Chrome," Google Chrome Help, https://support.google.com/chrome/answer/95647 ("You can choose to delete existing cookies, allow or block third-party cookies, and set preferences for certain websites […] You can allow or block third party cookies by default"); "BlockThirdPartyCookies," Microsoft, September 2, 2025, https://learn.microsoft.com/en-us/deployedge/microsoft-edge-browser-policies/blockthirdpartycookies ("[T]hird-party cookies are allowed by default, but users can change this setting"); "Manage cookies in Microsoft Edge: View, allow, block, delete and use," Microsoft, https://support.microsoft.com/en-us/windows/manage-cookies-in-microsoft-edge-view-allow-block-delete-and-use-168dab11-0753-043d-7c16-ede5947fc64d ("If you don't want third party sites to store cookies on your PC, you can block cookies").

231 The *c_user* cookie is included in the Meta Pixel transmissions only when a user is logged into their Facebook account. Its value corresponds to the user's Facebook ID. The *datr* cookie is a browser-unique identifier that acts as a security measure. It is used to recognize trusted browsers from which users have previously logged in to Facebook. The *fr* cookie is used to deliver, measure, and improve the relevancy of ads. "Meta Cookies Policy," Meta, https://www.facebook.com/privacy/policies/cookies?annotations[0]=explanation%2F1_common_cookies_and_uses ("Cookie[:]c_user; xs[,] Description[:] We use these cookies to authenticate you and keep you logged in as you navigate between Facebook Pages[.] Cookie[:] fr[,] Description[:] Depending on your choices, this cookie is used to deliver, measure and improve the relevancy of ads"); "Meta Cookies Policy - Security, site and product integrity," Meta, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2 ("'Datr' is a unique identifier for your browser that, amongst other things, helps us protect you from fraud. For example, it helps us identify trusted browsers where you have logged in before. 'Datr' has a lifespan of two years"); "Meta Cookies Policy - Advertising, recommendations, insights and measurement," Meta, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 ("For example, the 'fr' cookie is used to deliver, measure and improve the relevancy of ads, with a lifespan of 90 days").

232 "Meta Cookies Policy - Advertising, recommendations, insights and measurement," Meta, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 ("Cookies allow us to help deliver ads to people who have previously visited a business's website, purchased its products or used its apps and to recommend products and services based on that activity. Cookies also allow us to limit the number of times that you see an ad so you don't see the same ad over and over again. For example, the 'fr' cookie is used to deliver, measure and improve the relevancy of ads, with a lifespan of 90 days"); "Meta Cookies Policy - Security, site and product integrity," Meta, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2 ("'Datr' is a unique identifier for your browser that, amongst other things, helps us protect you from fraud. For example, it helps us identify trusted browsers where you have logged in before. 'Datr' has a lifespan of two years").

**Figure 21**
**Visit to *biktarvy.com* in Firefox Default Regular Browsing Mode**[233]




88. Modern browsers such as Chrome, Edge, Mozilla Firefox, and Safari also all have the option to block all cookies. When this setting is enabled, all cookies, including any first- and third-party cookies specific to Meta, are blocked.[234]

---

[233] *See* **Appendix D**; backup, "windows_firefox_biktarvy_default.har."

[234] "Delete, allow and manage cookies in Chrome," Google Chrome Help, https://support.google.com/chrome/answer/95647 ("Delete, allow, and manage cookies in Chrome[:] You can choose to delete existing cookies, allow or block third-party cookies, and set preferences for certain websites");"Learn about on-device site data in Chrome," Google Chrome Help, https://support.google.com/chrome/answer/14114868 ("You can choose how a website saves data on your device: […] Don't allow sites to save data on your device (not recommended): Sites may not work as you expect. Choose this option if you don't want to leave information on your device about sites you visit"); "Manage cookies in Microsoft Edge: View, allow, block, delete and use," Microsoft, https://support.microsoft.com/en-us/windows/manage-cookies-in-microsoft-edge-view-allow-block-delete-and-use-168dab11-0753-043d-7c16-ede5947fc64d ("If you don't want third party sites to store cookies on your PC, you can block cookies. But doing this might prevent some pages from displaying correctly, or you might get a message from a site letting you know that you need to allow cookies to view that site. […] Select Cookies and disable Allow sites to save and read cookie data (recommended) to block all cookies.");"Block websites from storing cookies and site data in Firefox," Mozilla Support, August 22, 2025, https://support.mozilla.org/en-US/kb/block-websites-storing-cookies-site-data-firefox ("To set Firefox to block cookies from all websites: […] Use the drop-down menu to choose the type of cookies to block"); "Manage cookies and website data in Safari on Mac," Apple, https://support.apple.com/en-eg/guide/safari/sfri11471/12.0/mac/10.14 ("Always block cookies: Select 'Block all cookies.' [:] Websites, third parties, and advertisers can't store cookies and other data on your Mac. This may prevent some websites from working properly").

c. *Website Visitors Can Visit Websites While Using Strict Browsing Modes That Can Block Transmissions Via the Meta Pixel*

89. Certain browsers, including Firefox and Safari, offer "strict" browsing modes that further restrict the transmission of browser user data to third parties, such as blocking all third-party cookies. [235] It is common for browsers in their private browsing sessions to enable by default some or all of the components involved in "strict" tracking prevention configurations.[236] For example, Firefox uses the open-source Disconnect filter list to block certain domains, including *facebook.net*,[237] which prevents transmissions via the Meta Pixel. To demonstrate this, I visited *biktarvy.com* in Firefox strict mode and, as shown in **Figure 22**, observed that all requests to *connect.facebook.net* were blocked, preventing transmissions via the Meta Pixel.

[235] *See* "Enhanced Tracking Protection in Firefox for desktop," Mozilla Firefox, October 2025, https://support.mozilla.org/en-US/kb/enhanced-tracking-protection-firefox-desktop ("To further increase privacy, select **Strict** Enhanced Tracking Protection. This will block the following: Social media trackers[;] All cross-site cookies[;] Tracking content in all windows[;] Cryptominers[;] Fingerprinters") (emphasis in original); "Privacy," Apple, https://www.apple.com/privacy/features ("Safari protects your privacy automatically. Private Browsing adds even more protections. When it's activated, Safari won't add the sites you visit to your history, remember your searches, or save any information from forms you fill out online — and advanced tracking and fingerprinting protections go even further to help prevent websites from tracking or identifying your device").

[236] *See*, *e.g.*, "Enhanced Tracking Protection in Firefox for desktop," Mozilla Firefox, October 2025, https://support.mozilla.org/en-US/kb/enhanced-tracking-protection-firefox-desktop ("Tracking content: These trackers are hidden in ads, videos and other in-page content. In **Standard** mode, tracking content is blocked only in Private Windows") (emphasis in original); "Privacy," Apple, https://www.apple.com/privacy/features ("When [private browsing mode]'s activated, Safari won't add the sites you visit to your history, remember your searches, or save any information from forms you fill out online[…]. Content blocker support is designed so that it can't send developers information about what you're looking at. And private browsing windows automatically lock — requiring your device password to be unlocked — when you're not using them").

[237] "Mozilla-Services: Shavar-Prod-Lists," GitHub, https://github.com/mozilla-services/shavar-prod-lists ("Firefox's Enhanced Tracking Protection features rely on lists of trackers maintained by Disconnect"); "Disconnectme: Disconnect-Tracking-Protection," GitHub, https://github.com/disconnectme/disconnect-tracking-protection/blob/master/services.json ("facebook.net").

**Figure 22**
**Visit to *biktarvy.com* in Firefox Strict Browsing Mode**[238]




90. Similarly, Safari users can enable "Advanced Tracking and Fingerprinting Protection" ("ATFP"), which prevents transmissions via the Meta Pixel. ATFP is enabled by default when browsing in Safari's private mode.[239] As shown in **Figure 23** below, when I visited *biktarvy.com* in Safari with ATFP active, requests to *connect.facebook.net* were blocked.

[238] *See* **Appendix D**; backup, "windows_firefox_biktarvy_strictMode.har."

[239] "Privacy," Apple, https://www.apple.com/privacy/features ("Safari protects your privacy automatically. Private Browsing adds even more protections. When it's activated, Safari won't add the sites you visit to your history, remember your searches, or save any information from forms you fill out online — and advanced tracking and fingerprinting protections go even further to help prevent websites from tracking or identifying your device. Known trackers are completely prevented from loading on pages, and link tracking protection removes tracking added to URLs as you browse. Content blocker support is designed so that it can't send developers information about what you're looking at. And private browsing windows automatically lock — requiring your device password to be unlocked — when you're not using them").

**Figure 23**
**Visit to *biktarvy.com* with Safari's ATFP Enabled**[240]




2. *Website Visitors Can Adjust Website-Specific Settings to Prevent the Transmissions of Certain Data*

91. As discussed in **Section V.A.3**, developers can configure their websites so that certain transmissions are not sent unless and until the website visitor consents. Consequently, the choices website visitors make when interacting with consent mechanisms, such as consent banners, can affect whether data is transmitted to Meta. Many websites display consent banners that give website visitors the option to consent to the transmission of specific data.[241] For example, when website visitors visit *biktarvy.com* from a California-based IP address, they are presented with a consent banner that includes an option to further customize transmissions through the "Cookie Settings" menu (*see* **Figures 24** and **25**).

---

240 *See* **Appendix D**; backup, "mac_safari_biktarvy_ATFP.har."

241 Habib, Hana et al., "'Okay, whatever': An Evaluation of Cookie Consent Interface," *CHI Conference on Human Factors in Computing Systems*, April 29, 2022, p. 1 ("When consumers visit a website for the first time, their experience is often interrupted with an interface related to the use of cookies. These interfaces [are] used to meet legal requirements for notice and consent to data collection").

**Figure 24**
**Consent Banner for Visitors to *biktarvy.com* With a California-Based IP Address[242]**




242 "Biktarvy," Gilead, https://www.biktarvy.com, accessed on December 1, 2025.

A13-4327

**Figure 25**
**Consent Preferences Settings for Visitors to *biktarvy.com* with a California-Based IP Address**[243]




92. In some cases, the page must also be reloaded after consent is given for transmissions to occur, further contributing to variation in transmission timing across website visitors. For example, as shown in **Figure 26**, when a website visitor visits *zyrtec.com* from a California-based IP address, transmissions to Facebook domains only occur after the website visitor selects "Accept All" in the consent banner and reloads the page.

---

[243] "Biktarvy," Gilead, https://www.biktarvy.com, accessed on December 1, 2025.

**Figure 26**
**Transmissions to Facebook Domains Occur Only After a California-Based Website Visitor Clicks "Accept" and Reloads the Webpage *zyrtec.com*[244]**




244 *See* **Appendix D**; backup, "windows_chrome_zyrtec_default.har," and "windows_chrome_zyrtec_noRefresh.har."




### 3. *Website Visitors' Prior Interactions with Meta Domains Can Affect Cookie Transmission and Matching*

93. Website visitors' prior interactions with Meta domains, such as *facebook.com*, can affect what data is transmitted via the Meta Pixel. Cookies associated with Meta may be set in website visitors' browsers based on the website visitors' prior interactions with Meta domains, as shown in **Figure 27** below. If the website visitor has never interacted with a Meta domain, no such cookies will be transmitted upon interactions with websites where the Meta Pixel is integrated. Similarly, website visitors who have interacted with Meta domains but are not logged into their Facebook account will not have the *c_user* cookie present in their browser, and consequently, this cookie will not be included in any data transmitted from websites where the Meta Pixel is integrated.

**Figure 27**
**Cookies Stored on Website Visitors' Browsers from Prior Interactions with *facebook.com* Based on Website Visit to *greenwichhospital.org*[245]**

| Prior Interactions with *facebook.com* | Third-Party Meta Cookies |
|---|---|
| No Interactions with *facebook.com* | |
| Visit *facebook.com* (Not Logged In) | *datr, fr, sb* |
| Visit *facebook.com* (Logged In) | *c_user, datr, fr, sb, xs* |

94. In contrast, website visitors logged into Facebook may have all relevant cookies (*e.g.*, *c_user, datr, fr, sb,* and *xs*) present in their browser. As a result, third-party cookie transmissions from websites integrating the Meta Pixel may vary according to website visitors' prior interactions with Meta domains.

95. Third-party cookie transmissions also depend on how recent the website visitor's prior interactions with Meta domains were. For example, a website visitor who was logged in during one portion of the Proposed Class Period may have had Meta-specific cookies transmitted to Meta when visiting a certain website, but that same website visitor later may no longer be logged into their Facebook account and may not have recently used Facebook, and thus may not have any Meta-specific cookies transmitted upon interactions with websites where the Meta Pixel is integrated.

### C. Facebook Users Have Other Controls That Affect Meta's Use or Storage of Data

96. Facebook users have other options to limit Meta's ability to use data from non-Meta websites and/or to dissociate it from their Facebook accounts. These controls do not prevent transmissions, but they do restrict how Meta uses or stores that data.

245 *See* **Appendix D**; backup, "windows_chrome_greenwichhospital_noVisit.har," "windows_chrome_greenwichhospital_noLogin.har," and "windows_chrome_greenwichhospital_default.har." Additional third-party Meta cookies may be stored on the user's browser. I list the third-party Meta cookies present in my testing of the *greenwichhospital.org* website.

### 1. *Online Behavioral Advertising ("OBA") Controls*

97. Meta defines OBA data as "[d]ata produced from user activity on a particular computer or device regarding interactions with non-affiliated websites and applications."[246] The data transmitted via the Meta Pixel from non-Meta websites and applications is considered OBA data.[247]

98. When users use industry-standard tools, such as those provided by the Digital Advertising Alliance ("DAA"), to opt out of OBA, a Meta-specific opt-out cookie is set in users' browsers called the *oo* cookie.[248] I show an example of the *oo* cookie in **Figure 28** below. An *oo* cookie remains in a user's browser until it either is cleared by the user or expires after five years.[249] While browsers with the *oo* cookie may continue to transmit OBA data to Meta, this information is not used for personalized ad delivery.[250] In addition, even if a user has not opted out at the

[246] PIXEL_HEALTH000000044-053 at 044 ("'OBA data': Data produced from user activity on a particular computer or device regarding interactions with non-affiliated websites and applications").

[247] PIXEL_HEALTH000000044-053 at 049-050 (Return[] to our previous definition of 'OBA data': Data produced from user activity on a particular computer or device regarding interactions with non-affiliated websites and applications. This data can be raw or inferred. This data may also include data produced from observations of online activity between a user and a non-affiliated website or application using a Facebook product or tool, such as browsing activity within the Facebook In-App Browser. Examples of data that fall within these restrictions: […] Pixel fires from non-Facebook-family sites and related knowledge produced from those events").

[248] PIXEL_HEALTH000000044-053 at 051 ("We respect the opt-outs a user sets using the Digital Advertising Alliance (DAA), Digital Advertising Alliance of Canada (DAAC), and European Digital Advertising Alliance (EDAA) controls. […] When the user interacts with a toggle on any of the above sites to opt out of online behavioral advertising, we drop an opt out cookie ('oo cookie') in the browser"). *See also* "Advertising, recommendations, insights and measurement," Meta, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.3&dialog_back=1 ("We also use cookies, such as our 'oo' cookie, which has a lifespan of 400 days, to help you opt out of seeing ads from Meta based on your activity on third-party websites").

[249] PIXEL_HEALTH000000044-053 at 051 ("When the user interacts with a toggle on any of the above sites to opt out of online behavioral advertising, we drop an opt out cookie ('oo cookie') in the browser. The opt out will be dropped if the user decides to clear their browser cookies. The cookie can otherwise live for up to 5 years").

[250] PIXEL_HEALTH000000044-053 at 050-051 ("Even when data is in scope, a user's OBA opt-out does not affect our ability to use the data for any use case in which[:] 1. the data is not being used to influence the ads a user sees, or 2. the use case is not specific to the user […] These use cases may include: Measurement / Reporting / Analytics / Metrics (not being used to influence the ads a user sees)"). Note, at least as early as February 2024, the *oo* cookie lifespan changed from 5 years to 400 days. *See* "Cookies Policy - Advertising, recommendations, insights and measurement," Wayback Machine, February 15, 2024, https://web.archive.org/web/20240215013356/https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.3&dialog_back=1 ("We also use cookies, such as our 'oo' cookie, which has a lifespan of 400 days, to help you opt out of seeing ads from Meta based on your activity on third-party websites"). *See also* "Cookies Policy - Advertising, recommendations, insights and measurement," Wayback Machine, August 27, 2023, https://web.archive.org/web/20230827233146/https://www.facebook.com/privacy/policies/cookies?subpage=sub

time of data transmission, Meta also checks for the OBA opt-out status at the time of ad delivery.[251] These controls have been in place since at least 2017.[252]

page-1.3&dialog_back=1 ("We also use cookies, such as our 'oo' cookie, which has a lifespan of five years, to help you opt out of seeing ads from Meta based on your activity on third-party websites").

[251] PIXEL_HEALTH000000044-053 at 045 ("In order for a user to be served Online Behavioral Advertising, we must verify data usage permissions from the user at two points in time: 1. Time of Data Collection: The user must not be opted out through any opt out mechanism at the time of data collection for the OBA data to be used for any personalized ad delivery. 2. Time of Ad Delivery: The user must not be opted out at the time of ad delivery for any OBA data to be used for personalized ad delivery").

[252] "Implementation Instructions for DAA Participants to WebChoices," DAA, March 6, 2017, https://digitaladvertisingalliance.org/DAA_style/ADS/DAAWebChoices2.0_Spec_v1.pdf ("PUBLISHED/UPDATED March 6, 2017[.] This document describes how the opt-out platform works and how to integrate your company's opt-out infrastructure with the WebChoices tool"); "AdChoices Accountability Program: 2017 Compliance Report," Ad Standards, 2017, https://adstandards.ca/wp-content/uploads/2018/03/2017AdChoicesComplianceReport.pdf ("The DAAC, the U.S. Digital Advertising Alliance (DAA), and the European Interactive Digital Advertising Alliance (EDAA) operate self-regulatory programs to set consumer-friendly standards for IBA practices in their respective jurisdictions. Many features of the DAAC, DAA, and EDAA programs are similar, enabling global companies to seamlessly implement the programs in each jurisdiction").

**Figure 28**
**Example of *oo* Cookie When a User Opts Out of OBA and Visits *biktarvy.com*[253]**




99. In addition to using DAA controls, mobile device users can adjust settings that limit ad personalization, such as "Limit Ad Tracking" on iOS or "Opt out of Ads Personalization" or "Delete Advertising ID" on Android devices, which may prevent the transmission of the mobile

[253] *See* **Appendix D**; backup, "windows_chrome_biktarvy_OBA.har."

device user's device ID.[254] Users can also use Facebook account-level settings to "modify[] the setting marked 'Ads based on data from partners'" to opt out of OBA.[255]

### 2. *Off-Meta Technologies ("OMT") Controls*

100. OMT—formerly known as Off-Facebook Activity ("OFA")—controls allow users with a Facebook account to view and manage the data that businesses and organizations share with Meta about users' interactions on non-Meta websites, including websites that integrate the Meta Pixel.[256] Through these controls, which are shown in **Figure 29**, users can disconnect specific activities from their account, clear all past OMT data, and/or prevent future activity from being associated with their Facebook accounts.[257]

---

[254] PIXEL_HEALTH000000044-053 at 051-052 ("Apple provides a specific privacy option called 'Limit Ad Tracking', reachable through the Privacy section of the user's device settings. When the user has utilized the 'Limit Ad Tracking' option, the user's advertising device identifier is also rendered unaccessible [*sic*] in iOS 10+ versions […] In order to opt out on Android, the user must access Google Services and select the Opting out of Ads Personalization option. The advertising identifier for the device is still available, but the user's opt out choice for personalized advertising must be respected"); "Advertising ID," Google Play Console Help, https://support.google.com/googleplay/android-developer/answer/6048248 ("Delete your device's advertising ID 1. On your Android device, go to **Settings**. 2. Tap **Privacy > Ads**. 3. Tap **Delete Advertising ID** and confirm your changes. **Tip:** Your advertising ID will be deleted, but apps may have their own settings, which can also affect the types of ads you see") (emphasis in original).

[255] PIXEL_HEALTH000000044-053 at 052 ("Users on Facebook can opt out of OBA by visiting their Facebook Ad Settings and modifying the setting marked 'Ads based on data from partners'").

[256] "Meta Cookies Policy - If you have a Facebook account," Meta, December 12, 2023, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-4.1 ("You can review Your activity off Meta technologies, which is a summary of activity that businesses and organisations share with us about your interactions with them, such as visiting their apps or websites. They use our Business Tools, such as Facebook Login or Meta Pixel, to share this information with us"). *See also* "The best person to be in control of data is you," Meta, https://www.facebook.com/off-facebook-activity ("Off-Facebook Activity. A tool that gives you more control of your data […] View a summary of information Facebook receives about your activity on other apps and websites […] If you'd like, you can disconnect that information from your account, and it will not be associated with you personally").

[257] Wooldridge Declaration, ¶ 15 ("Specifically, using the Activity Off-Meta Technologies ('OMT') (formerly the 'Off-Facebook Activity') feature, Meta users can disconnect historical third-party activity data from their Facebook and Instagram accounts using the 'Clear Previous History' option. Meta users can also 'turn off' storage of future connections between their Facebook and Instagram accounts and their activities off Meta's platforms using the 'Disconnect Future Activity' option, which will also result in the disconnection of historical third-party activity data from their accounts. In addition, Meta users can 'turn off' storage of future connections between their Facebook accounts and their activities off Meta's platforms on a website-by-website or app-by-app basis using the 'Disconnect Specific Activity' option. OMT is subject to some exceptions for security and safety needs. Meta made the OMT controls broadly available to Facebook users in February 2020"); "Disconnect your past activity off Meta technologies," Meta, https://www.facebook.com/help/287199741901674 ("Disconnect past activity off Meta technologies from your Facebook or Instagram accounts through Accounts Center […] When you disconnect your activity off Meta technologies from your account[:] Only your activity off Meta technologies history will be disconnected from your account").

**Figure 29**
**OMT Controls for a Testing Facebook Account[258]**




[258] "Your activity off Meta technologies," Meta, https://www.facebook.com/off_facebook_activity.

101. Meta stores a "separable identifier" or "SID" in association with event data. The SID can be used in internal Meta databases to "connect" event data to a Facebook User ID ("UID").[259] When a user uses OMT controls to prevent future activity from being associated with the user's Facebook account, (1) their SID is reset on a daily basis and (2) the mapping between any prior SID and the identifier for the user's Facebook account, or UID, is removed.[260] When the SID value changes, event data generated under the prior SID cannot be linked to data generated under the new SID.[261]

## VI. DR. HASHMI'S ANALYSIS OF META'S SOURCE CODE IS UNRELIABLE

### A. Dr. Hashmi's Review of Meta's Systems Is Incomplete

102. Dr. Hashmi was asked to review "the Meta Source Code that filters certain terms related to health conditions and treatments."[262] He claims to have reviewed Meta's Source Code for the period up to October 2023 and claims to have used "a pretty good methodology," whereby he builds a "high-level understanding of what [the] technology is about, how it is structured, what

---

259 Patel, Mayur et al., "Redesigning our systems to provide more control over Off-Facebook activity," Engineering at Meta, August 20, 2019, https://engineering.fb.com/2019/08/20/core-infra/off-facebook-activity/ ("Challenge #2: Disconnecting the data[:] The data warehouse was not designed for deleting or updating individual rows. […] Since deleting or updating individual rows in real time is not feasible, we had to find a solution […] We implemented these decisions in part by allocating a new separable identifier (SID) for each person, then replacing UID [(User Identifier)] keys with SIDs. We then created a separate mapping between SIDs and UIDs that can be accessed when data is processed").

260 Patel, Mayur et al., "Redesigning our systems to provide more control over Off-Facebook activity," Meta, August 20, 2019, https://engineering.fb.com/2019/08/20/core-infra/off-facebook-activity/ ("We then created a separate mapping between SIDs and UIDs that can be accessed when data is processed. In most cases, when a person uses Off-Facebook Activity to disconnect that information, we remove this mapping between the UID and SID within 48 hours, which breaks the process of joining individual rows in data warehouse tables with a user account […] If a person chooses to have off-site activity disconnected going forward, we automatically disconnect it and rotate SIDs on a daily basis").

261 Patel, Mayur et al., "Redesigning our systems to provide more control over Off-Facebook activity," Meta, August 20, 2019, https://engineering.fb.com/2019/08/20/core-infra/off-facebook-activity/ ("We then created a separate mapping between SIDs and UIDs that can be accessed when data is processed. In most cases, when a person uses Off-Facebook Activity to disconnect that information, we remove this mapping between the UID and SID within 48 hours, which breaks the process of joining individual rows in data warehouse tables with a user account […] We then generate a new SID to be associated with the person's account going forward").

262 Hashmi Report, ¶ 12 ("Plaintiffs' Counsel asked me to review (1) Meta's source code relating to Meta's Pixel, Conversions API ('CAPI'), and mobile SDK, including how Meta's servers receive, store, and use data collected by Meta's Pixel, CAPI, and mobile SDK ('Meta Source Code') and (2) the Meta Source Code that filters certain terms related to health conditions and treatments ('Health Terms')").

is the overall architecture" and identifies "certain keywords" and "certain very unique phrases" that he used as pointers to review in the Source Code.[263] However, Dr. Hashmi's review of Meta's Source Code is incomplete. Within the time period (up to October 2023), which he claims to have reviewed, Dr. Hashmi failed to analyze code and documentation related to relevant Meta technical measures, such as Core Setup,[264] Dynablocking,[265] and the health term blocklist used in the Universal Filter.[266] Dr. Hashmi did not provide a review of any code after

---

263 Oral & Videotaped Deposition of Dr. Atif Hashmi, PhD, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580, October 29, 2025 ("Hashmi Deposition"), 57:7-13 ("Q. Fair to say that all of the opinions in your report are cabined to that October 23, 2023, version and the versions prior to that that you reviewed? A. Yeah, I think I -- I thought that was clear in my report, because in many places, I say that my opinions go up to the October 2023 version of the source code"), 36:8-37:17 ("Q. You were just starting to talk about where -- how you decided where to start your review in the source code that was made available to you. A. Yeah. […] Okay. So when I start working on a case -- all of my cases are very source code-heavy, so I spend a lot of time studying source code. But as you pointed out, source code is very vast. Like, for example, in this case, I think there were terabytes of source code that were produced. And you have to point out -- you have to identify very quickly what is the right starting point so that you don't waste a lot of time looking at irrelevant source code. And for me, working on this case -- cases and being a computer scientist myself, a pretty good methodology that I have developed over time where the start for me is to talk to the counsel to understand, okay, what are some of the aspects that they are interested in understanding? From there, I ask for technical documents that the companies might have produced so that I can review those technical documents and build a very high-level understanding of what is this technology about, how is it structured, what is the overall architecture? And often, reviewing those technical documents, I am able to identify certain keywords, certain very unique phrases, which can allow me to then go back -- or go to the source code computer and then at least return some searches so I can say: Okay, these very unique terms, where they are showing up in the source code or in what files they are showing up").

264 *See, e.g.,* 93d47fee477c142861ee3df000db921e16cc2e4, June 11, 2023.

PIXEL_HEALTH000874369-370 at 369 ("Core-setup formerly known as Protected Data Mode is a mode in which a pixel, app, CAPI, or offline setup can be placed in which restricts the amount of potentially sensitive data an advertiser can send to Meta. It limits potential risk from free-form data, urls, and automatic events"). *See also* PIXEL_HEALTH000877095-125 at 095 ("Beginning July 20, 2023, we are introducing core setup, which includes new capabilities to restrict certain types of data for Meta Business Tools").

265 *See, e.g.,* 66f582c9fa67879ba9bed934ab534bfac6a34ab8, September 1, 2023; 7c0aca098287c057c748a751a05dd0b69e06f29b, September 1, 2023.

PIXEL_HEALTH000876876 at slides 55-57 ("Dynamic blocking (or "dynablocking") is a feature that can designate certain parameters as restricted for a particular Business Tool (e.g. a Meta Pixel) when certain SIS potentially sensitive data detection thresholds are met").

266 *See, e.g.*, 4625041dc498bbede99722822aaab16ff1ae7204, March 30, 2023. .

PIXEL_HEALTH000565826-828 at 826-827 ("Below is a summary of data types that are filtered under Universal & Enhanced Filtering. Universal Filtering [:] […] Done using exact keyword or value matching[:] […] Health Category terms in Hive table signals_integrity_blocklisted_terms_normalized (as of 10/3/2023)[:] i. Terms under HEALTH_MEDICAL_CONDITION (~1839 terms like autism, second trimester, septicemia etc)[,] ii. Terms under HEALTH_DATA (~1283 terms like revlimid, iloperidone, orlistat capsules etc)[,] iii. Terms under PRESCRIPTION (~1181 terms like maraviroc, triflupromazine, triphasil-28 etc)"); PIXEL_HEALTH001226464-471 at 464 ("Meta rolled out an extension of Blocklist terms to filter more Health, PII & Finance related keys under new online detectors. Rollout of these detectors began in September 2023 and they were launched in production fully by the first week of November 2023, with some additional configuration enhancements made thereafter").

October 2023—which I understand is relevant because the Proposed Class Period runs through the present time[267]—resulting in the omission of systems implemented or expanded on or around that time, such as Core Setup and Dynablocking.[268]

103. Dr. Hashmi does not discuss that, at least as of October 2023, Meta had implemented the filtering of terms included in a list of health terms as part of Meta's Universal Filter.[269] As I discussed in **Section IV.C.1,** this additional list of terms contains over 4,000 terms under three categories: "health medical condition," "health data," and "prescription."[270] This blocklist is used in the [redacted] a detector applied to all advertisers, which Dr. Hashmi fails to discuss.[271] This system is distinct from the [redacted]

---

267 Motion for Class Certification, p. 13 ("Plaintiffs seek to certify four classes for a Class Period of June 17, 2018 to the present").

268 *See, e* [redacted]

269 Hashmi Deposition, 131:4-132:7 ("Paragraph 69, is it fair to say that this begins a section of your analysis regarding the filters that Meta has implemented to filter out potentially sensitive health data? A. That's right. Q. To clarify, this filtration process occurs after the checkers and restricted list filter out data sent from Certain Pixel IDs and URLs in the first two steps we just discussed? A. Yes, that's right. […] Q. At this stage, how many different filtration processes has Meta implemented? […] A. I think, based on my review of the source code with respect to filtration processes related to health terms, I identified [redacted]"), 138:10-139:9 ("Q. So you're aware Meta made various updates to this filtration system over time? A. There were changes in the source code. For example, like prior to – prior to December 2019 Meta's system did not include the stateful or stateless filter. Then in July of 2020, the stateful filter was -- machine learning-based methodology was included in the -- in the stateful filter. And then in April of 2023, the stateful -- Stateless Data Filter was introduced. So there were additions to the source code. Q. In other words, Meta added new aspects, like the stateless filtration system to its overall filtration efforts in the time period where you observed the code? A. I wouldn't call stateless data filtering as something additional, because as you pointed out, it's using a block list of term, which was already part of the stateful filtering process. What I would say is that they -- they moved position of the filter from being something that is impacted by the back end to make its determination to front end so that they don't -- they can block initial instances of the data that -- that may show up which is classified to be sensitive").

270 4625041dc498bbede99722822aaab16ff1ae7204, March 30, 2023 [redacted]

PIXEL_HEALTH000565826-828 at 826-827 ("Below is a summary of the data types that are filtered under Universal & Enhanced Filtering. Universal Filtering[:] […] Done using exact keyword or value matching[:] […] Health Category terms in Hive table signals_integrity_blocklisted_terms_normalized (as of 10/3/2023)[:] i. Terms under HEALTH_MEDICAL_CONDITION (~1839 terms like autism, second trimester, septicemia etc)[,] ii. Terms under HEALTH_DATA (~1283 terms like revlimid, iloperidone, orlistat capsules etc)[,] iii. Terms under PRESCRIPTION (~1181 terms like maraviroc, triflupromazine, triphasil-28 etc)").

271 5f6ff291e2c32604d9e9a95c15d73d604544d024, August 29, 2023 [redacted]
ae105683c428cb06727f4aefd573c69841a45571, September 8, 2023 [redacted]

A13-4339

[redacted] that Dr. Hashmi discusses, which applies to Meta's Business Tools operating in apps and domains that Meta categorizes as health-related, as I discuss in **Section IV.C.2**. In addition, Dr. Hashmi does not consider the system Meta developed to [redacted][272]

104. Dr. Hashmi does not mention Dynablocking in his report, even though a [redacted]—and is mentioned in multiple produced documents [redacted].[273] As I describe in

---

2ece5d91c81285277cb23c2939867051c4b75ed9, October 13, 2023 [redacted]

Hashmi Deposition, 110:6-111:3, ("Q. Were any of the filters that you found in the source code applicable to all advertisers, regardless of how the advertiser was classified? A. So I know that if an advertiser is classified as being in the healthcare category, then those filters that we talked about are invoked, but I didn't investigate what other categories might also trigger the use of those filters. Q. Did you investigate whether no category is required for some of the filters? […] A. think if I remember correctly -- again, I have to now look back into the actual source code documents, but the -- the use of the filter was controlled by the -- the categories that were assigned to a particular Pixel. Now, I don't -- I remember that one of the categories was health. I remember another category was finance or something. But I didn't investigate exhaustively what all what the other categories were because my assignment was about understanding how health data or data that is considered health-related is processed by -- by Meta servers"), 114:1-5 ("Q. Did you review any regular expression rules that apply to all advertisers? A. I'm trying to think if I describe -- I don't believe I describe any regular expression-based rules in my report").

[272] *See, e.g.*, 0c39486521cf4d5490cd6bc66d442465294b3747, July 9, 2020 [redacted]

Hashmi Deposition, 115:8-18 ("Q. Are you familiar with the B system, spelled B-I-I? A. No. Q. Do you recall seeing anything about a BII system in your review of the source code? A. I looked at a lot of source code, so I -- I might have come across those modules, but as I sit here, I don't recall. Q. Do you recall if the BII system is discussed anywhere in your report? A. I don't believe so").

I do not opine on whether blood type constitutes health-related information. I merely discuss blood type because Meta refers to it as one of "Health category Terms." *See* PIXEL_HEALTH000565826-828 at 827 ("Below is a summary of the data types that are filtered under Universal & Enhanced Filtering. Universal Filtering[:] […] 3. Done using ML Model (BII Detection)[:] […] c. Other Health category Terms[:] i. Health, Blood Type").

[273] *See*, *e.g.*, 7c0aca098287c057c748a751a05dd0b69e06f29b, September 1, 2023. *See also* [redacted]

PIXEL_HEALTH000876876 at slides 51, 54-62 ("Dynamic blocking (or 'dynablocking') is a feature that can designate certain parameters as restricted for a particular Business Tool (e.g. a Meta Pixel) when certain SIS potentially sensitive data detection thresholds are met"); PIXEL_HEALTH000876935 ("Clientside Dynablocking[:] Dynablocking keys are merged with normal PSD keys to block on the client side (both pixel and app). […] Serverside Dynablocking[:] As always, server side redundant filtering is required because around 8% of pixels do not use our JS and send data directly to our endpoint"); PIXEL_HEALTH000909624-635 at 624-626 ("Dynablocking is a feature that can designate certain parameters to be restricted for a particular Business Tool (e.g., a Meta Pixel) when certain SIS potentially sensitive data detection thresholds are met"); PIXEL_HEALTH000947768-797 at 769, 771, 787, 789, 791-793, ("Dyna-Blocking: Enforce Client Side or Server Side blocking of escalated PSD Parameters on Business Tools"); PIXEL_HEALTH001226464-471 at 464-470 ("Meta has developed an automated blocking mechanism designed to identify and dynamically block the transmission of a subset of previously filtered potentially sensitive keys identified in prior pixel fires ('Client

**Section IV.C.2** and **IV.F**, Dynablocking is designed to prevent the transmission of certain parameters designated as potentially sensitive and occurs on the client side for the Meta Pixel and Facebook SDK, and on the server side for CAPI. Meta Business Tool IDs that send certain parameters that are repeatedly dynablocked may be escalated to Core Setup.[274] Therefore, Dr. Hashmi's overview of Meta's technical measures related to preventing the transmission or use of potentially sensitive information is incomplete.

105. Dr. Hashmi also failed to mention "Core Setup" in his report. As I discuss in **Section IV.F**, Core Setup applies to certain Meta Business Tool IDs or domains/apps and includes those that Meta categorizes as health-related. Core Setup is designed to prevent the transmission of data, including custom parameters and URL paths and parameters, for the Meta Pixel and Facebook SDK and to remove that data upon receipt for CAPI. Dr. Hashmi does not provide a review of Core Setup, even though:

a. Meta implemented Core Setup in July 2023, within Dr. Hashmi's code review period;[275]

b. The term [redacted], which Dr. Hashmi claimed he reviewed;[276]

---

Side Dyna-Blocking'"); PIXEL_HEALTH000909351-393 at 360 ("Dynamic blocking ('dynablocking'): Parameters detected (potentially over a detection threshold) by SIS to contain PSD are logged by data source (potentially in combination with data such as event name and payload location). […] Dynablocking consists of the following: Parameters that are designated for dynablocking will, when operating on the client-side (e.g. Pixel, SDK), be blocked from transmissions to Meta. Parameters that are designated for dynablocking will, when operating on the server-side (e.g. CAPI, App Events API), be discarded prior to identity matching").

[274] PIXEL_HEALTH000947768-797 at 768 ("Any advertiser that sends Meta high confidence potentially sensitive data will go through a strike process and potentially be put into Core Setup"); PIXEL_HEALTH000876876 at slide 59 ("If an advertiser's Business Tool repeatedly sends parameters that meet the thresholds to be designated for dynablocking — whether newly detected or previously actioned on — that Business Tool may be escalated into a Core Setup").

[275] PIXEL_HEALTH000877095-125 at 095 ("Beginning July 20, 2023, we are introducing core setup, which includes new capabilities to restrict certain types of data for Meta Business Tools. […] Currently, these changes may primarily affect advertisers globally in health and finance verticals, in particular, potential healthcare or financial service providers"). *See also* Hashmi Report, ¶ 13 ("Based on my review of the Meta Source Code, including versions from July 2018 until October 2023, Meta's servers executing the Meta Source Code related to receiving, filtering, storing, and using data collected by Meta's Pixel, CAPI, and mobile SDK operate as discussed in this report").

[276] *See, e.g.,* ce83d2a6dff9d19d7f197c2c302e53edb5a2cfc6, June 15, 2023 [redacted] da5befb4ee5121d98c27259568d2ebc110f92815, June 6, 2023

c. There are tens of produced documents describing Core Setup in some capacity,[277] and Dr. Hashmi claims his methodology in this case is to review produced documents to identify key code pointers;[278]

d. At least three deponents explained its functionality and timeline of development and launch;[279]

---

[redacted]; 08f62207e3b48b760e31759bb6d6e7f14a310449, June 7, 2023 [redacted] e72aad22c0c97a2fc4427a71fc5dd297651517cc, June 15, 2023 [redacted]

277 *See*, *e.g*., PIXEL_HEALTH000873919; PIXEL_HEALTH000874369-370; PIXEL_HEALTH000874441-443; PIXEL_HEALTH000876877; PIXEL_HEALTH000877095-125; PIXEL_HEALTH000877146-148; PIXEL_HEALTH001214637-649; PIXEL_HEALTH000873965-986; PIXEL_HEALTH000874367-368; PIXEL_HEALTH000874638-639; PIXEL_HEALTH000875733-740; PIXEL_HEALTH000875792-822; PIXEL_HEALTH000876773-796; PIXEL_HEALTH000876884; PIXEL_HEALTH000876885; PIXEL_HEALTH000876886; PIXEL_HEALTH000876887-888; PIXEL_HEALTH000876889-890; PIXEL_HEALTH000876891; PIXEL_HEALTH000877149-150; PIXEL_HEALTH000909439-447; PIXEL_HEALTH000909493-501; PIXEL_HEALTH000947768-797; PIXEL_HEALTH001337716-723; PIXEL_HEALTH001365316; PIXEL_HEALTH001365333-337; PIXEL_HEALTH000877126-145; PIXEL_HEALTH000876970-978; PIXEL_HEALTH000875725-732; PIXEL_HEALTH000875757-762.

278 Hashmi Deposition 36:8-37:17 ("Q. You were just starting to talk about where -- how you decided where to start your review in the source code that was made available to you. A. Yeah. […] Okay. So when I start working on a case -- all of my cases are very source code-heavy, so I spend a lot of time studying source code. But as you pointed out, source code is very vast. Like, for example, in this case, I think there were terabytes of source code that were produced. And you have to point out -- you have to identify very quickly what is the right starting point so that you don't waste a lot of time looking at irrelevant source code. And for me […] a pretty good methodology that I have developed over time where the start for me is to talk to the counsel to understand, okay, what are some of the aspects that they are interested in understanding? From there, I ask for technical documents that the companies might have produced so that I can review those technical documents and build a very high-level understanding of what is this technology about, how is it structured, what is the overall architecture? And often, reviewing those technical documents, I am able to identify certain keywords, certain very unique phrases, which can allow me to then go back -- or go to the source code computer and then at least return some searches so I can say: Okay, these very unique terms, where they are showing up in the source code or in what files they are showing up").

279 *See, e.g.,* Wooldridge Deposition 267:25-268:22 ("Q. What is core setup? A. Core setup is a mode that a Pixel app website could be placed into in order to minimize the data it shares with Meta. Q. What types of data does core setup apply to? A. The minimization that I was referring to applies to -- it removes several pieces of data, including the part of the URL; in part, they include parameters and anchor or fragment, as well as the custom data parameters as well as button click events. Q. How do developers get enrolled in core setup? A. There are three ways people could be enrolled in core setup: The first is an advertiser could configure their Pixel to have core setup enabled themselves; The second way is if Meta categorizes a given website in a particular way, core setup will be applied to the associated data; And the third way is if an advertiser sends metadata that is filtered above certain thresholds, their Pixel or app will be placed into core setup. Q. When was core setup launched? A. Core setup was launched in Q3 2023"). *See also* Anand Deposition 80:11-20 ("Q. Okay. Can you explain Core

e. Meta provides public documentation of Core Setup;[280] and

f. Core Setup was considered by Dr. Shafiq,[281] who relies on Dr. Hashmi's review of the Source Code.[282]

Despite all of this, when asked, "[d]o you know what a core setup is?", Dr. Hashmi responded, "I might have heard the term, but I don't recall exactly."[283]

106. Dr. Hashmi claims that, at least until October 2023, Meta's Stateful and Stateless data filters "did not detect or remove Health Terms from the host name/path part of the URL."[284] Dr. Hashmi's analysis is incomplete because, in July 2023, Meta began implementing Core Setup for certain websites classified as health-related,[285] which removes all parts of the URL after the domain for websites classified as health-related prior to any filtration (*see* **Section IV.F**).

---

Setup? A. Core setup was a project that my team was working on in 2023. And on a high level my understanding was to truncate the data properties, event properties specifically. It had to find, like, data events on custom data property, URL query parameters. And then the Core Setup Project also had a notification system to notify web source developers on what Meta has received and identified and then how to take actions on those"); Video-Recorded Deposition Upon Oral Examination of Manish Singhal, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO (VKD), April 2, 2025 ("Singhal Deposition") 167:22-168:8 ("Q. Okay. To your recollection, when was core setup -- whether it was called -- whether it was initially called -- this is the beauty of this. Whether it was initially called 'protected mode' or always called 'core setup,' to your -- best of your recollection, when was core setup first proposed as a concept in Signals Integrity? […] A. I don't remember the exact time frame, but it was in Q2 2023 -- just to be explicit, from April to June").

280 *See* "About Core Setup," Meta, https://www.facebook.com/business/help/124742407297678.

281 Shafiq Report, Opinion #5.

282 Shafiq Report, ¶¶ 160-161 ("Plaintiffs have obtained all four types of source code evidence in this case. It is my understanding that Dr. Atif Hashmi will address the shortcoming of Meta's purported Filter as described in Meta's internal source code. For my purposes, I did not conduct source code analysis but have instead reviewed (1) general design documents; (2) deposition testimony; and (3) most important, the Meta Pixel log data produced by Meta. It is my understanding that Dr. Hashmi's review of the source code revealed that the Filter did not apply to normal full-string URLs or Button Click data but instead only applied to data contained in search queries or custom data parameters").

283 Hashmi Deposition, 104:13-15.

284 Hashmi Report, ¶¶ 15d ("Thus, at least until October 2023, Meta's Stateful Data Filter did not detect or remove Health Terms from the host name/path part of the URL"), 16d ("Thus, at least until October 2023, Meta's Stateless Data Filter did not detect or remove Health Terms from the host name/path part of the URL").

285 PIXEL_HEALTH000877095-125 at 095, 097 ("Beginning July 20, 2023, we are introducing core setup, which includes new capabilities to restrict certain types of data for Meta Business Tools. Core setup helps businesses by helping reduce the potential for information prohibited by our Business Tools Terms from being shared. […] Currently, these changes may primarily affect advertisers globally in health and finance verticals, in particular, potential healthcare or financial service providers. […] Q. Which advertisers/businesses will this change apply to? How do I know if this change will apply to my advertiser? A. At this time, these changes may primarily apply to advertisers globally in health and finance verticals, in particular, potential healthcare or financial service providers") (emphasis removed).

Therefore, no term—health-related or not—exists to filter from the path part of the URL received from Meta Business Tool IDs or domains enrolled in Core Setup.

### B. Dr. Hashmi's Claims About Meta's Receipt of Button-Related Information from Sensitive Domains Are Incomplete

107. Dr. Hashmi claims that at least until October 2023, Meta's "Stateful Data Filter" and "Stateless Data Filter" "did not detect or remove Health Terms in button text."[286] In contrast, when claiming that "Meta's servers allowed potential sensitive vertical sources to automatically transmit Captured Button Click Data to Meta's servers at least until the fall of 2022,"[287] Dr. Hashmi refers to Meta's technical measures to prevent the transmission of SubscribedButtonClick events—including Button Text—from certain health-classified entities from nearly the inception of those events in 2017, as discussed in **Section IV.B**.

108. As discussed in **Section IV.B**, Meta had systems to block the transmission of SubscribedButtonClick events—including blocking the transmission of Button Text data—for at least some entities classified as sensitive according to the sales verticals, [redacted][288] Therefore, Dr. Hashmi's focus on filtration systems to claim that Meta "did not detect or remove Health Terms in button text" is misleading because Meta had measures to

---

286 Hashmi Report, ¶ 15d ("at least until October 2023, Meta's Stateful Data Filter did not detect or remove Health Terms in button text (identified by the buttonText key)"), 16d ("at least until October 2023, Meta's Stateless Data Filter did not detect or remove Health Terms in button text (identified by the buttonText key)").

287 Hashmi Report, ¶ 126e ("Meta's servers allowed potential sensitive vertical sources to automatically transmit Captured Button Click Data to Meta's servers at least until the fall of 2022. I haven't seen the classifications stored within the [redacted] table and because Meta did not preserve the [redacted] table beyond its standard retention period of 90 days, I am unable to determine which healthcare providers (if any) were classified as being sensitive vertical sources by the [redacted] script during or before September 2022").

288 *See, e.g.*, 0276d95c2e86e64e5b4413b64964e075dbc971f0[redacted]. Files [redacted] are present in the most recent version of the codebase.

Wooldridge 30(b)(6) Deposition, 30:12-20 ("So Meta had a system which disabled ButtonClicks for health advertisers that existed for -- you know, as I understand, since 2017. That system disabled ButtonClicks based on sales verticals. At some point, that system didn't or stopped enrolling new pixels. And so it continued to function at a diminished capacity for some period of time. Once Meta became aware of this, Meta promptly fixed that issue").

A13-4344

prevent transmission of SubscribedButtonClick events—including button text—at least for some advertisers from August 2017.

109. If Dr. Hashmi's conclusion that "Meta's servers allowed potential sensitive vertical sources to automatically transmit Captured Button Click Data to Meta's servers at least until the fall of 2022"[289] is based on the observation that Meta progressively enrolled a growing number of advertisers classified as sensitive, his reasoning is flawed. The fact that the classification system expanded over time does not, by itself without further analysis, imply that earlier versions were incomplete or inadequate as to healthcare-related advertisers, for several reasons:

a. Changes in the number of ad accounts classified as sensitive may not necessarily reflect an increasing rate of classification; they may at least partially be explained by an overall increase in the number of advertisers on Meta's platforms.

b. The classification of an ad account as sensitive (according to sensitive verticals) does not imply that the ad account transmitted any data to Meta, let alone SubscribedButtonClick events.[290]

c. An increase in the total number of advertisers classified as "sensitive" does not demonstrate that any, much less precisely how many, advertisers were classified as relating to health specifically.[291] Instead, Dr. Hashmi treats all sensitive advertisers together (including potentially those classified as relating to other categories) and makes no attempt to

---

289 Hashmi Report, ¶ 126c, e ("Meta Source Code and other documents produced by Meta indicate that the Data Capture Sources marked as sensitive vertical sources by the initial versions of the scripts that marked Data Capture Sources as sensitive vertical sources were underinclusive. For example, the [redacted] script classified roughly 486,583 Data Capture Sources as being sensitive vertical sources in September 2022, whereas the [redacted] script classified roughly 2.8 million Data Capture Sources as being sensitive vertical sources. A subsequent version [redacted] classified roughly 3.3 million Data Capture Sources as being sensitive vertical sources. A subsequent version [redacted] classified roughly 4.6 million Data Capture Sources as being sensitive vertical sources. […] Thus, Meta's servers allowed potential sensitive vertical sources to automatically transmit Captured Button Click Data to Meta's servers at least until the fall of 2022").

290 Wooldridge 30(b)(6) Deposition, 56:14-20 ("A. [I]n general, the sales vertical classification is based on the sales vertical. It essentially based on which ad accounts owns a pixel. A[n] ad account can own a pixel that never fires anything; not just doesn't fire button clicks, but doesn't fire anything ever").

291 PIXEL_HEALTH000884272-275 ("We disable automatic events (microdata and button clicks) and automatic Advanced Matching for pixels in sensitive verticals (healthcare, finance, etc.). Today we are leveraging the sales vertical classification to classify pixels in restricted verticals").

distinguish between the various categories.[292] Therefore, the addition of an advertiser in the financial category to the list would be treated by Dr. Hashmi's methodology the same as the addition of a health-related advertiser.

### C. Dr. Hashmi's Opinion About How Meta's Servers Receive, Store, and Use Data Is Misleading

110. Dr. Hashmi claims that Meta uses data transmitted through the Meta Pixel and CAPI to generate a [redacted] [redacted], which is stored in the "UP2X table" as the [redacted] category, to select ads for users.[293] However, an analysis of Meta's source code, at best, suggests that [redacted] Dr. Hashmi's analysis does not establish the effect of event data on what ads are displayed to users, if any.

111. As I explain below, the ads users see are selected through an auction process that balances, among other factors, user-related information, available ads, and advertiser bids. As discussed in **Section V.C.1**, users can opt out of OBA, which would exclude offsite event data sent from Meta's Business Tools from consideration in selecting which ad to deliver to a user.[294]

---

292 Hashmi Report, ¶ 126c, e ("Meta Source Code and other documents produced by Meta indicate that the Data Capture Sources marked as sensitive vertical sources by the initial versions of the scripts that marked Data Capture Sources as sensitive vertical sources were underinclusive. For example, the [redacted] script classified roughly 486,583 Data Capture Sources as being sensitive vertical sources in September 2022, whereas [redacted] script classified roughly 2.8 million Data Capture Sources as being sensitive vertical sources. A subsequent version [redacted] classified roughly 3.3 million Data Capture Sources as being sensitive vertical sources. A subsequent version [redacted] classified roughly 4.6 million Data Capture Sources as being sensitive vertical sources. […] Thus, Meta's servers allowed potential sensitive vertical sources to automatically transmit Captured Button Click Data to Meta's servers at least until the fall of 2022").

293 Hashmi Report, ¶¶ 18-20 ("[A]fter filtering the Captured Data […] Meta's servers process the filtered Captured Data transmitted at least via Meta's Pixel and CAPI using a series of data processors (e.g., URL Parser Processor, MegaTaxon Processor, and others) and an [redacted] where features correspo [redacted] Meta's servers write the feature scores corresponding to the [redacted] within [redacted] category of the UP2X table. Thus, Meta's servers utilize the [redacted] generated using the filtered Captured Data transmitted at least by Meta's Pixel and CAPI and stored corresponding to the [redacted] category of the UP2X table to select advertisements for Meta's users").

294 *See, e.g.*, PIXEL_HEALTH000000044-053 at 050 ("When the data is in scope, the user's OBA opt out status applies to that data for any use case in which the data will influence the advertisements shown to that specific user").

Accordingly, code analysis alone is insufficient to determine the impact that event data *might* have on the ads displayed to users, and whether different ads would have been shown had the particular event data at issue not been available. Thus, Dr. Hashmi's methodology for claiming that Meta relied on [redacted] to select ads for users is unreliable.

112. As discussed in **Section V.C.1**, users can opt out of personalized ads delivery associated with their Facebook account by opting out of OBA. Dr. Hashmi does not consider the possibility that when users take such actions, their intent data is not used for ad personalization.[295] Meta's ad delivery system checks the OBA status of a user as data is received by Meta's servers and does not use event data for users who have opted out to inform their ad delivery.[296]

113. Dr. Hashmi's description of the UP2X database is also incomplete. The UP2X database contains information associated with multiple categories in addition to [redacted].[297] Dr. Hashmi does not establish the specific role that

---

[295] *See, e.g.*, [redacted] (applies to multiple versions of the file I reviewed).

PIXEL_HEALTH000000044-053 at 045 ("We first check a user's OBA settings at the time of data collection to see if the data can be used for personalized ads ranking and targeting products. If the data is subject to OBA controls, we still store this data and can use it for non-restricted use-cases such as measurement or non-user specific ranking features and labels").

[296] PIXEL_HEALTH000115192, pp. 23-24; PIXEL_HEALTH000316628, at slide 36; PIXEL_HEALTH000000044-053 at 047 ("At the time of ad delivery, we must verify the user's data usage permissions, which correspond to two scenarios: Did the user opt out of any OBA data being used for personalized ads delivery purposes from the platform environment they were in? User opt-outs can be stored within the device settings or browser cookies of the user's current environment, and can be read directly by FB or obtained from the third-party making the request (Audience Network). Did the user indicate to Facebook that they would like to opt out of any OBA data being used for personalized ads delivery purposes? This can be set using Facebook's internal ad settings ('Ad Preferences') We must honor the opt out if the user has restricted data usage through any of the settings").

[297] The [redacted] *See also* [redacted] (applies to multiple versions of the file I reviewed).

(30)(b)(6) Remote Videotaped Deposition of Mayurkumar Patel, *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, May 5, 2025 ("Patel Deposition") 77:6-79:14 ("Q. And is that what's -- among other things – what's stored in UP2X, is user features? […] A. Yeah, it may be one of the types. Q. And when it stores a user feature, is that user feature connected to a particular user ID? […] A. My general understanding that it would be -- like, my general understanding is that UP2X is key value store, and the user would be part of the key. Q. Is it the only part of the key, or are there other parts of the key? […] A. My personal understanding would be that it would be part of the key. There may be other parts of the key. I -- I would, again, have to look at all the use cases to be able to definitively answer that for you. Q. And so that part of the key that concerns the user ID, the match between the events and user ID is -- is just from the identity matching that occurred upstream; right? […] Q. Yeah. I can try to rephrase it to the -- to the extent you didn't understand it. Q. So if I understand correctly, it's not that UP2X does its own new identity matching. It just takes the identity matching that would have occurred

[redacted] plays in ad delivery, as it is only one of many types of information retrieved from the UP2X system.[298]

114. Which ad is displayed to a user depends on numerous dynamic factors, the effects of which cannot be determined through static code analysis.[299] Moreover, as Dr. Hashmi admitted, he considered only one of the many inputs Meta potentially uses to predict ad relevance and influence ad delivery.[300] Dr. Hashmi acknowledged during his deposition that (1) he "can't exhaustively describe the entirety of the process,"[301] and (2) he did not examine all the inputs that determine which ads are served because his opinion was that data from the Meta Pixel

---

further upstream in Meta's systems to associate a user ID with a key and with a value; is that right? […] A. So data stored in UP2X doesn't necessarily only be the business tools data that we've kind of established some kind of basis on those products. There is other types of data as well. The -- there is only one identity prediction that happens when Meta receives these events").

[298] Hashmi Report, ¶ 20 ("Seventh, Meta's servers utilize the [redacted] generated using the filtered Captured Data transmitted at least by Meta's Pixel and CAPI and stored corresponding to the [redacted] category of the UP2X table to select advertisements for Meta's users").

[299] PIXEL_HEALTH000000023-043 at 039 ("Ads delivery system is to server user request with most matched ads candidates. Ads candidates are ranked in multi-stage manner with different model types. Here are the simple explanation of core components in the chart above. AdFinder: Generate the final ranked ads list and return to caller […]. There are around 500 ads candidates ranked at this stage. AdIndexer: An in-memory indexing system is mainly responsible for generating the initial candidate list of ads. […] There are around 4K ads candidates ranked and 10K for matching at this stage[.] AdPublisher: AdPublisher is responsible to gather different data sources and periodically push ads candidates to AdIndexer with some basic eligibility criteria[.] Prospector: Prospector is responsible for ranking 'dynamic products'. For example, the ads ranking system may decide to show an Amazon ad related to electronics[.] Sigrid predictor: Responsible for running the production models (V0 models) and experimental models (QRT models). […] UP2X: A flash key-value store for user side ML features[.] ASX: An in-memory key-value store for ads ranking dense features"). *See also* PIXEL_HEALTH000218635-666 at 636-639.

[300] Hashmi Deposition, 168:14-21 ("Q. Does Meta use all the features in the F3 framework for delivering ads? A. That, I don't know. Again, as I said, I have investigated the -- the feature map is generated using the Pixel data and how that is used by that targeting system. I did not investigate the other inputs because they are not pertinent to my -- my opinion in the report"); 154:3-6 ("Q. You can't say whether Pixel data is the only data that's used to form user representations, correct? A. That's right, and I don't say it in my report either"), 148:12-22 ("Q. Do you know if any data, other than event data, Meta receives through the Pixel, CAPI, or SDK is used in the unified intent user data category of the UP2X table? A. So I just want to make sure, my -- my opinion is about the use of the filtered captured data by the Meta's servers and to store -- and to generate user representation using the captured data and store it in the unified intent data of category of UP2X table. For that conclusion, I only need to look at the portions of the code that I am describing in the report"), 152:8-18 ("Your report also claims that these user representations are ultimately used to select ads for Meta's users. Are these user representations the only data uses for this purpose? A. So I investigated this portion of the source code in detail to understand how the Pixel data propagates into the -- the ad-targeting system. There could be other inputs, but I -- I didn't evaluate those, because my conclusion was that this particular data is one of the inputs").

[301] Hashmi Deposition, 154:22-155:1 ("Q. Can you describe how Meta selects which ad to show a given user? A. I can describe to you how the user representation is used in that process, but I can't exhaustively describe the entirety of the process").

provided "one of the inputs to the ad-targeting system."[302] Dr. Hashmi's analysis, therefore, does not establish what effect, if any, event data, let alone potentially sensitive data sent by healthcare providers, had on the ads a particular user saw. In fact, Dr. Hashmi himself admits that he does not offer any opinion on "how a particular advertisement is selected and then served to a user."[303]

115. Meta's advertising system uses a multi-stage process to determine which ads are shown to a particular user. The process involves [redacted].[304]

[302] Hashmi Deposition, 152:22-153:3 ("Q. It's one of the several inputs, correct? A. It's one of the inputs. I don't know about several other inputs. I don't know. I know this is one of the inputs, and that's what my opinion is, that one of the inputs to the ad-targeting system is the user representation that is generated by the Pixel data").

[303] Hashmi Deposition, 159:1-10 ("Q. Are you offering any opinion as to whether any particular event data sent through the Pixel or CAPI actually resulted in any particular ad being shown to a user? A. My opinion is about how the process utilizes the user representations, the ad-targeting progress utilizes the user representation as part of the process for selecting advertisement, but I don't have any opinion about how a particular advertisement is selected and then served to a user").

[304] *See, e.g.*, [redacted] (applies to multiple versions of the file I reviewed).

PIXEL_HEALTH000218635-666 at 638 ("AdFinder – This is the entry point into the ads ranking system. It receives ads requests from multiple platforms, talks to other services, performs the major ranking stages to generate the final ranked ads list and returns the list of ads to the caller. […] AdIndexer – This is an in-memory indexing system responsible for hosting/serving eligible ads for a given user. It was originally deployed as part of AdFinder, but is now deployed as a separate service. […] AdIndexer is mainly responsible for generating the initial candidate list of ads, which get ranked by other models running within AdFinder"), at 640 ("Figure 2: Multi-Stage Ranking Setup in Ads"); PIXEL_HEALTH000000023-043 at 023 ("There are hundreds of ranking engineers developing new features and model architectures daily to deliver the highest quality models, which are measured by an 'Ads Score'. Ads Score is the total value generated for both advertisers and people based on the ads shown, and more importantly, engaged with").

PIXEL_HEALTH000218635-666 at 637 ("The Ads Ranking system is designed to rank ads for a variety of platforms, […] It performs a multi-stage ranking process to rank a subset of ads, […] One key aspect of the multi-stage ranking process is that it uses cheaper models in the early stages of ranking which require less time and resources, and more expensive models in the later stages as the pool of ad candidates becomes smaller"), 652 ("There are in total over 300 models used in production to give predictions for the following typical (but not limited to) cases in multiple stages: […] [P]probability of a click given an ad impression. […] [P]robability of conversion given an ad click. […] [P]robability of X out given an ad impression").

[redacted].[305]

116. Because Meta's ad ranking process involves the use of machine learning models, determining the effect of each particular type of data (*e.g.*, Button Text information from a specific website) on which ads were shown to each user at each instance is difficult—if not impossible—because of how machine learning models operate in general, not only within Meta's systems. Determining such an impact would require, among other things, a complete history of all models and a full historical record of the data used to train and make predictions using these models at each point in time. This is further complicated by the fact that machine learning models may discard certain data to avoid overfitting (*i.e.*, when additional inputs degrade rather than improve model performance, such as prediction accuracy).[306]

117. In addition, to determine the effect of any particular data point (*e.g.*, a Custom Event parameter) on a specific ad shown to a user, one would need to know all advertising bids—which influence the trade-off between ad relevance and advertiser preferences[307]—for all ad candidates available

---

305 *See, e.g.*, [redacted] PIXEL_HEALTH000218635-666 at 638 ("AdLogger – Major service to log online features, join with events to label example and generate online/offline training data."); PIXEL_HEALTH000437963-059 at 012 ("Auction calculation[:] Advertiser bid x estimated action rates [denoted as "Maximizing Advertiser Value"] + user value [denoted as "Optimizing Consumer Experience"] = total value[.] […] The ad with the highest total value wins the auction and shows to the individual").

306 *See* Dalton, Lori A. and Edward R. Dougherty, "Small-Sample Classification," *Information Science for Materials Design and Discovery*, 2016, pp. 77-101, p. 81 ("A classification rule can yield a classifier that makes few errors, or even no errors, on the training data but performs poorly on the distribution as a whole, a situation called overfitting"); Kuhn, Max and Kjell Johnson, *Applied Predictive Modeling*, Springer, 2016, p. 62 ("In addition to learning the general patterns in the data, the model has also learned the characteristics of each sample's unique noise. This type of model is said to be over-fit and will usually have poor accuracy when predicting a new sample"); Srivastava, Nitish et al., "Dropout: A Simple Way to Prevent Neural Networks from Overfitting," *Journal of Machine Learning Research*, Vol. 15, No. 56, June 14, 2014, p. 1929 ("Deep neural nets with a large number of parameters are very powerful machine learning systems. However, overfitting is a serious problem in such networks. […] Dropout is a technique for addressing this problem. The key idea is to randomly drop units (along with their connections) from the neural network during training. […] This significantly reduces overfitting").

307 "About ad auctions," Meta, https://www.facebook.com/business/help/430291176997542 ("To ensure that the winning ad maximizes value for both people and businesses, the winner of the auction is the ad with the highest total value. The total value is a combination of 3 major factors: Bid: The bid placed by an advertiser for that ad (in other words, what the advertiser is willing to pay to achieve their desired outcome). There are multiple ways to manage your bid in the ad auction […] Estimated action rates: An estimate of whether a particular person engages with or converts from a particular ad (in other words, the probability that showing an ad to a person leads to that desired outcome of the advertiser) […] Ad quality: A measure of the quality of an ad as determined

at the time each ad was displayed, and what data was available to the machine learning models that contributed to the prediction.

118. Because of the complexity of collecting all such information, if at all possible, combined with the computational costs required to retrain all machine learning models to simulate an alternative scenario in which a particular data point was not available, it may be impossible to assess whether or how particular event data had any impact on the ad ranking process or the ads displayed to users.

119. Given the fundamental limitations of code analysis for estimating the impact of any data point on what ads users saw and the incompleteness of Dr. Hashmi's analysis, his opinion that "the [redacted] category of the UP2X table is used to select advertisements for Meta's users" is misleading.

## VII. DR. SHAFIQ'S OPINIONS ARE FLAWED AND UNRELIABLE

### A. Opinion 1: Dr. Shafiq Fails to Provide a Reliable Method to Identify "All or Almost All" Healthcare Provider Websites and Apps

120. Dr. Shafiq claims that "Meta can and does programmatically identify healthcare provider websites and apps where it collects data via Meta Pixel and other Meta Business Tools."[308] Dr. Shafiq defines "programmatically" to mean the "creation of a computer program that can be used to answer the question presented in an objective and accurate fashion."[309] However, in Opinion 1, Dr. Shafiq primarily summarizes Meta's internal classification systems individually, does not provide any methodology to validate the individual systems or to combine these systems, and concludes that "Plaintiffs ha[ve] created a list of healthcare providers that were verified by human review after its inclusion on one or more of the [lists referenced in Opinion 1] and knowledge that it had the Pixel at some point in time," which is attached as Exhibit I to

from many sources including feedback from people viewing or hiding the ad and assessments of low-quality attributes in the ad, such as withholding information, sensationalized language and engagement bait. Together, estimated action rates and ad quality measure ad relevance. Because these are components of the auction, an ad that's more relevant to a person could win an auction against ads with higher bids").

308 Shafiq Report, ¶ 48 ("I was asked by Counsel to determine whether Meta can and does programmatically identify healthcare provider websites and apps from which it collected information via Meta Pixel and other Meta Business Tools. The short answer to both questions is yes").

309 Shafiq Report, ¶ 138.

his report.[310] In doing so, Dr. Shafiq fails to demonstrate that Meta has any programmatic way to accurately identify "all or almost all healthcare provider websites and apps" or that he has developed any methodology, manual or programmatic, capable of doing so.[311]

#### 1. *Dr. Shafiq Fails to Establish That Meta's Megataxon System Would Identify All or Almost All "Healthcare Provider Websites"*

121. Dr. Shafiq notes that "Meta maintains a classification taxonomy called Megataxon that includes multiple layers of categories and sub-categories."[312] Dr. Shafiq further describes that the "Megataxon categories and sub-categories are assigned by Meta when it processes information collected through Meta Business Tools, such as Meta Pixel."[313] Dr. Shafiq focuses on the production of Megataxon classifications for 208 of the "664 domains that Plaintiffs had identified […] as medical provider web properties."[314] He determines that, because 205 of these 208 domains received Megataxon classifications that Plaintiffs mapped to their list of HIPAA/CMIA-covered entities, "[the] remediation of Megataxon classifications would provide comprehensive and reliable classifications that could help identify all or almost all healthcare provider websites."[315] As I discuss below, Dr. Shafiq's methodology does not establish that

---

310 Shafiq Report, ¶ 75 ("It is my understanding that counsel for Plaintiffs has created a list of healthcare providers that were verified by human review after its inclusion on one or more of the above lists and knowledge that it had the Pixel at some point in time. The list is attached as Exhibit I").

311 *See, e.g.,* Shafiq Report, ¶ 56 ("Based on the partial data that Meta produced above, it is my opinion that remediation of Megataxon classifications would provide comprehensive and reliable classifications that could help identify all or almost all healthcare provider websites from which Meta was collecting information through the Pixel at that time"). I do not offer any opinion on what constitutes a "healthcare provider website" or "healthcare provider app." I use these terms to reference how Dr. Shafiq uses them in his report. However, Dr. Shafiq himself does not provide a consistent definition of the types of websites or apps he intends to identify. *See* Shafiq Report, ¶¶ 51 ("Among those, Counsel provided me with the following list of Megataxon categories and sub-categories that correspond to HIPAA and CMIA covered entities listed in Meta's letter"), 60 ("I retained only those domains whose top predicted category was one of the following: Healthcare Provider, Abortion, Health Coverage, Illness or Injury, Medication and Prescription, Menstrual Cycle, Mental Health Condition, Patient Portal, Pregnancy and Childbirth, Sexual and Reproductive Care, or Substance Use Disorder").

312 Shafiq Report, ¶ 52 ("The Megataxon categories and sub-categories are assigned by Meta when it processes information collected through Meta Business Tools, such as Meta Pixel, using the Pixel Mapper and stored, among other locations, in a table named *parsed_pixel_events*").

313 Shafiq Report, ¶ 52.

314 Shafiq Report, ¶ 54 ("For example, Plaintiffs initial discovery requests to Meta on February 9, 2023, included an attached Exhibit A with a list of 664 domains that Plaintiffs had identified at that point as medical provider web properties. Meta's June 6, 2025 production contained detailed Megataxon classifications for 208 of the 664").

315 Shafiq Report, ¶¶ 54 ("Meta's June 6, 2025 production contained detailed Megataxon classifications for 208 of the 664. For those domains where Meta produced Megataxon data, Meta placed 99 percent of them into one or

Meta—or Dr. Shafiq himself—can programmatically and accurately identify "healthcare provider websites." Because his methodology relies on an input list that Plaintiffs have already manually reviewed, [316] he does not evaluate its accuracy and does not assess whether it can distinguish "healthcare provider websites" from websites outside that category.

### a. *Dr. Shafiq's Methodology Is Conceptually Flawed*

122. Dr. Shafiq does not explain why Megataxon would be capable of accurately identifying "all or almost all healthcare provider websites and apps." [317] Dr. Shafiq, without providing any additional analysis or validation, relies on a mapping that Plaintiffs—not Meta—created to link Megataxon categories with what they refer to as HIPAA/CMIA categories, meaning categories that Plaintiffs associate with HIPAA- and CMIA-covered entities. [318] Under Dr. Shafiq's approach, if a webpage receives a Megataxon classification that Plaintiffs mapped to one of their HIPAA/CMIA categories, Dr. Shafiq classifies that webpage as falling into Plaintiffs' HIPAA/CMIA categories.[319]

123. Dr. Shafiq's finding that Megataxon classified 99 percent of the 208 "medical provider web properties" into Plaintiffs' HIPAA/CMIA-mapped categories is dependent on evaluating Megataxon using an input list of websites that Plaintiffs had already manually labeled as

---

more of the HIPAA/CMIA categories in the list set forth above"), 56 ("Based on the partial data that Meta produced above, it is my opinion that remediation of Megataxon classifications would provide comprehensive and reliable classifications that could help identify all or almost all healthcare provider websites from which Meta was collecting information through the Pixel at that time"). *See also* Shafiq Report, Exhibit C, column "matched_mtTaxonomyL0L7".

[316] Shafiq Report, ¶ 54 ("For example, Plaintiffs initial discovery requests to Meta on February 9, 2023, included an attached Exhibit A with a list of 664 domains that Plaintiffs had identified at that point as medical provider web properties").

[317] Shafiq Report, ¶ 56 ("Based on the partial data that Meta produced above, it is my opinion that remediation of Megataxon classifications would provide comprehensive and reliable classifications that could help identify all or almost all healthcare provider websites from which Meta was collecting information through the Pixel at that time").

[318] Shafiq Report, ¶ 51 ("Meta maintains a classification taxonomy called Megataxon that includes multiple layers of categories and sub-categories. Among those, Counsel provided me with the following list of Megataxon categories and sub-categories that correspond to HIPAA and CMIA covered entities listed in Meta's letter").

[319] I do not offer any opinion on what constitutes a HIPAA- or CMIA-covered entity. I use the term "HIPAA/CMIA-mapped categories" to refer to Plaintiffs' HIPAA/CMIA categories that they mapped to Megataxon classifications. *See* Shafiq Report, ¶ 51 ("Among those, Counsel provided me with the following list of Megataxon categories and sub-categories that correspond to HIPAA and CMIA covered entities listed in Meta's letter.").

"medical provider web properties."[320] During his deposition, Dr. Shafiq acknowledged that his methodology depends on using a "relevant" input list and likened using a different type of list to "putting diesel in a gas engine," which would cause the car "not to work well."[321]

124. Because Dr. Shafiq's evaluation is conditioned on a predefined input of "medical provider web properties" that Plaintiffs prepared, Dr. Shafiq's 99 percent figure measures only a true positive rate: the proportion of already-known Plaintiffs-identified positives that a system re-identifies as positives. During his deposition, Dr. Shafiq admitted that he only "attempted to compute the agreement or the reliability of Megataxon on the data that Meta had produced."[322] Despite this statement, Dr. Shafiq misleadingly describes his 99 percent result as a measure of "accuracy" in his report.[323] However, the true positive rate is not the same as accuracy, which measures how well a system classifies all items it examines—both those that belong in the category and those that do not.[324] By limiting his analysis to a list of websites already labeled by Plaintiffs, Dr. Shafiq does not assess Megataxon's overall accuracy for his stated purpose—*i.e.*, he does

---

320 *See* Shafiq Report, ¶ 54 ("For example, Plaintiffs initial discovery requests to Meta on February 9, 2023, included an attached Exhibit A with a list of 664 domains that Plaintiffs had identified at that point as medical provider web properties. Meta's June 6, 2025 production contained detailed Megataxon classifications for 208 of the 664. For those domains where Meta produced Megataxon data, Meta placed 99 percent of them into one or more of the HIPAA/CMIA categories in the list set forth above").

321 Video-Recorded Deposition of Zubair Shafiq, Ph.D, *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, November 19, 2025 ("Shafiq Deposition"), 130:10-25 ("A. Again, I'm not offering any legal opinions in this case, but if you're asking me a general question about how Megataxon should be used, I think there is a fundamental mismatch between what I think your view is and how I'm trying to describe the methodology to you. Let me try to explain it more plainly. If you have a gasoline car -- Q. Mm-hmm. A. And you put as input diesel in the fuel en- -- fuel compartment, the car is not going to work well. So the way you're trying to explain the methodology is coming across as, if I use a system in a different unintended way, you may see different outcomes. The car may not work. You need to use it correctly"), 134:10-23 ("Q. So if that's the case, then these lists would have to be relatively accurate for purposes in which you're looking for in terms of identifying medical providers, right? The input list let's say – and we're going to turn -- talk about RDTT in a moment -- in order for it to be gasoline and not diesel, the RDTT list would have to relatively reliably identify medical providers; right? […] A. The way I would put it is, that these input lists that are – you're using in these methodologies have to be relevant. They cannot be something completely different").

322 Shafiq Deposition, 107:16-21 ("Q. So you have not attempted to calculate a false positive rate at present? […] A. I have attempted to compute the agreement or the reliability of Megataxon on the data that Meta had produced").

323 Shafiq Report, ¶ 55 ("To illustrate the accuracy and what is missing, I provide the following chart with information for a subset of the healthcare provider domains that I understand were either specifically identified in Plaintiffs' various complaints or other cases that were consolidated into this case").

324 "Classification: Accuracy, recall, precision, and related metrics," Google, https://developers.google.com/machine-learning/crash-course/classification/accuracy-precision-recall#accuracyaccuracy ("Accuracy is the proportion of all classifications that were correct, whether positive or negative. […] The true positive rate (TPR), or the proportion of all actual positives that were classified correctly as positives, is also known as recall").

not evaluate Megataxon's ability to distinguish between websites that Dr. Shafiq would consider to be "medical provider web properties" and those that he would not.

125. As an analogy, Dr. Shafiq's evaluation of Megataxon is like testing the accuracy of an email spam filter using only emails already known to contain spam content. Suppose the filter correctly labels 205 of 208 spam emails as spam. The result would show a true positive rate of approximately 99 percent.[325] But a true positive rate is not the same as accuracy. If that same filter were tested on a set of 5,000 emails that consists of 208 spam emails and 4,792 non-spam emails, and misclassified all of the non-spam emails as spam in addition to already misclassifying three of the spam emails as non-spam, its accuracy would be only four percent, as the filter only classifies 205 emails correctly out of 5,000 total emails.[326] The analogy also illustrates that such a test would reveal nothing about the filter's ability to recognize new spam emails it has not already been told are spam. In the same way, because Dr. Shafiq evaluates Megataxon only on the 208 websites already identified by Plaintiffs as "medical provider web properties," his 99 percent figure reflects agreement within a preselected input, not Megataxon's actual accuracy in identifying "medical provider web properties."

126. Dr. Shafiq also bases his conclusion regarding Megataxon classifications on a sample of 208 of the "664 domains that Plaintiffs had identified […] as medical provider web properties."[327] However, he does not show that this 208-domain subset is representative of the "healthcare provider websites" Dr. Shafiq intends to identify. When a sample is not representative, any findings based on that sample, including Dr. Shafiq's 99 percent true positive rate, may reflect peculiarities of that subset rather than the population of interest and may not generalize to the broader intended target population.[328] Because Dr. Shafiq fails to show that the subset he

---

325 The true positive rate here is calculated as follows: $\frac{205}{208} = 0.986$.

326 The accuracy here is calculated as follows: $\frac{205}{5000} = 0.041$.

327 Shafiq Report, ¶ 54 ("Plaintiffs initial discovery requests to Meta on February 9, 2023, included an attached Exhibit A with a list of 664 domains that Plaintiffs had identified at that point as medical provider web properties. Meta's June 6, 2025 production contained detailed Megataxon classifications for 208 of the 664").

328 When selecting a sample—a portion of the entire data or population of interest—researchers typically seek to minimize sources of error that can make sample estimates differ from the true population. One source of error is sampling bias, which occurs when the subset of data chosen for analysis does not represent the population to which the conclusions are intended to apply. This can result from choices that over-represent or under-represent specific data observations, often occurring when selecting a sample based on certain criteria. *See*, *e.g.*, "Sample

focuses on is representative, his findings from that subset may not generalize to the broader group of "healthcare provider websites."

### b. *Dr. Shafiq's Methodology Fails to Consider That Megataxon Does Not Classify Websites*

127. Dr. Shafiq classifies an entire website into Plaintiffs' HIPAA/CMIA category if a single webpage within that website receives a Megataxon classification that Plaintiffs mapped to their HIPAA/CMIA category.[329] Under this approach, if Megataxon misclassifies even a single webpage within a website into a Plaintiffs' HIPAA/CMIA-mapped category, Dr. Shafiq's method would classify that entire website as a "healthcare provider website." Dr. Shafiq does not account for the fact that once any single webpage within a domain falls into a Plaintiffs' HIPAA/CMIA-mapped category, that classification is effectively extended to all webpages within the website, regardless of whether the remainder of that website contains content that Dr. Shafiq or Plaintiffs would consider healthcare-related. For example, a general retail website that includes a pharmacy webpage, or a general news website that contains an article on medical

---

Selection Bias," Corporate Finance Institute, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/sample-selection-bias/ ("Sample selection bias is the bias that results from the failure to ensure the proper randomization of a population sample. The flaws of the sample selection process lead to situations where some groups or individuals in the population are less likely to be included in the sample. The presence of sample selection bias may distort the statistical analysis of a sample and affect the statistical significance of the chosen statistical tests. In addition, the statistical parameter may be overstated or understated and not representative of the entire population"); Russell, John Morgan, *Significant Statistics: An Introduction to Statistics*, Blacksburg, VA, Virginia Tech Department of Statistics, May 22, 2025, p. 32 ("Sampling data should be done very carefully and collecting data carelessly can have devastating results. For example, surveys mailed to households and then returned may be very biased (they may favor a certain group). It is often best for the person conducting the survey to select the sample respondents. When you analyze data, it is important to be aware of sampling errors and non-sampling errors. The actual process of sampling causes sampling errors. For example, the sample may not be large enough. Factors not related to the sampling process cause non-sampling errors. A defective counting device can cause a non-sampling error […] In statistics, sampling bias is created when a sample is collected from a population and some members of the population are not as likely to be chosen as others"); Triola, Mario F., *Elementary Statistics*, 12 Ed., Boston, MA, Pearson Education, 2014, pp. 35 ("Using data from a voluntary response (self-selected) sample is a really bad idea, because such a sample could very easily be biased in that it might not be at all representative of the population"), 715 ("Researchers can intentionally or unintentionally bias their study by the way in which subjects are selected. *Sampling bias* occurs when some individuals are more or less likely to be included in a study, and the result is a sample that is not random. Sampling bias can seriously distort the interpretation of study results and result in wrong or misleading conclusions").

[329] *See* the "taxonomy.py" file in the backup production to the Shafiq Report. This Python script aggregates Megataxon classifications at the domain level and flags the domain if any of the Megataxon classifications for that entire domain match one the Megataxon categories that Plaintiffs mapped to their HIPAA/CMIA categories.

issues, could—under Dr. Shafiq's approach—result in the entire website being treated as falling into a Plaintiffs' HIPAA/CMIA-mapped category.

128. As stated above, Dr. Shafiq relies on Plaintiffs' mapping between Megataxon categories and "HIPAA and CMIA covered entities," but provides no analysis or validation of why certain Megataxon classifications should correspond to any of Plaintiffs' HIPAA/CMIA categories.[330] Dr. Shafiq also does not account for the fact that webpages receiving Plaintiffs' HIPAA/CMIA-mapped categories may not reflect the types of "healthcare provider website" he intends to identify. For example, Megataxon classified a Costco product listing for children's boots under "Services//Health & Medical//Medical Facilities//Medical Centers."[331] **Figure 30** shows the corresponding webpage. Notably, the domain *costco.com* appeared on the list of "1,844 healthcare properties from which Meta is collecting information through the Meta Collection Tools" that Plaintiffs identified on June 21, 2023,[332] but was later removed from the updated list submitted with Plaintiffs' Motion for Class Certification on September 9, 2025.[333] In other words, Dr. Shafiq's approach would identify *costco.com* as a "healthcare provider website" even though Plaintiffs themselves ultimately excluded it from their list.

---

330 Shafiq Report, ¶ 51. *See also* Shafiq Deposition, 67:19-23 ("Q. I'm just trying to understand. They were provided in rows like this; yes? A. Counsel provided me the information that you see in both columns in table that is under Paragraph 51 of my report").

331 Megataxon's classification system is nested, grouping broader categorizations and funneling towards more specific classifications. For example, within the initial Classification of "Content/Health & Medical," there can be several sub-categories of classification, such as "Content/Health & Medical/Healthy Living," or "Content/Health & Medical/Medical Conditions." There are then more specific categories of classification within each of these levels. *See* Confidential Videotaped 30(b)(6) Deposition of Fred Leach, *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, May 16, 2025 ("Leach Deposition"), Exhibit 646, p. 1.

332 Consolidated Complaint, ¶¶ 128-129 ("Since the filing of the Consolidated Class Action Complaint, Plaintiffs have identified 1,844 healthcare properties from which Meta is collecting information through the Meta Collection Tools. Plaintiffs provided Meta with this list on June 21, 2023 and incorporate the list by reference into this First Amended Complaint via its attachment as Appendix A"). *See also* 2023.06.21 - Meta Medical Provider Sites.csv row 362 (counting the header row as row 1).

333 Exhibit 60 Domain List, *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, September 9, 2025. *See also* Shafiq Report, Exhibit I.

**Figure 30**
**Megataxon Assigned a Costco Product Listing for Kids' Boots to Categories that Plaintiffs Mapped to their HIPAA/CMIA Category "Hospitals/Clinics"[334]**




129. Similarly, Megataxon assigned a news article on former President Jimmy Carter and the facility tour webpage of a vet clinic to categories that Plaintiffs mapped to their HIPAA/CMIA category "Hospitals/Clinics" (*see* **Figure 31** and **Figure 32**).

334 PIXEL_HEALTH_CWD00001093, row 195,701; "Costco Wholesale, Kirkland Signature Kids' Shearling Ankle Boot," Wayback Machine, November 20, 2022, https://web.archive.org/web/20221120150505/https://www.costco.com/kirkland-signature-kid's-shearling-ankle-boot.product.4000058475.html, accessed on December 1, 2025.

**Figure 31**
**Megataxon Assigned a News Article on Former President Jimmy Carter to a Category that Plaintiffs Mapped to their HIPAA/CMIA Category "Hospitals/Clinics"[335]**



SUBSCRIBE NEWSLETTERS ADVERTISE | CLASSIFIEDS | JOBS | E-TRIB HIGH SCHOOL SPORTS NETWORK TRIBLIVE LOCAL

TRIB LIVE

THURSDAY, DECEMBER 4, 2025

SEARCH THE TRIB

Western Pennsylvania's trusted news source

LOCAL SPORTS NEWS OPINION A&E LIFESTYLES VIDEO OBITUARIES

U.S./WORLD

Jimmy Carter, 39th U.S. president, enters hospice care at home

AP ASSOCIATED PRESS | Saturday, Feb. 18, 2023 3:54 p.m. Go Ad-Free Today!

AP

In this Nov. 3, 2019 file photo, former President Jimmy Carter teaches Sunday school at Maranatha Baptist Church in Plains, Ga.

Content you may have missed

White House expected to submit plans for new ballroom to planning commission this month Dec 4, 2025

A single hostage still in Gaza after identification of Thai worker's remains Dec 4, 2025

Trump hosts the leaders of Congo and Rwanda to sign a key deal for peace in eastern Congo Dec 4, 2025

PARTNER NEWS How to Sell a Home That Needs a Lot of Repairs Oct 25, 2025

Trump to visit Pa. pushing efforts to curb inflation as high prices squeeze Americans Dec 4, 2025

Gallery: Photos from Dec. 4, 2025 Dec 4, 2025

335 PIXEL_HEALTH_CWD00001141, row 167,716; "Jimmy Carter, 39th U.S. president, enters hospice care at home," TribLIVE, https://triblive.com/news/world/carter-center-former-president-jimmy-carter-in-hospice-care/ accessed on December 4, 2025.

A13-4359

**Figure 32**
**Megataxon Assigned a Facility Tour Webpage of a Veterinary Clinic to a Category that Plaintiffs Mapped to their HIPAA/CMIA Category "Hospitals/Clinics"[336]**




130. In each of these three examples, under Dr. Shafiq's method, the corresponding websites—*costco.com*, *triblive.com*, and *hubcityvet.com*—would be classified by Dr. Shafiq as "healthcare provider websites" due to how Megataxon classified the individual webpages.

### 2. *Dr. Shafiq Fails to Establish That Meta's RDTT Classifications Would Identify All or Almost All "Healthcare Provider Websites"*

131. Dr. Shafiq considers another Meta classification system, RDTT, where he filters a produced list of 2.4 million global websites classified by RDTT down to a subset of websites purportedly meeting all of the following criteria: (1) the top category predicted by RDTT for each website is one of the categories that Dr. Shafiq claims are "healthcare-related;"[337] (2) RDTT's

[336] PIXEL_HEALTH_CWD00001101, row 8,717; "Hospital Tour," Hub City Vet, https://hubcityvet.com/hospital-tour/, accessed on December 1, 2025.

[337] Shafiq Report, ¶¶ 59-60 ("Meta produced a list of approximately 2.4 million domains classified under Meta's RDTT taxonomy […] I parsed this list of domain classifications to extract the set of U.S.-based domains (mapped to eTLD+1 level) that Meta's RDTT granular classification model identified as belonging to health-care

confidence score for the prediction was at least 0.8 (out of 1.0);[338] and (3) the website qualifies as "U.S.-based," for which Dr. Shafiq relied on factors such as the website's registration records and IP-geolocation.[339] Dr. Shafiq produced the filtered list, which includes 652 thousand domains, as Exhibit E of his report.[340] As I discuss below, Dr. Shafiq's analysis of RDTT is based on unsupported assumptions and fails to account for the fact that RDTT classifications may not identify "healthcare provider websites."

132. As an initial point, Dr. Shafiq does not rely on Plaintiffs' HIPAA/CMIA-mapped categories when analyzing RDTT as he did for Megataxon. Dr. Shafiq does not explain why either of his chosen approaches—adopting Plaintiffs' mapping for Megataxon and creating his own list of "health-related" categories for RDTT—would be an appropriate method for identifying "healthcare provider websites."[341] These differing approaches underscore that Dr. Shafiq never provides a consistent definition for what he means by a "healthcare provider website," let alone provides a proper evaluation of whether these classification systems can identify them.

133. While Dr. Shafiq uses RDTT's confidence scores generated by Meta, he does not explain whether and how Meta actually uses these scores.[342] During his deposition, Dr. Shafiq claimed

related categories. Specifically, I retained only those domains whose top predicted category was one of the following: Healthcare Provider, Abortion, Health Coverage, Illness or Injury, Medication and Prescription, Menstrual Cycle, Mental Health Condition, Patient Portal, Pregnancy and Childbirth, Sexual and Reproductive Care, or Substance Use Disorder").

338 Shafiq Report, ¶ 60 ("To ensure reliability, I further limited the list to domains where the model's confidence score for the top category was 0.8 or higher").

339 Shafiq Report, ¶¶ 60-61 ("I excluded domains that were subdomains, did not use a .com, .org, .net, .us, .edu, or .gov top-level domain to exclude non-US domains such as (e.g., .co.uk) […] Second, because domains ending in .com, .org, or .net can still belong to non-U.S. entities, I conducted additional filtering to remove non-U.S. domains. Specifically, I (1) checked WHOIS registration records to identify and exclude domains whose registrant country was outside the U.S., and (2) used IP-geolocation to identify and exclude domains hosted outside the U.S. The goal here was to further remove domains belonging to non-U.S. entities").

340 Shafiq Report, ¶ 62 ("This filtering resulted in a list of about 652 thousand domains classified by Meta's RDTT classification as belonging to the aforementioned fine-grained healthcare-related categories. The attached Exhibit E contains the complete list of the approximately 652 thousand domains that Meta placed into an RDTT health classification and that made it through the winnowing process described above").

341 Shafiq Report, ¶¶ 51 ("Among those, Counsel provided me with the following list of Megataxon categories and sub-categories that correspond to HIPAA and CMIA covered entities listed in Meta's letter."), 60 ("I retained only those domains whose top predicted category was one of the following: Healthcare Provider, Abortion, Health Coverage, Illness or Injury, Medication and Prescription, Menstrual Cycle, Mental Health Condition, Patient Portal, Pregnancy and Childbirth, Sexual and Reproductive Care, or Substance Use Disorder").

342 Shafiq Report, ¶¶ 59-60 ("On July 18, 2025, Meta produced a list of approximately 2.4 million domains classified under Meta's RDTT taxonomy, and the associated confidence scores for each category (ranging from 0

that he "was looking at the distribution of confidence scores assigned to domains" and that the 0.8 threshold "seemed to be at what's called the knee of the distribution."[343] When asked how he looked at the distribution of confidence scores in a list of approximately 2.4 million domains,[344] he stated that the Python code he produced "does everything," including calculating the distribution of RDTT confidence scores.[345] However, the code named "rdtt.py" that Dr. Shafiq produced simply assumes the 0.8 value as the threshold, and my review of his production shows no code or analysis that examines the distribution of RDTT confidence scores.[346]

134. Aside from Dr. Shafiq's deposition testimony about 0.8 being the "knee of the distribution," for which he never produced anything despite stating that he did in his deposition,[347] Dr. Shafiq's report otherwise provides no justification for selecting 0.8 as an appropriate confidence score threshold and offers no evidence that this threshold can distinguish correct classifications from misclassifications. For example, Dr. Shafiq fails to explain in his report why domains scoring just below that value—such as 0.78 or 0.79—would not be classified as "healthcare provider websites." Because Dr. Shafiq fails to provide any supporting analysis, his use of 0.8 as a cutoff is arbitrary and provides no reliable basis for evaluating RDTT's classifications.

135. Dr. Shafiq's filtered list, presented as Exhibit E to the Shafiq Report, includes numerous domains that, at least currently, do not correspond to active or valid websites. This issue is apparent from the first entry in Exhibit E, *000nfjsdec.com*, which has a Top Category of

---

to 1, where higher values indicate greater model confidence). […] To ensure reliability, I further limited the list to domains where the model's confidence score for the top category was 0.8 or higher").

343 Shafiq Deposition, 158:16-21 ("Q. Why did you choose .8 as the cut off score for your confidence analysis? A. In my analysis of the data, I was looking at the distribution of confidence scores assigned to domains, and .8 threshold seems -- seemed to be at what's called the knee of the distribution").

344 Shafiq Report, ¶ 59 ("On July 18, 2025, Meta produced a list of approximately 2.4 million domains classified under Meta's RDTT taxonomy, and the associated confidence scores for each category (ranging from 0 to 1, where higher values indicate greater model confidence)").

345 Shafiq Deposition, 162:1-7 ("Q. So you've produced some Python code in this case. Did you produce the Python code that you used to call the distribution from the 2.4 million domains in the RDTT database? A. The code that I provided I believe does everything").

346 *See* Shafiq Report, "rdtt.py," lines 72-75.

347 Shafiq Deposition, 158:16-21 ("Q. Why did you choose .8 as the cut off score for your confidence analysis? A. In my analysis of the data, I was looking at the distribution of confidence scores assigned to domains, and .8 threshold seems -- seemed to be at what's called the knee of the distribution"), 162:1-7 ("Q. So you've produced some Python code in this case. Did you produce the Python code that you used to call the distribution from the 2.4 million domains in the RDTT database? A. The code that I provided I believe does everything").

"Healthcare Provider" with a confidence score of approximately 0.98.[348] However, **Figure 33** shows that the domain cannot currently be reached. Dr. Shafiq fails to provide any method—programmatic or manual—for checking whether a currently inactive domain was ever a "healthcare provider website."

**Figure 33**
**The Chrome Browser Cannot Connect to Domain *000nfjsdec.com*[349]**




136. Dr. Shafiq also includes domains with confidence scores above his arbitrary 0.8 threshold, such as the wedding planning service website shown in **Figure 34** is classified into one of Dr. Shafiq's "healthcare-related categories" with a confidence score of 0.9.[350] Likewise, numerous personal-injury law firms, such as *berensonlaw.com*[351] and *dclawla.com*,[352] also

[348] Shafiq Report, Exhibit E, Tab "RDTT," row 2.

[349] "This site can't be reached," http://000nfjsdec.com/; "This site can't be reached," http://000nfjsdec.com/, accessed on December 2, 2025.

[350] Shafiq Report, Exhibit E, tab "RDTT," row 633,089.

[351] Shafiq Report, Exhibit E, tab "RDTT," row 62,166; "Top-Rated Fort Worth Personal Injury Lawyer Fighting For You," Berenson Injury Law, https://berensonlaw.com/.

[352] Shafiq Report, Exhibit E, tab "RDTT," row 145,196; "DC Law Firm, Dedicated Personal Injury Law Firm Serving California," Wayback Machine, September 16, 2022, https://web.archive.org/web/20220916191502/https://www.dclawla.com/.

exceed the 0.8 threshold. Dr. Shafiq provides no explanation for why websites such as these would be correctly categorized as "healthcare-related" under his RDTT methodology.

**Figure 34**
***wedinmexico.com* Has an RDTT Confidence Score of 0.90**[353]




137. Dr. Shafiq also fails to reliably exclude all non-U.S. domains, as his methodology relies on "IP-geolocation" and "WHOIS registration records,"[354] neither of which, as he acknowledges in his report, is reliable for identifying website location:

> WHOIS registration records are not always available or complete, as some records are redacted or privacy protected. Similarly, IP-based geolocation can reflect the location of a hosting provider's datacenter

[353] WedinMexico.com, "Homepage," Wayback Machine, August 21, 2017, https://web.archive.org/web/20170821073645/http://wedinmexico.com/. *See also* Shafiq Report, Exhibit E, row 633,089.

[354] Shafiq Report, ¶ 61 ("Second, because domains ending in .com, .org, or .net can still belong to non-U.S. entities, I conducted additional filtering to remove non-U.S. domains. Specifically, I (1) checked WHOIS registration records to identify and exclude domains whose registrant country was outside the U.S., and (2) used IP-geolocation to identify and exclude domains hosted outside the U.S. The goal here was to further remove domains belonging to non-U.S. entities").

> rather than the registrant's actual country, so non-U.S. domains may occasionally appear hosted in the United States and vice versa. Accordingly, while the filtering steps described above substantially reduce the likelihood of non-U.S. domains being included, some residual non-U.S. domains may still appear, though the vast majority of domains on this list are expected to be U.S.-based.[355]

138. Consistent with the limitations of IP geolocation that Dr. Shafiq highlights, the servers that host websites may change and/or be in multiple locations, depending on the server infrastructure of the hosting provider.[356] In addition, as an example of Dr. Shafiq's assessment of WHOIS records, the largest registrar of domains in the world is GoDaddy.[357] As a standard feature, GoDaddy offers "free domain privacy,"[358] which replaces the website developer's information in the WHOIS directory, including location, with GoDaddy's.[359] For example, *00academy.org*, which is included in Shafiq Report's Exhibit E, is the website of an entity that, based on its

---

355 Shafiq Report, footnote. 111.

356 *See*, *e.g.*, "Regions and Availability Zones," Amazon Web Services, https://aws.amazon.com/about-aws/global-infrastructure/regions_az/ ("AWS has the concept of a Region, which is a physical location around the world where we cluster data centers. We call each group of logical data centers an Availability Zone [(AZ)]. […] AWS customers focused on high availability can design their applications to run in multiple AZs. […] AZs are physically separated by a meaningful distance, many kilometers, from any other AZ, although all are within 100 km (60 miles) of each other"); "What Is Amazon CloudFront?," Amazon Web Services, https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/Introduction.html ("CloudFront delivers your content through a worldwide network of data centers called edge locations. […] As an example, suppose that you're serving an image from a traditional web server, not from CloudFront. For example, you might serve an image, sunsetphoto.png, using the URL https://example.com/sunsetphoto.png. Your users can easily navigate to this URL and see the image. But they probably don't know that their request is routed from one network to another—through the complex collection of interconnected networks that comprise the internet—until the image is found. CloudFront speeds up the distribution of your content by routing each user request through the AWS backbone network to the edge location that can best serve your content. […] You also get increased reliability and availability because copies of your files (also known as objects) are now held (or cached) in multiple edge locations around the world").

357 *See*, *e.g.*, "Domain Name Registrar Stats," Domain State, February 2025, https://www.domainstate.com/registrar-stats.html; Preusler, Christine, "20 Largest Domain Registrars in the World (2025)," HostingAdvice.com, March 13, 2025, https://www.hostingadvice.com/how-to/largest-domain-registrars/ ("GoDaddy is one of the most recognizable names in the industry — and for good reason. It is the world's largest domain registrar, with more than 20 million customers, 81 million domains, and nearly 6,000 employees across the globe").

358 "Register a Domain with GoDaddy," GoDaddy, https://www.godaddy.com/domains ("GoDaddy domain registration includes free domain privacy** to guard your personal info by replacing it with proxy info in the public WHOIS directory").

359 "Domain Name Proxy Agreement," GoDaddy, April 1, 2024, https://www.godaddy.com/legal/agreements/domain-name-proxy-agreement ("GoDaddy will display its contact information in the publicly available 'Whois' directory in place of Your information. GoDaddy shall keep Your name, postal address, email address, phone and fax numbers confidential").

Facebook Page, is located in Colombia (*see* **Figure 35**), yet the WHOIS database reports this website as U.S.-based (*see* **Figure 36**). Dr. Shafiq offers no validation of his proposed methodology to exclude non-US domains.

**Figure 35**
***00academy.org* Is Associated with an Entity that, According to its Facebook Page, Is Located in Colombia**[360]




---

[360] "Proyecto 0.0 Facebook Page," Meta, https://www.facebook.com/profile.php?id=61559094593520; "Proyecto 0.0," 00academy.org, https://00academy.org/; Shafiq Report, Exhibit E, row 5.

**Figure 36**
***00academy.org* Is Registered Under the US-Based Domain Provider Service, GoDaddy**[361]




3. *Dr. Shafiq Fails to Establish That Meta's Other Classification Systems Would Identify All or Almost All "Healthcare Provider Websites"*

139. In addition to the Megataxon and RDTT classification systems, Dr. Shafiq claims that "Meta created a program to specifically identify Patient Portals" and "maintains various classification methods and systems that can also be used to identify healthcare provider websites and apps"—namely Core Setup, the classification of advertiser verticals, and Facebook Page classifications (also known as "CatKit").[362] However, Dr. Shafiq fails to demonstrate that any of these systems provide reliable data or methods that can be used either in isolation or in combination with other systems to identify "healthcare provider websites."

---

[361] "RDAP Domain Lookup," who.is, https://who.is/rdap/00academy.org, Shafiq Report, Exhibit E, row 5.

[362] Shafiq Report, ¶¶ 50, 68-71.

*a. Dr. Shafiq Fails to Establish That Patient Portal Lists Would Identify All or Almost All "Healthcare Provider Websites"*

140. Dr. Shafiq claims that (1) Meta "had produced domain and app RDTT classifications that 'include patient portal classifications' reflected in the classification 'PATIENT_PORTAL' for domains and apps, which he attaches as Exhibit F;[363] (2) "Meta's amended interrogatory answer also referenced its SAE classifications of domains and apps" that "likewise include the category 'PATIENT_PORTAL'," which he attaches at Exhibit G;[364] and (3) "Meta's amended interrogatory answer also stated that a document […] 'was created as part of the previously identified process to block events that fire from URLs that included variations of 'patient portal' or common patient portal names such as 'mychart' in the URL,'" which he attaches as Exhibit H.[365] Dr. Shafiq collectively refers to these lists as Patient Portal Lists.

141. Dr. Shafiq does not test that these lists identify "healthcare provider websites." For example, my review of Exhibit H includes websites related to charter flights, newspaper articles, and knitting charts. The websites *bookmycharters.com* and *chart-minder.com* are included in Exhibit H.[366] As shown in **Figures 37** and **38**, these websites correspond to booking charter flights and private transportation, and creating knitting chart designs, respectively. Similarly, several newspaper domains are also included in Exhibit H, such as *chicagotribune.com*, *mlive.com*, and *healthcaredive.com*.[367] Dr. Shafiq fails to consider that websites included in these Patient Portal Lists may not be the "healthcare provider websites" that he intends to identify.

363 Shafiq Report, ¶ 65.

364 Shafiq Report, ¶ 66.

365 Shafiq Report, ¶ 67.

366 Shafiq Report, Exhibit H, rows 84 and 151.

367 Shafiq Report, Exhibit H, rows 133, 263, and 378.

**Figure 37**
***bookmycharters.com* Is Included in Exhibit H to the Shafiq Report**[368]




[368] Shafiq Report, Exhibit H, row 84. *See also* "Book Your Own Private Jet," BookMyCharters, https://bookmycharters.com accessed on December 1, 2025.

**Figure 38**
***chart-minder.com* Is Included in Exhibit H to the Shafiq Report**[369]




*b.* *Dr. Shafiq Fails to Establish That Core Setup, Advertiser Verticals Classifications, and CatKit Would Identify All or Almost All "Healthcare Provider Websites"*

142. Dr. Shafiq claims that "Meta also maintains various classification methods and systems that can also be used to identify healthcare provider websites and apps."[370]

143. However, for each of the additional systems that Dr. Shafiq references—Core Setup, Meta's sales advertiser verticals, and CatKit—Dr. Shafiq simply describes the produced data and then claims "[t]his information can be used to identify health-related Pixel IDs and/or domains […]."[371] Dr. Shafiq offers no methodology for using any of these systems, either in isolation or

---

369 Shafiq Report, Exhibit H, row 151. *See also* "Design, scan or customise your own knitting charts, for free," Chart Minder, https://www.chart-minder.com/ accessed on December 1, 2025.

370 Shafiq Report, ¶ 68.

371 Shafiq Report, ¶¶ 69 ("**Core Setup**: Meta produced a list of Meta Pixel IDs that were placed in a setting called Core Setup in 2024. It contains Pixel IDs and domains, along with classifications indicating whether they were categorized as 'health' based on the information in the 'category_and_treatments' column. This information can be used to identify health-related Pixel IDs and/or domains that were placed in Core Setup"), 70 ("**Advertiser Verticals**: Meta produced sales vertical data that classifies Pixel-associated domains into verticals and sub-verticals, such as 'Health Systems and Practitioners' and 'Counseling and Psychotherapy.' It contains Pixel IDs

A13-4370

in combination with the other systems he references, to identify "healthcare provider websites." Across all three systems, Dr. Shafiq fails to explain why these systems are suitable for identifying "healthcare provider websites" or to analyze the accuracy or reliability of the underlying classifications.[372]

### 4. *Dr. Shafiq Does Not Explain How the "Publicly Available Sources" He References Relate to the Meta Pixel or Other of Meta's Business Tools*

144. While Dr. Shafiq's Opinion 1 is about whether "Meta can and does programmatically identify healthcare provider websites and apps," Dr. Shafiq also makes an additional claim that there are "other publicly available sources that can be used to identify healthcare provider websites."[373] He lists two specific examples: a list of U.S. hospitals compiled by the American Hospital Association ("AHA"), which Dr. Shafiq does not produce and which is accessible only through an information request,[374] and a list of Providers of Services ("POS") provided by the Centers for Medicare & Medicaid Services ("CMS"), which, as Dr. Shafiq acknowledges, does not include websites or apps associated with these entities.[375]

145. Dr. Shafiq fails to connect the aforementioned lists to any of Meta's internal systems he previously discussed or to suggest that entities on those lists actually implemented the Meta Pixel.[376] To the extent Dr. Shafiq suggests that these publicly available sources could be used in conjunction with Meta's classification systems (even though he never explicitly says so in

---

and domains, along with sales subvertical classifications for many of those advertisers. This information can also be used to identify health-related Pixel IDs and/or domains"), 71 ("**Facebook Page Classifications (CatKit)**: Meta produced CatKit data that maps Pixel IDs to page categories for Facebook pages. This information can also be used to identify Pixel IDs whose categories match with a curated health-related list (e.g., 'Hospital,' 'Medical Center,' 'Surgical Center,' 'Dialysis Clinic,' etc.)").

372 Shafiq Report, ¶¶ 68-71.

373 Shafiq Report, ¶ 72 ("There also exist other publicly available sources that can be used to identify healthcare provider websites").

374 "AHA Annual Survey Database," AHA Data & Insights, https://www.ahadata.com/aha-annual-survey-database ("Get the hospital data you need to discover key insights delivered by a trustworthy source. Fill out the form and a representative will respond to you shortly").

375 Shafiq Report, ¶¶ 72-74 ("There also exist other publicly available sources that can be used to identify healthcare provider websites. The American Hospital Association (AHA) provides a list through its Annual Survey Database, which is a comprehensive inventory of U.S. hospitals […] The Centers for Medicare & Medicaid Services (CMS) provides a list of Providers of Services (POS). This list includes information on all facilities certified by CMS, such as hospital names, addresses, and provider IDs. To determine websites of these hospitals, one could use each hospital name and address on a search engine to identify domains").

376 Shafiq Report, ¶¶ 72-74.

his report), he provides no methodology demonstrating how these datasets could be combined or any validation supporting the reliability of such an approach.[377]

146. For example, the POS data that Dr. Shafiq references does not include website information.[378] Dr. Shafiq proposes using each hospital's name and address in a search engine to identify domains, but he provides no methodology to address factors that could undermine the accuracy of matching the entities in the POS list with websites that show up in search results, such as facilities with identical or similar names, facilities that change names and/or addresses with outdated CMS records that do not reflect these changes, or other potential sources of misidentification, which can result in entities being incorrectly matched to websites that are not associated with them. [379]

### 5. *Dr. Shafiq Fails to Provide a Methodology to Combine the Classification and Lists Referenced in Opinion 1 of His Report*

147. Dr. Shafiq stated in his deposition that, "[t]he task that I'm performing in Opinion 1 is simply to take all of these internal and external classifications and lists and triangulate all of this information, which can then be used to create a list of healthcare providers that can then further be verified."[380] However, across all the systems and lists he references in Opinion 1, including his unsupported claim that combining RDTT classifications with a remediated version of

377 Shafiq Report, ¶¶ 72-74.

378 Shafiq Report, ¶ 74 ("The Centers for Medicare & Medicaid Services (CMS) provides a list of Providers of Services (POS). This list includes information on all facilities certified by CMS, such as hospital names, addresses, and provider IDs. To determine websites of these hospitals, one could use each hospital name and address on a search engine to identify domains and filter the results to include only active, U.S.-based facilities").

379 Shafiq Report, ¶ 74.

While Dr. Shafiq notes that he was "informed" that Meta used the POS list to identify hospital domains, he provides no citation or evidence supporting this claim. *See* Shafiq Report, ¶ 75.

380 Shafiq Deposition, 44:3-8 ("The task that I'm performing in Opinion 1 is simply to take all of these internal and external classifications and lists and triangulate all of this information, which can then be used to create a list of healthcare providers that can then further be verified"). *See also* 42:4-9 (A. I'm not sure exactly what you're asking, so I will try to state what I did, which is use multiple classifications methodologies to try to triangulate across multiple classification systems whether a domain is classified into a relevant category"); 81: 24-82:3 ("A. In Opinion 1 of my report, I later on describe how various lists and classifications that are part of Opinion 1 of my report can be used together to triangulate – to triangulate list of healthcare providers"); 107:23-108:7 (" Q. So – and that's the entirety of you assignment with respect to Megataxon? A. The analysis that I'm performing for Megataxon exists in the larger context of Opinion 1 where I'm describing that you can take all of these internal and public classifications and lists you can use them to triangulate – Q. Okay. A. -- and create a list of healthcare providers").

Megataxon can "reliably identify all or almost all healthcare provider domains at issue,"[381] Dr. Shafiq provides no methodology for combining, or "triangulating," the various systems he discusses. As I discuss above, Dr. Shafiq fails to establish that any of the individual systems he references can accurately identify "healthcare provider websites and apps." Having failed to demonstrate that any single system can accurately identify "healthcare provider websites," Dr. Shafiq fails to explain why any combined list derived from those systems would not have similar issues. In addition, he provides no approach for reconciling conflicting classifications among the various systems and no validation process for determining whether any results from any such approach can accurately identify "healthcare provider websites and apps."[382]

148. Even assuming that these classifications and lists could be combined, Dr. Shafiq claims that any resulting list would need to be "manually vet[ted]."[383] Dr. Shafiq does not estimate the effort required to conduct this "manual vetting" process. For example, the RDTT classification data he relies on contains more than 2.4 million domains,[384] and even after applying the filters he describes, which as I discuss above include non-U.S. websites and websites that Dr. Shafiq may not consider "healthcare provider websites," the filtered list still contains approximately 625,000 domains.[385] Having offered no methodology for combining the various systems—much less for one that would produce a combined output that is "a short list" compared to the

---

381 Shafiq Report, ¶ 64 ("It is my opinion that the combination of (1) Meta's identification of domains on the RDTT list for which it was actively collecting data in June 2022; and (2) remediation of Megataxon classifications for those domains would enable Plaintiffs to reliably identify all or almost all healthcare provider domains at-issue in this case").

382 Shafiq Report, ¶¶ 48-75.

383 Shafiq Deposition, 44:3-8 ("The task that I'm performing in Opinion 1 is simply to take all of these internal and external classifications and lists and triangulate all of this information, which can then be used to create a list of healthcare providers that can then further be verified"), 201:3-19 ("A. Let's say the domain is 0229589559.com. This domain is classified by RDTT as a healthcare provider with the confidence of 0.8. If this domain, for example, is not included […], you could exclude […] this domain. And then these […] are essentially providing you the ingredients, and then you can line all of them up and then create a short list, which will be much shorter than, let's say, 652,000. And then you can manually vet that much shorter list to make a determination, whether a domain belongs to a healthcare provider or not").

384 Shafiq Report, ¶ 59 ("On July 18, 2025, Meta produced a list of approximately 2.4 million domains classified under Meta's RDTT taxonomy, and the associated confidence scores for each category (ranging from 0 to 1, where higher values indicate greater model confidence)").

385 Shafiq Report, ¶ 62 ("This filtering resulted in a list of about 652 thousand domains classified by Meta's RDTT classification as belonging to the aforementioned fine-grained healthcare-related categories. The attached Exhibit E contains the complete list of the approximately 652 thousand domains that Meta placed into an RDTT health classification and that made it through the winnowing process described above").

outputs of the individual systems[386]—Dr. Shafiq does not explain what this manual vetting would entail or how its accuracy would be ensured. He also does not address why domains excluded from any resulting combined list would be correctly excluded and therefore would not require manual vetting. Accordingly, Dr. Shafiq fails to demonstrate that any of the classification systems he references can be combined to accurately identify "all or almost all healthcare provider websites."[387]

#### 6. *Dr. Shafiq Fails to Provide a Reliable Method to Identify "All or Almost All" Healthcare Provider Apps*

149. Dr. Shafiq provides no methodology for programmatically identifying "healthcare provider apps." His discussion of apps is limited to summaries of various lists, none of which he analyzes.[388] He never explains how any of these systems could be used to accurately distinguish the "healthcare provider apps" Dr. Shafiq seeks to identify from those that would fall outside that category.[389] As with his discussion of "healthcare provider websites," Dr. Shafiq offers no method for combining the lists he references or for reconciling conflicting app classifications.[390]

---

[386] Shafiq Deposition, 201:3-19 ("A. Let's say the domain is 0229589559.com. This domain is classified by RDTT as a healthcare provider with the confidence of 0.8. If this domain, for example, is not included […], you could exclude […] this domain. And then these […] are essentially providing you the ingredients, and then you can line all of them up and then create a short list, which will be much shorter than, let's say, 652,000. And then you can manually vet that much shorter list to make a determination, whether a domain belongs to a healthcare provider or not").

[387] *See, e.g.*, Shafiq Report, ¶ 56 ("Based on the partial data that Meta produced above, it is my opinion that remediation of Megataxon classifications would provide comprehensive and reliable classifications that could help identify all or almost all healthcare provider websites from which Meta was collecting information through the Pixel at that time").

[388] Shafiq Report, ¶¶ 57 ("Meta also classifies apps using Megataxon. Megataxon app classifications remain live in Meta systems. I have attached as Exhibit D a list of 19,199 apps for which Meta assigned a healthcare provider Megataxon classification. Megataxon classifications for those domains where Megataxon classifications were produced, Meta placed 47 percent of them into one or more of the HIPAA/CMIA categories in the chart set forth above"), 65 ("On August 8, 2025, Meta served an amended answer to Plaintiffs' Interrogatory No. 3, stating that it had produced domain and app RDTT classifications that 'include patient portal classifications' reflected in the classification 'PATIENT_PORTAL' for domains and apps. Meta produced these documents on June 9, 2025. Attached as Exhibit F is the list of the 36 domains and 1,973 apps that Meta classified as PATIENT_PORTAL"), 66 ("On August 8, 2025, Meta's amended interrogatory answer also referenced its SAE classifications of domains and apps. These SAE classifications likewise include the category 'PATIENT_PORTAL.' Attached as Exhibit G is the list of the 49 domains and 1,791 apps that Meta classified as PATIENT_PORTAL under the SAE taxonomy").

[389] Shafiq Report, ¶¶ 57, 65-66.

[390] Shafiq Report, ¶¶ 57, 65-66.

Accordingly, Dr. Shafiq does not establish that Meta, or Dr. Shafiq himself, can or does programmatically identify "healthcare provider apps."

### B. Opinion 2: Dr. Shafiq Fails to Show That Meta's Matching System Can Accurately Identify Facebook Users from Offsite Data Transmitted to Meta

150. Dr. Shafiq states that "Meta's [*sic*] identifies Facebook users from the offsite data it receives via the Pixel on healthcare provider websites and apps,"[391] and he further claims "that Meta not only collected identifying information from Plaintiffs' and class members' devices and browsers, but also linked or associated that information with their Facebook accounts using" several of Meta's "matching methods."[392] As an initial point, Dr. Shafiq incorrectly claims that Meta "identifies Facebook users from the offsite data it receives via the Pixel on […] apps," which is incorrect—the Meta Pixel cannot even be implemented on apps (*see* **Section III.B.1**). Second, as I discuss in detail below, Dr. Shafiq fails to show that Meta's matching methods that he describes can accurately match offsite event data to Facebook users.

#### *1. Dr. Shafiq's Analysis Demonstrates That the Methods from the [redacted] System He Describes Cannot Reliably Match Event Data to Facebook Accounts Accurately*

151. According to Dr. Shafiq, "Meta matches offsite events to Facebook IDs" by using its [redacted] system.[393] Dr. Shafiq opines that "Meta's internal source code uses identity waterfall logic to [redacted], looking first to cookies that are available for matching; [redacted] and if neither of those options are available, it uses [redacted]' based upon IP address and User-Agent" information.[394] Also, according to Dr. Shafiq, after the [redacted] system estimates the likelihood that an event matches to a specific Facebook account, "[i]f Meta is at

---

[391] Shafiq Report, Opinion #2 ("Meta's [*sic*] Identifies Facebook Users from the Offsite Data It Receives Via the Pixel on Healthcare Provider Websites and Apps").

[392] Shafiq Report, ¶ 125.

[393] Shafiq Report, ¶¶ 102-103 ("**How Meta Matches Offsite Events to Facebook IDs**. […] At a high level, the Meta Pixel sends the identifiers to Meta's servers […] where Meta's server-side source code immediately extracts the identifiers and sends them to an internal identity resolution service called '[redacted]' When the identifiers reach [redacted]' Meta's internal source code uses [redacted] (emphasis in original).

[394] Shafiq Report, ¶ 103.

A13-4375

[redacted] then the information is linked to a Facebook user ID."[395]

152. Dr. Shafiq's description of the "[redacted] system underscores that these matching methods do not always enable definitive matching of events to Facebook accounts, let alone individual people. To the contrary, Dr. Shafiq's analysis of the Meta Pixel log file data shows that the system was able to "match 57.48 % of the events to a Facebook user,"[396] leaving nearly 39 million events "UNMATCHED" in his sample.[397]

153. Furthermore, even when Meta's "[redacted] system does make a match (*i.e.*, assigns an event to a Facebook account), as I discuss below, the process may result in incorrect matches because those assignments may be based on incorrect predictions or the matching methods may not be able to distinguish between people sharing browsers or devices.[398]

154. Specifically, Dr. Shafiq shows, as I discuss below, that the limitations of the data and technologies that compose the [redacted] he describes—namely, cookies, PII and Advanced Matching, and [redacted] algorithms—may prevent the [redacted] system from matching each event to the correct Facebook account even when a match is made.

a. *Dr. Shafiq Claims That "[redacted] Methods Can Match Event Data to Facebook Accounts Using Cookies, but Cookies Can Misidentify Facebook Accounts When Available*

155. The first step in Meta's "[redacted] system, as described by Dr. Shafiq, is to match event data to Facebook accounts using cookies.[399] As Dr. Shafiq acknowledges, cookies are not always

395 Shafiq Report, ¶ 103. *See also* Shafiq Report, ¶ 109 (citing to PIXEL_HEALTH000061560).

396 Shafiq Report, ¶ 118 ("The Meta Pixel log files include a column named [redacted] and [redacted] that identifies the specific method that Meta used to make the match. I list the the [sic] match types for a subset of domains mentioned in the complaint in Exhibit M. It shows that Meta was able to match 57.48% of the events to a Facebook user").

397 Shafiq Report, Exhibit M ("idg_match_type_report.xlsx"), tab "OVERALL."

398 Shafiq Report, ¶ 103. Dr. Shafiq cites to a document that Meta produced that states, "[b]ecause there are multiple different methods," Meta "might have *multiple identity candidates*" and would have to "just choose one," further confirming that Meta's system may make best-guess assignments rather than determining matches with certainty. Shafiq Report, ¶ 108 (presenting PIXEL_HEALTH000291033, slide 13) (emphasis in original).

399 Shafiq Report, ¶ 103 ("When the identifiers reach "[redacted] Meta's internal source code uses identity waterfall logic to match the event to a user, looking first to any cookies that are available for matching").

available to make these matches and, thus, other methods must be used.[400] Additionally, Dr. Shafiq does not consider that, because people share devices, cookies may still be used to match event data to Facebook accounts that don't belong to the user who took the action on the website, and he mischaracterizes certain properties of how cookies operate.

156. First, Dr. Shafiq acknowledges that sometimes "cookies are not available."[401] Dr. Shafiq's admission is consistent with user and developer controls (*see* **Section V**) and supported by the data. For example, 13.5 percent of the events in PIXEL_HEALTH_CWD00000131-0610 (*i.e.*, the "OSS data"), which Dr. Shafiq references in his report,[402] do not include any of the *fbp*, *fbc*, or *fr* cookies.[403] Moreover, 73.9 percent of the events in the OSS data do not include the *fr* cookie.[404]

157. Second, those events that are matched by cookies may be inaccurately matched because people share devices. A person may, for example, access a healthcare provider website on a shared browser that is still logged into another's Facebook account, potentially resulting in cookies being used to incorrectly link event data to that other person's Facebook account.

158. Finally, as I address below, Dr. Shafiq mischaracterizes cookies:

a. Dr. Shafiq claims that "[t]he Meta Pixel places and access [*sic*] cookies on user's devices when they visit websites where the Meta Pixel is installed"[405] and that "[t]he c_user, fr, and datr cookies are third-party cookies when they are set or accessed by Meta through the

---

400 Shafiq Report, ¶ 95. *See also* Shafiq Report, ¶ 103 ("[I]f no cookies are available […]").

401 Shafiq Report, ¶ 95. *See also* Shafiq Report, ¶ 103 ("[I]f no cookies are available […]").

Dr. Shafiq also notes that the _*fbp* cookie can only "be used to match an event to a person's Facebook account in any scenario where Facebook has previously set and accessed the fbp cookie in connection with a c_user or fr cookie." *See* Shafiq Report, ¶ 94.

402 *See, e.g.*, Shafiq Report, footnote 165.

403 My review of the produced schema reveals that the [redacted] ield contains a "[l]ist of all provided match keys." *See*, *e.g.*, PIXEL_HEALTH000487443. First- and third-party cookies are represented by "fbp," "fr_cookie," and "fbc" in the "all_provided_match_keys" field. In the OSS data, there are 352,614,753 observations without "fbp", "fr_cookie", or "fbc" in the "all_provided_match_keys" field, out of a total of 2,609,205,373 observations. *See* backup, "idg_match_type_string_count."

404 The *fr* cookie is represented by "fr_cookie" in the [redacted] field. In the OSS data, there are 1,927,405,494 observations without "fr_cookie" in the [redacted] field, out of a total of 2,609,205,373 observations. *See* backup [redacted]

405 Shafiq Report, ¶ 79.

Meta Pixel on non-Facebook websites."[406] However, as discussed in **Section V.B**, the Meta Pixel itself does not "place" or "set" *c_user*, *fr*, and *datr* third-party cookies. These cookies are set during interactions with the *facebook.com* domain.[407]

b. Dr. Shafiq states that, "[u]nlike traditional third-party cookies […], the Meta Pixel ghost-writes [the *_fbc* and *_fbp*] cookies as 'first-party' cookies associated with the non-Facebook site and sends these 'first-party' cookies to Facebook."[408] However, as I discuss in **Sections III.A**, **V.A**, and **V.B**, the *_fbc* and *_fbp* cookies are first-party cookies set by the first-party domains, as a result of developers' choices to implement the Meta Pixel, not by Meta. Third-party code that operates as a part of a website's code and sets first-party cookies for that website is not unique to the Meta Pixel. For instance, websites that use Stripe (the *__stripe_sid* cookie), which offers a suite of financial and payment products to businesses,[409] set a first-party cookie relevant to Stripe when visitors interact with the first-party domain.[410] For example, as shown in **Figure 39** below, when I visited *https://www.philanthropy.cam.ac.uk/civicrm/contribute/transact?reset=1&id=1492*, the *__stripe_sid* cookie was set under the first-party domain *philanthropy.cam.ac.uk*. Similar to the *_fbp* cookie, the *__stripe_sid* cookie, which takes part in fraud detection, generates a new cookie value for each website that a user visits.[411]

406 Shafiq Report, ¶ 87.

407 "Description of Cookies," Microsoft, https://support.microsoft.com/en-us/topic/description-of-cookies-ad01aa7e-66c9-8ab2-7898-6652c100999d ("First party cookies are cookies that are associated with the host domain.").

408 Shafiq Report, ¶ 90.

409 "Financial infrastructure to grow your revenue," Stripe, https://stripe.com/ ("A fully integrated suite of financial and payments products[.] Reduce costs, grow revenue, and run your business more efficiently on a fully integrated, AI-powered platform. Use Stripe to handle all of your payments-related needs, manage revenue operations, and launch (or invent) new business models").

410 *See, e.g.*, "Stripe Privacy Center," Stripe, https://stripe.com/it-si/legal/privacy-center ("For fraud detection, Stripe.js uses cookies, including `__stripe_mid`, `__stripe_sid`, and `m`, to collect signals differentiating legitimate behavior from fraudulent behavior […] Stripe cookies or similar technology are set on your domain (e.g. on your checkout flow) from the Stripe.js library. The current Stripe cookies from the Stripe.js library include fraud prevention cookies like `__stripe_mid`, `__stripe_sid`, and `m`, and also end-user authentication cookies like`pay_sid` and `__Host-LinkSession`); "Support Cambridge - Cookies list," University of Cambridge, https://www.philanthropy.cam.ac.uk/cookies-list ("__stripe_sid[:] Set for fraud prevention purposes and helps Stripe assess the risk associated with an attempted transaction").

411 "Stripe Privacy Center," Stripe, https://stripe.com/it-si/legal/privacy-center ("For fraud detection, Stripe.js uses cookies, including `__stripe_mid`, `__stripe_sid`, and `m`, to collect signals differentiating legitimate behavior from fraudulent behavior […] Stripe cookies or similar technology are set on your domain (e.g. on your checkout

**Figure 39**
**The __*stripe_sid* Cookie Was Set by First-Party Domain *philanthropy.cam.ac.uk***




b. *Dr. Shafiq Claims That "*[redacted] *Methods Can Match Event Data to Facebook Accounts Using PII, but PII Can Misidentify Facebook Accounts When Available*

159. According to Dr. Shafiq, the second step in Meta's "[redacted] system, for events not matched by the cookie matching process, is that Meta [redacted]."[412]

160. Similar to cookies, Dr. Shafiq acknowledges that Meta [redacted][3] which is supported by available evidence. In the document Dr. Shafiq presents titled, "Meta summarizes the matching methods," "[redacted] is listed as having only "[redacted] coverage.[414]

---

flow) from the Stripe.js library. The current Stripe cookies from the Stripe.js library include fraud prevention cookies like `__stripe_mid`, `__stripe_sid`, and `m`, and also end-user authentication cookies like`pay_sid` and `__Host-LinkSession`).

412 Shafiq Report, ¶ 103 ("Meta's internal source code uses identity waterfall logic to match the event to a user, looking first to any cookies that are available for matching; if no cookies are available, it looks for PII matching through Meta systems like advanced matching").

413 Shafiq Report, ¶ 103 ("[I]f no cookies are available, it looks for PII matching through Meta systems like advanced matching; and if neither of those options are available, it uses 'Identity Prediction'").

414 Shafiq Report, ¶ 112 ("Match Keys" table).

As another example, PII is not available in 90.1 percent of the events in the OSS data.[415] Finally, as I discussed above in **Section III.B.2**, automatic Advanced Matching is not allowed for certain restricted verticals, such as those websites categorized by Meta as health related.

161. Additionally, matches using PII may also be inaccurate because people share devices. A person may, for example, access a healthcare provider website on another person's browser, potentially resulting in the PII associated with the browser being used to link event data to the other person's Facebook account. In other words, even when PII is available (and it may not be), event data may still be linked to the Facebook accounts that do not belong to the user who took the action on the website.

#### c. *Dr. Shafiq Fails to Show That Meta's Identity Prediction Algorithms Can Accurately Match Event Data to Facebook Accounts*

162. According to Dr. Shafiq, the last step in Meta's "identity waterfall" utilizes IDP algorithms, which use IP addresses and User-Agent information as inputs.[416] Dr. Shafiq claims that, "if cookies are not available, Meta's internal document states that Meta will rely on IP address and User-Agent information that Meta has associated with a person's Facebook account to match data received through the Meta Pixel to the person's Facebook account."[417]

163. In the documents Dr. Shafiq presents, Meta characterizes IDP as a "last resort in our waterfall logic of matching methods"[418] and explains that the IDP system determining matches is probabilistic, meaning matches may be predicted by IDP's algorithms and are determined based

---

[415] I assume that PII is represented by values other than "fr_cookie," "fbp," "fbc," "ip_address," and "user_agent" in the [redacted] field. In the OSS data, there are 2,350,983,341 observations without these keys in the [redacted] field out of a total of 2,609,205,373 observations. *See* backup, [redacted]

[416] Shafiq Report, ¶ 103 ("Meta's internal source code uses [redacted], looking first to any cookies that are available for [redacted]; and if neither of those options are available, it uses "[redacted] based upon IP address and User-Agent").

[417] Shafiq Report, ¶ 95.

[418] Shafiq Report, ¶ 97 (presenting PIXEL_HEALTH000486625-634) ("IDP is our last resort in our waterfall logic of matching methods").

A13-4380

on the predicted probability that a match may be correct.[419] For example, 52.4 percent of the events in the OSS data with only IP address and User-Agent information were "UNMATCHED" to a Facebook account,[420] and a further 45.4 percent were "PREDICTED,"[421] which Meta describes as a "probabilistic" match.[422]

164. Consistent with this, according to Meta, the IDP system may predict multiple matches for the same event data.[423] Dr. Shafiq, however, describes no method for how to determine the correct Facebook account when multiple have been predicted as potential matches.

### 2. *Dr. Shafiq Misuses the Concept of Entropy to Imply, Incorrectly, That Information Collected by Meta Can Identify All Facebook Users That Would Be Part of a Proposed Class*

165. Dr. Shafiq claims that "[g]iven that the number of Internet users on Earth is ≈ 4 billion, the number of required entropy bits to uniquely identify a user or device on the internet is $\log_2$(4

---

419 The name "identity prediction" itself implies what the algorithm does: as stated in the "Future of Identity Prediction" document Dr. Shafiq discusses, IDP comprises "[p]robabilistic […] algorithms that use probabilistic match keys" to identify Facebook users. *See* Shafiq Report, ¶ 97 (presenting PIXEL_HEALTH000486625-634). *See also* PIXEL_HEALTH000420769-775 at 770 ("PREDICTED" is described by Meta as a match resulting from applying IDP and is "Probabilistic"); Shafiq Report, ¶ 114 (citing to PIXEL_HEALTH001369398-422) ("Under 'Probabilistic Matching,' Meta 'use[s] ML-based predictive models to create a match … This is also referred to as identity prediction and we use an approach called Deterministic Sync,' which 'relies on a user having logged in Facebook … in the last 90 days in order to associate their browser identity or Device ID to the Facebook user identity … we leverage prediction algorithms to infer an association between offsite signals and Facebook Identity. The simplest algorithm/feature is IP sequencing, which leverages frequency of the co-occurrence of User's [*sic*] X's browser identity pair appears on the same IP to infer the likelihood of browser identity belong [*sic*] to a Facebook user'").

420 In the OSS data, 184,120,474 observations have an "UNMATCHED" value in the [redacted] field out of a total of 351,390,763 observations with only "ip_address" and "user_agent" in the [redacted] field. *See* backup, [redacted]

421 In the OSS data, 159,576,895 observations have a "PREDICTED" value in the [redacted] field out of a total of 351,390,763 observations with only "ip_address" and "user_agent" in the [redacted] field. *See* backup, [redacted]

The final approximately 2 percent of observations in the OSS data have values "SHORT_WINDOW_MATCH," "LAST_USER," "MULTIPLE_ACCOUNT_MATCH," "SERVER_FRCOOKIE," "CURRENT_LOGIN," or no value at all in the [redacted]. *See* backup, [redacted]

422 "PREDICTED" is described by Meta as the "[p]robabilistic" match resulting from applying IDP. *See* PIXEL_HEALTH000420769-775 at 770.

423 PIXEL_HEALTH000420769-775 at 770 ("Based on patterns of IP Address and UA from onsite events, users are matched to offsite events based on Matched by Identity Prediction Service (based on a ML model combining IP clustering and Composite Clustering features). Prediction signals are IP address and parsed user agent of the request. There could be multiple predicted users").

billion) = 31.897 ≈ 32 bits."[424] Dr. Shafiq further asserts that if individual pieces of data "together exceed approximately 32-bits of entropy, then that set of information is deemed to be identifiable."[425] Dr. Shafiq then concludes that "the identifying information collected by Meta Pixel easily exceeds the 32-bit threshold."[426] He later describes Meta's "[redacted] system, which he claims uses the same type of information—purportedly exceeding this 32-bit threshold—to match event data to Facebook accounts.[427] However, Dr. Shafiq's argument misapplies the concept of entropy: assigning a unique identifier to each user is not the same as identifying a particular individual. While 32 bits of entropy may be sufficient to assign a unique identifier to every individual within a population, that does not mean those 32 bits of entropy—or any number of bits—can or cannot reveal the identity of any particular individual. As such, Dr. Shafiq's entropy analysis does not establish that the information he claims is incorporated into the "[redacted] system can be used to identify any particular Facebook account or user.

166. Entropy measures the amount of information needed to distinguish among all possible outcomes in a system. It does not measure whether the available information is adequate to identify any particular individual; rather, it reflects the theoretical amount of information an identifier could contain to uniquely distinguish—not identify—every individual within a population.[428] For example, a lottery ticket with a seven-digit number (assuming that each digit can be any number between 0 and 9) has enough possible combinations to assign a unique number to ten million participants. However, knowing a specific ticket number does not reveal who actually purchased that lottery ticket. Similarly, while 32 bits of entropy are enough to assign a unique

---

424 Shafiq Report, ¶ 99.

425 Shafiq Report, ¶ 100.

426 Shafiq Report, ¶ 101.

427 Shafiq Report, ¶ 103 ("When the identifiers reach "[redacted] Meta's internal source code uses [redacted] looking first to any cookies that are available for matching; [redacted]; and if neither of those options are available, it uses [redacted] based upon IP address and User-Agent").

428 Kubat, Miroslav, *An Introduction to Machine Learning*, 2 Ed., Springer, 2017, pp. 119-121 ("Entropy (Average Information Contents) […] the case with [minimum entropy] is regarded as perfect regularity because all examples belong to the same class; conversely, the case with [maximum entropy] is seen as a total lack of regularity […] The concept of entropy (lack of regularity) will help us deal with the main question: how much does the knowledge of the value of a discrete attribute […] tell us about an example's class?").

value to each of roughly four billion Internet users, as Dr. Shafiq notes, this does not mean those bits of information can reveal the identity of the individual associated with any particular value.

167. Dr. Shafiq's discussion of IP addresses and cookie values demonstrates his misuse of the concept of entropy, where he conflates the bit length of these pieces of information with whether they can identify specific individuals in practice.[429] As I discussed in **Section III.A**, IP addresses, which Dr. Shafiq describes as 32-bit in length, do not uniquely identify individual users: multiple users can share a single IP address, a single user can use multiple IP addresses, and users can mask their IP address using VPNs. Dr. Shafiq also fails to consider that the 32 bits reflect only IP addresses' theoretical entropy, whereas in the real world not all IP addresses are actually used.[430] Moreover, Dr. Shafiq overlooks that IP addresses are dynamic and can change over time, such that a single device may be associated with different IP addresses.[431] Similarly, while a cookie value of a given length may theoretically contain enough characters to assign a unique value to every individual within a population, that does not mean it can always identify the person associated with that cookie value. Moreover, cookies can be deleted, reset, or blocked at any time, and may be shared across multiple users (for example, users sharing the same browser).[432]

---

[429] Shafiq Report, ¶ 101 ("An IPv4 address alone can provide up to 32 bits of entropy, and IPv6 addresses extend to 128 bits. […] Cookies storing Universally Unique Identifiers (UUIDs) such as Meta's *c_user* cookie encode 128 bits by design, sufficient to uniquely distinguish every user").

[430] *See, e.g.,* Heidemann, John et al., "Census and Survey of the Visible Internet," *IMC'08: Proceedings of the 8th ACM SIGCOMM conference on Internet measurement*, pp. 169-182, p. 169 ("We then use these tools to evaluate address usage, where we find that only 3.6% of allocated addresses are actually occupied by visible hosts, and that occupancy is unevenly distributed, with a quarter of responsive /24 address blocks (subnets) less than 5% full, and only 9% of blocks more than half full"), Almohri, Hussain M.J. et al., "Predictability of IP Address Allocations for Cloud Computing Platforms," *IEEE Transactions on Information Forensics and Security*, Vol. 15, p. 1 ("We analyze the IP address allocation behaviors in two major cloud computing providers (Amazon Web Services and Google Cloud Platform) and find that the actual entropy provided by allocated IP addresses is limited").

[431] IP addresses are assigned dynamically. As a result, a device's IP address can change over time. *See* Hilson, Gary, "Static IP vs. dynamic IP addresses: Understanding the difference," Verizon Business, https://www.verizon.com/business/resources/articles/s/understanding-the-difference-between-static-ip-vs-dynamic-ip-addresses/ ("A dynamic IP address is a temporary address for devices connected to a network that continually changes over time. Most devices use dynamic IP addresses, which are assigned by the network when they connect. Dynamic IP addresses are automatically assigned by the network via Dynamic Host Control Protocol (DHCP)").

[432] *See*, *e.g.*, "Delete, allow and manage cookies in Chrome," Google Chrome Help, https://support.google.com/chrome/answer/95647 ("You can choose to delete existing cookies, allow or block third-party cookies, and set preferences for certain websites").

### 3. *Dr. Shafiq Mischaracterizes Meta's Mapping Between SIDs and UIDs to Imply Incorrectly That Meta Can Link All Event Data to Facebook Accounts*

168. Dr. Shafiq claims that, when an event is matched through the "[redacted] system, the resulting event data is stored with a SID[433] and that Meta "maintains a mapping between each [SID] and the user's Facebook account ID (also called UID),"[434] concluding that "Meta has linked the information collected via Meta Pixel on a non-Facebook website to a Facebook account holder."[435] However, Dr. Shafiq fails to consider that, as I discuss in **Section V.C.2**, users can use OMT controls to prevent OMT activity from being associated with their Facebook accounts. In most cases, when a user uses OMT controls, Meta removes the mapping between UID and SID within 48 hours and assigns new SID values on a daily basis.[436] To put this into perspective, if a user disconnects their activity for a full year while still interacting with non-Meta websites that integrated the Meta Pixel, Meta may generate more than 360 distinct SID values that, following removal of the UID–SID mapping, would no longer be mapped to a UID.

---

433 A SID, as I describe in **Section V.C.2**, is an internal identifier used by Meta to link event data to other data. Shafiq Report, ¶ 117 ("Meta maintains for each user a 'separable ID' (also called SID), which is a unique internal identifier, and also maintains a mapping between each separable ID and the user's Facebook account ID (also called UID)").

434 A UID is an internal identifier used by Meta to identify Facebook accounts. Shafiq Report, ¶ 117 ("Meta maintains for each user a 'separable ID' (also called SID), which is a unique internal identifier, and also maintains a mapping between each separable ID and the user's Facebook account ID (also called UID)").

435 Shafiq Report, ¶ 117 ("Each record in the Meta Pixel log files show whether or not Meta matched the identifying information collected via Meta Pixel to a specific Facebook user. For example, Meta Pixel log files include a column named [redacted]. The presence of a value in this column indicates that Meta matched the event data to a Facebook account holder. If not, this column is empty. Meta maintains for each user a 'separable ID' (also called SID), which is a unique internal identifier, and also maintains a mapping between each separable ID and the user's Facebook account ID (also called UID). In other words, when the [redacted] column is populated, Meta has linked the information collected via Meta Pixel on a non-Facebook website to a Facebook account holder").

436 Patel, Mayur et al., "Redesigning our systems to provide more control over Off-Facebook activity," Meta, August 20, 2019, https://engineering.fb.com/2019/08/20/core-infra/off-facebook-activity/ ("In most cases, when a person uses Off-Facebook Activity to disconnect that information, we remove this mapping between the UID and SID within 48 hours, which breaks the process of joining individual rows in data warehouse tables with a user account […] If a person chooses to have off-site activity disconnected going forward, we automatically disconnect it and rotate SIDs on a daily basis").

### C. Opinion 3: Dr. Shafiq Fails to Provide a Reliable Method to Identify Patient Button Clicks, Health Information, or Prescription Drug Information

169. Dr. Shafiq was asked to opine on whether "Meta collected and can programmatically identify data collected from healthcare provider websites that relate to class member communications involving (a) Patient Button Clicks, (b) Health Information, and (c) Prescription Drug Information."[437] Dr. Shafiq asserts that "Meta or any other competent entity" can do so.[438] As above, "programmatically" means the "creation of a computer program that can be used to answer the question presented in an objective and accurate fashion."[439]

#### *1. Dr. Shafiq Fails to Provide a Reliable Method to Identify Button Clicks*

170. Dr. Shafiq purportedly offers a methodology to "programmatically identify" "patient button clicks"[440] ("Buttons") into four categories: "Portal," "Payment," "Assessment," and "Schedule" (collectively, "Button Categories"). Dr. Shafiq claims that he "developed three approaches for this task": (1) manual labeling based on human review ("Manual Labeling"); (2) manually crafted patterns for automated classification ("Pattern Matching Approach"); and (3) a machine learning model for fully automated classification ("Machine Learning Approach").[441] For all three approaches, Dr. Shafiq appears to have relied on the same sample set of 25,126 Buttons (the "Sample Set").[442] All approaches offered by Dr. Shafiq are unreliable because they suffer from significant methodological flaws, yield outcomes that he does not justify, and are evaluated using a misleading methodology.

---

437 Shafiq Report, ¶ 126.

438 Shafiq Report, ¶¶ 12(a), 44-48, 137.

439 Shafiq Report, ¶ 138.

440 Shafiq Report, ¶¶ 137, 139 ("I was asked by Counsel whether Meta could programmatically identify 'Patient Button Clicks' (described below). […] I created a program to objectively classify button clicks in the Meta Pixel logs (SubscribedButtonClick events in Pixel Button Click and Inferred Website Events tables)").

441 Shafiq Report, ¶¶ 137-145.

442 Shafiq Report, ¶ 143, footnote 193.

*a. Dr. Shafiq's Sample Set Is Not Replicable and He Does Not Establish That It Is Representative*

171. Dr. Shafiq's selection of the 25,126 Buttons is not replicable.[443] In addition, Dr. Shafiq does not establish that his sample of Buttons is representative, and thus, as I discuss in **Section VII.A.1.a**, cannot be relied on as support for any conclusions about a larger population, such as Buttons more generally.

172. In the first instance, Dr. Shafiq's methodology depends on having a list of domains. Dr. Shafiq claims to have applied his methodology to "1,844 healthcare provider domains for which Meta produced class data" and cites to "Exhibit I: 2023-06-21 Meta Medical Provider Sites.csv."[444] However, Exhibit I provided by Dr. Shafiq contains 3,207 domains, not 1,844.[445] Therefore, Dr. Shafiq's methodology is not replicable from the start, as it is unclear what list of domains Dr. Shafiq intended to focus on.

173. Dr. Shafiq creates the Sample Set by taking the "top 10% of buttons (sorted by number of events)" per domain, capped at 100 per domain plus 100 randomly selected.[446] However, Dr.

---

443 *See*, *e.g.*, "Improving Reproducibility and Replicability in Research: Highlights From Three National Academies Reports," The National Academies of Sciences Engineering Medicine, 2019, https://nap.nationalacademies.org/resource/25303/Combined%20Reproducibility%20Brief%20vs2.pdf, p. 2 ("Replicability. One important way to confirm or build on previous results is to follow the same methods, obtain new data, and see if the results are consistent with the original ones"); Salanié, Bernard, "Instructions for Submitting Articles," Journal Of The Econometric Society, https://www.econometricsociety.org/publications/quantitative-economics/submissions/instructions-for-submitting-articles ("Prior to acceptance, authors must provide the raw data, code, and sufficient documentation to enable replication of all results presented in the paper and any approved online appendices"); Kopper, Sarah and Anja Sautmann, "Randomization," The Abdul Latif Jameel Poverty Action Lab, September 2023, https://www.povertyactionlab.org/resource/randomization ("Regardless of method, the randomization procedure should be verifiable, replicable, and stable, and the randomization outcome saved in a secure file or folder away from other project files. […] Set the seed for the random number generator (in Stata, set seed). Make sure that the seed is: 1. Preserved"); Nosek, B. A. et al., "Promoting an open research culture," *Science*, Vol. 348, No. 6242, June 26, 2015, pp. 1422-1425, p. 1422 ("Transparency, openness, and reproducibility are readily recognized as vital features of science. When asked, most scientists embrace these features as disciplinary norms and values"); Zogmaister, Cristina et al., "Assessing the Transparency of Methods in Scientific Reporting," *University of California Press*, Vol. 10, No. 1, 2024, p. 2 ("For instance, a certain effect might be affected by participants' characteristics, that differ in the original and in the replication study, as for example socioeconomic status […] Lack of transparency in the description of the population and sampling methods could hinder the possibility of discovering this difference between the two studies").

444 Shafiq Report, ¶ 139, footnote 191. Exhibit I to the Shafiq Report does not include this file.

445 2023.06.21 - Meta Medical Provider Sites.csv.

446 Shafiq Report, ¶ 143, footnote 193 ("Within each domain, the top 10% of buttons (sorted by number of events) were selected. If more than 10,000 buttons were present for any domain, the top 100 buttons were selected and

Shafiq did not disclose the random seed,[447] making replication of the Sample Set impossible. In fact, Dr. Shafiq acknowledged in deposition that the Sample Set is not replicable.[448]

174. Furthermore, Dr. Shafiq claims to sample Buttons by taking the "top 10% of buttons" per domain. According to Dr. Shafiq's description of his sampling methodology,[449] it means that the Sample Set should contain all domains that are present on the 1,844 list and are associated with the SubscribedButtonClick events in the Inferred Website data, which is 317 domains.[450] However, his sample only contains 304 domains. This means that 13 websites that are included in Plaintiffs' list of 1,844 domains and which are associated with SubscribedButtonClick events in the Inferred Website data, such as *ohiohealth.com*, *ucdavis.edu*, and *alliancehealthclinton.com*, do not appear in the Sample Set, with no justification from Dr. Shafiq.[451]

175. In addition to failing to disclose his approach to allow replication, Dr. Shafiq does not explain why 25,126 Buttons are representative of all Buttons that are included in the 304 domains, let alone all other domains not included in the Sample Set. As I discussed above, a non-

augment with 100 randomly selected buttons were added to the sample. This resulted in a sample of 25,126 buttons").

447 A random "seed" is the initial value used in a pseudorandom number generator to create a unique sequence of outputs. It can be used to reproduce the same random sequence. *See* "VBE Glossary," Microsoft Learn, https://learn.microsoft.com/en-us/office/vba/language/glossary/vbe-glossary#seedseed ("seed: An initial value used to generate pseudorandom numbers. For example, the Randomize statement creates a seed number used by the Rnd function to create unique pseudorandom number sequences"). *See also* "How do lava lamps help with Internet encryption?," Cloudflare, https://www.cloudflare.com/learning/ssl/lava-lamp-encryption/ (" A software program called a pseudorandom number generator (PRNG) is able to take an unpredictable input and use it to generate unpredictable outputs. Theoretically, a PRNG can produce unlimited random outputs from a random input […] When given the same seed to start with twice in a row, a PRNG will produce the exact same results"). *See also* Shafiq Report, ¶ 139, footnote 193.

448 Shafiq Deposition, 219:1-6 ("Q. You've provided the sample, but if someone wanted to replicate your sampling process, they could not do that; right? A. I believe Paragraph 193 explains how would one go about creating this sample. If that someone is competent, then they could use this process, that is described here, to create that sample. Q. But their 100 random buttons might be different than your 100 random buttons; correct? A. […] I think what you just described is what 'random' means").

449 Shafiq Report, ¶ 143 ("In the first approach, a sample of buttons from inferred_website_events were manually classified into one or more of the four categories, establishing ground truth for the analysis"); footnote 193 ("Within each domain, the top 10% of buttons (sorted by number of events) were selected. If more than 10,000 buttons were present for any domain, the top 100 buttons were selected and augment with 100 randomly selected buttons were added to the sample. This resulted in a sample of 25,126 buttons").

450 *See* backup, "shafiq_sample_set."

451 *See* backup, "shafiq_sample_set."

representative sample may reflect peculiarities of that sample rather than the population of interest and may not generalize to the broader intended target population.[452] Dr. Shafiq provided no justification for excluding other websites—such as the remaining 13 websites from the list of 1,844 domains he refers to, the approximately 3,207 websites referenced in the updated list produced by Plaintiffs (which he appears to have miscited), other domains associated with the SubscribedButtonClick events in the produced Inferred Website and Pixel Button Clicks data, which Dr. Shafiq excludes from analysis with no justification, or any additional websites that may have transmitted SubscribedButtonClick events to Meta.

176. Moreover, the way Dr. Shafiq selected Buttons within those websites requires similar justification, which he also does not provide. Dr. Shafiq's methodology selects only the top 10 percent of Buttons by number of events from each selected website and limits the number of Buttons analyzed per domain. However, he does not explain why such constraints would yield a representative sample of Buttons for each website.

177. Dr. Shafiq's Button selection process lacks any mechanism to ensure replicability or representativeness of his sample, and Dr. Shafiq provided no documentation or rationale addressing these deficiencies. He nevertheless depends on this Sample Set for all three approaches.

*b. Manual Labeling*

178. In Dr. Shafiq's Manual Labeling approach, contract employees manually reviewed and labelled the Sample Set to correspond with the Button Categories. I understand from Dr. Shafiq's testimony that the contract employees were "laypeople […] recruited by counsel and [] based in the U.S."[453] Dr. Shafiq testified that he did not recall the exact number of employees that

---

452 *See*, *e.g.*, Triola, Mario F., *Elementary Statistics*, 12 Ed., Boston, MA, Pearson Education, 2014, p. 75 ("Using data from a voluntary response (self-selected) sample is a really bad idea, because such a sample could very easily be biased in that it might not be at all representative of the population"), p. 715 ("Researchers can intentionally or unintentionally bias their study by the way in which subjects are selected. *Sampling bias* occurs when some individuals are more or less likely to be included in a study, and the result is a sample that is not random. Sampling bias can seriously distort the interpretation of study results and result in wrong or misleading conclusions").

453 Shafiq Deposition, 220:2-221:10 ("Q. So counsel supervised the initial labor -- labeling process in Paragraph 143? […] Were the contract em- -- employees attorneys or data scientists? A. It is my understanding they were laypeople. Q. […] Do you know how they were recruited? […] Do you have any idea where they came from? […] A. It is my understanding that these people were recruited by counsel and they are based in the U.S.").

were needed to review the Sample Set, but approximated that it took around ten people to complete the task.[454] Dr. Shafiq described "the process of labeling" as a "one shot" approach in which the contract employees were given Dr. Shafiq's instructions, "and then these employees were supposed to go through the sample of buttons."[455]

179. Though Dr. Shafiq presents this as the first of three approaches, he fails to explain how to scale what he refers to as "a tedious exercise" to more than 25,126 Buttons. Instead, Dr. Shafiq relies on Manual Labeling to "establish[] ground truth for the analysis."[456] In other words, Dr. Shafiq evaluates his other two methods (specifically, the Pattern Matching Approach and Machine Learning Approach) by comparing their outputs to the Button classifications produced by this manual review that Dr. Shafiq claims is "ground truth." Accordingly, the validity of his evaluation of his other two methods relies on the accuracy of the classifications assigned to Buttons through manual review. If the classifications are wrong, the reported "accuracy" is meaningless.

180. In fact, some of the Buttons were classified by the contract employees in ways that may not correspond to Dr. Shafiq's definitions of Button Categories.[457] **Figure 40** details a number of examples, including:

a. Employee portal Buttons that were classified under Dr. Shafiq's "Portal" category (*e.g.*, a Button associated with a destination to "*myhr.bannerhealth.com*" or a Button with the destination "*portal.lmhosp.org*" and Button Text "Employee Portal") despite Dr. Shafiq

---

454 Shafiq Deposition, 221:11-19 ("Q. How many contract employees were there? A. Sitting here today, I do not exactly recall the number of contract employees. […] [I]f my memory serves me correctly, I think ten is a good approximate number of […] contract employees that were used to […] do the manual classification").

455 Shafiq Deposition, 222:8-14 ("Q. And did you answer any questions from the contract employees as they worked their way through the process of labeling the sample? A. The process of labeling was -- the way I would describe it is one shot. I gave them instructions, and then these employees were supposed to go through the sample of buttons").

456 Shafiq Report, ¶¶ 143, 146, footnotes 199-200.

457 In this section, I provide examples of Dr. Shafiq's methodologies producing results that appear to be inconsistent with his own instructions and definitions. I do not opine on what constitutes accurate classification, but rather note that Dr. Shafiq's labeling and classification results are potentially inconsistent and, at minimum, require further validation that Dr. Shafiq failed to provide.

defining "Portal" to include only those Buttons that provide "patient portal login, logout, or signup"—not access to employee portals.[458]

b. Buttons that allow website visitors to register for health fairs that were classified under Dr. Shafiq's "Schedule" category, despite Dr. Shafiq defining "Schedule" to include only those Buttons allowing "scheduling or checking-in for an appointment with a doctor/provider online or by making a phone call."[459]

c. Buttons allowing student and instructor onboarding tests that were classified under Dr. Shafiq's "Assessment" category, despite Dr. Shafiq defining "Assessment" to include those Buttons that provide an "accessing or completing a health risk assessment/quiz" and "exclude general materials about health conditions where there is no health risk assessment/quiz."[460]

---

458 Shafiq Report, ¶ 139.a. Shafiq Report, Exhibit L ("manual label.xlsx"), rows 1,348-1,353 and 11,644.

459 Shafiq Report, ¶ 139.d. Shafiq Report, Exhibit L ("manual label.xlsx"), rows 12,525.

460 Shafiq Report, ¶ 139.c. Shafiq Report, Exhibit L ("manual label.xlsx"), rows 22,476.

**Figure 40**
**Select Button Classifications from Dr. Shafiq's "Ground Truth"[461]**

| ID | Resolved Document Link | Button Text | Button Destination | Category |
|---|---|---|---|---|
| 101750 | https://www.bannerhealth.com/employees/employee-resources | outside the Banner computer system | https://myhr.bannerhealth.com/?_ga=2.110993413.1626999127.1679109017-548296198.1673921441 | Portal |
| 101896 | https://www.bannerhealth.com/employees/employee-resources | outside the Banner computer system | https://myhr.bannerhealth.com/?_ga=2.117651401.1777115939.1682010860-2023967763.1675610745 | Portal |
| 104869 | https://www.bannerhealth.com/employees/employee-resources | outside the Banner computer system | https://myhr.bannerhealth.com/?_ga=2.249267331.528174272.1678318884-895980846.1620163192 | Portal |
| 104943 | https://www.bannerhealth.com/employees/employee-resources | outside the Banner computer system | https://myhr.bannerhealth.com/?_ga=2.25267709.1793282597.1681867793-118796148.1678736381 | Portal |
| 106234 | https://www.bannerhealth.com/employees/employee-resources | outside the Banner computer system | https://myhr.bannerhealth.com/?_ga=2.64053615.1505215195.1678473364-902362461.1673498049 | Portal |
| 106344 | https://www.bannerhealth.com/employees/employee-resources | outside the Banner computer system | https://myhr.bannerhealth.com/?_ga=2.68668562.2024515365.1681674061-1309545862.1654464370 | Portal |
| 539213 | https://www.dmc.org/health-professionals/im-an-employee-or-physician | Portal | https://www.dmc.org/portal | Portal |
| 567839 | https://www.frederickhealth.org/employer-solutions/isystoc-login/ | LOGIN NOW | https://secure-web.cisco.com/1QYfQb04vdv1jidIdQdoT3J09q0ZYxrDE26s1WiK8APzLJJdBiHxe1KKK7YBEIThMlnIVzhk18cz0PWH82cCildJtsPk8PdNmiDQN8yLWwMChNCIgi8rEa0Jb-35nQ-HfFNKmcB6Yl9gJbEwdGqV2pPUejRjVeP0XRrpHAjoc7MBrXXqFczdfRNJjv0zoiuyJBLsw4klRta6UDXmKVDGAs8hnUWLEXyBfFAQIUQzpoFq5Xo4NtxbYliKPrymX69cv51PvpEShqul9LAbHuVgafV8w6IlEZBa9V6jgoNYxl620vAxOMhnFnibip_ATPIVbv1vVy2-Z3VlHx3u9_CJ2SlBzk_fPujewBAZeXAVhtKuHyFsyzyTPW0BjsW7Rz8S2vJh7pzhyh1fXl31jDYI-SybNBH9jWVWnBwpJW_WkTdA/https\u00253A\u00252F\u00252Fisystoc.systocemr.com\u00252Fmdfredh\u00252Flogin.aspx | Portal |
| 718209 | https://www.lmhospital.org/employees | Employee Portal | https://portal.lmhosp.org/ | Portal |
| 726978 | https://www.marylanning.org/health-fair-registration/ | Submit Pre-Registration | https://www.marylanning.org/health-fair-registration/ | Schedule |
| 776557 | https://www.medstarhealth.org/blog/new-myhr-login-process | Login Now | http://www.myhrmedstar.net/ | Portal |
| 1052216 | https://northmemorial.com/location/maple-grove-hospital/?utm_source=google&utm_medium=organic&utm_campaign=local&utm_content=_removed_ | MyHR\nOpens in new window | https://myhrnorthmemorial.ultipro.com/ | Portal |
| 1070701 | https://www.paramounthealthcare.com/services/employers/plans-and-services/dental | MyParamount Login | https://www.myparamount.org/ | Portal |
| 1192608 | https://www.tmh.org/healthcare-professionals/student-and-instructor-onboarding/ | Take Post Test | https://www.tmh.org/healthcare-professionals/student-and-instructor-onboarding/student-and-instructor-onboarding-post-test | Assessment |
| 1268828 | https://uihc.org/university-employee-health-clinic-uehc | Getting started with ReadySet | \ | Portal |
| 1268861 | https://uihc.org/university-employee-health-clinic-uehc | ReadySet login for current employees | https://idp.uiowa.edu/idp/profile/SAML2/Unsolicited/SSO?providerId=https://uiowa.readysetsecure.com/rs/rest/samlsso | Portal |

461 Shafiq Report, Exhibit L ("manual label.xlsx").

A13-4391

c. *Pattern Matching Approach*

181. In computer science, "patterns" refer to recurring relationships that can be automatically detected in data. Pattern analysis enables generalizing the identified patterns to new data, predicting or classifying that new data without human input:[462]

> Pattern analysis deals with the automatic detection of patterns in data, and plays a central role in many modern artificial intelligence and computer science problems. By patterns we understand any relations, regularities or structure inherent in some source of data. By detecting significant patterns in the available data, a system can expect to make predictions about new data coming from the same source. In this sense the system has acquired generalisation power by 'learning' something about the source generating the data. […] By exploiting the knowledge extracted from a sample of data, they are often capable of adapting themselves to infer a solution[.]

The particular keywords and examples that Dr. Shafiq selected (*i.e.*, his "patterns") do not meet this definition. Dr. Shafiq fails to explain how the particular keywords and examples that Dr. Shafiq selected (*i.e.*, his "patterns") generalize to new data.[463]

182. Dr. Shafiq testified in his deposition that he selected his "patterns" based on the same sample that he used to evaluate the accuracy of his "patterns."[464] Of the 741 Button destination "patterns" and 142 Button text "patterns" Dr. Shafiq selected, 305 (nearly half) and 109 (more than three-quarters), respectively, are exact values from the sample set—also used in Manual Labeling and in evaluation of his Pattern Matching and Machine Learning approaches—showing that Dr. Shafiq's "patterns" merely restate the data content as opposed to identifying

462 Shawe-Taylor, John and Nello Cristianini, *Kernel Methods for Pattern Analysis*, New York, NY, Cambridge University Press, 2004, pp. 3-5.

463 Shafiq Report, ¶¶ 141-153.

464 Shafiq Deposition, 217:15-20 ("Q. And you had -- you manually crafted them from the sample of 25,126 buttons? A. The goal of these manually crafted patterns was to classify -- was to classify buttons that were in the sample with high precision. Q. Right. So, for example, if your sample hadn't included the domain capitalhealth.com, you wouldn't have included the button in Line 44 which is 'capital health.com/user/%' (as written); right? A. If you're asking me if the sample did not exist, then I think it is a true statement. Then if there is no sample, then you would not be able to implement the methodology that I'm describing here. But the methodology, as described, is implemented on the data that is also described in the report in the manner which is also described in the report").

underlying patterns within the data.[465] For instance, the Button "VBE\/HRA Questionnaire" associated with *medicareapply.healthmarkets.com* is categorized as an "Assessment" Button precisely because the same Button text, "VBE\/HRA Questionnaire," is a pattern included by Dr. Shafiq.[466]

183. Dr. Shafiq's approach and this result represent a textbook case of overfitting.[467] Because the same dataset was used both to construct the patterns and to test them, the evaluation is circular: the patterns were designed to perfectly reproduce classifications already known from manual review. In other words, Dr. Shafiq's claimed 99 percent accuracy is artificial and uninformative of how accurate his "patterns" would be when applied to a different set of data. The true measure of a model's accuracy is not how well it can predict or label the data it was trained on but how well it performs on previously unseen test data, so practitioners typically employ techniques such as cross-validation, regularization, and using sufficiently large and representative training datasets to ensure that a model's performance reflects true predictive ability rather than spurious correlations.[468]

---

465 I also observe that, when removing the trailing "%" wildcard character, which Dr. Shafiq commonly appends to URLs which he has "crafted" as "patterns," the number of Button destination patterns that match values in the sample data increases to 386. *See* backup, "shafiq_patterns."

466 Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Results," row number 9,250 and tab "Button Text Patterns," at row number 61.

467 *See, e.g.,* Dalton, Lori A. and Edward R. Dougherty, "Small-Sample Classification," *Information Science for Materials Design and Discovery*, 2016, pp. 77-101, p. 81 ("A classification rule can yield a classifier that makes few errors, or even no errors, on the training data but performs poorly on the distribution as a whole, a situation called *overfitting*. This situation I exacerbated by the use of complex classifiers with small samples"); Kuhn, Max and Kjell Johnson, *Applied Predictive Modeling*, Springer, 2016, p. 62 ("In addition to learning the general patterns in the data, the model has also learned the characteristics of each sample's unique noise. This type of model is said to be over-fit and will usually have poor accuracy when predicting a new sample"). James, Gareth et al., *An Introduction to Statistical Learning with Applications in R*, 2 Ed., June 21, 2023 Second Edition, 2021, p. 30 ("[I]n general, we do not really care how well the method works on the training data. Rather, we are interested in the accuracy of the predictions that we obtain when we apply our method to previously unseen test data"); Kuhn, Max and Kjell Johnson, *Applied Predictive Modeling*, Springer, 2016, pp. 69-70 ("k-Fold Cross-validation: The samples are randomly partitioned into k sets of roughly equal size.[…] The k resampled estimates of performance are summarized (usually with the mean and standard error) and used to understand the relationship between the tuning parameter(s) and model utility."), p. 125 ("Thus, the lasso yields models that simultaneously use regularization to improve the model and to conduct feature selection."), p. 177 ("Once the full tree has been grown, the tree may be very large and is likely to over-fit the training set. The tree is then *pruned* back to a potentially smaller depth."); PIXEL_HEALTH000000023-043 at 026 ("Feature importance workflow runs select features from a large feature pool. This is used to select a fixed amount of top features on demand from the newly proposed features, v0 model features and FAST pool").

468 *See*, *e.g.*, James, Gareth et al., *An Introduction to Statistical Learning with Applications in R*, 2 Ed., June 21, 2023 Second Edition, 2021, p. 30 ("[I]n general, we do not really care how well the method works on the training

184. As I show below, Dr. Shafiq's "patterns" include highly specific keywords and examples that he failed to explain how they could be applicable to data outside the sample he used to select his "patterns":

a. Highly specific Button texts:

i. "DENTEGRA MEMBER LOGIN AND RESOURCES"[469]

ii. "0-0-0 Request an Appointment"[470]

iii. "DELTA DENTAL MEMBER LOGIN AND RESOURCES"[471]

iv. "Pay your monthly Paramount premium"[472]

v. "BEEBE MEDICAL GROUP%\nPORTAL"[473]

b. "Patterns" that contain each other, such as "**Schedule Appointment**," "**Schedule Appointment** Now," and "**SCHEDULE APPOINTMENT** ONLINE\nOPENS IN NEW WINDOW." (emphasis added).[474]

c. Different variations of "taking a quiz" Button texts: "Take a Quiz," "TAKE OUR FREE DIGESTIVE HEALTH ASSESSMENT HERE!," "Take Our Heart Risk Assessment%," "Take Quiz," "Take the free Quiz," "Take the Quiz," "Take the stroke signs, symptoms, and treatments quiz."[475]

---

data. Rather, we are interested in the accuracy of the predictions that we obtain when we apply our method to previously unseen test data").

469 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," row 15.

470 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," row 63.

471 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," row 14.

472 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," row 38.

473 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," row 11.

474 *See, e.g.,* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," rows 129-131. Dr. Shafiq does not explain whether he applies his patterns as case sensitive or not. In any case, the term "Schedule Appointment" is present in multiple patterns. Dr. Shafiq does not explain why the same term appears in multiple patterns.

475 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," rows 53-59.

d. Button texts as they are, even with special characters that do not seem to contribute to the generalizability of the "patterns": "START BUTTON**...**," "Book an**n**Appointment," or "0**\n\n**Admission" (emphases added).[476]

e. Instances of destination "patterns" being exact phone numbers, even including "tel:" at the beginning and even with special characters "-" (*e.g.*, "tel: 315-867-2700," "tel:+12288675000," or "tel:518-234-2555").[477]

f. Exact URLs as they appear in the data:

i. *https://info.adventisthealth.org/site/core/#risk* (even including URL "anchor" that points to a specific part of the webpage)[478]

ii. *https://www.wth.org/financial-assistance-billing/financial-assistance/self-pay/*[479]

iii. *https://mycw107.ecwcloud.com/portal14650/jsp/100mp/login_otp.jsp*[480]

g. Exact URLs that are duplicates of each other (*e.g.*, destination *https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html* is included by Dr. Shafiq twice).[481]

h. Button destination "patterns" that contain a domain name, indicating they are only applicable to a specific domain. For example, "pattern" *https://www.westbocamedctr.com/services/obstetrics/online-pre-registration* will only be applicable to Buttons pointing to the *westbocamedctr.com* domain.[482]

185. As Dr. Shafiq testified, new datasets "may need" new patterns to classify the data, confirming that the particular "patterns" he selected are not generalizable and cannot classify new data

[476] *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Text Patterns," rows 23, 70, 62.

[477] *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Destination Patterns," rows 724-742.

[478] *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Destination Patterns," rows 610.

[479] *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Destination Patterns," rows 582.

[480] *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Destination Patterns," rows 121.

[481] *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Destination Patterns," rows 620-621.

[482] *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Button Destination Patterns," rows 720.

accurately.[483] Dr. Shafiq's less specific "patterns" (such as Button text "Book Now") produce classifications Dr. Shafiq failed to justify:

a. A "Book Now" Button on *nationaljewish.org* that links to a Marriott hotel booking page was classified under the "Schedule" category (*see* **Figure 41**).[484]

b. A "Register Now" Button for a workers' compensation symposium on *sih.net* was classified under the "Schedule" category (*see* **Figure 42**).[485]

c. A "MyBMH" Button on *bmhsc.org/for-health-professionals/careers/search-jobs* was classified as under the "Portal" category.[486]

483 Shafiq Deposition, 239:17-25("Q. And if the sample changes, you will have to create different patterns based on the new sample? A. If you have data from certain domains, which as I explain here is based on the domains that are described in Paragraph 139 of my report, you would craft these patterns for the buttons that are in that list. And that's what I'm describing here in this section of my report"); 240:21-241:9 ("Q. We are assuming that this pattern exists, but then you want to apply it to a different data set and that different data set is 1,000 randomly sampled domains from Exhibit E. You would have to craft additional buttons; right – button patterns, I mean? A. It depends. Q. Why does it depend? A. You may be able to reuse some or a vast majority of the existing patterns or you may need to craft some new patterns depending upon the new sample that you're describing hypothetically would be random sample of 1,000 domains from some on the list").

484 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Results," row 15,149.

485 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Results," row 19,115.

486 *See* Shafiq Report, Exhibit L ("pattern.xlsx") at tab "Results," row 2,133.

**Figure 41**
**Dr. Shafiq's Pattern Methodology Classifies a "Book Now" Button on *nationaljewish.org* That Links to a Hotel Booking Page Under the "Schedule" Category[487]**




487 "Hotels & Lodging in Denver," National Jewish, https://web.archive.org/web/20210923080704/https://www.nationaljewish.org/patients-visitors/visiting-us/travel/hotels-lodging; "National Jewish," Marriott Bonvoy, https://www.marriott.com/event-reservations/reservation-link.mi?id=1553788134461&key=CORP&app=resvlink.

A13-4397

**Figure 42**
**Dr. Shafiq's Pattern Methodology Classifies the "Register Now" Button for a "Workers' Compensation Symposium" on *sih.net*[488]**




186. To further illustrate the flaws with Dr. Shafiq's "patterns," I demonstrate applying them to specific Button observations in the Inferred Website data and Pixel Button Click data not included in his sample of 25,126 Buttons from 304 domains. Consistent with Dr. Shafiq's testimony that new data may require him to select new "patterns,"[489] I found that for websites not included on the Plaintiffs' manually-created list of domains, his "patterns" classified "Make Payment," "Go to Quick Bill Pay," and "View Payment History" Buttons on *centurylink.com*, an internet service provider's website, as "Payment" Buttons.[490] Similarly, Dr. Shafiq's "patterns" classified "Book Now" Buttons on a swim school's website,

488 "2025 Workers' Compensation Symposium," Southern Illinois Healthcare, https://www.sih.net/symposiums/workcomp.

489 Shafiq Deposition, 240:21 -241:9 ("Q. We are assuming that this pattern exists, but then you want to apply it to a different data set and that different data set is 1,000 randomly sampled domains from Exhibit E. You would have to craft additional buttons; right -- button patterns I mean? A. It depends? Q. Why does it depend? A. You may be able to reuse some or a vast majority of the existing patterns, or you may need to craft some new patterns depending upon -- the new sample that you're describing hypothetically would be a random sample of 1,000 domains from some other list").

490 PIXEL-HEALTH000781441, at rows 15, 2,251, and 2,625.

*goldfishswimschool.com*,[491] a car dealership's website, *beavertoyotastaugustine.com*,[492] and a Maine adventure resort's website, *northcountryrivers.com*,[493] within the "Schedule" category (*see* **Figure 43**).[494]

**Figure 43**
**Dr. Shafiq's Pattern Methodology Classifies the "Book Now" Button for a Maine Adventure Vacation Resort**




187. Finally, despite testifying that he may need to select new "patterns" to classify new data, Dr. Shafiq did not evaluate the feasibility of doing so, such as selecting "patterns" for his 7.3 million Button sample.[495] To put such a task into perspective, based on Dr. Shafiq's ratio of "patterns" to his corresponding 25,126 Button sample, for Dr. Shafiq to find sufficient "patterns" to accurately classify 7.3 million Buttons, he would have to select roughly 255 thousand unique keywords or examples to fit the data, which could be far less than the number of Buttons Dr. Shafiq would need to classify if he were to apply his methodology to the entire Button data within the Proposed Class Period.[496]

188. Plainly, Dr. Shafiq did not create generalizable "patterns." Instead, Dr. Shafiq's methodology extracted specific conditions from a sample of 25,126 Buttons to achieve artificially high "accuracy," without testing how those "patterns" would perform outside the sample. This approach, in which the same data is used both to identify patterns and to assess their accuracy, exemplifies overfitting, as explained above. A review of Dr. Shafiq's identified "patterns"

---

[491] PIXEL-HEALTH000781559, row 196,379.

[492] PIXEL-HEALTH000781559, row 997,141.

[493] PIXEL-HEALTH000781559, row 1,620,368.

[494] I do not perform a similar evaluation for the machine learning-based approach because the flaws in that proposed approach prevent reliable replication and render any comparison of accuracy meaningless.

[495] Shafiq Report, ¶ 148 ("After the evaluation, I applied the machine learning model on 7.3 million buttons in Pixel Button Click and Inferred Website Events tables for the 1,844 healthcare provider domains").

[496] (883/25,126) x 7,277,670 = 255,758.28.

confirms that they are overly specific and lack the generality necessary to perform beyond his limited dataset.

*d. Machine Learning Approach*

189. Finally, in the Machine Learning Approach, Dr. Shafiq "used a transformer-based machine learning model" to classify the Buttons.[497] Put another way, Dr. Shafiq turns to OpenAI to complete the task presented by Plaintiffs.[498] The Machine Learning Approach, however, is not deterministic, reproducible, or accurate. Dr. Shafiq's own produced data and my independent replication show that his model yields variable outcomes even with identical inputs.

190. Dr. Shafiq's Machine Learning Approach is unreliable because large language models ("LLMs") are non-deterministic.[499] Dr. Shafiq claims that "gpt-4.1-2025-04-14 version was used with temperature set to 0 for deterministic output."[500] Dr. Shafiq provided no basis for this claim and even repeated his misunderstanding during his deposition.[501] And contrary to Dr. Shafiq's assertion, it is well established in the field of artificial intelligence that it is not possible to eliminate randomness in LLM outputs.[502] Meaning, even if the temperature parameter is set to

---

497 Shafiq Report, ¶ 145 ("In the third approach, I used a transformer-based machine learning model to automatically classify the buttons").

498 Shafiq Report, ¶ 145 ("Specifically, I used a state-of-the-art GPT 4.1 model with a prompt to automatically classify buttons into one or more of the four categories"), footnote 196 ("https://openai.com/index/gpt-4-1/. More specifically, gpt-4.1-2025-04-14 version was used with temperature set to 0 for deterministic output").

499 Ege Demirci et al., "Are LLMs Truly Graph-Savvy? A Comprehensive Evaluation of Graph Generation," *Proceedings of the 63rd Annual Meeting of the Association for Computational Linguistics*, Vol. 4, pp. 884-897, p. 887 ("LLMs are inherently nondeterministic, meaning they can produce different responses to the same prompt due to the stochastic elements in their decoding processes").

500 Shafiq Report, ¶ 145, footnote 196.

501 Shafiq Deposition, 244:21-25 ("If the temperature is set to 0 as I have described here using the prompt and how they're provided, if you run the experiment again, you would observe the output of the model to be the same across different prompts").

502 Shafiq Report, footnote 196 ("More specifically, gpt-4.1-2025-04-14 version was used with temperature set to 0 for deterministic output").

*See, e.g.,* Klishevich, Eugene et al., "Measuring Determinism in Large Language Models for Software Code Review," arXiv, February 28, 2025, https://arxiv.org/pdf/2502.20747, p. 1 ("Our results reveal that even with temperature minimized, [Large Language Model "LLM"] responses varied to different degrees. These findings highlight a consideration about the inherently limited consistency (test-retest reliability) of LLMs—even when the temperature is set to zero—and the need for caution when using LLM-generated code reviews to make real-world decisions"); Atil, Berk et al., "LLM Stability: A detailed analysis with some surprises," arXiv, https://arxiv.org/html/2408.04667v2, p. 1 ("The evaluated LLMs are rarely deterministic at the raw output level; they are much more deterministic at the parsed output/answer level but still rarely 100% stable across 5 re-runs

zero, the model can produce different outputs when processing the same inputs (*e.g.*, a prompt and the underlying data used for classification).[503] In fact, in the field of artificial intelligence, it is well established that setting the temperature parameter to zero reduces randomness in model outputs, but does not eliminate it entirely.[504]

191. The non-deterministic nature of Dr. Shafiq's model is evident in his own backup data. He stated that he used "the exact same machine-learning pipelines with the exact same input parameters" when applying his methodology to both his 25,126-Button sample and the larger 7.3-million Button dataset.[505] If the model were deterministic, identical Buttons appearing in both datasets

with same data input"); Atil, Berk et al., "Non-Determinism of 'Deterministic' LLM Settings," arXiv, https://arxiv.org/pdf/2408.04667, p. 2 ("Many users of LLM platforms expect model performance to be deterministic when temperature=0. While many other users may have observed a degree of non-determinism in this setting, there is little if any quantification of this variance. We refer here to this behavior of output variance despite zero temperature as instability"); Herrera-Poyatos, David et al., "An overview of model uncertainty and variability in LLM-based sentiment analysis: challenges, mitigation strategies, and the role of explainability," *Frontiers in Artificial Intelligence*, August 11, 2025, p.1 ("Large Language Models (LLMs) have significantly advanced sentiment analysis, yet their inherent uncertainty and variability pose critical challenges to achieving reliable and consistent outcomes").

503 Shafiq Report, ¶ 146; Shafiq Deposition, 244:15-25 ("Q. […] [Y]ou set the temperature to 0? […] And you suggest that that makes the output deterministic. Does that mean that the same prompt, data, and model will give the same result each time? A. If the temperature is set to 0 as I have described here using the prompt and how they're provided, if you run the experiment again, you would observe the output of the model to be the same across different prompts").

504 Shafiq Report, footnote 196 ("More specifically, gpt-4.1-2025-04-14 version was used with temperature set to 0 for deterministic output").

*See, e.g.*, Klishevich, Eugene et al., "Measuring Determinism in Large Language Models for Software Code Review," arXiv, February 28, 2025, https://arxiv.org/pdf/2502.20747, p. 1 ("Our results reveal that even with temperature minimized, LLM responses varied to different degrees. These findings highlight a consideration about the inherently limited consistency (test-retest reliability) of LLMs—even when the temperature is set to zero—and the need for caution when using LLM-generated code reviews to make real-world decisions"); Atil, Berk et al., "LLM Stability: A detailed analysis with some surprises," arXiv, August 6, 2024, https://arxiv.org/html/2408.04667v2, p. 1 ("The evaluated LLMs are rarely deterministic at the raw output level; they are much more deterministic at the parsed output/answer level but still rarely 100% stable across 5 re-runs with same data input"); Atil, Berk et al., "Non-Determinism of 'Deterministic' LLM Settings," arXiv, https://arxiv.org/pdf/2408.04667, p. 2 ("Many users of LLM platforms expect model performance to be deterministic when temperature=0. While many other users may have observed a degree of non-determinism in this setting, there is little if any quantification of this variance. We refer here to this behavior of output variance despite zero temperature as instability"); Herrera-Poyatos, David et al., "An overview of model uncertainty and variability in LLM-based sentiment analysis: challenges, mitigation strategies, and the role of explainability," *Frontiers in Artificial Intelligence*, August 11, 2025, p. 1 ("Large Language Models (LLMs) have significantly advanced sentiment analysis, yet their inherent uncertainty and variability pose critical challenges to achieving reliable and consistent outcomes").

505 Shafiq Report, ¶ 148 ("After the evaluation, I applied the machine learning model on 7.3 million buttons in Pixel Button Click and Inferred Website Events tables for the 1,844 healthcare provider domains"), footnote 193 ("This resulted in a sample of 25,126 buttons"); Shafiq Deposition, 250:7-13 ("A. […] So I used the exact same

should have received identical classifications. They did not. Comparing the two datasets reveals 148 Buttons that were assigned different classifications, despite supposedly identical model settings and data inputs.[506] This internal inconsistency demonstrates that his methodology cannot produce stable, repeatable outcomes, directly contradicting his claims of determinism.

192. Next, as with the Pattern Matching Approach, the Machine Learning Approach also exhibits classifications that Dr. Shafiq failed to justify why they align with Dr. Shafiq's Button Categories. For example, the model classified "My Images" at "*https://www.abrazohealth.com/campaigns/l-d-nuture-campaign-2/Action/Edit/en#/Simple*" under the "Portal" category and classified "Basic ECG Interpretation Practice Test" at *https://www.bannerhealth.com/careers/profiles/staffing-services/benefits* under the "Assessment" category.[507]

193. Replication further confirms this conclusion. As I understand from Counsel, the protective order I signed does not permit me to share data produced in this matter with third parties, such as OpenAI. I identified example Buttons from Dr. Shafiq's analysis that were publicly accessible to repeat his procedure.[508] Using the same prompts, model, and instructions described by Dr. Shafiq, I conducted three independent runs. For example, a Button on the Auburn Hospital website, which redirected to a health app on the Google Play store, was classified by Dr. Shafiq's machine learning model as a "Portal" in one instance but wasn't assigned any classification on an earlier run of the model. As another example, Button "RAPID VIRTUAL EYE CARE" on the website *www.umiamihealth.org* was assigned the classification "Schedule" by the model in one instance, but, similarly, was not assigned a classification by the model in a separate instance.[509] As such, Dr. Shafiq's LLM method produces inconsistent outputs even under identical conditions.

---

machine learning pipeline with the exact same input parameters and ran it on 7.3 million buttons that are described in Paragraph 148 of my report").

506 *See* backup, "shafiq_ml_comparison."

507 Shafiq Report, Exhibit L ("all buttons machine learning classified.csv"), rows 4,702 and 547,247.

508 "Events for November 2025," Auburn Community Hospital, https://www.auburnhospital.org/events/; "Discover the UHealth Difference," University of Miami Health System, https://www.umiamihealth.org/. *See* Shafiq Report, Exhibit L ("all buttons machine learning classified.csv"), rows 206,423, 7,010,691.

509 *See* backup, "openai_api."

194. In addition to Dr. Shafiq's methodology not being deterministic, the code that Dr. Shafiq provided to illustrate his methodology is incomplete and non-functional. Specifically, the Python script he produced ("openai.py") imports (*i.e.*, loads the functionality) the OpenAI library but never initializes the API, and the variable "C" referenced in the script is undefined, meaning the code cannot execute successfully (*see* **Figure 44**).[510] Moreover, Dr. Shafiq failed to provide documentation that would allow me to verify his claimed results. Without these materials, his analysis cannot be checked.

[510] *See, e.g.*, "openai/openai-python," GitHub, https://github.com/openai/openai-python.

**Figure 44**
**Dr. Shafiq's Script for Machine Learning Based Button Classification[511]**



```python
import os, time, json, pandas as pd, argparse
from datetime import datetime
from openai import OpenAI

p = argparse.ArgumentParser()
p.add_argument('--input')
a = p.parse_args()

m = #SPECIFY MODEL
t = #SPECIFY TEMPERATURE
c = #SPECIFY KEY
P = #SPECIFY PROMPT

i1, i2, i3 = 2, 3, 4
L = ["Portal", "Payment", "Assessment", "Schedule"]

def g(q, rr=3):
    u = (q.get("bt") or "").strip()
    v = (q.get("dst") or "").strip()
    w = (q.get("url") or "").strip()
    prm = f"Current URL: {w}\nButton Text: \"{u}\"\nDestination URL: \"{v}\""
    for _ in range(rr):
        try:
            o = C.chat.completions.create(
                model=m,
                temperature=t,
                messages=[{"role":"system","content":P},{"role":"user","content":prm}]
            )
            return json.loads(o.choices[0].message.content)
        except Exception:
            time.sleep(2)
    return {}

def main():
    f = a.input
    x = datetime.now().strftime("%Y%m%d_%H%M%S")
    z = f"Labeled_{os.path.splitext(os.path.basename(f))[0]}_{m}_{x}.xlsx"
    d0 = pd.read_excel(f, header=None, dtype=str).fillna('')
    d0["url"] = d0.iloc[:, i1] if d0.shape[1] > i1 else ""
    d0["bt"] = d0.iloc[:, i2] if d0.shape[1] > i2 else ""
    d0["dst"] = d0.iloc[:, i3] if d0.shape[1] > i3 else ""
    for l in L:
        if l not in d0.columns:
            d0[l] = ""
    for idx, r in d0.iterrows():
        z1 = g(r)
        for l in L:
            d0.at[idx, l] = int(z1.get(l, 0))
```



195. Even if Dr. Shafiq's code were complete, his methodology yields contradictory results when compared with the Pattern Matching Approach. I applied Dr. Shafiq's manually crafted patterns to the Buttons that he classified under at least one of the Button Categories in the 7.3-million-

---

511 Shafiq Report, "openai.py."

A13-4404

Button dataset he analyzed using his machine learning method but did not classify using the manual-pattern approach. The machine learning and manual-pattern classifications differ for approximately 24 percent of those Buttons. For all the reasons demonstrated above, Dr. Shafiq's methodology is unreliable.[512]

### 2. *Dr. Shafiq Fails to Provide a Reliable Method to Identify Health Information and Prescription Drug Information in Full-String URLs*

196. Dr. Shafiq asserts that "Meta or any person" can "programmatically identify 'Health Information' […] in full-string URLs that Meta collects through Meta Business tools from healthcare providers" by (1) using "similar methodologies (*i.e.*, patterns or machine learning model) […] for button click classification"[513] and (2) relying on a 14-day remediated version of the *parsed_pixel_events* data, which includes Megataxon classifications and token extractions from full, untruncated URLs transmitted before the implementation of Core Setup.[514] Dr. Shafiq also states that a "similar methodology can be applied to identify 'prescription drug' information" and, in addition, that, "because the domain with the prescription drug name is included in every full-string URL,"[515] every "communication" (or

512 *See* backup, "shafiq_pattern_comparison."

513 Shafiq Report, ¶ 154 ("I was asked by Counsel whether Meta can programmatically identify 'Health Information' (described below) in full-string URLs that Meta collects through Meta Business tools from healthcare providers. The short answer to the question is yes. Meta or any other person could do so with the right data. To demonstrate this, one could use similar methodologies (i.e., patterns or machine learning model) as described earlier for button click classification").

514 Shafiq Report, ¶ 53 ("It is my understanding that Meta did not begin preserving data in *parsed_pixel_events* for this case until September 2024, a point in time by which it had implemented Core Setup, which truncated URLs collected by Meta Pixel from healthcare provider websites, changing the nature of *parsed_pixel_events* table. […] It is also my understanding that Meta later produced remediated Megataxon classifications for a subset of the data that it had previously produced in the Meta Pixel logs"), ¶ 155 ("The evidence I have reviewed in this case shows that Meta's PixelMapper used multiple processors, including MegaTaxon, keyword or token extractors, MegaEntities, and Page Classifications to make these classifications for its internal use in advertising. The outputs of the PixelMapper processors were stored in the *parsed_pixel_events* table. However, Meta did not begin preserving data in that table until September 2024, which was after it had implemented Core Setup (described below) to truncate URLs in mid-2024 for certain health-related domains. In June 2025, Meta made a partial production of Megataxon classifications that showed them to be accurate in identifying Health Information communications. Note that Meta only remediated 14 days of Megataxon classifications, and its dates of remediation only began in February 2023"). *See, e.g.,* PIXEL_HEALTH_CWD00001093, which contains untruncated URLs.

515 Shafiq Report, ¶ 157 ("It is my opinion that a similar methodology can be applied to identify 'prescription drug' information, what Plaintiffs describe as information about prescription drugs. […] Thus, because the domain with the prescription drug name is included in every full-string URL from such a website, then every communication would fit the definition").

event transmitted) from a prescription drug domain would fit Plaintiffs' definition of "prescription drug" information. However, Dr. Shafiq's claims that "Health Information" and prescription drug information can be programmatically identified are unsupported.

197. As an initial point, although Dr. Shafiq states that he "described below" in his report what he means by "Health Information," he never defines the term and offers no explanation of what criteria distinguish "Health Information" from other types of information.[516]

198. Dr. Shafiq further asserts that "one could use similar methodologies (*i.e.*, patterns or machine learning model)" to the one he proposed for classifying Buttons in order to extract "Health Information" from full-string URLs, but he never describes how his "manually crafted patterns" or "machine learning model" could be applied.[517] And, even if Dr. Shafiq's methods could be applied, he failed to explain why his methodologies would not suffer from the same issues I described in **Section VII.C.1**.

199. Dr. Shafiq's assertion that "Meta made a partial production of Megataxon classifications that showed them to be accurate in identifying Health Information communications" is also incorrect.[518] The "remediated" *parsed_pixel_event* data with non-truncated URLs on which Dr. Shafiq relies covers only a 14-day period beginning in February 2023.[519] Dr. Shafiq does not explain how any findings from this sample could be generalized to other time periods or to the broader *parsed_pixel_events* data, which has truncated URLs.[520] As Dr. Shafiq himself

516 Shafiq Report, ¶¶ 154-157 ("I was asked by Counsel whether Meta can programmatically identify 'Health Information' (described below) in full-string URLs that Meta collects through Meta Business tools from healthcare providers").

517 Shafiq Report, ¶ 154 ("To demonstrate this, one could use similar methodologies (i.e., patterns or machine learning model) as described earlier for button click classification").

518 Shafiq Report, ¶ 155 ("Meta made a partial production of Megataxon classifications that showed them to be accurate in identifying Health Information communications").

519 Shafiq Report, ¶ 155 ("The evidence I have reviewed in this case shows that Meta's PixelMapper used multiple processors, including MegaTaxon, keyword or token extractors, MegaEntities, and Page Classifications to make these classifications for its internal use in advertising. The outputs of the PixelMapper processors were stored in the *parsed_pixel_events* table. However, Meta did not begin preserving data in that table until September 2024, which was after it had implemented Core Setup (described below) to truncate URLs in mid-2024 for certain health-related domains. In June 2025, Meta made a partial production of Megataxon classifications that showed them to be accurate in identifying Health Information communications. Note that Meta only remediated 14 days of Megataxon classifications, and its dates of remediation only began in February 2023").

520 Shafiq Report, ¶ 53 ("It is my understanding that Meta did not begin preserving data in *parsed_pixel_events* for this case until September 2024, a point in time by which it had implemented Core Setup, which truncated URLs

acknowledges, the *parsed_pixel_events* data was generated after Meta implemented Core Setup, which truncates URLs on the client side (*see* **Section IV.F**).[521] Under Core Setup, the URL portion after the domain and custom parameters are removed. For example, assuming hypothetically that this website is placed under Core Setup, the full URL, *https://www.utsouthwestern.edu/ctplus/stories/2021/lung-transplant.html*, would be trimmed and transmitted to Meta as *https://www.utsouthwestern.edu/*.

200. Dr. Shafiq also fails to explain how the "extracted keyword tokens"[522] can accurately identify "Health Information." Dr. Shafiq presents a few examples where keyword tokens were attached to the Megataxon classification of the medical facility. However, Dr. Shafiq fails to explain why the presence of a token on a webpage—such as the token "cancer"—necessarily means that the webpage contains "Health Information." For example, as shown in **Figure 45**, "cancer" is associated with a webpage discussing funding for cancer research at Ohio State University. As another example, the keyword "cancer" in the domain *cancerresearch.org* is associated with a webpage with content on postdoctoral fellowships (*see* **Figure 46**).

---

collected by Meta Pixel from healthcare provider websites, changing the nature of *parsed_pixel_events* table. […] It is also my understanding that Meta later produced remediated Megataxon classifications for a subset of the data that it had previously produced in the Meta Pixel logs"), ¶ 155 ("The evidence I have reviewed in this case shows that Meta's PixelMapper used multiple processors, including MegaTaxon, keyword or token extractors, MegaEntities, and Page Classifications to make these classifications for its internal use in advertising. The outputs of the PixelMapper processors were stored in the *parsed_pixel_events* table. […] In June 2025, Meta made a partial production of Megataxon classifications that showed them to be accurate in identifying Health Information communications. Note that Meta only remediated 14 days of Megataxon classifications, and its dates of remediation only began in February 2023").

521 Shafiq Report, ¶ 155 ("However, Meta did not begin preserving data in that table until September 2024, which was after it had implemented Core Setup (described below) to truncate URLs in mid-2024 for certain health-related domains").

522 Shafiq Report, ¶ 156.

**Figure 45**
**Example of an Article on Cancer Research with Keyword "Cancer" at the *cancer.osu.edu* Domain**[523]



The James
The Ohio State University
Comprehensive Cancer Center

MyChart | Find a Doctor | Locations | Refer a Patient | Contact | Careers | News | Blog | Events | About | Search

For Patients & Caregivers | For Cancer Researchers | For Donors & Volunteers | For Health Care Professionals | Our Impact

Home Page > About the OSUCCC – James > Publications and Reports > Magazines and Publications > Frontiers > 2021 > Pelotonia Special Edition > Pelotonia fellowships boost student cancer researchers

2021

Pelotonia Special Edition

Pelotonia community and fundraising reenergized by return to in-person ride event

12-year Pelotonia financial summary

Pelotonia Institute for Immuno-Oncology has seen rapid growth since its launch

Inspiring innovation

Pelotonia fellowships boost student cancer researchers

Pelotonia Rider Profiles

Pelotonia-funded projects focus on colorectal, endometrial, lung and breast cancer in Ohio

Bringing top cancer researchers to Ohio State

PELOTONIA SPECIAL EDITION

Pelotonia fellowships boost student cancer researchers

Each year the Pelotonia Fellowship Program allots $2 million to support Ohio State students in any discipline or level of scholarship who want to conduct cancer research under the guidance of faculty mentors at the OSUCCC – James.

Since it began in 2010, the program has awarded 616 fellowships for projects undertaken by 278 undergraduates, 188 graduates, 142 postdoctoral fellows and eight medical students. It also has provided Ohio State undergrads with international research experiences in India and Brazil and has enabled students from those nations to help with cancer research at Ohio State. Students apply competitively for the fellowships, which are peer-reviewed and issued by a committee of faculty cancer researchers chaired by Pelotonia Fellowship Program Director Rosa Lapalombella, PhD, an associate professor in the Division of Hematology at Ohio State and a member of the Leukemia Research Program at the OSUCCC – James.

*On this and the next three pages are profiles of Pelotonia student scientists who received Pelotonia fellowships, including one as an undergraduate, one as a graduate and one as a postdoctoral fellow. All three participated in Pelotonia 21 as a Rider or Challenger.*

523 "Pelotonia fellowships boost student cancer researchers," OSU Comprehensive Cancer Center, 2021, https://cancer.osu.edu/about/publications-and-reports/magazines-and-publications/frontiers/2021/pelotonia-special-edition/pelotonia-fellowships-boost-student-cancer-researchers, accessed on October 17, 2025.

**Figure 46**
**Example of a Webpage on Postdoctoral Fellowships with Keyword "Cancer" at the *cancerresearch.org* Domain**[524]




201. Dr. Shafiq claims that the task "to identify 'prescription drug' information" is "easier" because "Plaintiffs contend that the name of the prescription drug in a URL from a prescription drug website or app is 'prescription drug' information and Plaintiffs have manually verified that all prescription drug domains on their current list for the Prescription Drug class include the name of the prescription drug in the name itself."[525] Dr. Shafiq offered no "similar methodology" except stating what the Plaintiffs contend.

### D. Opinion 4: Dr. Shafiq Misrepresents Meta's Technical Measures That Prevent the Receipt or Use of Health Information

202. Dr. Shafiq claims that Meta's Filter was "not effective" at "block[ing] health information or button clicks from being collected."[526] Dr. Shafiq's conclusion is unsupported by his own citations and lacks a reliable methodology because (1) he fails to define what filtration system(s) he evaluated;[527] (2) fails to review any of Meta's relevant Source Code related to these

524 "Postdoctoral Fellowships," Cancer Research Institute, https://www.cancerresearch.org/postdoctoral-fellowships, accessed on December 1, 2025.

525 Shafiq Report, ¶ 157.

526 Shafiq Report, ¶ 158 ("Counsel asked me whether Meta's Filter effectively blocked health information or button clicks from being collected. The short answer is that the Filter was not effective").

527 Shafiq Report, ¶ 163 ("Meta produced several documents describing or illustrating, at a high level, how the Filter works [citing PIXEL_HEALTH000565826; PIXEL_HEALTH000113932]").

mitigation measures and merely references Dr. Hashmi's code review (which, as discussed in **Section VI.A**, is itself unreliable);[528] and (3) bases his conclusions regarding the effectiveness of "Meta's Filter" on a flawed analysis.[529]

203. To start, Dr. Shafiq's analysis of the effectiveness of Meta's "Filter" is flawed because he does not define what he means by "Filter." Dr. Shafiq's undisclosed definition of "Meta's Filter" appears to derive from three documents he cites, which he describes as "high level" explanations of how the "Filter" operates.[530] These documents, however, describe Meta's systems only as they existed at a particular point in time in 2023. As I show in **Section IV**, Meta's technical measures have evolved since October 2018 and include a range of measures to classify data sources, detect potentially sensitive information, and filter data across various fields (*e.g.*, URL and event parameters). These processes include, for example, replacing sensitive values with "_removed_," which Dr. Shafiq refers to as "[REMOVED],"[531] discarding potentially sensitive parameters, blocking transmissions of certain types of data (such as through Core Setup for restricted domains), and preventing data transmissions entirely from specific categories of domains (*e.g.*, patient portals). Dr. Shafiq does not identify which specific system—or combination of systems—he evaluated, leaving the scope of his analysis undefined.[532]

---

[528] Dr. Shafiq only mentioned code review conducted by Dr. Hashmi, but he provided no explanation for how Dr. Hashmi's review helped him in forming his opinions. *See* Shafiq Report, ¶¶ 160-161 ("For my purposes, I did not conduct source code analysis but have instead reviewed (1) general design documents; (2) deposition testimony; and (3) most important, the Meta Pixel log data produced by Meta. It is my understanding that Dr. Hashmi's review of the source code revealed that the Filter did not apply to normal full-string URLs or Button Click data but instead only applied to data contained in search queries or custom data parameters").

[529] Shafiq Report, ¶ 158 ("Counsel asked me whether Meta's Filter effectively blocked health information or button clicks from being collected. The short answer is that the Filter was not effective"), ¶ 160-161 ("For my purposes, I did not conduct source code analysis but have instead reviewed (1) general design documents; (2) deposition testimony; and (3) most important, the Meta Pixel log data produced by Meta. It is my understanding that Dr. Hashmi's review of the source code revealed that the Filter did not apply to normal full-string URLs or Button Click data but instead only applied to data contained in search queries or custom data parameters"), ¶ 163 ("Meta produced several documents describing or illustrating, at a high level, how the Filter works [citing PIXEL_HEALTH000565826; PIXEL_HEALTH000113932]").

[530] Shafiq Report, ¶ 163 ("Meta produced several documents describing or illustrating, at a high level, how the Filter works), footnote 209 (citing PIXEL_HEALTH000565826 and PIXEL_HEALTH000113932). *See also* Shafiq Report, footnote 208 (citing PIXEL_HEALTH000859295).

[531] For consistency, I refer to the placeholder as "REMOVED" even though the code I reviewed and even the data Dr. Shafiq analyzes suggests that Meta uses placeholder [redacted] *See, e.g.*, 97594ff0c6221871d3552b7cac8b787a87a9dd7d, December 6, 2022 [redacted]

[532] Shafiq Report, ¶¶ 158-163.

204. To claim that Meta's "Filter" was not effective, Dr. Shafiq conducts a misleading analysis in which he "searched the unique URLs produced for MedStar Health in the Meta Pixel logs for the term 'REMOVED' (case insensitive) to determine how many URLs had been Filtered and their relative percentage."[533] Dr. Shafiq reports that "REMOVED" appeared in 2.7% of all unique URLs for *medstarhealth.org*, leading him to conclude that Meta's systems were not effective.[534] To start with, Dr. Shafiq failed to explain what "health-related content" is present in URLs that did not contain "REMOVED," if any. Moreover, Dr. Shafiq's analysis of the effectiveness of Meta's "Filter" is also limited to URLs associated with *medstarhealth.org*, and he offers no justification for why Meta's treatment of this single domain can represent Meta's systems as a whole, which operate across numerous websites and apps.[535] Dr. Shafiq additionally fails to define what level or percentage of filtration would constitute an "effective" system, let alone why he considers a single calculation for a single domain evidence of an ineffective system.[536]

205. To illustrate the methodological flaws in Dr. Shafiq's approach, consider an analogy to a spam filter. An ideal spam filter should detect and flag all spam emails while leaving non-spam messages unflagged.[537] Dr. Shafiq's method of calculating effectiveness, however, merely counts the percentage of emails labeled as spam—implying that more flagged messages indicate higher effectiveness. This reasoning is incorrect, as misclassifying legitimate emails as spam—or similarly, filtering URLs that do not contain potentially sensitive information—would inflate the "effectiveness" score despite being undesirable. For example, Dr. Shafiq's list of URLs

---

533 Shafiq Report, ¶ 158 ("The short answer is that the Filter was not effective"), ¶ 167 ("Next, to assess the Filter's impact on the full-string URLs in the Meta Pixel logs, I searched the unique URLs produced for Medstar Health in the Meta Pixel logs for the term 'REMOVED' (case insensitive) to determine how many URLs had been Filtered and their relative percentage").

534 Shafiq Report, ¶ 158 ("The short answer is that the Filter was not effective"), ¶ 167 ("My analysis showed that the term 'REMOVED' appeared in 5,821 of the 212,176 unique URLs [*sic*] medstarhealth.org, accounting for 2.7% of all unique URLs"). *See also* Shafiq Report, Exhibit K, MedStar Health.xlsx.

535 Shafiq Report, ¶¶ 134-135 ("Across various events collected by Meta Pixel, there are numerous full-string URLs with information about doctors, conditions, treatments, diseases, and other health information. […] For example, the Meta Pixel logs include 1,821,965 instances of full-string URLs that Meta collected through the Pixel at medstarhealth.org"). *See also* Shafiq Report, Exhibit K, MedStar Health.xlsx.

536 Shafiq Report, ¶¶ 158-169.

537 *See*, *e.g.*, Cormack, Gordon V., "Email Spam Filtering: A Systematic Review," *Foundations and Trends in Information Retrieval*, Vol. 1, No. 4, 2006, p. 17 ("An ideal spam filter would autonomously, immediately, and perfectly identify spam as spam and non-spam as non-spam").

based on which he evaluates effectiveness, includes instances such as homepages, error pages *https://access.medstarhealth.org/#/page-not-found/*, and even a non-existent webpage *https://www.medstarhealth.org/services/womens-haalth* (*see* **Figure 47**).[538] Dr. Shafiq fails to indicate what information Meta should have filtered in these examples.

**Figure 47**
**Dr. Shafiq's List Contains Non-Existent Webpages[539]**




206. In addition, Dr. Shafiq's reliance on the presence of "REMOVED" in URLs overlooks the broader variety of methods Meta employs to prevent the use of potentially sensitive information.

[538] Shafiq Report, Exhibit K, "MedStar Health.xlsx," rows 43,839 and 212,105.

[539] "Page Not Found," MedStar Health, https://www.medstarhealth.org/services/womens-haalth, accessed on December 1, 2025. *See also* Shafiq Report, Exhibit K, "MedStar Health.xlsx," row 212,105.

Replacing values with "REMOVED" is only one way Meta prevents the storage and use of potentially sensitive data. Other measures include discarding parameters identified as sensitive, truncating URLs to retain only domains, blocking the transmission of custom parameters (via Core Setup), and blocking transmissions from specific domains (*e.g.*, patient portals; *see* **Section IV**).[540] Returning to the spam filter analogy, evaluating effectiveness solely by counting messages moved to the spam folder ignores emails that may have been blocked entirely, underestimating the effectiveness of the filtration system. As such, solely searching for the term "REMOVED" is not a reliable method to assess Meta's efforts to prevent the use of potentially sensitive information.[541]

207. Finally, Dr. Shafiq focuses only on URLs, even though, as noted in the documents he cites, Meta's systems also filter data in other fields, such as custom parameters, which Dr. Shafiq failed to analyze.

208. In summary, Dr. Shafiq's assessment of the effectiveness of "Meta's Filters" rests on an undefined concept, a misrepresentation of testimony and Meta's technical documentation, and a methodologically flawed analysis. His conclusions, therefore, cannot be relied upon to assess the effectiveness of Meta's efforts to prevent the receipt and use of potentially sensitive information.

### E. Opinion 5: Dr. Shafiq's Assessment of Meta's Core Setup Is Unreliable

209. Dr. Shafiq claims that the "Meta Pixel still collects all of the identifying information that it collects when it is not placed in Core Setup" because (1) Core Setup does not block or filter

---

540 Meta's code [redacted]. *See* [redacted]

541 Shafiq Deposition, 259:25-260:21 ("Q. And is it your understanding that if data is removed, the term 'removed' always appears in the Meta Pixel logs? A. It is my understanding that the term 'removed' shows that filter was applied -- or let me put it this way, which is using the example of the URLs that are in Paragraph 166 of my report, if you observe a URL, for example, medstarhealth.org/mymedstar-patient-portal, if in a URL the term 'removed' does not appear, or the URL otherwise exists, then that tells you that filter did not impact Meta's collection of that URL. […] Q. If, in fact, the term 'removed' didn't always need to be there in order for the filter to have done something. A. This is not how I've described my analysis").

certain information and (2) hashed customer information could possibly be reversed.[542] As explained below, neither point supports Dr. Shafiq's claim.

210. Dr. Shafiq's assertions that Core Setup does not prevent the transmission of cookies, IP addresses, User Agent data, and PII are misleading.[543] As acknowledged by Dr. Shafiq, Core Setup is intended to block the transmission of (1) URLs except the domain and (2) custom parameters for the Meta Pixel operating on domains classified as restricted (*e.g.*, health-related).[544] I observe in my testing discussed in **Section IV.F** that Core Setup functions consistently with this description.[545] Relatedly, I have not seen any evidence that Core Setup is designed to block cookies, IP addresses, or User-Agent data. To do so, users and developers have other controls (*see* **Section V**). Meta also has developed other systems to block and filter PII (*see* **Section IV**).

211. Dr. Shafiq nevertheless states that, in Core Setup, the "Meta Pixel collects the plain SHA-256 hash of the full-string URL" and claims that the SHA-256 hashing of full-string URLs "poses serious privacy risks."[546] SHA-256 is a one-way mathematical formula that always produces

[542] Shafiq Report, ¶ 173 ("My testing and analysis show that Meta Pixel still collects certain identifying and content information even when it is placed in Core Setup), ¶ 174 ("In Core Setup, Meta Pixel still collects all of the identifying information that it collects when it is not placed in Core Setup. This includes […] identifiers such as email, first name, last name, and phone number in hashed format"), ¶ 175 ("Collecting a plain SHA256 hash of the full-string URL poses serious privacy risks […] it is trivial […] to re-identify the original full-string URL by performing a simple dictionary attack").

[543] Shafiq Report, ¶ 174 ("In Core Setup, Meta Pixel still collects all of the identifying information that it collects when it is not placed in Core Setup. This includes: (a) cookies […] (c) non-cookie identifying information […] such as an IP address in IP header, user agent in HTTP header […] and (d) identifiers such as email, first name, last name, and phone number in hashed format").

[544] PIXEL_HEALTH000909602-623 at 611 ("A Business Tool may be enrolled in core setup for reasons including: Classification-based enrollment: Association with domains or apps classified as health or financial-restricted").

[545] Shafiq Report, ¶ 172 ("When a Meta Pixel is in Core Setup, custom parameters (commonly sent through the 'cd' fields) are omitted, and URL-related parameters ('dl' and 'rl') are truncated to the domain level rather than the full-string URL. Furthermore, certain features such as 'automatic advanced matching' may not be available, and 'custom events' need to be reviewed."); PIXEL_HEALTH000909602-623 at 611 ("b. Core setup[:] Core setup is a Meta Business Tools configuration that, when applied to a particular Business Tool (e.g. a Meta Pixel), restricts certain data like custom parameters and full URLs. When Meta receives an event from a Business Tool in core setup that contains custom parameters and/or a full URL, custom parameters will be discarded and URL will be truncated to just the domain ("server-side" core setup functionality)"); PIXEL_HEALTH000909602-623 at 612 ("ii. Client-side core setup functionality[:] As it's loading, the Meta Pixel or App SDK configuration can reflect that this Business Tool is enrolled in core setup. If it is, custom parameters and parts of the URL after the domain will not be transmitted to Meta").

[546] Shafiq Report, ¶ 175 ("While the URL collected in the 'dl' or 'rl' parameters is truncated to the domain name, the hash of the full-string URL can still be collected in the 'ud[dl]' parameter. For example, as shown below,

the same fixed-length string of characters from the same input and cannot be reversed to determine the original input in a computationally efficient manner.[547] Contrary to Dr. Shafiq's mischaracterization, SHA-256 is widely recognized as an industry-standard tool: the algorithm is recommended by the National Institute of Standards and Technology ("NIST") for all applications used by federal agencies that employ secure hash algorithms, is used broadly across industries for data integrity and authentication, and forms the foundation of the security architecture of cryptocurrencies such as Bitcoin.[548]

212. Dr. Shafiq further claims that "[s]ince the plain SHA256 hash is a deterministic one-way function, […] it is trivial for Meta or anyone else […] to re-identify the original full-string URL by performing a simple dictionary attack," referring to the process of taking a list of URLs, hashing each one using the SHA-256 algorithm, and comparing the results to find matches that

---

Meta Pixel collects the plain SHA256 hash of the full-string URL SHA256 (https://wexnermedical.osu.edu/utility/search-results#/search/cancer) = 3b2b9e188b977e45e05091fb7513cb5cdcf054859bf2398c397e8de6d7ac27c6. Collecting a plain SHA256 hash of the full-string URL poses serious privacy risks because hashing does not make the URL information irreversibly 'anonymous.'").

547 *See* **Section III.B.2**. *See also* "Secure Hash Standard (SHS)," National Institute of Standards and Technology, August 2015, https://nvlpubs.nist.gov/nistpubs/FIPS/NIST.FIPS.180-4.pdf, p. 3 ("This Standard specifies secure hash algorithms, SHA-1, SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256. All of the algorithms are iterative, one-way hash functions that can process a message to produce a condensed representation called a *message digest*"); "Hash Functions," National Institute of Standards and Technology, September 9, 2024, https://csrc.nist.gov/projects/hash-functions ("Approved Algorithms[:] […] FIPS 180-4 specifies seven hash algorithms: SHA-256 […] An approved hash function is expected to have the following three properties: […] Preimage resistance: Given a randomly chosen hash value, it is computationally infeasible to find an input message that hashes to this hash value").

548 "NIST's Policy on Hash Functions," National Institute of Standards and Technology, September 14, 2016, https://csrc.nist.rip/groups/ST/hash/policy.html ("SHA-2 (i.e., SHA-224, SHA-256, SHA-384, SHA-512, SHA-512/224 and SHA-512/256): Federal agencies may use these hash functions for all applications that employ secure hash algorithms. NIST encourages application and protocol designers to implement SHA-256 at a minimum for any applications of hash functions requiring interoperability"); "The NSA and Bitcoin: Origins of the SHA-256 Hashing Algorithm," Supra, March 25, 2024, https://supra.com/academy/the-nsa-and-bitcoin-origins-of-the-sha-256-hashing-algorithm/ ("The origins of SHA-256 can be traced back to intelligence services in the US, namely the National Security Agency, or the NSA for short. […] Interestingly, SHA-256 is widely applied to cybersecurity, including digital signatures, password storage, and message authentication codes. It's also been employed in proof-of-work consensus algorithms used in blockchains like Bitcoin, for instance"); Callaghan, Peter, "Is SHA-256 Secure? Legal & Compliance Experts Say Yes—Here's Why," Pagefreezer, https://blog.pagefreezer.com/sha-256-benefits-evidence-authentication ("SHA-256 is the gold standard for data integrity, security, and digital evidence authentication. Its collision-resistant, one-way hashing algorithm ensures that electronic records remain tamper-proof and verifiable, making it indispensable in cybersecurity, legal compliance, and digital forensics").

correspond to the original URL.[549] First, Dr. Shafiq provides no evidence that Meta can, does, or even attempts "to re-identify the original full-string URL," let alone that Meta matches or attempts to match this data to Facebook accounts.

213. Second, Dr. Shafiq's characterization of re-identifying SHA-256 hashes as a "trivial" and "simple" task is misleading. Re-identifying SHA-256 hashes at scale would require building a dictionary encompassing not only all possible healthcare domains and associated webpages, but also the numerous URLs with parameters that can change based on user behavior, time of visit, and other browsing session-specific factors (*see* **Section III.A**).[550] For example, **Figure 48** shows a "full-string [URL] extracted from Meta Pixel logs" included in Exhibit K of the Shafiq Report, which contains URL parameters generated dynamically based on user inputs, including latitude and longitude coordinates for a preferred location, search radius, and sorting preferences.[551] This full-string URL has a SHA-256 hash value of "a05361ea7840d63dc4e0281c7439fa4aa063c2f4e1adbbd244684b03daa617a4."[552] As shown in **Figure 49**, any change to these inputs, such as entering a different location, adjusting the search radius, and changing the sorting order, would generate a different URL and, consequently, a completely different SHA-256 hash value (*i.e.*, "f3db8ec5045262033ef19512fc51dce057071e867a9fd873c1a4f429caddb3e8.")[553]

---

549 Shafiq Report, ¶ 175 ("Since the plain SHA256 hash is a deterministic one-way function, meaning that the same URL will always produce the same hash, it is trivial for Meta or anyone else for that matter to re-identify the original full-string URL by performing a simple dictionary attack—precomputing hashes of all full-string URLs (for example, a hospital's pages related to patient portal, bill payment, health risk assessment, or scheduling appointment) and comparing them to the collected hash.").

550 I discuss URLs that contain parameters in further details in **Section III.A**.

551 Shafiq Report, ¶ 134 ("I have attached the list of full-string URLs extracted from Meta Pixel logs for a subset of domains mentioned in the complaint in Exhibit K"). *See also* Shafiq Report, Exhibit K, file "MedStar Health.xlsx," row 48,332.

552 I hash the URL "https://dev.medstarhealth.org/locations#locationsearch_g=39.1733025|-77.1772737&locationsearch_distance by miles=25000&locationsearch_o=Distance,Ascending" using an online tool. *See* "Online Tools: SHA256," GitHub, https://emn178.github.io/online-tools/sha256.html.

553 I hash the URL "https://dev.medstarhealth.org/locations#locationsearch_g=39.0451663|-77.03917539999999&locationsearch_distance%20by%20miles=10&locationsearch_o=Navigation%20Title%2C Descending" using an online tool. *See* "Online Tools: SHA256," GitHub, https://emn178.github.io/online-tools/sha256.html.

**Figure 48**
**Example of a URL with Variable Parameters from Exhibit K of the Shafiq Report[554]**




554 "Find a Location (Original)," MedStar Health, https://dev.medstarhealth.org/locations#locationsearch_g=39.1733025|-77.1772737&locationsearch_distance by miles=25000&locationsearch_o=Distance,Ascendinglocationsearch_g=39.1733025|-77.1772737&locationsearch_distance by miles=25000&locationsearch_o=Distance,Ascending accessed on December 3, 2025; "SHA256 hash value - Medstar location search (original)," GitHub, https://emn178.github.io/online-tools/sha256.html, accessed on December 1, 2025.

**Figure 49**
**Example of a URL Changing Due to User Actions Which Corresponds to a Completely Different SHA-256 Value**[555]




214. Dr. Shafiq does not demonstrate that building a dictionary to capture all these variations is possible, nor did he identify any evidence that Meta has done or is doing this with hashed data that developers choose to send to Meta.[556] Contrary to Plaintiffs' assertion that Dr. Shafiq actually "un-hash[ed]" URLs "from publicly available data," Dr. Shafiq's report contains no

---

555 "Find a Location (Modified)," MedStar Health, https://dev.medstarhealth.org/locations#locationsearch_g=39.1733025|-77.1772737&locationsearch_distance%20by%20miles=25000&locationsearch_o=Distance,Ascendinglocationsearch_g=39.0451663|-77.03917539999999&locationsearch_distance%20by%20miles=10&locationsearch_o=Navigation%20Title%2CDescending, accessed on December 3, 2025; "SHA256 hash value - Medstar location search (modified)," GitHub, https://emn178.github.io/online-tools/sha256.html, accessed on December 1, 2025.

556 A dictionary attack utilizes a pre-defined list of inputs to attempt to decode a hash. An attacker attempting to decode a hash of a URL, for example, would need to compile all plausible webpage combinations. Currently, I am unaware of any practical approach to decoding SHA-256 hashes, and Dr. Shafiq fails to provide one. *See, e.g.*, "What are Dictionary Attacks?," JumpCloud, April 22, 2025, https://jumpcloud.com/it-index/what-are-dictionary-attacks ("At its core, a dictionary attack is a password-cracking technique that leverages a pre-defined list of words, commonly referred to as a 'dictionary,' to guess a password. […] If the target passwords are stored as hashes, the attacker hashes each word in the wordlist using the same hashing algorithm as the target system to create comparable values. […] The attacker compares each hashed word with the stored password hash. If there's a match, the attacker identifies the password"); Hoffman, Paul E. and Bruce Schneier, "Attacks on Cryptographic Hashes in Internet Protocols," Internet Engineering Task Force, November 2005, https://datatracker.ietf.org/doc/html/rfc4270, p. 9 ("Some significant preimaging attacks have already been discovered, but they are not yet practical. […] In this case, 'practical' means that it could be executed by an attacker in a meaningful amount of time for a meaningful amount of money").

demonstration that he "un-hash[ed]" URLs;[557] instead, Dr. Shafiq includes only one example in which he computes the SHA-256 value for a single URL, which does not demonstrate any capability to perform the kind of "dictionary attack" that he describes across the countless URL variations I discuss above.[558]

### F. Opinion 6: Dr. Shafiq's Analysis of the Transmission of Data to Meta's Servers Is Flawed

215. Dr. Shafiq claims that the Meta Pixel "collects the information while the communication is still occurring."[559] To support this claim, Dr. Shafiq tests a single website, *wexnermedical.osu.edu*, which he asserts "shows that the transmissions to the Meta's servers containing identifying and content information occur contemporaneously with the loading of the webpage."[560] Dr. Shafiq fails to define what he means by "contemporaneous" transmissions or to specify any threshold of time beyond which a transmission would no longer meet such a definition. This is relevant because the timing of transmissions can vary. Meta's documentation describes a range of developer options beyond the "Get Started" page Dr. Shafiq cites.[561] That documentation

---

557 Motion for Class Certification, p. 10 ("It wasn't until February 2023 that Meta began blocking certain patient portal events, and not until July 2024 did Meta begin truncating URLs that the Pixel sends to Meta on health websites (for example, www.hospital.org/cancer-treatment would be truncated to www.hospital.org); Shafiq Report, ¶¶ 173-176. Yet, even with these changes, Meta still (i) places _fbp cookies on patient devices; (ii) uses the computing resources of patient devices; (iii) collects detailed URLs in a form that is so easy to un-hash that Plaintiffs' expert did it from publicly available data; (iv) runs and uses a PixelMapper processor to interpret the remaining data for ads use. Shafiq ¶ 176").

558 Shafiq Report, ¶ 175 ("Meta Pixel collects the plain SHA256 hash of the full-string URL SHA256 (https://wexnermedical.osu.edu/utility/search-results#/search/cancer) = 3b2b9e188b977e45e05091fb7513cb5cdcf054859bf2398c397e8de6d7ac27c6").

559 Shafiq Report, Opinion #6.

560 Shafiq Report, ¶ 180 ("The following figure plots the time-series of the transmissions from the web browser to servers when the Wexner Medical Center's website is loaded. […] The plot shows that the transmissions to the Meta's servers containing identifying and content information occur contemporaneously with the loading of the webpage").

561 Shafiq Report, footnote 222 ("('To install the Pixel, we highly recommend that you add its base code between the opening and closing <head> tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages. Placing the code within your <head> tags reduces the chances of browsers or third-party code blocking the Pixel's execution. It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page [citing https://developers.facebook.com/docs/meta-pixel/getstarted]"); "Meta Pixel Advanced," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/ ("Tips for alternate implementations, using the Pixel with single-page web apps, and tracking conversions with button clicks and page scrolling").

explains, among other things, that developers can delay the firing of the Meta Pixel using the "setTimeout" option.

216. Certain events, such as SubscribedButtonClick, may occur after a user clicks a button on a page that has already been loaded. Dr. Shafiq failed to explain why he would consider transmission of such events contemporaneous "with the loading of the webpage."[562]

217. In addition to variability across websites, the timing of transmissions to Meta can also vary by website visitors. For example, as discussed in **Section V.B.2**, some implementations of user consent are configured so that transmissions to Meta will not occur until website visitors have first provided their consent. If consent is not granted, no data is transmitted. As I discuss in **Section V.B.2**, for some websites, after the website visitor clicks "accept" in the consent banner, the page must also be reloaded for transmissions to occur.

### G. Opinion 7: Dr. Shafiq's Opinion Concerning the Browser Storage and Computing Resources Used by the Meta Pixel Is Unreliable

218. Dr. Shafiq claims that the "Meta Pixel consumes computing resources and it does so in a measurable way."[563] Dr. Shafiq attempts to support his claim with three tests, finding that, "[a]t the time of testing, the size of the Meta Pixel source code JavaScript file (*i.e.*, fbevents.js) is roughly 81 kilobytes (KB)," "[f]or each website where Meta Pixel installs the fbp cookie, it takes up 41 bytes," and "[o]n a test emulating a fast 4G connection, Meta Pixel took approximately 932 milliseconds to download."[564] Dr. Shafiq's findings are unreliable.

219. First, Dr. Shafiq fails to define what he means by "measurable." If "measurable" simply means something that can be measured, virtually all internet activity would meet that definition, including the bytes of storage and milliseconds of load time that Dr. Shafiq references.

562 Shafiq Report, ¶¶ 177-180.

563 Shafiq Report, ¶ 181.

564 Shafiq Report, ¶¶ 183-185 ("At the time of my testing, the size of the Meta Pixel source code JavaScript file (i.e., fbevents.js) is roughly 81 kilobytes (KB). In plain terms, this means that every time a user's device loads a webpage containing Meta Pixel, the browser loads and stores about 81 KB of code from Meta's servers. Though the amount of storage taken up by Meta through the fbp cookie may be small for each device, it is measurable and consistent. For each website where Meta Pixel installs the fbp cookie, it takes up 41 bytes. […] Meta Pixel source code also adds measurable latency to webpage load times. On a test emulating a fast 4G connection, Meta Pixel took approximately 932 milliseconds to download in the web browser.").

220. Second, Dr. Shafiq ignores that, as discussed in **Section V**, a variety of users' and developers' controls exist to prevent the functionality of the Meta Pixel or transmission of *_fbp* cookies and the corresponding storage of resources. For example, when Adblock Plus is enabled, the *fbevents.js* script is not received by the browser, and the *_fbp* cookie is not set in browser memory.[565]

221. Third, Dr. Shafiq acknowledges that his observations apply only "at the time of [his] testing."[566] This distinction is important because, for example, when a user revisits webpages that have integrated the Meta Pixel, as shown in **Figure 50**, the *fbevents.js* script is not reloaded from the server but rather from the browser's cache. However, Dr. Shafiq presented no test to determine what "measurable" computing and/or network resources, if any, are needed to reload the script.[567]

565 *See* **Appendix D**; backup, "windows_chrome_biktarvy_default.har" and "windows_chrome_biktarvy_abp.har."

566 Shafiq Report, ¶ 183 ("At the time of my testing, the size of the Meta Pixel source code JavaScript file (i.e., fbevents.js) is roughly 81 kilobytes (KB)").

567 Shafiq Report, ¶¶ 181-185.

**Figure 50**
**When a User Revisits Webpages with the Meta Pixel, *fbevents.js* Was Loaded from the Browser's Cache**




222. Finally, Dr. Shafiq fails to consider in his discussion that, as I discuss in **Sections III.A**, **V.A**, and **VII.B.1**, as a technical matter, Meta does not implement the Meta Pixel or set the *_fbp* cookie; rather, website developers choose to implement the Meta Pixel on their websites and the Meta Pixel code, after being implemented by developers, sets the *_fbp* cookie for the website.

223. More broadly, Dr. Shafiq's findings are specific to, among other factors, browser configurations, network conditions, and the particular webpage tested, and may therefore vary under different conditions.

### H. Opinion 8: Dr. Shafiq Fails to Show That Meta Can Reliably Identify the Location of All Users, Healthcare Providers' Website Servers, or Meta's Relevant Servers

224. Dr. Shafiq claims that "Meta can ascertain the geographic location of users, healthcare providers' website servers, and Meta's own servers."[568] But the information Dr. Shafiq identifies for

568 Shafiq Report, ¶ 186.

Facebook accounts, healthcare providers' servers, and Meta's servers cannot reliably ascertain geographic locations of users, healthcare provider servers, or Meta servers at the time of a specific data transmission.

225. While Dr. Shafiq claims that, "[f]or users, Meta has multiple independent ways to determine location,"[569] the "ways" he proposes are unreliable. According to Dr. Shafiq, Meta can use:

a. "[T]he location a user entered when creating their profile";

b. "[T]he device/IP-based location history maintained by Meta";

c. "[T]he user's city, state, and country" logged by the Meta Pixel; and

d. "[D]ata associated with the table ads_pixel_traffic corresponding to users located in California."[570]

226. A Facebook account's profile information (*i.e.*, the first category) is only reliable if the Facebook account holder truthfully reports that information and updates it every time the account holder accesses websites from a different location (such as accessing a website from work with having home address reported in their account) or when they move to another location.

227. As discussed above in **Sections III.A** and **VII.B.1.c**, IP addresses cannot be used to accurately and precisely identify the locations of users in all instances because, for example, of VPN services. As such, Dr. Shafiq's third and fourth categories, the geographic data logged by the Meta Pixel and data associated with *ads_pixel_traffic*, may be similarly unreliable for determining user location because they are inferred from IP addresses.[571]

228. Dr. Shafiq claims that, "[f]or healthcare provider websites, Meta can determine server location using their IP addresses" by "cross-referenc[ing] healthcare provider domains with publicly available WHOIS and IP geolocation information."[572] Dr. Shafiq, however, fails to identify

---

569 Shafiq Report, ¶ 187.

570 Shafiq Report, ¶ 187.

571 PIXEL_HEALTH000032388-415 at 390 ("[C]ity[:] The city where the pixel is fired (inferred from geo IP location). [C]ountry[:] The country where the pixel is fired (inferred from geo IP location)"); PIXEL_HEALTH000032259-275 at 260 ("[C]ity[:] The city where the pixel is fired (inferred from geo IP location). [C]ountry[:] The country where the pixel is fired (inferred from geo IP location)").

572 Shafiq Report, ¶ 188.

which healthcare providers' website servers are at issue and ignores that websites can be hosted across *multiple* servers, including cloud-based servers, located in different places.[573] In addition, as I discuss in **Section VII.A.2**, the WHOIS records and IP geolocation information Dr. Shafiq relies on are not reliable for identifying server location, as he even acknowledges in his own report.[574]

229. Dr. Shafiq claims that, "[f]or Meta's own servers, Meta itself maintains authoritative knowledge of their physical locations" to support his conclusion that "Meta has various systems to identify geographic location of events its [*sic*] collects by Meta Pixel."[575] To start with, data transmissions to Meta are first received by Points of Presence ("PoPs")—Meta's equipment that facilitates faster access to Meta's services[576]—and then transmitted to Meta's data centers.[577] Given that the specific PoP that receives a given transmission depends on factors such as the location of the user's device or the developer's server, and that the set of Meta's PoPs has

---

573 *See*, *e.g.*, "How Web Sites Can Be Spread Across Multiple Web Servers - Guide 2024," CloudPages, May 13, 2024, https://cloudpages.cloud/blog/web-sites-can-be-spread-across-multiple-web-servers("Ever wondered how some websites handle so much traffic without crashing? Well, here's the secret: they spread themselves across multiple web servers. It's like having a team of servers instead of relying on just one. By doing this, websites can stay fast and reliable even when thousands of people are trying to access them at the same time").

574 Shafiq Report, footnote 111 ("WHOIS registration records are not always available or complete, as some records are redacted or privacy protected. Similarly, IP-based geolocation can reflect the location of a hosting provider's datacenter rather than the registrant's actual country, so non-U.S. domains may occasionally appear hosted in the United States and vice versa. Accordingly, while the filtering steps described above substantially reduce the likelihood of non-U.S. domains being included, some residual non-U.S. domains may still appear, though the vast majority of domains on this list are expected to be U.S.-based"). *See also* Shafiq Deposition, 173:13-22 ("Q. Do you recall -- and I think this is in your files -- what percentage of -- of registrants were outside the U.S. according to WHOIS data? A. It was certainly more than 0 percent. Q. Was it present for all domains or missing for a fair number of them? A. I explain in Footnote 111, that WHOIS information is not always available or the information sometimes is not complete").

575 Shafiq Report, ¶¶ 186, 189.

576 Declaration of Daniel Rampton, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-03580-WHO ("Rampton Declaration") 1:19-23 ("Meta's "Points of Presence" are a collection of dedicated, high-performance networking equipment that shorten the path that data has to travel from users' devices or advertisers' servers (depending on the mode of transmission) to reach Meta, thereby facilitating faster access to Meta's services (like Facebook)"); Petrova, Beloslava, "What is a Point of Presence (PoP) and Why Does It Matter?," CloudDNS, https://www.cloudns.net/blog/what-is-a-point-of-presence-pop-and-why-does-it-matter/ ("Every time you visit a website, stream a video, or access an online service, your request travels through multiple network points before reaching its destination. One of the key components that make this process fast, reliable, and secure is the Point of Presence (PoP). PoPs are strategically located infrastructure points that help reduce latency, balance network traffic, and optimize content delivery").

577 Rampton Declaration 2:1-3 ("Meta receives Event Data at a Point of Presence when transmitted by web or app developers using Business Tools code in their website or app and customer lists. This has been true for the entire time period from June 17, 2018 to the present").

changed over time, Dr. Shafiq's claims are not supported because Dr. Shafiq fails to determine whether it is feasible to determine which PoP received any particular data in the past.[578]

230. The fact that Meta knows the locations of its servers—distributed across 22 states as of 2025—does not imply that Dr. Shafiq could determine, or has provided any methodology to determine, which specific servers received, processed, or stored any particular data point.[579]

### I. Opinion 9: Dr. Shafiq's Opinions Related to Data Lineage Are Misleading

231. Dr. Shafiq asserts that "to accurately understand all the different uses of the at-issue data, a company should be able to identify and produce information about end-to-end data lineage in its systems with relative ease."[580] Based on his review of materials, Dr. Shafiq concludes that "Meta lacks end-to-end data lineage documentation"[581] and therefore "Meta cannot definitively say whether or how it uses the at-issue data" because "Meta cannot adequately trace the 'data lineage' of the at-issue data."[582] However, Dr. Shafiq's opinions are based on an incomplete review of available information and are misleading.

232. Although Dr. Shafiq claims to base his opinions on Meta's interrogatory responses,[583] those responses state that "[t]he most comprehensive way to trace the full data lineage" is to review

[578] Rampton Declaration 2:4-6 ("From June 17, 2018 through the present, Meta's Points of Presence have been located throughout the United States and internationally, although the exact number and locations of Meta's Points of Presence have varied over time."), 2:10-12 ("The Point of Presence that receives a particular transmission of Event Data depends on several factors, including the physical location of a user's device or the physical location of a developer's servers (again, depending on the mode of transmission)").

[579] "Meta Data Centers in the United States," Meta, https://datacenters.atmeta.com/wp-content/uploads/2025/11/Meta-United-States-Data-Centers.pdf. Meta as of 2025 had data centers in the following states: Alabama (Huntsville and Montgomery), Arizona, Georgia, Idaho, Illinois, Indiana, Iowa, Louisiana, Minnesota, Missouri, Nebraska, New Mexico, North Carolina, Ohio (Bowling Green and New Albany), Oregon, South Carolina, Tennessee, Texas (El Paso, Fort Worth, and Temple), Utah, Virginia, Wisconsin, and Wyoming.

[580] Shafiq Report, ¶¶ 198-199 ("In summary, to accurately understand all the different uses of the at-issue data, a company should be able to identify and produce information about end-to-end data lineage in its systems with relative ease. By end-to-end, I mean the ability to account for what it does with data from the moment it is collected to the moment it leaves a company's systems. In this case, Meta did not produce end-to-end data lineage for data it collects via Meta Pixel").

[581] Shafiq Report, Opinion 9.

[582] Shafiq Report, ¶¶ 196, 203.

[583] Shafiq Report, ¶¶ 200, 201.

Meta's source code.[584] But Dr. Shafiq did not perform any Source Code review,[585] and thus, cannot determine the extent to which the data lineage of Meta's "at-issue" data can or cannot be traced.

233. Dr. Shafiq ignores that "end-to-end data lineage documentation" is not sufficient to "definitively say" what role any particular piece of data played in determining what ad was shown to a user, which rely on a range of other inputs (*see* **Sections V.C** and **VI.C)** and involve machine learning models.

234. As discussed in **Section VI.C**, in machine learning models, which are a core part of Meta's ad delivery system,[586] data can be routinely discarded, and determining its impact on predicting ad relevance for particular users may be difficult or impossible. Modern machine learning models employ techniques, such as regularization, cross-validation, LASSO, and pruning, to address overfitting (*i.e.*, when additional inputs degrade rather than improve model performance).[587] Consequently, some data points may never contribute to model learning or prediction. Even when a data point is included in training, modern machine learning algorithms—particularly complex, non-linear models such as neural networks or ensemble methods—do not assign explicit or traceable weights to individual inputs.[588] Model predictions typically result from

---

584 Shafiq Report, ¶ 200 (citing to Meta's response to ROG 13: "The most comprehensive way to trace the full data lineage associated with Business Tool data received from a given developer is by reviewing the source code").

585 Shafiq Report, ¶¶ 160, 200, 201.

586 "Best practices for Meta ads delivery," Meta, https://business.facebook.com/business/help/950694752295474/ ("Meta's ads delivery system uses machine learning to optimize ad performance and help minimize your costs").

587 Lotfinejad, Mehdi, "Regularization in Machine Learning (with Code Examples)," Dataquest, January 2, 2025, https://www.dataquest.io/blog/regularization-in-machine-learning/ ("Regularization in machine learning is one of the most effective tools for improving the reliability of your machine learning models. It helps prevent overfitting, ensuring your models perform well not just on the data they've seen, but on new, unseen data too. […] Overfitting happens when a machine learning model learns the training data too well, including its noise and minor details. This results in a model that performs exceptionally on the training data but struggles to generalize to new, unseen data"); Kuhn, Max and Kjell Johnson, *Applied Predictive Modeling*, Springer, 2016, pp. 69-70 ("k-Fold Cross-validation: The samples are randomly partitioned into k sets of roughly equal size.[…] The k resampled estimates of performance are summarized (usually with the mean and standard error) and used to understand the relationship between the tuning parameter(s) and model utility"), p. 125 ("Thus, the lasso yields models that simultaneously use regularization to improve the model and to conduct feature selection"), p. 177 ("Once the full tree has been grown, the tree may be very large and is likely to over-fit the training set. The tree is then *pruned* back to a potentially smaller depth"); PIXEL_HEALTH000000023-043 at 026 ("Feature importance workflow runs select features from a large feature pool. This is used to select a fixed amount of top features on demand from the newly proposed features, v0 model features and FAST pool […]").

588 *See*, *e.g.*, PIXEL_HEALTH000218635-666; PIXEL_HEALTH000000023-043 at 031 ("FBLearner Flow is many different things to many different customers today. Generally speaking, FBLearner Flow is the platform

interactions among numerous parameters learned jointly from the data.[589] As a result, knowing the data lineage of a specific data point does not reveal whether that data point had any impact on the model's predictions.

### J. Opinion 10: Dr. Shafiq Fails to Provide a Reliable Method for Counting the Number of Proposed Class Members

235. Dr. Shafiq claims, "[f]or time periods, domains, and events where Meta preserved the data, specific class members (and the total number of them) can be programmatically identified using Meta's records."[590] However, Dr. Shafiq provides no methods that can reliably identify specific Facebook users from offsite data, as I discuss above in **Section VII.B**, nor any other method that can reliably count them.

236. Dr. Shafiq states that "Plaintiffs seek to certify a class capturing Patient Button Clicks and Health Information for the domains that Meta has classified [in RDTT] as Healthcare Provider, Mental Health Condition, Substance Use Disorder, and/or Health Coverage" and that, because "[t]here are hundreds of thousands of domains in this category," "there are more than 40 class members in each of those classes."[591] With respect to the proposed Prescription Drug Information Class, Dr. Shafiq similarly states that he understands "that Plaintiffs have identified hundreds of prescription drug domains […] including the more than 300 domains as per RDTT

---

for building, experimenting, and publishing ML workflows at Facebook. A workflow is basically a combination of data coming in from a source (such as a Hive table), an ML algorithm (such as a neural network, decision tree, or linear regression), and some post-processing instructions"); Kuhn, Max and Kjell Johnson, *Applied Predictive Modeling*, Springer, 2016, p. 142 ("A neural network model usually involves multiple hidden units to model the outcome. Note that, unlike the linear combinations in PLS, there are no constraints that help define these linear combinations. Because of this, there is little likelihood that the coefficients in each unit represent some coherent piece of information"), p. 202 ("The ensemble nature of random forests makes it impossible to gain an understanding of the relationship between the predictors and the response").

[589] Kuhn, Max and Kjell Johnson, *Applied Predictive Modeling*, Springer, 2016, p. 142 ("A neural network model usually involves multiple hidden units to model the outcome"), pp. 192-194 ("Bagging […] was one of the earliest developed ensemble techniques […] bagging effectively reduces the variance of a prediction through its aggregation process […] aggregating over many versions of the training data actually reduces the variance in the prediction").

[590] Shafiq Report, ¶ 209.

[591] Shafiq Report, ¶ 206 ("It is my understanding that Plaintiffs seek to certify a class capturing Patient Button Clicks and Health Information for the domains that Meta has classified as Healthcare Provider, Mental Health Condition, Substance Use Disorder, and/or Health Coverage (see RDTT classification). There are hundreds of thousands of domains in this category, leading me to conclude that there are more than 40 class members in each of those classes").

classification," and on that basis, he "conclude[s] that there are more than 40 class members."[592] Dr. Shafiq does not, however, provide any method to count Proposed Class Members.[593]

237. In addition to referencing the RDTT-classified domains, Dr. Shafiq asserts that, for the proposed Patient Status Button-Click, Patient Health Information, and Prescription Drug Information Classes, Proposed Class Members "can be programmatically identified using Meta's records" related to SIDs.[594] However, Dr. Shafiq does not provide a reliable method for counting Facebook users and instead only counts SIDs.[595] The number of SIDs does not provide an estimate for the number of unique Facebook users. In fact, as I discussed in **Section V.C.2**, because users can reset or disconnect SIDs, many SIDs can map to a single user's Facebook account, and not all SIDs map to potentially sensitive health information. In other words, the number of SIDs may exceed the number of Proposed Class Members.

238. For the proposed Patient Device Intrusion Class, Dr. Shafiq states that "the Meta Pixel consumes computing resources every time that a person goes to a website where the Pixel fires and the *fbp* cookie is placed on the person's device because it is marked as first-party cookie. Therefore, it is my opinion that there are more than 40 class members in the Patient Device Intrusion class."[596] Dr. Shafiq again fails to provide any method for counting or estimating the number of Proposed Class Members. Further, as I discussed in **Section V.A**, because the *_fbp* cookie varies across websites for the same user (and even varies across devices for the same

[592] Shafiq Report, ¶ 207 ("It is also my understanding that Plaintiffs have identified hundreds of prescription drug domains to Meta for the Prescription Drug Information class, including the more than 300 domains as per RDTT classification. Again, because there are hundreds of such domains, I conclude that there are more than 40 class members in the Prescription Drug Information class").

[593] Shafiq Report, ¶¶ 59-60, 62, 205-207.

[594] Shafiq Report, ¶ 209.

[595] Shafiq Report, ¶ 209 ("For the Patient Button Click class, the button click information that Meta collected and preserved in *pixel_button_clicks* and *inferred_website_events*. As discussed earlier, there are more than 600 thousand separable IDs (that Meta maps to Facebook User IDs) for which Patient Button Clicks were collected by Meta for the time period between February 17 and April 28, 2023. It is my opinion that that there are more than 40 class members. For the Health Information class, the relevant data that Meta collected and preserved in *ads_pixel_traffic*, *offsite_signals*, and *offsite_signals_pipe* also contains separable IDs (that Meta links or associated to Facebook User IDs). One can use the preserved data to precisely count SIDs in the data. Based on the full-string URL chart for MedStar Health, it is my opinion that that there are more than 40 class members. For the Prescription Drug Information class, the relevant data is in the same tables. For an example, I repeat the chart from above for Biktarvy. Based on the full-string URL chart for Biktarvy, it is my opinion that that there are more than 40 class members").

[596] Shafiq Report, ¶ 208.

user visiting the same website), relying solely on counting *_fbp* cookie values will overcount the number of users.

## VIII. MR. SMITH'S OPINIONS ARE FLAWED AND UNRELIABLE

### A. Mr. Smith's Analyses Do Not Support That SubscribedButtonClick Events Were Transmitted to Meta After Website Visitors Logged into a Patient Portal

239. In his supplemental declaration, Mr. Smith states that, in his initial declaration, he "documented how the Meta Pixel sent SubscribedButtonClick events to Meta's servers when a person clicked to LOG-IN to the patient portal at www.medstarhealth.org."[597] He also provided the summary of his opinion from his initial declaration that "Meta acquires the patient status of individuals logging into the 'patient portals' of their providers through click data, including the Meta Pixel 'SubscribedButtonClick.'"[598] However, Mr. Smith never claims in either of his declarations that he logged into a patient portal successfully or that any button he interacted with transmitted "patient status" information to Meta. In fact, during his deposition, Mr. Smith testified that he was not a patient of and did not successfully log into MedStar Health's patient portal,[599] which is verified by video showing his failed attempt to log in,[600] and he also testified that he did not log into the patient portals of various other hospital websites he reviewed.[601] Thus, Mr. Smith does not show whether SubscribedButtonClick events were transmitted to Meta's servers after logging into a patient portal, let alone whether "Meta acquires the patient status of individuals logging into the 'patient portals' of their providers."

---

597 Supplemental Smith Declaration, ¶ 3.

598 Supplemental Smith Declaration, ¶ 3.

599 Smith Deposition, 131:8-12 ("Q. And would you have had a username and password to enter on the MedStar Health patient portal? A. I would not have a valid username and password").

600 PL-EXPERT-SMITH_000760; PL-EXPERT-SMITH_000826.

601 *See, e.g.*, Smith Deposition, 137:5-8 ("Q. Okay. And do you recall if you actually logged into this MyChartPLUS web portal for Hartford Healthcare? A. No, I did not log in"), 138:9-11 ("Q. Were you able to log into Rush's MyChart Access? A. I was not"), 139:5-7 ("Q. And were you able to log into Summa Health's portal here? A. I was not"), 139:24-140:1 ("Q. And were you able to log into University Hospitals' portal? A. I was not"), 168:3-170:11 ("Q. I believe the first example is Dana-Farber Hospital. A. Yes. […] Q. From the information here, it does not appear that there is any indication that there was a login to a patient portal, right, in this action? A. There was not necessarily a login and not necessarily an attempt at a login").

### B. Mr. Smith's Analyses Do Not Support His Conclusion That SubscribedButtonClick Events Were Commonly Transmitted to Meta from Healthcare Provider Webpages

240. Mr. Smith additionally asserts that "[i]t's just been [his] experience" that, prior to November 2022, "SubscribedButtonClick happens all the time on hospital visits."[602] To support this assertion, which I address in more detail below, Mr. Smith improperly relies on 17 SAZ files generated from his interactions with 14 websites and a flawed configuration of the Meta Pixel.[603] I note that neither Mr. Smith's analysis of those 17 SAZ files nor the flawed configuration of the Meta Pixel he identifies provide any support for the summary of his opinion from his initial declaration that "Meta acquires the patient status of individuals logging into the 'patient portals' of their providers" (*see* **Section VIII.A**).[604]

#### *1. Mr. Smith's 17 SAZ Files Cannot Be Used to Reliably Assess "How Common It Was for the Meta Pixel to Send SubscribedButtonClick Events to Facebook from Web Pages of Healthcare Provider Web Sites"*

241. Mr. Smith states that, "[i]n [his] supplemental declaration, [he had] been asked to explain [his] understanding of how common it was for the Meta Pixel to send SubscribedButtonClick events to Facebook from web pages of healthcare provider Web sites prior to November 2022, based on [his] own personal knowledge and experience."[605] To do so, Mr. Smith selected and then analyzed 17 SAZ files that were generated from 14 websites as part of his expert work for the Simmons law firm in connection with unrelated, actual or contemplated litigation between February 2019 and August 2022.[606] Mr. Smith notes in his supplemental declaration "that

[602] Supplemental Smith Declaration, ¶ 5; Smith Deposition, 203:16-25 ("Q. How are you able to draw conclusions about all healthcare websites from the 14 that you analyzed here? A. It's just been my experience, you know, doing these cases that SubscribedButtonClick happens all the time on hospital websites. And the testing that I did, you know, the sampling I did, you know, showed the same thing").

[603] Supplemental Smith Declaration, ¶ 6 ("I analyzed 17 SAZ files created by the Fiddler web debugging proxy2 that were created between February 2019 and August 2022 as part of testing and analysis I personally performed of hospital Web sites and their use of tracking pixels including the Meta pixel").

[604] Supplemental Smith Declaration, ¶ 3.

[605] Supplemental Smith Declaration, ¶ 5. *See also* Smith Deposition, 161:3-12 ("Q. So your opinion in this supplemental declaration is about establishing how common it was for the Meta Pixel to sends SubscribedButtonClick events to Facebook, right? A. Based on the testing that I had done, you know, prior to August of 2022, my own experience, you know, in doing this kind of testing, how often did it show up").

[606] Supplemental Smith Declaration, ¶¶ 6-7 ("I analyzed 17 SAZ files created by the Fiddler web debugging proxy that were created between February 2019 and August 2022 as part of testing and analysis I personally performed

SubscribedButtonClick events were generated in all 17 files"[607] and that this result is consistent with his "experience […] doing these cases that SubscribedButtonClick happens all the time on hospital websites."[608] Mr. Smith's assessment that this happens "all the time" is apparently based solely on 17 examples from his personal experience interacting with 14 particular websites, as he never identified any other "hospital websites" where he has had this "experience." However, Mr. Smith fails to explain how these examples can be used to assess "how common it was for the Meta Pixel to send SubscribedButtonClick events to Facebook from web pages of healthcare provider Web sites."

242. In fact, the 17 particular SAZ files that Mr. Smith selected as examples are unreliable for making such an assessment.[609] Specifically, Mr. Smith does not establish that the 14 particular websites are representative of all healthcare provider webpages prior to November 2022 or that his interactions with those websites in the 17 SAZ files are representative of all users' interactions with healthcare provider webpages. As I discuss above in **Section VII.A.1.a**, because Mr. Smith fails to show that his selected subset of websites or his interactions with those websites are representative, his finding that "SubscribedButtonClick events were generated in all 17 files" may reflect peculiarities of just those files and may not generalize to the broader group of users' interactions with all healthcare provider webpages prior to

---

of hospital Web sites and their use of tracking pixels including the Meta pixel"); Smith Deposition, 192:22-193:9 ("Q. How did you select those 17 SAZ files to do the assessment that counsel requested in this supplemental declaration? A. The first thing I did was select out SAZ files that were related to Simmons. I did not choose hospital websites from other cases that I worked for, okay, from other law firms. And then I did some kind of search for the SAZ files that I had, that I had gotten over the years, looking for the SubscribedButtonClick […]").

607 Supplemental Smith Declaration, ¶ 8.

608 Smith Deposition, 203:16-25 ("Q. How are you able to draw conclusions about all healthcare websites from the 14 that you analyzed here? A. It's just been my experience, you know, doing these cases that SubscribedButtonClick happens all the time on hospital websites. And the testing that I did, you know, the sampling I did, you know, showed the same thing").

609 Mr. Smith does not indicate that his analysis of the 17 particular SAZ files he selected provides support for or even relates to his opinions in his initial declaration.

November 2022.[610] Moreover, Mr. Smith's selection methodology is neither documented nor replicable, which prevents a comprehensive audit.[611, 612]

243. First, Mr. Smith does not establish why the 14 particular websites that he used to generate his selected SAZ files are representative of all "web pages of healthcare provider Web sites."[613] The process Mr. Smith describes for selecting the 17 SAZ files, in fact, shows that Mr. Smith did not apply an appropriate sampling methodology or other selection criteria that would have allowed him to identify a representative list of websites. For example:

a. Mr. Smith selected only SAZ files generated from "hospital websites,"[614] meaning he failed to sample webpages from the websites of a variety of different healthcare provider types that Plaintiffs claim are at issue in this matter (*e.g.*, webpages from dentist websites).

---

610 Supplemental Smith Declaration, ¶ 8.

611 *See*, *e.g.*, "Improving Reproducibility and Replicability in Research: Highlights From Three National Academies Reports," The National Academies of Sciences Engineering Medicine, 2019, https://nap.nationalacademies.org/resource/25303/Combined%20Reproducibility%20Brief%20vs2.pdf ("Replicability. One important way to confirm or build on previous results is to follow the same methods, obtain new data, and see if the results are consistent with the original ones"); Salanié, Bernard, "Instructions for Submitting Articles," Journal Of The Econometric Society, https://www.econometricsociety.org/publications/quantitative-economics/submissions/instructions-for-submitting-articles ("Prior to acceptance, authors must provide the raw data, code, and sufficient documentation to enable replication of all results presented in the paper and any approved online appendices"); Kopper, Sarah and Anja Sautmann, "Randomization," The Abdul Latif Jameel Poverty Action Lab, September 2023, https://www.povertyactionlab.org/resource/randomization ("Regardless of method, the randomization procedure should be verifiable, replicable, and stable, and the randomization outcome saved in a secure file or folder away from other project files. […] Set the seed for the random number generator (in Stata, set seed). Make sure that the seed is: Preserved"); Nosek, B. A. et al., "Promoting an open research culture," *Science*, Vol. 348, No. 6242, June 26, 2015, pp. 1422-1425, p. 1422 ("Transparency, openness, and reproducibility are readily recognized as vital features of science. When asked, most scientists embrace these features as disciplinary norms and values"); Zogmaister, Cristina et al., "Assessing the Transparency of Methods in Scientific Reporting," *University of California Press*, Vol. 10, No. 1, 2024 ("For instance, a certain effect might be affected by participants' characteristics, that differ in the original and in the replication study, as for example socioeconomic status […] Lack of transparency in the description of the population and sampling methods could hinder the possibility of discovering this difference between the two studies").

612 I note that, consistent with not selecting replicable, representative samples, Mr. Smith does not characterize the 17 particular SAZ files he selected or the associated 14 websites as "samples" in his supplemental declaration and, in fact, never uses the term "sample" or "sampling" anywhere in the declaration.

613 Supplemental Smith Declaration, ¶ 5.

614 Supplemental Smith Declaration, ¶ 6; Smith Deposition, 161:13-21 ("Q. You were looking for SubscribedButtonClick events irrespective of whether there was anything health related in those transmissions, right? A. Well, I was looking for SubscribedButtonClick clicks on hospital websites. Seems to be if you're at a hospital website, it's going to be health related"), 192:22-193:21 ("Q. How did you select those 17 SAZ files to do the assessment that counsel requested in this supplemental declaration? A. The first thing I did was select out SAZ files that were related to Simmons. I did not choose hospital websites from other cases that I worked on,

b. Mr. Smith selected only SAZ files from within the collection of files that he had previously generated as part of his prior expert work performed for the Simmons law firm,"[615] meaning he excluded all websites that he did not find relevant to his specific assignments for those particular cases on which he was retained by the Simmons law firm.

244. The 17 particular SAZ files that Mr. Smith selected illustrate his flawed selection criteria. For example, Mr. Smith's selected files do not include any websites that did not send SubscribedButtonClick events, even though, as I show in **Section IV.B**, 1,059 of the 1,347 websites identified by Plaintiffs and present in the data did not transmit SubscribedButtonClick events.[616] Further, as I discuss in **Sections IV.F**, **V**, and **VI.B**, this could happen for a variety of reasons that Mr. Smith ignores, including a Meta Pixel or domain being placed into Core Setup by Meta, which Mr. Smith acknowledged during his deposition but failed to consider in his supplemental declaration.[617]

---

okay, from other law firms. And then I did some kind of search for the SAZ files that I had, that I had gotten over the years, looking for the SubscribedButtonClick. Actually it's E V equals SubscribedButtonClick. I then looked at the dates, you know, that they were in. I was given a certain range that they have to be in. Q. Right. So prior to November 2022? A. Right. Let me rephrase one thing I said. I actually looked for hospitals that were using, I searched for the Meta Pixel being used, so it was Facebook.com/T R that I did the search for"), 197:1-7 ("Q. Do you think of the selection of websites that you used for this analysis as a representative sample? A. Based on looking at SAZ files and HAR files over a good chunk of years, the answer is yes, SubscribedButtonClick are pretty common on hospital websites"), 203:16-25 ("Q. How are you able to draw conclusions about all healthcare websites from the 14 that you analyzed here? A. It's just been my experience, you know, doing these cases that SubscribedButtonClick happens all the time on hospital websites. And the testing that I did, you know, the sampling I did, you know, showed the same thing"), 208:15-209:5 ("Q. Mr. Smith, a little while ago we were talking about your opinion based on the overall research that you've done regarding hospitals who use the Meta Pixel; do you recall that discussion? A. Yes. Q. Can you quantify the number of hospitals that you have researched as part of your expert work. Q. It's probably in the range of 50 to 100. I don't know the exact number. Q. And do you have a sense of the number of hospitals overall in the country? A. I do not, no").

615 Smith Deposition, 202:15-21 ("Q. And just to be clear, if a website had not been the basis of any expert work that you had done for the Simmons firm, it would not have been considered as part of the analysis for your supplemental declaration, right? A. That's correct"), 204:1-7 ("Q. And when you say sampling, you mean selecting among the cases where you conducted testing for litigation? Yes. Sorry, I talked over you. Yes, it's based on the cases that I've done for the Simmons law firm, yes").

616 *See* backup, "sbc_domains." This analysis is limited to the dates shared by both the Offsite Signals dataset and the Pixel Button Clicks or Inferred Website datasets.

617 Smith Deposition, 103:6-104:25 ("Q. And what do you understand Core Setup is? A. With Core Setup, my understanding is that the Meta Pixel can be configured either by Meta or by a website to cut back on the amount of information that's sent in the Meta Pixel. And it's used on, I think the word that Meta uses is sensitive websites. So, you know, a hospital would probably fall under that category. And so in the Meta Pixel, I forget the categories of information that are not sent, but the full URL is not sent, maybe like a page title is not sent. Variables are not sent. So there is a list of things that are not sent. And my understanding is that Core Setup was added in like around May of 2024. […] Q. The impact that Core Setup has on the information that is actually transmitted is not discussed in your report, or your declaration, excuse me; is that right? A. That is correct").

245. Second, Mr. Smith's data collection process was restricted to his "own activity browsing different websites,"[618] and he does not establish why the particular way in which he interacted with healthcare provider websites was representative of all users visiting those websites. For example, to the extent Mr. Smith did not have valid login credentials or otherwise did not (or could not) log into the patient portals of the hospital websites he visited, which he confirmed during his deposition,[619] his interactions with the websites he analyzed would not be representative of the interactions of those users who were hospital patients or otherwise did successfully log into and interact with patient portals.

246. Additionally, as he described during his deposition, Mr. Smith generated his SAZ files from his interactions with websites using a specific profile that he created "for investigating health-related websites. And the profile is set up to use a standard […] Chrome settings."[620] It is based on the use of this profile that he concludes "that SubscribedButtonClick happens all the time on hospital websites."[621] However, as I discuss in **Section V.B** and Mr. Smith acknowledged in his deposition,[622] users have a variety of browsers from which to choose and various options within

618 *See, e.g.*, Smith Deposition, 196:15-20 ("Q. And so the files that were within the universe that you were searching all reflected your own activity browsing on different websites, is that fair? A. Yes").

619 *See, e.g.*, Smith Deposition, 131:8-12 ("Q. And would you have had a username and password to enter on the MedStar Health patient portal? A. I would not have a valid username and password"), 137:5-8 ("Q. Okay. And do you recall if you actually logged into this MyChartPLUS web portal for Hartford Healthcare? A. No, I did not log in"), 138:9-11 ("Q. Were you able to log into Rush's MyChart Access? A. I was not"), 139:5-7 ("Q. And were you able to log into Summa Health's portal here? A. I was not"), 139:24-140:1 ("Q. And were you able to log into University Hospital's portal? A. I was not"), 168:3-170:11 ("Q. I believe the first example is Dana Farber hospital. A. Yes. […] Q. From the information here, it does not appear that there is any indication that there was a log in to a patient portal, right, in this action? A. There was not necessarily a log in and not necessarily an attempt at a log in").

620 Smith Deposition, 75:7-76:2 ("Q. And can you describe the methodology that you use to create the SAZ files that form the basis for your declarations in this case? A. I start up Fiddler. Well, I typically start the browser up and I go to a profile that I've created, you know, for investigating health-related websites. And the profile is set up to use a standard, you know, Chrome settings. And then I start Fiddler. And then I go to -- I go to the website that I want to test. And I visit a variety of pages within that, within that hospital website. I also do searches and look around for doctors, that sort of thing. Q. So you said you have a profile with standard Chrome settings; is that right? A. That's correct, yes").

621 Smith Deposition, 203:16-25 ("Q. How are you able to draw conclusions about all healthcare websites from the 14 that you analyzed here? A. It's just been my experience, you know, doing these cases that SubscribedButtonClick happens all the time on hospital websites. And the testing that I did, you know, the sampling I did, you know, showed the same thing").

622 *See, e.g.*, Smith Deposition, 111:4-112:14 ("Q. And are you familiar with any other private browsing modes? A. You know, I think most browsers have a private browsing mode. The main purpose of it is to erase on the device where the browser has been. Q. Would that impact the information that would be transmitted via a tracking pixel? A. Yeah, I don't know with all different browsers what happens. I can't tell you. […] Q. But you are

each of those browsers that affect whether SubscribedButtonClick events will be transmitted when visiting healthcare provider websites. For example, one estimate showed that, by Q1 2024, 32 percent of U.S. internet users aged 16 to 64 used ad blockers in their browsers,[623] which would prevent the transmission of SubscribedButtonClick events. Mr. Smith himself uses an ad blocker in his browser, as shown in his initial declaration, which I reproduce in **Figure 51** below. However, my review of the 17 particular SAZ files Mr. Smith selected shows that, in the profile he uses for "investigating," he did not use any browser settings or ad blocking extensions that, as I discuss in **Section V.B**, would have prevented the transmission of SubscribedButtonClick events.

**Figure 51**
**Mr. Smith Has Browsed with an Ad Blocker Enabled[624]**




247. Finally, Mr. Smith does not document his SAZ file selection methodology, and his methodology is not replicable. During his deposition, when asked if the process he used to select his 17 SAZ

---

familiar with ad blockers that do have a function to block tracking pixels; is that right? A. I am familiar. Q. And that is a thing that exists, right? A. Yes").

623 "Ad Blocker Usage and Demographic Statistics," Backlinko, https://backlinko.com/ad-blockers-users#adblock-by-countryadblock-by-country ("Here's a list of all 53 countries that GWI analyzed, ranked by the percentage of ad blocker usage among internet users aged 16-64: […] USA [:] 32.2% […] As of Q1 2024, GWI estimates that **32.2%** of Americans use ad blockers. But there are other estimates too") (emphasis in original).

An earlier estimate showed that 16 percent of U.S. internet users used ad blockers in Q2 2015. *See* "The cost of ad blocking," PageFair and Adobe, 2015, https://gwern.net/doc/economics/advertising/2015-pagefair.pdf ("**16%** of the US online population blocked ads during Q2 2015") (emphasis in original).

624 Initial Smith Declaration, ¶ 112.

files from his larger collection of SAZ files, and thus his 14 particular websites, was documented anywhere, Mr. Smith responded, "[n]o. Not to my knowledge, no."[625] Further, when asked, "[c]ould you recreate that process sitting here today, if you had all of those files in front of you?" Mr. Smith responded that "I still have many SAZ files, so the answer is I could do something similar. I am not sure it would be identical to what I did back in August."[626]

*2. Mr. Smith's Analysis Improperly Relies on Developers' Misconfigured Integration of the Meta Pixel*

248. Mr. Smith acknowledges in both his initial declaration and supplemental declaration,[627] and confirmed during his deposition,[628] that developers can disable SubscribedButtonClick events so that those events are not transmitted to Meta. However to support his claim that SubscribedButtonClick events were commonly transmitted to Meta from hospital websites, Mr. Smith identifies an example that he asserts shows that, "[i]n spite of following Meta's instructions for disabling SubscribedButtonClick events, a Meta pixel with a SubscribedButtonClick event […] was still sent to a facebook.com server."[629] However, in Mr. Smith's example, the SubscribedButtonClick event was sent to Meta not because Meta's

[625] Smith Deposition, 201:13-25 ("Q. Okay. And you can't provide any further information about the additional files in the larger group that you were searching for and what they might have contained? A. I cannot, yeah. Q. Is this process documented anywhere? A. It's partially documented in this declaration. Q. Is the process that widowed down to the 17 files documented anywhere? A. No. Not to my knowledge, no").

Further, when asked if there is "a reason why you didn't explain this sampling or search process in the declaration," Mr. Smith responded, "I can't think of why I didn't. I don't know." *See* Smith Deposition, 196:21-25.

[626] Smith Deposition, 201:13-202:14 ("Q. Okay. And you can't provide any further information about the additional files in the larger group that you were searching for and what they might have contained? A. I cannot, yeah. Q. Is this process documented anywhere? A. It's partially documented in this declaration. Q. Is the process that widowed down to the 17 files documented anywhere? A. No. Not to my knowledge, no. Q. Could you recreate that process sitting here today, if you had all of those files in front of you? A. Yeah, I still have many SAZ files, so the answer is I could something similar. I am not sure it would be identical to what I did back in August. Q. And that's because when you were originally running this search, you didn't document the precise criteria or selections that you made at the time; is that right? A. Correct").

[627] Initial Smith Declaration, ¶¶ 12-14 ("Meta programmed these changes so they would occur by default unless the developer deploying the Pixel reconfigures it to 'Manual Only mode'"); Supplemental Smith Declaration, ¶ 10 ("As explained by Meta, SubscribedButtonClick events are automatically sent by the Meta pixel unless turned off by a web site").

[628] Smith Deposition, 205:3-8 ("Q. And a hospital could turn off the SubscribedButtonClick events if it wanted to? A. Well, yes, but as we have seen, we have to decipher the documentation to do that correctly").

[629] Supplemental Smith Declaration, ¶ 13.

instructions were inaccurate,[630] but because the Tufts Medical Center's website code to disable this type of event for the *https://www.tuftsmedicalcenter.org/PhysicianDirectory/Young-Kim* webpage was implemented incorrectly.[631]

249. As shown in **Figure 52**, Meta's public documentation provides instructions for how to disable Automatic Events, which includes SubscribedButtonClick events. The documentation states that developers can configure the Meta Pixel to "Manual Only mode" by adding the line "fbq('set','autoConfig','false','FB_PIXEL_ID')" above the code snippet that initializes the Meta Pixel.[632] The documentation includes a placeholder, FB_PIXEL_ID, for the locations where developers needs to add their numeric Meta Pixel ID in both the code snippet used to disable Automatic Events, fbq('set','autoConfig','false','FB_PIXEL_ID'), and the initialization code, fbq('init','FB_PIXEL_ID').[633] Additional public documentation also describes how the transmission of Automatic Events may be disabled by adding the code snippet "fbq('set', 'autoConfig', 'false', 'YOUR FB PIXEL ID or Variable in GTM')" to the "Meta (Facebook) Sitewide" tag.[634]

---

630 "Meta Pixel Advanced," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/ ("The Meta Pixel will send button click and page metadata (such as data structured according to Opengraph or Schema.org formats) from your website to improve your ads delivery and measurement and automate your Pixel setup. To configure the Meta Pixel to not send this additional information, in the Meta Pixel Base code, add fbq('set', 'autoConfig', 'false', 'FB_PIXEL_ID') above the init call"); "How To Disable Microdata Auto Event on Meta (Facebook) Pixel," Elevar, https://docs.getelevar.com/docs/how-to-disable-microdata-event-automatically-detected-on-facebook-pixel ("Facebook Sitewide Tag: First access the 'Meta (Facebook) Sitewide' tag and add the following code […] fbq('set', 'autoConfig', 'false', 'YOUR FB PIXEL ID or Variable in GTM')").

631 Supplemental Smith Declaration, ¶ 11.

632 Instructions to disable SubscribedButtonClick events can be found in Meta's public documentation. Facebook for Developers, "Pixel Code Reference," Wayback Machine, August 27, 2017, https://web.archive.org/web/20170827002341/https:/developers.facebook.com/docs/facebook-pixel/api-reference ("If you'd like to configure the Facebook Pixel to Manual Only mode, you can add the line fbq('set', 'autoConfig', 'false' 'FB_PIXEL_ID') above the init call in the Facebook Pixel Base code and the Facebook Pixel will no longer send this additional data").

633 Facebook for Developers, "Pixel Code Reference," Wayback Machine, August 27, 2017, https://web.archive.org/web/20170827002341/https:/developers.facebook.com/docs/facebook-pixel/api-reference ("fbq('set', 'autoConfig', false, 'FB_PIXEL_ID'); // Line to enable Manual Only mode. fbq('init', 'FB_PIXEL_ID'); //Insert Your Facebook Pixel ID below. fbq('track', 'PageView')").

634 "How To Disable Microdata Auto Event on Meta (Facebook) Pixel," Elevar, https://docs.getelevar.com/docs/how-to-disable-microdata-event-automatically-detected-on-facebook-pixel ("First access the 'Meta (Facebook) Sitewide' tag and add the following code. […] fbq('set', 'autoConfig', 'false', 'YOUR FB PIXEL ID or Variable in GTM')").

**Figure 52**
**Meta Documentation Demonstrating How Developers May Disable Automatic Events**[635]

```
<!-- Facebook Pixel Code -->
<script>
!function(f,b,e,v,n,t,s){
if(f.fbq)return;n=f.fbq=function(){n.callMethod?
n.callMethod.apply(n,arguments):n.queue.push(arguments)};if(!f._fbq)f._fbq=n;
n.push=n;n.loaded=!0;n.version='2.0';n.queue=[];t=b.createElement(e);t.async=!0;
t.src=v;s=b.getElementsByTagName(e)[0];s.parentNode.insertBefore(t,s)}(window,
document,'script','//connect.facebook.net/en_US/fbevents.js');
fbq('set', 'autoConfig', false, 'FB_PIXEL_ID');
// Line to enable Manual Only mode.
fbq('init', 'FB_PIXEL_ID');
//Insert Your Facebook Pixel ID below.
fbq('track', 'PageView');
</script>
<noscript>
<img height="1" width="1" style="display:none"src="https://www.facebook.com/tr?id=FB_PI
</noscript>
<!-- End Facebook Pixel Code -->
```

250. However, as shown in the Google Tag Manager file referenced by Mr. Smith and reproduced in **Figure 53**, the snippet used by the Tufts Medical Center website developers to disable SubscribedButtonClick events, fbq(\"set\",\"autoConfig\",\"false\",\"FB_PIXEL_ID\"), still includes the *placeholder* for the website's Meta Pixel ID, the FB_PIXEL_ID string, instead of the website's *actual Meta Pixel ID*. The actual Meta Pixel ID, which is 186555628522079, can be seen on the following correctly configured line of code that initializes the Meta Pixel, fbq(\"init\",\"186555628522079\"),[636] meaning the code for the Tufts Medical Center website had the placeholder correctly implemented in one section but not the other. Mr. Smith fails to show how this single example is anything other than an oversight and is indicative of any larger issue with disabling SubscribedButtonClick events. To the contrary, as I discuss in **Section V.A.2**, I observed that the website *creaonhcp.com* had correctly disabled SubscribedButtonClick events.

---

635 Facebook for Developers, "Pixel Code Reference," Wayback Machine, August 27, 2017, https://web.archive.org/web/20170827002341/https:/developers.facebook.com/docs/facebook-pixel/api-reference.

636 Supplemental Smith Declaration, ¶ 11.

**Figure 53**
**The Meta Pixel Contained in Tufts Medical Center's Google Tag Manager File**[637]


```
Request #39 of Tufts.Chrome-Windows.saz

GET https://www.googletagmanager.com/gtm.js?id=GTM-TTLN4K HTTP/1.1

{
        "function": "__html",
        "once_per_load": true,
        "vtp_html": "\n\u003Cscript
type=\"text\/gtmscript\"\u003E!function(b,e,f,g,a,c,d){b.fbq||(a=b.fbq=function(){a.callMethod?
a.callMethod.apply(a,arguments):a.queue.push(arguments)},b._fbq||(b._fbq=a),a.push=a,a.loade
d=!0,a.version=\"2.0\",a.queue=[],c=e.createElement(f),c.async=!0,c.src=g,d=e.getElementsByTag
Name(f)[0],d.parentNode.insertBefore(c,d))}(window,document,\"script\",\"https:\/\/connect.fac
ebook.net\/en_US\/fbevents.js\");fbq(\"set\",\"autoConfig\",\"false\",\"FB_PIXEL_ID\");fbq(\"init
\",\"186555628522079\");fbq(\"track\",\"PageView\");\u003C\/script\u003E\n\u003Cnoscript\u
003E\u003Cimg height=\"1\" width=\"1\" style=\"display:none\"
src=\"https:\/\/www.facebook.com\/tr?id=186555628522079\u0026amp;ev=PageView\u0026a
mp;noscript=1\"\u003E\u003C\/noscript\u003E\n\n",
        "vtp_supportDocumentWrite": false,
        "vtp_enableIframeMode": false,
        "vtp_enableEditJsMacroBehavior": false,
        "tag_id": 162
    },
```


251. My own testing demonstrates that, when Meta's instructions are correctly implemented, developers can disable the transmission of Automatic Events. For example, on a website in which I implemented the Meta Pixel,[638] I incorporated the code, fbq('set', 'autoConfig',false, 'FB_PIXEL_ID'), without first substituting in the website's Meta Pixel ID. As shown in **Figure 54**, the "SubscribedButtonClick" event was transmitted in this case. After replacing the placeholder string with the website's actual Meta Pixel ID, button clicks no longer result in the transmission of a SubscribedButtonClick event (*see* **Figure 55**).[639]

[637] Supplemental Smith Declaration, ¶ 11.

[638] *See* **Appendix D**; backup, "windows_chrome_tubular-bubblegum_disableAutoEventsPlaceholder.har."

[639] *See* **Appendix D**; backup, "windows_chrome_tubular-bubblegum_disableAutoEvents.har."

**Figure 54**
**SubscribedButtonClick Event Is Still Transmitted After Implementing fbq('set', 'autoConfig', false, 'FB_PIXEL_ID') Without Meta Pixel ID Substitution** [640]




640 *See* **Appendix D**; backup, "windows_chrome_tubular-bubblegum_disableAutoEventsPlaceholder.har."

A13-4440

**Figure 55**
**SubscribedButtonClick Event Is No Longer Transmitted After Implementing fbq('set', 'autoConfig', false, 'FB_PIXEL_ID') with Correct Meta Pixel ID Substitution [641]**




Signed on the 9th day of December, 2025.

Georgios Zervas

[641] *See* **Appendix D**; backup, "windows_chrome_tubular-bubblegum_disableAutoEvents.har."

APPENDIX A

CURRICULUM VITAE

# Georgios Zervas

Boston University
Questrom School of Business
595 Commonwealth Ave (Ofc. 605)
Boston, MA 02215

Phone: (617) 358-3319 (office)
Email: zg@bu.edu
Homepage: http://people.bu.edu/zg/
Google Scholar: https://scholar.google.com/citations?user=5L8vEA4AAAAJ

*Last updated: Mar. 4, 2025*

## Employment & Affiliations

### Current

**Associate Professor of Marketing** 2019–to date
Questrom School of Business, Boston University, Boston, MA

**Director of Online Initiatives and Innovation for BU Virtual and the Faculty of Computing and Data Sciences** 2023–to date
Boston University, Boston, MA

**Founding Member, Faculty of Computing & Data Science** 2019–to date
Boston University, Boston, MA

**Affiliated Faculty in Computer Science** 2016–to date
Boston University, Boston, MA

### Prior

**Faculty Director, MS in Business Analytics** 2019–2022
Questrom School of Business, Boston University, Boston, MA

**Assistant Professor of Marketing** 2013–2019
Questrom School of Business, Boston University, Boston, MA

**Visiting Researcher** 2013–2022
Microsoft Research New England, Cambridge, MA

**Visiting Scholar** Spring 2018
MIT Sloan, Cambridge, MA

**Simons Postdoctoral Fellow** 2011–2013
Yale University, New Haven, CT
*Advisor*: Joan Feigenbaum

**Affiliate at the Center for Research & Computation in Society** 2011–2013
Harvard University, Cambridge, MA

**Research Scientist** 2006–2012
CogoLabs Inc., Cambridge, MA, USA

**Cofounder** 2000–2005
Perlfect Solutions, London, UK

# Education

**Ph.D. Computer Science** 2005–2011
Boston University, Boston, MA, USA.
*Thesis*: Data-Driven Analysis of Electronic Commerce Systems.
*Advisors*: John W. Byers (BU) & Michael Mitzenmacher (Harvard).

**M.A. Interactive Media** 1999–2000
London College of Communication, London, UK.
*Thesis*: Automatic Website Generation Using Genetic Algorithms.
*Advisor*: Alan Sekers.

**M.Sc. Computer Science** 1998–1999
Imperial College, London, UK.
*Thesis*: Thesis: Advanced Clustering Algorithms.
*Advisor*: Stefan Rüger.

**B.Eng. Computer Science** 1995–1998
Imperial College, London, UK.
*Thesis*: Object Linking & Embedding for Linux.
*Advisor*: Steffen van Bakel.

# Publications

## Journals

1. Chiara Farronato and Georgios Zervas
   **Consumer Reviews and Regulation: Evidence from NY Restaurants**
   *Marketing Science*, Accepted.
2. Luis Armona, Greg Lewis, and Georgios Zervas
   **Learning Product Characteristics and Consumer Preferences from Search Data**
   *Marketing Science*, Forthcoming.
3. Shrabastee Banerjee, Chris Dellarocas Chris, and Georgios Zervas
   **Interacting User-Generated Content Technologies: How Questions and Answers Affect Consumer Reviews.**
   *Journal of Marketing Research*, (2021);58(4): 742-761.
4. Georgios Zervas, Davide Proserpio, and John W. Byers
   **A first look at online reputation on Airbnb, where every stay is above average**
   *Marketing Letters*, (2020): 1-16.
5. Giana Eckhardt, Mark Houston, Baojun Jiang, Cait Lamberton, Aric Rindfleisch, and Georgios Zervas
   **Marketing in the Sharing Economy**
   *Journal of Marketing*, 83.5 (2019): 5-27.
6. Davide Proserpio, Wendy Xu, and Georgios Zervas
   **You Get What You Give: Theory and Evidence of Reciprocity in the Sharing Economy**
   *Quantitative Marketing and Economics*, 16(4), (2018): 371-407.
7. Georgios Zervas, Davide Proserpio, and John W. Byers
   **The Rise of the Sharing Economy: Estimating the Impact of Airbnb on the Hotel Industry**
   *Journal of Marketing Research*, 54, no. 5 (2017): 687-705.
   – Finalist for the 2018 Paul E. Green Award.

8. Davide Proserpio and Georgios Zervas
**Online Reputation Management: Estimating the Impact of Management Responses on Consumer Reviews**
*Marketing Science*, 36, no. 5 (2017): 645-665
– Finalist for the 2018 John D. C. Little Award.

9. Michael Luca, and Georgios Zervas
**Fake It Till You Make It: Reputation, Competition, and Yelp Review Fraud**
*Management Science*, 62, no. 12 (2016): 3412-3427

## Full Papers in Peer-reviewed Conferences with Proceedings

1. Ceren Budak, Sharad Goel, Justin M. Rao, and Georgios Zervas
**Understanding Emerging Threats to Online Advertising**
In *Proceedings of the Sixteenth ACM Conference on Economics and Computation (EC '16)*. ACM, 2016.

2. John Byers, Michael Mitzenmacher, and Georgios Zervas
**The Daily Deals Marketplace: Empirical Observations and Managerial Implications**
In *ACM SIGecom Exchanges, Vol. 11, No. 2, December 2012, Pages 29–31*.

3. Joan Feigenbaum, Michael Mitzenmacher, and Georgios Zervas
**An Economic Analysis of User-Privacy Options in Ad-Supported Services**
In *Proceedings of the 8th Workshop on Internet & Network Economics*, WINE '12, pages 30–43. Springer Berlin Heidelberg, 2012.

4. John W. Byers, Michael Mitzenmacher, and Georgios Zervas
**The Groupon Effect on Yelp Ratings: A Root Cause Analysis**
In *Proceedings of the 13th ACM Conference on Electronic Commerce*, EC '12, pages 248–265. Valencia, Spain, 2012. ACM.

5. John W. Byers, Michael Mitzenmacher, and Georgios Zervas
**Daily Deals: Prediction, Social Diffusion, and Reputational Ramifications**
In *Proceedings of the 5th ACM international conference on Web Search and Data Mining*, WSDM '12, pages 543–552. Seattle, WA, USA, 2012. ACM.

6. John W. Byers, Brent Heeringa, Michael Mitzenmacher, and Georgios Zervas.
**Heapable Sequences and Subsequences**
In *Proceedings of the Workshop on Analytic Algorithmics and Combinatorics*, ANALCO '11, pages 33–44, San Fransisco, CA, USA, 2011. ACM.

7. John W. Byers, Michael Mitzenmacher, and Georgios Zervas
**Information asymmetries in pay-per-bid auctions**
In *Proceedings of the 11th ACM conference on Electronic Commerce*, EC '10, pages 1–12, New York, NY, USA, 2010. ACM.

8. John W. Byers, Michael Mitzenmacher, and Georgios Zervas
**Adaptive Weighing Designs for Keyword Value Computation**
In *Proceedings of the third ACM international conference on Web search and data mining*, WSDM '10, pages 331–340, New York, NY, USA, 2010. ACM.

9. Nikolaos Laoutaris, Georgios Zervas, Azer Bestavros, and George Kollios
**The Cache Inference Problem and its Application to Content and Request Routing**
In *Proceedings of the 26th Annual IEEE Conference on Computer Communications*, INFOCOM '07, pages 848–856, Anchorage, AK, USA, 2007. IEEE.

10. Georgios Zervas, and Stefan M. Rüger
**The Curse of Dimensionality and Document Clustering**
In *IEEE Seminar, Searching for Information: Artificial Intelligence and Information Retrieval Approaches*, pages 19/1–19/3, Glasgow, UK, 1999.

### Abstracts in Peer-reviewed Conferences with Proceedings

1. Luis Armona, Greg Lewis, and Georgios Zervas
**Learning Product Characteristics and Consumer Preferences from Search Data**
In *Proceedings of the 2021 ACM Conference on Economics and Computation (EC '21).*, pp. 98-99. ACM, 2021.

2. Greg Lewis and Georgios Zervas
**The Supply and Demand Effects of Review Platforms**
In *Proceedings of the 2019 ACM Conference on Economics and Computation (EC '19).*, pp. 197-197. ACM, 2019.

3. Shrabastee Banerjee, Chris Dellarocas, and Georgios Zervas
**Interacting User Generated Content Technologies: How Q&As Affect Ratings & Reviews**
In *Proceedings of the 2017 ACM Conference on Economics and Computation (EC '17).*, pp. 539-539. ACM, 2017.

4. Georgios Zervas, Davide Proserpio, and John W. Byers
**The Impact of the Sharing Economy on the Hotel Industry: Evidence from Airbnb's Entry Into the Texas Market**
In *Proceedings of the 2015 ACM Conference on Economics and Computation (EC '15).*, pp. 637-637. ACM, 2015.

5. Davide Proserpio and Georgios Zervas
**Online Reputation Management: Estimating the Impact of Management Responses on Consumer Reviews**
In *Proceedings of the 2015 ACM Conference on Economics and Computation (EC '15).*, pp. 79-79. ACM, 2015.

### Invited Articles

1. Davide Proserpio and Georgios Zervas
**Replying to Customer Reviews Results in Better Ratings**
*Harvard Business Review*, Feb. 14, 2018.

## Working Papers

1. Greg Lewis, Bora Ozaltun, and Georgios Zervas
**Maximum Likelihood Estimation of Differentiated Products Demand Systems**

2. Stephan Seiler, Song Yao, Georgios Zervas
**Causal Inference in Word-of-Mouth Research: Methods and Results**

3. Greg Lewis and Georgios Zervas
**The Welfare Impact of Consumer Reviews: A Case Study of the Hotel Industry**

4. Greg Lewis and Georgios Zervas
**Supply and Demand Responses to Consumer Review Platforms**

## Grants, Awards, & Honors

1. Marketing Science Institute (MSI) Scholar — 2023
2. Marketing Science Institute (MSI) Young Scholars — 2019
3. Dean's Research Scholar, Questrom School of Business — 08/2018
4. Shahdadpuri Research Award, Questrom School of Business — 10/2017
5. Hariri Institute Graduate Fellowship — 6/2015
   ($25,000 award)
6. Google Faculty Research Award — 2/2015
   ($35,000 unrestricted gift, plus $10,000 in Google Cloud credits)
7. Hariri Institute Junior Faculty Fellow — 2013–2015
8. Hariri Institute Research Grant — 1/2013
   Principal Investigator, with co-PI John W. Byers ($26,500)
9. Departmental Research Achievement Award, Computer Science Dept., Boston U. — 2010–2011

## Student Advising

1. Hannah Catabia, Master's Student, Computer Science Dept., Co-advisor — 2019–2023
2. Philip Zhao, PhD Student, Marketing Dept., Advisor — 2018–2024
   *Placement*: Peking University, Marketing
3. Shrabastee Banerjee, PhD Student, Marketing Dept., Advisor — 2015–2021
   *Placement*: Tilburg University, Marketing
4. Davide Proserpio, PhD Student, Computer Science Dept., Co-advisor — 2012–2015
   *Placement*: USC Marshall, Marketing

## Presentations and Invited Talks

**Learning Market Structure & Consumer Preferences from Search Data: An Application to Hotel Demand Estimation**

Conferences:

- Marketing Science 2019, Rome, Italy — 06/20/2019

**Consumer Reviews and Regulation: Evidence from NY Restaurants**

Academia:

- Dartmouth College — 06/12/2023
- University College London, UK — 04/05/2022
- Technische Universität Berlin, Germany — 10/04/2021
- Universitat zu Koln, Germany — 07/31/2021
- Brandeis University, Walthman, MA — 04/07/2021
- Yale School of Management, New Haven, CT — 10/30/2020

A13-4446

- University of Miami, Miami, FL 10/23/2020
- UMass Amherst Isenberg School of Management, Amherst, MA 02/03/2018

Conferences:

- Marketing Science 2018, Philadelphia, PA 06/14/2018
- BU Data Science Day, Boston University, Boston MA 01/26/2018
- Digital, Mobile Marketing, and Social Media Analytics Conference, NYU, New York, NY 09/12/2017
- Marketing Science, USC Marshall, Los Angeles, CA 06/10/2017
- Health Sector Data Blitz, Questom School of Business, Boston, MA 03/11/2017
- Marketing Analytics and Big Data conference, Columbia University, New York, NY 16/09/2017

**The Welfare Impact of Consumer Reviews: A Case Study of the Hotel Industry**

Academia:

- HEC, Paris, France 11/07/2019
- Duke Fuqua, Durham, NC 05/01/2019
- Harvard Business School, Boston, MA 03/12/2019
- NYU Stern, New York, NY 02/14/2019
- Columbia GSB, New York, NY 10/16/2018
- USC Marshall, Los Angeles, CA 4/14/2017
- Stanford GSB, Palo Alto, CA 4/12/2017
- Michigan Ross, Ann Arbon, MI 4/10/2017
- University of Toronto Rotman, Toronto, ON 2/17/2017
- University of Chicago Booth, Chicago, IL 1/31/2017
- Wharton, Philadelphia, PA 1/25/2017
- MIT Economics Dept., Cambridge, MA 10/24/2016

Conferences:

- QME 2016, Kellogg School of Management, Evanston, IL 09/01/2016
- SCECR 2016, Naxos, Greece 06/24/2016
- Greater China Conference on Mobile Big Data Marketing, Hong Kong 06/13/2016
- Marketing Science 2016, Shanghai, China 06/16/2016

**Online Reputation Management: Estimating the Impact of Management Responses on Consumer Reviews.**

Academia:

- Havard EconCS Seminar, Cambridge, MA 10/02/2015
- Hebrew University, Computer Science dept., Jerusalem, Israel 06/14/2015

**The Rise of the Sharing Economy: Estimating the Impact of Airbnb on the Hotel Industry**

Conferences:

- Open & User Innovation Conference 2015, Harvard Business School, Boston MA 08/03/2016
- CODE@MIT, Cambridge MA 10/16/2015
- Marketing Science 2015, Baltimore 05/20/2015
- NYU 2015 Conference on Digital Big Data, Smart Life, Mobile Marketing Analytics 23/10/2015

Academia:
- Simon Business School, University of Rochester 2/29/2016

Industry:
- Microsoft Research New England 11/18/2015

Government:
- Cambridge City Council, Cambridge, MA 7/19/2016

**Understanding Emerging Threats to Online Advertising**

Academia:
- Goizueta Business School, Emory University 02/27/2015
- MSR/Harvard Game Theory Seminar 12/17/2014
- Questrom School of Business, MPPL Seminar 04/17/2015

Industry:
- Betaworks, NYC 07/23/2015

**Fake It Till You Make It: Reputation, Competition, and Yelp Review Fraud**

Conferences:
- Marketing Science 2014, Emory University, Atlanta 06/13/2014
- WIN 2013: The 5th Workshop on Information in Networks 10/04/2013
- DIMACS Workshop on Economic Aspects of Information Sharing 02/08/2013

Industry:
- Google, Palo Alto, CA 02/12/2013

**The Groupon Effect on Yelp Ratings: A Root Cause Analysis**

Conferences:
- Marketing Science 2013, Istanbul, Turkey 07/13/2013
- SCECR 2012, Montreal, Canada 06/29/2012
- ACM EC 2012, Valencia, Spain 06/05/2012
- Yale Customer Insights Conference, New Haven, CT 03/15/2013
- CAOSS 2012: Workshop on Computational and Online Social Science, New York, NY 10/12/2012

Academia:
- Wellesley University, Computer Science Dept 02/27/2012
- Northeastern University, Computer Science Dept 03/28/2012
- Harvard University, School of Eng. & Appl. Sci., Joint EconCS/Theory Seminar 04/16/2012
- Berkeley University, Computer Science Dept 04/10/2012

Industry:
- Microsoft Research New York 02/27/2013
- Google, Palo Alto, CA 04/09/2012
- Yelp, San Francisco, CA 04/11/2012

**Daily Deals: Prediction, Social Diffusion, and Reputational Ramifications**

Conferences:

- New York Computer Science and Economics Day (*Poster session*.) 09/16/2011
- Cambridge Area Economics and Computation Day (*Poster session*.) 11/18/2011
- ACM WSDM 2012 02/11/2012

Academia:

- Harvard University, School of Eng. & Appl. Sci., Joint EconCS/Theory Seminar 10/20/2011
- Boston University, Mathematics Dept., Statistics and Probability Seminar 11/17/2011
- Columbia University, Computer Science Dept., Seminar 12/08/2011

Industry:

- IBM Research, Hawthorne, NY, Seminar 12/07/2011
- Microsoft Research New England, Economics Research Working Group 10/14/2011

**Information Asymmetries in Pay-Per-Bid Auctions: How Swoopo Makes Bank**

Conferences:

- ACM EC 2010 06/09/2010

Academia:

- Boston University, Computer Science Dept., Theory Seminar 03/19/2010
- Harvard University, School of Eng. & Appl. Sci., Joint EconCS/Theory Seminar 03/29/2010
- Northeastern University, Coll. of Comp. & Inf. Sci., Graduate Student Seminar 04/03/2010
- Williams College, Computer Science Dept., Invited Colloquium 10/22/2010

**Adaptive Weighing Designs for Keyword Value Computation**

Conferences:

- ACM WSDM 2010 02/06/2010

Academia:

- Boston University, Computer Science Dept., Networking Reading Group 02/08/2010
- Boston University, Computer Science Dept., CS565 Data Mining, Guest Lecture 03/23/2010

## Teaching

1. BA476: Machine Learning for Business Analytics (40 students) Fall 2024
2. BA476: Machine Learning for Business Analytics (87 students) Fall 2023
3. BA476: Machine Learning for Business Analytics (44 students) Spring 2023
4. BA476: Machine Learning for Business Analytics (47 students) Spring 2023
5. MK842: Machine Learning for Business Analytics (27 students) Spring 2023
6. BA810: Supervised Machine Learning (46 students) Fall 2021
7. BA810: Supervised Machine Learning (42 students) Fall 2021

8. BA810: Supervised Machine Learning (40 students) — Spring 2021
9. BA810: Supervised Machine Learning (34 students) — Spring 2021
10. BA810: Supervised Machine Learning (44 students) — Fall 2019
11. BA810: Supervised Machine Learning (42 students) — Fall 2019
12. MK476: Machine Learning for Business Analytics (26 students) — Spring 2019
13. MK824: Machine Learning for Business Analytics (44 students) — Spring 2019
14. MK824: Machine Learning for Business Analytics (40 students) — Spring 2018
15. MK824: Machine Learning for Business Analytics (43 students) — Spring 2017
16. MK323: Marketing Management (49 students) — Spring 2017
17. MK323: Marketing Management (48 students) — Fall 2015
18. MK323: Marketing Management (50 students) — Fall 2015
19. MK323: Marketing Management (47 students) — Fall 2014
20. MK323: Marketing Management (47 students) — Fall 2014
21. MK323: Marketing Management (49 students) — Fall 2013
22. MK323: Marketing Management (50 students) — Fall 2013

### Course Development

**MK476**, **MK842**, and **BA810** are courses that I developed that introduce undergraduate, MBA, and MSBA students to machine learning methods with applications in business analytics.

## Service

**Editorial Review Board** — 2020–to-date
Marketing Science

**Steering Committee Member** — 2019–to-2022
Rafik B. Hariri Institute for Computing, Boston University

**Editorial Review Board** — 2019–to-date
Journal of Marketing

**Editorial Review Board** — 2019–2023
Journal of Marketing Research

**Associate Editor** — 2019–to date
ACM Transactions on Economics and Computation

**Program committees:** EC 2024 (Senior Program Committee), EC 2023 (Area Chair), EC 2022 (Track Chair), EC 2021 (Program Committee), EC 2020 (Senior Program Committee), WebConf 2020, EC 2019 (Senior Program Committee), EC 2018 (Senior Program Committee), EC 2018, WWW 2018, ICIS 2018, EC 2017 (Senior Program Committee), EC 2016 (Senior Program Committee), WWW 2016 (Senior Program Committee), ICIS 2016, SCECR 2016, EC 2015, WSDM 2015, WWW 2015, AMMA 2015, COBE 2015, EC 2014, WSDM 2014, WWW 2014, ICWSM 2014, WWW 2013, WSDM 2013, EC 2012.

**Ad-hoc reviewer:** Management Science, Marketing Science, Journal of Marketing Research, Information Systems Research, Games and Economic Behavior, Review of Industrial Organization, Operations Letters, Management Information Systems Quarterly, Journal of Public Economics, Manufacturing & Service Operations Management.

## Media coverage

1. Some Smiling Faces in Online Customer Testimonials Are Stock Photos — 05/16/2019
   The Wall Street Journal
2. Why ranting on Yelp is the wrong way to complain about awful service — 04/03/2018
   The Boston Globe
3. Does a 'Sharing Economy' Foster Better Behavior? — 03/27/2018
   PC Magazine
4. For Hotels, Online Reviews Really Matter to the Bottom Line — 11/18/2016
   The Wall Street Journal
5. Don't Necessarily Judge Your Next E-Book By Its Online Review — 10/26/2015
   NPR All Things Considered
6. Five-star fakes — 10/24/2015
   The Economist
7. Ratings Now Cut Both Ways, So Don't Sass Your Uber Driver — 01/30/2015
   The New York Times
8. Airbnb, Uber, Lyft: de l'économie collaborative au business du partage — 08/16/2014
   Le nouvel Observateur
9. Airbnb versus hotels: Room for all, for now — 04/26/2014
   The Economist
10. Keeping crowdsourcing honest: can we trust the reviews? — 02/18/2014
    BBC News
11. Why It's So Hard to Figure Out the Sharing Economy's Winners and Losers — 02/10/2014
    The Atlantic Cities
12. Sharing Is Caring, Unless It Costs You Your Job — 02/05/2014
    The New York Times Bits Blog
13. Yelp Reviews: Can You Trust Them? — 11/04/2013
    BU Today
14. Fake reviews on Yelp?! Don't worry, we've got your back — 09/27/2013
    Yelp Official Blog

15. Yelp deems 20% of user reviews 'suspicious' — 09/24/2013
    Marketwatch, The Wall Street Journal
16. Yelp admits a quarter of submitted reviews could be fake — 09/13/2013
    BBC News
17. Underdog Businesses Are More Likely to Post Fake Yelp Reviews — 08/30/2013
    Harvard Business Review Blog Network
18. How Good Groupon Leads to Bad Yelp — 03/11/2013
    The Freaknomics Blog
19. For Some Businesses, Daily Deals Have A Dark Side — 07/06/2012
    NPR Morning Edition
20. Using Groupon Deals? Your Yelp Rating May Suffer — 04/11/2012
    The Huffington Post
21. Help for Yelp — 11/09/2011
    BU Today
22. Groupon IPO: An Internet star falls to Earth — 10/23/2011
    Christian Science Monitor
23. Is Groupon Bad For Business? — 10/18/2011
    WBUR
24. Groupon: Bad for Business? — 10/05/2011
    BU Today
25. Groupon's Morning After Problem — 10/04/2011
    Time Magazine
26. Coupon Sites Are a Great Deal, but Not Always to Merchants — 10/02/2011
    The New York Times
27. Groupon Deals May Hurt Your Yelp Ratings — 09/12/2011
    The Atlantic
28. Study: Daily Deals Hurt Businesses' Reputations — 07/06/2011
    The Wall Street Journal, "In Charge" blog
29. Groupon's Hidden Influence on Reputation — 09/12/2011
    The MIT Technology Review

## APPENDIX B

## PRIOR TESTIMONY

**Calhoun et al. v. Google, LLC, *U.S. District Court for the Northern District of California – San Jose Division*, Case No. 5:20-cv-05146-YGR-SVK**

Retained by Counsel for Google LLC (Defendant).
Deposition Testimony (January 2022).

**Brown et al. v. Google, LLC, *U.S. District Court for the Northern District of California – Oakland Division*, Case No. 4:20-cv-03664-YGR**

Retained by Counsel for Google LLC (Defendant).
Deposition Testimony (August 2022).

**Maximilian Klein et al. v. Meta Platforms, Inc., *U.S. District Court for the Northern District of California San Francisco Division*, Case No. 3:20-cv-08570-JD**

Retained by Counsel for Meta Platforms, Inc. (Defendant).
Deposition Testimony (March 2024).

**The State of Texas v. Google, LLC, *U.S. District Court of Victoria County, Texas*, Case No. 22-01-88230-D**

Retained by Counsel for Google LLC (Defendant).
Deposition Testimony (May 2024).

**Frasco et al. v. Flo Health, Inc., Google, LLC, Meta Platforms, Inc., and Flurry, Inc., *U.S. District Court for the Northern District of California*, Case No. 3:21-cv-00757-JD**

Retained by Counsel for Meta Platforms, Inc., Flurry, Inc., and Flo Health, Inc. (Defendant).
Deposition Testimony (July 2023).
Deposition Testimony (August 2024).
Trial Testimony (July 2025).

**Rene Cabrera and RM Cabrera Company, Inc. et al. v. Google LLC, *U.S. District Court for the Northern District of California, San Jose Division*, Case No. 5:11-cv-1263-EJD**

Retained by Counsel for Google, LLC, (Defendant).
Deposition Testimony (December 2024).

**iSpot.tv, Inc. v. Nadezhda Teyfukova et al., *U.S. District Court*, *Central District of California*, Case No. 2:21-CV-06815-MEMF-MAR**

Retained by Counsel for iSpot.tv, Inc. (Plaintiff).
Deposition Testimony (January 2025).

**GOLO, LLC. v. Amazon.com, Inc., and Amazon.com Services LLC, *U.S. District Court for the District of Delaware*, Case No. 1:23-cv-01200-MN**

Retained by Counsel for Amazon.com, Inc., and Amazon.com Services LLC. (Defendant).
Deposition Testimony (August 2025).

**In Re Meta Pixel Tax Filing Cases, *U.S. District Court for the Northern District of California, San Jose Division*, Case No. 5:22-cv-07557-PCP**

Retained by Counsel for Meta Platforms, Inc. (Defendant).
Deposition Testimony (December 2025).

# APPENDIX C

# MATERIALS RELIED UPON

**Legal Documents**

30(b)(6) Remote Videotaped Deposition of Mayurkumar Patel, *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, May 5, 2025.

30(b)(6) Videotaped Deposition of Tobias Wooldridge, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO (VKD), April 28, 2025.

Confidential Videotaped 30(b)(6) Deposition of Fred Leach, *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, May 16, 2025.

Declaration of Daniel Rampton, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-03580-WHO, December 4, 2025.

Declaration of Richard M. Smith in Support of Plaintiffs' Motion for Preliminary Injunction, *John Doe, et al. v. Meta Platforms, Inc.*, Case No. 3:22-cv-3580-WHO, August 25, 2022.

Declaration of Tobias Wooldridge, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-03580-WHO (VKD), December 9, 2025.

Defendant Meta Platforms, Inc.'s Ninth Set of Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-03580-WHO, October 31, 2025.

Exhibit 60 Domain List, *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, September 9, 2025.

Expert Report of Dr. Atif Hashmi, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580, September 9, 2025.

Expert Report of Zubair Shafiq, PhD, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580, September 9, 2025.

First Amended Consolidated Class Action Complaint, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, October 10, 2023.

Oral & Videotaped Deposition of Dr. Atif Hashmi, PhD, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580, October 29, 2025.

Plaintiffs' Notice of Motion and Motion for Class Certification, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO (VKD), September 9, 2025.

Supplemental Declaration of Richard M. Smith, *John Doe, et al. v. Meta Platforms, Inc.*, Case No. 3:22-cv-03580-WHO, September 8, 2025.

Video-Recorded Deposition of Zubair Shafiq, Ph.D., *In Re Meta Pixel Healthcare Litigation*, 3:22-cv-3580-WHO, November 19, 2025.

Video-Recorded Deposition Upon Oral Examination of Abhinav Anand, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO, April 1, 2025.

Video-Recorded Deposition Upon Oral Examination of Manish Singhal, *In Re Meta Pixel Healthcare Litigation*, No. 3:22-cv-3580-WHO (VKD), April 2, 2025.

Video-Recorded Deposition Upon Oral Examination of Tobias Wooldridge, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO, January 31, 2025.

Videotaped Deposition of David Abdul-Malak taken by Plaintiffs pursuant to notice on May 21, 2025, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO-VKD, May 21, 2025.

Videotaped Deposition of Richard M. Smith, *In Re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-3580-WHO, November 3, 2025.

**Bates-Stamped Documents**

PIXEL_HEALTH000000023-043
PIXEL_HEALTH000000044-053
PIXEL_HEALTH000000057-063
PIXEL_HEALTH000032259-275
PIXEL_HEALTH000032388-415
PIXEL_HEALTH000061560
PIXEL_HEALTH000076206-212
PIXEL_HEALTH000109836-838
PIXEL_HEALTH000115192
PIXEL_HEALTH000115367-369
PIXEL_HEALTH000115741
PIXEL_HEALTH000149960-966
PIXEL_HEALTH000218635-666
PIXEL_HEALTH000291033
PIXEL_HEALTH000294831-837
PIXEL_HEALTH000299900-910
PIXEL_HEALTH000316628
PIXEL_HEALTH000372832-837
PIXEL_HEALTH000420769-775
PIXEL_HEALTH000437963-059
PIXEL_HEALTH000473169-186
PIXEL_HEALTH000484906-908
PIXEL_HEALTH000486625-634
PIXEL_HEALTH000487443
PIXEL_HEALTH000565826-828
PIXEL_HEALTH000686808-819
PIXEL_HEALTH000873919
PIXEL_HEALTH000873965-986
PIXEL_HEALTH000874367-368
PIXEL_HEALTH000874369-370
PIXEL_HEALTH000874441-443
PIXEL_HEALTH000874638-639
PIXEL_HEALTH000875725-732
PIXEL_HEALTH000875733-740
PIXEL_HEALTH000875757-762
PIXEL_HEALTH000875792-822
PIXEL_HEALTH000876773-796
PIXEL_HEALTH000876876
PIXEL_HEALTH000876877
PIXEL_HEALTH000876884

PIXEL_HEALTH000876885
PIXEL_HEALTH000876886
PIXEL_HEALTH000876887-888
PIXEL_HEALTH000876889-890
PIXEL_HEALTH000876891
PIXEL_HEALTH000876898-899
PIXEL_HEALTH000876935
PIXEL_HEALTH000876970-978
PIXEL_HEALTH000877095-125
PIXEL_HEALTH000877126-145
PIXEL_HEALTH000877146-148
PIXEL_HEALTH000877149-150
PIXEL_HEALTH000884272-275
PIXEL_HEALTH000885210-229
PIXEL_HEALTH000909351-393
PIXEL_HEALTH000909439-447
PIXEL_HEALTH000909493-501
PIXEL_HEALTH000909502-518
PIXEL_HEALTH000909519-523
PIXEL_HEALTH000909571-573
PIXEL_HEALTH000909602-623
PIXEL_HEALTH000909624-635
PIXEL_HEALTH000947768-797
PIXEL_HEALTH000947873-875
PIXEL_HEALTH000948084-087
PIXEL_HEALTH001189530-543
PIXEL_HEALTH001214637-649
PIXEL_HEALTH001220235
PIXEL_HEALTH001221838-850
PIXEL_HEALTH001226464-471
PIXEL_HEALTH001238832-834
PIXEL_HEALTH001337716-723
PIXEL_HEALTH001365316
PIXEL_HEALTH001365333-337
PIXEL_HEALTH001369398-422
PL-EXPERT-SMITH_000760
PL-EXPERT-SMITH_000826

**Code**
Meta's produced source code.

**Data**

2023.06.21 - Meta Medical Provider Sites.csv.
PIXEL_HEALTH_CWD00000001-130
PIXEL_HEALTH_CWD00000131-610

PIXEL_HEALTH_CWD00000611-1090
PIXEL_HEALTH_CWD00001093
PIXEL_HEALTH_CWD00001101
PIXEL_HEALTH_CWD00001141
PIXEL_HEALTH000000176
PIXEL_HEALTH000781416-1515
PIXEL_HEALTH000781516-1615

**Academic Articles and Books**

Almohri, Hussain M.J., Layne T. Watson, and David Evans, "Predictability of IP Address Allocations for Cloud Computing Platforms," *IEEE Transactions on Information Forensics and Security*, Vol. 15, June 24, 2019.

Armona, Luis, Greg Lewis, and Georgios Zervas, "Learning Product Characteristics and Consumer Preferences from Search Data," *Marketing Science*, Vol. 44, No. 4, December 10, 2024, pp. 838-855.

Budak, Ceren, Sharad Goel, Justin Rao, and Georgios Zervas, "Understanding Emerging Threats to Online Advertising," *EC '16: Proceedings of the 2016 ACM Conference on Economics and Computation*, July 21, 2016, pp. 561-578.

Chung, Moonwon, Luv Sharma, and Manoj K. Malhotra, "Impact of Modularity Design on Mobile App Launch Success," *Manufacturing & Service Operations Management*, Vol. 25, No. 2, 2023, pp. 756-774.

Cormack, Gordon V., "Email Spam Filtering: A Systematic Review," *Foundations and Trends in Information Retrieval*, Vol. 1, No. 4, 2006.

Dalton, Lori A., and Edward R. Dougherty, "Small-Sample Classification," *Information Science for Materials Design and Discovery*, 2016, pp. 77-101.

Dutta, Nitul, Nilesh Jadav, Sudeep Tanwar, Hiren Kumar Deva Sarma, and Emil Pricop, *Cyber Security: Issues and Current Trends*, Vol. 995, Springer, 2022.

Ege Demirci, Rithwik Kerur, and Ambuj Singh, "Are LLMs Truly Graph-Savvy? A Comprehensive Evaluation of Graph Generation," *Proceedings of the 63rd Annual Meeting of the Association for Computational Linguistics*, Vol. 4, 2025, pp. 884-897.

Habib, Hana, Megan Li, Ellie Young, and Lorrie Faith Cranor, "'Okay, whatever': An Evaluation of Cookie Consent Interface," *CHI Conference on Human Factors in Computing Systems*, April 29, 2022.

Haefliger, Stefan, Georg von Krogh, and Sebastian Spaeth, "Code Reuse in Open Source Software," *Management Science*, Vol. 54, No. 1, January 2008, pp. 180-193.

Heidemann, John, Yuri Pradkin, Ramesh Govindan, Christos Papadopoulos, Genevieve Bartlett, and Joseph Bannister, "Census and Survey of the Visible Internet," *IMC'08: Proceedings of the 8th ACM SIGCOMM conference on Internet measurement*, October 20, 2008, pp. 169-182.

Herrera-Poyatos, David, Carlos Peláez-González, Cristina Zuheros, Andrés Herrera-Poyatos, Virilo Tejedor, Francisco Herrera, and Rosana Montes, "An overview of model uncertainty and variability in LLM-based sentiment analysis: challenges, mitigation strategies, and the role of explainability," *Frontiers in Artificial Intelligence*, August 11, 2025.

James, Gareth, Daniela Witten, Trevor Hastie, and Robert Tibshirani, *An Introduction to Statistical Learning with Applications in R*, 2 Ed., June 21, 2023.
Kubat, Miroslav, *An Introduction to Machine Learning*, 2 Ed., Springer, 2017.
Kuhn, Max, and Kjell Johnson, *Applied Predictive Modeling*, Springer, 2016.
Nosek, B. A., G. Alter, G. C. Banks, D. Borsboom, S. D. Bowman, S. J. Breckler, S. Buck, C. D. Chambers, G. Chin, G. Christensen, M. Contestabile, A. Dafoe, E. Eich, J. Freese, R. Glennerster, D. Goroff, D. P. Green, B. Hesse, M. Humphreys, J. Ishiyama, D. Karlan, A. Kraut, A. Lupia, P. Mabry, T. Madon, N. Malhotra, E. Mayo-Wilson, M. McNutt, E. Miguel, E. Levy Paluck, U. Simonsohn, C. Soderberg, B. A. Spellman, J. Turitto, G. VandenBos, S. Vazire, E. J. Wagenmakers, R. Wilson, and T. Yarkoni, "Promoting an open research culture," *Science*, Vol. 348, No. 6242, June 26, 2015, pp. 1422-1425.
Russell, John Morgan, *Significant Statistics: An Introduction to Statistics*, Blacksburg, VA, Virginia Tech Department of Statistics, May 22, 2025.
Shawe-Taylor, John, and Nello Cristianini, *Kernel Methods for Pattern Analysis*, New York, NY, Cambridge University Press, 2004.
Srivastava, Nitish, Geoffrey Hinton, Alex Krizhevsky, Ilya Sutskever, and Ruslan Salakhutdinov, "Dropout: A Simple Way to Prevent Neural Networks from Overfitting," *Journal of Machine Learning Research*, Vol. 15, No. 56, June 14, 2014.
Torrecilla-Salinas, C. J., J. Sedeño, M. J. Escalona, and M. Mejías, "Estimating, planning, and managing Agile Web development projects under a value-based perspective," *Information and Software Technology*, Vol. 61, January 29, 2015, pp. 124-144.
Triola, Mario F., *Elementary Statistics*, 12 Ed., Boston, MA, Pearson Education, 2014.
Zogmaister, Cristina, Michela Vezzoli, Alessio Facchin, Federica Paola Conte, Ezia Rizzi, Francesco Giaquinto, Elisa Cavicchiolo, Gabriele Fusco, Sara Pegoraro, and Maura Simioni, "Assessing the Transparency of Methods in Scientific Reporting," *University of California Press*, Vol. 10, No. 1, 2024.

**Publicly Available Documents**

"2022 State of APIs," RapidAPI, 2022, https://stateofapis.com/.
"2024 State of Open Source Report," OpenLogic, 2024, https://www.openlogic.com/sites/default/files/pdfs/report-ol-state-of-oss-2024.pdf.
"2025 Workers' Compensation Symposium," Southern Illinois Healthcare, https://www.sih.net/symposiums/workcomp.
"A Complete Guide on Securing Third-Party APIs in Mobile Apps," Virtual Spirit, March 7, 2023, https://virtualspirit.me/insights/169/a-complete-guide-on-securing-third-party-apis-in-mobile-apps.
"About ad auctions," Meta, https://www.facebook.com/business/help/430291176997542.
"About Adblock Plus," Adblock Plus, https://adblockplus.org/en/about.
"About advanced matching for web," Meta, https://www.facebook.com/business/help/611774685654668.
"About automatic events," Meta, https://www.facebook.com/business/help/1292598407460746.
"About Conversions API," Meta, https://www.facebook.com/business/help/2041148702652965.
"About cookie settings for the Meta Pixel," Meta, https://www.facebook.com/business/help/471978536642445.
"About Core Setup," Meta, https://www.facebook.com/business/help/124742407297678.

"About event parameters," Meta, https://www.facebook.com/business/help/308258403676519.
"About Google Tag Manager," Google, February 4, 2025, https://developers.google.com/tag-platform/tag-manager.
"About Meta Pixel," Meta, https://www.facebook.com/business/help/742478679120153.
"About standard and custom website events," Meta, https://www.facebook.com/business/help/964258670337005.
"ABP Filters Anti-CV," GitLab, August 03, 2018, https://gitlab.com/eyeo/anti-cv/abp-filters-anti-cv.
"ABP Filters," Adblock Plus, November 06, 2025, https://easylist-downloads.adblockplus.org/abp-filters-anti-cv.txt.
"Ad Blocker Usage and Demographic Statistics," Backlinko, September 2, 2024, https://backlinko.com/ad-blockers-users#adblock-by-country.
"Adblock Plus and (a little) more," Adblock Plus, November 29, 2023, https://blog.adblockplus.org/blog/meet-adblock-plus-the-original-ad-blocker.
"AdChoices Accountability Program: 2017 Compliance Report," Ad Standards, 2017, https://adstandards.ca/wp-content/uploads/2018/03/2017AdChoicesComplianceReport.pdf.
"Add the LinkedIn Insight Tag to your website," LinkedIn, February 2025, https://www.linkedin.com/help/lms/answer/a418880.
"Add the Meta Pixel with Google Tag Manager," Meta, https://www.facebook.com/business/help/1021909254506499.
"Adobe Analytics," Adobe for Business, https://business.adobe.com/products/analytics/adobe-analytics.html.
"Advanced Matching," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/.
"Advertising ID," Google Play Console Help, https://support.google.com/googleplay/android-developer/answer/6048248.
"Advertising, recommendations, insights and measurement," Meta, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.3&dialog_back=1.
"AHA Annual Survey Database," AHA Data & Insights, https://www.ahadata.com/aha-annual-survey-database.
"Analytics & Data Analysis Features List - Analytics," Google Marketing Platform, https://marketingplatform.google.com/about/analytics/features/.
"Android SDK Version Companion," Meta, https://developers.facebook.com/docs/reference/androidsdk/current/facebook/com/facebook/appevents/appeventslogger.companion.html/.
"Android SDK Version Flush Behavior," Meta, https://developers.facebook.com/docs/reference/androidsdk/current/facebook/com/facebook/appevents/appeventslogger.flushbehavior.html.
"API Web Service," National Weather Service, https://www.weather.gov/documentation/services-web-api.
"Automatic App Event Logging," Meta, https://developers.facebook.com/docs/app-events/automatic-event-collection-detail/.
"Best practices for Meta ads delivery," Meta, https://business.facebook.com/business/help/950694752295474/.

"Best practices for Meta Pixel standard event setup," Meta, https://www.facebook.com/business/help/2254103654917599.
"Biktarvy," Gilead, https://www.biktarvy.com.
"Block websites from storing cookies and site data in Firefox," Mozilla Support, August 22, 2025, https://support.mozilla.org/en-US/kb/block-websites-storing-cookies-site-data-firefox.
"BlockThirdPartyCookies," Microsoft, September 2, 2025, https://learn.microsoft.com/en-us/deployedge/microsoft-edge-browser-policies/blockthirdpartycookies.
"Book Your Own Private Jet," BookMyCharters, https://bookmycharters.com.
"Classification: Accuracy, recall, precision, and related metrics," Google, https://developers.google.com/machine-learning/crash-course/classification/accuracy-precision-recall#accuracy.
"ClickID and the fbp and fbc Parameters," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.
"Consent Management Platforms: Emerging Trends and Insights," TrustArc, https://trustarc.com/resource/consent-management-platforms-trends-and-insights/.
"Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.
"Conversions API End-to-End Implementation," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation.
"Conversions API," Meta, https://www.facebook.com/business/tools/conversions-api.
"Conversions API: Get Started," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/get-started/.
"Conversions API: Payload Helper," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/payload-helper.
"Cookie Consent Resource," Meta, https://developers.facebook.com/docs/app-events/cookies/.
"Cookies Policy - Advertising, recommendations, insights and measurement," Wayback Machine, February 15, 2024, https://web.archive.org/web/20240215013356/https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.3&dialog_back=1.
"Cookies Policy - Advertising, recommendations, insights and measurement," Wayback Machine, August 27, 2023, https://web.archive.org/web/20230827233146/https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.3&dialog_back=1.
"Costco Wholesale, Kirkland Signature Kids' Shearling Ankle Boot," Wayback Machine, November 20, 2022, https://web.archive.org/web/20221120150505/https://www.costco.com/kirkland-signature-kid's-shearling-ankle-boot.product.4000058475.html.
"Customer list formatting guidelines for custom audiences," Meta, https://www.facebook.com/business/help/2082575038703844.
"DC Law Firm, Dedicated Personal Injury Law Firm Serving California," Wayback Machine, September 16, 2022, https://web.archive.org/web/20220916191502/https://www.dclawla.com/.

"Delete, allow and manage cookies in Chrome," Google Chrome Help, https://support.google.com/chrome/answer/95647.
"Description of Cookies," Microsoft, https://support.microsoft.com/en-us/topic/description-of-cookies-ad01aa7e-66c9-8ab2-7898-6652c100999d.
"Design, scan or customise your own knitting charts, for free," Chart Minder, https://www.chart-minder.com/.
"Disconnect your past activity off Meta technologies," Meta, https://www.facebook.com/help/287199741901674.
"Disconnectme: Disconnect-Tracking-Protection," GitHub, https://github.com/disconnectme/disconnect-tracking-protection/blob/master/services.json.
"Discover the UHealth Difference," University of Miami Health System, https://www.umiamihealth.org/.
"Domain Name Proxy Agreement," GoDaddy, April 1, 2024, https://www.godaddy.com/legal/agreements/domain-name-proxy-agreement.
"Domain Name Registrar Stats," Domain State, February 2025, https://www.domainstate.com/registrar-stats.html.
"Dynamic URLs vs. static URLs," Google, September 22, 2008, https://developers.google.com/search/blog/2008/09/dynamic-urls-vs-static-urls.
"Enhanced Tracking Protection in Firefox for desktop," Mozilla Firefox, October 2025, https://support.mozilla.org/en-US/kb/enhanced-tracking-protection-firefox-desktop.
"Events for November 2025," Auburn Community Hospital, https://www.auburnhospital.org/events/.
"Everything you need to know about Internet cookies," Microsoft, April 25, 2023, https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies.
"Facebook Container - Prevent Facebook from tracking you on other websites," Mozilla Firefox, June 24, 2025, https://support.mozilla.org/en-US/kb/facebook-container-prevent-facebook-tracking.
"Facebook Pixel Events," Meta, https://www.facebook.com/business/m/one-sheeters/facebook-pixel-events.
"Facebook Pixel: What It Is and Why You Need It," SEO Digital Group, https://seodigitalgroup.com/facebook-pixel/.
"Facebook SDK for Android," GitHub, https://github.com/facebook/facebook-android-sdk.
"Facebook SDK for iOS," GitHub, https://github.com/facebook/facebook-ios-sdk.
"Financial infrastructure to grow your revenue," Stripe, https://stripe.com/.
"Find a Location (Modified)," MedStar Health, https://dev.medstarhealth.org/locations#locationsearch_g=39.1733025|-77.1772737&locationsearch_distance%20by%20miles=25000&locationsearch_o=Distance,Ascending.
"Find a Location (Original)," MedStar Health, https://dev.medstarhealth.org/locations#locationsearch_g=39.1733025|-77.1772737&locationsearch_distance by miles=25000&locationsearch_o=Distance,Ascending.
"Find a Location," Yale New Haven Health Greenwich Hospital, https://www.greenwichhospital.org/find-a-location#sort=relevancy&numberOfResults=25.

"Firing triggers and trigger exceptions," Google Tag Manager Help, https://support.google.com/tagmanager/answer/7679318.
"Get answers to frequently asked questions about the Meta Pixel," Meta, https://www.facebook.com/business/tools/meta-pixel/help/.
"Getting Started with the Facebook SDK for Android," Meta, https://developers.facebook.com/docs/android/getting-started.
"Getting Started with the Facebook SDK for iOS," Meta, https://developers.facebook.com/docs/ios/getting-started.
"Glossary," Mercurial Developers, https://www.mercurial-scm.org/help/topics/glossary.
"Go from raw data to real decisions instantly," Content Square, https://contentsquare.com/solutions/teams/analytics/.
"Hash Functions," National Institute of Standards and Technology, September 9, 2024, https://csrc.nist.gov/projects/hash-functions.
"Hashing," National Institute of Standards and Technology, https://csrc.nist.gov/glossary/term/hashing.
"Hg Log," Mercurial Developers, https://www.mercurial-scm.org/help/commands/log.
"History of the Mozilla Project," Mozilla.org, April 21, 2008, https://www-archive.mozilla.org/about/history.
"Homepage," Yale New Haven Health Greenwich Hospital, greenwichhospital.org.
"Hospital Tour," Hub City Vet, https://hubcityvet.com/hospital-tour/.
"Hotels & Lodging in Denver," National Jewish, https://web.archive.org/web/20210923080704/https://www.nationaljewish.org/patients-visitors/visiting-us/travel/hotels-lodging.
"How do lava lamps help with Internet encryption?," Cloudflare, https://www.cloudflare.com/learning/ssl/lava-lamp-encryption/.
"How Google Analytics works," Google, https://support.google.com/analytics/answer/12159447.
"How To Disable Microdata Auto Event on Meta (Facebook) Pixel," Elevar, https://docs.getelevar.com/docs/how-to-disable-microdata-event-automatically-detected-on-facebook-pixel.
"How Web Sites Can Be Spread Across Multiple Web Servers - Guide 2024," CloudPages, May 13, 2024, https://cloudpages.cloud/blog/web-sites-can-be-spread-across-multiple-web-servers.
"Implementation Instructions for DAA Participants to WebChoices," DAA, March 6, 2017, https://digitaladvertisingalliance.org/DAA_style/ADS/DAAWebChoices2.0_Spec_v1.pdf.
"Improving Reproducibility and Replicability in Research: Highlights From Three National Academies Reports," The National Academies of Sciences Engineering Medicine, 2019, https://nap.nationalacademies.org/resource/25303/Combined%20Reproducibility%20Brief%20vs2.pdf.
"Insight Tag," Linkedin, https://business.linkedin.com/marketing-solutions/insight-tag.
"Introduction to advanced matching for websites," Meta, https://www.facebookblueprint.com/student/path/211540/activity/205773.
"Introduction to tagging and the Google tag," Google, https://developers.google.com/tag-platform/devguides.
"Introduction to the server side," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Learn_web_development/Extensions/Server-side/First_steps/Introduction.

"IP Addresses," Branch, https://www.branch.io/glossary/ip-addresses/.
"Jimmy Carter, 39th U.S. president, enters hospice care at home," TribLIVE, February 18, 2023, https://triblive.com/news/world/carter-center-former-president-jimmy-carter-in-hospice-care/.
"Learn about on-device site data in Chrome," Google Chrome Help, https://support.google.com/chrome/answer/14114868.
"LinkedIn Insight Tag FAQs," LinkedIn, October 2025, https://www.linkedin.com/help/linkedin/answer/a427660.
"Manage cookies and website data in Safari on Mac," Apple, https://support.apple.com/en-eg/guide/safari/sfri11471/12.0/mac/10.14.
"Manage cookies and website data," Apple, https://help.apple.com/safari/mac/8.0/en.lproj/sfri11471.html.
"Manage cookies in Microsoft Edge: View, allow, block, delete and use," Microsoft, https://support.microsoft.com/en-us/windows/manage-cookies-in-microsoft-edge-view-allow-block-delete-and-use-168dab11-0753-043d-7c16-ede5947fc64d.
"Mercurial SCM," Mercurial Developers, https://www.mercurial-scm.org/.
"Meta App Events Overview," Meta, https://developers.facebook.com/docs/app-events/overview/.
"Meta Business Tools Terms," Meta, https://www.facebook.com/legal/technology_terms.
"Meta Cookies Policy - Advertising, recommendations, insights and measurement," Meta, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.
"Meta Cookies Policy - If you have a Facebook account," Meta, December 12, 2023, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-4.1.
"Meta Cookies Policy - Security, site and product integrity," Meta, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2.
"Meta Cookies Policy," Meta, https://www.facebook.com/privacy/policies/cookies?annotations[0]=explanation%2F1_common_cookies_and_uses.
"Meta Data Centers in the United States," Meta, https://datacenters.atmeta.com/wp-content/uploads/2025/11/Meta-United-States-Data-Centers.pdf.
"Meta Pixel Advanced," Meta, https://developers.facebook.com/docs/meta-pixel/advanced/.
"Meta Pixel and Conversions API," Adobe, https://commercemarketplace.adobe.com/apptrian-meta-pixel-and-conversions-api.html.
"Meta Pixel General Data Protection Regulation," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/gdpr/.
"Meta Pixel Get Started," Meta, https://developers.facebook.com/docs/meta-pixel/get-started/.
"Meta Pixel Implementation for Single Page Applications," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/tag_spa/.
"Meta Pixel Reference," Meta, https://developers.facebook.com/docs/meta-pixel/reference.
"Meta Pixel," Meta, https://developers.facebook.com/docs/meta-pixel/.
"Mozilla Firebird 0.6 - Release Notes," Mozilla Firefox, December 6, 2013, https://website-archive.mozilla.org/www.mozilla.org/firefox_releasenotes/en-us/firefox/releases/0.6.
"Mozilla Firebird 0.7 - Release Notes," Mozilla Firefox, December 6, 2013, https://website-archive.mozilla.org/www.mozilla.org/firefox_releasenotes/en-us/firefox/releases/0.7.

"Mozilla-Services: Shavar-Prod-Lists," GitHub, https://github.com/mozilla-services/shavar-prod-lists.

"National Jewish," Marriott Bonvoy, https://www.marriott.com/event-reservations/reservation-link.mi?id=1553788134461&key=CORP&app=resvlink.

"NIST's Policy on Hash Functions," National Institute of Standards and Technology, September 14, 2016, https://csrc.nist.rip/groups/ST/hash/policy.html.

"Online Tools: SHA256," GitHub, https://emn178.github.io/online-tools/sha256.html.

"openai/openai-python," GitHub, https://github.com/openai/openai-python.

"Page Not Found," MedStar Health, https://www.medstarhealth.org/services/womens-haalth.

"Pelotonia fellowships boost student cancer researchers," OSU Comprehensive Cancer Center, 2021, https://cancer.osu.edu/about/publications-and-reports/magazines-and-publications/frontiers/2021/pelotonia-special-edition/pelotonia-fellowships-boost-student-cancer-researchers.

"Postdoctoral Fellowships," Cancer Research Institute, https://www.cancerresearch.org/postdoctoral-fellowships.

"Privacy," Apple, https://www.apple.com/privacy/features.

"Proyecto 0.0 Facebook Page," Meta, https://www.facebook.com/profile.php?id=61559094593520.

"Proyecto 0.0," 00academy.org, https://00academy.org/.

"RDAP Domain Lookup," who.is, https://who.is/rdap/00academy.org.

"Regions and Availability Zones," Amazon Web Services, https://aws.amazon.com/about-aws/global-infrastructure/regions_az/.

"Register a Domain with GoDaddy," GoDaddy, https://www.godaddy.com/domains.

"Sample Selection Bias," Corporate Finance Institute, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/sample-selection-bias/.

"SDK vs. API: What's the difference?," IBM, https://www.ibm.com/think/topics/api-vs-sdk.

"Secure Hash Standard (SHS)," National Institute of Standards and Technology, August 2015, https://nvlpubs.nist.gov/nistpubs/FIPS/NIST.FIPS.180-4.pdf.

"Set up and install the Meta Pixel," Meta, https://www.facebook.com/business/help/952192354843755.

"Set up automatic advanced matching in Meta Events Manager," Meta, https://www.facebook.com/business/help/1993001664341800.

"SHA256 hash value - Medstar location search (modified)," GitHub, https://emn178.github.io/online-tools/sha256.html.

"SHA256 hash value - Medstar location search (original)," GitHub, https://emn178.github.io/online-tools/sha256.html.

"Specifications for Meta Pixel standard events," Meta, https://www.facebook.com/business/help/402791146561655.

"Static URLs or Dynamic URLs," Netgains, August 8, 2011, https://www.netgains.org/static-urls-or-dynamic-urls/.

"Storage array settings FAQ for SANtricity System Manager - What is cache flushing?," NetApp, June 19, 2025, https://docs.netapp.com/us-en/e-series-santricity/sm-storage/faq-storage-array-settings.html#what-is-cache-flushing.

"Stripe Privacy Center," Stripe, https://stripe.com/it-si/legal/privacy-center.

"Support Cambridge - Cookies list," University of Cambridge, https://www.philanthropy.cam.ac.uk/cookies-list.

"Template Usage," Mercurial Developers, https://repo.mercurial-scm.org/hg/help/templates.

"The best person to be in control of data is you," Meta, https://www.facebook.com/off-facebook-activity.

"The cost of ad blocking," PageFair and Adobe, 2015, https://gwern.net/doc/economics/advertising/2015-pagefair.pdf.

"The NSA and Bitcoin: Origins of the SHA-256 Hashing Algorithm," Supra, March 25, 2024, https://supra.com/academy/the-nsa-and-bitcoin-origins-of-the-sha-256-hashing-algorithm/.

"Third-party cookies and Firefox tracking protection," Mozilla Support, May 13, 2025, https://support.mozilla.org/en-US/kb/third-party-cookies-firefox-tracking-protection.

"This site can't be reached," http://000nfjsdec.com/.

"Top-Rated Fort Worth Personal Injury Lawyer Fighting For You," Berenson Injury Law, https://berensonlaw.com/.

"uBlock Origin," uBlock, https://ublockorigin.com/.

"Understand any audience instantly," GWI, https://www.gwi.com/.

"Understand TCP/IP addressing and subnetting basics," Microsoft, January 15, 2025, https://learn.microsoft.com/en-us/troubleshoot/windows-client/networking/tcpip-addressing-and-subnetting.

"URLs," VA.gov Design System, September 24, 2024, https://dev-design.va.gov/4152/components/url-standards/.

"Use the Meta event setup tool for web," Meta, https://www.facebook.com/business/help/777099232674791.

"User-Agent header," MDN Web Docs, July 4, 2025, https://developer.mozilla.org/en-US/docs/Web/HTTP/Reference/Headers/User-Agent.

"User-Agent Reduction," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Web/HTTP/Guides/User-agent_reduction.

"Using the API," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/using-the-api/.

"VBE Glossary," Microsoft Learn, https://learn.microsoft.com/en-us/office/vba/language/glossary/vbe-glossary#seed.

"VPN Advice You Can Trust," Top10VPN, https://www.top10vpn.com/.

"Web Cookies Best Practices," Temple University, November 27, 2024, https://help.temple.edu/TDClient/277/Portal/KB/ArticleDet?ID=20217.

"What are Dictionary Attacks?," JumpCloud, April 22, 2025, https://jumpcloud.com/it-index/what-are-dictionary-attacks.

"What do client side and server side mean? | Client side vs. server side," Cloudflare, https://www.cloudflare.com/learning/serverless/glossary/client-side-vs-server-side/.

"What Is A Data Analytics Platform? Types, Benefits, & How To Choose," Datateer, https://www.datateer.com/blog/data-analytics-platform.

"What is a domain name? | Domain name vs. URL," Cloudflare, https://www.cloudflare.com/learning/dns/glossary/what-is-a-domain-name/.

"What Is a URL?," MDN Web Docs, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL.

"What is a web browser?," Mozilla Firefox, https://www.firefox.com/en-US/more/what-is-a-browser/.
"What Is Amazon CloudFront?," Amazon Web Services, https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/Introduction.html.
"What is an SDK?," Amazon Web Services, https://aws.amazon.com/what-is/sdk/.
"What is Mobile Application Development?," Amazon Web Services, https://aws.amazon.com/mobile/mobile-application-development/.
"Your activity off Meta technologies," Meta, https://www.facebook.com/off_facebook_activity.
Alam, Ayaan, "JavaScript Cookies," IntelliPaat, October 8, 2025, https://intellipaat.com/blog/javascript-cookies/.
Atil, Berk, Alexa Chittams, Lisheng Fu, Ferhan Ture, Lixinyu Xu, and Breck Baldwin, "LLM Stability: A detailed analysis with some surprises," arXiv, August 6, 2024, https://arxiv.org/html/2408.04667v2.
Atil, Berk, Sarp Aykent, Alexa Chittams, Lisheng Fu, Rebecca J. Passonneau, Evan Radcliffe, Guru Rajan Rajagopal, Adam Sloan, Tomasz Tudrej, Ferhan Ture, Zhe Wu, Lixinyu Xu, and Breck Baldwin, "Non-Determinism of 'Deterministic' LLM Settings," arXiv, April 2, 2025, https://arxiv.org/pdf/2408.04667.
Barth, Adam, "HTTP State Management Mechanism," IETF, December 31, 2009, https://www.ietf.org/archive/id/draft-abarth-cookie-07.html.
Basques, Kayce, "Console Overview," Chrome for Developers, September 21, 2024, https://developer.chrome.com/docs/devtools/console.
Buxton, Oliver, "What does a VPN hide? 6 common identifiers VPNs disguise," Norton, February 21, 2025, https://us.norton.com/blog/privacy/what-does-a-vpn-hide.
Callaghan, Peter, "Is SHA-256 Secure? Legal & Compliance Experts Say Yes—Here's Why," Pagefreezer, https://blog.pagefreezer.com/sha-256-benefits-evidence-authentication.
Corrons, Luis, "What is a VPN and what does it do?," Norton, April 9, 2024, https://us.norton.com/blog/privacy/what-is-a-vpn.
Davis, Matt, "Cookies, Pixels, and Tags: The Data Privacy Implications of Each," Osano, July 25, 2025, https://www.osano.com/articles/privacy-cookies-pixels-and-tags.
Day, Brett, "What A VPN Hides (And What It Doesn't)," Forbes, September 26, 2025, https://www.forbes.com/advisor/business/software/what-does-vpn-hide/.
Eldridge, Thomas, "What Is a Weather API?," Meteomatics, November 13, 2023, https://www.meteomatics.com/en/weather-api/what-is-a-weather-api/.
Facebook for Developers, "AppEventsLogger," Wayback Machine, April 27, 2025, https://web.archive.org/web/20250427105149/https://developers.facebook.com/docs/reference/android/current/class/AppEventsLogger/.
Facebook for Developers, "FBSDKAppEvents," Wayback Machine, September 24, 2021, https://web.archive.org/web/20210924053056/https://developers.facebook.com/docs/reference/ios/current/class/FBSDKAppEvents/.
Facebook for Developers, "Pixel Code Reference," Wayback Machine, August 27, 2017, https://web.archive.org/web/20170827002341/https:/developers.facebook.com/docs/facebook-pixel/api-reference.
Gillis, Alexander S., "Dynamic IP Address," TechTarget, March 17, 2020, https://www.techtarget.com/whatis/definition/dynamic-IP-address.

Globytė, Ema, "NordVPN survey shows: A third of Americans use a VPN," NordVPN, June 28, 2023, https://nordvpn.com/blog/nordvpn-usage-survey-us/.

Goodwin, Michael, "What is an API (application programming interface)?," IBM, https://www.ibm.com/think/topics/api.

Hilson, Gary, "Static IP vs. dynamic IP addresses: Understanding the difference," Verizon Business, https://www.verizon.com/business/resources/articles/s/understanding-the-difference-between-static-ip-vs-dynamic-ip-addresses/.

Hodge, Rae, "No, Apple's Private Relay is not a VPN, but you can still try it out with iOS 15," CNET, February 10, 2022, https://www.cnet.com/tech/services-and-software/no-apples-private-relay-is-not-a-vpn-but-you-can-still-try-it-out-with-ios-15/.

Hoffman, Paul E., and Bruce Schneier, "Attacks on Cryptographic Hashes in Internet Protocols," Internet Engineering Task Force, November 2005, https://datatracker.ietf.org/doc/html/rfc4270.

Holfelder, Wieland, "A polyglot Google Chrome beta, with new privacy features," Google Chrome Blog, March 1, 2010, https://chrome.googleblog.com/2010/03/polyglot-google-chrome-beta-with-new.html.

Hoory, Leeron, "What Is a Proxy Server?," Forbes, September 10, 2025, https://www.forbes.com/advisor/business/what-is-a-proxy-server/.

Klishevich, Eugene, Yegor Denisov-Blanch, Simon Obstbaum, Igor Ciobanu, and Michal Kosinski, "Measuring Determinism in Large Language Models for Software Code Review," arXiv, February 28, 2025, https://arxiv.org/pdf/2502.20747.

Kopper, Sarah, and Anja Sautmann, "Randomization," The Abdul Latif Jameel Poverty Action Lab, September 2023, https://www.povertyactionlab.org/resource/randomization.

Lotfinejad, Mehdi, "Regularization in Machine Learning (with Code Examples)," Dataquest, January 2, 2025, https://www.dataquest.io/blog/regularization-in-machine-learning/.

Mazor, Orit, "Windows Beta Update: Translate and content controls," Google, March 1, 2010, https://chromereleases.googleblog.com/2010/03/windows-beta-update-translate-and.html.

Merewood, Rowan, "Understanding cookies," web.dev, October 30, 2019, https://web.dev/articles/understanding-cookies.

Nield, David, "How to Lock Down What Websites Can Access on Your Computer," Wired, November 4, 2018, https://www.wired.com/story/how-to-lock-down-websites-permissions-access-webcam/.

Patel, Mayur, Scott Renfro, and Benjamin Strahs, "Redesigning our systems to provide more control over Off-Facebook activity," Engineering at Meta, August 20, 2019, https://engineering.fb.com/2019/08/20/core-infra/off-facebook-activity/.

Petrova, Beloslava, "What is a Point of Presence (PoP) and Why Does It Matter?," CloudDNS, February 21, 2025, https://www.cloudns.net/blog/what-is-a-point-of-presence-pop-and-why-does-it-matter/.

Preusler, Christine, "20 Largest Domain Registrars in the World (2025)," HostingAdvice.com, March 13, 2025, https://www.hostingadvice.com/how-to/largest-domain-registrars/.

Salanié, Bernard, "Instructions for Submitting Articles," Journal Of The Econometric Society, https://www.econometricsociety.org/publications/quantitative-economics/submissions/instructions-for-submitting-articles.

Sheharyar, "Integrating Third-Party SDKs for Enhanced App Features," Softwarehouse, March 11, 2025, https://softwarehouse.au/blog/integrating-third-party-sdks-for-enhanced-app-features/.

Tomaschek, Attila, and Moe Long, "Best VPN Service for 2025: Our Top Picks in a Tight Race," CNET, October 9, 2025, https://www.cnet.com/tech/services-and-software/best-vpn/.

Vigderman, Aliza, and Gabe Turner, "Static vs. Dynamic IP Addresses," NordVPN, April 15, 2025, https://www.security.org/vpn/static-vs-dynamic-ip-address/.

WedinMexico.com, "Homepage," Wayback Machine, August 21, 2017, https://web.archive.org/web/20170821073645/http://wedinmexico.com/.

Zey, Tyler, "How to Run Cookie Banners Only in Certain States (and Hide Them Everywhere Else)," Ours Privacy, September 5, 2025, https://oursprivacy.com/guides/auto-show-cookie-banner-on-region.

# APPENDIX D
# TECHNICAL APPENDIX

1. In this technical appendix, I provide details of the testing conducted to investigate how controls available to users may affect the functionalities of the Meta Pixel. I also include details of my review of Meta's produced source code.

a. **Appendix D, Section I**, describes the testing protocol I used for the site testing of user controls conducted in my report.

b. **Appendix D, Section II**, describes the testing protocol I used for the site testing of developer controls conducted in my report.

c. **Appendix D, Section III**, describes the procedure implemented for non-site testing (*i.e.*, CAPI).

## I. TESTING OF META PIXEL TRANSMISSIONS UNDER DIFFERENT USER CONTROLS

2. I conducted these experiments on a Windows virtual machine (running Windows Server 2019 Datacenter Version 1809) and a MacBook Pro (running macOS Sonoma 14.5), both with IP addresses associated with California. In addition, I used Google Chrome (version 142), Firefox (version 145), and Safari (version 17.5) with the protocols described below.

3. Website visits performed to obtain some of the figures included in my rebuttal report were conducted separately from the completion of the site-testing process detailed below. The information shown in these figures is consistent with the results documented via the site

testing described below, for which I provide corresponding video recordings and HTTP Archive ("HAR") files in my produced backup.[1]

### A. Tests

4. For all experiments described in this section, I captured transmissions when visiting specific websites indicated by Plaintiffs to be associated with the Meta Pixel ("testing websites").[2] To illustrate how user actions, browser settings, and extensions impact transmissions to Meta, I recorded data transmissions under different configurations. I tested the following variations:

a. **Default:** This test observes the functionality of the Meta Pixel in Chrome when no specific user action is taken and no non-default settings or extensions are implemented.

b. **User Actions:** These tests observe the functionality of the Meta Pixel when specific user actions are taken. These consist of:

i. not refreshing the testing website,

ii. not logging in to Facebook,

iii. rejecting the use of third-party tools per site consent banners or privacy settings,

iv. not interacting with site consent banners,

[1] *See* backup.

[2] *See* 2023.06.21 - Meta Medical Provider Sites.csv.

v. using the browser console to transmit a Meta Pixel event with a custom parameter,

vi. visiting a specific subpage or subdomain of the testing sites, and

vii. opting out of online behavioral advertising.

c. **Browsers with Enhanced Default Privacy Configurations:** These tests observe the functionality of the Meta Pixel when the Firefox and Safari browsers are used in regular browsing sessions.

d. **Cookie Blocking and Privacy-Enhanced Browsing Modes:** These tests observe the functionality of the Meta Pixel when users configure their browsers to operate by blocking third-party cookies or implementing privacy-enhanced browsing modes (i.e., Firefox's Strict Mode and Safari's Advanced Tracking and Fingerprinting Protection).[3]

e. **Browser Extensions:** This test observes the functionality of the Meta Pixel when users implement the following extension:

i. Adblock Plus

## B. Specific Considerations

5. Certain site-testing variations required specific adjustments to the testing procedure:

[3] Browsers typically implement such features in private browsing sessions as well. For that reason, not all private browsing modes are included in tests.

### *1. Default Site Visits to greenwichhospital.org*

6. For the site visit to *greenwichhospital.org* and *creonhcp.com* using a default Chrome browsing configuration, in addition to downloading the HAR file associated with the site visit, I also downloaded: (1) the site source code that initializes the Meta Pixel, and (2) the code used to configure the specific Meta Pixel on the Greenwich Hospital site.[4]

### *2. Site Visits to Testing Websites With Specific User Actions*

7. I perform a site visit to *zyrtec.com*, using a Chrome browser with default configurations, where I accept the use of cookies and third-party tools. However, I do not refresh the page.[5]

8. I also perform various site visits to *greenwichhospital.org* and *mgmc.org* using a Chrome browser with default configurations, where I visit subpages or subdomains of the site to demonstrate URL values being truncated due to Core Setup or the absence of the Meta Pixel on the specific subdomain.[6]

### *3. Demonstration of Core Setup Blocking the Transmission of Custom Parameters*

9. As discussed in my report, the *greenwichhospital.org* site is placed into Core Setup, which prevents the transmission of custom parameters. In order to demonstrate this, I make use

---

4 The code used to configure the Meta Pixel is the JavaScript file retrieved by the GET request to *https://connect.facebook.net/signals/config/*. *See, e.g.*, backup, "windows_chrome_greenwichhospital_default."

5 *See* backup, "windows_chrome_zyrtec_noRefresh.har."

6 *See* backup, "windows_chrome_greenwichhospital_subpage.har," "windows_chrome_mgmc_subpage.har," and "windows_chrome_mgmc_subpage_1.har."

of the Chrome browser's console. The console allows site visitors to run JavaScript code, which may, depending on the code run, interact with or affect the site being visited.[7]

10. I visit the *greenwichhospital.org* site and, using the console, run the line of code "fbq('track', 'Donate', {testParam:'test'});."[8] This line of code directs the Meta Pixel equipped on the site to transmit the "Donate" event alongside the custom parameter "testParam" associated with the value "test."[9] I observe that, while the "Donate" event is transmitted as a result of this action, the custom parameter associated with it is not.

### C. Protocol

11. For each test, I collected transmissions using the following protocols:

1. Open the browser (either Chrome, Firefox, or Safari, as described above) in regular browsing mode.
2. Clear all browsing data, including cookies, cache, and search history.
3. Update browser settings as needed to match the type of experiment (e.g., blocking third-party cookies or turning on strict mode on Firefox).
4. Confirm that required extensions are either enabled or disabled as specified for the test (i.e., AdBlock Plus).

---

7 Basques, Kayce, "Console Overview," Chrome for Developers, https://developer.chrome.com/docs/devtools/console ("You can run JavaScript in the Console to interact with the page that you're inspecting. For example, Figure 2 shows the Console next to the DevTools homepage, and Figure 3 shows that same page after using the Console to change the page's title […] Modifying the page from the Console is possible because the Console has full access to the page's window."); "Run JavaScript in the Console," Chrome for Developers, https://developer.chrome.com/docs/devtools/console/javascript ("When building or debugging a page, it's often useful to run statements in the Console in order to change how the page looks or runs [..] Sometimes, you just want a code playground where you can test some code, or try out new JavaScript features you're not familiar with. The Console is a perfect place for these kinds of experiments").

8 *See* backup, "windows_chrome_greenwichhospital_customParameter.har."

9 This is the same snippet of code a developer would include in the site should they want to configure the Meta Pixel to transmit such an event. For the specification of how event parameters are configured. *See* "Conversion Tracking," Meta, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

a. When performing a private browsing mode test, close the default browsing window after this step and open a private browsing window.

5. Open a new tab and close any previous tab so that only one blank tab remains. If the experiment requires logging in to Facebook, navigate to *www.facebook.com* and log in.

6. Once logged in, open a new tab and close the previous one so that only a single new tab remains. Then open the Developer Tools network panel and start recording data transmissions. [10]

7. Copy and paste the URL of the testing webpage into the browser address bar. Accept all cookies unless the test specifies otherwise.

8. Wait for the page to load fully, then scroll to the bottom. Unless the test specifies otherwise, reload the page, and scroll down once more, either allowing the page to finish loading or waiting 15 seconds.

9. Pause recording of network transmissions and download the associated HAR file.

## II. TESTING OF META PIXEL TRANSMISSIONS UNDER DIFFERENT DEVELOPER CONTROLS

### A. Disable Automatic Events

12. In order to illustrate how developers can disable the transmission of automatic events, I implement the Meta Pixel on a website under my control[11] and modify its configuration to include the line of code "fbq("set", "autoConfig", "false", "FB_PIXEL_ID")". In one instance, I incorporate this command without replacing the placeholder string "FB_PIXEL_ID"

---

[10] This method excludes any automatic communications by the browsers that are not directly related with browsing activities associated with the visited website.

[11] I provide the HTML files comprising this site in my produced backup. The HTML files, based on the test being conducted, contained different content at different times consistent with the testing being performed.

with the actual Pixel ID associated with the website. Under this configuration, I observe that button click interactions result in the transmission of a SubscribedButtonClick event.[12]

13. In a different instance, I replace the placeholder string with the website's Pixel ID and repeat the same button click interactions under identical testing conditions. In this configuration, I observe that button clicks no longer result in the transmission of a SubscribedButtonClick event.[13]

**B. Disable First-Party Cookies**

14. In order to illustrate how developers can disable the transmission of first-party cookies, I implement the Meta Pixel on a website under my control and configure it using the Meta Events Manager. Within the Events Manager interface, I select the option to disable first-party cookies associated with the Meta Pixel.[14]

15. I then conduct browser-based testing on the website after disabling this option. I observe that the *fbp* query parameter is no longer included in Meta Pixel event transmissions.[15]

---

[12] *See* backup, "windows_chrome_tubular-bubblegum_disableAutoEventsPlaceholder.har."

[13] *See* backup, "windows_chrome_tubular-bubblegum_disableAutoEvents.har."

[14] *See* "About cookie settings for the Meta Pixel," Meta, https://www.facebook.com/business/help/471978536642445 ("You can disable first-party cookies and use the Meta Pixel with third-party cookies only. With this option, your Meta Pixel will be less effective in reaching customers on Meta technologies and less accurate in measurement and reporting").

[15] *See* backup, "windows_chrome_tubular-bubblegum_block1p.har."

## III. NON-SITE TESTING

### A. Conversions API

16. In order to illustrate how developers can transmit CAPI events, I establish an endpoint on Meta's servers to receive CAPI transmissions originating from my server (in this case, my computing device).[16] After generating an endpoint, I use a script in the Python programming language to transmit the event "myEvent," with a listed event time of 6 days prior to the execution of the script. I also include hashed user data values of first name and country.[17] I observed that after transmission, the event was displayed in the Meta Events Manager with the associated "event_time" value transmitted.[18]

---

[16] To set up CAPI manually developers must generate an access token, which can be done using Meta's Events Manager. Afterwards, developers can send events to the API endpoint at *https://graph.facebook.com/{API_VERSION}/{PIXEL_ID}/events?access_token={TOKEN}*. Events transmitted using CAPI must contain certain required parameters. *See* "Conversions API: Get Started," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/get-started/ ("To use the Conversions API, you need to generate an access token, which is passed as a parameter in each API call. Inside Events Manager, follow these steps[.]"); "Using the API," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/using-the-api/ ("To send new events, make a POST request to this API's /events edge from this path: https://graph.facebook.com/{API_VERSION}/{PIXEL_ID}/events?access_token={TOKEN}. When you post to this edge, Facebook creates new server events"Conversions API: Payload Helper," Meta, https://developers.facebook.com/docs/marketing-api/conversions-api/payload-helper.

[17] *See* backup, "CAPI Testing."

[18] *See* my rebuttal report.