Proposed Redacted Version of Defendant Meta Platforms, Inc.'s  Motion to Exclude Certain Opinions of Plaintiffs' Class Certification Expert Zubair Shafiq, Ph.D (Dkt. No. 1263-2)

1  **LATHAM & WATKINS LLP**
   Melanie M. Blunschi (Bar No. 234264)
2   *melanie.blunschi@lw.com*
   Kristin Sheffield-Whitehead (Bar No. 304635)
3   *kristin.whitehead@lw.com*
   505 Montgomery St., Suite 2000
4  San Francisco, CA 94111
   Telephone: +1.415.391.0600
5

6  Andrew B. Clubok (*pro hac vice*)
    *andrew.clubok@lw.com*
7  555 Eleventh St., NW, Suite 1000
   Washington, D.C. 20004-1304
8  Telephone: +1.202.637.2200

9
   Marissa Alter-Nelson (*pro hac vice*)
10   *marissa.alter-nelson@lw.com*
   1271 Avenue of the Americas
11 New York, NY 10020
   Telephone: +1.212.906.1345
12

13 Jessica Stebbins Bina (Bar No. 248485)
   *jessica.stebbinsbina@lw.com*
14 10250 Constellation Blvd., Suite 1100
   Los Angeles, CA 90067
15 Telephone: +1.424.653.5500

16
   *Attorneys for Defendant Meta Platforms, Inc.*
17

**GIBSON, DUNN & CRUTCHER LLP**
Lauren R. Goldman (*pro hac vice*)
*lgoldman@gibsondunn.com*
Darcy C. Harris (*pro hac vice*)
*dharris@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone: +1.212.351.4000

Elizabeth K. McCloskey (Bar No. 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (Bar No. 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: +1.415.393.8200

18             **UNITED STATES DISTRICT COURT**

19             **NORTHERN DISTRICT OF CALIFORNIA**

20                 **SAN FRANCISCO DIVISION**

21

22 IN RE META PIXEL HEALTHCARE          Case No. 3:22-cv-3580-WHO
   LITIGATION
23                                       **DEFENDANT META PLATFORMS,**
                                         **INC.'S MOTION TO EXCLUDE**
24                                       **CERTAIN OPINIONS OF PLAINTIFFS'**
                                         **CLASS CERTIFICATION EXPERT**
25 This Document Relates To:            **ZUBAIR SHAFIQ, PH.D.**

26 All Actions                          Date: April 22, 2026
                                         Time: 2:00 p.m.
27                                       Court: Courtroom 2 —17th Floor
                                         Hon**.** William H. Orrick
28

                    **FILED UNDER SEAL**

1

## NOTICE OF MOTION AND MOTION TO EXCLUDE

2     **PLEASE TAKE NOTICE** that on April 22, 2026 at 2:00 p.m., before the Honorable

3 William H. Orrick, United States District Court, Courtroom 2, 17th Floor, 450 Golden Gate Ave.,

4 San Francisco, California, 94102, Defendant Meta Platforms, Inc. ("Meta") will, and hereby does

5 move this Court for an order to exclude certain portions of the opinions and testimony of Dr. Zubair

6 Shafiq (the "Motion"), submitted by plaintiffs in support of their Motion for Class Certification.

7 Dkt. No. 1154-3 ("Class Cert. Motion," and cited as "Mot."). Meta seeks consideration of this

8 Motion in connection with plaintiffs' Class Cert. Motion. *See Lytle v. Nutramax Labs., Inc.*, 11

9 F.4th 1011, 1030-31 (9th Cir. 2024).

10     Meta's Motion is made pursuant to the Federal Rule of Evidence 702 and *Daubert v.*

11 *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"), and pursuant to the Court's

12 discretion to disregard unsupported evidence in connection with a motion under Federal Rule of

13 Evidence 23 to certify a class, on the grounds that Dr. Shafiq's Opinions 1, 3, and 10 and related

14 testimony should be excluded because they are not helpful to determining a fact in issue, not based

15 on sufficient facts or data, not the product of reliable principles and methods, and do not reflect a

16 reliable application of the principles and methods to the facts of the case.

17     Meta's Motion is based on this Notice of Motion, the accompanying Memorandum of

18 Points and Authorities, the concurrently filed Declaration of Melanie M. Blunschi and all exhibits

19 thereto, the concurrently filed Proposed Order, the complete files and records of this action, and

20 any matters and arguments as may come before the Court, including in connection with any oral

21 argument relating to this Motion.

22

## STATEMENT OF RELIEF SOUGHT

23     Meta seeks an order pursuant to Federal Rule of Evidence 702 and *Daubert* excluding Dr.

24 Shafiq's Opinions 1, 3, and 10, as further detailed in Meta's Motion, and any related testimony.

25

26

27

28

1    Dated: December 19, 2025                    Respectfully submitted,

2

3                                               LATHAM & WATKINS LLP

4                                               By */s/ Melanie M. Blunschi*
5                                                  Melanie M. Blunschi (Bar No. 234264)
                                                   *melanie.blunschi@lw.com*
6                                                  Kristin Sheffield-Whitehead (Bar No. 304635)
                                                   *kristin.whitehead@lw.com*
7                                                  505 Montgomery St., Suite 2000
                                                   San Francisco, CA 94111
8                                                  Telephone: +1.415.391.0600

9                                                  Andrew B. Clubok (*pro hac vice*)
10                                                 *andrew.clubok@lw.com*
                                                   555 Eleventh St., NW, Suite 1000
11                                                 Washington, D.C. 20004-1304
                                                   Telephone: +1.202.637.2200
12
                                                   Marissa Alter-Nelson (*pro hac vice*)
13                                                 *marissa.alter-nelson@lw.com*
                                                   1271 Avenue of the Americas
14                                                 New York, NY 10020
                                                   Telephone: + 1.212.906.1200
15
                                                   Jessica Stebbins Bina (Bar No. 248485)
16                                                 *jessica.stebbinsbina@lw.com*
17                                                 10250 Constellation Blvd., Suite 1100
                                                   Los Angeles, CA 90067
18                                                 Telephone: +1.424.653.5500

19                                                 **GIBSON, DUNN & CRUTCHER LLP**
20                                                 Lauren R. Goldman (*pro hac vice*)
                                                   *lgoldman@gibsondunn.com*
21                                                 Darcy C. Harris (*pro hac vice*)
                                                   *dharris@gibsondunn.com*
22                                                 200 Park Avenue
                                                   New York, NY 10166
23                                                 Telephone: +1.212.351.4000

24                                                 Elizabeth K. McCloskey (Bar No. 268184)
                                                   *emccloskey@gibsondunn.com*
25                                                 Abigail A. Barrera (Bar No. 301746)
                                                   *abarrera@gibsondunn.com*
26                                                 One Embarcadero Center, Suite 2600
                                                   San Francisco, CA 94111
27                                                 Telephone:  +1415.393.8200

28                                                 *Attorneys for Defendant Meta Platforms, Inc.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ........................................................................................................... 2

III.  LEGAL STANDARD .................................................................................................... 3

IV.   ARGUMENT ................................................................................................................ 4

      A.    Opinion 1 Is Irrelevant To Class Certification And Unreliable. ......................... 5

            1.    Opinion 1 Does Not Offer Relevant Information. ................................... 5

            2.    Opinion 1 is not Reliable. ....................................................................... 8

      B.    Opinion 3(a) Is Unreliable and Inapplicable To The Facts Of This Case. ......................................................................................................... 13

            1.    Dr. Shafiq's Manual Approaches Are Not Scalable And Are Not A "Programmatic" Method To Identify Button Clicks. ....................................................................................................... 15

            2.    Dr. Shafiq's AI Approach Is Unscientific, Untestable, And Unverifiable. .......................................................................................... 18

      C.    Opinion 3(b) Should Be Excluded. .................................................................. 22

            1.    Opinion 3(b) Is Unreliable. ................................................................... 22

            2.    Opinion 3(b) Is Irrelevant. .................................................................... 23

      D.    A Portion of Opinion 10 (¶ 209) Should Be Excluded. .................................... 24

V.    CONCLUSION ........................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## CASES

4

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
303 F.3d 256 (2nd Cir. 2002) ............................................................................................ 15

5

6

*Avon Prod., Inc. v. S.C. Johnson & Son, Inc.,*
984 F. Supp. 768 (S.D.N.Y. 1997) ...................................................................................... 19

7

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th Cir. 1995) ....................................................................................... passim

8

9

*Domingo ex rel. Domingo v. T.K.,*
289 F.3d 600 (9th Cir. 2002) ................................................................................... 8, 22, 24

10

11

*Eghnayem v. Bos. Sci. Corp.,*
57 F. Supp. 3d 658 (S.D.W. Va. 2014) ............................................................................... 21

12

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) ........................................................................................... 3, 5

13

14

*GPNE Corp. v. Apple, Inc.,*
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ............................................................... 19, 20

15

16

*Guidroz-Brault v. Missouri Pac. R. Co.,*
254 F.3d 825 (9th Cir. 2001) ............................................................................................... 7

17

*Hall v. Acad. Charter Sch.,*
2025 WL 2256653 (E.D.N.Y. Aug. 7, 2025) ...................................................................... 19

18

19

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.,*
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ......................................................................... 18, 20

