**LATHAM & WATKINS LLP**
Melanie M. Blunschi (Bar No. 234264)
 *melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
 *kristin.whitehead@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Andrew B. Clubok (*pro hac vice*)
 *andrew.clubok@lw.com*
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

Marissa Alter-Nelson (*pro hac vice*)
 *marissa.alter-nelson@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1345

Jessica Stebbins Bina (Bar No. 248485)
 *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1.424.653.5500

*Attorneys for Defendant Meta Platforms, Inc.*

**GIBSON, DUNN & CRUTCHER LLP**
Lauren R. Goldman (*pro hac vice*)
lgoldman@gibsondunn.com
Darcy C. Harris (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone: +1.212.351.4000

Elizabeth K. McCloskey (Bar No. 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (Bar No. 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: +1.415.393.8200

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

IN RE META PIXEL HEALTHCARE
LITIGATION

_____

This Document Relates To:

All Actions

_____

Case No. 3:22-cv-3580-WHO

**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' CLASS CERTIFICATION EXPERT ZUBAIR SHAFIQ, PH.D.**

Date: June 10, 2026
Time: 2:00 p.m.
Court: Courtroom 2 —17th Floor
Hon. William H. Orrick

**TABLE OF CONTENTS**

Page

I.    OPINION 1 SHOULD BE EXCLUDED ................................................................. 1

A.    Opinion 1 Is Irrelevant And Unreliable ................................................. 1

B.    None of Meta's Systems Or Lists Provides The Critical Missing Link ........................................................................................................ 2

C.    Plaintiffs' Evidentiary Arguments Do Not Save Dr. Shafiq's Methodology ........................................................................................... 6

II.   OPINION 3(a) SHOULD BE EXCLUDED. ......................................................... 7

A.    Dr. Shafiq's Manual Labeling Approach Is Not "Programmatic" Or Reliable ............................................................................................. 8

B.    Dr. Shafiq's Pattern Crafting Approach Is Not "Programmatic" Or Reliable ............................................................................................. 9

C.    Dr. Shafiq's AI Approach Is Unreliable ................................................ 10

1.    The AI Approach Is Not Replicable ........................................... 11

2.    The AI Approach Is Not Verifiable ............................................ 12

III.  OPINION 3(b) SHOULD BE EXCLUDED. ........................................................ 13

IV.   A PORTION OF OPINION 10 SHOULD BE EXCLUDED ................................ 14

V.    CONCLUSION ..................................................................................................... 15

## TABLE OF AUTHORITIES

**Pages**

### CASES

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) .................................................................. 9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)................................................................................. 8

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
683 F.3d 1144 (9th Cir. 2012) ............................................................................. 6

*Cabrera v. Cordis Corp.*,
134 F.3d 1418 (9th Cir. 1998) ............................................................................. 8

*Claar v. Burlington N.R.R., Co.*,
29 F.3d 499 (9th Cir. 1994) ................................................................................. 3

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ............................................................................... 1

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) .................................................................. 13, 14, 15

*GPNE Corp. v. Apple, Inc.*,
2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) .................................................. 7, 10

*Guidroz-Brault v. Mo. Pac. R. Co.*,
254 F.3d 825 (9th Cir. 2001) ............................................................................ 3, 5

*Hart v. BHH, LLC*,
2018 WL 3471813 (S.D.N.Y. July 19, 2018) ..................................................... 12

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) .............................................................. 10

*In re Celsius Network LLC*,
655 B.R. 301 (Bankr. S.D.N.Y. 2023)................................................................. 11

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ....................................................................... 14

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) .................................................................. 7

*Kamakahi v. American Society for Reproductive Medicine*,
305 F.R.D. 164 (N.D. Cal. 2015)......................................................................... 2

*Kohls v. Ellison*,
2025 WL 66514 (D. Minn. Jan. 10, 2025) ................................................................................ 11

*Kruglyak v. Home Depot U.S.A., Inc.*,
774 F. Supp. 3d 767 (W.D. Va. 2025) ..................................................................................... 11

*McPhail v. First Command Fin. Plan., Inc.*,
247 F.R.D. 598 (S.D. Cal. 2007) .............................................................................................. 1

*Moussouris v. Microsoft Corp.*,
311 F. Supp. 3d 1223 (W.D. Wash. 2018) ............................................................................... 13

*Newkirk v. Conagra Foods, Inc.*,
438 F. App'x 607 (9th Cir. 2011) .......................................................................................... 2, 7

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
655 F. Supp. 3d 1002 (S.D. Cal. 2023) .................................................................................... 14

*Perez v. State Farm Mut. Auto. Ins. Co.*,
2012 WL 13070406 (N.D. Cal. July 19, 2012) ............................................................... 3, 10, 11

*Pods Enterprises, Inc. v. U-Haul Intern., Inc.*,
2014 WL 2625297 (M.D. Fla. June 12, 2014) ........................................................................... 9

*Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ................................................................................................ 12

*Pooshs v. Phillip Morris USA, Inc.*,
287 F.R.D. 543 (N.D. Cal. 2012) .................................................................................... 4, 6, 10

*Rovid v. Graco Children's Prods. Inc.*,
2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) ........................................................................... 12

*Schwab v. Philip Morris USA, Inc.*,
2005 WL 2401647 (E.D.N.Y. Sep. 29, 2005) ...................................................................... 7, 10

*Sentius International, LLC v. Microsoft Corp.*,
2015 WL 331939 (N.D. Cal. Jan. 23, 2015) .............................................................................. 9

