**LATHAM & WATKINS LLP**
Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

Marissa Alter-Nelson (*pro hac vice*)
*marissa.alter-nelson@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1345

Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1.424.653.5500

**GIBSON, DUNN & CRUTCHER LLP**
Lauren R. Goldman (*pro hac vice*)
*lgoldman@gibsondunn.com*
Darcy C. Harris (*pro hac vice*)
*dharris@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone: +1.212.351.4000

Elizabeth K. McCloskey (Bar No. 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (Bar No. 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: +1.415.393.8200

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE META PIXEL HEALTHCARE LITIGATION

This Document Relates To:

All Actions

Case No. 3:22-cv-3580-WHO

**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFFS' CLASS CERTIFICATION EXPERT HAL J. SINGER, PH.D.**

Date: June 10, 2026
Time: 2:00 p.m.
Court: Courtroom 2 —17th Floor
Hon. William H. Orrick

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 1

A. Dr. Singer's Willingness-To-Accept Conjoint Methodology Is Unreliable. ........ 1

B. Dr. Singer's Decision To Hold Demand Fixed Further Renders His Opinions Unreliable. ........ 5

C. Dr. Singer's Overbroad Surveys Do Not Fit The Facts Or Theory Of This Case ........ 8

D. Dr. Singer's New Opinions Should Be Excluded. ........ 11

III. CONCLUSION ........ 12

# TABLE OF AUTHORITIES

## CASES

*Allen v. Conagra Foods, Inc.*,
331 F.R.D. 641 (N.D. Cal. 2019) (Orrick, J.) .......... 7

*Bailey v. Rite-Aid Corp.*,
338 F.R.D. 390 (N.D. Cal. 2021) .......... 5

*BillFloat Inc. v. Collins Cash Inc.*,
105 F.4th 1269 (9th Cir. 2024) .......... 8

*Broomfield v. Craft Brew All. Inc.*,
2018 WL 4952519 (N.D. Cal. Sep. 9, 2018) .......... 5

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
2022 WL 1203075 (N.D. Cal. Apr. 22, 2022) .......... 11, 12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... 4

*Davidson v. Apple, Inc.,*
2019 WL 2548460 (N.D. Cal. June 20, 2019) .......... 10, 11

*Davidson v. Apple, Inc.*,
2018 WL 2325426 (N.D. Cal. May 8, 2018) .......... 8, 9

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) .......... 1, 3

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018) .......... 5, 7

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) .......... 6, 7

*In re Bos. Univ. COVID-19 Refund Litig.*,
2023 WL 2838379 (D. Mass. Apr. 7, 2023) .......... 11

*In re JUUL Labs, Inc., Mktg. Sales Pracs. and Prods. Liab. Litig.*,
609 F.Supp.3d 942 (N.D. Cal. 2022) .......... 2, 8

*In re Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) .......... 7

*In re MyFord Touch Consumer Litig.*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) .......... 7

*In re Univ. of S. Cal. Tuition & Fees COVID-19 Refund Litig.*,
695 F. Supp. 3d 1128 (C.D. Cal. 2023) .......... 9, 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*,
500 F. Supp. 3d 940 (N.D. Cal. 2020) .......... 6, 9

*Johnson v. Nissan N. Am., Inc.*,
2022 WL 2869528 (N.D. Cal. July 21, 2022) (Orrick, J.) .......... 5

*Jones v. United States*,
933 F. Supp. 894 (N.D. Cal. 1996) .......... 4

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
305 F.R.D. 164 (N.D. Cal. 2015) .......... 8

*Krommenhock v. Post Foods LLC*,
334 F.R.D. 552 (N.D. Cal. 2020) (Orrick, J.) .......... 7, 8

*Kumandan v. Google LLC*,
2023 WL 8587625 (N.D. Cal. Dec. 11, 2023) .......... 3

*Lessin v. Ford Motor Co.*,
2024 WL 5007092 (S.D. Cal. Oct. 31, 2024) .......... 7

*Maldonado v. Apple, Inc.*,
2021 WL 1947512 (N.D. Cal. May 14, 2021) .......... 5, 7, 12

*McMorrow v. Mondelēz Int'l, Inc.*,
2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) .......... 9

*Murphy v. DirecTV, Inc.*,
724 F.3d 1218 (9th Cir. 2013) .......... 11

*Opticurrent, LLC v. Power Integrations, Inc.*,
2018 WL 6727826 (N.D. Cal. Dec. 21, 2018) .......... 12

*RingCentral, Inc. v. Nextiva, Inc.*,
2021 WL 12171869 (N.D. Cal. June 25, 2021) .......... 9

