Jason 'Jay' Barnes, State Bar No. 362776
*jaybarnes@simmonsfirm.com*
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel: 212-784-6400
Fax: 212-213-5949

Geoffrey Graber, State Bar No. 211547
*ggraber@cohenmilstein.com*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699

Jeffrey A. Koncius, State Bar No. 189803
*koncius@kiesel.law*
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel: 310-854-4444
Fax: 310-854-0812

Andre M. Mura, State Bar No. 298541
*amm@classlawgroup.com*
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.: 510-350-9700
Fax: 510-350-9701

Beth E. Terrell, State Bar No. 178181
*bterrell@terrellmarshall.com*
**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: 206-816-6603
Fax: 206-319-5450

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE META PIXEL HEALTHCARE LITIGATION

This Document Relates To:

All Actions

Case No. 3:22-cv-03580-WHO (VKD)

**PLAINTIFFS' RESPONSE TO META'S DEMONSTRATIVE PROVIDED AT THE JUNE 12, 2026 HEARING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Hon. William H. Orrick

**REDACTED**

At the hearing on June 12, 2026, Defendant Meta Platforms, Inc., introduced a new demonstrative exhibit that it had not previously provided to Plaintiffs. *See* ECF No. 1388. The Court accepted the demonstrative but permitted Plaintiffs to file a response to the information contained in the demonstrative by Wednesday, June 17, 2026. ECF No. 1386. Please find Plaintiffs' response attached.

DATED: June 17, 2026

Respectfully submitted,

By: */s/ Jay Barnes*
**SIMMONS HANLY CONROY LLP**
Jason 'Jay' Barnes, State Bar No. 362776
*jaybarnes@simmonsfirm.com*
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel: 212-784-6400
Fax: 212-213-5949

By: */s/ Geoffrey Graber*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
Geoffrey Graber, State Bar No. 211547
*ggraber@cohenmilstein.com*
1100 New York Avenue NW, Fifth Floor
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
*koncius@kiesel.law*
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel: 310-854-4444
Fax: 310-854-0812

**TERRELL MARSHALL LAW GROUP PLLC**
Beth E. Terrell, State Bar No. 178181
*bterrell@terrellmarshall.com*
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: 206-816-6603

Fax: 206-319-5450

**GIBBS MURA LLP**
Andre M. Mura, State Bar No. 298541
*amm@classlawgroup.com*
1111 Broadway, Suite 2100
Oakland, CA 94607
Tel.: 510-350-9700
Fax: 510-350-9701

*Attorneys for Plaintiffs and the Proposed Class*

**SIGNATURE ATTESTATION**

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from its other signatories.

