# Public Version of Defendant Meta Platforms, Inc.'s Opposition to the Motion for Class Certification

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

**LATHAM & WATKINS LLP**
ANDREW B. CLUBOK (*pro hac vice*)
andrew.clubok@lw.com
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200

MELANIE M. BLUNSCHI, SBN 234264
melanie.blunschi@lw.com
KRISTIN I. SHEFFIELD-WHITEHEAD, SBN 304635
kristin.whitehead@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 395-8129
Facsimile: (415) 393-8095

*Attorneys for Defendant Meta Platforms, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE META PIXEL HEALTHCARE LITIGATION

This Document Relates To:

All Actions

Case No. 3:22-cv-03580-WHO

**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**FILED UNDER SEAL**

Date: April 22, 2026
Time: 2:00 p.m.
Courtroom 2, 17th Floor

Date Action Filed: June 17, 2022
Honorable William H. Orrick III

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

BACKGROUND ..... 3

- A. Meta's Business Tools allow web and app developers to share data with Meta. ..... 3
- B. Healthcare providers can lawfully incorporate the Business Tools on their websites and apps, and Meta works hard to avoid receiving or using any sensitive data. ..... 4
- C. Plaintiffs sue Meta over its alleged receipt of data from their healthcare providers, and this Court allows claims based on protected health information from hospitals to proceed. ..... 6
- D. Plaintiffs seek certification of four classes encompassing more than 650,000 websites and apps. ..... 6

LEGAL STANDARD ..... 7

ARGUMENT ..... 7

- I. Individualized issues predominate over common issues. ..... 7
  - A. Plaintiffs cannot prove classwide that every web and app developer sent each class member's protected health information to Meta. ..... 7
  - B. Whether users consented to share information with Meta is an individualized issue. ..... 16
  - C. Plaintiffs' evidence of Meta's intent and knowledge varies from developer to developer, from data to data, from tool to tool, and over time. ..... 21
  - D. There are numerous other claim-specific individualized issues. ..... 23
  - E. Plaintiffs' damages theories require additional individualized inquiries. ..... 27
- II. Plaintiffs' proposed classes expand the case beyond the limits this Court imposed and do not present a "superior" method of adjudication. ..... 29
- III. An injunctive-relief class cannot be certified. ..... 30

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

## Cases

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) .......... 30

*In re Apple iPhone Antitrust Litig.*,
2025 WL 3124160 (N.D. Cal. Oct. 27, 2025) .......... 13

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) .......... 19

*Backhaut v. Apple Inc.*,
2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) .......... 19

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 18

*Bliss v. CoreCivic, Inc.*,
711 F. Supp. 3d 1233 (D. Nev. 2024) .......... 19, 27

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) .......... 26

*Brown v. Google, LLC*,
2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) .......... 19

*Byrd v. Aaron's, Inc.*,
2017 WL 4326106 (W.D. Pa. Aug. 4, 2017) .......... 13

*Cahen v. Toyota Motor Corp.*,
717 F. App'x 720 (9th Cir. Dec. 21, 2017) .......... 13

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .......... 16, 18

*Campbell v. Facebook Inc.*,
315 F.R.D. 250 (N.D. Cal. 2016) .......... 17, 27

*Cole v. Quest Diagnostics Inc.*,
2025 WL 3172640 (3d Cir. Nov. 13, 2025) .......... 9, 14

*Colman v. Theranos, Inc.*,
325 F.R.D. 629 (N.D. Cal. 2018) .......... 29

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 27, 28

*Cotter v. Lyft, Inc.*,
60 F. Supp. 3d 1059 (N.D. Cal. 2014) .......... 25

*Daghaly v. Bloomingdales.com, LLC*,
2024 WL 5134350 (9th Cir. Dec. 17, 2024) .......... 26

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Davidson v. Hewlett-Packard Co.*,
2021 WL 4222130 (N.D. Cal. Sept. 16, 2021) ..... 20

*DellaSala v. Samba TV, Inc.*,
2025 WL 3034069 (N.D. Cal. Oct. 30, 2025) ..... 24, 25

*Doe I v. Google LLC*,
2025 WL 1616720 (N.D. Cal. June 6, 2025) ..... 21, 22

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) ..... 10

*Doe v. GoodRx Holdings, Inc.*,
No. 3:23-cv-00501-AMO (N.D. Cal. July 31, 2024) ..... 29

*Doe v. MedStar Health, Inc.*,
2023 WL 4931348 (Md. Cir. Ct. Mar. 10, 2023) ..... 11, 15, 29

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ..... 23

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. May 19, 2025) ..... 25, 26

*In re Google Inc. Cookie Placement Privacy Litig.*,
806 F.3d 125 (3d Cir. 2015) ..... 26

*In re Google Inc. Gmail Litig.*,
2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ..... 17, 19, 20

*In re Google RTB Consumer Priv. Litig.*,
2024 WL 2242690 (N.D. Cal. Apr. 4, 2024) ..... 17, 19, 25

*Griffith v. TikTok, Inc.*,
2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ..... 14, 15, 26

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) ..... 16, 18

*Hart v. TWC Prod. & Tech. LLC*,
2023 WL 3568078 (N.D. Cal. Mar. 30, 2023) ..... 20

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2006) ..... 21

*Hill v. NCAA*,
7 Cal. 4th 1 (1994) ..... 20

*Hill v. Workday, Inc.*,
773 F. Supp. 3d 779 (N.D. Cal. 2025) ..... 9

*Huntsman v. Southwest Airlines Co.*,
2021 WL 391300 (N.D. Cal. Feb. 3, 2021) ..... 7

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Katz-Lacabe v. Oracle Am., Inc.*,
2023 WL 2838118 (N.D. Cal. Apr. 6, 2023) ....................23

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006)....................24

*L.B. v. LinkedIn Corp.*,
2025 WL 2899514 (N.D. Cal. Oct. 10, 2025)....................17, 18

*M.D. v. Google LLC*,
2025 WL 2710095 (N.D. Cal. Sept. 23, 2025)....................17, 18

*Matthew Enter. v. Chrysler Grp.*,
2016 WL 2957133 (N.D. Cal. May 23, 2016) ....................11

*McDaniel v. Meta Platforms, Inc.*,
Case No. 21-cv-383231 (Cal. Super. Ct. Dec. 30, 2024) ....................13

*In re Meta Healthcare Pixel Litig.*,
713 F. Supp. 3d 650 (N.D. Cal. 2024) ....................6, 12, 27

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................6, 16, 24, 30

*Mikulsky v. Bloomingdale's LLC*,
713 F. Supp. 3d 833 (S.D. Cal. 2024) ....................26

*Mikulsky v. Noom, Inc.*,
2024 WL 251171 (S.D. Cal. Jan. 22, 2024) ....................13

*Miller v. Elam*,
2011 WL 1549398 (E.D. Cal. Apr. 21, 2011)....................19

*Nguyen v. BDO Seidman, LLP*,
2009 WL 7742532 (C.D. Cal. July 6, 2009) ....................30

*O'Connor v. Uber Techs., Inc.*,
58 F. Supp. 3d 989 (N.D. Cal. 2014) ....................25

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023)....................18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)....................7

*Oman v. Delta Air Lines, Inc.*,
889 F.3d 1075 (9th Cir. 2018)....................25

*Planned Parenthood Fed'n of Am., Inc. v. Newman*,
51 F.4th 1125 (9th Cir. 2022)....................24

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025)....................13

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Rabin v. Google LLC*,
787 F. Supp. 3d 934 (N.D. Cal. 2025) ....... 30

*RJR Nabisco, Inc. v. European Cmty.*,
579 U.S. 325 (2016) ....... 25

*Roe v. Amgen Inc.*,
2024 WL 2873482 (C.D. Cal. June 5, 2024) ....... 24

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) ....... 17, 18

*Smith v. City of Oakland*,
2008 WL 2439691 (N.D. Cal. June 16, 2008) ....... 30

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ....... 12

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ....... 6, 12, 16, 18

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ....... 28

*Sullivan v. Oracle Corp.*,
51 Cal. 4th 1191 (2011) ....... 24

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006) ....... 30

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....... 7, 21

*Webb v. Smart Documents Sols., LLC*,
499 F.3d 1078 (9th Cir. 2007) ....... 18

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) ....... 26

*Zinser v. Accufix Rsch. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) ....... 30

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ....... 26

**Statutes**

18 U.S.C. § 2511 ....... 21, 23

Cal. Civ. Code § 56.05 ....... 8

Cal. Penal Code § 631 ....... 6, 21, 24, 25, 26

Cal. Penal Code § 632 ....... 6

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**Rules**

Fed. R. Civ. P. 23 .......... 7, 30

Fed. R. Civ. P. 37 .......... 11

Fed. R. Civ. P. 50 .......... 8

**Regulations**

45 C.F.R. § 160.103 .......... 8

## INTRODUCTION

Plaintiffs ask this Court to certify four sprawling classes encompassing millions of people who sent data to more than 650,000 websites and apps. Plaintiffs' request is unprecedented: no class like the ones they propose has ever been certified. And it is utterly unmanageable. There are numerous cases around the country involving a *single* web or app developer's use of Meta's Business Tools. Some of those cases have been dismissed on the pleadings; others are still in the discovery phase; still others have been thrown out on summary judgment; and one recently went to a seven-day jury trial. In each case, courts have carefully considered the language of the developer's privacy policies, how the developer configured the Business Tools, what data was sent to Meta, what actions users took (and whether they did so on their own behalf), what disclosures users saw or agreed to, and an array of other developer-specific and user-specific facts. The notion that this could be done for hundreds of thousands of developers and millions of users at once blinks reality. Plaintiffs' motion should be denied.