20

*In re Celsius Network LLC,*
655 B.R. 301 (Bankr. S.D.N.Y. 2023) ................................................................................ 18

21

*In re: Autozone, Inc.,*
2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) .................................................................... 21

22

23

*Kamakahi v. Am. Soc'y for Reprod. Med.,*
305 F.R.D. 164 (N.D. Cal. 2015) ................................................................................. 3, 4, 8

24

25

*Klein v. Meta Platforms, Inc.,*
766 F. Supp. 3d 956 (N.D. Cal. 2025) ............................................................................. 3, 15

26

27

*Kruglyak v. Home Depot U.S.A., Inc.,*
774 F. Supp. 3d 767 (W.D. Va. 2025) ................................................................................ 19

28

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ......................................................................................................... 18

*Lytle v. Nutramax Labs., Inc.*,
   114 F.4th 1011 (9th Cir. 2024) ...................................................................................... 3, 5

*Myers v. United States*,
   2014 WL 6611398 (S.D. Cal. Nov. 20, 2014) .................................................................. 24

*Newkirk v. Conagra Foods, Inc.*,
   438 F. App'x 607 (9th Cir. 2011) ...................................................................................... 9

*NuVasive, Inc. v. Kormanis*,
   2019 WL 9633645 (M.D.N.C. Mar. 18, 2019) .................................................................. 7

*Rambus Inc. v. Hynix Semiconductor Inc.*,
   254 F.R.D. 597 (N.D. Cal. 2008) .................................................................................... 22

*Rearden LLC v. Walt Disney Co.*,
   2021 WL 6882227 (N.D. Cal. July 12, 2021) .................................................................. 21

*Rovid v. Graco Children's Prods. Inc.*,
   2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) .............................................................. 15, 19

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ............................................................................................ 3

*Schwab v. Philip Morris USA, Inc.*,
   2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005) .......................................................... 10, 18

*United States v. Hebshie*,
   754 F. Supp. 2d 89 (D. Mass. 2010) .............................................................................. 19

*United States v. Holguin*,
   51 F.4th 841 (9th Cir. 2022) ............................................................................................ 8

**RULES**

Fed. R. Evid. 702 .................................................................................................... passim

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

META'S MOT. TO EXCLUDE EXPERT
ZUBAIR SHAFIQ
CASE NO. 3:22-cv-3580-WHO

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs' certification bid attempts to sweep in four massive classes that cover activity across more than 650,000 websites and apps and purports to adjudicate the claims of millions of users in a single proceeding, despite countless developer-and-user-specific variables that defeat any prospect of common proof. Mot. 13-14; *see also* Meta's Opposition to Plaintiffs' Motion for Class Certification, Dkt. 1251-51 ("Opp.") 1-2, 7-16. To give the illusion of ascertainability and commonality where none exists, plaintiffs draw heavily from Dr. Zubair Shafiq's Report. *See generally* Mot. 1-12; Expert Report of Zubair Shafiq, Ph.D., Dkt. 1155-10 ("Shafiq Rpt.").

Meta moves to exclude Dr. Shafiq's Opinions 1, 3, and 10 (the "Challenged Opinions") because each fails to meet the standards set forth in Federal Rule of Evidence 702.[1] With Opinion 1, Dr. Shafiq claims to be able to show that "Meta can programmatically identify healthcare provider websites and apps" (Shafiq Rpt. ¶¶ 48-75) to identify the websites and apps in plaintiffs' proposed classes. But the touchstone of plaintiffs' class definitions is whether the websites and apps are associated with entities that are covered by the Health Insurance Portability and Accountability Act ("HIPAA") or the California Medical Information Act ("CMIA")—and Dr. Shafiq admits that his proffered methodologies cannot be used to identify websites or apps provided by HIPAA- or CMIA-covered entities. Dr. Shafiq's Opinion 3 is that "Meta can programmatically identify 'Patient Button Clicks'" and "Health Information" (Shafiq Rpt. ¶¶ 126-157), but he has outsourced this analysis to an unverifiable artificial intelligence model without offering a real methodology. And Dr. Shafiq's Opinion 10 purports to identify specific class members, but provides no methodology to reliably match events to people.

Because the Challenged Opinions do not "logically advance[] a material aspect" of plaintiffs' Class Cert. Motion, they should be excluded under Rule 702. *See Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995).

---

[1] Meta has focused this Motion on the Opinions that Plaintiffs most heavily rely on for class certification. The parties have agreed that the parties may reserve challenges under Daubert to the merits stage. Dkt. 1111, 1208.

## II.     BACKGROUND

This case concerns a set of "Business Tools" that Meta makes publicly available for web and app developers; namely, (1) the Pixel; (2) the Software Development Kit ("SDK"); (3) Conversions API ("CAPI"); and (4) "custom uploads." Mot. 2, 14.[2]  Web and app developers can use the Business Tools to measure activity on their websites or apps, better understand their users' activity and needs, and improve their products and services.  Expert Report of Georgios Zervas, Ph.D., Dkt. 1251-14 (A13-4244-4477) ("Zervas Rpt.") ¶¶ 25-27; Opp. 3-5.

Plaintiffs allege that healthcare providers that implemented the Business Tools, including the Meta Pixel, in their websites or apps transmitted to Meta certain health information protected by HIPAA or CMIA.  Compl., (Dkt. 335) ¶ 1.  Plaintiffs seek to certify four classes, all of which span from June 17, 2018 to the present day: (1) the Patient Status Button-Click Class; (2) the Patient Health Information Class; (3) the Prescription Drug Information Class; and (4) the Patient Device Intrusion Class.  Mot. 13.

The proposed Patient Status Button-Click Class includes "[a]ll Facebook users who had at least one patient portal, medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from Class Healthcare Providers." *Id.*  The proposed Patient Health Information Class includes "all Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events described above." *Id.*  For both classes, the "Class Healthcare Providers" are purportedly those listed in Exhibits 60 and 72 attached to the Class Cert. Motion, which plaintiffs claim to be "healthcare providers covered by HIPAA." *Id.* at 13-14.  Exhibit 60 (Dkt. 1154-59) is an Excel file listing 3,207 domains that appears to be the exact same document as Exhibit I to the Shafiq Report.  Exhibit 72 (Dkt. 1154-66) is an Excel file that includes over 650,000 domains and apps and appears to be largely derived from Exhibit  E to the Shafiq Report.

The proposed Prescription Drug Information Class includes "[a]ll Facebook users whose communications with a prescription drug website for which they have a prescription, were

---

[2] "Custom uploads" is not a term Meta uses; it understands this reference to "custom uploads" to mean uploaded customer lists from developers. *See* Dkt. 334-3 ("Compl.") ¶¶ 1 & n.1, 7, 83.

1    obtained by Meta." Mot. 13. Plaintiffs claim that the at-issue prescription drug domains are listed

2    in Exhibit 73 (Dkt. 1154-67), which plaintiffs claim are "all prescription drug companies . . .

3    covered by the CMIA." *Id.* at 14.

4        Finally, the proposed Patient Device Intrusion Class includes "[a]ll Facebook users for

5    whom Meta placed an _fbp cookie and/or used computing resources by sending data to Meta

6    through their device and/or by computing Core Setup logic on their device while at a Healthcare

7    Provider property." Mot. 13. Plaintiffs never say whether the fourth class includes all of the other

8    proposed classes, some subset, or some other list of entities.

9    **III.    LEGAL STANDARD**

10       Under Rule 702, plaintiffs have the burden to demonstrate that (a) Dr. Shafiq's opinions

11   "will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) Dr.

12   Shafiq's "testimony is based on sufficient facts or data"; (c) his "testimony is the product of reliable

13   principles and methods"; and (d) his opinions "reflect[] a reliable application of the principles and

14   methods to the facts of the case." Fed. R. Evid. 702. At all stages, courts apply the *Daubert*

15   standard when evaluating expert testimony. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006

16   (9th Cir. 2018). Whether a district court conducts a "'full' [or] 'limited' *Daubert* inquiry is a

17   function of what aspect of FRCP 23 is being addressed" and what information was available to the

18   expert. *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1030 (9th Cir. 2024). Regardless, courts

19   must evaluate whether the expert's testimony "both rests on a reliable foundation and is relevant

20   to the task at hand." *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025).

21       "The reliability prong requires the court to act as a gatekeeper to exclude junk science,"

22   and an expert's opinion "should be excluded as unreliable if it suffer[s] from serious

23   methodological flaws." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 176 (N.D. Cal.

24   2015); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). Relevance

25   "depends on what the parties will need to show to support or defeat class certification, and the

26   class certification questions of predominance and commonality in turn depend on the elements of

27   [the] underlying [] claim." *Kamakahi*, 305 F.R.D. at 174. A court "must ensure that the proposed

28   expert testimony . . . logically advances a material aspect of the proposing party's case." *Daubert*

1    *II*, 43 F.3d at 1315.  If it does not, the testimony must be excluded.  *Kamakahi*, 305 F.R.D. at 182.

2    **IV.    ARGUMENT**

3            To achieve class certification, plaintiffs must demonstrate that there is a classwide method

4    to prove that putative class members' "protected healthcare data" was transmitted to Meta.  Opp.