*Sonneveldt v. Mazda Motor of Am., Inc.*,
2024 WL 5242611 (9th Cir. Dec. 30, 2024) .............................................................................. 5

*United States v. Johnson*,
122 F. Supp. 3d 272 (M.D.N.C. 2015) ....................................................................................... 6

**RULES**

Fed. R. Evid. 702 ............................................................................................................ 1, 7, 8, 10

Fed. R. Evid. 702(c) ................................................................................................................... 2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

META'S REPLY IN SUPPORT OF MOTION TO
EXCLUDE OPINIONS OF ZUBAIR SHAFIQ
CASE NO. 3:22-CV-3580-WHO

Fed. R. Evid. 702(d).................................................................................................................. 2, 9

Dr. Shafiq's opinions fail to meet the requirements of Rule 702 and should be excluded. Plaintiffs' opposition concedes key points that render Dr. Shafiq's Opinions 1, 3(a), 3(b), and 10 both unreliable and irrelevant to class certification. Plaintiffs *admit* that Dr. Shafiq's proposed methodologies cannot identify domains associated with HIPAA- or CMIA-covered entities. This is fatal because plaintiffs *agree* that identifying such domains is a necessary step in defining their proposed classes. Dr. Shafiq also lacks reliable methodologies: his proposals either require extensive manual classification and verification of more than ***650,000*** websites or ask the Court to entrust the entire process to an unverified AI model. Neither comports with *Daubert*.

## I.    OPINION 1 SHOULD BE EXCLUDED

### A.    Opinion 1 Is Irrelevant And Unreliable

In Opinion 1, Dr. Shafiq opines that Meta or plaintiffs can programmatically and "reliably identify all or almost all healthcare provider domains at-issue in this case." Dkt. 1155-10 ¶ 64. Yet plaintiffs admit that Dr. Shafiq's methodologies ***cannot*** actually "make the ultimate determination" of whether a given website or app relates to a HIPAA- or CMIA-covered entity, which is required to identify their "At-Issue Data." Dkt. 1323 at 2-3. As Dr. Shafiq provides no method for actually identifying the "At-Issue Data," his Opinion 1 is both unreliable and irrelevant to class certification and should be excluded. Dkt. 1263-2 at 5-13; *see also* Dkt. 1323 at 2-3.

Plaintiffs insist that Dr. Shafiq's analysis is still relevant because he provides a "baseline for identifying HIPAA/CMIA entities at issue," which human reviewers could thereafter manually examine to verify and remove any false positives. Dkt. 1323 at 2-3, 10, 12-13. But Dr. Shafiq's "baseline" includes over 650,000 "websites and apps"—all of which he testified must be ***manually reviewed*** and revised to identify at-issue HIPAA- or CMIA-covered entities. Dkt. 1263-6 at 43:19-44:8; 199:1-16; Dkt. 1263-2 at 7-8. A "baseline" that includes 650,000 websites and apps that may or may not have anything to do with plaintiffs' case does not "logically advance[] a material aspect" of plaintiffs' class certification motion and is thus irrelevant. *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995); *McPhail v. First Command Fin. Plan., Inc.*, 247 F.R.D. 598, 605 (S.D. Cal. 2007) (excluding expert opinions that were "not useful in evaluating whether class certification requirements have been met").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

More fundamentally, as explained in Meta's motion, Dr. Shafiq "never explains how two classification systems [*i.e.*, MegaTaxon and RDTT] that do not identify HIPAA and CMIA-covered entities could somehow be combined to identify such entities." Dkt. 1263-2 at 8. Plaintiffs argue that "combining datasets is a straightforward process" and Meta's internal classifications can be "triangulated." Dkt. 1323 at 3. But plaintiffs still do not explain what the "triangulation" process entails or how the datasets (which plaintiffs agree do not identify HIPAA- or CMIA-covered entities) will somehow be combined to identify such entities. Dkt. 1263-2 at 5. As in *Kamakahi v. American Society for Reproductive Medicine*, Dr. Shafiq's analysis "does not reliably support his conclusion" that combination is possible. 305 F.R.D. 164, 182 (N.D. Cal. 2015). This "analytical gap" renders Opinion 1 irrelevant. *Newkirk v. Conagra Foods, Inc.*, 438 F. App'x 607, 608-09 (9th Cir. 2011).

### B.     None of Meta's Systems Or Lists Provides The Critical Missing Link

After making these critical concessions up front, plaintiffs make pages of specific arguments about MegaTaxon, RDTT, and other lists Dr. Shafiq claims could be "triangulated" to reach a "baseline" of websites and apps that could then be manually reviewed. Dkt. 1323 at 3-13. None of these arguments cure the core deficiencies identified above: *i.e.*, they do not demonstrate that MegaTaxon or RDTT, alone or together, can identify HIPAA- or CMIA-covered entities. Nor do they refute Meta's other arguments that Dr. Shafiq's methodologies are unreliable and unreliably applied. Dkt. 1263-2 at 8-13; Fed. R. Evid. 702(c)-(d).