*Shin v. Sanyo Foods Corp. of Am.*,
348 F.R.D. 477 (C.D. Cal. 2025) .......... 7

*Townsend v. Monster Beverage Corp.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) .......... 12

*W. Exp. Servs., Inc. v. Webtrans Logistics, Inc.*, 2022 U.S. Dist. LEXIS 218970 (C.D. Cal. Aug. 19, 2022) .... 4

*Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) .... 12

## RULES

Fed. R. Civ. P. 26(a)(2)(D)(ii) .... 9

Fed. R. Evid. 702 .... 12

## OTHER AUTHORITIES

Jonathan Chapman, Mark Dean, Pietro Ortoleva, Erik Snowberg, Colin Camerer, *Willingness to Accept, Willingness to Pay, and Loss Aversion* (Nat'l Bureau of Econ. Rsch., Working Paper No. 30836, 2023) .... 3

Joseph R. Buckman, Jesse C. Bockstedt, and Matthew T. Hashim, *Relative Privacy Valuations Under Varying Disclosure Characteristics*, Info. Sys. Rsch. 375 (2019) .... 3

Xiao-Bai Li, Xiaoping Liu, and Luvai Motiwalla, *Valuing Personal Data with Privacy Consideration*, Decision Sci. 393 (2021) .... 2

## I. INTRODUCTION

*Daubert*'s gatekeeping function guards against "expert" testimony that has the appearance of rigor and reliability, but in fact lacks it. That is the case with Dr. Singer's opinions in this case. Dr. Singer's opinions fail in two critical respects: (1) he applies a willingness-to-accept conjoint methodology that is known to inflate damages and has never been accepted by any court (or the relevant scientific community); and (2) his surveys fail to match plaintiffs' actual case theory. While plaintiffs assert these concerns go to "weight," they are core admissibility issues because both render Dr. Singer's opinions unreliable and unhelpful.

Plaintiffs in opposition try to save Dr. Singer's conclusions by overstating their academic acceptance, but their own sources demonstrate that willingness-to-accept conjoint analyses are *not* generally accepted. Nor can plaintiffs fix the other flaws in Dr. Singer's methodology: their own cases explain why, even if willingness-to-accept conjoint studies were accepted (and they are not), Dr. Singer's survey methodology does not pass muster. And despite Dr. Singer's assertions that his original analysis was reliable, he still tried to sneak in three brand new surveys in his reply. While these new surveys are equally flawed, his submission of them implicitly acknowledges the merits of Meta's critiques. For all these reasons, his opinions should be excluded.

## II. ARGUMENT[1]

### A. Dr. Singer's Willingness-To-Accept Conjoint Methodology Is Unreliable.

Plaintiffs contend that because willingness-to-*pay* ("WTP") choice-based conjoint analysis is an accepted methodology, Dr. Singer's novel use of willingness-to-*accept* ("WTA") conjoint surveys to calculate damages in this case should be acceptable, too. Opposition ("Opp.") at 8-9 (Dkt. 1319-5). This is wrong. Variants of methodologies are not extended the same protection as accepted methodologies; they must be analyzed on their own merits. *See Engilis v. Monsanto Co.*, 151 F.4th 1040, 1054 (9th Cir. 2025). That is the case here. And even an expert using a known methodology is still subject to exclusion if their execution of that methodology is unreliable. *Id.*

[1] Capitalized terms not defined herein have the meaning given to them in the Motion (Dkt. 1263-3). Unless noted, all emphasis is added and internal citations are omitted. Citations to "Ex. __" are to the exhibits accompanying the Omnibus Declaration of Melanie M. Blunschi in Support of Meta's Motions To Exclude Plaintiffs' Class Certification Experts (Dkt. 1262), and the concurrently filed Reply Omnibus Declaration of Melanie M. Blunschi.

(excluding expert because a method appropriate "in one case . . . might not suffice in another"). Unlike the WTP methodology cases plaintiffs rely on, Dr. Singer's WTA methodology has not been accepted by the field or the courts, and is known to inflate damages. It should be excluded.

***WTA conjoint surveys are not accepted by courts or in the field.*** Contrary to plaintiffs' claims that WTA surveys are "well accepted" and have "robust support," Opp. at 2, 8, WTA is *not* a well-established and commonly used choice-based conjoint format. To the contrary, no court appears to have *ever* accepted a WTA conjoint survey as a measure of damages. Mot. at 10. Plaintiffs try to sidestep the lack of support by arguing that no court has ever rejected a WTA survey, Opp. at 10, but that turns the Daubert inquiry on its head—it is *plaintiffs' burden* to establish the reliability of Dr. Singer's methodology. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. and Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 1004 (N.D. Cal. 2022) (Orrick, J.) ("The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied.").