*/s/ Andre M. Mura*
Andre M. Mura

| Patient Status Button Click Class | | | |
|---|---|---|---|
| **Button-Click Data** | **Patient Status** | **Data Reflects Own Health Status** | **No Express or Implied Consent** |
| Class membership determinable through objective, classwide proof: (1) the Provider List (ECF 1377) identifies about 5,000 HIPAA-covered HCPs that used the Pixel; (2) the [redacted] table (which goes back 10 years) shows the time period the Pixel was firing from each website (Shafiq Rebuttal, ¶¶ 64-66); and (3) the Pixel sent button click data on 99.6% of healthcare provider websites because the default automatic events setting (Shafiq Rebuttal ¶ 36).<br><br>Each named plaintiff clicked on one of four types of patient status buttons (patient portal, medical appointment, bill payment, or diagnostic assessment) on Provider List website. *See* ECF 1377-3 (listing Rush [Row 2069]; WakeMed [Row 2071]; Providence [Row 3808]; Kaiser [Row 1888]; Medstar [Row 2741]); Ex. 74 at 19 (Doe I); Ex. 12 at 1 (Doe IV); Ex. 76 at 18 (Doe V); Ex. 77 at 17 (Doe IX); Ex. 78 at 19-20 (Doe X); Ex. 79 at 18 (Doe II); Ex. 80 at 18 (Doe III).<br><br>Although arguably unnecessary, each named plaintiff also corroborated button clicks through patient portal activity logs, which all Provider List HCPs maintain pursuant to federal law for a minimum of six years. | No attestation necessary to show patient status because "the act of clicking the [PSBC] button, when coupled with the [HCP] URL and the other information transmitted by the Pixel, sufficiently identifies the website user as a patient." *See* ECF 159 at 13. Patient status is thus HIPAA PHI. *See id*.<br><br>For any portion of the class period for which Meta has not preserved button click data, class member can attest that they clicked one of four patient status buttons on a Provider List HCP or, *if the Court requires*, submit portal or appointment request records. | Contrary to Meta's chart, there is no evidence that *any* named plaintiff logged into a Provider List HCP for anyone outside their family; and no evidence that any plaintiff device was used by anyone outside of patient's relatives and household members. Only Doe V testified that she logged into a patient portal for her mother.<br><br>**Doe I** testimony that Meta cites is not about button clicks: "Possibly" looked up a "phone number" for father on provider website. A2-307. Doe I states she logged in. Ex. 74 at 19.<br>**Doe II** denied knowledge that husband logged into portal on plaintiff's device. A2-573–574. States he logged into his portal. Ex. 79 at 18.<br>**Doe III** states he logged into patient portal. Ex. 80 at 18. Meta cites to a portion of Doe III's deposition that is not in the record, but which does not suggest that he clicked on a button for anyone else.<br>**Doe IV** testimony that Meta cites is not about button clicks; she denied searching on behalf of "non-family members." A2-451**.** Doe IV states she logged into patient portal. Ex. 12 at 1.<br>**Doe V** stated she logged into patient portal Ex. 76 at 18. Logged in for mother, which falls within HIPAA protection. *See* A2-533.<br>**Doe IX** states she logged into patient portal. Ex. 79 at 18. Meta cites to a portion of Doe IX's deposition that is not in the record, but which does not suggest that she clicked on a button for anyone else.<br>**Doe X** testimony that Meta cites is not about button clicks. A2-362–364, -411. Doe X states she logged into her patient portal. Ex. 80 at 20.<br><br>Regarding **Doe V**, HIPAA protects information relating to medical care of relatives and household members. *See* Reply at 6-7 (citing 45 C.F.R. § 164.514(b)(2)(i)); *see Doe I v. Google LLC*, 2025 WL 1616720, at *2 (N.D. Cal. June 6, 2025) (HIPAA governs acquisition of health information that is identifiable even if an individual is not actually identified); Cohen ¶ 104 (even misclassification is a privacy harm).<br><br>Plaintiffs need not prove a HIPAA violation to prevail. Reply at 1-3. | Neither HCP provider policies nor posting on Facebook show class members expressly or impliedly consented to Meta's interception of their health information.<br><br>For data protected by HIPAA—here, the four types of button clicks that reveal patient status—consent must be obtained via a signed HIPAA authorization. *See* Mot. at 20. Consent to share protected health information (PHI) from a HIPAA-covered HCP, however, cannot be obtained through or implied from website privacy policies. *See id*. (citing Cohen Report ¶¶ 135-36, discussing HHS Bulletin on Use of Online Tracking Technologies); 45 C.F.R. § 164.508; 42 U.S.C. § 1320d-6. Thus, website privacy policies are legally irrelevant for HIPAA-protected health information. It is undisputed that no class members executed a valid HIPAA authorization for her PHI to be sent to Meta. Consequently, Meta has not carried its burden of establishing consent.<br><br>Even if such data were not protected by HIPAA, there is still no express or implied consent for the reasons summarized on next page in Patient Health Information Class chart.<br><br>Voluntarily posting on Facebook or a blog does not manifest consent to wiretapping, device intrusion, or privacy invasion on a patient's HCP website. *See* Reply at 16.<br><br>**Doe IV:** Prescription drug websites definitionally are not a part of the PSBC Class, which is limited to HIPAA-covered entities, Mot. at 13, and has been further limited to hospitals, doctors, and mental health providers. *See* ECF 1377-3.<br><br>**Doe X:** Adventist's policy language is irrelevant if information is HIPAA PHI; additionally, policy does not provide actual disclosure. *See* Patient Health Information Class chart. |