*First*, individualized issues for every developer and every class member will predominate. Take the most basic element of plaintiffs' claims: proving Meta received a particular class member's protected health information. That alone will require plaintiffs to navigate a matrix of interrelated developer- and user-specific issues. First, as plaintiffs admit, they would need to prove the relevant developer is covered under HIPAA or the Confidentiality of Medical Information Act (CMIA). But many of the developers in the lists plaintiffs provide are clearly *not* covered under those laws—among them a wedding website, a Mumbai-based IT services company, and a bar in San Diego—and it recently took an entire trial to figure out whether a *single* app developer was covered under the CMIA (the answer was no). Second, plaintiffs would need to prove that the developer sent data about the class member to Meta—which will require answering individualized questions both about the particular developer (like whether, when, and how it configured Meta's Business Tools) and about the particular class member (like what actions they took on the website or app), as well as questions about whether Meta's systems prevented receipt or use of the data. Third, assuming Meta *did* receive any data about this person from a HIPAA- or CMIA-covered provider, plaintiffs would need to prove that the person was a patient of that provider when the data was sent—something the data itself (which is available only for a portion of the class period) does not reveal on its own. Fourth, plaintiffs would need to prove

that the data was matched to the class member's Facebook profile, which again turns on both developer-specific facts (like what matching settings they used) and user-specific facts (like their browser and Facebook account settings). Only then would plaintiffs finally reach the crux of the matter: proving that the data at issue actually conveyed the class member's own protected health information. This would have to be repeated for each potential class member, for each of the websites and apps they used.

And that is just the start. Plaintiffs must litigate consent, an issue that has featured prominently in this case and others involving Meta's Business Tools. This inquiry, too, will require developer-specific and user-specific analyses. Other courts, after parsing the language of individual developers' privacy policies, have dismissed claims (including claims involving health information) based on the developer's disclosures. There would be no manageable way for this Court or a jury to consider hundreds of thousands of disclosures, including their changes over time, en masse. Every class member also could have consented by learning about the alleged data-sharing at issue from publicly available sources (like news articles or even this lawsuit), or by sharing their health information with Meta directly by posting it on Facebook or Instagram (as many plaintiffs did). And all this is still just the beginning—every class member will need to confront additional individualized issues like intent, damages, and a litany of claim-specific elements. Resolving this intertangled matrix of issues for hundreds of thousands of developers and millions of potential class members all at once is impossible, and blending these issues together would violate Meta's due process rights and the Rules Enabling Act.

*Second*, plaintiffs' proposal blows past the limits this Court imposed and is not a superior way to adjudicate the case. This Court and another following its lead have held that consolidating cases involving telehealth providers, prescription drug companies, and apps would be unnecessary and inefficient. Plaintiffs include those entities in their classes anyway. This case also raises novel issues ill-suited for class treatment, and the high damages plaintiffs seek are enough to spur individual suits.

*Third*, there is no basis or need for an injunctive-relief class. Money, not an injunction, is the clear focus of plaintiffs' claims. And in any event, injunctive relief is unwarranted now for the same reason this Court denied it three years ago (really, *a fortiori*): Meta has continued to improve its systems to avoid receiving even potentially sensitive health information.

The Court should deny plaintiffs' motion for class certification.

# BACKGROUND

## A. Meta's Business Tools allow web and app developers to share data with Meta.

This case concerns a set of "Business Tools" that Meta makes publicly available for web and app developers. Tools like these are ubiquitous: numerous companies offer them, and millions of web and app developers use them to measure activity on their platforms. A1-3; A5-1439–1508; A12-3126–43; A12-3342.[1] Meta's tools are free and customizable—web and app developers choose whether, where, and how to incorporate them into their website or app. A1-3–4.

These tools are no secret. When people sign up for a Facebook account, they agree to Meta's Terms of Service, Privacy Policy, and Cookies Policy. Mot. 16. Those policies explain that Meta receives data about users' activity on third-party websites and apps that incorporate the Business Tools; that Meta uses the data for ads; and that Meta and third parties use "cookies" on users' browsers or devices to facilitate these processes. A3-649–1438. Web and app developers also have their own policies with their own disclosures about what information they share and with whom. *See infra* 17–18.

Plaintiffs' proposed classes encompass data sent by developers through four different methods: (1) the Meta Pixel; (2) the Software Development Kit ("SDK"); (3) Conversions API ("CAPI"); and (4) "custom uploads." Mot. 2, 14.[2]

***Pixel.*** Web developers can incorporate Pixel code on their websites to measure certain actions users take (called "events"). A1-3. Meta provides "standard" events, and developers can also create "custom" events. *Id.* Some "automatic" events are sent by default, but developers can choose not to send automatic events. A1-3–4. Developers can also choose what information to send along with an event. A1-4. And they can place preconditions on sending information—for example, many developers configure their websites not to send any information unless and until a user clicks "accept" on a pop-up banner asking users to agree to the website's use of analytics. A1-4; A13-4326–29. Users' individual settings, including ad-blocking software and private browsing modes (like in Firefox or

[1] Citations to "A#-#" are to the appendix filed concurrently with this brief. The first # represents the volume, and the second represents the page number (*e.g.*, A1-3 refers to appendix volume 1, page 3).

[2] "Custom uploads" is not a term Meta uses. Meta understands plaintiffs' reference to "custom uploads" to mean uploaded customer lists from developers. *See* Dkt. 335 ¶¶ 1 & n.1, 7, 83.

Safari), can also prevent any data from being sent. A13-4319–22.

***SDK.*** While the Pixel operates only on websites, Meta's SDK code is for apps. A13-4275–76. Unlike websites, apps do not send URLs or button clicks. A1-3–4. Event data from apps is stored and then sent once certain conditions set by the developer are met (*e.g.*, once 50 events are stored). A13-4277–78. Users' device settings can affect what data is sent. A1-5; A13-4279.

***CAPI.*** CAPI is distinct from the Pixel and SDK in several ways. Instead of being sent from a user's web browser or device, data is transmitted server-to-server—that is, from a developer's server directly to Meta. A1-4; A13-4273. As with the Pixel and SDK, however, developers choose which (if any) data to send and under what conditions. A1-4; A13-4273–74.

***Customer lists.*** Developers can send lists of their customers to Meta and use those lists to deliver ads to the people on the list (if Meta can match those people to Facebook or Instagram accounts) or to "lookalike" audiences that share behaviors with the people on the list. A1-5. This process is based on developers' own, pre-existing lists; it does not involve the transmission of event data. *Id.*

**B. Healthcare providers can lawfully incorporate the Business Tools on their websites and apps, and Meta works hard to avoid receiving or using any sensitive data.**

Some of the web and app developers that use Meta's Business Tools are healthcare providers. Healthcare providers can use these tools for legitimate purposes without sharing sensitive information. A2-180; A8-2469–70, 2472, 2479, 2482, 2489, 2492, 2513. Indeed, the Department of Health and Human Services has advised that "a regulated entity may engage a technology vendor to" "collect and analyze information about how users interact with regulated entities' websites or mobile applications." A12-3381.

Meta prohibits developers from sending "sensitive" information, however, and has developed ways to prevent receipt and use of even *potentially* sensitive information developers may send.

***Contractual requirements, notifications, and developer education.*** To use Meta's Business Tools, developers must agree to the Business Tools Terms and Commercial Terms. A1-6–8. Those terms forbid sending "sensitive" data of any kind, specifically including "health" information. A1-6; A1-63, 70, 84; A2–123. Developers must also "represent and warrant" that they "have all of the necessary rights and permissions and a lawful basis . . . for the disclosure and use of Business Tool Data,"

and "that [they] have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage that includes . . . how users can opt-out of the collection and use of the information for ad targeting." A1-6, 25–85. Meta regularly educates and reminds developers about these obligations. A5-1514–1626; A6-1627–96; A9-2794–99, 2805; A11-2971–79. And whenever Meta's systems detect potentially sensitive data, Meta filters it out and sends a notification to the developer advising it to check its Business Tools configurations to ensure no sensitive data is sent. A1-12–13; A5-1514–1626; A6-1627–96; A9-2794–99, 2805; A11-2971–79.

***Technical systems.*** Meta has also built and continuously enhances systems designed to prevent its receipt and use of even *potentially* sensitive information, including health information. A1-8–17; A2-130–133; A5-1510; A7-1750–53; A13-4280–303. These systems include, among other things, data filters, machine-learning tools, a button-click blocking mechanism, URL truncation, and discarding of data from patient portals. A1-8–17; A7-1750–53; A13-4280–4303. Meta's systems have changed over time. Meta's treatment of button-click data—a central focus of plaintiffs' claims—is a good case study. At the start of the class period in June 2018, entities Meta classified as health-related could not send automatic events (including button-click events) using Pixel code. A1-10; A13-4284–85. In October 2020, in connection with a database migration at Meta, an issue occurred that inadvertently allowed newly created Pixels to send automatic events. A1-11; A13-4286. Meta discovered this issue in June 2022 and fixed it in two waves in October 2022 and early 2023. A1-10; A13-4286–87. Separately, in July 2023 Meta launched a data-restriction feature called "Core Setup," which applies to health-classified domains (and other data sources). Core Setup prevents the transmission of certain kinds of event data or drops it upon receipt (depending on the Business Tool used), like full-string URLs and custom event parameters. A1-13–14; A5-1510; A13-4297–4301. These are just a sample of Meta's efforts:




A1-8–17. These efforts are dynamic and ongoing, and they have prevented a substantial amount of data from being received or used by Meta. *Id.*; A13-4303.