5    7-9.  That, in turn, requires plaintiffs to prove on a classwide basis that the websites and apps that

6    sent data are covered under HIPAA or the CMIA.  *Id.*; *see also* Mot. 13-14 (plaintiffs agree these

7    entities must be "HIPAA or CMIA covered entities").  Plaintiffs rely on Dr. Shafiq to "objectively

8    identif[y]" the at-issue websites and apps and the specific data at issue.  Mot. 13-14 (citing Shafiq

9    Rpt. ¶¶ 81-91, 126-53).  But Dr. Shafiq's Challenged Opinions should be excluded because they

10   are not relevant (as they do not identify HIPAA- or CMIA-covered entity websites or apps) or

11   reliable (as none of his methodologies allows anyone to "programmatically" identify at-issue

12   websites, apps, or health information or specific class members).

13           Opinion 1 does not provide a programmatic method—or any method—to identify HIPAA-

14   or the CMIA-covered websites and apps.  To the contrary, Dr. Shafiq's analysis merely results in

15   large lists—totaling hundreds of thousands of entries—of websites and apps that would need to be

16   individually investigated and manually verified to confirm whether they are covered by HIPAA or

17   CMIA.  Opinion 1 is thus unhelpful. In addition, it lacks a reliable methodology.

18           Opinions 3(a) and 3(b) fail for similar reasons.  Dr. Shafiq purports to describe a

19   methodology to "programmatically" identify "patient class member" "button clicks," "health

20   information," and "prescription drug information" disclosed by website operators[3] to Meta, but he

21   does not actually do so.  Instead, he describes two manual methods (neither of which is

22   generalizable to hundreds of thousands of websites) and then proposes to simply have an

23   unverifiable AI model manage the rest.  Neither of these methods are shown to be reliable,

24   reproducible, or scalable to the heterogeneous data at issue, and these opinions should be excluded.

25           Finally, the portion of Opinion 10 claiming that specific class members can be

26   "programmatically" identified using Meta's records should be excluded because it depends on

27

28   ---
     [3] Though Dr. Shafiq references "Meta Business tools," his analysis for Opinions 3(a) and 3(b) solely focuses on websites (not apps) and the Meta Pixel.

Opinions 1 and 3, which fail, and because Opinion 2, which provides only a narrative description of Meta's data matching systems, does not support this conclusion.

### A.    Opinion 1 Is Irrelevant To Class Certification And Unreliable.

#### 1.    Opinion 1 Does Not Offer Relevant Information.

An expert's opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Thus, expert opinions should be excluded if they do not "logically advance[] a material aspect" of plaintiffs' case. *Daubert II*, 43 F.3d at 1315. The court must ensure that expert evidence is relevant "in evaluating whether class certification requirements have been met." *Lytle*, 114 F.4th at 1031; *see also Ellis*, 657 F.3d at 982 (expert testimony must be relevant to certification). Because Opinion 1 does not actually identify at-issue websites or apps, as Dr. Shafiq himself admits (*see, e.g.*, Ex. 1 at 36:17-37:9, 44:3-20, 46:24-47:8, 82:7-14, 142:9-17, 193:21-194:11, 204:21-205:3, 211:3-212:20), it should be excluded as irrelevant.[4]

Opinion 1 states that plaintiffs can "reliably identify all or almost all healthcare provider domains at-issue in this case" using, among other things, Meta's internal RDTT and MegaTaxon classifications. Shafiq Rpt. ¶ 64. Plaintiffs identify two exhibits to their Class Cert. Motion, (Exhibits 60 and 72) as purportedly identifying at-issue entities. Mot. 13. Both exhibits correspond to exhibits attached to Opinion 1.[5] Opinion 1, however, is a bait-and-switch: ***none of Meta's internal classifications can be used to identify HIPAA or CMIA-covered entities, nor does Dr. Shafiq provide a methodology to do so***. Indeed, as Dr. Shafiq admitted at deposition, he did not analyze whether *any* of the websites or apps listed on either exhibit were actually associated with HIPAA- or CMIA-covered entities. Ex. 1 at 36:17-42:10, 43:19-45:6, 51:14-21. This alone shows that Opinion 1 is irrelevant to plaintiffs' Class Cert. Motion. *See Daubert II*, 43 F.3d at 1315. The internal Meta classifications examined by Dr. Shafiq for Opinion 1—either individually or together—do not take into consideration whether the entity associated with the website or app

---

[4] Unless otherwise noted, all emphasis is added, internal citations are omitted, and citations to "Ex." are to the exhibits of the concurrently submitted Declaration of Melanie M. Blunschi.

[5] Exhibit 60 appears to be the same document as Exhibit I, which (as Dr. Shafiq describes it) is a list of healthcare providers that counsel for plaintiffs created. Shafiq Rpt. ¶ 75; Ex. 1 at 204:21-205:3. Plaintiffs fail to explain how Exhibit 72 was compiled, but when cross-referenced with Dr. Shafiq's exhibits, it appears to largely mirror Exhibit E attached to his report.

1   is covered by HIPAA or CMIA. Opp. 9. *See* Dkt. 1085 at 3 (rejecting plaintiffs' demand that Meta

2   "investigate thousands, or hundreds of thousands, of entities" to determine HIPAA or CMIA

3   coverage); Dkt. 278 at 2 (similar); Dkt. 1251-8, A7-1697-1737.

4       ***MegaTaxon.*** MegaTaxon is a hierarchical taxonomy of topics and categories that is used

5   to predict a classification for, among other things, event data or an app. *See* Dkt. 624. There are

6   numerous MegaTaxon categories and subcategories, some of which are "health-related." *Id.* As

7   with Meta's other taxonomies or classification systems and as Meta explained to plaintiffs (*see id.*

8   at 4), MegaTaxon classifications are not tailored to, or determinative of, whether the entities

9   associated with such webpage event data or apps are governed by or comply with specific legal

10  regimes such as HIPAA or CMIA. Opp. 9; Zervas Rpt. ¶¶ 127-30. While event data from a

11  hospital's webpage might be classified in a "health-related" MegaTaxon category, so might event

12  data associated with a newspaper article about a medical condition or a historical description of a

13  building that was once used for medical purposes. Zervas Rpt. ¶¶ 128-29; *see also* Ex. 5 (false

14  positives in MegaTaxon).

15      Dr. Shafiq opines that "Megataxon can be used to reliably identify healthcare providers."

16  Shafiq Rpt. ¶ 54. However, to support his Opinion 1 and be relevant to the Class Cert. Motion,

17  Dr. Shafiq must provide the crucial link: that MegaTaxon classifications can be used to reliably

18  identify the at-issue websites and apps associated with HIPAA- or CMIA-covered entities. He

19  does not. In fact, Dr. Shafiq acknowledges that he cannot and does not give an opinion on whether

20  any particular website with associated MegaTaxon event data classifications is governed by

21  HIPAA or CMIA. Ex. 1 at 40:14-42:21; 43:19-44:8, 49:20-50:16; 117:24-118:19; 130:6-15.

22      Instead, for his opinion that MegaTaxon can be used to identify such websites, Dr. Shafiq

23  relied exclusively on a table provided to him by plaintiffs' counsel: the left column of which

24  includes "HIPAA/CMIA categories" and the right column includes the "Megataxon

25  classifications" that plaintiffs' counsel believed would correspond to a given "HIPAA/CMIA"

26  category. Shafiq Rpt. ¶ 51; Ex. 1 at 40:14-41:14; Ex. 4 (excerpt of Dr. Shafiq's "matching"). But

27  this exercise is fundamentally flawed because it depends on the untested assumption that

28  "Megataxon classifications [] correspond to HIPAA and CMIA covered entities" (Shafiq Rpt. ¶

1    55), despite Meta telling plaintiffs that "MegaTaxon does not take into account or consider

2    HIPAA- or CMIA-coverage when predicting classifications" (Dkt. 624 at 4).  *See Guidroz-Brault*

3    *v. Missouri Pac. R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) (excluding expert whose "assumption

4    [found] no support in the physical facts").  Dr. Shafiq offers no support, other than the *ipse dixit*

5    of plaintiffs' counsel, that these MegaTaxon classifications correspond to entities covered by

6    HIPAA or CMIA.[6]  *See NuVasive, Inc. v. Kormanis*, 2019 WL 9633645, at *2 (M.D.N.C. Mar. 18,

7    2019) ("[I]t is not acceptable for an expert to rely on summaries provided by a lawyer or on client

8    data cherry-picked by a lawyer, without independently verifying the information.").  Moreover,

9    Dr. Shafiq acknowledged that any websites or apps that correspond to these MegaTaxon categories

10   would need to be ***manually reviewed*** to determine whether they are actually associated with a

11   HIPAA or CMIA entity.  Ex. 1 at 43:19-44:8, 199:1-16.  As such, Dr. Shafiq admits that Meta's

12   MegaTaxon classifications cannot be used to "programmatically" or "reliably" identify at-issue

13   websites or apps.