*MegaTaxon*. MegaTaxon is used to predict a classification for, among other things, event data and apps. Dkt. 624 at 2. A given domain (*e.g.*, costco.com) can be associated with any number of MegaTaxon categories because the webpages within it contain varying content (*e.g.*, costco.com/f/-/optical, https://www.costco.com/patio-lawn-garden, costco.com/health-beauty-spa-gifts, etc.). For his analysis, Dr. Shafiq took a pre-vetted list of healthcare domains already verified by plaintiffs' counsel to be associated with HIPAA- or CMIA-covered entities and confirmed that *some* event data associated with *some* URL within that domain was associated with one of a laundry list of MegaTaxon classifications that plaintiffs' counsel told him "correspond[ed] to HIPAA and CMIA covered entities." Dkt. 1155-10 ¶¶ 51-57. From the fact that this analysis

generated a high true-positive rate (known health-related domains were sometimes linked to health-related MegaTaxon classifications), Dr. Shafiq inferred the inverse—i.e., that *all* domains associated with event data that received a MegaTaxon "health-related" category are "HIPAA/CMIA" covered entities. *Id.*

As Meta pointed out, this conclusion is not reliable, because Dr. Shafiq did not test whether the MegaTaxon "health-related" categories accurately identified At-Issue Data from domains *not* pre-identified as healthcare websites; *i.e.*, how MegaTaxon might categorize data from domains like costco.com or cnn.com.[1]  Dr. Shafiq's methodology is analogous to testing the accuracy of a spam filter by feeding it only emails already known to be spam: if the filter correctly labels 205 of 208 spam emails, the result shows a 99 percent true positive rate, but that number reveals nothing about the filter's tendency to misclassify legitimate emails as spam (*i.e.*, false positives).  Dkt. 1251-14 ("Zervas Rpt.") ¶ 125.  This is "precisely the type of methodology that is 'biased toward a particular conclusion' and therefore does not 'comport[] with the dictates of good science.'" *Perez v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 13070406, at *6 (N.D. Cal. July 19, 2012) (quoting *Daubert II*).  A 99% true positive rate—with no false positive rate or method to eliminate false positives—does not support Dr. Shafiq's conclusion that "Megataxon can be used to reliably identify healthcare providers" at issue in this case. Dkt. 1155-10 ¶ 54; *Perez*, 2012 WL 13070406, at *6 (excluding expert whose "skewed" methodology did "not actually support the [] conclusions").

Nor is Dr. Shafiq's conclusion supported by a reliable methodology that can be reliably applied classwide because, as explained above, Dr. Shafiq's method yields hundreds of thousands of websites that require individual, human verification.  Dkt. 1263-2 at 9-10; *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (expert cannot "include unsupported speculation"); *Claar v. Burlington N.R.R., Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (similar, affirming exclusion).

Plaintiffs provide three responses: (1) "the triangulation process and human review

---

[1] For example, event data from a Costco product listing for children's boots received the Megataxon classification "Medical Center." Zervas Rpt. ¶ 128; Dkt 1263-2 at 10.

verification removes any false positives," (2) calculating an error rate is "impossible because Meta spoliated the relevant domain-level Megataxon classifications," and (3) an error rate is "only one factor" in assessing the reliability of an expert's methodology. Dkt. 1323 at 5-6.

None of these renders Dr. Shafiq's methodology reliable. *First*, a methodology that relies on human review of hundreds of thousands of websites is neither "programmatic" (as Dr. Shafiq falsely claims, Dkt. 1155-10 ¶ 12(a)), nor practical.[2] Further, no "triangulation process" could possibly identify HIPAA- or CMIA entities when MegaTaxon itself does not identify such entities. *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 547 (N.D. Cal. 2012) (exclusion warranted when "expert's purported methodology fails to explain his final conclusion."). *Second*, plaintiffs cannot blame Meta's alleged spoliation of data for Dr. Shafiq's failure to provide an error rate. Dkt. 1323 at 5-6. He did not provide an error rate even for the data that was available to him and did not provide any methodology—let alone a reliable one—to identify or eliminate false positives. Dkt. 1263-2 at 10. *Finally*, Meta did not move solely on Dr. Shafiq's failure to provide an error rate, but on fundamental flaws pervading his analysis. Dkt. 1263-2 at 8-10.

**RDTT**. Dr. Shafiq's methodology of filtering down the RDTT List is arbitrary and unreliable because he "provides no explanation or rationale for his filtering process," including for selecting the eleven sub-categories he used, using a 0.8 confidence score as a threshold, and filtering out non-U.S. entities. Dkt. 1263-2 at 11-12. To distract from these core failures, plaintiffs lay out a host of discovery disputes. *See* Dkt. 1323 at 6-8. But discovery disputes are irrelevant to Meta's Motion: Dr. Shafiq's *methodologies* are unreliable, regardless of the available data.

Selection of "healthcare-related" sub-categories: Plaintiffs claim that it is "obvious" why Dr. Shafiq selected the eleven RDTT subcategories: because Meta's *descriptions* of the categories align with the "types of entities that are covered by HIPAA and the CMIA." Dkt. 1323 at 8. But there is *no evidence* that Meta uses RDTT to identify HIPAA or CMIA-covered entities. The types of entities covered by HIPAA or CMIA may partially overlap with Meta's "health-related" RDTT categories, but the overlap may be both underinclusive and overinclusive: not all "health-related"

---

[2] Indeed, "human review" might be equally inconclusive: Dr. Shafiq, for example, could not say whether event data associated with a college sorority blog was correctly given the MegaTaxon classification of "Medical Center." Dkt. 1263-2 at 10, 13.

entities are covered under HIPAA or CMIA and not all HIPAA- or CMIA-covered entities are given "health-related" RDTT classifications. Dr. Shafiq simply assumed, without foundation, that these categories included exclusively HIPAA or CMIA-covered entities.  As Meta's Motion explained, the facts do not support this assumption—rendering Dr. Shafiq's opinion unreliable.[3] Dkt. 1263-2 at 7-8; *Guidroz-Brault*, 254 F.3d at 830 (excluding expert whose "assumption [found] no support in the physical facts"); *Sonneveldt v. Mazda Motor of Am., Inc.*, 2024 WL 5242611, at *2 (9th Cir. Dec. 30, 2024) (excluding expert who "failed to provide sufficient facts and data to 'support … every necessary link' in his" opinion).