None of the academic sources plaintiffs cite support Dr. Singer's analysis here. Dr. Singer cites only four examples of WTA conjoints valuing an individual's data—and those examples, far from supporting Dr. Singer, contribute to the literature cautioning *against* reliance on WTA conjoint surveys in the data privacy context. *See* Mot. at 9-10, n.12; Singer Rpt. ¶¶ 35 n.40, 37 n.50, 46 n.76, 50 n.95 (Dkt. 1154-9) (citing Exhs. 13, 14, 15, and 16); *see also* Ex. 33 (Singer Dep.) at 177:6-178:3, 257:4-265:4 (Dr. Singer confirming he cannot identify any other examples). Acquisti et al. (2013), a survey upon which Dr. Singer relies, crystalizes why WTA conjoint analyses are ***not*** well accepted in the literature: WTA conjoint surveys in the data privacy context were found to ***inflate results over five times*** that of WTP conjoints. Ex. 14 at 252 (finding a WTA:WTP ratio of 5.47:1 in the privacy context, up from 2.92:1 with ordinary consumer goods). Similarly, Prince and Wallsten (2022) acknowledge that "a substantial literature finds that WTA estimates tend to be higher than WTP estimates." Ex. 13 at 859. Dr. Singer's final two decades-old examples have been widely criticized, including by other practitioners relied on by Dr. Singer, for measuring only stated preferences of data that "are not consistent with their economic valuation." *E.g.*, Ex. 34, Xiao-Bai Li, Xiaoping Liu, and Luvai Motiwalla, *Valuing Personal Data*

*with Privacy Consideration*, 52(2) Decision Sci. 393, 396 (2021) (criticizing Hann et al. 2002, 2007 (Exhs. 15 and 16)).

Neither Dr. Singer nor plaintiffs have identified even a single additional use of WTA conjoint surveys in *any* context, let alone data privacy. Instead, Dr. Singer's Reply Report grasps at literature employing *non-conjoint* WTA surveys in other contexts. Singer Reply Rpt. ¶ 8 (Dkt. 1318-2). There too, the authors recognize WTA's inflation of results. *See, e.g.*, Ex. 35, Joseph R. Buckman, Jesse C. Bockstedt, and Matthew T. Hashim, *Relative Privacy Valuations Under Varying Disclosure Characteristics*, 30(2) Info. Sys. Rsch. 375, 379 (2019) (survey "participants tend to overstate their WTA"); Ex. 36, Jonathan Chapman, Mark Dean, Pietro Ortoleva, Erik Snowberg, Colin Camerer, *Willingness to Accept, Willingness to Pay, and Loss Aversion*, 30 (Nat'l Bureau of Econ. Rsch., Working Paper No. 30836, 2023) ("[T]he majority of the general population exhibit an endowment effect" and "WTA and WTP are not only different, but largely uncorrelated."). Far from supporting Dr. Singer's approach, these authors criticize the few examples he relies on. *See, e.g.*, Ex. 34 at 396, Li et al. (2021).

Plaintiffs argue that the use of WTA is reasonable here because plaintiffs allege the property rights to the At-Issue Data belong to Facebook users. Opp. at 9. But a party's allegations or legal theories cannot justify an expert's use of an unreliable method. *E.g.*, *Engilis*, 151 F.4th at 1054 ("[T]alismanic invocation of [an accepted method]" does not support admission when improperly used.). Dr. Singer himself cites a case where, just as here, plaintiffs alleged data rights belonged to individuals, but the conjoint expert fielded a well-accepted WTP survey—not a WTA survey. Singer Rpt. ¶ 44 n.74 (citing *Kumandan v. Google LLC*, 2023 WL 8587625 (N.D. Cal. Dec. 11, 2023)). Dr. Singer could have done the same.

Plaintiffs also argue that "WTA is generally accepted," supposedly even by Meta's experts. Opp. at 10. But their citations do not support this claim. Dr. Hauser did not "implicitly recognize[]" that WTA conjoints are acceptable, as plaintiffs claim, *id.*: he stated that unlike traditional WTP conjoint surveys, "the Singer Surveys more closely resemble a different methodology called contingent valuation ("CV"), which the scientific literature has consistently demonstrated to be wholly unreliable." Hauser Rpt. ¶ 42 (Dkt. 1251-14); *id.* ¶ 47 (WTA surveys

are "*non-standard*"). Further, Dr. Tadelis, an economist, did not provide any opinion on survey methods; he simply commented on one of Dr. Singer's sources. Tadelis Rpt. ¶ 48 n.52 (Dkt. 1251-14). *Daubert* cautions against letting methodologies with only "minimal support within the community" through the gate. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993). That is the case here.