| Patient Health Information Class | | | |
|---|---|---|---|
| **Event Data from Provider?** | **Patient Status** | **Data Reflects Own Health Status** | **No Express or Implied Consent** |
| Meta is wrong that Plaintiffs have insufficient data to show that longform URLs were obtained from their class providers. Plaintiffs can use HCP provider list and [redacted] to confirm dates Pixel fired from specific HCP websites. Recall that the Pixel collected full-string URLs by default. *See* Shafiq Report ¶ 39. Meta has supplied no evidence that any hospital changed their Pixel's configurations to prevent full string URLs from being sent.<br><br>If needed, class members can attest that they visited a particular HCP website during the period confirmed by [redacted] table. | Event data does not reflect patient status itself; class members will attest that they were a patient of a particular provider starting at a particular date.<br><br>As with PSBC Class, Meta does not contest that any named plaintiff was a patient of their stated provider. | Meta surmises that named plaintiffs visited HCP websites to search for information that does not relate to their status as patients but instead related to family members or non-family members. This ignores that the class is defined to include *only* longform URL communications of a *patient*'s own provider. Also, HIPAA protections for patients extend to family members, including for longform URLs. HIPAA aside, Meta commonly promises to block even "potentially sensitive health-related data." *See* Pls' Exs. 14, 45, 63, 65, 70, 71, 81, 110 and Meta Exs. 1 and 230. There is no evidence that expectations of privacy in communications shared with the class member's own HCP that reveal doctors, conditions, or treatments would be different in any way even if they relate to another's care.<br><br>Plaintiffs need not prove a HIPAA violation. Reply at 1-3. | **No HCP privacy policy discloses Meta's particular conduct:** No provider policy discloses that the provider will share identifiable health information with Meta that Meta associates with a Facebook account; all include language to the contrary. *See* Reply at 9-10; *Flo Health*, 349 F.R.D. 557, 571 (N.D. Cal. 2025) (citing *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023)). All provider policies are *materially* the same for the question of actual disclosure, and there will be a common question whether disclosures of cookies and tracking *generally* gives sufficient notice of the particular conduct—specifically, identifiable information is paired with health information for Meta to score and place in a secret user profile for Meta's commercial gain. *See* Reply at 12-14.<br><br>**No implied consent even if policies actually disclosed that health info plus identifiers would be shared with Meta:** Meta promises to block even potentially sensitive health information. This informs what a reasonable person would understand from HCP policies that disclose general tracking. An HCP website's statement about what it might do cannot be read in isolation, but rather must be understood in light of Meta's express, common contract privacy statements, including that Meta will employ "advanced technical systems to detect potential misuse of [Meta's] products" (Ex. 63), and that Meta will block even "potentially sensitive health related-data" (Ex. 81). *See* Reply at 11-12 (citing *Calhoun v. Google LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024 ("[T]he circumstances, considered as a whole, [must] demonstrate that a reasonable person [would have] understood that [the] action[s] would be carried out."), and *Torres v. Prudential Fin. Inc.*, 2024 WL 4894289, at *4 (N.D. Cal. Nov. 26, 2024) (same, certifying class)). Given that a reasonable consumer would understand that Meta would block any potentially sensitive health data sent to Meta, even an HCP's actual disclosure (that it tracks health information paired with identifiers) would not be enough to create predominating individualized issues, because claims do not resolve differently among the class. *See True Health Chiro., Inc. v. McKesson Corp.*, 896 F.3d 923, 931-32 (9th Cir. 2018) (cited in Reply at 8); *Van*, 61 F.4th at 1067 (defendant must "provide sufficient evidence that the individualized issues *bar recovery* on at least some claims" (emphasis added)); *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *18 (N.D. Cal. Oct. 27, 2016) (finding implied consent defense did not defeat predominance because there was a "dearth of evidence" of actual notice and defendant "actively tried to hide" the offending conduct).<br><br>**Implied consent is not a defense to contract claims and has "no place" when consent procured by contract.** Reply at 9-11. Extrinsic evidence "at variance with the written agreement … cannot serve to … alter the obligations under the agreement." *See* Reply at 9-11.<br><br>**The existence of HIPAA and medical ethics standards create common patient expectations of privacy for which a website privacy policy is insufficient to obtain consent for *Meta's* at-issue conduct.** Cohen Rep. ¶¶ 118-141. Even inaccurate information, if it creates a reasonable basis to identify a person, is protected by HIPAA. *See* Reply at 6 (citing Ex. 81; Cohen Report ¶ 104).<br><br>**Meta should not be permitted to raise predominance issues *across* classes by comparing HCP privacy policies with prescription drug websites' privacy policies.** Pharmaceuticals companies like Gilead are not HIPAA-covered entities and may have different disclosures as differently regulated entities that have different relationships with website visitors than HIPAA-covered HCPs.<br><br>**Doe IV:** See PSBC Class chart response—Doe IV's communications with Biktarvy are not part of the Patient Health Information Class.<br>**Doe IX:** Adventist Health's privacy policy, like all others, does not actually disclose the material information: that Meta collects individually identifiable information, pairs to individual user profiles, scores it, and uses it for commercial gain. *See* A8-2611-2612 ("Cookies in and of themselves do not personally identify users" … "Adventist Health will not … trade your PII to third parties for their own direct marketing use unless we receive your express consent to do so."). |

| Prescription Drug Information Class | | | |
|---|---|---|---|
| **Drug Website Data** | **Active Prescription** | **Data Reflects Own Health Status** | **No Express or Implied Consent** |
| Meta gives three pincites to Doe IV's interrogatory responses (A7-1773, -1776, -1778), but those citations say nothing about "her event data."<br><br>If Meta did not preserve the URLs that would show what actions Doe IV took on www.biktarvy.com, Plaintiffs can refer to [redacted] to determine when there was a Pixel on that domain and cross-reference against when Doe IV attests she visited. | Doe IV testified that she did visit the website *after* she obtained a prescription for Biktarvy, so there is no dispute of fact for the jury for those communications. | Meta did not challenge this for Doe IV.<br><br>For absent class members, prescription status can be shown by (1) affidavit; or, if the Court deems it necessary, (2) proof of a valid prescription. | See Patient Health Information Class chart, same reasoning: no actual disclosure, and Meta's promises to block even potentially sensitive health information means a reasonable consumer would understand that Meta would *not* have access to their prescription drug information paired with identifiers. *See Calhoun*, 113 F.4th at 1147.<br><br>Gilead's 2024 Consumer Health Data policy states that it uses health information in marketing only "[a]s permitted under applicable law" and "in accordance with applicable law"—but the CMIA requires signed authorization before a pharmaceutical company discloses individually identifiable "medical information." *See* Cal. Civ. Code § 56.05(j)(1) (defining "medical information"); *id.* at § 56.102(b) (indicating pharmaceutical companies must obtain valid authorizations to share medical information); *id.* at § 56.11 (describing valid authorizations). |