**C. Plaintiffs sue Meta over its alleged receipt of data from their healthcare providers, and this Court allows claims based on protected health information from hospitals to proceed.**

On June 17, 2022, John Doe sued Meta over its alleged receipt of data from "hospital websites" that used Pixel code to convey "patient communications." Dkt. 1 ¶ 1. As amended, the operative complaint asserts claims by John and Jane Does—all Facebook users—including (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) intrusion upon seclusion; (4) violation of the California Comprehensive Computer Data Access and Fraud Act (CDAFA); (5) violation of the federal Wiretap Act; and (6) violation of sections 631 and 632 of the California Invasion of Privacy Act (CIPA). Dkt. 335 (Compl.) ¶¶ 24–38, 368–474, 515–40.

Meta's policies, to which all Facebook users agree, bar claims that Meta received data reflecting users' activity on third-party apps and websites. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 8 (9th Cir. 2018) (affirming dismissal of claims based on data from "healthcare-related websites"). But this Court found an exception for "protected health information." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 791 (N.D. Cal. 2022). So, to prove their claims, plaintiffs must show the data Meta received about them falls into the exception for "health information from their medical provider." *Id.* at 794; *see also In re Meta Healthcare Pixel Litig.*, 713 F. Supp. 3d 650, 654–55 (N.D. Cal. 2024).

**D. Plaintiffs seek certification of four classes encompassing more than 650,000 websites and apps.**

Plaintiffs now seek certification of four sweeping classes from June 17, 2018 to the present: a "Button-Click Class," a "Health Information Class," a "Prescription Drug Information Class," and a "Device Intrusion Class." Mot. 13. The first two classes include data from "[t]he Class Healthcare Providers listed in Exhibit 72 and Exhibit 60," *id.*—more than 650,000 different websites and apps. The third class includes data from "prescription drug domains . . . listed in Exhibit 73," *id.* at 13–14—another 400+ websites. Plaintiffs never say which entities the fourth class includes. Their motion asserts that "[t]he types of entities at issue are all HIPAA or CMIA covered entities." Mot. 14.

For all four classes, plaintiffs press claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) intrusion upon seclusion, and (4) violation of CDAFA. Mot. 15. For the first three classes, plaintiffs also assert claims for violation of the federal Wiretap Act and CIPA sections 631 and 632. *Id.*

## LEGAL STANDARD

A "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation marks omitted). "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). Certification is proper "only if the trial court is satisfied, after a rigorous analysis," that the plaintiff has met that burden. *Dukes*, 564 U.S. at 350–51 (quotation marks omitted).

## ARGUMENT

No class like the ones plaintiffs propose has ever been certified. For good reason: The interrelated matrix of developer-specific and user-specific issues inherent in plaintiffs' claims would be impossible to litigate in a single trial, and blending them all together would violate due process and the Rules Enabling Act. Plaintiffs' motion should be denied.

### I. Individualized issues predominate over common issues.

The predominance requirement applies both to elements and affirmative defenses. *See, e.g.*, *Huntsman v. Southwest Airlines Co.*, 2021 WL 391300, at *11 (N.D. Cal. Feb. 3, 2021). And at class certification, "[w]hat matters . . . is not the raising of common questions"; it is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotation marks omitted). Here, there are no classwide answers to *any* of the most important issues in the case: whether Meta received class members' protected health information, consent, intent, and a host of other key questions that would need to be answered before judgment could be entered in favor of a single class member. That precludes class treatment.

#### A. Plaintiffs cannot prove classwide that every web and app developer sent each class member's protected health information to Meta.

This Court allowed plaintiffs' claims to go forward based on their allegations that Meta received their protected health information. Making that showing as to each class member will require plaintiffs to navigate a complicated web of developer-specific and user-specific facts, including whether: (1) the web or app developer is a covered healthcare provider under HIPAA or the CMIA; (2) the developer

sent *any* data (let alone protected health data) about the class member to Meta; (3) the class member was a patient of that provider; (4) Meta matched that data to the class member's account; and (5) that data reflects the class member's own protected health information. *None* of these questions can be answered for 650,000 developers, or millions of class members, all at once.

**1. There is no classwide way to prove that each of the web and app developers at issue is a covered entity under HIPAA or the CMIA.**

The starting point for plaintiffs' claims is determining whether a developer is covered under HIPAA or the CMIA. Plaintiffs acknowledge as much. *See, e.g.*, May 16, 2023 Hr'g Tr. at 10:2–5 ("For example, if WebMD has an app, that doesn't come in to here because HIPAA is not at play. That's not a HIPAA covered entity or a CMIA covered entity."). But there is no way to make that determination for 650,000+ entities at once. HIPAA and the CMIA each provide a detailed set of regulations, processes, and defined terms. *See, e.g.*, 45 C.F.R. § 160.103 (definitions); Cal. Civ. Code § 56.05(j) (definitions); *id.* § 56.10 (disclosure requirements); A13-3962–64, 3971–73. Applying these provisions to *one* entity can be a complicated, time-consuming, fact-intensive task; applying them to many entities in a single proceeding would be impossible.

In *Frasco v. Flo Health*—a single-developer case involving Meta's SDK and a period-tracking app—Judge Donato stated after discovery, summary judgment, and five days of trial that he was inclined to grant Flo Health's Rule 50(a) motion on a CMIA claim because he had "not seen any evidence that Flo fits the definition of provider of healthcare, that the Flo users fit the definition of patient, or that medical information as defined in Section 56.05, which is premised in substantial measure on those two other[] definitions, the patient and provider of healthcare, is an issue here." Trial Tr. at 1095:18–23, No. 3:21-cv-00757-JD (N.D. Cal. July 30, 2025). It took years of litigation to reach that point for a single app; those questions could never be worked out for more than 650,000 different web and app developers in a single proceeding.

Plaintiffs offer no viable solution. They provide three lists of entities (Exhibits 60, 72, and 73) and insist the "entities at issue are all HIPAA or CMIA covered." Mot. 14. But many of the entities on those lists are, on their face, not even remotely health-related—for example, "haleyandevan.com" (a wedding website); "ynotudesigns.com" (a Mumbai-based IT services company); and

"zymology21.com" (a bar in San Diego). Pltfs. Ex. 72; A2-165–67; A12-3401–17. Some may appear at first glance to be health-related, but are not—like "yoga-doc.com," a website on plaintiffs' lists that turns out to be an Indonesian site about online gambling. Pltfs. Ex. 72; A2-168; A12-3418–23. Others, as in *Flo*, will present difficult edge cases; in a case involving one of the sites on plaintiffs' lists, a court recently described a split in authority over CMIA coverage and declined to reach the issue. *Cole v. Quest Diagnostics Inc.*, 2025 WL 3172640, at *3 n.5 (3d Cir. Nov. 13, 2025). Many serve dual roles—providing public-facing general resources, and also treating patients—that would complicate the analysis, potentially resulting in some parts of the website being covered and others not. *See, e.g.*, https://www.hopkinsmedicine.org/ (offering appointment scheduling, news, fellowships, and research articles); A12-3424–71. Many would also require extraterritoriality analyses—the lists are not limited to entities in the United States, and the CMIA does not even apply outside California. *See Hill v. Workday, Inc.*, 773 F. Supp. 3d 779, 800–01 (N.D. Cal. 2025). None of this can be resolved classwide.

It comes as no surprise that plaintiffs' lists are poor proxies for HIPAA and CMIA coverage. They rely on internal taxonomies Meta uses to broadly categorize websites—which, as Meta has repeatedly told plaintiffs, are not designed to (and do not) reflect HIPAA's or the CMIA's legal standards. *See* Dkt. 1085 at 3 (rejecting plaintiffs' demand that Meta "investigate thousands, or hundreds of thousands, of entities" to determine HIPAA or CMIA coverage); Dkt. 278 (similar); A7-1697–1737. And while plaintiffs' expert purports to have "winnow[ed]" the lists to focus on "healthcare-related" entities and exclude "non-U.S. domains," Pltfs. Ex. 3 ¶¶ 60–62, many non-healthcare-related and non-U.S. entities remain in plaintiffs' lists, and their expert's rough "winnowing" process cannot substitute for actual analysis under HIPAA or the CMIA. Even plaintiffs' expert admitted the results would need to "further be verified." A2-647. As it was in *Flo*, this must be litigated one by one.

**2. There is no classwide way to prove that a developer sent any data about a class member to Meta.**

If Meta never received any data about a particular class member, that person has no claim. As a result of Meta's standard retention policies, however, the oldest classwide data is from March 2022, and plaintiffs' proposed classes go back to June 2018. Reconstructing whether data was sent during that four-year period is likely impossible; to the extent it can be done at all, it would require developer-

specific and class-member-specific analyses.