14        ***RDTT.***  RDTT is a taxonomy that Meta's signals integrity systems—that is, technical

15   mechanisms intended to prevent the receipt and use of potentially sensitive data sent by

16   developers—use to classify domains and apps.  Declaration of Tobias Wooldridge ("Wooldridge

17   Decl.") (Dkt. 1251-2, A1-1–17) ¶ 30.  To do so, a model processes information from website

18   homepages and app store data to generate a source classification using various categories, some of

19   which are health-related.  *Id.* ¶¶ 30-31.  This process is not designed to determine, nor can it

20   determine, whether a given domain or app is governed by or complies with specific legal regimes

21   such as HIPAA or CMIA.  Opp. 9; *see also* Dkt. 1085 at 3; Dkt. 278; Opp. A7-1697-1737;

22   Wooldridge Decl. ¶¶ 30-31

23        Like his MegaTaxon opinion, Dr. Shafiq fails to provide the crucial link that Meta's RDTT

24   classifications can be used to reliably identify at-issue websites or apps.  During discovery, Meta

25   produced a list of approximately 2.4 million domains and apps broadly classified by Meta with

26

27   _____

     [6] At his deposition, Dr. Shafiq confusingly tried to suggest that *Meta* had identified these
28   classifications as applying to HIPAA- or CMIA-covered entities, but the correspondence he cited
     says no such thing. *See also* Ex. 1 at 49:6-51:21; Ex. 2, Letter from Lauren Goldman dated October
     17, 2023 entitled "In re Meta Pixel Healthcare Litig., Case No. 3:22-cv-3580-WHO" at 1-2.

"health-related" RDTT classifications (the "RDTT List").  Shafiq Rpt. ¶ 59.  Dr. Shafiq applied a series of filters to the RDTT List to supposedly narrow it to U.S.-based websites that were predicted to belong to healthcare-related categories.  *Id.* ¶ 60-61.  The result of Dr. Shafiq's filtering is a sub-list of roughly 652,000 domains, attached as Exhibit E to the Report.  *Id.* ¶ 62.  But Dr. Shafiq admitted that this list ***does not actually identify HIPAA or CMIA-affiliated apps and websites***.  Ex. 1 at 49:20-50:16; 51:14-21; 193:21-194:11.

Nonetheless, after describing these two separate lists, Dr. Shafiq concludes "that the combination of" MegaTaxon and RDTT data "would enable [p]laintiffs to reliably identify all or almost all healthcare provider domains at-issue in this case."  Shafiq Rpt. ¶ 64.  Critically, he never explains how two classification systems ***that do not identify HIPAA and CMIA-covered entities*** could somehow be combined to identify such entities.  Shafiq Rpt. ¶¶ 48-75.  As in *Kamakahi*, Dr. Shafiq's analysis "does not reliably support his conclusion" that Meta, or anyone, can identify the relevant websites and apps operated by HIPAA- or CMIA-covered entities. 305 F.R.D. at 182.  The critical link—identifying HIPAA- and CMIA-covered entities—is missing.  "Absent such a showing," Opinion 1 is irrelevant because it does not "logically advance[] a material aspect" of plaintiffs' case on class certification and is, thus, properly excluded. *Daubert II*, 43 F.3d at 1315; Fed. R. Evid. 702(a).

## 2.    Opinion 1 is not Reliable.

An expert must explain the basis for their conclusions in a way that allows the court to determine whether they are using "reliable principles and methods" and are reliably applying them to the facts of the case.  Fed. R. Evid. 702(c)-(d); *see also Daubert II*, 43 F.3d at 1315-16.  The court's inquiry "focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'"  *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert II*, 43 F.3d at 1316).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).

Dr. Shafiq's opinion that a handful of Meta's taxonomies or internal classifications and third-party lists could somehow generate an accurate list of all HIPAA- or CMIA-related websites

1   or apps at issue in this case is not only irrelevant (as explained above) but also unreliable, as it is

2   entirely speculative and based on flawed and unverifiable methodology.  Dr. Shafiq identifies no

3   method—let alone, a reliable one—for using either MegaTaxon or RDTT, separately or together,

4   or any of the other assorted lists to actually identify at-issue websites.  Shafiq Rpt. ¶¶ 48-75.  Even

5   were it otherwise, Dr. Shafiq never combined—or proposed any feasible or reliable method for

6   combining—these lists into a usable output. *Id.* ¶¶ 48-75; Zervas Rpt. ¶¶ 147-48.  As such, Opinion

7   1 should be excluded as unreliable.  Fed. R. Evid. 702(c)-(d); *Newkirk v. Conagra Foods, Inc.*, 438

8   F. App'x 607, 608-09 (9th Cir. 2011) (affirming exclusion of expert who "did not sufficiently

9   justify his foundational assumption or refute the contrary record evidence" and where the

10  "'analytical gap between the existing data and the opinion [] proffer[ed]'" was "too large").

11       ***MegaTaxon.***   To support his opinion that "Megataxon can be used to reliably identify

12  healthcare providers," Dr. Shafiq looked at a "list of 664 domains that [p]laintiffs had identified []

13  as medical provider web properties" and the MegaTaxon classifications for event data from a

14  subset of 208 of those domains.  Shafiq Rpt. ¶ 54.  He then opined that 99 percent of those 208

15  domains had a MegaTaxon classification that corresponded to at least one HIPAA/CMIA category

16  provided by plaintiffs' counsel.  *Id*.  From this, Dr. Shafiq concludes that MegaTaxon could be

17  used to identify HIPAA- or CMIA-covered websites.

18       However, Dr. Shafiq's methodology is flawed and does not support this conclusion.  *Id.*;

19  Ex. 1 at 81:5-12.  First, Dr. Shafiq began his MegaTaxon analysis with a list of pre-vetted domains

20  from plaintiffs' counsel.  Shafiq Rpt. ¶ 54.  He then found that the majority of domains identified

21  by plaintiffs' counsel as health provider web properties had associated event data that also received

22  at least one MegaTaxon classification that plaintiffs' counsel had designated as "HIPAA/CMIA."

23  *Id.* Dr. Shafiq did not examine the MegaTaxon classifications of event data from domains that had

24  *not* been prescreened by plaintiffs' counsel; *i.e.*, the overall accuracy of using MegaTaxon in

25  classifying event data from websites generally.  Shafiq Rpt. ¶ 54; Ex. 1 at 112:11-119:23, 120:1-

26  127:13.  So, for example, Dr. Shafiq does not opine on how frequently MegaTaxonMegaTaxon

27  classifications of event data from a webpage like "Nike.com"—which plaintiffs have agreed is not

28  a medical provider—would include one of the enumerated MegaTaxon classifications.  Shafiq Rpt.

¶¶ 51-57; *see also* Ex. 2 (October 17 Letter).  Thus, the only reliable conclusion that Dr. Shafiq can reach from his analysis is that MegaTaxon classifications can be used to tag counsel-verified health providers with MegaTaxon classifications that plaintiffs' counsel believes to be health-related.  Shafiq Rpt. ¶¶ 51-57.  Dr. Shafiq says nothing about whether MegaTaxon classifications could be used to accurately identify event data from medical provider websites generally (let alone HIPAA or CMIA websites, which it cannot do as explained above), outside of the limited world of the event data for the 208 domains selected by plaintiffs' counsel.  Shafiq Rpt. ¶ 54.

This is a fatal flaw.  To understand the accuracy of any identification system, one must know the frequency of false-positives—in this case, webpages associated with event data that received one of the MegaTaxon classifications that plaintiffs mapped to their HIPAA/CMIA categories, but are ***not*** associated with a HIPAA- or CMIA-covered entity.  Zervas Rpt. ¶ 122-26; *see also Daubert II*, 43 F.3d at 1316 (an "expert's bald assurance of validity is not enough" because testimony must be "based on sound science"); *Schwab v. Philip Morris USA, Inc.*, 2005 WL 2401647, at *2 (E.D.N.Y. Sept. 29, 2005) (courts evaluate data by looking at "the rates for false positives and negatives").  Dr. Shafiq provides no methodology to identify or eliminate such false positives.  Shafiq Rpt. ¶¶ 51-57.  To the contrary, during his deposition, Dr. Shafiq confirmed that he did not calculate a false positive rate and could not even ascertain what *would* constitute a false positive.  Ex. 1 at 107:2-108:7; *see also* Ex. 5 (examples of false positives); Zervas Rpt. ¶ 128-30.  For instance, when presented with evidence that event data with a URL associated with a Costco product listing for children's boots received the MegaTaxon classification of "Medical Center," Dr. Shafiq could not say whether Costco should or should not be considered an at-issue healthcare provider.  Ex. 1 at 112:11-119:23; Ex. 5 at 1–2; Ex. 6.  Likewise, when presented with evidence that event data from a Delta Gamma sorority blog had the MegaTaxon classification of "Medical Center," Dr. Shafiq could not say whether or not Delta Gamma should or should not be considered an at-issue healthcare provider.  Ex. 1 at 120:1-127:13; Ex. 5 at 3–4; Ex. 7.  Without a methodology for identifying or weeding out such false positives, Dr. Shafiq has no way to assess the accuracy of using MegaTaxon classifications for his asserted purpose.  Shafiq Rpt. ¶ 54.

***RDTT***.  Dr. Shafiq's opinion that the RDTT List and his filtering methodology "would

enable [p]laintiffs to reliably identify all or almost all healthcare provider domains at-issue in this case" is also unreliable. Shafiq Rpt. ¶ 64. As noted above, RDTT is an internal Meta taxonomy used to categorize domains and apps as part of Meta's internal systems to prevent the receipt and use of potentially sensitive data. Wooldridge Decl. ¶¶ 30-31. Dr. Shafiq applies a series of filters to the RDTT List to try to identify only those domains that are U.S.-based and that would be an at-issue healthcare provider. Shafiq Rpt. ¶¶ 59-61. Notwithstanding the fact that this winnowing process would not leave Dr. Shafiq with a reliable list of domains associated with HIPAA or CMIA-covered entities (*see supra* Section IV.A.1), Dr. Shafiq's methodology of filtering down the RDTT List is arbitrary, unexplained, and unreliable.