Confidence score: Dr. Shafiq's selection of a 0.8 or higher confidence score as a threshold is arbitrary; he provided no justification for using this threshold as a proxy for HIPAA or CMIA coverage.  Dkt. 1263-2 at 11-12.  Plaintiffs argue that (1) the 0.8 threshold was "at the 'knee' of the distribution"; and (2) that the threshold is purportedly "more conservative than Meta's" own RDTT thresholds.  Dkt. 1323 at 9.  Neither response explains how a 0.8 threshold "ensure[s] reliability" *for identifying HIPAA- or CMIA-covered entities*—something that, as explained above, Meta itself does not use RDTT, or its confidence scores, to do.  Dkt. 1263-2 at 7-8, 11.

Non-U.S. entities: Plaintiffs claim that Dr. Shafiq "substantially reduce[d] the likelihood of non-U.S. domains being included" in his results "by combining multiple filters."  Dkt. 1323 at 10.  But he presented no error rate, nor any method to confirm website validity.  Thus, there is no way to know whether this claim is correct.  Dkt. 1263-2 at 12; Zervas Rpt. ¶¶ 137-38.[4]  Contrary to plaintiffs' assertion that Meta "demands [] perfection" (Dkt. 1323 at 10), Meta did not demand an error rate of zero; but without *any* attempt to calculate such a rate, Dr. Shafiq's conclusion that his methodology effectively excluded U.S. entities is unsupported and unreliable.  Dkt. 1155-10

---

[3] Plaintiffs claim that Meta's Motion is "inappropriate" because Meta "did not produce RDTT classifications until July 2025" and provided explanations for them later in October 2025.  Dkt. 1323 at 9 n.4.  This is a non-issue: Meta produced RDTT classifications two months before Dr. Shafiq submitted his original report.

[4] Plaintiffs claim that Meta's data can be used to identify "RDTT domain countries" but Meta refuses to produce this data.  Dkt. 1323 at 10 n. 5.  Meta has since produced the requested data.  Dr. Shafiq nevertheless fails to offer a reliable methodology—whether using Meta's data or not—to exclude non-U.S. and non-active or invalid websites.

¶ 64;[5] *see also United States v. Johnson*, 122 F. Supp. 3d 272, 332 (M.D.N.C. 2015) (excluding expert whose "methodology contain[ed] several unknown rates of error without any reliable method to control for them").

Further verification: Through his filtering process, Dr. Shafiq arrived at a list of ***more than 650,000 domains*** that were classified into the eleven sub-categories that he assumed aligned with HIPAA or CMIA. Dkt. 1155-10 ¶ 62. As explained above, plaintiffs and Dr. Shafiq ***agree*** that this list does not identify the at-issue HIPAA- or CMIA-covered entities and that the results would need to "further be verified" (Dkt. 1263-6 at 43:25-44:8) and "refined" (Dkt. 1323 at 11). The ***only*** methodology plaintiffs and Dr. Shafiq provide to further verify and refine this list is a manual, human review of each classification. *Id.* Human review of each entry on Dr. Shafiq's list of 652,000 domains is not a "programmatic" methodology that can be applied classwide. Dkt. 1155-10 ¶ 48.

***Other Lists.*** Dr. Shafiq lists a few additional sources that he says "can be used to identify healthcare provider websites" at issue in this case. Dkt. 1155-10 ¶ 72; *see also id.* ¶¶ 65-74. But he never explains *how* they can be used (independently or in combination) for this purpose. *See* Dkt. 1263-2 at 13. Plaintiffs argue that Dr. Shafiq uses these sources "as inputs within his larger methodology to 'triangulate' across multiple classification systems." Dkt. 1323 at 12. But Dr. Shafiq provides no detail on his "triangulation" methodology, which attempts to combine systems and lists that ***do not identify*** websites or data associated with HIPAA- or CMIA-covered entities to somehow arrive at a list of such associated websites. Reliable expert methodology requires sufficient detail and explanation. *See Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Dr. Shafiq's conclusory and unexplained "triangulation" methodology fails to meet that standard and should be excluded. *Pooshs*, 287 F.R.D. at 547.

**C.    Plaintiffs' Evidentiary Arguments Do Not Save Dr. Shafiq's Methodology**

---

[5] Plaintiffs also argue that Meta has its "own false-positive rate metrics" but has not "produced any documents with those calculations." Dkt. 1323 at 10-11 n.6. But Meta's classifications systems do not look for whether an entity, domain, app, or data is governed by HIPAA or CMIA, so Meta's "false positive rate metrics" are irrelevant to the question of whether HIPPA or CMIA apply.

Plaintiffs' only argument that Meta's cases *Newkirk v. ConAgra Foods, Inc.*, 438 F. App'x 607, 608-09 (9th Cir. 2011), *Schwab v. Philip Morris USA, Inc.*, 2005 WL 2401647, at *2 (E.D.N.Y. Sep. 29, 2005), and *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) are inapplicable is that unlike the experts there, "Dr. Shafiq relies on Meta's classifications, not his own." Dkt. 1323 at 12. Thus, sprinkled throughout their opposition, plaintiffs make the argument that Meta's own systems are "admission[s] by a party opponent [that] are admitted as substantive evidence of the fact stated." Dkt. 1323 at 9, 11-12.