***WTA's inflated results render it unreliable.*** Plaintiffs try to downplay WTA's well-documented inflationary effects by arguing that they can be addressed on cross-examination. Opp. at 11. But that argument ignores Rule 702's gatekeeping function, which compels the court to "act as a 'gatekeeper' to exclude junk science." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 176 (N.D. Cal. 2015). As *Daubert* recognizes, expert opinion that *looks* reliable (but isn't)—such as a highly polished survey based on a fundamentally flawed methodology—and expert opinion that *is* reliable can appear very similar to a jury. *See Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996) (excluding expert after recognizing the "special dangers inherent in [] expert testimony" because "[s]uch testimony 'can be both powerful and quite misleading'") (quoting *Daubert*, 509 U.S. at 595). That is why the Court must exclude methodology that is fundamentally unreliable.

As explained above, WTA conjoint surveys inflate results. This is a point plaintiffs, Dr. Singer, and Meta all agree on. Opp. at 11; Singer Rpt. ¶ 37; Mot. at 9. In an effort to muddy the water, plaintiffs suggest that Meta's expert Dr. Hauser somehow harbored doubt about whether WTA results are actually inflated. Opp. at 11 (citing Hauser Dep. at 45:2-8, 49:15-51:8); *id.* at 10 (same). But plaintiffs misstate Dr. Hauser's testimony on this topic. Dr. Hauser confirmed that loss aversion and the endowment effect cause it to be "highly likely" that respondents to Dr. Singer's WTA conjoint surveys would overweigh losses more than gains. *See* Ex. 37 (Hauser Dep.) at 44:15-53:20 (explaining "highly likely" means 80-90% but he can't specify between those percentages). This is in line with Dr. Singer's own cited surveys, which show WTA values in the data privacy context coming in at ***five times*** as much as WTP.

In these circumstances, cross-examination cannot solve for an unreliable methodology. *See W. Exp. Servs., Inc. v. Webtrans Logistics, Inc.*, 2022 U.S. Dist. LEXIS 218970, at *6, *10 (C.D.

Cal. Aug. 19, 2022) (rejecting argument that "issues can be addressed on cross-examination" when expert offered "no valid basis" for opinion).

### B. Dr. Singer's Decision To Hold Demand Fixed Further Renders His Opinions Unreliable.

Dr. Singer's WTA conjoint surveys should be excluded for the reasons explained above—*i.e.*, that WTA conjoint surveys are not generally accepted by courts or the relevant field (data privacy valuation), and dramatically inflate results. But his surveys also fail the reliability test because he chose to hold demand fixed, meaning that Dr. Singer (and plaintiffs) would award damages based solely on respondents' subjective responses about the value of their data.

Plaintiffs claim that Meta seeks to exclude Dr. Singer's analysis under the minority case law position among district courts, but is foreclosed by the majority position. Opp. at 12-14. Not so. Under the cases that plaintiffs cite as the "weight of authority," fixed-supply[2] conjoint analyses are not inherently unreliable when based on "*[r]eal-world price and* quantity data." Opp. at 12 (citing *Maldonado v. Apple, Inc.*, 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021)). But Dr. Singer's conjoint surveys are not so based. As Meta explained in its Motion, plaintiffs' cases support Dr. Singer's exclusion because his opinions, unlike many of the cases plaintiffs rely on, are ***not based on "actual market[] prices as the basis for the prices in the survey."*** Mot. at 8-9 (quoting *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018), and additionally citing *Broomfield v. Craft Brew All. Inc.*, 2018 WL 4952519, at *18 (N.D. Cal. Sep. 9, 2018); and *Bailey v. Rite-Aid Corp.*, 338 F.R.D. 390, 410 (N.D. Cal. 2021)).

Dr. Singer's surveys fail because his surveys did not incorporate real-world prices. *See Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528, at *7 (N.D. Cal. July 21, 2022) (Orrick, J.) (cited Opp. at 12) (allowing model that captures the "***objective value for the car in the real-world under prevailing market conditions*** . . . quite similar to the use of 'real-world' price data"). Plaintiffs argue that Dr. Singer "took into account Meta's demand" and "held fixed as a matter of historical fact," Opp. at 14, but they fundamentally misstate Meta's arguments. Dr. Singer's surveys presented respondents with a made-up price range of $0 to $20. Singer Rpt. ¶ 61, 67. This

[2] Case law refers to fixed-supply conjoint damages models because courts have only accepted WTP conjoint surveys. Because Dr. Singer instead offers WTA surveys, he refers to fixed demand.

range was not based on real-world pricing data, and certainly not actual market prices that prevailed during the proposed class period, as required.[3] *See, e.g.,* Ex. 11 (Singer Dep.) at 168:18-169:12 ("There's no market that precisely goes after this at-issue data. . . . [T]he purpose of my model is to create such a marketplace."). Instead, it underscores why Dr. Singer's conjoint analysis does not fit within the majority-rule cases cited by plaintiffs and why his refusal to consider demand renders his opinions unreliable.