***Developer-specific analyses.*** For every developer, plaintiffs would need to prove (1) the developer used a Meta Business Tool at the relevant time; (2) the developer configured the code to send particular information; and (3) Meta's systems did not prevent receipt or use of that information. These questions cannot be resolved on a classwide basis.

*First*, even proving that a developer used Meta's Business Tools (and when) would be unmanageable to do for more than 650,000 entities at once. Several entities on plaintiffs' lists have already sworn that they never used the Business Tools. A8-2496–97, 2502, 2504, 2507–08, 2540–41, 2545–46. And, because plaintiffs failed to pursue third-party discovery on this issue, the record does not even contain the evidence necessary to answer this question for many others.

*Second*, plaintiffs cannot prove classwide how developers configured Meta's Business Tools on their website or app. The tools are customizable, and "what matters is where on the web property the source code exists" and what "type of information" it is configured to send. *Doe I v. Google LLC,* 741 F. Supp. 3d 828, 839 (N.D. Cal. 2024). Some developers incorporated Business Tools code on patient portal pages; others did not. *Compare* A7-2527 (yes), *with* A7-2536 (no), *and* A7-2513–14 (no). Some developers incorporated the tools only on areas of their sites where they did not offer any "transaction[s] relating to patient health care" (like online scheduling), precluding transmission of health information. A7-2513–14. And developers' use of the Business Tools changed over time—for example, some stopped using certain Business Tools altogether during the class period. A7-2513, 2527. Developers also differed in how they configured the Business Tools to work in tandem with consent banners and the like. Some programmed the code not to send any information to Meta unless and until a user completed a consent flow. A13-4310–11. Others presented such a consent flow only in certain states. *Id.* And some disabled automatic events, including button clicks, or turned off the transmission of certain cookies, like the "fbp" cookie. A13-4313–17. Plaintiffs lack the evidence necessary to answer these questions one by one, much less classwide.[3]

---

[3] Plaintiffs try to circumvent (part of) this problem by arguing that because Meta "spoliated" data in certain tables, it "should be foreclosed" from arguing that button-click "automatic configurations may have been changed by the healthcare providers." Mot. 14–15. But even that partial fix for one of plaintiffs' proposed classes (the Button-Click Class) runs into multiple problems of its own. For one,

*Third*, Meta's efforts to avoid receiving even potentially sensitive information prevented many developers from ever sending the data at issue, and determining which developers may have sent what data during which time period would require individualized analyses. Plaintiffs' Button-Click Class illustrates the point. Automatic events (including button-click events) were disabled for developers Meta classified as health-related throughout the relevant time period—unless the developer installed Pixel code between 2020 and 2022, when an issue in Meta's systems occurred. *See supra* 5. It would take developer-by-developer analysis to figure that out. Indeed, plaintiffs' expert confirmed that his navigation around various hospital websites and to their patient portals prior to November 2022 did not always result in any button-click data being sent. A2-631–32. And, in February 2023, Meta began discarding *all* data received from any patient portals Meta was able to identify. A1-13. Finally, starting in July 2023, Meta placed developers classified as health-related into Core Setup, which blocks receipt of custom event parameters and full-string URLs from Pixel and SDK code (and drops this data immediately upon receipt if sent through CAPI code). A1-13–14; A7-1750–53. In sum: it would require complex individualized analyses to determine, for each of the 650,000+ entities on plaintiffs' lists, whether it was classified as health-related; if so, when; whether it was affected by the button-click issue; whether Meta identified and discarded data from its patient portal; and whether the data was sent through Pixel, SDK, or CAPI code incorporated by the developer.

***User-specific analyses.*** Then, for every class member, plaintiffs would also need to prove that the class member took actions on the website or app that resulted in information being sent. Even if they did so, class members' use of common ad-blocking technologies or certain private browsing modes—which millions of Americans use—would have prevented data from being sent, as plaintiffs' own expert testified. A2-621; *see also* A13-4318–21; *Doe v. MedStar Health, Inc.*, 2023 WL 4931348,

---

plaintiffs are asking for adverse inferences, but that remedy is available "only upon finding that the [spoliating] party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *see, e.g.*, *Matthew Enter. v. Chrysler Grp.*, 2016 WL 2957133, at *3 (N.D. Cal. May 23, 2016). In ruling on plaintiffs' spoliation motion, this Court "d[id] not find that Meta purposefully destroyed evidence to avoid its obligations," Dkt. 880, so adverse inferences would be improper. Moreover, the allegedly spoliated data would cover only a period of months; under Meta's 90-day retention policy for the relevant table, even if Meta had preserved all data the day the complaint was filed on June 17, 2022 (a logistical impossibility), data would stretch back only to March 2022—not to June 2018, the start of plaintiffs' class period. A1-5.

at *8 (Md. Cir. Ct. Mar. 10, 2023) (denying class certification given "the use of different browsers, different settings on [users'] browsers, or even the use of different search engines").

All these developer-specific, class-member-specific, and timing-specific variables would be a slog to sort out. There is no way to answer these questions classwide.

**3. There is no classwide way to establish each class member's patient status.**

Next, every class member must prove they were a patient of the provider that sent their data at the time the data was sent. Plaintiffs' claims are predicated on web-browsing data that would not support a claim absent a patient-provider relationship. *Compare, e.g.*, Compl. ¶ 28, *with Smith v. Facebook, Inc.,* 262 F. Supp. 3d 943, 954 n.5 (N.D. Cal. 2017). Plaintiffs survived dismissal only because they alleged they "were communicating with their healthcare providers about their healthcare needs." *In re Meta Healthcare Pixel Litig.*, 713 F. Supp. 3d at 655; *see also id.* at 654.

That will be impossible to prove classwide. Take Jane Doe IV, the sole proposed representative for the Prescription Drug Information Class. Mot. 14. Her claims are based on visits to the website for Biktarvy, an HIV medication. A7-1776. But she first visited the Biktarvy website in 2017—*before* she was prescribed or used Biktarvy—"just to do research." A2-441, 462–63; A7-1773, 1778. Any data sent based on that activity would not be actionable. *See Smith*, 745 F. App'x at 8–9. Similarly, in *Doe v. Eating Recovery Center*—another case involving the Meta Pixel—Judge Chhabria granted summary judgment for the defendant under the CMIA because the plaintiff became a patient only "after the data at issue was shared." 2025 WL 2983143, at *1 (N.D. Cal. Oct. 17, 2025). Many other individuals whose data Meta received were *never* in any patient-provider relationship—for example, individuals who visited a webpage to conduct general research, or for someone else, or even by accident. *See* A13-3975–83. Jane Doe X illustrates the point: she visited a prescription drug website (entyvio.com), but testified she never used that drug and could not say whether she visited the website as part of online research or whether she simply "accidentally click[ed]" on it. A2-424–25. In fact, "75 percent of sessions" on the websites plaintiffs identify "were brief with a duration of measurable activity of less than 30 seconds," suggesting accidental or non-meaningful engagement with the site. A13-4154. And plaintiffs' own expert confirmed that button-click data from a patient portal login page could be sent regardless of whether a person *successfully* logged in, as occurred when the expert visited

the page simply to test it. A2-625–28. Every class member will need to be asked individually whether and when they entered into any patient-provider relationship.

**4. There is no classwide way to prove that Meta matched any data to a class member's Facebook account.**

When Meta gets data from a developer through the Business Tools, it tries to match that data to a Facebook account. But matching is not always possible—and if data is not individually identifiable, there is not even Article III standing, let alone any actionable privacy violation. *See, e.g.*, *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025); *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. Dec. 21, 2017); *Mikulsky v. Noom, Inc.*, 2024 WL 251171, at *4 (S.D. Cal. Jan. 22, 2024).

For the period for which no data exists given Meta's standard retention policies (before early- or mid-2022, depending on the type of data at issue), determining whether any data was matched to a class member's Facebook account will turn on a combination of developer-specific facts *and* user-specific facts (and may not be determinable at all). Meta's ability to match depends on, among other things, what data a developer chooses to send, whether the developer is using Meta's "advanced matching" feature, whether the user is logged into a Facebook or Instagram account on the device being used, and a user's own browser and account settings. A2-11–12; A7-2337; A12-3472–78; A13-4317, 4330–37. There is no classwide answer.

**5. There is no classwide way to prove that any data matched to a Facebook account reflects a class member's own protected health information.**

To support a claim, the shared data must convey a class member's *own* protected health information—not information about someone else, which is not sensitive or protected with respect to the class member. *See supra* 13. Courts therefore deny class certification where individualized inquiries are necessary to determine whether data reflects a user's own information. *See, e.g.*, *In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *12–13, 16 (N.D. Cal. Oct. 27, 2025); *Byrd v. Aaron's, Inc.*, 2017 WL 4326106, at *14–15 (W.D. Pa. Aug. 4, 2017); Order Denying Class Certification at 15, 19, *McDaniel v. Meta Platforms, Inc.*, Case No. 21-cv-383231 (Cal. Super. Ct. Dec. 30, 2024).

For two reasons, plaintiffs cannot prove classwide that any data Meta received reflects their own protected health information. *First*, even when a covered healthcare provider sends data about a patient's website or app activity that Meta matches to that person's Facebook account, that data will

not necessarily convey the user's patient status or any other protected health information. *See, e.g.*, *Cole*, 2025 WL 3172640, at *3 (affirming dismissal of CMIA claim in Pixel case involving website on plaintiffs' lists because data did not convey "medical information"). *Second*, even when data reveals health information, it may not reflect the class member's *own* health status. Answering both questions will, again, require a combination of developer-specific and user-specific facts, plus analysis of each piece of data Meta allegedly received.