First, Dr. Shafiq provides no explanation or rationale for his filtering process. To begin with, Dr. Shafiq admits he has no understanding of "how the domains were placed on the [RDTT] list." Shafiq Rpt. ¶ 63. This is a critical flaw because Dr. Shafiq draws all his conclusions from data he does not actually understand. Nonetheless, Dr. Shafiq used internal columns from the RDTT list ("domain" and ████████████████) to filter data from the list to create a sublist. Ex. 8 (RDTT excerpt). The ███████████████ row includes a long string of sub-categories. *Id.* Dr. Shafiq parsed through this list of sub-categories and identified eleven as "healthcare-related." Shafiq Rpt. ¶ 60. Dr. Shafiq does not provide any explanation as to why he selected these sub-categories. Dr. Shafiq "further limited the list to domains where the model's confidence score for the top category was 0.8 or higher." *Id.* Dr. Shafiq does not explain why he selected a confidence score of 0.8, and—despite not knowing what Meta uses these scores for— Dr. Shafiq asserts his 0.8 threshold "ensure[s] reliability." Shafiq Rpt. ¶ 60; Ex. 1 at 162:8-165:18. But Dr. Shafiq did not test whether this was true. *Id.*; Zervas Rpt. ¶ 133-34. He identified no standard, error rate, or justification for using "top category + ≥0.8" as a proxy for HIPAA or CMIA coverage, and he offered no protocol to detect or remove false positives. Shafiq Rpt. ¶ 60; Ex. 1 at 162:8-165:18; Zervas Rpt. ¶133-34. Indeed, even a cursory review of Dr. Shafiq's Exhibit E demonstrates that this filter does *not* reliably eliminate false positives. Shafiq Rpt. ¶¶ 58-64; Zervas Rpt. ¶¶ 135-36. For example, "wedinmexico.com"—a wedding planner in Mexico—is

1  categorized as a "Healthcare Provider" with a confidence score of 0.90.[7]  Zervas Rpt. ¶ 135.

2      After filtering the RDTT List to his list of eleven "healthcare-related" sub-categories with

3  a "confidence score" of 0.8 or higher, Dr. Shafiq applied further filters which, he asserts, excluded

4  non-U.S. entities.  Shafiq Rpt. ¶¶ 60-62.  This filtering process included: (1) retaining only domains

5  ending in ".com, .org, .net, .us, .edu, or .gov"; and (2) checking WHOIS registration records and

6  IP-geolocation.  *Id.*  But Dr. Shafiq does not present any error rates and his filtering results make

7  clear that his method is insufficient to exclude non-U.S. entities.  Shafiq Rpt. ¶¶ 58-64.  He

8  provides no methodology to exclude non-U.S. entities that use domain registrars like

9  GoDaddy.com, which offer "domain privacy" and replace website developer information,

10  including location, in the WHOIS directory with GoDaddy's.  Zervas Rpt. ¶ 138.  Dr. Shafiq's

11  final winnowed-down list continues to include entities outside the U.S., such as "00academy.org,"

12  which appears to be based in Colombia.  *Id.* ¶ 138; Exs. 3 (excerpt of Exhibit E to Shafiq Report),

13  9 ("00academy.org"); Ex. 1 at 194:13-196:3.  He also offers no method to confirm that the domains

14  listed are or were active, valid websites; many are not.  Zervas Rpt. ¶¶ 137-38; Ex. 1 at 183:5-

15  185:7.

16      Second, even after applying his arbitrary filtering criteria to arrive at a list of approximately

17  652,000 domains (Exhibit E), Dr. Shafiq provides no facts or data to support his conclusion that

18  this list could be used to "reliably identify all or almost all healthcare provider domains at-issue in

19  this case."  Shafiq Rpt. ¶ 64.  He conducted no tests to determine whether the 652,000 domains

20  remaining after his filters were applied were actually U.S. healthcare-related websites associated

21  with HIPAA/CMIA-covered entities.  Zervas Rpt. ¶ 135-38.  He did not analyze any samples to

22  confirm his filtering methodology worked.  *Id.*  And, in fact, as is clear from even a cursory review,

23  his resulting Exhibit E is *not* a viable list of at-issue websites: numerous domains do not exist, and

24  it includes false positives like wedinmexico.com, as well as non-U.S. domains, such as

25  "00academy.org."  *Id*; Exs. 3, 9; Ex. 1 at 194:13-196:3.  As Dr. Shafiq admits, even after his

26  supposedly programmatic winnowing process, the results would need to "further be verified."  Ex.

27  1 at 43:25-44:8.  Dr. Shafiq's proffered filtering methodology does not support his opinion that

28

---

[7] This number is rounded to two digits.

RDTT classifications can be used to programmatically identify at-issue websites and apps.

*Other Lists.* Even though Dr. Shafiq claims that RDTT and MegaTaxon classifications can be used to "reliably identify all or almost all healthcare provider domains at-issue in this case," he continues Opinion 1 by listing additional sources that could potentially "be used to identify healthcare provider websites and apps." Shafiq Rpt. ¶¶ 65-74. This opinion is not supported by any methodology, let alone a reliable one. Zervas Rpt. ¶¶ 139-46. Other than providing a two- to three-sentence description of these sources, Dr. Shafiq does not explain how they can be used to reliably identify at-issue websites and apps. Shafiq Rpt. ¶¶ 69-74. Merely summarizing record evidence is not expert testimony and such "unhelpful restatement[s] of the facts as [the expert] sees them" should be excluded. *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1030 (S.D. Cal. 2023)

At the close of Opinion 1, Dr. Shafiq asserts that "counsel for [p]laintiffs has created a list of healthcare providers that were verified by human review after its inclusion on one or more of the above lists and knowledge that it had the Pixel at some point in time," which he attaches as Exhibit I. Shafiq Rpt. ¶ 75. Dr. Shafiq provides no further explanation regarding what exactly this list is or why it supports his conclusion that "*Meta* can and does programmatically identify healthcare provider websites and apps." Shafiq Rpt. ¶¶ 48. At deposition, however, Dr. Shafiq confirmed that *there was no programmatic methodology* that could combine these data sets or verify their accuracy at identifying HIPAA/CMIA entities; rather, these various lists would ultimately need *manual verification*. Ex. 1 at 43:19-44:20, 46:17-47:8, 197:14-198:7.

In sum, Opinion 1 gives the illusion of technical review where there is none. Dr. Shafiq loosely uses terms like "healthcare provider" and "healthcare-related" to explain his opinions and supposed methodologies, but none go to the crucial point that plaintiffs must prove for their class certification motion: that the methodologies proposed by Dr. Shafiq can be used to reliably and accurately identify HIPAA/CMIA-covered entity websites and apps. Dr. Shafiq's methodologies are also unreliable and do not support his conclusions. Opinion 1 should be excluded.

### B. Opinion 3(a) Is Unreliable and Inapplicable To The Facts Of This Case.

In support of plaintiffs' Class Cert. Motion, Dr. Shafiq's Opinion 3(a) provides that "Meta

1  could programmatically identify 'Patient Button Clicks.'" Shafiq Rpt. ¶ 137. Plaintiffs define the

2  "Patient Status Button-Click Class" as "[a]ll Facebook users who had at least one patient portal,

3  medical appointment, bill payment, or diagnostic assessment button click obtained by Meta from

4  Class Healthcare Providers." Mot. 13. And Dr. Shafiq defines "programmatically" to mean

5  "creation of a computer program that can be used to answer the question presented in an objective

6  and accurate fashion." Shafiq Rpt. ¶ 138. But Dr. Shafiq's proffered methodology to

7  "programmatically" identify buttons that allegedly transmitted health information is to simply feed

8  Meta's data into a commercially available large language AI model and trust the results. This is

9  fundamentally not a reliable method, including because courts have already recognized such

10  models to produce inaccurate results, and because Dr. Shafiq's methodology cannot be reliably

11  scaled to the billions of buttons on over 650,000 potential domains at issue in this case. *See* Fed.

12  R. Evid. 702(c)-(d). Opinion 3(a) should thus be excluded.

13      In Opinion 3(a), Dr. Shafiq claims he "created a program to objectively classify button

14  clicks in the Meta Pixel logs" into one of four categories: (1) portal; (2) payment; (3) assessment;

15  and (4) schedule. Shafiq Rpt. ¶ 139. Dr. Shafiq provides three different "approaches" to classify

16  button clicks: (a) manual labeling; (b) manually crafted patterns; and (c) using a machine learning

17  model. Shafiq Rpt. ¶ 142. He first selected a small sample of buttons, applied his three approaches

18  to the sample, and compared the results of the second two approaches to his manual labeling

19  approach. *Id.* ¶¶ 142-46. The first two approaches require intensive manual review and are thus

20  neither "programmatic" nor scalable. As Dr. Shafiq acknowledges, there were more than "7.3

21  million buttons in Pixel Button Click and Inferred Website Events tables" associated with 1,844

22  domains in the dataset made available to him. *Id.* ¶ 148. Yet plaintiffs propose a class spanning

23  more than 650,000 domains, underscoring plaintiffs' need for a genuinely "programmatic"

24  method. Thus, the thrust of Dr. Shafiq's opinion is that the Court should simply rely on the third

25  method—artificial intelligence—to label the unknown millions of buttons at issue if the proposed

26  classes are certified. *Id.* ¶¶ 148-50. His first two approaches are introduced to prop up his third,

27  and ultimate approach—feeding all the data to GPT4 and trusting the results. *Id.* ¶¶ 145-46, 148.