The problem with this argument is that Meta has **never** stated that its internal classification systems can be used to identify HIPAA- or CMIA-covered entities—and none of plaintiffs' cited evidence remotely suggests otherwise. It is **Dr. Shafiq's opinion**, not Meta's, that Meta's systems, designed for other purposes, can be used to identify HIPAA- or CMIA-covered entities. Claiming reliance on "Meta's classifications" does not salvage Dr. Shafiq's opinion because "Meta's classifications" do not support his conclusion. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 996 n.22 (C.D. Cal. 2012) (categorization of music artists unreliable where "industry information" expert relied on, including "Defendants' internal classifications," did not support conclusion). The admissibility of Meta's internal systems is irrelevant to whether plaintiffs have met their burden to demonstrate that Dr. Shafiq's opinion is reliable under Rule 702.

## II.    OPINION 3(a) SHOULD BE EXCLUDED.

Dr. Shafiq's Opinion 3(a) is that Meta can "programmatically" identify four specific types of patient button clicks. Dkt. 1155-10 ¶¶ 137–53. Dr. Shafiq defines "programmatically" to mean "creation of a computer program that can be used to answer the question presented in an objective and accurate fashion." *Id.* ¶ 138. But his proposed "programmatic" methodology requires *manual* review and pattern crafting that are not scalable to plaintiffs' proposed classes and outsources the task to a commercial machine learning model. *See* Dkt. 1263-2 at 13-21. Dr. Shafiq's manual approaches do not support his conclusion that Meta can "programmatically" identify patient button clicks, and entrusting an AI model is not a reliable methodology, especially without any reliable method to verify the results. Dkt. 1263-2 at 13-21.

Plaintiffs argue that "[a]ll of Meta's challenges go to the weight of his opinion, not [its]

admissibility." Dkt. 1323 at 14. Not so. "[W]hen an expert opinion is based on data [or] a methodology . . . that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998).

### A.    Dr. Shafiq's Manual Labeling Approach Is Not "Programmatic" Or Reliable

Dr. Shafiq purports to use the manual labeling results as the "ground truth" to evaluate the accuracy of manual pattern crafting and his AI model (Dkt. 1155-10 ¶ 143)—but he failed to ensure the accuracy of the manual labeling results. Dkt. 1263-2 at 16-17. Plaintiffs claim Dr. Shafiq's approach is reliable because he provided the same instructions to all reviewers and reviewed all manual labels. Dkt. 1323 at 14-15. But Dr. Shafiq wholly fails to describe the process or results of this review. Plaintiffs also argue that Meta has not proven the manual labeling results inaccurate. *Id.* at 15. But it is *plaintiffs'* burden to demonstrate that Dr. Shafiq's methodology is reliable. Fed. R. Evid. 702. And Meta *did* provide examples of apparent errors in the manual labels: employee portal buttons were classified as "Portal" (defined to include only patient portals), buttons to register for health fairs were classified as "Schedule" (defined to include only doctor appointments), and buttons for student and instructor onboarding tests were classified as "Assessment" (defined to include only health assessments). Zervas Rpt. ¶ 180.

Manual labeling is also not "programmatic" or scalable. Contract employees manually categorized approximately one-third of one percent of the buttons within Dr. Shafiq's larger sample. *See* Dkt. 1155-10 ¶ 143 n.193 (25,126 buttons out of ~7.3 million buttons associated with 1,844 domains). Dr. Shafiq did not initially explain why this sample was selected, why it is representative, or how his manual labeling approach could be applied to the potentially billions of buttons associated within his 650,000 domains. Dkt. 1263-2 at 15-16. Dr. Shafiq now asserts that he selected the top 10% of buttons because they were the most likely to be clicked. Dkt. 1318-2 ¶ 84. Plaintiffs then claim that his sample size is "robust," that this sampling method captures "many different healthcare-provider sites," and "the per-domain cap (e.g., 100 buttons) further prevents large domains from dominating the dataset." Dkt. 1323 at 14. But these responses all

assume—without basis—that buttons are placed, configured, or designed the same way across all websites—not only those he sampled, but the 650,000 he did not. And plaintiffs still have no answer as to how manual labels could possibly be applied to hundreds of thousands of domains.

Without any evidence that the manual labeling approach is accurate or scalable, Opinion 3(a), the entirety of which rests on manual labeling results, is unsupported and unreliable. *Cf. Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 693-94 (N.D. Cal. 2019) (excluding expert because the report "contained too many errors to be relied upon").[6]

### B. Dr. Shafiq's Pattern Crafting Approach Is Not "Programmatic" Or Reliable

Dr. Shafiq's "pattern crafting" approach is likewise not reliable or scalable. Dr. Shafiq manually crafted patterns from the same 0.34% of buttons and his patterns are highly specific to this sample set: nearly two-thirds of the "button text patterns" are *exact values* from the sample buttons. Dkt. 1263-2 at 17-18. Plaintiffs concede that, if this approach were to be used for a broader set of the billions of buttons across 650,000 domains, Dr. Shafiq would need to ***manually*** craft new patterns. Dkt. 1323 at 16 ("[A]dditional patterns can be created as needed to account for previously unseen button text or destinations."). Rather than address this serious deficiency, plaintiffs attack a strawman argument and claim that "Meta incorrectly assert[s] that the structure of the analysis is 'one pattern per button.'" *Id.* at 15. But Meta's critique was that Dr. Shafiq's manually crafted patterns are specific to the small sample of buttons he reviewed (with many indeed being "one pattern per button") and he provides no reliable methodology to apply his approach to the larger universe of potential buttons (which could reach the billions). Dkt. 1263-2 at 17; Fed. R. Evid. 702(d). Plaintiffs have no answer to this critique.