Plaintiffs also argue that his failure to use real-world pricing is acceptable because it was not specifically criticized by Meta's experts. Opp. at 15. This is irrelevant to the *Daubert* analysis and also wrong. While Dr. Hauser did not address this issue, because it was outside the scope of his assignment, Hauser Rpt. ¶ 7, Dr. Tadelis dedicated an entire section of his report to explaining how "Dr. Singer's analysis of the market equilibrium price is incomplete and contradicted by basic economic principles applied to personal information," Tadelis Rpt. ¶¶ 86-100.[4]

Plaintiffs' cases do not endorse fixed-supply (or demand) analyses carte blanche. Rather, as discussed above, the conjoint experts in these cases typically used *actual market prices* in their surveys. *See* Mot. at 8. As one example (that plaintiffs specifically point to), *Hadley v. Kellogg Sales Co.* held that "conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the

---

[3] In his Reply Report, Dr. Singer defended his price range by referring to three online platforms raised by Dr. Hauser as examples of programs operating in "a very different context." *Compare* Singer Reply Rpt. ¶ 52, *with* Hauser Rpt. ¶ 25 n.48. None of these programs were used by Dr. Singer to inform his price range. Ex. 11 at 168:12-170:12 (confirming "market benchmarks" meant only the Google Online Insights Study). Further, Dr. Singer provides no analysis for when those programs were in effect or how (or if) those programs relate to the allegations or the At-Issue Data in this case. Singer Reply Rpt. ¶ 52. They do not. Hauser Rpt. ¶ 25 n.48.

[4] More fundamentally, the question of reliability under *Daubert* is a *legal* analysis that *courts* must undertake. If the Court finds it useful, Dr. Tadelis addresses the economic principles of supply and demand, and he specifically explains how "[b]y treating Meta's demand as fixed and only changing users' willingness to accept, Dr. Singer's analysis does not identify the point where supply and a non-vertical demand curve intersect. His approach implicitly assumes that Meta would purchase the same amount of At-Issue Data regardless of price, an assumption that contradicts basic economic principles. As a result, his estimate cannot be interpreted as a market equilibrium price, or even as a meaningful market outcome." *Id.* ¶ 90; *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) ("[Expert] does not actually calculate a market price premium; he examines only what consumers say they would be willing to pay for certain vehicles. . . . [T]his ignores the 'supply' part of the supply/demand curve.").

prices used in the surveys underlying the analyses ***reflect the actual market prices*** that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the ***actual quantities of products sold*** during the class period." 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018) (cited Opp. at 13). And while plaintiffs cite *Lessin v. Ford Motor Co.* for the proposition that "whether a conjoint expert 'meaningfully' accounted for supply-side factors is an issue that goes to" weight, Opp. at 13-14, *Lessin* endorsed the *Hadley* test and first determined that the "***price range to be used in the survey will reflect the actual market prices*** that prevailed during the Class Period" to avoid exclusion, before allowing remaining challenges to go to weight. 2024 WL 5007092, at *4 (S.D. Cal. Oct. 31, 2024). This Court too has endorsed the *Hadley* test. *See Allen v. ConAgra Foods, Inc.*, 331 F.R.D. 641, 673 (N.D. Cal. 2019) (Orrick, J.) (citing *Hadley*, 324 F. Supp. 3d at 1105-06, and noting further that "price points in [the] survey were based on ***actual, historical, market-clearing prices***"). Multiple other of plaintiffs' cited authorities apply the same principle. *See, e.g., Krommenhock v. Post Foods LLC*, 334 F.R.D. 552, 576 (N.D. Cal. 2020) (Orrick, J.) (cited Opp. at 14) (allowing fixed-supply conjoint "*because*" it "utilized prices that 'mirror' those actually observed in the market" and "actual sales data"); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969–71 (N.D. Cal. 2018) (cited Opp. at 12) (prices were "within a range of negotiable price discounts not uncommon [in the market]"); *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (cited Opp. at 12) ("Plaintiffs' survey expert 'consulted pricing of the [products] at issue . . . to ensure that the results would 'reflect the market.'").