***Patient Status Button-Click Class.*** This class includes people whose shared data included button-click data from a "patient portal, medical appointment, bill payment, or diagnostic assessment." Mot. 13. But plaintiffs' methodology for identifying this data sweeps in false positives—for example, it misclassifies a job-search button on one site as a patient "portal" button, and misclassifies a hotel booking button on another site as a medical "schedule" button. A13-4395–96. Determining whether each button conveys protected health information would require analysis of each webpage (some of which are no longer available)—and a factfinder may conclude some are health-related and others not. *See Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *5 (C.D. Cal. Sept. 9, 2024) (denying certification where "privacy concerns are not identical across all websites that use the [TikTok] Pixel").

Even if button-click data reflects *something* health-related, it may not be matched to the class member whose health information it reflects. That could happen in several scenarios, none of which would be decipherable from the data. One is when a person uses their device to access care for someone else. Some healthcare providers offer "proxy portals" that allow family members or patient representatives to access someone else's health information. A8-2528; *see* A13-4155–57; A13-3983–86. Many providers also allow individuals to book appointments for others. *See* A13-4155. And plaintiffs here provide other examples: Jane Doe V accessed MedStar's website for her mother, A3-510–511, 514; John Doe II accessed WakeMed's website for his husband, A2-572–74, 580–81; Jane Doe I "might have" looked up health information for her father, A2-306–07; and Jane Doe X helped multiple other people look up doctors using her own devices, A2-410–11.

A similar problem arises when a person accesses a website or app using someone else's device. That activity could be matched to the device *owner's* Facebook account, rather than the person *using* the device. A1-5. Jane Doe X, for example, testified that she "probably" used her husband's devices

to access healthcare websites for herself. A2-412. There are no classwide answers here.

***Patient Health Information Class.*** This class includes people whose shared data included "communication[s] or fact[s] identifying a doctor, condition, or treatment." Mot. 13. But it will take individualized analysis of each purported communication to determine whether it identifies a doctor, condition, or treatment. For example, the domain "cancer.osu.edu" contains articles about fellowships for cancer research that would be swept into plaintiffs' proposed class. A13-4407–09. Some individuals may also navigate around a website while looking for basic, non-health-related information, like "searching for the location of the parking garage." *MedStar Health*, 2023 WL 4931348, at *9 (denying certification). And plaintiffs' own expert opined that whether certain information constitutes "health" information depends on "context." A2-614–15. Plaintiffs offer no viable method for conducting this context-dependent analysis on a classwide basis, and again, "privacy concerns are not identical across all websites that use the Pixel"—or even across all URLs sent by a single website. *Griffith*, 2024 WL 4308813, at *5; *see also* A13-3713–22 (survey revealing different privacy expectations).

Nor, again, is it possible to tell from the data whether any communications reflect a class member's *own* health status. Plaintiffs give examples like "medstarhealth.org/doctors/paul-a-sack-md" and "medstarhealth.org/services/diabetes." Mot. 3. But a person need not actually *be treated by* Dr. Sack, or *have* diabetes, to visit those URLs. Instead, a "person could very well search treatments, medical conditions, and potential providers for a partner, parent, or child," or "could also search for treatment that they ultimately do not need or are not eligible to receive." *A.D. Aspen Dental Mgmt., Inc.*, 2024 WL 4119153, at *8 (N.D. Ill. Sept. 9, 2024); *see* A13-3983–87 (data not identifying person whose health is at issue is not HIPAA-protected). And, again, a person may visit health-related websites using a shared device rather than their own. *See supra* 14–15. Jane Doe I, Jane Doe V, John Doe II, and John Doe III all testified that there were URLs associated with their Facebook accounts that they never visited. A2-258; A2-322; A2-540–42; A2-567, 583; A12-3577–3635.

***Prescription Drug Information Class.*** Plaintiffs say this class "includes *all* communications" at the websites listed in Exhibit 73 "because all identified properties contain the name of the prescription drug in the domain itself." Mot. 14 (emphasis added). That is demonstrably false: Exhibit 73 includes sites like "atasteforlifewithzarela.com" (which refers to restaurateur Zarela Martinez) and

"hpforlife.org" (Harvard Pilgrim Healthcare, not a drug). Pltfs. Ex. 73; A12-3479–86. For URLs that do have a drug name, the same problem as with the other classes applies—a person visiting the website may or may not do so to obtain medication on their own behalf, or on their own device. *See supra* 14–15. They may not even visit the site for any health-related purpose at all: "atasteforlifewithzarela.com," for example, currently redirects to a drug website, but as of 2022 it showcased a partnership with Zarela Martinez and provided access to "fun, simple-to-follow recipes." A12-3479–86. A person may have visited the website for the recipes, not the drug. There are no classwide answers to these questions.

***Patient Device Intrusion Class.*** For their final proposed class, plaintiffs try to steamroll these problems by arguing Meta is liable "regardless of the specific content of the communication" based on the "unauthorized placement of the _fbp cookie and use of their computing device." Mot. 14. That effort fails. Plaintiffs clearly consented to the use of cookies on their devices to share data, so those practices are not "unauthorized." *Id.*; *see supra* 3. The basis of plaintiffs' claims—their only justification to avoid Meta's consent defense—is Meta's alleged receipt of protected health information. *See supra* 6. So plaintiffs have no claims for cookie placement or the use of their devices without (at least) making that showing. And that brings along all the problems described above.

**B. Whether users consented to share information with Meta is an individualized issue.**

"[C]onsent is an overarching issue that could preclude relief for all of the claims at issue." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 791. But even setting aside Meta's policies, class members could have consented to share their data (1) through disclosures and privacy policies from the hundreds of thousands of entities on plaintiffs' lists; (2) by learning about the practices at issue through public sources, like news outlets and advertisements; and (3) by sharing their health information with Meta directly on Facebook and Instagram. Meta has the right to fully litigate each of these defenses, and doing so will require developer-specific and user-specific evidence and analyses.

**1. Each website or app at issue provided its own disclosures that could establish express or implied consent.**

Class members' agreement to privacy policies disclosing the data-sharing at issue would establish their express consent. *See, e.g.*, *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024); *Hammerling v. Google, LLC*, 2024 WL 937247, at *2–3 (9th Cir. Mar. 5, 2024); *Smith*, 745 F. App'x

at 8–9; *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4–5 (N.D. Cal. July 28, 2021) (collecting cases). And class members impliedly consented to data-sharing if they saw the disclosures and continued to use the healthcare entity's website or app. *See, e.g.*, *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 266 (N.D. Cal. 2016). The need to examine a range of different disclosures to assess consent—including the text of each policy and the structure of individual consent flows—means individualized issues predominate. *E.g.*, *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *14 (N.D. Cal. Apr. 4, 2024); *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *14 (N.D. Cal. Mar. 18, 2014).

This case presents that problem in spades. Plaintiffs' proposed classes encompass hundreds of thousands of websites and apps, each with their own disclosures. Many developers *clearly* disclosed the data-sharing at issue and required users to agree, establishing consent as a matter of law. Judge Davila recently granted a motion to dismiss where Spring Fertility, "a covered entity like the providers in the Meta Pixel Action," provided disclosures "so specific that there can be no reasonable expectation that the information provided to Spring Fertility is private." *L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *4, 8–11 (N.D. Cal. Oct. 10, 2025). Similarly, Judge Martínez-Olguín granted a motion to dismiss where BlueChew (a website that "connect[s] [users] with physicians and other health care providers for the diagnosis and treatment of erectile dysfunction") "clearly stated" it would share data with Meta. *M.D. v. Google LLC*, 2025 WL 2710095, at *1, 5 (N.D. Cal. Sept. 23, 2025) (quotation marks omitted). Other developers' disclosures may be subject to multiple plausible interpretations. As to those, "a fact-finder needs to interpret the express terms of any agreements to determine whether [those] agreements adequately notify individuals regarding the interceptions." *In re Gmail*, 2014 WL 1102660, at *15.

Developers' disclosures varied in several key respects, including (1) disclosures about what data would be shared; (2) disclosures about *how* data would be shared, and with whom; and (3) consent flows to secure users' agreement. And even for individual developers, all of this varied over time.

***Disclosures about what data was shared.*** Some developers disclosed they would collect information entered into data fields, including appointment requests, A8-2570–71, and health information, A8-2709, and that they share the information they collect with third parties. *See also* A9-2759–63; A11-2958–61. At least one specifically instructed users not to send confidential information through its website. A8-2599–2600. And many developers substantively changed their disclosures

over time. A8-2576–80, 2614–27; A9-2641–2675, 2697–2705; *see also, e.g.*, *M.D.*, 2025 WL 2710095, at *4–5 (concluding BlueChew's older policies "fall short of providing explicit notification of the conduct at issue," but policy adopted in 2024 "clearly" did so).