28      None of the three approaches, either individually or collectively, demonstrate a reliable,

1    intellectually rigorous approach to identifying relevant button click data. *Klein*, 766 F. Supp. 3d

2    at 962 (a court "may evaluate whether the expert proffered sufficient facts or data to support . . .

3    every necessary link in [his] theory, with an eye toward foundation, not corroboration"").

4    Moreover, Dr. Shafiq's conclusion that his AI-generated results can be presumed accurate because

5    the results "matched" his manually-labeled results on the same sample is flawed because (a) his

6    sample is not representative of the data as a whole; and (b) he made no efforts to validate the larger

7    data set generated by artificial intelligence, either by sampling it or by reproducing the results. As

8    a result, Opinion 3(a) is not reproducible, has no validated error rate, and cannot be reliably applied

9    to all buttons on a proposed list of over 650,000 websites. *See Rovid v. Graco Children's Prods.*

10   *Inc.*, 2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) (a reliable methodology must be reproducible).

11   Opinion 3(a) should be excluded.

12          1.      **Dr. Shafiq's Manual Approaches Are Not Scalable And Are Not A**

13                  **"Programmatic" Method To Identify Button Clicks.**

14          Dr. Shafiq's first two approaches (manual labeling and manually crafting patterns) do not

15   support his conclusion that "a computer program[] can be used . . . in an objective and accurate

16   fashion" to "identify patient button clicks," as both require extensive human labeling and thus are

17   not executable by computer program. Shafiq Rpt. ¶¶ 137-38. "[W]hen an expert opinion is based

18   on data [or] a methodology . . . that are simply inadequate to support the conclusions reached,

19   *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*

20   *v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2nd Cir. 2002).

21          ***Manual Labeling***.  Dr. Shafiq began his button click analysis by selecting a small sample

22   of 25,126 buttons (the "Sample Set") from the 7.3 million buttons on 1,844 websites that were

23   available to him in the data produced to plaintiffs. Shafiq Rpt. ¶ 143; Zervas Rpt. ¶¶ 171-77. He

24   did so by selecting "the top 10% of buttons (sorted by number of events)" for those domains[8] and,

25   "[i]f more than 10,000 buttons were present for any domain, the top 100 buttons were selected and

26   _____

27   [8] The Report misleadingly suggests that this sample includes "1,844 healthcare provider domains."
     Report ¶ 139, 143 n.193. Only 317 domains out of the 1,844 had associated button click data, and
28   Dr. Shafiq's Sample Set includes only 304 unique domains. Zervas Rpt. ¶ 174. Dr. Shafiq does not
     explain or otherwise address this discrepancy.

augment [sic] with 100 randomly selected buttons." Shafiq Rpt. ¶ 143 n.193. Dr. Shafiq never explains why these particular buttons were chosen, nor does he demonstrate that they were representative of the broader set of buttons. Shafiq Rpt. ¶¶ 137-53; Zervas Rpt. ¶¶ 171-77.

Dr. Shafiq then had contract employees manually review and categorize the Sample Set buttons into the four categories: portal, payment, assessment, and schedule. Shafiq Rpt. ¶¶ 139, 143; Zervas Rpt. ¶¶ 178-79. But it is website developers, not Meta, who create and name the buttons on a given webpage and whether a button relates to one or more of the four categories is context-dependent. Zervas Rpt. ¶¶ 26-27, 180. For example, a button labeled "portal" could relate to a patient portal or an employee portal and a human reviewer would have to look at (among other things) the contents of the webpage, where the button is placed, and the landing page once the user clicks on the button to distinguish between the two. *Id.* ¶ 180. While Dr. Shafiq relied on contract employees to manually label the Sample Set buttons, he was not involved in recruiting them and, at deposition, did not know who these people were or even how many were hired for the task (he guessed ten). Ex. 1 at 220:8-24, 221:11-19. Dr. Shafiq provided instructions to counsel who then relayed them to the contract employees who were asked "to use their best judgment to classify each of the buttons in the sample into one of the four provided categories." Ex. 1 at 222:8-225:2.[9]

It is obvious that this *manual* labeling approach is not a "programmatic" method to identify relevant button clicks across the potential universe of billions of buttons on 650,000 or more websites. But importantly, this manual labeling approach itself is unreliable and thus its results cannot serve as the "ground truth" to assess the accuracy of Dr. Shafiq's other approaches. *See* Shafiq Rpt. ¶ 143. Dr. Shafiq did not review the manual labeling results for any errors or test them for accuracy. Ex. 1 at 219:19-222:23; 230:12-231:9. He did not identify a quality-control sample or any corrective process for mislabels—leaving in employee portal buttons misclassified as "Portal" and buttons allowing student and instructor onboarding tests misclassified as "Assessment." *Id.*; Zervas Rpt. ¶ 180. He identified no screening process or training for the contract employees, nor did he provide any protocol for rating their accuracy. Ex. 1 at 230:12-

---

[9] At Dr. Shafiq's deposition, plaintiffs' counsel informed us that "prompt.txt"—a document that Dr. Shafiq describes only as the prompt that he provided GPT 4.1 in the AI approach—also served as the "instructions" for the manual labelers.

231:22. Dr. Shafiq's manual labeling approach was also not tested nor is it testable; as Dr. Shafiq puts it, "[t]he process of labeling was – the way I would describe it is one shot." Ex. 1 at 222:11-18. Nonetheless, the manual labeling results serve as Dr. Shafiq's "ground truth" for his claim that his GPT4 model is accurate. Shafiq Rpt. ¶ 143. These flaws in Dr. Shafiq's manual labeling approach render his entire Opinion 3(a) unreliable.

***Manual Pattern Crafting***. Dr. Shafiq's pattern crafting approach is simply another variation of manual labeling. Here, Dr. Shafiq took the same unrepresentative Sample Set and manually crafted "741 patterns on button destination and 142 patterns on button text" to classify buttons into one or more of the four categories. Shafiq Rpt. ¶ 144; Ex. 10 at 2-23 (Dr. Shafiq's "patterns"). He created nearly a thousand "patterns" to apply to the 25,126 buttons to sort them into the same four categories as the manual labeling process. Zervas Rpt. ¶¶ 181-88.

Dr. Shafiq's manual pattern crafting approach cannot be reliably applied to the facts of this case because his "patterns" are specific to the Sample Set and cannot be generalized to the potential universe of buttons. Zervas Rpt. ¶¶ 182-84. At deposition, Dr. Shafiq admitted that the "patterns" he crafted for the Sample Set could not be used to reliably classify additional buttons from domains not in the Sample Set. Ex. 1 at 236:24-237:7; 238:15-239:16. Indeed, nearly half of the "button destination patterns" and nearly two-thirds of the "button text patterns" are ***exact values*** from the Sample Set. Zervas Rpt. ¶ 182; Ex. 10 at 2-23. For example, the contract employees labeled the button text "VBE∨HRA Questionnaire" associated with a particular link[10] as an "Assessment." Similarly, Dr. Shafiq created the "button text pattern" of "VBE∨HRA Questionnaire" to indicate an "Assessment." Zervas Rpt. ¶ 182; Ex. 10 at 21. While this method will capture the sample button associated with the original link as an "Assessment," it cannot be used to identify any button not containing the exact words "VBE∨HRA Questionnaire." Zervas Rpt. ¶ 183. And Dr. Shafiq makes no attempt (or explain how) to apply the "manual pattern crafting" approach to any larger data set. Shafiq Rpt. ¶ 144.

In sum, Dr. Shafiq's manual labeling and pattern crafting approaches to identify and

---

[10] "https://medicareapply.healthmarkets.com/apply/medicare/confirmation?packageId=e17be 83e-c690-445c-83fc-3d6c446b2b14"

1    categorize button clicks do not support his conclusion that Meta can "programmatically" identify

2    relevant patient button clicks.  All these two approaches do is manually label a tiny subset of data

3    with no explanation as to how these approaches could be extrapolated to a vastly larger dataset.

4    Shafiq Rpt. ¶¶ 143-44, 46.  Neither is a reliable methodology nor can they be reliably applied to

5    the facts of this case.  They are properly excluded under Rule 702.

6              **2.       Dr.   Shafiq's   AI   Approach   Is   Unscientific,   Untestable,   And**

7              **Unverifiable.**

8              Rule 702 demands that an expert's method be reliable and Dr. Shafiq's third approach—

9    simply feed all the data to a GPT4 model and trust the results—is anything but.  Fed. R. Evid.