Nor can plaintiffs demonstrate that pattern crafting is "programmatic." Dr. Shafiq "manually crafted" the patterns (Dkt. 1323 at 13) and must manually craft additional patterns for "previously unseen" buttons (*id.* at 16). Plaintiffs suggest that this is still a "programmatic" approach because once the patterns are manually crafted, buttons are "automatically assigned to

---

[6] Plaintiffs' reliance on *Pods Enterprises, Inc. v. U-Haul Intern., Inc.*, 2014 WL 2625297, at *3 (M.D. Fla. June 12, 2014), and *Sentius International, LLC v. Microsoft Corp.*, 2015 WL 331939, at *5 (N.D. Cal. Jan. 23, 2015), is misplaced. Dkt. 1323 at 15. Both cases addressed quality control criticisms of consumer surveys and are inapposite.

its corresponding category." *Id.* at 13. But the only thing the computer program is doing is applying rules that must be manually crafted, updated, and changed by Dr. Shafiq. Such an approach does not support his Opinion 3(a). *Pooshs*, 287 F.R.D. at 547 (method must support an expert's conclusion); *Perez*, 2012 WL 13070406, at *3 (same).

### C.    Dr. Shafiq's AI Approach Is Unreliable

Dr. Shafiq's use of a commercially available AI model to classify buttons—his only potentially "programmatic" approach—is antithetical to the requirements of Rule 702. "Experts must follow some discernable methodology and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp.*, 2014 WL 1494247, at *4. Dr. Shafiq's AI approach is exactly that: he feeds button data into a commercially available GPT-4 large language model and accepts whatever classifications it returns. Dr. Shafiq's AI approach is not scientific, testable, or verifiable.

Plaintiffs claim that an AI model generally can be trusted because "classification[] tasks . . . are the sorts of tasks for which AI models are accurate." Dkt. 1323 at 16. *First*, that AI models may be "accurate" for certain tasks does not mean plaintiffs have demonstrated that Dr. Shafiq's AI approach for the specific task here meets the requirements under Rule 702 and *Daubert*. Core *Daubert* considerations include whether the technique has been tested, the known or potential rates for false positives and negatives, and whether the expert is employing the same reliable methodologies as he would in his regular professional work. *See In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1171 (N.D. Cal. 2007); *Schwab*, 2005 WL 2401647, at *2. Dr. Shafiq and plaintiffs have not demonstrated the reliability of applying a commercial AI model to the facts of this case, including the factors mentioned above.

*Second*, plaintiffs provide no support for their claim that classifying button texts and destinations is a "simple classifications task[]" for which "AI models are accurate." Dkt. 1323 at 16. As Meta noted and Dr. Shafiq recognized, "whether a button relates to one or more of the four categories is context-dependent" and requires considering the purpose and function of the buttons, among other things. Dkt. 1263-2 at 16; Dkt. 1155-10 ¶ 139 (providing definitions of each button category); *id.* ¶ 143 (describing the manual labeling task as a "tedious exercise").

*Third*, courts have not accepted commercially available AI models as a scientific methodology. *See* Dkt. 1263-2 at 18-19 (citing cases); *Kohls v. Ellison*, 2025 WL 66514, at *4 (D. Minn. Jan. 10, 2025) ("[W]hen attorneys and experts abdicate their independent judgment and critical thinking skills in favor of ready-made, AI-generated answers, the quality of our legal profession and the Court's decisional process suffer."). Plaintiffs argue that Meta's cases are inapposite because they relate to AI hallucinations of fake case cites in legal briefs. Dkt. 1323 at 16. But plaintiffs miss the point. The courts in Meta's cases expressed a more fundamental skepticism towards relying on commercially available AI models. *See, e.g., In re Celsius Network LLC*, 655 B.R. 301, 308-09 (Bankr. S.D.N.Y. 2023) (AI generated report was not "a reflection of the expert's own knowledge, experience, expertise and methods used"); *Kruglyak v. Home Depot U.S.A., Inc.*, 774 F. Supp. 3d 767, 770 (W.D. Va. 2025) (AI "platforms sometimes 'hallucinate,' meaning they provide inaccurate responses."); *Kohls*, 2025 WL 66514, at *4 (condemning expert's abdication of independent judgment in favor of GPT-4o). The known risks of inaccuracy and inconsistency in AI models apply equally to drafting a brief or classifying a button. Zervas Rpt. ¶ 190 n.502 (collecting sources). Plaintiffs and Dr. Shafiq have not demonstrated with sufficient evidence that the GPT-4 AI model is a reliable methodology to identify and classify button click data in this case.