Finally, Dr. Singer cannot save his defective surveys by offering to do an unspecified after-the-fact demand adjustment. Opp. at 14-15 (citing Singer Rpt. ¶ 123; Singer Reply Rpt. ¶ 20). Even at class certification where a fully executed damages model is not necessary, "[m]erely gesturing at a model or describing a general method will not suffice to meet this standard." *Shin v. Sanyo Foods Corp. of Am.*, 348 F.R.D. 477, 484-86 (C.D. Cal. 2025) (denying class certification). Dr. Singer did not craft his surveys based on real-world pricing, and thus fails to meet the standard articulated for admissible conjoint surveys. *See, e.g.*, *Maldonado*, 2021 WL 1947512, at *22; *Hadley*, 324 F. Supp. 3d at 1105; *Fitzhenry-Russell*, 326 F.R.D. at 606;

*Krommenhock*, 334 F.R.D. at 576. For this independent reason, his conjoint surveys are unreliable and should be excluded.

**C. Dr. Singer's Overbroad Surveys Do Not Fit The Facts Or Theory Of This Case**

Dr. Singer's WTA conjoint surveys not only lack reliability in their own right, but they also lack relevance because they do not fit the facts of this case. A damages model that fails to translate "the legal theory of the harmful event into an analysis of the economic impact of that event" is not relevant and cannot support class certification. *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013); *see also Kamakahi*, 305 F.R.D. at 176.

Plaintiffs again try to dismiss Meta's arguments, now minimizing them as "technical inadequacies" and mere "critiques about the wording of Dr. Singer's surveys" that go to weight, rather than admissibility. Opp. at 15. Both cases plaintiffs rely on are inapposite. Plaintiffs point to *BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1276 (9th Cir. 2024), to say that survey evidence "should be admitted as long as [it is] conducted according to accepted principles"—i.e., is reliable—"and [is] relevant." Opp. at 15 (alterations in original). But this does not alter the threshold reliability and relevance requirements of Rule 702 for survey opinions, and each is an independent basis to exclude Dr. Singer's opinions in this case. *BillFloat*, 105 F.4th at 1276.[5] Meanwhile, the surveys relevant to *In re JUUL Labs* tested only a "small subset" of plaintiffs' larger "theory of liability at the heart of the claims." *In re JUUL Labs*, 609 F. Supp. 3d at 973-75. Here, unlike in *BillFloat* and *JUUL Labs*, there is a complete mismatch: plaintiffs' proposed classes and alleged liability theories are *different from* what Dr. Singer's surveys tested. *See* Mot. at 11-14.

In these circumstances, courts *do* exclude survey experts, or find those experts' opinions do not support certification, under *Comcast's* requirement that damages models measure "only those damages attributable" to plaintiffs' theory of liability and nothing more. *Comcast*, 569 U.S. at 28. *Davidson v. Apple, Inc.* is illustrative. 2018 WL 2325426, at *23 (N.D. Cal. May 8, 2018).

---

[5] Moreover, the "technical inadequacies" in that case related to "the respondent universe," lack of "separate control group," and "control stimuli." *BillFloat*, 105 F.4th at 1276. To be sure, Dr. Singer's surveys do suffer from some of the same shortcomings here, but Meta is not seeking exclusion on those bases. *See generally* Mot.

There, the expert's survey asked about a broad generic defect rather than the specific touchscreen defect alleged. *Id.* The court found that the expert's opinions did not support certification because the survey had assumed that respondents would value the defects equally but failed to isolate damages attributable to only the specific theory of liability alleged. *Id. Davidson* is not alone. In *McMorrow v. Mondelēz Int'l, Inc.,* the conjoint expert was excluded because their survey could not isolate "whether the respondents would pay a price premium because the product is advertised as being 'nutritious,'" or because it is "advertised as providing 'steady energy,' or a combination of the two." 2020 WL 1157191, at *1 n.2 (S.D. Cal. Mar. 9, 2020). The same result follows when a conjoint expert's survey provided overbroad information to respondents so could not isolate the harm from only the theory alleged. *See In re Volkswagen*, 500 F. Supp. 3d at 949-50. Like the surveys in *Davidson*, *McMorrow*, and *In re Volkswagen*, Dr. Singer's surveys test theories that are broader than plaintiffs' allegations and so fail to isolate damages attributable to the specific theory of liability in this case.[6]