***Disclosures about how the data was shared, and with whom.*** Some developers disclosed cookies generally. A8-2606; A9-2687; A10-2814. Others had detailed disclosures about pixels and web beacons. A8-2551, 2593; A9-2634–35, 2699; A9-2724–25. Cigna, a health insurance company, disclosed that it collects data about "medical conditions" and that it shares that information for "marketing and advertising purposes" with "third-party ad network providers," including through "tracking technologies" such as "pixel tags." A9-2738–39, 41–42. Multiple policies specifically mentioned Meta's Business Tools, A9-2634, 2680; others did not, A9-2606, 2630, 2687, 2788; A10-2814. And some added or removed references to Meta over time. *Compare* A8-2561–65; A9-2789–91; A9-2687–90; *with* A9-2680; A9-2634; A9-2767.

***Consent flows.*** Developers' consent flows also varied. Some had pop-up banners requiring users to consent before sending any data. A13-4310–13. Others sent data until a person opted *out*. *Id.* Analyzing the enforceability of many of those consent flows would require complex, multi-factored analyses that often result in protracted litigation. *See, e.g.*, *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515–17 (9th Cir. 2023) (finding consent flow adequate); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–58 (9th Cir. 2022) (reaching the opposite result).

Plaintiffs ignore all this variability. They assert in a parenthetical, tucked at the end of a string cite, that "website privacy policies cannot authorize healthcare providers to send HIPAA protected health information to third parties." Mot. 20. But HIPAA does not supply the standard for consent; plaintiffs' claims and binding Ninth Circuit precedent do. Plaintiffs do not (and could not) bring any HIPAA claim, because "HIPAA provides for no private right of action." *Webb v. Smart Documents Sols., LLC*, 499 F.3d 1078, 1080 (9th Cir. 2007). Instead, they assert wiretapping, CDAFA, contract, and privacy claims, where privacy policies with on-point disclosures establish consent. *See Calhoun*, 113 F.4th at 1147; *Hammerling*, 2024 WL 937247, at *2–3; *Smith*, 745 F. App'x at 8–9; *Silver*, 2021 WL 3191752, at *4–5. That legal rule applies even when health information is at issue. *See L.B.*, 2025 WL 2899514, at *8–11; *M.D.*, 2025 WL 2710095, at *5. Plaintiffs cite no authority saying they can

transplant the regulatory requirements of a claim they cannot bring (HIPAA) into the consent standard for the claims they brought. *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 114 (2011) (without statutory right of action, "it would make scant sense to allow [plaintiffs] to sue on a form contract implementing the statute"); *Miller v. Elam*, 2011 WL 1549398, at *4 (E.D. Cal. Apr. 21, 2011).

**2. Class members consented if they learned about the challenged practices and continued to use the website or app at issue.**

"[C]ourts have consistently held that implied consent is a question of fact that requires looking at all of the circumstances surrounding the [alleged] interceptions to determine whether an individual knew that her communications were being intercepted." *In re Gmail*, 2014 WL 1102660, at *16. This is "an intensely factual question." *Id.* And courts deny class certification where determining implied consent requires individualized inquiries about what disclosures and other sources (including news articles) each class member "knew, read, saw, or encountered." *Brown v. Google, LLC*, 2022 WL 17961497, at *19 (N.D. Cal. Dec. 12, 2022); *see also, e.g.*, *In re Google RTB*, 2024 WL 2242690, at *12–14; *Bliss v. CoreCivic, Inc.*, 711 F. Supp. 3d 1233, 1238–42 (D. Nev. 2024); *Backhaut v. Apple Inc.*, 2015 WL 4776427, at *14–15 (N.D. Cal. Aug. 13, 2015); *In re Gmail*, 2014 WL 1102660, at *16–18.

Here, in addition to developers' disclosures, class members could have learned about the data-sharing at issue from numerous other public sources. News articles published before and after this lawsuit was filed described Meta's potential receipt of the data at issue. On February 22, 2019, *The Wall Street Journal* reported that apps shared information like "body weight, blood pressure, menstrual cycles, or pregnancy status" with Facebook. A12-3488–96. On June 16, 2022, *The Markup* reported that "the Meta Pixel was installed inside the password-protected patient portals of seven health systems." A12-3498–3503. This lawsuit (filed June 17, 2022) is public information, and news media have continued to report on the lawsuit itself and on the data-sharing practices more broadly. A12-3504–3512. These articles and other similar ones have reached tens of millions of people. A2-138–42. Plaintiffs' counsel have also engaged in recruitment efforts, alerting more individuals to the practices at issue. A2-195–96, 234–35, 321, 330–31, 442–43, 472–73, 549–50; A6-1786; A7-2072, 2136–37; A12-3514–19. Individual healthcare providers have notified their users that they installed Meta

Pixel code inside their patient portals. A9-2766–67; A12-3123–24; *see* A2-559–61, 566, 578, 595–97; A7-2297–2322. Litigating these "inquiries—determining to what disclosures each [c]lass member was privy and determining whether that specific combination of disclosures was sufficient to imply consent—will lead to numerous individualized inquiries that will overwhelm any common questions." *In re Gmail*, 2014 WL 1102660, at *18; *see also* A13-3713–22 (survey revealed majority of respondents expected to see similar data used for targeted advertising).

**3. Many class members shared health information with Meta directly on Facebook and Instagram.**

If class members shared information with Meta directly on Facebook or Instagram, they cannot sue Meta for its receipt of data revealing the same information. Meta clearly discloses that it "collect[s] . . . [w]hat you do on our Products," including "your posts." A3-755, 761; A4–771, 780–81, 793–94, 871–72, 950–51, 1050–51, 1150–51, 1250–51, 1341. Choosing to post something on Facebook or Instagram manifests consent for Facebook to receive it, and class members lack any reasonable expectation that Meta would not learn facts they shared directly on Meta's platforms. *See, e.g.*, *Davidson v. Hewlett-Packard Co.*, 2021 WL 4222130, at *7 (N.D. Cal. Sept. 16, 2021), *aff'd*, 2022 WL 17352186 (9th Cir. Dec. 1, 2022); *Hill v. NCAA*, 7 Cal. 4th 1, 26 (1994). And "individualized factual questions of whether each user actually maintained their reasonable expectation of privacy" preclude class treatment. *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *9 (N.D. Cal. Mar. 30, 2023).

Multiple plaintiffs freely shared with Meta the same information at issue here. Several specifically disclosed patient status: Jane Doe IV posted a photo of herself in a hospital waiting room and "checked in" on Facebook at hospitals and urgent care clinics, A2-452–59, 466–67; A7-2385, 2388, 2390, and Jane Doe V "checked in" at a hospital, A2-481–88; A7-2392–99. Others identified doctors, conditions, or treatments: Jane Doe IX posted on Facebook about her arthritis, visits to an acupuncturist, and taking a weight gain supplement, A2-216–29; A8-2435, 2437–38; John Doe III disclosed his bipolar disorder and treatment in Facebook posts (and on public blogs), A2-259–68; A8-2444–61; Jane Doe X posted on Facebook about her medication, her pregnancy, and her miscarriages, A2-337, 350–53, 358–60, 386–87; A8-2324–35; A9-2439–43; and Jane Doe V posted about her blood pressure and medication, anxiety and medication, emergency room visits, that she was considering weight loss

surgery, and that she was "going to see a cardiologist"—and admitted she was "comfortable" with Facebook knowing all this information, A2-488–509; A8-2400–33. Many other individuals have joined and posted in Facebook groups for specific conditions, insurers, and healthcare providers. A12-3520–76. Facebook users (including plaintiffs here) also clicked on health-related links and ads on Facebook, which conveys the same URL information described in plaintiffs' classes. A7-2365–83; A12-3636–3693. Plaintiffs have no classwide method of screening such people out of their classes.

**C. Plaintiffs' evidence of Meta's intent and knowledge varies from developer to developer, from data to data, from tool to tool, and over time.**

Plaintiffs' wiretapping, CDAFA, and privacy-tort claims require them to prove that Meta *intentionally* or *knowingly* received their protected health information. *See* 18 U.S.C. § 2511(1)(a); Cal. Penal Code § 631(a); *id.* § 632(a); *id.* § 502(c)(1), (c)(8); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286-87 (2006). To make that showing, plaintiffs must focus narrowly on the information "at issue in this lawsuit"; it is not enough to show that Meta "intended to collect any old communication." *Doe I v. Google LLC*, 2025 WL 1616720, at *2 (N.D. Cal. June 6, 2025) ("*Google Pixel II*").

To be sure, Meta's position is that plaintiffs cannot meet their burden on intent. Meta's Business Tools Terms and efforts to avoid receiving even *potentially* sensitive information reinforce that. *See supra* 4–5. But if this Court agrees with plaintiffs that intent is a fact question, then the evidence plaintiffs rely on would require a series of individualized inquiries. And it would violate due process to allow plaintiffs to handpick their favorite evidence from a few select developers, data types, and time periods, and then invite the jury to render an omnibus intent finding for different kinds of data from hundreds of thousands of developers over seven-plus years. *See Wal-Mart*, 564 U.S. at 367.

*First*, plaintiffs rely on communications between Meta and individual developers, *see* Mot. 7–8, but Meta's communications with different developers varied. Consider just two: Adventist and Currax. Meta notified Adventist it had sent "potentially violating health data," and Meta filtered that information out of its systems. A9-2800–03. Meta similarly notified Currax about potentially sensitive health data it had sent, prompting a dialogue about how to restrict that data. A11-2973–79. Afterward, Meta followed up to confirm Currax had changed its settings. A11-2972. These communications show Meta acting to *prevent* specific developers from sending protected health information. So plaintiffs'

reliance in their motion on developer-specific communications is fatal, because that evidence varies and would require a factfinder to review Meta's interactions with each developer.