10   702(c)-(d).  Here, Dr. Shafiq claims to have "used a state-of-the-art GPT 4.1 model with a prompt"

11   to classify the Sample Set.  Shafiq Rpt. ¶ 145.  As explained below, however, Dr. Shafiq's use of

12   a commercially available AI model has led to opinions that are is unreliable, untestable and

13   unverifiable, which requires their exclusion under Rule 702

14              *Daubert* obligates "judges to analyze the direct determinants of scientific merit, the extent

15   and quality of the underlying empirical data."  *Schwab*, 2005 WL 2401647, at *2.  The court must

16   "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that

17   characterizes the practice of an expert in the relevant field."  *In re Bextra & Celebrex Mktg. Sales*

18   *Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1171 (N.D. Cal. 2007) (quoting *Kumho Tire*

19   *Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  A court looks to, for example, "the size of the

20   researchers' database, its composition, the test conditions, and the rates for false positives and

21   negatives."  *Schwab*, 2005 WL 2401647, at *2.  Other core *Daubert* considerations include

22   "whether the proffered theory or technique has been tested," "the known or potential rate of error

23   of the technique or theory when applied," "whether the expert has unjustifiably extrapolated from

24   an accepted premise to an unfounded conclusion;" "whether the expert has adequately accounted

25   for obvious alternative explanations;" and "whether the expert is being as careful as he would be

26   in his regular professional work."  *In re Bextra*, 524 F. Supp. 2d at 1171.

27              Currently available commercial AI models fail under each of these *Daubert* considerations.

28   *Cf. In re Celsius Network LLC*, 655 B.R. 301, 308-09 (Bankr. S.D.N.Y. 2023) (valuation report

written by artificial intelligence at instruction of valuation expert was not reliable, and therefore it was not admissible). Indeed, federal case law is now replete with instances in which courts acknowledge that artificial intelligence is known to be unreliable. *See, e.g.*, *Kruglyak v. Home Depot U.S.A., Inc.*, 774 F. Supp. 3d 767, 770 (W.D. Va. 2025) ("It has become widely known that such platforms sometimes 'hallucinate,' meaning they provide inaccurate responses."); *Hall v. Acad. Charter Sch.*, 2025 WL 2256653, at *1 (E.D.N.Y. Aug. 7, 2025) (noting that use of generative artificial intelligence to assist in the drafting of legal papers created fictitious authority).

Dr. Shafiq's approach, which depends on trusting such a model with no means of verification, is likewise unreliable. "Experts must follow some discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (excluding expert opinion as unreliable). Dr. Shafiq's AI approach is exactly this—it is a black box into which he feeds data and gets the results he wants. That is not a reliable methodology.

***Dr. Shafiq's AI Approach Is Not Replicable.*** "The results of any scientific test should be repeatable at least three times in order to eliminate the possibility of results being skewed by conditions specific to the time that the test was first conducted." *Rovid v. Graco Children's Prods. Inc.*, 2018 WL 5906075, at *5 (N.D. Cal. Nov. 9, 2018) (quoting *Avon Prod., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 787 (S.D.N.Y. 1997) (Sotomayor, J.) (declining to credit test conducted only once with no replications)). Indeed, "'reproducibility is the *sine qua non* of science.'" *Id.* (quoting *United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010)). "Without multiple tests, [an expert] cannot show that his results are reproducible or reliable." *Id*. Here, Dr. Shafiq admits he ran each test (one for the Sample Set and one applied to the broader set of 7.3 million buttons) through the AI model ***only once***, and confirmed "[w]hat is produced is the one instance of the output." Ex. 1 at 245:1-246:17, 247:20-248:14. "[P]erforming a test only once does not meet any standard of rigor—scientific, courtroom, or otherwise." *Rovid*, 2018 WL 5906075, at *6. Further, without repetition, there is no information about the potential rate of error and whether uncontrolled variables affected the results of Dr. Shafiq's AI approach. *Id.* at *5, n.5.

Dr. Shafiq implies that multiple tests are not necessary because he made the AI output

1  "deterministic" by "set[ting] temperature to 0." Shafiq Rpt. ¶ 145 n.196. In his words, "[i]f the

2  temperature is set to 0 . . . [and] you run the experiment again, you would observe the output of

3  the model to be the same across different prompts." Ex. 1 at 244:18-25. However, Meta's expert

4  Dr. Georgios Zervas re-ran portions of Dr. Shafiq's experiment and got different results. Zervas

5  Rpt. ¶¶ 191-93. This is not surprising because the "inherent uncertainty and variability" of large

6  language models, such as the GPT4 model used by Dr. Shafiq, "pose critical challenges to

7  achieving reliable and consistent outcomes." Zervas Rpt. ¶ 190 n. 502 (collecting literature).

8  Therefore, "even if the temperature parameter is set to zero, the model can produce different

9  outputs when processing the same inputs (*e.g.*, a prompt and the underlying data used for

10  classification)." *Id.* ¶ 190. Large language AI models are a black box and cannot be relied upon

11  to produce consistent outputs; Dr. Shafiq's approach is thus antithetical to Rule 702's core demand

12  that expert conclusions stem from methods that can be fairly and rigorously tested in an objective

13  manner. *In re Bextra*, 524 F. Supp. 2d at 1171; *GPNE Corp.*, 2014 WL 1494247, at *4.

14      ***Dr. Shafiq's AI Approach Is Unreliable And Unverifiable.*** Dr. Shafiq claims that his AI

15  approach can be trusted because his AI model's classification results for the Sample Set "matched"

16  98.9% of the results from his manual labeling approach. Shafiq Rpt. ¶ 146. Thus, Dr. Shafiq

17  implies that his AI approach can be presumed to reliably and accurately identify and categorize

18  buttons on the more than 650,000 domains potentially at issue. *Id.* ¶¶ 146, 148. Dr. Shafiq's

19  assessment of the AI approach's accuracy is flawed and greatly exaggerates the alleged accuracy.

20  But even if his AI approach were sufficiently accurate for the Sample Set, Dr. Shafiq fails to

21  demonstrate that the Sample Set is representative and that his AI approach is scalable to the entire

22  universe of button click data for the proposed classes. Zervas Rpt. ¶¶ 174-77.

23      First, Dr. Shafiq's alleged accuracy of his AI model results is misleading. Dr. Shafiq

24  asserts that his AI approach is trustworthy because the output produced by AI for the Sample Set

25  matched 98.9% of the results from the manual labeling approach. Shafiq Rpt. ¶ 146. But Dr.

26  Shafiq's accuracy assessment was agnostic to the four specific categories, meaning he claimed that

27  the output was a "match" for a button if his AI model applied "***any*** of the four categories . . .,

28  regardless of which specific category is marked." Shafiq Report ¶ 146 n. 200. Thus, a button

1  labeled "patient portal" by manual review but "payment" by GPT4 would be counted as a "match"

2  and considered accurate.  Shafiq Rpt. ¶ 146 nn. 199-200.  This relaxed criterion inflates the true

3  positive rates, minimizes the false positive rates, and obscures misclassification across the four

4  categories.

5      Second, Dr. Shafiq makes no showing that the Sample Set is representative of the button

6  click data as a whole.  Courts exclude expert opinions derived from unrepresentative sample sets.

7  *See, e.g., Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227, at *7 (N.D. Cal. July 12, 2021)

8  (excluding an expert, in part, "because her study used too small a sample and flawed

9  methodology"); *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 682-83 (S.D.W. Va. 2014)

10  (recognizing that an expert opinion was flawed because it failed to use a sufficient sample size).

11  In selecting the Sample Set, Dr. Shafiq failed to explain if and how the Sample Set—from a mere

12  304 domains—was a representative sample of the larger set of 7.3 million buttons on which he

13  later applied his AI approach or the entire set of buttons associated with over 650,000 domains.

14  Shafiq Rpt. ¶¶ 137-53; Zervas Rpt. ¶¶ 171-77.

15      Finally, Dr. Shafiq failed to demonstrate that the AI approach is scalable beyond the

16  Sample Set.  Dr. Shafiq did not verify—and offered no method to verify—the accuracy of any

17  button click labels that are not first classified by manual review.  Shafiq Rpt. ¶ 148.  While Dr.

18  Shafiq "applied the machine learning model on 7.3 million buttons" to allegedly the same domains,

19  he provides no information on whether this produced reliable and accurate results.  *Id.*; Ex. 1 at

20  250:23-251:21; Zervas Rpt. ¶ 195.  Dr. Shafiq also fails to provide any methodology to apply his

21  AI approach to the entire universe of buttons for the more than 650,000 domains or how to gauge

22  the accuracy of an AI approach if it were to be applied on all buttons for the relevant domains.  Dr.

23  Shafiq's opinion that any of his manual or AI approaches can be applied accurately, objectively,

24  and reproducibly across an enterprise-scale, heterogeneous dataset is entirely unsupported.

25      In sum, Dr. Shafiq's AI approach is not a reliable method and Opinion 3(a) does not reflect

26  a reliable application of his proffered AI approach to the facts of this case.  Under Rule 702, these

27  are "serious methodological flaws" that warrant exclusion of Opinion 3(a).  *In re: Autozone, Inc.*,

28  2016 WL 4208200, at *16 (N.D. Cal. Aug. 10, 2016); Fed. R. Evid. 702(c)-(d).