### 1.    The AI Approach Is Not Replicable

Even if the AI approach was theoretically reliable (it is not), Dr. Shafiq has not reliably applied it. Dr. Shafiq applied his AI approach only once to the sample set of buttons and once to a broader set of 7.3 million buttons. Dkt. 1263-6 at 245:1-246:17; 247:20-248:14. Without multiple tests, there is no evidence this method will produce consistent, *replicable* results. *Perez*, 2012 WL 13070406, at *7 (excluding expert where methodology was not replicable). Dr. Shafiq claims he can show replicability because AI model "outputs are highly consistent at temperature 0." Dkt. 1318-2 ¶ 97. But the research he cites to does not say that; for example, one article Dr. Shafiq cited says the opposite: "models are ***not deterministic even with a temperature of 0***, and [] the

degree of stability changes from model to model and task to task."[7]  Dr. Shafiq has no evidence that outputs are "highly consistent" for the specific task he asked GPT4 to perform.  *Rovid v. Graco Children's Prods. Inc.*, 2018 WL 5906075, at *5 (N.D. Cal. Nov. 9, 2018) (without multiple tests, expert "cannot show" "results are reproducible or reliable").

Plaintiffs argue that Dr. Zervas (Meta's expert) was able to "replicate Dr. Shafiq's model, confirming that it can be repeated."  Dkt. 1323 at 17.  This is wrong.  Dr. Zervas used the "same prompts, model, and instructions" but *did not perform the same test* as Dr. Shafiq because the protective order in this case does not allow him to do so.  Zervas Rpt. ¶ 193.  Instead, Dr. Zervas identified publicly accessible example buttons from Dr. Shafiq's analysis, conducted three runs on each, and documented "inconsistent outputs even under identical conditions."  *Id.* Moreover, as plaintiffs' own authorities acknowledge, the question is not whether Dr. Shafiq's *model* "can be repeated" (Dkt. 1323 at 17), but whether his *results* can be repeated, which Dr. Shafiq failed to demonstrate.  *See Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) ("testability factor" requires that '[s]omeone else using the same data and methods . . . be able to replicate *the result*.'") (emphasis added); *Hart v. BHH, LLC*, 2018 WL 3471813, at *5 (S.D.N.Y. July 19, 2018) (collecting authorities that "results must be capable of replication") (cited in Dkt. 1323 at 17).

## 2.    The AI Approach Is Not Verifiable

***Inflated accuracy.*** Plaintiffs assert that a classification is "accurate" if the button belongs to any of four categories because, "[i]n the context of class certification, the threshold issue is whether the methodology can reliably distinguish buttons that belong to *any* patient-related category." Dkt. 1323 at 18.  But Dr. Shafiq never provided any error rates, so he has no evidence that his AI approach "can reliably distinguish buttons that belong . . . from those that do not." *Id.*

***Sample size.***  Plaintiffs claim that sample size goes to weight, not admissibility. Dkt. 1323 at 18.  But Meta argued that Dr. Shafiq's sample was not shown to be *representative*, not that it was the wrong size.  Dkt. 1263-2 at 21.  Without a representative sample, there is no basis to

---

[7] Atil et al., *LLM Stability: A Detailed Analysis with Some Surprises*, arXiv at 1 ("The naive expectation would be that [GPT-4o] is entirely deterministic with temperature 0") (cited in Dkt. 1318-2 ¶ 97 n.184); Ouyang et al., *An Empirical Study of the Non-Determinism of ChatGPT in Code Generation*, arXiv ("[W]e find that setting the temperature to 0 does not guarantee determinism in code generation") (cited in Dkt. 1318-2 ¶ 97 n.185).

believe that Dr. Shafiq's AI approach could be accurately applied to the potential universe of billions of buttons. *See id.*; *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244-45 (W.D. Wash. 2018) (excluding expert whose "methodology, based upon inferences from [an] incomplete sample, [was] unreliable" because "[r]epresentativeness is essential to the reliability of a study").

*Scalability*. Lastly, plaintiffs argue that the AI approach is scalable because Dr. Shafiq "applied the exact same methodology to the dataset of over 7 million buttons across 1,844 domains." Dkt. 1323 at 18. But Dr. Shafiq did not *verify* the AI model results for classifying these 7 million buttons: to assess accuracy, his methodology would have required him to—but he did not—manually label all of them to establish a new "ground truth." Dkt. 1155-10 ¶¶ 143, 146.

## III. OPINION 3(b) SHOULD BE EXCLUDED

Dr. Shafiq's Opinion 3(b) baldly asserts that Meta can "programmatically" identify "specific Health Information or Prescription Drug Information in Full-String URLs." Dkt. 1155-10 ¶ 154. Other than stating that "similar methodologies" as those identified in Opinion 3(a) can be used (*id.* ¶ 154), Dr. Shafiq does not explain how such methodologies can be applied or assessed on the different types of data. Dkt. 1263-2 at 22. Dr. Shafiq's opinion rests on nothing more than his assurance that a methodology could theoretically work and is obvious "ipse dixit" that must be excluded. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).

Plaintiffs now claim that "a model [to identify Health Information or Prescription Drug Information] could use any one or a combination of five separate models that Meta has created and used." Dkt. 1323 at 19. But this proposed methodology is plaintiffs', not Dr. Shafiq's, and is being proffered for the first time in opposition to Meta's Motion. Plaintiffs also provide no evidence demonstrating that the systems or models can reliably identify the relevant facts or communications. Plaintiffs' attempt to provide a methodology on behalf of Dr. Shafiq fails.

None of plaintiffs' other responses save Opinion 3(b) either. *First*, plaintiffs claim that "it is not Dr. Shafiq's role to define the communications or facts identifying a doctor, condition, or treatment." Dkt. 1323 at 19. But it *is* his role to define or explain what he means by "communications or facts identifying a doctor, condition, or treatment" because his opinion is that Meta can "programmatically" identify such communications or facts. Dkt. 1155-10 ¶ 155.