***Dr. Singer's surveys do not match plaintiffs' case theories.*** Plaintiffs deny that Dr. Singer tested survey respondents' "valuation of Meta's use of their data." as opposed to merely valuing the alleged data collection. Opp. at 17. Plaintiffs are mistaken: Dr. Singer told respondents no fewer than four times that Meta would "use" their data, not only "collect" it. From the start respondents were told they had been "selected to participate in a survey about **data collection and use,**" Singer Rpt. at 81, 120, 157 (emphasis in original), and the survey "will tell you more about data collection *and use* on Facebook," *id.* at 82, 121, 158. The sole purpose of some survey screens was to describe how "**Meta uses the information it collects from partners**") (emphasis in original). *Id.* at 86, 125, 162. Respondents could not advance in the survey until they confirmed they "understand what data Meta collects from partners and *how Meta uses this information.*" *Id.*

---

[6] Plaintiffs fault rebuttal expert Dr. Hauser for not "run[ning] his own survey to quantitatively test whether revised descriptions would have had any effect on the results." Opp. at 16. No such requirement exists. It is well established that rebuttal experts are not required to "conduct independent alternative opinions or investigations." *RingCentral, Inc. v. Nextiva, Inc.*, 2021 WL 12171869, at *4 (N.D. Cal. June 25, 2021); Fed. R. Civ. P. 26(a)(2)(D)(ii). Other courts evaluating the experts rebutting Dr. Singer's surveys have held the same. *See In re Univ. of S. Cal. Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d 1128, 1153 (C.D. Cal. 2023) (rejecting plaintiffs' argument that rebuttal expert must field his own survey to show the impact of his critiques of Dr. Singer's survey).

at 87, 126, 163. Dr. Singer cannot claim to have isolated only the impact of collection. Survey literature finds that respondents do not compartmentalize background framing, on the one hand, and responding to choice-task questions, on the other hand—the former influences the latter. Hauser Rpt. ¶ 91. After informing respondents they would be evaluating how their data would be "collected and used," respondents' selections cannot be separated from that framing. *See* Hauser Rpt. ¶ 89; Ex. 37 at 29:1-11, 30:6-18 ("You really just can't take these – these words [Access and No Access] in isolation."), 31:6-20 ("Q. I'm asking you, in determining what the words "access" or "no access" mean in the survey, can you identify anything else in Dr. Singer's survey other than what is on page 92 that's relevant? A. The entire survey is relevant. . . . A definition cannot be taken in isolation. It's within the context."). Plaintiffs could have defined the scope of their proposed classes to include both receipt and use of data, but they elected not to. Class Cert. Mot. at 13 (Dkt. 1154-3). Their damages model must do the same. *See Davidson v. Apple, Inc.,* 2019 WL 2548460, at *13 (N.D. Cal. June 20, 2019).

Plaintiffs and Dr. Singer also had the ability to include the full Meta Privacy Policy in the Attributes module if they believed, as they now claim, it was necessary for context and enhanced realism. Opp. at 17. But including only some and not all of that policy, and not including "context" about what and how many other companies are collecting their same At-Issue Data, affects results. *See* Hauser Rpt. ¶ 98-99. Courts find that such omissions can improperly inflate damages calculations. *See Davidson*, 2019 WL 2548460, at *14.

***Dr. Singer's surveys broaden descriptions of the At-Issue Data beyond plaintiffs' proposed class definitions.*** Similarly, while plaintiffs argue the differences between their proposed class definitions and the information categories tested in Dr. Singer's surveys are minimal, they do not dispute that there are differences. Opp. at 15, 18-20; Mot. at 11-12. Whether they are minimal or meaningful is unknown,[7] because Dr. Singer did not test the *actual* information

---

[7] Plaintiffs claim that new surveys designed by Dr. Singer after Meta filed the Motion "made no difference" to Dr. Singer's conclusions, even after purportedly correcting for some of the deficiencies identified by Dr. Hauser and Meta, including around plaintiffs' theory of the case. Opp. at 16, 19-20; Singer Reply Rpt. ¶¶ 12-14. But neither Meta nor Dr. Hauser have had an opportunity to analyze these late results, and the new surveys as well as plaintiffs' reliance on them should be ignored as improper rebuttal. *See infra* at Section D.

plaintiffs claim was unlawfully disclosed for each proposed class. Instead, he provided broader and different data sets than those at issue. Mot. at 11-12.

It is plaintiffs who determined how to define their proposed classes. In fact, plaintiffs' complaint listed some of these additional categories of information, but—critically—their proposed class definitions do not. First Am. Consol. Class Action Compl. ¶ 6 (Dkt. 335) (including, for example, "symptoms," "diagnoses," and prescription "side effects"); *id.* ¶ 353 (originally alleging a class definition broadly based on "health information"). The very fact that plaintiffs elected to remove these additional information types from those listed in the proposed class definitions they seek to certify shows the words have separate meanings. *See, e.g., Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) ("[M]ention of one matter implies the exclusion of all others.").