*Second*, plaintiffs critique Meta's efforts to prevent receipt and use of potentially sensitive data, *see* Mot. 8–10, but Meta deployed different systems throughout the class period to address different types of data, developers, and webpages, *see supra* 4–5. Meta clearly did not intend to receive data it blocked or filtered—so plaintiffs would (at least) need to prove that Meta's systems failed to detect and filter or block each specific piece of data at issue. *See Google Pixel II*, 2025 WL 1616720, at *2.

*Third*, plaintiffs argue the Pixel code sent some data (like button-click data) "by default" (Mot. 4–5), but that differs based on the data and tool at issue. Automatic button-click events exist only for the Pixel code, not for any other method at issue (SDK, CAPI, and custom uploads). *See* A1-3–4; A13-4277. A jury would have to analyze different evidence for each method, inviting confusion.

*Fourth*, all this evidence varied over time. During plaintiffs' seven-year (and counting) class period from 2018 to the present, Meta's efforts to avoid receiving and using sensitive information have constantly improved. Evaluating plaintiffs' evidence would require reconstructing the state of play at the time of each alleged interception: When did the developer configure the Business Tools code? What had Meta communicated to the developer leading up to that point? Were Meta's systems designed to (and did they) filter out or prevent receipt or use of the data? Which code did the developer use, and what were the settings for that code at that time? Plaintiffs have no classwide answers.

* * *

Each of these cross-cutting issues creates class-certification problems. And the unmanageability of plaintiffs' proposed classes is especially stark in light of the numerous *combinations* of developer-specific and user-specific variables that would need to be litigated before judgment could be entered for any class member. The following chart—which is underinclusive of all the issues and permutations described above—demonstrates just some of the layered complexity inherent in plaintiffs' claims. And even after that, every putative class member would still need to navigate the claim-specific, injury, and damages issues described below. It is impossible to resolve *any* of these questions—much less *all* of them—on a classwide basis.




**D. There are numerous other claim-specific individualized issues.**

The cross-cutting issues above are more than enough to deny plaintiffs' motion in full. But the claims here also present a laundry list of additional, independently disqualifying individualized issues.

**1. One-party consent cannot be litigated classwide.**

The federal Wiretap Act is a one-party consent statute. 18 U.S.C. § 2511(2)(d). At the motion-to-dismiss stage, this Court held that developers' consent would turn on "evidence-bound determinations" about "what Meta disclosed to healthcare providers, how it described and trained healthcare providers on the Pixel, and how the healthcare providers understood the Pixel worked and the information that then could or would be collected by Meta." *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1078 (N.D. Cal. 2023). Meta's position is that all developers consented by choosing to incorporate Meta's Business Tools code on their website or app. *See Katz-Lacabe v. Oracle Am., Inc.*, 2023 WL 2838118, at *10 (N.D. Cal. Apr. 6, 2023). But if plaintiffs resist that across-the-board consent, assessing every developer's knowledge and tech-savviness will require developer-specific analyses.

Some developers engaged directly with Meta to learn how to incorporate and customize the Business Tools code. A9-2795–99, 2809, 2779; A11-2944–54; A12-3101–3121. Others had little to

no direct interaction with Meta, relying on outside experts to manage the Business Tools on their behalf. A8-2532–33; A12-2980–3053; A12-3059, 3068–96. Based on their individual knowledge and understanding, developers configured Meta's Business Tools code in myriad different ways and transmitted different information. *See supra* 10. And whether developers transmitted or turned off automatic events (and understood that ability) is similarly individualized. *See supra* 5, 10–11.

Plaintiffs try to get around this problem by invoking the crime-tort exception. Mot. 21. But that exception—to the extent it applies at all—cannot be invoked against Meta classwide.

*First*, the crime-tort exception does not apply at all. "Multiple courts in this district have found that the crime-tort exception to the Wiretap Act is inapplicable where the defendant's primary motivation was to make money, not to injure plaintiffs tortiously." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 797; *see also, e.g.*, *Roe v. Amgen Inc.*, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024). That purpose does not become criminal or tortious merely because *an interception itself* was allegedly criminal or tortious; such a bootstrapping theory runs straight into Ninth Circuit precedent, which makes clear that the "criminal or tortious purpose must be separate and independent from the act of the recording." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022).

*Second*, if the crime-tort exception applies at all, plaintiffs cannot show it applies classwide. Plaintiffs say Meta used data "in pre-existing user profiles," "to commit a further invasion of privacy," and for "advertising." Mot. 21. Each theory requires proving that protected health information is at issue, which plaintiffs cannot show classwide. *See supra* 7–16. And, in any event, Meta does not match all of the data it receives, nor does it use all of that data for advertising (depending on, among other things, each user's settings). A1-4–5; A13-4331–37; *see also* A7-2337–64. Whether it did so for particular data will vary from developer to developer and from class member to class member.

**2. Whether data was intercepted in California is an individualized issue.**

To prove their CIPA and CDAFA claims, plaintiffs must show their data was intercepted in California. Section 631(a) of CIPA is limited to communications "sent from, or received at any place within this state." The presumption against extraterritoriality puts the same requirement on plaintiffs' other CIPA and CDAFA claims. *DellaSala v. Samba TV, Inc.*, 2025 WL 3034069, at *3–4 (N.D. Cal. Oct. 30, 2025); *see Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011); *Kearney v. Salomon Smith*

*Barney, Inc.*, 39 Cal. 4th 95, 119–20 (2006). And when a class member's location is essential to establishing a claim or defense, class certification is inappropriate. *See, e.g.*, *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 587 (N.D. Cal. May 19, 2025) (denying certification of CIPA § 631 claim).

Plaintiffs' nationwide class members were all over the country when they used healthcare websites or apps. Multiple plaintiffs confirmed they accessed their providers' sites or apps outside California. A2-256, 305–06, 310–20, 534–39, 572; A7-1806, 1868, 2031, 2217, 2284–85. Any data sent using Pixel or SDK code would have come from plaintiffs' devices and been received at one of Meta's "Points of Presence" around the country. A2-136. CAPI transmissions and customer list uploads, which are sent directly by developers and received at one of Meta's Points of Presence, also take place all around the country. *Id.* None of this is determinable on a classwide basis.

Plaintiffs offer two counterarguments to ward off this problem; neither is availing. *First*, plaintiffs say it is enough that "Meta 'is headquartered in California' and 'manages' its ad delivery program from this state." Mot. 22 (quoting *In re Google RTB*, 2024 WL 2242690, at *10). That is wrong. CIPA § 631 expressly requires that data be "sent from, or received at" California. Extraterritoriality similarly focuses on "the conduct that creates liability." *Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075, 1079 (9th Cir. 2018) (quotation marks omitted); *see also RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016). Here, "interception of the data is the critical element," so what matters is where that happened. *DellaSala*, 2025 WL 3034069, at *4.

*Second*, plaintiffs argue that Meta's Terms contain a California choice-of-law clause. But "a contractual choice of law provision that incorporates California law presumably incorporates all of California law—including California's presumption against extraterritorial application of its law." *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1005 (N.D. Cal. 2014); *see also Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1065 (N.D. Cal. 2014).

Tacitly acknowledging this problem, plaintiffs propose subclasses of individuals who "communicated from California" or "exchanged a communication with a California-based healthcare provider." Mot. 22 n.6. But again, whether a developer is "based" in California is irrelevant; what matters is where the alleged interception happened. *Supra* 25. Nor can "Meta's records" identify individuals who "communicated from California." Mot. 22 n.6. Those records reflect *predicted* location based on

many factors, including IP addresses—not *actual* location. A13-4364–67, 4422–25; *see also Frasco*, 349 F.R.D. at 587 (SDK data insufficient to show location). And VPNs can mask IP addresses and obscure a person's location. A13-4257–59. In 2019, a quarter of Americans used a VPN or some other proxy server; by 2023, a third of Americans used VPNs. *Id.*; *see also* A2-189–90, 211–13, 575–76. Sorting all this out would require individualized inquiries.

**3. Whether Meta received the "contents" of a communication is an individualized issue.**

Under the federal Wiretap Act and CIPA § 631, plaintiffs must show Meta intercepted the "contents" of their communications, meaning "the intended message conveyed by the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014); *see Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020). This analysis is "contextual with respect to each communication" and does not yield to "general answer[s]." *In re Google Inc. Cookie Placement Privacy Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) (quotation marks omitted). For example, URLs reflecting the fact of a website visit, "as opposed to information [plaintiffs] might have entered while using the website," are not "contents." *Daghaly v. Bloomingdales.com, LLC*, 2024 WL 5134350, at *1 (9th Cir. Dec. 17, 2024); *see also, e.g.*, *Zynga*, 750 F.3d at 1108–09; *Mikulsky v. Bloomingdale's LLC*, 713 F. Supp. 3d 833, 845 (S.D. Cal. 2024); *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1082–83 (C.D. Cal. 2021). The contextual analysis this element requires precludes class certification. *See Griffith*, 2024 WL 4308813, at *6–7.