## C.    Opinion 3(b) Should Be Excluded.

Opinion 3(b) seeks to support plaintiffs' certification of the "Patient Health Information Class," defined as "[a]ll Facebook users who had at least one communication or fact identifying a doctor, condition, or treatment acquired by Meta from Class Healthcare Providers, excluding Button-Click events," and the "Prescription Drug Information Class," defined as "[a]ll Facebook users whose communications with a prescription drug website for which they have a prescription, were obtained by Meta." Mot. 13. Spanning just four short paragraphs, Opinion 3(b) asserts that similar "pattern" or "machine learning" methods to those described in Opinion 3(a) could "programmatically identify" "health information" or "prescription drug information" in full-string URLs. Shafiq Rpt. ¶¶ 154-57. However, Dr. Shafiq does not explain how to apply the manual pattern crafting and AI approaches he developed to classify button clicks to identify "health information" and "prescription drug information" in full-string URLs. Opinion 3(b) is thus conclusory and unsupported by sufficient facts or data. Further, Opinion 3(b) does not provide a methodology to identify relevant "health information" or "prescription drug information" and is thus irrelevant to plaintiffs' class certification motion.

### 1.    Opinion 3(b) Is Unreliable.

Dr. Shafiq's opinion that "one could use similar methodologies (*i.e.*, patterns or machine learning model) as described earlier for button click classification" to "programmatically identify" health and prescription drug information in URLs is unsupported by facts or data and any reliable methodology. Shafiq Rpt. ¶¶ 154-55, 157; Fed. R. Evid. 702(b). Dr. Shafiq does not explain how the manual or AI approaches described above can be used to identify a "communication or fact identifying a doctor, condition, or treatment" or "communications with a prescription drug website" for which a class member has a prescription. Shafiq Rpt. ¶¶ 154-57; Mot. 13; Zervas Rpt. ¶¶ 196-201. Opinion 3(b) is obvious *ipse dixit* not based on any facts or data and should be excluded. *Domingo ex rel. Domingo*, 289 F.3d at 607; *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 605 (N.D. Cal. 2008) (excluding expert because "it is clear from [the expert's] report that he did no analysis").

## 2.    Opinion 3(b) Is Irrelevant.

Opinion 3(b) is also not helpful in understanding the evidence or determining a fact in issue on class certification. Fed. R. Evid. 702(a). First, Dr. Shafiq does not provide any details on how he defines (or how to identify) a "communication or fact identifying a doctor, condition, or treatment" in URLs. Dr. Shafiq claims that various Meta internal systems can do so, providing an example of extracted keyword tokens of "lung," "cancer," and "screening" from a user's search about "lung cancer screening" on bannerhealth.com having a MegaTaxon classification of "Medical Facilities" to the event. *Id.* ¶ 155-56. But as explained above, Dr. Shafiq fails to demonstrate that Meta's taxonomies, such as MegaTaxon, can be used to accurately classify information "identifying a doctor, condition, or treatment," which is necessary to identify plaintiffs' proposed Patient Health Information Class. *See supra* Section IV.B. Nor does the mere fact that keywords related to a medical condition were extracted establish that a *patient's* medical condition was communicated; the same words could be in a newspaper article. Dr. Shafiq's methodology does not "logically advance[] a material aspect" of the proposing party's argument and is thus irrelevant. *Daubert II*, 43 F.3d at 1315.

Second, Dr. Shafiq's opinion that "a similar methodology can be applied to identify 'prescription drug' information" is likewise irrelevant. Shafiq Rpt. ¶ 157. It is unclear what Dr. Shafiq means by a "similar methodology." *Id.* However, regardless of whether the proposed methodology is using Meta's internal classification systems or applying one of his manual or AI approaches, Opinion 3(b) is untethered to plaintiffs' motion. Plaintiffs' proposed Prescription Drug Information Class includes "[a]ll Facebook users whose communications with a prescription drug website *for which they have a prescription*, were obtained by Meta." Mot. 13. Dr. Shafiq does not explain how any of his proffered methods or approaches will identify Facebook users *who had a prescription* for the drug included in the domain's URL. Shafiq Rpt. ¶ 157.[11]

---

[11] Instead, Dr. Shafiq asserts that because "Plaintiffs contend that the name of the prescription drug in a URL from a prescription drug website or app is 'prescription drug' information," and "because the domain with the prescription drug name is included in every full-string URL from such a website, then every communication would fit the definition." Shafiq Rpt. ¶ 157. This is nonsensical, and inconsistent with the proposed class definitions.

**D.      A Portion of Opinion 10 (¶ 209) Should Be Excluded.**

1

2          Finally, the portion of Dr. Shafiq's Opinion 10, by which Dr. Shafiq claims "specific class

3    members (and the total number of them) can be programmatically identified using Meta's records,"

4    should be excluded because Dr. Shafiq conducted no analysis to support this opinion.  Shafiq Rpt.

5    ¶ 209.  Instead, he appears to rely on Opinions 1, 2, and 3, none of which support his conclusion.

6    *Id*.  For the reasons explained above, Opinions 1 and 3 do *not* offer a viable basis to identify at-

7    issue websites, apps, and button clicks.  That means that two of the three "legs" underlying this

8    opinion fail, and therefore Opinion 10 fails.  *Domingo ex rel. Domingo*, 289 F.3d at 607 ("A trial

9    court may exclude evidence when it finds that 'there is simply too great an analytical gap between

10   the data and the opinion proffered."); *Myers v. United States*, 2014 WL 6611398, at *41 (S.D. Cal.

11   Nov. 20, 2014) ("Such guesswork cannot pass the reliability standard.").

12         Opinion 2 likewise does not support Dr. Shafiq's assertion that Meta could identify

13   "specific class members" "programmatically."  Opinion 2 describes in general terms how Meta's

14   matching systems *can* work across cookies, IP address, user agent, and internal identifiers,

15   interspersed with document excerpts and screenshots.  Shafiq Rpt. ¶¶ 76-125.  In substance,

16   Opinion 2 is a general narrative of Meta's matching systems based on generic documents that

17   provides no classwide methodology or testable protocol that can be applied to the data at issue in

18   this case.  Consequently, Dr. Shafiq offers no end-to-end showing of how, how often, or with what

19   accuracy Meta matched events to user IDs across the at-issue sites and apps and the entire class

20   period.  His ultimate conclusion that "specific class members (and the total number of them) can

21   be programmatically identified using Meta's records" is thus unsupported.  *Id.*  ¶ 209; Fed. R.

22   Evid. 702(b).

23         Because Dr. Shafiq does not identify any methodology, much less a classwide

24   methodology, to identify at-issue websites, apps, or button clicks, and likewise fails to demonstrate

25   that Meta can reliably and consistently match data to individual Facebook accounts to identify

26   individual class members, Dr. Shafiq's opinion that "specific class members can be

27   programmatically identified using Meta's records" is unsupported, unreliable, and should likewise

28   be excluded.  Shafiq Rpt. ¶ 209; *see also Domingo ex rel. Domingo*, 289 F.3d at 607.

1    **V.     CONCLUSION**

2         For the foregoing reasons, Meta respectfully requests that the Court exclude Dr. Shafiq's

3    Challenged Opinions and related testimony.

4

5    Dated: December 19, 2025                    Respectfully submitted,

6

7                                              LATHAM & WATKINS LLP

8                                              By */s/ Melanie M. Blunschi*
                                                   Melanie M. Blunschi (Bar No. 234264)
9                                                  *melanie.blunschi@lw.com*
                                                   Kristin Sheffield-Whitehead (Bar No. 304635)
10                                                 *kristin.whitehead@lw.com*
                                                   505 Montgomery St., Suite 2000
11                                                 San Francisco, CA 94111
                                                   Telephone:  +1.415.391.0600
12

13                                                 Andrew B. Clubok (*pro hac vice*)
                                                   *andrew.clubok@lw.com*
14                                                 555 Eleventh St., NW, Suite 1000
                                                   Washington, D.C. 20004-1304
15                                                 Telephone: +1.202.637.2200

16                                                 Marissa Alter-Nelson (*pro hac vice*)
17                                                 *marissa.alter-nelson@lw.com*
                                                   1271 Avenue of the Americas
18                                                 New York, NY 10020
                                                   Telephone: + 1.212.906.1200
19

20                                                 Jessica Stebbins Bina (Bar No. 248485)
                                                   *jessica.stebbinsbina@lw.com*
21                                                 10250 Constellation Blvd., Suite 1100
                                                   Los Angeles, CA 90067
22                                                 Telephone: +1.424.653.5500

23

24                                                 **GIBSON, DUNN & CRUTCHER LLP**
                                                   Lauren R. Goldman (*pro hac vice*)
25                                                 *lgoldman@gibsondunn.com*
                                                   Darcy C. Harris (*pro hac vice*)
26                                                 *dharris@gibsondunn.com*
                                                   200 Park Avenue
27                                                 New York, NY 10166
                                                   Telephone: +1.212.351.4000
28
                                                   Elizabeth K. McCloskey (Bar No. 268184)

1    *emccloskey@gibsondunn.com*
      Abigail A. Barrera (Bar No. 301746)
2      *abarrera@gibsondunn.com*
      One Embarcadero Center, Suite 2600
3    San Francisco, CA 94111
      Telephone:   +1415.393.8200
4

5    *Attorneys for Defendant Meta Platforms, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

META'S MOT. TO EXCLUDE EXPERT
ZUBAIR SHAFIQ
CASE NO. 3:22-cv-3580-WHO