*Second*, in response to Meta's argument that "the mere fact that keywords related to a medical condition were extracted [does not] establish that a *patient's* medical condition was communicated" (Dkt. 1263-2 at 23), plaintiffs state that "Dr. Shafiq would use the model on healthcare provider domains, not news websites." Dkt. 1323 at 20. But Dr. Shafiq has not proposed a reliable methodology to identify such domains, *see supra* § I.A-B, nor for isolating *patient* information on such domains even if he could identify them.

*Third*, plaintiffs assert that "Dr. Shafiq does not need to identify class members 'who had a prescription for the drug included in the domain's URL'" because class members can self-report. Dkt. 1323 at 20. But asking potential class members (who used potentially 650,000 websites) is neither "programmatic" nor based on Meta's records. Dkt. 1155-10 ¶ 209; *infra* § IV.

*Finally*, plaintiffs suggest that Dr. Shafiq's AI approach can be used to "programmatically" identify "Health Information or Prescription Drug Information." Dkt. 1323 at 19-20. Merely stating that the AI approach can be reliably used is *ipse dixit* and Dr. Shafiq provides no detail on how this model can be used (including prompts or parameters) or verified. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) (expert declaration "so incomplete as to be inadmissible as irrelevant" when all the court had was expert's assurance he could build a model).[8]

## IV.    A PORTION OF OPINION 10 SHOULD BE EXCLUDED

Meta moved to exclude the portion of Dr. Shafiq's Opinion 10 that claims "specific class members (and the total number of them) can be programmatically identified using Meta's records." Dkt. 1155-10 ¶ 209. Plaintiffs do not dispute that this opinion relies on Opinions 1, 2, and 3. *See* Dkt. 1323 at 20-21. Because Opinions 1 and 3 should be excluded, Opinion 10 should be excluded as well. *See Domingo*, 289 F.3d at 607.

Opinion 2, comprised of general descriptions of Meta's matching systems, also does not support Opinion 10. *See* Dkt. 1263-2 at 24. Plaintiffs concede that, other than Dr. Shafiq's "entropy analysis," Opinion 2 merely summarizes how Meta's matching can work in theory. Dkt. 1323 at 21. This is not proper expert testimony. *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp.

---

[8] Plaintiffs also argue it is "unjust" for Meta to criticize Dr. Shafiq for relying on data from a 14-day period, but Meta's Motion made no such argument. Dkt. 1323 at 20.

3d 1002, 1030 (S.D. Cal. 2023) ("[U]nhelpful restatement[s] of the facts as [the expert] sees them" should be excluded). And Dr. Shafiq's "entropy analysis" does not support his Opinion 2 because his opinion is theoretical. He offers no method by which "entropy" could be applied to the actual data in this case and thus does not support his conclusion that "specific class members can be programmatically identified." Dkt. 1155-10 ¶¶ 99, 209.

Plaintiffs also argue that Opinion 2 is reliable because Dr. Shafiq "includes concrete examples from named plaintiffs," demonstrating "the methodology." Dkt. 1323 at 21. This proposed "methodology" is neither programmatic nor capable of being applied classwide. Dr. Shafiq knew and searched for the separable ID values associated with plaintiffs' specific Facebook accounts. Dkt. 1155-10 ¶ 121. He does not demonstrate that this process could be applied to identify specific class members without already knowing their separable IDs.[9] Opinion 2, even if reliable, does not support Opinion 10. Opinion 10 should thus be excluded. *Domingo*, 289 F.3d at 607.

## V.   CONCLUSION

For the foregoing reasons, Meta's Motion to Exclude should be granted.

Dated: April 21, 2026                    Respectfully submitted,


                                         LATHAM & WATKINS LLP

                                         By */s/ Melanie M. Blunschi*
                                            Melanie M. Blunschi (Bar No. 234264)
                                            *melanie.blunschi@lw.com*
                                            Kristin Sheffield-Whitehead (Bar No. 304635)
                                            *kristin.whitehead@lw.com*
                                            505 Montgomery St., Suite 2000
                                            San Francisco, CA 94111
                                            Telephone: +1.415.391.0600

---

[9] Plaintiffs mischaracterize Meta corporate representative Fred Leach's testimony. Dkt. 1323 at 21. Mr. Leach testified that "Meta can connect behavior on the Internet from its [] users back to a Meta profile. That's – that's it. . . . [T]hat's the identification. And so there are broader connotations of identification, and Meta can't go beyond that." Dkt. 1154-17 at 59:14-18. Mr. Leach did not testify that Meta can identify specific Meta users.

Andrew B. Clubok (*pro hac vice*)
andrew.clubok@lw.com
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

Marissa Alter-Nelson (*pro hac vice*)
marissa.alter-nelson@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1345

Jessica Stebbins Bina (Bar No. 248485)
jessica.stebbinsbina@lw.com
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1.424.653.5500


**GIBSON, DUNN & CRUTCHER LLP**
Lauren R. Goldman (*pro hac vice*)
lgoldman@gibsondunn.com
Darcy C. Harris (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone: +1.212.351.4000

Elizabeth K. McCloskey (Bar No. 268184)
emccloskey@gibsondunn.com
Abigail A. Barrera (Bar No. 301746)
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: +1.415.393.8200


*Attorneys for Defendant Meta Platforms, Inc.*