Dr. Singer has admitted he cannot apportion out the value respondents place on one activity or word versus another. Ex. 11 at 342:17–343:16. This alone breaks the necessary link between plaintiffs' theory of liability and the harm being measured from that theory. *See Davidson*, 2019 WL 2548460, at *17.[8] For this reason too, Dr. Singer's surveys must be excluded.

**D. Dr. Singer's New Opinions Should Be Excluded.[9]**

Finally, after the Motion was filed, plaintiffs filed the Reply Report, where Dr. Singer offers three new surveys fielded after the initial report and two new analyses based on his original data, none of which was included in his original report despite being based on data and information available at that time. Singer Reply Rpt. ¶¶ 1 n.4, 12–14, 25, App. 2–7 (new surveys); *id.* ¶¶ 63(f), 78–86 (new analyses). But "new analysis is not proper rebuttal." *City & Cnty. of San Francisco*

---

[8] Plaintiffs emphasize that the *In re Boston University COVID-19 Refund Litigation* court did "not mean to impugn the thoroughness or reasonableness" of Dr. Singer's analysis or to "imply that he does not accurately calculate what he set out to measure." Opp. at 18. This does not change the fact that someone can be thorough and overbroad at the same time. *In re Bos. Univ. COVID-19 Refund Litig.*, 2023 WL 2838379, at *3 (D. Mass. Apr. 7, 2023). As relevant here, Dr. Singer's surveys improperly aggregated two "distinct and separate" theories (separate breach of contract claims for an alleged failure to provide in-person instruction and to provide access to campus facilities) and exclusion was warranted because value could not be apportioned to each individual theory. *Id.* at *2. In contrast, the plaintiffs in *In re University of Southern California* alleged only one breach of contract claim so measuring harm attributable to the full theory was appropriate. *In re Univ. of S. Cal. Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d at 1150.

[9] Dr. Singer's new opinions are also the subject of Meta's Objection to Reply Evidence (Dkt. 1334).

*v. Purdue Pharma L.P.*, 2022 WL 1203075, at *1 (N.D. Cal. Apr. 22, 2022); *see also Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1027–28 (C.D. Cal. 2018) (striking new survey conducted after defendant's expert identified flaws in original survey); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *6–8 (N.D. Cal. Dec. 15, 2014) (striking "new regression analysis that attempted to address some of the criticisms" by another expert). While Dr. Singer claims his new analyses are designed to address Dr. Hauser's criticisms, Rule 26 does not allow an expert to "respond[] to an identified omission in [their] report by performing a new analysis." *Purdue Pharma L.P.*, 2022 WL 1203075, at *1. These new analyses should be excluded outright as improper rebuttal. Alternatively, these new surveys and analyses should be excluded on their merits because they are based on the same unsupported and unreliable WTA conjoint methodology. *See supra* at Sections A-B.

Separately, Dr. Singer's Reply Report also addresses Dr. Tadelis's affirmative opinions regarding website user engagement. Singer Reply Rpt. ¶¶ 107-112. Dr. Singer has demonstrated no "experience, training, or education" whatsoever in the field of website user engagement. Fed. R. Evid. 702; *see* Singer Rpt. at Appx. 1, p.46. Nor does he rely on any academic literature to support his assertions. Singer Reply Rpt. ¶¶ 107-112. These out-of-scope and unqualified musings should be excluded. *See, e.g.*, *Maldonado*, 2021 WL 1947512, at *17-18 (excluding chemical/nuclear engineer's opinions regarding "reliability engineering" after rejecting the argument that "the principles he opines about are common between his field and this one"); *Opticurrent, LLC v. Power Integrations, Inc.*, 2018 WL 6727826, at *14 (N.D. Cal. Dec. 21, 2018) (excluding opinion where expert lacked relevant qualifications).

## III. CONCLUSION

For the foregoing reasons and those in the Motion, the Court should exclude Dr. Singer's opinions in full.

Dated: April 21, 2026

Respectfully submitted,

**LATHAM & WATKINS LLP**

By */s/ Melanie M. Blunschi*
Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Andrew B. Clubok (*pro hac vice)*
*andrew.clubok@lw.com*
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

Marissa Alter-Nelson (*pro hac vice*)
*marissa.alter-nelson@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: + 1.212.906.1200

Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1.424.653.5500

**GIBSON, DUNN & CRUTCHER LLP**
Lauren R. Goldman (*pro hac vice*)
*lgoldman@gibsondunn.com*
Darcy C. Harris (*pro hac vice*)
*dharris@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone: +1.212.351.4000

Elizabeth K. McCloskey (Bar No. 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (Bar No. 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: +1415.393.8200

*Attorneys for Defendant Meta Platforms, Inc.*