Here, as in *Griffith*, individualized inquiries are necessary to understand the millions of different purported communications at issue and the context in which they were sent. The Health Information and Prescription Drug Information classes include all manner of URLs—including URLs that merely reveal "the fact that [a class member] visited" a particular website. *Daghaly*, 2024 WL 5134350, at *1; *see* Mot. 13–14. The Button-Click Class likewise includes data that reflects "mouse clicks," *Yoon*, 549 F. Supp. 3d at 1082, but no "information [a class member] might have entered while using the website," *Daghaly*, 2014 WL 5134350, at *1. Meta's filtration process may also have removed any "contents" that contained potentially sensitive health information. *See supra* 5.

**4. Whether class members suffered any effect on device performance is an individualized issue.**

Under CDAFA, plaintiffs must prove "damage or loss," which requires them to show a

"measurable impact on their devices." *In re Meta Healthcare Pixel Litig.*, 713 F. Supp. 3d at 658. Plaintiffs' proposed Device Intrusion Class also requires them to show either the placement of the "_fbp" cookie on their devices or the use of their computing resources. Mot. 13.

To the extent plaintiffs can make these showings at all, they cannot do so on a classwide basis. CAPI and customer list uploads generally do not affect plaintiffs' devices—the transmission comes directly from a developer to Meta. A1-4; A13-4273–74, 4279. For Pixel or SDK code, most (if not all) effects would have no noticeable impact, and would also depend on developer-specific settings (like preventing the Pixel from operating until a user consents) and user-specific settings (like ad blockers, which would prevent the placement of the "_fbp" cookie on their device). A13-4304–17. There is thus no classwide method to determine whether users' device performance was affected by Meta's Business Tools at all, let alone in any measurable way.

**E. Plaintiffs' damages theories require additional individualized inquiries.**

Plaintiffs seek multiple categories of damages, including statutory damages, actual damages, disgorgement, and punitive damages. But they have no method for reliably calculating those damages on a classwide basis, precluding certification. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

***Statutory Damages.*** Plaintiffs propose no model at all for awarding statutory damages; they simply assert that such damages exist under the federal Wiretap Act and CIPA and should be awarded. Mot. 28. But statutory damages are discretionary and "are not to be awarded mechanically." *Campbell*, 315 F.R.D. at 268. Each class member's entitlement turns on a multi-factor test. *See id.* at 268. The balance of factors will differ not only for the different types of alleged violations and data, but also for every class member—for example, "the question of 'whether or not there was actual damage to the plaintiff' would vary between class members, and would be answered in the negative for many class members." *Id.* That precludes certification. *Id.* at 269; *see also Bliss*, 711 F. Supp. 3d at 1243–46.

The evidence here confirms this problem. Several plaintiffs shared health information publicly on Facebook, undercutting the severity of any violation and the extent of any intrusion. *See supra* 20–21. Most testified that they experienced only intangible harms—no financial, reputational, property-based, or other actual harm. A2-223, 269–72, 279–88, 397–99, 446–49, 543–48, 584–94. Most also admitted they continue to use their healthcare websites. A2-209, 289–90, 419–20, 460; A7-1773, 1834,

1997, 2060, 2124–25, 2185. Some alleged violations may have a reasonable purpose, like a hospital trying to improve its public-health outreach campaigns. A2-180; A8-2469–70, 2472, 2479, 2482, 2489, 2492. All these individualized issues preclude a mechanical award of statutory damages.

***Actual Damages.*** Plaintiffs offer two models for actual damages, but neither works. One of plaintiffs' experts admitted there is no market for the data at issue, and purported to measure its value using a "willingness-to-accept" conjoint survey that is known to inflate results and that no court has ever accepted in any data privacy case. A13-4034, 4039–45; A2-601–06. The other expert purported to identify the fair market value of the data, but failed to base his analysis on "comparable transactions": *none* of them is based on health data. A13-4191–204; A2-638. Neither methodology can reliably calculate classwide damages. And, again, many of the plaintiffs could not "identify any harm" beyond an asserted privacy violation, A2-269–70; *see also* A2-296, 399, 448, 544, 585, and none identified actual damages in discovery (despite Meta's requests), A7-1816–1976.

***Disgorgement.*** Plaintiffs' model for calculating Meta's profits also fails. Instead of calculating profits based on the data at issue, plaintiffs' expert used entire revenue verticals or health-related classifications—which, as he admitted, include revenue from data and developers unrelated to this case. Dkt. 1054-10 at 22; A13-4205–4219. A "methodology that identifies damages that are not the result of the wrong" cannot support certification. *Comcast*, 569 U.S. at 37.

***Punitive Damages.*** Plaintiffs say little about punitive damages, simply asserting they "are amenable to classwide resolution." Mot. 30. Not so. Punitive damages must account for "the degree of reprehensibility of the defendant's misconduct" and "the actual or potential harm suffered by the plaintiff." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). Plaintiffs' claims involve the alleged receipt of different kinds of data from hundreds of thousands of different entities, and plaintiffs' purported evidence of intent—a key component of "reprehensibility," *id.*—differs by developer, by data, by tool, and over time. *See supra* 21–22. Class members also have widely different perceptions and experiences of harm (if any). *See supra* 27–28. Any punitive damages award here would necessarily be arbitrary and decoupled from the evidence necessary to justify it.

**II. Plaintiffs' proposed classes expand the case beyond the limits this Court imposed and do not present a "superior" method of adjudication.**

This case began as a case about "hospital websites" conveying "patient communications." Dkt. 1 ¶ 1. Throughout the case, this Court has "tr[ied] to keep the hospital litigation cases separate from everything else." May 16, 2023 Hr'g Tr. at 6:9–10. But plaintiffs' sprawling classes rope in entities the Court specifically declined to fold into this litigation and communications that are not health-related at all. Plaintiffs thus fail to show a "superior" way to "fairly and efficiently adjudicate[e] this case," or that any "marginal efficiencies of class treatment . . . surmount the lingering uncertainties in managing the proposed class[es]." *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 640, 650 (N.D. Cal. 2018).

*First*, this Court already rejected the idea that claims involving every entity in plaintiffs' sweeping classes should be litigated together. In *Hey Favor*, the Court concluded that consolidation was not "necessary (or even desirable) for purposes of judicial efficiency." Dkt. 75 at 2, No. 3:23-cv-00059-WHO (N.D. Cal. May 24, 2023); *see also* May 16, 2023 Hr'g Tr. at 6:14–15 ("the telemed cases are different"). Following that reasoning, Judge Martínez-Olguín declined to move claims involving a prescription drug company into this case. Dkt. 207, *Doe v. GoodRx Holdings, Inc.*, No. 3:23-cv-00501-AMO (N.D. Cal. July 31, 2024). Plaintiffs ignore those decisions—Hey Favor itself is even on plaintiffs' lists, along with other telemed providers and drug companies. Pltfs. Ex. 60 at 20. They also sweep in all manner of other health-related and health-adjacent entities (like counseling services and insurance companies), straying far beyond hospitals. Pltfs. Exs. 60, 72. And, contrary to this Court's prior statements, they lump in "app-based SDK claims" and other tools and platforms. Dkt. 75 at 2, *Hey Favor*, No. 3:23-cv-00059-WHO. Plaintiffs offer no justification for disregarding this Court's limits, and there is no manageable way to litigate claims concerning different kinds of data sent through different tools from so many different kinds of entities all at once.

*Second*, plaintiffs' claims "raise novel questions" ill-suited for resolution in a class action. *MedStar*, 2023 WL 4931348, at *10 (denying certification). Where plaintiffs seek to apply causes of action "in a new situation," courts decline to explore the contours of the new theories in a class action. *Id.* Another court considering claims based on MedStar's alleged use of the Business Tools thus concluded that "class certification is not the superior method for the adjudication of these claims at this time." *Id.*

*Third*, there is "sufficient monetary incentive [for class members] to pursue their own claims."

*Nguyen v. BDO Seidman, LLP*, 2009 WL 7742532, at *8 (C.D. Cal. July 6, 2009). CIPA alone authorizes high statutory damages ($5,000 per violation), not to mention the other damages plaintiffs seek. *See* Mot. 28–30. All that is enough to spur putative class members to pursue individual claims.

**III. An injunctive-relief class cannot be certified.**

Plaintiffs tack on a perfunctory request for injunctive-relief classes under Rule 23(b)(2). Mot. 30. The Court should deny that request.

*First*, as the drive-by treatment in plaintiffs' motion betrays, injunctive relief is an afterthought. "Rule 23(b)(2) certification is inappropriate where the primary relief sought is monetary." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001); *see also Rabin v. Google LLC*, 787 F. Supp. 3d 934, 954 (N.D. Cal. 2025). There is little doubt plaintiffs are focused on money.

*Second*, injunctive relief is no more appropriate today than it was when this Court denied it three years ago. Then, this Court denied a preliminary injunction in view of Meta's ongoing efforts "to detect and prevent the receipt of potentially sensitive information at scale." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 804. Meta has continued to improve those efforts. *See supra* 5. Meta's ongoing and extensive work in this technologically complex area counsels now, as it did before, against injunctive relief. *Cf. Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 331 (4th Cir. 2006) (no certification where injunctive relief was moot); *Smith v. City of Oakland*, 2008 WL 2439691, at *1 (N.D. Cal. June 16, 2008) (same).

**CONCLUSION**

The Supreme Court has cautioned that Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Plaintiffs cannot show that this case is the exception warranting class treatment, given the many and substantial individualized issues. The Court should deny the motion for class certification.

DATED: December 9, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Lauren R. Goldman*
Lauren R. Goldman

*Attorneys for Meta Platforms, Inc.*